Approved: _____          **22 MAG 10337**
THOMAS S. BURNETT/NOAH SOLOWIEJCZYK
Assistant United States Attorneys

Before:   HONORABLE GABRIEL W. GORENSTEIN
          United States Magistrate Judge
          Southern District of New York

- - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA             :   **SEALED COMPLAINT**

          - v. -                     :   Violation of 7 U.S.C.
                                         §§ 9(1), 13(a)(2),
AVRAHAM EISENBERG,                   :   13(a)(5); 17 C.F.R.
                                         § 180.1; 18 U.S.C. § 2
                                     :
                       Defendant.        COUNTY OF OFFENSE:
                                     :   New York

- - - - - - - - - - - - - - - - - - X


SOUTHERN DISTRICT OF NEW YORK, ss.:

        BRANDON RACZ, being duly sworn, deposes and says that he is a Special Agent with the Federal Bureau of Investigation ("FBI") and charges as follows:

COUNT ONE
(Commodities Fraud)

        1.  In or about October 2022, in the Southern District of New York and elsewhere, AVRAHAM EISENBERG, the defendant, willfully and knowingly, directly and indirectly, used and employed, and attempted to use and employ, in connection with a swap, a contract of sale of a commodity in interstate and foreign commerce, and for future delivery on and subject to the rules of a registered entity, a manipulative and deceptive device and contrivance, in contravention of Title 17, Code of Federal Regulations, Section 180.1, by: (1) using and employing, and attempting to use and employ, a manipulative device, scheme, and artifice to defraud; (2) making, and attempting to make, untrue and misleading statements of material fact and omitting to state material facts necessary in order to make the statements made not untrue or misleading; and (3) engaging, and attempting to engage in acts, practices, and courses of business which operated and

would operate as a fraud and deceit upon other persons, to wit, EISENBERG engaged in a scheme involving the intentional and artificial manipulation of the price of perpetual futures contracts on a cryptocurrency exchange called Mango Markets, and other manipulative and deceptive devices and contrivances.

(Title 7, United States Code, Sections 9(1) and 13(a)(5); Title 17, Code of Federal Regulations, Section 180.1; Title 18, United States Code, Section 2.)

## COUNT TWO
(Commodities Manipulation)

2. In or about October 2022, in the Southern District of New York and elsewhere, AVRAHAM EISENBERG, the defendant, did knowingly and intentionally manipulate and attempt to manipulate the price of a commodity in interstate commerce, and for future delivery on and subject to the rules of a registered entity, and of a swap, to wit, EISENBERG engaged in a scheme involving the intentional and artificial manipulation of the price of perpetual futures contracts on a cryptocurrency exchange called Mango Markets.

(Title 7, United States Code, Section 13(a)(2); Title 18, United States Code, Section 2.)

The bases for my knowledge and for the foregoing charge are, in part, as follows:

3. I am a Special Agent with the FBI and I have been personally involved in the investigation of this matter. This affidavit is based upon my personal participation in the investigation, and my conversations with law enforcement officers, law enforcement employees, and witnesses, as well as a review of documents. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of this investigation. Where the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

### Overview of the Mango Markets Manipulation Scheme

4. As described in greater detail below, Mango Markets is a decentralized cryptocurrency exchange that has its own native crypto token, called MNGO. Investors can buy and sell MNGO and other cryptocurrencies on Mango Markets. Investors on Mango

Markets can also buy and sell perpetual futures ("Perpetuals") based on the relationship between the value of MNGO and the value of a crypto stablecoin called USD Coin ("USDC"), which is designed to be pegged to the dollar. Perpetuals are "swaps" under the Commodity Exchange Act. An investor who buys a Perpetual for MNGO stands to profit if the value of MNGO rises relative to the value of USDC, and an investor who sells a Perpetual for MNGO stands to profit if the value of MNGO falls relative to the value of USDC. Finally, Mango Markets allows investors to borrow cryptocurrency from the exchange, in amounts based on the value of the borrower's portfolio, and to withdraw that borrowed cryptocurrency.

      5.  As explained in greater detail below, in or about October 2022, AVRAHAM EISENBERG, the defendant, participated in a scheme to steal approximately $110 million by artificially manipulating the price of MNGO Perpetuals on Mango Markets (the "Market Manipulation Scheme"). The scheme worked as follows: EISENBERG used an account that he controlled on Mango Markets to sell a large amount of Perpetuals for MNGO and used a separate account on Mango Markets to purchase those same Perpetuals. In other words, EISENBERG sold himself MNGO Perpetuals. EISENBERG then engaged in a series of large purchases of MNGO, with the objective of artificially increasing the price of MNGO relative to USDC, which had the effect of increasing the price of MNGO Perpetuals on Mango Markets. That purchasing achieved the desired effect, causing the price of MNGO Perpetuals on Mango Markets to increase precipitously over the course of approximately 20 minutes. Over that time span of approximately 20 minutes, the price of MNGO Perpetuals rose from approximately 0.0382 USDC/MNGO to approximately 0.54 USDC/MANGO, an increase of approximately 1300 percent.

      6.  As the price of MNGO Perpetuals on Mango Markets rose as a result of the Market Manipulation Scheme perpetrated by AVRAHAM EISENBERG, the defendant, the value of the MNGO Perpetuals that EISENBERG had purchased also rose. Because Mango Markets allows investors to borrow and withdraw cryptocurrency based on the value of their assets on the platform, the increase in the value of the MNGO Perpetuals EISENBERG had purchased allowed EISENBERG to borrow, then withdraw, approximately $110 million worth of various cryptocurrencies from Mango Markets, which came from deposits of other investors in the Mango Markets exchange. When EISENBERG borrowed and withdrew that cryptocurrency, he had no intention to repay the borrowed funds. Accordingly, after EISENBERG borrowed and withdrew essentially all of the cryptocurrency deposits on the Mango Markets platform, EISENBERG ceased manipulating the price of MNGO Perpetuals, causing the price

of MNGO Perpetuals to fall significantly. Due to EISENBERG's withdrawals, other investors with deposits on Mango Markets lost much, or all, of those deposits.

### Background on Mango Markets

7. Based on my training and experience, my participation in this investigation, my review of publicly available records (including the Mango Markets website), and my participation in discussions with individuals knowledgeable about Mango Markets, I have learned, in substance and in part, the following:

      a. Mango Markets is a decentralized cryptocurrency exchange that allows investors to lend, borrow, swap, and leverage-trade cryptocurrency assets. Mango Markets is run by the Mango Decentralized Autonomous Organization (the "Mango DAO"). A decentralized autonomous organization, or "DAO," generally refers to an entity structure in which there is no central decision-making authority, and such authority is instead distributed across digital token holders, who cast votes to make decisions. In the context of the Mango DAO, for instance, holders of MNGO are allowed to vote on changes to Mango Markets and issues related to the governance of the Mango DAO, among other things.

      b. To use Mango Markets, an investor must connect a cryptocurrency wallet to the exchange, create a Mango Markets account, and deposit cryptocurrency into that account. Once an investor has created and funded a Mango Markets account, the investor can trade different types of cryptocurrencies, including the MNGO token, on the Mango Markets exchange.

      c. One type of trade investors can make is known as a "spot" trade. In a spot trade, an investor exchanges one cryptocurrency for another, at whatever the prevailing exchange rate between those two cryptocurrencies is at the time of the transaction. Investors can also make leveraged spot trades, in which the investor's deposits and other positions are used as collateral, allowing the investor to buy more of another cryptocurrency on margin than the investor could purchase through a one-for-one exchange.

      d. Another type of trade available on Mango Markets is a perpetual futures contract, or "Perpetual" for short. When an investor buys or sells a Perpetual for a particular cryptocurrency, the investor is not buying or selling that cryptocurrency. Instead, the investor is buying or selling

4

exposure to future movements in the value of that cryptocurrency relative to another cryptocurrency. For example, if an investor buys a MNGO Perpetual at a price of 0.02 USDC/MNGO, the investor is "long" on MNGO, and the value of that perpetual will rise if the value of MNGO rise above 0.02 USDC/MNGO. Conversely, if an investor sells a MNGO Perpetual at a particular price, the investor is "short" on MNGO, and the value of that Perpetual will rise if the value of MNGO falls relative to USDC. Like with spot trading, investors on Mango Markets can also make leveraged Perpetuals trades, in which the investor's deposits and other positions act as collateral, thereby allowing the investor to buy a larger Perpetual position than the value of those deposits.

   e. For the reasons given above, the price of a Perpetual at any particular time depends on, among other things, the relative value of two cryptocurrencies. To determine the relative value of cryptocurrency pairs for purpose of pricing Perpetuals, Mango Markets uses an "oracle," which is a computer program that calculates the relative value of cryptocurrency pairings by looking at the exchange rate of those cryptocurrencies on various cryptocurrency exchanges (the "Oracle"). When the Oracle price changes for a particular cryptocurrency pairing, the price of Perpetuals in that cryptocurrency pairing also changes on Mango Markets. Accordingly, changes in the relative price of cryptocurrency pairs on other exchanges impact the price of Perpetuals on the Mango Markets platform.

   f. In addition to allowing investors to use deposits and other positions as collateral for leveraged trades, Mango Markets also allows investors to use those deposits and positions as collateral for borrowing and withdrawing cryptocurrency from the Mango Markets exchange. To borrow through Mango Markets, investors must access the Mango Markets website and click a button labeled "borrow" that allows the user to borrow cryptocurrency. The user can withdraw the cryptocurrency the user has borrowed by clicking another button labeled "withdraw." The cryptocurrency that investors borrow through Mango Markets comes from cryptocurrency that other investors have deposited in Mango Markets accounts.

   g. The amount that an investor on Mango Markets can withdraw is determined by a formula that looks at, among other things, the value of the cryptocurrency deposited in the investor's account, the value of the investor's positions on Mango Markets, and the amount of cryptocurrency that the investor has already borrowed through Mango Markets. Mango Markets uses a formula to track the relationship between these assets and liabilities, which

5

Mango Markets labels the "health" of the account. If the "health" of a Mango Markets account falls below zero, the investor's positions on Mango Markets can be liquidated.

8. I understand that virtual currencies, such as USDC, are "commodities" under the Commodity Exchange Act ("CEA"). *See, e.g., C.F.T.C. v. McDonnell*, 287 F. Supp. 3d 213 (E.D.N.Y. 2018) ("A 'commodity' encompasses virtual currency both in economic function and in the language of the statute."); *United States v. Reed*, No. 20 Cr. 500 (JGK), 2022 WL 597180, at *3 (S.D.N.Y. Feb. 28, 2022) (finding "defendant had ample notice from the broad definition of commodities under the CEA that cryptocurrencies were within the definition of commodities"). Accordingly, Perpetuals based on the relative value of MNGO and USDC are "swaps" under the CEA. *See* 7 U.S.C. § 1(47)(A).

### EISENBERG's Market Manipulation Scheme

9. Based on my review of records and data from a company called Circle, I have learned, in substance and in part, the following:

   a. Circle provides a platform that allows individuals to create accounts, in which they can purchase, sell, store, and transfer the crypto stablecoin USDC.

   b. In or about 2019, AVRAHAM EISENBERG, the defendant, opened an account at Circle ("Circle Account-1"). I know that EISENBERG is the user of Subject Account-1 because the account opener used the name "Avraham Eisenberg" and provided a photograph of EISENBERG's passport. I have reviewed that photograph and recognize the person pictured on the passport as EISENBERG.

10. Based on my review of publicly available trading data, data from a cryptocurrency exchange ("Exchange-1"), and data from Circle, I have learned that, on or about October 11, 2022, AVRAHAM EISENBERG, the defendant, created a large Perpetual position based on the relative value of MNGO and USDC by funding two Mango Markets accounts and selling a large amount of Perpetuals from one to the others. Specifically, I have learned, in substance and in part, the following:

    a. On or about October 11, 2022, in the late morning and early afternoon,[1] Circle Account-1, which belongs to EISENBERG, sent approximately 14,179,322 USDC to a cryptocurrency wallet that then sent approximately 12,499,900 USDC to an account at Exchange-1 (the "Exchange-1 Account") which as explained below, is also controlled by EISENBERG.

    b. Between approximately 3:36 p.m. and 3:50 p.m., Exchange-1 Account sent approximately 5,524,838 USDC to a cryptocurrency wallet ("Solana Wallet-1") on the blockchain known as Solana, which is the blockchain on which Mango Markets is built.

    c. At approximately 3:47 p.m., the Exchange-1 Account sent approximately 4,999,999.95 USDC to another wallet on the Solana blockchain ("Solana Wallet-2").

    d. Between approximately 6:08 p.m. and 6:18 p.m., the Exchange-1 Account sent approximately 5,000,100 USDC to a Mango Markets account ("Mango Account-1").

    e. Between approximately 6:07 p.m. and 6:18 p.m., Solana Wallet-2 sent approximately 4,999,998.95 USDC to a different Mango Markets account ("Mango Account-2").

    f. Between approximately 6:24 p.m. and 6:25 p.m., Mango Account-2 sold to Mango Account-1 Perpetuals based on the relative value of MNGO and USDC. The Perpetuals were based on a total of approximately 488,302,109 MNGO, at a price of 0.0382 USDC/MNGO. Accordingly, Mango Account-1 held a "long" position, the value of which would rise if the value of MNGO relative to USDC rose above 0.0382 USDC/MNGO (the "Long MNGO Perpetual Position"). Mango Account-2 held a "short" position, the value of which would rise if the value of MNGO relative to USDC fell below 0.0382 USDC/MNGO (the "Short MNGO Perpetual Position").

    g. Because the USDC that funded both Mango Account-1 and Mango Account-2 originated with EISENBERG's account at Circle, it appears that EISENBERG controlled or at a minimum funded both Mango Account-1 and Mango Account-2. Accordingly, EISENBERG was on both sides of the MNGO Perpetual transaction described above.

---

[1] All times are in Eastern Time and, based on my review of travel records, I have learned that EISENBERG was in Puerto Rico at the time of the Market Manipulation Scheme.

11.     As described in the following paragraphs, immediately after the creation of the Long and Short MNGO Perpetuals, AVRAHAM EISENBERG, the defendant, used USDC to purchase large amounts of MNGO on multiple cryptocurrency exchanges, which had the effect of artificially increasing the value of MNGO relative to USDC.

12.     Based on my review of publicly available trading data on the Solana blockchain and my review of publicly available documents (including from Mango Markets), I have learned, in substance and in part, the following:

     a.     Aggregator-1 is a program that allows users to buy and sell cryptocurrency across a number of different cryptocurrency exchanges simultaneously.  Aggregator-1 is available through the Mango Markets, as another way for Mango Markets investors to buy and sell cryptocurrency.  One of the cryptocurrency exchanges through which Aggregator-1 transacts is one of the programs from which the Oracle gathered data for pricing Perpetuals.

     b.     As explained above, on or about October 11, 2022, Circle Account-1, which was the account belonging to AVRAHAM EISENBERG, the defendant, at Circle, sent USDC to the Exchange-1 Account, which then sent USDC to Solana Wallet-1.

     c.     Between approximately 6:26 p.m. and approximately 6:45 p.m., on or about October 11, 2022, the user of Solana Wallet-1 executed multiple transactions on Jupiter Aggregator, in which the user of Solana Wallet-1 sold USDC for a total of over 3.4 million MNGO.

     d.     At the same time as the user of Solana Wallet-1 was purchasing a large volume of MNGO through Aggregator-1, the value of MNGO relative to USDC rose from a low of approximately 0.0389 USDC/MNGO to a high of approximately 0.91 USDC/MNGO on the exchange utilized by the Oracle for pricing Perpetuals.

13.     Based on my review of data and records from a cryptocurrency exchange that has offices in, among other locations, Manhattan, New York ("Exchange-2"), communications with representatives of Exchange-2, and publicly available documents (including from Mango Markets), I have learned, in substance and in part, the following:

     a.     Exchange-2 was one of the exchanges from which the Oracle gathered data for pricing Perpetuals.

b. On or about October 11, 2022, an individual opened and funded an anonymous account on Exchange-2 (the "Exchange-2 Account").

c. Between approximately 6:26 p.m. and approximately 6:45 p.m., the Exchange-2 Account sold USDT for over 1 million MNGO. During that period, the price of MNGO rose from a low of approximately 0.04 USDT/MNGO to a high of approximately 0.45 USDT/MNGO. Like USDC, USDT is a stablecoin designed to be pegged to the dollar.

d. I have learned that AVRAHAM EISENBERG, the defendant, controlled the Exchange-2 Account. Specifically, I have learned, in substance and in part, that following the Market Manipulation Scheme, Exchange-2 froze funds in the Exchange-2 Account, and EISENBERG initiated a legal action to try to retrieve the funds from the account, claiming to be the owner.

e. Opening, funding, and trading through Exchange Account-2 resulted in wires and data being transmitted to, among other locations, Exchange-2's office in Manhattan.

14. Based on my review of data and records from Exchange-1, records from Google, and publicly available documents (including from Mango Markets), I have learned, in substance and in part, the following:

a. Exchange-1 was one of the exchanges from which the Oracle gathered data for pricing Perpetuals.

b. As explained above, Circle Account-1, which belongs to AVRAHAM EISENBERG, the defendant, sent USDC to the Exchange-1 Account on or about October 11, 2022.

c. The Exchange-1 Account was opened on or about September 19, 2022, using a passport and personal identifying information that appears to belong to a Ukrainian woman, along with a particular Gmail address ("Gmail Address-1").

d. Nonetheless, it appears that the Exchange-1 Account is controlled by EISENBERG for the following reasons, among others:

i. As explained above, EISENBERG's Circle Account, Circle Account-1, sent over 12 million USDC to the Exchange-1 Account.

9

ii. Gmail Address-1, which was used to create the Exchane-1 Account, was created on or about September 1, 2022 — just a few weeks before the Exchange-1 Account was opened. The recovery email address for Gmail Address-1 is "avi@thimessolutions.com," which is registered to EISENBERG. Similarly, the recovery phone number for Gmail Address-1 is the same phone number that EISENBERG listed as his contact phone number for Circle Account-1. Accordingly, it appears that EISENBERG actually controls Gmail Address-1, which was then used to create the Exchange-1 Account.

e. Between approximately 6:26 p.m. and 6:40 p.m., the Exchange-1 Account sold USDC for a total of over 16 million MNGO. During that period, the price of MNGO rose from a low of approximately 0.0388 USDC/MNGO to a high of approximately 0.1557 USDC/MNGO.

15. By artificially manipulating the value of MNGO relative to USDC, AVRAHAM EISENBERG, the defendant, also intended to and did increase the price of MNGO Perpetuals on Mango Markets, which significantly increased the value of the Long MNGO Perpetual Position that EISENBERG had purchased, thereby allowing EISENBERG to borrow and withdraw large amounts of cryptocurrency from Mango Markets. Specifically, based on my review of publicly available data from Mango Markets, I have learned, in substance and in part, the following:

a. As explained above, the price of Perpetuals on Mango Markets was set by the Oracle, which calculates the relative price of cryptocurrencies by looking at prices on other cryptocurrency exchanges.

b. During the trading described above, the price of Perpetuals based on the relative value of MNGO and USDC on Mango Markets rose significantly. Specifically, between approximately 6:26 p.m. and 6:45 p.m., on or about October 11, 2022, the price of MNGO Perpetuals on Mango Markets rose from approximately 0.0382 USDC/MNGO to a high of approximately 0.54 USDC/MNGO — an increase of over 1300 percent.

c. As the price of MNGO Perpetuals rose, the value of the Long MNGO Perpetual Position that Mango Account-1 had purchased rose, accordingly. Because of that increase in value, EISENBERG, who controlled Mango Account-1, was able to use the "borrow" and "withdraw" function on Mango Markets to borrow and

withdraw a large amount of cryptocurrency, without the "health" of Mango Account-1 dropping low enough to trigger liquidation.

    d. Following that increase in borrowing power, EISENBERG borrowed and withdrew approximately $110 million worth of different cryptocurrencies from Mango Markets. For example:

    i. At approximately 6:29 p.m., Mango Account-1 borrowed and withdrew approximately 50,000,000 USDC from Mango Markets and sent those assets to Solana Wallet-1.

    ii. At approximately 6:36 p.m., Mango Account-1 borrowed and withdrew approximately 400,000 SOL, which is the Solana cryptocurrency, from Mango Markets, and sent those assets to Solana Wallet-1.

    iii. At approximately 6:37 p.m., Mango Account-1 borrowed and withdrew approximately 798,000 mSOL, which is a crypto token on the Solana blockchain, and approximately 282.12 wBTC, which is a cryptocurrency designed to track the value of Bitcoin, from Mango Markets.

    iv. At approximately 6:41 p.m., Mango Account-1 borrowed and withdrew approximately 2,807,721 USDC and approximately 3,266,426 USDT, which is a cryptocurrency designed to track the value of the dollar, from Mango Markets, and sent those assets to Solana Wallet-1.

    v. At approximately 6:45 p.m., Mango Account-1 borrowed and withdrew approximately 2,354,260 SRM, which is the native cryptocurrency for a platform called Serum, and approximately 32,409,565.06 MNGO, from Mango Markets, and sent those assets to Solana Wallet-1.

    e. The cryptocurrency that EISENBERG borrowed and withdrew came from, among other places, the deposits and assets belonging to other Mango Markets investors. The user of Mango Account-1 withdrew effectively all available funds from Mango Markets.

    f. While EISENBERG purported to be borrowing the cryptocurrency, he appeared to have no intention of actually repaying those loans. Following the withdrawals described above, Solana Wallet-1, the Exchange-1 Account, and the Exchange-2 Account ceased purchasing MNGO and began to sell MNGO for USDC. The price of MNGO tokens fell precipitously, causing the price of MNGO Perpetuals on Mango Markets to fall to approximately 0.02

USDC/MNGO.  As a result, the Long MNGO Perpetual Position dropped to having a negative value and the "health" of Mango Account-1 fell below zero, making Mango Account-1 subject to liquidation. There was, however, nothing to liquidate because EISENBERG had already withdrawn the cryptocurrency.

### EISENBERG Admits to the Market Manipulation Scheme

16.  Based on my review of publicly available posts on a website where holders of MNGO can vote on Mango DAO proposals, as well as my communications with individuals who have knowledge of Mango DAO's operations, I have learned, in substance and in part, the following:

a.  Between on or about October 11 and 13, 2022, representatives of Mango DAO engaged in negotiations with an individual purporting to be the perpetrator and others purporting to be in contact with the perpetrator.  The negotiations focused on, among other things, the perpetrator returning some of the cryptocurrency from the attack.

b.  Based on those negotiations, on or about October 13, 2022, members of the Mango DAO issued a written proposal on the Mango DAO message board and to the user of Solana Wallet-1.  The proposal had, among other things, the following terms: (i) the Mango DAO would receive cryptocurrency worth approximately $67 million from the user of Solana Wallet-1; (ii) the funds from the user of Solana Wallet-1 would, in combination with funds owned by the Mango DAO, be used to, among other things, repay Mango Market investors who had lost deposits; (iii) holders of MNGO would agree to waive certain civil claims and refrain from pursuing criminal investigations or attempting to freeze assets taken during the scheme.  The proposal also called for the user of Solana Wallet-1 to make a 10,000,000 USDC payment to a wallet controlled by members of the Mango DAO, no later than 12 hours after the issuance of the proposal, and before a final vote.

c.  On or about October 15, 2022, a cryptocurrency wallet on the Ethereum blockchain ("Ethereum Wallet-1") sent approximately 10 million USDC to a wallet controlled by members of the Mango DAO.  Based on the proposal described above, it therefore appears that the user of Solana Wallet-1 also controls Ethereum Wallet-1.

d.  After the transfer described, members of the Mango DAO voted to approve the October 13, 2022 proposal described

12

above. Following that approval, multiple cryptocurrency wallets sent the Mango DAO approximately $57 million worth of cryptocurrency, in addition to the 10 million USDC that Mango DAO had already received.

        e. Members of Mango DAO and Mango Markets did not receive the rest of the cryptocurrency that had been taken, which amounted to approximately $40 million worth of different cryptocurrencies.

        17. Shortly after the negotiations described above, AVRAHAM EISENBERG, the defendant, claimed responsibility for the Market Manipulation Scheme. Specifically, based on my review of publicly available information on Twitter, I have learned, in substance and in part, the following:

        a. EISENBERG uses a particular Twitter account ("Twitter Account-1"). EISENBERG appears to be the user of Twitter Account-1 because the username of the account is "Avraham Eisenberg" and, in the past, Twitter Account-1 displayed a user photograph that I know was an image of EISENBERG based on my review of his passport photograph.

        b. On or about October 15, 2022 – the same day as the repayment of some cryptocurrency as described above – Twitter Account-1 displayed a series of posts stating, in substance and in part, that the user of Twitter Account-1 had "operated a highly profitable trading strategy" that "took place on[] Mango Markets" and resulted in Mango Markets becoming "insolvent."[2]

        c. Moreover, EISENBERG's posts on Twitter Account-1 show that he was aware of the laws prohibiting market manipulation. For example, on or about September 1, 2022, Twitter Account-1 posted a link to a press release from the United States Attorney's Office of the Southern District of New York, announcing charges, including under the CEA, in connection with a defendant artificially manipulating a foreign currency exchange rate in order to trigger a payment under an options contract.

        18. Based on my review of travel records, I have learned that, on or about October 12, 2022 – the day after the Market Manipulation Scheme – AVRAHAM EISENBERG, the defendant, flew from

---

[2] The posts also stated, in substance and in part, that the user of Twitter Account-1 had helped negotiate an agreement to make users of Mango Markets whole and that the user of Twitter Account-1 believed all of his actions were legal.

13

the United States to Israel. Based on the timing of the flight, the travel appears to have been an effort to avoid apprehension by law enforcement in the immediate aftermath of the Market Manipulation Scheme.

　　　　WHEREFORE, the deponent respectfully requests that a warrant be issued for the arrest of AVRAHAM EISENBERG, the defendant, and that he be arrested, and imprisoned or bailed, as the case may be.

　　　　　　　　　　　　　　　　/s/ Brandon Racz (sworn telephonically)
　　　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　　BRANDON RACZ
　　　　　　　　　　　　　　　　Special Agent
　　　　　　　　　　　　　　　　FBI

Sworn to me through the transmission of this
Affidavit by reliable electronic means, pursuant to
Federal Rules of Criminal Procedure 4.1 and 41(d)(3), this
**23rd** th day of December, 2022

_[signature: Gabriel W. Gorenstein]_
_____
THE HONORABLE GABRIEL W. GORENSTEIN
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK