UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATE OF AMERICA,

                Plaintiff,

      -against-

AVRAHAM EISENBERG,

                Defendant.

Case No.: 23-CR-010 (RMB)

---

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT AVRAHAM EISENBERG'S OMNIBUS MOTION TO DISMISS AND MOTION TO SUPPRESS

Brian E. Klein
Ashley E. Martabano
Waymaker LLP
515 S. Flower Street, Suite 3500
Los Angeles, California 90071
(424) 652-7800

Sanford N. Talkin
Noam B. Greenspan
Talkin, Muccigrosso & Roberts, LLP
40 Exchange Place, 18th Floor
New York, New York 10005
(212) 482-0007

*Attorneys for Avraham Eisenberg*

## TABLE OF CONTENTS

I.    PRELIMINARY STATEMENT ........................................................................ 1

II.   MOTION TO DISMISS ................................................................................... 1

    A.   Introduction................................................................................................. 1

    B.   Mango Markets and Mr. Eisenberg's Lawful Trades ............................... 3

    C.   Motion to Dismiss Standard....................................................................... 6

    D.   The Commodities Fraud Counts (Counts One and Two)  Should Be Dismissed Because the Government Has Not Alleged  the Elements of a Violation of the CEA........................................................................................................................ 8

           1.    The Government Has Failed to Allege Any Commodity Falling Under the CEA............................................................................. 10

           2.    Count One Should be Dismissed Because the Government Has Failed to Allege A Misrepresentation on Mr. Eisenberg's Part.... 14

    E.   Counts One and Two Should Be Dismissed On Due Process Grounds ............... 16

           1.    The Definition of Manipulative Is Unconstitutionally Vague .................. 16

           2.    The Government Did Not Provide Fair Notice that the CEA Could Apply to the Mango Perpetuals........................................................... 23

    F.   Counts One and Two Should Be Dismissed Because the Statutory and Regulatory Reach Of the Government Over the Mango Markets Protocol Presents a Major Question and Violates The Rule of Lenity ........................................................... 24

    G.   The Wire Fraud Count Should Be Dismissed Because Mr. Eisenberg Did Not Make Any Material Misrepresentation or Omission and Did Not Deceive Anyone ........................................................................................................................ 27

III.  MOTION TO SUPPRESS ............................................................................. 29

    A.   Introduction............................................................................................... 29

    B.   The Unlawful Search and Seizure of Mr. Eisenberg's Devices.......................... 32

    C.   The Warrantless Search and Seizure of Mr. Eisenberg's Luggage Was Unlawful ........................................................................................................................ 38

           1.    Legal Standard .............................................................................. 38

           2.    Discussion ..................................................................................... 39

    D.   The Government's Twenty-Four-Day Delay In Applying For A Search Warrant Was Unreasonable ...................................................................................... 41

           1.    Legal Standard .............................................................................. 42

            2.    First Factor: Lengthy of Delay................................................... 44

           3.    Second Factor: Importance of the Property to Mr. Eisenberg ................. 46

           4.    Third Factor Whether the Defendant Had a Diminished Interest in the Property ........................................................................................ 48

5.     Fourth Factor: Justifications for the Delay ................................................. 49

E.     <u>The Exclusionary Rule</u>................................................................................ 52

IV.    CONCLUSION........................................................................................................... 54

## **TABLE OF AUTHORITIES**

**Cases**

*Apprendi v. New Jersey,*
   530 U.S. 466 (2000)................................................................ 6

*Arizona v. Gant,*
   556 U.S. 332 (2009)................................................................ 38

*Arkansas v. Sanders,*
   442 U.S. 753 (1979)................................................................ 39

*Babbit v. Sweet Home Chapter of Communities for a Great Oregon,*
   515 U.S. 687 (1995)................................................................ 25

*Bouie v. City of Columbia,*
   378 U.S. 347 (1964)................................................................ 23

*California v. Acevedo,*
   500 U.S. 565 (1991)................................................................ 38, 39

*Capital LLC v. Credit Suisse Grp. AG,*
   996 F.3d 64 (2d Cir. 2021).................................................... 10

*Cargill, Inc. v. Hardin,*
   452 F.2d 1154 (8th Cir. 1971) .............................................. 22

*Carpenter v. United States,*
   138 S. Ct. 2206 (2018)............................................................ 43

*CFTC v. Enron Corp.,*
   No. H-03-909,
   2004 WL 594752 (S.D. Tex. Mar 10, 2004)........................... 17

*CFTC v. Gelfman Blueprint, Inc.,*
   No. 17-7181 (PKC),
   2018 WL 6320656 (S.D.N.Y. Oct. 16, 2018) ....................... 12, 13

*CFTC v. Int'l Foreign Currency, Inc.,*
   334 F. Supp. 2d 305 (E.D.N.Y. 2004) ................................. 10

*CFTC v. McDonnell,*
   287 F. Supp. 3d 213 (E.D.N.Y. 2018) ................................. 8, 10, 12, 13

*CFTC v. My Big Coin Pay, Inc.,*
   334 F. Supp. 3d 492 (D. Mass 2018) ................................... 8, 13

*CFTC v. Reed*,
   481 F. Supp. 2d 1190 (D. Colo. 2007)........................................................... 10

*CFTC v. Reynolds*,
   No. 1:19-cv-05631-MKV,
   2021 WL 796683 (S.D.N.Y. Mar. 2, 2021) ............................................... 12

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
   467 U.S. 837(1984)..................................................................................... 24

*Chimel v. California*,
   395 U.S. 752 (1969)............................................................................... 38, 40

*Choi v. Tower Research Capital LLC*,
   2 F.4th 10, 13 n.2 (2d Cir. 2021) ............................................................ 11

*City of Chicago v. Morales*,
   527 U.S. 41 (1999)..................................................................................... 23

*Cleveland v. United States*,
   531 U.S. 12 (2000)..................................................................................... 26

*Connally v. General Constr. Co.*,
   269 U.S. 385 (1926)................................................................................... 16

*Dowling v. United States,*
   473 U.S. 207, 105 S. Ct. 3127, 87 L. Ed.2d 152 (1985)............................ 6

*Frey v. CFTC*,
   931 F.2d 1171 (7th Cir. 1991) .................................................................. 17

*Grayned v. City of Rockford*,
   408 U.S. 104 (1972)................................................................................... 16

*Harry v. Total Gas & Power N. Am., Inc.*,
   244 F. Supp. 3d 402 (S.D.N.Y. 2017)....................................................... 11

*In re Abrams*,
   No 88-10,
   1994 WL 506250 (CFTC Sept. 15, 1994)................................................. 17

*In re Platinum and Palladium Antitrust Litigation*,
   61 F.4th 242 (2d. Cir. 2023) ....................................................................... 8

*In re Soybean Futures Litigation*,
   892 F. Supp. 1025 (N.D. Ill. 1995) ........................................................... 19

*In re Voyager Dig. Holdings, Inc.*,
   649 B.R. 111 (Bankr. S.D.N.Y. 2023) ........................................................................ 2

*Javent*, 549 F. Supp. 3d at 1359 ................................................................................. 50

*Kolender v. Lawson*,
   461 U.S. 352 (1983) ................................................................................................. 23

*Lagemann v. Spence*,
   No. 18 Civ. 12218 (GBD), 2020 WL 5754800 (S.D.N.Y. May 18, 2020) ................. 12

*Lanzetta v. New Jersey*,
   306 U.S. 451 (1939) ................................................................................................. 23

*Marty's Adult World v. Town of Enfield*,
   20 F.3d 512 (2d Cir. 1994) ...................................................................................... 16

*Maynard v. Cartwright*,
   486 U.S. 356 (1988) ................................................................................................. 16

*McEvoy Travel Bureau, Inc. v. Heritage Travel, Inc.*,
   904 F.2d 786 (1st Cir. 1990) ................................................................................... 27

*McLaughlin v. Anderson*,
   962 F.2d 187 (2d Cir. 1992) .................................................................................... 27

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*,
   456 U.S. 353 (1982) ................................................................................................... 8

*My Big Coin Pay, Inc.*,
   334 F. Supp. 3d (D. Mass. 2018) ............................................................................ 13

*Not All Virtual Currencies are Created Equal: Regulatory Guidance in the Aftermath of CFTC v. McDonnell*,
   8 Am. U. Bus. L. Rev. 199 (2019) ........................................................................... 14

*Onel v. Top Ships, Inc.*,
   806 F. App'x 64 (2d Cir. 2020) ............................................................................... 15

*Rewis v. United States*,
   401 U.S. 808 (1971) ................................................................................................. 25

*Riley v. California*,
   573 U.S. 373, 393 (2014) ......................................................................................... 43

*Russell v. United States*,
  369 U.S. 749 (1962)........................................................................................ 7

*S.E.C. v. Riel*,
  282 F. Supp. 3d 499 (N.D.N.Y. 2017).............................................................. 11

*Sanabria v. United States*,
  437 U.S. 54 (1978)...................................................................................... 6, 12

*Set Capital LLC v. Credit Suisse Grp. AG*,
  996 F.3d 64 (2d Cir. 2021)............................................................................. 15

*U.S. ex rel. O'Donnell v. Countrywide Home Loans, Inc.*,
  822 F.3d 650 (2d Cir. 2016)........................................................................... 27

*United States v. Aleynikov*,
  676 F.3d 71 (2d Cir. 2012)........................................................................... 6, 7

*United States v. Bass*,
  404 U.S. 336 (1971)....................................................................................... 26

*United States v. Bastian*,
  112 F. Supp. 2d 378 (S.D.N.Y. 2000)............................................................. 16

*United States v. Burgard*,
  675 F.3d 1029 (7th Cir. 2012) ....................................................................... 47

*United States v. Chadwick*,
  433 U.S. 1 (1977)............................................................................... 38, 39, 40

*United States v. Connolly*,
  24 F.4th 821 (2d Cir. 2022) ........................................................................... 27

*United States v. Cruikshank*,
  92 U.S. 542 (1875).......................................................................................... 7

*United States v. Flotron*,
  2018 WL 1401986 (D. Conn Mar. 20, 2018) .................................................. 18

*United States v. Ganias*,
  824 F.3d 199 (2d Cir. 2016)........................................................................... 43

*United States v. Haqq*,
  F. Supp. 2d 383 (S.D.N.Y. 2002) .................................................................. 38

*United States v. Hay*,
  No. 19 Cr. 170 (RJA),
  2023 WL 142119 (W.D.N.Y. Jan. 10, 2023) ................................................................ 45, 53

*United States v. Hess*,
  124 U.S. 483 (1888) ........................................................................................................ 7

*United States v. Javat*,
  No. 18 Cr. 20688 (DMB) (CM),
  2019 WL 3729060 (S.D. Fla Aug. 8, 2019)..............................................39, 41, 45, 46, 50

*United States v. Lanier*,
  520 U.S. 259 (1997) ................................................................................................ 16, 23

*United States v. Mitchell*,
  565 F.3d 1347 (11th Cir. 2009) ............................................................................ 42, 45, 51

*United States v. Nadi*,
  996 F.2d 548 (2d Cir. 1993) ........................................................................................ 16

*United States v. Pirro*,
  212 F.3d 86 (2d Cir. 2000) ...................................................................................... 6, 12

*United States v. Radley*,
  659 F. Supp. 2d 803 (S.D. Tex. 2009) .................................................................. passim

*United States v. Reed*,
  No. 20-cr-500 (JGK),
  2022 WL 597180, (Feb. 28, 2022 S.D.N.Y.) ................................................................. 13

*United States v. Regent Off. Supply Co.*,
  421 F.2d 1174 (2d Cir. 1970)........................................................................................ 28

*United States v. Reliant Energy Servs., Inc.*,
  420 F. Supp. 2d 1043 (N.D. Cal. 2006) ................................................................ passim

*United States v. Ross*,
  963 F.3d 1056 (11th Cir. 2020) .................................................................................... 42

*United States v. Rybicki*,
  354 F.3d 124 (2d Cir. 2003)........................................................................................ 27

*United States v. Shellef*,
  507 F.3d 82 (2d Cir. 2007).......................................................................................... 28

*United States v. Smith*,
   967 F.3d 198 (2d Cir. 2020) ........................................................................ passim

*United States v. Sparks*,
   806 F.3d 1323 (11th Cir. 2015) ................................................................... 42

*United States v. Tisdol*,
   544 F. Supp. 3d 219 (D. Conn. 2021) .......................................................... 45, 52

*United States v. Todd*,
   446 F.3d 1062 (10th Cir. 2006) ................................................................... 8

*United States v. Weaver*,
   659 F.3d 353 (4th Cir. 2011) ....................................................................... 8, 27

*United States v. Wells*,
   No. 20 Cr. 633(NRB),
   2023 WL 2223474 (S.D.N.Y. Feb. 23, 2023) ............................................. 44

*United Stats v. Martin*,
   157 F.3d 46 (2d Cir. 1998) ........................................................................... 42, 44

*Util. Air Regul. Grp. v. E.P.A.*,
   573 U.S. 302 (2014) ..................................................................................... 25

*West Virginia v. Env't Prot. Agency*,
   142 S.Ct. 2587 (2022) .................................................................................. 25

*Wilson v. Merrill Lynch & Co.*,
   671 F.3d 120 (2d Cir. 2011) ......................................................................... 15

**Statutes**

17 C.F.R. § 180.1 ............................................................................................. 9

18 U.S.C. § 1343 ............................................................................................. 26

7 U.S.C. § 13(a)(2) .......................................................................................... 10, 16, 18

7 U.S.C. §§ 9(1), 13(a)(2), (a)(5) ................................................................... 3, 8, 9

7 U.S.C.§ 1a (9) .............................................................................................. 10, 12, 13, 24

**Other Authorities**

*Meet the New Boss, Same as the Old Boss: How Federal Agencies have Leveraged Existing Law to Regulate Cryptocurrency*,
    57 Am. Crim. L. Rev. Online 34 (2020) ................................................................... 2

*New Things Under the Sun: How the CFTC is Using Virtual Currencies to Expand its Jurisdiction*,
    15 Ark. L. Rev. 205 (2020) ............................................................................. 13, 14

Torts § 529 (1977) ...................................................................................................... 27

**Rules**

Fed. R. Crim. P. 12(b)(3)(B)(iv) .............................................................................. 1, 6

I.   **PRELIMINARY STATEMENT**

Defendant Avraham Eisenberg brings this omnibus motion in which he moves: (1) to dismiss the indictment under Federal Rule of Criminal Procedure 12(b)(3)(B)(iv) with prejudice; and (2) to suppress four seized digital devices and various documents taken from the luggage he was carrying at the airport at the time of his arrest in violation of his Fourth Amendment rights. The grounds for each motion are set forth below.

II.   **MOTION TO DISMISS**

    A.   <u>**Introduction**</u>

The indictment alleges that Mr. Eisenberg manipulated the commodities markets and committed a scheme to defraud through wholly lawful purchases of MNGO, a digital token related to Mango Markets.  In essence, Mango Markets is a blockchain protocol built on a set of cryptographic smart contracts in which users pool certain types of digital assets to provide leverage and facilitate certain types of transactions in digital assets.  The rules applicable to the protocol are set forth in the Mango Markets' open-source code, to which all its users, including the alleged victims, have access.

Mango Markets is neither a securities exchange nor a commodities exchange, and MNGO is neither a security nor a commodity under existing law.  It is well known that both the Securities and Exchange Commission ("SEC") and Commodity Futures Trading Commission ("CFTC") make conflicting claims to having regulatory jurisdiction over what are most accurately referred to as "digital assets," like MNGO is alleged to be, but neither agency has issued regulations providing any guidance over whether such assets are securities or commodities and both take conflicting positions as to the scope of their respective jurisdictions. Bills intended to provide regulatory clarity are stalled in Congress.  As a bankruptcy judge in this district has concluded:

> Regulators themselves cannot seem to agree as to whether
> cryptocurrencies are commodities that may be subject to regulation
> by the CFTC, or whether they are securities that are subject to
> securities laws, or neither, or even on what criteria should be
> applied in making the decision.

*In re Voyager Dig. Holdings, Inc.*, 649 B.R. 111, 119 (Bankr. S.D.N.Y. 2023); *see also* John

Marinelli, *Meet the New Boss, Same as the Old Boss: How Federal Agencies have Leveraged*

*Existing Law to Regulate Cryptocurrency*, 57 Am. Crim. L. Rev. Online 34 (2020) ("Absent

legislation on the subject, agencies have relied on existing law . . . [t]hese efforts have led to the

peculiar situation in which cryptocurrencies are defined variously as property, funds,

commodities, and securities for the purposes of regulation. This environment leaves many

questions unanswered.").

Indeed, in this very matter involving Mr. Eisenberg, the SEC and CFTC have taken

conflicting and ultimately irreconcilable positions. The SEC filed a civil complaint alleging that

Mr. Eisenberg manipulated the trading price and volume of MNGO—categorizing MNGO as an

investment contract and thus a security. *See* Complaint at ¶ 1, SEC v. Avraham Eisenberg, No.

1:23-cv-503 (S.D.N.Y. Jan. 20, 2023), Dkt. 1 ("SEC Complaint"). By contrast, the CFTC, in its

own civil complaint against Mr. Eisenberg, fails to allege that MNGO is either a security or a

commodity; rather, the CFTC argues that Mr. Eisenberg artificially inflated the price of MNGO-

USDC "swaps"—which, by contrast, the SEC labels "perpetual futures contracts." *See*

Complaint at ¶¶ 23-25, CFTC v. Avraham Eisenberg, No. 23-cv-00173 (S.D.N.Y. Jan. 9, 2023),

Dkt. 1 ("CFTC Complaint").

Into this regulatory void walks the Department of Justice ("DOJ"), charging as a criminal

scheme acts that are fully permitted under the Mango Markets' smart contracts, and which are

based on the open-source cryptographic code that governs the protocol. But Mango Markets

does not fall within the jurisdiction of the SEC or CFTC under existing law. While the

indictment might sound like something the Court has heard before, using familiar terminology from the securities and commodities caselaw, in fact, the government is trying to fit a square peg in a round hole.  The statutes that the government asserts Mr. Eisenberg violated do not apply, and the government's attempt to stretch them is both unpersuasive and so totally unprecedented that the charges are a deprivation of defendant's right to fair notice.  The DOJ's theories conflict even with the theories of the CFTC itself, in that the DOJ purports to sweep all "cryptocurrencies" under the commodities umbrella, while the CFTC is content to premise its jurisdiction on the claim that Mango Markets' "perpetual futures contracts" are swaps.

As further demonstrated below, the Court should reject the government's attempt to extend the Commodities Exchange Act ("CEA"), 7 U.S.C. §§ 9(1), 13(a)(2), (a)(5), into uncharted waters without fair notice.

The Government also charges Mr. Eisenberg with commodities and wire fraud counts, even though there are no allegations that Mr. Eisenberg deceived anyone.  Based on Second Circuit precedent, a critical element of any fraud charge is that there be a material misrepresentation or omission, but no such misrepresentations or omission is alleged, and, in fact, no one was deceived.  The fraud charges should therefore be dismissed.

For these reasons, the indictment should be dismissed with prejudice.

**B.**      **Mango Markets and Mr. Eisenberg's Lawful Trades**

Mango Markets ("Mango Markets" or "Mango protocol") is a decentralized protocol, built on the Solana blockchain, that allows users to pool their digital assets in order to provide leverage to engage in different types of digital asset transactions, including derivatives and other leveraged or margined transactions.  (*See* https://docs.mango.markets/; *see also* CFTC Complaint ¶ 2.)  The Mango protocol further allows users to engage in "borrowing" transactions in which

they can withdraw digital assets against the value of the assets placed on collateral.  (CFTC Complaint ¶ 2.)   Deposits placed with Mango Markets "automatically earn interest and serve as available collateral to leverage a trade or withdraw a borrow."  (*See* https://docs.mango.markets/mango-markets/beginner-tips.)

One of the unique derivatives offered on the Mango protocol is what the protocol calls "perpetual futures contracts" ("Perpetuals").  These contracts allow users to take long or short positions on the future of an underlying index price.  (*See* https://docs.mango.markets/mango-markets/perp-markets; *see generally* CFTC Complaint at ¶¶23-25, No. 1:23-cv-00173.)  These Perpetuals are based on the relative value between two digital assets.  An investor with a long position will profit if the value of an underlying asset increases and will lose money if it decreases; an investor with a short position will lose money if the asset's value increases and profit if the value decreases.  (Indictment ("Ind.") ¶ 2*; see also* CFTC Complaint at ¶ 25, No. 1:23-cv-00173.)

To determine the values of digital assets in the Mango protocol, as well as the values of the Perpetuals, the protocol uses what is called an "oracle" – or a data source on which smart contracts rely to make decisions.  As explained by the company Chainlink:

> Blockchain oracles are entities that connect blockchains to external systems, thereby enabling smart contracts to execute based upon inputs and outputs from the real world.
>
> . . .
>
> Oracles provide a way for the decentralized Web3 ecosystem to access existing data sources, legacy systems, and advanced computations. Decentralized oracle networks (DONs) enable the creation of hybrid smart contracts, where on-chain code and off-chain infrastructure are combined to support advanced decentralized applications (dApps) that react to real-world events and interoperate with traditional systems.

https://chain.link/education/blockchain-oracles.  Here, the Oracle calculates the "relative value of two cryptocurrencies by looking at the exchange rate of those cryptocurrencies on various exchanges."  (Ind. ¶ 11.)  According to the code that governs the Mango protocol, as the Oracle price for particular assets changes, so does the settlement price of the Perpetuals.

While Mango Markets had a website, the information provided on it about the protocol was very limited.  As is customary in the decentralized blockchain community, to use the protocol, users were directed to look at the open-source computer code itself to understand how the smart contracts (and thus the platform) operated.  There were no terms of service that provided any limitations on use; the only terms were set forth in the code.

The indictment alleges that Mr. Eisenberg perpetuated a "scheme to fraudulently obtain approximately $110 million" from Mango Markets, (Ind. ¶ 1), through a pattern of trading in MNGO and Perpetuals, *(Id.* ¶¶ 15-20), but, indeed, the various alleged actions were all lawful. Specifically, Mr. Eisenberg is alleged:

> (1) to have purchased MNGO-USDC Perpetuals "based on a total of approximately 488,302,109 MNGO, at a price of 0.0382 USDC/MNGO";
>
> (2) to have purchased large quantities of MNGO; and
>
> (3) to have withdrawn assets from the protocol based on the value of his collateral in the Mango protocol, based on the Oracle's determination of the prices of the underlying assets and Mango Markets' formula as to the value of his collateral and the amount that could be withdrawn.

*(Id.* ¶¶ 11-12, 16-17, 19-20.)

Mr. Eisenberg is thus alleged to have used Mango Market's trading features within the parameters of Mango Markets' smart contracts – which were open source and fully available to all users of the protocol.  The Mango protocol operated as it was designed to do.  Even assuming the facts in the indictment are true – as defendant and the Court at this stage must do – the fact

that the protocol permitted Mr. Eisenberg to withdraw $110 million in trading profits from Mango Markets demonstrates that his actions were fully permissible under the rules of the protocol, as set forth in its open-source code.

### C.   Motion to Dismiss Standard

"[T]he indictment must contain an allegation of every fact which is legally essential [for] the punishment to be inflicted." *Apprendi v. New Jersey*, 530 U.S. 466, 512 (2000) (internal quotation marks omitted).  This right is rooted in the U.S. Constitution.  The Fifth Amendment provides that: "No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury."  U.S. Const. amend. V.  As the Second Circuit has explained, "If the indictment does not state the essential elements of the crime, the defendant cannot be assured that he is being tried on the evidence presented to the grand jury." *United States v. Pirro*, 212 F.3d 86, 92 (2d Cir. 2000).  Similarly, the Sixth Amendment guarantees that a defendant "be informed of the nature and cause of the accusation" and thus requires that an indictment state the essential elements of the crime.  *Id.* (citations omitted).

Accordingly, a defect in the indictment, including a failure to state an offense, may be grounds for pre-trial dismissal.  *See* Fed. R. Crim. P. 12(b)(3)(B)(iv).  As the Second Circuit has instructed:

> Since federal crimes are "solely creatures of statute," *Dowling v. United States,* 473 U.S. 207, 213, 105 S. Ct. 3127, 87 L. Ed.2d 152 (1985), a federal indictment can be challenged on the ground that it fails to allege a crime within the terms of the applicable statute.

*United States v. Aleynikov*, 676 F.3d 71, 75–76 (2d Cir. 2012) (citing *Pirro,* 212 F.3d at 91-92). The indictment must be considered by the district court "as it was actually drawn, not as it might have been drawn.  *See Pirro,* 212 F.3d. at 92 (citing *Sanabria v. United States,* 437 U.S. 54, 65– 66 (1978) ("The precise manner in which an indictment is drawn cannot be ignored.").  A

defendant who objects to the indictment before trial is entitled to an exacting review of the indictment.  *Id.*

The Supreme Court has made clear that it is insufficient for an indictment merely to intone the general statutory language of the offense.  In *Russell v. United States*, the Supreme Court instructed that "where the definition of an offence, whether it be at common law or by statute, includes generic terms, it is not sufficient that the indictment shall charge the offence in the same generic terms as in the definition; but it must state the species—it must descend to particulars."  369 U.S. 749, 765 (1962) (citing *United States v. Cruikshank,* 92 U.S. 542 (1875)). As the Supreme Court explained:

> Undoubtedly, the language of the statute may be used in the general description of an offense, but it must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offense . . . with which he is charged.

*Id.* (quotation omitted); *United States v. Hess*, 124 U.S. 483 (1888).  Similarly, in *Cruikshank*, the Supreme Court held:

> The object of the indictment is, first, to furnish the accused with such a description of the charge against him as will enable him to make his defence . . . ; and, second, to inform the court of the facts alleged, so that it may decide whether they are sufficient in law to support a conviction, if one should be had. For this, facts are to be stated, not conclusions of law alone. A crime is made up of acts and intent; and these must be set forth in the indictment, with reasonable particularity of time, place, and circumstances.

92 U.S. at 558.  An indictment must be dismissed if "it fails to allege a crime within the terms of the applicable statute."  *Aleynikov*, 676 F.3d at 75-76.

A further basis to dismiss the indictment is where undisputed evidence shows that the facts alleged do not constitute a crime.  District courts may properly rule on a motion to dismiss an indictment when the undisputed evidence shows that, "as a matter of law, the Defendant could not have committed the offense for which he was indicted."  *United States v. Todd*, 446 F.3d

1062, 1067-69 (10th Cir. 2006); *United States v. Weaver*, 659 F.3d 353, 355 n* (4th Cir. 2011)

(motion to dismiss appropriate where "the government does not dispute the ability of the court to

reach the motion and proffers, stipulates, or otherwise does not dispute the pertinent facts").

> **D.     The Commodities Fraud Counts (Counts One and Two)**
> **Should Be Dismissed Because the Government Has Not Alleged**
> **the Elements of a Violation of the CEA**

The government's charges under the CEA are fatally flawed, requiring dismissal of

Counts One and Two.

The CEA has "been aptly characterized as a comprehensive regulatory structure to

oversee the volatile and esoteric futures trading complex." *Merrill Lynch, Pierce, Fenner &*

*Smith, Inc. v. Curran*, 456 U.S. 353, 355-56 (1982) (citation omitted).  In the CFTC's own

words, the CEA "regulates the trading of commodity futures in the United States."[1]  The CEA

further provides the CFTC jurisdiction over spot trades involving commodities but only where

fraud or manipulation is involved.  *In re Platinum and Palladium Antitrust Litigation*, 61 F.4th

242, 266-267 (2d. Cir. 2023) ("Sections 6 and 9 of the CEA proscribe fraud in commodities

markets.") (citing 7 U.S.C. §§ 9(1), 13(a)(2)); *CFTC v. My Big Coin Pay, Inc.*, 334 F. Supp. 3d

492, 495 (D. Mass 2018) ("CFTC has additional powers under the [CEA], including the general

anti-fraud and anti-manipulation authority over 'any . . . contract of sale of any commodity in

interstate commerce' . . . ."); *CFTC v. McDonnell*, 287 F. Supp. 3d 213, 229 (E.D.N.Y. 2018)

(CFTC jurisdictional expansion into "spot trade commodity fraud" justified under CEA).

In the indictment, the government has charged two purported violations of the CEA.

Count One alleges that Mr. Eisenberg violated Section 9(1) of the CEA, which prohibits any

---

[1] *Commodity Exchange Act & Regulations*, CFTC, *available at*
https://www.cftc.gov/LawRegulation/CommodityExchangeAct/index.htm#:~:text=The%20Com
modity%20Exchange%20Act%20(CEA,under%20which%20the%20CFTC%20operates.

person from "us[ing] or employ[ing] . . . in connection with any . . . contract of sale of any

commodity in interstate commerce, and for future delivery on . . . any manipulative or deceptive

device or contrivance in contravention of such rules and regulations" the CFTC promulgates.

7 U.S.C. § 9(1).  (Ind. ¶ 23.)  Count One further alleges that Mr. Eisenberg violated several

subsections of 17 C.F.R. § 180.1, which prohibits intentionally or recklessly, "in connection with

any swap, or contract of sale of any commodity in interstate commerce, or contract for future

delivery on and subject to the rules of a registered entity":  (1) using or employing any

"manipulative device, scheme, or artifice to defraud," (*id.* § 180.1(a)(1)); (2) making "any untrue

or misleading statement of a material fact or to omit to state a material fact necessary in order to

make the statements made not untrue or misleading," (*id.* § 180.1(a)(2)); and (3) engaging "in

any act, practice, or course of business, which operates or would operate as a fraud or deceit

upon any person," (*id.* § 180.1(a)(3)).  (Ind. ¶ 23.)[2]  Mr. Eisenberg allegedly violated these

provisions by engaging in a scheme involving: (1) the "intentional and artificial manipulation" of

(a) "the relative value of USDC and MNGO" and (b) the price of perpetual futures contracts on

Mango Markets; (2) trading with himself to create artificial perpetual futures contracts positions

on Mango Markets; (3) misrepresenting his intentions to borrow cryptocurrency from Mango

Markets, and (4) using false personal identifiers and location information, allegedly to further the

scheme.  (*Id.*)

      Count Two alleges a violation of Section 13(a)(2) of the CEA, which makes it a felony to

"manipulate or attempt to manipulate the price of any commodity in interstate commerce, or for

---

[2] Count One also references 7 U.S.C. § 13(a)(5) (Ind. ¶ 23), which is a penalty provision making it felony for a person "willfully to violate any other provision of" the CEA or "any rule or regulation thereunder," but notes that no person "shall be subject to imprisonment under this paragraph for the violation of any rule or regulation if such person proves that he had no knowledge of such rule or regulation."

future delivery on and subject to the rules of a registered entity, or of a swap." 7 U.S.C.

§ 13(a)(2).  Mr. Eisenberg allegedly violated this provision by executing a scheme "involving the

intentional and artificial manipulation of the price of perpetual futures contracts on Mango

Markets." (Ind. ¶ 25.)

### 1.     The Government Has Failed to Allege Any Commodity Falling Under the CEA

The CEA defines commodities as follows:

> The term "commodity" means wheat, cotton, rice, corn, oats, barley,
> rye, flaxseed, grain sorghums, mill feeds, butter, eggs, Solanum
> tuberosum (Irish potatoes), wool, wool tops, fats and oils . . .
> cottonseed meal, cottonseed, peanuts, soybeans, soybean meal,
> livestock, livestock products, and frozen concentrated orange juice,
> and all other goods and articles . . . and all services, rights, and
> interests . . . in which contracts for future delivery are presently or
> in the future dealt in.

7 U.S.C.§ 1a (9).  A good therefore is only a "commodity" if contracts for its future delivery

were permitted at the time of enactment or enforcement.  *McDonnell*, 287 F. Supp. 3d at228

("Where a futures market *exists* for a good, service, right, or interest, it may be regulated by

CFTC, as a commodity.") (emphasis added); *CFTC v. Reed*, 481 F. Supp. 2d 1190, 1194 (D.

Colo. 2007) ("In 1974 the CEA was amended to expand its jurisdiction from a statutory list of

enumerated commodities to include all goods and articles in which a futures contract *is traded*.")

(emphasis added).  A contract for future delivery, or a "futures contract" for short, "is an

agreement to purchase or sell a particular commodity on a later date at a predetermined price."

*Set Capital LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 69 n.3 (2d Cir. 2021); *CFTC v. Int'l

Foreign Currency, Inc.*, 334 F. Supp. 2d 305, 310 (E.D.N.Y. 2004) ("Futures contracts are

contracts that are bought or sold at a specific price and fixed quantity for future delivery.").

Futures contracts typically have a predetermined date and contemplate actual delivery of the

contracted commodity.  *See Harry v. Total Gas & Power N. Am., Inc.*, 244 F. Supp. 3d 402, 408

(S.D.N.Y. 2017) ("A futures contract is an agreement for the purchase or sale of a particular commodity for delivery on a fixed date in a future month.") (citation omitted); *S.E.C. v. Riel*, 282 F. Supp. 3d 499, 508 n.2 (N.D.N.Y. 2017) (same).

Despite the confusing name, the Perpetuals – *i.e.*, "perpetuals futures contracts" (Ind. ¶ 23) – are not in fact futures contracts in the Mango Markets ecosystem, as the government's allegations themselves make clear: "When an investor buys or sells a Perpetual for a particular cryptocurrency, the investor is not buying or selling that cryptocurrency. Instead, the investor is buying or selling exposure to future movements in the value of that cryptocurrency relative to another cryptocurrency." (*Id.* at ¶ 10.) The indictment further explains that buying a Perpetual means you are "long" on the value of that cryptocurrency, that selling a Perpetual means you are "short" on the value of that cryptocurrency, and that "[e]ither party to a Perpetual can settle the Perpetual at any time and realize their gain or loss." (*Id.*); *see also* CFTC Complaint ¶ 23 (alleging Perpetuals to be swaps, not futures or commodities).

While a futures contract "is an agreement to purchase or sell a particular asset on a later date at a predetermined price," *Choi v. Tower Research Capital LLC*, 2 F.4th 10, 13 n.2 (2d Cir. 2021), parties to a Perpetual do not determine the price – a Perpetual is the purchase or sale of "exposure to future movements in the value of [one] cryptocurrency relative to another cryptocurrency." (Ind. ¶ 10.) Perpetuals also do not contemplate the exchange of assets on a future date; rather "[e]ither party to a Perpetual can settle the Perpetual at any time and realize their gain or loss." (*Id.*) A Perpetual is also not a commodity because there is no market for future contracts on Perpetuals.

Second, MNGO is not a commodity, and the government does not allege as much – it neither uses the word "commodity" when describing MNGO nor alleges that MNGO is a good,

article, service, right, or interest "in which contracts for future delivery are presently or in the future dealt in," 7 U.S.C. § 1a(9) *i.e.*, that futures contracts on MNGO can be dealt.  Instead, the Indictment merely alleges that MNGO is "Mango Markets' native crypto token," and that "[h]olders of MNGO were allowed to vote on changes to Mango Markets and issues related to the governance of the Mango DAO [Decentralized Autonomous Organization]."  (Ind. ¶¶ 2, 7.)[3]

The government may assert that cryptocurrencies are commodities and that because it has alleged that MNGO is a cryptocurrency, (*see* Ind. ¶ 8), it has (indirectly) satisfied the need to allege a commodity under the CEA.  As an initial matter, this argument fails because allegations cannot be read into an indictment.  *See Pirro*, 212 F.3d at 92 ("[T]he indictment must be considered as it was actually drawn, not as it might have been drawn.") (citing *Sanabria v. United States*, 437 U.S. 54, 65-66 (1978).

Moreover, this theory is a non-starter for several reasons.  The CFTC has never issued regulations that would include cryptocurrencies – let alone all digital assets – within the definition of commodities, and the Second Circuit has therefore never recognized them as such.  That has left district courts to sort it out, and while some unpublished district court cases within this District have found certain cryptocurrencies to be commodities, none of those cryptocurrencies are at issue here.  The three cryptocurrencies found to be commodities are Bitcoin, Ether, and Litecoin, each of which differ significantly from MNGO.  *See, e.g., Lagemann v. Spence*, No. 18 Civ. 12218 (GBD), 2020 WL 5754800, at *2, 12 (S.D.N.Y. May 18, 2020) (Bitcoin, Ether, Litecoin); *CFTC v. Reynolds*, No. 1:19-cv-05631-MKV, 2021 WL

---

[3] Because a motion to dismiss is controlled by the government's allegations in its indictment, the Defense adopts the government's characterizations of MNGO as both a native crypto token and a cryptocurrency only for the purposes of the motion.  It does not otherwise accept those characterizations.

796683, at *5 (S.D.N.Y. Mar. 2, 2021) (Bitcoin); *CFTC v. Gelfman Blueprint, Inc.*, No. 17-7181

(PKC), 2018 WL 6320656, at *8 (S.D.N.Y. Oct. 16, 2018) (Bitcoin); *McDonnell*, 287 F. Supp.

3d at 227 (Bitcoin, Litecoin).[4]  As to each of these cryptocurrencies, however, there is a futures

contract market.[5]  *See McDonnell*, 287 F. Supp. 3d at 228 ("Where a futures market exists for a

good, service, right, or interest, it may be regulated by CFTC, as a commodity, without regard to

whether the dispute involves futures contracts.").  Because MNGO has no futures contracts or a

futures market, it cannot come within the scope of the CEA.[6]

   The CFTC's own civil complaint lends support for the conclusion that MNGO is not a

commodity.  *See generally* CFTC Complaint.  Although the CFTC's enforcement staff generally

---

[4] The government may argue that some of these decisions used broad language to suggest that all cryptocurrencies fall within the jurisdiction of the CEA.  *See Gelfman Blueprint, Inc.*, 2018 WL 6320656 at *8 ("Virtual currencies such as Bitcoin are encompassed in the definition of 'commodity' under Section 1a(9) of the Act.") (citations omitted); *McDonnell*, 287 F. Supp. 3d at 227-28 (stating that "[v]irtual currencies can be regulated by CFTC as a commodity" but also noting that "CFTC does not have regulatory authority over simple quick cash or spot transactions that do not involve fraud or manipulation"); *United States v. Reed*, No. 20-cr-500 (JGK), 2022 WL 597180, at *4 (Feb. 28, 2022 S.D.N.Y.) ("'Contracts for future delivery' in cryptocurrencies are 'dealt in.'  Thus, under the plain language of the CEA, cryptocurrencies fall within the definition of commodities.") (alterations omitted) (citing *CFTC v. My Big Coin Pay, Inc.*, 334 F. Supp. 3d 492, 496-98 (D. Mass. 2018).  To the extent these decisions purport to reach any digital assets other than the ones involved in the particular cases, those portions of the decision are *dicta* and lack any precedential value.

[5] Wayne Duggan, *What are Bitcoin Futures? How do they Work?*, Forbes.com, *available at* https://www.forbes.com/advisor/investing/cryptocurrency/what-are-bitcoin-futures/; *Trade Ethereum Futures Contracts*, Kraken, *available at* https://www.kraken.com/features/futures/ethereum; *Trade Litecoin Futures Contracts*, Kraken, *available at* https://www.kraken.com/features/futures/litecoin.

[6] The defense is aware of only one, out-of-circuit, district court that has found a token lacking a futures market to be a commodity.  *See generally My Big Coin Pay, Inc.*, 334 F. Supp. 3d (D. Mass. 2018).  The reasoning in *My Big Coin Pay, Inc.* is highly questionable, as it gives "CEA §1a(9) a dubious reading that threatens to render the commodity definition a nullity . . . Instead, the statute means what it says: [o]nly goods in which futures contracts are dealt are commodities; other goods are not."  James M. Blakemore, *New Things Under the Sun: How the CFTC is Using Virtual Currencies to Expand its Jurisdiction*, 15 Ark. L. Rev. 205, 243 (2020).  Accordingly, the reasoning in *My Big Coin Pay, Inc.*, which has not been adopted in this Circuit, should be rejected.

articulates a broad view of its own jurisdiction over what it sometimes calls "virtual currencies,"[7] in this case, the CFTC claims regulatory authority only through the Perpetuals, which it alleges to be swaps, but does not claim that MNGO is a commodity or that the Perpetuals are futures. *Id.* at ¶¶23-25.

Accordingly, Counts One and Two of the indictment are fatally flawed because the government has not and cannot allege that MNGO is a commodity.  Simply put, because there is no futures market for MNGO, it is not a commodity and the government therefore cannot satisfy the elements of the CEA.  *See* Blakemore, *supra* at 242-43 ("[T]he statute means what it says: Only goods in which futures contracts are dealt are commodities; other goods are not.").

### 2.  Count One Should be Dismissed Because the Government Has Failed to Allege A Misrepresentation on Mr. Eisenberg's Part

The government's charge that Mr. Eisenberg committed commodities fraud, Count One, fails for the additional reason that it has not alleged that he made any material misrepresentation or omission.[8]

---

[7]  The CFTC's broad view has been subject to heavy criticism.  *See, e.g.*, Allen Kogan, *Not All Virtual Currencies are Created Equal: Regulatory Guidance in the Aftermath of CFTC v. McDonnell*, 8 Am. U. Bus. L. Rev. 199, 219 (2019) ("CFTC's classification of all virtual currencies as commodities lacks a substantial legal basis").

[8]  In context of motions to dismiss in civil cases, courts have found that a use of market power or a trading strategy alone, without false statements or omissions, does not amount to fraud.  *See CFTC v. Parnon Energy, Inc.*, 875 F. Supp. 2d 233 (S.D.N.Y. 2012) (scheme based on abuse of market power without misstatements or omissions did not sound in fraud even though defendants' dominant market position permitted them to apply upward price pressure because they did not do so in a "deceitful or misleading manner"); *CFTC v. Amaranth Advisors LLC*, 554 F. Supp. 2d 523 (S.D.N.Y. 2008) (scheme based on alleged timing of trades did not sound in fraud); *Choi v. Tower Research Capital LLC*, 165 F. Supp. 3d 42 (S.D.N.Y. 2016) (submission of above or below market bids to alter market price did not sound in fraud) (citing *CFTC v. Wilson*, 27 F. Supp. 3d 517, 532 (S.D.N.Y. 2014) (attempted manipulation was effectuated through "a particular trading strategy" and did not involve "misleading statements or omissions" so CFTC failed to allege fraud).

In the securities context, the Second Circuit has interpreted "scheme to defraud" to necessitate material misrepresentation by the defendant.  This principle applies even when an alleged scheme involves manipulation of the market through open-market transactions.  *See, e.g., Wilson v. Merrill Lynch & Co.*, 671 F.3d 120, 129–30 (2d Cir. 2011) ("In order for market activity to be manipulative, that conduct must involve misrepresentation or nondisclosure."); *Onel v. Top Ships, Inc.*, 806 F. App'x 64, 67 (2d Cir. 2020) (same); *see also Set Capital LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 76–77 (2d Cir. 2021) ("While a defendant may manipulate the market through open-market transactions, some misrepresentation or nondisclosure is required.").

The government has failed to assert that Mr. Eisenberg's alleged scheme constitutes anything other than a "particular trading strategy" involving MNGO Perpetuals and MNGO tokens; indeed, the indictment fails to allege a single misleading statement or omission that misled the market and furthered Mr. Eisenberg's alleged scheme – and also names no victim who relied on such (non-existent) deceit.  (*See* Ind. ¶¶ 16, 17, 17(b), 17(d), 17(g)).

While the government tries to remedy its failure to allege a misrepresentation through extraneous and irrelevant allegations that Mr. Eisenberg failed to register the Exchange-1 and Exchange-2 accounts using his real identity and location, (*id.* ¶ 23), these allegations fall far short of constituting a misrepresentations that "effectuated manipulation."  *Wilson*, 27 F. Supp. 3d at 532.  Anonymity and code names are common in technology (and on Twitter) and did not deceive anyone in the marketplace.[9]  (True names, for example, would not have affected the amount of collateral withdrawn).  These alleged omissions are facially insufficient and not

---

[9] Nominee accounts can also be common and are not by themselves an indicia of criminality.

causally connected to the alleged manipulation and therefore cannot remedy the missing element in Count One.

### E.   Counts One and Two Should Be Dismissed On Due Process Grounds

#### 1.   The Definition of Manipulative Is Unconstitutionally Vague

"It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). "[T]he vagueness doctrine bars enforcement of a 'statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application.'" *United States v. Lanier,* 520 U.S. 259, 266 (1997) (quoting *Connally v. General Constr. Co.*, 269 U.S. 385, 391 (1926)); *Marty's Adult World v. Town of Enfield*, 20 F.3d 512, 516 (2d Cir. 1994) (a statute is unconstitutionally vague if it "fails to give persons of ordinary intelligence fair notice that their contemplated conduct is proscribed"); *United States v. Bastian*, 112 F. Supp. 2d 378, 380 (S.D.N.Y. 2000) (applying the void for vagueness doctrine to a criminal statute).  Challenges for vagueness can be "on an as-applied basis." *Maynard v. Cartwright*, 486 U.S. 356, 361 (1988).  "When the challenge is vagueness as-applied, there is a two-part test: a court must first determine whether the statute gives the person of ordinary intelligence a reasonable opportunity to know what is prohibited and then consider whether the law provides explicit standards for those who apply it." *United States v. Nadi*, 996 F.2d 548, 551 (2d Cir. 1993) (citation omitted).

Counts One and Two are both rooted in purported manipulation:  Count One, which charges Commodities Fraud, alleges "artificial manipulation of the relative value of USDC and MNGO" as well as the alleged creation of "artificial perpetual futures contracts" on Mango Markets.  (Ind. ¶¶ 23, 25.)  Count Two, which charges Commodities Manipulation, alleges "a scheme involving the intentional and artificial manipulation of the price of perpetual futures

contracts on Mango Markets."  7 U.S.C. § 13(a)(2); (Ind. ¶ 25.)  While the basis for both counts

is manipulation (*i.e.*, manipulation of the price of MNGO in relation to USDC[10], or manipulation

of the price of the Perpetuals), the CEA and implementing regulations failed to give notice that

the alleged conduct could be considered manipulative at all, making each unconstitutionally

vague as applied.

 While the statutes and regulations prohibit price manipulation, the CEA does not define

the term "manipulation."  For that reason, courts have looked to caselaw in the civil context and

CFTC guidance to define manipulation.  *See, e.g. United States v. Radley*, 659 F. Supp. 2d 803,

813 (S.D. Tex. 2009); *United States v. Reliant Energy Servs., Inc.*, 420 F. Supp. 2d 1043, 1057

(N.D. Cal. 2006).  Generally, price manipulation is the "intentional exaction of a price

determined by forces other than supply and demand."  *Frey v. CFTC*, 931 F.2d 1171, 1175 (7th

Cir. 1991); *Radley*, 659 F. Supp. 2d at 813; *Reliant Energy Servs., Inc.*, 420 F. Supp. 2d at 1057;

*In re Abrams*, No 88-10, 1994 WL 506250, at *10 (CFTC Sept. 15, 1994) ("A market participant

must have acted with the purpose or conscious object of causing or effecting a price or price

trend in the market that did not reflect the legitimate forces of supply and demand.").  Courts

have established four prongs necessary to prove manipulation: "(1) the defendants possessed the

ability to influence prices, (2) an artificial price existed, (3) the defendants caused the artificial

price, and (4) the defendants specifically intended to cause the artificial price."  *Radley*, 659 F.

Supp. 2d at 813 (alterations and internal quotations omitted).

 But this test only exacerbates the vagueness problem with "manipulation," because "there

is no universally accepted measure or test of price artificiality."  *CFTC v. Enron Corp.*, No. H-

---

[10] USDC or USD Coin is a digital stablecoin that is pegged one for one to the US Dollar. *See* https://www.circle.com/en/usdc.

03-909, 2004 WL 594752, *6 (S.D. Tex. Mar 10, 2004).  Indeed, as the *Radley* court held, the definition of artificial is uncertain, "and that uncertainty makes application of the manipulation statute unconstitutionally vague as applied to the facts of this case."  *Radley*, 659 F. Supp. 2d at 813.

The dearth of criminal prosecutions for commodities manipulation further compounds the vagueness problem.  The first reported commodities manipulation prosecution occurred only in 2006.  *See generally Reliant Energy Servs., Inc.*, 420 F. Supp. 2d 1043.  A second reported criminal prosecution, *Radley*, 659 F. Supp. 2d 803, came in 2009.[11]  Because both included a vagueness challenge at the motion to dismiss stage, *Reliant* and *Radley* serve as instructive guideposts in determining whether "manipulation" under the CEA is vague as applied in this case.

First, in *Reliant*, defendants owned five electricity generation plants and, in early June 2000, entered long-term trading contracts for electricity delivery expecting electricity prices to increase.  *Reliant*, 420 F. Supp. 2d at 1046.  However, on June 19, 2000, the spot market price for electricity unexpectedly fell.  *Id.*  To avoid a multi-million-dollar loss, the indictment alleges that defendants manipulated the California electricity market to increase the price of electricity.  *Id.*  To carry out their plan, defendants created the "false and misleading appearance of an electricity supply shortage" by (1) shutting down Reliant's generation plants, (2) physically withholding electricity, (3) submitting supply bids at inflated prices, and (4) "disseminating false and misleading rumors and information . . . regarding the availability and maintenance status of, and environmental limitations on, Reliant's . . . generation plants."  *Id.*

---

[11] There was at least one other criminal prosecution that faced a vagueness challenge, but it was for commodities fraud, and it a lacks substantive analysis addressing vagueness.  *See, e.g., United States v. Flotron*, 2018 WL 1401986, at *5 (D. Conn Mar. 20, 2018).

Defendants raised a vagueness as-applied challenge to the criminal manipulation charge under Section 13(a)(2) of the CEA. *Id.* at 1053.  The *Reliant* court, applying the four-prong test for manipulation, carefully reviewed the meaning of the term "artificial pricing" in the second prong and asked whether a person of ordinary intelligence could understand defendants' conduct to constitute "artificial pricing." *Id.* at 1056.  Defendants contended that withholding "one's own product from the market" was not artificial but a legitimate act reflecting supply and demand.  *Id.* at 1059.  While the court agreed, it noted that other deceptive acts were alleged – that defendants shut down several of its power plants, exacerbated the supply shortage by buying additional electricity, and disseminated false and misleading rumors regarding its supply.  *Id.*  Although the question of whether a market force is "legitimate might be debatable in any given case," the Court found undebatable the illegitimacy of the false and misleading rumors – "[t]he dissemination of false information into a commodities market has long been recognized as a form of price manipulation." *Id.* at 1058 (citing *In re Soybean Futures Litigation*, 892 F. Supp. 1025, 1045-47 (N.D. Ill. 1995)).

By contrast, in *Radley*, the government alleged that defendants, former British Petroleum ("BP") traders in natural gas liquids such as TET propane, conspired to (1) "acquire dominance in the 2004 TET propane market"; and (2) "withhold a portion of TET propane from sale in order to artificially inflate its price."  659 F. Supp 2d . at 807.  Their alleged goal was to enrich BP, which would, in turn, enrich defendants because they would "obtain[e] bonuses based on BP's profits generated from the sales of TET propane at artificially high prices." *Id.*  To execute their plan, defendants "used BP's resources to buy contracts for delivery of large amounts of TET propane, even though BP had no commercial need for TET propane." *Id.*  These large purchases gave BP a dominant long position; thus, if the cost of TET propane increased, BP

would be entitled to buy it at a "previously negotiated lower price." *Id.* To capitalize on BP's

dominant long position, defendants allegedly "misled the market" about the "true supply" of

TET propane by presenting "show" offers designed to "falsely convey" that BP wished to sell

propane while simultaneously presenting multiple bids to buy on Chalkboard, an electronic

trading platform. *Id.* This created the impression that multiple counterparties wished to buy

propane. *Id.* After achieving the desired price increase, defendants would then sell TET propane

at this increased price. *Id.*

      In dismissing the indictment, the *Radley* court applied the four-prong manipulation test

and found the government's allegations regarding the second element – whether "an artificial

price existed" – too uncertain, making the CEA manipulation statute "unconstitutionally vague

as applied to the facts of [the] case." *Id.* at 813. The question was, "has the government alleged

behavior clearly outside of the 'legitimate' forces of supply and demand?" *Id.* at 814. The court

answered "no." First, trading to make profit from "the movements in the price of TET propane"

is "legitimate." *Id.* Second, although the government alleged that defendants "took substantial

pains to conceal . . . the truth about their purchasing of TET propane[,]" they failed to allege

"that defendants lied about their activity." *Id.* ("Mere concealment is not sufficient to show that

their actions were not legitimate forces of supply and demand."). The court also addressed

defendants alleged trading activity on Chalkboard. *Id.* at 815. Defendants posted numerous bids

at the highest prevailing price ("best bids") and also posted multiple bids at the same time

("stacked bids") that successfully increased the TET propane price artificially. *Id.* While the

court deemed the trading activity allegations to be the government's best argument, the court still

found these allegations unpersuasive because the best bids and stacked bids did not amount to

misrepresentations or lies.  *Id.*  Indeed, when defendants' bids were successful, "defendants actually went through with the transactions."  *Id.*

As described above, survival of the indictment in these two cases turned on whether the defendants disseminated "false information into a commodities market" because such conduct is "unquestionably encompassed by the concepts of price manipulation and price artificiality." *Reliant Energy Servs. Inc.*, 420 F. Supp. 2d at 1058; *Radley*, 659 F. Supp. 2d at 815 (quoting *Reliant*).

Mr. Eisenberg allegedly sold himself MNGO Perpetuals on Mango Markets, thereby giving him a long position on MNGO's value relative to USDC.  (Ind. ¶ 16.)  Mr. Eisenberg then allegedly purchased millions of MNGO with USDC and USDT[12] to raise MNGO's value relative to USDC and therefore raise the value of the Perpetuals he allegedly sold himself.  (*Id.* ¶¶ 17, 18.)  Once the value of the Perpetuals rose, he was allegedly able to borrow large amounts of cryptocurrency from Mango Markets and withdraw it to different accounts.  (*Id.* ¶¶ 19, 20.)

Mr. Eisenberg's alleged trading tactics are akin to the bidding tactics in *Radley*.  Just like the "best bids" and "stacked bids" were not misleading because they were "actually bids" in that the defendants went through with the transactions when their bids were accepted, Mr. Eisenberg's alleged trades were not misleading because they were real trades – he actually bought the MNGO tokens.  (Ind. ¶ 17); *cf. Radley*, 659 F. Supp. 2d at 815.  Moreover, while the government asserts that Mr. Eisenberg's long and short MNGO perpetual positions were "artificial," this is incorrect – the indictment confirms that he stood to lose or gain on the long

---

[12] USDT, also known as Tether, is another digital asset; it is a digital stablecoin pegged at one to one ratio with a matching fiat currency.

position and does not allege any differently for the short position.  (*Compare* Ind. ¶ 16 *with* ¶ 23.)

Most importantly, as discussed above, there is no allegation that Mr. Eisenberg made false or misleading statements to impact the price of MNGO.[13]  In other words, even assuming the allegations in the indictment as charged, Mr. Eisenberg stood to lose or gain like any market participant.  Without false statements – which are not alleged – the term "manipulation" is unconstitutionally vague and capable of sweeping in legitimate conduct that is part of the lawful operation of the markets.  The allegedly "manipulative" trading alone then, which shifted MNGO's price in a favorable direction, would not be understood to be clearly prohibited by a person of ordinary intelligence.  *Compare Radley*, 659 F. Supp. 2d at 816 ("Acting in a manner that shifts the price of a commodity in a favorable direction is the business of profit-making enterprises, and if it is done without fraud or misrepresentation, it does not clearly violate the CEA"), *with Reliant Energy Servs. Inc.*, 420 F. Supp. 2d at 1059 (finding critical to its holding that the CEA was not unconstitutionally vague because "defendants are charged with the dissemination of false and misleading rumors and information to . . . brokers and other traders regarding the availability and maintenance status of Reliant's power plants." (citations and

---

[13] To purportedly illustrate Mr. Eisenberg's intent behind, and concealment of, the allegedly manipulative scheme, the government alleges he misrepresented his intentions to borrow from Mango Markets and used false personal identifiers and location information to further the scheme – he transferred USDC to an account "registered to a different person with a foreign address."  (Ind. ¶¶ 15, 23).  Whether Mr. Eisenberg intended to borrow from Mango Markets and whether his name was on the accounts used had no bearing on the price of MNGO or the Perpetuals during the scheme.  As such, these alleged actions are insufficient to show that the transactions were governed by anything other than legitimate forces of supply and demand and provide no support for the government's assertion that an artificial price was created.  *See Reliant Energy Servs. Inc.*, 420 F. Supp. 2d at 1067 (the inquiry of whether a price is artificial "focuses primarily upon whether illegitimate forces are at work in the marketplace"); *Radley*, 659 F. Supp. 2d at 814-15 ("Mere concealment is not sufficient to show that [one's] actions were not legitimate forces of supply and demand.").

internal quotations omitted), *and Cargill, Inc. v. Hardin*, 452 F.2d 1154, 1163 (8th Cir. 1971) (explaining that "the floating of false rumors which affect futures prices" is "one of the most common manipulative devices").  Moreover, the defense has found no criminal case in which a court has applied the CEA to conduct such as the trading activity here.

Under these circumstances, a person of ordinary intelligence, reading the statutes and regulations at the time of the conduct alleged, would not have understood the trades in this case to be illegal.  The lack of criminal prosecutions of these statutes and regulations, combined with those statutes and regulations being held unconstitutionally vague as applied to the facts of *Radley*, which are analogous to those alleged here, demonstrates that there was a lack of notice to Mr. Eisenberg that the trades here were criminal.

> **2.     The Government Did Not Provide Fair Notice that the CEA Could Apply to the Mango Perpetuals**

The indictment should also be dismissed because Mr. Eisenberg lacked fair warning that the alleged trading of Perpetuals and withdrawal of assets against collateral, which were fully permissible under the open-source code that governed Mango Markets, constituted a crime.

The Due Process Clause protects individuals from being "required at peril of life, liberty or property to speculate as to the meaning of penal statutes."  *Lanzetta v. New Jersey*, 306 U.S. 451, 453 (1939); *see Bouie v. City of Columbia*, 378 U.S. 347, 351 (1964).  The Supreme Court has taken special care to require that penal statutes define criminal offenses with "sufficient definiteness that ordinary people can understand what conduct is prohibited."  *Kolender v. Lawson*, 461 U.S. 352, 357 (1983).  Mr. Eisenberg was not given fair warning that his conduct could be deemed "manipulative" and affect a "commodity."  As explained above, the government has not implemented any statute or regulation that would define "commodities"

under the CEA to include any digital assets, much less MNGO, the specific digital asset at issue here.

Due process "bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope." *United States v. Lanier*, 520 U.S. 259, 266 (1997).  In this case, the government's theory that the commodities laws reach the instant conduct is too novel to comply with due process and fair notice.  Dismissal of the indictment is therefore required.

### F. <u>Counts One and Two Should Be Dismissed Because the Statutory and Regulatory Reach of the Government Over the Mango Markets Protocol Presents a Major Question and Violates the Rule of Lenity</u>

The government, in charging that the alleged conduct is criminal under the commodities laws, has gone far beyond the power Congress authorized under the CEA.  Under *Chevron* deference and the major questions doctrine, Counts One and Two must be dismissed.  *See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984).

Here, the government attempts to charge commodities fraud and manipulation when no commodity was involved.  Under *Chevron* step one, the question is "whether Congress has directly spoken to the precise question at issue.  If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842-43.  As explained above, neither MNGO nor the Perpetuals have a futures market.  That should end the inquiry – Congress clearly did not intend the alleged conduct to be within the purview of the DOJ (or CFTC) under the CEA because Congress clearly defined commodity, and neither MNGO nor the Perpetuals come within that definition.  *See* 7 U.S.C. § 1a(9) (defining commodities as "goods and articles . . . and all services, rights, and interests . . . in which contracts for future delivery are presently or in the future dealt in").

To the extent the Court finds that ambiguity does exist, whether digital assets with no futures market, such as MNGO, are commodities, fails *Chevron* step two, which instructs that, "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843.  Whether an asset without a futures market can be a commodity is a novel issue. Now, the government seeks to criminally prosecute alleged price manipulation of such an asset. At least one court has questioned criminally prosecuting commodities manipulation at all:

> To be sure, a gap of two generations between enactment of a statute and prosecution under that statute is certainly a surprise.  If commodities price manipulation were sufficiently harmful to society to require a criminal prohibition, it seems strange that it would take the government this long to get around to enforcing the statute.

*Reliant Energy Servs. Inc.*, 420 F. Supp. 2d at 1054.

In other words, the government is "asserting highly consequential power beyond what Congress could reasonably be understood to have granted."  *West Virginia v. Env't Prot. Agency*, 142 S.Ct. 2587, 2609 (2022).  As such, "the Government must – under the major questions doctrine – point to 'clear congressional authorization' to regulate in that manner."  *Id.* at 2614 (quoting *Util. Air Regul. Grp. v. E.P.A.*, 573 U.S. 302, 324 (2014).  It cannot.  Absent congressional authorization to extend the reach of the CEA's criminal provisions to the conduct alleged, Counts One and Two must be dismissed.

Further, the rule of lenity also mandates that Counts 1 and 2 be dismissed. "[A]mbiguity concerning the ambit of criminal statutes should be resolved in favor of lenity.  *Rewis v. United States*, 401 U.S. 808, 812 (1971) (citations omitted).  The rule "is premised on two ideas: First, a fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed; second, legislatures and not courts should define criminal activity."  *Babbit v. Sweet Home Chapter of Communities for a Great Oregon*,

515 U.S. 687, 704 n.18 (1995) (citations and internal quotations omitted).  Here, the government

attempts to charge commodities manipulation based on allegations that Mr. Eisenberg

manipulated the price of MNGO, which is not a commodity because it has no futures market.

(Ind. ¶¶ 23, 25.)  This offends the rule of lenity because the CEA fails to provide notice that it

might apply to the alleged conduct.  Neither does precedent interpreting the CEA provide such

notice.  For example, there is no binding precedent that MNGO is a commodity.  In addition, the

reported criminal prosecutions for commodities manipulation each involve the manipulation of

an asset *with* a futures market at the time of enforcement. *See, e.g., Reliant Energy Servs., Inc.*,

420 F. Supp. 2d 1043 (electricity); *Radley*, 659 F. Supp. 2d 803 (natural gas liquid).  As noted,

regulators cannot agree on the legal classification of digital assets, in general, and the CFTC and

SEC even disagree on how to classify MNGO specifically – the SEC's civil complaint

categorizes MNGO as a security while the CFTC does not allege whether MNGO is either a

security or commodity.  *Compare* SEC Complaint *with* CFTC Complaint.

In sum, the indictment alleged a novel and expansive interpretation of the CEA's reach,

lacking support from any previously published regulation or case.  No reasonable person could

read the CEA and from that reading understand that the alleged conduct is criminal.  As such, the

government is asking the Court to define the alleged conduct as criminal, not the legislature,

which the rule of lenity protects against.  *United States v. Bass*, 404 U.S. 336, 348 (1971)

("[B]ecause of the seriousness of criminal penalties, and because criminal punishment usually

represents the moral condemnation of the community, legislatures and not courts should define

criminal activity.");  *see also Cleveland v. United States*, 531 U.S. 12, 24 (2000) (explaining that

it will not "approve a sweeping expansion of federal criminal jurisdiction in the absence of a

clear statement by Congress").  As such, Counts One and Two should be dismissed pursuant to

the rule of lenity.

### G.      The Wire Fraud Count Should Be Dismissed Because Mr. Eisenberg Did Not Make Any Material Misrepresentation or Omission and Did Not Deceive Anyone

Count Three, which alleges a violation of 18 U.S.C. § 1343, should also be dismissed

because the government has failed to allege any material misrepresentation or omission, which is

an essential element of the alleged crime.  The Sand model jury instruction for wire fraud

explains this element as follows:

> The first element that the government must prove beyond a reasonable doubt is that there was a scheme or artifice to defraud [the victim] of money or property (if applicable: or the intangible right of honest services) by means of false or fraudulent pretenses, representations, or promises.

Sand, Instruction 44-4 First Element-Existence of a Scheme or Artifice to Defraud.  The Second

Circuit has held that, without proving a material misrepresentation, the government cannot prove

the existence of such a scheme to defraud.  *United States v. Weaver*, 860 F.3d 90, 94 (2d Cir.

2017) (*citing* U.S. *ex rel. O'Donnell v. Countrywide Home Loans, Inc.*, 822 F.3d 650, 657 (2d

Cir. 2016)); *see also United States v. Rybicki*, 354 F.3d 124, 147 (2d Cir. 2003) (a scheme to

defraud must be "accompanied by a material misrepresentation . . . or omission").[14]

While no specific false statement is required, the indictment must still allege a deceptive

representation to properly plead wire fraud.  *See United States v. Connolly*, 24 F.4th 821, 833-34

(2d Cir. 2022) (government must prove "a scheme to engage in some form of deception, such as

a half-truth, *i.e.*, a 'representation stating the truth so far as it goes' [that is] misleading because

of the 'failure to state additional or qualifying matter' . . . or fraudulent omissions") (quoting

---

[14] *See supra* II (D)(2), for a discussion regarding analogous requirement in securities fraud cases that defendant make a material misrepresentation.

Restatement (Second) of Torts § 529 (1977)); *McLaughlin v. Anderson*, 962 F.2d 187, 192 (2d

Cir. 1992) ("The mail fraud statute requires some element of deception."); *see also McEvoy*

*Travel Bureau, Inc. v. Heritage Travel, Inc.*, 904 F.2d 786, 791 (1st Cir. 1990) ("[T]he scheme

must be intended to deceive another, by means of false or fraudulent pretenses, representations,

promises, or other deceptive conduct").

The indictment fails to allege any deceptive statement or any deceptive conduct facially

sufficient to charge wire fraud.  Mr. Eisenberg's alleged conduct was fully permitted on the

Mango Markets platform, and he deceived no one.  *See supra* II(B).

As discussed above, the government cannot cure the lack of an alleged material

misrepresentation or omission through the irrelevant allegations (Ind. ¶ 27 ) that Mr. Eisenberg

did not associate his own identity with certain accounts.  (*See Id.* ¶¶ 15(b), 17(b), 17(f).)  These

allegations lack any connection to the government's fraud claim.  As discussed above,

anonymity or programmer code names are common and accepted in the technology business and

within the blockchain community, and there is no alleged nexus between (1) the lack of Mr.

Eisenberg's identity on the Exchange-1 Account and Exchange-2 Account; and (2) the fact that

the collateral was permitted to be withdrawn.  Mango Markets had no processes that would have

prevented the withdrawal were Mr. Eisenberg's name used, and there was no deception that

would have changed or affected the amount of collateral withdrawn.  Indeed, the Second Circuit

has "drawn a fine line between schemes that do no more than cause their victims to enter into

transactions they would otherwise avoid—which do not violate the mail or wire fraud statutes—

and schemes that depend for their completion on a misrepresentation of an essential element of

the bargain—which do violate the mail and wire fraud statutes."  *United States v. Shellef*, 507

F.3d 82, 108 (2d Cir. 2007).  If a representation is not directed at the "nature of the bargain," it

cannot constitute any "scheme to defraud." *United States v. Regent Off. Supply Co.*, 421 F.2d 1174, 1179 (2d Cir. 1970) (reversing convictions for mail fraud because "solicitation of a purchase by means of false representations not directed . . . to the nature of the bargain" does not "constitute a scheme to defraud") (internal quotations omitted).

Here, the government has not and cannot allege that the success of Mr. Eisenberg's alleged scheme "depended" on his alleged misrepresentations involving the Exchange-1 and Exchange-2 Accounts. Moreover, those accounts remain entirely disconnected from Mango Markets – so any related representations could not possibly speak to the "nature" of any "bargain" between Mr. Eisenberg and Mango Markets, either. Simply put, the government cannot prove that the alleged lack of disclosure of account identity had anything to do with the success of the alleged crime, so the allegations do not amount to a material misrepresentation or omission.

***

For the above reasons, Mr. Eisenberg respectfully requests that the Court dismiss the indictment with prejudice.

### III.    MOTION TO SUPPRESS

#### A.    <u>Introduction</u>

Mr. Eisenberg moves for suppression of evidence from his four digital devices: a Razer Blade 17 Pro laptop computer, a Oneplus 9 Pro smartphone, and two Samsung smartphones (collectively, the "Subject Electronics"). He also moves for suppression of identification cards and other documents as well as other items taken from the luggage he was carrying at the airport at the time of his arrest ("Luggage Items"). Despite Mr. Eisenberg possessing an expectation of privacy in these items, the government failed to meet its requirement to obtain a warrant prior to the search and seizure of the Subject Electronics and Luggage Items.

On no fewer than eight occasions, the government, via law enforcement agents, asserted in written paperwork related to its collection and review of the Subject Electronics and Luggage Items, including a later-filed search warrant application for the Subject Electronics, that the items were seized incident to arrest, implying that the search and seizure was excused from the warrant requirement.[15]  However, a review of the relevant facts demonstrates that this assertion is inaccurate.  Mr. Eisenberg's property was taken from his still-closed luggage well after he was dispossessed of it, and likely well after his arrest.  While the defense currently does not know exactly when the luggage was opened and searched and the items seized by the Federal Bureau of Investigation ("FBI"), the intrusion occurred at a time when Mr. Eisenberg was not in the same room as the luggage, let alone within arm's reach of the bags.  Consequently, The search incident to arrest exception does not apply, and the seizure was unlawful.

The subsequent search of the Subject Electronics was unlawful for the additional reason that the government unreasonably delayed seeking a search warrant to review the contents of the devices.  Despite having obtained a Complaint and arrest warrant prior to the arrest of Mr. Eisenberg which contained all of the relevant facts later used in the search warrant, the government delayed obtaining a warrant for approximately twenty-four days.  During that time, one or more agents from the FBI clearly expressed to Mr. Eisenberg both orally and in writing that the Subject Electronics had been seized, and he could not recover them.  As a result, Mr. Eisenberg could not manage his investment or bank accounts, even via an intermediary, lost access to funds he needed for various purposes, including paying for and preparing his legal defense, and lost substantial sums of money on investments that he could not sell.  There appears

---

[15] Notably, while the government has repeatedly asserted the applicability of the search incident to arrest doctrine, it has not asserted, and seemingly conceded, the application of any other exception to the warrant requirement.

to be no reasonable explanation for the delay.  The record contains no evidence of any exigent matters in this case taking precedence over Mr. Eisenberg's substantial interest in the Subject Electronics.  Nor were there any apparent issues of lack of manpower or insufficiency of law enforcement or judicial resources to obtain a warrant.  Just the opposite, the government was represented in this case by the largest and most powerful United States Attorney's Office ("USAO") in the country, working in conjunction with the FBI, at least two other  major investigative agencies, and two civil regulatory enforcement agencies, the CFTC and SEC. Indeed, the government's investigative and prosecutorial "firepower" in this case was remarkable, particularly in light of the fact that the matter involved only a single defendant.

Rather than marshal the extraordinary resources at its disposal to expeditiously seek a warrant to review the Subject Electronics, an obligation forcefully articulated by the Second Circuit and other courts, the government chose to prioritize other investigative priorities unconnected to the protection of Mr. Eisenberg's property rights.  Indeed, the government obtained at least one other search warrant in the interim – for social media account information – setting out almost all of the same facts required for a search warrant to review the Subject Electronics.  At approximately the same time, the CFTC charged Mr. Eisenberg in a detailed civil complaint.  All the while, the government sat on the unlawfully seized Subject Electronics to Mr. Eisenberg's substantial detriment.

The Subject Electronics and Luggage Items should thus be suppressed because they were seized without a warrant in violation of Mr. Eisenberg's Fourth Amendment rights. Furthermore, the Subject Electronics should also be suppressed under the separate ground that the government unreasonably delayed seeking and executing a search warrant in violation of the doctrine set forth in *United States v. Smith*, 967 F.3d 198, 202 (2d Cir. 2020) and its progeny.

### B.    The Unlawful Search and Seizure of Mr. Eisenberg's Devices

Mr. Eisenberg arrived at Puerto Rico's Luis Munoz Marin International Airport on the

evening of December 26, 2022.  Affidavit of Avraham Eisenberg ("Aff.") ¶ 2.  Unbeknownst to

him at that time, he had been charged in a sealed Complaint on December 23, 2022, with

commodities fraud, commodities manipulation, and market manipulation, and a warrant had been

issued for his arrest.  Dkt. 1 (Complaint); Ex. A[16] (arrest warrant).  Mr. Eisenberg disembarked

from the plane with a backpack and a suitcase and made his way towards customs and

immigration.  Aff. ¶ 3.

Once at the customs counter, a Unites States Customs and Border Protection ("CBP")

agent questioned Mr. Eisenberg regarding the purpose of his trip and the general contents of his

luggage.  Aff. ¶ 4.  The CBP agent then directed Mr. Eisenberg to an area several feet away from

the Customs counter for additional questioning, and there another CBP officer opened the

suitcase and backpack.  Aff. ¶ 5.  After looking through the contents of Mr. Eisenberg's luggage

and asking questions about a few of the items within, this CBP officer returned the few items he

had removed to the luggage, and the search concluded.  *Id.*

After speaking with the customs agents, Mr. Eisenberg was escorted into a private room

away from the customs hall and separated from his luggage, which remained closed and in the

customs hall.  Aff. ¶¶ 6-7.  There were several agents in the room with him.  Aff. ¶ 6.  Mr.

Eisenberg has not personally seen his luggage or any of its contents since that time.  Aff. ¶ 7.

Upon entry into the room, Mr. Eisenberg was shown a warrant for his arrest.  Aff. ¶ 9.

He was ordered to empty his pockets, patted down, and one cell phone and a wallet were taken

from his person.  *Id.*  Mr. Eisenberg was then placed in handcuffs.  *Id.*  From there, he was

---

[16] Unless specifically denoted otherwise, "Ex. _" refers to exhibits attached to the July 28, 2023,
Declaration of Sanford Talkin ("Decl.").

escorted through a back entrance out of the airport and placed into a car, which transported him out of the airport and to the local police station where he was lodged overnight.  Aff. ¶ 10.

The following morning, December 27, 2022, Mr. Eisenberg was taken by FBI agents to the FBI's San Juan Field Office.  Aff. ¶ 11.  There, Special Agent Michael Crawford ("SA Crawford") showed Mr. Eisenberg two photos, which together showed his three cell phones.  *Id.* In addition to the three cell phones – on having been on his person and two having been in his luggage – Eisenberg also had one laptop computer and power cord, which were not in the photos but he soon thereafter learned had been removed from the luggage.  Aff. ¶¶ 11-12.  Mr. Eisenberg did not witness the removal of any of his four electronic devices (collectively, "the Subject Electronics") from his luggage and was not informed by law enforcement when these items had been removed.  Aff. ¶ 11.  Nor was he informed whether law enforcement had done any further searching of his luggage while accessing the backpack and suitcase and removing the electronics.  *See id.*

At the FBI Field Office, SA Crawford presented Mr. Eisenberg with and a handwritten "Receipt for Property," Aff. Ex. A, which listed:

- a charcoal grey Hasselblad cell phone with a [1] logo;

- a charcoal grey Samsung cell phone (IMEI:[17]357111200989170);

- a white Samsung cell phone; and

- a black and green Razer laptop computer and power cord.

---

[17] IMEI stands for International Mobile Equipment Identity and is a 15-digit number unique to each phone, the equivalent of a device's fingerprint.  *See https://www.verizon.com/articles/prepaid-and-cpo/what-to-know-when-buying-a-used-phone/#:~:text=An%20IMEI%20stands%20for%20International,number%20unique%20to%20each%20device.*

The receipt was dated December 26, 2023, [18] and indicated that the items had been "Collected/Seized" – rather than being "Returned to" or "Released to" Mr. Eisenberg. *Id.* Both Mr. Eisenberg and SA Crawford signed the Receipt for Property. Aff. ¶ 14. The document appeared to indicate that it had been SA Crawford who had seized the electronics because SA Crawford, in Mr. Eisenberg's presence, signed the receipt on behalf of the government. Aff. Ex. A; Aff. ¶¶ 12, 14. The document indicated only that the collection/seizure of the Subject Electronics had occurred at the airport, but it offered no details about any of the electronics having been within luggage, let alone specifically which ones and when and where they were removed from the luggage. Aff. Ex. A. Mr. Eisenberg was also presented with a second property receipt, also handwritten, which indicated that the suitcase and backpack were "seized" from him at the airport on December 26, 2022. Aff. Ex. A; Aff. ¶ 13. Both Mr. Eisenberg and SA Crawford also signed this second property receipt. Aff. ¶ 14.

From his present circumstances and the Receipt for Property documents he had signed, Mr. Eisenberg understood that he could not get back any of the Subject Electronics. Aff. ¶ 16. Nevertheless, he asked SA Crawford later that day about his luggage items, including his devices, and Agent Crawford stated that Mr. Eisenberg's family or attorney could get the rest of his luggage back, but the Subject Electronics had been seized and would be sent to an FBI office on the mainland of the United States and held there. Aff. ¶ 17. This conversation confirmed Mr. Eisenberg's understanding that neither he nor his family could recover any of the seized devices.

---

[18] The date on the Receipt for Property appears to have been changed from December 27, 2023, to December 26, 2023, a change initialed by SA Crawford. Aff. Ex. A. The reason for the date change is unclear, particularly in light of the fact that the initial date correctly reflected (and the edited date incorrectly reflected) the date on which Mr. Eisenberg signed the Receipt. Aff. ¶¶ 11-14.

*Id.*  Mr. Eisenberg instructed his local attorney in Puerto Rico to attempt to recover the luggage and to give it to his family, but the luggage was never returned.  Aff. ¶ 18.

In a "Collected Item Log" dated December 28, 2022, and drafted by SA Crawford and approved by Supervisory Special Agent Christine Perez ("SA Perez"), the Subject Electronics were listed as being "Collected" on December 26 at 6:30 pm – an hour before Mr. Eisenberg was allegedly arrested – at an unspecified location.  Ex. C.  The Log stated that the Subject Electronics were "Locate[d] by" and "Seize[d] by" SA Perez.  *Id.*  The form also stated twice that the items were acquired pursuant to a "Search incident to arrest" of Mr. Eisenberg.  *Id.* There was no indication on the form of whether these items were removed from Mr. Eisenberg's luggage or what role, if any, SA Crawford played in the seizure of the Subject Electronics.  *See id.*

SA Crawford also prepared a Form FD-302 ("302") on December 28, 2022, which described, among other things, Mr. Eisenberg's arrest.  Ex. B.  According to the 302, SA Crawford, SA Perez, and three other agents, two from the FBI and one from Homeland Security, were involved in the arrest of Mr. Eisenberg at approximately 7:30 pm at Luis Munoz Marin Airport.  *Id.*  The 302 further stated that "[a]gents conducted a search incident to arrest and [Mr. Eisenberg's] luggage and personal items were seized."  *Id.*  The 302 did not clearly state where or when the luggage was searched, though it could be read to indicate that this occurred at the airport, and it omitted the fact that Mr. Eisenberg was not present at the time of the search and seizure of his luggage.  *See id.*

In a separate "Collected Item Log" document dated January 4, 2023, and drafted by SA Crawford and approved by SA Perez, there was a detailed description of Mr. Eisenberg's luggage, consisting of a "[b]lue suitcase" and a "[b]lack backpack with personal items."  Ex. D.

The luggage and personal items were listed as being "Collected" on December 26 at 6:30 pm – an hour before Mr. Eisenberg was allegedly arrested – at an unspecified location. *Id.* The Log stated that they were "Locate[d] by" and "Seize[d] by" SA Crawford. *Id.* The paperwork provided no explanation of the apparent discrepancy that when the luggage was opened, SA Perez located and seized the electronics, but SA Crawford was reported to have located and seized everything else, apparently at or around the same time. *See id.*; Ex. C.

The Log listed various items, including credit cards and identification cards, taken from the luggage, some of which were assertedly contained in "a plastic bag" within the luggage. Ex. D. There was no information as to when these items were removed from the luggage (or the plastic bag). This Log also stated twice that the items were acquired in a "[s]earch incident to arrest." *See id.*

On January 6, 2023, the government applied for a search warrant ("First Warrant") for stored electronic communications associated with Mr. Eisenberg's social media accounts and email addresses. Ex. I. The First Warrant application affidavit was sworn by Special Agent Brandon Racz ("SA Racz") and was 47 pages long. *Id.* It included detailed information about, among other things, the nature of the alleged criminal conduct, the training of SA Racz in investigating financial crimes, and the connection between the alleged criminal conduct and electronically stored information. *Id.* Magistrate Judge Sarah Netburn approved the First Warrant that same day. *Id.* The First Warrant included no mention of the Subject Electronics. *See id.*

On January 19, 2023, Mr. Eisenberg's attorney sent a formal letter to the government noting the seizure of "various items including luggage (with clothes, toiletries, etc.) and digital devices (which, we understand, include three smartphones)" and requested that "everything [be]

promptly returned."  Ex. K.  The letter reiterated that "Mr. Eisenberg, of course, does not consent

to the search of any of the items seized upon his arrest (*e.g.*, the digital devices) or any other

seized items (*e.g.*, communications and materials obtained through search warrants)" and

reserved his right to challenge the searches and seizures of such items.  *Id.*

That same day, January 19, 2023, the government applied for another search warrant

("Second Warrant") to search the Subject Electronics.  Ex. J.  The application affidavit stated

that law enforcement officers arrested Mr. Eisenberg on December 26, 2022, at the airport in

Puerto Rico after he had returned to the United States from Israel.  *Id.*  The affidavit further

stated that "[i]n connection with the arrest, officers seized the Subject Devices."  *Id.*  The

affidavit did not disclose that three of the four devices were in Mr. Eisenberg's luggage or offer

any description of how and when the items were removed from Mr. Eisenberg's person or

luggage.  *See id.*  The affidavit also offered no explanation for the 24-day delay in obtaining a

search warrant.  *See id.*  The Second Warrant was issued that same day by Magistrate Judge

Barbara Moses.  *Id.*  The government thereafter conducted a forensic examination of the Subject

Electronic and seized a vast number of communications and documents, most of which it has

now produced as evidence in this prosecution.

According to two separate 302s, both dated January 30, 2023, SA Racz and Special

Agent Gurdeep Singh ("SA Singh") made copies of identification documents and other

"miscellaneous" documents in New York on January 27, 2023.  Ex. E, Ex. L.  The 302s stated

that these documents were "collected from Mr. Eisenberg during his arrest on December 26,

2022," a statement potentially in tension with the Collected Item Log from January 4, 2023,

which described the documents as having been taken from Mr. Eisenberg's luggage and a plastic

bag therein.  *Compare id. with* Ex. D.  There was no documentation relating to the transport of

Mr. Eisenberg's luggage and documents from Puerto Rico to New York.  Mr. Eisenberg has been

unable to recover his luggage or any of its contents.  Aff. ¶ 7.  Despite having apparently

rummaged through his luggage and having removed and copied some of the items found therein,

the government has not to date applied for a search warrant relating to the luggage or its

contents.

      **C.**    <u>**The Warrantless Search and Seizure of Mr. Eisenberg's Luggage Was
Unlawful**</u>

          **1.**    **Legal Standard**

The Warrant Clause of the Fourth Amendment of the United States Constitution "protects

people from unreasonable government intrusion into their legitimate expectation of privacy."

*United States v. Chadwick*, 433 U.S. 1, 7 (1977), *overruled on other grounds by California v.*

*Acevedo*, 500 U.S. 565 (1991).  It is bedrock constitutional law that the government must have a

search warrant to search and seize a person's property unless it can demonstrate the application

of a recognized exception to the requirement by a preponderance of the evidence.  *Arizona v.*

*Gant*, 556 U.S. 332, 338 (2009).  One such exception is that the government may conduct certain

types of searches incident to a lawful arrest.[19]  *See, e.g., Id.* at 343 (2009); *Chimel v. California*,

395 U.S. 752, 763 (1969).  In authorizing the search incident to arrest exception, the Supreme

Court has stated that "[w]hen an arrest is made, it is reasonable for the arresting officer to search

the person arrested in order to remove any weapons [and] it is entirely reasonable for the

arresting officer to search for and seize any evidence on the arrestee's person in order to prevent

its concealment or destruction."  *Id.*  Searches incident to arrest are thus confined geographically

---

[19] As noted above, law enforcement officers asserted at least eight times on various FBI forms
and applications that their seizure of Mr. Eisenberg's electronics and luggage was done incident
to arrest, without having ever attempted to explain the circumstances under which those seizures
took place.

to "the area within [the arrestee's] immediate control – construing that phrase to mean the area from which he might gain possession of a weapon or destructible evidence.  There is no comparable justification, however, for routinely searching any rooms other than that in which an arrest occurs."  *See id.* (finding thorough search of entire house unlawful because the search "went far beyond the petitioner's person and the area from within which he might have obtained either a weapon or . . . evidence").

It is well established that individuals have an expectation of privacy regarding the contents of their luggage such that the warrant requirement attaches to luggage and its contents. *See*, *e.g.*, *United States v. Haqq*, F. Supp. 2d 383, 389 (S.D.N.Y. 2002) (excluding gun found in warrantless search of suitcase and noting that "society recognizes [] an expectation [of privacy] in a suitcase that one takes with him for a two-week trip, packs his belongings therein, and treats as his own, even if it is borrowed from a roommate") (citing *Arkansas v. Sanders*, 442 U.S. 753, 762 (1979), *overruled on other grounds by California v. Acevedo*, 500 U.S. 565 (1991)).

## 2.     Discussion

Law enforcement's searches of the suitcase and backpack after Mr. Eisenberg's arrest were unlawful as they were "'remote in time [and] place from the arrest, [and] no exigency exist[ed].'"  *United States v. Javat*, 549 F. Supp. 3d 1344, 1355 (S.D. Fla. 2019) (quoting *Chadwick*, 433 U.S. at 15) *adopted by United States v. Javat*, No. 18 Cr. 20688 (DMB) (CM), 2019 WL 3729060 (S.D. Fla Aug. 8, 2019).  The recovered evidence should thus be excluded.

On the current record, including the discovery produced to date, it is unclear whether it was SA Crawford or his supervisor, SA Perez, that was the first law enforcement agent to search Mr. Eisenberg's suitcase and backpack.  And while it is also not entirely clear when and where the search or searches occurred, and more specifically, whether they occurred at the airport, at the FBI office, or somewhere else, it is clear that the search occurred at a time and place when

Mr. Eisenberg was not in the same room, let alone in proximity to his luggage.  Indeed, Mr. Eisenberg did not witness law enforcement's search of his luggage.  His belongings were taken from him prior to his being escorted to a private room at the airport, shown an arrest warrant, handcuffed, and arrested, while his closed luggage remained in the customs hall.  On the current record, all that can be stated as to the timing of the search is that it occurred sometime after Mr. Eisenberg was escorted to the private room and arrested on the evening of December 26, 2022, and sometime before he was shown pictures of the cell phones and asked to sign Receipts for the Subject Electronics and the Luggage Items the next day at the San Juan, Puerto Rico FBI Field Office.  At the time of the search, the luggage was not even in the same room as Mr. Eisenberg, let alone within his grasp or otherwise in "the area within his immediate control."  *Chimel v. California*, 395 U.S. 752, 793 (1969).  There was no threat that Mr. Eisenberg would grab a weapon or other dangerous instrument or that he would be able to destroy evidence.  By the time that SA Crawford and/or SA Perez searched the luggage, it was in the exclusive control of law enforcement, Mr. Eisenberg having been long divested of the bags.

Under the circumstances, the only reasonable course of action was for SA Crawford and/or SA Perez to apply for a warrant to search the luggage, which the government did not do. Conversely, it was unreasonable for those agents (and later SA Racz and SA Singh) to search the bags knowing that they did not have a warrant to do so.  As the Supreme Court has stated, "Once law enforcement officers have reduced luggage or other personal property not immediately associated with the person of the arrestee to their exclusive control, and there is no longer any danger that the arrestee might gain access to the property . . . a search of that property is no longer an incident of the arrest."  *Chadwick*, *433 U.S.* at 15.

Because the government failed to obtain a warrant and cannot meet its burden to establish that the search of Mr. Eisenberg's luggage falls within the search incident to arrest exception to the warrant requirement, the items recovered from Mr. Eisenberg's luggage, including the Subject Electronics and the Luggage Items should be excluded.

Moreover, while there was one electronic device – a cell phone – that the government recovered from Mr. Eisenberg's pocket and therefore arguably did not obtain as the result of the unlawful search, there is no evidence with which to identify this specific device.  Indeed, both the Receipt for Property and Collected Item Log documents group all four electronic devices together without distinguishing which three were in the luggage and which one was not. Likewise, the Second Warrant grouped all of the Subject Electronic and stated only that all four were seized "in connection with the arrest."  Ex. J.  "When the government seizes an individual's property, it must make a clear record and chain-of-custody of that seizure and retention of evidence, especially so when that evidence is fungible or subject to exchange."  *Javat*, 549 F. Supp. 3d at 1357.  Having failed to do so and unable to identify the particular cell phone taken from Mr. Eisenberg's person, the government has failed to meet its burden and should be precluded from using any evidence derived from the unlawful search of all of the Subject Electronics.  *See id.* (excluding cell phone lawfully seized from defendant's person in addition to four cell phones seized from his messenger bag in airport seizure because the government was "unable to identify that particular Samsung cell phone that was lawfully seized incident to arrest").

### D.   The Government's Twenty-Four-Day Delay In Applying For A Search Warrant Was Unreasonable

Setting aside the government's unlawful collection of the devices, evidence obtained from the Subject Electronics should be excluded for a second, independent reason.  Rather than

move for a warrant expeditiously to begin the forensic review of the four devices taken from Mr. Eisenberg, the government waited more than three weeks, a period recognized by numerous courts as excessive.  While this delay was occurring, Mr. Eisenberg and his family were denied access to the devices, effectively stripping them of control of various cryptocurrency and other investment accounts that Mr. Eisenberg was actively managing, costing him millions of dollars in losses.  *See* Aff. ¶¶ 22-28.  There appears to be no reasonable explanation for the government's delay in this case.  Unlike several other cases involving this issue where a delay was found to be reasonable, here the government appears to have had no serious impediment to obtaining a search warrant immediately.  It knew all of the relevant information needed to obtain such a warrant well before Mr. Eisenberg's arrest, the case involved no more immediate tasks than the search warrant application, and there were no manpower concerns.  Rather, the record indicates that the government simply did not prioritize applying for a search warrant, despite the clear and forceful admonition from the Second Circuit in *United States v. Smith*, 967 F.3d 198, 202 (2d Cir. 2020), that such investigatory and prosecutorial conduct would likely result in the exclusion of evidence.

### 1.    Legal Standard

While it is common for law enforcement to seize a suspect's personal property if they have probable cause, the Fourth Amendment requires that they act diligently in applying for a search warrant.  *Id* at 202  ("The right of the police to seize a person's property pending the issuance of a search warrant presupposes that the police will act with diligence to apply for the warrant."); *United Stats v. Martin*, 157 F.3d 46, 54 (2d Cir. 1998) ("[E]ven a seizure based on probable cause is unconstitutional if police act with unreasonable delay in securing a warrant."); *United States v. Sparks*, 806 F.3d 1323, 1340 (11th Cir. 2015) ("[I]f after seizing an item, law enforcement unreasonably delays obtaining a warrant to search the item, a reasonable seizure can

become unreasonable.") (citation omitted), *overruled on other grounds by United States v. Ross*, 963 F.3d 1056, 1057 (11th Cir. 2020) (en banc).  Courts "demand expediency in obtaining a search warrant to search evidence in order to avoid interfering with a continuing possessory interest for longer than reasonably necessary, in case the search reveals no evidence (or permissibly segregable evidence) of a crime and the item has no independent evidentiary value and is not otherwise forfeitable."  *United States v. Mitchell*, 565 F.3d 1347, 1352 (11th Cir. 2009).

Recently, the Second Circuit and other courts have repeatedly and clearly signaled that the requirement for diligence is paramount with respect to personal electronics, particularly cell phones, because of both the ubiquity of their warrantless seizure and because of the heightened property interest individuals have in their electronic devices.  *See Smith*, 967 F.3d at 207 ("[W]e have recognized the special concerns that apply when law enforcement seize and search people's personal electronic data and communication devices.  'Tax records, diaries, personal photographs, electronic books, electronic media, medical data, records of internet searches, banking and shopping information – all may be kept in the same device, interspersed among the evidentiary material that justifies the seizure or search.'") (quoting *United States v. Ganias*, 824 F.3d 199, 218 (2d Cir. 2016) (en banc).  The Supreme Court has also recently recognized the heightened property interest implicated by law enforcement seizure of a person's cell phone:

> The storage capacity of cell phones has several interrelated consequences for privacy. First, a cell phone collects in one place many distinct types of information – an address, a note, a prescription, a bank statement, a video – that reveal much more in combination than any isolated record. Second, a cell phone's capacity allows even just one type of information to convey far more than previously possible. The sum of an individual's private life can be reconstructed through a thousand photographs labeled with dates, locations, and descriptions; the same cannot be said of a photograph or two of loved ones tucked into a wallet. Third, the data on a phone

> can date back to the purchase of the phone, or even earlier. A person might carry in his pocket a slip of paper reminding him to call Mr. Jones; he would not carry a record of all his communications with Mr. Jones for the past several months, as would routinely be kept on a phone. Finally, there is an element of pervasiveness that characterizes cell phones but not physical records. . . . Today . . . it is no exaggeration to say that many of the more than 90% of American adults who own a cell phone keep on their person a digital record of nearly every aspect of their lives – from the mundane to the intimate.

*Riley v. California*, 573 U.S. 373, 393 (2014) (remarking that "modern cell phones" are "such a pervasive and insistent part of daily life that the proverbial visitor from Mars might conclude they were an important feature of human anatomy"); *Carpenter v. United States*, 138 S. Ct. 2206, 2210 (2018) ("Cell phones and the services they provide are such a pervasive and insistent part of daily life that carrying one is indispensable to participation in modern society.").

In *Smith*, the Second Circuit set forth four factors "generally relevant to whether the police have waited an unreasonable amount of time before seeking a search warrant: (1) the length of the delay, (2) the importance of the seized property to the defendant, (3) whether the defendant had a reduced property interest in the seized item, and (4) the strength of the state's justification for the delay." 967 F.3d at 206. Evaluation and balancing of these factors in relation to the facts of this case weighs in favor of exclusion of the Subject Electronics.

## 2.      First Factor: Lengthy of Delay

Mr. Eisenberg was arrested on December 26, 2022, and his devices were seized at or around that time. The next day he was shown pictures of his cell phones and signed a receipt for his devices. Yet, despite having extraordinary resources at its disposal, the government did not apply for and receive a warrant to search the Subject Devices until January 19, 2023. This significant delay of twenty-four days was without justification and unreasonable.

In *Smith*, the Second Circuit stated that the delay of a month – approximately seven days longer than the delay in this case – in applying for a search warrant to search the contents of a personal electronic device (a tablet) was "unreasonable *per se*" and "well exceeds what is ordinarily reasonable."  *Id.*  In doing so the Court noted the previous admonition it had given that "'[i]n some circumstances eleven days might well constitute an unreasonable delay,' and '***we*** ***would normally expect police officers to secure a search warrant in considerably less time*** ***than' eleven days***."  *Id.* (quoting *Martin*, 157 F.3d at 54) (emphasis added).  Since that time, virtually every court considering a delay similar in length to that at issue here has found that length unreasonable and determined that this factor favors exclusion.  *See, e.g.*, *United States v. Wells*, No. 20 Cr. 633(NRB), 2023 WL 2223474 at *3 (S.D.N.Y. Feb. 23, 2023) ("The length of both the 29-day and 48-day delays were presumptively unreasonable. . . . [T]his factor weighs in favor of Wells as to both delays."); *United States v. Hay*, No. 19 Cr. 170 (RJA), 2023 WL 142119 (W.D.N.Y. Jan. 10, 2023) (agreeing with Magistrate that 22-day delay "weighs in [defendant's] favor"); *Javat*, 549 F. Supp. 3d at 1358 (finding twenty-day delay "not insubstantial" and "weighs modestly in favor of Javat); *United States v. Tisdol*, 544 F. Supp. 3d 219, 226 (D. Conn. 2021) (holding delay of thirty-four days "well exceeds what is ordinarily reasonable"); *see also United States v. Mitchell*, 967 F.3d 198, 211 (11th Cir. 2009) (holding prior to *Smith* that delay of twenty-one days was unreasonable and demanded exclusion).

As the Second Circuit noted, "[I]f the police have probable cause to seize an item in the first place, there is little reason to suppose why they cannot promptly articulate that probable cause in the form of an application to a judge for a search warrant."  *Smith*, 967 F.3d at 207.  Here, the government has repeatedly asserted that it possessed probable cause for the search and seizure of the Subject Electronics.  Law enforcement could have, and should have, obtained a

search warrant for Mr. Eisenberg's electronics even before he was arrested.  In any event, there is no plausible argument that it reasonable should have taken the FBI more than a few days to obtain the necessary warrant.  Instead, the government held Mr. Eisenberg's electronic devices – already unlawfully seized, as described above – for over three weeks without applying for a warrant, unreasonably infringing on his important property interests.  The length of the delay therefore strongly favors exclusion of the Subject Electronics.

### 3.      Second Factor: Importance of the Property to Mr. Eisenberg

The second factor, the importance of the seized property to the defendant, also favors suppression.  While personal electronics are of significant importance to all people, they were of extreme importance to Mr. Eisenberg, a cryptocurrency trader whose entire personal and professional life revolved around his electronic devices.  *See* Aff. ¶ 19 (stating that he used the laptop "almost every day, usually for many hours each day"); ¶ 20 (stating that he "used each of the[] [cell phones] extensively to communicate with friends and contacts, to store a large amount of personal and business data, and to store and access financial accounts").  Indeed, Mr. Eisenberg lost what likely amounts to millions of dollars in assets by being deprived of access – direct and indirect – to the Subject Electronics.

Mr. Eisenberg acknowledges that his possessory interest in his phones and laptop was somewhat diminished by his incarceration and his resultant inability to personally possess his electronics.  Nevertheless, because of the unique facts of this case, he still maintained a substantial interest in this property.  As noted in *Javat*, "Had his family been allowed to keep those devices at the time of this arrest, [defendant] could have asked them to access information on his behalf."  549 F. Supp. 3d at 1358.  For Mr. Eisenberg that same ability would have been particularly important.  At the time of his arrest, Mr. Eisenberg was actively managing numerous short-term investments, both in volatile stocks and cryptocurrency.  Aff. ¶¶ 24-25.  A number of

those positions appear to have lost significant value.  *Id.*  Mr. Eisenberg wanted his family and attorneys to take possession of these accounts and convert them into more stable investments, including in interest-bearing vehicles.  *Id.*  However, Mr. Eisenberg and his representatives have been unable to access his investment accounts because they require unique passwords and two-factor authentication codes tied to his electronic devices.  *Id.*

Defense preparation was also inhibited in various ways by Mr. Eisenberg's inability to access the Subject Electronics during the relevant period.  He was unable to access many of his bank and investment accounts, which held funds he intended to use to hire experts, discovery review providers, and other vendors to assist his lawyers, thereby slowing down the preparation of his defense.  Aff. ¶¶ 23, 26-27.  He also permanently lost access to various communications that contained potentially helpful witness information and evidence because they were on phone applications that likely did not automatically preserve all content.  Aff. ¶¶ 29-30.

Upon his arrest, Mr. Eisenberg was immediately concerned about the taking of his electronics.  The morning following his arrest, while he was being processed at the FBI field office in Puerto Rico, Mr. Eisenberg was asked to sign a Receipt of Property for the electronics, which stated that the items were being seized and not returned.  Aff. ¶ 12, Ex. A.  Nevertheless, he asked SA Crawford that day about his electronics.  Aff. ¶ 17.  SA Crawford responded that they were being seized and sent to an FBI office in the mainland United States.  *Id.*  In other words, Mr. Eisenberg was told (both orally and in writing) in no uncertain terms that he would not be getting his electronic devices back.  Even though he knew with near certainty that he would not be able to recover the Subject Electronics, Mr. Eisenberg asked his attorney to recover from the government and give to his family whatever possessions possible.  Aff. ¶ 18.  On January 19, 2023, unaware that the government was in the process of applying for a search

warrant, the defense again attempted to get the Subject Electronics back in a letter from counsel to the government.  Ex. K.  In all these ways, Mr. Eisenberg clearly expressed his strong desire for the return of the electronic devices – which, as noted, played a critical role in his personal and professional life.  *See United States v. Burgard*, 675 F.3d 1029, 1033 (7th Cir. 2012) ([I]t can be revealing to see whether the person from whom the item was taken ever asserted a possessory claim to it – perhaps by checking on the status of the seizure or looking for assurances that the item would be returned.  If so, this would be some evidence (helpful, though not essential) that the seizure in fact affected her possessory interest.").

The Subject Electronics were extremely important to Mr. Eisenberg.  The government's seizure and refusal to return the devices, even though it did not have a warrant to search the devices and for weeks did not seek such a warrant, harmed Mr. Eisenberg in multiple ways.  Though it is difficult to calculate the precise financial losses, Mr. Eisenberg believes he lost millions of dollars by not being able to access his short-term investments indirectly through his family and attorneys.  Moreover, each week that went by without access to his devices, and, consequently, to his funds, delayed and harmed his ability to prepare his legal defense.  For these reasons, the Subject Electronics were very important to Mr. Eisenberg, and the second factor favors exclusion.

### 4.    Third Factor Whether the Defendant Had a Diminished Interest in the Property

In *Smith*, the Second Circuit noted that the defendant's interest in the property was undiminished because: (1) the electronic device had been taken from within another piece of property owned by the defendant (a car); (2) the defendant had not consented to the taking of the device; (3) the defendant had not subsequently given consent to the searching of the device; (4) the device was not owned by a co-owner who had consented to its search; and (5) the device

had not been voluntarily relinquished to a third party.  *Smith*, 967 F.3d at 208.  Consequently, the Second Circuit determined that the defendant "did nothing to reduce his property interest by means of consent or voluntarily relinquishing control of his" electronic devices.  *Id.*  Likewise, each of these findings would apply with equal force in this case.  Mr. Eisenberg similarly had an undiminished interest in the property, and the third *Smith* factor therefore also favors exclusion.

Nor is there any evidence in the record that any of the electronic devices had any evidentiary value that would have justified law enforcement's retention of the devices without regard to whether the government sought a search warrant to search their contents.  *See id.* at 209.  These were phones and a computer, not a weapon or narcotic.  The Subject Electronics' "evidentiary value turned solely on what [law enforcement] might find from a search of [their] contents.  And [law enforcement] could not search [their] contents unless and until they applied for a search warrant."  *Id.*

To the extent that there was probable cause to seize the electronics in the first place, "the existence of probable cause diminished [Mr. Eisenberg's] property interest for only so long as it was reasonable for [law enforcement] to wait before obtaining a warrant to search its contents." *Id.*  Here, there was absolutely no reason not to obtain a warrant immediately at the time of his arrest, and the potential existence of probable cause would therefore have no bearing on the strength of Mr. Eisenberg's property interest.  Because Mr. Eisenberg maintained a strong and undiminished property interest in the Subject Electronics, the third factor weighs in his favor.

### 5.    Fourth Factor: Justifications for the Delay

Perhaps the factor weighing most heavily in favor of a determination that the delay was unreasonable is the lack of any apparent justification for the delay in obtaining a search warrant, let alone an explanation justifying over three weeks' delay.  The arrest of Mr. Eisenberg was the result of a proactive investigation by the largest and most well-resourced USAO in the country

working in conjunction with an incredible array of highly sophisticated and well-resourced law enforcement agencies, led by the FBI, all focused on Mr. Eisenberg, the sole defendant in the case. Moreover, the government's ability to obtain a search warrant for the Subject Electronics, and its tactical decision to delay doing so, are fully displayed by the government's highly detailed application for and receipt of the First Warrant to search Mr. Eisenberg's social media and email accounts, which was filed after Mr. Eisenberg's arrest but weeks before the Second Warrant was sought to search the Subject Electronics. Because the government apparently could have applied for a warrant at any time, its election to delay over three weeks was patently unreasonable and weighs heavily in favor of exclusion.

Mr. Eisenberg was arrested on December 26, 2023, and charged in a detailed Complaint with market manipulation for his alleged role in obtaining millions of dollars' worth of digital assets. At that time, the government had been actively investigating Mr. Eisenberg for weeks, if not months, and was in possession of all of the information it would later use in its search warrant application. Nothing prevented the government from complying with *Smith*'s admonition to seek a search warrant for electronic devices immediately.

Certainly, the government was not lacking resources. *Cf. Javat*, 549 F. Supp. 3d at 1359; *Smith*, 544 F.3d at 209. Rarely has a government team had access to greater investigatory and prosecutorial manpower. First, the case was being handled by the USAO for the Southern District of New York ("SDNY"), the largest and most powerful prosecutor's office in the country. Second, the prosecutorial team was supported by additional litigatory assistance supplied by the Department of Justice's National Cryptocurrency Team ("NCET"). *See* SDNY Press Release, *Alleged Perpetrator of $100 Million Crypto Market Scheme to Make Initial Appearance in the Southern District of New York*, Feb. 2, 2023, available at

https://www.justice.gov/usao-sdny/pr/alleged-perpetrator-100-million-crypto-market-manipulation-scheme-make-initial.  Third, the investigation was supported by nearly every major federal law enforcement agency.  While the New York field office of the FBI led the investigation and would ultimately take the lead in the search warrant application, the case was also supported by the Department of Homeland Security's Homeland Security Investigations ("HSI") unit and the Internal Revenue Service-Criminal Investigation unit.  *Id.*  Indeed, at the time of Mr. Eisenberg's arrest, on the day after Christmas, at least five federal agents were present from the FBI and HSI.  Fourth, the investigation was also supported by the country's two leading civil enforcement agencies, the CFTC and the SEC.  *Id.*  In fact, the CFTC initiated a civil enforcement action against Mr. Eisenberg by filing a detailed Complaint on January 9, 2023,[20] ten days before the Second Warrant application was filed.  The SEC later filed suit against Mr. Eisenberg, as well.

If the involvement of the formidable array of law enforcement agencies assisting SDNY and NCET in this case were not sufficient proof that the government could have obtained a search warrant at any time, the government demonstrated its ability to promptly obtain a warrant by applying for and receiving the First Warrant on January 6, 2023 – almost two weeks before it applied for the Second Warrant – for social media and email account information relating to Mr. Eisenberg.  There is no apparent reason why the government needed to seek out that warrant before complying with its obligation to swiftly obtain a warrant for the Subject Electronics.  And even if the First Warrant were urgent, with the tremendous resources at its disposal, the

---

[20] *See* CFTC Complaint; CFTC Press Release 8647-23, *CFTC Charges Avraham Eisenberg with Manipulative and Deceptive Scheme to Misappropriate Over $110 million from Mango Markets, a Digital Asset Exchange*, dated January 9, 2023, available at https://www.cftc.gov/PressRoom/PressReleases/8647-23.

government could have sought and obtained a warrant for the Subject Electronics either prior to or at the same time as the First Warrant.  It simply chose not to.

In a case preceding *Smith*, the Eleventh Circuit in *Mitchell* found unsatisfactory the government's explanation that only one agent, who had left for a two-week professional training, was capable of reviewing the computer seized in that case.  The Eleventh Circuit ultimately concluded that "[n]o effort was made to obtain a warrant within a reasonable time because law enforcement officers simply believed that there was no rush.  Under these circumstances, the twenty-one-day delay was unreasonable."  565 F.3d at 1351.  Likewise, here, the government's apparent election not to use its vast resources – resources that dwarfed those available in *Mitchell* – to seek a search warrant for twenty-four days was unjustified and weighs heavily in favor of excluding the evidence at issue.

### E.   The Exclusionary Rule

For the reasons stated above, the government's seizure of Mr. Eisenberg's electronics violated his Fourth Amendment rights both because it was unlawfully searched and seized without a warrant on or about December 26 and because the subsequent twenty-four-day delay in obtaining a warrant was unreasonable.  Generally, when the government is found to have violated the defendant's Fourth Amendment rights, the remedy is exclusion of the tainted evidence.  Exclusion is the appropriate remedy here because the warrantless search and seizure of the Subject Electronics and Luggage Items was unlawful, and there is a long, well-documented history of exclusion in such circumstances.[21]

Exclusion is also the proper remedy for the government's unreasonable delay in seeking the Second Warrant.  While the Second Circuit in *Smith* declined to apply the Exclusionary Rule

---

[21] While there are certain extraordinary exceptions to the exclusionary rule, the government has not to date asserted any such exception and none are patently obvious from the facts of this case.

despite finding a constitutional violation because it found that "an objectively reasonable officer would [not necessarily] have known that the delay amounted to a violation of the Fourth Amendment," 967 F.3d at 213, *Smith* served to put law enforcement "on notice" that unreasonable delays "will no longer be tolerated" and would result in the suppression of evidence. *Tisdol*, 544 F. Supp. 3d at 227.

Since the publication of *Smith*, district courts have deemed the government to have sufficient notice that unreasonable delay in seeking a search warrant will result in exclusion. As one court noted, "*Smith* essentially directed that [an] unreasonable delayed search [] caused by police department foibles are unacceptable" and will lead to evidence suppression. *Id.* at 228. Another district court held that unreasonable delay in seeking a search warrant for a phone after *Smith*, "equates to 'recklessness' or 'gross negligence'" and therefore requires exclusion because law enforcement is on notice of the requirement to promptly seek a warrant. *Hay*, 2023 WL 142119, at *11. In light of *Smith* and its progeny, the government here had ample notice of its obligation to promptly obtain a warrant to search the Subject Electronics and its failure to meet this obligation demands exclusion.

The warrant requirement is bedrock criminal law, and its violation has resulted in the exclusion of evidence for decades. The government's constitutional violations demand exclusion of the Subject Electronics and the Luggage Items and any evidence that may have been derived therefrom.

## IV.    CONCLUSION

***

For all the reasons above, the Court should grant Mr. Eisenberg's motions to dismiss and suppress.


Dated:  July 28, 2023                          Respectfully Submitted,

                                               */s/ Brian E. Klein*

                                               _____

                                               Brian E. Klein
                                               Ashely E. Martabano
                                               Waymaker LLP

                                               -and-

                                               Sanford N. Talkin
                                               Noam B. Greenspan
                                               Talkin, Muccigrosso & Roberts, LLP

                                               *Attorneys for Avraham Eisenberg*