UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
UNITED STATES OF AMERICA,

                -against-

AVRAHAM EISENBERG,

                         Defendant.
------------------------------------------------------------------X

AFFIDAVIT

23 Cr. 10 (RMB)

I, Avraham Eisenberg, declare under penalty of perjury and pursuant to 28 United States Code, Section 1746, that the following is true and correct:

1. I am the defendant in the above-captioned matter.

2. In the evening of December 26, 2022, I arrived by airplane at The Luis Munoz Marin International Airport in Carolina, Puerto Rico, just outside of San Juan.

3. I disembarked the airplane with my luggage, a backpack and a suitcase.

4. I walked to the United States Customs counter. There, I was questioned by a United States Customs and Border Protection ("CBP") agent regarding the purpose of the trip I had just completed and general questions about the contents of my luggage.

5. The CBP agent directed me to a specific area several feet away from the Customs counter for additional questioning, and there another CBP officer opened the suitcase and backpack. I recall the agent pulling out the laptop and asking me to turn it on, and then letting me turn it off without any further inspection and put it away in the luggage. I also recall the agent pulling out over-the-counter medication and asking me questions about it. I do not recall any other items being removed from the luggage. I also recall being questioned about a plastic bag, which was not removed, containing my Israeli citizenship application and other documents regarding my naturalization, and I answered the agent's questions. After

answering those questions, everything was returned to the luggage, and I understood the search to be complete. I was told by the agent that I could be forced to unlock the computer but that they were not going to do so.

6. Next, I was directed and escorted by law enforcement agents to a private room away from the customs hall where the above-described activity took place. In that room, several agents were present and stood in my immediate vicinity.

7. My luggage, which contained my personal effects, including portable electronics, clothing, identification documents and other possessions, remained in the customs hall. I have not seen or been in possession of my luggage or the contents thereof since I was removed to this private room.

8. From the moment I was escorted into the private room by law enforcement, I did not feel free to refuse entry into the room, leave the room or exit the airport.

9. This belief was confirmed when, almost immediately after entering the room, I was shown a warrant for my arrest, asked to empty the contents of my pockets, including the removal of my wallet, and I was handcuffed. From this point on, I do not recall being asked any further questions.

10. Later on December 26, 2022, while still handcuffed, I was escorted out of the airport through a back door of the airport, placed in the back seat of a car by agents of the Federal Bureau of Investigation ("FBI") and then transported to, and lodged in, a local jail.

11. On December 27, 2022, in the morning, I was transported, by FBI agents from the local jail to the San Juan FBI Field Office. There, I was shown two pictures of three cellphones that belonged to me and which had either been in my luggage or on my person at the time I was

detained by law enforcement at the airport the night before. I did not witness the removal of the electronics from my luggage.

12. I was also presented with two property receipts by an FBI agent (attached collectively as Exhibit A), whom I believe to be Special Agent Michael Crawford ("SA Crawford"). One receipt was for four electronic devices, a charcoal grey Hasselbad cellphone with a [1] logo[1], a charcoal grey Samsung cellphone, a white Samsung cellphone, and a black and green Razer laptop and power cord (collectively referred to as the "Subject Electronics"). The three cellphones listed in the receipt were the same as those in the photos I was shown. The laptop and power cord were not in the photos.

13. A second receipt was for my luggage: a suitcase and backpack, both containing personal belongings, that had also been taken from me the night prior at the airport.

14. At SA Crawford's instruction, I signed both receipts. He also signed both receipts.

15. Both receipts indicated that the property on them had been "seized." From this, I understood that the FBI did not intend to return these items to me.

16. Even though I already believed that my property had been seized and would not be returned to me, I sought to confirm that belief.

17. Later that day, I asked the person I believed to be SA Crawford about the Subject Electronics and he told me that that they had been seized and would be sent to FBI on the mainland further confirming my belief that neither I nor my family would be able to retrieve any of the Subject Electronics. SA Crawford told me that, unlike the Subject Electronics, someone could retrieve the luggage on my behalf.

---

[1] I believe this reference to be to a phone I owned made by OnePlus. Hasselbad is the name of the camera manufacturer.

18. On the first date I appeared in person before the Court in Puerto Rico, (I believe December 30, 2022) I met with a Puerto Rican attorney. I asked him to retrieve my luggage and give it to my mother, who had flown to San Juan to attend my detention hearing. I later learned that my attorney had not recovered my luggage.

19. I purchased the Razer laptop in or about September 2021. Since then, I have regularly used it almost every day, usually for many hours each day. I used it extensively to communicate with friends and contacts, to store a large amount of personal and business data, and to store and access financial accounts.

20. I purchased the three smartphones in 2021 and 2022 and used each of them extensively to communicate with friends and contacts, to store a large amount of personal and business data, and to store and access financial accounts.

21. On each of my Subject Electronics, I had a password manager app or extension installed, including those known as "Blur" and "Ironvest", in addition to passwords that were saved on Google Chrome and built-in password managers such as Samsung Pass. Because of differences in how these apps synced, each device had a somewhat different set of passwords stored in those apps. Much of my stored communication, personal, financial and business data was also only found on a single device, as it was not fully backed up and synced between devices.

22. The devices also contained the means to access many of my online accounts, including serving as the mechanism by which I would obtain two-factor authentication ("2FA") codes. One of those accounts was a bank account at Customers Bank. Without my Subject Electronics, I could not access my saved password and could not obtain a 2FA code and therefore could not access my Customers Bank account.

23. My account at Customers Bank contained a substantial amount of money that was unconnected to this case. As such, had my Subject Electronics been returned to my family or attorneys, my representatives would have been able to access those funds, which I required for several legitimate purposes, including paying my attorneys.

24. My Subject Electronics also served as the sole source of 2FA for many other online accounts. As of this date, neither my family nor my lawyers have been successful in gaining access to several such accounts, resulting in a lack of access to more than $25 million in funds that could be used to pay attorney fees and expenses. Additionally, several of these accounts do not earn interest, and were I able to gain access to these funds, I would instruct my family to move some of the money to interest-bearing accounts.[2]

25. Another account that could only be accessed with my seized devices is a brokerage account at Charles Schwab. I recently learned that the value of the investment portion of this account grew by almost 50% since my arrest. Had I been able to access my investment accounts, I would have directed my representatives to liquidate various short-term investments that I was actively managing, and which have decreased in value substantially, and to instead invest the funds in my Schwab account. Though I cannot calculate the exact amount of loss I have incurred because I am still unable to access many of my accounts, I am confident that I lost millions of dollars by being denied access to my accounts.

26. Because of my lack of access to funds in my Customer Bank account, among others, my attorneys needed to obtain powers of attorney to access the accounts, a process that has proved lengthy and expensive. The delay caused by this lack of access has harmed the

---

[2] I am aware various banks during the relevant period advertise annual percentage yield rates of between 4.5% and 5%. At such rates, a $2.5 million deposit would earn almost $60,000 in interest in six months.

preparation of my legal defense because I was unable to pay vendor bills, and, for example, the defense could not retain a discovery vender until months later.

27. Without access to the Subject Electronics, I was also unable to access important information regarding loans that I had made. While I wished to direct my representatives to attempt to collect some of those loans, I could not do so because I did not have the contact information, or support documents necessary. This, too, deprived me of funds I needed for my legal defense, among other things.

28. I also had unique contact information saved on several of the Subject Electronics for individuals that I believe may be useful sources of information for the defense. Lacking those devices prevented or substantially delayed me and my attorneys from contacting those individuals and obtaining information from them in preparation for trial.

29. The preparation of my defense in this case has also been inhibited by my ability (directly or indirectly) to access my accounts on several messaging platforms and cryptocurrency exchanges in order to obtain information in the accounts or exported from them and saved locally on my devices. Each of those accounts could only be accessed through the Subject Electronics, and many of those accounts required 2FA, which would require using one of my seized phones. Each of the accounts contained data that I believe would be beneficial to preparing a defense in this case and which I have been unable to access.

30. Some of the communications on my seized devices were not automatically retained after a period of time, and would be inaccessible after 30 days or less, based on my knowledge of how the communication apps and companies worked. These communications include conversations with counsel and potential witnesses, which I believe would have been beneficial to my defense and are now probably permanently lost.

31. At the time of my arrest in December 2022, I, or a company I owned, was a party in 5 civil litigations and arbitrations. Several of those cases had started discovery. I have been unable to pursue those cases, however, as documents required to do so were stored on the Subject Electronics. Had my attorneys been given possession of those devices, they would have been able to access the relevant documents and the cases could have proceeded.

_____
Avraham Eisenberg