UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

v.                                                              23 Cr. 10 (RMB)

AVRAHAM EISENBERG,

*Defendant.*

**GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANT AVRAHAM EISENBERG'S MOTIONS TO DISMISS AND SUPPRESS**

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

Thomas Burnett
Peter J. Davis
Assistant United States Attorneys

Tian Huang
Special Assistant United States Attorney

*Of Counsel*

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ............................................................................. 1

BACKGROUND ............................................................................................... 3

   I.     Mango Markets ........................................................................... 3

   II.    Eisenberg's Criminal Scheme ..................................................... 5

   III.   The Complaint and Indictment ................................................... 7

ARGUMENT .................................................................................................... 8

   I.     The Motion to Dismiss Should Be Denied. ................................ 8

       A.    Legal Standard .................................................................. 8

       B.    Counts One and Two Adequately Allege Violations of the
           Commodities Exchange Act Because Eisenberg
           Manipulated a Swap and a Commodity. ............................ 10

       C.    Count One Properly Alleges a Fraudulent and Manipulative
           Scheme. .......................................................................... 15

       D.    The Constitutional Challenges to Counts One and Two
           Should be Denied ............................................................. 22

       E.    The Statutory Construction Challenges to Counts One and
           Two Should Be Denied ..................................................... 27

       F.    The Wire Fraud Count Should Not Be Dismissed ................. 29

   II.    The Motion to Suppress Should Be Denied ................................. 32

       A.    Factual Background .......................................................... 33

           1.  The Arrest and Seizure .............................................. 33

           2.  The Initial Appearance and Logging of Seized Items ............ 34

           3.  Eisenberg's Detention ................................................ 35

           4.  The Indictment and Initial Search Warrant ...................... 36

           5.  The Subsequent Search Warrant ................................... 37

           6.  Requests for Seized Material ....................................... 37

       B.    The Government Lawfully Seized Eisenberg's Cellphones,
           Laptop, and Documents. ................................................... 38

           1.  The Cellphones, Laptop, and Documents Were Lawfully
              Seized Pursuant to a Border Search and Search Incident to
              Arrest. .................................................................... 38

           2.  The Agents Inevitably Would Have Seized the Cellphone,
              Laptop, and Documents in Eisenberg's Luggage Through a
              Lawful Inventory Search. ............................................ 41

3. Eisenberg's Arguments Do Not Warrant Suppression or a Hearing................................................................................................. 44

C.    The Government Did Not Unreasonably Delay in Applying for a Search Warrant. .......................................................... 46

1. The Touchstone of the Fourth Amendment is Reasonableness. .................................................................... 46

2. The Agents Acted Reasonably in Obtaining a Warrant......................................... 47

a. The Length of Delay Does Not Favor Exclusion. ............................................... 47

b. Eisenberg Overstates the Importance of the Devices......................................... 49

c. Eisenberg Had a Substantially Diminished Property Interest in the Devices. .................................................... 51

d. The Delay Was Justified. ....................................................... 54

e. On Balance, the Agents' Actions Were Reasonable. ......................................... 55

3. Suppression Is Unwarranted Because the Agents Acted in Good Faith. ....................................................... 56

CONCLUSION................................................................................ 58

# **Table of Authorities**

## **Cases**

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87 (2d Cir. 2007) ........................... 18, 19, 20

*Brigham City v. Stuart*, 547 U.S. 398 (2006)........................................................................ 45, 47

*CFTC v. Amaranth Advisors LLC*, 554 F. Supp. 2d 523 (S.D.N.Y. 2008)................................. 21

*CFTC v. Gorman*, 587 F. Supp. 3d 24 (S.D.N.Y. 2022) ............................................................ 19

*CFTC v. Kraft Food Grp.*, 153 F. Supp. 3d 996 (N.D. Ill. 2015) .................................... 20, 21, 26

*CFTC v. McDonnell*, 287 F. Supp. 3d 213 (E.D.N.Y. 2018)................................................. 14, 15

*CFTC v. My Big Coin Inc.*, 334 F. Supp. 3d 492 (D. Mass. 2018)............................................. 14

*CFTC v. Parnon Energy Inc.*, 875 F. Supp. 2d 233 (S.D.N.Y. 2012) .............................. 21, 25, 26

*Conservation L. Found., Inc. v.*

   *Longwood Venues & Destinations, Inc.*, 422 F. Supp. 3d 435 ............................................. 29

*Costello v. United States*, 350 U.S. 359 (1956) ........................................................................ 9

*Durland v. United States*, 161 U.S. 306 (1896) ................................................................. 31, 32

*Gurary v. Winehouse*, 190 F.3d 37 (2d Cir. 1999) .................................................................. 19

*Hechavarria v. Sessions*, 891 F.3d 49 (2d Cir. 2018) .............................................................. 28

*Herring v. United States*, 555 U.S. 135 (2009)................................................................... 56, 57

*Illinois v. Lafayette*, 462 U.S. 640 (1983)............................................................................... 41

*In re Amaranth Nat. Gas Commodities Litig.*, 587 F. Supp. 2d 513 (S.D.N.Y. 2008)................ 25

*In re BFXNA Inc.*, CFTC No. 16-19, 2016 WL 3137612 (June 2, 2016) ................................... 13

*In re Coinflip, Inc.*, CFTC No. 15-29, 2015 WL 5535736 (Sept. 17, 2015) .............................. 13

*In re Platinum & Palladium Antitrust Litig.*, 61 F.4th 242 (2d Cir. 2023)................................ 11

*In re TeraExchange LLC*, CFTC No. 15-33, 2015 WL 5658082, n.3 (Sept. 24, 2015) .............. 13

*Maynard v. Cartwright*, 486 U.S. 356 (1988).......................................................................... 23

*Morisette v. United States*, 342 U.S. 246 (1952) .................................................................... 19

*Ploss v. Kraft Food Grp.*, 197 F. Supp. 3d 1037 (N.D. Ill. 2016) ............................................ 20

*S.E.C. v. Masri*,

   523 F. Supp. 2d 361 (S.D.N.Y. 2007)............................................................................... 18

*Santa Fe Indus., Inc. v. Green*, 430 U.S. 462 (1977)............................................................... 21

*SEC v. Dorozhko*, 574 F.3d 42 (2d Cir. 2009)......................................................................... 17

*SEC v. LEK Secs. Corp.*, 276 F. Supp. 3d 49 (S.D.N.Y. 2017)................................................ 21

*SEC v. Vali Management Partners*, No. 21-453, 2022 WL 2155094 (2d Cir. 2022)....... 18, 19, 20

*Set Capital LLC v. Credit Suisse Grp.*, 996 F.3d 64 (2d Cir. 2021) .................................. passim

*Smith v. Ohio*, 494 U.S. 541 (1990)....................................................................................... 41

*Tabbaa v. Chertoff*, 509 F.3d 89 (2d Cir. 2007) ..................................................................... 39

*Thomas v. United States*, 775 F. App'x 477 (11th Cir. 2019) .................................................. 49

*U.S. ex rel. O'Donnell v. Countrywide Home Loans, Inc.*, 822 F.3d 650 (2d Cir. 2016)....... 17, 31

*U.S. v. Muse*,

   No. 06 Cr. 600 (DLC), 2007 WL 391563 (S.D.N.Y. Jan. 30, 2007) ...................................... 24

*United States v. Aiyer*, 33 F.4th 97 (2d Cir. 2022)......................................................... 9

*United States v. Autuori*, 212 F.3d 105 (2d Cir. 2000) ................................................ 31

*United States v. Bragg*, 44 F.4th 1067 (8th Cir. 2022) ................................................ 52

*United States v. Canales*, 91 F.3d 363 (2d Cir. 1996) ................................................. 28

*United States v. Chanu*, 40 F.4th 528 (7th Cir. 2022) ........................................... 17, 32

*United States v. Connolly*, 24 F.4th 821 (2d Cir. 2022)............................................... 31

*United States v. Corbett*,
   No. 20 Cr. 213 (KAM), 2021 WL 4480626 (E.D.N.Y. Sept. 30, 2021) ................... 49

*United States v. Coscia*, 866 F.3d 782 (7th Cir. 2017) ............................... 32, 35, 36, 37

*United States v. Cushnie*, No. 14 Cr. (PGG), 2014 WL 7447149 (S.D.N.Y. Dec. 31, 2014) ...... 41

*United States v. Daugerdas*, 837 F.3d 212 (2d Cir. 2016).............................................. 9

*United States v. Dawkins*, 999 F.3d 767 (2d Cir. 2021) ........................................ 10, 30

*United States v. Delva*, 858 F.3d 135 (2d Cir. 2017) ................................................... 40

*United States v. Ellis*, No. 19 Cr. 857 (NSR), 2020 WL 6784139 (S.D.N.Y. Nov. 17, 2020)...... 43

*United States v. Farhane*, 634 F.3d 127 (2d Cir. 2011) ............................................... 22

*United States v. Flores-Montano*, 541 U.S. 149 (2004) ............................................... 39

*United States v. Ganias*, 824 F.3d 199 (2d Cir. 2016)........................................... 47, 56

*United States v. Greenberg*, 835 F.3d 295 (2d Cir. 2016) ........................................... 31

*United States v. Griffiths*, 47 F.3d 74 (2d Cir. 1995)..................................... 41, 42, 43

*United States v. Halloran*, 821 F.3d 321 (2d Cir. 2016)............................................... 22

*United States v. Hana*, No. 94 Cr. (RPP),
   1994 WL 323642 (S.D.N.Y. July 5, 1994) ............................................................... 42

*United States v. Haqq*, 278 F.3d 44 (2d Cir. 2002) ..................................................... 53

*United States v. Heath*, 455 F.3d 52 (2d Cir. 2006)..................................................... 42

*United States v. Houtar*, 980 F.3d 268 (2d Cir. 2020) ................................................. 22

*United States v. Irving*, 452 F.3d 110 (2d Cir. 2006)........................................ 39, 40, 41

*United States v. Javat*, 549 F. Supp. 3d 1344 (S.D. Fla. 2019) .............................. 48, 49

*United States v. Johnson*, 875 F.3d 1265 (9th Cir. 2017)............................................. 52

*United States v. Juwa*, 508 F.3d 694 (2d Cir. 2007) ................................................... 10

*United States v. Kinzler*, 55 F.3d 70 (2d Cir. 1995)..................................................... 27

*United States v. Klump*, 536 F.3d 113 (2d Cir. 2008)................................................... 45

*United States v. Laist*, 702 F.3d 608 (11th Cir. 2012) ................................................ 49

*United States v. Lanier*, 520 U.S. 259 (1997).............................................................. 23

*United States v. Levy*, 803 F.3d 120 (2d Cir. 2015)......................................... 39, 40, 44

*United States v. Litchfield*, 986 F.2d 21 (2d Cir. 1993) ............................................... 28

*United States v. Mendez*, 315 F.3d 132 (2d Cir. 2002)................................... 41, 42, 43

*United States v. Milani*, 739 F. Supp. 216 (S.D.N.Y. 1990)......................................... 23

*United States v. Morillo*,
   No. 08 Cr. 676 (NGG), 2009 WL 3254431 (E.D.N.Y. Oct. 9, 2009)......................... 42

*United States v. Nadi*, 996 F.2d 548 (2d Cir. 1993)..................................................... 23

iv

*United States v. Perea*, 986 F.2d 633 (2d Cir. 1993) ...................................................... 42, 43, 45

*United States v. Perez*, 575 F.3d 164 (2d Cir. 2009) ............................................................. 9

*United States v. Radley*, 632 F.3d 177 (5th Cir. 2011) ....................................................... 26

*United States v. Reed*,
  No. 20 Cr. 500 (JGK), 2022 WL 597180 (S.D.N.Y. Feb. 28, 2022) ........................... 14, 15, 27

*United States v. Regan*, 937 F.2d 823 (2d Cir. 1991) ..................................................... 19, 20, 21

*United States v. Reliant Energy Servs., Inc.*,
  420 F. Supp. 2d 1043 (N.D. Cal. 2006) ............................................................. 25, 26, 27, 28

*United States v. Resendiz-Ponce*, 549 U.S. 102 (2007) .................................................... 16

*United States v. Roberts*, 363 F.3d 118 (2d Cir. 2004) ..................................................... 23

*United States v. Royer*, 549 F.3d 886 (2d Cir. 2008) ........................................................ 19

*United States v. Russell*, 369 U.S. 749 (1962) ................................................................. 9

*United States v. Rybicki*, 354 F.3d 124 (2d Cir. 2003) ...................................................... 23

*United States v. Sharma*, No. 18 Cr. 340 (LGS),
  2019 WL 3802223 (S.D.N.Y. Aug. 13, 2019) .......................................................... 49, 52

*United States v. Shaw*, 531 F. App'x 946 (11th Cir. 2013) ................................................ 52

*United States v. Shellef*, 507 F.3d 82 (2d Cir. 2007) ........................................................ 30

*United States v. Smith*, 967 F.3d 198 (2d Cir. 2020) .................................................... passim

*United States v. Stringer*, 730 F.3d 120 (2d Cir. 2013) ...................................................... 9

*United States v. Sullivan*, 797 F.3d 623 (9th Cir. 2015) ............................................. 49, 52, 55

*United States v. Temple*, 447 F.3d 130 (2d Cir. 2006) ....................................................... 24

*United States v. Thomas*, 757 F.2d 1359 (2d Cir. 1985) ..................................................... 57

*United States v. Thompson*, 29 F.3d 62 (2d Cir. 1994) ...................................................... 41

*United States v. Torres*,
  No. 20 Cr. 608 (DLC), 2021 WL 1947503 (S.D.N.Y. May 13, 2021) ................................... 8

*United States v. Ulbricht*, 31 F. Supp. 3d 540 (S.D.N.Y. 2014) ......................................... 27

*United States v. Velastegui*, 199 F.3d 590 (2d Cir. 1999) ................................................... 9

*United States v. Walters*, 910 F.3d 11 (2d Cir. 2018) ...................................................... 10

*United States v. Wedd*, 993 F.3d 104 (2d Cir. 2021) ............................................... 9, 10, 29

*United States v. Weimert*, 819 F.3d 351 (7th Cir. 2016) ................................................. 31

*United States v. Wells*,
  No. 20 Cr. 633 (NRB), 2023 WL 2223474 (S.D.N.Y. Feb. 23, 2023) ................ 48, 49, 53, 54

*United States v. Williams*, 930 F.3d 44 (2d Cir. 2019) ............................................. 42, 44, 45

*Universal Health Servs., Inc. v. United States*, 579 U.S. 176 (2016) ................................. 31

*Wilson v. Merrill Lynch & Co.*, 671 F.3d 120 (2d Cir. 2011) ........................................... 20

## Rules

76 Fed. Reg. ................................................................................................................. 16

85 Fed. Reg. 37 ............................................................................................................. 13

Fed. R. Crim. P. 41(b)(1) ........................................................................................... 48, 55

Fed. R. Crim. P. 41(g) ........................................................................................... 53

Fed. R. Crim. P. 7(c)(1) ........................................................................................... 8

## PRELIMINARY STATEMENT

Avraham Eisenberg orchestrated a fraudulent and manipulative scheme to steal over $100 million of cryptocurrency from a platform called Mango Markets.  The scheme was criminal from beginning to end: He set up cryptocurrency accounts that were not in his own name.  He used two accounts on Mango Markets to sell himself a massive "Perpetual"—a product that gave him exposure to changes in the relative value of cryptocurrencies called USDC and MNGO.  He made massive purchases to artificially inflate the price of MNGO relative to USDC.  And then he stole over $100 million from the Mango Markets platform by clicking an option to "borrow" those funds, even though he had no intention to repay them or make required interest payments.

Eisenberg knew this was wrong.  He made sure not to use his own name on the accounts he created to carry out the attack.  He fled to Israel immediately afterward.  He had previously filed and tweeted about market-manipulation lawsuits.  And in negotiations after the attack, he asked Mango Markets representatives to refrain from making criminal referrals.

His motion to dismiss ignores the allegations in the Indictment and the legal standard for a motion to dismiss.  Instead, he devotes page after page to attacking various strawmen.

In his motion to dismiss, Eisenberg ignores that the allegations in the Indictment far exceed the requirement to proceed to trial.  Rather than contending otherwise, he raises a series of arguments that miss the point.  He claims that MNGO is not a "commodity" under the Commodities Exchange Act and that a Perpetual is not a "contract for sale."  These arguments are irrelevant.  The Indictment does not turn on MNGO being a commodity or a Perpetual being a contract for sale.  Instead, the basis of the Indictment is that Perpetuals are "swaps" under the Commodities Exchange Act and USDC is a commodity.

Similarly, Eisenberg claims that the Indictment does not allege a misrepresentation, ignoring important allegations in the Indictment and the governing law.  The Indictment identifies

a series of misrepresentations that Eisenberg used to orchestrate his scheme, including that Eisenberg misrepresented that he was going to "borrow" from Mango Markets when he had no intention of repaying the $110 million loan; employed a false identity; and lied about his location. And even setting those aside, a misrepresentation is not required to prove the charges under the Commodities Exchange Act in the Indictment.  Decades of Circuit case law hold that market manipulation itself is a form of fraud, even without a misrepresentation.

Eisenberg's constitutional challenges are no better.  A claimed lack of fair notice is not a basis to dismiss an Indictment, and Eisenberg particularly has no grounds to make such a claim in this case: His conduct and statements clearly show that he knew what he was doing was wrong, and years of case law and agency announcements gave him notice that his conduct was illegal.

Finally, Eisenberg's motion to suppress suffers from an equally flagrant disregard for obvious facts.  Eisenberg pretends that a search incident to arrest was the only basis to seize his electronics, and that agents simply sat idly for three weeks before obtaining a warrant for those devices.  Neither is true.  Eisenberg was arrested traveling into the country from abroad.  The agents, therefore, had the authority to search and seize items pursuant to their border-search authority, and even if they had not done so, they inevitably would have searched and seized his items during a subsequent inventory search.  Eisenberg was also arrested in Puerto Rico, where he was detained pending transfer to New York.  The arresting agents, who had no role in this investigation, reasonably decided to send the devices to New York—where the case agents were located and Eisenberg was heading—for a search warrant.  Agents in New York applied for a warrant within 24 hours of those devices arriving, before Eisenberg even made it to the District. By any metric, the seizures and search were reasonable.

## **BACKGROUND**

### I.      **Mango Markets**

Mango Markets is a cryptocurrency exchange that allows investors to purchase and borrow cryptocurrencies and cryptocurrency-related financial products.  Indictment ¶ 6.  The exchange is run by an entity called the Mango Decentralized Autonomous Organization (the "Mango DAO").  *Id.*  Mango DAO has its own crypto token, called MNGO, that investors can buy and sell.  *Id.* ¶ 7.  The organization is "decentralized" in that holders of MNGO are allowed to vote on changes to Mango Markets and issues related to the governance of Mango DAO.  *Id.*

People who want to use Mango Markets have to create an account by connecting a cryptocurrency wallet to the exchange, and then deposit cryptocurrency into that account.  *Id.* ¶ 8.  Once an investor creates an account, that investor can trade cryptocurrencies and other products on the platform.  *Id.*  One simple trade that investors can make is known as a "spot" trade.  *Id.* ¶ 9.  In a "spot" trade, an investor exchanges one cryptocurrency for another at the prevailing exchange rate between those two cryptocurrencies.  *Id.*

Another product investors can trade on Mango Markets is a perpetual futures contract, commonly known as a "Perpetual."  *Id.* ¶ 10.  When an investor buys or sells a Perpetual, that investor is not buying or selling cryptocurrency.  *Id.*  Instead, the investor is buying or selling exposure to changes in the relative value of two cryptocurrencies.  *Id.*  For example, one Perpetual available on Mango Markets is based on the relative value of MNGO and USDC, a cryptocurrency stablecoin that is designed to track the price of the dollar (a "MNGO Perpetual").  *Id.*  This product lets investors buy and sell exposure to the relative value of MNGO and USDC.  *Id.*

Imagine, for instance, an investor sells a MNGO Perpetual to another investor when the Perpetual shows a price of 0.02 USDC/MNGO (in other words, 0.02 USDC per MNGO).  *Id.*  The seller investor is "short" MNGO, and the value of the position will rise if the value of MNGO falls

relative to USDC. *Id.* Conversely, the investor who buys the Perpetual is "long" on MNGO, and the value of that position will rise if the value of MNGO rises above 0.02 USDC/MNGO. *Id.*

Either party to a Perpetual can "settle" at any time to realize their gains or losses. *Id.* To make settlement work, Mango Markets needs a way to determine the settlement price of Perpetuals. For that, Mango Markets uses an "Oracle." *Id.* ¶ 11. The Oracle is a program that calculates the relative value of two cryptocurrencies by looking at the exchange rate of those cryptocurrencies across various exchanges. *Id.* When the Oracle price changes for a particular cryptocurrency pairing, the settlement price of Perpetuals based on that pairing also changes. *Id.* So in the example described above, if the Oracle price of USDC/MNGO changes to 0.05 USDC/MNGO, the investor with the "long" Perpetual position can settle, forcing the investor with the "short" position to pay 0.03 USDC/MNGO. Parties to Perpetuals also make or receive regular "funding" payments while the Perpetual is open. *Id.* ¶ 12. Funding payments are calculated based of the mid-price of bids and asks for that Perpetual, compared to the Oracle price. *Id.* The purpose of funding payments is to ensure that purchase prices of Perpetuals stay close to settlement prices. *Id.*

Finally, in addition to allowing investors to trade cryptocurrencies and Perpetuals, Mango Markets also allows investors to borrow and withdraw cryptocurrency through the platform. *Id.* ¶ 13. To borrow cryptocurrency, an investor accesses the website and clicks a button labeled "borrow." *Id.* The investor can then either use the borrowed funds on Mango Markets or withdraw the funds from the platform by clicking another button labeled "withdraw." *Id.* Borrowed funds come from cryptocurrency that other investors have deposited onto the platform, and the borrower is obligated to make interest payments that go to lenders until the borrower repays the loan. *Id.* To ensure that investors do not borrow too much cryptocurrency, Mango Markets uses an

algorithm to evaluate the assets and liabilities of each account on the platform, and liquidate accounts if assets fall below a certain threshold relative to liabilities. *Id.* ¶ 14.

## II.     Eisenberg's Criminal Scheme

Eisenberg orchestrated a scheme to fraudulently steal $110 million worth of cryptocurrency from Mango Markets. *Id.* ¶ 1. His crime involved an intricate series of lies, deceitful trading, and manipulation to line his own pockets at the expense of Mango DAO and other investors.

Eisenberg began his scheme by moving money for his attack through an account at a major cryptocurrency exchange registered under someone else's identity ("Exchange-1" and the "Exchange-1 Account"). *Id.* ¶ 15(b). Specifically, on October 11, 2022, Eisenberg sent approximately 12,499,900 USDC to Exchange Account-1, which was registered not in his own name, but instead in the name of a woman from Ukraine. *See id.* Eisenberg then used that falsely named account to supply the funds for two new accounts on Mango Markets. *Id.* ¶¶ 15(c)-(f). He sent approximately 5,000,100 USDC to the first Mango Markets account ("Mango Account-1"). *Id.* ¶ 15(e). And he sent approximately 4,999,998.95 USDC to the second Mango Markets account ("Mango Account-2"). *Id.* ¶ 15(f).

After opening those accounts, Eisenberg traded with himself—rather than other market participants—to create a massive MNGO Perpetual position. *Id.* ¶ 16. As explained above, Mango Markets allows investors to trade Perpetuals, including MNGO Perpetuals that are based on the relative value of MNGO and USDC. Investors trade with one another—not with Mango DAO— so someone seeking to buy or sell a Perpetual must find someone else willing to take the other side of the transaction. Eisenberg, however, traded with himself: He used Mango Account-2 to sell MNGO Perpetuals to Mango Account-1. *Id.* The scale was massive, with Mango Account-2 selling Perpetuals based on a total of approximately 488,302,109 MNGO, at a price of 0.0382 USDC/MNGO. *Id.* Because of this trade, Mango Account-1 held a "long" position, the value of

which would rise if the value of MNGO relative to USDC rose above 0.0382 USDC/MNGO (the "Long MNGO Perpetual Position"). *Id.* Mango Account-2, by contrast, held a "short" position, which would benefit if the value of MNGO fell relative to USDC (the "Short MNGO Perpetual Position"). *Id.*

With those positions created, Eisenberg went to work manipulating the Oracle that determined the settlement price of MNGO Perpetuals. Eisenberg carried out this manipulation by buying huge quantities of MNGO with USDC and USDT (another stablecoin designed to track the dollar) in three places: Exchange-1, a second cryptocurrency exchange ("Exchange-2"), and decentralized cryptocurrency-trading platform ("Aggregator-1"). *Id.* ¶ 17. He selected these trading locations because they were the three sources that the Oracle used to determine the settlement price of MNGO Perpetuals. *Id.* By buying huge quantities of MNGO with USDC and USDT on these platforms, he was able to artificially drive up the price of MNGO relative to USDC, increasing the settlement price of MNGO Perpetuals on Mango Markets. *Id.* ¶¶ 17-18.

The manipulative trading happened rapidly across all three platforms, occurring between approximately 6:26 p.m. and 6:45 p.m. on the same day. *Id.* ¶ 17. In that short window of time, Eisenberg used USDC to buy more than 16 million MNGO on Exchange-1, driving the exchange rate from 0.0388 to 0.1557 USDC/MNGO. *Id.* ¶ 17(b). On Aggregator-1, he used USDC to buy more than 3.4 million MNGO, driving the exchange rate on that platform from 0.0389 to 0.91 USDC/MNGO. *Id.* ¶ 17(d). And on Exchange-2, he used USDT to buy over 1 million MNGO, driving the exchange rate from 0.04 to 0.45 USDT/MNGO. *Id.* ¶ 17(g).

Because the Oracle relied on those three sources to determine the settlement price of MNGO Perpetuals, that settlement price artificially skyrocketed during Eisenberg's trading. *Id.*

¶ 18.  Between 6:26 p.m. and 6:45 p.m., the settlement price of MNGO rose from approximately 0.0382 to a high of approximately 0.54 USDC/MNGO—an increase of over 1300 percent.  *Id.*

Eisenberg used the artificial jump in the price of MNGO Perpetuals to steal $110 million off of Mango Markets.  Mango Account-1 held the Long MNGO Perpetual Position.  As the price of MNGO Perpetuals rose, the value of that position rose as well.  *Id.* ¶ 19.  This made the assets held in Mango Account-1 appear very valuable, giving Eisenberg the ability to "borrow" large quantities of cryptocurrency through Mango Account-1 without triggering liquidation.  *Id.* ¶ 19.  Eisenberg took advantage of that ability by borrowing approximately $110 million worth of different cryptocurrencies from Mango Markets, which was effectively all of the available funds on the platform.  *Id.* ¶ 20.

Eisenberg was not, however, actually "borrowing" the cryptocurrency—he was stealing it.  He had no intention to repay the loan, nor did he have any intention to pay the required interest.  *See id.* ¶ 21.  Instead, he immediately withdrew the funds and transferred them to other cryptocurrency accounts under his control.  *Id.* ¶ 20.

Once he had emptied out the funds from Mango Markets, Eisenberg stopped purchasing MNGO with USDC.  *Id.* ¶ 22.  Without his manipulative trading, the value of MNGO relative to USDC crashed, and the price of MNGO Perpetuals fell to approximately 0.02 USDC/MNGO.  *Id.*

## III.    The Complaint and Indictment

On December 23, 2022, the Honorable Gabriel W. Gorenstein authorized a complaint (the "Complaint") charging Eisenberg with commodities fraud, in violation of Title 7, United States Code, Sections 9(1) and 13(a)(5) and Title 17, Code of Federal Regulations, Section 180.1, and with commodities manipulation, in violation of Title 7, United States Code, Section 13(a)(2).  Eisenberg was in Israel at the time of the complaint.  On or about December 26, 2022, Eisenberg

flew from Israel to Puerto Rico, with a layover in Spain.  He was arrested when he arrived at the airport in Puerto Rico and has remained in custody since his arrest.

On January 9, 2023, a grand jury in the Southern District of New York returned an indictment (the "Indictment") charging Eisenberg in three counts.  Counts One and Two charge Eisenberg with the same violations of the Commodities Exchange Act ("CEA") as in the Complaint.  Count Three charges Eisenberg with wire fraud, in violation of Title 18, United States Code, Sections 1343 and 2 (the "Wire Fraud Count").

## ARGUMENT

### I.     The Motion to Dismiss Should Be Denied.

The Indictment's detailed factual allegations far exceed the minimal requirement that it track the language of the relevant statutes.  That is all that is required and is more than enough to defeat Eisenberg's motion.  Nonetheless, Eisenberg raises a series of improper challenges that primarily arise from a fundamental misunderstanding of the commodities fraud and manipulation counts, a failure to acknowledge the factual allegations detailing Eisenberg's misrepresentations and manipulative scheme, or both.  The Court should deny Eisenberg's motion.

#### A.  Legal Standard

An indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged" and must, for each count, "give the official or customary citation of the . . . law that the defendant is alleged to have violated."  Fed. R. Crim. P. 7(c)(1); *United States v. Torres*, No. 20 Cr. 608 (DLC), 2021 WL 1947503, at *3 (S.D.N.Y. May 13, 2021). An indictment is sufficient under Rule 7 and the Fifth Amendment "as long as it (1) contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and (2) enables the defendant to plead an acquittal or conviction in bar of future prosecutions for the same offense."  *United States v. Wedd*, 993 F.3d 104, 120 (2d Cir. 2021)

(internal quotation marks and alteration omitted).

To satisfy these requirements, "an indictment need do little more than to track the language of the statute charged and state the time and place . . . of the alleged crime." *Id*. That is, it need only describe the "core of criminality to be proven at trial," not "the particulars of how a defendant effected the crime." *United States v. Daugerdas*, 837 F.3d 212, 225 (2d Cir. 2016).[1]

When considering a motion to dismiss an indictment, "the facts alleged by the government must be taken as true." *United States v. Velastegui*, 199 F.3d 590, 592 n.2 (2d Cir. 1999). The law is well settled that "[a]n indictment returned by a legally constituted and unbiased grand jury . . . if valid on its face, is enough to call for trial of the charges on the merits." *Costello v. United States*, 350 U.S. 359, 363 (1956). Contrary to Eisenberg's claim regarding the motion to dismiss standard, it is not proper to weigh the sufficiency of the evidence underlying the indictment unless the Government has made "a full proffer of the evidence it intends to present at trial," which has not happened here. *United States v. Perez*, 575 F.3d 164, 166 (2d Cir. 2009). Nor is Eisenberg correct that a motion to dismiss is an appropriate vehicle to judge a case based on allegedly undisputed facts; such a procedure, which is akin to "summary judgment" is not available for "a federal criminal indictment." *United States v. Aiyer*, 33 F.4th 97, 117 (2d Cir. 2022).

These limitations exist because indictments are "not meant to serve an evidentiary function," but rather, "to acquaint the defendant with the specific crime with which he is charged, allow him to prepare his defense, and protect him from double jeopardy." *United States v.*

---

[1] Eisenberg is wrong to rely on *United States v. Russell*, 369 U.S. 749, 765 (1962), for the proposition that an indictment needs to lay out all the details of how a defendant committed the charged offense. *See* Br. at 7. The Second Circuit has held that *Russell* did not articulate a "broad requirement applicable to all criminal charges," but instead applies only to a narrow category of cases and elements, such as a charge related to a "refusal to answer questions in a congressional inquiry." *United States v. Stringer*, 730 F.3d 120, 125-27 (2d Cir. 2013).

*Juwa*, 508 F.3d 694, 701 (2d Cir. 2007) (internal citations omitted). Accordingly, "at the indictment stage, [courts] do not evaluate the adequacy of the facts to satisfy the elements of the charged offense." *United States v. Dawkins*, 999 F.3d 767, 780 (2d Cir. 2021) (internal citations omitted). "That is something [courts] do after trial." *Id.* Dismissal is a "drastic remedy that should be utilized with caution and only in extreme cases." *United States v. Walters*, 910 F.3d 11, 26 (2d Cir. 2018) (internal citations omitted).

### B. Counts One and Two Adequately Allege Violations of the Commodities Exchange Act Because Eisenberg Manipulated a Swap and a Commodity.

Eisenberg first challenges Counts One and Two on the grounds that his conduct falls outside the scope of the relevant statutes because MNGO is not a commodity under the CEA. Br. at 14. This argument is not properly the subject of a motion to dismiss. There is no plausible dispute that the Counts One and Two of the Indictment "track[s] the language of the statute[s]"— including the language related to commodities and swaps—and gives the defendant notice of the charges against him. *Wedd*, 999 F.3d at 120. In fact, the Indictment goes well beyond the requirements of Rule 7 and the Fifth Amendment by including detailed factual allegations about the nature of Eisenberg's scheme.

In any event, Eisenberg's claim fails on the merits because he miscasts the charges in Count One and Two. Those Counts are not, as Eisenberg claims, based on the premise that MNGO is a commodity. Rather, Eisenberg's criminal scheme violated the CEA, as charged in Counts One and Two, because the MNGO Perpetual is a swap and because USDC is a commodity.

The CEA "is a remedial statute" designed, in part, to "serve[] the crucial purpose of protecting the innocent individual investor . . . from being misled or deceived." *In re Platinum & Palladium Antitrust Litig.*, 61 F.4th 242, 266 (2d Cir. 2023) (internal citation omitted). The Indictment charges Eisenberg with violating two provisions of the CEA that are central to those

remedial goals.  Count One charges him with violating Section 6(c)(1) and Rule 180.1, which prohibit fraud, including manipulation, in connection with "any swap," a "contract of sale of any commodity in interstate commerce," or any "contract for future delivery."  17 C.F.R. § 180.1(a). Count Two charges Eisenberg with violating a separate provision, known as Section 9(a)(2), which prohibits manipulating, or attempting to manipulate, "the price of any commodity in interstate commerce, or for future delivery . . . , or of any swap."  7 U.S.C. § 13(a)(2).[2]

Eisenberg's crime is properly charged in Count One because his criminal scheme was "in connection with" a "swap" and a "contract of sale of any commodity in interstate commerce." Start with swaps.  The CEA defines swaps to include any arrangements where parties agree to "exchange . . . payments based on the value or level of [one] or more . . . rates, currencies, commodities, securities, . . . quantitative measures, or other financial or economic interests or property of any kind."  7 U.S.C. § 1a(47)(A)(iii).  A swap transfers between the parties "the financial risk associated with a future change" in the value of those interests, without actually exchanging the interests.  *Id.*  Thus, a swap has three basic elements: (1) an agreement to exchange payments based on the value of one or more interests; (2) the transfer of risk associated with the change in that value; and (3) the lack of an actual exchange of the underlying interests.

The MNGO Perpetual that was central to Eisenberg's scheme is a swap because it has all three of these elements.  *See CFTC v. HDR Global Trading Ltd.* , No. 20 Civ. 8132 (LTS), Dkt. 91 (S.D.N.Y. May 5, 2022) (order finding that perpetuals are swaps).  First, a MNGO Perpetual is an arrangement to exchange payments—both the funding payments and the settlement payment. Indictment ¶¶ 11-12.  Those payments are based on multiple factors, including the relative value

---

[2] The terms "Section 6(c)(1)" and "Section 9(a)(2)" refer to the relevant sections within the CEA, codified in the United States Code at 7 U.S.C. § 9(1) and 7 U.S.C. § 13(a)(2), respectively.

of USDC and MNGO as measured by the Oracle (for the settlement payment) and the difference between the prevailing mid-price for MNGO Perpetuals and the Oracle price (in the case of funding payments).  *Id.*  Second, the purpose of the MNGO Perpetual is so that the parties can exchange exposure to the financial risk associated with a change in the relative value of MNGO and USDC.  *Id.* ¶ 10.  And third, the MNGO Perpetual does not involve the parties actually exchanging USDC for MNGO.  *Id.*  This falls squarely within the CEA's definition of a swap.

Because Eisenberg's criminal scheme was "in connection with . . . [a] swap," it is properly charged in Count One under Section 6(c)(1) and Rule 180.1.  While no more is required, Eisenberg's scheme is also properly charged in Count One because it was in connection with a "contract of sale of [a] commodity"—namely, USDC, which is a virtual currency.  The CEA defines commodity to include, with limited exceptions, "all goods and articles . . . and all services, rights and interests . . . in which contracts for future delivery are presently or in the future dealt." 7 U.S.C. § 1a(9).  USDC and other virtual currencies—which are digital assets that serve as medium of exchange—are commodities under the plain language of this statute.  *See* CFTC, "A CFTC Primer on Virtual Currencies," *available at* https://www.cftc.gov/sites/default /files/idc/groups/public/documents/file/labcftc_primercurrencies100417.pdf

For one, there is no plausible dispute that virtual currencies, including USDC, are "goods [or] articles" because they are valuable property.  *See, e.g.*, "Goods," Black's Law Dictionary (10th ed. 2014) ("[t]angible or movable personal property other than money; esp., articles of trade or items of merchandise <goods and services> . . . .[t]hings that have value, whether tangible or not"); "Article," Black's Law Dictionary (10th ed. 2014) ("a particular item or thing"); *cf.* I.R.S. Notice 2014-21 (Apr. 14, 2014) (virtual currency treated as property for U.S. federal tax purposes).

"Contracts for future delivery" are also "presently . . . dealt" in USDC.  *See, e.g.*, MEXC, "A Beginner's Guide to USDC Futures Trading," *available at* https://www.mexc.com /futures/how-to-buy-USDC; OKX, "OKX to List USDC Futures for BTC and ETH," *available at* https://www.okx.com/help-center/13162302731277; Nicholas Otieno, Bybit Launches Futures Contracts Settled in USDC Stablecoin," Blockchain.News (June 28, 2022), *available at* https://blockchain.news/news/bybit-launches-futures-contracts-settled-in-usdc-stablecoin. Contracts for future delivery are also dealt in other virtual currencies, such as Bitcoin and Ethereum.  *See, e.g.*, CME Group, "Frequently asked questions: Cryptocurrency futures," *available at* https://www.cmegroup.com/articles/faqs/frequently-asked-questions-cryptocurrency-futures.html.  Thus, under the unambiguous terms of the CEA, USDC is a "commodity," just like other virtual currencies.

Consistent with the plain language of the statute, the CFTC has held, since at least 2015, that "virtual currency is a commodity as that term is defined by [the] CEA" and has regulated virtual currencies accordingly.  CFTC, "Retail Commodity Transactions Involving Certain Digital Assets," 85 Fed. Reg. 37,734, 37,735 (2020); *see, e.g.*, *In re Coinflip, Inc.*, CFTC No. 15-29, 2015 WL 5535736, at *2 (Sept. 17, 2015) (consent order); *In re TeraExchange LLC*, CFTC No. 15-33, 2015 WL 5658082, at *3, n.3 (Sept. 24, 2015) (consent order); *In re BFXNA Inc.*, CFTC No. 16-19, 2016 WL 3137612, at *5 (June 2, 2016) (consent order).

Multiple courts, including in this Circuit, have also held that virtual currencies are commodities under the CEA.  *See, e.g.*, *United States v. Reed*, No. 20 Cr. 500 (JGK), 2022 WL 597180, at *3-4 (S.D.N.Y. Feb. 28, 2022) ("[U]nder the plain language of the CEA, cryptocurrencies fall within the definition of commodities."); *CFTC v. McDonnell*, 287 F. Supp. 3d 213, 228 (E.D.N.Y. 2018) ("Virtual currencies can be regulated by CFTC as a commodity.");

*CFTC v. My Big Coin Inc.*, 334 F. Supp. 3d 492, 495-98 (D. Mass. 2018) (finding that a particular coin was a commodity because it was a "virtual currency"). Indeed, the Government is not aware of any decision finding that a virtual currency in which futures are traded, such as USDC, is not a commodity, and the defense cites none. Thus, because Eisenberg's scheme involved selling USDC to manipulate the relative value of USDC and MNGO, his scheme was "in connection with" a contract of sale commodity—specifically, USDC—which is a second, independent basis for Count One.

As for Count Two, the Indictment properly alleges a violation of Section 9(a)(2) because Eisenberg's scheme involved "manipulat[ing] or attempt[ing] to manipulate the price of . . . [a] swap." 7 U.S.C. § 13(a)(2). A central aspect of Eisenberg's criminal plan was to manipulate the price of MNGO Perpetuals on Mango Markets. Because a MNGO Perpetual is a swap, that means Eisenberg's scheme involved manipulating the price of a swap.

None of Eisenberg's motion to dismiss engages with this straightforward application of the CEA to his criminal conduct. Instead, Eisenberg claims that a Perpetual is not a contract for future delivery and that MNGO is not a commodity. Br. at 11-13. That is a misdirection. The Indictment does not depend on the claim that a Perpetual is a contract for future delivery. What matters is that it is a swap. The Indictment also does not turn on whether or not MNGO is a commodity. USDC is the relevant commodity, and even if it were not a commodity, Counts One and Two would still stand because a Perpetual is a swap. This should not have been a surprise to Eisenberg: The Complaint explicitly alleged that "Perpetuals are 'swaps'" and "virtual currencies, such as USDC, are 'commodities.'" Compl. ¶¶ 4, 8. Eisenberg simply set up and attacked a strawman.

The claim that there is some "irreconcilable" inconsistency between the Indictment and civil complaints filed by the CFTC and SEC is also a creature of Eisenberg's own creation. Br. at

2-3, 13-14.  The CFTC's complaint alleges that USDC is a commodity and that Perpetuals are swaps.  *See CFTC v. Eisenberg*, No. 23 Civ. 173 (LGS), Dkt. 1 at ¶¶ 2, 15.  That is on all fours with the charges in Counts One and Two.  The SEC's complaint, by contrast, is based on the premise that MNGO is a security.  *See SEC v. Eisenberg*, No. 23 Civ. 503 (LGS), Dkt. 1 at ¶ 30. There is no inconsistency between that allegation and either the CFTC's complaint or the Indictment.  Nor is the fact that multiple agencies have taken action against Eisenberg a problem. It is common for "[f]ederal agencies" to have "concurrent or overlapping jurisdiction over a particular issue or area."  *McDonnell*, 287 F. Supp. 3d at 228; *accord Reed*, 2022 WL 597180, at *4 ("[S]everal agencies may have concurrent regulatory authority in the cryptocurrency space."). Eisenberg's policy preferences about the proper regulator for cryptocurrency are not a basis for a motion to dismiss.  Counts One and Two allege violations of the CEA, so his motion should be denied.

### C.  Count One Properly Alleges a Fraudulent and Manipulative Scheme.

Eisenberg next moves to dismiss Count One, which alleges commodities fraud in violation of Section 6(c)(1) and Rule 180.1, claiming that the Indictment fails to allege "any material misrepresentation or omission."  Br. at 14-15.  This is doubly wrong: the Indictment alleges that Eisenberg made multiple material misrepresentation, and a material misrepresentation is not required to establish a violation of Section 6(c)(1) and Rule 180.1.

Section 6(c)(1) authorizes the CFTC to make regulations prohibiting "any manipulative or deceptive device or contrivance" in connection with a swap or contract of sale of a commodity.  7 U.S.C. § 9(1).  The CFTC exercised that authority through Rule 180.1, which prohibits, among other things, the following three categories of misconduct: (1) using "any manipulative device, scheme, or artifice to defraud"; (2) making "any untrue or misleading statement of a material fact"

or omitting any material fact "necessary in order to make the statements made not untrue or misleading"; and (3) engaging "in any act, practice, or course of business, which operates . . . as a fraud or deceit upon any person."  17 C.F.R. § 180.1(a). This rule is "modeled . . . on SEC Rule 10b-5," and the CFTC's regulations state that interpreting Rule 180.1 should "be guided," although "not controlled, by the substantial body of judicial precedent applying the comparable language of SEC Rule 10b-5."  CFTC, "Prohibition on the Employment , or Attempted Employment, of Manipulative and Deceptive Devices and Prohibition on Price Manipulation," 76 Fed. Reg. 41,398, 41,399 (2011).

Eisenberg's challenge to Count One falters out of the gate because he does not contend that the Indictment fails to include "the elements of the offense charged," "fairly inform[] [him] of the charge[s]," or "enable[] him to plead an acquittal or conviction in bar of future prosecutions for the same offense."  *United States v. Resendiz-Ponce*, 549 U.S. 102, 108 (2007).  Nor could he: Count One plainly tracks the language of Rule 180.1 and identifies the relevant conduct that is the subject of the offense.  That is all that is required at this stage of the case.

Instead, Eisenberg makes the factual argument that the Indictment does not allege a material misrepresentation or omission.  This claim is factually incorrect and legally not a basis for a motion to dismiss.

On the facts, Eisenberg is wrong to claim that the Indictment fails to allege a material misrepresentation or omission.  Eisenberg ignores that the Indictment alleges he misrepresented that he was going to "borrow" funds from Mango Markets.  Indictment ¶¶ 19-21.  That representation was false.  Borrowing connotes an intent to repay and, in the context of Mango Markets, to make the required interest payments.  *See, e.g.*, Merriam Webster, "Borrow" (defining "borrow" as "to take or receive something with the promise or intention of returning it").

Eisenberg, however, was not actually borrowing; he was stealing.  He had no intention to repay the loans or to pay interest.  As will be described further below in the section addressing Eisenberg's challenge to the wire-fraud charge in Count Three, this is a classic misrepresentation. *United States v. Chanu*, 40 F.4th 528, 541 (7th Cir. 2022); *see also U.S. ex rel. O'Donnell v. Countrywide Home Loans, Inc.*, 822 F.3d 650, 658-59 (2d Cir. 2016) (explaining that it is fraudulent for a party to make a promise it did not intend to keep "at the time of contract execution").

Eisenberg entirely ignores this misrepresentation, instead focusing only on the fact that the Indictment alleges that he did not use his real identity when registering with Exchange-1 and Exchange-2.  Br. at 15-16.  Aside from that not being the only misrepresentations in the scheme, Eisenberg is wrong to argue that lying about his identity does not amount to fraud.  In *United States v. Khalupsky*, the Second Circuit found that the "use of stolen employee login credentials to gain further system access was deceptive" under Section 10(b), as "[e]very time the hackers attempted to access parts of the system by entering stolen credentials, they misrepresented themselves to be authorized users." 5 F.4th 279, 291 (2d Cir. 2021); *see also SEC v. Dorozhko*, 574 F.3d 42, 51 (2d Cir. 2009) ("[M]isrepresenting one's identity . . . is plainly 'deceptive' . . . .'"").  Likewise, here, Eisenberg lied about his identity and location in order to gain access to Exchange-1 and Exchange-2 to aid in his scheme.  That, too, is an actionable misrepresentation.

Separately, Eisenberg is legally wrong to argue that Count One could be dismissed for failing to allege a misrepresentation or omission.  A misrepresentation or omission is not required to sustain a charge under Section 6(c)(1) and Rule 180.1.  The second prong of Rule 180.1 bars making misleading statements or omissions.  *See* 17 C.F.R. § 180.1(a)(2).  But the first and third do not; they prohibit, respectively, using "any manipulative device, scheme, or artifice defraud,"

and engaging in "any act, practice, or course of business, which operates . . . as a fraud or deceit." *Id.* § 180.1(a)(1), (3).  For decades, courts in this Circuit have recognized (in the context of cases under the analogous Rule 10b-5), that these provisions "prohibit[] not only material misstatements but also manipulative acts," including market manipulation.  *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007).

Market manipulation is a form of deception because it involves "intentional or willful conduct designed to deceive or defraud [other market participants] by controlling or artificially affecting" prices.  *S.E.C. v. Masri*, 523 F. Supp. 2d 361, 367 (S.D.N.Y. 2007); *accord Set Capital LLC v. Credit Suisse Grp.*, 996 F.3d 64, 76 (2d Cir. 2021).  This can be established through conduct alone and does not require proof of a misrepresentation.  The Second Circuit recently affirmed this principle in *SEC v. Vali Management Partners*, No. 21-453, 2022 WL 2155094 (2d Cir. 2022).  In the district court, Judge Cote had instructed the jury on a Rule 10b-5 claim that "[m]anipulation refers to intentional or willful conduct designed to deceive or defraud investors by controlling or artificially affecting" prices, and that "[a]n act can be manipulative even if it conducted on the open market or through ordinary market activity."  *SEC v. Lek Secs. Corp.*, No. 17 Civ. 1789 (DLC), Dkt. 556, at 2586-87.  The Second Circuit affirmed that instruction, explaining that the manipulative acts can violate Rule 10b-5—which is Rule 180.1's analogue in the securities context—when "accompanied by manipulative intent."  *Vali*, 2022 WL 2155094, at *1.

That decision is consistent with case law that stretches back over a decade, holding that "market activity aimed at deceiving investors as to" the value of a product is unlawful deception.  *ATSI Commc'ns*, 493 F.3d at 100; *see, e.g.*, *Set Capital LLC v. Credit Suisse Grp.*, 996 F.3d 64, 76 (2d Cir. 2021) (holding that deception includes "intentional or willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities"); *Gurary*

*v. Winehouse*, 190 F.3d 37, 45 (2d Cir. 1999) ("The gravamen of manipulation is deception of investors into believing" that prices "are determined by the natural interplay of supply and demand, not rigged by manipulators."). That includes criminal cases brought under Rule 10b-5. *See United States v. Royer*, 549 F.3d 886, 899 (2d Cir. 2008) (approving criminal jury instruction that "[t]he essential element of manipulation is the deception of investors into believing that prices at which they purchase and sell securities are determined by the natural interplay of supply and demand"); *United States v. Regan*, 937 F.2d 823, 829 (2d Cir. 1991) (holding, in criminal case, that "[f]ailure to disclose that market prices are being artificially depressed operates as a deceit on the market place and is an omission of a material fact").

While these decisions address Rule 10b-5, the same principle applies to Rule 180.1. Rule 180.1 contains the same operative language as Rule 10b-5, and so should be interpreted in parallel on this point. *See Morisette v. United States*, 342 U.S. 246, 263 (1952) (explaining that when Congress uses specific terms of art or legal phrasing, there is a presumption that it "knows and adopts the cluster of ideas that were attached to each borrowed word"). And courts applying Section 6(c)(1) and Rule 180.1 in cases involving manipulation have drawn from this Circuit's securities case law. *See, e.g.*, *CFTC v. Gorman*, 587 F. Supp. 3d 24, 43 (S.D.N.Y. 2022) (holding, under Section 6(c)(1) and Rule 180.1 that, "an open-market transaction can be manipulative when there is intent to manipulate"); *CFTC v. Kraft Food Grp.*, 153 F. Supp. 3d 996, 1011 (N.D. Ill. 2015) (holding that Section 6(c)(1) claim "should be interpreted in line with Section 10(b)"); *Ploss v. Kraft Food Grp.*, 197 F. Supp. 3d 1037, 1054 (N.D. Ill. 2016) (same).

Eisenberg's argument to the contrary misapprehends the law. Eisenberg quotes passages from three cases for the proposition that manipulation must involve misrepresentations or nondisclosure. Br. at 15. He takes those passages out of context. Those passages do not mean

that manipulation exists only when there is an affirmative misrepresentation or a classic omission—in other words, an omission arising from a "fiduciary relationship" or the need to avoid making a statement not misleading. *ATSI Commc'ns*, 493 F.3d at 101.

Instead, those decisions hold that, if a defendant has fully disclosed to the market all the material information about the manipulative transaction, it is not deceptive manipulation. *See Regan*, 937 F.2d at 829 ("Failure to disclose that market prices are being artificially depressed operates as a deceit on the market and is an omission of a material fact." (internal citation omitted)); *Wilson v. Merrill Lynch & Co.*, 671 F.3d 120, 129-30 (2d Cir. 2011) ("The market is not misled when a transaction's terms are fully disclosed."); *Set Capital*, 996 F.3d at 76-77 (allowing manipulation claim to proceed when all material facts were not fully disclosed to investors). Eisenberg's portrayal of the case law is irreconcilable with the holdings of *Vali Management*, *Set Capital*, and *Regan*, each of which allowed manipulation claims based on open-market transactions, notwithstanding the absence of a misstatement or misleading omission other than the general failure to disclose the manipulative conduct. *See Vali*, 2022 WL 2155094, at *1 (upholding claim based on sales to manipulate the price of an option); *Set Capital*, 996 F.3d at 75-77 (same); *Regan*, 937 F.2d at 829 (upholding conviction based on manipulative shorting).

Eisenberg also misinterprets the case law that he cites for the claim that "use of market power or a trading strategy alone, without false statements or omissions, does not amount to fraud." Br. at 14 n.8. They say nothing of the sort. Those decisions involved motions to dismiss civil claims for violations of Section 9(a)(2)—the statute charged in Count Two, not Count One. *See, e.g.*, *CFTC v. Parnon Energy Inc.*, 875 F. Supp. 2d 233, 244 (S.D.N.Y. 2012); *CFTC v. Amaranth Advisors LLC*, 554 F. Supp. 2d 523, 529 (S.D.N.Y. 2008). That statute, unlike Section 6(c)(1) and Rule 180.1, authorizes manipulation claims even when the conduct is fully disclosed; that is, when

there is no deception.  *See Kraft*, 153 F. Supp. 3d at 1008-20 (explaining differences between the relevant provisions).  The decisions Eisenberg cites simply hold that, under that different statute, the applicable pleading standard is not the heightened pleading standard for fraud.  *See, e.g.*, *Parnon*, 875 F. Supp. 2d at 244 (refusing to apply heightened pleading standard); *Amaranth*, 554 F. Supp. 2d at 531 (same).  None of the decisions hold that Section 6(c)(1) and Rule 180.1 do not prohibit manipulative trading.

Here, there is no question that the Indictment adequately alleges that Eisenberg engaged in manipulative and deceptive trading practices.  Eisenberg created the Long and Short MNGO Perpetual Positions by engaging in a trade with himself.  Indictment ¶ 16.  That is a form of "wash" trading that has long been considered deceptive.  *See Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 476 (1977) (listing "wash sales" as one type of manipulative practice).  Eisenberg also made massive purchases of MNGO with USDC for the purpose of temporarily and artificially inflating the value of MNGO and the price of MNGO Perpetuals.  Indictment ¶¶ 17-20.  This, too, is a classic form of market manipulation.  *See, e.g.*, *Set Capital*, 996 F.3d at 75-77 (sales to manipulate price of option were manipulative); *Regan*, 937 F.2d at 829 (shorting to benefit another position was manipulative); *SEC v. LEK Secs. Corp.*, 276 F. Supp. 3d 49, 59 (S.D.N.Y. 2017) (sales to manipulate price of option were manipulative).  And far from fully disclosing his scheme, Eisenberg took steps to hide it, including by moving money through multiple cryptocurrency wallets and using accounts that were anonymous and under the names of other people.  Indictment ¶ 15.  This is classic deceptive market manipulation.  The motion to dismiss should be denied.

### D.  The Constitutional Challenges to Counts One and Two Should Be Denied

Eisenberg next claims that Counts One and Two of the Indictment should be dismissed because they are unconstitutionally vague. His challenges are not a basis to dismiss and are groundless on the merits.

"The void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *United States v. Halloran*, 821 F.3d 321, 337 (2d Cir. 2016) (internal citation omitted). "The doctrine addresses concerns about (1) fair notice and (2) arbitrary and discriminatory prosecutions." *Id.* at 338 (internal citation omitted). Under the fair notice prong, the question is "whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." *Id.*

"When a vagueness challenge alleges a lack of notice, the relevant inquiry is whether the statute presents an ordinary person with sufficient notice of . . . what conduct is prohibited." *United States v. Houtar*, 980 F.3d 268, 273 (2d Cir. 2020) (internal citation omitted). "This requirement assures that statutes do not lull the potential defendant into a false sense of security, giving him no reason even to suspect that his conduct might be within its scope." *Id.* (internal citation omitted). "Statutes need not, however, achieve meticulous specificity, which would come at the expense of flexibility and reasonable breadth." *Id.* (internal citation omitted); *accord United States v. Farhane*, 634 F.3d 127, 139 (2d Cir. 2011). Besides the statutory language itself, "clarity at the requisite level may be supplied by judicial gloss on an otherwise uncertain statute." *United States v. Lanier*, 520 U.S. 259, 266 (1997).

Eisenberg's vagueness claim is not properly brought as a motion to dismiss. Vagueness challenges are "as applied," so courts "must await conclusion of the trial" to determine whether a

statute is unconstitutionally vague in a particular case.  *United States v. Milani*, 739 F. Supp. 216, 218 (S.D.N.Y. 1990); *see also United States v. Rybicki*, 354 F.3d 124, 129 (2d Cir. 2003) ("Panel opinions of this Court have repeatedly held that when, as in the case before us, the interpretation of a statute does not implicate First Amendment rights, it is assessed for vagueness only 'as applied,' *i.e.*, in light of the specific facts of the case at hand and not with regard to the statute's facial validity.").  That is, in part, because "[o]bjections to vagueness under the Due Process Clause rest on the lack of notice, and hence may be overcome in any specific case where reasonable persons would know that their conduct is at risk."  *Maynard v. Cartwright*, 486 U.S. 356, 361 (1988); *United States v. Nadi*, 996 F.2d 548, 550 (2d Cir. 1993) ("[O]ne whose conduct is clearly proscribed by the statute cannot successfully challenge it for vagueness.").

These clear holdings doom Eisenberg's motion to dismiss.  There is no basis to conclude from the Indictment that Eisenberg lacked notice his actions were unlawful.  Instead, the allegations clearly suggest he "actually believed what [he was] doing was illegal."  *United States v. Roberts*, 363 F.3d 118, 123 (2d Cir. 2004).  First, Eisenberg tried to hide his identity and location by using someone else's identity to open Exchange-1 Account, and used false information about his location to open Exchange-2 Account.  Indictment ¶¶ 15(b), 17(f).  Second, Eisenberg, in attempting to settle with Mango DAO after his criminal actions, attempted to extract a promise that members of Mango DAO would refrain from pursuing criminal investigations based on his conduct.  Compl. ¶ 16(b).  And third, Eisenberg has publicly demonstrated an awareness of the laws surrounding market manipulation, including as they pertain to cryptocurrency.  For example, on Twitter, Eisenberg posted on or about September 1, 2022 a link to a press release from this Office announcing charges, including under the CEA, in connection with a defendant artificially manipulating a foreign currency exchange rate in order to trigger a payment under an options

contract. *Id.* ¶ 17(c). And according to public records, Eisenberg has filed at least one lawsuit against a cryptocurrency platform for allegedly engaging in market manipulation in violation of the CEA before executing his scheme in this case. *Eisenberg v. Numeris Ltd.*, 3:22 Civ. 1325 (GMM) (D.P.R. July 6, 2022), Dkt. 1 (Complaint), at 12-13.

Even setting aside the procedural posture, the argument that the statutes in Counts One and Two are unconstitutionally vague—which would eviscerate core provisions of the CEA and run against decades of case law—is also meritless. Eisenberg does not even meaningfully try to explain his position that Section 6(c)(1) and Rule 180.1 are unconstitutionally vague. Nor could he. As explained above, Section 6(c)(1) and Rule 180.1 are modeled off longstanding provisions in the securities laws. Civil and criminal cases alleging unlawful market manipulation have been brought under those laws for decades. *See supra* at 18-19. And proving criminal liability under Section 6(c)(1) and Rule 180.1 requires proof that the defendant acted "willfully," 7 U.S.C. § 13(a)(5), that is voluntarily and with a wrongful purpose, *see, e.g.*, *United States v. Temple*, 447 F.3d 130, 137 (2d Cir. 2006), which guards against the possibility that a defendant could be convicted without knowing that their actions were wrongful. *See, e.g.*, *Roberts*, 363 F.2d at 123 (explaining that a fair-notice claim "must be met with some measure of skepticism" when a statute has a *mens rea* requirement); *U.S. v. Muse*, No. 06 Cr. 600 (DLC), 2007 WL 391563, at *2 (S.D.N.Y. Jan. 30, 2007) (same).

The challenge to the statute charged in Count Two—Section 9(a)(2)—is similarly meritless. To prove a violation of this provision, the Government must show that "(1) the defendant possessed an ability to influence market prices; (2) an artificial price existed; (3) the defendant caused the artificial price; and (4) the defendant specifically intended to cause the artificial price." *In re Amaranth Nat. Gas Commodities Litig.*, 587 F. Supp. 2d 513, 530 (S.D.N.Y.

24

2008) (internal citation omitted).  While this provision does not require proof of willfulness, it does require a specific intent to create an artificial price.  *See United States v. Reliant Energy Servs., Inc.*, 420 F. Supp. 2d 1043, 1053 (N.D. Cal. 2006); *see also* Indictment ¶ 25 (alleging that Eisenberg "knowingly and intentionally manipulated and attempted to manipulate").

Eisenberg contends that this test is vague because there is no uniform definition of price artificiality.  But some version of this anti-manipulation statute has been in the CEA since the 1920s.  The Grains Futures Act, H.R. 11843, 67th Congress (1922), *available at* uscode.house.gov/statviewer.htm?volume=42&page=1002#.  And settled case law defines an artificial price as one that "does not reflect basic forces of supply and demand," including when a price "is higher than it would have been absent Defendant['s] conduct."  *CFTC v. Parnon Energy Inc.*, 875 F. Supp. 2d 233, 246 (S.D.N.Y. 2012) (internal citation omitted). Further, there is no risk that a defendant will be convicted without knowingly creating an artificial price because the Government will need to prove specific intent to create such a price.  *See Reliant*, 420 F. Supp. 2d at 1053.

Eisenberg's argument is not really a vagueness challenge, but rather an attempt to litigate the substance of whether he, in fact, intended to and did create an artificial price in this case, which he pursues through a lengthy analysis of *United States v. Radley* and *United States v. Reliant*.  Br. at 17, 21.  A motion to dismiss is not the proper place for this type of deeply fact-based argument. And even if it were, Eisenberg's challenge would fail because he misreads *Reliant* and is wrong to rely on *Radley*.

Start with *Reliant*.  That case did not, as Eisenberg contends, require evidence of a false statement to prove an artificial price.  Br. at 18-22.  Rather, the alleged "dissemination of false and misleading rumors and information" to other brokers was just *one* of the acts in the alleged scheme.

*Reliant*, 420 F. Supp. 2d at 1059-60.  The *Reliant* court found that the alleged withholding of electricity, shut down of several power plants, and purchase of additional electricity from other markets—none of which are "false statements"—also "affect[ed] the basic forces of supply and demand."  *Id.*  This is consistent with the long line of decisions from this Circuit holding that open-market manipulation can create an artificial price.  *See supra* at 18-19.

As for *Radley*, that case is an extreme outlier.  It is true that, there, a District Court held that Section 9(a)(2) was impermissibly vague in the absence of allegations of false statements.  But the Fifth Circuit on appeal explicitly declined to affirm the judgment on those grounds.  *United States v. Radley*, 632 F.3d 177, 180-81 (5th Cir. 2011) (affirming the *Radley* district court's conclusion that the defendants' conduct fell within a statutory exemption for off-exchange commodities transactions but "reserv[ing] comment on the constitutional issue").  And no other court in the country has reached the same conclusion.

In fact, at least one court has explicitly rejected *Radley*'s reasoning.  In *Parnon*, Judge Pauley rejected a challenge to a CEA claim based on *Radley*, calling that decision "a bridge too far."  875 F. Supp. 2d at 248 n.2.  Judge Pauley observed that *Radley*'s reasoning would "contradict the established principle that the CEA reaches . . . well-recognized manipulations" that do not involve false statements, such "as intentional squeezes."  *Id.*; *accord Kraft*, 153 F. Supp. 3d at 1008-20 (explaining how Section 9(a)(2) traditionally reached tactics such as corners and squeezes).  The *Radley* decision would also be inconsistent with the long line of cases from the securities context—cited above—that hold it is unlawful to "control[] or artificially affect[] the price of securities."  *Set Capital*, 996 F.3d at 76.  If the concept of price artificiality were unconstitutionally vague, none of the cases would be correctly decided—a result that is plainly untenable in light of decades of Circuit case law.

Eisenberg's remaining claims have, if anything, even less merit.  He claims he did not have "fair notice that the CEA could apply to the Mango Perpetuals."  Br. at 23.  But this is a fact argument that is belied by the allegations in the Indictment.  It also is at odds with the plain text of the CEA, which applies to all swaps and commodities, as well as the extensive history of regulatory actions and judicial decisions extending the CEA to the context of cryptocurrencies.  Indeed, Judge Koeltl recently rejected a similar "fair notice" challenge to applying the CEA in the context of cryptocurrencies and cryptocurrency products, even though the conduct at issue in that case dated back to 2014—years before Eisenberg's crime.  *See Reed*, 2022 WL 597180, at *2-4 (rejecting fair notice argument).

The complaint that there are few commodities-manipulation prosecutions, Br. 18, 24, is also irrelevant.  As the Second Circuit has noted, "[t]he claimed novelty of this prosecution does not help [defendant's vagueness challenge], for it is immaterial that there has been no litigated fact pattern precisely in point."  *United States v. Kinzler*, 55 F.3d 70, 74 (2d Cir. 1995) (internal citation omitted); *see also Reliant*, 420 F. Supp. 2d at 1054 ("The fact that this might be the government's premiere criminal prosecution under the criminal manipulation provision [of the CEA] does not itself answer the court's inquiry whether the statute is unconstitutionally vague."); *United States v. Ulbricht*, 31 F. Supp. 3d 540, 566 (S.D.N.Y. 2014) ("The fact that a particular defendant is the first to be prosecuted for novel conduct under a pre-existing statutory scheme does not ipso facto mean that the statute is ambiguous or vague or that he has been deprived of constitutionally appropriate notice.").  And as noted above, Eisenberg has publicly tweeted about prosecutions under the CEA that are currently ongoing in this District.  *See supra* at 23-24.  He cannot now claim that he lacked notice such a prosecution was possible.

**E.  The Statutory Construction Challenges to Counts One and Two Should Be Denied**

Eisenberg presents a grab-bag of statutory construction arguments that are all based on the faulty premise that the commodities fraud and manipulation charges rely on the government claiming that MNGO is a commodity.  Br. at 24-26.  But given the discussion above addressing this misguided premise, *supra* at 10-15, the canons of statutory construction cited by Eisenberg have no application here.

Through his rule of lenity argument, Eisenberg also revisits his claims that the relevant statutes are somehow ambiguous, though he does not point out what part of the statutes are ambiguous (for example, contesting that the term "manipulate" is ambiguous and thus invokes the rule of lenity, as in *Reliant*).  Against the backdrop of the earlier vagueness discussion, *supra* at 23-38, and "[w]here statutory and regulatory provisions unambiguously cover the defendant's conduct, the rule [of lenity] does not come into play."  *United States v. Litchfield*, 986 F.2d 21, 22 (2d Cir. 1993); *see also United States v. Canales*, 91 F.3d 363, 368 (2d Cir. 1996) (rejecting rule of lenity claim where "no ambiguity arose from the manner in which the statute was narrowly applied to the defendant" (internal citation and alteration omitted)); *Reliant*, 420 F. Supp. 2d at 1060-61 (finding the rule of lenity inapplicable).

Likewise, "*Chevron* deference is appropriate only when the language is ambiguous and the intent of Congress unclear."  *Hechavarria v. Sessions*, 891 F.3d 49, 56 (2d Cir. 2018), *as amended* (May 22, 2018).  *Chevron* deference is not necessary here because there is nothing ambiguous about the CEA.  USDC is a "commodity," and the MNGO Perpetuals are "swaps" under the plain text of the statute.

It also bears noting that the "major questions doctrine,"[3] as Judge Rakoff recently discussed in *Securities and Exchange Commission v. Terraform Labs Pte. Ltd.*, "is reserved for the most extraordinary cases where the agency claims broad regulatory authority *and* the area to be regulated is one invested with particular economic and political significance" and thus "has been rarely invoked."  No. 23 Civ. 1346 (JSR), 2023 WL 4858299, at *8 (S.D.N.Y. July 31, 2023) (emphasis in original).  While the cryptocurrency industry is "important," it "falls far short of being a 'portion of the American economy' bearing 'vast economic and political significance."  *Id.* at *8.  And Eisenberg cannot credibly argue that the Government "exercise[s] vast economic power" over the cryptocurrency and/or commodities markets.  *Id.*  Eisenberg's statutory construction arguments should be denied.

### F.  The Wire Fraud Count Should Not Be Dismissed

Finally, Count Three of the Indictment should not be dismissed, as the allegations track the statutory language of 18 U.S.C. § 1343, including alleging that Eisenberg obtained money "by means of false and fraudulent pretenses, representations, and promises."  Indictment ¶ 27.  Eisenberg does not dispute that the Indictment sufficiently tracks the statutory language and provides notice of the charge against the defendant and the elements of the offense.  *Wedd*, 993 F.3d at 120.  Instead, Eisenberg argues that the wire fraud count should be dismissed because, he claims, his alleged conduct was fully permitted on the platform and he deceived no one.  Br. at 27-

---

[3] Eisenberg appears to conflate *Chevron* deference with the major questions doctrine, but the latter doctrine is "an exception to *Chevron* deference."  *Conservation L. Found., Inc. v. Longwood Venues & Destinations, Inc.*, 422 F. Supp. 3d 435, 456 n. 13 (D. Mass. 2019), *vacated and remanded on other grounds*, No. 20-1024, 2020 WL 6111192 (1st Cir. Oct. 14, 2020); *see also* Thomas B. Griffith & Haley N. Proctor, "Deference, Delegation, and Divination: Justice Breyer and the Future of the Major Questions Doctrine," 132 YALE L.J. FORUM 693, 714-18 (2022) (summarizing the Supreme Court's recent "retreat from *Chevron*," including Justice Gorsuch's "finaliz[ation of] the major question's doctrine's divorce from the *Chevron* doctrine").

28.  These are factual arguments not appropriate to be resolved at this stage.  *Dawkins*, 999 F.3d at 780.

As with his earlier challenge that Count One fails to allege a material misrepresentation or omission, Eisenberg trains his argument only on his failure to register the Exchange-1 and Exchange-2 accounts using his real identity.  Br. at 28-29.  This time, aside from making the same incorrect claim that his use of a false identity is not a misrepresentation, *see supra* at 17, Eisenberg also claims that his false identity misrepresentation has "no alleged nexus" to his theft of funds from Mango Markets.  That is wrong.  Eisenberg's scheme began by his opening Exchange-1 Account with a false identity; through that account, he sent funds for his two Mango Markets accounts.  Indictment ¶¶ 15(c)-(f).  In setting up his anonymous account on Exchange-2, Eisenberg provided false information about his location to circumvent Exchange-2's restrictions on traders from the United States.  *Id.* ¶ 17(f).  Eisenberg then used Exchange-1 and Exchange-2 Accounts to manipulate the Oracle into driving up the settlement price of MNGO Perpetuals on Mango Markets.  *Id.* ¶¶ 17-18.  It was through those actions that Eisenberg then was in a position to steal the $110 million from Mango Markets.  Setting aside that Eisenberg is factually incorrect, his reliance on two right-of-control theory fraud cases, *United States v. Shellef*, 507 F.3d 82 (2d Cir. 2007) and *United States v. Regent Office Supply Company*, 421 F.2d 1174 (2d Cir. 1980), Br. at 28-29, also are of no moment where, as here, the "property" that was the object of the fraud was not Mango users' intangible right to make informed economic decision but, instead, their money.

Furthermore, Eisenberg's restrictive reading misses that the Indictment also alleges another misrepresentation—that Eisenberg, as part of the scheme, falsely represented that he would "borrow" funds from Mango Markets, when he had no intention to repay or pay interest.

The wire fraud statute "penalize[s] using . . . a wire communication to execute any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." *United States v. Greenberg*, 835 F.3d 295, 305 (2d Cir. 2016). Under the wire fraud statute, a representation is false not only if it is "actual[ly] false," but also if it involves "some form of deception, such as a half-truth." *United States v. Connolly*, 24 F.4th 821, 833 (2d Cir. 2022); *see, e.g.*, *Universal Health Servs., Inc. v. United States*, 579 U.S. 176, 191 (2016) ("A statement that misleadingly omits critical facts is a misrepresentation . . . ."); *United States v. Autuori*, 212 F.3d 105, 118 (2d Cir. 2000) ("[I]t is just as unlawful to speak 'half truths' or to omit to state facts necessary to make the statements made . . . not misleading.") (internal citation omitted); *United States v. Weimert*, 819 F.3d 351, 355 (7th Cir. 2016) ("[T]he concept of a misrepresentation is also broad, reaching not only false statements of facts but also misleading half-truths and knowingly false promises.").

The Second Circuit has recognized that conveying a particular intention that is not genuinely held can be a misrepresentation. In *U.S. ex rel. O'Donnell v. Countrywide Home Loans, Inc.*, the Second Circuit explained that a contractual promise to take some action can be fraudulent if the party making the promise did not intend to keep it "at the time of contract execution." 822 F.3d 650, 658-59 (2d Cir. 2016). To illustrate that principle, the Second Circuit cited *Durland v. United States*, 161 U.S. 306 (1896). There, the Supreme Court held that a defendant had committed mail fraud by offering bonds with no intent to pay according to the schedule in the bond indentures. *Id.* at 313-15. The fact that the failure to pay also constituted a breach of contract did not mean that the empty promise was not also a misrepresentation. *Id.*

This principle is also evidenced in the context of "spoofing," where a trader places buy or sell orders that the trader actually intends to cancel, with the goal of manipulating the price of a

stock or commodity.  The Seventh Circuit has found such conduct to constitute a misrepresentation in violation of the wire fraud statue, as the order "signals a trader's intent to buy or sell," but placing such an order while "obscuring [the] intent to cancel . . . advance[s] a quintessential 'half-truth' or implied misrepresentation—the public perception of an intent to trade and a private intent to cancel in the hopes of financial gain."  *Chanu*, 40 F.4th at 541; *see also United States v. Coscia*, 866 F.3d 782 (7th Cir. 2017).

In this case, Eisenberg's scheme also involved a fraudulent half-truth because Eisenberg misrepresented that he was "borrowing" from Mango Markets.  To complete the transaction, Eisenberg used the "borrow" function on Mango Markets to borrow the approximately $110 million worth of cryptocurrency, on which he was obligated to make interest payments to the lenders until he repaid the loan.  Indictment ¶¶ 19-20.  As noted above, "borrow" is defined as "to take or receive something with promise or intention of returning it."  Merriam Webster, "Borrow."  But Eisenberg had no intention to repay those funds or pay interest.  Indictment ¶ 21.  Like in the spoofing cases, Eisenberg signaled an interest in borrowing (and thus, intention to pay back the funds and make the obligated interest payments), while harboring secret intentions to not repay nor to pay the required interest.  As the wire fraud count was properly alleged, Eisenberg's motion to dismiss this charge also must be denied.

This case, in short, is one for the jury.  Eisenberg violated well-established legal principles prohibiting fraud and manipulation.  His arguments to the contrary are fundamentally fact disputes for trial, not for a motion to dismiss.

## II.     The Motion to Suppress Should Be Denied.

Federal agents arrested Eisenberg when he was entering the country and seized his electronic devices, among other things.  Those agents, who were not part of the investigation, shipped the devices to agents in New York, who promptly obtained a warrant before Eisenberg

arrived in New York for his initial appearance.  Eisenberg's motion to suppress the fruits of that warrant should be denied.  It ignores that agents had legitimate grounds to search his belongings pursuant to their border-search and inventory-search authority, and it omits key facts about the reasonable efforts agents took to promptly obtain a warrant.

### A.  Factual Background[4]

#### 1.  The Arrest and Seizure

Eisenberg committed his criminal scheme on the evening of October 11, 2022.  Indictment ¶ 1.  The next day, Eisenberg fled the United States to Israel.  Compl. ¶ 18.

On December 22, 2022, the Government received an alert that Eisenberg had booked a flight scheduled to depart from Israel on December 25, 2022 and arrive in Puerto Rico on December 26, 2022, with a layover in Spain.  *See* Gov't Ex. 1.  Later that day, a special agent with the FBI ("FBI Agent-1") sent a request for assistance to the FBI in Puerto Rico, seeking help arresting Eisenberg upon his arrival in the United States.  *See* Gov't Ex. 2.  The next day, on December 23, 2022, the Honorable Gabriel W. Gorenstein authorized the Complaint and issued a warrant for Eisenberg's arrest.

As anticipated, Eisenberg departed Israel on or about December 25, 2022, had a layover in Spain, and arrived at the Luis Munoz Marin International Airport in Puerto Rico on the evening of December 26, 2022.  *See* Gov't Ex. 24.  Five law enforcement officers—three with the FBI ("FBI Agent-2" through "-4"), one who was an FBI Task Force Officer from CBP ("CBP Officer-1"), and one from HSI ("HSI Agent-1")—were awaiting Eisenberg's arrival in response to FBI Agent-

---

[4] As explained below, a hearing is not required to deny Eisenberg's motion.  The facts recited herein rely on documents and Eisenberg's affidavit and papers.  While the relevant witnesses, as is expected, have varying recollections of certain details, the account in this brief is consistent with the substance of how the Government expects witnesses would testify at a hearing.  Citations to "Aff" refer to Eisenberg's affidavit and citations to Gov't Ex. refer to the Government Exhibits attached to this opposition.

1's request for assistance.  *See* Gov't Ex. 3.  The officers waited for Eisenberg near the area where CBP conducts secondary checks of individuals arriving in the United States from abroad.  *See* Gov't Ex. 3; Aff. ¶ 4.

When Eisenberg reached the counter, a CBP officer stopped him and asked him basic questions about his trip.  Aff. ¶ 4.  That officer directed Eisenberg to a secondary inspection area, where CBP Officer-1 helped conduct a search of Eisenberg's luggage.  Aff. ¶ 5.  He found, among other things, a laptop computer (the "Laptop"), two cellphones, and plastic bag containing various documents (the "Documents").  Gov't Exs. 3-7.

While Eisenberg was at the secondary inspection, FBI Agents-3 and -4, and HSI Agent-1 approached him and brought him to an interview room, where they placed him in handcuffs.  Aff. ¶¶ 6-7.  Those agents searched Eisenberg's person during his arrest and seized a third cellphone (collectively with the other two cellphones, the "Cellphones") and Eisenberg's wallet.  *See* Gov't Ex. 3; Aff ¶ 9.  The agents reported the arrest and seizure of the Cellphones and Laptop to FBI Agent-1, who relayed that information to other relevant members of law enforcement.  *See* Gov't Ex. 8.

## 2.  The Initial Appearance and Logging of Seized Items

On the morning of December 27, 2022, agents at the FBI office in San Juan ("FBI San Juan") took an accounting of the valuable items that had been in Eisenberg's luggage.  That involved taking photographs of the Cellphones and the Laptop, as well as various electronic accessories, such as batteries and power cords.  *See* Gov't Ex. 21.  FBI Agents-2 and -3 ultimately prepared two property receipts: one that listed the Cellphones, the Laptop, and the power cord, which they planned to ship to New York expeditiously, and another that listed Eisenberg's luggage, which contained the rest of his belongings.  *See* Gov't Exs. 4-5.  The receipts reflected that the electronics and the luggage had been seized on December 26, 2022—when those items

were taken into custody.  *Id.*

That same day, FBI Agent-3 picked Eisenberg up from the local police precinct and brought him to the FBI for his remote initial appearance.  *See* Gov't Ex. 3.  While at FBI San Juan, FBI Agent-3 showed Eisenberg the property receipts, and Eisenberg signed them.  Aff. ¶¶ 11-12.  FBI Agent-3 also showed Eisenberg photographs of his electronic devices.  *Id.*  Eisenberg had his initial appearance in the early afternoon.  *See United States v. Eisenberg*, 22 Mag. 1583, Dkt. 3 (D.P.R.).  He was ordered temporarily detained, pending a bail and removal hearing.  *Id.* Dkt. 4.

The next day, December 28, 2022, FBI Agent-3 sent an alert (called a "Lead Report"), directing the FBI evidence technicians to send the Cellphones and Laptop to the FBI field office in New York ("FBI New York").  *See* Gov't Ex. 9.  FBI Agent-3 labeled the Lead Report a "priority," which meant that it had a deadline of seven days—here, January 4, 2023.  *Id.*

FBI Agent-3 did not send the rest of Eisenberg's luggage, or his wallet, to New York at that time because he expected that someone associated with Eisenberg might retrieve it.  *See* Gov't Ex. 10.  While waiting for someone to claim the items, FBI Agent-3 prepared a log of the money in Eisenberg's wallet and the Documents.  *See* Gov't Ex. 6.  By January 11, 2023, no one had attempted to claim the items, so FBI Agent-3 sent the luggage, including the Documents, to FBI New York.  *See* Gov't Ex. 10.

### 3.  Eisenberg's Detention

On December 30, 2022, a United States Magistrate Judge in the District of Puerto Rico held a detention and removal hearing for Eisenberg.  *See United States v. Eisenberg*, 22 Mag. 1583, Dkt. 7 (D.P.R.)  Eisenberg waived his right to challenge removal, but argued that he should be granted bail.  *Id.*  The Magistrate Judge reserved decision and, on January 4, 2023, ordered that Eisenberg should be detained pending trial.  *Id.* Dkt. 9.

As a result of the detention decision, Eisenberg was transported by the United States

Marshals Service to the Southern District of New York.  He made his initial appearance in the Southern District on February 2, 2023.  Dkt. 8.  At that appearance, Eisenberg consented to continued detention.  *Id.*  He has been in custody since.

### 4.  The Indictment and Initial Search Warrant

At his initial appearance in the District of Puerto Rico on December 27, Eisenberg had exercised his right to be indicted, or have a preliminary hearing, within 14 days of his arrest. *United States v. Eisenberg*, 22 Mag. 1583, Dkt. 7 (D.P.R.)  The Government, therefore, had until January 10, 2023 to receive approval to seek, and to obtain, and indictment.  *Id.*

Notwithstanding the holidays, the Government moved swiftly to continue investigating Eisenberg's crime and obtain an indictment.  For example, on January 6, 2023, FBI Agent-1 applied for and obtained a warrant to search certain electronic accounts from Google, Twitter, and Discord.  *See* Gov't Ex. 25.  And on January 9, 2023, the Government obtained the Indictment. Dkt. 4.

The Government also moved expeditiously to obtain a warrant to search the Cellphones and Laptop.  As explained above, on December 28, 2022, FBI Agent-3 sent a priority Lead Report, directing the evidence technicians at the FBI office in Puerto Rico to send the Cellphones and Laptop to FBI New York by January 4, 2023 at the latest.  *See* Gov't Ex. 9.

The devices had not arrived by January 13, 2023, so FBI Agent-1—who had been waiting for them—asked another FBI agent in New York ("FBI Agent-5") to contact an FBI office in Puerto Rico regarding the devices' whereabouts.  *See* Gov't Ex. 11.  FBI Agent-5 called the FBI office in Puerto Rico on January 13, 2023 that day.  *See* Gov't Ex. 12-13.  At approximately 11:55 a.m., an evidence technician at the FBI office in Puerto Rico sent the Cellphones and Laptop to New York via Federal Express.  *See* Gov't Exs. 9, 14-16.

The devices reached the FBI office in New York on January 17, 2023 and were logged into

evidence at approximately 1:15 a.m.  *Id.*  FBI Agent-1 had been tracking the devices.  When they arrived, he sent the evidence technicians in New York an email, asking for confirmation about when the devices were received into evidence, so FBI Agent-1 could pick them up.  *See* Gov't Ex. 17.  FBI Agent-1 picked up the Cellphones and Laptop at approximately at approximately 1:45 p.m. on January 17, 2023—less than an hour after they arrived from Puerto Rico.  *See* Gov't Exs. 14-16.

That same day, the Government sent an email to this Court, stating that it had a proposed search warrant in this case and asking if this Court would like to handle the warrant or refer it to Magistrate Court.  *See* Gov't Ex. 18.  A little after noon the following day, January 18, 2023, this Court responded, referring the warrant to Magistrate Court.  *Id.*  Several minutes later, the Government sent the Honorable Barbara Moses an application for a warrant to search Eisenberg's devices.  *See* Gov't Ex. 19.  Judge Moses authorized the warrant on the morning of January 19, 2023.

### 5.  The Subsequent Search Warrant

After obtaining the warrant to search Eisenberg's devices, personnel in the FBI's Computer Analysis and Response Team ("CART") began attempting to access and extract data from the devices and convert that data into a readable format.  While converting data from one of Eisenberg's cellphones into a readable format, CART employees observed that the device contained child pornography.  On or about February 6, 2023, the Government applied for and obtained a second warrant, expanding the scope of the original warrant to search for evidence of offense related to the possession and receipt of child pornography.  *See* Gov't Ex. 26.

### 6.  Requests for Seized Material

The first time the Government received a request for Eisenberg's luggage or his devices was via a letter from Eisenberg's attorneys on January 19, 2023—after the Government had

already applied for a search warrant.  *See* Gov't Ex. 27.  The Government successfully converted data from two of the Cellphones into a readable format in early February 2023 and from the Laptop in early August 2023.  The Government has, to date, been unable to access data from the third Cellphone.

Eisenberg and his attorneys have been able to review the data from Eisenberg's devices for months.  As is common in cases involving child pornography, the Government has made the extractions available for review at FBI New York, and informed the defense that the Government will facilitate Eisenberg traveling from the detention facility to the FBI office to review those materials with his attorneys.  Nonetheless, neither Eisenberg nor his attorneys have reviewed that data.[5]

### B.   The Government Lawfully Seized Eisenberg's Cellphones, Laptop, and Documents.

Eisenberg's motion to suppress is based on the premise that the agents could only have lawfully seized those items incident to arrest.  Br. at 29-30.  That premise is false.  In addition to having the authority to conduct a search incident to arrest, the agents also had the ability to lawfully search Eisenberg's belongings pursuant to their authority to conduct border searches and inventory searches.  The agents lawfully exercised that border-search authority, in addition to their authority to search incident to arrest.  And even if they had not done so, the agents inevitably would have discovered the Cellphones, Laptop, and Documents items through a lawful inventory search.

### 1.   The Cellphones, Laptop, and Documents Were Lawfully Seized Pursuant to a Border Search and Search Incident to Arrest.

One glaring omission from Eisenberg's affidavit and brief is the fact that, when he arrived at the airport in Puerto Rico, he was entering the country from abroad.  That omission makes an

---

[5] The Government more recently obtained access to data from Eisenberg's Laptop, and Eisenberg has scheduled time to review that data in September.

important difference because the Fourth Amendment permits warrantless searches and seizures at the border.  The Cellphones, Laptop, and Documents were seized consistent with that border search authority and with the authority to search incident to arrest.

"It is well established that the government has broad powers to conduct searches at the border even where . . . there is no reasonable suspicion that the prospective entrant has committed a crime."  *Tabbaa v. Chertoff*, 509 F.3d 89, 97 (2d Cir. 2007); *accord United States v. Flores-Montano*, 541 U.S. 149, 153 (2004) ("Congress . . . has granted the Executive plenary authority to conduct routine searches and seizures at the border, without probable cause or a warrant . . . .").  It is equally settled that "the Customs area of an international airport is the functional equivalent of a border for purposes of the border search doctrine."  *United States v. Levy*, 803 F.3d 120, 122 (2d Cir. 2015); *accord United States v. Irving*, 452 F.3d 110, 123 (2d Cir. 2006).

The Second Circuit has held that this border-search authority allows officials acting at the direction of other law-enforcement agencies to conduct searches for evidence of fraud.  In *Levy*, CBP officers stopped the subject of a fraud investigation when he was entering the country at an airport.  *Levy*, 803 F.3d at 121.  Outside of the suspect's presence, the officers inspect his luggage and found a notebook with information relevant to the investigation.  *Id.*  The officers photocopied the notebook before allowing the suspect to leave.  *Id.*  The Second Circuit held that this was a valid exercise of the border search authority, even though the CBP officers were conducting the search to "further[] another federal agency's criminal investigation."  *Id.* at 123-24.

Consistent with this lawful border-search authority, the agents searched Eisenberg's luggage at the border, seizing the Laptop, Documents, and two of the three Cellphones.  There is no legitimate dispute that Eisenberg was stopped at the border:  He arrived in Puerto Rico on an international flight, and the relevant events at the airport occurred in the Customs area.  *Irving*,

452 F.3d at 123 ("An airport is considered the functional equivalent of a border and thus a search there may fit within the border search exception."). When he reached Customs, CBP Officer-1 helped search Eisenberg's luggage, finding the Laptop, the Documents, and two of the three Cellphones. Once those items were in view, the officers involved in the search were legally entitled to seize them because they were plainly items that would contain evidence of the fraud under investigation. *See United States v. Delva*, 858 F.3d 135, 149 (2d Cir. 2017) (holding that agents may seize evidence if they are "lawfully in a position from which they view [it]"). That is precisely what happened: the arresting agents took the Laptop, Documents, and the two Cellphones, along with the rest of Eisenberg's belongings, into federal custody.

Eisenberg's third Cellphone was lawfully seized pursuant to both the border-search authority and as a search incident to arrest. As explained above, agents brought Eisenberg to an interview room, where they placed him in handcuffs. The agents then searched his pockets, where they found his wallet and the third Cellphone, both of which they seized. Aff. ¶¶ 5, 9; Br. 32. That seizure is consistent with the border-search authority because the Second Circuit has long held that, at the border, searches of "outer clothing, luggage, a purse, wallet, pockets or shoes" are allowed, even without a warrant or any suspicion. *Irving*, 452 F.3d at 123.

Seizing the third Cellphone was also a permissible exercise of the authority to conduct searches incident to arrest. That doctrine "permits police to search a lawfully arrested person and areas within his immediate control." *Smith v. Ohio*, 494 U.S. 541, 543 (1990). It applies to items seized within the defendant's area of control "even when an arrestee is handcuffed or otherwise restrained by police." *United States v. Cushnie*, No. 14 Cr. (PGG), 2014 WL 7447149, at *11 (S.D.N.Y. Dec. 31, 2014). Because the third Cellphone and wallet were on Eisenberg's person at the time of his arrest, they were in his area of control and lawfully subject to seizure.

In sum, the agents' seizure of Eisenberg's Cellphone, Laptop, and Documents were a straightforward exercise of their lawful authority at the border and to search incident to arrest.

### 2. The Agents Inevitably Would Have Seized the Cellphone, Laptop, and Documents in Eisenberg's Luggage Through a Lawful Inventory Search.

Even if the agents had not seized the Cellphones, Laptop, and Documents from Eisenberg's luggage pursuant to their authority to conduct border searches, they inevitably would have seized those items pursuant to a lawful inventory search.

"[I]nventory searches of items lawfully obtained by the police fall within a well-defined exception to the Fourth Amendment's warrant requirement." *United States v. Thompson*, 29 F.3d 62, 65 (2d Cir. 1994). "[I]t is entirely proper for police to remove and list or inventory property found on the person or in the possession of an arrested person who is to be jailed." *Illinois v. Lafayette*, 462 U.S. 640, 646 (1983); *accord United States v. Mendez*, 315 F.3d 132, 137 (2d Cir. 2002) (explaining the constitutional basis for inventory searches). An inventory search "must be conducted pursuant to established inventory procedures," *United States v. Griffiths*, 47 F.3d 74, 78 (2d Cir. 1995), "[t]he existence of [which] may be proven by reference to either written rules and regulations." *Mendez*, 315 F.3d at 137. Not "every detail of a search," however, "must be governed by a standardized policy." *United States v. Williams*, 930 F.3d 44, 55-56 (2d Cir. 2019).

This inventory-search exception "has been combined" with the "inevitable discovery doctrine . . . to admit . . . evidence if the contested evidence would . . . have been discovered in the course of a valid inventory search." *United States v. Morillo*, No. 08 Cr. 676 (NGG), 2009 WL 3254431, at *9 (E.D.N.Y. Oct. 9, 2009); *accord Mendez*, 315 F.3d at 137. The "inevitable discovery doctrine" holds that evidence obtained even during an unreasonable search or seizure "should not be excluded if the government can prove that the evidence would have been obtained inevitably without the constitutional violation." *United States v. Heath*, 455 F.3d 52, 55 (2d Cir.

2006); *see United States v. Griffiths*, 47 F.3d 74, 77-78 (2d Cir. 1995) (reversing exclusion of evidence because "possession would have been . . . inventoried").  Establishing that evidence inevitably would have been discovered pursuant to an inventory search requires proving three things: First, that law enforcement "had legitimate custody of the . . . property being searched." *Mendez*, 315 F.3d at 138.  Second, that "when [agents] in the [law enforcement] agency in question conducted inventory searches, they did so pursuant to established or standardized procedures."  *Id.* And third, "that those procedure would have inevitably led to the discovery of the challenged evidence."  *Id.*

These three elements are easily met here.  First, the arresting agents had "legitimate custody" of Eisenberg's luggage.  *Id.*  When Eisenberg was arrested, he was alone at the airport with his luggage.  The Second Circuit has long held that, "[w]hen a person is arrested in a place other than his home, the arresting officers may impound the personal effects that are with him at the time to ensure the safety of those effects or to remove nuisances from the area," including impounding an "arrested individual's luggage."  *United States v. Perea*, 986 F.2d 633, 643-44 (2d Cir. 1993); *see also United States v. Hana*, No. 94 Cr. 116 (RPP), 1994 WL 323642, at *2 (S.D.N.Y. July 5, 1994) (holding that seizure of briefcase in connection with arrest was lawful). The agents did just that, taking all of Eisenberg's luggage and belongings back with them to FBI San Juan.

Second, FBI agents conduct mandatory inventory searches of impounded items "pursuant to established or standardized procedures."  *Mendez*, 315 F.3d at 138.  The FBI has a written inventory protocol set forth in the agency's Domestic Investigations and Operations Guide ("DIOG").  Under the DIOG, "after lawfully taking custody of property, FBI employees *must* conduct a prompt and thorough search of the contents of the property, including searching any

locked or unlocked containers and inventorying their contents."  Gov't Ex. 20. (emphasis added). This mandatory policy ensured that the agents inevitably would have conducted an inventory search of Eisenberg's luggage, even if they had not searched the luggage at the border.  *See, e.g.*, *Perea*, 986 F.2d at 644 (seizure valid if items "inevitably would have been discovered as part of a valid inventory search"); *Griffiths*, 47 F.3d at 78 (seizure valid if items would have been found "pursuant to established inventory procedures").  Indeed, Courts in this District have held that, in light of the DIOG, it is inevitable the FBI will inventory seized baggage, such as Eisenberg's luggage.  *See United States v. Ellis*, No. 19 Cr. 857 (NSR), 2020 WL 6784139, at *5 (S.D.N.Y. Nov. 17, 2020) (relying on DOIG for decision that FBI inevitably would have conducted inventory search of bag).

    The agents in Puerto Rico also acted in accordance with the DIOG.  Even though the agents had already found the Cellphones, Laptop, and Documents during the border search, they performed a separate inventory search of Eisenberg's luggage after it was back at FBI San Juan. That search involved taking photographs of Eisenberg's devices and electronics and identifying other valuables, such as identification documents, bank and credit cards, and money that had been in Eisenberg's luggage and wallet.  Gov't Exs. 21, 6, 7.   The agents recorded what they found by preparing both property receipts and "Collected Item Logs," which they incorporated by reference into the arrest report, which is known as an "FD-302."  Gov't Exs. 3-7; *see* Gov't Ex. 20 ("A written summary showing the results of the inventory must be recorded in an FD-302 . . . .").  This confirms that the agents inevitably would have conducted an inventory search of Eisenberg's pursuant to a standardized, mandatory policy.  *See, e.g.*, *Williams*, 930 F.3d at 55-57 (upholding inventory search pursuant to standardized policies); *Lopez*, 547 F.3d at 369-70 (same).

    Third, and finally, the agents inevitably would have found the Cellphones, Laptop, and

43

Documents in Eisenberg's luggage pursuant to an inventory search. There is no dispute that those items were in Eisenberg's luggage, and because of their size and value they would have been impossible to miss. By way of example, FBI Agent-2's photographs of items from Eisenberg's luggage includes photographs of much smaller, less significant electronics.

Accordingly, even setting aside the valid exercise of border-search authority, the agents inevitably would have seized the Cellphones, Laptop, and Documents from Eisenberg's luggage.

### 3. Eisenberg's Arguments Do Not Warrant Suppression or a Hearing.

None of the claims in Eisenberg's motion or supporting papers warrant suppression or a hearing. For one, Eisenberg's motion is based on the false premise that the Cellphones, Laptop, and Documents could only have been lawfully seized pursuant to a search incident to arrest. Br. at 29-30. That is not the case, so Eisenberg's extensive discussion of his proximity to the luggage when items were seized is irrelevant. For purposes of the border-search and inventory-search exceptions, Eisenberg did not have to be in close proximity to his luggage for the searches to be lawful. *See Levy*, 803 F.3d at 121 (noting that border search occurred outside suspect's presence).

Eisenberg's purported basis for ignoring the border-search and inventory-search exceptions is that the FBI paperwork documenting the search and seizure refers to a search incident to arrest. *See* Br. at 38 n.19. But that has no legal or factual significance. Legally, what type of search the officers thought they were performing does not matter for the Fourth Amendment. "An action is reasonable under the Fourth Amendment, regardless of the individual officer's state of mind, as long as the circumstances, viewed objectively, justify [the] action." *Brigham City v. Stuart*, 547 U.S. 398, 404 (2006); *accord Williams*, 930 F.3d at 56; *United States v. Klump*, 536 F.3d 113 (2d Cir. 2008). That the agents wrote search incident to arrest as the header to certain paperwork reveals nothing of substance. The agents arrested Eisenberg on December 26 and took all his belongings into custody connection with that arrest. *See Perea*, 986 F.2d at 644 (holding

that agents may impound property).  Using "search incident to arrest" was simply shorthand for that series of events.  There was no requirement to write out all the legal bases for collecting Eisenberg's property on the headers of internal FBI paperwork.[6]

The factual claims in Eisenberg's papers also do not cast doubt on the lawfulness of the border search or the inevitability of the inventory search.  With respect to the border search, Eisenberg acknowledges that a CBP officer looked through his luggage, and even found the Laptop and the bag containing the Documents.  Aff. ¶ 5.  Eisenberg's motion also acknowledges that the third Cellphone was seized from his pocket, Br. at 32, although Eisenberg conspicuously omits that fact from his affidavit, Aff. ¶ 9.

Eisenberg claims that he did not see the CBP officer remove those items or find the two Cellphones in the luggage.  *Id.*  But he admits that he was taken away from his luggage for the arrest, *id.* ¶¶ 5-7, and the documentary record is clear that the devices were located and seized at that time.  The arrest reports reflect the seizures, and an email between Government employees from the night of the arrest states that the agents found three cellphones and a laptop.  Gov't Exs. 3, 8.  There is no legitimate dispute that the items at issue were lawfully seized at the border.[7]

As for the inventory-search exception, Eisenberg provides no basis to question that the agents inevitably would have conducted an inventory search of his luggage, even if they had not conducted a search at the border.  Nor could he: the DOIG is clear that an inventory search was

---

[6] Eisenberg notes that the "Collected Item Logs" list the relevant seizures occurring at 6:30 p.m., which he says is "an hour before [he] was allegedly arrested."  Br. at 35.  But he leaves out that the logs say "6:30 p.m. *EST*."  Gov't Exs. 7-8.  That is an important omission because Puerto Rico is an hour ahead of Eastern Time, so 6:30 p.m. EST is consistent with a 7:30 p.m. arrest in Puerto Rico.

[7] The exact timing of when agents found the devices at the border, and whether they removed those items from the luggage—as opposed to left them in the bags—are of no moment.  What matters is that the agents lawfully found the items at the border and transported them back to FBI San Juan.

required, and agents' actions reflect that they inventoried valuable items in Eisenberg's luggage following his arrest. Thus, even if the Court were to find that testimony was necessary to find that the items at issue were seized pursuant to a border search, a hearing would still be unnecessary because those items inevitably would have been seized during an inventory search. Eisenberg's motion can, accordingly, be denied without a hearing.

### C. The Government Did Not Unreasonably Delay in Applying for a Search Warrant.

There is no merit to Eisenberg's claim that the Government unconstitutionally delayed in applying for a warrant to search the Cellphones and Laptop. Everything about the Government's process for obtaining a warrant was reasonable. Having the devices shipped from Puerto Rico to New York for a warrant was logical: The case was charged in New York, and the agents investigating the case were based here. The agents closely monitored the progress of the devices and applied for a warrant within 24 hours of them arriving in the district. And Eisenberg was not meaningfully deprived of his devices during that period because he was in custody being transferred from Puerto Rico to New York the entire time. The motion should be denied.

### 1. The Touchstone of the Fourth Amendment is Reasonableness.

The Fourth Amendment protects people "against unreasonable searches and seizures." The "ultimate touchstone is reasonableness." *Brigham City*, 547 U.S. at 398; *United States v. Ganias*, 824 F.3d 199, 209 (2d Cir. 2016) (en banc) ("The touchstone of the Fourth Amendment is reasonableness."). Consistent with this focus on reasonableness, the Second Circuit has held that, when law enforcement officers "temporarily seize a person's property pending the issuance of a search warrant," the officers must "act with diligence to apply for the warrant." *United States v. Smith*, 967 F.3d 198, 205 (2d Cir. 2020). The purpose of this doctrine is to "avoid interfering with a continuing possessory interest for longer than reasonably necessary" and to allow the judiciary to "promptly evaluat[e] and correct[] improper seizures." *Id.* at 205-06.

46

The Second Circuit has explained that "four factors are generally relevant to whether the police have waited an unreasonable amount of time before seeking a search warrant." *Id.* at 206. Those factors are: "(1) the length of the delay, (2) the importance of the seized property to the defendant, (3) whether the defendant had a reduced property interest in the seized item, and (4) the strength of the state's justification for the delay." *Id.* These factors must be viewed holistically, and "essentially seek to balance the individual's possessory interest against the government's continuing interest in retaining the property for investigation or prosecution." *Id.* at 206 n.1.

Here, the Government's actions in obtaining a warrant for the Cellphones and Laptop were entirely reasonable. The brief delay between the seizure of those devices and the warrant was attributable entirely to the need to ship the devices to New York, where Eisenberg was being prosecuted, and the relevant agents monitored that process diligently. Eisenberg's possessory interest was not meaningfully harmed by that brief delay because he was in custody travelling from Puerto Rico to New York during the entire period.

### 2. The Agents Acted Reasonably in Obtaining a Warrant.

#### a. The Length of Delay Does Not Favor Exclusion.

The length of the delay in this case does not favor exclusion. Eisenberg claims that there was a "24-day delay in applying for a search warrant," Br. at 41, but that leaves out important context and is incorrect about the timeline.

Critically, Eisenberg ignores that his devices were seized in Puerto Rico, by agents who had no substantive involvement in his case. The agents who were responsible for the investigation and search warrant were located in New York. Those agents received the Cellphones and Laptop on January 17. They could not apply for a warrant in this District until the devices were here. *See* Fed. R. Crim. P. 41(b)(1). The day the devices arrived, the Government reached out to this Court about an application for a search warrant and, after receiving a response from this Court on January

18, immediately sent that application to the magistrate judge on duty.  Gov't Ex. 19.  In short, the agents in charge of the investigation and prosecution applied for the warrant *within 24 hours* of receiving the devices.

Moreover, even if the Court were to count the full period between seizure and application, that amounts to 22 days, not 24.  Eisenberg's 24-day calculation is based on the premise that the agents applied for the search warrant on January 19.  *See* Br. at 44.  In reality, the agents reached out to the Court about the application two days earlier—on January 17—and the subsequent delay was not due to waiting by the Government, but rather to arranging which judge would review the warrant and when that judge was available to swear it out.  Gov't Exs. 18, 19.  Thus, the true length of time between the seizure and the application for a warrant was 22 days.

Even that 22-day calculation does not weigh in favor of exclusion, and certainly not strongly.  It is true, as Eisenberg notes, that some courts have found delays of around 20 days to favor defendants.  *See, e.g.*, *United States v. Wells*, No. 20 Cr. 633 (NRB), 2023 WL 2223474, at *3 (S.D.N.Y. Feb. 23, 2023) (finding 29-day delay weighed in favor of defendant); *United States v. Javat*, 549 F. Supp. 3d 1344, 1358 (S.D. Fla. 2019) (finding 20-day delay weighed in favor of defendant).  But even the cases that make such a finding have noted that a delay of around 20 days only tipped that way "slight[ly]", *Wells*, 2023 WL 2223474, at *3, or "modestly," *Javat*, 549 F. Supp. 3d at 1358.  And courts in this District and elsewhere have found delays of well over 20 days ultimately not unreasonable.  *See, e.g.*, *Wells*, 2023 WL 2223474, at *7 (finding delays of 29 and 48 days not unreasonable); *United States v. Sharma*, No. 18 Cr. 340 (LGS), 2019 WL 3802223, at *6-*7 (S.D.N.Y. Aug. 13, 2019) (three-month delay); *United States v. Corbett*, No. 20 Cr. 213 (KAM), 2021 WL 4480626, at *5 (E.D.N.Y. Sept. 30, 2021) (101-day delay); *United States v. Sullivan*, 797 F.3d 623, 633 (9th Cir. 2015) (21-day delay); *Thomas v. United States*, 775 F. App'x

477, 491 (11th Cir. 2019) (33-day delay); *United States v. Laist*, 702 F.3d 608, 616 (11th Cir. 2012).  Given the context of the delay at issue here—namely, a delay to transfer the devices to the agents who would apply for and execute the warrant—a period of 22 days was not unreasonably long.

### b.  Eisenberg Overstates the Importance of the Devices.

The second factor—the importance of the devices to the defendant—focuses on "nature of the property seized" and the "particular significance" of the property to the defendant.  *Smith*, 967 F.3d at 207-08.  While the Government acknowledges that, in the abstract, this factor weighs modestly in favor of Eisenberg, it should bear little significance in the Fourth Amendment analysis here because Eisenberg was in custody between the seizure and the application for the warrant and because Eisenberg dramatically overstates the importance of the devices during that period.

In *Smith*, the Second Circuit recognized that "the search and seizure of personal electronic devices . . . implicates different privacy and possessory concerns than the search and seizure of a person's ordinary personal effects."  *Id.* at 208.  This is because personal electronic devices typically contain large volumes of data, including significant amounts of personal information that may have nothing to do with an investigation.  *Id.* at 207.  In light of this decision, and the fact that Eisenberg represents that he regularly used the Cellphones and Laptop for business and personal reasons, the Government recognizes that the devices were important to him.

This importance, however, does little to support Eisenberg's Fourth Amendment challenge.  One central purpose of the reasonableness inquiry here is to ensure the Government avoids "interfering with a continuing possessory interest for longer than reasonably necessary."  *Id.* at 205.  But Eisenberg had a dramatically diminished possessory interest in the Cellphones and Laptop.  He was in custody, being transported from Puerto Rico to New York, during the entire period between the seizure and the warrant.  As explained in greater detail in the next section,

courts routinely hold that defendants have substantially diminished possessory interest while in custody because they cannot personally use the seized devices.

Eisenberg also wildly overstates the hardship that resulted from the seizures.  For one, Eisenberg's affidavit and brief appear to focus on the entire period from the seizure to the present. That is nonsensical for two reasons.  First, Eisenberg's challenge is to the reasonableness of the delay between the seizure and the warrant application, so that 22-day period is what matters for the Fourth Amendment analysis.  Ever since then, the Government has had the devices pursuant to a warrant.  Eisenberg does not identify any prejudice he suffered during that brief three-week period, when he was also in transit from Puerto Rico to New York.

Second, focusing on the full period since the seizure is inappropriate because, as Eisenberg well knows, he is not able to get back his devices because they contain child pornography.  The Government found child pornography on one of the Cellphones by early February and has since found child pornography on the Laptop and the other operable Cellphone.  Because of that contraband, Eisenberg could not have received the return of his devices, so it would be wrong to consider everything for which he claims he might have used them.

Even setting those issues aside, Eisenberg's claims of hardship are not credible.  One part of Eisenberg's affidavit claims that the seizure hampered his defense because, among other things, he was unable to look up "contact information," obtain certain information "saved locally on [his] devices," or find certain communications.  Aff. ¶¶ 28-30.  But Eisenberg leaves out critical information: the Government has made available to the defense the full extractions from the two Cellphones the Government has accessed and the Laptop.  To the extent there is important data on those devices, the defense has access to it.  The claim that the defense has been hampered is particularly outlandish because neither Eisenberg, nor his attorneys, have ever reviewed the

Cellphone extractions, despite their being available for months.

Eisenberg's claim of financial hardship also rings hollow.  At the outset, Eisenberg stole tens of millions of dollars, so there is significant reason to doubt the legitimacy of his claim to any of the funds he discusses.  The substance of his claims are also not credible.  Eisenberg, for instance, claims about his inability to access funds at Customers Bank.  Aff. ¶¶ 22-26.  But his lawyers informed the Government that they had the funds from that account by March 2023, just a few months after his arrest.  Gov't Ex. 22.  Eisenberg also claims that he has been harmed by being unable to move money to a Schwab account.  Aff ¶¶ 22-26.  But his attorneys informed the Government that Schwab closed that account months ago.  Gov't Ex. 23.  Moreover, while it might be the case that Eisenberg used his devices to hold passwords or authentication keys for various accounts, Aff. ¶ 22, it does not follow that there is no way to access the accounts without the devices.  People lose electronic devices all the time and manage to work with their banks to solve any access issues.

Finally, it bears repeating that Eisenberg and his attorneys have had the ability to review extractions from two of the Cellphones for months, but have not done so.  If there were passwords, account information, or other important data on the devices, they could have, and still can, retrieve them.  The fact that they have not attempted to do so speaks volumes about their actual importance.

### c.  Eisenberg Had a Substantially Diminished Property Interest in the Devices.

The third factor—"whether the defendant had a reduced property interest in the seized item[s]," *Smith*, 967 F.3d at 206—weighs decisively against Eisenberg.  Eisenberg was in custody during the entire period between the seizure and the search warrant; his attorneys and family made essentially no effort to obtain the devices during that time; the Government had probable cause to believe the devices contained evidence of Eisenberg's crime; and the devices had independent evidentiary value, even without a search warrant.

Most importantly, Eisenberg had a sharply diminished possessory interest in the devices because he was in custody during the entire period between their seizure and the search warrant. Indeed, the Government obtained the search warrant before Eisenberg even made it to New York for his initial appearance.  Because defendants in custody are not able to use personal devices, courts consistently hold that they have a diminished possessory interest in those devices. *See, e.g.*, *Sullivan*, 797 F.3d at 635 (finding reduced interest, in part, because defendant "was in custody the entire time"); *United States v. Bragg*, 44 F.4th 1067, 1071-72 (8th Cir. 2022) (finding defendant had reduced interest because of his "arrest and detention"); *United States v. Johnson*, 875 F.3d 1265, 1276 (9th Cir. 2017) (finding reduced interest because defendant was in "continuous custody"); *United States v. Shaw*, 531 F. App'x 946, 949 (11th Cir. 2013) (finding reduced interest because defendant was "in custody throughout" the delay); *Sharma*, 2019 WL 3802223, at *6-*7 (finding interest diminished because of "detention and bail conditions").  Indeed, the defense does not cite a single case where a court has ever suppressed evidence due to an unreasonable delay obtaining a warrant, when the defendant was in custody throughout the duration of that delay.

Eisenberg tries to sidestep this case law by claiming that his attorneys or family could have taken the devices.  But that does alter the analysis.  "Fourth Amendment rights are personal rights . . . that may not be vicariously asserted." *United States v. Haqq*, 278 F.3d 44, 47 (2d Cir. 2002). Eisenberg's possessory interest is at issue in the Fourth Amendment analysis, not the possessory interests of his family or lawyers.  And in any event, none of Eisenberg's lawyers or family members requested a return of the devices between their seizure and the application for a search warrant.  Eisenberg does not claim otherwise, acknowledging that the first request for the devices was sent by his lawyers on January 19—after the Government had already applied for a warrant.

Instead, Eisenberg says he believed that he could not obtain the devices because an agent

told him they were being sent to New York.  Aff. ¶ 17.  But that statement did not foreclose a request for the devices, and his attorneys had every right to file a motion under Rule 41(g) for a return of the property.  Fed. R. Crim. P. 41(g) ("A person aggrieved by an unlawful search and seizure of property or by the deprivation of property may move for the property's return.").  The fact that Eisenberg did not file such a motion weighs even further against his claim.

Separately, the Government had a substantial interest in maintaining possession of the devices.  The Second Circuit recognized in *Smith* that "[t]he fact that there was probable cause" to believe a seized device contained evidence of crime "allowed more time" for law enforcement to obtain a warrant because "the Fourth Amendment . . . tolerate[s] greater delays after probable-cause seizures."  967 F.3d at 208-09.  In this case, the "probable cause that existed to search [Eisenberg's devices] was stronger than the probable cause . . . in *Smith*."  2023 WL 2223474, at *5.  In *Smith*, the probable cause consisted solely of the fact that the defendant was a sex offender and an officer briefly saw what appeared to look like child pornography.  *Smith*, 967 F.3d at 209.  Here, by contrast, Eisenberg "had been the subject of an ongoing investigation into criminal activity" that took place entirely over the internet—and thus required the use of electronic devices—and had already had a warrant issued for his arrest.  *Wells*, 2023 WL 2223474, at *5.  This gave the Government a powerful interest in maintaining the devices long enough to obtain a warrant.

What is more, the Government had a strong interest in maintaining the devices because they have independent evidentiary value.  In *Smith*, the Second Circuit distinguished the device in that case—the evidentiary value of which "turned solely on . . . its contents"—from items that have "independent evidentiary value."  967 F.3d at 208-09.  While the classic example of something with independent evidentiary value is a "murder weapon" or "obvious contraband," *id.* at 209, on

the unique facts of this case, Eisenberg's devices had independent evidentiary value, as well. For example, as explained in the Complaint, the Government identified a Google email address associated with a cryptocurrency account, held in the name of a Ukrainian woman, that Eisenberg used in his scheme. Compl. ¶ 14. Google, like other companies, retains data about the types of devices that access, or are registered to, Google email accounts. Thus, the Government could use the fact that Eisenberg had certain devices—"regardless of . . . their contents," *Smith*, 967 F.3d at 209—to prove that Eisenberg was the one who used certain Google accounts involved in the scheme. This is an independent reason the Government had a basis to retain the devices.

### d. The Delay Was Justified.

Finally, the rationale for the time between the seizure and the warrant in this case was entirely reasonable. Eisenberg was charged in New York, but arrested in Puerto Rico. The agents who made the arrest and seized his devices had no role in the investigation of his case. The responsible agents were in New York, and that is where Eisenberg's case was going to proceed. It was eminently reasonable for the agents in Puerto Rico to send the devices to New York, so a search warrant could be obtained and executed by the agents who were investigating the case, in the district where the case was charged. *See Sullivan*, 797 F.3d at 635 (explaining that the "need to transfer" a device before searching it is a "reasonable basis" for delay).

The agents in New York also acted diligently in obtaining the search warrant. The agents could not apply for a warrant in the district until the devices arrived, *see* Fed. R. Crim. P. 41(b)(1), so they closely monitored the devices' progress. That included reaching out to FBI Puerto Rico, Gov't Exs. 11-13; keeping track of the FedEx package when the devices were en route, Gov't Ex. 17; and retrieving the devices from evidence as soon as they arrived at FBI New York, Gov't Ex. 14-16. The Government then moved swiftly to apply for a warrant, reaching out to this Court the same day, and sending the application to the duty magistrate immediately after being referred there,

Gov't Ex. 18-19.

While waiting for the devices, the agents also actively worked on other aspects of the case. This included obtaining warrants to search accounts at Twitter, Google, and Discord.[8]  Gov't Ex. 25.  It also included presenting the case to a grand jury and obtaining the Indictment—a resource-intensive and time-sensitive step that had to occur within 14 days of Eisenberg's arrest.

The difference between these facts and those at issue in *Smith* highlight the diligence displayed in this case.  In *Smith*, an officer pulled a car over on suspicion of drunk driving.  *Smith*, 967 F.3d at 202.  When searching the car, the officer saw pornography on a tablet device.  *Id.*  He then learned that the driver was a registered sex offender.  *Id.*  A state investigator directed the officer to seize the tablet for a search.  *Id.* at 202-03.  The investigator then let the tablet sit for over a month before seeking a warrant, without conducting any further investigation or providing a reason for the delay other than a busy workload.  *Id.* at 203, 210-11.  The facts here could not be more different: the agents diligently worked to transfer devices to New York, then rapidly applied for a warrant, all while taking significant steps in Eisenberg's case.  Indeed, the agents here had a warrant in hand before Eisenberg even arrived in New York from Puerto Rico.

### e.  On Balance, the Agents' Actions Were Reasonable.

Ultimately, the "touchstone of the Fourth Amendment is reasonableness," *Ganias*, 824 F.3d at 209, and the agents acted reasonably here.  The Government had a strong "interest in retaining [the devices]," both to obtain a warrant and because they had independent evidentiary value.  *Smith*, 967 F.3d at 206 n.1.  It was reasonable to transfer the devices to New York; the place where the agents running the investigation and executing the search warrant were based.  And the

---

[8] Eisenberg is wrong to suggest that the Government should have obtained a warrant for the devices before obtaining the warrant for these accounts.  The Government had to wait for the devices to arrive before applying for a warrant, but was under no such restriction for the accounts.

agents swiftly obtained a warrant upon the devices reaching the District.  Eisenberg's "possessory interest" in the devices was not unreasonably infringed upon during this process because he was in custody, being transported to New York.  No court has excluded evidence under circumstances like these, and Eisenberg gives no compelling reason why this case should be the first.

### 3.  Suppression Is Unwarranted Because the Agents Acted in Good Faith.

Even if the delay before obtaining a warrant were constitutionally unreasonable, the proper remedy would not be exclusion because the agents acted in good faith.

"The fact that a Fourth Amendment violation occurred . . . does not necessarily mean that the exclusionary rule applies."  *Herring v. United States*, 555 U.S. 135, 140 (2009).  Excluding evidence is the "last resort" and "applies only where it results in appreciable deterrence" and when that deterrent value is not outweighed by the "substantial social costs" of exclusion.  *Id.*; *accord Smith*, 967 F.3d at 211.  Thus, "[t]o trigger the exclusionary rule, [law enforcement] conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system."  *Herring*, 555 U.S. at 144.  Exclusion "serves to deter deliberate, reckless, or grossly negligent conduct."  *Id.*

There was no such misconduct here.  The agents who arrest Eisenberg promptly directed the evidence technicians at FBI Puerto Rico to send the devices to New York on a "priority" basis, with a deadline of January 4, 2023.  The agents in New York kept close track of the devices, reaching out for updates when they had not been shipped, tracking them in the mail, and then obtaining them immediately upon their arrival in New York.  FBI Agent-1 then applied for a search warrant within 24 hours of receiving those devices.  This was a good-faith effort to promptly obtain a warrant and certainly not deliberate, reckless, or grossly negligent conduct.

Any claim that the devices could have been shipped more quickly, or the warrant could have been obtained in some other manner, is not a basis for exclusion.  In *Herring*, the Supreme

Court explained that errors by law enforcement officers—such as "recordkeeping errors" or "negligent . . . miscommunications"—do not warrant excluding evidence because any "marginal" deterrent value "cannot justify the substantial cost of exclusion."  555 U.S. at 145-47.  Thus, even if it were possible to have shipped the devices faster or have obtained the warrant through other means, that would not render exclusion appropriate.  The record clearly shows that the agents had every interest in obtaining and searching the devices promptly, and that they acted accordingly. Playing Monday-morning quarterback of that process is not grounds for exclusion.

On top of that, the Government disclosed the timeline in its warrant application. *See United States v. Thomas*, 757 F.2d 1359, 1366-68 (2d Cir. 1985) (holding that disclosure of relevant facts in warrant application can be basis for good faith).  The application disclosed that agents seized the devices on December 26, 2022.  Def. Ex. J at ¶ 3.  It explained that Eisenberg likely used computers and cellphones to manage finances, store passwords, access online accounts, and communicate with others. *Id.* at ¶ 17.  And it disclosed some intervening investigative steps, such as the application to search online accounts and the Indictment. *Id.* at ¶¶ 8-9.  The Magistrate Judge therefore had the essential facts for assessing whether the Government had unreasonably delayed in applying for the warrant.  The agents acted in good faith in relying on the issuance of that warrant.

Nothing about the way law enforcement acted in this case evinced a deliberate, reckless, or grossly negligent disregard for the Constitution.  The agents took reasonable steps to promptly obtain a warrant that was important to the case.  Exclusion is not warranted.

## <u>CONCLUSION</u>

For the foregoing reasons, the Government respectfully requests that the Court deny Eisenberg's pretrial motions in their entirety.

DATED: August 25, 2023
          New York, New York

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney


By:__/s/_____
Thomas Burnett / Peter J. Davis
Assistant United States Attorneys
(212) 637-1064 / 2468

Tian Huang
Special Assistant United States Attorney
(202) 598-2523