UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

               Plaintiff,

     -against-

AVRAHAM EISENBERG,

               Defendant.

Case No.: 23-CR-010-(RMB)

---

## <u>REPLY IN SUPPORT OF DEFENDANT AVRAHAM EISENBERG'S OMNIBUS MOTION TO DISMISS AND MOTION TO SUPPRESS</u>

Brian E. Klein
Ashley E. Martabano
Waymaker LLP
515 S. Flower Street, Suite 3500
Los Angeles, California 90071
(424) 652-7800

Sanford N. Talkin
Noam B. Greenspan
Talkin, Muccigrosso & Roberts, LLP
40 Exchange Place, 18th Floor
New York, New York 10005
(212) 482-0007

*Attorneys for Avraham Eisenberg*

## <u>**TABLE OF CONTENTS**</u>

I.   PRELIMINARY STATEMENT ........................................................................... 1

II.   MOTION TO DISMISS ..................................................................................... 1

   A.   Introduction ............................................................................................... 1

   B.   Counts One and Two Must be Dismissed Because the Government Has Not Alleged the Elements of a Violation of the CEA ................................................................. 2

   C.   Count One Must be Dismissed Because the Government Fails to Allege Misrepresentation or Deceit "In Connection With a Contract of Sale of a Commodity"... 7

   D.   Dismissal of Counts One and Two on Constitutional Grounds is Warranted............... 11

   E.   Dismissal of Counts One and Two on Statutory Interpretation Grounds is Warranted. 15

   F.   Count Three Should be Dismissed Because the Indictment Fails to Allege an Essential Element ....................................................................................................... 17

III.   MOTION TO SUPPRESS ................................................................................. 19

   A.   Introduction ............................................................................................... 19

   B.   Problematic Assertions in the Government's "Factual Background" ........................... 21

   C.   The Search and Seizure of Mr. Eisenberg's Property was Unconstitutional ................. 25

      1.   The Property was Seized by FBI Agents With No Border Search Authority. ........... 25

      2.   The Arresting Officers Failed to Follow Search Protocol ......................................... 28

   D.   The Government's 23-Day Delay in Applying for a Search Warrant was Unreasonable 31

      1.   Factor 1: Length of Delay ............................................................................... 32

      2.   Factor 2: Importance of the Property to Defendant .................................................. 32

      3.   Factor 3: Whether the Defendant had a Diminished Property Interest....................... 35

      4.   Factor 4: Justification for the Delay ................................................................... 38

   E.   Exclusionary Rule ....................................................................................... 40

IV.   CONCLUSION................................................................................................ 42

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Alabama Association of Realtors v. Department of Health & Human Services*,
  141 S. Ct. 2485 (2021) ................................................................................................ 16

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2007) ...................................................................................... 7, 10

*Biden v. Nebraska*,
  143 S. Ct. 2355 (2023) ................................................................................................ 16

*CFTC v. Avraham Eisenberg*,
  No. 23-cv-00173 (S.D.N.Y. Jan. 9, 2023) .................................................................... 6

*CFTC v. Enron Corp.*,
  2004 WL 594752 (S.D. Tex 2004) .............................................................................. 15

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
  467 U.S. 837, 843 (1984) ....................................................................................... 15, 16

*Durland v. United States*,
  161 U.S. 306 (1896) ..................................................................................................... 17

*Eisenberg v. Numeris Ltd.*,
  3:22-cv-1325 (GMM) (D.P.R. July 6, 2022) .............................................................. 12

*Ernst & Ernst v. Hochfelder*,
  425 U.S. 185 (1976) ....................................................................................................... 7

*Florida v. Wells*,
  495 U.S. 1 (1990) ......................................................................................................... 29

*Gustafson v. Alloyd Co. Inc.*,
  513 U.S. 561 (1995) ....................................................................................................... 6

*Hamling v. United States*,
  418 U.S. 87 (1974) ......................................................................................................... 3

*Illinois v. Lafayette*,
  462 U.S. 640 (1983) ..................................................................................................... 29

*In Re Eagle Market Makers, Inc.*,
  CFTC Docket No. 19-08, 2019 WL 2884626 (CFTC June 28, 2019) .......................... 8

*Kearney v. Prudential-Bache Sec. Inc.*,
    701 F. Supp. 416 (S.D.N.Y. 1988) ........................................................... 6

*Maynard v. Cartwright*,
    486 U.S. 356 (1988) ............................................................................... 13

*Parkcentral Global Hub Ltd. v. Porsche Auto Holdings SE*,
    763 F.3d 198 (2d Cir. 2014) .................................................................... 4

*SEC v. Coinbase, Inc.*,
    No. 1:23-cv-04738-KPF (S.D.N.Y. Aug. 4, 2023) ................................. 16

*SEC v. Eisenberg*,
    No. 1:23-cv-503 (S.D.N.Y. Jan. 20, 2023) .............................................. 4

*SEC v. Lek Secs. Corp.*,
    Case No. 17-cv-1789 (S.D.N.Y., filed Mar. 10, 2017) ............................. 7

*SEC v. Terraform Labs Pte. Ltd.*,
    No. 23-cv-1346 (JSR), 2023 WL 4858299 (S.D.N.Y. July 31, 2023)...................... 16

*SEC v. Vali Management Partners*,
    No. 21-cv-453, 2022 WL 2155094 (2d Cir. 2022) .................................... 7

*Set Capital LLC v. Credit Suisse Group AG*,
    996 F.3d 64 (2021) ............................................................................ 7, 11

*U.S. ex rel O'Donnell v. Countrywide Home Loans, Inc.*,
    822 F.3d 650 (2d Cir. 2016) .................................................................. 17

*United States v. Aleynikov*,
    676 F.3d 71 (2d Cir. 2012), ................................................................... 17

*United States v. Alfonso*,
    759 F.2d 728 (9th Cir. 1985) ................................................................. 26

*United States v. Babilonia*,
    854 F.3d 163 (2d Cir. 2017) .................................................................. 31

*United States v. Chanu*,
    40 F.4th 528 (7th Cir. 2022) ................................................................. 18

*United States v. Civil*,
    No. 17 Cr. 19 (MW), 2017 U.S. Dist. LEXIS 158377 (N.D. Fla. Aug. 1, 2017) ................. 36

*United States v. Connolly*,
    24 F.4th 821 (2d Cir. 2022) ................................................................... 17

*United States v. Coscia*,
    866 F.3d 782 (7th Cir. 2017) ................................................................ 18

*United States v. Dauray*,
    215 F.3d 257 (2d Cir. 2000)............................................................... 6, 10

*United States v. Delva*,
    858 F.3d 135 (2d Cir 1997)............................................................. 27, 31

*United States v. Eng*,
    971 F.2d 854 (2d Cir. 1992)................................................................ 25

*United States v. Escobar*,
    No. 15 Cr. 260 (PAM), 2016 WL 3676176 (D. Minn. July 7, 2016) ...................... 38

*United States v. Grills*,
    18 Cr. 228 (JPS), 2019 WL 558732 (E.D. Wis. Oct. 30, 2019) ........................... 36

*United States v. Hay*,
    19 Cr. 170 (RJA), 2023 WL 142119 (W.D.N.Y. Jan. 10, 2023) ........................... 36

*United States v. Heath*,
    455 F.3d 52, 60 (2d Cir. 2006)............................................................. 29

*United States v. Javat*,
    549 F. Supp. 3d 1344 (S.D. Fla. 2019) ....................................... 28, 35, 36

*United States v. Juwa*,
    508 F.3d 694 (2d Cir. 2007)................................................................. 2

*United States v. Lanier*,
    520 U.S. 259 (1997)......................................................................... 13

*United States v. Milani*,
    39 F. Supp. 216 (S.D.N.Y. 1990).......................................................... 12

*United States v. Pacheco*,
    225 F.3d 148 (2d Cir. 2000)................................................................. 6

*United States v. Perea*,
    986 F.2d 633 (2d Cir. 1993)............................................................... 28

*United States v. Pirro*,
212 F.3d 86 (2d Cir. 2000) ............................................................................. 3

*United States v. Radley*,
659 F. Supp. 2d 803 (S.D. Tex. 2009) ................................... 12, 13, 14, 15

*United States v. Regent Office Supply*,
421 F.2d 1174 (2d Cir. 1979) ...................................................................... 19

*United States v. Reliant Energy Services, Inc.*,
420 F. Supp. 2d 1043 (N.D. Cal. 2006) ..................................................... 12

*United States v. Rybicki*,
354 F.3d 124 (2d Cir. 2003) ........................................................................ 12

*United States v. Sandoval Vargas*,
854 F.2d 1132 (9th Cir. 1988) .................................................................... 25

*United States v. Shellef*,
507 F.3d 82 (2d Cir. 2007) .......................................................................... 18

*United States v. Smith*,
555 F. Supp. 3d 563 (N.D. Ill. 2021) .................................................. passim

*United States v. Soto-Soto*,
598 F.2d 545 (9th Cir. 1979) ...................................................................... 25

*United States v. Starr*,
816 F.2d 94 (2d Cir.1987) ........................................................................... 19

*United States v. Sullivan*,
797 F.3d 623 (9th Cir. 2015) ...................................................................... 39

*United States v. Taghizadeh*,
41 F.3d 1263 (9th Cir. 1994) ...................................................................... 26

*United States v. Tisdol*,
544 F. Supp. 3d 219 (D. Conn. 2021) ........................................... 36, 38, 41

*Utility Air Regulatory Group v. Environmental Protection Agency*,
573 U.S. 302 (2014) ..................................................................................... 15

*Wilson v. Merrill Lynch & Co.*,
671 F.3d 120 (2d Cir. 2011) .................................................................... 7, 11

**Statutes**

15 U.S.C. § 78c(a)(68)(A) ................................................................................................ 4

15 U.S.C. § 78i ................................................................................................................ 9

15 U.S.C. § 78j (Exchange Act, Section 10(b)) ............................................................ 7

17 C.F.R. § 180.1 ....................................................................................................... 2, 9

18 U.S.C. § 1343 ........................................................................................................... 17

7 U.S.C § 6c(A)(1)(A-C) ............................................................................................... 9

7 U.S.C. § 13(a)(2) .......................................................................................................... 2

7 U.S.C. § 1a(47)(A)(iii) ............................................................................................ 3, 4

7 U.S.C. § 9(1) .................................................................................................... 2, 5, 7, 8

**Rules**

Fed. R. Crim. P. 12(b)(3)(B)(iv) .................................................................................... 1

Fed. R. Crim. P. 29 ....................................................................................................... 12

Fed. R. Crim. P. 41 ....................................................................................................... 39

## I.     PRELIMINARY STATEMENT

Defendant Avraham Eisenberg respectfully submits this reply brief in further support of his omnibus motion: (1) to dismiss the indictment under Fed. R. Crim. P. 12(b)(3)(B)(iv) with prejudice; and (2) to suppress, under the Fourth Amendment, seized digital devices and documents taken from his luggage.  In light of the government's opposition, the defense respectfully requests a hearing on these motions. The grounds for each motion are below.

## II.    MOTION TO DISMISS

### A.     <u>Introduction</u>

The biting tone and strong language of the government's opposition cannot hide the fact that its indictment has not put Mr. Eisenberg on notice of the alleged crimes for which he is to be tried.  While the government asserts that Mr. Eisenberg ignores allegations in the indictment, creates and attacks strawmen, and argues the merits, the government's arguments only underscore that the indictment is incurably defective.  Against a confusing regulatory backdrop, the indictment's allegations left open various potential theories of liability, and its supposed clarifications establish that the charges are novel, ill-defined, and flawed.  In other words, while it is the government's burden to prepare a charging document that provides notice and permits the preparation of a defense, the government failed to do so.

Given the indictment's vagaries, Mr. Eisenberg was left to attempt to guess at the government's potential theories of liability.  The government argues that the motion should be denied because the defense guessed wrong, providing in its opposition, belatedly and insufficiently, what it wanted the indictment to say.  The Constitution and Federal Rules of Criminal Procedure require that the indictment alone provide notice of the charges, not the indictment augmented by outside sources, like its complaint and the government's opposition.

As detailed below, the indictment is fatally flawed, and Mr. Eisenberg's motion to dismiss should be granted, and the indictment dismissed with prejudice.

**B.**   <u>**Counts One and Two Must be Dismissed Because the Government Has Not Alleged the Elements of a Violation of the CEA**</u>

The "primary purpose" of an indictment is to "acquaint the defendant with the specific crime with which he is charged, allow him to prepare his defense, and protect him from double jeopardy." *United States v. Juwa*, 508 F.3d 694, 701 (2d Cir. 2007) (internal citations omitted). Here, Count One, charging an alleged violation of the Commodity Exchange Act ("CEA"), 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1 ("Rule 180.1"), and Count Two, charging an alleged violation of 7 U.S.C. § 13(a)(2), both require, as an essential element, a swap, sale of commodity, or sale of a futures contract.  Yet, the indictment fails to include any allegation that provides notice of the predicate swap, commodity, or futures contract at issue.  Now, the government calls Mr. Eisenberg's challenge a "misdirection" because, when forced to guess as a result of a deficient indictment, it asserts he guessed wrong.  (Opp. at 14.)  But Mr. Eisenberg's arguments are not a misdirection or a misreading of the indictment; rather, the indictment fails to label or describe any asset as a commodity or to state that the Perpetuals are the type of swaps to which the CEA applies.

The government contends that Counts One and Two should withstand Mr. Eisenberg's motion to dismiss because the indictment "tracks the language of the statute . . . and gives the defendant notice of the charges against him."  (Opp. at 10.)  While the indictment does track the language of the statute, the Supreme Court has held that tracking language alone is insufficient: "Undoubtedly the language of the statute may be used in the general description of an offence, but it must be accompanied with such a statement of facts and circumstances as will inform the accused of the specific offence . . . with which he is charged." *Hamling v. United States*, 418

U.S. 87, 117-18 (1974).  This is where the indictment fails – its lack of an informative statement of facts tailored to the alleged offense.

For Count One, the government includes statutory allegations that Mr. Eisenberg:

> willfully and knowingly . . . used and employed . . . in connection
> with a swap, a contract of sale of a commodity in interstate
> commerce, and for future delivery on . . . a manipulative and
> deceptive device and contrivance, in contravention of [Rule 180.1].

(Ind. ¶ 23.)  The predicate for the "in connection with" element could therefore reach a swap, a commodity, or a future, and the indictment did not say even which one was at issue.  Not surprisingly, Mr. Eisenberg thought the government was contending that MNGO – which it calls a "crypto token" (*id.* at ¶ 2) – is a commodity but apparently it does not.  Rather, the government now claims that a predicate commodity is USDC, citing the criminal complaint to fill the indictment's gaps.  (*See* Opp. at 14 (citing Comp. ¶¶ 4, 8).)  The government improperly asks the Court to read those allegations into the indictment.  *See United States v. Pirro*, 212 F.3d 86, 92 (2d Cir. 2000) (limiting analysis to "facts . . . considered by the grand jury").  The indictment is legally deficient on the simple basis that it does not allege that any purported cryptocurrency[1] referenced in the indictment is a commodity under the CEA.

That same deficiency dooms the government's theory that the Perpetuals are "swaps" under the CEA and therefore could underlie Counts One and Two.  The indictment never asserts that the Perpetuals are swaps, and the government attempts to satisfy its notice requirement by citing the indictment's fact allegations describing the Perpetuals and then comparing those to the statute.  (*See* Opp. at 11-12 (citing Ind. ¶¶ 10-12 and 7 U.S.C. § 1a(47)(A)(iii)).)

---

[1] As noted in the underlying motion (Mot. at 12, n.3), because the indictment's allegations control for purposes of a motion to dismiss, the defense does not challenge the government's generalizations of MNGO and USDC as "cryptocurrencies" only for purposes of the motion.

The fact that the government seeks to meet the notice requirement by relying on a general description of Perpetuals is itself a concession that the indictment was unconstitutionally vague and did not allege a swap.  In any event, the new claim is oversimplified and fails to clarify matters or resolve the notice issue, given the regulatory confusion and inconsistency here.  While the CEA generally extends to swaps, the statute has many exclusions, including one for security-based swaps.  7 U.S.C. § 1a(47)(B)(x); *see generally Parkcentral Global Hub Ltd. v. Porsche Auto Holdings SE*, 763 F.3d 198, 205 n.7 (2d Cir. 2014) (while "the CEA defines swaps broadly . . . this broad statutory definition is subject to numerous exclusions").  As noted in the Motion, the SEC contends that MNGO is a security.  *See SEC v. Eisenberg*, No. 1:23-cv-503 (S.D.N.Y. Jan. 20, 2023), Dkt. 1, ¶ 1.  If the SEC is correct, the Perpetuals would potentially be security-based swaps and therefore governed by securities laws, not the CEA.  *See* 15 U.S.C. § 78c(a)(68)(A)(ii)(I) (a security-based swap, under 7 U.S.C. § 1a, is one based on "a single security or loan, including any interest therein or on the value thereof"); 7 U.S.C. § 1a(47)(B)(x) (excluding security-based swaps, other than mixed swaps, from the CEA's definition of "swap"). The CFTC has authority over swaps, the SEC has authority over security-based swaps, and the "Commissions jointly are to prescribe such regulations regarding mixed swaps as may be necessary to carry out the purposes of Title VII."  Further Definition of "Swap," "Security-Based Swap," and "Security-Based Swap Agreement"; Mixed Swaps; Security-Based Swap Agreement Recordkeeping, 77 Fed. Reg. 48208-01, 48308 (Aug. 13, 2012) (Joint final rule; interpretations; request for comment on an interpretation).  Put simply, if MNGO is a security as the SEC alleges, the CEA may not apply to the swaps at issue here.  The government's after-the-fact efforts to salvage the indictment's charges raise new issues, providing further evidence that the

government has failed to engage with the regulatory complexity and uncertainty here and the counts were vague as charged.

In a further effort to shoehorn its allegations into the CEA, the government equates its allegation that USDC is a "crypto stablecoin" (Ind. ¶ 2) with an allegation that USDC is a commodity, citing CFTC interpretive guidance and CFTC consent orders for the proposition that all virtual currencies are commodities.  (*See* Opp. at 13-14.)[2]  This theory was not disclosed in the indictment and presents other new problems.

The government's new claim that USDC is a commodity does not provide a basis for the application of the CEA and cannot salvage Counts One and Two because USDC, a stablecoin pegged to the U.S. dollar, only served as the medium of exchange for purchases of MNGO (a non-commodity), and to settle the Perpetuals.  The CEA only applies to transactions "in connection with any … ***contract of sale of any commodity***."  7 USC § 9(1) (emphasis added).  But the government does not allege any "contract of sale" of USDC, and it could not, because such an allegation would not accurately reflect the role of USDC in the transactions at issue.  The government alleges certain purchases of MNGO using USDC, but those involved contracts of sale of MNGO, not USDC.  Rather, just like physical dollars (greenbacks) can be used as a medium of exchange for a purchase of, say, a car, the contract of sale is for the car, not for the dollars.  Put simply, it is the object of the transaction – the thing bought or sold for USDC – that must be a commodity for the CEA to apply.  *Kearney v. Prudential-Bache Sec. Inc.*, 701 F.

---

[2] Notably, the CFTC guidance cited by the government, Retail Commodity Transactions Involving Certain Digital Assets, 85 Fed. Reg. 37734, 37735 (2020), is far more nuanced than the government's position here, stating that only those digital assets that could be "used as [] a medium of exchange in commerce," fall within the scope of the "virtual currency" definition.

Supp. 416, 424 (S.D.N.Y. 1988) ("'in connection with' requirement mandates that the alleged fraud concern the fundamental nature of . . . contract").

Under the government's claim, any purchase or sale transaction in which USDC is used as the medium of exchange would bring that transaction within the ambit of the CEA. But as the CFTC complaint against Mr. Eisenberg notes, "billions of dollars of USDC chang[es] hands every day." *CFTC v. Avraham Eisenberg*, No. 23-cv-00173 (S.D.N.Y. Jan. 9, 2023), Dkt. 1 ("CFTC Complaint") ¶ 15. Bringing all those transactions under the CEA simply because USDC was the medium of exchange would be an absurd result and statutes "should be interpreted in a way that avoids absurd results." *United States v. Dauray*, 215 F.3d 257, 264 (2d Cir. 2000); *see also Gustafson v. Alloyd Co. Inc.*, 513 U.S. 561, 575 (1995) (when interpreting statutes, courts "avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words") (cleaned up); *United States v. Pacheco*, 225 F.3d 148, 154 (2d Cir. 2000) (a statutory provision must be interpreted "in a way that renders it consistent with the tenor and structure of the whole act or statutory scheme") (citation omitted). The government's argument simply does not square with the limited reach of the CEA. Accordingly, the fact that the alleged crime may have involved USDC as a medium of exchange in connection with MNGO sales does not provide a cognizable theory of criminal liability under the statute. Notably, the CFTC did not charge commodities fraud or manipulation this way. *Cf.* CFTC Complaint ¶¶ 48-64.

In sum, the Court should reject the government's attempt to read allegations into the indictment and raise novel theories as to what digital assets or derivatives might arguably – if the regulatory landscape were clear – bring a transaction under the antifraud provisions of the CEA. A criminal prosecution, where the liberty of an individual is at stake, is no place for ambiguity as to the charged crime and the conduct underlying it. The Court should dismiss the CEA claims.

**C.   Count One Must be Dismissed Because the Government Fails to Allege Misrepresentation or Deceit "In Connection With a Contract of Sale of a Commodity"**

In his opening brief, Mr. Eisenberg pointed out that, to find a violation of 7 U.S.C. § 9 and Rule 180.1 thereunder, there must be some misrepresentation or omission that deceived other marketplace participants, even under an open-market trading theory of manipulation.  (*See* Mot. at 15 (collecting cases).)

The government's cases are not to the contrary but merely stand for the proposition that a misrepresentation can be made through an act or conduct rather than having to be a verbal or written statement.  (*See* Opp. at 18.)  The government cites securities fraud cases arising under Section 10(b)(5) of the Exchange Act, which the government says should be "interpreted in parallel" with the similar language of Rule 180.1.  (Opp. at 19.)  But in each cited securities case, the appellate court found manipulative conduct that in fact deceived investors in the securities market charged in the case.  *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd*., 493 F.3d 87, 100 (2d Cir. 2007) ("[C]ase law in this circuit . . . has required a showing that an alleged manipulator engaged in market activity aimed at deceiving investors as to how other market participants have valued a security."); *SEC v. Vali Mgmt. Partners*, No. 21-cv-453, 2022 WL 2155094, at *1 (2d Cir. 2022) (approving jury instruction and citing *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 199 (1976) (manipulation "connotes intentional or willful conduct designed to deceive or defraud investors")); *Set Capital LLC v. Credit Suisse Grp. AG,* 996 F.3d 64, 77 (2021) ("Deception is the gravamen of a claim for market manipulation."); *Wilson v. Merrill Lynch & Co.*, 671 F.3d 120, 130 (2d Cir. 2011) (manipulative conduct "must involve misrepresentation or nondisclosure.").  Indeed, the government notes with approval Judge Cote's jury instruction in *SEC v. Lek Secs. Corp.*, which defined manipulation as "intentional or willful conduct designed

to deceive or defraud investors."  (*See* Opp. at 18 (citing No. 17-cv-1789 (DLC), Dkt. 556 at 2586-87).)  These authorities only affirm that unless it works a deception to the regulated market at issue – here, the CEA-regulated commodities or swap markets  – the alleged manipulative conduct does not come within the scope of the statute.

By contrast, here, the alleged manipulative conduct, under the government's theory, occurred either (1) when Mr. Eisenberg allegedly established a large position in long MNGO perpetuals through "wash trades" (Opp. at 21, citing Indict. ¶ 16), or (2) when Mr. Eisenberg allegedly purchased large quantities of MNGO on two exchanges and a decentralized cryptocurrency-trading platform (*id.*, citing Ind. ¶ 16).  But neither of these actions was deceptive conduct affecting a commodities market nor, as required by the statute, were these actions "in connection with a contract of sale of a commodity."  7 U.S.C. § 9.

Taking first the alleged establishment of a large position in Perpetuals, the government inaccurately asserts that Mr. Eisenberg acquired this position through "wash trades" – a "form of trading" the government claims is "long considered deceptive."  (Opp. at 21.)  The government fails to define a "wash trade," which the CFTC has classified as trades effectively between the same beneficial owner with the intent "to negate risk or price competition and avoid a bona fide market position."  *See In Re Eagle Mkt. Makers, Inc.*, CFTC Docket No. 19-08, 2019 WL 2884626, at *3 (CFTC June 28, 2019).  In other words, a trade is a "wash trade" when a party takes both sides of the trade to avoid the price competition that a market would provide, creating a false price for some other purpose such as to inflate the trading volume or the price of the applicable commodity/security.  *See* Ernst & Ernst, 425 U.S. at 205 n. 25.

Indeed, by statute, the CFTC expressly proscribes wash sales only in certain situations not alleged here, specifically when made: (1) to hedge any transaction in interstate commerce in

the commodity; (2) to determine the price basis of any such transaction in interstate commerce in the commodity; or (3) to deliver any such commodity sold, shipped, or received in interstate commerce for the execution of the transaction.  7 U.S.C § 6c(a)(1)(A-C).[3]  The government has not alleged the occurrence of any proscribed conduct because the alleged trading was not for the purpose of inflating the volume or price of the Perpetuals.  According to the indictment, the trades were made for the purpose of acquiring a large position in the Perpetuals.  In other words, the government concedes by its own allegations that Mr. Eisenberg's alleged Mango Markets trades were not "wash trades" because his intent was to take a bona fide position in Perpetuals.

The government's other theory of market manipulation – that Mr. Eisenberg allegedly purchased large quantities of MNGO on two exchanges and a decentralized cryptocurrency-trading platform – fares no better, because, as the government now concedes, MNGO is not a commodity.  Given that the CEA can only reach a "manipulative device, scheme, or artifice to defraud," "in connection with any swap or contract of sale of any commodity" (17 C.F.R. § 180.1(a)(3)), the CEA simply does not reach the alleged MNGO purchases.

Although its analysis is limited, the government apparently tries to create a link between the trading of MNGO – which is not a commodity – with commodities trading by noting that the MNGO was purchased with USDC.  (Opp. at 21.)  But as discussed above (*supra* at 5-6), USDC – the digital equivalent of the U.S. dollar – was simply used as a medium of exchange and was not the good being bought or sold, so the CEA does not apply to the transaction at all.  It would create absurd results if the purchase of a non-commodity with USDC becomes a transaction

---

[3]  Similarly, under the Exchange Act, a securities trade which involves no change in the beneficial ownership is prohibited only when its purpose is to create "a false or misleading appearance of active trading in any security," or "a false or misleading appearance with respect to the market for any such security."  15 U.S.C. § 78i.

regulated by the CEA, making the CFTC the regulator of all digital purchases. *See Dauray*, 215 F.3d at 264. The CEA therefore does not reach the alleged manipulation.

In addition to its failure to allege a viable theory of the application of the CEA, the government's claim is also deficient because it fails to allege a material misrepresentation or omission. The government's asserted material misrepresentations are that Mr. Eisenberg did not use his true identity in registering with Exchange-1 and Exchange-2 and falsely stated that he would repay the obtained funds he "borrowed" from Mango Markets. (*See* Opp. at 16-17.)

Regarding the alleged misrepresentations as to the identity of the account owners of the exchanges, these representations are not alleged to have been made in "in connection with" any swap or commodity. The government offers a series of cases in which, on the particular facts presented, courts found a misrepresentation as to identity to be deceptive. (*See* Opp. at 17.) These miss the point: Mr. Eisenberg does not contend that a stolen or false identity can never be an actionable misrepresentation, but the alleged misrepresentations here were made to the exchanges[4] and pertained to the trading of MNGO, which is not a commodity,[5] not to Mango Markets regarding the trading of the Perpetuals, the alleged swaps. *See supra* at 8. These alleged representations – that occurred outside Mango Markets -- simply did not deceive Mango Markets users "as to how other market participants. . . . valued a [swap]." *ATSI Commc'ns, Inc.*, 493 F.3d at 100.

---

[4] Only managers, not users, of these exchanges knew of and relied on the identity information of account holders. (*See* Ind. ¶ 15(a), ¶17(f)).

[5] The representations also did not cause a "false pricing signal" to be sent (*see id.* at 100) regarding MNGO; the MNGO prices were real prices, created when sellers increased their price as, according to the indictment, Mr. Eisenberg purchased MNGO. *ATSI Commc'ns, Inc.*, 493 F.3d at 100.

As to the alleged misrepresentation of an intent to borrow, the government cites no source for its conclusory assertion that a user of Mango Markets – a decentralized protocol – had an obligation to repay assets withdrawn against a user's account, and there was none.  (*See* Ind. ¶¶ 19-21.)  The government's claim is that, because a "button" in the protocol used the word "borrow," and due to the Webster's definition of "borrow," there was an obligation to repay. (*See* Opp. at 16.)  The name on a button does not create a legal obligation.  In fact, the Mango protocol did not require a user to agree to anything: users signed no agreement; there were no terms of service; and the government does not contend otherwise. The only binding rules applicable to Mango Markets were in the protocol's code itself, which was disclosed in Github;[6] this code allowed withdrawal of digital assets against the value of a user's Perpetuals as alleged in the indictment.  (*See* Ind.¶¶ 19-21.)  As explained in *Set Capital*, deception is the gravamen of a market manipulation claim, and "the market is not misled when a transaction's terms are fully disclosed."  996 F.3d at 77 (citing *Wilson*, 671 F.3d at 130 (cleaned up)).  Here, the terms that permitted the alleged withdrawal were fully disclosed; there was no representation that the digital assets withdrawn would be returned; and thus, the alleged misrepresentation based on an intent to borrow fails.

### D.    Dismissal of Counts One and Two on Constitutional Grounds is Warranted

The government's primary response to Mr. Eisenberg's Constitutional challenge is to ask the Court not to reach it.  (*See* Opp. at 22-23.)  The government is wrong to contend that any vagueness-as-applied argument is premature and cannot be decided at the motion to dismiss

---

[6] Github provides a public website for developers to host, store, manage, and change code.  *What is GitHub? A Beginner's Introduction to GitHub*, Kinsta (Dec. 13, 2022), *available at* https://kinsta.com/knowledgebase/what-is-github/; *see also Blockworks Foundation*, GitHub, *available at* https://github.com/blockworks-foundation (mango markets code available on Github).

stage.  *Radley* and *Reliant* – both decided at the motion to dismiss stage – make this clear.
*United States v. Reliant Energy Servs., Inc.*, 420 F. Supp. 2d 1043, 1053 (N.D. Cal. Feb. 28,
2006); *United States v. Radley*, 659 F. Supp. 2d 803, 812-16 (S.D. Tex. Sept. 17, 2009).  The
government's reliance on *United States v. Rybicki*, 354 F.3d 124, 129 (2d Cir. 2003), is
misplaced.  *Rybicki* does not bar vagueness-as-applied challenges at the motion to dismiss stage,
but instead simply delineates between facial and as-applied vagueness challenges.

As for *United States v. Milani*, 739 F. Supp. 216, 217 (S.D.N.Y. 1990), the government
misconstrues the opinion:  The district court there did not state that as-applied vagueness
challenges can never be decided at the motion to dismiss phase, but rather concluded it could not
rule on the challenge presented there in the absence of a full trial record  *Id.*  While the district
court concluded it "must await conclusion of the trial," it cited no controlling authority requiring
restraint, and the record is unclear whether, as here, the defendant's challenge in *Milani* was
based only on the facts as alleged.  However, given the court's reference to Fed. R. Crim. P. 29,
it is reasonable to conclude that the defendant sought to rely on evidence outside the indictment's
four corners.  Here, Mr. Eisenberg asks the Court to consider only the facts as alleged and –
considering that this case involves the same charges as *Reliant* and *Radley* and that Mr.
Eisenberg's challenge is to the vagueness as applied to the government's allegations – the
defense respectfully contends that vagueness may be considered now.

In fact, it is the government that reaches outside the four corners, pointing to (disputed)
facts outside the indictment to claim (improperly) that Mr. Eisenberg had subjective notice that
his conduct was unlawful.  (*See* Opp. at 23-24 (citing Compl. ¶¶ 16(b), 17(c), and *Eisenberg v.
Numeris Ltd.*, 3:22-cv-1325 (GMM) (D.P.R. July 6, 2022)).)  The Court should not consider
these allegations, and the standard is an objective "reasonable person" one in any event.

*Maynard v. Cartwright*, 486 U.S. 356, 361 (1988) ("Objections to vagueness under the Due Process Clause rest on the lack of notice, and hence may be overcome in any specific case where reasonable persons would know that their conduct is at risk."); *United States v. Lanier*, 520 U.S. 259, 266 (1997) (enforcement of a statute prohibited if it is "so vague that men of common intelligence must necessarily guess at its meaning") (citation omitted).

Using an objective standard, the government has failed to allege facts to provide notice of how the CEA applies.  As discussed in the motion, the government's theory is that Mr. Eisenberg allegedly manipulated the price of MNGO – not a commodity – to manipulate the price of the Perpetuals – allegedly swaps.  (Mot. at 36.)  In other words, the government claims that Mr. Eisenberg's crime was to manipulate the price of an asset that the CEA does not reach to indirectly cause an "artificial price" of an asset that the CEA does reach.  The Court, taking the allegations as true, as it must, and without reaching an issue of fact, can determine upon a motion to dismiss that the CEA does not reach this conduct.  The court can further construe both "manipulation" and "artificial price" to be vague.

*Radley*, which dismissed an indictment at the motion to dismiss stage, is instructive.  It engaged in detailed analysis on the "artificial price" prong of the CEA, examining whether the government had alleged behavior clearly outside the "legitimate" forces of supply and demand. *See Radley*, 659 F. Supp. 2d at 814.  Here, as in *Radley*, the government's theory is that Mr. Eisenberg's transactions were something "other than legitimate forces of supply and demand." *Id.*  Here, as in *Radley*, the government has failed.[7]  Further, the government then seeks to argue

---

[7] The *Radley* court began by listing the facts alleged in the superseding indictment.  The case alleged that one asset, TET propane, was a commodity as defined by the CEA.  The Oil Price Information Service ("OPIS") collected information from propane traders and brokers and would publish the price of TET propane sales daily, including the "OPIS average" – the day's midpoint between high and low transactions.  Prices outside the OPIS range of recent transactions *could*

that Mr. Eisenberg's concealing his identity both from the market and to open an account on

Exchange-2 is evidence of manipulation.  But as *Radley* explained, "Mere concealment is not

sufficient to show that []actions were not legitimate forces of supply and demand."  659 F. Supp.

2d at 814.  The same is true here.  The government never explains how Mr. Eisenberg allegedly

concealing his identity or using a nominee account to buy MNGO on certain exchanges caused

the price of MNGO – much less the price of Perpetuals – to be artificial.  Even by the

government's allegations, Mr. Eisenberg actually took on exposure to the market in purchasing

the MNGO, and the rise in MNGO's price was a legitimate exercise of the laws of supply and

demand, as sellers increased their prices as he continued to make market purchases.  (*See* Ind. ¶

17.)  Mr. Eisenberg allegedly further (legally) purchased long and short Perpetuals, and, as

explained above, his trades did not constitute wash trades.  *See supra* at 8-9.  It is

unconstitutionally vague how this conduct constituted manipulation of the price of a swap.

Further, it is unconstitutionally vague as to how the price of Perpetuals was "artificial."

As in *Radley*, this Court should find that "there is no universally accepted measure or test of

price artificiality."  659 F. Supp. 2d at 816 (citing and distinguishing *CFTC v. Enron Corp.*, 2004

---

impact the prices paid by traders or end users. "Accordingly, a sale which affected the OPIS
average would in turn affect the prices of any OPIS average transactions." *Id.* at 806-07.  In light
of the mechanics of this market, the government alleged that the defendants "conspired to
manipulate the price of February 2004 TET propane, . . . , and defraud counterparties who
purchased February 2004 TET propane based on the OPIS average price….The government
generally alleges that defendants conspired to . . . withhold a portion of the commodity from sale
in order to artificially inflate the price. This would enrich BP when it sold propane at artificially
high prices and would increase the price for OPIS average transactions." *Id.* (internal citations
omitted).  Five of the government's charges were price manipulation and attempted price
manipulation based on the OPIS average price, which the government alleged was an artificial
price set by the defendant's manipulation.  *Id.* at 809.  The OPIS price is not a regulated
commodity.  The TET propane underlying that average price was a regulated commodity.  This
is similar to, though the inverse of, the government's allegations here, that Mr. Eisenberg
engaged in transactions of MGNO (which is not a commodity), which then impacted the price of
perpetuals swaps, which the government alleges are a commodity.

WL 594752 (S.D. Tex 2004)).  Mr. Eisenberg urges the Court to find, as the *Radley* court did, that:

> *This uncertainty is the very thing that the constitutional vagueness doctrine is meant to protect against* . . . the conduct alleged here has never been clearly prohibited as causing an artificial price. Accordingly, the government has not pleaded facts regarding the existence of an artificial price that can sustain defendants' vagueness challenge.…

*Id.* (emphasis added) (internal citations omitted).

### E.    Dismissal of Counts One and Two on Statutory Interpretation Grounds is Warranted

Having attempted (and failed) in its opposition to identify a commodity and a swap that could provide a predicate for the CEA, the government asserts that there is no novel question as to the CEA's reach, thereby rendering inapplicable Mr. Eisenberg's *Chevron* deference and rule of lenity arguments.  (Opp. at 28-29.)  Because a criminal case is no place to pioneer new applications of the statute, the Court should address steps one and two of *Chevron*, apply the rule of lenity, and read the statute narrowly.

First, as demonstrated above, the government has grossly oversimplified the statutory and regulatory landscape concerning swaps.  *See supra* at 4.  There are no allegations in the indictment that tailor the Perpetuals to the CEA, and the government has failed to consider that the securities laws – rather than the commodities laws – might apply to the Perpetuals (if any regulatory scheme applies at all to Mango Markets).  Given that the SEC says MNGO is a security, and the government and CFTC claim the swaps are commodities, there is clearly statutory ambiguity under *Chevron*.  *See Util. Air Reg. Grp. v. EPA*, 573 U.S. 302, 328 (2014) (agency interpretation not entitled *Chevron* deference in part because "agencies are not free to adopt unreasonable interpretations" of statutes").

Second, the government's opposition raises a new argument: that the CEA applies to any transaction for which USDC serves as a medium of exchange.  As discussed earlier (*supra* at 6), this interpretation would create an absurd result because the CFTC would have authority to regulate all digital purchases made with USDC, even when it is not the subject of the "contract of sale", as transactions involving a commodity.  As such, the government does not merit *Chevron* deference; the Court should invoke the rule of lenity and conclude that in the absence of regulatory clarity, the CEA cannot reach such a novel issue.

The defense recognizes that after it filed the motion to dismiss, a court in this district held that the major questions doctrine does not apply to the crypto-currency industry because it does not "bear[] vast economic and political significance."  *SEC v. Terraform Labs Pte. Ltd.*, No. 23-cv-1346 (JSR), 2023 WL 4858299, at *8 (S.D.N.Y. July 31, 2023) (citation omitted).  The *Terraform* court wrongly sought to limit the major questions doctrine, finding that an industry should be considered to have the required "vast economic and political significance" only if it "resembles . . . the industries that the Supreme Court has previously said meet this definition." *Id.* at *8.  This ignores more recent Supreme Court precedent where it applied the doctrine to a debt cancellation program estimated to have a $469-$519 billion economic impact partly on the basis that it had previously held that the doctrine was applicable even to an industry with an economic impact of only approximately $50 billion.  *Biden v. Nebraska*, 143 S. Ct. 2355, 2373 (2023) (citing *Alabama Association of Realtors v. Department of Health & Human Services*, 141 S. Ct. 2485 (2021)).  The value of the digital asset industry is approximately twice that of the industry in *Nebraska*; it is estimated to be worth around $1 trillion.  *See SEC v. Coinbase, Inc.*, No. 1:23-cv-04738-KPF (S.D.N.Y. Aug. 4, 2023), Dkt. 36 at 22.  The political significance is extraordinary, too, evidenced by the fact that there are competing Congressional bills pending

that recognize (but do not agree) about how to resolve the regulatory uncertainty.  *See, e.g.*, Jason Brett, *Congress Creates A Storm Of Crypto Legislation*, Forbes (August 3, 2023).   While Congress tries to clear up jurisdictional ambiguities, the government should not be permitted to exploit the gaps through a novel criminal prosecution of Mr. Eisenberg.

### F.  Count Three Should be Dismissed Because the Indictment Fails to Allege an Essential Element

In response to Mr. Eisenberg's challenge to the wire fraud charge, the government initially asserts, as it has elsewhere, that his wire fraud challenges are factual and need not be resolved at this time.  (Opp. at 29-30.)  But Mr. Eisenberg has not challenged the alleged facts (although he will do so at trial); instead, he has contended that the indictment's allegations "fail to allege a crime within the terms of the applicable statutes," *United States v. Aleynikov*, 676 F.3d 71, 75-76 (2d Cir. 2012), and on that basis, the wire fraud count should be dismissed.

On the merits, the government agrees that some "form of deception" (Opp. at 31, citing *United States v. Connolly*, 24 F.4th 821, 833 (2d Cir. 2022)) is required to meet the element of "false or fraudulent pretenses, representations or promises" under 18 U.S.C. § 1343.  The government's examples of how this element has been met in other cases illustrate why there is no actionable pretense, representation, or promise here at all.  Unlike *U.S. ex rel O'Donnell v. Countrywide Home Loans, Inc.*, 822 F.3d 650 (2d Cir. 2016), a case that expressly involved an "affirmative misstatement" theory (*id.* at 663), there was no "contractual promise" to anyone; unlike *Durland v. United States*, 161 U.S. 306 (1896), there were no statements to investors.

As explained above, the problem with the government's theory of misrepresentation concerning the alleged ownership of the exchange accounts is that, if they deceived anyone, it was the managers of those exchanges – not Mango Markets' users.  The two alleged "cryptocurrency exchanges" – Exchange-1 and Exchange-2 – are totally different marketplaces

than Mango Markets.  The government does not and cannot allege that the users of the Mango protocol – the alleged victims of the charged scheme – knew or relied on any claims regarding the identity of the account holders on Exchange-1 and Exchange-2.  Because the alleged misrepresentations did not affect the alleged victims, the conduct does not meet the elements of the statute.

The government relies on two spoofing cases, *United States v. Chanu*, 40 F.4th 528 (7th Cir. 2022), and *United States v. Coscia*, 866 F.3d 782 (7th Cir. 2017), to support its claim that market conduct without an express representation can suffice to establish misrepresentation under the statute.  (*See* Opp. at 32.)  But in both cases, it was clear that the alleged manipulative trading conduct itself represented a communication to the other market participants – *i.e.*, market participants received and relied on the pricing signals created by the spoofing trades.   As the district court explained in *United States v. Smith*, 555 F. Supp. 3d 563, 574 (N.D. Ill. 2021), "Spoofing can constitute misrepresentation by creating illusory market movement through the injection of false information into the market."  Here, the market movement was not illusory, as the facts alleged are that Mr. Eisenberg  made real purchases of MNGO through market counterparties.  (*See* Ind. ¶ 3).

Moreover, the alleged misrepresentations concerning the account holders occurred on the exchanges, and as to the market for MNGO – not on Mango Markets and as to the Perpetuals market.  In this case, there is no allegation of a representation through open market conduct communicated to the users of Mango Markets – the alleged victims.  *See generally United States v. Shellef*, 507 F.3d 82, 108 (2d Cir. 2007) and *United States v. Regent Off. Supply*, 421 F.2d

1174, 1179, (2d Cir. 1979) (misrepresentation must go to nature of bargain);[8] *see also United States v. Starr*, 816 F.2d 94 (2d Cir.1987) (no scheme to defraud where alleged misrepresentations were made to United States Postal Service rather than to alleged scheme victims in bulk mail pricing scheme).

As to the alleged misrepresentation of an intent to borrow (and return), as discussed above, the problem with this theory is that there is no cited source for the claim that Mango Markets' users were required to repay assets withdrawn against the collateral in their accounts, and there was none.  *See supra* at 11.  Given that the rules of the Mango protocol were disclosed, there is no deceit here, so there can be no misrepresentation that would satisfy the elements of Count One.

## III.   MOTION TO SUPPRESS

### A.   <u>Introduction</u>

Mr. Eisenberg has moved to suppress three cell phones and a laptop ("Subject Electronics"), and any evidence obtained therefrom, and all documents, items and information taken from his luggage ("Luggage Items") because the government lacked a warrant to search or seize these items.  These warrantless searches are not remedied by the search incident to arrest exception to the warrant requirement, the exception which the government's agents repeatedly and solely stated as the basis for their search and which the government included as a basis for the seizure in its later (substantially delayed) warrant application.

---

[8] The government's attempt to limit these to their facts as "right of control" cases (Opp. at 30) misses the point.  Regardless, whether the person allegedly defrauded in the scheme was to receive money or an intangible right, an alleged misrepresentation must affect the benefit of the bargain, *i.e.*., what the person expected to receive in the transaction at issue.

In response to this motion, the government chides the defense for a "flagrant disregard for obvious facts,"[9] (Opp. at 2.) for failing to anticipate its pivot away from its agent's purported basis for the search and toward a border search theory. [10]  The government's attempt to support this position is not credible.  Rather than submit a sworn statement from any of the agents who arrested the defendant in Puerto Rico and/or searched or seized his luggage, whom the government concedes – "have varying recollections" of the essential facts (Opp. at 33 n. 4.), the government makes various assertions of fact that are unsupported by any citation, or that are attributed to documents in the record, that, upon review, do not set forth the assertion.

Notably, even the factual scenario the government has problematically set forth fails to identify when, where, or by whom the "Subject Electronics" and "Luggage Items" were searched and seized.  Indeed, the government establishes little other than that Mr. Eisenberg's luggage was seized at the airport and likely searched elsewhere by non-border agents for the collection of evidence of a crime unrelated to the border or border security.  The government has thus failed to meet its burden to prove that the border search exception applies.

Equally unavailing is the government's argument that the discovery of evidence regarding the Subject Electronics and Luggage Items was inevitable as a result of an inventory

---

[9] Importantly, the vast majority of the "facts" that government alleges the defense "flagrantly disregarded," are found in the exhibits to the opposition, most of which were produced only after the filing of this motion.  Nor does the government address its failure to preserve evidence relating to the search.  For example, the defense served a Rule 17 subpoena on U.S. Customs and Border Protection for video footage of Eisenberg and his luggage in the airport on December 26, 2023, and was told that CBP does not possess any responsive materials.  It appears that the government took no steps to collect or preserve this evidence.

[10] The government asserts baselessly that "using 'search incident to arrest' was simply and that the eight separate instances in which the agents and attorneys, including in the January 19 warrant application, characterized the search and seizure as a search incident to arrest, "reveal[] nothing of substance."  (Opp. at 44-45.)  Trained FBI agents surely are aware that a search incident to arrest is a specifically defined legal concept, not "simply shorthand."

search.  It is uncontroverted that the arresting agents in Puerto Rico never intended to hold the Subject Electronics in inventory and instead began the process of shipping the devices to New York even before Mr. Eisenberg was taken into custody.  Moreover, the arresting officers did not follow FBI procedures – a strict requirement for inventory searches – including the directive that they document all of the items, not just those they wish to seize, and that they expeditiously procure a warrant.  Additionally, an inventory search only provides agents the authority to seize self-apparent evidence of a crime, typically weapons and narcotics, not the personal electronics and documents at issue here.  For all three of these reasons, the inevitable discovery exception is inapplicable.

Finally, the government's seizure of the Subject Electronics was unconstitutional for the additional reason that, pursuant to *United States v. Smith*, 967 F.3d 198, 202 (2d Cir. 2020), its delay of over three weeks in obtaining a search warrant was unreasonable in the face of the virtually limitless resources it had to obtain a warrant and the substantial prejudice suffered by the defendant as he was denied access to important information on the devices.  The government's response is predicated on the false premise that it was entitled to delay applying for a warrant at the expense of Mr. Eisenberg's rights because it preferred to seek a warrant in New York rather than in Puerto Rico.  The government's delay was therefore wholly unjustified and unreasonable, and the evidence from the Subject Electronics should be suppressed.

### B.        Problematic Assertions in the Government's "Factual Background"

The factual basis for the government's motion is asserted in a section of the government's brief entitled "Factual Background," which begins on page 33.  The government asserts that "a hearing is not required" despite noting that "the relevant witnesses" – presumably the government's agents – "have varying recollections of certain details."  (Opp. at 33 n.4.)  Rather than explain those differences, the government presents what the government asserts is "the

account [] consistent with the substance of how the government expects witnesses would testify at a hearing." *Id.* It thus attempts to usurp the Court's function as factfinder and makes its own credibility determinations, discarding the testimony it does not wish the Court to hear and urging the Court not to hold a hearing where this contradicting testimony could be elicited. More problematic still, the government refuses to show its work. Rather than submit affidavits from its witnesses, the government sets forth a factual record unsupported by any evidence, often misattributed to documents bearing no support, including:

- Government Assertion 1 (Opp. at 33-34): "Five law enforcement officers—three with the FBI . . . one who was an FBI Task Force Officer from CBP ("CBP Officer-1") . . . and one from HSI . . . waited for Eisenberg near the area where CBP conducts secondary checks of individuals arriving in the United States from abroad. *See* Gov. Ex. 3; [Eisenberg] Aff. ¶ 4."

    - Gov. Ex. 3 identified five officers, none of them with any identified connection to CBP, who "conducted a search incident to arrest" and "seized" Eisenberg's "luggage and personal items."

    - ¶ 4 of Eisenberg's Affidavit is totally irrelevant to this proposition and discusses his interaction at the customs desk with a separate officer not alleged to be involved in the search or arrest.

    - There is no evidence in the record regarding "secondary checks" or where the officers were standing.

    - The reference to "CBP Officer-1,"[11] which appears to be a reference to FBI TFO Pedro Amador ("FBI TFO Amador"), is also unsupported. Gov. Ex. 3 refers to an "FBI TFO" but makes no reference at all to the involvement of any CBP officer. There is no other reference to FBI TFO Amador in the record.

- Government Assertion 2 (Opp. at 34): An unidentified CBP "officer directed Eisenberg to a secondary inspection area where CBP Officer-1 helped conduct a search of Eisenberg's luggage. [Eisenberg] Aff. ¶ 5."

    - There is no evidence, either in Eisenberg's affidavit or anywhere else, that "CBP Officer-1" performed any search of Eisenberg's luggage. Eisenberg's Affidavit is

---

[11] The government has further muddled the record by anonymizing the agents in its brief despite the fact that their names are disclosed in Gov. Ex. 3 and that they are potential witnesses.

a particularly improper source for this assertion as he testifies to no knowledge of the identity of any CBP officer, let alone the purported CBP Officer-1.

- o   Assuming that this is a reference to FBI TFO Amador, as noted above, there is no evidence in the record that he had any connection to CBP.

- Government Assertion 3 (Opp. at 34): CBP Officer-1 "found, among other things, a laptop computer (the 'Laptop'), two cellphones, and a plastic bag containing various documents (the 'Documents').  Gov't Exs. 3-7."

  - o   Gov. Ex. 3, an FBI 302 report, as noted identifies no CBP Officer.  Moreover, it notes only that a "search incident to arrest" occurred, but it does not state who conducted it or identify what, if anything, was located.

  - o   Gov. Ex. 4 is a "Receipt for Property" identifying three cell phones, not two, and a laptop that have been "Collected/Seized."  The document states that the property was "Received By" FBI Special Agent Michael Crawford ("FBI SA Crawford").  There is no mention of any CBP Officer or of any search.

  - o   Gov. Ex. 5 is a "Receipt for Property" for a suitcase and a backpack "Received By" FBI SA Crawford.  There is no mention of any CBP Officer or of any search.

  - o   Gov. Ex. 6 is a "Collected Item Log" drafted by FBI SA Crawford on January 4, 2023, which describes the contents of both the suitcase and backpack, including a plastic bag purportedly from within the backpack containing various documents.  The Log states that FBI SA Crawford both located and seized the items.  The Log notes a "search incident to arrest."  It includes no mention of any specifics of the search and no mention of any CBP Officer or border search.

  - o   Gov. Ex. 7 is a "Collected Item Log" drafted by FBI SA Crawford on January 4, 2023, which describes three cell phones, one laptop computer, and one power cord for the laptop.  The Log states that FBI Special Agent Christine Perez ("FBI SA Perez") both located and seized the items.  The Log notes a "search incident to arrest."  It includes no mention of any specifics of the search and no mention of any CBP Officer or border search.

  - o   The five cited exhibits not only do not support the government's factual statement; they disprove it.  The documents assert that all of the property was located and seized by FBI SAs Crawford and Perez as a search incident to arrest with no involvement from CBP or any other officer.

- Government Assertion 4 (Opp. at 34): "While Eisenberg was at the secondary inspection, FBI Agents [Crawford and Gennaro Itri] and HSI Agent [Joaquin Sandoval] approached him and brought him to an interview room, where they placed him in handcuffs.  [Eisenberg] Aff. ¶¶ 6-7."

- o Eisenberg's Affidavit did not identify any particular agent with whom he interacted during the arrest and never mentioned Itri or Sandoval.

- o There is no evidence in the record, and certainly none in Eisenberg's Affidavit, that any of the arresting agents approached Eisenberg in the customs hall. Moreover, Eisenberg does not use the term "secondary inspection" in his affidavit.

- **Government Assertion 5 (Opp. at 34):** "The agents reported the arrest and seizure of the Cellphones and Laptop to FBI Agent [Brandon Racz], who relayed that information to other relevant members of law enforcement.  *See* Gov't Ex. 8."

  - o Gov. Ex. 8 is a heavily redacted email from DOJ attorney Jessica Peck regarding the seizure of the property.  There is no indication that this information went to or came from FBI SA Racz, whose name is nowhere in the cited document.

- **Government Assertion 6 (Opp. at 34):** "On the morning of December 27, 2022, agents at the FBI office in San Juan ('FBI San Juan') took an accounting of the valuable items that had been in Eisenberg's luggage.  That involved taking photographs of the Cellphones and the Laptop, as well various electronic accessories, such as batteries and power cords. *See* Gov't Ex. 21."

  - o Government Ex. 21 is a series of photographs of electronics devoid of any information regarding when, where, and by whom the photos were taken.

- **Government Assertion 7 (Opp. at 34):** Crawford "did not send . . . Eisenberg's luggage, or his wallet, to New York [on December 28, 2023] because he expected that someone associated with Eisenberg might retrieve it.  *See* Gov't Ex. 10."

  - o Government Ex. 10 is a January 11, 2023, request from Crawford to "Please send 1B6, 1B7, 1B8, 1B9 to the FBI New York ECR."  Assuming these items represent the luggage, wallet, and their contents, there is no description of FBI SA Crawford's motivation for sending these items.

As the above recitation makes clear, a substantial majority of the government's factual recitation is unsupported and often directly inconsistent with record citations.  Indeed, the government's use of "*See*" signals, which is highly unusual in a statement of facts before each of its assertions, appears to be a tacit acknowledgement that the record citations are not directly supportive.  The government should be held accountable for its tactical choice not to submit any sworn statements from its agents and its baseless factual statements should be disregarded by the Court.  The motion should therefore be granted because the government has not met its burden.

C.    **The Search and Seizure of Mr. Eisenberg's Property was Unconstitutional**

    1.    **The Property was Seized by FBI Agents With No Border Search Authority.**

Acknowledging the lack of a warrant and the inapplicability of the search incident to arrest exception, the government now argues that the items were seized pursuant to a border search.  Not only has the government failed to meet its burden to prove this exception applied, the factual record, even after the government's attempted distortions, is conclusive that the search and seizure was not a border search.  *See United States v. Eng*, 971 F.2d 854, 855-56 (2d Cir. 1992) (*Eng I*) (burden on government to show inevitability).

The Collected Items Logs state explicitly that the Luggage Items were "Located By" and "Seized By" FBI SA Crawford and that the Subject Electronics were "Located By" and "Seized By" FBI SA Perez.  (Gov. Exs. 6, 7.)  FBI chain of custody logs confirm that FBI SAs Crawford and Perez seized the Subject Electronics and that the devices were never in the custody of any CBP officer.  (Gov. Exs. 14, 15, 16.)  Moreover, FBI SA Crawford and other law enforcement agents repeatedly wrote that the search was done incident to arrest and never made mention of any border-related officer or function.  (Gov Exs. 3, 6-7, 14-16.)  It is therefore uncontroverted that the search and seizure were executed exclusively by FBI agents without authorization or delegation from any border agent as part of a general law enforcement effort and could not have been a border search.  *See, e.g.*, *United States v. Soto-Soto*, 598 F.2d 545, 548-49 (9th Cir. 1979) (holding that FBI agent could not conduct a border search because he was "not a customs or immigration officer" and possessed "no delegat[ed] authority . . . to conduct this search" and because the search was for "general law enforcement purposes, not for the enforcement of customs laws" or other border-related issues); *United States v. Sandoval Vargas*, 854 F.2d 1132, 1136 (9th Cir. 1988) ("Searches conducted by [] law enforcement agents [other than customs,

immigration, and Coast Guard officials] are not considered border searches . . . and must therefore meet the traditional demands of the fourth amendment.") *overruled on other grounds by United States v. Taghizadeh*, 41 F.3d 1263 (9th Cir. 1994) (en banc); *cf. United States v. Alfonso*, 759 F.2d 728, 735 (9th Cir. 1985) (upholding search done as "a collaborative effort under the aegis of and in cooperation with Customs agents" because it was "executed under the authority and direction of those agencies having jurisdiction in safeguarding the borders"). Though doing so would still be insufficient, the government has not even proven that the search took place at the border.  Rather, the government has indicated that FBI SAs Crawford and Perez took pictures of and documented some of the items in the luggage at their office, not at the airport.  *See* Gov. Ex. 21.

The government attempts to address the deficiencies in its claim with the problematic assertions noted above.  The government states that "[w]hen [Eisenberg] reached Customs, CBP Officer-1 helped search Eisenberg's luggage, finding the Laptop, the Documents, and two the three Cellphones" and that "[o]nce those items were in view" the "arresting agents took [them], along with Eisenberg's belongings, into federal custody."  (Opp. at 40.)  There are myriad defects with this rendition.  *First* and foremost, the assertion is baseless: there is no evidence of any CBP Officer being involved in the search of Mr. Eisenberg's luggage, there is no evidence that any "arresting agent" could view any such search, and there is no evidence that any such agent took possession of Mr. Eisenberg's property.  Indeed, CBP records produced for the first time as exhibits to the opposition include no mention of any search or seizure of his luggage. (Gov. Ex. 24.)

*Second*, the government's account is vague.  The government does not identify the "arresting agents," and there is no account of who took Mr. Eisenberg's property out of the

airport.  Nor is there any explanation of when and where the Subject Electronics were ultimately removed from the luggage.  Without any defined account of the search, the government cannot meet its burden.  The government states inaccurately that Gov. Exs. 3 and 8 establish that the Subject Electronics were "lawfully seized at the border."  (Opp. at 45.)  Gov. Ex. 3 is a 302 Report that states in relevant part only that "Agents conducted a search incident to arrest and [Eisenberg's] luggage and personal items were seized."  In addition to not mentioning CBP, Gov. Ex. 3 also does not state that the Subject Electronics were located and/or seized at the airport (or anywhere else).  Nor is there any explanation of the "search incident to arrest."  Gov. Ex. 8 is a heavily redacted December 26, 2023, email from DOJ attorney Jessica Peck at 8:31 PM – over three hours after the arrest allegedly took place – stating in relevant part that "[a]rresting agents in San Juan said they have 3 cellphones and a computer."  The email does not exclude the possibility, consistent with other evidence, that the two cell phones and laptop were removed from the luggage at the FBI's offices by FBI agents.

*Third*, the government's apparent invocation of the "plain view" exception is misplaced. The lone plain view case cited by the government (*see* Opp. at 40) states, "Under the plain-view exception, if police are lawfully in a position from which they view an object, *if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object*, they may seize it without a warrant."  *United States v. Delva*, 858 F.3d 135, 149 (2d Cir 1997) (emphasis added).[12]  The items here, personal electronics and unspecified documents, bear no immediately apparent incriminating character, and there is no evidence that the officers, whom

---

[12] The critical emphasized portion of this quote is omitted from the government's citation.

the government repeatedly stated had no role in investigating the case, had a lawful right to access the objects.

Finally, Mr. Eisenberg in his motion to suppress noted that the government was unable to identify which cell phone was taken from his person at the time of arrest and therefore could not meet its burden to show that an exception to the warrant requirement applied.  The government does not respond, effectively conceding its inability to identify this third cell phone and rendering moot its discussion of law enforcement's authority to seize items from the person of an arrestee.  *United States v. Javat*, 549 F. Supp. 3d 1344, 1357 (S.D. Fla. 2019) (excluding cell phone lawfully seized from defendant's person in addition to four cell phones seized from his messenger bag in airport seizure because the government was "unable to identify that particular Samsung cell phone that was lawfully seized incident to arrest").

The evidence demonstrates that Mr. Eisenberg's luggage was seized and searched by FBI agents as part of their general law enforcement function.  The government is therefore unable to meet its burden to prove that the border search exception applies.

### 2.    The Arresting Officers Failed to Follow Search Protocol

The government argues that even if the agents did not have authority to search and seize Mr. Eisenberg's property under their border search authority, "they inevitably would have seized those items pursuant to a lawful inventory search."  (Opp. at 41.)  Here, too, the government takes little care with the record and fails to meet its burden to show inevitable discovery.

"The rationale underlying the exception for inventory searches is [that] [w]hen a person is arrested in a place other than his home, the arresting officers may impound the personal effects that are with him at the time to ensure the safety of those effects or to remove nuisances from the area."  *United States v. Perea*, 986 F.2d 633, 643 (2d Cir. 1993).  It is uncontroverted that the arresting agents never intended to, and did not in fact, impound the Subject Electronics.  The day

after Mr. Eisenberg's arrest, December 27, FBI SA Crawford told Mr. Eisenberg that the Subject

Electronics were being shipped to the mainland.  (Eisenberg Aff. ¶ 17.)  The next day, December

28, FBI SA Crawford sent a Lead Report, which was approved by his supervisor, FBI SA Perez,

directing that the Subject Electronics be sent to New York on a "Priority" basis.  (Gov. Ex. 9.)

FBI SAs Crawford and Perez thus determined immediately not to impound and hold the Subject

Electronics in inventory.  Notably, this decision was made before it was even determined that

Mr. Eisenberg would be removed to New York, which did not take place until December 30,

(Opp. at 35 (citing *United States v. Eisenberg*, 22 Mag. 1583, Dkt. 7 (D.P.R.)), and long before

Mr. Eisenberg actually arrived in New York on February 2, 2023.  FBI SAs Crawford and Perez

thus ordered the shipment of the Subject Electronics to New York without regard to whether Mr.

Eisenberg would be held in Puerto Rico, further evidence that they had no intention of

safeguarding Mr. Eisenberg's personal effects and that no inventory search was ever

contemplated, let alone inevitable.  *See United States v. Heath*, 455 F.3d 52, 60 (2d Cir. 2006)

(holding inevitable discovery exception proper "only where a court can find, with a high level of

confidence, that each of the contingencies necessary to the legal discovery of the contested

evidence would be resolved in the government's favor").

The agents also failed to satisfy the crucial element of  inventory searches that the search

be conducted pursuant to "established inventory procedures."  *Illinois v. Lafayette*, 462 U.S. 640,

644 (1983); *see also Florida v. Wells*, 495 U.S. 1, 4 (1990) (standard search criteria important to

ensure "that an inventory search [] not be a ruse for a general rummaging in order to discover

incriminating evidence").  The government contends that FBI SAs Crawford and Perez

conducted a search of Mr. Eisenberg's luggage pursuant to the FBI's Domestic Investigations

and Operations Guide ("DIOG").  (Opp. at 43.)  Initially, though the government asserts that

Gov. Ex. 20 is the relevant portion of the DIOG – a non-public, unproduced document – there is no evidence in the record to confirm that the page-and-a-half excerpt is what the government purports it to be or that it is from the effective version.[13]  Even assuming that this is the operative guide, FBI SAs Crawford and Perez did not follow it.  Gov. Ex. 20 states that "[a] written summary showing the results of the inventory must be recorded" and "[t]he written summary must include, but is not limited to, a description of the property and the items secured for safekeeping. Agents must provide receipts for all items retrieved during inventory searches." The agents here failed to make a written summary and failed to produce receipts for most of the items in the luggage.  As the photos taken in Gov. Ex. 21 demonstrate, Mr. Eisenberg possessed a number of sets of valuable headphones, battery packs, and other electronics.  In contravention of the DIOG, the agents made no written record of any of these items or of any of the clothing and other possessions in the luggage.  The only items recorded in writing by FBI SA Crawford were those items the government intended to seize as evidence.  Gov. Ex. 20 also directs that "[w]henever there is probable cause to believe an inventory search would also yield items of evidence or contraband, agents must obtain a search warrant when feasible."  As discussed below, it was immediately feasible to obtain a warrant, and the agents breached the DIOG by delaying for weeks in obtaining a warrant for the Subject Electronics and never obtaining a warrant for the Luggage Items.  Because the agents failed to follow the protocol, the search and seizure of the property pursuant to an inventory search would have been unlawful.

Finally, even if FBI SAs Crawford and Perez had undertaken an inventory search, they would not have been authorized to seize the Subject Electronics and Luggage Items.  Much like

---

[13] There appears to be a production issue with Ex. 20 wherein each paragraph is preceded by "(U)" instead of what might have been an alphabetic or numerical numbering of the paragraphs, rendering specific citation impossible.

the plain view doctrine discussed above, inventory searches typically allow for the seizure only of objects whose "incriminating character is immediately apparent."  *Delva*, 858 F.3d 135, 149. In the context of plain view or inventory searches, seizure of everyday objects like cell phones "is justified where the officers have probable cause to believe that the objects contain or constitute evidence."  *United States v. Babilonia*, 854 F.3d 163, 180 (2d Cir. 2017).  The government has repeatedly noted how little FBI SAs Crawford and Perez knew about and were involved in the investigation of the case,[14] and they would therefore not have had probable cause to believe the Subject Electronics or Luggage Items constituted evidence.  The government has thus not met its burden to prove that the seizure was lawful.

> **D.      The Government's 23-Day Delay in Applying for a Search Warrant was Unreasonable**

Mr. Eisenberg also moves for exclusion of the Subject Electronics on the basis of *United States v. Smith*, 967 F.3d 198, 202 (2d Cir. 2020), because the government's multiweek delay in obtaining a warrant to search the devices was prejudicial and unreasonable.  The government's opposition confirms the essential facts in Mr. Eisenberg's motion: the government's only explanation for the delay, that it preferred to obtain a warrant in New York rather than Puerto Rico, is illegitimate, particularly given the government's indifference to the amount of time that shipment took and the prejudice caused to Mr. Eisenberg.  The government's lack of regard for the consequences of its tactics is the definition of recklessness and necessitates exclusion.

---

[14] *See* Opp. at 2 ("The arresting agents [] had no role in this investigation."); Opp. at 47 ("Eisenberg's [] devices were seized in Puerto Rico by agents who had no substantive involvement in the case."); Opp. at 54 ("The agents who made the arrest and seized his devices had no role in the investigation of his case.")

### 1.   Factor 1: Length of Delay

Initially, the government takes issue with Mr. Eisenberg's claim that the delay between seizure and the issuance of the warrant was twenty-four days from December 26, 2022, to January 19, 2023.  In light of the government's exhibits, almost all of which had not previously been produced, Mr. Eisenberg revises his position to subtract one day because the government emailed the warrant application to the Court on January 18, 2023, during business hours.  (Gov. Ex. 19.)  The government's argument that its delay ended on January 17, 2023, on the basis of Gov. Ex. 18, an email to chambers after close of business that did not attach an application or state that the warrant was ready, is unpersuasive.

In its response, the government concedes "that some courts have found delays of around 20 days to favor defendants,"  (Opp. at 48), and its only response is to seek to diminish the importance of this factor.  Given this concession that courts that have considered delays of twenty days or more have found the delay presumptively unreasonable, and the fact that the government can point to no case that has held otherwise, there is no dispute that factor one favors Mr. Eisenberg.

### 2.   Factor 2: Importance of the Property to Defendant

The second factor, the importance of the seized property to the defendant, also favors Mr. Eisenberg.  "[T] government acknowledges in the abstract [that] this factor weighs modestly in favor of Eisenberg."  (Opp. at 49.)  The government further states that "[i]n light of [*Smith*], and the fact that Eisenberg represents that he regularly used the Cellphones and Laptop for business and personal reasons, the Government recognizes that the devices were important to him."  *Id.* Nevertheless, the government states that Mr. Eisenberg's interest in the property should be disregarded because he was in custody during the relevant period, ignoring or misstating the

numerous ways Mr. Eisenberg explained he was prejudiced by his representatives, his family or attorneys, not having access to the Subject Electronics.

In his moving papers, Mr. Eisenberg explained that he was actively managing numerous short-term investments, both in volatile stocks and cryptocurrency, and that lack of access to his devices stymied his desire to have his representatives move those assets to stable long-term investment vehicles not requiring active management. (Mot. 46-47). He further explained that he lost access to bank accounts and other funds, which he would have used to hire attorneys and experts to immediately start working on his case. (*Id.*) Finally, he explained that certain contacts and messages on his devices that could have led to the discovery of relevant evidence were inaccessible, and, in some cases, autodeleted after a short period of time. (*Id.*)

The government argues that these sources of prejudice are "wildly overstate[d]" because "Eisenberg's affidavit and brief appear to focus on the entire period from the seizure to the present." (Opp. at 50.) The government's assertion is inaccurate; all of the sources of prejudice noted by Mr. Eisenberg were particularly acute during the period from arrest to warrant application ("Relevant Period"). During that time, Mr. Eisenberg's assets lost value, his bank accounts were inaccessible, and potential evidence was permanently lost. Moreover, Mr. Eisenberg's lack of access to the Subject Electronics during the Relevant Period caused him continuing prejudice. For example, Mr. Eisenberg's inability to facilitate the liquidation of his short-term accounts in January 2023 prevented him from avoiding losses that actually accrued both during the Relevant Period and thereafter.

After unfoundedly criticizing the defense for not sufficiently focusing on the Relevant Period, the government proceeds to do exactly what it declared improper. The government asserts that "the Government has made available to the defense the full extractions from the two

Cellphones the Government has accessed and the Laptop." *Id.* The government notably declines to disclose that this access was offered in March 2023, well after the Relevant Period, and at a time when discovery was being turned over, which made the government's offer far less necessary. Moreover, access to the physical device – not merely the extraction – was required to access the financial accounts due to the need for two-factor authentication.

The government employs the same tactic of confusing time periods in its response to the harm Mr. Eisenberg suffered as a result of the lack of bank account access. The government vaguely asserts that it "doubts the legitimacy of his claim to any [] funds" and then acknowledges that Mr. Eisenberg's counsel informed the government that he was accessing certain bank funds without objection from the government. (Opp. at 51 (citing Gov. Exs. 22, 23).) The government then notes that Mr. Eisenberg's counsel gained access to an account at Customer's Bank in late March 2023, (Gov. Ex. 22), more than two months after the Relevant Period, and that Schwab eventually closed Mr. Eisenberg's account in June 2023, (Gov. Ex. 23), some six months after the Relevant Period. The government's reference to the Schwab closure in June 2023 is particularly puzzling given Mr. Eisenberg's statements that he would have transferred assets into the account when it was still available to him five months earlier in January 2023. Finally, the government argues that "[p]eople lose electronic devices all the time and manage to work with their banks to solve any access issues." (Opp. at 51.) The government ignores the fact that Mr. Eisenberg was incarcerated and could not simply call or go to his bank to resolve the access issues the government had caused. Indeed, it took months for counsel, at Mr. Eisenberg's considerable expense, to regain access to the Customer's Bank account. For all these reasons, the property was important to Mr. Eisenberg and factor two favors exclusion.

### 3.     Factor 3: Whether the Defendant had a Diminished Property Interest

Mr. Eisenberg pointed out in his motion that the analysis done in *Smith* applies equally to this case and leads to the conclusion that defendant's property interest was undiminished; thus, the third factor favors Mr. Eisenberg. This included the fact that Subject Electronics were taken out of luggage owned by Mr. Eisenberg, that he did not consent to their search or seizure, that he never subsequently gave consent, that he was the sole owner of the devices, and that the devices were never relinquished to a third party. *Smith*, 967 F.3d at 208.

As it did with the first factor, the government responds by ignoring *Smith* and conflating the relevant analysis with the analysis of a different factor. The government sidesteps the question of whether Mr. Eisenberg did anything to diminish his interest in the property and instead rehashes its factor two argument about whether the fact of Mr. Eisenberg's incarceration lessened the importance to him of the property. In support, the government cites a series of out-of-circuit cases, almost all of which preceded *Smith* and none of which undertakes the *Smith* analysis utilized by every court in this Circuit.

The government then further veers away from the factor three analysis with a series of specious assertions. First, the government states that "the defense does not cite a single case where a court has ever suppressed evidence due to an unreasonable delay obtaining a warrant, when the defendant was in custody throughout the duration of that delay." (Opp at 52.) In addition to being irrelevant to factor 3, the assertion is not true. In *Javat*, 549 F. Supp. 3d at 1358-59, a case cited by the defense and with substantially similar facts to those at issue here, the Court noted that, despite the fact that defendant was in custody throughout, "Javat did not consent to the seizure of his cellphones and laptop, and this weighs in his favor." The district court ultimately found the government's twenty-day delay unreasonable in light of the unlawful search of his luggage and excluded all evidence from his digital devices. *Id.* at 1360. Numerous

other courts have likewise excluded evidence on the basis of unreasonable delay in obtaining a

warrant to search the cell phone of an incarcerated defendant.  *See*, *e.g.*, *United States v. Civil*,

No. 17 Cr. 19 (MW), 2017 U.S. Dist. LEXIS 158377, at *7 (N.D. Fla. Aug. 1, 2017) (noting that

11th Cir caselaw "does not stand for the proposition that just because a defendant is in custody

he or she loses all possessory interest in his or her property" and excluding phone evidence due

to unexplained 25-day delay); *United States v. Grills*, 18 Cr. 228 (JPS), 2019 WL 558732 (E.D.

Wis. Oct. 30, 2019) (excluding phone evidence due to 55-day delay and noting that "[t]o find that

a person's possessory interest in his phone diminishes beyond constitutional protection the

moment he is incarcerated would be like saying a person also suddenly lacks a cognizable

interest in his journal, his mail, or his bank account once he is incarcerated"); *United States v.*

*Tisdol*, 544 F. Supp. 3d 219, 225 (D. Conn. 2021) (excluding phone evidence against

incarcerated defendant due to 34-day delay); *United States v. Hay*, 19 Cr. 170 (RJA), 2023 WL

142119, 2023 U.S. Dist. LEXIS 4319, at *30 (W.D.N.Y. Jan. 10, 2023) (excluding cell phone

evidence of individual in custody after 18-month delay in obtaining warrant).

Next, the government again returns to the factor 2 analysis and argues that Mr.

Eisenberg's assertion that his property interests could have been protected by a return of the

Subject Electronics to his family or attorneys was somehow an argument about "the possessory

interests of his family or lawyers," an illogical assertion explicitly rejected by *Javat*, 544 F.

Supp. 3d at 1359 ("Javat [] is correct that had his family been allowed to keep those devices at

the time of his arrest, Javat could have asked them to access information on his behalf.").

The government, still stuck on Factor 2, also argues, citing no authority, that Mr.

Eisenberg's oral request the day after his arrest, which was denied by FBI SA Crawford, for the

return of the Subject Electronics (Eisenberg Aff. ¶ 17),[15] was insufficient to show his desire for

their return because he did not file a Rule 41(g) motion.  This argument, too, was rejected by

*Javat*, which held that an oral request by Javat's wife was sufficient.  *Id.*

The government further argues that Mr. Eisenberg's property interest was diminished

because the government had probable cause to seize the phone.  (Opp. at 53.)  The Second

Circuit stated that "the existence of probable cause is relevant . . . but far from dispositive to

deciding the reasonableness of the ensuing delay."  *Smith*, 967 F.3d at 209.  In essence, the

stronger the probable cause, the easier and faster it should be for the government to obtain a

warrant.  *See id.* ("[T]o the extent that Smith's possessory interest was offset by the police's

probable cause to seize the tablet, the police's interest was delimited by the obligation to seek a

search warrant without unreasonable delay.").

The government's attempts to distinguish this case from *Smith* are vague and speculative.

The government states that the Subject Electronics might have "independent evidentiary value"

because "Google retains data about the types of devices that access, or are registered to, Google

email accounts."  (Opp. at 54.)  The government cites no authority for the proposition and offers

no explanation for what it means by "type of device."  Type of device could as easily mean a

phone versus a laptop as it could an Apple smartphone versus an Android device.  In either

instance, there is no meaningful evidentiary value.  Moreover, the government states only the

speculation that the "type of device" could be determined and notably does not state that it knew

during the Relevant Period (or later) what "type of device" had been used to access any Google

account.  Numerous cases have rejected the sort of vague allegations the government makes here

---

[15] The government's assertion that Mr. Eisenberg's "first request for the devices was sent by his
lawyers on January 19" (Opp. at 52), is false.

about the independent evidentiary value of a cell phone.  *See*, *e.g.*, *United States v. Escobar*, No. 15 Cr. 260 (PAM), 2016 WL 3676176, at *5 (D. Minn. July 7, 2016) ("The Government is not seeking to introduce the phone itself as evidence in this case.  Instead, the Government wants to introduce the contents of the phone."); *Tisdol*, 544 F. Supp. 3d at 227 ("It is obvious that Defendant's cell phone was not inherently criminal.").

The government has thus provided no evidence that Mr. Eisenberg's interest in the Subject Electronics was in any way diminished, and Factor 3 favors exclusion.

### 4.      Factor 4: Justification for the Delay

In his moving papers, Mr. Eisenberg noted that the lack of any reasonable justification for the delay weighed heavily in favor of the defense.  The government's opposition essentially confirms that the government had more than ample resources and information with which to get a warrant at any time, including before Mr. Eisenberg's arrest.  Instead, the government unpersuasively argues that it was entitled to a multiweek delay because it did not wish to obtain a warrant in another district.  The government then applauds the work of its New York agents, despite the fact that for weeks they did nothing to obtain a warrant, implicitly shifting the blame to the Puerto Rican FBI, with no acknowledgement that the Puerto Rican agents were also part of the government team.  None of these excuses are remotely sufficient justification.

On no fewer than five occasions in its brief, the government makes the quizzical assertion, in sum and substance, that its delay was "attributable entirely to *the need* to ship the devices to New York, where Eisenberg was being prosecuted."  (Opp. 47 (emphasis added); *see also id.* 46 ("Having the devices shipped to New York was logical."); 47 ("The agents . . . *could not apply for a warrant in this District* until the devices were here.") (emphasis added); 54 ("It was eminently reasonable for reasonable for the agents in Puerto Rico to send the devices to New York, so a search warrant *could be obtained* and executed by the agents who were investigating

the case, in the district where the case was charged.") (emphasis added); 55 n. 8 ("The Government *had to wait* for the devices to arrive before applying for a warrant.") (emphasis added).)  No such need existed.  Fed. R. Crim. P. 41 would have permitted the government to obtain a search warrant in Puerto Rico.  Indeed, the warrant application could have been sworn out by a New York agent (in person or by phone), or an agent in Puerto Rico relying on hearsay from a New York agent.  SDNY attorneys obtain out-of-district warrants on a near-daily basis. The government thus recklessly prioritized its own convenience in getting a warrant in its home district over Mr. Eisenberg's constitutional rights.  The lack of any legitimate explanation for the delay strongly supports exclusion.  *See Civil*, 2017 U.S. Dist. LEXIS 158377, at *8 (excluding evidence because government "provided no explanation as to why DEA waited twenty-five days to obtain the warrant to search the seized cell phones"); *Grills*, 2019 WL 5587328, at *8 ("[T]he government has not articulated a single reason why the shift from state to federal law enforcement agencies would necessitate such a long delay.").

In defense of this manufactured "need to transfer" theory, the government several times cites the decision in *United States v. Sullivan*, 797 F.3d 623, 635 (9th Cir. 2015).  In addition to the fact that *Sullivan* is non-binding and preceded *Smith*, it offers no support for the government's theory that its convenience was reasonable justification.  In *Sullivan,* "parole officers transferred custody of the evidence to the Berkeley Police Department because the California Department of Corrections did not have the technical ability to conduct a forensic search of the laptop."  *Id.* at 629.  The Court credited this "need to transfer the laptop between agencies" as a reasonable basis for the delay.  *Id.* at 635.  By contrast, the government here has offered no technical (or any other valid) reason for a need to transfer the devices, and the devices were not transferred "between agencies" but instead remained within the FBI.

In addition to the logical and legal fallacy of the "need to transfer," the government attempts to rely on the factual fallacy that "the agents in New York also acted diligently in obtaining the search warrant."  (Opp. at 54.)  The government does not contest that the New York agents took no action to obtain a warrant before January 13, 2023, approximately eighteen days after the arrest, and offers no support for its baseless claim that "[t]he agents monitored the progress of the devices."  (Opp. at 46.)  The government further lauds its New York agents for working on other aspects of the case, while they ignored Mr. Eisenberg's property, highlighting the obvious – that the government had ample resources but chose not to use them to get a warrant for the Subject Electronics.  And even once it became clear on January 13 that the devices were still in Puerto Rico, the government team still recklessly prioritized the convenience of applying for a warrant in New York, despite knowing that this would cause substantial additional delay.

Implicit in the government's faulty theory that the New York agents were "diligent" is an attempt to blame the Puerto Rican FBI agents for the delay.  The factual record suggests that both FBI Puerto Rico and New York were at fault for the delay – the former for failing to send the devices and the latter for doing nothing for weeks to monitor the location of the devices and for permitting the transfer in the first place.  Regardless, both offices are part of the same agency and the same government prosecution team.  The government's implicit attempt to blame and distance itself from FBI Puerto Rico is thus meritless.

The government's total lack of justification weighs heavily in favor of exclusion.

### E.    <u>Exclusionary Rule</u>

Application of the exclusionary rule is straightforward given the facts of this case.  The government initially trampled Mr. Eisenberg's Fourth Amendment rights when it rifled through his luggage after his arrest and pulled out the Subject Electronics and Luggage Items.  Even now that the government has shifted its theory from a search incident to arrest that occurred when Mr.

Eisenberg was nowhere near the luggage to a supposed border search by FBI agents with no authority over or connection to the border, the government cannot justify the reckless action of its agents.  The constitutional violations are compounded by the government's prioritizing obtaining a warrant in a comfortable jurisdiction over expeditiousness.  The government does not deny that it was aware of its obligations under *Smith*—which itself stated that it was putting the government on notice that future violations would result in exclusion—or that it was aware of the potential delay inherent in shipping the Subject Electronics to New York.  *See Tisdol*, 544 F. Supp. 3d at 227-28 (noting that in *Smith* "the Second Circuit put law enforcement on notice that month-long, unjustified delays will no longer be tolerated").  Nor can the government deny that it received additional notice of the risk of delay when it learned that the Subject Electronics remained in Puerto Rico on January 13, 2023, and still prioritized its own convenience.

The government's good faith argument is inconsistent with the facts.  The central basis for the government's delay was not miscommunication or the "possibil[ity] to have shipped the devices faster" (Opp. at 57); it was the government's conscious choice to prioritize obtaining a warrant in its home district and disregarding the known risk that this tactical choice could lead to delay and the exclusion of evidence.  This is the very definition of recklessness.  Nor is it accurate that the government disclosed all of the relevant facts to the Magistrate Judge in the warrant application.  The government conveyed to the Magistrate Judge that its search was done incident to arrest, an argument it has now abandoned.  It further neglected to alert the Magistrate Judge that it had no legitimate justification for the delay in obtaining a warrant, which occurred because the government did not want to obtain a warrant in Puerto Rico.  The government's good faith argument is therefore unpersuasive, and the evidence should be excluded.  *See Tisdol*, 544 F. Supp. 3d at 228 (rejecting good faith argument because the government failed "to disclose

a fulsome account of the Second Circuit's explicit directive in *Smith*" in its warrant application

and "failed, without explanation, to obtain or seek a search warrant promptly").

## IV.    CONCLUSION

For the reasons set forth above and in the moving papers, Mr. Eisenberg respectfully

requests that the Court grant his motions to dismiss and suppress.

Dated:  September 11, 2023                    Respectfully Submitted,

                                              */s/ Brian E. Klein*

                                              _____

                                              Brian E. Klein
                                              Ashley E. Martabano
                                              Waymaker LLP

                                              -and-

                                              Sanford N. Talkin
                                              Noam B. Greenspan
                                              Talkin, Muccigrosso & Roberts, LLP

                                              *Attorneys for Avraham Eisenberg*