

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

October 30, 2023

**By ECF**
Hon. Arun Subramanian
Southern District of New York
500 Pearl Street
New York, NY 10007

      Re:    <u>United States</u> v. <u>Avraham Eisenberg</u>, 23 Cr. 10 (AS)

Judge Subramanian:

      The Government submits this letter in further opposition to defendant Avraham Eisenberg's motion to suppress the Subject Electronics.[1] Those devices were lawfully seized at the border and, even if they had not been so seized, would inevitably have been discovered and seized pursuant to an inventory search. The defendant's affidavit and briefing do not raise any genuine dispute about the key facts demonstrating that the seizures were lawful or would have inevitably occurred. Instead, the defense tries to manufacture the appearance of dispute by raising spurious challenges to collateral issues, and by asking the Court to delve into the subjective understanding of the agents about the nature of the seizures through citations to post-arrest paperwork. None of that is a basis for suppression. The Supreme Court has "long rejected any attempt to inject subjectivity into the Fourth Amendment context," *United States v. Weaver*, 9 F.4th 129, 145 (2d Cir. 2021) (*en banc*). The defendant's motion should be denied.

      **A. The Seizures Were Lawful**

      The facts in the record—both from the defendant's own affidavit and from Government exhibits—show that the Government lawfully seized the Subject Electronics pursuant to its border-search and search-incident-to-arrest authority and inevitably would have discovered the devices pursuant to an inventory search.

      The Government has "plenary authority to conduct routine searches and seizures at the border, without probable cause or a warrant." *United States v. Flores-Montano*, 541 U.S. 149, 153 (2004). The defendant's affidavit shows that is what happened. On the evening of December 26, 2022, the defendant traveled from abroad and arrived at the United States Customs counter at the international airport in Puerto Rico, where an agent from U.S. Customs and Border Protection ("CBP") questioned him. (Def. Aff. ¶¶ 2, 4.) The defendant was then directed a few feet away from the Customs counter, where a CBP agent searched his luggage. (*Id.* ¶ 5.)

---

[1] This letter is submitted per the Court's Order, ECF No. 45. Capitalized terms in this letter are defined in the Government's opposition. The Government intends to use evidence from the Subject Electronics at trial.

The defendant admits that the luggage contained some of the Subject Electronics, *id.* ¶ 7, and unsurprisingly, the agent searching that luggage found them—specifically, the Laptop and two of the Cellphones, *id.*; Gov't Exs. 3-7. Indeed, Eisenberg acknowledges watching an agent find the Laptop. (Def. Aff. ¶ 5.) Agents also found a third Cellphone on the defendant's person, while they were placing him under arrest in a room adjoining the Customs area; another point the defendant acknowledges. (*See id.* ¶ 9; Def. Br. 32.) The agents participating in the arrest then gathered all of the defendant's belongings—including the Subject Electronics and the rest of his luggage—and took it into FBI custody because the defendant was going to be transported to a local jail. *See United States v. Perea*, 986 F.2d 633, 643-44 (2d Cir. 1993) (finding it appropriate to impound personal effects of arrestee). The agents also reported to members of the case team that they had seized the Subject Electronics. (Gov't Ex. 8.)

Even if the Subject Electronics had not been seized at the airport, they inevitably would have been discovered and seized during an inventory search. After the agents took the defendant into custody, they transported him to a local jail. They also brought the defendant's belongings, including his luggage, back to the FBI office in San Juan ("FBI San Juan"). The FBI has a written policy stating that, "after lawfully taking custody of property, FBI employees must conduct a prompt and thorough search of the contents of the property, including searching any locked or unlocked containers and inventorying their contents." (Gov't Ex. 20.) Consistent with that policy, despite having already found the Subject Electronics, agents took an accounting of the valuables in the defendant's luggage, which included taking photographs of the devices and electronics, and identifying other valuables that had been taken from the luggage. (Gov't Ex. 21 at 4-5.)

Because of this mandatory inventory procedure, the agents inevitably would have found the Subject Electronics that were in the defendant's luggage—namely, the Laptop and two of the Cellphones. And, the agents would inevitably have found the third Cellphone from the defendant's person because he would not have been booked in a jail without first emptying his pockets.

## B. The Defendant's Factual Arguments Are Contradicted by the Record or Irrelevant

Defendant's reply does not dispute the key facts: namely, that agents searched his belongings at the border, seized the Subject Electronics there, and conducted an inventory search at FBI San Juan. Instead, defendant attempts to manufacture irrelevant factual disputes by labeling details in the Government's opposition "problematic." (Reply at 21-24.)

In the first three "Government Assertions," defendant appears to dispute that a CBP officer was involved in the border search of his luggage. That claim is frivolous. The defendant's own affidavit states that "[t]he *CBP agent* directed me to a specific area several feet away from the Customs counter for additional questioning, and there another *CBP officer* opened the suitcase and backpack. (Def. Aff. ¶ 5 (emphasis added).) What is more, the Government provided the defense with information to confirm that CBP Officer-1 is a CBP Officer. CBP Officer-1 is Task Force Officer ("TFO") Amador, who is a CBP officer who works with the FBI. The Government expects that TFO Amador will testify that he has worked for CBP for approximately 20 years. Moreover, before the reply was filed, the Government produced interview notes reflecting TFO Amador's 20-year background as a CBP officer. CBP records also show that a CBP officer initially processed defendant, that defendant was referred to "baggage secondary," and that defendant was transferred to a CBP TFO and FBI Special Agent Crawford. (Gov't Ex. 24.) Accordingly, although the

defendant contends that "[i]t is therefore uncontroverted that the search and seizure were executed exclusively by FBI agents," Reply at 25, the defendant's affidavit, the CBP records, and the testimony at the hearing will prove that the CBP searched the defendant's luggage at the border.

There is also no merit to the idea that the defendant's belongings were searched at the border, but that the Subject Electronics were not discovered. The defendant admits that a CBP officer found the Laptop, and his brief acknowledges that agents seized one of the Cellphones from his person (although that is omitted from his affidavit). (Def. Aff. ¶ 5; Def. Br. 32.) There is also no dispute that the other two Cellphones were in the defendant's luggage. It would have been passing strange for the officer to miss those devices, and the Government anticipates that agents will testify that those cellphones were also located at the border. Indeed, the records the Government has produced confirm that those items were seized: Members of the case team were exchanging emails about the exact number and type of electronics seized as of *8:31 p.m. the night of the arrest*. (Gov't Ex. 8 (email sent at 8:31 p.m.).)

Next, in what the defense calls the fourth "Government Assertion," the defendant appears to question where exactly in the customs hall the arresting agents approached him before his arrest. (Reply at 23-24.) It is unclear why this matters. Even still, the defendant's affidavit establishes that he was "directed and escorted by law enforcement agents to a private room away from the customs hall." (Aff. ¶ 6.) And the CBP records of the encounter only confirm that defendant was "transferred over to a CBPO TFO . . . and FBI Special Agent Michael Crawford." (Gov't Ex. 24.)

The fifth "Government Assertion" the defense challenges is also not a basis for dispute about any issue of consequence. The defendant claims it is "problematic" that the Government did not name the agent who alerted DOJ attorneys that the Subject Electronics had been seized on December 26, 2022. (Reply at 24.) That does not matter to this dispute, and the Government did not identify the agent because that information was not in a record. The point is that the case team knew exactly how many devices had been seized from the defendant shortly after he was arrested at the border, which corroborates that those devices were found and seized at customs.

Similarly, the defendant appears to challenge that the agents' inventory photographs of the electronics were taken on December 27, 2022. (Reply at 24.) Not only did the Government produce native files of these photographs, which have the date "20221227" in the file name, the photographs have metadata showing that they were taken on December 27, 2022. Moreover, the Government produced notes of an interview with SA Perez reflecting that SA Perez and a TFO conducted an inventory of the luggage and took these pictures on December 27, 2022.

Finally, the defendant questions why the agent sent a Lead Report requesting that the Subject Electronics go to New York on December 28, 2022, but did not send defendant's luggage or wallet to New York until January 11, 2023. (Reply at 24.) Again, the defendant's question is irrelevant to the Fourth Amendment analysis before the Court. Instead, the important (undisputed) point is that nobody claimed the seized items between December 26, 2022 and January 11, 2023.

### C. Defendant's Legal Arguments Are Incorrect

The defendant's arguments in reply also make legal errors. *First*, the defendant contends that the officers "repeatedly wrote that the search was done incident to arrest and never made

mention of any border-related officer or function." (Reply at 25.) But the Supreme Court and Second Circuit have rejected attempts to inject an officers' subjective intent into the Fourth Amendment analysis. *Weaver*, 9 F.4th at 145. This is because it is the facts that determine the legality of a seizure, not the officers' subjective intent: "An action is reasonable under the Fourth Amendment, regardless of the individual officer's state of mind, as long as the circumstances, viewed objectively, justify [the] action." *Brigham City v. Stuart*, 547 U.S. 398, 404 (2006). The Fourth Amendment does not require the internal law enforcement paperwork to list every legal basis for seizing the property; instead, the inquiry is whether the facts support the search's legality.

*Second*, the defendant attempts to impose impractical requirements on law enforcement that are not found in the Fourth Amendment. The defendant contends that the FBI custody logs show that "the devices were never in the custody of any CBP officer." (Reply at 25.) It is unsurprising that the FBI agents, and not the CBP officers who conducted the border search, ultimately took the defendant's belongings to the FBI office and kept the custody logs. Not only is this unsurprising, the Second Circuit has "commended" this practice: "Official interagency collaboration, even (and perhaps especially) at the border, is to be commended, not condemned." *United States v. Levy*, 803 F.3d 120, 123 (2d Cir. 2015). More fundamentally, the question is not whether CBP officers "took custody" of the devices after defendant's arrest, it is whether the CBP officers seized the Subject Electronics at the border. The CBP records and defendant's affidavit establish that a CBP officer conducted a search of defendant's baggage at a secondary inspection, found the electronic devices, the defendant was taken away from his luggage for the arrest, and the defendant never saw his belongings again. (Aff. ¶¶ 5, 7.) These items were therefore seized at the border during a border search.

This is why the Fourth Amendment is concerned with what happened, not paperwork or subjective beliefs. The agents involved in arresting the defendant were not involved in investigating the case. They arrested the defendant in an airport, where they had to take his belongings after CBP Officer-1 finished the search. In writing the paperwork, it was sensible to list the agents who took everything back to FBI San Juan as the seizing agents, and to bucket everything under the heading of a search incident to arrest. There is no Fourth Amendment requirement to draw distinctions in administrative paperwork about the legal basis for each seizure, or list all the relevant information that might bear on a Fourth Amendment analysis.

*Third*, the defendant contends that even if the CBP conducted the search of the luggage, they were not permitted to seize the electronic devices under the plain view doctrine because they "bear no immediately apparent incriminating character." (Reply at 27.) However, courts have recognized that electronic devices can satisfy the plain view doctrine when the case involves computer crimes: "With regard to the plain view doctrine, it is true that an electronic device is not a gun, a knife, or a bag of drugs—classic examples of articles that are obviously incriminating. But electronic devices may be seized under the plain view doctrine when officers have cause to believe that the crime under investigation was committed with the aid of a computer." *United States v. Thomas*, No. 14 Cr. 31 (RNC), 2015 WL 164075, at *8 (D. Conn. 2015). Here, the criminal complaint charged defendant with committing commodities fraud in the cryptocurrency market and using multiple online accounts. Indeed, the CBP records of the encounter listed the fraud statutes with which the defendant was charged. (Gov't Ex. 24.) Given that the defendant committed this scheme online using online accounts, the CBP acting at FBI's direction had every

reason to seize the Subject Electronics in plain view. This is only corroborated by the fact that law enforcement subsequently obtained search warrants, and the defendant does not challenge that probable cause existed to support the warrants.

*Finally*, even if the defendant's arguments regarding the border search and search incident to arrest were correct—which they are not, the motion should still be denied because the agents would have seized the Subject Electronics as part of a lawful inventory search. The defendant contends that inevitable discovery should not apply because the agents did not *actually* "impound" the Subject Electronics to hold them "in inventory." That misunderstands the law. The Subject Electronics were not impounded and sent to inventory because they were found at the border and promptly sent to New York. The inevitable discovery doctrine asks the *hypothetical* question about whether the agents inevitably would have found and seized the items pursuant to an inventory search, even if they had not seized them at the border. *See United States v. Mendez*, 315 F.3d 132, 138 (2d Cir. 2002). Here, the agents would have conducted an inventory search of the luggage and found the Subject Electronics had they not found them at the border. FBI policy required them to do so, and they did, in fact, conduct an inventory search at FBI San Juan and inventory other items. That the agents sent the Subject Electronics to New York, rather than inventory, is because they had already been seized. It has no bearing on their inevitable discovery.

The defendant's paperwork-based challenge to inevitable discovery is misguided. The defendant claims that inevitable discovery does not apply because the agents did not create a written summary of every item they found when they conducted an inventory search. This argument wrongly prioritizes form over substance. Inventory searches must occur pursuant to "standardized criteria or established routine" to ensure that they are done for legitimate caretaking purposes, rather than investigatory purposes. *United States v. Williams*, 930 F.3d 44, 54 (2d Cir. 2019). But the Second Circuit has been clear that not "every detail of a search" must "be governed by a standardized policy." *Id.* at 54-55. The point is to ensure that the inventory search does not, "in practice, become a purposeful and general means of discovering evidence of crime." *Id.*

Here, there is no dispute that the agents conducted an inventory search to follow policy, not for investigative purposes, and that such a search would inevitably have led to discovery of the Subject Electronics. For one, the timing of the search is telling: the agents *already* found the Subject Electronics on December 26. This shows that the search of the luggage the next day was for caretaking purposes; they had no need to go find the Subject Electronics. The way the agents executed and recorded the search was also consistent with a caretaking function. The agents prepared property receipts, prepared a collected-item log, took pictures of the electronics in the defendant's luggage, and incorporated those materials into an arrest report. (Gov't Exs. 3-7.) The photographs are noteworthy: the agents took photographs of electronics that had no investigative value, such as headphones. (*E.g.*, Gov't Ex. 21 at 26.). That shows an effort to memorialize valuable items in the luggage, not a pretext for investigation. Nothing more is required to show that even if the Subject Electronics were not found and seized at the border, agents inevitably would have discovered them during an inventory search.

        Respectfully submitted,

        DAMIAN WILLIAMS
        United States Attorney

by: \_\_*/s/ Thomas Burnett*_____
        Thomas Burnett / Peter J. Davis
        Assistant United States Attorneys

        Tian Huang
        Special Assistant United States Attorney