NB9KEISH

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                        23 CR 10 (AS)

5   AVRAHAM EISENBERG,

6                                        Hearing
              Defendant.
7   ------------------------------x

8                                        New York, N.Y.
9                                        November 9, 2023
                                         2:30 p.m.
10

11  Before:

12                  HON. ARUN SUBRAMANIAN,

13                                       District Judge

14                          APPEARANCES

15  DAMIAN WILLIAMS
         United States Attorney for the
16       Southern District of New York
    PETER DAVIS
17  THOMAS SOMERSET BURNETT
    TIAN HUANG
18       Assistant United States Attorneys

19  TALKIN MUCCIGROSSO & ROBERTS LLP
         Attorneys for Defendant
20  BY:  SANFORD N. TALKIN
         NOAM GREENSPAN
21       -AND-
    WAYMAKER LLP
22  BY:  BRETT H. KLEIN

23

    Also Present:
24

    RYAN SEARS, USAO, Paralegal
25  JULIA DRUCKER, USAO, Paralegal

NB9KEISH

1          (Case called)

2          THE DEPUTY CLERK:  Can the parties, starting with the

3     government, please state their appearances for the record.

4          MR. DAVIS:  Good afternoon, your Honor.  Peter Davis,

5     Thomas Burnett, Tian Huang, for the government.  I'm joined at

6     counsel table by Ryan Sears and Julia Drucker, from my office,

7     and Special Agent Racz.

8          THE COURT:  Good afternoon, everyone.

9          And for the defense?

10         MR. TALKIN:  Good afternoon, your Honor.  Sam Talkin,

11    Noam Greenspan, and Brian Klein, for Mr. Eisenberg, who's

12    seated down here.

13         THE COURT:  Good afternoon to you.

14         And good afternoon, Mr. Eisenberg.

15         MR. TALKIN:  Your Honor, if you can indulge me for one

16    minute?  I just sat in this chair, and it caught my leg, and I

17    want to switch.

18         THE COURT:  Of course, of course.

19         (Pause)

20         MR. TALKIN:  Thank you.

21         THE COURT:  No problem.

22         We are here for an evidentiary hearing on

23    Mr. Eisenberg's motion to suppress as to electronics and other

24    luggage items that were obtained on the date of his arrest.

25         So, Mr. Davis, I appreciate that the Court inquired as

NB9KEISH                    Itri - Direct

1    to the witnesses who would be in attendance here today and

2    prepared to testify.  So, Mr. Davis, are you prepared to

3    proceed?

4           MR. DAVIS:  Yes, your Honor.

5           THE COURT:  Okay.

6           Who do we have up first?

7           MR. BURNETT:  The government calls Special Agent Itri.

8           THE COURT:  Okay.  You can approach and be sworn in.

9    GENNARO ITRI,

10        called as a witness by the Government,

11        having been duly sworn, testified as follows:

12          THE DEPUTY CLERK:  Please state your first and last

13   name for the record, and slowly spell your last name.

14          THE WITNESS:  Sure.  Gennaro Itri, I-t-r-i.

15          THE COURT:  Okay.  Mr. Davis, you may proceed.

16          MR. BURNETT:  Thanks.  Mr. Burnett.

17          THE COURT:  Sorry.

18   DIRECT EXAMINATION

19   BY MR. BURNETT:

20   Q.  Good afternoon.

21   A.  Good afternoon.

22   Q.  Why where do you work?

23   A.  I work at the FBI San Juan division.

24   Q.  What's your title there?

25   A.  I am a special agent.

NB9KEISH                          Itri - Direct

1   Q.  How long have you been a special agent for?

2   A.  Approximately six years.

3   Q.  Are you assigned to a particular group within the FBI?

4   A.  Yes, I am.

5   Q.  What group is that?

6   A.  It's the white collar crimes group.

7   Q.  Generally speaking, what are your responsibilities as a

8   member of the white collar crimes group?

9   A.  Typically, we run investigations that have to deal with any

10  type of fraud.

11  Q.  Did you participate in an operation to arrest Avraham

12  Eisenberg on December 26, 2022?

13  A.  I did.

14  Q.  I'd like to start with how you got involved in that

15  operation.

16          Around when did you first learn about the operation to

17  arrest Mr. Eisenberg?

18  A.  It was approximately, I believe, two days prior to the

19  arrest.

20  Q.  Had you had any role investigating Mr. Eisenberg up to that

21  point?

22  A.  I did not.

23  Q.  How did you learn about the operation?

24  A.  Through another agent on my squad, Special Agent Michael

25  Crawford.

NB9KEISH                        Itri - Direct

1    Q.  What did he tell you about the operation?

2    A.  Not much; just that the New York division of the FBI had

3    sent a lead, and they requested us to arrest Mr. Eisenberg in

4    Puerto Rico.

5    Q.  What is a lead?

6    A.  It's just basically a communication from one division to

7    another stating we need your assistance.

8    Q.  Now, I'm going to have you take a look at what's been

9    marked for identification as Government Exhibit 103.

10             MR. BURNETT:  Since this is the first time, is

11   everyone able to see this on the screen?

12             It let's look it, yes.

13             (Pause)

14             THE COURT:  Okay, Mr. Burnett.

15   BY MR. BURNETT:

16   Q.  Do you see that this is an email, subject line, "Forward

17   Ops Plan - Airport Arrest - WCC"?

18   A.  Yes, sir.

19   Q.  Do you see that you're in the "To" line of this email?

20   A.  Yes, sir.

21   Q.  Is this a true and correct copy of an email that you

22   received and its accompanying attachment?

23   A.  Yes, sir.

24             MR. BURNETT:  The government offers Exhibit 103 and

25   its attachment, 103A.

NB9KEISH                          Itri - Direct

1          MR. TALKIN:  No objection.

2          THE COURT:  The document will be admitted.

3          (Government's Exhibits 103 and 103A received in

4   evidence)

5   BY MR. BURNETT:

6   Q.  Now, let's focus on the attachment column or line here.

7          Do you see it says FD-888 airport?

8   A.  I do.

9   Q.  What kind of document is that?

10  A.  The FD-8888 is a standard form that the FBI uses to plan

11  any type of operation.

12  Q.  Let's take a look at that.

13         MR. BURNETT:  If you could please pull up Government

14  Exhibit 103A.

15  Q.  What type of document are we looking at here?

16  A.  This is the FD-888 operations plan.

17  Q.  Is this the one that was attached to that email?

18  A.  It is.

19  Q.  If you could focus first on the top box here.  Do you see

20  that there's a planned operation date?

21  A.  I do.

22  Q.  What's the date of it?

23  A.  The planned operation date is listed as 12/26/22.

24  Q.  And what is the case title?

25  A.  The case title is Avraham Eisenberg, Mango Markets, MNGO

1   token market manipulation.

2           MR. BURNETT:  If could you take this down, Mr. Sears,

3   and go towards the bottom of the page.

4   Q.  Do you see there's a section titled "Overall Mission

5   Concept"?

6   A.  I do.

7   Q.  What information goes in that part of this FD-888?

8   A.  This is just a brief synopsis of what's going to happen,

9   who, what, where, when, why.

10  Q.  Now, I'd like to take a look at a couple of sentences here.

11  If you look at the second sentence, do you see that it says,

12  "Eisenberg will be arrested by CBP upon arrival into PR.  The

13  WCC squad will take custody of Eisenberg and transport to

14  Guaynabo municipal police station"?

15  A.  Yes.

16  Q.  If you look in the caution statement, the second sentence,

17  do you see that says, "Subject will be arrested by CBP during

18  secondary inspection at airport"?

19  A.  Yes.

20  Q.  Now, you're a member of the FBI, correct?

21  A.  Correct.

22  Q.  Could you explain why these portions of the operation plan

23  are discussing CBP doing an arrest in the secondary inspection

24  if you, as the FBI, were brought into the case to do the

25  arrest?

NB9KEISH                      Itri - Direct

A.  It was our understanding at the time that Mr. Eisenberg was

taking an international flight and coming into Puerto Rico.

And based on that, he would have to go through Customs and

Border Protection anyway, so they could also -- they could do

the arrest.

            MR. BURNETT:  Now, Mr. Sears, if you could take that

down and turn to page 5 of the PDF.

Q.  Do you see there's a list of names here?

A.  Yes, sir.

Q.  Could you read the names, please?

A.  Sure.

            FBI Special Agent Michael Crawford, FBI Special Agent

Geno Itri, FBI Special Agent Cristine Perez, and FBI TFO Pedro

Amador.

Q.  Why are those people listed here?

A.  Those were the people with the FBI who were going to be

participating in this operation.

            MR. BURNETT:  Finally, Mr. Sears, if we could take a

look at the next page.

Q.  Do you see there's a section of this document titled

"Coordinating Instructions"?

A.  Yes, sir.

Q.  Just generally speaking, what goes into that section of the

operations plan?

A.  This is typically where you'd put a timeline of events and

NB9KEISH                    Itri - Direct

1   what was going to occur based on specific dates and times.

2   Q.  Now, do you see there's a section here for 12/26/22?

3   A.  Yes, sir.

4   Q.  The first two lines here refer to yourself, Special

5   Agent Crawford, Special Agent Perez arriving at San Juan and

6   doing an operations briefing.

7           Do you see that?

8   A.  I do, yes, sir.

9           MR. BURNETT:  Thank you, Mr. Sears.  We can take that

10  down.

11  Q.  And I want to focus on basically right where we left off in

12  the operations plan, so at around 6:00 p.m., the day of the

13  arrest.

14          Did you meet with Special Agent Crawford and Special

15  Agent Perez at the FBI that day?

16  A.  I believe so, yes.

17  Q.  And did you go to the airport from there?

18  A.  We did.

19  Q.  Where in the airport did you go?

20  A.  We parked at the airport, we went to the CBP section, or

21  the section of the airport where international flights would

22  come in for people to be processed.

23  Q.  Did you meet anyone there?

24  A.  I did, yes.

25  Q.  Who did you meet there?

NB9KEISH                        Itri - Direct

A.  FBI TFO Pedro Amador and also another HSI agent.

Q.  When you say "FBI TFO," can you explain what you mean by that?

A.  Yes, sir.  It's a task force officer, someone from an outside agency who works with the FBI.

Q.  Do you know which agency TFO Amador works outside of the FBI?

A.  Customs and Border Protection.

Q.  Where were you while you were in the airport while you were waiting for Mr. Eisenberg to arrive?

A.  There's an area at CBP, the receiving area where passengers have to come down, and we were all seated in one little waiting area near some escalators in the secondary inspection point.

Q.  Could you describe, generally, what that area looks like?

A.  Yeah.  It's just a big wide open area.  There were some escalators that came down from when people arrived.  Underneath those escalators was the waiting area.  And close to the escalators or close to the waiting area was also where people could be -- secondary inspection, where there were some conveyor belts, some computers where you can bring people over.

Q.  So we'll come back to that secondary inspection area in just a minute.

       But, first, did there come a time when you learned that Mr. Eisenberg had arrived at the airport?

A.  Yes.

NB9KEISH                    Itri - Direct

1    Q.  How did you learn that?

2    A.  One of the agents on-scene had told us that Mr. Eisenberg

3    had gotten off the plane.

4    Q.  Where was Mr. Eisenberg when you first saw him?

5    A.  He was coming -- he had just gotten off the escalator, and

6    he was coming towards the CBP inspection point.

7    Q.  What happened when he got there?

8    A.  When he got there, he was stopped by, I believe it was, the

9    CBP, TFO -- FBI TFO Pedro Amador and I believe the HSI agent.

10   Q.  Where, if anywhere, did the HSI agent and TFO Amador take

11   Mr. Eisenberg?

12   A.  Not too far away, just to the secondary inspection, I

13   believe, is what it's called.  The secondary inspection point

14   where the conveyor belts were and the computers.

15   Q.  Could you describe specifically what that secondary

16   inspection area looks like?

17   A.  Yeah.  It just looks like, I mean, a typical conveyor belt

18   like at a supermarket or where you put your stuff through

19   security at the airport, and there was also some computers, and

20   that's about it.

21   Q.  Where did you go when Mr. Eisenberg went over to that

22   secondary inspection area?

23   A.  I followed close by.

24   Q.  About how far away from the secondary area did you end up?

25   A.  I would say approximately five feet.

NB9KEISH                          Itri - Direct

1   Q.  Could you see what was going on in the area from where you

2   were standing?

3   A.  Yes, sir.

4   Q.  And where were the CBP officers you mentioned — so Amador

5   and the HSI agent — standing when they got over to the

6   secondary area?

7   A.  They were on one side of the conveyor belt, near the

8   computers, and then on the other side was Mr. Eisenberg.

9   Q.  Could you see if Mr. Eisenberg had any baggage with him?

10  A.  Yes.

11  Q.  What did he have?

12  A.  He had one backpack and one -- it looked like a carry-on

13  luggage.

14  Q.  What, if anything -- well, let me take those one at a time,

15  actually.

16          Starting with the carry-on luggage, you said?

17  A.  Yes, sir.

18  Q.  So what, if anything, did the CBP officers do with

19  Mr. Eisenberg's luggage when he got over to the secondary area?

20  A.  The luggage was placed on top of the conveyor belt.

21  Q.  And what, if anything, did they do with it when it was on

22  the belt?

23  A.  They -- while they were talking to him, they opened up the

24  luggage.

25  Q.  Were you able to see inside the luggage?

NB9KEISH                          Itri - Direct

1    A.  Yes.

2    Q.  Could you describe what you saw?

3    A.  I know in the carry-on, the luggage bag appeared to be just

4    clothes, personal items.  And then in his backpack, he had some

5    other items.

6    Q.  Let's take those one at a time.

7            So the carry-on luggage, what do you recall seeing

8    there?

9    A.  Just personal items, clothing.  That's about it.

10   Q.  Now, how about the backpack, what did the CBP officers do

11   with the backpack?

12   A.  Again, after they had placed it on the conveyor belt area,

13   in between the CBP officer and Mr. Eisenberg, at some point the

14   bag was opened.

15   Q.  What did they do with the bag once it was opened?

16   A.  It was -- the contents were removed.

17   Q.  Were you able to see some of the things that they took out

18   of the bag?

19   A.  Yes, sir.

20   Q.  What did you see?

21   A.  I saw a laptop and at least one cell phone.

22   Q.  Why do you say "at least one cell phone"?

23   A.  I believe there were more, but I'm not -- wasn't a hundred

24   percent, but I know there were -- I believe we ended up with

25   multiple cell phones that day.

1  Q.  Now, based on your training as a fraud investigator, were

2  the laptop and the cell phones you saw significant?

3  A.  Yes, sir.

4  Q.  Why is that?

5  A.  Typically, those are items that are used a lot by people

6  for perpetrating those types of crimes, and they're of high

7  evidentiary value, they contain a lot of information.

8  Q.  Where did the CBP officers place the contents of the

9  backpack as they were taking the things out of the bag?

10  A.  I believe they just placed them right on the belt there,

11  next to the bags.

12  Q.  Now, did there come a time, after Mr. Eisenberg arrived at

13  the secondary area, that he was taken to another location?

14  A.  Yes, sir.

15  Q.  Where was he taken?

16  A.  He was taken to another area, I would say, about ten feet

17  away, where there was a little room, which was, I believe, a

18  secondary -- or a search -- maybe a search or interview room,

19  they called it.

20  Q.  Who took him there?

21  A.  That was myself, the CBP Task Force Officer Pedro Amador,

22  and FBI Special Agent Michael Crawford.

23  Q.  Can you describe what happened in that room after the three

24  of you took Mr. Eisenberg over there?

25  A.  Yeah.  So at that point, again, I had been standing back, I

NB9KEISH                    Itri - Direct

1    hadn't introduced myself at that point, so I introduced myself,

2    FBI Special Agent Michael Crawford introduced himself as the

3    FBI, and we advised Mr. Eisenberg that he was under arrest for

4    a warrant out of New York, and we placed him into handcuffs.

5    Q.  What, if anything, did you and the other officers do when

6    Mr. Eisenberg -- when you were in the process of arresting

7    Mr. Eisenberg?

8    A.  After he was placed in handcuffs, he was searched incident

9    to arrest.

10   Q.  Do you remember if there was anything found during the

11   search incident to arrest?

12   A.  Yes.

13   Q.  What was found?

14   A.  There was, I believe, a cell phone and a wallet in his

15   pockets.

16   Q.  Now, about how long would you say you were in that room

17   with Mr. Eisenberg?

18   A.  Not very long; just a couple of minutes.

19   Q.  Who was in charge of handling Mr. Eisenberg after that

20   arrest?

21   A.  I was not.  It was other agents.

22   Q.  Other agents who had been in that room?

23   A.  Correct.

24   Q.  And where did those other agents take Mr. Eisenberg after

25   leaving the arrest room?

1    A.  He was brought back to where we had previously come from,

2    over by the conveyor belts and the secondary inspection area.

3    Q.  I want to focus back now on Mr. Eisenberg's belongings,

4    those two bags you talked about earlier.

5         You testified that the CBP officers had taken items,

6    including electronics, out of the bags; is that correct?

7    A.  Correct.

8    Q.  Did they eventually put those items back in the bags?

9    A.  I believe so, yes.

10   Q.  Do you recall who did that?

11   A.  I do not recall.

12   Q.  What happened with those bags after Mr. Eisenberg's arrest?

13   A.  I took custody of the bags, and we left the airport with

14   Mr. Eisenberg and the luggage.

15   Q.  Now, did you, when you took the bags, keep the electronics

16   separate or transport them inside the bags?

17   A.  They were left inside the bags that they came from.

18   Q.  Why not have them separate, like in an evidence bag or

19   something?

20   A.  We did not have evidence bags at the time.

21   Q.  Where did you bring Mr. Eisenberg's luggage, so the

22   carry-on and the backpack?

23   A.  They were placed in my FBI vehicle.

24   Q.  And what did you do after putting the bags in your car?

25   A.  We were -- I followed the other agents who had

NB9KEISH                          Itri - Direct

1   Mr. Eisenberg to the Guaynabo municipal jail.

2   Q.  What is that?

3   A.  It's just a local holding facility.  I believe it was too

4   late at night to bring Mr. Eisenberg to the federal facility.

5   Q.  What happened when you got to that facility?

6   A.  I didn't go directly to the facility, but I had to stop and

7   grab him some food and snacks and something to drink.  Once I

8   arrived, I gave those snacks over to the other agents who had

9   Mr. Eisenberg, at which point, that was it at that location.

10  Q.  Where did you go after the jail?

11  A.  After the jail, I went to the FBI San Juan office.

12  Q.  What did you do when you got there?

13  A.  I unloaded the bags from my vehicle, brought them into the

14  office.

15  Q.  Where did you put those bags?

16  A.  They were placed in the white collar squad area.

17  Q.  Why that area?

18  A.  It's the typical location to where we put times that don't

19  have -- that don't need to be entered into evidence that exact

20  day.

21  Q.  Had you put arrestees items in that area before in your

22  career?

23  A.  Yes, many times.

24  Q.  Now, did you do anything else related to the case that

25  evening?

NB9KEISH                    Itri - Cross

1   A.  Not that evening.

2   Q.  How about the next morning?

3   A.  Yes, sir.

4   Q.  What did you do?

5   A.  Myself and another agent went to pick up Mr. Eisenberg at

6   the municipal jail, where we had picked him up, and went to the

7   FBI San Juan office for further processing.

8   Q.  Other than helping with the processing of Mr. Eisenberg

9   that day, have you had any other interactions with

10  Mr. Eisenberg?

11  A.  I have not.

12  Q.  And have you had any other involvement with Mr. Eisenberg's

13  bags after that night when you dropped them off at the FBI?

14  A.  I have not.

15          MR. BURNETT:  No further questions, your Honor.

16          THE COURT:  Okay.  Thank you.

17          Cross-examination?

18  CROSS-EXAMINATION

19  BY MR. GREENSPAN:

20  Q.  Good afternoon, Mr. Itri.

21  A.  Good afternoon, sir.

22  Q.  You testified you were assigned to help in the arrest of my

23  client, Mr. Eisenberg, correct?

24  A.  That's correct.

25  Q.  And you were told about that assignment by Michael

NB9KEISH                          Itri - Cross

1    Crawford; is that right?

2    A.  Yes, that's correct.

3    Q.  You testified that you weren't involved in planning the

4    operation, right?

5    A.  I was not.

6    Q.  You testified about an operations plan.

7             Do you remember that?  You were shown that exhibit?

8    A.  Yes, sir.

9    Q.  And in that exhibit, you were shown a page that talked

10   about an operations briefing.

11            Do you recall that?

12   A.  Yes, sir.

13   Q.  Were you involved in that operations briefing?

14   A.  I don't recall.

15   Q.  You testified about going to the airport.

16            Do you remember that?

17   A.  Yes, sir.

18   Q.  And at the airport, you said you met two agents, I believe,

19   right?

20   A.  Correct.

21   Q.  Who were those agents?

22   A.  Was the FBI TFO Pedro Amador and another HSI agent,

23   Homeland Security Investigations agent.

24   Q.  Do you know the name of that HSI agent?

25   A.  I don't, no.

NB9KEISH                          Itri - Cross

1    Q.   Do you know how that agent came to be there?

2    A.   I don't.

3    Q.   You described, in your testimony just a moment ago, seeing

4    Mr. Eisenberg -- I believe you described him descending down an

5    escalator; is that correct?

6    A.   He had to come down the escalator in order for us to

7    come -- in order for him to get to the secondary inspection

8    point.

9    Q.   Is that the first time you saw Mr. Eisenberg in person?

10   A.   After he had gotten off the escalator, yes.

11   Q.   And then you said in your testimony that -- I believe you

12   said he was stopped by the two agents, the task force officer

13   and the HSI agent; is that correct?

14   A.   Correct.

15   Q.   Did he interact with anybody before those two?

16   A.   I don't believe so.

17   Q.   You said that he was taken to what you called the secondary

18   inspection area, correct?

19   A.   Correct.

20   Q.   You described that as having a conveyor belt and computers,

21   right?

22   A.   Yes, sir.

23   Q.   You said you were how far away when he was at that point?

24   A.   Approximately five feet.

25   Q.   You described a backpack, and I think you called it a

NB9KEISH                         Itri - Cross

1     carry-on, right?

2     A.  Correct.

3     Q.  And the carry-on, is that something with wheels?

4     A.  Typically, yes.

5     Q.  Was it this one?

6     A.  I'm not sure if it had wheels or not.

7     Q.  Was Mr. Eisenberg carrying it in his hands?

8     A.  I don't recall.

9     Q.  You said the carry-on, in your testimony, you said it had

10    clothes and personal items, right?

11    A.  Yes, sir.

12    Q.  What kinds of personal items did it have in the carry-on;

13    do you recall?

14    A.  No.  Typically, just your basic items, clothes and, you

15    know, undergarments.

16    Q.  Nothing -- I'm sorry.

17    A.  No, that's what I considered personal items.

18    Q.  Okay.  So the personal items are also clothes?

19    A.  Correct.

20    Q.  So all you saw in there was clothes?

21    A.  Correct.

22    Q.  And then you described the opening of -- strike that.

23         Going back to the carry-on, were those clothes all

24    taken out of the carry-on and put on the conveyor belt?

25    A.  I don't recall if they all were.

NB9KEISH                    Itri - Cross

1   Q.  Was anything taken out of the luggage, out of the carry-on?

2   A.  I don't recall.

3   Q.  You described the backpack being opened, right?

4   A.  That's correct.

5   Q.  Was all of the contents removed from the bag pack?

6   A.  I don't know if all the contents were removed.  I know some

7   items were.

8   Q.  You described a laptop and at least one phone?

9   A.  Correct.

10  Q.  Those things were removed?

11  A.  Yes, sir.

12  Q.  Do you recall anything else that was removed?

13  A.  From the backpack?  I do not recall.

14  Q.  But you said that we ended up -- I think you said we ended

15  up with multiple phones?

16  A.  Correct.

17  Q.  But you don't recall anything more than the one phone being

18  removed from the luggage, right?

19  A.  No.  I stated I believed there was at least one.

20  Q.  At least one?  Understood.

21          After the removal of these items onto the conveyor

22  belt, I believe you testified that Mr. Eisenberg was taken to

23  what you described as an interview room; is that correct?

24  A.  Yes, sir.

25  Q.  In the interview room, you described Mr. Eisenberg being

NB9KEISH                         Itri - Cross

1    handcuffed?

2    A.  Yes, sir.

3    Q.  Who was it that handcuffed Mr. Eisenberg?

4    A.  I don't recall.

5    Q.  Was it you?

6    A.  I don't recall.

7    Q.  In the room, you said it was you, Agent Crawford, and Task

8    Force Officer Amador, right?

9    A.  I believe so, yes, sir.

10   Q.  Did anybody search Mr. Eisenberg?

11   A.  Yes, sir.

12   Q.  And who was that?

13   A.  I believe it was Task Force Officer Amador.

14   Q.  You said that a cell phone and a wallet were found in his

15   pocket; is that correct?

16   A.  Correct.

17   Q.  Was that in a pants pocket?

18   A.  I believe so.

19   Q.  Did you see Task Force Officer Amador take those things out

20   of the pocket?

21   A.  I would assume I saw him, but I can't say for certain.  I

22   mean, I don't know how else I would have known.

23   Q.  But you don't have a specific recollection of seeing Task

24   Force Officer Amador take those items out of the pocket?

25   A.  I know he searched them, and I know we had found a wallet

NB9KEISH                          Itri - Cross

1    and a cell phone.

2    Q.  Then you described coming out of the interview room.

3         At that point, could you see the backpack and the

4    carry-on?

5    A.  Yes.  They were left on the belt with, I believe, another

6    agent.

7    Q.  Who was that other agent?

8    A.  I believe it was the HSI, Homeland Security Investigations

9    agent.

10   Q.  Was there an Agent Perez that was with you?

11   A.  There was, yes.

12   Q.  And where was she at the time?

13   A.  I do not recall.

14   Q.  You said some things had been taken out of -- you couldn't

15   recall exactly what was taken out of the backpack, but you said

16   at least electronics were taken out of -- I'm sorry, strike

17   that.

18        You said some electronics were taken out of the

19   backpack, correct?

20   A.  Yes, sir.

21   Q.  Were those still lying on the conveyor belt?

22   A.  I don't recall if they were still lying there, or if they

23   were put back in the bag at that point.

24   Q.  Was anything on the conveyor belt, do you recall anything

25   other than -- any of the contents of those backpack and the

NB9KEISH                     Itri - Cross

1    carry-on, do you recall any of that still being on the conveyor

2    belt when you came out?

3    A.   I don't recall.

4    Q.   You said that you took possession of the backpack and the

5    carry-on, correct?

6    A.   That's correct.

7    Q.   Did that happen right then, when you came out of the

8    interview room?

9    A.   It was shortly thereafter, yes, sir.

10   Q.   When you say "shortly thereafter," was that in a matter of

11   minutes, a matter of seconds, do you recall?

12   A.   I don't recall.  I know we brought Mr. Eisenberg out.  I

13   don't recall how long it was before we gathered everything and

14   left.

15   Q.   And then did you pick up both of those bags and carry them

16   out of the airport with you?

17   A.   Yes, sir.

18   Q.   Did you take them directly to your car?

19   A.   Yes, sir.

20   Q.   Where did you put them in your car?

21   A.   In my trunk.

22   Q.   I believe you said once you were in your car, you followed

23   the other agents to a local jail; is that correct?

24   A.   Correct.

25   Q.   Was there anyone else in your car?

NB9KEISH                        Itri - Cross

1   A.  No, sir.

2   Q.  Who was in the car that you were following?

3   A.  I don't recall exactly who it was.  I know there was two

4   agents with Mr. Eisenberg.

5   Q.  Where was Agent Perez at this point?  She wasn't in your

6   car, right?

7   A.  Correct, she was not.

8   Q.  Was she in the other car?

9   A.  I do not recall which car she was in.

10  Q.  Okay.  Now, after the jail, you said you went back to the

11  FBI San Juan office, right?

12  A.  Yes, sir.

13  Q.  Did you stop anywhere on the way?

14  A.  On the way back?  No, I did not.

15  Q.  And you said you placed the luggage — by that, I mean the

16  backpack and the carry-on — in the white collar squad area,

17  correct?

18  A.  That's correct.

19  Q.  Did you lock it up in any way?

20  A.  No, it was not locked in anything.

21  Q.  Where was it?  Was it sitting on the floor, on a desk?

22  A.  It was basically in between my desk and Agent Perez's desk.

23  There's a little area where we can place items.

24  Q.  Do you and Agent Perez sit next to each other?

25  A.  That's correct.

NB9KEISH                        Itri - Cross

1    Q.   And these are desks?

2    A.   Yes, sir.

3    Q.   Open area?

4    A.   Yeah, open desks.

5    Q.   You said everything was placed back in the luggage, and by

6    "everything," I mean the electronics, and I believe you said it

7    was because you didn't have evidence bags?

8    A.   Correct.

9    Q.   Had anyone asked you to bring evidence bags?

10   A.   Not that I recall.

11   Q.   Is it typically your practice, when seizing items, to have

12   evidence bags?

13   A.   Depending on the situation.

14           MR. GREENSPAN:  Nothing further, your Honor.

15           THE COURT:  All right.  Any redirect?

16           MR. BURNETT:  No, your Honor.

17           THE COURT:  Okay.

18           Who do we have next?

19           And, Mr. Itri, you can be excused.  Thank you very

20   much.

21           THE WITNESS:  Thank you.

22           (Witness excused)

23           MR. DAVIS:  The government calls Special Agent Michael

24   Crawford.

25

NB9KEISH                          Crawford - Direct

1   MICHAEL CRAWFORD,

2          called as a witness by the Government,

3          having been duly sworn, testified as follows:

4              THE DEPUTY CLERK:  Can you please state your first and

5   last name for the record, and slowly spell your last name.

6              THE WITNESS:  Michael Crawford, C-r-a-w-f-o-r-d.

7              MR. DAVIS:  Thank you.

8              Your Honor, may I proceed?

9              THE COURT:  You may.

10  DIRECT EXAMINATION

11  BY MR. DAVIS:

12  Q.  Good afternoon, Special Agent Crawford.  Where do you work?

13  A.  I work for the FBI.

14  Q.  What is your title at the FBI?

15  A.  Special agent.

16  Q.  When did you join the FBI?

17  A.  2018.

18  Q.  What group are you assigned to in the FBI?

19  A.  The white collar crime squad.

20  Q.  Where is your office located?

21  A.  San Juan, Puerto Rico.

22  Q.  Can you explain generally what your duties and

23  responsibilities are as a special agent in the white collar

24  crimes unit?

25  A.  So, generally, investigate allegations of violations of

NB9KEISH                          Crawford - Direct

1    federal law, more specifically pertaining to financial crimes,

2    such as investment fraud, corporate fraud, fraud against the

3    government, and crimes such as this.

4    Q.  I want to direct your attention to December of 2022.

5           Did there come a time when you received a lead for a

6    potential operation involving Avraham Eisenberg?

7    A.  Yes.

8    Q.  Can you explain briefly what a lead is?

9    A.  A lead is a tasking sent from one field office in the FBI

10   to another or from one group to another group within the FBI.

11          MR. DAVIS:  Can we please publish what has been marked

12   for identification as Government Exhibit 102.

13   Q.  Special Agent Crawford, do you see Government Exhibit 102

14   on your screen?

15   A.  Yes.

16   Q.  What is Government Exhibit 102?

17   A.  A lead for FBI San Juan to conduct an arrest.

18   Q.  Is it a fair and accurate copy of the lead you received

19   about Mr. Eisenberg?

20   A.  Yes.

21          MR. DAVIS:  The government offers Government

22   Exhibit 102.

23          MR. TALKIN:  No objection.

24          THE COURT:  Exhibit 102 is admitted.

25          (Government's Exhibit 102 received in evidence)

NB9KEISH                          Crawford - Direct

1    BY MR. DAVIS:

2    Q.  Let's start at page 1 of Government Exhibit 102.

3            Could we start by reading the synopsis into the

4    record, please?

5    A.  Yes.  "Request for assistance from FBI San Juan to conduct

6    arrest of Avraham Eisenberg."

7    Q.  And then can you please read the "From "section at the top

8    of the document?

9    A.  "From:  New York NY-C43."

10   Q.  I want to turn now to page 2 of this document.

11           Can you please read the paragraph beginning with "a

12   criminal complaint."

13   A.  "A criminal complaint charging Eisenberg with commodities

14   fraud is expected to be sworn out on December 23, 2022.  An

15   arrest warrant will be provided to FBI San Juan once obtained."

16   Q.  Can we please read the next paragraph of Government

17   Exhibit 102?

18   A.  "Eisenberg is currently scheduled to fly from Tel Aviv,

19   Israel, to San Juan through Madrid, Spain, arriving in San Juan

20   on December 26, 2022.  The flight from Madrid to San Juan is

21   Iberia Flight 6301, which is scheduled to arrive at 7:45 p.m."

22   Q.  And now let's turn back to the first page.

23           What's the date of this document?

24   A.  The date of this document is December 22nd, 2022.

25   Q.  Who was your contact at FBI New York making this request?

1    A.  Brandon Racz.

2    Q.  Now, before the operation involving Mr. Eisenberg, what, if

3    any, documents did Special Agent Racz provide you as background

4    to the operation?

5    A.  So he provided me the case ID number, so I could review the

6    investigation.  He provided me the complaint and the arrest

7    warrant.

8            MR. DAVIS:  Can we pull up what's been marked for

9    identification as Government Exhibit 104.

10   Q.  Special Agent Crawford, do you recognize Government

11   Exhibit 104?

12   A.  I do.

13   Q.  What is it?

14   A.  Email correspondence between myself and Brandon Racz.

15   Q.  Is this email and its attachments a fair and accurate copy

16   of the email you received from Special Agent Racz?

17   A.  Yes.

18           MR. DAVIS:  The government offers Government

19   Exhibit 104 and its attachments, 104A and 104B.

20           MR. TALKIN:  No objection.

21           THE COURT:  Those documents will be admitted.

22           (Government's Exhibits 104, 104A, and 104B received in

23   evidence)

24   BY MR. DAVIS:

25   Q.  I want to start with the email on the top of 104.

NB9KEISH                    Crawford – Direct

1           What is the date of that email?

2    A.   The date is Friday, December 23rd, 2022.

3    Q.   What is the text of the email you received from Brandon

4    Racz?

5    A.   "Here are the stamped versions."

6    Q.   Let's turn to the attachments.  Let's start with Government

7    Exhibit 104A.

8           MR. DAVIS:  Can we please pull up 104A.

9    Q.   What is Government Exhibit 104A?

10   A.   Government Exhibit 104A is the complaint.

11   Q.   Who is the complaint against?

12   A.   The complaint is against Avraham Eisenberg.

13   Q.   Could you please read what the name of Count One of this

14   complaint is?

15   A.   Commodities fraud.

16   Q.   Turning to page 2, could we read what the name of Count Two

17   is?

18   A.   Commodities manipulation.

19          MR. DAVIS:  And then I want to turn to paragraph 5 of

20   the complaint.

21   Q.   Could you please read what's stated in paragraph 5 of the

22   complaint?

23   A.   "As explained in greater detail below, in or about

24   October 2022, Avraham Eisenberg, the defendant, participated in

25   a scheme to steal approximately 110 million by artificially

1    manipulating the price of MNGO Perpetuals on Mango Markets (the

2    market manipulation scheme).  The scheme worked as follows:

3    Eisenberg used an account that he controlled on Mango Markets

4    to sell a large amount of Perpetuals for MNGO, and he used a

5    separate account on Mango Markets to purchase those same

6    Perpetuals."

7    Q.  I'll stop you there.

8         MR. DAVIS:  We can take down Government Exhibit 104A

9    and pull up Government Exhibit 104B, which is in evidence.

10   Q.  What is Government Exhibit 104B?

11   A.  An arrest warrant for Mr. Eisenberg.

12        MR. DAVIS:  Let's take down Government Exhibit 104B.

13   Q.  You mentioned that your point of contact with FBI New York

14   was Special Agent Racz.

15        Do you remember that?

16   A.  Yes.

17   Q.  What, if anything, did you discuss with Special Agent Racz

18   about any devices that Mr. Eisenberg might have on his person

19   at the time of his arrest?

20   A.  That if Eisenberg traveled with devices on his person, they

21   would be seized incident to arrest.

22   Q.  What was your understanding of whether evidence of

23   Eisenberg's crimes could be found on those devices?

24   A.  My understanding was that there was likely to be probable

25   cause of evidence of the crimes on the devices.

NB9KEISH                          Crawford - Direct

1   Q.  Why do you say that?

2   A.  Because based on my experience and conversations with

3   Mr. Racz, financial crimes actors commonly use electronic

4   devices in furtherance of their schemes, especially when

5   related to cryptocurrencies, because the cryptocurrency markets

6   and exchanges can only be accessed through computers and

7   electronics.

8   Q.  When you received this lead from Special Agent Racz, what,

9   if any, operations plan did you come up with?

10  A.  I prepared an operations plan for the arrest of

11  Mr. Eisenberg.

12          MR. DAVIS:  Let's turn to Government Exhibit 103,

13  which is in evidence.

14  Q.  Special Agent Crawford, do you recognize this email chain?

15  A.  I do.

16  Q.  I want to start with the response that Elizabeth Pratt

17  sends to you on December 23rd.

18          Could you read what that email at the top there says?

19  A.  "Hi Mike.  TI approves.  Since CBP is doing the

20  interdiction, just copying Guillermo for awareness.  Thanks!

21  Liz."

22  Q.  What does "CBP is doing the interdiction" mean?

23  A.  That means Customs and Border Protection would be doing the

24  initial contact with Mr. Eisenberg at the airport.

25          MR. DAVIS:  Let's turn to Government Exhibit 103A.

NB9KEISH                          Crawford - Direct

1   Q.  Do you recognize Government Exhibit 103A?

2   A.  I do.

3   Q.  What is it?

4   A.  This is the operations plan for the arrest of

5   Mr. Eisenberg.

6   Q.  I want to turn to where it says "Overall Mission Concept"

7   in the middle of the page.

8         Do you see that?

9   A.  I do.

10  Q.  Could you please read starting on December 26, 2022?

11  A.  "On December 26, 2022, FBI San Juan white collar crime

12  squad will assist FBI New York in arrest of Avraham Eisenberg

13  on a criminal complaint.  Eisenberg will be arrested by CBP

14  upon arrival in the PR.  The white collar crime squad will take

15  custody of Eisenberg and transport to Guaynabo municipal police

16  station."

17  Q.  When it says here "Eisenberg will be arrested by CBP upon

18  arrival in the PR," what does that mean?

19  A.  That means that he would be arrested by Customs and Border

20  Protection at the airport in the customs area of San Juan,

21  Puerto Rico.

22  Q.  Let's turn now to the caution statement.

23         Do you see that?  It's still in Government Exhibit

24  103A, page 1.

25  A.  Yes, I see it.

1   Q.  Can you please read starting on "subject" and ending with

2   "airport"?

3   A.  "Subject is not known to be armed and dangerous.  Subject

4   will be arrested by CBP during secondary inspection at

5   airport."

6   Q.  What does the phrase "secondary inspection" mean?

7   A.  "Secondary inspection" is a more thorough and in-depth

8   inspection conducted by Customs and Border Protection of

9   travelers crossing into the United States through international

10  travel.

11          MR. DAVIS:  Let's turn now to page 7 of this document.

12          We're going to go up to where it says page 7 in the

13  bottom right, so it's going to be up a few pages.

14          There it is.  Perfect.

15  Q.  Do you see where it says, "Law enforcement participants in

16  the operation"?

17  A.  I do.

18  Q.  Who is the last person listed in that operation?

19  A.  Pedro Amador.

20  Q.  What is Pedro Amador's title?

21  A.  He's an FBI TFO and CBP liaison.

22          MR. DAVIS:  Let's turn now to the next page.

23  Q.  Do you see where it says, "Overall Primary Plan Summary"?

24  A.  Yes.

25  Q.  Can you please read starting from where it says, "on

NB9KEISH                         Crawford - Direct

1   December 26, 2022."

2   A.   "On December 26, 2022, personnel from the white collar

3   crime squad will meet at FOB and consolidate vehicles.

4   Personnel will travel to Luis Munoz Marin International

5   Airport.  Agents will notify CBP upon arrival at the San Juan

6   airport.  CBP personnel will conduct a secondary inspection of

7   Eisenberg upon arrival at San Juan airport and effect the

8   arrest.  Agents will take custody of Eisenberg and transport to

9   Guaynabo municipal prison."

10  Q.   When it says "CBP personnel will conduct a secondary

11  inspection of Eisenberg upon arrival," what does that mean?

12  A.   That means that when Mr. Eisenberg was identified at

13  customs, he would be called over to the secondary inspection

14  area, and his person and his luggage would be inspected and

15  searched by CBP.

16  Q.   Let's turn to the day of the operation.  I want to direct

17  your attention to December 26, 2022.

18         Did you participate in a law enforcement operation

19  involving Mr. Eisenberg at the airport that day?

20  A.   I did.

21         MR. DAVIS:  Let's take down this exhibit, please.

22  Thank you.

23  Q.   When did you arrive at the airport?

24  A.   It was approximately 6:45 p.m. that evening.

25  Q.   Who was with you when you arrived at the airport at

NB9KEISH                    Crawford - Direct

1    6:45 p.m. that evening?

2    A.   Special Agents Cristine Perez and Geno Itri.

3    Q.   When you first arrived at the airport around 6:45 p.m.,

4    where did you go?

5    A.   We went to the customs inspection area of the airport.

6    Q.   Who, if anyone, was taking the lead on the secondary

7    inspection of Mr. Eisenberg?

8    A.   Pedro Amador.

9    Q.   Is that TFO Amador we were speaking about earlier?

10   A.   Yes, it is.

11   Q.   After you arrived at the customs area you were referring

12   to, when was the first time, if ever, that you saw

13   Mr. Eisenberg?

14   A.   At some point after he had gotten off his plane and

15   Mr. Amador pointed him out.

16   Q.   Where was Mr. Eisenberg at the time?

17   A.   He was in the customs area at the airport.

18   Q.   What did you observe Mr. Eisenberg and Mr. Amador do next?

19   A.   Mr. Amador directed Mr. Eisenberg over to the secondary

20   inspection area at the airport.

21   Q.   Who was Mr. Eisenberg interacting with when he arrived at

22   the secondary inspection area?

23   A.   Mr. Amador.

24   Q.   Where were you standing when you saw Mr. Amador interacting

25   with Mr. Eisenberg at the secondary inspection area?

NB9KEISH                         Crawford - Direct

1   A.  Approximately ten to fifteen feet to the side.

2   Q.  Could you see what TFO Amador was doing?

3   A.  I could.

4   Q.  Could you see what Mr. Eisenberg was doing?

5   A.  I could.

6   Q.  Could you hear what was going on?

7   A.  Yes.

8   Q.  Let's start with what you saw.

9         What did you see TFO Amador and Mr. Eisenberg do next?

10  A.  I saw Mr. Amador direct Mr. Eisenberg to open up his

11  luggage.

12  Q.  After you saw Mr. Amador direct Mr. Eisenberg to open up

13  his luggage, what did you see happen next?

14  A.  I saw Mr. Amador direct Mr. Eisenberg to reveal where his

15  electronic devices were, if any, inside the luggage.

16  Q.  After you saw that direction, what did you see happen next

17  with respect to his luggage?

18  A.  I saw that a laptop and two cell phones were removed from

19  the luggage.

20  Q.  After you saw a laptop and two cell phones removed from the

21  luggage, where did those items go?

22  A.  They went to the side, kind of separate from the luggage,

23  but right next to it, and the two cell phones were placed in a

24  plastic bag.

25  Q.  Could you hear what Mr. Eisenberg and TFO Amador were

NB9KEISH                      Crawford - Direct

1    discussing while this was happening?

2    A.   Yes.

3    Q.   What could you hear?

4    A.   I heard Mr. Eisenberg ask if — and this is kind of a

5    summary, not verbatim, but Mr. Eisenberg asked if consent or a

6    search warrant was needed.  And Mr. Amador explained that it

7    wasn't because it was an international border crossing.

8    Q.   After you saw TFO Amador set aside these devices, what

9    happened next?

10   A.   So after the devices were set aside, Eisenberg was --

11   Mr. Eisenberg was directed over to myself and the other agents

12   that were there on the scene, and we escorted Mr. Eisenberg

13   over to the interview room that's close nearby to the secondary

14   inspection area.

15   Q.   Approximately how close is the interview room to where you

16   were standing and the secondary room?

17   A.   It's a short walk, maybe 20, 30 feet.

18   Q.   Who do you recall went with you into the interview room?

19   A.   Geno Itri, and then there was an HSI agent there as well

20   assigned to the airport.

21   Q.   Did Mr. Eisenberg take his luggage into the interview room?

22   A.   No, he did not.

23   Q.   Where was his luggage and the devices we discussed earlier

24   while this happened?

25   A.   So his luggage and devices stayed in the secondary

NB9KEISH                        Crawford - Direct

1    inspection area.

2    Q.  Let's talk about what happened inside of the interview

3    room.

4            What happened inside the interview room?

5    A.  So we informed Mr. Eisenberg that he was under arrest.  We

6    placed him in handcuffs --

7            MR. TALKIN:  Your Honor, I just have an objection to

8    the "we."  I would ask that he identify who exactly did what.

9            THE COURT:  Agent Crawford, can you identify who

10   you're referring to when up say "we"?

11           THE WITNESS:  Myself, Geno Itri, and Juanquin, the HSI

12   agent.

13   BY MR. DAVIS:

14   Q.  What, if anything, did Mr. Eisenberg have on his person at

15   that time?

16   A.  So he had a cell phone and a wallet.

17   Q.  Just to keep track, this is another cell phone in addition

18   to the two cell phones you mentioned earlier?

19   A.  Correct.

20   Q.  What did you do with the items that were seized from

21   Mr. Eisenberg's person?

22   A.  So after we took him out from the interview room in

23   handcuffs, we — being myself, Agent Itri, and the HSI agent,

24   Juanquin — placed the items, being the cell phone and the

25   wallet, in the plastic bag with the initial two cell phones.

NB9KEISH                          Crawford - Direct

1    Q.  After you placed those items into the bag with the cell

2    phones, what did you do with respect to Mr. Eisenberg's person?

3    A.  We put like a sweater over him so the handcuffs weren't

4    exposed in the airport to the public, and then we took him down

5    to Mr. Amador's vehicle for transport to prison.

6    Q.  Just to step back for a second, when you left the interview

7    room, where was Mr. Eisenberg's luggage and electronics that we

8    discussed earlier?

9    A.  It did not move from the secondary area, where it was

10   initially.

11   Q.  So after Mr. Eisenberg was placed in handcuffs, who was

12   responsible for transporting Mr. Eisenberg to prison?

13   A.  Myself and Mr. Amador were responsible for transporting him

14   to prison.

15   Q.  And who, to your knowledge, took custody or took control of

16   the luggage and devices?

17   A.  Geno Itri.

18   Q.  Who actually transported Mr. Eisenberg to the local prison?

19   A.  Myself and Mr. Amador.

20   Q.  And which prison was that?

21   A.  Guaynabo municipal prison.

22   Q.  What happened to the belongings that Mr. Itri took?

23   A.  So Mr. Itri transported them to the Guaynabo municipal

24   prison, and then after Mr. Eisenberg was remanded into prison,

25   myself and Geno Itri drove in his car to the FBI San Juan field

1    office, where we put the items in the squad area.

2    Q.  Did you ever return Mr. Eisenberg's belongings to him that

3    night?

4    A.  No.

5    Q.  Do you recall updating Special Agent Racz on the seizure of

6    the electronics at some point?

7    A.  Yes.

8    Q.  Do you remember exactly when you updated Special Agent Racz

9    about that?

10   A.  No.

11   Q.  I want to turn to the next day, the day after the arrest.

12           What did you personally do with respect to

13   Mr. Eisenberg?

14   A.  Myself and Geno Itri returned to the Guaynabo municipal

15   prison that morning, where we took custody of Mr. Eisenberg and

16   then transported him to the FBI San Juan field office.

17   Q.  I want to talk about now what happened after you arrived at

18   the FBI San Juan field office with Mr. Eisenberg.

19           What, if any, paperwork did you present for

20   Mr. Eisenberg's signature?

21   A.  So I presented him with receipts for property.

22           MR. DAVIS:  Can we pull up what's been marked for

23   identification as Government Exhibit 106, please.

24   Q.  Special Agent Crawford, do you recognize this document?

25   A.  Yes.

NB9KEISH                          Crawford - Direct

1   Q.  What is it?

2   A.  This is a receipt for property for Mr. Eisenberg's luggage.

3   Q.  Who drafted it?

4   A.  I did.

5   Q.  Is it a fair and accurate copy of the receipt you drafted

6   for the luggage?

7   A.  Yes.

8          MR. DAVIS:  The government offers Government

9   Exhibit 106.

10         MR. TALKIN:  No objection.

11         THE COURT:  Exhibit 106 is admitted.

12         (Government's Exhibit 106 received in evidence)

13  BY MR. DAVIS:

14  Q.  Let's start with the description of the items.

15         Special Agent Crawford, could you please read the

16  description of the items on this property receipt?

17  A.  "Suitcase with personal belongings and backpack with

18  personal belongings."

19  Q.  Now I want to go to the top right of this receipt.

20         Do you see where it's checked, "Received from and

21  seized"?  Do you see that?

22  A.  Yes.

23  Q.  What does that mean?

24  A.  That means that these items were seized from Mr. Eisenberg.

25  Q.  And then you see there's an on date line there.

NB9KEISH                         Crawford - Direct

1           Do you see that?

2   A.   Yes.

3   Q.   What date is that?

4   A.   December 26, 2022.

5   Q.   What does that date reflect?

6   A.   That reflects the date that they were seized from

7   Mr. Eisenberg.

8   Q.   And then, finally, there is a street address and city.

9           Do you see that?

10  A.   Yes.

11  Q.   What is the street address and city?

12  A.   Luis Munoz Marin International Airport, Carolina, Puerto

13  Rico.

14  Q.   Why is that street address listed?

15  A.   Because that is the location where the items were seized

16  from Mr. Eisenberg.

17  Q.   Did you present this document to Mr. Eisenberg for

18  signature on December 27th?

19  A.   Yes, I did.

20  Q.   And what happened?

21  A.   I presented them to Mr. Eisenberg, explained that we were

22  going to be seizing these items, and asked him if he had any

23  questions about it, and then we both signed it.

24  Q.   I want to turn to another document.

25           MR. DAVIS:  Can we pull up Government Exhibit 112,

NB9KEISH                     Crawford - Direct

1   please.

2   Q.  Special Agent Crawford, do you recognize this document?

3   A.  I do.

4   Q.  What is it?

5   A.  This is the evidence items collected log for

6   Mr. Eisenberg's personal belongings.

7   Q.  And who prepared it?

8   A.  I did.

9   Q.  Is it a fair and accurate copy of the evidence collected

10  items log that you prepared for Mr. Eisenberg's luggage and

11  personal belongings?

12  A.  Yes.

13          MR. DAVIS:  The government offers Government

14  Exhibit 112.

15          MR. TALKIN:  No objection.

16          THE COURT:  Exhibit 112 is admitted.

17          (Government's Exhibit 112 received in evidence)

18  BY MR. DAVIS:

19  Q.  Let's focus on page 1.

20          Can you please start by reading the description of the

21  items here under 1B?

22  A.  "Blue suitcase collected on December 26, 2022, at 6:30 p.m.

23  Eastern Standard Time.

24          "Seizing Individual:  Crawford, Michael.

25          "Located By:  Crawford, Michael.

1          "Black backpack with personal items.  Includes a

2    plastic bag with the following items."

3    Q.  I can stop you there and just ask a couple of questions.

4          You see the words "Seizing Individual"?  Do you see

5    that?

6    A.  Yes.

7    Q.  What does that mean?

8    A.  That means that that individual was responsible for

9    maintaining the chain of custody of these items and entering

10   the items into evidence.

11   Q.  And then do you see the "Located By"?

12   A.  Yes.

13   Q.  What does that mean?

14   A.  That means that that agent was physically present when

15   these items were seized.

16          MR. DAVIS:  Why don't we turn now to page 2.

17   Q.  Just if we could read the top line of 1B "Valuable" in the

18   middle of page 2?

19   A.  "U.S. currency."

20   Q.  And then going down to the next 1B valuable?

21   A.  "Israeli currency."

22          MR. DAVIS:  Let's turn back to the first page of this

23   document.

24   Q.  What's the date on this document?

25   A.  January 4, 2023.

NB9KEISH                          Crawford - Direct

1    Q.   What does that date reflect?

2    A.   That reflects the date that this document was approved by

3    my supervisor.

4    Q.   Under "Details," could you please read details?

5    A.   "Search incident to arrest of Mr. Avraham Eisenberg —

6    luggage and personal items."

7    Q.   Do you see where it says "Search incident to arrest"?

8         Why did you write that?

9    A.   Because these items were seized from Mr. Eisenberg after he

10   was arrested.

11   Q.   Let's now turn to the electronics.

12        MR. DAVIS:  Can we pull up Government Exhibit 110.

13   Q.   Do you recognize Government Exhibit 110?

14   A.   Yes.

15   Q.   What is it?

16   A.   This is a receipt for property for Mr. Eisenberg's

17   electronics.

18   Q.   Who prepared it?

19   A.   Cristine Perez.

20   Q.   I see your initials are on it as well, M.C.

21        Do you see that?

22   A.   Yes.

23   Q.   Why is that?

24   A.   Because I took this receipt for property down to

25   Mr. Eisenberg in the processing area, presented and explained

NB9KEISH                          Crawford - Direct

1    the document to Mr. Eisenberg, and we both signed it.

2    Q.  Sorry, my monitor was gone -- oh, it's back.

3            Is it a fair and accurate copy of the receipt of

4    property for these electronics?

5    A.  Yes.

6            MR. DAVIS:  The government offers Government

7    Exhibit 110.

8            MR. TALKIN:  No objection.

9            THE COURT:  All right.  Government Exhibit 110 is

10   admitted.

11           (Government's Exhibit 110 received in evidence)

12   BY MR. DAVIS:

13   Q.  Could you please read just the first parts of the

14   description of items on Government Exhibit 110?

15   A.  Charcoal gray Hasselblad cellular telephone with a 1 logo.

16           Charcoal gray Samsung with an IMEI number.

17           White Samsung with the IMEI number.

18           Black with green logo laptop designed and engineered

19   by Razer in California, with the model number.

20           And then:  Power cord for laptop.

21           MR. DAVIS:  We can zoom back out.

22   Q.  Looking up to the check boxes, do you see that it's checked

23   for collected and seized?

24           Do you see that?

25   A.  Yes.

NB9KEISH                          Crawford - Direct

1    Q.  What does that mean?

2    A.  That means that these devices and items were seized from

3    Mr. Eisenberg.

4    Q.  And then do you see a date there?

5    A.  Yes.

6    Q.  And what is that date?

7    A.  12/26/2022.

8    Q.  What does that date reflect?

9    A.  The date that these items were seized.

10        MR. DAVIS:  Let's turn now to Government Exhibit 111.

11   Q.  Do you recognize Government Exhibit 111?

12   A.  I do.

13   Q.  What is it?

14   A.  It's an evidence collected item log.

15   Q.  Who drafted Government Exhibit 111?

16   A.  I did.

17   Q.  Is this Government Exhibit 111 a fair and accurate copy of

18   the collected items log you prepared?

19   A.  Yes.

20        MR. DAVIS:  The government offers Government

21   Exhibit 111.

22        MR. TALKIN:  No objection.

23        THE COURT:  Exhibit 111 is admitted.

24        (Government's Exhibit 111 received in evidence)

25   BY MR. DAVIS:

NB9KEISH                         Crawford - Direct

1    Q.  Can you please, first off, look at the item type and

2    description.

3              Can you please read what the item types and listed

4    here were?

5    A.  Charcoal gray Hasselblad cellular telephone with a 1 logo.

6              Charcoal gray Samsung with an IMEI number.

7    Q.  And who is the collected -- do you see where it says,

8    "Collected On"?

9    A.  Yes.

10   Q.  What is the date listed?

11   A.  12/26/2022, at 6:30 p.m. Eastern Standard Time.

12   Q.  Who is listed as the seizing individual?

13   A.  Cristine Perez.

14   Q.  And who is listed as the located by person?

15   A.  Cristine Perez.

16   Q.  Do those have the same meaning as what we discussed

17   earlier?

18   A.  Yes.

19   Q.  Turning to the next item, is Cristine Perez also listed as

20   the seizing individual and located by individual on that one?

21   A.  Yes.

22   Q.  And what's the date that that was collected on?

23   A.  12/26/2022, at 6:30 p.m. Eastern Standard Time.

24             MR. DAVIS:  Now let's turn to page 2.

25   Q.  For all three of these items, is Cristine Perez listed as

NB9KEISH                    Crawford - Direct

1   both the located by and seizing individual?

2   A.  Yes.

3   Q.  And what's the date for the collected on date for these

4   three items?

5   A.  12/26/2022, at 6:30 p.m. Eastern Standard Time.

6           MR. DAVIS:  Let's turn back to page 1 of Government

7   Exhibit 111.

8   Q.  What's the date of this report?

9   A.  12/28/2022.

10  Q.  Now, if you recall, the date for the other collected items

11  report that we spoke about was approved at a later date; is

12  that right?

13  A.  Yes.

14  Q.  Why was this, Government Exhibit 111, approved on

15  December 28, 2022?

16  A.  Because these items were a priority to process into

17  evidence, because they were going to be shipped up to FBI New

18  York so FBI New York could write a search warrant for these

19  items.  And the luggage and personal effects, at the time we

20  discussed potentially returning them to one of Mr. Eisenberg's

21  representatives in Puerto Rico.

22          MR. DAVIS:  Let's now go to Government Exhibit 101.

23          And we can scan through to the next two pages so

24  Special Agent Crawford can take a look.

25  Q.  Special Agent Crawford, do you recognize that document?

NB9KEISH                         Crawford - Direct

1    A.  I do.

2    Q.  What is it?

3    A.  It's the inventory of personal property section of the

4    DIOG.

5    Q.  Is this the version of the DIOG that was updated on

6    July 19, 2022?

7    A.  Yes.

8             MR. DAVIS:  The government offers 101.

9             MR. TALKIN:  No objection.

10            THE COURT:  Exhibit 101 is admitted.

11            (Government's Exhibit 101 received in evidence)

12            MR. DAVIS:  Quickly, before we dig into Government

13   Exhibit 101, can we turn to Government Exhibit 157.

14            And then we can flip to the second page.

15   BY MR. DAVIS:

16   Q.  Do you recognize this?

17   A.  Yes.

18   Q.  What is it?

19   A.  This is the same section, that personal inventory section,

20   of the DIOG.

21   Q.  Is this the version of this section that was updated in

22   July 19, 2022?

23   A.  Yes.

24            MR. DAVIS:  The government offers Government

25   Exhibit 157.

1          MR. TALKIN:  No objection.

2          THE COURT:  Exhibit 157 is admitted.

3          (Government's Exhibit 157 received in evidence)

4          MR. DAVIS:  Let's turn back to Government Exhibit 101

5     first.

6     BY MR. DAVIS:

7     Q.  We've been talking about the DIOG.

8          What does the DIOG stand for?

9     A.  The Domestic Investigations and Operations Guide.

10         MR. DAVIS:  Let's turn now to page 2 of this document.

11    Q.  What is the subsection of this document at the top left?

12    A.  The subsection at the top left?  Okay.  "Inventory of

13    Personal Property."

14    Q.  What are the numbers in front of "Inventory of Personal

15    Property"?

16    A.  19.7.3.

17    Q.  I want to now direct your attention to a couple of

18    paragraphs.  Let's start with the first bullet, starting with

19    "Arrested Subjects."

20         Do you see that?

21    A.  Yes.

22    Q.  Could you please read from "Arrested Subjects."

23    A.  "Arrested Subjects often have purses, shoulder bags,

24    suitcases, vehicles, or other personal property capable of

25    containing objects in their possession during an arrest.  An

1    inventory of personal property ensures the safekeeping of the

2    property belonging to an arrested subject.  It must include

3    both the container and the contents of such container taken

4    into FBI custody."

5          MR. DAVIS:  I want to now focus on the fourth bullet,

6    if we could zoom back out.

7    Q.  Could you read the fourth bullet starting with, "as a

8    general rule."

9    A.  "As a general rule, after lawfully taking custody of

10   property, FBI employees must conduct a prompt and thorough

11   search of the contents of the property, including searching any

12   locked or unlocked containers and inventorying their contents.

13   A written summary showing the results of the inventory must be

14   recorded in an FD-302, an FD-597 (Receipt for Property), or an

15   FD-653 (Motor Vehicle Inspection Inventory Record).  The

16   written summary must include, but is not limited to, a

17   description of the property and the items secured for

18   safekeeping.  Agents must provide receipts for all items

19   retrieved during inventory searches."

20   Q.  Let's pause there for a second.

21         You said a specific FD number, an FD-597, Receipt for

22   Property.

23         Do you remember saying that?

24   A.  Yes.

25         MR. DAVIS:  Could we please pull up Government

NB9KEISH                          Crawford - Direct

1    Exhibits 110 and 106, which are in evidence, side by side.

2              Can we please highlight the upper left number, FD-597,

3    in both documents.

4    Q.  Are these the receipts of property forms that were being

5    referred to in the DIOG?

6    A.  Yes.

7              MR. DAVIS:  We can take this down.

8              I want to turn now to Government Exhibit 157.

9              Now let's go to page 1, footnote 1, and if we could

10   zoom in on that footnote.

11   Q.  If you could please read the first sentence?

12   A.  "The types of searches conducted under the inventory search

13   authority are to be distinguished from the types of searches

14   described in DIOG Section 19.7.3."

15   Q.  Just to be clear, the exhibit we were just talking about,

16   Government Exhibit 101, was that 19.7.3?

17   A.  Yes.

18   Q.  If you could keep reading the next sentence, please?

19   A.  "Those searches described as inventory of personal property

20   are conducted after an individual has been arrested and are

21   therefore included in the portion of the DIOG relating to

22   arrest procedures."

23   Q.  If you could keep going?

24   A.  "Although the procedures for conducting an inventory of an

25   arrestee's personal property and effects may, in fact, be

1    similar, their legal justification is different, and they must

2    therefore be treated differently.  Therefore, DIOG Subsection

3    19.7.3 does not establish agency policy in general for purposes

4    of conducting an inventory search."

5            MR. DAVIS:  Okay.  Let's take down Government

6    Exhibit 157.

7    Q.  After Mr. Eisenberg was presented with those property

8    receipts, what, if any, court proceedings did he have?

9    A.  He had a detention hearing.  I can't recall if he was

10   presented documents before or after his initial appearance, but

11   that also occurred on the same day.

12   Q.  Did there come a time when you sent a lead to have the

13   electronics that were seized sent to New York?

14   A.  Yes.

15   Q.  What is a lead?

16   A.  A lead is a tasking from one group to a different group in

17   the FBI or from one field office to a different field office

18   within the FBI.

19           MR. DAVIS:  Can we pull up what's been marked for

20   identification as Government Exhibit 158.

21   Q.  Do you recognize Government Exhibit 158?

22   A.  Yes.

23   Q.  What is it?

24   A.  This is a lead to send the electronic devices, previously

25   described, from the FBI San Juan evidence control room to the

NB9KEISH                        Crawford - Direct

1    FBI New York evidence control room.

2    Q.  Who drafted this document?

3    A.  I did.

4    Q.  Is it a fair and accurate copy of the lead you sent?

5    A.  Yes.

6              MR. DAVIS:  The government offers Government

7    Exhibit 158.

8              MR. TALKIN:  No objection.

9              THE COURT:  Exhibit 158 is admitted.

10             (Government's Exhibit 158 received in evidence)

11             MR. DAVIS:  Apologies.  I'm just having monitor

12   issues.

13   BY MR. DAVIS:

14   Q.  Do you see where it says next to "Created" in the upper

15   right?

16   A.  Yes.

17   Q.  What's the date next to "Created"?

18   A.  12/28/2022.

19   Q.  What does that date reflect?

20   A.  The date that my supervisor approved this document.

21   Q.  You see that there's a date that says "Due"?

22   A.  Yes.

23   Q.  What is the date next to that?

24   A.  January 4, 2023.

25   Q.  And do you see under "Precedence" -- do you see there's a

NB9KEISH                          Crawford – Direct

1    column called "Precedence"?

2    A.  Yes.

3    Q.  What is the precedence?

4    A.  Priority.

5    Q.  What does priority mean?

6    A.  It means that the lead is supposed to be treated in an

7    expedited manner.

8    Q.  How many times in your career have you issued a priority

9    lead?

10   A.  Just this one time.

11   Q.  And why did you do that?

12   A.  Because I knew that FBI in New York needed to receive these

13   items to proceed with a search warrant, a potential search

14   warrant, for these items.

15   Q.  Before you were asked to help on this arrest and search,

16   did you have any other role in the investigation of

17   Mr. Eisenberg?

18   A.  No.

19   Q.  Besides preparing for this hearing, after you sent the

20   leads asking for his devices and belongings be sent to New

21   York, did you have any other role in the investigation of

22   Mr. Eisenberg?

23   A.  No.

24            MR. DAVIS:  Your Honor, may I have one moment?

25            THE COURT:  Of course.

NB9KEISH                          Crawford - Cross

1          (Pause)

2          MR. DAVIS:  No further questions at this time.

3          THE COURT:  Okay.

4          Cross-examination?

5          MR. TALKIN:  Thank you, your Honor.

6          Can we put 158 back up?  I guess we can do it.

7    CROSS-EXAMINATION

8    BY MR. TALKIN:

9    Q.  Good afternoon.

10   A.  Good afternoon, sir.

11   Q.  Almost good evening.

12          We're looking at Exhibit 158 — it's the same document

13   that you just finished on — and you said that it was approved

14   on 12/28/2022, and that's why it says created date, right?

15   A.  Right.

16   Q.  When did you actually create that document, meaning when

17   did you draw it up?

18   A.  I think it was that -- I misspoke.  I created it on 12/28,

19   and it looks like -- I can't recall, to be honest, what

20   specific date I drafted it.  I believe it was approved on

21   12/28/2022.

22   Q.  So the question, and just so the record is clear, that

23   means you drafted it at least on 12/28/22 or before?

24   A.  Correct.

25   Q.  You listed it as a priority because you knew that New York

NB9KEISH                    Crawford - Cross

1   would want to get a warrant regarding the devices, correct?

2   A.  Correct.

3   Q.  And you are an FBI agent, right?

4   A.  Yes.

5   Q.  And there are courts -- there are district courts in

6   San Juan?

7   A.  Yes.

8   Q.  You're stationed in San Juan?

9   A.  Yes.

10  Q.  And there is a United States Attorney's Office in San Juan?

11  A.  Yes.

12  Q.  And if there's something that's a big rush, the warrant

13  could have been obtained in San Juan, correct?

14  A.  I believe so, yes.

15  Q.  So the priority decision you made was as a priority to get

16  it to New York as fast as you can, but you did not make a

17  priority decision to get a warrant for the devices in San Juan?

18  A.  This was not my decision because I was not the case agent

19  for the investigation.

20  Q.  I understand that, but knowing, as an FBI agent, there's a

21  priority, right?

22  A.  Right.

23  Q.  One way to solve that priority would be go ahead and get

24  the warrant in San Juan.  That would be one way to satisfy

25  that, right?

NB9KEISH                    Crawford - Cross

1    A.  Correct.

2    Q.  When you sent it, I believe you put the due date, that's

3    kind of an outside date to watch it, and that's January 4th of

4    2023?

5    A.  Yes.

6    Q.  On January 4th of 2023, you didn't check to see if the

7    electronics had made it to New York?

8    A.  I don't recall if I checked or not.

9    Q.  Do you recall ever checking after you created this lead?

10   A.  I don't recall if I checked or not after I created the

11   lead.

12   Q.  Let me ask you more directly:  Did you ever check to see if

13   the lead was taken care of after you put it in on 12/28 of '22?

14   A.  Yes, I did.

15   Q.  What date was that?

16   A.  I don't recall the date.

17   Q.  When you checked, how long after 12/28, without knowing the

18   date?  Was it soon thereafter, or was it a week later, two

19   weeks later, a month later?

20   A.  I think it was probably a week or so after I checked to see

21   the status, and then I saw that it had been covered at another

22   point.

23   Q.  It had been --

24   A.  I don't recall the specific dates that I checked.

25   Q.  So by the time you checked, it had already been, you said,

NB9KEISH                    Crawford - Cross

1    covered?

2    A.  I can't recall if it had been covered or not when I

3    checked.

4    Q.  If it hadn't been covered, wouldn't you have contacted

5    Special Agent Racz?

6    A.  I don't know.

7    Q.  Well, it's a priority, isn't it?

8    A.  Yes, it was a priority lead.

9    Q.  And it was a priority for the FBI to get it to New York?

10   A.  Correct.

11   Q.  And in following up that priority, it would be solid FBI

12   practice to go ahead, if it hasn't been covered, to contact the

13   agent in charge, meaning Special Agent Racz, correct?

14   A.  I think probably the better course of action would have

15   been to contact the evidence control room in San Juan, because

16   they were the ones that were assigned the actual lead itself.

17   Q.  But you didn't do that, did you?

18   A.  No, I did not.

19   Q.  I'm going to work backwards from your direct.  I'm going to

20   take you now to the day after the arrest.

21        The day after the arrest, you did some paperwork at

22   the San Juan office regarding this case, correct?

23   A.  Yes.

24   Q.  And we saw some of that paperwork minutes ago?

25   A.  Correct.

NB9KEISH                    Crawford - Cross

1   Q.  Starting with -- and not in this order -- let's take

2   Government Exhibit 106.

3          That's the receipt for property, and you created that,

4   that's your handwriting, right?

5   A.  Yes, it is.

6   Q.  And you created that on the 28th of December of 2022?

7   A.  No.  It was created the day following Mr. Eisenberg's

8   arrest.

9   Q.  So it was the 26th -- I'm sorry, the 27th?

10  A.  Yes.

11  Q.  So if he was arrested, we can agree he was arrested on the

12  26th, then you prepared this on the 27th?

13  A.  Yes.

14  Q.  And you yourself prepared it?

15  A.  I did.

16  Q.  And you identified, you say it was, on the right side

17  there, received from, and so it was received from Avraham Mayer

18  Eisenberg; is that right?

19  A.  Yes.

20  Q.  And then it was also seized because it was seized from him

21  as well, correct?

22  A.  Correct.

23  Q.  Seized meaning it was taken from him?

24  A.  Right.

25  Q.  It doesn't identify who took it, but somebody took it?

NB9KEISH                    Crawford - Cross

```
 1   A.  Correct.
 2              MR. DAVIS:  I want to take you now to Government
 3   Exhibit 111.
 4              Let's go down to -- can we go down a little bit to the
 5   bottom there, to the first item, digital -- 1B digital.
 6   Q.  If you look there, you see — and you talked about this on
 7   direct — you have collected on, meaning it was gathered on,
 8   12/26/22.
 9              We can agree on that?
10   A.  Yes.
11   Q.  And then you have the seizing individual listed as Cristine
12   J. Perez?
13   A.  Correct.
14   Q.  Located by Cristine J. Perez?
15   A.  Correct.
16   Q.  And the wording there above is "Seizing Individual,
17   Cristine J. Perez," and on direct examination, you said that
18   the seizing in this document means she's simply the person that
19   is directed to take it into custody and put it in the
20   chain-of-custody; is that correct?  That's what that means?
21   A.  Maintain chain of custody, enter it into evidence, correct.
22   Q.  And you learned that definition while you were trained at
23   the FBI?
24   A.  I've been told that definition, correct, by --
25   Q.  Correct.
```

NB9KEISH                        Crawford - Cross

1          So the definition of "seized" on Government

2     Exhibit 111 is different than the definition of "seized" on

3     Government Exhibit 106, correct?

4     A.  May I clarify?  So seizing --

5     Q.  No, they'll let you clarify.  I'm just asking you the

6     question.

7     A.  Yes, sir.

8     Q.  They mean something different, right?

9     A.  Yes.

10    Q.  And then going to Government Exhibit 110, this is the same

11    form, but it's a little bit different.  This was not prepared

12    by you, correct?

13    A.  No.

14    Q.  You had Mr. Eisenberg sign it, though, on the 27th, I

15    believe?

16    A.  Yes, sir.

17    Q.  And when he signed it, he was at your office, meaning FBI

18    office?

19    A.  Correct.

20    Q.  If you look at the top, where it says "Collected/Seized,"

21    that means it was either collected or seized from Avraham

22    Eisenberg, right?

23    A.  Correct.

24    Q.  So those two have a -- collected means something different

25    than seized?

NB9KEISH                      Crawford - Cross

1    A.  I guess –– I'm not aware; I don't know.

2    Q.  And we can agree that at some point in time, taking you

3    now — and I apologize for jumping around on you — taking you to

4    the airport, that the electronics were seized from

5    Mr. Eisenberg?

6    A.  Can you repeat that again, sir?

7    Q.  Sure, absolutely.

8         I want to take you to the time at the airport sometime

9    between when you arrived at the airport and when you left the

10   airport on the 267th of December of 2022.

11        During that time period that you described in detail

12   during your direct examination, during that time, electronic

13   devices, meaning at least two or three cell phones and a

14   computer, were seized from Mr. Eisenberg?

15   A.  Correct.

16   Q.  And they were seized by law enforcement?

17   A.  Correct.

18   Q.  Now, going back to 111, that was approved by

19   Cristine Perez, correct?

20   A.  Do you mind if I see the document?

21   Q.  Yes, I'm sorry.  I thought it was up.

22   A.  Can you repeat the question, sir?

23   Q.  Sure.

24        That document was approved by Cristine Perez; is that

25   correct?

NB9KEISH                    Crawford - Cross

1    A.  Correct.

2    Q.  And that's the same Cristine Perez that was at the airport

3    with you?

4    A.  Correct.

5    Q.  And we talked about this before — you were together with

6    Cristine Perez the next day, the 27th, at the FBI office, the

7    day after the arrest?

8    A.  Yes.

9    Q.  And you were together on the 28th as well?

10   A.  I do not know if we were together on the 28th or not.

11   Q.  So the date that this was approved, you don't know if you

12   were in the same location as her or not?

13   A.  I do not.

14        MR. TALKIN:  So now I want to go to 112.

15   Q.  That was approved on January 4th of 2023; you established

16   that on direct examination.  That's why that's dated that date?

17   A.  Correct.

18   Q.  This document, you prepared before then or on that date?

19   A.  I'm not aware.  I can't recall if I approved -- drafted it

20   on that date or before.

21   Q.  Did you draft it on the same date that you drafted 111,

22   that was approved on 12/28/22?

23   A.  I do not know if I drafted it on the same date.

24   Q.  If you drafted them on the same date, you would have

25   submitted them for approval on the same date, correct?

NB9KEISH                          Crawford - Cross

1    A.   I think it would depend on which document I finished first.

2    Q.   So you would have -- if you drafted it on the same date,

3    you would have submitted the first one and not submitted the

4    second one?

5    A.   I don't know.

6    Q.   So you don't know whether or not you would submit them

7    together or not?

8    A.   I don't.

9    Q.   You said that you had discussions with Special Agent Racz,

10   and the determination, or maybe a better word is strategy, is

11   that the items to be seized from Mr. Eisenberg would be seized

12   incident to arrest?

13   A.   Correct.

14   Q.   And you identified throughout your paperwork that the items

15   were seized incident to arrest?

16   A.   Yes.

17   Q.   And you said on direct examination, that means they were

18   seized when he was arrested at the time, because he was

19   arrested, they were seized, and that's why you called it

20   incident to arrest?

21   A.   Correct.

22   Q.   Now, again, you're an experienced FBI agent, correct?

23   A.   I mean, you would have to define experienced.

24   Q.   You've been doing it a couple of years, right?

25   A.   A little over five.

NB9KEISH                    Crawford - Cross

1   Q.  Okay.  Five years is --

2   A.  Right.

3   Q.  We can agree a five-year FBI agent has some experience?

4   A.  Five years of experience, yes, sir.

5   Q.  To be exact.

6        And during your time before you actually got out in

7   the field, you were trained?  You had pretty rigorous training

8   to become an FBI agent?

9   A.  Right, we go through the FBI academy.

10  Q.  And you learn about searches incident to arrest?

11  A.  Correct.

12  Q.  And you learned that that's an exception to needing a

13  warrant?

14  A.  Correct.

15  Q.  And you knew that when you had that conversation with Racz?

16  A.  Correct.

17  Q.  And you also know that it's a very specific term of art,

18  "incident to arrest," correct?

19  A.  I don't understand what you mean by that.

20  Q.  Sure.

21       In other words, not every search that happens after an

22  individual is arrested is a search incident to arrest?

23  A.  Can you repeat that again, please?

24  Q.  Sure.

25       Not every arrest -- excuse me, let me start over

1  again.

2           Not every search that happens of an individual that is

3  arrested is a search incident to arrest?

4  A.  That's correct.

5  Q.  But the basis for you identifying the searches throughout

6  your paperwork is because this was a search that happened after

7  arrest?

8  A.  That's correct.

9  Q.  Before your testimony here today, you read the briefs in

10 this case?

11 A.  What --

12 Q.  The legal documents.

13 A.  I've read some of the legal documents.

14 Q.  And you read about the search issues?

15 A.  Correct.

16 Q.  And you understand the legal issues at stake here in this

17 proceeding?

18 A.  I do not fully understand the issues, no.

19 Q.  That's understandable.

20          So let's move on to the inventory search documents

21 that you've seen.  I believe they were 157 and 101.

22          Do you remember looking at those?

23 A.  The search inventory documents or the property receipts?

24 Q.  No, no, I'm sorry, those are the actual regulations.

25 A.  From the DIOG?

NB9KEISH                    Crawford - Cross

1   Q.  I forget the acronym right now, but the guides for doing an
2   inventory search.
3   A.  Do you mind pulling it up?
4   Q.  Sure, we'll pull it up.
5            MR. DAVIS:  101, we'll start with.
6            And can we go to the second page.
7   Q.  That's what I'm talking about, the guidelines.
8            You're familiar with those, that's 19.7.3?
9   A.  Correct.
10  Q.  And within 19.7.3, kind of towards the bottom, it directs
11  you, as only the government can, to 18.6.12.4.1D, right?
12  A.  Yes.
13  Q.  That number corresponds to what is in evidence as, and I
14  will show you real quick, 157, Government Exhibit 157?
15  A.  Yes.
16  Q.  So going down to the footnote that you were shown at the
17  bottom there, the footnote basically says to you — and I am
18  paraphrasing, and just tell me if I'm wrong — that if you do a
19  search incident -- excuse me, if you do an inventory search
20  after an arrest of an individual that's going into custody, you
21  should go back to 19.7.3, that's what that footnote basically
22  says, right?
23  A.  I don't know where it says that you should go back to it.
24  Q.  I paraphrased.  Let me -- I'll read the second sentence.
25  The search is described as inventory of personal property that

NB9KEISH                    Crawford - Cross

1    are conducted after an individual has been arrested and are

2    therefore included in the portion of the DIOG relating to

3    arrest procedures.  Although the procedures for conducting an

4    inventory of an arrestee's personal property and effects may,

5    in fact, be similar, their legal justification is different,

6    and they must therefore be treated differently.  Therefore,

7    DIOG 19.7.3 does not establish agency policy for the purpose of

8    conducting an inventory search, right?

9              MR. DAVIS:  Objection.  It's not an accurate reading.

10             THE COURT:  Do you understand the question?

11             THE WITNESS:  I don't, to be honest, your Honor.

12             THE COURT:  Okay.

13             Counsel, given that the document is in the record, I

14   will permit counsel to make any arguments concerning the

15   construction of the document, but I'm going to sustain the

16   objection as to the question.

17   BY MR. TALKIN:

18   Q.  In short, the guidance that you look for, as an FBI agent,

19   under the circumstances of the arrest of Avraham Eisenberg, are

20   found in 19.7.3?

21   A.  Do you mind going back to 19.7.3?

22   Q.  I'll withdraw the question.  Don't worry about it.  It's

23   okay.  It's my fault.

24             Looking at 19.7.3, it sets out the requirements for an

25   inventory search; is that right?

NB9KEISH                         Crawford - Cross

1          MR. DAVIS:  Objection.

2          THE COURT:  That's overruled.

3          THE WITNESS:  The requirements for an inventory

4   search?

5   BY MR. TALKIN:

6   Q.  The procedure that must be followed to effect a proper

7   inventory search?

8   A.  I mean, I don't see where it says that specifically on this

9   page that's pulled up right now.

10          MR. DAVIS:  Objection.  I think this is the wrong

11   document, counsel.  I feel like --

12          MR. TALKIN:  Oh, it's the wrong document up.

13          I said 19.7.3.  I'm sorry, Exhibit 101.

14   BY MR. TALKIN:

15   Q.  Are you with me?

16          Okay.  Looking at 19.7.3, that lays out, for an FBI

17   agent, the procedure that an FBI agent should follow when

18   conducting an inventory search of personal property after an

19   arrest?

20   A.  Correct.

21   Q.  And after an individual is being placed into custody?

22   A.  Right.

23   Q.  Now I want to take you to the time when Mr. Eisenberg

24   arrived in the customs hall there at the airport.

25          At some point in time, he was taken into a room by you

NB9KEISH                         Crawford - Cross

1    and two other task force officers; is that correct?

2    A.  He was taken by myself and an FBI agent and an HSI agent.

3    Q.  And border patrol TFO or CBP Officer Pedro Amador was

4    outside, correct, outside of the room?

5    A.  Correct.

6    Q.  And as far inside that room, there was a pat-down search of

7    Mr. Eisenberg?

8    A.  Right, of his person, correct.

9    Q.  And you conducted that pat-down search?

10   A.  I don't recall which one of the three of us specifically

11   conducted it.

12   Q.  But it was either you, Itri, or the HSI officer?

13   A.  Correct.

14   Q.  And that yielded the recovery of a wallet and a cell phone?

15   A.  Correct.

16   Q.  You testified on direct examination that before you went

17   into the room with those three other individuals, including

18   Mr. Eisenberg, you had witnessed TFO Amador interact with

19   Mr. Eisenberg?

20   A.  Correct.

21   Q.  And during that interaction, you said that you saw

22   Agent Amador pull out electronics out of bags that seemed to

23   belong to Mr. Eisenberg?

24   A.  Correct.

25   Q.  And you saw those items be placed on a counter or belt, but

NB9KEISH                          Crawford - Cross

1    in that secondary search area?

2    A.   Correct.

3    Q.   And shortly after that event is when you and the other

4    agents went into the room, the private room?

5    A.   Right, after the second -- after Mr. Amador completed

6    the --

7    Q.   Pulled out the electronics?

8    A.   -- pulled out the electronics, we escorted Mr. Eisenberg

9    into the interview room.

10   Q.   You've been interviewed a few times by the Assistant United

11   States Attorneys prior to your testimony here?

12   A.   Correct.

13   Q.   One of those times was on August 9th of 2023?

14   A.   I can't recall the specific --

15   Q.   Sometime in late summer -- in the summer?

16   A.   I don't know.

17   Q.   During that interview, you talked about what you saw and

18   what you know about, basically, the subject matter which brings

19   us here today?

20   A.   Correct.

21   Q.   During that discussion, you didn't tell them that you saw

22   Special Agent Amador pull out electronics, did you?

23   A.   I can't recall what I told them on that date.

24            MR. TALKIN:  Can we pull up 3501-19, please.

25            If we can move down a little bit.

NB9KEISH                        Crawford - Cross

1    Q.  Can you read that okay?

2              MR. TALKIN:  That's better.

3    Q.  Now, when you were asked -- I'm sorry, my mind went blank

4    for a second.

5              When you were asked, and you discussed, what you saw

6    during the interaction between Officer Amador and --

7              MR. DAVIS:  Objection, your Honor.

8              THE COURT:  Grounds?

9              MR. DAVIS:  If he is trying to refresh his

10   recollection with a document, he can ask him to read it

11   silently to himself to ask the question again.  The initial

12   question was:  Do you recall saying a certain thing to the

13   government on a certain date?  He can show this document to him

14   to refresh his recollection, but the document is not evidence.

15   It can't be read.

16             THE COURT:  Counsel, do you want to rephrase your

17   question?

18   BY MR. TALKIN:

19   Q.  Let me ask you this:  Do you remember telling them that it

20   looked like Pedro asked some basic questions about where

21   Eisenberg was coming from and any electronic devices?

22   Eisenberg seemed to show where some electronics were during the

23   inspection.

24             Do you remember that?

25   A.  I mean, I remember discussing the events in question

NB9KEISH                          Crawford - Cross

1   with --

2   Q.  My question to you is very specific, and if you don't

3   remember, tell the Judge and ask if you can read this to

4   refresh your memory.

5           My question is:  Do you remember saying that?

6           MR. DAVIS:  Objection, your Honor.  If this document

7   is going to be used to refresh the witness' recollection, he

8   can read it and take it aside, and if it does refresh his

9   recollection, he can ask the question again.  If it doesn't, it

10  doesn't.  This isn't a document in evidence.  This isn't a

11  document that the witness authored.

12          THE COURT:  Yes, counsel, this is an email from other

13  individuals.  So would you like the witness to review the

14  document?

15  BY MR. TALKIN:

16  Q.  Yes, go ahead and review the document.

17          (Pause)

18  A.  Okay.

19  Q.  So I'm going to ask you the question again.

20          When you met with the prosecutors, and you discussed

21  the interaction between Mr. Eisenberg and Agent Amador, you

22  told them it looked like Pedro asked some basic questions about

23  where Eisenberg was coming from and any electronic devices he

24  had.  Eisenberg seemed to show where some electronics were

25  during the inspection.

NB9KEISH                    Crawford - Cross

1              Did you say that to the prosecutors?

2    A.  I don't recall the specific words I said to the

3    prosecutors.

4    Q.  Did you say something to that effect?

5    A.  Yes.

6    Q.  So, at that point in time, during that discussion with the

7    prosecutors, you weren't exactly sure that the devices had been

8    taken out of the bags?

9    A.  I mean, in that time, I mean, I knew that two of the phones

10   and one of the -- and the little laptop were with his luggage.

11   Q.  And that's before you went into the investigative room?

12   A.  Before I went into the interview room?

13   Q.  Correct.

14   A.  Right, those items were taken out of his luggage before I

15   went into the interview room.

16   Q.  During that same interview, didn't you tell the prosecutors

17   that when you came out of the interview room, that you saw

18   electronics and a cell phone in the secondary area, but you're

19   not sure how they got there?

20              Did you tell the prosecutors that?

21   A.  I don't recall saying that.

22   Q.  Take a look, refresh your recollection.  Take a look at the

23   bottom third of the page to help you save time.

24              (Pause)

25   A.  I don't recall.

NB9KEISH                    Crawford - Cross

1  Q.  So you don't recall whether or not you said that to the
2  prosecutors?
3  A.  I don't, I don't remember.
4  Q.  You said, on direct examination, that when you came out,
5  the wallet and the phone that had been taken during the
6  pat-down search was in your possession?
7          MR. TALKIN:  You can take that down.
8  Q.  I'll ask it again.
9          When you came out of the room, the interview room, in
10 your possession was the phone and the wallet that were
11 recovered during what you say was a pat-down?
12 A.  Right.  I don't remember if they were specifically in my
13 possession, but they were in our possession, being one of the
14 three agents that put Mr. Eisenberg in handcuffs.
15 Q.  And you put those -- when you came out, you put those, I
16 think you said, in an evidence bag?
17 A.  It was like a plastic bag.
18 Q.  Was it a plastic bag that contained other electronic
19 devices?
20 A.  Right; two cell phones.
21 Q.  And the plastic bag was a bag that was used to separate the
22 electronics from all the other items in the luggage?
23 A.  Correct.
24 Q.  And you are not sure whether or not it was an official
25 evidence bag, right?

NB9KEISH                      Crawford - Cross

1    A.  I don't know.

2    Q.  But it was certainly used as an evidence-type bag because

3    it separated the evidence that you know that you were trying to

4    seek, the cell phones, from the other items?

5    A.  It was used to store those items so we could transport

6    them.

7    Q.  To store those items, meaning electronic devices and other

8    similar --

9    A.  And the wallet, correct.

10   Q.  And the wallet.

11           And then after you put the wallet and the phone in

12   that separate bag, you did not take possession of anything else

13   at that point in time?

14   A.  Not that I can recall.

15   Q.  And you didn't really pay attention to what happened to

16   that plastic bag, did you?

17   A.  I do.  Geno Itri took custody of those items.

18   Q.  Beyond that -- once you saw Special Agent Itri had them in

19   his possession, that was the last you paid attention to them

20   until later on that day?

21   A.  Correct.

22           MR. TALKIN:  One second, your Honor?

23           (Pause)

24   Q.  At some point in time, you had a discussion with

25   Mr. Eisenberg about the devices, a brief conversation?

NB9KEISH                    Crawford - Cross

1   A.  When we were signing the property receipts, correct.

2   Q.  And during that time, you told him you were seizing the

3   items?

4   A.  Correct.

5   Q.  You told him they were going back to New York?

6   A.  Right.

7   Q.  And that was upon his asking you about the items?

8   A.  I believe so.

9   Q.  And he agreed to sign the two receipts, which I think is

10  110 and 112 in evidence?

11          MR. TALKIN:  Excuse me, 110 and -- let's pull up 110

12  first.

13  Q.  He agreed to sign that document?

14  A.  Correct.

15  Q.  And that's the discussion -- and that's at the time that

16  the discussion about the electronics you had with Mr. Eisenberg

17  took place?

18  A.  I mean, we did -- I believe so, yes, we discussed

19  electronics at that time.

20  Q.  And this document has the electronics listed in detail?

21  A.  Correct.

22  Q.  With IMEI numbers?

23  A.  It appears so, yes.

24  Q.  And other identifying numbers?

25  A.  Yes.

NB9KEISH                    Crawford - Cross

1          MR. TALKIN:  And then we go to 106.

2    Q.  And that's the other document he signed, meaning

3    Mr. Eisenberg?

4    A.  Correct.

5    Q.  And that just says, "Suitcase with personal belongings and

6    backpack with personal belongings"?

7    A.  Correct.

8    Q.  So that's referring to, basically, everything else that was

9    seized from Mr. Eisenberg that was not electronics?

10   A.  Correct.

11   Q.  But you didn't get any more specifics than that?

12   A.  No.

13   Q.  And this is the only document, other than 112, that you

14   created regarding the items other than electronics?

15          We'll put up 112 for you to remind you what it is.

16   A.  Okay.

17          (Pause)

18   A.  Go ahead, sir.

19   Q.  That's the only other document you created regarding items

20   other than devices?

21   A.  So I know there was documentation created, as well, for the

22   currency, because we have to process that separately, but I

23   don't know if that's part of this document or not.

24   Q.  So the currency is listed on 112, but you're saying there

25   might be another document about the currency?

NB9KEISH                         Crawford - Cross

1    A.  There might be about the currency, but that would be it.

2    Q.  I just want to take you now back — I'm almost done — to an

3    interview you did very recently, and that was on yesterday.

4          Do you remember speaking to the prosecutors yesterday?

5    A.  Yes.

6    Q.  When you spoke to the prosecutors yesterday, you described

7    again many of the events that bring us all here today; is that

8    correct?

9    A.  Correct.

10   Q.  And one of the things you discussed about was that bag that

11   we just had a discussion about; remember that?

12   A.  Yes.

13   Q.  And during that time, you say you talked about the bag, and

14   you told them, I don't really remember where the bag came from,

15   you thought it was a CBP bag.

16          Do you remember telling them that?

17   A.  I do.

18   Q.  So we don't want to call it an evidence bag because you're

19   not sure, but it sure seemed to be an evidence bag that

20   belonged to CBP, right?

21   A.  I guess kind of -- when I think of an evidence bag, I think

22   of the actual bag that the evidence is in when it gets

23   processed into evidence.

24   Q.  I understand.

25   A.  So that was not the bag it was in when it got processed

1   into evidence.

2   Q.  It was more of a collection bag?

3   A.  Correct, a collection bag.

4   Q.  But it was an official type bag, it wasn't just a trash

5   bag?

6   A.  It wasn't a trash bag, no.

7   Q.  And it was an official bag?

8   A.  I don't know if it was an official bag or not.

9           MR. TALKIN:  One second, your Honor?  Can I just check

10  my notes?  I think I'm finished.

11          THE COURT:  Sure.

12          (Pause)

13          MR. TALKIN:  That's all.  Thank you, Special Agent.

14          THE COURT:  Any redirect?

15          MR. DAVIS:  Very briefly, your Honor.

16  REDIRECT EXAMINATION

17  BY MR. DAVIS:

18  Q.  Special Agent Crawford, do you remember when defense

19  counsel was asking you to review certain notes in an email

20  about an interview you did with the government?

21  A.  Yes.

22  Q.  Did you draft that document you reviewed?

23  A.  No, I did not.

24  Q.  Is that the first time you have ever seen that document?

25  A.  Yes, it is.

NB9KEISH                    Crawford - Redirect

1   Q.  You don't know if anything in that document is true or

2   false, correct?

3   A.  I do not.  I mean, I haven't had the chance to review it.

4   It was the first time I saw it.

5   Q.  I want to talk about when defense counsel asked you, at the

6   beginning of your cross-examination, about possibly getting a

7   warrant in Puerto Rico.

8            Do you remember that?

9   A.  Yes.

10  Q.  You were not the case agent in charge of this case,

11  correct?

12  A.  I was not the case agent.

13  Q.  That's Special Agent Racz from New York?

14  A.  Correct.

15  Q.  You're not in charge of the evidence in the case against

16  Mr. Eisenberg, correct?

17  A.  I mean, once -- I said I was responsible for evidence at

18  one point in time, but once it got entered into the evidence

19  control room, the evidence was tracked by the investigation in

20  New York.

21  Q.  You wouldn't be responsible for reviewing any phone search

22  warrant, correct?

23  A.  No.

24  Q.  You wouldn't be responsible for creating a responsive set

25  on the search warrant, correct?

NB9KEISH                    Crawford - Redirect

```
 1   A.  No.

 2   Q.  You were asked questions on cross-examination about the

 3   definitions of collection and seized in FBI paperwork.

 4           Do you remember that?

 5   A.  Yes.

 6   Q.  I just want to go back to the time in the airport.

 7           Do you recall testifying on direct examination that

 8   you saw TFO Amador take two cell phones and a laptop out of the

 9   bag in secondary inspection?

10   A.  Correct.

11   Q.  And after you saw that, Mr. Eisenberg was arrested,

12   correct?

13   A.  Correct.

14   Q.  And when Mr. Eisenberg was arrested, you also seized a

15   phone from his person, correct?

16           MR. TALKIN:  I object to the leading.

17           THE COURT:  Yes, try to take out the leading a little

18   bit.

19   BY MR. DAVIS:

20   Q.  Do you recall -- what, if anything, did you do with the

21   cell phone you took from his person after he was arrested?

22   A.  I placed it with the other electronic devices.

23   Q.  After Mr. Eisenberg was arrested, did there come a time

24   when you gave those devices back to Mr. Eisenberg?

25   A.  No.
```

NB9KEISH                        Crawford – Redirect

1           MR. DAVIS:  Thank you, your Honor.

2           THE COURT:  Just to confirm, Agent Crawford, when you

3    testified that it wasn't your decision where to obtain a search

4    warrant, whose decision was it?

5           THE WITNESS:  I mean, that would go back to, like, the

6    actual AUSA and case agent assigned to the investigation, your

7    Honor.

8           THE COURT:  Okay.  Prior to December 28th, you

9    mentioned you had a couple of conversations with Agent Racz

10   concerning these electronics; is that correct, or is that not

11   correct?

12          THE WITNESS:  That's correct.

13          THE COURT:  Okay.  What were those discussions?

14          THE WITNESS:  Essentially just that if Mr. Eisenberg

15   traveled into the country with electronics, they would be

16   seized, and then the New York office was going to write a

17   search warrant for any electronics that were seized from

18   Mr. Eisenberg.

19          THE COURT:  Okay.  Did you have any discussions about

20   the timing of whether it was important to obtain a search

21   warrant promptly or anything of that nature, or was it a

22   general discussion about the need to get a search warrant?

23          THE WITNESS:  It was a general discussion.

24          THE COURT:  Okay.

25          Any follow-up from either side?

NB9KEISH

1          MR. DAVIS:  Nothing from the government, your Honor.

2          MR. TALKIN:  No, thank you, your Honor.

3          THE COURT:  Okay.  Agent Crawford, thank you.  You are

4     excused.

5          THE WITNESS:  Thank you, your Honor.

6          (Witness excused)

7          THE COURT:  Before we proceed with the next witness,

8     Mr. Davis, where are we in terms of timing?  I just want to

9     make sure -- it's already too late, but --

10          MR. DAVIS:  I guess --

11          THE COURT:  -- it's never too late to try to

12     streamline things, if we can.

13          MR. DAVIS:  My answer is not good, but I think where

14     we're at is we have two witnesses who traveled from Puerto Rico

15     that we would really insist on testifying today, if at all

16     possible.

17          We have one shorter witness, Pedro Amador, and then

18     another witness, Special Agent Perez, both of whom traveled in

19     specifically for this hearing.

20          THE COURT:  Absolutely.  No, the Court is here; I just

21     want to make sure that we address it.

22          We have had two witnesses testify extensively of the

23     background, kind of how the arrest occurred, so perhaps we can

24     streamline a little bit of the background and get to the heart

25     of the matter.  We do need to take just five minutes, so I'll

NB9KEISH                          Amador - Direct

1    give you five minutes to, hopefully, streamline those

2    presentations, and then we'll come back.

3            If anyone has any sort of timing issue that they want

4    to raise, just think about it and raise it.  I am at your

5    disposal.  So the Court is here to hopefully conclude

6    everything this afternoon, this evening.

7            MR. DAVIS:  Thank you, your Honor.

8            THE COURT:  Let's take five minutes.

9            (Recess)

10           THE COURT:  Are the parties ready to proceed?

11           MR. DAVIS:  Yes, your Honor.

12           The government calls CBP Task Force Officer Amador.

13   PEDRO AMADOR,

14       called as a witness by the Government,

15       having been duly sworn, testified as follows:

16           THE WITNESS:  Pedro Amador, P-e-d-r-o A-m-a-d-o-r.

17           MS. HUANG:  Your Honor, may I proceed?

18           THE COURT:  Of course.

19   DIRECT EXAMINATION

20   BY MS. HUANG:

21   Q.  Good afternoon, Officer Amador.

22   A.  Good afternoon.

23   Q.  Can you please tell me where you're employed?

24   A.  I'm employed at the San Juan Customs and Border Protection

25   field office.

NB9KEISH                         Amador - Direct

1    Q.  The Customs and Border Protection, that's also known as the

2    CBP, correct?

3    A.  Yes.

4    Q.  Are you okay if we refer to that as the CBP?

5    A.  It's okay.

6    Q.  About how long have you worked for the CBP?

7    A.  Twenty years.

8    Q.  What is your current title with the CBP?

9    A.  I'm a Customs and Border Protection officer, TTRT, which is

10   Tactical Terrorism Response Team, assigned to the Joint

11   Terrorist Task Force, FBI San Juan.

12   Q.  Do you have a title with that task force?

13   A.  I'm a task force officer for the JTTF.

14   Q.  What is a task force officer?

15   A.  It's an officer from another agency attached to a work

16   group for the JTTF, the Joint Terrorist Task Force, which is

17   within the FBI.

18   Q.  And when did you start acting as a task force officer?

19   A.  2019.

20   Q.  Just generally speaking, what are your responsibilities and

21   duties as a task force officer?

22   A.  I'm the liaison officer for the San Juan office, and

23   anything that has to do with CBP business, Customs and Border

24   Protection, they need any help with inspections, to look up

25   travel records, and stuff like that, anything they need within

NB9KEISH                         Amador - Direct

1   the CBP purview.

2   Q.  Directing your attention to the purpose of this hearing,

3   did there come a time when you were asked to assist with the

4   arrest of Avraham Eisenberg?

5   A.  Yes.

6   Q.  Why did you receive that request?

7   A.  As a CBP liaison at the FBI, they will come up to me for

8   the help.

9   Q.  When did you become the CBP liaison?

10  A.  At the same time I was assigned to the JTTF in 2019.

11  Q.  What do you do in that role as a CBP liaison?

12  A.  I get all the calls for help from the FBI.  If they need

13  anything from CBP, just -- I help out.

14  Q.  What kind of things do those agencies ask the CBP for

15  assistance with?

16  A.   Inspections at the border for border crossings, travel

17  records.

18  Q.  Why do they ask the CBP for help?

19  A.  CBP has the border crossing authority.  So when people

20  travel abroad, in and out, CBP has border crossing authority.

21  Q.  What training do you receive on border searches?

22  A.  Initially, the academy, and once a year, we take mutual

23  training just to keep up to date.

24  Q.  Now, turning your attention to December 26, 2022, did you

25  participate in a search and arrest of Avraham Eisenberg that

1   day?

2   A.  Yes.

3   Q.  Where did that take place?

4   A.  At the San Juan International Airport.

5   Q.  Around when did you arrive at the airport on December 26,

6   2022?

7   A.  In the afternoon.

8   Q.  Do you recall which flight Mr. Eisenberg was on?

9   A.  Iberia flight coming from Spain.

10  Q.  That's an international flight?

11  A.  Yes.

12  Q.  After passengers of an international flight arrive at

13  San Juan airport, what do they have to do?

14  A.  After they disembark the aircraft, they come to our

15  inspection area, they pick up the luggage.  After they have all

16  the luggage, they come through a line and wait to be -- for an

17  officer and primary officer, wait for them to call them and be

18  inspected.

19  Q.  And that would have also applied to Mr. Eisenberg?

20  A.  Yes.

21  Q.  When did you see Mr. Eisenberg?

22  A.  At the airport, I was flagged down that he went to the

23  primary area, and I was flagged down that he was there.

24  Q.  Why were you flagged down?

25  A.  I wrote an important record in the system, so when the

1   person comes to primary, the primary officer is going to know

2   that that person needs to go to secondary inspection.

3   Q.   What did you put into the system for Mr. Eisenberg?

4   A.   I uploaded the arrest warrant.

5   Q.   After you were flagged down, what happened next?

6   A.   I went to the inspection area and conducted a secondary

7   inspection.

8   Q.   Let's walk through the secondary inspection.

9           What did you do, what was your first step, with the

10   secondary inspection?

11   A.   Placed the luggage on the belt, take all the property that

12   is there outside, and make sure there's not contraband or

13   anything illegal, which is a standard operation for the border

14   search.

15   Q.   Do you recall what luggage Mr. Eisenberg had?

16   A.   There was a backpack and a luggage, you know...

17   Q.   What did you do with Mr. Eisenberg's luggage?

18   A.   Oh, I took the property out and inspected it.

19   Q.   Why did you do that?

20   A.   Under the border search authority, 19 CFR, we inspect

21   everything that come from aboard, make sure there's nothing

22   illegal or no contraband, anything like that.

23   Q.   You said he had two bags, correct?

24   A.   Yes.

25   Q.   So for the large bag, the larger bag, what did you take out

NB9KEISH                           Amador - Direct

1    from there?

2    A.  Personal items and stuff that belong to him, clothes.

3    Q.  What about the backpack, what did you take out from there?

4    A.  Backpack?  There was electronics and personal items, you

5    know.

6    Q.  Do you remember which electronics were in there?

7    A.  I remember a laptop, I remember a phone, and several other

8    items.  I wasn't sure what they were, but some kind of

9    electronics.  I wasn't sure what it was.

10   Q.  What did you do with those items?

11   A.  I put them to the side.

12   Q.  Why did you do that?

13   A.  As a habit, I put them to the side in case I need to go

14   into a further secondary inspection, since the 19 CFR gives the

15   authority to go into electronics for inspection.

16   Q.  What does 19 CFR specifically state?

17   A.  That's the border search authority.

18   Q.  Did you ask Mr. Eisenberg any questions?

19   A.  I ask him where he was coming from, was he traveling with

20   somebody else, and make sure that that was his property, his

21   luggage.

22   Q.  Did Mr. Eisenberg respond to you?

23   A.  Yes.

24   Q.  What did he say?

25   A.  Yes, that that was his.

NB9KEISH                          Amador - Direct

1   Q.  Do you remember if anyone else was with you when you were

2   conducting the secondary inspection?

3   A.  Yeah.  There was another CBP officer with me.

4   Q.  After you conducted this luggage inspection, what happened

5   next?

6   A.  After I finish, put the stuff back in the luggage, and I

7   walked with Mr. Eisenberg to the search room.

8   Q.  And what happened there?

9   A.  In the search room, I conducted a pat-down.

10  Q.  And what happened with the pat-down?

11  A.  Pat-down was -- I conducted a pat-down.  It was negative.

12  He didn't have anything on his self, he was good to go there,

13  and that's when I finished my inspection and turned it over to

14  the FBI agent.

15  Q.  And what happened after that?

16  A.  He was presented with the arrest warrant.

17  Q.  And what happened after he was presented with the arrest

18  warrant?

19  A.  He was under arrest, and then we got all the property, and

20  I transport him to the local jail.

21  Q.  Do you remember what happened to Mr. Eisenberg's luggage?

22  A.  Excuse me?

23  Q.  Do you remember what happened to Mr. Eisenberg's luggage?

24  A.  FBI agents took over the property.

25  Q.  And why did the FBI take over the property?

NB9KEISH                         Amador - Direct

A.  They had custody over him.

Q.  So after Mr. Eisenberg was transported to jail -- you said?

A.  Yes.

Q.  -- what happened after that?

A.  Well, he stayed there, and that was it for me.  I just did the transporting.

          MS. HUANG:  Mr. Sears, can we please show an exhibit that's been marked as Government Exhibit 168.

Q.  Officer Amador, do you recognize this document?

A.  Yes.

Q.  What is this document?

A.  That's a printout of the reports that generate from TECS.

Q.  And what is TECS?

A.  Treasury Enforcement Communications System.

Q.  What is the purpose of TECS?

A.  TECS is a system that CBP uses that has all the information on travelers and people that travel abroad.

          MS. HUANG:  Your Honor, the government offers Government Exhibit 168 into evidence.

          MR. GREENSPAN:  No objection.

          THE COURT:  It's admitted.

          (Government's Exhibit 168 received in evidence)

          MS. HUANG:  Mr. Sears, can we please turn to the second page of the document.

NB9KEISH                    Amador - Direct

1    BY MS. HUANG:

2    Q.  Officer Amador, do you see at the top there, it says, "TECS

3    Secondary Inspection Report"?

4    A.  Yes.

5    Q.  What does this report cover?

6    A.  That states the encounter, the secondary inspection that

7    took that day.

8    Q.  Who completed this report?

9    A.  The other officer that was with me.

10           MS. HUANG:  I think it's back to the first page.

11   Thank you.

12   Q.  Further down, do you see a section that says "Baggage"?

13   A.  Yes.

14   Q.  What does this section cover?

15   A.  It states that we actually inspect the luggage.

16   Q.  And it says "Bag Exam."

17           Do you see that in the middle there?

18   A.  Yes.

19   Q.  What does that mean?

20   A.  Stating the same, it's just that we conducted a bag exam.

21   Q.  And the "yes" there, what does that signify?

22   A.  That we did.

23   Q.  It says further down, "Personal Search."

24           Do you see that?

25   A.  Yes.

NB9KEISH                    Amador - Direct

1    Q.  What does that mean?

2    A.  That's referring to the pat-down.

3    Q.  And it says "yes" there?

4    A.  Yes.

5    Q.  What does that signify?

6    A.  That, in fact, it took place, the pat-down was done.

7          MS. HUANG:  Can we please turn to the next page,

8    Mr. Sears.

9    Q.  Officer Amador, do you see the section that says

10   "Comments/History"?

11   A.  Yes.

12   Q.  And it says here, "Subject was processed at primary by CBPO

13   Samuel Santiago and referred to a baggage secondary due to an

14   exact match on a PRIM lookout."

15          What is a PRIM lookout?

16   A.  It's primary, which means that the person on the record is

17   the person that is being inspected.

18   Q.  And it says, "Subject had an outstanding warrant by the FBI

19   for federal law offenses, law offense violations to several

20   statutes," and it says, "Subject was transferred over to CBPO

21   TFO Amador and FBI Special Agent Michael Crawford."

22          Do you see that?

23   A.  Yes.

24   Q.  Is that a correct recitation of what occurred?

25   A.  Yes.

NB9KEISH                          Amador - Direct

1              MS. HUANG:  Mr. Sears, can you please turn to the next

2       page.

3       Q.  Officer Amador, do you see at the top there, where it says

4       "TECS Person Query Detail"?

5       A.  Yes.

6       Q.  What does this report cover?

7       A.  The information of the person on the TECS system.

8       Q.  And further below, it says, "Search Details."

9              Do you see that?

10      A.  Yes.

11      Q.  And it says "Search Type" further down in the bottom half

12      of the document?

13      A.  Yes.

14      Q.  Do you see there it says "pat-down"?

15      A.  Yes.

16      Q.  And then also further down, it says "Searching Officer"

17      there?

18      A.  Yes.

19      Q.  And who is the searching officer?

20      A.  Myself.

21      Q.  Beyond December 26, 2022, did you have any further

22      involvement with this investigation?

23      A.  No.

24      Q.  Why didn't you submit the information in this form?

25      A.  On that day, since I was transporting him, the information

NB9KEISH                     Amador - Cross

1   needed to go into the system, so the officer help out, and he

2   entered the information there.

3              MS. HUANG:  No further questions, your Honor.

4              THE COURT:  All right.

5              Cross-examination?

6   CROSS-EXAMINATION

7   BY MR. GREENSPAN:

8   Q.  Good afternoon, Mr. Amador.

9   A.  Good afternoon.

10  Q.  Mr. Amador, are you familiar with something called a

11  Form 6051D?

12  A.  Yeah.  That's a seizure form.

13  Q.  You didn't fill one out in this case, right?

14  A.  No.

15  Q.  And you didn't fill one out because you didn't seize

16  anything, right?

17  A.  Repeat.

18  Q.  What is a seizure form?  Can you describe what that is?

19  A.  The seizure form?  That's when you have to seize anything,

20  but, in this case, we didn't seize anything.

21  Q.  Going back to the events of the evening of December 26th

22  that you spent most of your direct talking about, who first saw

23  Mr. Eisenberg in the airport?

24  A.  Who first saw?

25  Q.  Yes.

NB9KEISH                          Amador - Cross

1         Which person first saw Mr. Eisenberg?

2    A.  I don't understand the question.

3    Q.  Did somebody see Mr. Eisenberg coming down into the customs

4    area?

5    A.  Many people did.  I mean, I don't understand...

6    Q.  How did you become aware that Mr. Eisenberg was in the

7    customs area?  Did you see him?  Did somebody tell you?

8    A.  Yes, somebody told me.

9    Q.  And who was that?

10   A.  Primary officer.

11   Q.  And who's the primary officer?

12   A.  Santiago.

13   Q.  Okay.

14        Who spoke to Mr. Eisenberg first, you, Mr. Santiago,

15   or somebody else?

16   A.  I don't remember.

17   Q.  Typically, is there a primary inspection that happens

18   before the secondary inspection?

19   A.  Yes.

20   Q.  Do you do primary inspections?

21   A.  Sometimes.

22   Q.  Did you do the primary inspection in this case?

23   A.  No.

24   Q.  So who did the primary inspection?

25   A.  Santiago.

1   Q.  So, Mr. Santiago spoke to Mr. Eisenberg before you did?

2   A.  I believe so, yeah.  I don't remember well how it was.

3   Q.  I'm sorry, I didn't catch the last part.

4   A.  Well, that was a different setup there, so it's like the

5   primary officer was the secondary officer.  He was right there

6   in the same booth.  So once I get flagged, I walked in, so we

7   were both there.

8   Q.  Okay.  Is it a different setup than you're normally used

9   to; is that what you're saying?

10  A.  Yes.

11  Q.  Once you had Mr. Eisenberg's baggage on the table or the

12  carousel in the secondary inspection area, you said that you

13  started taking things out, right?

14  A.  Yes.  That's a standard, that we take everything out to

15  inspect it.

16  Q.  And did you take everything out of both bags?

17  A.  Yes.

18  Q.  When you were taking everything out, where were the FBI

19  agents?  Were they with you?

20  A.  They were somewhere around, but I don't remember where,

21  because I'm working the inspection, so I'm not looking around

22  to say who's behind me.

23  Q.  Once you took everything out, did you then put it back in?

24  A.  The stuff went back in, and the electronics stayed out.

25  Q.  So the electronics are on the --

NB9KEISH                          Amador - Cross

1    A.  On the belt.

2    Q.  -- the belt; is that correct?

3         Did those electronics go into some sort of container

4    or bag?

5    A.  I didn't put them there.  I don't -- at that point, no.

6    Q.  You didn't put them into anything.  Did you see anybody

7    else put them into anything?

8    A.  No.

9    Q.  You said you took Mr. Eisenberg and escorted him then into

10   a room?

11   A.  The TECS room.

12   Q.  Is that also sometimes called an interview room?

13   A.  Yes.

14   Q.  At this point, you said you did a pat-down, right?

15   A.  Yes.

16   Q.  Who else was in that room with you?

17   A.  Special Agent Crawford.

18   Q.  Just the two of you and Mr. Eisenberg?

19   A.  That's what I remember.

20   Q.  And so you described Mr. Eisenberg being presented with a

21   warrant?

22   A.  Yes.

23        Well, I didn't; Special Agent Crawford did.

24   Q.  Exactly, right.

25        And you described him being handcuffed, right?

NB9KEISH                    Amador - Cross

```
 1   A.  Say it again?

 2   Q.  Was Mr. Eisenberg then handcuffed?

 3   A.  Yes.

 4   Q.  And did you do that, or did Mr. Crawford do that?

 5   A.  I don't remember.

 6   Q.  Do you carry handcuffs on you?

 7   A.  Yes.

 8   Q.  You said another CBP officer helped you conduct a secondary

 9   inspection?

10   A.  Yes.

11   Q.  Was that Officer Santiago?

12   A.  Yes.

13            (Pause)

14            MR. GREENSPAN:  Apologies for the delay, your Honor.

15            THE COURT:  No, that's fine.

16            MR. TALKIN:  He's from our tech department, your

17   Honor.  When he's asking questions, it's hard.

18            THE COURT:  I've been there.

19            MR. GREENSPAN:  Mr. Talkin, can you pull up

20   Exhibit 115, please.

21            (Pause)

22            MR. GREENSPAN:  Is it possible to scroll down just a

23   little bit here?

24            Oh, perfect.  Thank you.

25
```

NB9KEISH                        Amador - Cross

1    BY MR. GREENSPAN:

2    Q.  Mr. Amador, do you recognize this picture?

3    A.  Yes.

4    Q.  And what is it?

5    A.  The FIS, federal inspection site, of Luis Munoz Marin

6    International Airport in San Juan.

7    Q.  Did you take this picture?

8    A.  I did.

9            MR. GREENSPAN:  I move Exhibit 115 into evidence.

10           MS. HUANG:  No objection.

11           THE COURT:  It's admitted.

12           (Government's Exhibit 115 received in evidence)

13   BY MR. GREENSPAN:

14   Q.  When did you take this picture?

15   A.  A few days ago.

16   Q.  Does this picture, that you took a few days ago, depict the

17   airport in substantially the same way that it existed on

18   December 26th of 2022?

19   A.  Yes.

20   Q.  And these are -- you can see various conveyor belts behind

21   the podiums, right?  Do you see that?

22   A.  Yes.

23   Q.  Is that the secondary inspection sites that you're talking

24   about?

25   A.  Yes, sir.

NB9KEISH                        Amador - Cross

1    Q.  And above each of those, on the roof, you can see there's a

2    camera there, right?

3    A.  Yes, sir.

4    Q.  Have you ever pulled footage from those cameras?

5    A.  I haven't.

6    Q.  Have you ever seen footage from those cameras?

7    A.  I seen the monitors, but -- if that's what you mean.

8    Q.  What monitors are you referring to, sir?

9    A.  Monitors that you can see, the cameras.

10   Q.  Are those the monitors that are on those podiums?

11   A.  No.

12   Q.  Where are the monitors that you're referring to?

13   A.  They're in a separate area.

14   Q.  Okay.  So you've seen the monitors, and you've seen that

15   they depict what you can see from those cameras; is that what

16   you're saying?

17   A.  Yes, I know of them.  I don't work with the cameras, but,

18   yeah, I know about them.

19   Q.  Are you aware whether those cameras were functional on the

20   night of the arrest?

21   A.  I really can't tell you if they were working or not; I

22   don't know.

23   Q.  Do those cameras show the entire area of the secondary

24   inspection?

25   A.  Like, I don't work in that area, so I don't know what

1    exactly they cover.

2    Q.  When you've seen them on the monitors in the room, as you

3    described, do they appear to show the entire area, or are you

4    not sure?

5    A.  Yeah, I'm not sure.  I don't know if they cover an entire

6    area.

7             MR. GREENSPAN:  No further questions, your Honor.

8             MS. HUANG:  Just a very brief redirect, your Honor?

9             THE COURT:  Of course.

10   REDIRECT EXAMINATION

11   BY MS. HUANG:

12   Q.  Officer Amador, do you remember that you were asked briefly

13   about the seizure of Mr. Eisenberg's luggage?

14   A.  Yes.

15   Q.  What happened to Mr. Eisenberg's luggage after the

16   inspection?

17   A.  FBI took custody of it because once we done with the border

18   search authority, and he was served with the arrest, the FBI

19   took custody of it.

20   Q.  So when you said there wasn't a seizure, you meant that the

21   CBP did not seize it, correct?

22   A.  Exactly.

23            MS. HUANG:  No further questions, your Honor.

24            THE COURT:  Okay.

25            Mr. Amador, you are excused.  Thank you so much.

1            THE WITNESS:  Thank you, sir.

2            (Witness excused)

3            THE COURT:  Mr. Davis, Mr. Burnett, or Ms. Huang?

4            MR. BURNETT:  Yes.  The government calls Special

5   Agent Perez.

6   CRISTINE PEREZ,

7        called as a witness by the Government,

8        having been duly sworn, testified as follows:

9            THE DEPUTY CLERK:  Can you please state your first and

10  last name, and slowly spell your last name for the record.

11           THE WITNESS:  Cristine Perez, P-e-r-e-z.

12           THE COURT:  All right.  Mr. Burnett, you may proceed.

13  DIRECT EXAMINATION

14  BY MR. BURNETT:

15  Q.  Special Agent Perez, where do you work?

16  A.  I work with the FBI.

17  Q.  What's your title there?

18  A.  Special agent.

19  Q.  How long have you been a special agent for?

20  A.  Four years.

21  Q.  Are you assigned to a particular group?

22  A.  Yes.

23  Q.  What group is that?

24  A.  The white collar crime group, financial fraud.

25  Q.  Did you participate in an operation on December 26, 2022,

NB9KEISH                          Perez - Direct

1   to arrest Avraham Eisenberg?

2   A.  I did.

3   Q.  So I want to just fast forward straight to the day of that

4   arrest.

5           Before the arrest took place, did you meet at the FBI

6   office in San Juan?

7   A.  Yes.

8   Q.  Who did you meet with there?

9   A.  Special Agent Michael Crawford, Special Agent Gennaro Itri,

10  and myself.

11  Q.  What took place between the three of you when you met at

12  that office in San Juan?

13  A.  We went over the operational plan.

14  Q.  And who led that meeting?

15  A.  Special Agent Crawford.

16  Q.  Could you describe, generally, what Special Agent Crawford

17  told you about the case and the operation in that meeting?

18  A.  So Special Agent Crawford told us it had to do with

19  cryptocurrency.  He didn't go into detail about it, but we did

20  discuss where we were going to meet, what we were going to do,

21  everybody's role in the overall operation.

22  Q.  Did you go to the airport later that day?

23  A.  Yes.

24  Q.  Where in the airport did you go to?

25  A.  We went to the area where CBP usually has their offices,

1  where the international flights get in.

2  Q.  Did you meet anyone there?

3  A.  Yes.

4  Q.  Who did you meet with?

5  A.  Task force officers from the CBP, Pedro Amador, and HSI

6  Special Agent -- Supervisory Special Agent Juanquin Sandoval.

7  Q.  Did there come a time, when you were at the airport, that

8  you learned that Mr. Eisenberg had arrived?

9  A.  Yes.

10 Q.  How did you learn that?

11 A.  When he came down the escalators where normally

12 international flights come in, he went to secondary, to talk to

13 one of the custom officers, and TFO Pedro Amador — sorry,

14 Amador — he told us that he had come in.

15 Q.  Where did you go after Mr. Eisenberg got to that secondary

16 area?

17 A.  We went to where the custom officer was, it was like a

18 little podium kind of thing, and it had a conveyor belt behind

19 it.

20 Q.  About how far away would you say you were when you got

21 there?

22 A.  I would say from where I am right now to where you are.

23 Q.  Could you see what was going on?

24 A.  Yes.

25 Q.  Could you see if Mr. Eisenberg had any baggage with him?

NB9KEISH                        Perez - Direct

1    A.   Yes.

2    Q.   What did he have?

3    A.   He had a carry-on luggage and a backpack.

4    Q.   So I want to take those one at a time, starting with the

5    carry-on luggage.

6            What, if anything, did you see the CBP officers do

7    with that carry-on luggage?

8    A.   So when TFO Amador, he started taking the items out, we

9    were closer because we had moved closer to where the conveyor

10   belt was, so we saw that from the baggage, he didn't -- at

11   least the luggage, he didn't take anything out, he just looked

12   through it.

13   Q.   Were you able to see inside that luggage?

14   A.   Yes.

15   Q.   What kind of things were in there?

16   A.   Clothing.  I think there was a pair of Crocs.

17   Q.   Now, let's switch gears from the carry-on bag to the

18   backpack.

19            What, if anything, did the CBP officers do with that

20   backpack in the secondary area?

21   A.   He started taking items out of the bag.

22   Q.   And who is the "he" you're talking about there?

23   A.   TFO Amador.

24   Q.   Were you able to see what TFO Amador was taking out of the

25   backpack?

1    A.  Yes.

2    Q.  Could you describe what you saw?

3    A.  It was mostly electronics.  It was cell phones, a laptop,

4    batteries, headphones.

5    Q.  Do you remember, like, about how many cell phones you saw

6    come out of the bag?

7    A.  There were multiple cell phones.

8    Q.  Now, based on your training as a fraud investigator, did

9    any of the items that came out of the backpack stand out to

10   you?

11   A.  Yes.

12   Q.  Which ones?

13   A.  The cell phone and the laptop.

14   Q.  Why is that?

15   A.  Typically, those items store data.

16   Q.  Why is that important?

17   A.  Because throughout our investigations, we find, in laptops

18   and in cell phones, that they have communication between them

19   and either victims or perpetrators.

20   Q.  Now, did there come a time, after Mr. Eisenberg arrived at

21   the secondary area, that he was taken to another location?

22   A.  Yes.

23   Q.  Where was he taken?

24   A.  He was taken to a room off to my -- where I was standing,

25   to my left.

NB9KEISH                    Perez - Direct

1   Q.  Did you go with Mr. Eisenberg to that room?

2   A.  No.  TFO Amador and I stayed with the baggage.

3   Q.  And about how long was Mr. Eisenberg in that separate room?

4   A.  I would say five to ten minutes.

5   Q.  Where did he go after he came back out?

6   A.  He came back to where we were.

7   Q.  Now, I want to focus on Mr. Eisenberg's belongings again.

8           You testified that TFO Amador took a number of items,

9   including electronics, out of the backpack, correct?

10  A.  Yes.

11  Q.  When he took those out of the backpack, where did he put

12  them?

13  A.  He put it in the conveyor belt.

14  Q.  And now, after Mr. Eisenberg came out of the arrest room,

15  where did Mr. Eisenberg go?

16  A.  He went to the back exit of the airport.

17  Q.  What does that lead to?

18  A.  That leads to the parking lot, where, typically, the CBP

19  officers have their cars.

20  Q.  What happened to the baggage when Mr. Eisenberg was taken

21  out of the airport?

22  A.  Special Agent Itri and myself took it with us.

23  Q.  When you took it with you, where were those electronics?

24  A.  TFO Amador had already put them inside the backpack,

25  exactly where he found them.

1    Q.  Why did you transport those in the bags, in Mr. Eisenberg's

2    bags?

3    A.  We didn't have any evidence bags or anything of that

4    nature.

5    Q.  You mentioned that you and Special Agent Itri took the

6    bags; is that correct?

7    A.  Yes.

8    Q.  Where did those bags go?

9    A.  It went into Special Agent Itri's car.

10   Q.  And where did you go after the bags went into Special

11   Agent Itri's car?

12   A.  We went to meet Special Agent Crawford and TFO Amador at

13   the exit so we can follow them to transport Eisenberg to the

14   Guaynabo police station.

15   Q.  Did you follow them to the police station?

16   A.  We did.

17   Q.  Were you in the same car as Mr. Itri or a separate one?

18   A.  Separate cars.

19   Q.  What happened when you got to the precinct?

20   A.  We took Eisenberg in.  They were able to put him in a jail

21   cell.  We gave them water and some snacks.

22   Q.  Where did you go after dropping Mr. Eisenberg off there?

23   A.  I went home.

24   Q.  Did you have any other involvement in the case that night?

25   A.  No.

1   Q.  So I want to switch gears now to the next day.

2           Did you go back to the FBI San Juan office that day?

3   A.  Yes.

4   Q.  Around what time did you get there?

5   A.  7:30, 8:00.

6   Q.  Did you do anything in connection with the case that day?

7   A.  Yes.

8   Q.  What did you do?

9   A.  I conducted an inventory on Mr. Eisenberg's luggage and

10  backpack.

11  Q.  So, before we discuss the particulars of this case, I want

12  to ask you a bit of background about these inventory searches.

13          Have you received training about when to conduct

14  inventory searches?

15  A.  Yes.

16  Q.  Where did you receive that training?

17  A.  FBI academy.

18  Q.  Could you describe, at a high level, what you've been

19  trained about the situations in which you're supposed to

20  conduct inventory searches?

21  A.  Whenever we have an arrest, we inventory that person's

22  luggage or personal belongings.

23  Q.  Have you also received training about how to conduct those

24  inventory searches?

25  A.  Yes.

1    Q.  Where was that training?

2    A.  FBI academy.

3    Q.  Could you, again, describe, in broad terms, what you have

4    been trained about how to conduct these inventory searches?

5    A.  So we were trained to take an inventory, write down the

6    items of value that we find, find a specific descriptor of each

7    item in order to make them unique, and to take pictures of

8    where we took the items from and the items themself.

9    Q.  What's the point of writing things down and taking

10   pictures?

11   A.  Because we need to memorialize the items and what we did.

12   Q.  I'd like to have you take a look --

13          MR. BURNETT:  If we can pull it up Government

14   Exhibit 101, which is already in evidence.

15          If we could turn to the second page, please.

16   Q.  Have you reviewed this document before?

17   A.  Yes.

18   Q.  What is this document?

19   A.  This is part of the DIOG.  It's the inventory of personal

20   property.

21   Q.  What, broadly speaking, does this part of the DIOG cover?

22   A.  About inventory searches and any other type of searches in

23   regards to personal belongings.

24   Q.  And I'd like you just to look at one part.

25          MR. BURNETT:  If you could zoom in, please, Mr. Sears,

1    on the fourth paragraph.

2    Q.  Do you see, at the beginning of the second sentence,

3    there's a reference to a written summary?

4    A.  Yes.

5    Q.  Do you also see, a little further down on the paragraph,

6    there's a reference to agents should also memorialize facts

7    pertinent to other activities?

8    A.  Yes.

9    Q.  Now, have you received training on the types of steps

10   you're supposed to take to memorialize an inventory search?

11   A.  Yes.

12   Q.  Could you explain that?

13   A.  So we were taught in training that we needed to take a

14   picture of each -- where we got the items from — in some cases,

15   the room or in a container — and the item itself.  So we take

16   pictures of every part of the item, and then we memorialize it

17   with the picture with -- like I mentioned, with the picture,

18   but we also do a 302, in which we write everything that we

19   found of value, and we also do an FD-597, which is a receipt of

20   property.

21   Q.  I want to be clear about something:  Are you trained to

22   write down every single thing that you find in a bag?

23   A.  No.

24   Q.  Why not?

25   A.  Because some items -- we typically -- what we look for are

1    items of value.  So it means, for example, something that is

2    either valuable, like financially valuable, like something

3    that's expensive or something that needs to be kept safe or

4    something that is evidence, considered evidence.

5            MR. BURNETT:  Thank you, Mr. Sears.  You can take this

6    down.

7    Q.  And I'd like now to focus on the day after the arrest, when

8    you conducted the inventory search of Mr. Eisenberg's

9    belongings.

10           Was anyone with you during that search?

11   A.  Yes.

12   Q.  Who was with you?

13   A.  A task force officer.

14   Q.  Do you recall the specific person, who it was?

15   A.  No, I don't.

16   Q.  Why did you have someone with you during the inventory

17   search?

18   A.  It's part of the FBI protocol — whenever you do a search,

19   we have to have somebody present as a witness.

20   Q.  Now, you mentioned that Mr. Eisenberg had two bags when he

21   was arrested, correct?

22   A.  Yes.

23   Q.  Did you search just one of those bags or both of them?

24   A.  Both of them.

25   Q.  Why both?

1   A.  Because it was in his person.

2   Q.  What, if anything, did you do to memorialize the inventory

3   search you conducted?

4   A.  I took both pictures of the items and also wrote an FD-597.

5   Q.  Again, did you photograph every item that was in the bags

6   you searched?

7   A.  No.

8   Q.  Why not?

9   A.  Because not all items were valuable, considered valuable.

10  Q.  Now, have you, before this hearing, had a chance to review

11  Government Exhibits 122 to 156 and their subparts?

12  A.  Yes.

13  Q.  What are those?

14  A.  Pictures of the items that were considered valuables and

15  both containers.

16  Q.  Were those photographs that you took during this inventory

17  search?

18  A.  Yes, I did.

19          MR. BURNETT:  The government offers 122 to 156.

20          THE COURT:  Any objection?

21          MR. TALKIN:  No.

22          THE COURT:  Those documents will be moved into

23  evidence.

24          (Government's Exhibits 122 to 156 received in

25  evidence)

1              MR. BURNETT:  I'd like to start, if we could, pulling

2     up, side by side, Government Exhibit 154 and 154A.

3     BY MR. BURNETT:

4     Q.  What's the image on the left?

5     A.  That's his carry-on luggage.

6     Q.  Do you see there's kind of a screenshot on the right?

7     A.  Yes.

8     Q.  What is that?

9     A.  The metadata.

10    Q.  Do you see there's a date taken there?

11    A.  Yes.

12    Q.  What does that say?

13    A.  December 27, 2022.

14    Q.  Is that the date and the approximate time that you took

15    this photograph?

16    A.  Yes.

17    Q.  Now, did you open this carry-on bag as part of the

18    inventory search?

19    A.  Yes.

20    Q.  Could you describe, generally, what you found inside of it?

21    A.  It was mostly clothing and, like I mentioned, the pair of

22    Crocs.

23    Q.  Did you take photos of anything that was inside?

24    A.  No.

25    Q.  Why not?

NB9KEISH                         Perez - Direct

1    A.  Because they were not deemed as valuable items.

2              MR. BURNETT:  Let's take those down.

3              Mr. Sears, if we could pull up Government's

4    Exhibits 152 and 152A side by side.

5    Q.  What's the image on the left?

6    A.  His backpack.

7    Q.  And what's the date taken on the right?

8    A.  December 27, 2022.

9    Q.  Did you open this backpack as part of the inventory search?

10   A.  Yes.

11   Q.  Could you describe, again generally, what you found inside

12   of it?

13   A.  We found the cell phones, the laptop, those batteries, like

14   the carry-on batteries, cables, headphones.

15   Q.  Did you take photos of some of those things?

16   A.  Yes.

17   Q.  Let's take a look at some of those — not all, of course —

18   but let's start with Government Exhibit 128.

19              What's this a photograph of?

20   A.  The cell phones.

21   Q.  Were these the phones that you testified about earlier

22   being found at the airport?

23   A.  Yes.

24              MR. BURNETT:  We can take that down and show

25   Government Exhibit 141.

NB9KEISH                         Perez - Direct

1    Q.  What's that a photograph of?

2    A.  The laptop.

3    Q.  Is this the laptop that you testified about being found at

4    the airport?

5    A.  Yes.

6         MR. BURNETT:  All right.  We can take that down.

7         Mr. Sears, I'm going to test TrialDirector here.  Can

8    we try and pull up four exhibits at the same time —

9    Government's Exhibits 146, 148, 151, and 132?

10        It's all right; we can do two at a time.  That was too

11   ambitious.  Why don't we just do 146 and 148.

12   Q.  What are these?

13   A.  Headphones.

14   Q.  And if you could take a look now at 151 and 132, what are

15   these?

16   A.  The one on the left is a headphone, and the one on the

17   right, I think it was like a battery pack.

18   Q.  Why did you take photographs of these sorts of things?

19   A.  I considered they were valuable, and I took pictures of it

20   just in case.

21        MR. BURNETT:  Mr. Sears, we can take those down as

22   well.

23   Q.  Now, after you completed your inventory search, what did

24   you do with the items that you had found in the bags?

25   A.  I put them back in the bags.

NB9KEISH                         Perez - Direct

1    Q.  Why did you do that?

2    A.  For safekeeping.

3    Q.  Where did you put the bags?

4    A.  They were at my desk.

5    Q.  Now, did there come a time when you helped move the items

6    elsewhere?

7    A.  Yes.

8    Q.  Where did you move those items to?

9    A.  To the evidence collection room.

10   Q.  I'm going to have you take a look at three documents, one

11   at a time.  The first is Government Exhibit 105.

12            MR. BURNETT:  Mr. Sears, if you could just scroll down

13   through this for the witness.

14            And if you could take a look at Government Exhibit 108

15   next and then 166 after that.

16   Q.  Do you recognize the documents you have just seen?

17   A.  Yes.

18   Q.  What are they?

19   A.  This is chain of custody.

20   Q.  Are they true and accurate copies of chain-of-custody

21   documents from this case?

22   A.  Yes.

23            MR. BURNETT:  The government offers 105, 108, and 166.

24            MR. TALKIN:  No objection.

25            THE COURT:  Those documents will be admitted.

1          (Government's Exhibits 105, 108, and 166 received in

2     evidence)

3          MR. BURNETT:  Let's take a look at Government

4     Exhibit 105, just to use one example to orient everyone.

5     BY MR. BURNETT:

6     Q.  Now, do you see at the top of this, there is a description

7     row, I think it's the third row down, that says "Red rope

8     containing charcoal gray Samsung"?

9     A.  Yes.

10    Q.  And it has an evidence item number above that of 1B2,

11    correct?

12    A.  Yes.

13         MR. BURNETT:  And, Mr. Sears, if you could scroll down

14    one page here.

15    Q.  Now, do you see there is a box on the right, it's the

16    second box down, that has "Signature of Seizing Individual"

17    listed in it?

18    A.  Yes.

19    Q.  What's the name under that?

20    A.  My name.

21    Q.  Why are you listed as the seizing individual here?

22    A.  When I conducted the inventory, I was considered the

23    seizing agent.

24    Q.  Now, does the fact that you're listed as the seizing

25    individual mean you were the person who pulled these items out

1    of the backpack at the airport?

2    A.  No.

3    Q.  So what does a seizing individual, in FBI parlance, mean?

4    A.  It means the individual that took the item inventoried the

5    item.  As you saw before, it had a descriptor.  I was the one

6    that provided the descriptor of the item, and then I'm the one

7    that's responsible in turning that item into the evidence

8    collection room.

9    Q.  Do you see there's a column here called "Relinquished

10   Custody"?

11   A.  Yes.

12   Q.  The first entry under that, is that your name again?

13   A.  Yes.

14   Q.  What's the date and time?

15   A.  December 28, 2022.

16   Q.  What does that mean?  What does this entry mean?

17   A.  That's the day I took it to the evidence room.  It was

18   packaged, sealed, labeled, and provided to the evidence room.

19   Q.  Now, have you reviewed the other documents that we just

20   flipped through before offering them into evidence?

21   A.  Yes.

22   Q.  Are you listed as the seizing individual and the person who

23   relinquished custody for all of those?

24   A.  I am.

25   Q.  Does that mean the same thing on all of those documents?

1    A.  Yes.

2    Q.  So let's now take a look at just a little bit more

3    paperwork, then the paperwork logs will end.

4            MR. BURNETT:  I'd like to pull up, side by side,

5    Government Exhibits 111 and 110, which are already in evidence.

6    Q.  Let's start with Government Exhibit 110, which is on the

7    right.

8            Who prepared the contents of this document?

9    A.  Special Agent Michael Crawford.

10   Q.  And who actually wrote out the charcoal gray Hasselblad,

11   that information?

12   A.  He wrote it in Sentinel.

13   Q.  He wrote it --

14   A.  The one on the left.

15   Q.  I'm sorry, I'm thinking about the one on the right.

16   A.  The one in handwriting, that's my handwriting.  I filled

17   that out.

18   Q.  When did you prepare it?

19   A.  On the 27th.

20   Q.  And why did you put it together?

21   A.  Because that's the way I kept the inventory.

22   Q.  And now, the document on the left, what's that?

23   A.  That's a document that it's prepared and put into Sentinel.

24   Q.  What is Sentinel?

25   A.  It's our database where we keep all, like, documentation.

NB9KEISH                         Perez - Direct

```
 1   Q.  Is this effectively a summary of the property receipt
 2   that's on the right?
 3   A.  Correct.
 4   Q.  Could you see how, in Government Exhibit 111, the one on
 5   the left, you're listed in the column for both seizing
 6   individual and located by?
 7   A.  Yes.
 8   Q.  Could you explain what that means?
 9   A.  It means that I was the one that found the item at FBI
10   space, and I was the one that inventoried it.
11   Q.  Again, does it mean you were the one who found it at the
12   airport?
13   A.  No.
14        MR. BURNETT:  And just one last document.  If we could
15   take a look at Government Exhibit 106.
16   Q.  Do you see here in "Description of Items," it says,
17   "Suitcase with personal belongings, backpack with personal
18   belongings"?
19   A.  Yes.
20   Q.  Are those statements accurate summaries of Mr. Eisenberg's
21   bags, aside from those other devices you've listed out?
22   A.  Yes.
23   Q.  And as you mentioned earlier, was there anything else you
24   did to memorialize valuable items that were in those bags?
25   A.  We put it in a 302.
```

NB9KEISH                            Perez - Cross

1   Q.  Now, other than this inventory search that you've

2   described, have you had any other involvement with the

3   investigation of Mr. Eisenberg's case?

4   A.  No.

5           MR. BURNETT:  No further questions, your Honor.

6           THE COURT:  Okay.

7           Cross-examination?

8   CROSS-EXAMINATION

9   BY MR. TALKIN:

10  Q.  Good evening.

11  A.  Good evening.

12  Q.  You just described the valuable items that were inside the

13  luggage that were not electronics, and you said you put that in

14  a 302.

15          A 302 is an official -- an FBI report -- a name for

16  one of the types of official FBI reports?

17  A.  Yes.

18  Q.  And putting up Exhibit 111, that's not a 302?

19  A.  Yes.  That's a 1087.

20  Q.  And the 302 that you put that other information on, did you

21  file that in Sentinel?

22  A.  I did not.

23  Q.  Do you know if any other agent did?

24  A.  Mostly likely, Special Agent Crawford.

25  Q.  Do you know?  I'm not --

NB9KEISH                          Perez - Cross

1    A.  Oh, I don't know.

2    Q.  You talked about -- I'm going to take you to after the

3    electronics have been out, and you or you directed somebody to

4    put them back into the bag, you said, correct?

5           After the electronics had been taken out of the

6    luggage, then, at some point, they got back into the luggage,

7    correct?

8    A.  You mean when we were at the airport?

9    Q.  Correct.

10   A.  I did not direct anybody to put them in there.  They did it

11   themselves.

12   Q.  And "they" is who?

13   A.  TFO Amador.

14   Q.  When you say "put them in there," you're talking about back

15   in the luggage?

16   A.  Back in the backpack.

17   Q.  Do you remember being interviewed by the prosecution a few

18   times in anticipation of your testimony today?

19   A.  I was interviewed by the prosecution.

20   Q.  And the first time, I believe it might have been a

21   telephone call with a couple of Assistant United States

22   Attorneys in the summertime?

23   A.  I was interviewed by them.

24   Q.  First over the telephone, right?

25   A.  Yes.

NB9KEISH                        Perez - Cross

1   Q.  And during that telephone conversation, you stated that you

2   asked the CBP officer to put everything back into the luggage;

3   you told the government that during that interview, correct?

4   A.  I do not recall.

5              MR. TALKIN:  Can we pull up 3502-002, please.

6   Q.  I'm going to ask you to take a look at this document, and

7   in about the middle of the page, there are four bullet points.

8   Look at the last bullet point, read it to yourself, and let me

9   know if that refreshes your recollection.

10             (Pause)

11  A.  Sorry, what bullet point?

12  Q.  There are two bullet points, and then there's four of them

13  underneath that.  The fourth of those four, kind of in the

14  middle of the page.  I know that's not great for you.

15             If you're looking at black dots on your document, it

16  is the — one, two, three, four, five, six, seven — eighth black

17  dot from the top.  Not circles; the black dots.

18             MR. TALKIN:  Can we highlight that?

19             (Pause)

20             THE COURT:  Is there a question?

21  BY MR. TALKIN:

22  Q.  Does that help refresh your recollection?

23             Does that help you remember whether you said that or

24  not?

25  A.  No.

NB9KEISH                          Perez - Cross

1   Q.  So just so we're clear for the record, you have no memory

2   of telling a prosecutor during an interview over the telephone

3   that you asked the CBP officer to put everything back in the

4   luggage?

5               MR. BURNETT:  Asked and answered.

6               THE COURT:  It's overruled.

7               You can answer.

8               THE WITNESS:  Sorry.

9               No, I do not recall.

10  BY MR. TALKIN:

11  Q.  Now, you described that the search --

12              THE COURT:  Take that document down.

13  Q.  You described the search on direct examination.  I just

14  want to make sure I got the timing correct.

15              The CBP officer, during your testimony, you said took

16  the items — when I say "the items," I mean the devices, the

17  electronic devices — out of the baggage before Mr. Eisenberg

18  was taken into the interview room, correct?

19  A.  Out of the backpack.

20  Q.  Great.

21              When Mr. Eisenberg first came to the secondary area,

22  wasn't he separated from his luggage?

23  A.  When he was taken into the --

24  Q.  Before he went into the room, when he first came into the

25  secondary --

NB9KEISH                          Perez - Cross

A.  No.  He was next to it.

Q.  But, eventually, he was separated from it, and he was taken

into the room?

A.  He was taken into the room.

Q.  And when he was taken into the room, you and Amador were

standing outside by the baggage?

A.  Close to the baggage, yes.

Q.  In that area?

A.  In that area.

Q.  And it was after Mr. Eisenberg came out of that interview

room when his baggage was actually searched; isn't that

correct?

A.  No.

Q.  Do you remember, during the interview, telling — I'm going

back to the same telephone interview — telling the prosecutors

that after Eisenberg came out, CBP/ICE person from the airport

went through Eisenberg's luggage?  Do you remember telling them

that?

A.  I do not recall.

Q.  I'm going to ask you to take a look at the same document.

        Again, same procedure — read those and let me know if

that helps you remember what you said, since you do not

remember.

        (Pause)

Q.  Does that help you remember?

NB9KEISH                              Perez - Cross

A.  No.

Q.  So just so the record's clear, you have no recollection, or
you do not remember, telling the prosecutor that Eisenberg came
out of the room about ten minutes later; after Eisenberg came
out, CBP/ICE person from the airport went through Eisenberg's
luggage?  You have no memory of saying that?

A.  No.

Q.  You're the individual -- you were the agent that did the
inventory search, correct?

A.  Yes.

Q.  And Crawford did not do the inventory search with you?

A.  No.

Q.  And you inventoried the electronics, and sort of
electronics meaning batteries, things that seemed electronics
to you, the things depicted in the pictures that are in
evidence now, right?

A.  Yes.

Q.  And you also looked through the baggage for other valuable
personal items?

A.  Yes.

Q.  And in there was credit cards, correct?

A.  I would assume so, yes.

Q.  Do you remember?  I don't want you to assume.

A.  No, I don't remember.

Q.  And there was money?

NB9KEISH                          Perez - Cross

1    A.  I don't remember.

2    Q.  But if there were credit cards, procedure would require you

3    to memorialize that in a photograph and/or a document, correct?

4    A.  The credit cards?

5    Q.  Yes.

6    A.  Yes.

7    Q.  And if there's, for example, U.S. currency, you would

8    memorialize that, per procedure, in a photograph and/or a

9    document?

10   A.  Yes.

11   Q.  And you would do the same for things such as a passport?

12   A.  Yes.

13   Q.  Driver's license?

14   A.  Yes.

15   Q.  Closer, but yes?

16   A.  Yes.

17   Q.  And, in this case, you did not do that, correct?

18   A.  No.

19   Q.  But if they were in the luggage, you would have done that?

20   A.  I don't recall if they were in the luggage.

21   Q.  No, but if they were, procedure would direct you to do

22   that, correct?

23   A.  Yes.

24          MR. TALKIN:  I'm going to ask that we pull up

25   Government Exhibit 101.

1    Q.  That's the procedure for inventory searches that you were

2    following when you did the inventory search in this case?

3    A.  Yes.

4          MR. TALKIN:  Going to the bottom of the number 7, just

5    that whole last sentence.

6    Q.  I think you read this before, so I won't read it out loud,

7    but getting to the point I want to ask you about, it says that

8    you should memorialize facts pertinent to other activities

9    undertaken, including a noninventory-related search conducted.

10         Do you see that?

11   A.  Yes.

12   Q.  And, in this case, there was a noninventory search

13   conducted, correct?

14   A.  Not by me.

15   Q.  Right, but it was done by other -- your other agents,

16   correct?  It was done at the airport?

17   A.  It was done by CBP.

18   Q.  Right.

19         And you didn't memorialize details of that

20   noninventory search anywhere as part of you preparing the

21   inventory documents in this case?

22   A.  I did not.

23   Q.  And you did that even though -- well, withdrawn.

24         Going to the same document --

25         MR. TALKIN:  Number 3, Noam.

NB9KEISH                          Perez - Cross

1    Q.  -- the first sentence, which will be highlighted for you in

2    a second — there we go — it says, "As a general rule, after

3    lawful taking custody of property, FBI employees must conduct a

4    prompt and thorough search," correct?

5    A.  Yes.

6    Q.  So you want to get -- that's why you went and did what you

7    did that day to the items you cataloged the next day, because

8    that's prompt, right?

9    A.  What do you mean by --

10   Q.  In other words, by creating 110 and 111, by doing that, you

11   were categorizing promptly the items that you had found that

12   you looked at during the inventory search that you considered

13   important or valuable?

14   A.  That were considered valuable, yes.

15   Q.  Okay.

16            And you did that the next day because you knew you had

17   to do that under the word "promptly," but pretty quickly,

18   correct, you're required to do that?

19   A.  Yes.

20   Q.  And you didn't do it the next week because that wouldn't

21   have been very prompt, would it?

22   A.  Correct.

23   Q.  At some point in time — and I'm asking you when this

24   happened — you had a discussion with Mr. Eisenberg about his

25   electronics, correct, a brief discussion?

NB9KEISH                          Perez - Cross

1    A.  No.

2    Q.  Do you remember him asking you -- well, didn't he ask you

3    about his electronics, and you told him, don't worry about it,

4    CBP will take care of it, they will be safe?  Do you remember

5    telling him that?

6    A.  No.

7    Q.  I'm going to ask you to take a look at 3502-02.

8           When you were interviewed by -- I'm talking about the

9    same telephone interview we talked about before.  When you were

10   interviewed by the prosecutors, you discussed if you had a

11   discussion with Mr. Eisenberg about the computer and his items.

12          Do you remember that?

13   A.  Yes.

14   Q.  And you explained to the prosecutors that the substance —

15   not the exact words, but the substance — of that conversation

16   was that Eisenberg asked you what you and the team were going

17   to do with his stuff, including the computer, and you said

18   they're going to be fine, she said she'll take care of it.  You

19   said, I'll take care of it; nothing is going to happen to it.

20   You said that to him, right?

21   A.  I told him I was going to keep them safe.

22   Q.  And that's because he expressed concern for his items to

23   you?

24   A.  Correct.

25          MR. TALKIN:  Can we pull up 158, please.

NB9KEISH                         Perez - Cross

1                Almost there.  This is the end.

2        BY MR. TALKIN:

3        Q.  You recognize this document, correct?  If you don't, take a

4        minute and look at it and let me know if you don't.

5                (Pause)

6        A.  Yes.

7        Q.  And this is what's called a lead, I think; is that the term

8        you used for it?

9        A.  Correct.

10       Q.  And this is kind of a directive to make things happen

11       within the FBI; is that right?

12       A.  Yes.

13       Q.  And this was prepared by Special Agent Crawford?

14       A.  Yes.

15       Q.  And this is regarding the -- you see the bottom, 1B1, 1B2,

16       1B3, that's all the electronics in the case, correct?

17       A.  I do not know.  I don't know the B numbers.

18               MR. TALKIN:  If we could pull up Exhibit 111.

19               Actually, no.

20       Q.  Look at --

21               MR. TALKIN:  The documents that were just put in?

22               MR. BURNETT:  Your Honor, we'll stipulate that these

23       are --

24               MR. TALKIN:  Exhibit 108.

25               THE COURT:  Yes, he's trying to establish that --

1          MR. TALKIN:  That those are the electronics.  I don't

2    think there's a dispute.  I understand she doesn't remember,

3    but I just -- so as long as there's a stipulation.  So we can

4    agree that that is the electronics.

5    BY MR. TALKIN:

6    Q.  And that was Crawford sending them to New York with

7    priority.  You see that on the upper left corner?

8    A.  That's Crawford requesting for the evidence control room to

9    send it to New York.

10   Q.  Right.

11         And it's given a precedence as a priority, correct?

12   Look on the upper left corner.

13   A.  Priority?  Yes.

14   Q.  And this document is a document that you approved?

15   A.  Yes.

16   Q.  And you approved it because you're his supervisor or one of

17   his supervisors?

18   A.  No.

19   Q.  You approved it because you have the authority to approve

20   it?

21   A.  I was the acting supervisor.

22   Q.  So you're not regularly, but as far as at the time you

23   approved this document, you were the supervisor?

24   A.  I was the acting supervisor.

25   Q.  And that was done on 12/28 of '22?

1   A.  It was created, yes.

2            MR. TALKIN:  Nothing further.  Thank you.

3            MR. BURNETT:  Very, very quickly.

4            Mr. Sears, can we pull up Government Exhibit 109.

5   REDIRECT EXAMINATION

6   BY MR. BURNETT:

7   Q.  Do you recall that you were asked about a 302?

8   A.  Yes.

9   Q.  Is this a 302?

10  A.  Yes.

11  Q.  Does this 302 summarize the arrest of Mr. Eisenberg and the

12  seizure of his belongings?

13  A.  Yes.

14  Q.  Do you see that there is a second paragraph that says

15  "Note"?

16  A.  Yes.

17  Q.  Could you just read that?

18  A.  "A receipt of items seized was attached to the 1A file of

19  the evidence items collected log."

20  Q.  Based on your training, is that how the receipts for these

21  inventory searches are logged in connection with 302s?

22  A.  Yes.

23            MR. BURNETT:  No further questions.

24            Sorry.  The government offers 109.

25            THE COURT:  It's admitted.

NB9KEISH

1           (Government's Exhibit 109 received in evidence)

2           THE COURT:  Agent Perez, just one question:  When you

3    approved the lead that we were just looking at, did you have an

4    understanding of why the electronics were being sent to New

5    York?

6           THE WITNESS:  Yes.

7           THE COURT:  What was that understanding?

8           THE WITNESS:  From my understanding, was that New York

9    requested the items.

10          THE COURT:  Okay.  And based on your training, did you

11   know at that time that a search warrant was going to be needed

12   for the electronics?

13          THE WITNESS:  Yes.

14          THE COURT:  Okay.  And did you have an understanding

15   at that time that a search warrant needed to be obtained pretty

16   quickly because you didn't have a warrant at that time?

17          THE WITNESS:  Correct.

18          THE COURT:  Okay.  So, then, why didn't you just get a

19   search warrant in Puerto Rico?

20          THE WITNESS:  Because the case was being worked from

21   New York.

22          THE COURT:  Right, but did someone tell you not to get

23   it in Puerto Rico?

24          THE WITNESS:  No.

25          THE COURT:  Did you have any discussions about the

NB9KEISH

1    need to obtain a search warrant quickly with anyone else on the

2    team?

3           THE WITNESS:  I did not.  Everything regarding this

4    case was being worked with -- by Special Agent Michael

5    Crawford.  He was the one that received the lead initially, so

6    he was working everything concerning that.

7           THE COURT:  Right, but based on your training from the

8    FBI academy and elsewhere, did you have your own understanding

9    of the need to get a search warrant if you wanted to hang onto

10   these electronics?

11          THE WITNESS:  Yes.

12          THE COURT:  Okay.  So did you think at that time that

13   maybe the government needed to go to Puerto Rico to get the

14   search warrant just so it could be done quickly, given that

15   there was no warrant at that time?

16          THE WITNESS:  From what I understood, Special

17   Agent Crawford told me that New York was working on the search

18   warrant.  That's why we were sending the items over there.

19          THE COURT:  So Agent Crawford related to you that the

20   electronics needed to be sent to New York, but, other than

21   that, you didn't have an independent -- you didn't think about

22   whether a warrant could or should be obtained in Puerto Rico;

23   is that fair?

24          THE WITNESS:  Yes.

25          THE COURT:  Okay.

NB9KEISH                         Perez - Recross

1              MR. TALKIN:  I just have a very quick follow-up to

2       the --

3              THE COURT:  That's fine.

4              MR. TALKIN:  Can we pull up 109 that we were just

5       looking at.

6       RECROSS EXAMINATION

7       BY MR. TALKIN:

8       Q.  Just looking at 109, that is a 302, so we've solved that

9       mystery, and it does refer to a collection log, correct?

10      A.  Yes.

11      Q.  This is dated 12/28 of 2022, correct?

12      A.  Yes.

13      Q.  That means it was generated on that date and approved on

14      that date, correct?

15      A.  Yes.

16      Q.  So it would be impossible for this document to be referring

17      to an evidence items collected log that was created on, say,

18      January 4th of 2023, correct?

19      A.  Correct.

20              MR. TALKIN:  Nothing further.  Thank you.

21              THE COURT:  Okay.  Thank you, Agent Perez.  You are

22      excused.

23              THE WITNESS:  Thank you.

24              THE COURT:  Appreciate your attendance here.

25              (Witness excused)

NB9KEISH                       Racz - Direct

1            THE COURT:  Mr. Davis?

2            MR. DAVIS:  The government calls Special Agent Racz.

3            THE COURT:  Okay.  We're going to get it done here, so

4    let's move forward.

5    BRANDON RACZ,

6         called as a witness by the Government,

7         having been duly sworn, testified as follows:

8            THE DEPUTY CLERK:  Please state your first and last

9    name for the record, and slowly spell your last name.

10           THE WITNESS:  Brandon Racz.  Last name is R-a-c-z.

11   DIRECT EXAMINATION

12   BY MR. DAVIS:

13   Q.  Good afternoon, Special Agent Racz.

14           Where do you work?

15   A.  The FBI.

16   Q.  And what is your title at the FBI?

17   A.  Special agent.

18   Q.  What group are you assigned to in the FBI?

19   A.  I'm assigned to a squad that investigates violations —

20   securities fraud, commodities fraud, money laundering, and

21   other white collar offenses.

22   Q.  Can you describe, generally, what your duties and

23   responsibilities are as a special agent?

24   A.  Sure.

25           So I investigate violations of federal law, I collect

1    evidence, interview witnesses, execute search warrants, execute

2    arrest warrants.

3    Q.  Did there come a time where you became involved in the

4    investigation of someone named Avraham Eisenberg?

5    A.  Yes.

6    Q.  What is your role in that investigation?

7    A.  I'm the case agent.

8    Q.  So let's pause on this.  We've heard a lot about agents in

9    the FBI.

10          What's the difference between a special agent and a

11   case agent?

12   A.  So a case agent is the special agent that's assigned to a

13   particular investigation.  So the case agent is responsible for

14   all investigative matters in that case.

15   Q.  And you said you were assigned to FBI New York; is that

16   right?

17   A.  Correct.

18   Q.  Where is your office located?

19   A.  26 Federal Plaza, kind of across the street from here.

20   Q.  When an investigation is operated out of a specific field

21   office, what does that mean for the case agent?

22   A.  Sorry, could you repeat that?

23   Q.  What are the duties and responsibilities of a case agent on

24   a particular case?

25   A.  All investigative aspects of the case.  So, collecting

NB9KEISH                          Racz - Direct

1   evidence, interviewing witnesses, whatever investigative

2   activities take place.

3   Q.   Which field office was in charge of the investigation of

4   Avraham Eisenberg?

5   A.   The New York field office.

6   Q.   I want to turn your attention to December 26, 2022.

7   A.   Okay.

8   Q.   Did law enforcement take any investigative steps on that

9   day with respect to Mr. Eisenberg?

10  A.   Yes.

11  Q.   What, if any, steps did they take?

12  A.   They effected the arrest of Mr. Eisenberg.

13  Q.   Did there come a time where you learned that law

14  enforcement had seized devices when Mr. Eisenberg was arrested?

15  A.   Yes.

16  Q.   How did you learn that?

17  A.   From Special Agent Michael Crawford.

18  Q.   When, approximately, did you learn that?

19  A.   Sometime shortly after his arrest, there was a series of

20  conversations we had about multiple devices being seized and

21  that there were -- and then a later conversation that day of

22  more specifics, of what devices, what kind of devices.

23  Q.   Who, if anyone, at the U.S. Attorney's Office for the

24  Southern District of New York did you tell that information to?

25  A.   AUSA Tom Burnett.

NB9KEISH                        Racz - Direct

1   Q.  Let's pause for a second.

2           Where was Mr. Eisenberg arrested?

3   A.  In Puerto Rico.

4   Q.  Were you in Puerto Rico for his arrest?

5   A.  No.

6   Q.  Where were you?

7   A.  I believe I was likely home, but somewhere in the area of

8   my home, at least.

9   Q.  Is that in the Tristate area?

10  A.  It is.

11  Q.  So let's talk now about the devices that were seized.

12          What, if anything, did you do to request those devices

13  come to New York?

14  A.  I asked Special Agent Crawford to have the devices checked

15  into evidence and shipped up to the New York evidence control

16  unit.

17  Q.  Why did you do that?

18  A.  So that we can obtain a search warrant, and we couldn't

19  obtain a search warrant until they arrived in the district.

20  Q.  What timeline did you expect them to arrive in the Southern

21  District of New York?

22  A.  I expected them to be shipped promptly and arrive pretty

23  quickly.

24  Q.  Why did you think that?

25  A.  We discussed the urgency of it, and I knew that Special

1   Agent Crawford had submitted a lead to do that promptly.  He

2   had told me that he had checked it into evidence and made that

3   request.

4   Q.  I want to show you what's in evidence as Government

5   Exhibit 158.

6              MR. DAVIS:  Can we pull that up.

7   Q.  Do you recognize Government Exhibit 158?

8   A.  I do.

9   Q.  And is this the lead we're referring to?

10  A.  It is.

11  Q.  Do you see where it says, "Precedence:  Priority"?

12  A.  Yes.

13  Q.  What does that mean?

14  A.  So there's a few default options that you can choose for

15  precedence.  The default of those options is routine, which is

16  like a 60-day default due date, but you can also choose

17  priority and set due dates as well.

18  Q.  Do you have to get any additional approvals to get a

19  priority lead?

20  A.  Some -- I think the practice is you're supposed to -- if

21  another office is involved, you're supposed to contact that

22  field office and notify them that they're getting assigned a

23  priority lead.  This was intradivision, so I don't know if

24  there was approvals outside of the approver of this document.

25  Q.  Understood.

1          When was this lead created?

2    A.   On December 28, 2022.

3    Q.   Do you see where it says due date there?

4    A.   Yes.

5    Q.   What was the due date?

6    A.   July 4, 2023.

7    Q.   What was your expectation, generally, about when these

8    devices would arrive pursuant to this lead?

9    A.   I thought they would be shipped by the 4th of January.

10   Q.   Approximately how long would it take to ship the devices

11   from Puerto Rico to New York?

12   A.   I don't know what the default like FedEx speed is, but

13   probably a couple of days, a few days.

14   Q.   I want to pause here.  You testified that you were in the

15   Tristate area at the time of the arrest, and the investigation

16   was out of the New York field office.

17          Why did law enforcement request that the devices be

18   shipped to New York rather than get a search warrant in Puerto

19   Rico?

20   A.   In my experience, that's been the practice of both the FBI

21   New York office, as well as the Southern District of New York,

22   that was prosecuting the case.

23   Q.   So let's dig into some of the reasons behind that practice.

24          What are some of the reasons why you would seek to

25   have the devices shipped to New York rather than get a search

NB9KEISH                          Racz - Direct

1    warrant in the District of Puerto Rico?

2    A.   There are a number of reasons.

3         One, it's prudent for the court in the district that

4    the case is being prosecuted to be responsible for overseeing

5    search warrants in the matter as well.

6         Another major reason is resources.  It's typical

7    practice for the investigating office to handle investigative

8    steps regarding that office's investigations.  And particularly

9    in this case, FBI New York has significantly more resources

10   than FBI San Juan, and this is a resource-intensive activity.

11   Q.   So let's explain that.

12        When you say "this is a resource-intensive activity,"

13   what do you mean?

14   A.   So it's not just obtaining the search warrant, but then the

15   actual search of the devices, particularly electronic devices

16   that may or may not be readily accessible, there's both

17   software and physical personnel resources that are available in

18   greater quantities, in New York particularly.  And searches of

19   these devices are not -- it's not a one-day thing; they can go

20   on for quite some time, a year or more.

21        In fact, in this particular matter, they've gone on

22   for quite some time, and are still ongoing and requiring the

23   resources of the New York office.

24   Q.   To step back, does FBI San Juan have anything to do with

25   the actual investigation of the crimes in this case?

1    A.   No.

2    Q.   Besides the arrest and seizures that we've been discussing

3    today, were they involved in interviewing witnesses?

4    A.   No.

5    Q.   Were they involved in searching other devices?

6    A.   No.

7    Q.   Were they involved in searching any ESI, stored ESI?

8    A.   No.

9    Q.   I want to talk generally about your general practice in the

10   FBI beyond this case.

11          Can you speak about your general practice of how the

12   FBI operates when devices are seized outside of S.D.N.Y., but

13   the investigation is being run out of the New York field

14   office?

15   A.   Yeah.   In the situations where they're seized outside of

16   the Southern District without a warrant, they have been sent

17   back to the Southern District of New York, and once they

18   arrive, we obtain a search warrant.   That's been my experience

19   throughout the eight or so years that I've been here.

20   Q.   Let's now go back into the time frame when the devices

21   were -- the lead was sent in Puerto Rico.

22          After the lead was put in to send the devices to New

23   York, what is the next step you took with respect to obtaining

24   those devices in New York?

25   A.   I checked to see if they had arrived in New York.

NB9KEISH                          Racz - Direct

1    Q.  And had they arrived yet?

2    A.  No.

3            MR. DAVIS:  I want to pull up what's been marked for

4    identification as Government Exhibit 159.

5    Q.  Do you recognize this document?

6    A.  I do.

7    Q.  What is it?

8    A.  It's a text message thread between myself and another

9    agent, Special Agent Gurdeep Singh.

10   Q.  What's the date of that text message there?

11   A.  It's beginning January 13th of 2023.

12   Q.  Is that a fair and accurate depiction of the screenshot of

13   those text messages?

14   A.  Yes.

15           MR. DAVIS:  The government offers Government

16   Exhibit 159.

17           MR. TALKIN:  No objection.

18           THE COURT:  Admitted.

19           (Government's Exhibit 159 received in evidence)

20   BY MR. DAVIS:

21   Q.  Can we -- the text on the left, are those your text

22   messages?

23   A.  Yes.

24   Q.  Would you read from the top, and I will read Special

25   Agent Singh's texts?

NB9KEISH                        Racz - Direct

1   A.  Sure.

2           "Hey, will you be in today?  Need to contact San Juan

3   evidence and have them ship Eisenberg devices ASAP."

4   Q.  "No.  RDO today.  Do you need something?  I have my laptop

5   with me."

6   A.  "Ah, okay.  I'll try on a proffer break.  Tried yesterday

7   to contact Bianca Cruz who got the evidence lead.  No

8   response."

9   Q.  "Okay, let me try contacting her."

10  A.  "Lead expired over a week ago."

11  Q.  "LOL.  What's happening in PR?"

12  A.  "Cannot get the warrant until the devices are in S.D.N.Y."

13  Q.  All right.  And then it says, "Have an update.  Call when

14  you can"?

15  A.  Yes.

16  Q.  So now I want to focus on the time period between

17  December 26, 2022, when Mr. Eisenberg was arrested, and

18  January 13th of 2023.

19          So focusing on that time period, did law enforcement

20  take any investigative steps in that time period that did not

21  concern the electronic devices that were seized in Puerto Rico?

22  A.  Yes.

23  Q.  What kinds of steps?

24  A.  We continued to interview witnesses in this matter,

25  obtained another search warrant for social media accounts

1    associated with Mr. Eisenberg, and obtained a -- I testified

2    before the grand jury, and we obtained a grand jury indictment.

3    Q.  So let's drill down to that.  So when Mr. Eisenberg was

4    arrested on December 26, 2022, what was the charging

5    instrument?

6    A.  Criminal complaint.

7    Q.  And what is the deadline for the government to indict

8    someone after they've been charged by a criminal complaint

9    where they're detained?

10   A.  Fourteen days.

11   Q.  So now I want to fast forward back to January 13.

12           MR. DAVIS:  Let's pull down Government Exhibit 159.

13           And I want to show Government's Exhibits 160 and 161,

14   side by side, please.

15   Q.  Do you recognize these documents?

16   A.  I do.

17   Q.  What are they?

18   A.  They are screenshots of call logs that Special Agent Singh

19   prepared for this proceeding.

20   Q.  Are they fair and accurate screenshots of those call logs?

21   A.  Yes.

22           MR. DAVIS:  The government offers Government

23   Exhibits 160 and 161.

24           MR. TALKIN:  No objection.

25           THE COURT:  Those are admitted.

NB9KEISH                          Racz - Direct

1              (Government's Exhibits 160 and 161 received in

2      evidence)

3      BY MR. DAVIS:

4      Q.  What are the dates of those calls?

5      A.  January 13th.

6              MR. DAVIS:  I want to now turn back to Government

7      Exhibit 158 for a moment.

8      Q.  Turning down to the bottom, can you see where it says "Lead

9      fully covered"?

10     A.  Yes.

11     Q.  What was the date that the lead was fully covered?

12     A.  January 13, 2023.

13     Q.  Is that the same date as those calls that we just saw?

14     A.  Yes.

15     Q.  Did there come a time where -- well, let me pause there for

16     a second.  Do you know why the lead wasn't completed on the

17     original due date?

18     A.  No.

19     Q.  Did there come a time when the devices did arrive in the

20     Southern District of New York?

21     A.  Yes.

22             MR. DAVIS:  I want to show what's been marked for

23     identification as Government Exhibit 163.

24     Q.  What is Government Exhibit 163?

25     A.  It's an email that I sent to the FBI New York evidence

NB9KEISH                           Racz - Direct

1   control unit on January 17th, 2023.

2   Q.  Can you read the body of that email?

3   A.  Sure.

4        "Evidence:  You should be receiving evidence items 1B1

5   through 1B5 for 318CNY3671011 from FBI San Juan evidence.

6   Please let me know when you receive them.  They arrived via

7   FedEx today, and I will check them out."

8   Q.  Is this a fair and accurate copy of that email?

9   A.  Yes.

10       MR. DAVIS:  The government offers Government

11  Exhibit 163.

12       THE COURT:  It's admitted.

13       (Government's Exhibit 163 received in evidence).

14       MR. DAVIS:  And now I want to pull what's in evidence

15  as Government Exhibit 166.

16       And can we look on the right side.

17  BY MR. DAVIS:

18  Q.  There is a box that says "Accepted Custody 1/17/23."

19       Do you see that?

20  A.  Yes.

21  Q.  Can you read, under the reason, what it says?

22  A.  "Checkout."

23  Q.  And on the right side, do you see "Received from San Juan"?

24  A.  Oh, the one above it?

25  Q.  Yes.

1    A.  Yes.  Sorry, yes, I do.

2    Q.  That says, "Received from San Juan"?

3    A.  Correct.

4    Q.  What's the time?

5    A.  1:15 p.m.

6    Q.  And then below it, there's another entry.  Do you see that?

7    A.  Right.

8    Q.  Whose entry is that?

9    A.  That's my entry.

10   Q.  And what's the reason?

11   A.  Checkout.

12   Q.  And what is the time?

13   A.  1:45 p.m.

14          MR. DAVIS:  We can take that down.

15   Q.  Did there come a time where you obtained a search warrant

16   for these devices?

17   A.  Yes.

18          MR. DAVIS:  Can we show Government Exhibit 167?

19          THE COURT:  Mr. Talkin, is there a dispute from

20   January 17th until January 19th as to what transpired?

21          MR. TALKIN:  No.

22          THE COURT:  Okay.

23          Just to maybe speed things along, if it is possible

24   here.

25          MR. DAVIS:  Of course.  I'm happy to do so.

NB9KEISH                        Racz - Direct

1          THE COURT:  Now, Mr. Talkin, you would agree with the

2     government's account of what occurred from January 17th to

3     January 19th; is that fair?  Or are there any disputes there

4     that we need to cover?

5          MR. TALKIN:  I don't think -- one second.

6          (Counsel confer)

7          MR. TALKIN:  Your Honor, there is not a dispute.  The

8     only thing is timing-wise, because, obviously, that's what

9     we're getting at.  Because if you remember from all the filings

10    in this case, there is an argument about a day or two because

11    the government says that they presented it for signing to the

12    Court on the 18th, when it was like 6:00 o'clock at night.  So

13    the only dispute --

14         THE COURT:  I think that's in the papers.

15         MR. TALKIN:  That's in the papers, that's what I'm

16    saying, but I just don't want to waive --

17         THE COURT:  Oh, no, you're not waiving anything.

18         MR. TALKIN:  Other than that --

19         THE COURT:  I'm wondering if there is a factual

20    dispute that would need to be addressed here?

21         MR. TALKIN:  The answer to that is no.

22         THE COURT:  Okay.

23         All right.  Mr. Davis, I'm happy to let you proceed,

24    but just to make it easier.

25         MR. DAVIS:  No, Judge, I'm happy to trim down.  I

1    think I want to ask one kind of background question, but just

2    to be clear, before then, I would like to offer into evidence

3    Government Exhibit 167, which is the search-and-seizure

4    warrant, and then also --

5             THE COURT:  That document will be admitted.

6             (Government's Exhibit 167 received in evidence)

7             MR. DAVIS:  -- the emails, I think, that my colleague

8    in opposition is referencing, which are Government Exhibits 164

9    and 165 and 113.  These are DOJ emails, including the ones to

10   the Court and the email to Jessica Peck on the night of the

11   arrest.

12            THE COURT:  Any objections to those?  And those were

13   emails that were attached to the government's papers.

14            MR. TALKIN:  No objection.  I just wanted -- the

15   Jessica Peck one, can I just have one minute?  On the other

16   stuff, so there's no objection.

17            THE COURT:  Of course.

18            (Pause)

19            MR. TALKIN:  That's fine.

20            THE COURT:  Those are admitted.

21            (Government's Exhibits 113, 164, and 165 received in

22   evidence)

23   BY MR. DAVIS:

24   Q.  Last question, Special Agent Racz:  Can you just talk about

25   the process for getting a search warrant from a magistrate

NB9KEISH                          Racz - Cross

1   judge for a second?  How does it work, and how is it presented?

2   A.  Sure.

3        So a warrant affidavit and application is prepared,

4   it's typically sent to Magistrate Court in advance so they have

5   the opportunity to review it, and, depending on the magistrate,

6   they may require either an in-person swearing to that affidavit

7   or some, these days, do it telephonically.

8   Q.  Typically, does the U.S. Attorney in the district in which

9   the warrant is sought coordinate with the Court?

10  A.  Yes.

11           MR. DAVIS:  Can I have one moment, your Honor?

12           THE COURT:  Of course.

13           (Pause)

14           MR. DAVIS:  No further questions at this time, Judge.

15           THE COURT:  Okay.  Thank you.

16           Mr. Talkin?

17  CROSS-EXAMINATION

18  BY MR. TALKIN:

19  Q.  Good evening.

20  A.  Good evening.

21  Q.  I'm not going to focus on after the 17th, so everything I'm

22  asking you about, in case there's any question, is before that.

23  A.  Understood.

24  Q.  The lead was supposed to be filled by, at the latest,

25  January 4th of 2023, correct?

1   A.   Right.

2   Q.   And as the lead case agent, it's your -- it was, at that

3   time, your responsibility to see if the lead was fulfilled or

4   not, correct?

5   A.   The lead is not assigned to me, so it's the responsibility

6   of the lead, whoever it's assigned to, to make sure that that's

7   fulfilled.

8   Q.   And that's assigned to an FBI agent, correct?

9   A.   Incorrect.

10  Q.   It's assigned to an employee of the federal government?

11  A.   Yes.

12  Q.   Someone under the control of the FBI?

13  A.   Yes.

14  Q.   It is not assigned to Avraham Eisenberg, is it?

15  A.   No.

16  Q.   And at some point in time -- well, you know that as of the

17  28th -- or as of the arrest on the 26th of '22, you wanted to

18  get those devices to New York as soon as possible, correct?

19  A.   Yes.

20  Q.   Because you know about the Smith case, and you know the

21  time is ticking, correct?

22  A.   I don't -- I don't know what "time is ticking" means.

23  Q.   Okay.  You knew that there are requirements on the

24  government, meaning the FBI and the U.S. Attorney's Office, to

25  have phones, devices, like electronic devices, searched very

NB9KEISH                        Racz – Cross

1    promptly?

2    A.  I know it's supposed to be a reasonable period of time.

3    Q.  Correct.

4            I'm not asking you what that period of time is, but

5    you know that time is of the essence?

6    A.  I know that it needs to be -- a search warrant needs to be

7    obtained in a reasonable amount of time.

8    Q.  And you knew that's why it was made a priority to get to

9    you, meaning that is why Crawford made it a priority to get to

10   you because you had requested they get it to you as fast as

11   possible?

12   A.  Yes.

13   Q.  And that was based on your knowledge that if you wanted to

14   search the phone, you needed to get the search warrant as soon

15   as possible?

16           MR. DAVIS:  Objection.

17           THE COURT:  Grounds?

18           MR. DAVIS:  Asked and answered.

19           THE COURT:  That's overruled.

20           THE WITNESS:  Sorry, could you repeat it, then?

21   BY MR. TALKIN:

22   Q.  I hope so.

23           THE COURT:  Or ask your next question.

24   Q.  The reason that you let Crawford know that you wanted to

25   get it to New York as soon as possible was so that you could

NB9KEISH                        Racz - Cross

1   get the search warrant done as soon as possible to satisfy this

2   time restraint that is upon the FBI and the government?

3   A.   Again, I don't know that there's, like, a time constraint.

4   We need to get it in a reasonable amount of time, so I

5   wanted --

6   Q.   You didn't tell them get it to me whenever you want, right?

7   A.   No.

8   Q.   You told them to get it to me as soon as you can?

9   A.   I probably just -- I don't recall exactly what I said.   I

10  would have said to please ship the devices to New York, and it

11  would be understood that it should be done promptly.

12  Q.   Did you request it be done by priority?

13  A.   I don't remember exactly what I told them.

14  Q.   Did you impart any wisdom upon Agent Crawford that would

15  make him think you wanted it priority?

16  A.   Yeah, I expressed the desire that I had, that I wanted it

17  to get to New York quickly and so that we could obtain a

18  warrant.

19  Q.   And you knew that quickly to you was by the outside date

20  January 4th of 2023?

21  A.   I knew that once I saw the actual lead, which I wouldn't

22  have seen for a number of days.   He just told me that he

23  checked it into evidence and that he instructed evidence, via

24  lead, to ship it to New York.

25  Q.   And then it didn't get to New York, and eight days went by

1    before you even did anything to see where that phone was,

2    correct?

3    A.  Well, I think eight days probably went by before I was ever

4    in the office again because I was on leave for that entire

5    week, but still working on this matter.

6    Q.  But you're not the only FBI agent in New York, are you?

7    A.  I was the one assigned to this investigation.

8    Q.  Right, you were assigned to this investigation.

9           So the reason the eight days -- and I'm not trying to

10   be personally hard to you, but the reason that you didn't do

11   anything during those eight days is because you were on

12   vacation?

13          MR. DAVIS:  Objection.

14          Withdrawn.  Sorry.

15          THE COURT:  You can answer.

16          THE WITNESS:  I didn't see the actual physical lead

17   during those days because I think I would have come back into

18   the office on the 3rd of January, with the 2nd being the

19   federal holiday, one of multiple in this time frame, but I did

20   actually other investigative steps during that time.  I can't

21   see that lead unless I'm physically present in the office.

22   Q.  I understand.

23          But you know that you don't have the phone?

24   A.  Well, I wouldn't even know if evidence had received it

25   because I'm not in the office.

NB9KEISH                        Racz - Cross

1   Q.  But you had said that you wanted to get the phone so you

2   could do the search warrant, right?

3   A.  Right.  So it --

4   Q.  And you wanted to do the search warrant?

5   A.  I wanted to obtain a search warrant, yes.

6   Q.  So it should have crossed your mind that you wanted to find

7   out where that phone was before --

8   A.  Well, what I was told was that the devices were checked

9   into evidence on the 28th and that they were being shipped, and

10  then I would be in the office, like, two or three business days

11  later.

12  Q.  Which is, what, the 4th?

13  A.  The 3rd or the 4th.

14  Q.  Or the 3rd.

15          So let's talk about the 5th of January, the 6th of

16  January, the 7th of January, the 8th of January, the 9th of

17  January, the 10th of January, the 11th of January, and the 12th

18  of January.

19  A.  Okay.

20  Q.  During that time period, you didn't do anything to find out

21  why that phone wasn't in New York?

22  A.  I periodically checked to see if they were in New York.  I

23  don't control the shipping of the device or monitoring FedEx,

24  typically, so I was waiting, and, in the interim, on, I believe

25  it was, the 6th, we obtained another warrant in this matter,

NB9KEISH                        Racz - Cross

1   and on the 9th, I testified before the grand jury.

2          MR. TALKIN:  Can we pull up Defendant's A for ID,

3   please.

4   Q.  Is this the warrant you were talking about that you did

5   during the time?  You just said you did another warrant.  Is

6   this the warrant, the warrant for --

7   A.  Yes, it is.

8   Q.  -- communications?

9          So in this warrant that you did on January 6th — or it

10  was signed on January 6th, so you worked on it around there —

11  you did not write the affidavit, did you?

12  A.  I did not draft the initial affidavit, no.

13  Q.  The government did, correct?

14  A.  Correct.

15  Q.  And you looked it over, of course, before you signed it,

16  and you signed it, right?

17  A.  Well, I review it, we discuss any edits, and --

18  Q.  Then you sign it?

19  A.  Yeah.

20  Q.  And this particular -- going to the last page -- well, this

21  particular warrant was done remotely, correct?

22  A.  I don't know.  Can I see the --

23  Q.  Yes, we'll go to the last page for you.

24          MR. TALKIN:  Your Honor, I'll offer this into evidence

25  as well.  It's Defendant's A.

NB9KEISH                    Racz – Cross

1              MR. DAVIS:  No objection.

2              THE COURT:  It will be admitted.

3              (Defendant's Exhibit A received in evidence)

4    BY MR. TALKIN:

5    Q.  Looking at that, does that refresh --

6    A.  It seems that it would have been, yes.

7    Q.  It seems or it is?  It was done electronically.

8    A.  Well, yeah, someone affixed my electronic signature, so I

9    assume I was not physically present, yeah.

10   Q.  On the left side, it says it was, "Sworn to me through the

11   transmission of this affidavit through reliable electronic

12   means," correct?

13   A.  Yes, it does.

14   Q.  At no time did you ever try to file a search warrant in

15   Puerto Rico using electronic means, did you?

16   A.  I did not, no.

17   Q.  At no time did you fly down there and try to get a search

18   warrant regarding the devices?

19   A.  No.

20   Q.  At no time did you arrange for the government here to

21   prepare an affidavit for the United States Attorneys down in

22   Puerto Rico?

23   A.  Did I?  No, I did not arrange for that.

24   Q.  To your knowledge, did the government, the ones you were

25   working with closely on this case, take the time to arrange for

1    a warrant to be sworn out for these devices down in Puerto

2    Rico?

3    A.  No.  We were planning to swear out a warrant in the

4    Southern District of New York.

5    Q.  And you didn't change that plan around the 10th, 11th,

6    12th, 13th of January, when you realized that you didn't have

7    the devices?

8    A.  No.  It would still be quicker if they would just

9    physically ship the devices since we've already prepared to get

10   the warrant in the Southern District.

11   Q.  Right.

12        It takes a long time to change the top of a document

13   from Southern District of New York to the District of Puerto

14   Rico; is that why?

15   A.  It's not that.  The districts have their own warrant

16   requirements, their own format, whether another agent would be

17   required to swear it out, you'd have to convey the probable

18   cause to them.  It's typically a much more involved process

19   than just getting the devices and submitting it here.

20   Q.  But if you could have done it electronically --

21   A.  I have no idea whether I could have done it electronically.

22   Q.  Right, but you know he was presented when he was arrested,

23   right?  Remember when Mr. Eisenberg was presented initially?

24   A.  I know he was presented, but that doesn't affect -- that

25   doesn't give me any knowledge whether or not --

NB9KEISH                        Racz - Cross

1   Q.  Before you say --

2   A.  -- the District of Puerto Rico would have required

3   in-person swearing the warrant.

4   Q.  Of course, but — but — you know that that initial

5   presentment was done electronically?

6   A.  I don't recall.

7   Q.  You're aware now that that was the case?

8   A.  That he was presented electronically?

9   Q.  The initial presentment.

10  A.  I mean, he was in New York.  You're saying --

11  Q.  No, I'm talking about in Puerto Rico.

12  A.  I'm sorry, in Puerto Rico.

13          He was -- he presented over video or something?

14  Q.  Yes.

15  A.  I don't know.

16  Q.  And the basic format of the warrant that you did on

17  January 6th is not very different, except for maybe a page or

18  two about electronics, than the affidavit you would ultimately

19  have prepared for the January 19th warrant for the electronics,

20  correct?

21  A.  Sorry, are you asking whether the stored communications

22  warrant --

23  Q.  Right.

24          I mean, it was obviously different, but it wasn't

25  drastically different; most of the pages were the same?

NB9KEISH                    Racz - Cross

1    A.  It incorporates a lot of the same things, I'm sure.

2    Q.  And you talked about resources -- well, let me ask you

3    this:  You didn't want to issue the -- your understanding is

4    you didn't want to do the -- it wasn't prudent, in your

5    opinion, to do the warrant in Puerto Rico because it had --

6    once you did the warrant there, it would have to be searched in

7    Puerto Rico; is that your understanding?

8    A.  It wouldn't necessarily have to be, but, typically, if

9    you're going to obtain the warrant somewhere else, the initial

10   search should probably take place there because there's a time

11   constraint on the warrant.

12   Q.  Right, there's a time constraint, but someone can get it on

13   a plane or a FedEx to New York in one day, and you could use

14   all the resources that you were just talking about in New York

15   on a warrant that was executed in Puerto Rico, correct?

16   A.  I'm not sure someone would authorize a plane to fly these

17   devices.

18   Q.  Correct, but you could FedEx them?

19   A.  They were FedExed.

20   Q.  They were.

21          But you're talking about the reasons that you wouldn't

22   go get one in Puerto Rico was because the resources were all in

23   New York, correct?  Didn't you say that that was one of the

24   reasons?

25   A.  The resources are all in New York, but once the warrant is

NB9KEISH                         Racz - Cross

1   obtained, you have to begin the search within 14 days, and

2   there could be a number of things happen where the devices

3   don't actually arrive or get rerouted or lost or -- and you

4   can't actually begin that search.

5   Q.  Right.

6          So one thing that could happen is you could have made

7   sure, by going down there and getting it and bringing it back,

8   right?  You could have done that?

9   A.  I do not think I could have done that.  I'm not sure --

10  Q.  Well, you physically --

11  A.  -- funding would have been authorized to do that.

12  Q.  So, basically, the reason you didn't do that was the

13  convenience of saving the government money, right?

14  A.  The reason I didn't fly down to get --

15  Q.  Yes.

16         You just said that you wouldn't get authorized to fly

17  down there and grab the phone and bring it back to New York to

18  use all the great resources you talked about because it

19  wouldn't be funded by the government.

20         That's the reason?

21  A.  I don't think that's the reason.

22  Q.  Okay, that's a reason.  You'll agree with me that's a

23  reason, right?

24  A.  A reason?  It would not be authorized for me to fly down to

25  collect the devices.  It would be a waste of money, yes.

1  Q.  It would have been a waste of the government's money to try

2  to make sure the devices were searched quickly, correct?

3  A.  No.

4  Q.  If you had gotten the search warrant quickly in Puerto

5  Rico, you could have gotten it to New York and done all the

6  work that you were talking about in New York as far as

7  searching the phone, correct?

8  A.  I don't know that, because there's a lot of variables at

9  play that...

10 Q.  Well, you were concerned about those 14 days, right?  You

11 just said to the Court that, well, there's 14 days, and we have

12 to start the search within 14 days; if we don't, we have a

13 problem, right?  That was one of your concerns?

14 A.  Well, that was a concern of the hypothetical example that

15 you gave me.

16 Q.  Correct.

17 A.  In reality --

18 Q.  Was that --

19 A.  -- the devices were being shipped, so that wasn't a concern

20 of mine.

21 Q.  So you could have gotten the warrant down there the day you

22 learned that there was no -- the day you learned that it hadn't

23 been shipped on the 5th or the 6th or the 7th or the 8th, you

24 could have gotten a warrant down there and known it was coming

25 to New York, and you could have searched it here, right?

NB9KEISH                    Racz - Cross

1   A.  I didn't follow.

2   Q.  Sure.

3          You're talking about -- you're trying to say, or

4   you're telling the Court, that one of the reasons that you

5   didn't want to get the search warrant done in Puerto Rico is

6   because all the resources to get it done are up here in New

7   York, correct?  You said that on direct examination.  Not all,

8   but the resources are here in New York to get it done quicker?

9   A.  There's many reasons -- I said there was many reasons, and

10  the investigating office is, in my experience, always the one

11  that obtains the warrant and processes --

12  Q.  Right, but that's just FBI policy, that's a decision made

13  by the FBI, right?  There's no law behind that.  That's just an

14  FBI policy.  That's a decision the FBI makes without consulting

15  Avraham Eisenberg about what they're going to do with his

16  phone, right?  The FBI makes that decision?

17  A.  Yes.

18  Q.  And the FBI is empowered to make the opposite decision, to

19  make sure that the phone gets to New York quickly, correct?

20  They could, they could have flown you down there if they wanted

21  to make that decision.  Nothing was stopping you other than

22  funding and authorizations within the bureaucracy of the FBI?

23  A.  I don't know about that.

24  Q.  Or a fellow agent.  Or we could have had a Puerto Rican FBI

25  agent who you worked with fly it up here with them if it was so

1    urgent, right?  That could have happened, and it didn't?

2    A.  I've never seen anything like that happen.

3    Q.  Or you could have had an FBI agent that you're working with

4    go to property, take it themselves, FedEx it themselves to you,

5    and make sure it came up; you could have done that as well?

6    A.  No, I don't think that would follow the protocol of the

7    evidence control unit.

8    Q.  Right.

9         So you're saying that protocols of the FBI also were

10   an inhibitor to the phone getting to New York quickly?

11   A.  Well, there's evidence handling requirements.

12   Q.  I understand.

13        But it ultimately did get sent by FedEx, right?

14   A.  It did.

15   Q.  So there's a process for the FBI to get a phone to FedEx?

16   A.  Yes, through the evidence control unit.

17   Q.  So the evidence control unit could have done that quicker

18   upon the prodding of the FBI office in New York?

19   A.  That was what we sought.

20   Q.  And when it wasn't done, you just let it go?

21   A.  I called the actual individual that was assigned the lead

22   and tried to contact her directly, and I didn't get a hold of

23   her.  And then I had another agent call the office -- another

24   agent that they knew in that office and physically go down to

25   the evidence control unit themselves to request that they be

1    shipped immediately.

2    Q.  And all that happened -- everything you just described

3    happened approximately two and a half weeks after the arrest in

4    this case?

5    A.  I don't know if it's -- after the arrest?

6    Q.  After the arrest and the seizure.

7    A.  It was the 26th to the 12th, I guess.

8    Q.  To the 13th?

9    A.  No, because the calls were made on the 12th.

10   Q.  So the 26th to the 12th.  My math, it's pretty close, two

11   and a half weeks.

12   A.  Sorry.  Go ahead.

13           THE COURT:  Mr. Talkin, anything further?

14           MR. TALKIN:  I don't think so.  I'm just checking my

15   list, your Honor.  Thank you.

16           (Pause)

17           MR. TALKIN:  Let me check with my learned colleagues,

18   and then I think I'm done.

19           THE COURT:  Of course.

20           (Pause)

21   BY MR. TALKIN:

22   Q.  Throughout your career, you have had warrants sworn out in

23   other districts, correct?

24   A.  Yes.

25           MR. TALKIN:  Nothing further.

1          THE COURT:  Mr. Davis?

2          MR. DAVIS:  Briefly, your Honor.

3    REDIRECT EXAMINATION

4    BY MR. DAVIS:

5    Q.  I want to speak a little bit about your general experience

6    in the FBI.

7          Approximately how many arrests have you participated

8    that didn't occur in S.D.N.Y.?

9    A.  Where I was physically there or just generally involved in?

10   Q.  Generally involved in.

11   A.  I don't know.  Around 20, maybe.

12   Q.  When devices were seized in those investigations, were they

13   shipped back to New York?

14         MR. TALKIN:  Objection to the relevance.

15         THE COURT:  It's overruled.

16         THE WITNESS:  In my experience, I'm not aware of any

17   warrant being obtained out of district when the devices were

18   seized without the warrant -- without a warrant, sorry.  They

19   were always shipped back to the investigating office for a

20   warrant to be obtained.

21   BY MR. DAVIS:

22   Q.  And, just to be clear, to test your memory, is there was

23   one occasion where there was an exigent circumstance that comes

24   to mind where you would get a warrant out of district?

25   A.  There's one situation that comes to mind, but the warrant

NB9KEISH                         Racz - Recross

1  had already been obtained, it was just that the office in which

2  the warrant was executed, that local FBI field office processed

3  one of the devices due to exigent circumstances of the device

4  needed to be kept awake and unlocked.

5  Q.  Turning back to the date of the arrest and the seizure,

6  what was your expectation of when those devices were going to

7  arrive in New York?

8  A.  Promptly.

9  Q.  Is that reasonable, in your mind?

10           MR. TALKIN:  Objection.

11           THE WITNESS:  Yes.

12           MR. DAVIS:  One moment, your Honor?

13           (Pause)

14  BY MR. DAVIS:

15  Q.  Did you experience in arrests out of district and shipping

16  those devices back to New York inform your decision in this

17  case to ship the devices here to New York?

18  A.  Yes.  It's what we've always done.  It's what I've always

19  done and what anyone I know has done.

20           MR. DAVIS:  Nothing further, your Honor.

21  RECROSS EXAMINATION

22  BY MR. TALKIN:

23  Q.  I think what I just heard you say on redirect examination

24  is when an exigency exists, the FBI is able to accommodate it

25  and satisfy the exigency, right?

NB9KEISH                         Racz - Recross

1    A.  Yes.  It depends on the situation.  This was not one of

2    those times.

3    Q.  This case wasn't, right?  You're saying this case was not

4    one of those times?

5    A.  This particular -- the shipping of the devices was a

6    standard process that had been followed for many years from

7    everyone I know that does it.

8    Q.  Right.

9          So the FBI made the determination what the standard

10   policy is, correct?

11   A.  Made the determination of what the policy is?

12   Q.  You just said it was the standard -- this is what happens

13   standard, so that's how it works, that's basically what you're

14   saying, right?

15   A.  I think your initial question was about exigency, and this

16   was not exigency.

17   Q.  I apologize, I thought we had moved on from there.

18         Then you had said, well, this is how it works, this is

19   the standard policy?

20   A.  Right, this is the standard practice -- I don't know, you

21   keep saying policy, but it's the standard practice --

22   Q.  Let's define "this," just so we're clear.  When you say

23   "this," you're talking about the shipping of a device?

24   A.  Sorry, I'm not tracking what the original --

25   Q.  You're saying this is the standard policy or practice.

When you use the word "this," what are you referring to?

A.   The shipment -- so when devices have been seized out of

district, and a warrant is required to then search them, the

standard practice is to ship the devices to the investigating

office so that a warrant could be obtained in the district in

which the investigation is being prosecuted or investigated.

Q.   That's what I thought you said.

          So the timing of the shipping and how the shipping is

done is determined by the standard practices in the FBI?

A.   I don't know about timing.  The device -- the standard is

that the devices are shipped back, and when that happens, I've

seen it happen -- I've seen it take longer than this, I've seen

it come quicker than this.

Q.   But we're talking about this case, and it was your

responsibility to get the phone, wasn't it?

A.   And I did.

Q.   You did after two and a half weeks, correct?

A.   That's when they arrived, yep.

Q.   Correct.

          And you didn't do anything in between there -- you

didn't do anything in between that period of time to get a

warrant in Puerto Rico, correct?

A.   Because I was doing things to get a warrant in the Southern

District --

Q.   That's the because, but the answer is you didn't do

NB9KEISH

1   anything, right?

2   A.   There was no reason for me to do that.

3   Q.   Because of the standard FBI practices?

4   A.   Because the devices were being shipped to New York to

5   obtain a warrant in the Southern District of New York.

6            MR. TALKIN:   Nothing further.

7            THE COURT:   Agent Racz, just one question:   There was

8   the text message that said, "LOL.   What is happening in PR"?

9            THE WITNESS:   Yes.

10           THE COURT:   When you called down to PR, to Puerto

11  Rico, did you ask what was going on or what the reason for the

12  delay was?

13           THE WITNESS:   So I called the evidence technician that

14  was assigned the lead to ship it, and I get ahold of her.   It

15  was another agent, a Special Agent Gurdeep Singh, that spoke to

16  another agent in that field office --

17           THE COURT:   Okay.

18           THE WITNESS:   -- who went to the evidence control unit

19  directly and spoke to somebody in that unit to have them ship

20  it, and then right after that, it was shipped.

21           THE COURT:   Okay.   Did you talk to Agent Singh about

22  what the reason was for any delay in shipping the devices to

23  New York?

24           THE WITNESS:   I don't recall him saying what the

25  reason for the delay was, just that it was being handled, no.

NB9KEISH

1          THE COURT:  So you don't know why there was any delay

2     in shipping the devices?

3          THE WITNESS:  I don't, but this was -- the arrest

4     occurred on a federal holiday of Christmas, there was New

5     Year's Day the next week, there was a lot of -- probably not a

6     lot of people in the office.

7          MR. TALKIN:  I object to the conjecture.

8          THE COURT:  Yes, I'm not going to consider that

9     answer.

10          But you don't know, one way or the other, what the

11     reason was; is that fair?

12          THE WITNESS:  I don't know.

13          THE COURT:  Okay.  Thank you, Agent Racz.  I

14     appreciate it, coming here so late.  So thank you.

15          THE WITNESS:  Yes.

16          (Witness excused)

17          THE COURT:  I think we made it.

18          So anything else to proffer or add to the record here?

19          MR. TALKIN:  There may be.  I have to talk to the

20     government.

21          The prior inconsistent statements, I may -- usually I

22     work out a stipulation.  My understanding of the law is when

23     they don't remember, that's the equivalent of a denial,

24     otherwise we'd be in a situation where a witness would just say

25     I don't remember saying that, I don't remember saying that.

NB9KEISH

1    I'll hash that out with the government, I'm sure they have a

2    differing view, but the law is the law.  We'll work that out.

3            Also, the accuracy of the documents was put into

4    question by the government.  I think that I would call a

5    witness, the person who took that, to say whether or not they

6    take accurate notes or not or they take wrong notes.  Again, I

7    usually work that out in a stipulation.  I'm asking your Honor

8    to let us work through that.  If we can't get to a solution,

9    then we'll inform the Court, but I think that those items, in

10   my experience, are able to be worked out because there's really

11   no dispute about certain things.  It's just whether or not it's

12   appropriate or not by the different points of view.

13           THE COURT:  Okay.  That's fine.

14           Mr. Davis, do you have anything to add there?  I'm

15   happy for the parties to discuss, and if you can't resolve the

16   issue, you can contact the Court jointly, and I'll figure it

17   out.

18           MR. DAVIS:  Yes, we'll discuss with counsel and come

19   to a resolution.

20           THE COURT:  Okay.  Let's say if you can't work it out,

21   contact the Court by this coming Wednesday.  And you can just

22   jointly call chambers.  We'll be there.

23           Anything else?

24           MR. DAVIS:  Nothing from the government, your Honor.

25           THE COURT:  I have one question just about what's at

NB9KEISH

1    issue in the motion.  So we have the electronics, and then we

2    have everything else.  Now, the motion has been presented as to

3    everything, but, obviously, the inquiry has been focused on

4    these electronics.

5            So, from the government's perspective, is it planning

6    to use anything other than the electronics, and, if not, can

7    the parties meet and confer and maybe take that off the table?

8    There's been no presentation of evidence or really argument

9    concerning the other items that were seized on the date of the

10   arrest.

11           MR. DAVIS:  Your Honor, can we include this in our

12   update to the Court on Wednesday?

13           THE COURT:  Absolutely.

14           MR. TALKIN:  And, your Honor, we'll confer.  I just

15   want to point out that although we didn't argue about it at the

16   hearing, we made the motion --

17           THE COURT:  That's why I asked the question.

18           MR. TALKIN:  There's been no evidence to the contrary.

19           THE COURT:  So it may be that it's a nonissue because

20   those pieces of evidence are not going to be used, but I'll

21   look to the parties to give me an update, and if it's still an

22   issue, then the Court will rule on it.

23           Anything else, Mr. Davis?

24           MR. DAVIS:  No, your Honor.  Thank you.

25           THE COURT:  Anything else, Mr. Talkin?

NB9KEISH

1            MR. TALKIN:  No.  Thank you, your Honor.

2            THE COURT:  All right.  I really appreciate everyone

3      staying here so late, and I'm pleased that we were able to get

4      through all these witnesses and be done with this.  I'll take

5      the motion under advisement.  You'll have a decision shortly on

6      that, as well as we're also working on the motion to dismiss,

7      which I understand is still pending.

8            MR. DAVIS:  Thank you, your Honor.

9            THE COURT:  Thank you so much.

10            (Adjourned)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        INDEX OF EXAMINATION

 2    Examination  of:                        Page

 3    GENNARO ITRI

 4    Direct By Mr. Burnett . . . . . . . . . . . . 3

 5    Cross By Mr. Greenspan . . . . . . . . . . . .18

 6    MICHAEL CRAWFORD

 7    Direct By Mr. Davis . . . . . . . . . . . . .28

 8    Cross By Mr. Talkin . . . . . . . . . . . . .60

 9    Redirect By Mr. Davis . . . . . . . . . . . .85

10    PEDRO AMADOR

11    Direct By Ms. Huang  . . . . . . . . . . . .90

12    Cross By Mr. Greenspan . . . . . . . . . . . 101

13    Redirect By Ms. Huang  . . . . . . . . . . . 108

14    CRISTINE PEREZ

15    Direct By Mr. Burnett . . . . . . . . . . . 109

16    Cross By Mr. Talkin . . . . . . . . . . . . 129

17    Redirect By Mr. Burnett . . . . . . . . . . 141

18    Recross By Mr. Talkin . . . . . . . . . . . 144

19    BRANDON RACZ

20    Direct By Mr. Davis . . . . . . . . . . . . 145

21    Cross By Mr. Talkin . . . . . . . . . . . . 161

22    Redirect By Mr. Davis . . . . . . . . . . . 177

23    Recross By Mr. Talkin . . . . . . . . . . . 178

24                      GOVERNMENT EXHIBITS

25    Exhibit No.                        Received
```

1    103 and 103A  . . . . . . . . . . . . . . . . 6

2    102    . . . . . . . . . . . . . . . . . . . .29

3    104, 104A, and 104B   . . . . . . . . . . . .31

4    106    . . . . . . . . . . . . . . . . . . . .44

5    112    . . . . . . . . . . . . . . . . . . . .46

6    110    . . . . . . . . . . . . . . . . . . . .49

7    111    . . . . . . . . . . . . . . . . . . . .50

8    101    . . . . . . . . . . . . . . . . . . . .53

9    157    . . . . . . . . . . . . . . . . . . . .54

10   158    . . . . . . . . . . . . . . . . . . . .58

11   168    . . . . . . . . . . . . . . . . . . . .97

12   115    . . . . . . . . . . . . . . . . . . . 106

13   122 to 156   . . . . . . . . . . . . . . . . 120

14   105, 108, and 166   . . . . . . . . . . . . 125

15   109    . . . . . . . . . . . . . . . . . . . 142

16   159    . . . . . . . . . . . . . . . . . . . 153

17   160 and 161   . . . . . . . . . . . . . . . 156

18   163    . . . . . . . . . . . . . . . . . . . 157

19   167    . . . . . . . . . . . . . . . . . . . 160

20   113, 164, and 165   . . . . . . . . . . . . 160

21                       DEFENDANT EXHIBITS

22   Exhibit No.                            Received

23    A  . . . . . . . . . . . . . . . . . . . . 168

24

25