

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

November 28, 2023

**By ECF**
The Honorable Arun Subramanian
Southern District of New York
500 Pearl Street
New York, NY 10007

    Re:    <u>United States</u> v. <u>Avraham Eisenberg</u>, 23 Cr. 10 (AS)

Judge Subramanian:

The evidence at the hearing confirmed that Avraham Eisenberg's motion to suppress devices seized during his arrest (the "Devices") should be denied. The Government seized those devices lawfully and obtained a warrant with a reasonable period of time.

    **A.  The Government Lawfully Seized the Devices.**

The Government seized two cellphones and a laptop during a lawful border search, pursuant to its "plenary authority to conduct routine searches and seizures at the border," *United States v. Flores-Montano*, 541 U.S. 149, 153 (2004), and seized a third cellphone from Eisenberg's person incident to arrest. Even if the Devices had not been lawfully seized at the border, the agents inevitably would have discovered them during a mandatory inventory search.

The arrest plan contemplated that CBP would conduct a secondary inspection of Eisenberg at the border. (GX 103A.) That is what happened. When Eisenberg arrived at the border on the evening of December 26, 2022, CBP TFO Amador took him to a secondary inspection area, searched his luggage, identified his electronic devices, and separated them. (Tr. 94:9-95:15; *see* Tr. 13:15-25, 39:12-24, 113:2-7.) Following the search, Eisenberg was taken to an interview room, placed under arrest, and another cellphone was seized from his person. (Tr. 41:2-25, 15:5-15.) At that point, FBI agents, who were fraud investigators and had received the criminal complaint charging Eisenberg with cryptocurrency manipulation through online accounts, (*e.g.*, GX 104, GX104A), lawfully took custody of Eisenberg and the Devices, effecting the seizure, (Tr. 42:15-43:1, 16:3-20). *See United States v. Babilonia*, 854 F.3d 163, 179-81 (2d Cir. 2017) (holding cellphone seizure warranted when there was probable cause it contained evidence of the offense).

The next day, even though the agents had seized the Devices the night before, SA Perez conducted an inventory search of Eisenberg's luggage. This involved searching the luggage, taking pictures of items of value, and creating property receipts. (Tr. 116:1-120:4; GX 122-156, 106, 110-12.) Because of this FBI-mandatory inventory procedure, *see* GX 101, the agents inevitably would have found the Devices that were in Eisenberg's luggage. And, of course, the agents inevitably would have found the third cellphone on Eisenberg's person because they would not have taken him to jail without first emptying his pockets. (Tr. 15:5-15, 41:2-25.)

The agents' accounts of the seizure and inventory search were corroborated by documentary evidence. For example, at 8:31 p.m. the night of the arrest, prosecutors emailed about the exact number and type of seized electronics, (GX 113), which proves the devices had been seized that night. Similarly, the metadata from photographs taken during the inventory search confirm the search took place the morning of December 27, as SA Perez testified. (GX 122-156.)

None of the defense's arguments line up with the evidence from the hearing. Eisenberg speculated that a CBP officer was not involved in the border search, and that the Devices were not discovered at the border. But all of the agents testified to the contrary. Eisenberg also claimed that the agents did not conduct a genuine inventory search, nitpicking at the documentation of the search. But SA Perez explained that, consistent with her training, she went through all of Eisenberg's luggage and took photographs to memorialize items of value, regardless of their investigatory significance. (Tr. 116:1-120:4.) This is what an inventory search is supposed to be, and claims about imperfect paperwork are not a basis for suppression. *United States v. Williams*, 930 F.3d 44, 54-55 (2d Cir. 2019) (holding that not "every detail" of an inventory search must follow "a standardized policy"). Indeed, for purposes of the inevitable-discovery doctrine, the inquiry is not even focused on what the officers actually did, but rather whether valid policies inevitably would have led to the discovery. *See United States v. Mendez*, 315 F.3d 132, 137-39 (2d Cir. 2002) (applying inevitable-discovery doctrine despite "doubt that the . . . officers were conducting a valid inventory search themselves").

At bottom, the defense's motion can succeed only if all of the agents were not truthful, but the Court should reject any suggestion of dishonesty. The agents' accounts were consistent and corroborated by the documents. The agents told the truth about their memories of a routine arrest that took place over one year ago, for a case they did not investigate. That their memories differed on ancillary details, or did not line up perfectly with notes of phone interviews from months before the hearing, does not show they were lying. Perfect recall is not the standard, and minor differences prove the agents were honestly explaining their recollections, rather than coordinating a false story. Even a suggestion from this Court that the agents were not credible would threaten their careers. It would make little sense for four Puerto Rico-based agents to risk their careers by lying about a case in which they had little involvement. The agents truthfully described the facts of a lawful seizure, which is corroborated by documentary evidence, and this Court should deny the motion.

### B. The Agents Did Not Unreasonably Delay in Obtaining a Warrant.

The agents also did not unreasonably delay in obtaining a warrant to search the Devices. The question is not whether the Government obtained the warrant as quickly as possible. Rather, it is whether the agents acted reasonably, which involves balancing the Government's "interest in retaining the property for investigation" against Eisenberg's "possessory interest." *United States v. Smith*, 967 F.3d 198, 206 & n.1 (2d Cir. 2020). The balance in this case was reasonable: The agents waited a modest period to obtain a warrant based on the reasonable decision to obtain it in this District, and Eisenberg's interests were not meaningfully harmed by the brief delay.

The timeline of events shows that the agents acted with reasonable diligence to obtain a warrant. Before the arrest, SA Racz told SA Crawford that he intended to obtain a warrant to search any devices in New York. (Tr. 148:11-149:3; *see also* Tr. 88:2-23.) Both agents understood this meant SA Crawford should ship devices promptly. (*Id.*) He did just that: Eisenberg was

arrested on the night of Monday, December 26, and on Wednesday, December 28, SA Crawford submitted a "priority" lead, directing the evidence unit to ship the devices by January 4, 2023. (GX 158; Tr. 58:41-59:23.) This was the only priority lead SA Crawford has issued in his career, and he did it because he knew New York needed the devices for a warrant. (*Id.*)

SA Racz saw that priority lead and understood it meant that the devices would be shipped by January 4, and arrive a few days later. (Tr. 150:7-22.) January 4 was a Wednesday, so if the devices were shipped on that date, they likely would not arrive before the weekend. The following Monday was January 9, and the devices had not arrived. When the devices had not arrived by Thursday, January 12, SA Racz contacted FBI San Juan's evidence unit. (GX 159.) He did not get a response, so he had another agent follow up the next day, and the devices were promptly shipped. (*Id.*; Tr. 152:20-156:12.) That was the beginning of a long weekend, so SA Racz obtained the devices and applied for a warrant on Tuesday, January 17, which was the next workday.

In all, there were 22 calendar days between the seizure and the warrant application. Courts in this Circuit and elsewhere have upheld searches that involved considerably longer delays. (Gov. Br. at 48-49.) And here, calendar days are not a good measure of the true interval: Because of the holiday season there were only 14 workdays between the seizure and the application for a warrant. *See United States v. Watson*, 23 Cr. 82 (EK), 2023 WL 7300618, at *9 (E.D.N.Y. Nov. 6, 2023) (discounting weekends and holidays); *United States v. Martin*, 157 F.3d 46, 54 (2d Cir. 1998) (same); *United States v. Kamaldoss*, 19 Cr. 543 (ARR), 2022 WL 1200776, at *16 (E.D.N. Y. Apr. 22, 2022) (same). This timeline reflects diligent efforts to obtain a warrant promptly.

The interval between seizure and warrant was reasonable, both because the Government had a reasonable basis for its actions and because Eisenberg had a significantly diminished interest in the Devices. This case is nothing like *Smith*, where there was "an absence of any investigative activity" and the agent lacked an articulable reason for the delay. *See Smith*, 967 F.3d at 210-11. On the investigative front, the Government took important steps between the seizure and obtaining a warrant. Because the defendant was detained, the Government had 14 days to obtain an indictment. (Tr. 154:16-155:10.) SA Racz sensibly prioritized that deadline, which required presenting to a grand jury by January 9, 2023. (Dkt. 4.) SA Racz also participated in witness interviews and prepared another warrant. (*See* Tr. 154:16-155:10, 170:16-171:1.)

It was also reasonable to ship the devices from Puerto Rico to New York. When devices are seized without a warrant during an arrest, it is a common practice to ship those devices to the investigating office for the warrant. (*See* Tr. 150:14-152:19, 177:5-178:19, 179:25-180:13.) There are sound reasons for that practice. Applying for a warrant in the district where the case is being investigated ensures the case agent can swear to the warrant application, which helps guarantee its accuracy. (Tr. 151:24-152:8, 169:12-19.) That is critical in a case like this one, where the facts are complex and the agents in Puerto Rico had no role in the investigation. (*See id.*)

Sending the devices to the investigating district also serves an important resource-allocation function. It ensures that data from the devices can be extracted in the district where the investigative team plans to search them. (*See* Tr. 151:2-23, Tr. 171:21-172:4 (discussing 14-day window to execute warrant); Fed. R. Crim. P. 41(e)(2)(A)(i).) This is important because extractions can be complicated and require a back-and-forth between investigators and the extraction team to obtain all relevant data. (Tr. 151:2-23.) Here, that issue was particularly acute

because FBI New York has substantially more resources for extracting data than FBI San Juan, making it more efficient to obtain the warrant and conduct the extractions here. (*See id.*)

The practice of sending devices to the investigating district is also reasonable because it does not necessarily lengthen the period between seizure and warrant. It is often the case that time passes between a seizure and obtaining a warrant, even when no shipment is involved. There may, for instance, be competing investigative priorities and the need to take time to carefully prepare an application, particularly in cases involving complex facts. *See, e.g.*, *United States v. Wells*, 20 Cr. 633 (NRB), 2023 WL 2223474, at *6 (S.D.N.Y. Feb. 23, 2023) (finding ongoing investigation justified delay); *United States v. Corbett*, 20 Cr. 213 (KAM), 2021 WL 4480626, at *6 (E.D.N.Y. Sept. 30, 2021) (same). Thus, it is reasonable to expect that shipping devices will not materially alter the timeline for obtaining a warrant.

The facts here illustrate the point. Based on his conversations with SA Racz, SA Crawford put in a "priority" lead to ship the devices to New York. (GX 158.) SA Racz reasonably thought the devices would arrive a few days after January 4. (Tr. 150:7-13.) Had SA Racz received the devices on that timeline, it would have been, at most, two weeks after the seizure. That would not meaningfully have extended the timeline for getting a warrant compared to getting one in Puerto Rico given other competing case obligations, such as the need to indict by January 9. The fact that the Devices arrived later than expected was due to an unforeseen delay in the evidence room at FBI San Juan, which SA Racz moved to rectify promptly, and in any case certainly did not render the search unreasonable under the Fourth Amendment. (GX 159.) The plan to ship the devices, then, was reasonable in its inception and reasonably executed by the agents.[1]

The defense's primary argument has been that the Government could have sought a warrant in Puerto Rico. That is legally correct. But that Rule 41 *allows* the Government to seek a warrant in Puerto Rico does not mean the Constitution *requires* it to do so. The Fourth Amendment requires only that the Government act reasonably, and the defense has no legal support for effectively turning Rule 41's permissive set of options into a constitutional rule requiring the Government to obtain a warrant in the district of seizure. *See United States v. Ganias*, 824 F.3d 199, 209 (2d Cir. 2016) (en banc) ("The touchstone of the Fourth Amendment is reasonableness.").

Moreover, the defense's focus on the process for obtaining the warrant ignores another important factor in the reasonableness analysis: balancing the length of the delay against the defendant's "possessory interest" in the devices. *Smith*, 967 F.3d at 208. Here, Eisenberg's significantly diminished possessory interest in his devices during the period between the seizure and the warrant strongly support the reasonableness of the Government's conduct. Eisenberg has done nothing to substantiate the claim in his affidavit that his interests were harmed because he lacked access to the Devices during the period between his arrest and the warrant. While electronics are generally important, *see Smith*, 967 F.3d at 207-08, Eisenberg has not corroborated his affidavit's assertions that the three-week delay hurt his defense or his finances. (Gov. Br. at

---

[1] The Government has identified additional facts about relevant events in the FBI San Juan evidence room, and it can present those facts if directed to do so by the Court. *See In re Terrorist Bombings*, 552 F.3d 177, 196-97 (2d Cir. 2008) (holding that courts should consider evidence relevant to suppression even if offered after a suppression hearing).

49-52 (explaining why these claims are meritless).) This Court should not grant the defendant's motion based on those assertions, without evidence or testimony on the issue. *See United States v. Deleston*, 15 Cr. 113 (PKC), 2015 WL 4745252, at *5 (S.D.N.Y. July 24, 2015) (defendant's affidavit "is rarely, if ever, considered" in a suppression hearing if defendant does not testify).

Nonetheless, even if the Court assumes the truth of Eisenberg's claims, the delay was still reasonable. Eisenberg had a significantly diminished possessory interest in the Devices because he was incarcerated. (Gov. Br. at 52 (collecting cases).) In the cases the defense cites, the courts agreed with that principle, but found delays unreasonable because of considerably longer delays without any explanation. *See, e.g.*, *United States v. Grills*, 18 Cr. 228 (JPS), 2019 WL 5587328 (E.D. Wis. Oct. 30, 2019) (55 days); *United States v. Hay*, 19 Cr. 170 (RJA), 2023 WL 142119 (W.D.N.Y. Jan 10, 2023) (18 months).[2] Here, the Government applied for the warrant before Eisenberg even arrived in New York, and the defense has not identified any efforts by Eisenberg's attorneys or his family to obtain the Devices before that application.

The Government also had a powerful interest in keeping the Devices. Unlike in *Smith*, "the Government had strong probable cause" to search the devices based on its "ongoing investigation" and powerful evidence of Eisenberg's crime. *Wells*, 2023 WL 2223474, at *5-6 (finding strength of probable cause weighs in favor of Government); *see Watson*, 2023 WL 7300618, at *10 (same). Also unlike in *Smith*, the physical devices themselves had investigative relevance. *See* Gov. Br. at 53-54. For example, a cryptocurrency account used to perpetrate the crime was created under a Ukrainian woman's name. That account was linked to an email address, the registration data for which listed a particular phone with the IMEI number. That IMEI number is written on one of the Devices, so it had evidentiary value "regardless of . . . [its] contents." *Smith*, 967 F.3d at 209. Given Eisenberg's diminished possessory interest and the Government's strong investigatory interests, the modest delay in obtaining a search warrant here was reasonable.

Finally, at a minimum, suppression is not warranted because there is no evidence that the delay here was "deliberate, reckless, or grossly negligent, or the result of systemic or recurring negligence." *Watson*, 2023 WL 7300618, at *11. The agents tried to obtain a warrant promptly, illustrated by, among other things, the "priority" lead, SA Racz following up with FBI San Juan, and SA Racz applying for a warrant within 24 hours of the Devices arriving in New York. There was no reason for SA Racz to believe shipping the Devices was unconstitutional; doing so is a standard, reasonable practice. Indeed, Judge Schofield had rejected a delay-based challenge in one of SA Racz's other cases that also involved shipping devices. *See United States v. Sharma*, 18 Cr. 340 (LGS), 2019 WL 3802223, at *3, *5-7 (S.D.N.Y. Aug. 13, 2019). There is also no evidence the agents had any reason to think they were meaningfully interfering with Eisenberg's interests, given his incarceration and the absence of requests for the Devices from Eisenberg's family or representatives. In short, the agents tried to obtain a warrant within a reasonable time; they had no reason to believe they were harming Eisenberg's interests; and they gained nothing from delay. This is not the type of deliberate, reckless, or grossly negligent conduct that warrants suppression.

---

[2] The defense's reliance on *United States v. Javat*, 549 F. Supp. 3d 1344 (S.D. Fla. 2019), is misplaced. That decision held that a 20-day delay "was constitutionally reasonable" and would not have justified exclusion, absent a separate constitutional violation. *Id.* at 1348.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

by: __/s/ *Thomas Burnett*_____
    Thomas Burnett / Peter J. Davis
    Assistant United States Attorneys

    Tian Huang
    Special Assistant United States Attorney