**TALKIN, MUCCIGROSSO & ROBERTS, L.L.P.**
ATTORNEYS AT LAW
40 EXCHANGE PLACE
18TH FLOOR
NEW YORK, NEW YORK 10005
———
(212) 482-0007 PHONE
(212) 482-1303 FAX
WWW.TALKINLAW.COM
EMAIL: INFO@TALKINLAW.COM

MARYLAND OFFICE:
5100 DORSEY HALL DRIVE
SUITE 100
ELLICOTT CITY, MD 21042

410-964-0300

NEW JERSEY OFFICE:
2500 PLAZA 5
HARBORSIDE FINANCIAL CENTER
JERSEY CITY, NJ 07311

201-342-6665

**BY ECF**                                                    November 28, 2023
Honorable Arun Subramanian
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

                                Re:    United States v. Avraham Eisenberg, 23 Cr. 10 (AS)

Dear Judge Subramanian:

      Defendant Avraham Eisenberg respectfully submits this letter in further support of his motion to suppress. The witnesses' testimony at the November 9, 2023 hearing confirmed that law enforcement planned to, and did, seize Mr. Eisenberg's electronic devices when he was arrested on December 22, 2022 without obtaining a warrant in advance despite there being no practical or legal impediment to doing so, rendering the government's 23-day delay[1] in obtaining a warrant to search the Subject Electronics a serious violation of *United States v. Smith*, 967 F.3d 198 (2d Cir. 2020). The agents' testimony—though contradictory in certain important respects—confirmed that the government had no legitimate explanation for the delay. The agents' testimony also confirmed both that the Subject Electronics were seized by FBI agents lacking border authority and that the agent who claimed to conduct an inventory search failed to follow the applicable policy guide in almost every meaningful respect. The Subject Electronics should thus be suppressed both due to the unreasonably delayed warrant and because their seizure was unlawful.

**A.  Unreasonable And Unjustified Delay In Obtaining A Warrant**[2]

      The hearing evidence eviscerated the government's "need to transfer" justification for the unreasonable 23-day delay in seeking a warrant and demonstrated that the Subject Electronic should be

---

[1] As discussed in Mr. Eisenberg's Reply, Dkt. No. 37 at 32, the government's attempt to attribute a day of delay to the Court as a result of an email it sent to Judge Berman's chambers after close of business on January 17, 2023 that did not attach a warrant application or otherwise state that the application was complete is unpersuasive. *See* GX 164.

[2] As noted in the defendant's prior submissions, *Smith* sets forth a four-factor analysis of the reasonableness of the government's delay in obtaining a search warrant after seizing personal electronics. Because the Court Order setting the hearing focused only on the reason for delay and there was no new evidence presented at the hearing regarding the first three factors, Mr. Eisenberg substantially rests on his previous positions as to why each of those factors favors suppression, and focuses on the fourth factor, which was addressed in depth at the hearing, the government's failure to provide reasonable justification for the delay. *See* Dkt. No. 28 at 44-49, No. 37 at 32-38. However, he does point out that SA Crawford and SA Perez both testified that Mr. Eisenberg expressed immediate concern regarding his electronics to each of them, confirming his previous testimony and further strengthening his argument that the devices were important to him. Tr. 81:24-82:19, 137:23-138:24.

Page 2

suppressed pursuant to *Smith*. The evidence presented at the hearing established that that delay was both wholly unnecessary and entirely the fault of the government (and its FBI agents), which: (1) made the determination to send the devices to New York even though a warrant could have been issued immediately in Puerto Rico; (2) failed to send the devices in a timely manner; and (3) failed to monitor the location of the devices for weeks after the arrest.

The hearing testimony established that even before the arrest, the government was aware of its obligations under *Smith* and deliberately disregarded the risks it was undertaking by not seeking a warrant in Puerto Rico. FBI SA Michael Crawford testified that before the arrest the government: (1) intended a warrantless seizure of Mr. Eisenberg's personal electronics; (2) intended to ship those devices to New York; (3) knew that it was required to get a warrant to review the devices swiftly; and (4) understood that it could easily mitigate risk by obtaining a warrant in Puerto Rico. Tr. 33:17-21, 52:14-21, 69:9-13, 88:13-18, 52:14-21. FBI SA Perez testified that: (1) "a search warrant needed to be obtained pretty quickly;" (2) a search warrant was necessary "to hang onto the electronics"; and (3) New York said it was "working on the search warrant" immediately after the arrest. Tr. 142:14-17, 143:18. FBI SA Racz testified that he was aware shortly after the arrest that devices had been seized and understood that a warrant had to be obtained expeditiously. Tr. 147:13-22, 164:14-18. He further understood that even if the devices were sent on a priority basis to New York, it could take a week or more for them to arrive. Tr. 150:7-13 (understood due date to ship was 1/4/23 and FedEx took "a few days").

The agents' testimony also proved that there was no practical or legal need to transfer the devices. SA Racz testified that while it was standard practice for FBI New York to have devices seized elsewhere sent back to New York, he knew of no legal (or even formal policy) requirement for this practice. Tr. 174:12-17. The practical reasons SA Racz offered in support of FBI New York's practice were also unpersuasive. First, SA Racz asserted, without explanation, that "it's prudent for the court in the district that the case is being prosecuted to be responsible for overseeing the warrant," Tr. 151:3-23, though it was self-evident that the district court in Puerto Rico could handle the uncomplicated warrant at issue. Next, he stated that the warrant application was "resource-intensive," *id.*, implying, without support or explanation, that FBI San Juan lacked the resources. But on cross examination, SA Racz conceded that, just as the government did on January 6 to obtain a warrant for social media information, DX-A, warrant applications may be drafted by case AUSAs, with the agent only subsequently reviewing and swearing out the supporting affidavit, and that a warrant may be sworn to by an agent remotely. Tr. 167:4-168:13. The New York AUSAs could thus have drafted a warrant for SA Racz to swear out telephonically before a San Juan magistrate. Finally, SA Racz implied inaccurately that a warrant obtained in Puerto Rico would have required that FBI San Juan conduct the review. Tr. 151:11-23. Tellingly, the investigative team in New York did not search the Subject Electronics; they were transferred to the FBI's Computer Analysis and Response Team ("CART") for review, a procedure easily executed by any FBI office. *See* GX 162 (noting that SA Racz checked out device on 1/24/23 to transfer to CART, which took custody on 1/31/23).[3]

---

[3] SA Racz also misstated the law when he expressed a "hypothetical" concern that "once the warrant is obtained, you have to begin the search within 14 days." Tr. 171:20-172:4; 173:10-15. The majority view is that the government need do no more than take possession of the phone within 14 days to meet the requirements of Rule 41. *See, e.g.*, *United States v. Estime*, No. 19 Cr. 711 (NSR), 2020 U.S. Dist. LEXIS 191242, *39-40, 2020 WL 6075554 (S.D.N.Y. Oct. 14, 2020) ("[T]his court agrees with the majority of courts that, under Rule 41(e)(2)(B), a search warrant for ESI is executed through 'the seizure . . . of the media' which is accomplished when the physical storage device is in the custody of the government."). Further, the same probable cause could have been used to apply for a new warrant in the unlikely event that the government was unable to copy the data on the devices within 14 days. *See* Rule 41(e)(2)(A).

Page 3

Moreover, it was not just the government's decision to send the devices to New York that caused the inordinate delay, but also the FBI's lack of care while transferring the devices. FBI San Juan failed to send out the devices for almost two-and-a-half weeks, and SA Racz and FBI New York did nothing to follow the devices or ensure their delivery during that same period. Tr. 176:2-12. When confronted with this fact, SA Racz made hollow excuses about a leave (during which he was working) that ended no later than January 3, Tr. 164:25-165:25, asserted that he "periodically checked to see if [the devices] were in New York," though he pointed out no "checking" he had done before January 12, Tr. 166:1-167:1, disclaimed responsibility for "the shipping of the devices or monitoring FedEx," without identifying who was responsible, *id.*, and pointed out that he had prioritized other tasks like getting the social media warrant and interviewing witnesses over protecting Mr. Eisenberg's property rights. *Id.* Even after conceding that he had taken no action to ensure shipment of the devices between December 26 and January 12, SA Racz refused to concede that this dereliction lasted two-and-a-half weeks. Tr. 176:2-12.

Since the government unilaterally chose to seize the Subject Electronics without a warrant and then chose to prioritize getting a warrant in New York, responsibility for the delay created by these choices falls squarely upon the government.  Remarkably, when it became clear on January 13, 2023 that the devices remained in Puerto Rico, the government, instead of acting expeditiously, continued to prioritize the convenience of getting a warrant in New York, knowing full well that further delay would result.[4] The government's excuses and explanations for its prioritization of convenience over Mr. Eisenberg's rights are meritless, and the Subject Electronics should be excluded pursuant to *Smith*.

## B.  The Subject Electronics Were Not Seized Pursuant to a Border Search

The hearing testimony of the four arresting law enforcement agents was contradictory and inconsistent on fundamental facts to the point of unreliability and insufficient to satisfy the government's burden in warrantless searches. *See United States v. Perea*, 986 F.2d 633, 639 (2d Cir. 1993). The agents also had vastly different accounts than they had conveyed to the government during interviews three months earlier. Among other things, the agents' accounts disagreed on (1) whether an evidence bag was used to separate the electronics or the items were just placed back in the luggage; (2) who was in the room for the arrest; (3) who conducted the pat down; and (4) whether the search happened before or after the arrest. SA Perez testified that the search of Mr. Eisenberg's luggage by TFO Amador took place before he was escorted into the interview room but had previously stated that the search occurred after Mr. Eisenberg had spent ten minutes in the interview room and then come out. Tr. 112:4-113:4, 132:13-134:7, Stip., Dkt. No. 60, ¶4. Similarly, Although SA Crawford testified at the hearing that he observed the devices removed and set on a counter by TFO Amador prior to Mr. Eisenberg being taken into the interview room, he previously told the prosecution during an interview that he observed the devices after he came out of the interview room and did not know how they got there. Tr. 39:12-41:1, 75:15-76:9, 79:16-80:2, Stip. ¶2. SA Perez also directly contradicted herself when she testified that TFO Amador placed the electronics back in the luggage of his own volition after having previously told the government that she directed him to place the devices back in the luggage. Tr. 114:23-25, 130:2-132:9, Stip. ¶4.

Though muddled the record did establish that after CBP completed whatever search it did, CBP returned all of the items to the luggage and sealed the bags, Tr. 96:4-6, 114:23-25; it was solely the FBI agents that took the luggage out of the airport, transported it to its office, and accessed the items the following day. Tr.115:5-116:10. As the defense has previously noted and the government has not

---

[4] SA Racz's assertion that on January 13 when the devices were still in Puerto Rico it would have been faster to get the warrant in New York, Tr. 169:5-10, is simply illogical given that the warrant could have been drafted and sworn remotely and issued immediately in Puerto Rico.

Page 4

contested, FBI agents have no authority to conduct a border search or seizure. *See United States v. Soto-Soto*, 598 F.2d 545, 549 (9th Cir. 1979); *United States v. Sandoval Vargas*, 854 F.2d 1132, 1136 (9th Cir. 1988). Section 19 U.S.C. § 1581 limits border authority to "customs officials," a term which, as defined in 19 U.S.C. § 1401(i), excludes FBI agents. *See United States v. Victoria-Peguero*, 920 F.2d 77 (1st Cir. 1990). Border searches and seizures that are not "executed by a person statutorily authorized to conduct" such searches may only be performed "by an individual who by delegation of authority is so empowered," and "the delegation of authority must be clear." *United States v. Brown*, 858 F. Supp. 297, 300 (D.P.R. 1994). While CBP was present and interacted with Mr. Eisenberg at the airport, that interaction had ceased before the FBI seized and later searched the defendant's luggage. Moreover, the government failed to establish that CBP had in any way delegated authority to the FBI. Instead, the testimony established that it was the FBI in charge of the operation, that TFO Amador was operating at the behest of the FBI, and that the FBI, at its sole discretion, seized the property. Tr. 92:2-13 (Amador testifying he was "asked to assist" because he "get[s] all the calls for help from the FBI"); 96:21-97:19 (Amador testifying that "FBI agents took custody of the property" because "[t]hey had custody over" Mr. Eisenberg); 101:10-20 (Amador testifying that he did not fill out "a seizure form" because CBP "didn't seize anything").[5]

The seizure of the Subject Electronics was also inappropriate under the plain view exception. All of the agents agreed that once TFO Amador completed his search, CBP replaced everything, including the Subject Electronics, in the bags before anything was seized. 16:3-11, 96:4-7, 114:23-25. "[T]he 'plain view' doctrine . . . 'is associated only with the seizure of items' that are—as the label indicates—in plain view." *United States v. Delva*, 858 F.3d 135, 149 (2d Cir. 2017) (quoting *Ruggiero v. Krzeminski*, 928 F.2d 558, 562 (2d Cir. 1991). This is so because "[i]f an article is already in plain view, neither its observations nor its seizure would involve any invasion of privacy." *Horton v. California*, 496 U.S. 128, 133 (1990). Once the Subject Electronics were placed back in the sealed luggage, they were no longer in plain view and could not be seized (and later searched) subject to the plain view exception.[6]

## C.  The FBI Did Not Conduct A Valid Inventory Search

The hearing evidence disproved the government's assertion that the Subject Electronics would have inevitably been discovered as part of the December 27, 2022 inventory search conducted by SA Perez. That search violated almost every major portion of the applicable policy document, Section 19.7.3 of the Domestic Investigations and Operations Guide ("DIOG"), DX 101, which states that "[a]n inventory search must strictly adhere to the following standardized criteria and procedures," and there was no evidence that she would have inevitably performed her search differently in any other circumstance.

The DIOG mandates that "[a] written summary showing the results of the inventory must be recorded in an" official FBI form." "The written summary must include . . . a description of the property and the items secured for safekeeping." SA Perez prepared only one written summary, GX 110, which

---

[5] In its letter filed shortly before the hearing, the government represented that "CBP officers seized the Subject Electronics at the border," an assertion proved inaccurate by the testimony of the agents, which established that CBP did not seize any of Mr. Eisenberg's possessions. Dkt. No. 46 at 4-5.

[6] While there is a line of cases relating to controlled delivery of contraband that states that CBP's initial plain view seizure of the contraband persists even after the drugs are repackaged, *see, e.g., Illinois v. Andreas*, 463 U.S. 765 (1983); *United States v. Singh*, 811 F.2d 758 (2d Cir. 1987), those case are inapplicable here because CBP did not seize the devices, the seized electronics are not contraband, and no controlled delivery is involved.

Page 5

included only the Subject Electronics, which the FBI had decide not to takin into inventory.[7] SA Perez failed to create any record of several hundred dollars in cash, credit cards, passports and ID cards, and official paperwork seized from Mr. Eisenberg. She conceded that this was a violation of FBI procedure.[8] Tr. 135:2-23. SA Perez also failed to create a "written summary" of thousands of dollars' worth of headphones and other electronics. *See United States v. Hunt*, 2019 WL 8501434 (W.D.N.Y. 2019) (finding that deviation from policy, including failure to properly document contents of seized vehicle "reveals the impermissible purpose of the search"). The DIOG also requires that "Agents must provide receipts for all items retrieved during inventory searches." The agents failed to give Mr. Eisenberg receipts for anything other than the Subject Electronics and the luggage itself.

The DIOG further mandates that the agents memorialize "facts pertinent to . . . a non-inventory-related search conducted and any evidence collected." SA Perez asserted that GX 109 was that factual summary, Tr. 141:7-22, but GX 109 states only that "Agents conducted a search incident to arrest and AVRAHAM's luggage and personal items were seized," failing to describe the border search conducted by CBP. Tr. 136:6-22. GX 109 also fails to include any reference to the money, credit cards, passports, and the headphones and other electronics, which had not been logged.

The DIOG mandates that "[w]henever there is probable cause to believe an inventory search would also yield items of evidence or contraband, agents must obtain a search warrant when feasible." SA Perez and the government failed to obtain a warrant for weeks despite their belief both pre-arrest and immediately post-arrest that the devices would yield evidence. Tr. 113:8-19.

In its prior letter, the government glossed over these critical failures to follow protocol[9] and stated that SA Perez's photos were evidence that her search of the luggage was for inventory purposes, particularly because they were taken after the devices were recovered at the border. Dkt. No. 46 at 5. But SA Perez did not testify to any belief that a border search had been conducted and the photos were not called for by the DIOG. SA Perez took photos only of electronic items, similar to the items seized as evidence. She did not provide those photos to Mr. Eisenberg or anyone else. Even if the photos were permitted to serve as a substitute for a written summary—which they were not—nothing SA Perez did with them indicates that that was her intent. Instead, it appears that she took photos of electronics she found as she was rummaging through Mr. Eisenberg's property looking for evidence, something the FBI had not previously had the opportunity to do.

## <u>CONCLUSION</u>

For the reasons stated above, and those previously stated in defendant's prior submissions, the Subject Electronics should be suppressed. Thank you for Your Honor's consideration of this letter.

---

[7] The government has baselessly asserted that the devices "were not impounded and sent to inventory because they were found at the border." Dkt. No. 46 at 5. Hearing testimony established that the decision to send the Subject Devices to New York was made in New York even before the arrest and had no relation to the border. Tr. 52:14-21. Indeed, none of the FBI agents believed that a border search had been done.

[8] Nearly a week later, SA Crawford documented the credit cards, IDs, and currency, but this was not part of the inventory search. SA Perz's testified that SA Crawford did not participate in the inventory search, Tr. 134:8-12, and, conceded that this documentation would not have been "prompt." Tr. 137:16-22.

[9] The government referred to the issue of SA Perez's major protocol violations as "form over substance," Dkt. No. 46 at 5, citing *United States v. Williams*, 930 F.3d 44, 55 (2d Cir. 2019), but *Williams* involved **no** protocol violation and merely held that the officers' reinspection of an impounded car after suspecting they had missed something was reasonable to complete the inventory.

Page 6

Respectfully submitted,

*Sanford Talkin*

*Noam Greenspan*

Sanford Talkin
Noam Greenspan

-and-

Brian Klein
Ashley Martabano
Riley Smith

cc: all counsel of record (by ECF)