

Waymaker LLP
515 S. Flower Street, Suite 3500
Los Angeles, California 90071
T 424.652.7800

December 11, 2023

**Brian E. Klein**
Direct (424) 652-7814
bklein@waymakerlaw.com

***Via ECF***

Honorable Arun Subramanian
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

**Re: United States v. Avraham Eisenberg**
**23 Cr. 10 (AS)**

Dear Judge Subramanian:

Defendant Avraham Eisenberg respectfully submits this letter in further support of his motion to dismiss and in response to two issues raised during the December 6, 2023 oral argument on his motion to dismiss. Per the Court's minute entry, the purpose of this letter is to address: (1) the authority the government cited during oral argument that was not raised in its opposition to the motion to dismiss; and (2) the Court's question regarding whether the MNGO Perpetuals are mixed swaps covered by the Commodities Exchange Act ("CEA").

## I. New Authorities the Government Cited at Oral Argument

A fundamental flaw of the indictment is that the government has alleged a commodities-related scheme to move the price of something (MNGO) that the government concedes is not a commodity through transactions on exchanges the government has not alleged are regulated commodities markets. The government attempted to breeze past these defects in its opposition. During oral argument, however, the government presented several new cases and one new statutory section and related arguments to the Court in an attempt to save the indictment. For the reasons discussed below, these new authorities are unavailing and should be rejected.

### A. The Government's New Cases and Theories Do Not Change the Fact that It Has Failed to Satisfy the "In Connection With" Element for Count One

During oral argument, the government for the first time discussed *Rubin v. United States*, 449 U.S. 424 (1981), *Marine Bank v. Weaver*, 455 U.S. 551 (1982), and *Chemical Bank v. Arthur Andersen & Co.*, 726 F.2d 930 (2d Cir. 1984) to assert that a loan obtained in exchange for a pledge of a security may be deemed "in connection with" the purchase or sale of a security for purposes of Section 10(b), 15 U.S.C. § 78j, and Rule 10b-5, 17 C.F.R. 240.10b5. Regarding Count One (Commodities Fraud), the government argued that the interpretation of "in connection with" in these securities fraud cases lends support to its position that the "in






connection with" element of 7 U.S.C. § 9(1)[1] is satisfied as to the alleged swaps, the MNGO Perpetuals, because "Mango Markets and the Mango Markets investors [] are in the swaps market" due to the fact that "they're taking Mr. Eisenberg's swap position on as collateral for their loans." (*See* 12/6/23 Transcript ("Tr.") at 23:8-13.) But these cases fail to cure, and, in fact, amplify, defects in the indictment highlighted by the securities fraud cases cited in the government's opposition. (*See* Dkt. 36, Opp. at 19.) That is, unless the alleged manipulative conduct works a deception upon the regulated market at issue—here, Mango Markets—the alleged manipulative conduct does not come within the scope of the statute. (Dkt. 37, Reply at 7-8.)

In *Chemical Bank*, a publicly-traded company called Frigitemp secured financing from various banks ("the Banks") in order to fund its expansion, which included an agreement wherein the Banks advanced $4 million to its subsidiary, Elsters, in exchange for promissory notes guaranteed by Frigitemp that pledged 100% of Elsters' common stock. 726 F.2d at 933. Eleven days before the Elsters notes matured, Frigitemp filed for bankruptcy and Elsters ceased business resulting in losses to the Banks, including a $2 million loss on the Elsters notes. *Id.* The Banks sued Arthur Andersen & Co. (Andersen), among others, claiming violations of Section 17(a) of the Securities Act of 1933 ("Section 17(a)"), Section 10(b), and Rule 10b-5. *Id.* The Banks alleged that Andersen made several misrepresentations when it audited and certified Frigitemp's financial statements, which the Banks relied on in transacting with Frigitemp. *Id.* at 933-34. "[T]here [was] no allegation that Andersen, which had never been Elsters' auditor, misrepresented the value of Elsters or its stock[.]" *See id.* at 943.

The Second Circuit, after analyzing *Rubin* and *Marine Bank*, concluded that it was compelled to answer the very question that *Rubin* explicitly did not decide: "'whether misrepresentations or omissions involved in a securities transaction but not pertaining to the securities themselves can form the basis of a violation'" of Section 17(a), Section 10(b), or Rule 10b-5. *Id.* at 943. The Second Circuit stated, "our answer is in the negative" because "[t]he Act and Rule impose liability for a proscribed act in connection with the purchase or sale of a security; it is not sufficient to allege that a defendant has committed a proscribed act in a transaction of which the pledge of a security is a part." *Id.* The Second Circuit noted, "Andersen is not alleged to have deceived the Banks with respect to the pledge of the Elsters stock; the Banks got exactly what they expected." *Id.*

At oral argument, the government acknowledged that in *Chemical Bank* "the court found that the pledge was not 'in connection with'" the offer or sale of a security, but stated that this was "for factual reasons," implying inaccurately that the case holding was distinguishable from

---

[1] The relevant potion of the statute reads: "It shall be unlawful for any person, directly or indirectly, to use or employ . . . ***in connection with*** any swap, or a contract of sale in interstate commerce . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission shall promulgate. . . . " 7 U.S.C. § 9(1) (emphasis added). Likewise, the implementing regulation, 17 C.F.R. § 180.1(a), uses similar language and includes the "in connection with" phrase.






the instant matter. (Tr. at 22:6-10.) Here, as in *Chemical Bank*, the alleged manipulation was not "in connection with" the MNGO Perpetuals. None of the assets allegedly withdrawn from investors on Mango Markets bore any connection to the MNGO acquired on other exchanges. *See Ring v. AXA Fin., Inc.*, 483 F.3d 95, 100-01 (2d Cir. 2007) (the *Chemical Bank* holding instructs that "in determining whether . . . a plaintiff may maintain a Rule 10(b) suit, we must disaggregate separate promises of a product or transaction."). Indeed, the only deceptive conduct allegedly committed on Mango Markets relating to the purchase of MNGO Perpetual positions was that these were supposedly "wash trades" and that Mr. Eisenberg did not accurately disclose his identity and location when entering into the transaction. (*See* Opp. at 21.) As detailed in the reply, the government has not alleged the occurrence of any proscribed conduct (*See* 7 U.S.C. § 6c(a)(1)(A-C)) and, according to the indictment, the trades were done to acquire a large position in the MNGO Perpetuals and therefore intended to establish a bona fide position. (*See* Reply at 8-9 (citing *In Re Eagle Mkt. Makers, Inc.*, CFTC Docket No. 19-08, 2019 WL 2884626, at *3 (CFTC June 28, 2019) (CFTC classified wash trades as those effectively between the same beneficial owner with the "intent to negate risk or price competition and avoid a bona fide market position").) Moreover, the indictment makes no attempt to specifically connect the behavior of any Mango Markets investor, or anyone else, with Mr. Eisenberg's alleged deception regarding his identity and location.[2] *See, e.g., Prod. Res. Grp., L.L.C. v. Stonebridge Partners Equity Fund, L.P.*, 6 F. Supp. 2d 236, 240 (S.D.N.Y. 1998) ("Plaintiff's allegations in this case fail for the same reason as did the claims in [*Chemical Bank* and other cases]: the alleged misrepresentations made by defendants were not 'in connection with' the purchase or sale of securities, because they did not pertain to the value, nature or investment characteristics of the securities at issue.").

One of the government's newly-cited cases, *Graham v. SEC*, 222 F.3d 994, 996 (D.C. Cir. 2000), illustrates the logical fallacy of the government's argument that although Mr. Eisenberg's Perpetuals trades were "used for a different thing" than a typical wash trade, the trade "was not bona fide" because the long and short positions netted against each other. (Tr. at 54:11-16.) But the government never explained, let alone alleged in the indictment, why the MNGO Perpetual positions netting to zero or Mr. Eisenberg's use of nominee accounts to create the positions would have led investors not to deposit funds. In *Graham*, an investor "effectuated 203 sets of wash and match trades," between accounts he controlled at different broker-dealers in order to float himself and capitalize on the mismatch in payment terms, whereby he could force the broker to pay him immediately on the sale side but had five days to transfer funds on the buy

---

[2] The indictment further alleged that Mr. Eisenberg "misrepresent[ed] his intentions to borrow cryptocurrency from Mango Markets." (Ind. ¶ 23.) Even accepting the truth of the allegation for present purposes, it relates to the later transactions in which Mr. Eisenberg allegedly borrowed and withdrew cryptocurrency, not to the acquisition of the Perpetuals. Moreover, this alleged misrepresentation is analogous to Friditemp's guarantee of the loan the Banks provided Elsters in *Chemical Bank*. The Second Circuit held the guarantee insufficient to satisfy the "in connection with" prong because "neither the notes nor the guarantee were a 'security.'" 726 F.2d at 943. Likewise, Mr. Eisenberg's alleged intent to borrow cryptocurrency was not a "swap" and bore no relation to the value of the Perpetuals.






side. 222 F.3d at 998-99. Judge Garland noted that the brokers "would not have made [these payments] had they realized that [the investor]—with his shaky financial condition—was also on the other side of the transaction, promising to pay for the same stock within five days. *Id.* at 1001. By contrast, the government has made no allegation in this case that Mr. Eisenberg's conduct deceived any investor into doing (or not doing) anything.

The other new cases the government cites do not undercut Mr. Eisenberg's contention that unless the manipulative conduct works a deception on the regulated market at issue, the alleged conduct is not "in connection with" the swap. For example, the government's references at oral argument to insider trading cases, citing *United States v. O'Hagan*, 521 U.S. 642 (1997), and other cases involving stock market trading on illicitly obtained information, *United States v. Khalupsky*, 5 F.4th 279 (2d Cir. 2021), to show claim that "the fraud does not need to be directed . . . at an investor" are inapplicable.[3] (*See* Tr. at 24:20-25:19.) This is because, even though the target of the deception is the holder of the information, "the fraud is consummated, not when" the information is stolen, "but when, without disclosure to [the misappropriator's] principal, he uses the information to purchase or sell securities." *O'Hagan*, 521 U.S. at 656. The deception is thus inextricably intertwined with "gain[ing an] advantageous market position . . . and simultaneously harm[ing] members of the investing public" through the act of transacting in securities. *Id.* By contrast, the government alleges no such deceptive act on the part of Mr. Eisenberg at the time of the purported acquisition of the MNGO Perpetuals on Mango Markets. In short, the government's pivot to these insider trading cases from the cases it approves of in its opposition stating that manipulation is the "intentional or willful conduct designed to deceive or defraud other investors" is unavailing.[4] (*See* Opp. at 18-19 (collecting cases)); *see also Schreiber v. Burlington Northern, Inc.*, 472 U.S. 1, 6 (1985) (addressing manipulation under Section 14e, stating that manipulation "connotes intentional or willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities).

In sum, the government's new cases add little to the previous briefing regarding the "in connection with" element, and do not undermine Mr. Eisenberg's entitlement to dismissal of the indictment. Rather, they support dismissing the indictment because the alleged deceptive conduct had no alleged effect on the regulated market.

B. <u>7 U.S.C. § 2 Does Not Support the Government's "Contract of Sale" Theory</u>[5]

During oral argument, the government adopted the Court's summary of its new argument that "if there was [a] carveout for mediums of exchange, then you wouldn't need these explicit

---

[3] While the government cited *Khalupsky* in its opposition (Opp. 17), its discussion of the case in its brief regarded whether Mr. Eisenberg's alleged misrepresentations were material and bore no relation to whether the "in connection with" provision of the statute was satisfied.
[4] The other new cases are *In re American Continental*, 49 F.3d 541 (9th Cir. 1995) and *United States v. Hild*, 644 F. Supp. 3d 7 (S.D.N.Y. 2022). Neither undermine Mr. Eisenberg's positions.
[5] While the government did not cite any new cases in support of this point—presumably because, like the defense, it has found none—it based a new argument on (statutory) authority not discussed in the briefing, and the defense therefore addresses the issue in this letter.





carveouts for things like foreign currency spot transactions [in 7 U.S.C. § 2(c)(1)(A)] because currency is a medium of exchange and yet Congress saw fit to have explicit carveouts for those because they would otherwise fall within the definition of 'commodity.'" (Tr. at 9:15-21.) The argument is unpersuasive because neither the text of the statute nor the legislative history indicate that foreign currency was exempted because it was a medium of exchange rather than the potential object of manipulation.

Examining the text of 7 U.S.C. § 2(c)(1)(A), in addition to excluding foreign currency, the statute excludes things like "government securities," "security warrants," and "mortgages." None of the other categories of things carved out from the jurisdiction of the CEA is in any way related to a medium of exchange. The government never explained why it believed that this list of exemptions, or the inclusion of foreign currency in the list, demonstrated that Congress was considering which mediums of exchange to exempt, and nothing from the items included in the list indicates that this was Congress's consideration.[6]

Moreover, the legislative history of the amendment suggests that the exemption of certain foreign currency transactions had nothing to do with the fact that they could function as a medium of exchange. Congress overhauled the CEA in 1974 to extend the safeguards previously limited to futures markets in a number of agricultural commodities to other futures markets, including foreign currency. *See CFTC v. Standard Forex*, No. 93 civ. 0088 (CPS), 1993 WL 809966, at *8 (E.D.N.Y. Aug. 9, 1993). The ultimate legislation was paired back from that initially proposed in response to concerns from the Treasury Department, with the Senate Committee explaining "that the regulation of certain futures transactions in foreign currencies and other financial instruments by the Commission was 'unnecessary' because these types of transactions were already effectively regulated by bank regulatory agencies[.]" *Id.* at 9 (citing S. Rep. No. 1131, 93d Cong., 2d Sess. (1974), *reprinted in* 1974 U.S.C.C.A.N. 5843, 5863-64.). There is no indication that Congress considered whether and which mediums of exchange it wished to exclude (or include). Instead, its focus was on which futures markets required additional protection from manipulation.[7]

---

[6] The government did not address at oral argument the massive expansion of the jurisdiction of the statute that would result from a reading of 7 U.S.C. § 2 to grant the CEA jurisdiction over every transaction involving domestic currency or foreign currency (much of which is not carved out). "'Congress, in enacting the securities laws, did not intend to provide a broad federal remedy for all fraud."' *Chemical Bank*, 726 F.2d at 938 (quoting *Great Western Bank & Trust v. Kotz*, 532 F.2d 1252, 1253 (9th Cir. 1976)). So too, the government has offered no justification of its attempt to turn the CEA into a remedy for all fraud.

[7] Nor do the contours of the foreign currency exemption indicate that foreign currency was necessarily excluded because it could be used as a medium of exchange. The statute does not exclude foreign currency futures contracts. *See Standard Forex*, 1993 WL 809966, at *7.






The government's theory that the purchasing of MNGO was a "contract of sale" because it was accomplished by selling USDC, which the government alleged to be a commodity, thus fails because MNGO, as the government concedes, is not a commodity.[8]

## II. Whether the MNGO Perpetuals are Mixed Swaps Covered by the CEA

At oral argument, the Court asked the government whether the MNGO Perpetuals are mixed swaps. (Tr. at 32:20-24.) In response, the government claimed that the MNGO Perpetuals are either "regular swaps" or mixed swaps "because USDC is a commodity . . . or because there are these fundings rates that are embedded in the contracts or in the [MNGO Perpetuals]."[9] (*Id.* at 32:25-33:7.) As detailed in the motion to dismiss and reply, the government failed to provide notice that the MNGO Perpetuals are commodities or swaps, and now shifts to an alternative theory that they qualify as mixed swaps. (*See* Dtk. 28 Mot. at 11; Reply at 3-4.)

As the CFTC put succinctly, "[a] mixed swap . . . is both a security-based swap and a swap." Further Definition of "Swap," "Security-Based Swap," and "Security-Based Swap Agreement"; Mixed Swaps; Security-Based Swap Agreement Recordkeeping, 77 Fed. Reg. 48208-01, 48291 (Aug. 13, 2012) (Joint final rule; interpretations; request for comment on an interpretation) ("Joint Final Rule"); *see also CFTC v. Archegos Capital Management LP*, 2023 WL 6123102, at *3 (S.D.N.Y. Sep. 19, 2023) ("[A] mixed swap is a swap that is both (1) based on a single security or narrow-based security index and (2) also based on another financial or economic interest falling within the CFTC's regulatory authority, such as a broad-based security index. In other words, a mixed swap is both a swap and a security-based swap.") (citing 7

---

[8] The government also raised a new argument at oral argument based on *CFTC v. McDonnell*, 287 F. Supp. 3d 213 (E.D.N.Y. 2018), asserting that it stood for the general proposition that "the antifraud provisions of the CEA apply to spot cryptocurrency transactions[.]" (Tr. at 52:8-15.) *McDonnell* involved the alleged theft of the popular cryptocurrencies Bitcoin and Litecoin by the defendants under the false promise of investment advice. 287 F. Supp. 3d at 217-18. The court in that case held that the CFTC had jurisdiction to bring suit even though the alleged transactions were in the spot market because the cryptocurrencies involved had futures markets. *Id.* at 227; (*see* Mot. at 13 n.4 (explaining that *McDonnell* is dicta as to any digital asset not involved in the case).) By contrast, MNGO is not alleged to have had a futures market and is not a commodity, and the alleged trades were therefore not contracts of sale.

[9] Regarding USDC being a commodity, that is alleged only in the complaint and argued in the government's opposition and is not alleged in the indictment. (Compl. ¶¶ 4, 8; Opp. at 11-12.) During the colloquy with the Court, defense counsel did not mean to say that the government's claim that USDC is a commodity is unchallenged for purposes of this motion. (Tr. at 38.) The defense simply was trying to make the point that the complaint alleges it and the opposition takes that position. In the latter, the government cites internet sources that it asserts demonstrate that USDC has a futures market, and the defense is not in a position to challenge that authority at this preliminary stage. (*See* Opp. 13.) The government, of course, bears the burden of proving that USDC is a commodity at trial, and the defense reserves its right to challenge that contention.





U.S.C. § 1a(47)(D); Joint Final Rule at 48291). The CFTC and SEC agree that the scope of mixed swaps is intended to be "narrow," and only covers "a small subset of Title VII instruments." *See* Joint Final Rule at 48211, 48291. The scope of mixed swaps extends only as far as needed to effectuate the purpose of Title VII of the Dodd-Frank Act. *See id.* at 48291.

Importantly, the government has never previously alleged, and certainly did not do so in either the criminal complaint or the indictment, that the MNGO Perpetuals are mixed swaps. Indeed, the indictment did not even allege that the Perpetuals were swaps of any kind. The complaint only generically alleges they are swaps, which are typically understood to mean commodities swaps. (Compl. ¶¶ 4, 8.; *see* Opp. at 11 (citing 7 U.S.C. § 1a(47)(A)(iii) (defining swaps the CEA governs)).) Moreover, the indictment does not allege the necessary underlying facts to conclude that the Perpetuals were mixed swaps; namely, that MNGO is a security.

An indictment must "contain some amount of factual particularity to ensure that the prosecution will not fill in elements of its case with facts other than those considered by the grand jury." *United States v. Pirro*, 212 F.3d 86, 92 (2d Cir. 2000) (internal citation omitted). For the mixed swaps theory, the government fails at step one because there is no allegation that the MNGO Perpetuals are based on a security or narrow-based security index. The government effectively conceded this point at oral argument when it said, "they're either just regular swaps and MNGO is not a security or they're mixed swaps both because USDC is a commodity . . . or there are these funding rates[.]" (Tr. at 33:2-7.) *Pirro* instructs that the government's answer, "well, maybe," is not enough for notice because prosecutors are not allowed "to make a subsequent guess as to what was in the minds of the grand jury at the time they returned the indictment[.]" *Pirro*, 212 F.3d at 92 (internal citation omitted).

Further, the MNGO Perpetuals were not mixed swaps because their value depended only on the value of MNGO and not USDC, which was merely the medium for settlement, no different than if the Perpetual had settled in dollars, pesos, or any other currency or currency equivalent. As the indictment noted, USDC is a "stablecoin" pegged to the value of the dollar. (Ind. ¶ 2.) During oral argument, the government made the unpersuasive argument, wholly untethered to any allegation in the indictment, that the trading manipulated the value of USDC, before reversing itself and conceding that "we're not making the argument that these trades were causing the USDC to depeg" or otherwise change "the price of USDC relative to the dollar." (Tr. at 10:22-11:13.)

To be a mixed swap, the MNGO Perpetuals have to be based in part on a security or narrow-based security index. The indictment does not identify/allege either, so the notice requirement is unsatisfied. As such, a mixed swap theory for either Count One and Two fails.

***

For all the reasons above, in Mr. Eisenberg's motion to dismiss and reply in support of it, and raised by defense counsel at oral argument, the Court should grant Mr. Eisenberg's motion and dismiss the indictment with prejudice.





Very truly yours,

Brian E. Klein
Ashley E. Martabano
Riley P. Smith
Waymaker LLP

-and-

Sanford N. Talkin
Noam B. Greenspan
Talkin, Muccigrosso & Roberts, LLP

Attorneys for Defendant Avraham Eisenberg