NC61EISA

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4           v.                 23 Cr. 10 (AS)

5   AVRAHAM EISENBERG,

6             Defendant.       Oral Argument
    ------------------------------x

7                          New York, N.Y.
8                          December 6, 2023
                          2:06 p.m.

9

10  Before:

11                HON. ARUN SUBRAMANIAN,

12                         District Judge

13                    APPEARANCES

14  DAMIAN WILLIAMS
15      United States Attorney for the
       Southern District of New York
16  BY:  THOMAS S. BURNETT, ESQ.
       PETER J. DAVIS, ESQ.
17      TIAN HUANG, ESQ.
       Assistant United States Attorneys

18

19  WAYMAKER LLP
      Attorneys for Defendant
20  BY:  BRIAN E. KLEIN, ESQ.

21  TALKIN, MUCCIGROSSO & ROBERTS, LLP
      Attorneys for Defendant
22  BY:  SANFORD N. TALKIN, ESQ.
       NOAM B. GREENSPAN, ESQ.

23

24

25

NC61EISA

```
1              (Case called)
2              THE DEPUTY CLERK:  Can the parties, starting with
3    counsel for the government, please state their appearances for
4    the record.
5              MR. BURNETT:  Good afternoon, your Honor.  I'm Tom
6    Burnett for the government.  I'm joined by Peter Davis and Tian
7    Huang.
8              THE COURT:  Good afternoon.
9              MR. KLEIN:  Good afternoon, your Honor.  Brian Klein
10   for Mr. Eisenberg, along with my co-counsel Sam Talkin and Noam
11   Greenspan.  And our client is present.
12             THE COURT:  Good afternoon.  And good afternoon,
13   Mr. Eisenberg.
14             Who is going to be doing the speaking on behalf of the
15   government today?
16             MR. BURNETT:  Largely me, your Honor.
17             THE COURT:  And for Mr. Eisenberg?
18             MR. KLEIN:  Me, your Honor.
19             THE COURT:  Okay.  So we're here for argument on the
20   pending motion to dismiss.  I'll start off by saying that as to
21   both the motion to dismiss and the motion to suppress, the
22   Court will deliver its decision no later than the end of next
23   week.  So I know that you've been waiting for a while, I
24   apologize for that, but we will work expeditiously to get you
25   decisions on both motions.
```

NC61EISA

1          So let's turn to the motion to dismiss.  The Court had

2     issued some questions or issues for the parties to address.

3     Let's start, Mr. Burnett, with the issue of USDC as a

4     commodity.  First, just a question of what the government plans

5     to do here.  Obviously you've alleged that the MNGO perpetuals

6     are swaps covered by the CEA.  Is the government actually

7     planning to proceed on the theory that USDC is a commodity for

8     Counts One and Two?

9          MR. BURNETT:  So I want to make sure I'm understanding

10     the question exactly.  Are you getting at the contract of sale

11     point or whether USDC itself is a commodity?

12          THE COURT:  I'm getting at just a question of what the

13     government plans to assert here.

14          MR. BURNETT:  Sure.  So with respect to whether USDC

15     is a commodity, the government certainly plans to argue that.

16          THE COURT:  So then walk me through the government's

17     theory as to how you get——let's focus on Count One.  Let me

18     take a step back.  Is that as to both Count One and Count Two,

19     meaning is the government contending that USDC is a commodity

20     and so, for purposes of Count Two, there was a manipulative

21     device as to the price of USDC?  Or is it just as to Count One?

22          MR. BURNETT:  So the fraud related to USDC is just as

23     to Count One.  Count Two focuses solely on the swap.

24          THE COURT:  Perfect.  Okay.  So let's go to Count One.

25     So could you walk me through how you get from USDC as the

NC61EISA

commodity, so you have a contract of sale of USDC, and then how

you have a manipulative device in connection with that contract

of sale of USDC, given the allegations of the indictment that

focus on the manipulation of the MNGO perpetuals.  So that's

the kind of question that I have, and I'm hoping that you can

help me with that.

          MR. BURNETT:  Sure, your Honor.  First, just

logistically, do you mind if I go over there or just sit, just

so I'm not like hunched over?

          THE COURT:  Whatever is more convenient for you.  I'm

happy for you to sit; I'm happy for you to use the lectern, if

it's more convenient.

          MR. BURNETT:  Okay.  I'm happy to just use the

lectern.

          THE COURT:  Perfect.

          MR. BURNETT:  So before I get directly to the question

you asked, I want to make sure I'm clear about something on

framing, just for procedural purposes.

          As the Court is aware, in connection with criminal

indictments, the government doesn't need to lay out its theory

of how it plans to meet all the elements of a crime, and for

purposes of evaluating a motion to dismiss, there's a

difference between when the government is representing that

it's making a full proffer of its facts versus not making a

full proffer of its facts, and at this stage the government is

NC61EISA

1    not taking the position that it has and is laying out all the

2    facts that support the charge in the case here, which I just

3    want to make sure I'm putting on the record for purposes of

4    analyzing the motion to dismiss.

5         THE COURT:  I understand that.  But you would agree

6    that under cases like *Pirro*, if something that's in the

7    indictment simply isn't a crime, then that is something that

8    the Court can consider on a motion to dismiss, correct?

9         MR. BURNETT:  So if it is the case that the government

10   has committed that what it has laid out in the indictment is

11   the full extent of its proof here, I think there's a difference

12   between the speaking portion of the allegation and the portion

13   of the indictment that outlines or identifies the statutory

14   language.  Our position is that if we've tracked the statutory

15   language, the rest of the indictment gives some notice to the

16   public and to the defendant about what the crime is but is not

17   a full statement of the government's proof or legal theories.

18        THE COURT:  So how do you square that with cases like

19   *Pirro*, where the court didn't just look to see whether the

20   elements of the statute were alleged in the way that you're

21   suggesting, but actually performed an inquiry to determine

22   whether there was a crime, given the law and the case law——on

23   the tax issue it was in that case——and a majority of the court

24   said that because the facts as alleged did not constitute a

25   crime in the view of the majority, then that portion of the

NC61EISA

1    complaint, at least, would be dismissed?

2                MR. BURNETT:  So my understanding is that there, there

3    was more of a commitment from the government in terms of, what

4    you're reading in the indictment here is the full statement of

5    the crime, and that's the reason the court was able to proceed

6    on those grounds, and under those circumstances, it's

7    appropriate to do so.

8                THE COURT:  Okay.  So that's the difference between

9    *Pirro* and cases like *Dawkins* and *Wedd* that indicate that where

10   the question is really is whether facts could be put forward at

11   trial that would constitute a crime, that's not really an

12   inquiry that the Court engages in on a motion to dismiss.

13               MR. BURNETT:  Right.  And so you know the reason it's

14   set up that way is because the government can appeal from a

15   grant of a motion to dismiss, but whether it can appeal from a

16   Rule 29 decision depends on a number of other factors.  So

17   basically it's set up to allow the government to commit early

18   on that this is the full statement of what we're trying to

19   prove here, so if the Court dismisses the case on those

20   grounds, the government can appeal directly, whereas it may not

21   have that opportunity to do so otherwise.  So it's not really

22   analogous to, like, civil motions to dismiss or summary

23   judgment, where it's either party can kind of raise something

24   in the same way.

25               THE COURT:  Well, the language of the criminal

NC61EISA

1    provisions that are at issue and the language in the analogous

2    civil rules, the language is very similar, and so the approach

3    that——I understand what you're saying about the appellate

4    rights and it's a different context, but it seems that the law

5    in the criminal context is almost like the pre-*Twombly* standard

6    of, well, if the government can succeed on any set of facts,

7    then it's permitted to move forward, whereas in the civil

8    context, obviously there is a plausibility or a sufficiency

9    analysis that is done at the pleading stage.  But I understand

10   your point, I understand the argument, and I understand the

11   authorities in this area.  So with that, maybe you can help me

12   out a little bit on the USDC question.

13         MR. BURNETT:  Of course, your Honor.  So why don't I

14   start with why this is a contract of sale for a commodity, and

15   then I'll go from there to why the fraud is in connection with

16   the contract of sale.  So the first question——

17         THE COURT:  I understand that USDC satisfies the

18   definition of commodity, at least in the government's

19   perspective, because there's an existing futures market for

20   USDC, and then obviously there are allegations in the

21   indictment about a sale of USDC in exchange for MNGO.  So

22   tracking the language of the CEA and the language of the

23   indictment, you have not only alleged the elements of the

24   statute but you've explained how the facts map onto those

25   elements.  So I'm with you till then.  And I'm going to turn to

NC61EISA

1    the defense and get their perspective, but I'm with you up to

2    that point.  So maybe you can take me from there.

3          MR. BURNETT:  Sure.  And I think the first question

4    you had put in the order was whether USDC——whether these are

5    contracts of sale, and I think our position is they are

6    contracts of sale, and the reason primarily is the plain text

7    of the statute.  The statute defines a contract of sale as any

8    sale, agreement of sale, or agreement to sell; and the

9    regulatory language interprets that as sales, purchases,

10   agreements of sale, or purchases and agreements to sell and

11   purchase.  So I think selling USDC for MNGO is a heartland in

12   the textual definition of what a contract of sale of a

13   commodity is.  There's a point that the defense raises that,

14   well, here, USDC is used as a medium of exchange, as opposed to

15   some other thing.  I think there are a few issues with that

16   argument.

17          First, there's no carveout from the definition of

18   "contract of sale" in the CEA for what the purpose is that the

19   commodity is being used, i.e., whether it's being used as a

20   medium of exchange or not being used as a medium of exchange.

21   So we don't think there's a reason to add that textual

22   limitation on the contract of sale language.

23          And the second thing, which I think is the statutory

24   context that helps the Court understand that point, relates to

25   some important carveouts that are in the text of the CEA.  So

NC61EISA

| | |
|---|---|
| 1 | Section 2 of the CEA, which relates to the jurisdiction of the |
| 2 | CFTC and also the reach of the CEA, has extensive and very |
| 3 | detailed carveouts for different types of foreign currency |
| 4 | transactions, including foreign currency spot transactions, |
| 5 | foreign currency swaps, foreign currency options.  And the |
| 6 | reason that the statutory scheme needs to have all those |
| 7 | carveouts for foreign currencies is because foreign currencies |
| 8 | otherwise do fall in the definition of "commodity" and would be |
| 9 | subject to the same contract of sale that— |
| 10 | THE COURT:  Could I have the citation for that again. |
| 11 | MR. BURNETT:  7 U.S.C. Section 2 is the portion of the |
| 12 | statute that is about the jurisdiction.  In terms of the |
| 13 | carveout specifically, I do have it here.  Just a moment. |
| 14 | Yeah, so it's primarily in 7 U.S.C. 2(c)(1)(A). |
| 15 | THE COURT:  Got it.  So if I'm understanding you, if |
| 16 | there was this carveout for mediums of exchange, then you |
| 17 | wouldn't need these explicit carveouts for things like foreign |
| 18 | currency, spot transactions, because currency is a medium of |
| 19 | exchange, and yet Congress saw fit to have explicit carveouts |
| 20 | for those because they would otherwise fall within the |
| 21 | definition of "commodity." |
| 22 | MR. BURNETT:  That's exactly right.  And to put even |
| 23 | just a little bit of pressure on the medium of exchange concept |
| 24 | shows that it easily falls apart.  So imagine that the |
| 25 | transactions here had been buying MNGO with Bitcoin instead of |

NC61EISA

1   buying MNGO with USDC.  There are people who use Bitcoin as a

2   medium of exchange.  That's a main function that it's pitched

3   as being able to serve as.  But this medium of exchange test

4   would require you to kind of analyze, on a case-by-case basis,

5   whether the person in this situation is using it as a medium of

6   exchange versus as a way to hedge a Bitcoin risk or a gain or

7   lose exposure to Bitcoin, which there's nothing in the statute

8   that would justify that intent-based definition of "contract of

9   sale," as opposed to just, is a commodity involved in this

10  contract of sale.

11          THE COURT:  I understand that.  Perhaps the stronger

12  version of the argument is, let's assume that you're right.  So

13  you have a contract of sale of USDC, but where the medium of

14  exchange point really factors in is the "in connection with"

15  requirement, meaning the manipulative device has to be in

16  connection with the contract of sale of USDC.  And so when you

17  kind of read all that text together, it seems like you have to

18  have manipulation as to USDC, which is not at least alleged in

19  the indictment.  Whether that's grounds for dismissal or not,

20  it's not the gravamen of the indictment, since the indictment

21  is focused on the manipulation of the MNGO perpetuals.

22          MR. BURNETT:  So I certainly agree that the heart of

23  the indictment is about the perpetuals, and we can get to that

24  later.  But I do think that the case, that the indictment also

25  makes out manipulation in connection with these contracts of

NC61EISA

1   sale.

2          THE COURT:  Of USDC.

3          MR. BURNETT:  Of USDC.  Because——so it's not

4   manipulating the price of USDC in the sense of manipulating the

5   price of USDC relative to the dollar.  So we're not making the

6   argument that these trades were causing the USDC to depeg in

7   some way.  Rather, what it's doing is it's——I think what's

8   important here is this is not like using USDC to, like, buy a

9   potato or, like, buy a taco truck.  The way the

10  cryptocurrencies trade is very similar to the way that foreign

11  exchange trading is done, in the sense that they trade as

12  pairs, and so their value is really the pair relative to one

13  another.

14          And to kind of illustrate the point here, it is

15  certainly the case that the trading here caused the MNGO, the

16  value of MNGO relative to USDC to change substantially.

17  Because the trading happens so quickly, I'm actually not even

18  sure if it changed the value of MNGO relative to, say, Bitcoin

19  or the dollar or to other assets that it might trade in.

20          So I think it's wrong to think about this in terms of

21  just, did it change the value of USDC.  To change the value of

22  USDC relative to what?  And here, there was manipulation of the

23  MNGO USDC market, which caused the relative value of those two

24  currencies to change dramatically.  And the contracts of sale,

25  the sales of USDC for MNGO, was how that happened.  This was

NC61EISA

1   directly in a USDC market where the manipulation occurred, and

2   that's why the manipulation was in connection with USDC, even

3   though the ultimate end goal was to manipulate the price of the

4   swap to get money from investors on the Mango Markets platform.

5   And I think to kind of illustrate——

6          THE COURT:  Am I correct that both the contracts of

7   sale, meaning the trades, the sales of USDC for MNGO and then

8   the MNGO perpetuals themselves, they both implicate the pair

9   that you're referring to, meaning the USDC-MNGO pair.  So

10  whether you look at it in terms of the swap or whether you look

11  at it in terms of the contract of sale of USDC, you're talking

12  about the same pair of instruments, either securities or

13  commodities or however it's defined.

14         MR. BURNETT:  So that's right, with one caveat that I

15  actually think is important to this foreign exchange analogy

16  that I was making earlier.  So not only does the USDC-MNGO pair

17  kind of trade as its own value pairing; it trades as its own

18  value pairing differently on different platforms.  So basically

19  what happened here is there were three platforms that were

20  relevant to the trading, and the defendant's trading caused the

21  relative value of MNGO and USDC to change to different extents

22  on each of those platforms, and Mango Markets basically had a

23  software program that took, looked at that trading——

24         THE COURT:  This is before——

25         MR. BURNETT:  Yeah——and drew from that.  So there is

NC61EISA

1    actually a difference between the USDC-MNGO measure that you're

2    seeing on Mango Markets as opposed to the values, but I think

3    this actually goes to show why this is manipulation in

4    connection with USDC as well, because on all these separate

5    platforms, there's separate changes to this relative value of

6    USDC-MNGO that are independent of the way the swap value is

7    changing and independent of the way that value is changing on

8    the other platforms as well.

9           THE COURT:  Okay.  So your position is because you

10   have this pair and that pair is what was involved in the

11   contract of sale of USDC, that's how you get from "in

12   connection with" to "contract of sale" to the underlying

13   commodity, since USDC, the only way it could be really carved

14   out would be if there was any credence to the medium of

15   exchange concept.  You say there isn't any basis for it in the

16   statute, and there are explicit carveouts for certain other

17   mediums of exchange, and so this wasn't one of the explicit

18   carveouts that Congress put in place.

19          MR. BURNETT:  Not only that.  I think it would do some

20   serious damage to the way CFTC has regulated in this area or

21   given guidance in this area to do a medium of exchange

22   carveout.  So there's one regulatory guidance piece that we

23   cited in our briefing which relates—the CFTC guidance related

24   to retail commodity transactions, which really aren't relevant

25   here, but what is important is in that guidance, the way the

NC61EISA

```
1    CFTC identifies which cryptocurrencies are commodities, it's
2    really by looking at which cryptocurrencies are used as mediums
3    of exchange versus other cryptocurrencies, which kind of have
4    different purposes.  So in fact, the way the CFTC has
5    identified the universe of cryptocurrencies that are
6    commodities is by looking at which ones are used as mediums of
7    exchange.  It would do some serious damage to the way they've
8    approached that issue to say medium of exchange is carved out
9    entirely.
10            THE COURT:  Okay.  So you've covered "in connection
11   with," "contract of sale," and USDC as a commodity.  So I'm
12   going to take you one step backward to "manipulative device."
13            So if I'm conceiving of it in this way——and you've
14   made clear that the swaps market is different, it's on a
15   different platform, there's a different analysis there.  So if
16   we're just focusing on the USDC-MNGO transactions, then how was
17   there any price artificiality or manipulative device as to
18   those trades, given that they were open-market USDC sales for
19   MNGO?
20            MR. BURNETT:  And that goes to the Second Circuit case
21   law in the securities context primarily, but it's also been
22   applied in the commodities context, which is that open-market
23   trades that are designed to move a price can be manipulative
24   and fraudulently manipulative and can create an artificial
25   price when what is determining the price is really the
```

NC61EISA

1    intentional rigging by the trader as opposed to the natural

2    interplay of supply and demand.

3            THE COURT:  It was literally just Mr. Eisenberg's

4    intent when he was engaging in those sales?

5            MR. BURNETT:  Yes.  And the Second Circuit has

6    explicitly held that sometimes intent is all that——the

7    difference between lawful trading and nonlawful trading in the

8    context of open-market manipulation.  That was most recently

9    the *Vali Management* case, which affirmed a jury instruction

10   from Judge Cote in *LEK Securities* that said that explicitly.

11   And Judge Liman in the *Phillips* case——which happened just a

12   couple weeks ago——gave a similar instruction.

13           THE COURT:  Okay.  So is there any other conduct other

14   than the allegation and Mr. Eisenberg's intent that would

15   support a finding of there being a manipulative device or a

16   price artificiality just with respect to the USDC-MNGO trades?

17           MR. BURNETT:  So this also gets into some of the

18   points we made about the secretive way in which Mr. Eisenberg

19   got on to those platforms.  So with respect to one of the

20   platforms, Mr. Eisenberg used someone else's identity to get on

21   to the platform and did the trading under that different

22   person's identity.  With respect to another platform he used——

23           THE COURT:  VPN, and came in through pull-in, I think.

24   That's not in the indictment, but——

25           MR. BURNETT:  Yeah, that's right.  There was actually

NC61EISA

1     like literally a passport photo of a Ukrainian woman that was

2     used to register the account.  So it wasn't just a VPN alone;

3     it was also this fake identity.

4             THE COURT:  Okay.  I understand that on USDC.

5             So that takes us to MNGO perpetuals as the swaps.  And

6     so obviously in the order that the Court issued, we cited to

7     language from the government's brief in *Phillips*, where it

8     discussed the "in connection with" requirement.  And I

9     understand that *Phillips* was a different situation, where the

10    real question was whether you could have manipulative conduct

11    on an unregulated market that then has an impact in a regulated

12    market, so it's a different factual context.  That being said,

13    the government did characterize the "in connection with"

14    requirement in a way that does not seem to map very clearly

15    onto what happened in this case.  So I'm hoping you can help me

16    with that.

17            MR. BURNETT:  So to the extent that's the way it read,

18    I was part of the trial team for *Phillips* and——

19            THE COURT:  You wrote it.  You wrote that language.

20            MR. BURNETT:  ——that was not the intent of the way we

21    wrote.  As you pointed out, there was a concern that

22    Judge Liman had expressed at different points during the case

23    that basically there is clear——this actually goes to the point

24    I was making earlier about foreign exchange.  There are clear

25    laws that carve out spot foreign exchange trading from certain

NC61EISA

1     types of CFTC regulation, and what Judge Liman was expressing a

2     concern about was that we would, either in that case or down

3     the road, basically charge spot manipulation cases and say,

4     well, there are, like, swaps that are based on this.  Those

5     swaps aren't really important to, like, the case, they don't

6     matter to anyone involved, but, like, they're swaps so we can

7     charge it.  And the sentence was meant to emphasize that this

8     is not that——that *Phillips*, sorry, not this——the *Phillips* case

9     was not that type of scenario.  There, the spot market

10    manipulation was done specifically to manipulate a swap, that

11    that was the goal, and the whole point of the manipulation was

12    to defraud the parties to that swap.  What we weren't trying to

13    do in that language was define the entire universe of "in

14    connection with," and the definition of——

15             THE COURT:  Okay.  So do you have a case for me?

16    Because if we look back, the best authority you probably have

17    for how "in connection with" should be construed is from some

18    of the pronouncements of the CFTC in connection with the

19    promulgation of Section 180.1, in which they indicate that if

20    there is impact to the market, then that would be within the

21    broad scope of what the Commission thought should fall under

22    "in connection with."  But if you look at the securities cases

23    that are often looked to as analogies——like *Chadbourne & Parke*

24    and some other cases——they're usually in the context of the

25    manipulation having to do with counterparties to the

NC61EISA

1    transaction; really, you're trying to deceive someone who is in

2    one of these transactions in which the manipulation is

3    occurring.  And obviously we don't have that here because

4    Mr. Eisenberg is on both sides of the swap transaction.  So

5    help me out with that, if you have a case or some authority

6    that would show that it has a broader scope than just that.

7              MR. BURNETT:  Absolutely.  And if you don't mind, or

8    bear with me, I think there's a little bit of stepping back,

9    because there are a lot of cases that I think go to this point.

10             But first, before we do that, I want to just kind of

11   hit on the kind of basic factual theory of what we're working

12   with here, because that will help understand, or help kind of

13   guide the analysis of the case law.

14             What's important here is while it is true that

15   Mr. Eisenberg was on both sides of the swap, there wasn't like

16   some investor on the other side of the swap, the Mango Markets

17   platform, and, by extension, the Mango Markets investors, were

18   taking on Mr. Eisenberg's swap position as collateral for a

19   loan.  So the way that the platform works is basically that

20   you're allowed, as a user of Mango Markets, to borrow against

21   the value of assets that you have, including swap positions

22   that you have.  And the extent of your borrowing is dictated by

23   the size of your positions.  And when you do that, you're

24   putting up your positions as collateral for the loans that

25   you're getting.  And the way it works is if you don't have

NC61EISA

1    enough collateral, at some point you get liquidated, which

2    means a liquidator comes in, takes that position, and tries to

3    sell it off to recoup as much as it can of the value of the

4    asset, which is very, very similar, basically the same——

5              THE COURT:  No, I get that.  The problem I have there

6    is that at that point, right, you're outside of the swap market

7    or the commodity market, unless you're conceiving of the

8    ultimate transaction, when Mr. Eisenberg is alleged to have

9    borrowed and withdrawn cryptocurrency, based on his holding in

10   the MNGO perpetual, as almost being a sale back to Mango

11   Markets of the MNGO perpetual in exchange for the crypto that

12   he then takes.  So then you can kind of conceive of Mango

13   Markets as being a party in the swaps market.  They're taking

14   on his position in the swap in exchange for lending him this

15   cryptocurrency.  But, you know, the actual transaction is

16   outside of the actual swap market.  They're not a counterparty

17   to the swap; he's not selling a swap; he's not doing anything

18   in the swap market itself.

19             MR. BURNETT:  So I disagree.  I think both practically

20   and with the securities case law, that's not the way it works

21   out.

22             So practically, one way to think about this is like,

23   imagine if you had a statute that said fraud in connection with

24   housing is prohibited.  What that analysis basically is saying

25   is that if someone were to fraudulently inflate the value of

NC61EISA

| 1 | their house to get a massive home mortgage loan, that's not |

their house to get a massive home mortgage loan, that's not

fraud in connection with housing because the bank is taking the

house as collateral but is not actually buying it.  The

"purchase and sale" language that you're focusing on, or this

need for there to be some kind of sale, is not in the swap part

of the Commodities Exchange Act.  It is in the 10b-5 context,

but it's not in the Commodities——

THE COURT:  Yeah, the purchase and sale, that

restricts the "in connection with" language in the securities

context in a sort of different way, because what I'm saying

here is that, I give you that if there is a manipulative device

in connection with the swap, in any point in the swap

transaction, that would count under the CEA, while it might not

work in the securities context because of the buy and sell, the

"purchase and sale" language.  But what I'm saying here is that

the actual transaction with Mango Markets occurs not in the

context of the swap transaction itself; it's just that the swap

functions as collateral for the borrowing that Mr. Eisenberg

does subsequent to the alleged manipulative conduct, right?

MR. BURNETT:  So it doesn't occur in connection with

the creation of the swap, but it occurs in connection with the

pendency of the swap and the use of that swap as collateral.

And the reason that's important is, if you look to the

regulatory language on this, the CFTC was actually very clear

that pendency of the swap was one of the things it was focused

NC61EISA

1    on.

2              But I think to kind of go back to the securities

3    context for a minute, there's actually a really useful Supreme

4    Court case, and I think it's helpful to think about this, and

5    it's—if I can just pull it up here.

6              It is the *Rubin* case.

7              THE COURT:  And do you have a cite?

8              MR. BURNETT:  Yeah.  It's 449 U.S. 424.  So that's a

9    '33 Act case, so it's not a 10b-5 case.

10             THE COURT:  Give me that citation again?

11             MR. BURNETT:  Sorry.  It's 449 U.S. 424.

12             THE COURT:  Okay.

13             MR. BURNETT:  And so that was a '33 Act case, but it's

14   been applied both by the Supreme Court and the Second Circuit

15   to the '34 Act/10b-5 context.

16             So the facts of that case were very similar in a lot

17   of ways to the facts we have here.  In that case, the defendant

18   had used and misrepresented the value of securities that he was

19   pledging to secure a loan.  And the question before the court

20   in that case was whether that pledge of securities was in an

21   offer or sale of a security.  And the Supreme Court held, yes,

22   it is in an offer or sale of a security because by pledging

23   this as collateral, you're effectively giving a contingent

24   future possessory interest to the other side in that property.

25   And that language "in the offer or sale" from the '33 Act is

NC61EISA

textually narrower than the "in connection with" language.  And
the Supreme Court has recognized that, in *Marine Bank v.
Weaver*, which is 455 U.S. 551, footnote 2, the court explicitly
recognizes that this idea that a pledge of security for a loan
is the same thing as an offer or sale of a security applies to
the 10b-5 context.  The Second Circuit has also recognized that
in *Chemical Bank v. Arthur Andersen*, which is 726 F.2d 930.
Now there, the court found that the pledge was not "in
connection with" for factual reasons but adopted this basic
premise from *Rubin*.

          So I think this *Rubin* line of cases is important for
two different reasons.  First, it would be I think anomalous to
interpret the Commodities Exchange Act, which does not have
this "purchase or sale" requirement, as narrower than 10b-5,
which has this "purchase or sale," which is an additional
limitation on the "in connection with" requirement.  That's the
first part.

          And then second, I'd urge you to read kind of the
rationale of the court in *Rubin*, because the court does a good
job there I think of explaining why, for antifraud purposes and
the policies behind the antifraud laws, it doesn't make any
sense to treat an investor in a security differently than
someone who's taking that security on as collateral for a loan,
because in both cases they're relying on the counterparty to be
truthful about the value of that, the expected future value of

NC61EISA

1    that, and they're in the same type of alliance position.  And I

2    think that goes back to this housing analogy that I was making

3    earlier, which, if you have "in connection with" a house

4    instead of "in connection with" a swap, there's no reason to

5    limit that with just a purchase or sale of a house as opposed

6    to do with anything to do with the ownership of the house,

7    including using that house as collateral for a loan.

8         So I think what this shows is Mango Markets and Mango

9    Markets investors very much are in the swaps market.  They're

10   not necessarily, for this transaction, involved in the swap

11   itself, but they're beholden to the value of the swaps market

12   because they're taking Mr. Eisenberg's swap position on as

13   collateral for their loans.

14        So I think there are kind of other cases that make the

15   same point.  I think there's a line in *In re American*

16   *Continental*, which is a Ninth Circuit case, 49 F.3d 541, which

17   is:  A pledge of securities to secure a margin brokerage

18   account constitutes a purchase or sale.  And I think there's

19   actually one kind of recent S.D.N.Y. case before Judge Abrams

20   that helps illustrate this point a little bit.  So it's *U.S. v.*

21   *Hild*.  The relevant case citation is 644 F.Supp.3d 7.  But the

22   case citation isn't as important as the basic facts.  And the

23   idea in that case was, you had a defendant who ran a company

24   that basically bundled different types of loans and mortgages

25   into portfolios.  And those in the case were the security,

NC61EISA

1    those portfolios.  And what the defendant did was

2    misrepresented the value of those securities to go out and get

3    loans from borrowers that it needed to keep things going.  And

4    in that case, it was a repo loan, so technically there was a

5    purchase or sale because the borrower was, like, briefly taking

6    on the portfolio.  But it makes no sense as a matter of text or

7    policy to treat like a repo loan differently from a collateral

8    loan in these contexts.  In both situations, you're beholden on

9    the persons making the representation to honestly represent the

10   value of the thing that they have.

11            So I think that kind of is the set of case law that

12   most directly addresses the Court's question.  There's a

13   broader set of case law also that I think is very clear that

14   the fraud does not need to be directed or aimed at an investor

15   in order to meet these standards.  These are also from the

16   securities context largely, but if you'll bear with me, I'll go

17   through a couple, just because I think they're useful for the

18   legal point.

19            THE COURT:  Sure.

20            MR. BURNETT:  So the first kind of bucket of cases are

21   the misappropriation theory of insider trading cases.  So in

22   those situations, the victim of the fraud is not purchasers or

23   sellers of a security; the victim is the corporate entity

24   usually that had their information misappropriated.  So the

25   fraud is not directed at investors; the fraud is directed at

NC61EISA

1    the company.  But the fact that the proceeds of that

2    fraud——basically the fraudulently obtained information——is used

3    to purchase a security has been sufficient to satisfy the "in

4    connection with" requirement.  And like the Supreme Court in

5    *O'Hagan* was clear that Section 10(b) does not confine its

6    coverage to deception of a purchaser or seller of securities.

7    There's kind of a separate line of cases, the most recent of

8    which is *U.S. v Khalupsky* in the Second Circuit, 5 F.4th 279.

9    And that's a case where what happened was a trader basically

10   worked with a team of hackers to hack into news sources to get

11   information that they then used for trading.  So it's another

12   situation where the fraud was on those victims of the hacking,

13   not on anyone who was in the market for those securities.  But

14   the Second Circuit also held that that satisfied the "in

15   connection with" requirement.  And the relevant quote is:  "The

16   defendant's assertion that the deception must have targeted

17   investors contradicts the plain language of 10b-5.  The

18   deception need be only in connection with the purchase or sale

19   of any security."  So that's kind of one set of cases.

20          Another set of cases are these fraud on the broker

21   cases.  So I think the kind of clearest one here is a Garland

22   opinion from the DC Circuit, which was *Graham v. SEC*.  That's

23   222 F.3d 994.  And it's a little bit of a complicated fact

24   pattern, but the basic gist of it is that the defendant there

25   had brokerage accounts at a bunch of different brokers and

NC61EISA

owned like basically one batch of securities, but he was

running short on cash.  So what he'd do is he'd sell the

securities from himself at one brokerage account to his own

brokerage account at a different broker, at an inflated price,

and because of the rules about the timing on which he could

take out a loan using the proceeds of the sale as margin versus

what he actually needed to, like, cover for the sale he just

made allowed him to get basically a bunch of loans from his

brokers using these sales to himself, that were not real sales,

to fund the transactions.  That was held to be in connection

with the purchase or sale of a security, even though there,

it's clearly no fraud on the investor.  He was the investor.

It's fraud on the broker.  And it's actually pretty much on all

fours with this case here in the sense that it's

misrepresenting the collateral to get out a loan from another

entity.  In that case it was a broker; and here, the folks on

Mango Markets.

THE COURT:  And there's no reliance or injury

requirement here, right?  So it's really a question of

just—the government, in its brief in *Phillips*, said

"material."  And is that the right way to think of the "in

connection with" requirement, meaning, who would the

manipulative device have been material to, whether it's a party

to the transaction, a broker, some of the other examples that

you're giving?  How do you conceive of it in this context where

NC61EISA

1    you don't have, as you would in the civil context, a plaintiff

2    saying that they were the targets of the manipulative device

3    and were injured as a result of it?

4          MR. BURNETT:  I actually think it's just the standard

5    instruction on "in connection with," which was just, did this

6    coincide with or was it a necessary aspect to the scheme.  The

7    material point is something we can address and will, assuming

8    this case goes to trial, in connection with jury instructions.

9    I think the government's position is that materiality is

10   something you need to prove in misstatement cases but not in

11   price manipulation cases.  But that is I think something that's

12   certainly not a motion to dismiss type issue.  It was heavily

13   litigated before Judge Liman later on in the case.

14         THE COURT:  Okay.  And did these questions solely

15   arise with respect to Count One?  Do they come up in the

16   context of Count Two in another form?  Count Two doesn't have

17   the "in connection with" language, but is there some other way

18   that there is some balance on Count Two, the language there?

19         MR. BURNETT:  So I think——they don't apply to Count

20   Two, and I think the way to think about the difference between

21   Count One and Count Two is that Count One is a fraud charge,

22   Count Two is not a fraud charge.

23         So for Count One, Count One basically recognizes——or

24   the CEA and the Dodd-Frank Act that lead to Count One basically

25   recognize that fraud can be manipulative because it can be used

NC61EISA

in—or manipulation can be fraud because it can be used in a
deceptive way.  So that's why, when the government needs to
prove its case with respect to Count One, it has to satisfy not
only the "in connection with" element but also these elements
about "scheme to defraud," "specific intent to defraud," that
sort of thing.  Those elements are not present with respect to
Count Two, and that's because Count Two has a bit of a
different genesis.  Count Two is a much older statute that
dealt with—I think the way to think about it, really, is it's
almost more of an antitrust statute, which is basically using
market power to manipulate swaps or manipulate certain
contracts related to commodities is per se criminal without
regard to whether it's fraudulent or not.  And to kind of think
about the difference, you can imagine a situation—the way we
like to think about it is kind of like old-timey market
cornering.  So if someone—let's think back to, like, Ulysses
S. Grant era—like, had a corner on the market for gold, which
is a thing that happened back then, Count Two would prohibit
that person from using the market power to corner the gold
futures market and manipulate the price of gold options.  Even
if they were going out on Wall Street and yelling, "I'm doing
this, I have market power, you all have to pay me whatever I
want," because that would be manipulation, that would not be
fraud because it would be totally forthright, he'd be
announcing what he was doing, it would be very public to

NC61EISA

1    anyone, so it would not be actionable under Count One, because

2    it would be fully disclosed.  But it would apply under Count

3    Two.  And I think the difference——why one has a fraud origin

4    and the other doesn't have a fraud origin——goes to kind of, who

5    is it aimed at, who is it deceiving, that kind of thing,

6    doesn't really make sense, because what matters is the object

7    of Count Two is the swap, is manipulating the price of the

8    swap.  That's it.  And he needed specific intent to create an

9    artificial price, which is kind of the trick for Count Two that

10   does not apply to Count One, but——or at least not explicitly,

11   because he needs to both have achieved and specifically

12   intended the artificial price.  So there's kind of more going

13   on that are separate elements in Count Two that don't appear in

14   Count One, but not the ones that the Court has been focused on.

15          THE COURT:  Okay.  And then same question on the

16   manipulative device and price artificiality as to the swap

17   transaction.  Putting aside any conduct in the separate market

18   for the contracts of sale of USDC that we previously discussed,

19   the additional deceptive conduct, in the government's view,

20   would be either the failure of Mr. Eisenberg to disclose that

21   he had no intent to repay the loan——is there anything else with

22   regard to the swap that the government would say constitutes

23   deceptive conduct?  I understand your intent point.

24          MR. BURNETT:  Yeah.  So it goes to the borrow broadly.

25   It's not only not expressing intent not to repay but not to pay

NC61EISA

1    interest, and not to——and that, like, the value of the thing

2    you're taking a loan out against is fraudulently inflated.

3         THE COURT:  Okay.  And how do you respond to

4    Mr. Eisenberg's argument that the protocols just weren't set up

5    in that way, that it's not a conventional contract where you

6    sign on the dotted line and agree to repay with interest and

7    everything the government contends, the protocols just allow

8    you to borrow and withdraw, that's what it allows you to do, so

9    there's nothing that was not permitted by the Mango Markets

10   protocols that Mr. Eisenberg did.

11        MR. BURNETT:  So I think the answer there is that you

12   are still——it's called a smart contract for a reason.  You are

13   still agreeing to do this.  It's self-executing in the sense

14   that the code automatically will take the interest payments

15   from you if it's there, but you're still making this

16   representation that you're doing a borrow and that——and you're

17   signing up for interest to be drawn down from your account.  I

18   think the cases that we cited in the wire fraud context are the

19   ones that are most on point here.  There are a couple.  I think

20   the first one——and I don't have the citations as handy, but

21   they're in our brief.  So, *Durland*.  So *Durland* was the older

22   Supreme Court case where there was a——basically someone issued

23   a bond with no intent to actually make the scheduled coupon

24   payments that were on the bond.  And the Supreme Court held

25   that, well, that's fraud because you made——you incurred the

NC61EISA

obligation with no intent to carry it out, at the outset of the

time you made that obligation.  So the fact that it was public,

that everyone could see the bond or that there were other

contractual remedies people could have pursued to kind of get

back the bond payments didn't change the fundamental point that

it was still a fraudulent representation.  And the *Countrywide*

case recognized that that's still good law in the Second

Circuit, albeit on the facts of *Countrywide*, it didn't apply.

I think the other cases are these spoofing cases in the Second

Circuit——or, sorry——the Seventh Circuit we cited, which were

*Chanu* and *Coscia*, and there, basically the fraud was putting in

buy or sell orders into order books for commodities with the

intent to pull those buy and sell orders before someone

actually hit them.  And the idea there is that you're very

publicly putting out this representation, I'm here to buy, I'm

here to buy, and if someone hit that bid, you would be

obligated to buy and go through with it, but what makes it

deceptive is you're putting out that representation; you're

saying, I'm willing to take on this obligation, when you

secretly have no intent to do so.  So it's the expressing

willingness to take on a certain obligation with the concealed

intent not to actually go through with it that makes it

deceptive.

          THE COURT:  Okay.  And there's an allegation in the

indictment that as to the two accounts that Mr. Eisenberg

NC61EISA

1   allegedly used to have the long and short MNGO perpetual

2   positions, they were not known to the public to be owned by

3   him.  What is that allegation and what is its significance

4   here?  Do you remember the allegation?

5           MR. BURNETT:  I remember the allegation.  I mean, the

6   significance is in part that people would not have known,

7   looking at it, that it was the same person that was—that was

8   involved in the transaction.

9           THE COURT:  Does that matter?

10          MR. BURNETT:  It matters to the extent that there

11  would be a defense at trial or otherwise that this was all

12  publicly disclosed, not just that there was buying but that the

13  buying was done by Mr. Eisenberg and it was done for this

14  particular reason.

15          THE COURT:  Well, Mango Markets was certainly aware in

16  its system that Mr. Eisenberg was on both sides of the

17  transaction; is that correct?

18          MR. BURNETT:  I don't think that's right.

19          THE COURT:  You don't think that's right.

20          Okay.  Last question:  Are MNGO perpetuals mixed

21  swaps?  Is that the government's contention?  I know it's not

22  in the indictment, but given the SEC's position that MNGO is a

23  security, it would have to be a mixed swap for the CEA to apply

24  here, right?

25          MR. BURNETT:  So we definitely think they qualify as

NC61EISA

1     mixed swaps.  We think whether MNGO is a security is not really

2     something that is decisive to the case because they're either

3     just regular swaps and MNGO is not a security or they're mixed

4     swaps both because USDC is a commodity, which brings it into

5     mixed swaps territory, or because there are these funding rates

6     that are embedded in the contracts or in the perpetuals, which

7     are another basis for moving it into the mixed swap.

8            THE COURT:  And just teach me, just a 101 question,

9     but is it permissible for the government in a criminal

10    prosecution to take a position that is different than a

11    position that the SEC is taking in active litigation?

12           MR. BURNETT:  Yes.

13           THE COURT:  Okay.  We'll see what Mr. Eisenberg has to

14    say about that.

15           And those are my questions.  If there's anything else

16    within that field that you'd like to bring to the Court's

17    attention, I'm happy for you to address it now, but if not,

18    I'll turn to Mr. Eisenberg and give the government a chance for

19    a rebuttal at the end.

20           MR. BURNETT:  If you don't mind me just checking my

21    notes quickly.

22           Oh, so there's one last case that I just wanted to

23    bring the Court's attention to, which I think goes to this

24    "aimed at Mango Markets" idea that comes up in the defense

25    brief and was also posed I think in the last question that the

NC61EISA

1    Court asked.  And the case there, which we cite in our brief

2    but not for this point, is *U.S. v. Greenberg*, and that's

3    835 F.3d 295, which is a Second Circuit case.  And that case

4    held that in a wire fraud context, there's no requirement for a

5    convergence between the object of the——between the entity

6    that's being defrauded and the victim that you're trying to get

7    money from.  That's not something that is required.  You can

8    make a fraudulent representation of Party A with the idea of

9    obtaining money from Victim B, and that is a wire fraud even

10   though A and B are different people.  We think that what

11   they're interpreting there is the "scheme to defraud" language

12   from wire fraud, which applies in the same way to the

13   securities context.  We think the case law is good there too.

14   But we don't think it's right to even think about, like, aimed

15   at Mango Markets since it's a software platform, but even if

16   something is aimed at Mango Markets, it doesn't matter, because

17   you can aim at one to get money from another, and that's a

18   crime.

19          THE COURT:  Okay.  Last question:  Where is the

20   $110 million in cryptocurrency now?  I know some of it

21   allegedly was paid back or returned to at least someone

22   affiliated with Mango Markets, but help me out with that, if

23   you know.

24          MR. BURNETT:  So I can get into part of it.

25          So part of the money that was taken, there was

NC61EISA

1  basically a negotiation between Mr. Eisenberg and members of

2  the MNGO DAO where a chunk of the funds was returned, so that

3  was where some of it is.  As to where the rest of it is, I

4  think it's a combination of——I don't want to get out ahead of

5  my skis or reveal things that are not appropriately public at

6  this stage.

7          THE COURT:  Okay.  That's fair.  Thank you for the

8  argument.

9          And Mr. Klein?  All right.  Same thing as Mr. Burnett.

10 Whatever's more comfortable from you.  If you want to argue

11 from the seat, if you want to take the lectern, that's fine for

12 the Court.

13         MR. KLEIN:  Depends on your questions what would be

14 comfortable.

15         Your Honor, thank you for giving us the opportunity to

16 talk about the motion to dismiss, and I do appreciate the

17 issues or the questions you raised in advance because it

18 allowed us to at least home in on what you might be most

19 concerned about or focused about.

20         Obviously you just heard a lot from the government,

21 including a lot of new cases they reeled off that we haven't

22 had a chance to look at or agree whether their interpretation

23 of them is accurate, so we may be requesting a chance to do so.

24         But I think I want to again turn back to your

25 questions or the issues you raised.  And you led off with a

NC61EISA

question about USDC, and this is an issue we raised in our

reply.  And I think what——stepping back from there a little

bit, you know, our client was charged in this case with this

indictment.  We looked at this indictment.  We went through,

what is he charged with, right?  What are they saying here?

What is the focus of the charge?  What are the crimes they're

looking at here?  And what's this trial going to look like?

And then when you do a motion to dismiss, hey, have they met

the——is this, on its face, valid charges?

You started out with those questions with the

government.  And I think one of our concerns here is, it's a

little bit like whack-a-mole for us.  We're learning new things

today; we're learning how they're going to focus.  In their

responses they're like, oh, well, you didn't know that?  You

should have looked at our complaint.  Oh, you didn't know it

was a swap?  Well, you should have been reading between the

lines of these allegations and interpreted this as a swap.  And

we don't do those things.  And that, you know, strikes me as a

problem overall.  And I think that's one thing your questions

sort of identify is sort of a lack of information to our

client, putting him on notice, and it goes to the core of one

of our arguments, which is this void for vagueness argument.

And we think that's a real issue here.  And, you know, the

government can get up here and do a lot of explanation now

about what they meant and how it should be interpreted, but I

NC61EISA

1    think that is a really important issue to think about.

2         And I think that's why we presented your Honor with

3    the *Radley* case, because there's a lot of similarities here.

4    Of course the underlying facts are different.  But big picture,

5    complex set of tradings happened.  Those BP traders, you know,

6    they did these trades.  They went up to the judge——and we put

7    in the facts in detail here.  But at the end of the day, they

8    did what they were allowed to do on the trading platform.

9    That's the same thing here.  There's no allegation that my

10   client hacked into this platform, manipulated code in some way;

11   there's no allegation even that the purchases weren't bona fide

12   purchases.

13        So if you start with how they lay out this indictment,

14   the first thing they allege my client did was go on to Mango

15   and do two bona fide transactions——a long position.  And they

16   concede that essentially because they're saying he wanted that

17   long position so that ultimately he, in their words, could cash

18   that money out, borrow it out and not intending to repay it.

19   And then what they do is they conflate that with this other

20   markets, these crypto exchanges.  And I think one thing to

21   focus on is those exchanges were not commodities markets.

22   Those are exchanges.  And then they twist the language a little

23   bit in there and say, oh, he was selling, allegedly, USDC for

24   MNGO.  He was purchasing MNGO.  There's no allegation in this

25   indictment that the USDC price was manipulated.  It's all

NC61EISA

1    about——the allegations are all about manipulating the MNGO

2    price so that the oracle would send information back to the

3    MNGO protocol so they would make his long position very

4    valuable.  Again, a bona fide position.

5         So what the government didn't talk about today and

6    what they seem to have completely walked away from, that was in

7    their opposition, was the idea that these were wash trades.

8    They weren't.  These were bona fide positions they were taking,

9    under their theory.  And those positions, it happened to be

10   that he was on both sides.  Didn't have to be that way.

11        And I think that goes to a number of the points that

12   you are raising here.  We're not seeking a carveout for USDC as

13   a medium of exchange.  USDC wasn't the object of any of this.

14   There's no——you're not going to be creating a crazy——

15        THE COURT:  Just so I understand, you're not taking

16   the position that under the language of the CEA, USDC does not

17   qualify as a commodity.  You would agree that under the

18   language of the commodity definition, it fits.

19        MR. KLEIN:  I'll agree that their claim is that

20   there's a futures market for it, and for purposes of this,

21   therefore, that would qualify as a commodity, yes.

22        THE COURT:  Okay.  So you're not challenging it, for

23   purposes of the motion to dismiss.

24        MR. KLEIN:  Yes, your Honor.

25        THE COURT:  Okay.

NC61EISA

1          MR. KLEIN:  So they've made that, and we're not

2     disputing that at this time, but it was——

3          THE COURT:  How do you deal with, going to the

4     next——I'm going to walk you through the same way I did with the

5     government.

6          MR. KLEIN:  I was worried about that, your Honor.

7          THE COURT:  The contract of sale of USDC, Mr. Burnett

8     points to language that interprets "contract of sale," that

9     language, very broadly to basically include both sides of the

10    transaction and not just the purchase; so not just the purchase

11    of MNGO but also the sale of USDC, if it's a commodity.

12          MR. KLEIN:  He's using, allegedly, the USDC to buy the

13    MNGO.  That's the object of this contract, okay?  So the object

14    of this contract is to buy the MNGO.  There was never an

15    intent, under their own theory, to manipulate the price of

16    USDC, right?  And if you accept the government's version of it,

17    they put up a parade of horribles about this medium of exchange

18    idea.  But here's the other parade of horribles.  Everything in

19    USDC in all these market transactions are now covered by this,

20    because any time you use USDC in any transaction, you're

21    immediately sucked into this.  That can't be the point of

22    what's happening here.  The focus of this case, which they seem

23    to be moving around, is the MNGO perpetuals and the MNGO token,

24    not USDC.

25          THE COURT:  Do you have any authority interpreting the

NC61EISA

1    language "contract of sale" in a way that makes clear that the

2    Court should focus on the object of the transaction, as you put

3    it, as opposed to just using a textual reading of the broad

4    definition of "contract of sale"?

5             MR. KLEIN:  Your Honor, we cited to one case in our

6    reply on page 5, coming into page 6, the *Kearney* case.  And I

7    can read the cite to you again, your Honor.  It's—

8             THE COURT:  If it's in the reply—

9             MR. KLEIN:  It's in the reply, yes, your Honor.

10            THE COURT:  —we'll find it.

11            MR. KLEIN:  And so I think that gets to the core issue

12   here, you know, on this point, on this first point.  And then

13   your other questions, you know, they sort of all fall in line

14   with this idea, and again, it's our premise here—sorry.  I

15   just lost your questions, your Honor.

16            One second.  Sorry.

17            Oh.

18            THE COURT:  Well, so I can—

19            MR. KLEIN:  I got it.

20            THE COURT:  Yeah, and I think what Mr. Burnett says

21   is, look, there's this broad definition of "contract of sale,"

22   and then if you take it one further step back and look at "in

23   connection with," that phrasing has received a very broad

24   interpretation both in the securities context and the

25   commodities context.  And so when you put all of that together,

NC61EISA

it points away from an interpretation that would require that there be manipulative conduct specifically with respect to USDC, as long as there is manipulative conduct in connection with the transaction, and Mr. Burnett offered an explanation for how we could think of that here.  That's enough to sustain the charge.

MR. KLEIN:  And in doing so, he walked away from his wash trade thing in his opposition, because he needed to.

But I think what I would focus on there on the "in connection with" is, these were bona fide transactions on the Mango Markets.  There was a real bona fide position taken on long, and a real short.  Those are completely legitimate positions.  The government, again, puts those in there at the start of its allegations of the fraud.  Then what happens is, according to them, on an off market——not a commodities exchange, on off markets——there are some purchases of MNGO with USDC.  Not only USDC though, to be clear.  One of the exchanges, USDT was used.  And that's in the indictment.  And that that affects the price of MNGO.  Okay?  And what they're doing is they're conflating these things together.  Now, look——

THE COURT:  Well, I don't think they're conflating them together.  I think they are acknowledging that those were separate markets or separate exchanges.  But I guess in terms of the legal ramifications of that separate conduct, in *Phillips*, at least, conduct that occurred in an unregulated

NC61EISA

market that then impacted a regulated market could be

considered in determining whether there was a sufficient

allegation of a manipulative device.  And so why wouldn't that

apply here?  So even if you're right that there are kind of two

separate things going on, given that the government alleges

there was a connection, isn't that enough?

MR. KLEIN:  Well, one of the issues raised was like,

these are two parties, and Mr. Burnett explained he was

obviously, or in his mind, addressing something analogous to

Judge Liman's decision, which, I don't know the issues, I

haven't read all the briefing, I don't know what was going on

in that case.  But I think for us, the core issue is that our

client was——and I'm just harping back to, again, these were

both bona fide transactions on this market.  They were

legitimate positions taken out.  If people don't like the

results of them, you know, that's something else.  But these

were bona fide positions.  And I think when you look at that

and you look at——and you've got——and the indictment agrees with

that, and then you look at what *Phillips* is saying, and it

talks about the materiality, my client was taking out his

positions, so there was no, like, to him, what his other self

was doing was material, right?  He's on both sides of this

transaction.  This happenstance is.  Someone could have come in

and been on the other side.  That's not the case we have here.

He happens to have been on both sides.  And I think when you

NC61EISA

look past that, if you say, okay, well, this "in connection

with" is so broad, then my question to your Honor back is, or

our response is, this goes into *Radley* and the void for

vagueness arguments.  You know, we had a very convoluted

discussion of the statute and how it applies and how these

different pieces fit together.  You know, this is the core of

what the *Radley* court is talking about there.  And I think that

would be our focus there would be like, okay, assuming that is

true——and we're not conceding it——you still can do another

layer of analysis, your Honor, and that's what we'd ask you to

do in that part.

              And when you turn to the last couple questions you

raised, whether the manipulative conduct must be aimed at——

              THE COURT:  Just to test that, I mean, we obviously

have a new context because there just aren't that many cases

arising in the cryptocurrency realm, right?  And there

certainly are not very many criminal prosecutions in this area,

so I'll grant you all of that.  But I take it that the

allegation is, what's the difference between what is alleged

here——whether it occurred or not is another question, but what

is alleged here——and a classic pump and dump scheme, meaning

that the MNGO perpetuals were pumped up and then Mr. Eisenberg

is alleged to have cashed in on that by engaging in this borrow

and withdraw transaction and then obviously the price of the

MNGO perpetuals craters in the aftermath because he's not

NC61EISA

1    trading anymore.  And that's a kind of fact scenario, if you

2    rip it out of the cryptocurrency context and drop it into

3    normal securities, that has been the subject of criminal

4    prosecution for decades.

5         MR. KLEIN:  The difference——one of the differences,

6    your Honor, is, in those pump and dump cases, which I've done

7    as both a prosecutor and defense lawyer, you're on the same

8    market, right?  You're operating on the same market.  You're

9    trading back and forth, whether it's wash trading, in some way

10   to pump the price up, right?  You're doing a lot of trading

11   usually on the same market.  What's different here is there's

12   these separate markets that provide this oracle, okay?  And you

13   know, this is a square peg trying to fit into a round hole with

14   these first two counts, and it's creating problems, which is

15   why they're doing gymnastics to explain why it should work.

16   They shouldn't have to do those gymnastics.  It should be, in

17   my opinion, obvious.  And that goes, again, back to our

18   vagueness argument.

19        And there are——well, I will say there are quite a few

20   cryptocurrency prosecutions, but I defend a lot of people in

21   this space.  So it's becoming more common.  I would say there

22   are fewer commodities prosecutions overall.  It's a relatively

23   rarely charged thing.  And that's why you have not that many

24   decisions to look to, and that's why they're looking to the SEC

25   or the securities law, 10b-5.  But when you look at where they

NC61EISA

1    are charged, you look at *Radley*, again, the same thing.  It's a

2    classic case, at least the government thought in that case, of

3    sort of manipulating the price, pumping and dumping, traders

4    benefiting.  But the court there stepped back and said, hey,

5    are they on notice?  Is this vague?  And I think that's where

6    we would——again, I hate to keep going back to that same spot,

7    but I think you can always come back to that same spot when

8    we're grappling with these issues.  And that's one reason also

9    we raised the rule of lenity, which is, in a criminal

10   case——it's different than a civil case, different than other

11   cases——the tie goes to the defendant on these kinds of things.

12           THE COURT:  Right.  The tie goes to the defendant in

13   some cases, but a prerequisite is that there is either a

14   statutory or regulatory ambiguity, and I'm not understanding

15   you to be arguing that there is actually a statutory or

16   regulatory ambiguity.  I think your argument really is sounding

17   in void for vagueness and due process principles.

18           MR. KLEIN:  You're right, your Honor.

19           THE COURT:  And perhaps there's an ambiguity in the

20   scope of the manipulative device, what that means, and price

21   artificiality, which I think in *Radley*, there's some

22   conflation.  I think *Radley* is really saying that you can't

23   have price artificiality unless you have some actual fraud, or

24   a misstatement that's made; that's what it's really saying.

25   And it characterizes it as a void for vagueness argument, but I

NC61EISA

1    think it's really just saying that it's not possible that you

2    could have an artificial price if all you have is bona fide

3    trading and nothing else.

4                MR. KLEIN:  Let me focus on that last point, which

5    is——

6                THE COURT:  Okay.

7                MR. KLEIN:  ——the gravamen of these cases, or of what

8    the charges are, the first two charges, the second one was

9    deception, right?  That's the core point.  You've got to be

10   deceiving somebody.  You know, trading itself manipulates the

11   price, right?  It's deceptive trading that's illegal.  And the

12   issue here——and you asked the question, the last two questions

13   about, you know, must be aimed at deceiving investors.  Again,

14   that didn't happen here, based on their own allegations, on the

15   MNGO perpetuals.  It wasn't a deceit.  It was a legitimate

16   position, completely.  And then you go, okay, the government

17   says, well, it's just on the market, just some sort of like, in

18   general, this, like, nebulous idea.  There's still deceit that

19   has to be there.  And that's why you see Judge Cote in the

20   instruction talk about that.  And the government puts it in

21   their brief.  And maybe they didn't realize what they were

22   doing when they did that because we jumped on it.  But Judge

23   Cote even says that.  So it says——let me find it.

24                Judge Cote's instruction specifically includes,

25   defining manipulation as "intentional or willful conduct

NC61EISA

1    designed to deceive or defraud investors."  That's in the

2    instruction.  And that was cited in the opposition, and we

3    cited it in our reply.  And so I think that's a core principle

4    here.  There has to be deceit.  And on the Mango Markets, which

5    is the core of their case, unless they're pivoting somehow

6    here, that's where they're alleging the deceit happened is on

7    the Mango Markets, right?  And the protocol in that—

8         THE COURT:  Well, no, I think Mr. Burnett is saying

9    they're alleging that it occurred both in the context of the

10   contracts of sale of USDC for MNGO and in the MNGO perpetuals

11   market.  In both those places there was a manipulative device

12   in connection with those two transactions.  At least that's

13   what I understood the government to be saying here.

14        MR. KLEIN:  The allegations are that it was

15   manipulated on the off-market cryptocurrency exchange to affect

16   the oracle, which would affect the perpetual price.  This isn't

17   two separate cases, right?  I know your Honor knows this.

18        THE COURT:  No, I understand.  As I take it, the

19   government is saying that the key is intent.  And you can have

20   deceit without fraud or a misstatement in the way that *Radley*

21   says.  So *Radley* hasn't been followed, I don't think, by any

22   other court, and conventionally, while some kind of deception

23   is required, that deceit can be an omission or it can be, the

24   government submits, in the form of intent alone.  Do you

25   disagree with that, or are there other authorities that would

NC61EISA

| | |
|---|---|
| 1 | support the notion that you would require——you would need |
| 2 | something more? |
| 3 | MR. KLEIN:  Well, I'd like to look at the authorities |
| 4 | the government was citing today about this issue, which was |
| 5 | just brought up now, so I haven't had a chance to go through |
| 6 | those.  But I think we are focused on the idea in our brief |
| 7 | that the deceit has to go to investors or people.  At the end |
| 8 | of the day, it has to go down to somebody.  And that's——they |
| 9 | can't meet that here. |
| 10 | THE COURT:  Meaning somebody in the transaction or |
| 11 | just somebody?  Because—— |
| 12 | MR. KLEIN:  Investors, somebody in the—— |
| 13 | THE COURT:  In the transaction.  Meaning that, you're |
| 14 | saying you can't even get out of the starting gate because as |
| 15 | to that MNGO perpetuals, Mr. Eisenberg was on both sides of |
| 16 | that deal and so—— |
| 17 | MR. KLEIN:  They don't get out of that starting gate, |
| 18 | your Honor. |
| 19 | THE COURT:  For that reason.  Because he was on both |
| 20 | sides of the deal.  Whether or not you might have a wire fraud |
| 21 | count because of his interactions with Mango Markets——that's |
| 22 | Count Three——that's another story, but as to Count One, at |
| 23 | least, you are limited to a manipulative device employed with |
| 24 | respect to investors in the transactions that are listed in the |
| 25 | statute. |

NC61EISA

1    MR. KLEIN:  His transactions on Mango Markets, as

2    alleged, were designed to—they're bona fide positions,

3    designed to increase, and then he cashed them out.  So I

4    think—I want to think about your question, make sure I totally

5    understand it, but I think the answer is yes, your Honor.

6    There was no misrepresentation to anybody on the Mango Markets

7    protocol.  Those were legitimate positions.  And the fact—you

8    know, they make some big hullabaloo about, he didn't identify

9    himself.  Mango Markets protocol didn't require anybody to

10   identify themselves.  There was no protocol.  You didn't have

11   to sign or put your name anywhere.  They're never going to put

12   that into evidence.  There's no requirement.

13   THE COURT:  Right.  But you would agree that at this

14   stage I can't really consider those extrinsic facts, given the

15   very low standard of review of indictments; meaning that you're

16   going to have the chance to make those arguments on a Rule 29

17   motion, if appropriate, at the time of trial or, if it's

18   denied, after trial.

19   MR. KLEIN:  Yes.

20   THE COURT:  But the evidence in the record—

21   MR. KLEIN:  I agree that you have to look at the

22   indictment and read it, interpret it, certainly.  But I'm

23   asking you to do that in this case, your Honor.  To be clear,

24   we are asking you to do that.  We want you to do that because

25   there are a lot of deficiencies here.  And those are the ones

NC61EISA

1      we've been pointing out.

2              And I think I've exhausted my points.

3              THE COURT:  Okay.  And how much time would you want to

4      respond to the authorities that were cited here today?  I want

5      to give you a full opportunity to respond to them.  I do want

6      to get the parties decisions on these motions as soon as I can

7      because I know that they've been pending for a while.  Although

8      they haven't been pending in front of me for a long time, but,

9      you know, I take on the burden of the entire court, so—

10             MR. KLEIN:  We appreciate you trying to expedite the

11     decision here, your Honor.  May I have one moment to talk to my

12     co-counsel.

13             THE COURT:  Absolutely.

14             MR. KLEIN:  Your Honor, Monday?  Is that okay?

15             THE COURT:  That works.  Okay.  So Monday, we'll have

16     a response to the new authorities cited by the government here

17     today.

18             One last question.  So I asked you this question about

19     statutory or regulatory ambiguity, which I think is required

20     for there to be a trigger on either major questions doctrine

21     and *Chevron*, that's invoked in the briefing, or the rule of

22     lenity.  So is there any statutory or regulatory ambiguity that

23     you are relying on here?

24             MR. KLEIN:  Well, we think there is, your Honor.  We

25     think it's so broadly drawn that there is some ambiguity here.

NC61EISA

1          THE COURT:  Where is that ambiguity?

2          MR. KLEIN:  Which statute are we focusing on now?

3          THE COURT:  As I understand it, there are two places

4     where you're invoking the doctrine, both in terms of the

5     definition of "swap" and in the definition of "contract of sale

6     of a commodity."

7          MR. KLEIN:  I would think some of the ambiguity lies,

8     because now the government is trying to grab a hold of it, in

9     the "contract of sale of any," when actually the underlying

10    language uses the medium of exchange to purchase something, so

11    I think that has some ambiguity there.  Let me think about

12    that——

13          THE COURT:  The ambiguity would be that——well, as to

14    the medium of exchange point, the government's response is that

15    there are actually explicit carveouts for things that are

16    mediums of exchange, where Congress believed that those should

17    be carved out of a definition and so that demonstrates that the

18    definition of "commodity" is actually clear, that it covers

19    what it covers.  But I take it that your argument is, as to

20    "contract of sale of a commodity," that doesn't answer your

21    question of whether you look at the object of that contract of

22    sale as opposed to just looking at both sides of it no matter

23    what.  So if you have a situation where there's USDC or

24    anything, if it's used as a medium of exchange and the real

25    object of the purchase or sale is the thing at the other end of

NC61EISA

1    the transaction, that's what you need to look at when you're

2    then piecing together the remaining elements of the statute.

3              MR. KLEIN:  Yes, your Honor.

4              THE COURT:  Okay.  Understood.  Thank you.

5              Mr. Burnett, any response?

6              MR. BURNETT:  Just a few really quick points.

7              THE COURT:  Of course.

8              MR. BURNETT:  So first, you asked the question about

9    case law on this "contract of sale" point.  I realize I

10   forgot——I can't remember if this is in our brief or not, but

11   *CFTC v. McDonnell*, which is a Judge Weinstein opinion, 287

12   F.Supp.3d 213, explains that the antifraud provisions of the

13   CEA apply to spot cryptocurrency transactions, which we think

14   is kind of straightforward, answers this question.  So that's

15   that.

16             Second, on the point about *LEK Securities*——this is the

17   Judge Cote instruction——it's right that that case uses the word

18   "investors," as do other manipulation cases in the circuit.  I

19   think the point there is they're using the word "investors"

20   because that's who was the one who was being deceived by the

21   manipulation in those cases.  If it was someone who was doing a

22   pump and dump scheme and taking out a loan based on the pumped

23   value of their shares as opposed to selling their pumped shares

24   back into the market, the principle is the same, that someone

25   who's in the market for these securities, be it as collateral

NC61EISA

or as an investment, is the one who's being deceived.  So the
fact that they say "investors" in there is not holding that
manipulation claims, unlike all other claims under 10b-5, are
limited to deception of investors.  It's just conforming the
facts to the instruction.

The third point is this, like, kind of transaction
limitation to the swap question.  So there's this point about,
well, because Mr. Eisenberg was on both sides, therefore, no
one else can bring this.  I think we've answered that.  There's
the regulatory guidance on pendency and there's this collateral
point we've made, but I also add that there's a distinction
here that's important between government actions versus private
actions, in the sense that there is a separate section of the
CEA——7 U.S.C. Section 25——that imposes separate limitations on
when someone could bring a private right of action under the
CEA, which does implicate some requirements about needing to be
a purchaser or seller or——they're more complicated than that,
but basically you shouldn't be importing those private right of
action provisions into a government——into a government
enforcement action because they're separate requirements.  If
Congress wanted to impose those, it could have imposed them on
the government.  It didn't.

Then the last point is more for clarity of the record
and preserving our position here.  Just because I didn't talk
about the wash trade element, obviously doesn't mean we are

NC61EISA

```
1    agreeing that there was not a wash trade or that these were
2    bona fide transactions, but this is not a motion to dismiss
3    argument.  Whether they're bona fide or not is a question the
4    jury can decide.
5              THE COURT:  Okay.  But these are not like conventional
6    wash trades.
7              MR. BURNETT:  In the sense that he's on the same side
8    of both transactions.
9              THE COURT:  But in terms of what wash trades are
10   usually used for.
11             MR. BURNETT:  It's used for a different thing, but it
12   was not bona fide in the sense that he was not genuinely trying
13   to make an investment in MNGO, because if you hold the short
14   and the long position, your net on MNGO is 0.  If it goes up on
15   one, it goes down on the other.  It's only being used to do
16   this scheme, stealing the money off the platform.
17             THE COURT:  Okay.  Look, Mr. Eisenberg's argument is,
18   we just spent an hour and a half with a very complicated
19   statutory scheme in a novel factual context, multiple different
20   markets.  How does this comport with fair notice and due
21   process principles, as outlined in Lanier and other cases, to
22   just drop these charges on Mr. Eisenberg?  I mean, let's take a
23   step back.  You have the SEC, the CFTC, and the government
24   going after Mr. Eisenberg based on what the defense says were
25   real trades, with no misrepresentations of any kind.  You know,
```

NC61EISA

1    flag for the moment the borrow and withdraw transaction.  But

2    how does that comport with just normal void for vagueness and

3    fairness principles that the Supreme Court has outlined?

4            MR. BURNETT:  Of course.  A few things.

5            So first, the fact that they are real trades, the

6    Second Circuit has rejected over and over and over again as a

7    defense to these charges.  The fact that the defense bar

8    continues to deny that real trades can be manipulation doesn't

9    make it void for vagueness.  There was a conviction a couple

10   weeks ago on exactly this same——

11           THE COURT:  Well, the *Radley* court recognizes that but

12   said, look, if you have real trades, that could be the subject

13   of a prosecution, but you need to have some fraud or an

14   affirmative misstatement in order to satisfy the constitutional

15   requirements here, given the novelty of the framework and the

16   complicated statutory scheme, etc.

17           MR. BURNETT:  And the Second Circuit has rejected

18   that.  And, frankly, the Fifth Circuit refused to adopt it too.

19   It didn't decide it one way or the other.  But there's one

20   district court in the country who's reached that decision.  And

21   the Second Circuit has consistently rejected it.  And a court

22   in this district a couple weeks ago rejected it.  That's one

23   point.

24           Second, I think the facts at trial will belie this

25   idea that Mr. Eisenberg was surprised by the prosecution.  We

NC61EISA

think there is evidence from both before he did this, including

him using fake identity to set up one of these accounts, as

well as his flight to Israel and certain other things we have

in text messages and other pieces of evidence, that will show

Mr. Eisenberg was quite aware that he was breaking the law.

And this goes also on Count One to the fact that we need to

show willfulness, which means we need to prove that

Mr. Eisenberg knew that his conduct was wrong, which has

traditionally been held as a reason why not to dismiss a case

on void for vagueness grounds because if it was really the case

that the defendant had no idea what he was doing was wrong, we

wouldn't be able to prove willfulness and we just wouldn't have

established a crime.  So I think that's another angle to it.

         And finally, while there are——this is certainly a more

complicated statute than, like, the gun possession statute or

other ones, and there are technical elements and all that, but

at the end of the day, Mr. Eisenberg artificially inflated the

price of an asset, used that asset as collateral for a loan

that he knew he had no intention of ever being able to pay off

or trying to pay off, and ran off with the money.  This is

classic heartland pump and dump style scheme.  It's in a new

context.  A DeFi makes it a little more complicated.  We don't

think this is a novel application of the statute.

         THE COURT:  I understand.  And I take it that, using

the language of *Lanier*, since the inquiry focuses on

NC61EISA

1    Mr. Eisenberg's conduct and that is not fully outlined in the

2    indictment, that Mr. Eisenberg can make all these arguments on

3    a Rule 29 motion and down the line when there's a full factual

4    record, but it's hard to address that in a way that would be

5    favorable for Mr. Eisenberg on the face of the indictment

6    alone, given where we started, which is the limited review on a

7    motion to dismiss in the first place.

8              MR. BURNETT:  Yes, your Honor.

9              THE COURT:  Okay.  And then the only thing I'll say

10   is, when you were describing the conduct, you added in the word

11   "artificiality," and I think that's the source of the

12   defendant's argument is that, what does that mean, like

13   artificial versus real?

14             MR. BURNETT:  I think that's right.  But I think.  Oh,

15   sorry.  I didn't mean to interrupt.

16             THE COURT:  No.  Go ahead.

17             MR. BURNETT:  The way that will bear out is one of——on

18   Count Two, we need to prove that he specifically intended to

19   create an artificial price.  So if he didn't intend that, he

20   had no idea what artificial was, then the jury will acquit him.

21             THE COURT:  Okay.  Fair enough.

22             And Mr. Klein, just one additional question.  On the

23   mixed swap question, what is your position there?  So I

24   understand that there's a discussion in your brief that says

25   the SEC is referring to MNGO as a security, and the suggestion

NC61EISA

1    in your briefing is that for that reason, it may be that the

2    swaps are not covered by the CEA.  But given that there is a

3    provision in the CEA that says that it covers mixed swaps,

4    where there's a security and then something else, including a

5    commodity or another interest, wouldn't that fall into that

6    definition regardless of whether MNGO was a security?

7            MR. KLEIN:  Well, your Honor, I think we're missing

8    the "mixed" part there.  There's not a commodity there.  We're

9    saying it would be a security swap.  That's what we said in our

10   brief.

11           THE COURT:  Right.  But the swap is based on the value

12   of MNGO and then USDC, right?  And as we've discussed, for

13   purposes of the motion to dismiss, at least, you're not

14   disputing that USDC falls into the technical definition of

15   "commodity."  So under that understanding, that would be a

16   mixed swap that would fall under the ambit of the CEA.

17           MR. KLEIN:  What I would say there, your Honor, is

18   they don't have the USDC as a commodity in their indictment, so

19   it's not a mixed swap in their indictment.  So they're bound by

20   the corners of their indictment.  And we hear a lot today, new

21   facts, new allegations that they make it sound like there's a

22   lot more here.  So I was just saying that in their papers they

23   said there's a futures market, and I'm not——

24           THE COURT:  Are you challenging the general

25   proposition that, at least for purposes of this motion to

NC61EISA

1   dismiss, that the MNGO perpetuals would count as mixed swaps?

2          MR. KLEIN:  I would say they don't have the

3   allegations to meet that definition in their indictment.

4          THE COURT:  Just outside of whether they've alleged it

5   or not.  Because I think the government's position is they

6   didn't have to allege it, given the principles that govern

7   review of a motion to dismiss an indictment.  But putting that

8   to the side, are you——

9          MR. KLEIN:  Well, I disagree with that principle.

10          THE COURT:  No, I understand the dispute.  And you put

11   that in your papers.

12          MR. KLEIN:  Okay.

13          THE COURT:  I'm just trying to understand whether

14   there is a substantive argument you can make as to why the MNGO

15   perpetuals would not qualify as mixed swaps so that the Court

16   can think about that.  Whether or not I'm able to get to it,

17   given the standards governing the motion to dismiss, that's a

18   separate issue, but I want to just know if there's a

19   substantive reason.  For instance:  Yeah, it would cover it

20   under certain circumstances but for this reason, it's not a

21   mixed swap in this case and you have to look at this statutory

22   provision.  Something like that.

23          MR. KLEIN:  Your Honor, I'd like to——can we include

24   that in what we file on Monday?

25          THE COURT:  Yes, you can include that in what you file

NC61EISA

1    on Monday.

2              MR. KLEIN:  Thank you.

3              THE COURT:  Okay.  Anything else from either side?

4              All right.  I really appreciate the argument today,

5    and the Court will endeavor to get you a decision on both

6    motions by the conclusion of next week.  I will await

7    Mr. Eisenberg's submission on Monday relating to the issues

8    that we discussed, the new cases and the question of the

9    perpetuals as mixed swaps.

10             Thank you very much.  We are adjourned.

11             ALL COUNSEL:  Thank you.

12                              o0o

13

14

15

16

17

18

19

20

21

22

23

24

25