UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

-against-

AVRAHAM EISENBERG,

Defendant.

---

23-cr-10 (AS)

ORDER & OPINION

ARUN SUBRAMANIAN, United States District Judge:

Defendant Avraham Eisenberg has moved to suppress evidence obtained from searches of three cell phones and a laptop.[1] For the following reasons, the motion is DENIED.

## BACKGROUND

The crimes in the indictment were allegedly committed on October 11, 2022. Dkt. 4 ¶ 15. The next day, Eisenberg left the United States for Israel. GX-104A ¶ 18.

A few months later, the government discovered that Eisenberg was planning to fly from Israel to Puerto Rico. GX-102 at 2. The FBI agent leading the investigation, Agent Racz, got a warrant for Eisenberg's arrest. GX-104B. He also sought help from the FBI in Puerto Rico to arrest Eisenberg upon arrival. Suppression Hrg. Tr. 30:1–31:1; GX-102. To that end, he sent Agent Crawford, who is based in Puerto Rico, the complaint and arrest warrant and directed him to seize any devices that Eisenberg was travelling with. Tr. 31:2–34:7. Agent Crawford put together an operations plan for Eisenberg's arrest. Tr. 34:8–11; GX-103. He also met with Agents Itri and Perez, who were to help with the arrest, to go over the plan. Tr. 110:3–10.

Eisenberg landed at the Luis Muñoz Marin International Airport in Puerto Rico on December 26, 2022. He was stopped at customs and directed to a secondary inspection area. Tr. 11:4–14. There, Customs and Border Patrol (CBP) Officer Pedro Amador, who served as a liaison to the FBI, searched Eisenberg's luggage. Tr. 94:9–22. Officer Amador found a laptop and two cell phones, which he set aside. Tr. 10:1–8; 39:16–24; 95:4–11. Agents Crawford, Itri, and Perez

---

[1] Eisenberg initially moved to suppress "various documents taken from the luggage he was carrying at the airport at the time of his arrest" in addition to evidence obtained from his electronic devices. Dkt. 28 at 1. But the government has said it will use only evidence from Eisenberg's electronic devices. Dkt. 54 at 1. So this Court need not address Eisenberg's suppression motion as it relates to these other items.

were also present and watched Officer Amador conduct the search. Tr. 11:10–13:25; 38:24–39:3; 111:15–113:7.[2]

Agent Perez stayed with the luggage while other agents took Eisenberg into an interview room. Tr. 40:10–20; 14:16–14:22; 114:1–2. There, Eisenberg was arrested and searched, which turned up a wallet and third cell phone. Tr. 41:2–16.

At some point, Officer Amador put Eisenberg's devices back in his luggage. Tr. 16:5–9. One of the agents also put the third cell phone and wallet in his luggage. Tr. 80:4–23. Agents Itri and Perez then took the luggage to Agent Itri's car. Tr. 114:20–115:9. Officer Amador and Agent Crawford took Eisenberg to a local jail, Tr. 42:18–21, and Agent Itri followed them. Tr. 16:12–17:14. After dropping off Eisenberg, Agent Crawford joined Agent Itri in his car, and the two of them took the luggage to the FBI office. Tr. 42:22–43:1. At some point, Agent Crawford updated Agent Racz that devices had been seized from Eisenberg. Tr. 43:5–10.

The next day, December 27, Agent Perez conducted an inventory search of Eisenberg's luggage. Tr. 116:1–116:10. She photographed items that might be considered valuable, including his laptop and several pairs of headphones. GX-122–156; Tr. 120:2–18. That same day, Agent Crawford provided property receipts to Eisenberg and told him that the FBI was seizing his devices. Tr. 44:2–45:23, 52:16–21; GX-106.

Agent Crawford prepared a lead (a message requesting assistance from another FBI division), which was approved by his supervisor on December 28. Tr. 5:2–7, 57:12–58:24. The lead directed the San Juan evidence-control room to send Eisenberg's electronic devices to the FBI in New York. *Id.* He marked the "Precedence" level as "Priority" and set a deadline of January 4. Tr. 58:21–59:14; GX-158.

On January 12, the devices had still not arrived in New York, so Agent Racz tried to contact the Puerto Rico agent to whom the lead was assigned. Tr. 153:5–154:8; GX-159. He got no response. *Id.* The next day, Agent Racz had another FBI agent call the Puerto Rico office. Tr. 153:5–154:9. Later that day, an evidence technician in the Puerto Rico FBI office sent the devices to New York. Tr. 156:11–12; GX-158. The devices reached New York on January 17, and Agent Racz picked them up. GX-162. That same day, the Government emailed the Court asking whether it would like to handle the proposed search warrant or have a magistrate judge do so. GX-164. The Court responded on January 18, referring the warrant to the magistrate judge. *Id.* The warrant issued on January 19, 2023. GX-165; GX-167.

---

[2] After the evidentiary hearing, the parties submitted a stipulation that Agent Perez said in a phone interview on August 9th that agents brought Eisenberg to another room (and then brought him out) before Officer Amador conducted the search. Dkt. 60 ¶ 4. I credit the testimony of other agents at the hearing, including the testimony of Officer Amador himself, who said that the search was conducted before Eisenberg was taken to the interview room. In any event, the order of events does not affect the validity of the border search.

**DISCUSSION**

Eisenberg now moves to suppress the evidence from his laptop and phones. He gives two reasons suppression is warranted: (1) the airport searches and seizures were unconstitutional, and (2) the delay in getting a warrant to search his devices was unconstitutional. Though Eisenberg is wrong on the first, he is right on the second. Still, suppression is unwarranted because the good-faith exception applies.

**I.   The searches and seizures were lawful.**

**A.   The search of Mr. Eisenberg's luggage was lawful under the border-search exception.**

The government says that the search of Eisenberg's luggage is valid under the border-search exception to the warrant requirement. Eisenberg counters that the exception does not apply because the search and seizure "were executed exclusively by FBI agents … as part of a general law enforcement effort." Dkt. 37 at 25.

But Eisenberg is incorrect that the search was executed by FBI agents. The evidence at the suppression hearing showed that Eisenberg's luggage was searched by CBP Officer Amador. Amador and the FBI agents present at the scene testified to that, and I find no reason to discredit their testimony. Tr. 12:18–24 (Itri testimony); 39:9–24 (Crawford testimony); 94:15–22 (Amador testimony); 112:4–113:4 (Perez testimony). Though later administrative forms characterized the devices as having been seized pursuant to a search incident to arrest, Eisenberg cites no authority indicating that how the police characterize a seizure is conclusive for determining its lawfulness. The reasonableness of a search or seizure depends on the "circumstances, viewed *objectively*." *Brigham City v. Stuart*, 547 U.S. 398, 404 (2006) (citation omitted).

Eisenberg is also incorrect that the motive for the search of his belongings matters; the border-search exception applies regardless of whether the impetus for the search is prompted "by a criminal investigative motive." *United States v. Levy*, 803 F.3d 120, 123 (2d Cir. 2015) (citation omitted).

**B.   The FBI agents lawfully seized the devices.**

Eisenberg further argues that it was unlawful for the FBI to seize his luggage from the airport because the border-search exception does not apply to seizures by FBI agents. It is true that FBI agents took custody of Eisenberg's devices after they were discovered during the border search. But those agents had probable cause to believe Eisenberg's electronic devices were connected to his alleged crimes, so the seizure was lawful.

In *United States v. Kirk Tang Yuk*, 885 F.3d 57, 79 (2d Cir. 2018), officers performing a protective sweep seized two cell phones in plain view. The defendant moved to suppress evidence from those phones. The district court denied the motion and the Second Circuit affirmed, explaining that "[i]n light of the knowledge gained through [the officers'] investigation into [the defendant's] narcotics trafficking activities—including through wiretaps of cell phones on which

3

he conducted trafficking-related business—the officers had probable cause to seize the cell phones as likely connected with his criminal activity." *Id.*

Here too, the FBI agents had probable cause to seize Eisenberg's devices as likely connected with his criminal activity. The agents were aware that Eisenberg was being arrested on a warrant for charges related to cryptocurrency and fraud. *See, e.g.*, GX-102; Tr. 31:2–7, 33:22–34:7, 110:16–21; *cf. Whiteley v. Warden*, 401 U.S. 560, 568 (1971) ("Certainly police officers called upon to aid other officers in executing arrest warrants are entitled to assume that the officers requesting aid offered the magistrate the information requisite to support an independent judicial assessment of probable cause."). Based on their experience, they also knew that electronic devices were likely to have evidence of such crimes. Tr. 14:1–7, 113:8–19.

If there was any doubt, the collective-knowledge doctrine confirms that the officers had probable cause. Although the agents that were immediately involved in the seizure may not have had detailed knowledge of Eisenberg's alleged crimes, they were acting at the direction of an agent who did. Under the collective-knowledge doctrine, "even if the law enforcement officer actually conducting the [seizure] lacks the relevant facts to support probable cause, the [seizure] may nonetheless be permissible if the officer acted on the assessment or instructions of other officers who did have such facts." *United States v. Babilonia*, 854 F.3d 163, 178 (2d Cir. 2017). Here, Eisenberg's devices were seized at the direction of Agent Racz. *See* Tr. 33:17–34:7. And Racz had probable cause, based on his investigation, to believe that the devices were connected to Eisenberg's crimes. In the affidavit that Racz swore out in connection with the criminal complaint, he explained that Eisenberg's crimes involved manipulation on a cryptocurrency exchange. GX-104A ¶ 1. Such crimes necessarily entail the use of electronic devices. *Cf. United States v. Thomas*, 2015 WL 164075, at *9 (D. Conn. Jan. 13, 2015), *aff'd sub nom. United States v. Walters*, 678 F. App'x 44 (2d Cir. 2017) (finding that agents had probable cause to seize a laptop bag where they thought that a laptop may have been used to post the minor's online advertisement for sex). Plus, Agent Racz explained in the affidavit how Eisenberg used email addresses and phone numbers to create the accounts he used to carry out his alleged crimes. GX-104A ¶ 12(d)(ii). Agent Racz also explained that Eisenberg had used Twitter to discuss his "trading strategy" and its effect on Mango Markets. *Id.* ¶ 17. All of this lends further support for the belief that Eisenberg's devices were connected to his criminal activity.

Indeed, Eisenberg's main argument isn't that the FBI agents lacked probable cause to seize his devices. Instead, it is that the plain-view doctrine does not apply because "CBP replaced everything, including the Subject Electronics, in the bags before anything was seized." Dkt. 62 at 4. In other words, even though the FBI agents had already seen the devices and had probable cause to seize them, they were not authorized to take them because Officer Amador had returned them to Eisenberg's luggage.

Eisenberg cites no authority for this proposition, nor does it square with the rationale behind the plain-view doctrine. "The plain view doctrine is grounded on the proposition that once police are lawfully in a position to observe an item first-hand, its owner's privacy interest in that item is lost." *Illinois v. Andreas*, 463 U.S. 765, 771 (1983). Once Eisenberg's luggage was lawfully

searched by the CBP agent in the presence of the FBI agents, his privacy interest in its contents was lost. It does not matter that these devices were returned to Eisenberg's luggage: Eisenberg never regained possession of his luggage, so he could not have regained a privacy interest in it. Thus, the seizures of Eisenberg's two phones and laptop were lawful.

> C. The seizure of the third phone was lawful pursuant to a search incident to arrest.

Eisenberg does not dispute that one of his phones was lawfully found and seized pursuant to a search incident to arrest. Instead, he argues that the government cannot identify which phone was seized this way. But because seizure of the other two phones was lawful, nothing turns on this. *Cf. United States v. Javat*, 549 F. Supp. 3d 1344, 1357 (S.D. Fla. 2019), *report and recommendation adopted*, 2019 WL 3729060 (S.D. Fla. Aug. 8, 2019) (suppressing evidence from a lawfully seized cellphone where three other cellphones were seized unlawfully, and the government couldn't identify which cellphone was the one seized lawfully).

One last point on the validity of these airport searches and seizures: Eisenberg complains that the agents' testimony was "contradictory and inconsistent" on certain facts, including "(1) whether an evidence bag was used to separate the electronics or the items were just placed back in the luggage; (2) who was in the room for the arrest; (3) who conducted the pat down; and (4) whether the [border] search happened before or after the arrest." Dkt. 62 at 3. But these facts have no bearing on the constitutional question. In fact, Eisenberg makes no attempt to explain how these facts affect the analysis. Dkt. 62 at 3. Nor do minor inconsistencies as to these ancillary facts undermine the credibility of the witnesses. The testimony was mostly consistent. And it was entirely consistent on all facts bearing on the propriety of the searches and seizures.

> D. Alternatively, denial of suppression is warranted under the inevitable-discovery doctrine.

Even if Eisenberg were correct that the initial searches and seizures were flawed, suppression would be unwarranted. Under the inevitable-discovery doctrine, "evidence that was illegally obtained will not be suppressed if the government can prove that the evidence would have been obtained inevitably even if there had been no statutory or constitutional violation." *United States v. Mendez*, 315 F.3d 132, 137 (2d Cir. 2002) (internal quotation marks omitted). The government can argue that discovery was inevitable because of an inventory search. *Mendez*, 315 F.3d at 137–38. To do so, it "must prove three things: (1) that the police had legitimate custody of the … property being searched, so that an inventory search would have been justified; (2) that when the police … conducted inventory searches, they did so pursuant to established or standardized procedures; and (3) that those inventory procedures would have inevitably led to the discovery of the challenged evidence." *Mendez*, 315 F.3d at 138 (cleaned up).

All three criteria are satisfied here. First, the FBI had legitimate custody of Eisenberg's property, as Eisenberg was lawfully arrested while alone in an airport. *See United States v. Sobers*, 792 F. App'x 904, 905 (2d Cir. 2020); *United States v. Ellis*, 2020 WL 6784139, at *4 (S.D.N.Y. Nov. 17, 2020); 3 Wayne R. LaFave, *Search & Seizure* § 5.5(b) (6th ed. 2022) (requirement that

police must have lawful possession of item to be inventoried "presents no problem when a person is arrested in some public place while carrying a suitcase or like object, for it would be clearly improper for the police to simply leave the container unattended at the scene of the arrest").

Second, the FBI conducts inventory searches pursuant to established procedures. Under the Domestic Investigations and Operations Guide, "after lawfully taking custody of property, FBI employees must conduct a prompt and thorough search of the contents of the property, including searching any locked or unlocked containers and inventorying their contents." Dkt. 36-20 at 2. Indeed, another court in this district has found that because of this FBI policy, it was inevitable that the FBI would inventory a seized bag and discover two cell phones inside. *Ellis*, 2020 WL 6784139, at *1, 3–4. Finally, there is no dispute that the inventory procedures would have inevitably led to the discovery of these electronic devices.

Eisenberg says the inevitable-discovery doctrine is inapplicable for three reasons. First, he says that the agents in Puerto Rico never intended to hold the devices in inventory. Dkt. 37 at 21. But that is irrelevant. The question is not what the agents intended here but whether, had the devices not been discovered at the airport, they would have been discovered pursuant to an inventory search after Eisenberg was arrested.

Second, Eisenberg points out that the FBI agents purported to perform an inventory search here. Tr. 116:1–116:10. And he says that the way they performed that search indicates that there is not in fact a standard policy for inventory searches. Eisenberg's argument fails. Nothing that was done here suggests that, despite the written policy, the FBI's inventory searches are in fact treated as a matter of "selective discretion." *United States v. Lopez*, 547 F.3d 364, 371 (2d Cir. 2008). On the contrary, what took place here shows that the FBI routinely searches the contents of property in its custody and that it has a genuine caretaking purpose for doing so. After all, the agents already knew what was in Eisenberg's luggage; they knew that his backpack had the electronic devices. If the FBI's policy was in fact a ruse for rummaging for incriminating evidence, no such rummaging was necessary. The FBI agents could have just taken Eisenberg's devices from his backpack and called it a day. *See* Tr. 112:8–113:7, 143:22–25 (Agent Perez testifying that the electronics were found in and returned to the backpack); Tr. 116:9–10, 119:20–120:1 (Agent Perez testifying that she did an inventory search of both seized bags). Instead, they opened his suitcase too. *See* Tr. 119:20–120:1. And they went through and carefully photographed his valuables, including things with no evidentiary value, like headphones. *See, e.g.*, GX-151.

Finally, Eisenberg argues that an inventory search gives agents the authority to seize only self-apparent evidence of a crime, like weapons. He argues that agents could seize the electronic devices only if they had "probable cause" and emphasizes that the "government has repeatedly noted how little" the FBI agents involved in the inventory search knew about the investigation. Dkt. 37 at 30–31. But the agents involved in the inventory search were some of the same agents involved in the airport arrest and initial seizure of Eisenberg's luggage. For the reasons above, these agents knew enough to have probable cause to seize Eisenberg's devices.

## II.  The delay was unreasonable, but the good-faith exception applies.

### A.  The 23-day delay in getting a warrant was unreasonable.

Eisenberg also says the delay of more than three weeks in getting a search warrant for the devices was unreasonable. Dkt. 37 at 21. To determine whether a delay is unreasonable, courts look at "[1] the length of the delay, [2] the importance of the seized property to the defendant, [3] whether the defendant had a reduced property interest in the seized item, and [4] the strength of the state's justification for the delay." *United States v. Smith*, 967 F.3d 198, 203 (2d Cir. 2020) (brackets in original, citation omitted).

Under the Second Circuit's decision in *Smith*, the delay in seeking a warrant to search Eisenberg's devices was unreasonable. In *Smith*, an officer found an intoxicated Smith passed out in his car. *Id.* at 202. While looking for Smith's identification in the car, the officer noticed an electronic tablet with an image of what appeared to be child pornography. *Id.* After learning that Smith was a registered sex offender, the officer seized the tablet. *Id.* at 202–03. The next day, when Smith returned home, a police investigator sought his consent to search the tablet, but he declined. *Id.* at 203. The investigator waited more than a month to get a warrant to search the tablet, which yielded dozens of images and videos of child pornography. *Id.* Smith later moved to suppress that evidence, arguing that the officer's delay was unreasonable. *Id.* at 204.

The Court agreed with Smith that the delay was unreasonable under the Fourth Amendment. First, as to the length of the delay, the Court found that the month-long delay "well exceeds what is ordinarily reasonable." *Id.* at 207. The Court emphasized that the delay was much longer than an 11-day delay that was deemed a close call in a prior case. *See id.* (discussing *United States v. Martin*, 157 F.3d 46, 54 (2d Cir. 1998)). So the first factor weighed "substantially" in Smith's favor. *Id.*

Second, as to the importance of the seized property, the court acknowledged that electronic devices implicate significant and unique privacy concerns. *Id.* at 207–08. Still, the Court found that this factor weighed in the government's favor because the district court had concluded that Smith's testimony about the significance of the tablet to him was "spare in detail, that he had alternative electronic devices that could serve the same functions as his tablet, and that he did not request return of the tablet." *Id.* at 208.

Third, as to Smith's property interest, the Court emphasized that although the police had probable cause to seize Smith's tablet, the existence of probable cause was not dispositive as to Smith's property interest. *Id.* at 209. Rather, the Court found that this factor was neutral or even weighed in Smith's favor because he did not consent to the seizure or search of his tablet, and the tablet did not have any investigative or prosecutorial value apart from a search of its contents. *Id.* at 208–09.

Fourth, as to the justification for the delay, the Court noted that the officer "engaged in very little investigation of Smith" between seizing the device and applying for the warrant. *Id.* at 210. And the Court found that neither the officer's caseload nor the geographical size of the region

he covered justified the delay. *Id.* The court noted the absence of "any particular investigation or police duty that specifically delayed [the officer] in applying for a search warrant." *Id.* So the Court found that the fourth factor weighed in Smith's favor too. *Id.* at 211.

After running through these factors, the Court held that the balance weighed in favor of finding a Fourth Amendment violation, explaining that the officer "was not diligent in seeking a warrant … and there were no overriding circumstances to otherwise justify a month-long delay." *Id.* at 211.

The delay in this case was also unreasonable. In *Smith*, the Second Circuit found that a month-long delay in seeking a warrant "well exceeds what is ordinarily reasonable." *Smith*, 967 F.3d at 207. Here, the delay was close to a month and more than twice as long as the 11-day close call: 23 days passed between the seizure of Eisenberg's devices and the application for a warrant. The government argues that only the time during which the New York agents had the devices should be counted. But it cites no authority for this proposition, nor does the Court see the logic in drawing such a distinction. As another court has explained, "[d]elay is delay, and the effect on the *target* is the same, whatever or whoever causes that delay." *In re Application for Search Warrant*, 527 F. Supp. 3d 179, 183 (D. Conn. 2020). The government also points to the fact that the seizure occurred around the holidays. But holidays can account for only a few days of delay. And as in *Smith*, it appears that the facts material to the probable-cause determination were known to the FBI on the same day that the devices were seized from Eisenberg, making it unreasonable for the FBI to wait so long. 967 F.3d at 207. So this first factor weighs strongly in Eisenberg's favor.

As to the second factor, the "starting point is to consider the nature of the property seized." 967 F.3d at 207. In *Smith*, the Court noted the significant privacy concerns implicated by the seizure of electronic devices like laptops and cellphones. *Id.* at 207–08. Nonetheless, it affirmed the district court's finding that this factor favored the government where there was little detail about the importance of the device to the defendant. *Id.* at 208.

Here, the government seized Eisenberg's three phones and laptop. Eisenberg uses the devices "extensively to communicate with friends" and "to store a large amount of personal and business data." Dkt. 29 ¶¶ 19–20. He also says that the devices contained information for accessing funds that are unconnected to this case, and without access to these devices, he was unable to manage (or have relatives manage) his investments for a time and unable to pay for his legal defense. *Id.* ¶¶ 22–28. So unlike with Smith, Eisenberg has shown the particular significance of these devices. Finally, Eisenberg also says he asked about the devices and was told that neither he nor his family could retrieve them. *Id.* ¶ 17. This factor thus weighs strongly in Eisenberg's favor.

The next factor considers whether Eisenberg had a reduced property interest in the devices. In *Smith*, the Second Circuit found that this factor was "either neutral or weigh[ed] in [defendant's] favor" where the item was seized without consent but with probable cause and the item did not have any investigative or prosecutorial value apart from a further search of its contents. *Id.* at 209. Here, Eisenberg's belongings were seized without consent and with probable cause, and they did not have significant investigative or prosecutorial value beyond their contents. While the

government claims that one of the devices had "IMEI" information written on it that may link it to a cryptocurrency account used in the scheme, by and large the value of the devices is what is on them. But unlike the defendant in *Smith*, Eisenberg was incarcerated during the entire delay. This reduces his possessory interest in the devices and nullifies some of the devices' value outlined under factor two, such as communicating with friends. *See United States v. Sullivan*, 797 F.3d 623, 633 (9th Cir. 2015) ("Where individuals are incarcerated and cannot make use of seized property, their possessory interest in that property is reduced."). So the Court finds that this factor weighs slightly in the government's favor.

Finally, the government's justification for the delay weighs in Eisenberg's favor. In *Smith*, the Second Circuit found that this factor weighed in the defendant's favor where the police engaged in little investigation between seizing the device and applying for a warrant. 967 F.3d at 210. The Court found that neither the officer's caseload nor the geographical size of the region he covered justified the delay. *Id.* The Court suggested that a delay might be justified where there was a "particular investigation or police duty that specifically delayed" the officer in applying for a search warrant. *Id.* Here, though the FBI pushed forward with the investigation, there is no evidence of any "particular investigation or police duty that specifically delayed" getting a warrant. *Id.* The government points to the fact that during this time, Agent Racz also needed to put together an indictment. But there was no testimony showing that the indictment was the cause of the delay here. So this factor too weighs in Eisenberg's favor.

As in *Smith*, the balance of these factors weighs in favor of finding a Fourth Amendment violation. Here, as there, the officers were not diligent in seeking a warrant and there were "no overriding circumstances to otherwise justify a [nearly] month-long delay." *Smith*, 967 F.3d at 211.

## B.   The good-faith exception applies.

But just as in *Smith*, that finding does not end the inquiry. "Not every violation of the Fourth Amendment justifies invocation of the exclusionary rule to require suppression of evidence." *Smith*, 967 F.3d at 211. "[T]he exclusionary rule applies only if the police have violated the Constitution deliberately, recklessly, or with gross negligence, or if a constitutional violation is the product of recurring or systemic negligence." *Id.* Evidence is not suppressed when the constitutional violation was the "product of isolated simple negligence." *Id.* at 211–12. On the other hand, evidence is suppressed when the constitutional violation was a deliberate strategic choice. *Id.* at 212. Ultimately, the question is objective: "whether a reasonably well trained officer would have known that the search was illegal in light of all of the circumstances." *Id.* at 212 (citation omitted).

Here, there is no evidence that the constitutional violation was deliberate or the product of recurring or systemic negligence. The FBI agents in Puerto Rico put the devices on an expedited shipping schedule. GX-158; Tr. 59:3–7, 149:11–24. And when Agent Racz learned on January 12th that the devices still had not been shipped, he contacted the FBI agent in Puerto Rico who had been assigned the lead. GX-159. He had another agent follow up the next day, explaining that

9

they needed to have Puerto Rico "ship Eisenberg['s] devices ASAP." *Id.*; Tr. 152:20–154:12. That same day, the other agent contacted the Puerto Rico office, which immediately shipped the devices. Tr. 156:8–14; GX-158. On January 17th, Agent Racz learned that the devices had arrived in New York. He contacted the FBI New York evidence lab, let them know that they should be getting the devices, and asked them to tell him when they did. GX-163; Tr. 156:22–158:13. Thirty minutes after the New York evidence lab recorded the devices as received, Agent Racz checked them out. *Id.* That same day, the government emailed the Court asking whether it would like to handle the warrant or refer it out. GX-164. The Court responded the next day, referring the warrant to the Magistrate Court. *Id.* A few minutes later, the government sent the magistrate judge the warrant application, and the warrant issued on the morning of January 19th. GX-165; GX-167.

It is of course true that the Puerto Rico FBI office still failed to ship the devices for nearly three weeks, blowing past the January 4th deadline, and that Agent Racz did not follow up until January 12th. But given the efforts made to expedite things when the error was discovered, this appears to be the result of isolated simple negligence, not a recurring issue or deliberate strategic choice.

It is also true that the decision to get the warrant in this district rather than Puerto Rico was a deliberate decision, motivated in part by a desire to ensure warrants are accurate and to conserve FBI resources; the Puerto Rico office had not been involved in any part of the investigation other than the arrest. Tr. 151:24–152:8, 169:12–19, 151:2–23. But the question, for purposes of the good-faith exception, is whether the *constitutional violation* was deliberate. *Smith*, 967 F.3d at 211. Eisenberg does not contend that getting a warrant in this district is itself unconstitutional; just that the delay in doing so was unconstitutional. But as explained, the 23-day delay was the result of "isolated simple negligence," not of any stratagem on the part of the government, such as an attempt to "arrest [the defendant] without a warrant, in order to question [the defendant] outside of the presence of counsel." *See Smith*, 967 F.3d at 212 (quoting *United States v. Stokes*, 733 F.3d 438, 443–44 (2d Cir. 2013)).

Nor would a reasonably well-trained officer have known that the 23-day delay here violated the Constitution. This is a case where the delay was close to the line; it was less than the delay held unconstitutional in *Smith*, and the holidays complicate things too. Plus, there are factors bearing on the constitutionality of this case that distinguish this case from *Smith*, preventing a reasonably well-trained officer from knowing that the delay was unconstitutional. For example, Eisenberg was incarcerated during the delay, unlike in *Smith.* While these distinctions do not suffice to make the delay constitutional, they do bear on whether a reasonably well-trained officer would have known of the violation. As the Second Circuit observed in *Smith*, the reasonableness of delay "depends on the assessment and balancing of multiple factors" as "this is not an area of Fourth Amendment law that has reduced itself to bright-line rules." 967 F.3d at 212. The circumstances here are not so extreme or analogous to *Smith* that a reasonably well-trained officer would know that the warrant issued by the magistrate judge was invalid. *Cf. United States v. Delima*, 2023 WL 7404054, at *17 (D. Vt. Nov. 9, 2023) (excluding evidence where there was a delay of at least 45 days); *United States v. Adams*, 2023 WL 1960214, at *7–8 (W.D.N.Y. Feb. 13,

2023) (same where there was a 108-day delay); *United States v. Hay*, 2023 WL 142119, at *11 (W.D.N.Y. Jan. 10, 2023) (same where there was an 18-month delay); *United States v. Nguyen*, 2021 WL 1325797, at *3 (S.D. Iowa Mar. 16, 2021) (same where there was a 4- to 27-month delay); *Untied States v. Tisdol*, 544 F. Supp. 3d 219, 228–229 (D. Conn. 2021) (same where government "misled the magistrate judge" in warrant affidavit).

This case meets the standard for the good-faith exception under *Smith*. However, the government is cautioned that if the delay in this case becomes the norm, suppression may be warranted in the future. *See* 967 F.3d at 211 (exclusionary rule applies where "a constitutional violation is the product of recurring or systemic negligence"). To that end, if this situation comes up again, the government should think hard about whether a warrant can be obtained in the jurisdiction where evidence is obtained, or whether further measures can be taken to ensure that the evidence is transported to this district on an expedited basis.

SO ORDERED.

Dated: December 18, 2023
New York, New York

_____
ARUN SUBRAMANIAN
United States District Judge