UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

                          :

UNITED STATES OF AMERICA

                          :

        - v. -

                          :   23 Cr. 10 (AS)

AVRAHAM EISENBERG,

                          :

                  Defendant.    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**THE GOVERNMENT'S MOTIONS IN LIMINE**

 

DAMIAN WILLIAMS
United States Attorney
Southern District of New York

Thomas S. Burnett
Peter Davis
Assistant United States Attorneys

Tian Huang
Special Assistant United States Attorney
     - *Of Counsel* -

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

BACKGROUND ........................................................................................................... 2

ARGUMENT ................................................................................................................ 7

I.   The Court Should Preclude the Defendant From Introducing Evidence and
     Arguments that Are Irrelevant and Unfairly Prejudicial ................................... 7

   A.   The Court Should Exclude Evidence and Arguments that Cryptocurrency Is
        Unregulated or that the Charges Against the Defendant Are Novel ...................... 7

   B.   The Court Should Exclude Evidence and Arguments that Mango Markets
        Was Not Regulated in the United States. ................................................... 9

   C.   The Court Should Exclude the Defendant's "Code is Law" Arguments. ............. 10

   D.   The Court Should Preclude Evidence About Mango Markets' Terms of
        Service Implemented After the Defendant's Crimes. ........................................ 16

   E.   The Court Should Exclude Argument that the Defendant's Partial Repayment
        Is a Defense to the Charged Crimes ........................................................... 19

II.  The Court Should Preclude the Defendant From Introducing Self-Serving
     Exculpatory Statements. .......................................................................... 20

CONCLUSION .......................................................................................................... 23

## TABLE OF AUTHORITIES

*Danis v. Velez*, 797 F.3d 192 (2d Cir. 2015) ............................................................. 21

*In re Amaranth Natural Gas Commodities Litig.*, 730 F.3d 170 (2d Cir. 2013) .................................. 11-12

*In re Foreign Exchange Benchmark Rates Antitrust Litigation*, No. 13 Civ. 7789

    (LGS), 2022 WL 4087842 (S.D.N.Y. Sept. 6, 2022) ............................................................. 18

*United States v. Phillips*, No. 22 Cr. 138 (LJL),

    2023 WL 5671227 (S.D.N.Y. Sept. 1, 2023) ...................................................................... 13

*R.M. Perlman, Inc. v. New York Coat, Suit, Dresses, Rainwear & Allied Workers' Union Loc. 89-22-1,*
*I.L.G.W.U., AFL-CIO*, 33 F.3d 145 (2d Cir. 1994) ................................................................... 18

*S.E.C. v. Geon Industries, Inc.*, 531 F.2d 39 (2d Cir. 1976) ......................................................... 18

*SEC v. Vali Management Partners*, No. 21-453, 2022 WL 2155094 (2d Cir. 2022) ............................... 12

*Set Capital LLC v. Credit Suisse Grp.*, 996 F.3d 64 (2d Cir. 2021) .................................................. 11, 12

*U.S. ex rel. O'Donnell v. Countrywide Home Loans, Inc.*, 822 F.3d 650 (2d Cir. 2016) ......................... 11

*United States v. Bakhtiari*, 913 F.2d 1053 (2d Cir. 1990) ............................................................. 7

*United States v. Bankman-Fried*,

    No. 22 Cr. 673 (LAK), 2023 WL 6283509 (S.D.N.Y. Sept. 26, 2023) ........................................ 14-15

*United States v. Bankman-Fried*,

    No. 22 Cr. 673 (LAK), 2023 WL 4194773 (S.D.N.Y. June 27, 2023) ......................................... 20

*United States v. Blake*, 195 F. Supp. 3d 605 (S.D.N.Y. 2016) ....................................................... 21

*United States v. Borrero*, No. 13 Cr. 58 (KBF), 2013 WL 6020773 (S.D.N.Y. Nov. 1, 2013) .................. 8

*United States v. Calderon*, 944 F.3d 72 (2d Cir. 2019) ............................................................... 20

*United States v. Chanu*, 40 F.4th 528 (7th Cir. 2022) ........................................................... 11, 13

*United States v. DiMaria*, 727 F.2d 265 (2d Cir. 1984) .............................................................. 21

*United States v. Dinga*, 609 F.3d 904 (7th Cir. 2010) ............................................................... 21

*United States v. Ebbers*, 458 F.3d 110 (2d Cir. 2006) ............................................................... 13

*United States v. Gotti*, 457 F. Supp. 2d 395 (S.D.N.Y. 2006) ....................................................... 21

*United States v. Harwood*, 998 F.2d 91 (2d Cir. 1993) .............................................................. 22

*United States v. Jabar*, 19 F.4th 66 (2d Cir. 2021) .................................................................. 20

*United States v. Kadir*, 718 F.3d 115 (2d Cir. 2013) ................................................................ 21

*United States v. Kwong*, 69 F.3d 663 (2d Cir. 1995) ................................................................. 7

*United States v. Lange*, 834 F.3d 58 (2d Cir. 2016) ............................................................... 22-23

*United States v. Marin*, 669 F.2d 73 (2d Cir. 1982) .................................................................. 21

*United States v. Miller*, 626 F.3d 682 (2d Cir. 2010) ................................................................ 7

*United States v. Netschi*, 511 F. App'x 58 (2d Cir. 2013) ........................................................... 22

*United States v. Paul*, 110 F.3d 869 (2d Cir. 1997) ............................................................... 14, 7

*United States v. Rigas*, 490 F.3d 208 (2d Cir. 2007) ......................................................................... 13-14

*United States v. Rosado*, 728 F.2d 89 (2d Cir. 1984) ................................................................. 8

*United States v. Sindona*, 646 F.2d 792 (2d Cir. 1980) ......................................................... 20

*United States v. Stewart,* No. 03 Cr. 717 (MGC), 2004 WL 113506 (S.D.N.Y. Jan. 26, 2004) ................ 8

*United States v. Vincent*, 416 F.3d 593 (7th Cir. 2005) ........................................................... 20

### INTRODUCTION

The Government respectfully submits these motions *in limine* in advance of the trial of defendant Avraham Eisenberg, scheduled to begin on April 8, 2023. The defendant carried out a fraudulent scheme to steal over $110 million worth of cryptocurrency from the customers of a platform called Mango Markets. For that conduct, he is charged with commodities fraud, commodities manipulation, and wire fraud.

While the platforms through which the defendant committed his crimes—decentralized and centralized cryptocurrency exchanges—are relatively new, the core criminal conduct is not. The defendant carried out his scheme by deceptively pumping up the value of an asset, then reaping the rewards of that artificial price inflation by using that asset as collateral for a loan that he never intended to repay. These actions constitute fraud and market manipulation: conduct that federal criminal law has prohibited for decades. And the elements of those crimes will direct the jury to decide whether the defendant acted deceptively and whether he had the requisite *mens rea*.

The defense should not be permitted to turn this case into a referendum on the regulation of cryptocurrency or suggest that criminal laws prohibiting fraud and market manipulation somehow do not apply in this space. To that end, the Court should prohibit certain evidence and arguments about the supposed lack of regulation for cryptocurrency generally and of Mango Markets in particular. The Court should also limit arguments that the defendant's conduct was legal, simply because the code on Mango Markets did not stop him from carrying out his crime, and the platform lacked terms of service. The protections of federal criminal law are not limited by privately designed computer codes or contracts, and that is just as true in the context of cryptocurrency as it is in any other setting.

**BACKGROUND**

Mango Markets is a decentralized cryptocurrency exchange that allows people to trade cryptocurrencies and other cryptocurrency-related products, including perpetual futures based on the relative value of MNGO and USDC (a "MNGO Perpetual").[1]  One feature of the platform is that it allows customers to borrow and lend different cryptocurrencies.  Mango Markets advertised that borrowing operates like a collateralized loan:  A borrower selects an amount and type of cryptocurrency to borrow, which is limited by the value of the borrower's assets.  The borrowed funds come from the deposits of other customers on the platform.  The borrower is obligated to make interest payments, which are automatically withdrawn from the borrower's account.  If the value of the borrower's assets falls, those assets are subject to liquidation to satisfy the loan.

As a decentralized exchange, Mango Markets operated through a so-called "smart contract," which is essentially a computer program that automatically executes the terms of an agreement, without the intervention of a third party.  This means that, when customers traded or borrowed on Mango Markets, those transactions occurred automatically, and the smart contract included code designed to enforce the terms of the agreement.  For example, with respect to borrowing, the smart contract used the value of the borrower's assets to determine the amount that customer could borrow; it automatically withdrew interest from the borrower's account; and it had features to begin liquidation if the value of the borrower's assets fell below required thresholds.

In October 2022, the defendant orchestrated a scheme to fraudulently steal over $110 million worth of cryptocurrency from Mango Markets.  His crime involved an intricate series of lies, deceitful trading, and manipulation to line his own pockets at the expense of other Mango

---

[1] For a more detailed description of Mango Markets and the mechanics of the defendant's crime, *see* Gov. Opp. to Def. Mot. to Dismiss, Dkt. 36.

Markets customers and the Mango DAO, which ran Mango Markets.

Eisenberg's scheme started with a lie. He went to a centralized exchange ("Exchange-1") and registered for an account using someone else's identity. Once that account was created, he funded it with approximately 12,499,900 USDC. He then used that cryptocurrency to create and fund two accounts on Mango Markets, sending one ("Mango Account-1") approximately 5,000,100 USDC, and sending the other (Mango Account-2") approximately 4,999,998.95 USDC.

After opening those Mango Markets accounts, Eisenberg traded with himself—rather than other market participants—to create a massive MNGO Perpetual position. Specifically, Eisenberg used Mango Account-2 to sell Mango Account-1 Perpetuals based on a total of approximately 488,302.109 MNGO, at a price of 0.0382. This meant Mango Account-1 had a "long" position that would benefit if the value of MNGO rose above 0.0382 USDC (the "Long MNGO Perpetual Position"), and Mango Account-2 had an equivalent "short" position if the value of MNGO fell below 0.0382 USDC (the "Short MNGO Perpetual Position").

This was not a bona fide attempt to invest in either MNGO or USDC and were not genuine trades, inasmuch as nothing was actually exchanged between anyone. Because Eisenberg was on both sides of the position, any increase in the value of MNGO would result in the value of the Long MNGO Perpetual Position in Mango Account-1 rising. But that increase in value would be offset by an equal *decrease* in value of the Short MNGO Perpetual Position in Mango Account-2, leaving the defendant with no change in net value between the two accounts.

The real reason for the large MNGO Perpetual positions was to facilitate fraud and market manipulation. Mango Markets used an "Oracle" to set the price of MNGO Perpetuals. That Oracle looked at MNGO transactions on three platforms to set the price of MNGO Perpetuals: Exchange-1, another centralized cryptocurrency exchange ("Exchange-2"), and a decentralized

cryptocurrency-trading platform ("Aggregator-1"). Eisenberg went to each of these platforms and used either USDC (for Exchange-1 and Aggregator-1) or USDT (for Exchange-2) to buy massive quantities of MNGO. Two of these platforms—Ecxhange-1 and Exchange-2—had terms of service that barred users from engaging in abusive market conduct and market manipulation.

Nonetheless, the defendant's purchases were not bona fide investments in MNGO. Instead, his goal was to manipulate the value of MNGO relative to USDC, with an eye toward artificially increasing the price of MNGO Perpetuals on Mango Markets. His manipulative trading happened rapidly across all three platforms. Over a span of roughly 20 minutes, the defendant used USDC to buy more than 16 million MNGO on Exchange-1, driving the exchange rate from 0.0388 to 0.1557 USD/MNGO. On Aggregator-1, he used USDC to buy more than 3.4 million MNGO, driving the exchange rate on that platform from 0.0389 to 0.91 USDC/MNGO. And on Exchange-2, he used USDT to buy over 1 million MNGO, driving the exchange rate from 0.04 to 0.45 USDT/MNGO. This caused the price of MNGO Perpetuals on Mango Markets to skyrocket, rising from 0.0382 to a high of approximately 0.54 USDC/MNGO—an increase of over 1300 percent.

The defendant used this artificial spike in the price of MNGO Perpetuals to fraudulently steal approximately $110 million of cryptocurrency off of Mango Markets. As the price of MNGO Perpetuals rose, so too did the apparent value of the Long MNGO Perpetual in Mango Account-1. Of course, the value of the short MNGO Perpetual in Mango Account-2 also fell, but that was of no concern to the defendant because his goal was not to make a bona fide investment. Instead, the defendant used took advantage of the artificial spike in the value of the Long MNGO Perpetual to "borrow" approximately $110 million worth of different cryptocurrencies from other depositors on Mango Markets, which was effectively all of the available funds on the platform.

The defendant was not, however, "borrowing" the cryptocurrency—he was stealing it. He

knew he was using misleading information about the value of his assets to momentarily inflate his borrowing power.  And he had no intention to repay or make required interest payments.  Instead, his goal was to immediately drain all the cryptocurrency in Mango Account-1 off the platform and let the value of MNGO Perpetuals collapse, leaving nothing of value in the account to liquidate.

With the proceeds of his crime pocketed, the defendant turned to plotting how he would get away with it.  To get out of the reach of law enforcement, he bought tickets to Israel and fled the country on October 12, 2022—the day after the offense.  Over the course of October 11 through 13, 2022, he also negotiated a deal with representatives of the Mango DAO, whereby the defendant would return approximately $67 million worth of the stolen cryptocurrency; the Mango DAO would put up the remaining cryptocurrency necessary to make Mango Markets depositors whole, which amounted to over $40 million worth of cryptocurrency; and the Mango DAO would, at the defendant's request, agree not to pursue criminal charges (leaving the defendant with approximately $40 million in stolen cryptocurrency).

Throughout the negotiations with the Mango DAO, the defendant did not reveal his identity to the Mango DAO or the public.  Nonetheless, members of the public began to speculate that he was behind the scheme.  For instance, on or about October 12, 2022, an individual who blogs about the cryptocurrency space published an article accusing the defendant of being behind the attack. Even after being publicly identified, however, the defendant waited until he was out of the United States and had extracted his agreement from Mango DAO not to press charges before coming forward.  Only then, on October 15, 2022, did the defendant put out a public statement on Twitter, calling his scheme a "highly profitable trading strategy" that involved "legal open market actions."

The defendant's words and actions before, during, and after his crime show that this statement was false, and that he knew what he was doing was wrong.  To give just a few examples:

Before the crime, the defendant filed a market-manipulation lawsuit under the Commodities Exchange Act against another cryptocurrency platform; posted on Twitter about the market-manipulation prosecution against Neil Phillips; and, in the days leading up to the offense, conducted online searches about fraud and market manipulation.  During the crime, the defendant took steps to conceal his identity by registering on Exchange-1 with someone else's identity and using the option to create an anonymous account on Exchange-2.  And after the crime, the defendant: deleted messages that he had posted on Discord before the crime, which referenced a plan to get a "9 figure payday" by "tak[ing] a long position and . . . mak[ing the] numba go up"; purchased tickets to Israel and fled the United States, later telling a friend that he was staying abroad "until stuff blows over"; insisted on the Mango DAO agreeing not to pursue criminal charges against him before returning any funds; and conducted research on market manipulation and commodities fraud, which included asking a friend for a lawyer who knew about the Commodities Exchange Act.

Text messages between the defendant and one of his acquaintances ("Individual-1") shortly after the attack highlight the defendant's state of mind.  The defendant told Individual-1 he was in the process of leaving the United States to Israel and remarked, "[h]opefully I don't get added to no fly in the next two hours[.] Any ideas how to turn crypto into cash in large amounts[?]"  When Individual-1 asked if it was "easy to extradite US citizens" from Israel, the defendant responded, "[f]irst they have to find me though."  The defendant and Individual-1 then turned to discussing the cryptocurrency the defendant had obtained.  The defendant remarked that he wanted customers of Mango Markets to be able to get their money back to "[g]et[] rid of sympathetic victims"—leaving Mango DAO holding the loss.  He added that he would have preferred to use Tornado Cash—a program designed to scramble the origin of cryptocurrency—rather than engage in

"negotiation bs," but could not do so because Tornado was sanctioned.  Indeed, when Individual-1 mentioned that the defendant would not do well in prison, the defendant even speculated about where he might end up incarcerated and about potentially receiving a pardon.

## **ARGUMENT**

I.      **The Court Should Preclude the Defendant From Introducing Evidence and Arguments that Are Irrelevant and Unfairly Prejudicial.**

Under Federal Rule of Evidence 402, "[i]rrelevant evidence is not admissible" at trial, and under Rule 403, a court may exclude even relevant evidence "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." *See United States v. Miller*, 626 F.3d 682, 689-90 (2d Cir. 2010).

A defendant is entitled to present a defense only if it has a foundation in the evidence, *see United States v. Kwong*, 69 F.3d 663, 667-68 (2d Cir. 1995), and as long as it does not fail as a matter of law, *see United States v. Bakhtiari*, 913 F.2d 1053, 1057 (2d Cir. 1990).  If the Court finds a defense insufficient as a matter of law, the Court is under no duty to allow the defendant to present the evidence, or advance the defense, to the jury.  *See United States v. Paul*, 110 F.3d 869, 871 (2d Cir. 1997) (citing *United States v. Bailey*, 444 U.S. 394, 416-17 (1980)).

A.  **The Court Should Exclude Evidence and Arguments that Cryptocurrency Is Unregulated or that the Charges Against the Defendant Are Novel.**

The defendant should be precluded from arguing or adducing evidence that cryptocurrency is unregulated or that the charges in this case are somehow novel.  The defense has argued, in its motion to dismiss, that regulatory agencies have taken what are—in the defense's view—conflicting positions about whether, and the extent to which, cryptocurrency is regulated.  MTD at 1-2.  The defense has also claimed that the charges in this case are a novel.  *Id.* at 2-3.  Those arguments should not be presented to the jury.

7

Arguments about the state of regulation in the cryptocurrency industry, and the alleged novelty of the charges, have no relevance to any fact of consequence. *See United States v. Stewart*, No. 03 Cr. 717 (MGC), 2004 WL 113506, at *2 (S.D.N.Y. Jan. 26, 2004) (concluding that "[a]ny characterization of the securities fraud charge . . . as 'novel' is irrelevant to the jury's consideration of the indictment in this case," and ordering that "[t]he defense may not argue or present evidence to the jury that tends to show that this count is an unusual or unprecedented application of the securities laws"). The sole question before the jury is whether the facts prove beyond a reasonable doubt that the defendant is guilty. *See United States v. Rosado*, 728 F.2d 89, 93 (2d Cir. 1984) (criticizing admission of evidence about the propriety of a prosecution "for turning the trial away from a determination of whether the elements of the offense charged had been proved beyond a reasonable doubt into a wide-ranging inquiry into matters far beyond the scope of legitimate issues in a criminal trial"); *United States v. Borrero*, No. 13 Cr. 58 (KBF), 2013 WL 6020773, at *2 (S.D.N.Y. Nov. 1, 2013) (precluding cross examination regarding a government charging decision in part because "the limited amount of probative value that the . . . charging decisions add is substantially outweighed by the risk of undue confusion and an unnecessary sideshow . . ."). This will require the jury to determine, for instance, whether the Perpetuals at issue in this case are "swaps" and whether the defendant acted in good faith. It is not, however, a referendum on regulation in the cryptocurrency industry generally, or the Government's charging decisions in this particular matter.

Moreover, any plausible relevance is substantially outweighed by the danger of confusing issues, misleading the jury, and wasting time. Opening the door to arguments about the state of regulation in cryptocurrency would necessarily involve a digression into the various agencies responsible for regulating the industry and the different ways in which they have, and have not,

regulated the space.  Claims about the novelty of the prosecution would, similarly, require a detour into the similarities and dissimilarities between this case and others charging fraud and market manipulation.  These would be time-wasting sideshows that would risk confusing the jury about the facts relevant to this case and misleading jurors into believing the case was a referendum on cryptocurrency regulation writ large.  None of that is pertinent to the jury's task of deciding whether the defendant committed market manipulation and fraud.  It should be excluded entirely.

**B.  The Court Should Exclude Evidence and Arguments that Mango Markets Was Not Regulated in the United States.**

The Court should also exclude evidence and argument suggesting that Mango Markets was not regulated in the United States.  The defense has claimed, in its motion to dismiss, that "Mango Markets does not fall within the jurisdiction of the SEC or CFTC under existing law."  MTD at 2. This, too, has no place before a jury at trial.

Whether or not Mango Markets was subject to the jurisdiction of the SEC or CFTC is not relevant to the elements of any charged offenses.  To prove the jurisdictional elements of those crimes, the Government need not prove that Mango Markets was a U.S.-regulated exchange. Rather, it must prove, for the commodities fraud and manipulation charges, that the defendant's crime was in connection with a "swap" or "contract of sale of any commodity," and for the wire-fraud charge, that the defendant's crime involved an interstate wire.  The argument that Mango Markets was not subject to SEC or CFTC jurisdiction, then, is a sideshow that is not relevant to any fact of consequence.

Arguments or evidence about whether Mango Markets was subject to regulation by American regulatory agencies would also be a confusing waste of time, and would risk intruding on the exclusive province of the Court to instruct the jury on the law.  To avoid the misimpression that this was a point of any relevance, the Government may have to introduce evidence to refute

the defense's claim.  This could devolve into a trial-within-a-trial about an issue that is not relevant to any element of the charged offenses.  This risk of confusion and delay substantially outweighs any value to the point, which is a separate basis for exclusion.

**C.  The Court Should Exclude the Defendant's "Code is Law" Arguments.**

A central theme of the defense's motion to dismiss was that the defendant's actions were "permitted" by the code on which Mango Markets operated, and that his actions were "fully permissible under the rules" of the protocol.  MTD at 4-6.  This appears to be a version of an argument that "code is law":  Namely, that because the Mango Markets code did not prevent the defendant's attack, and because the platform did not have terms of service, his conduct was legal.

This argument is wrong and fundamentally misunderstands the charges in this case.  The defendant is not charged with hacking or gaining unauthorized access to Mango Markets.  He is charged with market manipulation and fraud.  It is no defense to claim that market manipulation and fraud were technological feasible or not prohibited by terms of service.  The criminal laws protect people from market manipulation and fraud regardless of whether privately designed computer codes and contracts do the same.  Accordingly, the defendant's "code is law" claim is not a legally valid defense and presents a high risk of confusing the jury.  The Court should exclude arguments to that effect and restrict how the defense is permitted to use evidence about the Mango Markets code and the absence of terms of service.

> **1.  Technological Feasibility and the Lack of Terms of Service Are Not Defenses to Market Manipulation and Fraud.**

As described above, Mango Markets is a decentralized cryptocurrency exchange that allows users to trade cryptocurrencies and cryptocurrency-related products, including Perpetuals. The platform also permits users to lend and borrow cryptocurrency, based on a formula that restricts the amount of borrowing to a certain percentage of the user's assets and requires regular

interest payments until the loan has been repaid.  Because Mango Markets was decentralized, users' agreements to trade, borrow, and lend on the platform were enforced by a smart contract.

The charges in this case do not claim that the defendant hacked or altered the Mango Markets code.  *See, e.g.*, 18 U.S.C. § 1030(a)(2) ("Whoever . . . intentionally accesses a computer without authorization or exceeds authorized access . . . .").  Rather, the charges allege that the defendant engaged in market manipulation and fraud.  Count One charges the defendant with commodities fraud.  One aspect of that fraud was selling USDC to inflate the price of MNGO Perpetuals, thereby fraudulently inflating the value of his assets on Mango Markets.  Market manipulation is a form of fraud where, as here, it is "designed to deceive or defraud investors by controlling" prices. *Set Capital LLC v. Credit Suisse Grp.*, 996 F.3d 64, 76 (2d Cir. 2021).  Another aspect of the fraud was when the defendant—relying on the fraudulently inflated value of his assets—"borrowed" huge quantities of cryptocurrency from Mango Markets, despite having no intention to repay those funds or make required interest payments.  *See U.S. ex rel. O'Donnell v. Countrywide Home Loans, Inc.*, 822 F.3d 650, 658-59 (2d Cir. 2016) (explaining that promise without intent to keep promise is fraud); *United States v. Chanu*, 40 F.4th 528, 541 (7th Cir. 2022) (holding that offer with hidden intent to cancel is fraud).  Count Three, which charges wire fraud, similarly sounds in fraud:  It rests on the premise that the defendant deceptively misrepresented the value of his assets on Mango Markets and his intentions to "borrow" from the platform (including his intention to pay interest).

Count Two, which charges commodities manipulation, is focused on the defendant's manipulation of the price of MNGO Perpetuals.  Unlike commodities fraud, commodities manipulation does not require proof of deception or intent to deceive.  Instead, it criminalizes intentionally manipulating the prices of swaps, including products like MNGO Perpetuals.  *See In*

11

*re Amaranth Natural Gas Commodities Litig.*, 730 F.3d 170 (2d Cir. 2013).   The defendant committed this crime by artificially inflating the price of MNGO Perpetuals on Mango Markets, regardless of whether that was deceptive or part of a scheme to defraud.

That market manipulation and fraud were technologically feasible on Mango Markets, or that Mango Markets lacked terms of service, is not a defense to the charges in this case.   Start with market manipulation under the commodities-fraud and commodities-manipulation statutes.   The Circuit has repeatedly held that open-market transactions—such as buying or selling an asset— can be unlawful when done with manipulative intent.   *See, e.g.*, *SEC v. Vali Management Partners*, No. 21-453, 2022 WL 2155094, at *1 (2d Cir. 2022) ("open-market transactions that are not inherently manipulative may constitute manipulative activity when accompanied by manipulative intent" (internal bracket, quotation marks, and citation omitted)); *Set Capital*, 996 F.3d at 77 (same).   These open-market trades are, of course, technologically feasible, and the Second Circuit has never required a showing that the any terms of service prohibited the conduct at issue before allowing a manipulation claim to proceed.

The decision in *Set Capital* is instructive.   There, the Second Circuit considered a lawsuit against Credit Suisse, alleging that the bank had used large purchases of futures contracts to manipulate the price of related derivatives.   996 F.3d at 69.   The Second Circuit held that open-market trading in the futures contracts that was designed to "destroy the value" of those derivatives constituted fraudulent manipulation.   *Id.* at 77.   Those manipulative trades were feasible: no code prevented Credit Suisse from making them.   And the Second Circuit did not require any showing that there were terms of service or contractual rules prohibiting the manipulative activity.   The law prohibiting manipulation is what made the conduct illegal, not anything about the technological restraints or private contractual arrangements.

The recent decision in *United States v. Phillips* is also on point. No. 22 Cr. 138 (LJL), 2023 WL 5671227 (S.D.N.Y. Sept. 1, 2023). There, the defendant was charged with making massive open-market trades to manipulate the dollar-rand exchange rate, so it would fall low enough to trigger a payment under a barrier option. *Id.* at *1-3. There was nothing technologically stopping the defendant from making huge open-market trades in the relevant currencies. Nor were there any terms of service or other private contractual arrangements prohibiting the manipulative conduct. What made it illegal was the law prohibiting fraudulent manipulation. *See id.* at *9-12. There did not need to be some other technological or contractual restraint to prohibit the conduct.

Turning to the wire-fraud charge, it is also no defense to claim that the fraud was technologically feasible or not barred by terms of service. The decision in *United States v. Chanu*, 40 F.4th 528, 541 (7th Cir. 2022), illustrates the principle. There, the Seventh Circuit held that "spoofing"—where a trader manipulates prices by placing orders to buy or sell, with the intent to cancel those orders—constitutes wire fraud. *Id.* (holding that spoofing is wire fraud). The Court reached that decision without requiring any proof that "spoofing" was technologically or contractually prohibited on the platforms the defendants used. That makes perfect sense: what matters in a fraud case is whether the scheme was deceptive, not whether it involved hacking or breaking private contractual rules.

These basic principles appear time and again in fraud cases. For example, the Second Circuit has repeatedly held that financial statements can be fraudulent, even if they are compliant with Generally Accepted Accounting Principles. *See, e.g.*, *United States v. Ebbers*, 458 F.3d 110, 125-126 (2d Cir. 2006) (rejecting argument that, in a fraud case, the Government had to proof "that the underlying accounting was improper under GAAP") (citing *United States v. Simon*, 425 F.2d 796, 805-06 (2d Cir. 1969) (Friendly, J.)); *United States v. Rigas*, 490 F.3d 208, 220 (2d Cir. 2007)

("It has been the long-held view in this Circuit that GAAP neither establishes nor shields guilt in a securities fraud case."). This shows that a representation can be fraudulent, even if it complies with other rules or standards applicable to the representation. This is on all fours with the case here: The Government does not need to prove that the defendant's scheme was prevented by Mango Markets code or barred by terms of service to prove that it was fraudulent.

### 2. The Court Should Exclude "Code is Law" Arguments and Restrict Evidence About Mango Markets Code and Lack of Terms of Service.

The criminal laws protect people from market manipulation and fraud, regardless of whether private entities design code or create contracts that prohibit the same conduct. Because it is no defense to the crimes that the defendant's scheme was technologically feasible or not barred because of the lack of terms of service, the Court should limit the defense in two ways: First, the Court should prevent the defense from arguing to the jury that the defendant is not guilty if the code or the lack of terms of service did not bar the scheme. And second, the Court should restrict the presentation on evidence about the Mango Markets code and lack of terms of service to prevent such an improper suggestion, including potentially through a limiting instruction.

Any argument that the charged conduct was legal if it was not prevented by the code or lack of terms of service should be precluded because it is legally wrong. *See Paul*, 110 F.3d at 871 ("If . . . the court finds that the defendant's evidence is insufficient as a matter of law to establish [a] defense, the court is under no duty to give the requested jury charge or to allow the defendant to present the evidence to the jury."). Cryptocurrency is not unique. People who invested on Mango Markets did not give up the protections of federal law simply because Mango Markets did not have code or a contract that stopped the defendant before he stole everything from the platform. *See United States v. Bankman-Fried*, No. 22 Cr. 673 (LAK), 2023 WL 6283509, at *3 (S.D.N.Y. Sept. 26, 2023) (precluding evidence that customers or investors were "negligent,

gullible, or insufficiently vigilant" because "the unreasonableness of a fraud victim . . . does not bear on a defendant's criminal intent" (collecting cases)).  Allowing the argument to the contrary would confuse and mislead the jury about the applicable law, and so should be prohibited in its entirety.[2]

    To be sure, the Government recognizes that evidence about the Mango Markets code and lack of terms of service may have some relevance at trial.  The defendant, for example, may attempt to argue that such evidence supports a defense that he had a good-faith belief that his conduct was not wrongful.  If the defendant intends to use evidence about the code and lack of terms of service for that purpose, the Government respectfully submits that the Court should carefully restrict the presentation of that evidence.  There is a significant danger that the way in which the evidence is presented could suggest (if not explicitly state) the argument that the code and lack of terms of service are a defense to the crime.  Defense questioning on these topics, for example, could easily blur the line between straightforward facts and impermissible arguments by incorporating language about whether the defendant's scheme was "allowed" on Mango Markets or "not prohibited" on Mango Markets.

    One way to ensure that evidence on these subject remains in bounds is to make sure questioning and testimony are specific.  Questions about what is "allowed" or "prohibited" on Mango Markets misleadingly blur the distinction between the legal prohibitions at issue in the case, and the Mango Markets code and lack of terms of service, and may suggest, misleadingly, some intention by Mango Markets to permit the defendant's conduct.  Instead, questions should be specific to what was possible under the Mango Markets code, and whether Mango Markets did,

_____

[2] As noted above, two of the exchanges that the defendant used to commit the charged offenses had terms of service prohibited illegal or abusive trading activity (in the case of Exchange-1) and, explicitly, market manipulation (in the case of Exchange-2).

or did not, have terms of service covering particular conduct.  Another important restriction that the Court should impose is a limiting instruction, informing the jury that evidence about the code and lack of terms of service are relevant only to a particular issue—such as whether the defendant acted in good faith—and not to whether the conduct constituted fraud or market manipulation.

These restrictions are necessary to ensure that the jury does not take away the misimpression that, when it comes to cryptocurrency (and cryptocurrency alone), anything goes so long as the code allows it or there are no terms of service that prohibit it.  The laws prohibiting fraud and market manipulation protect investors by virtue of Congress's decision to criminalize such activity.  It is no defense that private actors have not perfectly designed code, or implemented terms of service, to separately prohibit what is already illegal.  The defense should not be able to suggest otherwise to the jury.

**D. The Court Should Preclude Evidence About Mango Markets' Terms of Service Implemented After the Defendant's Crimes.**

After the conduct at issue in this case, Mango Markets implemented terms of service that prohibit people using the platform from engaging in conduct similar to the crimes the defendant committed.  The Court should preclude the defendant from introducing evidence that Mango Markets implemented these terms of service:  Because they were created after the charged offenses, they are not relevant, and any limited probative value they may have would be substantially outweighed by the risk that the jury would be confused or misled into believing that the defendant's conduct was legal because Mango Markets did not have terms of service until after his crime.

In 2023, Mango Markets published terms of service for people using the marketplace. Those terms of service included a "Limitations on Usage" provision, which requires users to agree to not engage in a variety of activities, including "improper or abusive trading practices," such as

"any fraudulent act or scheme to defraud, deceive, trick or misled," "fraudulent trading,"
"manipulative tactics, including without limitation pumping and dumping, wash trading, and
tactics commonly known as 'rug pulls,'" and "knowingly making any bid or offer for the purpose
of making a market price that does not reflect the true state of the market."  The terms also prohibit
the usage of "the Website in any manner that could interfere with, disrupt, negatively affect, or
inhibit other users from fully enjoying the Website, or that could damage, disable, overburden, or
impair the functioning of the Website in any manner."

These terms of service, which were implemented after the defendant's crime, are not
relevant to any issue in the case.  Because they were published after the defendant's conduct, they
are not relevant to his *mens rea*.  As described above, terms of service were also not required for
the anti-fraud and anti-manipulation laws to apply to the defendant's conduct, so the
implementation of those terms of service has no bearing on whether the defendant was allowed to
commit the charged offense.

The implementation of the terms of service is also inadmissible under Rule 407, and the
principles underlying that Rule underscore why the new terms of service are not relevant.  Under
Rule 407, "[w]hen measures are taken that would have made an earlier . . . harm less likely to
occur, evidence of the subsequent measures is not admissible to prove: negligence . . . a defect in
a product or its design; or a need for a warning or instruction."  Fed. R. Evid. 407.  The rationale
for Rule 407 is that evidence of subsequent remedial measures "has been considered unreliable
because it is unfairly prejudicial and has little probative value."  2 Weinstein's Federal Evidence
§ 407.03 (2021).  Indeed, admitting this kind of evidence would discourage parties from taking
steps to avoid further harm in fear that their subsequent remedial measures would be presented as

an admission of prior negligence or a prior need for more warnings or instructions.  *See* Fed. R. Evid. 407 advisory committee's note (describing policy rationale for rule).

Mango Market's addition of terms of use to avoid future harm is a form of subsequent remedial measure squarely within the meaning of Rule 407.  *See id.* (noting that the rule is meant to encompass evidence of measures such as "changes in company rules"); *see also R.M. Perlman, Inc. v. New York Coat, Suit, Dresses, Rainwear & Allied Workers' Union Loc. 89-22-1, I.L.G.W.U., AFL-CIO*, 33 F.3d 145, 156 (2d Cir. 1994) (rewording or removal of a clause was subsequent remedial measure under Rule 407).  And the Second Circuit has prohibited the use of new corporate policy changes pursuant to Rule 407 because "the subsequent taking of measures which would have made a violation less likely normally cannot be considered as proving that failure to take them earlier was negligent." *S.E.C. v. Geon Industries, Inc.*, 531 F.2d 39, 52 (2d Cir. 1976); *see also In re Foreign Exchange Benchmark Rates Antitrust Litigation*, No. 13 Civ. 7789 (LGS), 2022 WL 4087842, at \*4-5 (S.D.N.Y. Sept. 6, 2022) (concluding that the banks' decisions to close down "chat rooms that allegedly created the conditions for a conspiracy" by employees was a "paradigmatic" remedial measure that was inadmissible under Rule 407). Likewise here, Mango Markets' subsequent invocation of terms of use should not be admissible under Rule 407, not only to show Mango Markets acted negligently, but also to show a "defect" in the platform or a "need for a warning or instruction" at the time of the defendant's crime.

Finally, any limited probative value that the new terms of service may have is substantially outweighed by the significant risk of misleading or confusing the jury and prompting a digression into the origins of the terms of service.  With respect to misleading and confusing the jury, evidence about the new terms of service is highly likely to give jurors the misimpression that, because Mango Markets did not have similar terms of service at the time of the defendant's crime, his

conduct was legal.  As explained above, that is legally incorrect.  Moreover, to combat that false impression, the Government may have to offer evidence about the reasons for implementing the terms of service, which is an unnecessary departure from the relevant facts of the case and may implicate privilege issues.  No marginal relevance of the new terms of service could warrant these real, significant risks of juror confusion and distraction.

### E.  The Court Should Exclude Argument that the Defendant's Partial Repayment Is a Defense to the Charged Crimes.

As explained above, immediately after the defendant stole approximately $110 million worth of cryptocurrency off of Mango Markets, he fled the country.  Once safely abroad, he used his massive leverage over Mango Markets to negotiate what he hoped was protection from criminal exposure.  Specifically, the defendant proposed a deal to the Mango DAO, whereby the defendant would return a portion of what he had stolen and the Mango DAO would use that money, plus tens of millions of dollars from the Mango DAO's treasury, to repay customers.  In exchange, the defendant demanded that MNGO token holders waive any claims against him and "not pursue any criminal investigations."

Desperate to have customer funds returned, the Mango DAO ultimately approved a version of this proposal.  Specifically, in exchange for a promise not to pursue claims or "criminal investigations," the defendant agreed to return approximately $67 million of the roughly $110 million he had stolen.  The Mango DAO treasury was left on the hook for the remaining $40 million needed to make Mango Markets users whole.

Although evidence regarding these events may be admissible for other purposes at trial— and, indeed, the Government may offer such evidence, the defendant should be precluded from arguing that his partial repayment of stolen funds is a defense to the charged crime.  The Second Circuit has consistently held that repayment is not a defense to fraud.  For both wire fraud and

commodities fraud, "the fact that the defendant believes (rightly or wrongly) that he will ultimately be able to work things out so that the victim[s] will suffer no loss is no excuse for the real and immediately loss contemplated to result from the defendant's fraudulent conduct." *United States v. Calderon*, 944 F.3d 72, 90 (2d Cir. 2019); *see United States v. Jabar*, 19 F.4th 66, 77 (2d Cir. 2021) ("Proof of actual injury to the victim is not required . . . ."). It is, therefore, "immaterial as a matter of law whether the defendant intended to repay [stolen] funds because the offense is [complete] where . . . there is an immediate intent to . . . defraud." *United States v. Bankman-Fried*, No. 22 Cr. 673 (LAK), 2023 WL 4194773, at *9 (S.D.N.Y. June 27, 2023).

In light of this black-letter law, it would be legally incorrect for the defense to argue that the defendant's repayment shows that he is not guilty. Once a fraud has occurred, "[w]hat might have later happened as to repayment is not material and could not be a defense." *United States v. Sindona*, 646 F.2d 792, 800 (2d Cir. 1980); *accord United States v. Vincent*, 416 F.3d 593, 601 (7th Cir. 2005) ("Nor is it a defense to [wire fraud] that the accused voluntarily returned the funds."). Indeed, the argument would be particularly misplaced here, where the defendant returned only a portion of the stolen funds, and the Mango DAO was forced to spend nearly $40 million worth of cryptocurrency to repay unrecouped customer losses. On these facts, there is no legal basis to use the repayment of funds as a basis for asserting the defendant's innocence or good faith.

## II. The Court Should Preclude the Defendant From Introducing Self-Serving Exculpatory Statements.

As explained above, the defendant took steps to conceal his identity during and immediately after his crime. But as people began to speculate that he was behind the scheme, the defendant eventually came forward—days after the crime—claiming on Twitter that he believed his actions were legal. The defendant made similar statements to others in the following days,

including in interviews.  The defendant should not be allowed to introduce these self-serving exculpatory statements at trial because they are inadmissible hearsay.

A hearsay statement is an "out-of-court statement offered to prove the truth of the matter asserted."  *Danis v. Velez*, 797 F.3d 192, 200 (2d Cir. 2015).  When the Government offers a defendant's statement against him, that "is not hearsay."  *United States v. Marin*, 669 F.2d 73, 84 (2d Cir. 1982); Fed. R. Evid. 801(d)(2).  It is typically admissible, "regardless of whether such statements were made against [the defendant's] interests when made."  *United States v. Gotti*, 457 F. Supp. 2d 395, 397 (S.D.N.Y. 2006).

It is well established that a defendant does not have a parallel ability to offer his own out-of-court statement into evidence.  That is because "when the defendant seeks to introduce his own prior statement for the truth of the matter asserted, it is hearsay, and it is not admissible."  *Marin*, 669 F.2d at 84; *see also United States v. Kadir*, 718 F.3d 115, 124 (2d Cir. 2013) ("A defendant may not introduce his own prior out-of-court statements because they are hearsay, and . . . not admissible." (internal quotation marks omitted)).

This hearsay bar applies when defendants seek to introduce out-of-court statements that contain self-serving explanations of the reasons why the defendant took certain actions.  It is true that Federal Rule of Evidence 803(3) contains a hearsay exception for statements about the declarant's "then-existing state of mind."  But that exception does not apply to statements that "face . . . backwards," seeking to explain *past* events.  *United States v. DiMaria*, 727 F.2d 265, 271 (2d Cir. 1984); *United States v. Blake*, 195 F. Supp. 3d 605, 610-11 (S.D.N.Y. 2016) (precluding a defendant from introducing her own out-of-court statements to law enforcement officers in which she pointed the finger at co-defendants as reflecting a then existing state of mind because such statements reflected a "self-serving explanation of past events"); *United States v.*

21

*Dinga*, 609 F.3d 904, 908-09 (7th Cir. 2010) (affirming the rejection of a defendant's attempt to introduce evidence of his offer to take a polygraph after his arrest).

Imposing this restriction is in keeping with the purpose of the state-of-mind exception, the basis for which "focus[es] on the contemporaneity of the statement and the unlikelihood of deliberate or conscious misrepresentation." *United States v. Harwood*, 998 F.2d 91, 98 (2d Cir. 1993) (quoting *United States v. Cardascia*, 951 F.2d 474, 487 (2d Cir. 1991)). "Thus, to fall within Rule 803(3)'s 'state of mind' hearsay exception, the statements sought to be introduced must relate to the declarant's state of mind during the [illegal conduct]" and not what the declarant "said or did after the [illegal conduct] had taken place and as the scheme itself was being discovered." *United States v. Netschi*, 511 F. App'x 58, 61 (2d Cir. 2013) (affirming district court's exclusion of statements the defendant "made and reactions he had concerning the unraveling of the scheme").

Under these settled legal principles, the defense should not be permitted to introduce evidence of his own exculpatory statements. The defendant's claim, days after the offense, that he believed his actions are legal are classic hearsay statements. The purpose introducing them would be for the truth of the matter asserted—namely, that the defendant did not think he was doing anything wrong. The statements do not qualify for the exception for then-existing state of mind because they were not made at the time of the crime, but rather made well after the fact.

Indeed, admitting these statements would implicate all of the reasons that hearsay is prohibited. They were made after the attack when the defendant had every incentive to lie. Further still, and despite their obvious unreliability, the Government cannot cross-examine the defendant about these statements. Moreover, the defendant's false exculpatory statements are not necessary to place the Government's anticipated evidence in context or to avoid a risk that the jury will be misled; rather, they are "post-hoc explanations for prior conduct." *United States v. Lange*, 834

F.3d 58, 79 (2d Cir. 2016) (holding that rule of completeness did not require admission of full grand jury testimony where omitted statements were post-hoc explanations that did not alter the meaning of the admitted testimony). The defense should be precluded from eliciting the defendant's false exculpatory statements or other statements made by the defendant.

## **CONCLUSION**

For the foregoing reasons, the Government respectfully submits that the Court should grant the Government's motions *in limine*.

Dated: New York, New York
         December 21, 2023

                                        Respectfully submitted,

                                        DAMIAN WILLIAMS
                                        United States Attorney
                                        Southern District of New York


                              By:    /s/_____
                                        Thomas S. Burnett
                                        Peter Davis
                                        Assistant United States Attorneys

                                        Tian Huang
                                        Special Assistant United States Attorney