UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No.: 23 Cr. 10 (AS) |
| Plaintiff, | |
| -against- | |
| AVRAHAM EISENBERG, | |
| Defendant. | |

## DEFENDANT AVRAHAM EISENBERG'S OPPOSITION TO THE GOVERNMENT'S MOTION TO EXCLUDE PROPOSED TESTIMONY OF JEREMY SHERIDAN AND DR. JOHN MONTGOMERY

Brian E. Klein
Ashley E. Martabano
Riley P. Smith
Waymaker LLP
515 S. Flower Street, Suite 3500
Los Angeles, California 90071
(424) 652-7800

Sanford N. Talkin
Noam B. Greenspan
Talkin, Muccigrosso & Roberts, LLP
40 Exchange Place, 18th Floor
New York, New York 10005
(212) 482-0007

*Attorneys for Avraham Eisenberg*

## TABLE OF CONTENTS

I.    PRELIMINARY STATEMENT ................................................................ 1

II.    LEGAL STANDARD.......................................................................... 2

III.    ARGUMENT..................................................................................... 3

     A.    The Court Should Permit All of Mr. Sheridan's Proposed Testimony........................ 3

         1.    Mr. Sheridan's Proposed Background Testimony is Not Improper State-of-Mind Testimony ......................................................................... 3

         2.    Mr. Sheridan's Proposed Testimony Regarding the Mango Markets Terms of Service Is Relevant and Not a "Code Is Law" Argument .................................. 8

         3.    Mr. Sheridan's Proposed Testimony Regarding "Strategic Utilization of Market Mechanics" Is Not State of Mind Testimony and is Otherwise Admissible.................. 12

         4.    Mr. Sheridan's Proposed Testimony Is Not Improper "Victim Blaming"....... 13

     B.    The Court Should Permit All of Dr. Montgomery's Proposed Testimony................ 16

         1.    Dr. Montgomery's Opinions Regarding the Financial Instruments Involved Is Relevant Expert Testimony ................................................................ 16

         2.    Dr. Montgomery's Proposed Testimony Regarding Price Artificiality is Well Within the Role of an Expert..................................................... 18

         3.    Dr. Montgomery is Qualified To Testify Regarding General Trading Strategies......................................................................... 22

         4.    Dr. Montgomery's Proposed Testimony Regarding U.S. Dollar-Denominated Instruments is Relevant and Admissible ........................................ 24

IV.    CONCLUSION................................................................................. 26

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
 303 F.3d 256 (2d. Cir. 2002)...................................................................................... 2

*CFTC v. Wilson*,
 No. 13 Civ. 7884 (RJS),
 2018 WL 6322024 (S.D.N.Y. Nov. 30, 2018) .......................................................... 22

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
 509 U.S. 579 (1993)................................................................................................... 2

*Gurary v. Winehouse*,
 190 F.3d 37 (2d Cir. 1999).................................................................................... 22

*In Au New Haven, LLC v. YKK Corp.*,
 No. 15 Civ. 3411 (GHW)(SN),
 2019 WL 1254763 (S.D.N.Y. Mar. 19, 2019) .......................................................... 6

*In re Blech Sec. Litig.*,
 No. 94 Civ. 7696,
 2003 WL 1610775 (S.D.N.Y. Mar. 26, 2003) .......................................................... 4

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
 299 F. Supp. 3d 430 (S.D.N.Y. 2018)...................................................................... 23

*In re Rezulin Products Liability Litig.*,
 309 F. Supp. 2d 531 (S.D.N.Y. 2004).................................................................. 6, 23

*Louis Vuitton Malletier v. Dooney & Bourke, Inc.*,
 525 F. Supp. 2d 558 (S.D.N.Y. 2007)....................................................................... 3

*McCullock v. H.B. Fuller Co.*,
 61 F.3d 1038 (2d Cir. 1995).................................................................................... 24

*SEC v. U.S. Envtl., Inc.*,
 No. 94-cv-6608 (PKL),
 2002 WL 31323832 (S.D.N.Y. Oct. 16, 2002) ................................................. 17, 19

*Singh v. Knuckles, Komosinski & Manfro, LLP*,
 18 Civ. 3213 (NSR),
 2022 WL 862251, (S.D.N.Y. March 23, 2022) ....................................................... 11

*United States v. Ahmed*,
   No. 14 Cr. 277 (DLI),
   2016 WL 8732355 (E.D.N.Y. June 24, 2016) ................................................... 14, 15

*United States v. Amico*,
   486 F.3d 764 (2d Cir. 2007) ...................................................................................... 14

*United States v. Bilzerian*,
   926 F.2d 1285 (2d Cir. 1991) .............................................................................. 4, 16

*United States v. Frankel*,
   682 Fed. App'x 20 (2d Cir. 2017) ............................................................................. 14

*United States v. Isola*,
   548 Fed. App'x 723 (2d Cir. 2013) ........................................................................... 14

*United States v. Lesniewski*,
   No. 11 Cr. 1091 (VM),
   2013 WL 3776235 (S.D.N.Y. July 12, 2013) ........................................................... 14

*United States v. Mendlowitz*,
   No. 17 Cr. 248 (VSB),
   2019 WL 6977120 (S.D.N.Y. Dec. 20, 2019) ............................................................. 8

*United States v. Nekritin*,
   No. 10 Cr. 491 (KAM),
   2011 WL 2462744 (E.D.N.Y. June 17, 2011) ........................................................... 14

*United States v. Phillips*,
   No. 22 Cr. 138 (LJL),
   2023 WL 6620146 (S.D.N.Y. Oct. 10, 2023) .................................................. 8, 20, 23

*United States v. Russo*,
   74 F.3d 1383 (2d Cir.1996) ........................................................................................ 16

*United States v. Scop,*
   846 F.2d 135 (2d Cir. 1988) ....................................................................................... 19

*United States v. Taylor*,
   562 F.2d 1345 (2d Cir. 1977) ..................................................................................... 19

*United States v. Udeokoro*,
   No. 17 Cr. 629 (AMD),
   2023 WL 4138477 (E.D.N.Y. June 22, 2023) ........................................................... 14

**Rules**

Fed. R. Evid. 702 ................................................................................. 2, 4, 16, 20, 23, 25

Fed. R. Evid. 704 ................................................................................................ 17, 19

Fed. R. Evid. 403 ................................................................................................ 16, 25

**Other Authorities**

Transcript of Record,
*United States v. Phillips*,
22 Cr. 138 (LJL) (Oct. 24, 2023 S.D.N.Y)……………………………………………………20

## I.     PRELIMINARY STATEMENT

Granting the government's motion to exclude the proposed expert testimony of Jeremy Sheridan and Dr. John Montgomery would prevent Avraham Eisenberg from mounting a number of appropriate and important defenses at trial.  The Court should permit all of their proposed expert testimony.

The government does not contest (nor could it credibly) that Mr. Sheridan, a cybersecurity professional for over 25 years (who established the Secret Service's first dedicated illicit finance and digital asset investigative team), is qualified to provide expert testimony generally regarding blockchains, decentralized finance, and cryptocurrency analysis and investigation.  The government challenges a relatively small portion of his proposed testimony, and that relates in sum to the basic design of the Mango Markets protocol; that it did not contain explicit terms of service at the time of Mr. Eisenberg's alleged trades nor have prohibitions coded into it against them, and numerous risks that were ultimately highlighted by Mr. Eisenberg's alleged trades were publicly disclosed well in advance.  Among its problems, the government's motion tries to recast portions of Mr. Sheridan's proposed testimony as either opining about Mr. Eisenberg's or the protocol developers' intent despite the fact that his disclosure includes no reference to their states of mind (and he will not testify to either party's intent).  The government also implicitly argues that expert testimony should only be admissible when supporting prosecution theories when it repeatedly fails to acknowledge that its experts will testify on some of the very same topics for which it argues Mr. Sheridan should not be permitted to testify.  Rather remarkably, the government also objects to his proposed testimony because he did not work for Mango Markets (when the same is true of the government's experts) and to the defense revealing Mr. Sheridan's background as a former law enforcement office

(when it intends to call as a potential expert a current FBI Special Agent, as well as what are expected to be a number of other current law enforcement officers as lay witnesses).

Turning to Dr. Montgomery, a financial economist with almost four decades of experience, the government does not contest that he is qualified to testify generally regarding digital and non-digital financial assets and markets. Like with Mr. Sheridan, the government's objections to Dr. Montgomery's proposed testimony are fatally flawed. The challenged portions relate essentially to the characteristics of the MNGO Perpetuals and a comparison of those characteristics to swaps in non-digital markets, whether the price of MNGO Perpetuals on October 11, 2022 was artificial, the widely known and discussed preference of traders in financial markets not to disclose their trading strategies, and proposed testimony regarding the private issuance of financial instruments which establishes that USDC functioned as a medium of exchange in the alleged trading. The government's objections attempt to recast this testimony into legal conclusions—it is all factual—and testimony of intent—no mention of intent or state of mind is made or implied. And the government fails to acknowledge (here too) that topics it asserts are irrelevant to the defense of this case on which Dr. Montgomery will opine are central to the disclosed testimony of its own experts.

The government's objections to both the testimony of Mr. Sheridan and Dr. Montgomery find no support in fact or law, and its motion should be denied.

## II.   LEGAL STANDARD

Federal Rule of Evidence 702 governs the admissibility of expert testimony and requires "that the evidence or testimony 'assist the trier of fact to understand the evidence or to determine a fact in issue.'" *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 591 (1993). "[T]he *Daubert* inquiry is fluid and will necessarily vary from case to case." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d. Cir. 2002). "[T]he Federal Rules of Evidence favor the

admissibility of expert testimony." *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558 562 (S.D.N.Y. 2007). "As a result, excluding expert testimony is the exception rather than the rule, particularly since vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof can serve as the means to attack shaky by admissible evidence." *Id.* (citation omitted).

## III.   ARGUMENT

### A.   The Court Should Permit All of Mr. Sheridan's Proposed Testimony

The government seeks to exclude four sections of Mr. Sheridan's proposed testimony: (1) background testimony about open-source software and blockchains, including Mango Markets; (2) his opinion regarding what Mango Markets' terms of service were (and were not) at the time of the alleged trading, (3) his opinion regarding the types of trading that were technologically feasible on the Mango Markets' protocol, or "code,"; and (4) his opinion regarding the systematic vulnerabilities in the Mango Markets' protocol that were exposed by the alleged trading. (*See* Dkt. 80, "Mot.", at 5-16.) Rather than address the substance of his proposed testimony, the government either cherry picks and distorts his expert disclosure and argues against admission of testimony the defense does not seek to offer or objects to unfavorable inferences as opposed to Mr. Sheridan's actual proposed testimony. None of the government's arguments, which are addressed in turn below, has merit, and the Court should not exclude any of Mr. Sheridan's proposed testimony.

### 1.   Mr. Sheridan's Proposed Background Testimony Is Not Improper State-of-Mind Testimony

The government's assertion that Mr. Sheridan "proposes to impermissibly speculate about the Mango Markets protocol designers' intent" seriously misstates his notice and should be rejected. (*See* Mot. at 5.) Among the major flaws with the government's argument is that Mr.

Sheridan's proposed testimony does not include a discussion of intent, and the government is
objecting to the same type of background testimony it has disclosed it would like to introduce
through one of its experts.

Mr. Sheridan's two proposed opinions at issue, which plainly include nothing about
motive or intent and from which the government cherry picks words and phrases, state as
follows:

> Mr. Sheridan is expected to offer background testimony on open-source software,
> blockchains (including protocols, decentralization, and DAOs) and
> cryptocurrencies (*e.g.*, Bitcoin, Solana (SOL), Mango (MNGO), USDC, USDT,
> *etc.*).  Specifically, he will explain that the protocols are designed to, in some
> instances, enable conduct, and in others, prevent it. Though technically feasible at
> the time of the trades at issue, Mango Markets had no Terms of Service beyond its
> code—it only gave a warning to users.
>
> Mr. Sheridan is expected to opine that the trades allegedly executed by Mr.
> Eisenberg were not prohibited by the Mango Markets protocol (including the
> Mango DAO), as well as the Solana blockchain.  He may also opine that at the
> time of the alleged trades, it was publicly available how the pricing oracles
> operated, and that the Mango Markets methods for determining the health of an
> end-user account were designed such that parties could significantly overleverage
> transactions.

(Mot. Ex. B at 2.)

In cases involving complicated financial products and transactions, "expert testimony
may help a jury understand unfamiliar terms and concepts."  *United States v. Bilzerian*, 926 F.2d
1285, 1294 (2d Cir. 1991).  It is "proper . . . for an expert familiar with the market to explain
terms and practices that a lay jury would not understand."  *In re Blech Sec. Litig.*, No. 94 Civ.
7696, 2003 WL 1610775, at *19 (S.D.N.Y. Mar. 26, 2003); *see also* Fed. R. Evid. 702 Advisory
Committee Notes ("There is no more certain test for determining when experts may be used than
the common sense inquiry whether the untrained layman would be qualified to determine
intelligently and to the best possible degree the particular issue without enlightenment from those
having a specialized understanding of the subject involved in the dispute.").

Mr. Sheridan's proposed testimony falls within the heartland of accepted expert testimony in complex financial cases and should be permitted.  It is a straightforward opinion on a complicated topic.  Mango Markets is a blockchain protocol built on a set of cryptographic smart contracts in which users pool certain types of digital assets to provide leverage and facilitate certain types of transactions in digital assets.  These are complex technological creations that a lay juror would not understand without expert explanation.

In its motions *in limine*, the government previously "recognize[d] that evidence about the Mango Markets code and lack of terms of service may have some relevance at trial."  (Dkt. 77 at 15.)  To that end, the government has noticed its intention to call a cryptocurrency expert, Kapil Jain, to provide testimony on these precise topics.  The government expert disclosure states that Mr. Jain will "provide a general overview of cryptocurrencies and the blockchain, including by offering examples of cryptocurrencies and explaining how they are transacted on the blockchain and on cryptocurrency exchanges."  (Ex. 1, Gov. Discl. at 1.)  The government further proposes that Mr. Jain will "describe the cryptocurrency trading and investing options available to users of Mango Markets in October 2022, as well as the economic features of those trading and investing options."  (*Id.* at 2.)  Finally, the government states that Mr. Jain will testify regarding the pricing oracle and its effect on the "funding feature" of the MNGO Perpetuals whereby automatic transfers are executed "depending on the difference between the market rate at which Perpetuals are trading and the oracle price."  (*Id.*)  In short, Mr. Jain's proposed testimony relates to the same topics as the testimony of Mr. Sheridan to which the government objects.

Rather than address the substance of Mr. Sheridan's unobjectionable testimony or acknowledge that it intends to introduce testimony on similar topics through one of its own experts, the government attempts to recast Mr. Sheridan's testimony as "state of mind" testimony

"about what the Mango Markets developers intended." (*See* Mot. at 6.)  The government's logic is so divergent from the plain language of the defense disclosure that it is difficult to follow.  As shown above, after explaining the technology generally and the terms of Mango Markets specifically, Mr. Sheridan may opine regarding whether Mango Markets' code permitted the alleged trades.  (Mot. Ex. B at 2.)  None of the proposed testimony relates to the designers' intent.  Rather, it goes to how Market Markets' code worked in practice.

Compounding the problems with the government's argument, its cited cases relate to mental state testimony that is inapposite because Mr. Sheridan does not intend to so testify.  In *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 545 (S.D.N.Y. 2004), the district court excluded proposed testimony from numerous experts "about [defendant's] profit motive[.]"  Likewise, *In Au New Haven, LLC v. YKK Corp.*, involved the exclusion of an expert's proposed testimony that "he has seen no evidence of an intent to induce infringement."  No. 15 Civ. 3411 (GHW)(SN), 2019 WL 1254763, at *13 (S.D.N.Y. Mar. 19, 2019).  Unlike these cases, the challenged testimony does not relate to the intent of the defendant or of the designers of Mango Markets.

The government further argues that the proposed testimony should be excluded because "Mr. Sheridan has no expertise in Mango Markets' systems and protocols" because he "did not work at Mango Markets and has no insight into the protocols' design." (Mot. at 7.)  While it is true that Mr. Sheridan did not work there, the same can be said for the government's expert, Mr. Jain, and the fact that neither did is not a reason to exclude their testimony.

Although it does not specifically state as much, the government's objection may be to the use of the term "design."  That term in context means nothing more than that Mr. Sheridan will testify to the characteristics and features of the protocol, in much the same way that the

6

government offers the testimony of Mr. Jain regarding the manner in which USDC was "designed."  (Ex. 1 at 3.)

The government's unexplained and conclusory assertion that Mr. Sheridan "has no insight" into the features of the protocol and what it did and did not permit users to do is demonstrably false.  (*See* Mot. at 7.)  As Mr. Sheridan's curriculum vitae, which is included in the defense's disclosure, details, he is an expert in digital currencies, blockchain, and smart contracts who has conducted more than 60 federal and state financial and cybercrime investigations, and has served as an expert on cryptocurrency matters, including, in some instances, providing sworn testimony, in numerous matters before federal courts, grand juries, and U.S. House and Senate committees.  (*See* Mot. Ex. B at 12.)  Notably, the government does not challenge Mr. Sheridan's qualifications per se and offers no explanation of why his extensive familiarity with cryptocurrency protocols, like Mango Markets, would not provide him "insight" into Mango Markets.  Of course it would and does.

Mr. Sheridan proposes to opine on the technological design of a blockchain protocol, including Mango Markets, and the effects of said design based on his extensive education, knowledge, experience, and training in cybersecurity and blockchain technology.  (*See* Mot. Ex. B at 2.)  Further, as disclosed, this opinion was based on his review of publicly-available information relating to Mango Markets, including documents published by Mango Markets itself about the protocol's design and how it operates—including much of the same evidence relied upon by the government's experts, Messrs, Jain and Mordecai.  (*Id.* at 2; Ex. 1 at 32.)  Mr. Sheridan has analyzed the information and, relying on his professional expertise, formed conclusions regarding the effects of that design.  (*Id.*)  That is a reliable basis for expert testimony.  *See, e.g., In re Blech Sec. Litig.*, 2003 WL 1610775, at *19 (holding that expert

testimony about "what effects [particular practices] may have on the market" was permitted); *United States v. Phillips*, No. 22 Cr. 138 (LJL), 2023 WL 6620146, at *12 (S.D.N.Y. Oct. 10, 2023) (holding that a review of "scholarly articles and mass media" was a reliable basis for expert opinions and testimony was admissible because expert brought "her academic expertise to bear when testifying as to the events described and views espoused in the sources she reviewed").

Finally, the government asserts that Mr. Sheridan's testimony should be excluded because it would be duplicative of the testimony of "a witness from Mango Markets" whom it intends to call.  (Mot. at 7.)  This argument is problematic for at least three significant reasons. First, the government again fails to acknowledge that the same could be said of its expert, Mr. Jain, who also is not a witness from Mango Markets.  Second, the government has not disclosed the name, role, or proposed testimony of this supposed witness, and there is therefore no basis to determine whether the proposed testimony will actually be duplicative.  Third, the cases upon which the government relies involved rulings made at trial after the testimony of the lay witness. *See, e.g., United States v. Mendlowitz*, No. 17 Cr. 248 (VSB), 2019 WL 6977120, at *7 (S.D.N.Y. Dec. 20, 2019) ("I explained that I was going to reserve decision because it was premature to make a ruling without hearing the testimony of the witnesses. . . .").

2.   Mr. Sheridan's Proposed Testimony Regarding the Mango Markets Terms of Service Is Relevant and Not a "Code Is Law" Argument

The government's effort to contort Mr. Sheridan's proposed testimony regarding the Mango Markets terms of service into a purported "code is law" defense is plainly inconsistent with the substance of the defense's disclosure and should be rejected.  A review of his disclosed

opinions demonstrates that they are relevant to the jury's determination of whether Mr.

Eisenberg's alleged misrepresentations were material, a central issue in the trial.

The government states that Mr. Sheridan should not be permitted to "opine that 'the

trades allegedly executed by Mr. Eisenberg were not prohibited by the Mango Markets protocol'

and that Mango Markets could have had terms of service, but did not" because, according to the

government, this testimony is "irrelevant and unfairly prejudicial."  (Mot. at 8-9.)  The

government fails to reconcile this (erroneous) position with its previous (correct) contention in

its motions *in limine* that "[t]o be sure, the [g]overnment recognizes that evidence about the

Mango Markets code and lack of terms of service may have some relevance at trial."  (Dkt. 77 at

15.)  As the government previously acknowledged, evidence that Mr. Eisenberg's trades were

permissible under Mango Markets' rules potentially "supports a defense that he had a good-faith

belief that his conduct was not wrongful."  (*Id.*)  Moreover, for the reasons previously explained

by Mr. Eisenberg in his opposition to those motions in *limine*, this evidence is also relevant to

whether his alleged misrepresentations were material.  (*See* Dkt. 79 at 7-11.)

As an initial matter, the government is incorrect when it says Mr. Sheridan will testify

that Mango Markets did not have terms of service.  (*See* Mot. at 8.)  Mr. Sheridan's proposed

testimony is that the protocol "had no Terms of Service **beyond its code**—it only gave a warning

to users."  (*See* Mot. Ex. B at 3 (emphasis added).)  The warning provided up to and at the time

of Mr. Eisenberg's alleged trades stated: "The V3 protocol is in public beta.  This is unaudited

software, use at your own risk[.]'"  (*Id.* at 4.)  Mr. Sheridan is also expected to testify that

"Mango Markets could have implemented thorough terms of service addressing actions that were

allowed by the code but prohibited by the Protocol's policies.

Despite acknowledging that it is aware that Mr. Eisenberg has not and will not assert a "code is law" defense, which has already been thoroughly briefed in his opposition to the government's motions *in limine*, the government nevertheless repackages this straw man as an objection to Mr. Sheridan's testimony.  (Mot. at 9 (citing Dkt. 79 at 9-11).)  Mr. Sheridan's proposed testimony is not, as the government mistakenly surmises, "to excuse [Mr. Eisenberg's] behavior as legal."  (*See* Mot. at 9.)  Mr. Sheridan's testimony regarding what the terms of service did or did not permit is factual, not legal in nature and thus admissible.

Perhaps acknowledging this, the government baldly asserts that "Mr. Sheridan's proposed testimony ***implies*** a legal conclusion" that "defendant's behavior [w]as legal because it was 'not prohibited' on the protocol or by the terms of service."  (*See* Mot. at 9 (emphasis added).)  Nothing in Mr. Sheridan's disclosure even hints at the implication of a legal conclusion.  Instead, it appears that the government's true concern is that Mr. Sheridan's testimony may undercut the government's case.  If the jury concluded that Mr. Eisenberg's trades complied with the rules of Mango Markets and that he therefore did not intend to break the law and that his alleged misrepresentations were immaterial, that would be a proper outcome.  Mr. Eisenberg has every right to present a defense, including the testimony of an expert witness in connection with matters of substantial relevance like Mr. Sheridan's proposed testimony on this subject.

The government next argues that the phrase "'alter[]' the code" is confusing because Mr. Eisenberg is not charged with a hacking-related offense.  (Mot. at 10.)  This argument mischaracterizes the language of the disclosure, which states, in relevant part, that "the alleged trades on Mango Markets . . . leveraged the platform's existing capabilities without altering the underlying code."  (*Id.* Ex. B at 3.)  Mr. Sheridan's proposed testimony is simply another way of explaining that Mr. Eisenberg complied with the rules of the exchange and used the

tools provided.  Any further inference or insinuation by the government is merely speculative and unmoored from the language of the disclosure.  Moreover, to the extent the government believes that a question or answer is imprecisely phrased, that is an objection that can be made at trial, not a proper basis for the exclusion of an expert.  *See Singh v. Knuckles, Komosinski & Manfro, LLP*, 18 Civ. 3213 (NSR), 2022 WL 862251, at *3-4 (S.D.N.Y. March 23, 2022) (finding that a motion *in limine* to preclude a lay witness from using the medical terms "anxiety" and "IBS" during testimony was premature—"the permissibility of the use of such terms is based on the counsel's line of questioning and the context of the use of the words [the witness]").

The government asserts inaccurately that Mr. Sheridan's testimony "is not expert testimony" because he "plans to read excerpts from publicly available documents in evidence." (*See* Mot. at 10.)  As noted above, Mango Markets pointed the user to the computer code.  Mr. Sheridan's testimony about the code is therefore necessary so the jury can understand that the code, which the jury could not read and interpret alone, permitted Mr. Eisenberg's alleged trades.

Lastly, the government rather remarkably expresses concern that the jury will be swayed by Mr. Sheridan's testimony because he is "a former law enforcement officer," seemingly unaware of the massive irony of this argument.  (*See* Mot. at 16.)  The government has disclosed that it intends to call as a potential expert FBI Special Agent Joel DeCapua "as a witness to provide testimony about, and introduce charts summarizing, the flow of cryptocurrency between accounts and wallets relevant to the charges."  (Ex. 1 at 1.)  Moreover, the government will surely call other law enforcement witnesses as lay witnesses.  The government is apparently unconcerned that the jury will be swayed by one or more witnesses it intends to call that are *current* law enforcement agents, only that the defense may call one witness who is no longer a

federal agent.  The government's argument is hypocritical, can easily be handled with a jury instruction,[1] and should not be given any consideration.

Mr. Sheridan's testimony regarding what Mango Markets' code and terms of service did and did not permit is relevant and appropriate expert testimony, and the government's request to exclude such testimony should be denied.

3.   <u>Mr. Sheridan's Proposed Testimony Regarding "Strategic Utilization of Market Mechanics" Is Not State of Mind Testimony and Is Otherwise Admissible</u>

The Court should not entertain the government's request to preclude Mr. Sheridan's testimony that "the alleged trades on Mango Markets utilized authorized functionalities, highlighting systematic vulnerabilities such as oracle weaknesses and low liquidity token risks." (Mot. Ex. B at 3.)

The government asserts incorrectly that "the point of this testimony is to cast [Mr.] Eisenberg as having benign intentions to bring attention to a flaw in the Mango Markets code, rather than criminal intent to steal."  (*See* Mot. at 11.)  The actual point of the testimony, which is stated explicitly in the disclosure, is to explain the "[m]arket [m]echanics" that permitted the alleged trading by "leverag[ing] the platform's existing capabilities without altering the underlying code."  (*See* Mot. Ex. B at 3.)  In other words, Mr. Sheridan will explain how and why the alleged trading succeeded without any manipulation of the protocol's code, a critical component to the jury's understanding of the way in which the purported trades could have taken place without any violation of the terms of service.  The government's contention that the

---

[1] As is standard, the defense intends to request that the jury be instructed that the testimony of law enforcement personnel is entitled to no greater weight than the testimony of other witnesses by virtue of the law enforcement witnesses' professional background and expects that the jury will comply with this instruction if it is given.

testimony relates to Mr. Eisenberg's "benign intentions" is wholly without support in the language of the disclosure. (*See* Mot. at 11.)

The government apparently reads the proposed testimony to mean that Mr. Eisenberg traded because ***he wanted to*** "highlight[] systematic vulnerabilities" of Mango Markets' protocol. (*See id.* at 12.) Based on that reading, it inaccurately contends that Mr. Sheridan's testimony is an unreliable opinion on intent. But this is not Mr. Sheridan's opinion. He is merely opining on the code, stating that its design made it vulnerable and that the alleged trading illustrated this vulnerability. This testimony is relevant and appropriate, and the government's argument, which is based on an illogical misreading of the disclosure, should be rejected.

4.    Mr. Sheridan's Proposed Testimony Is Not Improper "Victim Blaming"

The government's claim that Mr. Sheridan's proposed testimony regarding known and publicly disclosed vulnerabilities of the Mango Markets platform is improper "victim blaming" is without merit. (*See* Mot. at 12-15.) His proposed testimony is relevant because it demonstrates the risks and vulnerabilities known to both Mango Markets and the public (including Mr. Eisenberg), which could have influenced both Mr. Eisenberg's intent in allegedly engaging in the charged transactions and the materiality of purported misrepresentations. The government's recasting of probative testimony is merely an attempt to preclude a valid defense.

The government takes issue with the proposed testimony within the "Terms of Service Analysis," "Platform Vulnerabilities Acknowledgement," and "Lack of Risk Management and Governance Frameworks" sections. (Mot. at 13, 15; Mot. Ex. B at 4-5.) In summary, in those sections, the defense discloses Mr. Sheridan's opinions regarding the fact that Mango Markets users confirmed that they were informed that the platform was unaudited and contained risks; were informed of several specific risk areas, including some that were implicated by the trading alleged in this case; and were made aware that the platform lacked the risk management and

governance structure of other decentralized finance platforms.  (Mot. Ex. B at 4-5.)

Additionally, Mango Markets was put on notice in March 2022 (more than six months before

Mr. Eisenberg's alleged trades) about its susceptibility to a trading strategy nearly identical to

that alleged in this case and chose not to make changes.  (*Id.*)  All of these facts are obviously

relevant to the knowledge and actions of both Mr. Eisenberg and the purported victims and the

analysis of whether a scheme to defraud could possibly have existed.

     Without even addressing what the opinions are, the government states summarily that

they amount to "blame-the-victim tactics" without a single word of explanation.  (*See* Mot. at

13.)  As discussed above, the testimony is probative of knowledge and materiality and is not

being introduced in connection with negligence by any potential victim.[2]

     The government further distorts the proposed testimony, stating that Mr. Sheridan plans

to do nothing more than read the terms of service—a curious assertion because the government

contends that no terms of service exist—the Mango Markets Litepaper, and a third-party

---

[2] Because the testimony is not "victim blaming," the government's cited cases are inapplicable. For instance, in *United States v. Frankel*, 682 Fed. App'x 20, 22 (2d Cir. 2017), the district court excluded "evidence of Citigroup's alleged negligence in conducting due diligence on the loan transactions."  In *United States v. Amico*, 486 F.3d 764, 780 (2d Cir. 2007), the district court excluded argument "that the victim could have discovered based on external sources that the representation was false."  In *United States v. Isola*, 548 Fed. App'x 723, 725 (2d Cir. 2013), the district court excluded "evidence of the victim lenders negligence."  Here, Mr. Sheridan's proposed testimony is evidence relevant to, but not determinative of or an opinion about, intent and materiality.  The government's citations to Medicare fraud cases do not support the government's position either.  These cases stand for the proposition that a defendant cannot negate intent by presenting evidence that the victim did not discover the fraud.  *See, e.g., United States v. Udeokoro*, No. 17 Cr. 629 (AMD), 2023 WL 4138477, at *7 (E.D.N.Y. June 22, 2023); *United States v. Ahmed*, No. 14 Cr. 277 (DLI), 2016 WL 8732355, at *4 (E.D.N.Y. June 24, 2016); *United States v. Lesniewski*, No. 11 Cr. 1091 (VM), 2013 WL 3776235, at *2 (S.D.N.Y. July 12, 2013); *United States v. Nekritin*, No. 10 Cr. 491 (KAM), 2011 WL 2462744, at *7 (E.D.N.Y. June 17, 2011).  As one district court explained, that is because the fraud occurs when the misrepresentation was made.  *Udeokoro*, 2023 WL 4138477, at *7.

security audit.  (*See* Mot. at 13.)  That is, of course, not what the disclosure states.  Mr. Sheridan proposes to explain the technical concepts in these documents—*e.g.,* socialization of losses, oracle error, illiquid deposits, and smart contract exploits—and the significance of these disclosed risk areas.  (*See* Mot. Ex. B at 4.)  Moreover, Mr. Sheridan's disclosed opinions include a comparison of the risk management and governance frameworks, including the disclosed risk areas, between Mango Markets and other similar platforms to provide the jury with a framework for understanding the significance of this disclosed information to those with experience in the cryptocurrency industry, including Mr. Eisenberg and the Mango Market DAO. (*Id.* at 5.)

The government's mischaracterization of Mr. Sheridan's testimony is particularly stark with respect to its objection to his opinion regarding the fact that in a Discord chat conversation from March 30, 2022, almost seven months before the trades at issue, Mango Markets was informed that its platform was susceptible to a transaction in which a trader "open[s] a big long and short position for example $2,000,000" and "push[es] the price of MNGO-SPOT up by 25%." Decoding Mango's Vulnerability, *Neptune Mutual* (Oct. 12, 2022) *available at* https://neptunemutual.com/blog/decoding-mangos-vulnerability/.  (*See* Mot. Ex. B. at 5.)  The government incorrectly asserts that "it does not matter if Mango Markets was aware" of the precise flaw that Mr. Eisenberg allegedly exploited in his trades.  (*See* Mot. at 15.)  The fact that Mango Markets had notice of the issue and elected not to address it is strongly probative of the fact that it was not and could not be misled by Mr. Eisenberg.

Unlike the defendants in the cases the government cites, Mr. Sheridan's testimony is relevant to show that Mr. Eisenberg did not intend to defraud anyone at the time of the alleged acts.  That is permissible, and the testimony should be admitted.  *See, e.g.*, *Ahmed*, 2016 WL

15

8732355, at *4 ("Of course, the burden remains with the government to affirmatively prove Defendant acted intentionally, and nothing in this opinion prohibits Defendant from arguing, through admissible evidence, that he mistakenly over-billed Medicare.")

**B.      The Court Should Permit All of Dr. Montgomery's Proposed Testimony**

The government's arguments to exclude Dr. Montgomery's testimony should be rejected. His testimony is not trying "to replace the Court's instructions with his own, and to step into the jury box to give an opinion on whether the government created an artificial price." (*See* Mot. at 16.)  Nor does he "fail[] to show his work or offer any analysis, let alone reliable analysis required under Rule 702." (*See id.*)  Like with Mr. Sheridan's, his testimony is appropriate expert testimony focused on essential issues that will arise at trial, and it is necessary to Mr. Eisenberg's defense.

        1.      Dr. Montgomery's Opinions Regarding the Financial Instruments Involved Is Relevant Expert Testimony

The government first takes issue with Dr. Montgomery's proposed testimony explaining "conventional futures and swaps" and how they "differ from the so-called perpetual futures offered on Mango Markets," asserting that it should be excluded under Federal Rules of Evidence Rules 403 and 702.  (Mot. at 16; Mot. Ex. B at 8.)  Large swaths of the case against Mr. Eisenberg are about financial assets and trading techniques that a lay jury will not understand without help from an expert with specialized and technical knowledge in the field. *Bilzerian*, 926 F.2d at 1294 ("Particularly in complex cases involving the securities industry, expert testimony may help a jury understand unfamiliar terms and concepts."); *United States v. Russo*, 74 F.3d 1383, 1395 (2d Cir.1996) (same).

As an initial matter, the government's argument is inconsistent because it is calling an expert who will offer testimony on the exact same topic.  In its disclosure, the government states

that Mr. Jain will testify regarding the "concept[] and economics [of] swaps in commodities and foreign exchange markets" and to "explain that similar products and concepts are often available in cryptocurrency markets, including Mango Markets." (Ex. 1 at 1.)  Mr. Jain is also expected to testify regarding the "economic features of a type of product available to users of Mango Markets called a perpetual futures contract ('Perpetuals')." (*Id.* at 2.)  The government thus takes the incongruous position that its own expert should be allowed to define the concept of "swaps" and explain to the jury ways in which the MNGO Perpetuals are similar to conventional swaps (*i.e.,* swaps in commodities and foreign exchange markets) but objects to Dr. Montgomery disagreeing and testifying "that MNGO Perpetuals differed from conventional swaps." (*See* Mot. at 17.)  The government's apparent distinction is that only expert testimony supporting its theory is relevant; however, this finds no support in the law and should be rejected.

The government's argument that Dr. Montgomery's testimony encroaches on the Court's role to instruct the jury on the definition of swap and the jury's role to decide whether MNGO Perpetuals are swaps should also be rejected. (*See* Mot. at 17.)  While an expert may not state "opinions embodying legal conclusions that encroach upon the court's duty to instruct on the law," experts are permitted to testify regarding "factual conclusions that embrace an ultimate issue to be decided by the fact finder." *SEC v. U.S. Envtl., Inc.*, No. 94-cv-6608 (PKL), 2002 WL 31323832, at *4 (S.D.N.Y. Oct. 16, 2002).  As explained in the Advisory Committee's Note to Federal Rule of Evidence 704, an expert witness may testify to an ultimate issue as long as the testimony is helpful and would not "merely tell the jury what result to reach."  Dr. Montgomery's testimony will be both factual in nature and helpful to the jury because he will compare and contrast contracts that have historically been referred to as swaps in more traditional commodities and foreign exchange markets and explain what characteristics those

contracts have and the manner in which they differ from MNGO perpetuals.  (Mot. Ex. B at 8.)
The jury will then be able to apply the testimony of both experts, should it find either or both
credible, to the definition of swap they are given in the Court's instructions and determine
whether the MNGO perpetuals are swaps.

 The government's argument that Dr. Montgomery's testimony on this issue is unreliable
because he "provides no basis to conclude that his understanding of 'conventional' and
'traditional' swaps tracks the legal definition of swaps" is also unpersuasive.  (*See* Mot. at 17.)
Dr. Montgomery uses these terms in the colloquial sense and is simply describing long-standing
markets for trading financial products, just like Mr. Jain does in referring to swaps in
commodities and futures markets.  (*Compare* Ex. 1 at 1, *with* Mot. Ex. B at 8.)  And similarly to
Mr. Jain, Dr. Montgomery's curriculum vitae demonstrates that he has ample experience and
expertise to provide such an opinion.  The government in fact does not contest that Dr.
Montgomery is qualified to testify as an expert on financial products and markets.  His testimony
on these subjects should therefore be permitted.

  2. <u>Dr. Montgomery's Proposed Testimony Regarding Price Artificiality Is
Well Within the Role of an Expert</u>

 The government argues that Dr. Montgomery cannot testify about whether a price was
"artificial" because: (1) it usurps the role of the Court to instruct on the law and the jury's role to
apply the law to the facts before it"; (2) his opinion is unreliable; and (3) it necessarily requires
him to opine regarding Mr. Eisenberg's intent.  (Mot. at 18-22.)  While the government's first
and third arguments are meritless for the reasons stated below, out of an abundance of caution
and to address any possible concerns, the defense attaches as Exhibit 2 a limited revised
disclosure from Dr. Montgomery relating to these opinions regarding the fundamental value of
MNGO and the effect that value has on price artificiality.  Mr. Eisenberg would not object to the

government providing a supplemental rebuttal disclosure should it wish to do so.  Given that there is still ample time before trial, this additional limited disclosure does not prejudice the government.

Turning back the substance of the government's arguments, its initial objection is that "[t]he meaning of the terms 'artificial' as well as the relevance of those concepts [sic] are legal conclusions the Court will answer in its jury charge."  (Mot. at 19.)  The government misstates the law.  Whether a price is artificial is a factual matter, not a legal conclusion.  As noted, experts are permitted to testify regarding "factual conclusions that embrace an ultimate issue to be decided by the fact finder."  *U.S. Envtl., Inc.*, 2002 WL 31323832, at *4.  Likewise, Rule 704 states, "[a]n opinion is not objectionable just because it embraces an ultimate issue."  *See also United States v. Taylor*, 562 F.2d 1345, 1358-59 (2d Cir. 1977).

The Second Circuit in *United States v. Scop* applied this standard to an expert's opinion on price artificiality in the securities fraud context.  846 F.2d 135, 140 (2d Cir. 1988).  The district court in that case excluded the expert's opinions because they were "legal conclusions that were highly prejudicial and went well beyond his province as an expert in securities trading."  *Id.*  This was because "he drew directly upon the language of the statute and accompanying regulations concerning 'manipulation' and 'fraud.'"  *Id*.  But the Second Circuit said, "[h]ad [the expert] merely testified that controlled buying and selling of the kind alleged here can create artificial price levels to lure outside investors, ***no sustainable objection could have been made***."  *Id.* (emphasis added).

The concept of an artificial price here is a factual issue.  Indeed, the government properly states the applicable inquiry: "whether a price is set by the [] interplay of supply and demand."  (*See* Mot. at 19.)  The government asserts as "problematic" that defendant's expert "notice does

not define what [Dr. Montgomery] means by 'artificial,'" but the government then proceeds to define the term, demonstrating that it knows exactly what the term means. (*Id.*) Likewise, the government states that the term "artificial" will need to be defined by the Court in its instructions. (*Id.* at 19.) While the Court may, indeed, choose to define the term, it is not a term of art and has a widely understood definition. As a result, in *United States v. Phillips*, the district court's instructions repeatedly referred to "artificially affecting" a price without defining that phrase or the word "artificial." *See generally* Transcript of Record at 1333-1387, *United States v. Phillips*, 22 Cr. 138 (LJL) (Oct. 24, 2023 S.D.N.Y). Expert testimony here and on these subjects is not only appropriate, it is necessary to explain to the jury the forces of supply and demand that could have affected the price of MNGO perpetuals at the time of Mr. Eisenberg's alleged trading on October 11, 2022.

Next, the government seeks to exclude Dr. Montgomery's testimony about price artificiality and fundamental value as unreliable under Rule 702, stating that "Dr. Montgomery . . . has not done anything to reliably analyze the price of MNGO Perpetuals in a manner that is relevant to this case." (Mot. at 20.) To the extent there was any confusion, Dr. Montgomery's supplemental disclosure, which is attached, addresses that concern. (*See* Ex. 2.)

Dr. Montgomery's opinion is not based on some undisclosed mechanical analysis; it is based on his observation of MNGO's nature and characteristics. The January 12, 2024 disclosure notes that "the current trading price of MNGO may not accurately reflect a fundamental value." (Mot. Ex. B at 8.) Indeed, Dr. Montgomery is of the opinion that MGNO does not have a fundamental value. (*See id.* at 8; Ex. 2 at 2.) Fundamental value is a widely used term in financial economics that means the value of cash flows that the instrument may provide. (Ex. 2 at 1.) This value can reflect the risk or uncertainty of those cash flows, any time

lags in realizing such cash flows (*i.e.,* discounts for the time value of money), and any

contingencies or options embodied in the financial instrument.  (*Id.* at 1-2.)  In other words,

MNGO's value is not backed by anything (*e.g.,* gold), nor does it confer ownership like a stock

in an entity with assets and/or a revenue stream.  (*See id.*)  MNGO's value thus cannot be

determined by its cash flows.  (*Id.*)  When an asset does not have a fundamental value, its value

is the market-driven price, "meaning its value is purely driven by the interplay of supply and

demand."  (*Id.*)  And because the asset's value is always a reflection of the interplay of supply

and demand, price movement resulting from open market trading, absent wash trading, is not

artificial.  (*Id.*)  Given that MNGO does not have a fundamental value, then its value is

established purely by market forces.   As such, any particular price of MNGO which results from

open trades on a market at any given time cannot be said to be artificial.  Thus, the government

cannot establish that the price of MNGO was artificial at the time of the alleged trading, let alone

that the settlement price of the oracle or the trading price of MNGO Perpetuals was artificial.

     This is particularly true given the thin market for MNGO recognized by both Dr.

Montgomery and Dr. Mordecai.  In such a market, any sizable transaction in MNGO will have a

marked effect on MNGO's price.  Dr. Mordecai appears to separate Mr. Eisenberg's alleged

trading from that of the rest of the market in order to opine that those trades moved the price of

MNGO and thus created an artificial price.  (Ex. 1 at 4.)  Dr. Montgomery's opinion rebuts this,

as he believes such an opinion misconstrues artificiality.  (*See* Mot. Ex. B at 7; Ex. 2 at 2-3.)

Particularly given the illiquid market conditions, almost any transaction in MNGO would have

moved the price.  But just because a price has changed does not mean that the price is no longer

a product of the supply and demand of the market, and therefore that the price is artificial.

The government's final argument that Dr. Montgomery cannot testify about whether a price was "artificial" because it necessarily requires him to ascertain Mr. Eisenberg's intent defies common sense and legal terminology.  (*See* Mot. at 19.)  The government has conflated the terms "manipulation" and "artificiality."  A price is artificial if it does not reflect the market forces of supply and demand.  Intent is irrelevant.  *See CFTC v. Wilson*, No. 13 Civ. 7884 (RJS), 2018 WL 6322024, at *14 (S.D.N.Y. Nov. 30, 2018) (criticizing CFTC's attempt to "conflate artificial prices with the mere intent to affect prices").  Even the cases cited by the government are clear about this distinction.  (*See* Mot. at 19 (citing *Gurary v. Winehouse*, 190 F.3d 37, 45 (2d Cir. 1999) ("The gravamen of **manipulation** is deception of investors into believing that prices at which they purchase and sell securities are determined by the natural interplay of supply and demand, not rigged by manipulators.") (emphasis added).)  Because Dr. Montgomery will not testify regarding whether the price of the perpetuals was manipulated, Mr. Eisenberg's intent (or lack thereof) is irrelevant to the testimony, and the government's assertion is meritless.

In the same vein, the government further criticizes Dr. Montgomery's opinion, stating that it fails to "account[] for the drastic increase in price of MNGO on October 11, 2022 due to defendant's trading."  (Mot. at 20.)  The government's disagreement with Dr. Montgomery's opinion is not a valid basis for excluding his testimony.  The government will have the opportunity to present a divergent opinion by its expert, Dr. Mordecai, and it can then cross-examine Dr. Montgomery.  The jury should be allowed to decide which expert's opinion is more persuasive, as happens daily in criminal trials across the country.

3.  <u>Dr. Montgomery Is Qualified to Testify Regarding General Trading Strategies</u>

With regard to Dr. Montgomery's proposed testimony concerning general trading strategies, the government inaccurately tries (again) to recast proposed general factual testimony

as improper state-of-mind testimony.  The government attempts to refashion Dr. Montgomery's simple opinion about a common market strategy, "that it is typical for traders to attempt to conceal their trading intentions and strategies from other market participants in those markets," into testimony regarding Mr. Eisenberg's state of mind.  (*See* Mot. at 22.)  As the government's cited case explains, improper state-of-mind testimony is that which contains "interpretations of conduct or views as to the motivation of parties."  (*Id.* (citing *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d at 541).)  But Dr. Montgomery is not opining on Mr. Eisenberg's motivations or intent.  Instead, based on his extensive "experience and research in the economics of trading in financial markets[,]" Dr. Montgomery explains that traders, ***in general***, conceal "their trading intentions and strategies."  (Mot. Ex. B at 8.)  He further explains the objective benefit of doing so, "If information held by a trader leaks to other market participants, the profit opportunity the trader had from the information may be lost. . . .".  (*Id.* at 3.)  The government's attempt to transform his observations about general market strategy into testimony about Mr. Eisenberg's intent is not a logical reading of his disclosed opinion and should be rejected.

The government asserts that Dr. Montgomery lacks sufficient expertise to give this opinion because he "has no experience as a trader in financial markets" and because "he does not claim to have studied the intentions and strategies of financial market traders."  (Mot. at 23.)  But his extensive experience in "management of investment portfolios" is more than sufficient to qualify him to render the (relatively basic) opinion at issue.  *See In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 466 (S.D.N.Y. 2018) ("A formal education in a particular field is sufficient to qualify a witness as an expert as a general matter, such that a lack of extensive practical experience directly on point does not necessarily preclude [the] expert from testifying.").  As the government itself recently argued successfully in defense of an expert,

"practical experience working as a[] trader is not necessary" under Rule 702 to admit such general testimony. *Phillips*, 2023 WL 6620146, at *12 (S.D.N.Y. Oct. 10, 2023). The government's quibble with Dr. Montgomery's experience goes "to his testimony's weight and credibility—not its admissibility—and can be "explored on cross-examination." *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1043 (2d Cir. 1995).

          4.      <u>Dr. Montgomery's Proposed Testimony Regarding U.S. Dollar-Denominated Instruments Is Relevant and Admissible</u>

Finally, the government seeks to exclude Dr. Montgomery's testimony "that many U.S. dollar-denominated instruments considered part of the U.S. money supply are issued by private entities" so "[i]ssuance by a private entity is therefore not a unique characteristic of cryptocurrencies." (Mot. Ex. B. at 8.) The government argues that this testimony is irrelevant and would confuse the jury. (Mot. at 24.) But, as the government also seems to acknowledge, Dr. Montgomery's testimony is offered in response to the testimony of Mr. Jain that USDC "is different from the U.S. dollar (including that it is issued by a private entity)." (*Id.*; Ex. 1 at 1.) Should the government wish to withdraw this testimony from Mr. Jain, the defense would (likely) not need to offer Dr. Montgomery's response. Otherwise, Dr. Montgomery's testimony is relevant because it directly refutes the government's theory, and any confusion to the jury as a result of this tangential testimony will have been caused by the government, which would have made an issue of the contents of the U.S. money supply.

Here, whether USDC, a stablecoin, can serve as the predicate commodity for commodities fraud (Count One) is a contested issue, which must be resolved by the jury. As the Court noted in its order denying Mr. Eisenberg's motion to dismiss, issues surrounding this determination "require a factual record to evaluate." (Dkt. 67 at 4.) The defense intends to demonstrate that MNGO-USDC transactions were not contracts of sale of USDC but instead

were contracts of sale of MNGO, which the government concedes is not a commodity.  The Court has found that USDC was a medium of exchange similar to the U.S. Dollar and other U.S. Dollar-denominated instruments.  (*See id.* at 4.)  Were the purchase of a non-commodity with USDC covered by the CEA, so too could a purchase of a non-commodity using dollars.  As such, evidence comparing and contrasting USDC and U.S. Dollar/U.S. Dollar-denominated instruments is relevant at trial.[3]

The government's expert, Mr. Jain, will purportedly testify about "the economic features and uses for [USDC]."  (Ex. 1 at 3.)  For example, Mr. Jain will purportedly explain "that USDC is a stablecoin that is different from the U.S. dollar (including in that it is issued by a private entity), but is designed to closely match the value of U.S. dollar and explain the economics of how this is supposed to operate."  (*Id.*)  Dr. Montgomery's testimony is evidence to the contrary; the mere fact that USDC is issued by a private entity does not distinguish it from other U.S. Dollar-denominated instruments.  As such, Dr. Montgomery's testimony is highly relevant and therefore admissible under Rule 702.

The government's Federal Rule of Evidence 403 argument is equally unconvincing.  (*See* Mot. at 24.)  Both the government's and Mr. Eisenberg's experts are going to have to explain complicated and intricate economic concepts.  That includes Mr. Jain's proposed testimony about the similarities and differences between USDC and the U.S. Dollar.  If anything, Mr. Jain's testimony will require more time, as he will be discussing many features of both assets.  Dr. Montgomery on the other hand, proposes to testify only on one characteristic.  If, indeed, the prejudice of confusion outweighs the probative value of evidence on this topic, both the

---

[3] The government appears to misconstrue the relevance of the testimony, arguing that the testimony is irrelevant to whether USDC has a futures market and is therefore a commodity. (Mot. at 24.)

government's proposed expert testimony and the defense's contrary testimony should

be excluded.  The government's proposal that only its expert be permitted to testify on the issue

is unjust, inconsistent with the law, and should be rejected.

## IV.    CONCLUSION

For the foregoing reasons, the testimony of Mr. Sheridan and Dr. Montgomery should be

permitted and the government's motion denied.

DATED:    February 26, 2024                    Respectfully Submitted,


By:*/s/ Brian E. Klein*
Brian E. Klein
Ashley E. Martabano
Riley P. Smith
Waymaker LLP

-and-

Sanford N. Talkin
Noam B. Greenspan
Talkin, Muccigrosso & Roberts, LLP

*Attorneys for Avraham Eisenberg*