

*U.S. Department of Justice*

*United States Attorney
Southern District of New York*

---

*The Silvio J. Mollo Building
One Saint Andrew's Plaza
New York, New York 10007*

March 6, 2024

**By ECF**
The Honorable Arun Subramanian
Southern District of New York
500 Pearl Street
New York, NY 10007

      Re:    <u>**United States**</u> v. <u>**Avraham Eisenberg**</u>, **23 Cr. 10 (AS)**

Judge Subramanian:

      On February 26, 2024, defendant Avraham Eisenberg provided to the Government a third revised expert disclosure. Ex. 1. This latest disclosure highlights the inadmissibility of Dr. Montgomery's proposed testimony. As newly disclosed, Dr. Montgomery intends to claim that assets have "fundamental value" only if they produce cash flows; that MNGO does not have a "fundamental value" because it generates no cash flows; and that, because it has no fundamental value, the price of MNGO could not be "artificial" because it was set by trading in the "open market." This opinion must be excluded because it offers a legally incorrect interpretation of "artificial" price that will confuse the jury and intrude on this Court's responsibility to state the law. It also improperly applies the facts to this incorrect view of the law, intruding on the jury's role. This is far outside the bounds of permissible expert testimony under Rule 702, and unfairly prejudicial under Rule 403.

      As an initial matter, the defendant did not seek the Court's permission to file a third amended disclosure on February 26, 2024, which is months after the expert notice deadline of October 30, 2023, set by the Court following agreement of the parties, ECF No. 44, and more than six weeks after the supplemental expert notice deadline of January 12, 2024, set by the Court upon request of the defendant, ECF No. 75. This is likely because, in granting the defendant's request to provide a supplemental expert notice by January 12, 2024, the Court "warned" the defense "that going forward, it will be expected to comply with all scheduling orders. The Court is unlikely to grant any further extension requests." *Id.* Although the defense claims that the Government is not prejudiced by these iterative disclosures, including a supplemental disclosure filed after the Government's *Daubert* deadline, the result is that the Government and the Court are forced to shoot at a moving target, and the Government is denied the benefit of preparation for potential expert testimony, which the disclosure deadline is intended to protect, and which the Government has provided to the defendant.[1]

---

[1] There are of course issues that come up during trial preparation that require additional motion practice outside of the set schedule. But the substance of the defendant's expert opinions, which were due to be noticed in October 2023, is not one of them. Instead, the defendant's iterative disclosures are simply attempts to fix deficiencies pointed out by the Government.

Procedural issues aside, the substance of this latest disclosure highlights that the defense's strategy is to have Dr. Montgomery set up a legally incorrect standard of what constitutes an "artificial" price, and then measure the defendant's conduct against that erroneous standard. This strategy is not allowed under Rules 702 or 403. To recap, Dr. Montgomery seeks to opine that "at the time of the defendant's alleged trading on October 11, 2022 the price of the MNGO Perpetuals was not artificial." Ex. 1 at 2. He arrives at this opinion through his proposed testimony that MNGO does not have a "fundamental value" because it does not generate cash flows and thus "every price of MNGO resulting from open-market trades is a market-driven price" rather than an "artificial" one. *Id.*

As the Government noted in its *Daubert* motion—and is even clearer now—there are multiple problems with this proposed testimony. *First*, the premise that Dr. Montgomery can tell the jury what "artificial" means runs afoul of Rule 702. As the Government noted in its initial *Daubert* motion, expert "testimony on issues of law is inadmissible." *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991); *see, e.g.*, *United States v. Avenatti*, No. 19 Cr. 374 (JMF), 2022 WL 103298, at *2 (S.D.N.Y. Jan. 11, 2022) (collecting cases). Defining the term "artificial price" is an exercise in interpretation of the applicable statute and law. For the swap-manipulation count, this Court will need to instruct the jury that it needs to find an "artificial price" existed and that the defendant intended to cause such a price. *See* 7 U.S.C. § 13(a)(2); *In re Amaranth Natural Gas Comm. Litig.,* 730 F.3d 170, 173 (2d Cir. 2013). It will also have to define that term. Similarly, with respect to commodities fraud, this Court will instruct the jury that it is fraudulent to attempt to "artificially" affect a price and, again, will define the meaning of that term. *See* 7 U.S.C. § 9(1). Dr. Montgomery's proposed testimony intrudes on that responsibility to say what the law is by providing his own definition of "artificial." Courts in this Circuit have consistently prevented experts from taking that step into the law, *Bilzerian*, 926 F.2d at 1294, and this Court should do the same. In its opposition to the Government's *Daubert* briefing, the defense tries to sidestep this issue by claiming that "[w]hether a price is artificial is a factual matter, not a legal conclusion." Def. Opp. at 19. That is incorrect. This argument is notably imprecise: Whether a price is artificial is a mixed question of law and fact that requires applying facts to the legal standard. As explained below, that is a task for the jury. But for purposes here, the more precise problem with Dr. Montgomery's testimony is that he *defines* artificiality, which is defining an important legal standard at issue in this case. An expert cannot set out a legal measuring stick for the jury; that is the Court's job alone.

Next, the defendant misses the point of the Second Circuit's opinion in *United States v. Scop*, 846 F.2d 135 (2d Cir. 1988). Def. Opp. at 19. Eisenberg focuses on that court's remark that "[h]ad [the expert] merely testified that controlled buying and selling of the kind alleged here *can create artificial price levels to lure outside investors*, no sustainable objection could have been made." *Id.* (quoting *Scop*, 846 F.2d at 140) (emphasis added). But here, Dr. Montgomery is not testifying about how something *could* have created artificial prices or how artificial prices *could* theoretically affect market participants. Rather, he is opining that the MNGO price at the time of Eisenberg's trading on October 11, 2022 "*was* not artificial" and, apparently, could never be artificial based on his definition. Ex. 1 at 2 (emphasis added). In fact, the Second Circuit, in discussing this portion of *Scop*, clarified that it is expert testimony that "focused solely on factual conclusions and did not involve any legal characterizations," which "simply described certain [] transactions and [the expert's] opinion on their effect on the market" that is admissible. *United*

*States v. Russo*, 74 F.3d 1383, 1395 (2d Cir. 1996).

*Second*, the defense's new disclosure reveals the peril of allowing experts to define legal terms because Dr. Montgomery gives a legally incorrect interpretation of artificial price. Dr. Montgomery intends to tell the jury that, absent wash trading, open-market trading cannot create an "artificial" price. Ex. 1 at 2. That is legally wrong. As the Government briefed at the motion-to-dismiss stage, ECF No. 36 at 18-20, the Second Circuit has repeatedly held that open-market transactions alone can have an "artificial" impact "when accompanied by manipulative intent," such that, in some cases, "scienter is the only factor that distinguishes legitimate trading from improper manipulation." *Set Capital LLC v. Credit Suisse Grp.*, 996 F.3d 64, 77 (2d Cir. 2021); *accord SEC v. Vali Mgmt.*, 2022 WL 2155094, at *1 (2d Cir. June 15, 2022) (holding that open-market activity can "artificially" affect prices "when accompanied by manipulative intent"); *ATSI Commc'ns Inc. v. Shaar Fund Ltd.*, 493 F.3d 87, 100 (2d Cir. 2007) (same). Dr. Montgomery's proposed definition of "artificial price" is inconsistent with these decisions: In his view, even trading done with the intent to temporarily and dramatically increase a price, for no purpose other than to benefit some other position the trader holds, could not create an artificial price if it was done in the open market. But this is exactly the sort of price "rigged by manipulators," *ATSI*, 493 F.3d at 100, that the Second Circuit has already held can be artificial, *see Set Capital*, 996 F.3d at 77 (finding that "flood[ing] the market" to change prices can be manipulative). The defense cannot rewrite the law through an expert opinion.

What is more, Dr. Montgomery's legally incorrect definition of "artificial price" is also based on a legally erroneous premise that would eviscerate the anti-manipulation rules in the Commodities Exchange Act ("CEA"). Per Dr. Montgomery, an asset that does not generate cash flows does not have a "fundamental" value, so open-market trading (absent wash trading) cannot create an artificial price for such an asset. There is no legal support for the view that the prohibition of open-market manipulation cannot apply to assets that do not have cash flows, and it is at odds with binding Circuit precedent. For instance, in *Set Capital*, the Second Circuit upheld an open-market manipulation claim that involved trading to alter the price of certain notes whose value was based on market volatility, as measured by the VIX Index. 996 F.3d at 69. Neither the VIX Index nor the notes generated a stream of cash flows, but that did not stop the Circuit from concluding that massive trading designed to alter the value of the products at issue could create an artificial price signal by creating a "liquidity squeeze." *See id.* at 77. There was no discussion of the notes needing to have a "fundamental value," nor has there ever been such a discussion in any of the Second Circuit decisions upholding open-market manipulation.

Dr. Montgomery's novel "fundamental value" rule would seriously undermine the anti-manipulation provisions of the CEA. Most commodities—such as staples like corn, wheat, and oil—do not have "fundamental value" based on cash flows. Many "swaps" subject to the CEA—such a foreign-currency options and interest-rate derivatives—also do not generate, and are not based on things that generate, recurring cash flows. Dr. Montgomery's definition of artificiality would mean that the CEA is powerless to prevent open-market manipulation of any of these products. Even trading strategies explicitly designed to artificially increase prices through temporary squeezes, or decrease them through dumping, would be fair game. This is at odds with the purpose of the anti-manipulation provisions of the CEA, which were designed, in part, to prohibit such practices. *See, e.g.*, *CFTC v. Parnon Energy Inc.*, 875 F. Supp. 2d 233, 248 & n.2

(S.D.N.Y. 2012) (noting the CEA was designed to prohibit "intentional squeezes"); *CFTC v. Kraft Food Grp.*, 153 F. Supp. 3d 996, 1008-20 (N.D. Ill. 2015) (same). And it is at odds with multiple decisions in this Circuit holding that open-market trading can artificially affect prices even for products that do not generate cash flows. *See CFTC v. Amaranth*, 554 F. Supp. 2d 523, 534 (S.D.N.Y. 2008) (holding "manipulative intent alone can support liability for otherwise legal, open-market transactions); *CFTC v. Gorman*, 587 F. Supp. 3d 24, 59 (S.D.N.Y. 2022) (same); *United States v. Phillips*, No. 22 Cr. 138 (LJL), 2023 WL 5671227, at *11-12 (S.D.N.Y. Sept. 1, 2023) (market manipulation involving currency options).

*Third*, in addition to being legally wrong, Dr. Montgomery offers no basis for his definition of "artificial" prices. His disclosure cites no treatises, papers, or other academic work finding that prices cannot be artificial when the asset in question has no cash flows and the price is determined by trading, even if that trading is designed to rig the price. His opinion is also directly at odds with the concept of price artificiality in other areas of law and economics. In antitrust, for example, prices set by monopolists or cartels are often deemed "artificial," even though the goods in question trade at those prices and there is no wash trading. *See, e.g.*, *Gelboim v. Bank of America*, 823 F.3d 759, 770 (2d Cir. 2016) (explaining antitrust injury arises from "artificial" prices created by collusion). Dr. Montgomery cannot, consistent with Rule 702, simply assert his own definition of "artificial" price for purposes of this case.

*Finally*, by opining that the defendant's trading did not create an artificial price, Dr. Montgomery is intruding on the jury's role to apply the facts to the law and is impermissibly opining on the defendant's intent. As explained in the Government's *Daubert* motion, offering the opinion that the defendant did not create an "artificial" price involves stepping into the jury's shoes and resolving an essential element in the case. ECF No. 80 at 18-21. That is generally not permitted, so this Court should preclude Dr. Montgomery from "usurp[ing] . . . the role of the jury in applying [the] law to the facts before it." *United States v. Lumpkin*, 192 F.3d 280, 289 (2d Cir. 1999) (internal citation omitted). The issue is particularly acute in this case because opining on the existence of an "artificial" price necessarily involves addressing the defendant's *intent*. As this Court has recognized—and consistent with Circuit precedent— "[i]n some cases, scienter is the only factor that distinguishes legitimate trading from improper manipulation." *United States v. Eisenberg*, No. 23 Cr. 10 (AS), 2023 WL 8720295, at *5 (S.D.N.Y. Dec. 18, 2023) (quoting *ATSI*, 493 F.3d at 102). Dr. Montgomery's proposed testimony takes the intent question from the jury and replaces it with his own question about fundamental value.

Dr. Montgomery gives away the game when he carves out an exception to his new legal framework for price movement that is caused by the *unnatural* interplay of supply and demand: "As such, because the asset's value is always a reflection of the interplay of supply and demand, price movement *that is the result of the natural interplay of supply* and demand on the open market, absent wash trades, is not artificial." Ex. 1 at 2 (emphasis added). This definition is circular. According to Dr. Montgomery, MNGO's value is "always a reflection of the interplay of supply and demand," unless it is not. Dr. Montgomery does not define what would be an *unnatural* price movement, but the law is clear, as stated above, that the answer is a trader's intent. Thus, Dr. Montgomery is giving an unreliable opinion on an ultimate question of intent.

Accordingly, the Court should exclude Dr. Montgomery's proposed testimony outlined in the February 26, 2024 supplemental expert disclosure.

        Respectfully submitted,

        DAMIAN WILLIAMS
        United States Attorney

by:   */s/ Thomas Burnett*_____
        Thomas Burnett / Peter J. Davis
        Assistant United States Attorneys

        Tian Huang
        Special Assistant United States Attorney