

Waymaker LLP
515 S. Flower Street, Suite 3500
Los Angeles, California 90071
T 424.652.7800

March 12, 2024

**Brian E. Klein**
Direct (424) 652-7814
bklein@waymakerlaw.com

*Via ECF*

Honorable Arun Subramanian
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

**Re:** <u>United States v. Avraham Eisenberg</u>
23 Cr. 10 (AS)

Dear Judge Subramanian:

  Defendant Avraham Eisenberg respectfully submits this opposition to the government's March 6, 2024 letter motion ("Mot." Dkt. 91) to exclude Dr. John Montgomery's opinions ("Opinions") contained in his February 26, 2024 updated disclosure. (Mot. Ex. 1.) The government's motion should be denied because the Opinions are permissible expert testimony for which the defense has provided a more than sufficient basis.

  As an initial matter, the government, despite its inaccurate assertion to the contrary, has been on notice of the Opinions regarding MNGO lacking a fundamental value and its resultant lack of price artificiality since the defense's January 12, 2024 expert disclosure. (Dkt. 80 Ex. B at 7-8.) The updated disclosure explicitly stated that it was submitted "out of an abundance of caution" and "to clarify" previously disclosed opinions. (Mot. Ex. 1.) The government's unexplained claim that it has been prejudiced by a supposed "moving target" and an inability to prepare is meritless. (Mot. at 1.) Not only has the government had notice since January 12, it has responded with rebuttal expert testimony from its two experts. (Dkt. 90 Ex. A.) It has now also had the opportunity to object (again) more than a month in advance of trial; however, for the reasons stated below those objections are unpersuasive and should be rejected.

**I. Dr. Montgomery's Opinion Regarding Artificiality Is Not a Legal Conclusion**

  The government argues that "the premise that Dr. Montgomery can tell the jury what 'artificial' means runs afoul of Rule 702" because this is an "issue[] of law." (Mot. at 2.) The government also raised this argument in its February 9, 2024 motion to exclude, (Dkt. 80), and, after acknowledging here that the defense challenged that argument, concedes—internally contradicting its own argument—that the issue "is a mixed question of law and fact." (*See id.*) The government does not cite to a single authority for either the general proposition that experts may not testify regarding mixed questions of law and fact or that testimony regarding the economic analysis of whether a price was artificial, plainly a factual issue, is impermissible.

Case 1:23-cr-00010-AS   Document 93   Filed 03/12/24   Page 2 of 5



Hon. Arun Subramanian
March 12, 2024
Page 2 of 5

Indeed, another judge of this District held permissible testimony (introduced by the government) defining artificiality in substantially similar terms to that in the Opinions. *See SEC v. Badian*, 822 F. Supp. 2d 352, 363 (S.D.N.Y. 2011) (permitting expert testimony equating trading "to artificially increase or artificially depress the share price" with "trading [that] drive[s] the price of a stock away from its fundamental value").

The government continues by arguing that the Court "will also have to define th[e] term" artificial. (Mot. at 2.) In support, it cites the commodities fraud and commodities manipulation statutes, neither of which discusses the term "artificial," and *In re Amaranth Nat. Gas Commodities Litig.*, 730 F.3d 170, 173 (2d Cir. 2013), which does not define the term. (Mot. at 2.) While it is correct that the Court will need to instruct the jury that it needs to find an "artificial price" existed and that Mr. Eisenberg intended to cause such a price, the government incorrectly asserts that the Court needs to define price artificiality, as the jury instructions in the recent *Phillips* case illustrate. *See generally* Transcript of Record at 1333-1387, *United States v. Phillips*, 22 Cr. 138 (LJL) (S.D.N.Y. Oct. 24, 2023). But if the Court does choose to define it, Dr. Montgomery's definition, (*see* Mot. Ex. 1 at 2 ("price movement that is the result of the natural interplay of supply and demand on the open market, absent wash trades, is not artificial")), comports with both the government's definition in its previous motion, (*see* Dkt. 80 at 19 (inquiry is "whether a price has been set by the natural interplay of supply and demand")), and that of the case law. *See, e.g., In re Amaranth Nat. Gas Commodities Litig.*, 587 F. Supp. 2d 513, 530 (S.D.N.Y. 2008) (referring to "natural interplay of supply and demand"); *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 100 (2nd Cir. 2007) (same in securities context).

## II.    The Government Blatantly Misconstrues Dr. Montgomery's Opinions

The government next (mis)states that "Dr. Montgomery intends to tell the jury that, absent wash trading, open-market trading cannot create an 'artificial' price." (*See* Mot. at 3.) That is false. Rather than the sweeping opinion about all assets imaginable, Dr. Montgomery's opinion is actually limited to one very specific category, a subsegment of cryptocurrency with no underlying worth such as MNGO. His opinion is that *when an asset does not have a fundamental value*—because it lacks any underlying cash flow—its value is purely driven by the interplay of supply and demand. (Mot. Ex. 1 at 2.) For such assets, price movements resulting from the natural interplay of supply and demand are not artificial, absent wash trading because there is no underlying baseline from which to measure their worth. (*Id.*) As Dr. Montgomery disclosed, "fundamental value . . . is a widely used term in financial economics." (*Id.* at 1.) Measuring artificiality in this way has also been accepted as expert testimony in this and other districts. *See Badian*, 822 F. Supp. 2d at 363. Likewise, Dr. Montgomery's definition of fundamental value and use of that concept as a basis for asset valuation are widely accepted in both the field of financial economics and in the courts. *See, e.g., Tenn. Gas Pipeline Co. v. FRC*, 926 F.2d 1206, 1208 n.2 (D.C. Cir. 1991) ("'[T]he fundamental value of [any] asset is the discounted sum of all future income flows that will be received by the owner of the asset.'") (second alteration in original) (quoting Roger A. Morin, Utilities Cost of Capital 74 (1984)). "Fundamental value is a technical concept which depends on the present value of expected cash flows (*e.g.,* dividends, interest or principal payments, liquidation values), 'as estimated by well informed and capable


analysts.'" *In re PolyMedica Corp. Secs. Litig.*, 432 F.3d 1, 14 n.18 (1st Cir. 2005) (quoting Jonathan R. Macey et al., *Lessons from Financial Economics: Materiality, Reliance, and Extending the Reach of Basic v. Levinson,* 77 Va. L. Rev. 1017, 1022 (1991)); *In re Initial Pub. Offering Sec. Litig.*, 260 F.R.D. 81, 104 (S.D.N.Y. 2009) ("The sum of all [] discounted cash flows is considered the fundamental value of a company."); *In re Stillwater Mining Co.*, 2019 WL 3943851, at *51 (Del. Ch. Ct. Aug. 21, 2019) (post-trial decision credited expert testimony that "[t]he price of a security in a market that is fundamental-value efficient should reflect its intrinsic value, defined as 'the present value of all cash payments'").

Rather than address the substance of the Opinions, the government mischaracterizes them and introduces a "parade of horribles" based on its contrived misreading. First, the government states that the Opinions "would eviscerate the anti-manipulation rules in the Commodities Exchange Act ('CEA')." (Mot. at 3.) The government points to *Set Capital LLC v. Credit Suisse Grp.*, 996 F.3d 64 (2d Cir. 2021), and argues that that case is at odds with the Opinions because "the Second Circuit upheld an open market manipulation claim that involved trading to alter the price of certain notes whose value was based on market volatility." (Mot. at 3.) But *Set Capital* did not involve the CEA, and the government argument rests on a fundamental misstatement of the facts; namely that the allegedly manipulated asset—the XIV notes—did not have a cash flow. (*See id.*) Notes are, by definition, debt instruments that pay interest and/or principal payments, classic forms of cash flows in a fundamental value analysis. *See Bowe*, 432 F.3d at 14 n.18. As the Circuit explained, "to receive a payment from Credit Suisse based on the closing indicative value, XIV noteholders could redeem their notes early or attempt to hold their notes through maturity." *Set Capital LLC*, 996 F.3d at 70. "In the event of early redemption, acceleration, or maturity of the XIV Notes, Credit Suisse agreed to pay noteholders based on the notes' 'closing indicative value.'" *Id*. MNGO, by contrast, had no redemption rights, paid no interest, and had no market index serving as the basis for its value. The government's reliance on *Set Capital* is thus misplaced.

The government then pivots from one factual fallacy to another, asserting with no authority or explanation that "staples like corn, wheat, and oil [] do not have 'fundamental value' based on cash flows." (*See* Mot. at 3.) Such staples, however, obviously can and do generate cash flows by being used as raw materials or inputs into industrial processes that generate cash flows. Similarly, swaps such as foreign currency options and derivatives—which the government also asserts. without explanation, lack cash flows—generate cash flow via arbitrage opportunities and other payments. Indeed, the very definition of "swap" under the CEA typically requires "payment." Section 7 U.S.C. § 1a(47)(A) defines "swap" as applying to "contract[s] . . . that provides for any . . . payment . . . that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency." *Id.* § 1a(47)(A)(ii). The government's attempt to stretch the Opinions beyond all recognition should be rejected.

Perhaps most perplexing is the government's unexplained assertion that the Opinions are at "directly at odds" with the definition of "artificial" in antitrust (and unspecified "other areas of law and economics"). (*See* Mot. at 4.) Dr. Montgomery's disclosure states that "when an asset does not have a fundamental value, its value can only be the market-driven price," the "natural interplay of supply and demand on the open market." (Mot. Ex. 1 at 2.) Extra-market collusion is

Case 1:23-cr-00010-AS   Document 93   Filed 03/12/24   Page 4 of 5



Hon. Arun Subramanian
March 12, 2024
Page 4 of 5

quite obviously not a "market driven price"; nor is bid rigging or other anti-competitive behavior "the natural interplay of supply and demand."

### III. Dr. Montgomery's Opinions Do Not Intrude on the Jury's Role or Opine on Mr. Eisenberg's Intent

The government goes on to argue that "Dr. Montgomery is intruding on the jury's role to apply the facts to the law and is impermissibly opining on the defendant's intent." (Mot. at 4.) But Dr. Montgomery's opinion is a factual opinion regarding the characteristics of MNGO as an asset and the effect of those characteristics on how MNGO is valued. This is nothing more than permissible "testi[mony] about the economic realities of [Mr. Eisenberg's] conduct rather than the ultimate legal conclusion that [Mr. Eisenberg did not] violate[] the law." *In re Term Commodities Cotton Futures Litig.*, 2020 WL 5849142, at *23 (S.D.N.Y. Sep. 30, 2020). Such factual testimony, even were it to "embrace an ultimate issue to be decided by the jury," is plainly admissible. *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991).

The government also reprises an argument it made at least four times in its prior brief, baselessly asserting that Dr. Montgomery is "impermissibly opining on the defendant's intent." (*See* Mot. at 4.) Again, the government conflates manipulation with artificiality. Commodities manipulation has four separate elements, one of which is the creation of an artificial price and another of which is intent. *See In re Amaranth Nat. Gas Commodities Litig.*, 730 F.3d at 173; *CFTC v. Wilson*, No. 13 Civ. 7884 (RJS), 2018 WL 6322024, at *14 (S.D.N.Y. Nov. 30, 2018). The plain language of the Opinions makes clear that they relate to whether MNGO was capable of having an artificial price in open market trading, *irrespective of intent*.[1] The proposed testimony makes no mention whatsoever of Mr. Eisenberg.

In trying to buttress its argument, the government notes the Court's prior holding that "'*[i]n some cases*, scienter is the only factor that distinguishes legitimate trading from improper manipulation.'" (Mot. at 4 (quoting *United States v. Eisenberg*, 2023 WL 8720295, at *5 (S.D.N.Y. Dec. 18, 2023) (emphasis added)).) The government, however, appears to turn "in some cases" into "in all cases" and contends, that "the law is clear"—though it cites to none—that the only way for a price movement to be the result of anything other than "the natural interplay of supply and demand . . . is a trader's intent." (*See* Mot. at 4.) Neither this Court nor any other has so held, and indeed the very example of antitrust monopolists or cartels that the government previously raised is one clear example to the contrary. Dr. Montgomery's testimony is therefore well within the bounds of the law. Should the government disagree with his opinions, it can try to impeach him through cross-examination.

For all the above reasons, the government's letter motion should be denied.

---

[1] This comes in stark contrast with Mr. Jain's rebuttal testimony, which, as the defense has noted, impermissibly opines on whether certain undisclosed assets can be manipulated. (*See* Dkt. 90 at 1-2.)



Hon. Arun Subramanian
March 12, 2024
Page 5 of 5

Very truly yours,

Brian E. Klein
Ashley E. Martabano
Riley P. Smith
Waymaker LLP

 -and-

Sanford N. Talkin
Noam B. Greenspan
Talkin, Muccigrosso & Roberts, LLP

*Attorneys for Avraham Eisenberg*