O3E1EISA

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4                   v.                        23 Cr. 10 (AS)

5   AVRAHAM EISENBERG,

6                   Defendant.               Oral Argument
    ------------------------------x

7
                                             New York, N.Y.
8                                            March 14, 2024
                                             2:10 p.m.

9

10  Before:

11                  HON. ARUN SUBRAMANIAN,

12                                           District Judge

13
                          APPEARANCES
14
    DAMIAN WILLIAMS
15       United States Attorney for the
         Southern District of New York
16  BY:  PETER J. DAVIS, ESQ.
         THOMAS S. BURNETT, ESQ.
17       TIAN HUANG, ESQ.
         Assistant United States Attorneys
18
    WAYMAKER LLP
19       Attorneys for Defendant
    BY:  BRIAN E. KLEIN, ESQ.
20

21  TALKIN, MUCCIGROSSO & ROBERTS, LLP
         Attorneys for Defendant
22  BY:  SANFORD N. TALKIN, ESQ.
         NOAM B. GREENSPAN, ESQ.
23

24  ALSO PRESENT:  BRANDON RACZ, Special Agent, FBI

25

O3E1EISA

1          (Case called)

2          THE COURT:  All right.  We're here for a hearing on

3    pending motions *in limine* and motions to exclude certain expert

4    testimony.

5          So first, let's start with appearances for the

6    government.

7          MR. DAVIS:  Good afternoon, your Honor.  Peter Davis,

8    Thomas Burnett, Tian Huang for the government, and we're joined

9    at counsel table by Special Agent Brandon Racz.

10         THE COURT:  Good afternoon.

11         And for the defense.

12         MR. KLEIN:  Good afternoon, your Honor.  Brian Klein

13   here with our client Avraham Eisenberg, with——oh.

14         MR. GREENSPAN:  Noam Greenspan and Sam Talkin.

15         THE COURT:  Okay.  Good afternoon.  And good afternoon

16   to you, Mr. Eisenberg.  I hope you're hanging in there.

17   Everything okay?

18         THE DEFENDANT:  (Nodding)

19         THE COURT:  Okay.  Let's start with the motions *in*

20   *limine*.

21         I think the best way to do this is to go motion by

22   motion.  Folks should remain seated because these microphones

23   are so short.  So we can just go back and forth on some of

24   these issues.

25         So I'll start with Mr. Eisenberg's motions *in limine*.

O3E1EISA

| 1 | There are two motions, but one is raised for purposes of |

1    There are two motions, but one is raised for purposes of

2    preservation, so I'll start with the motion to exclude general

3    references by the government at trial to victims divorced from

4    any particular identification.  That's Mr. Eisenberg's motion

5    No. 1.  Now as I understand it, the government is going to

6    identify the victims at issue which, in the government's view,

7    are the Mango Markets DAO and the Mango Markets customers; is

8    that correct?

9         MR. BURNETT:  That's right.  We won't identify like

10   all of those customers by name but by category.

11        THE COURT:  By category.  And so given that

12   understanding, is there any further basis from the defense to

13   exclude those references to victims?

14        MR. KLEIN:  Your Honor, they alleviated our concern by

15   doing that.  Obviously we'll see what happens in their opening

16   and at trial, but for now we are satisfied.

17        THE COURT:  Okay.  And of course, as with any motion

18   *in limine*, as things develop during trial, then all you need to

19   do is approach the bench and we can hash it out.

20        So the motion No. 1 will be denied based on the

21   understanding that's been provided in this hearing.

22        And motion No. 2 is to exclude duplicative government

23   exhibit testimony.  And the defense indicates that it's raising

24   that for preservation purposes, but from the government's

25   perspective, is there going to be a concern here that the

O3E1EISA

1    government's witnesses are providing duplicative testimony?

2    Just give me some explanation on what the differences are

3    between the two experts.

4                MR. BURNETT:  Sure.  So the differences between the

5    experts are pretty significant.  One of the experts, Mr. Jain,

6    will be effectively talking about the economic features of

7    USDC, the economic features of perpetuals, and kind of

8    explaining some of the basics of cryptocurrency terminology.

9    Then Mr. — or Dr. Mordecai, the other expert, will largely be

10   talking about data analysis and the economic analysis of the

11   actual scheme that was carried out.  I think, you know, there

12   might be some brief overlap to the extent that when

13   Mr. Mordecai uses certain terms and concepts that came up

14   during Mr. Jain's testimony, he may need to briefly define them

15   to make sure the jury is not lost, because it would be a little

16   awkward otherwise not to, but the goal is not to waste anyone's

17   time.  We have every incentive not to be duplicative in an

18   annoying or unnecessary way.

19                THE COURT:  Okay.  So I'll deny this branch of

20   Mr. Eisenberg's motion.  Of course, as with the other one, if

21   there's any issue that comes up during trial, then you can

22   raise it.

23                So let's move to the government's motions *in limine*.

24   First, now I've numbered these.  Please let me know if I'm

25   missing something.  I think the way it was laid out in the

O3E1EISA

1    motion wasn't by number; it was by category.  So I'm going to

2    use a numerical system when I'm going through these, but you'll

3    let me know if I'm missing something.

4          So the first motion concerns arguments or presentation

5    that the charges against Mr. Eisenberg are novel; essentially

6    that the application of the Commodities Exchange Act claims to

7    his conduct would be novel and unprecedented.  The argument

8    from Mr. Eisenberg is that that's relevant because of, among

9    other things, the *mens rea* requirement.  And so from the

10   government's perspective, why isn't that right?  Given the

11   willfulness requirement that attaches to at least the

12   commodities fraud claim, why can't Mr. Eisenberg argue that the

13   application here is novel?

14         MR. BURNETT:  So we think there are two reasons.  One

15   is, maybe there is an issue with the way legally they're

16   defining willfulness, but I think I'm going to take that second

17   because I think that's not a dispute that the Court needs to

18   resolve right now, because more fundamentally, the problem with

19   this argument is a foundational point.

20         So for something to go—for evidence to go to *mens*

21   *rea*, there needs to be some foundation that the defendant

22   actually saw or thought the thing that is being argued from.

23   So I think this is a little hard to think about in the abstract

24   but easier to think about in the context of specific examples.

25         So for instance, one of the things that's cited in the

O3E1EISA

```
 1    briefing is that Mr. Eisenberg tweeted about a market
 2    manipulation case involving an FX trader name Neil Phillips,
 3    and that tweet included a DOJ press release about that charge.
 4    Now I think it would certainly be fair game for both the――for
 5    the defense and the government to argue inferences from that
 6    tweet, like, look, this is not about cryptocurrency, it is
 7    about open market manipulation, within the context of the text
 8    of the tweet, and like the DOJ press release, because there's a
 9    foundation that Mr. Eisenberg saw that and thought something
10    about it.  What would not be allowed would be then kind of an
11    open-ended, let's go through the docket of what was going on in
12    the Phillips case, like, here's the motion to dismiss, here's
13    the response to the motion to dismiss, here are some of the
14    legal issues and lawyers' characterizations of those issues,
15    because there's no foundation that Mr. Eisenberg was actually
16    reviewing that or following it.
17           THE COURT:  Well, that's true.  But I think here, the
18    argument is that there is a foundation because what we are
19    talking about is Mango Markets and the conduct at issue, and
20    simply whether the application of the law to that conduct as to
21    which there is a foundation would either support or refute an
22    inference concerning willful intent.  So I guess I'm taking
23    your point and shifting the focus of the inquiry, which is,
24    yeah, it's not about, directly, what Mr. Eisenberg actually
25    thought or didn't think, and of course the government is
```

O3E1EISA

1    challenging Mr. Eisenberg's ability to put through his experts

2    any kind of testimony concerning intent, but what they're

3    essentially saying is, if you take the basic conduct and the

4    basic conduct is so different than anything the law has been

5    applied to, from that, that can be one of the things that the

6    jury considers when thinking about Mr. Eisenberg's intent,

7    along with whatever else they want to put in on those grounds.

8    Why isn't that a possibility?  I'm not saying that you are

9    going to say that's wrong, but——

10    MR. BURNETT:  So I think there's both a relevance

11    issue and a 403 issue with respect to that.  So when we're

12    talking about——so for instance, like, I don't even know how

13    this would, like, come out in trial, but let's say the defense

14    gets up and in their case in chief starts like dumping in court

15    decisions about market manipulation, saying, well, this one

16    isn't about crypto, this one's not about open market

17    manipulation, this one's not about that; that can't plausibly

18    go to the defendant's intent because there is no evidence that

19    he ever saw or thought about those cases.  So to the extent

20    this is an intent argument, there's not the foundational step

21    that he saw the facts that would inform that intent or not.

22    THE COURT:  Wouldn't that be an argument that you

23    would raise during trial?  I mean, part of the issue here is

24    that neither you nor I know exactly what evidence is going to

25    be put in that would implicate this concern.  So isn't this the

O3E1EISA

1    type of issue that we would evaluate with respect to the

2    evidence that comes in?  Because if you're making a foundation

3    argument, then you could make that argument.  I'm not

4    foreclosing any argument that you might make.  Usually the

5    motion *in limine* would be relevant if there was some actual

6    thing that we knew was on the horizon that was going to come in

7    and you had a challenge to that general thing coming in.  But

8    it seems like maybe we don't have an issue here because we

9    don't know what this thing is that would come in, for precisely

10   the reason that you're saying; you can't imagine what it is.

11   If they try to put in court decisions about Phillips, you would

12   have an argument that that would be inadmissible for a number

13   of reasons, right?

14          MR. BURNETT:  Yes.  I think certainly if we're on the

15   same page that there would need to be some kind of foundation

16   to link whatever the thing is to Mr. Eisenberg's intent, that

17   it could be handled on a case-by-case basis.  Really the reason

18   we raised this at the motion *in limine* stage was in part to

19   frame this but also, in some cases that are similar to this

20   case, defense has effectively opened on, "This is a totally

21   novel prosecution, the government's never done anything

22   before," making an argument that's effectively untethered to an

23   intent and basically something that is impugning the

24   government's decision to bring this case because it is novel

25   and abstract, which is effectively more like lawyer advocacy

O3E1EISA

1    about what their view on the law is, not even an intent

2    argument.  I haven't——I didn't got a representation that that's

3    going to happen, but from experience in cases like this,

4    there's a risk of that happening, which is often why we bring

5    this motion, to make sure that's not on the horizon.

6              THE COURT:  Okay.  I'm mindful of the issue.

7              I'll let whoever's going to speak on Mr. Eisenberg's

8    behalf address it, if they would like to.

9              MR. KLEIN:  Your Honor, we don't intend to dump in

10   those documents.  I will say I think this motion is premature.

11   If we are addressing these issues, they plan to be tethered to

12   evidence and facts that the government puts in, in response, or

13   to——we'll have a foundation for putting them in.  So I think

14   your Honor is on the right track there.

15             I would just note one quick thing——it's a little side

16   issue, but——when they filed this motion, they listed types of

17   evidence they might put in, and they had like six categories or

18   four categories.  I mean, we do plan to object to the Phillips

19   tweet coming in and the lawsuit being filed.  We can address

20   that at the time of the trial, whatever.  We obviously didn't

21   see this note.  We haven't seen their exhibit list.  But we

22   think there are other grounds to exclude both of those in fact,

23   so——the Phillips tweet, so we wouldn't even bother dumping the

24   Phillips documents.

25             THE COURT:  Understood.  So this is the kind of issue

1    that we can address at the final pretrial conference.

2              But for purposes of the motion *in limine*, I'm going to

3    go ahead and deny the motion without prejudice to reasserting

4    these arguments at a later juncture.

5              MR. BURNETT:  Thank you, your Honor.

6              THE COURT:  Okay.  Now as to whether Mango Markets was

7    regulated in the US, while I could see an argument as to the

8    novelty of this case and how that goes to willfulness, I don't

9    know how Mango Markets' regulatory status goes to an issue in

10   this case.  So maybe whoever's going to speak on

11   Mr. Eisenberg's behalf can explain that.

12             MR. KLEIN:  Yes.

13             THE COURT:  Maybe you're not intending to raise that

14   type of issue.

15             MR. KLEIN:  Well, we may, your Honor.  I think we

16   addressed it in our brief on page 9.  They're planning to offer

17   into evidence, again, stuff about my client's alleged knowledge

18   about the Commodity Exchange Act, knowledge about certain

19   issues there.  They also plan, we understand, to call people to

20   discuss Mango Markets and how it worked, and the implication is

21   clear from both of those that they're going to say, he should

22   have known that what he was doing was covered by the

23   Commodities Exchange Act.

24             THE COURT:  And you can defend those arguments.  But

25   the precise issue here is whether or not Mango Markets was

O3E1EISA

1    subject to the jurisdiction of the SEC or CFTC.  So it's a

2    slightly separate issue.  And I'm not sure that there is a

3    relevance to that particular issue.

4          MR. KLEIN:  I think we should be permitted to ask

5    certain questions on cross-examination.  I don't know what

6    they're going to elicit on direct so it's hard to know, your

7    Honor, but it may become relevant depending on what the person

8    they put on or people they put on and how they discuss Mango

9    Markets——how it operated, how it functioned, what our client

10   knew.  So again, we're sort of operating in a little bit of a

11   vacuum because we don't know exactly how they're going to put

12   on their case, what their exhibits are, but we do think——

13         THE COURT:  Is the government going to raise the

14   jurisdictional status, whether this market was under the

15   jurisdiction of the SEC or the CFTC in any of its presentation

16   of the evidence?

17         MR. BURNETT:  No.  From our perspective, the only

18   jurisdictional thing that matters is whether the antifraud and

19   antimanipulation provisions apply in this case, and that's the

20   jurisdictional element that the Court will instruct the jury

21   on, not these separate issues about whether this is a

22   registered entity or should have been a registered entity

23   and/or somewhere in between, or with whom.

24         And I'd add, this actually puts a point on this

25   foundational issue because let's say we put on a witness for

O3E1EISA

1   Mango Markets who talks about how Mango Markets works.  If they
2   were to ask that person, well, aren't you subject to——you're
3   not subject to CFTC regulation, right?  That can't plausibly go
4   to *mens rea* because there's no foundation that Mr. Eisenberg
5   had any knowledge or idea of what Mango Markets' view of
6   whether it was subject to SEC or CFTC jurisdiction was.

7           This kind of dovetails back to the point I was making
8   earlier about how these foundational issues will be important
9   to police.  You can't just say it goes to intent without
10  explaining why it goes to intent.

11          THE COURT:  Okay.  I'm going to grant this branch of
12  the government's motion, particularly on 402, 403 grounds,
13  because I think this particular issue is more attenuated than
14  the argument as to whether the application of the law to
15  Mr. Eisenberg's conduct was novel or not.  It goes to
16  jurisdictional and regulatory issues that either the Court is
17  going to instruct the jury about or which just aren't relevant
18  to the case in any way.  Of course, again, as with everything
19  else, if it comes up and the government opens the door, then
20  you can certainly approach and you can revisit this issue.

21          All right.  Now we go to the next branch of the
22  government's motion, which is to preclude the defendant's "code
23  is law" arguments; the idea being that because the Mango
24  Markets code did not prevent the conduct at issue and the
25  platform did not have terms of service, Mr. Eisenberg's conduct

O3E1EISA

1    was legal.  As to this, my understanding from the submissions

2    is that the defendant does not plan to make that argument; is

3    that fair?

4            MR. KLEIN:  Yes, your Honor.  We're not planning to

5    make that argument.

6            THE COURT:  It is also my understanding that the

7    government recognizes that evidence about the Mango Markets

8    code and lack of terms of service may have some relevance at

9    trial, including on intent, right?

10           MR. BURNETT:  Yes.  And if I could make a suggestion

11   here.  I think this issue becomes most concrete with respect to

12   some of the *Daubert* arguments that come up, particularly with

13   respect to Mr. Sheridan, so what I might propose is to kind of

14   move this to the end of the motion *in limine* discussion and it

15   can segue into the *Daubert* discussions, because that's where it

16   gets concrete.

17           THE COURT:  No, you're a hundred percent right on

18   that, and without prejudice to any of those particular

19   arguments on the Sheridan motion, as a general matter, I mean,

20   you've moved *in limine* to preclude general arguments along

21   these lines, Mr. Eisenberg says he's not going to make those

22   arguments, so I think I'm going to deny the motion *in limine* in

23   general.  But to get to the particular issue, you're not

24   suggesting that the lack of terms of service and the function

25   of the code, what it permitted and didn't permit, that that is

O3E1EISA

1    irrelevant to the issues in the case, given what you've put in

2    your papers?

3        MR. BURNETT:  That's right.  I think we have concerns

4    about the arguments that are made about them and the way that's

5    presented.

6        THE COURT:  Okay.  So I'm going to deny this branch of

7    the government's motion, but of course that's without prejudice

8    to what happens at trial and certainly without prejudice to our

9    discussion on Mr. Sheridan's expert testimony.  I understand

10   that you have particular arguments that you've focused on

11   there.

12       Okay.  And just a side note.  So there are three

13   claims here.  One of them is wire fraud.  If this were just a

14   wire fraud prosecution, would you have any basis to exclude any

15   of this evidence on the terms of how Mango Markets worked, what

16   its terms of service were?  Would there be any basis to exclude

17   any of that?  Because you would have to prove the scheme to

18   defraud, and that scheme would involve the relationship between

19   Mr. Eisenberg and Mango Markets and its customers, and so if

20   that relationship is just as a result of the code and terms of

21   service, how they changed, all that stuff, I mean, wouldn't

22   that necessarily have to come in barring some separate

23   admissibility issue?  Because that's a primary issue that the

24   government would have to address.

25       MR. BURNETT:  So I want to make sure I'm understanding

O3E1EISA

1   what you mean by "come in."

2            So I think, as we've agreed here, the facts would come

3   in.  I think it would still be correct that the argument that

4   because there was not like a term of service saying you can't

5   commit fraud and the code did not prohibit fraud does not make

6   it a defense; that that is not an absolute defense to wire

7   fraud.

8            THE COURT:  And that is not going to be permitted, and

9   Mr. Eisenberg says that they're not going to try to do that.

10           MR. BURNETT:  Right.  So I think we're on the same

11  page, that this comes in as to all of the charges.  The

12  relevance differs depending on the charge, but the point is

13  more the inference and the way it's argued.

14           THE COURT:  Okay.  Understood.

15           Okay.  The next branch of the government's motion is

16  on terms of service implemented after the alleged crime.

17  Mr. Eisenberg says, look, you recognize that the absence of

18  terms of service at the time of the offense may be relevant to

19  things like intent.  The fact that terms of service were

20  instituted afterward is plainly relevant to highlight the lack

21  of terms of service during the time in question.  There would

22  be, in another case, potential grounds under Rule 407 to

23  exclude the change in the terms of service.  But Rule 407

24  doesn't apply here.  That's what the other circuits have held

25  uniformly.  And my understanding of Rule 407 is that the

O3E1EISA

1    preclusion of changes in terms or warning, things of that

2    nature, is not because they're not relevant but because there

3    was a policy concern about incentivizing companies to do those

4    types of things, to change their warnings to put measures in

5    place to protect against future harms, not because it's not

6    relevant or reliable or anything like that.

7          So given all that, why shouldn't Mr. Eisenberg be

8    allowed to introduce testimony or evidence concerning changes

9    in terms of service subject to all the other things we talked

10   about?  They can't say that the lack of terms of service or

11   changes in terms of service means that this is not illegal, or

12   legal, subject to all those other issues.

13         MR. BURNETT:  I'll start with the 403 arguments here,

14   but first, with the relevance prong——

15         THE COURT:  Sure.

16         MR. BURNETT:  ——it's actually not relevant to

17   anything.  And it's not relevant for this reason.  It's not

18   relevant to the defendant's intent because at the time that he

19   committed the crime, the defendant had no way of knowing

20   whether or if Mango Markets was going to add terms of service

21   later.  The fact that they ultimately did or what those terms

22   of service covered could not possibly have been in the

23   defendant's head.  What could have been in the defendant's head

24   is the absence of terms of service at the time, which the

25   defense will be allowed to offer.  The government will probably

O3E1EISA

1    make that point as well. But the creation of them does not

2    bear on his intent at the time because he couldn't have

3    possibly known which way it would shake out in the future.

4            THE COURT: That's true. But doesn't it just come in

5    because, you know, you have someone from Mango Markets on the

6    stand and you say, well, at the time of the offense, it wasn't

7    against any terms of service to do X, Y, or Z, and they say,

8    well, I don't know. And then you just bring in the later terms

9    of service and you show it to him and you say, well, you

10   changed this to add those terms of service so clearly at the

11   time of the offense, the terms of service did not address the

12   thing that you changed in the later terms of service. Why

13   isn't that something that could be raised? Now I don't know if

14   it will, but I'm saying it's relevant not because these later

15   terms of service were in Eisenberg's head in some way at the

16   time of the offense but just to highlight the differences

17   between what was the state of play at the time of the offense

18   and what happened afterwards. I understand that's all that

19   they're trying to get——

20           MR. BURNETT: Sure, but highlighting the difference

21   between the time of the offense and after needs to be relevant

22   to something. My expectation is if a witness from Mango

23   Markets were asked, "Did the attack violate any terms of

24   service that were in place at the time," that person would say,

25   "No, there were no terms of service at the time." Then the

O3E1EISA

1    fact that there were later terms of service, I guess it like
2    highlights that there were no terms of service before, but
3    highlighting it is not relevant.  It doesn't move the ball
4    forward on any actual issue related to the defendant's intent,
5    because he couldn't have known what they were going to do.
6    What matters is the lack of terms of service at the time, both
7    as to the defendant's intent but also as to Mango Markets'
8    expectations or the expectations of Mango Markets' customers.
9    So I agree it would be relevant to highlighting the difference,
10   but highlighting the difference is not a relevant fact.
11            It is also I guess confusing and misleading to the
12   jury in a few different ways.
13            So first of all, it does kind of run into some of
14   these "code is law"-type inferences.  I think because it's not
15   really relevant to anything related to intent, the natural
16   inference of jurors sitting there will draw is like, well,
17   gosh, like, you have it now, so now it would be prohibited, but
18   like, you didn't have terms of service then so, like, why is
19   this then illegal?  That's the inference the jury will
20   naturally draw from this, which is exactly the inference that
21   the defense is saying they're not going to try and draw out.
22   So that's a serious 403 problem.
23            We also think that there is kind of some additional,
24   like, underlying privilege problem that this may implicate
25   about why they didn't have terms of service before or why they

O3E1EISA

1    changed them, like, what the thought process was there,

2    particularly in the DeFi context, where it's kind of like who

3    is the terms of service between, because normally it's an

4    agreement between the user and, like, a particular entity.  I

5    don't think it's worth getting——that piece is worth getting

6    into now, but——

7        THE COURT:  I can't imagine what the privilege issue

8    would be with Mr. Eisenberg.  I mean, you have the terms of

9    service, right?  You haven't raised the privilege issue.  If

10   there is some sort of privilege issue that I'm not

11   appreciating, then I'll obviously hear it, but——

12       MR. BURNETT:  Yeah.  I think the bigger point is that

13   there is no relevance to highlighting, to this highlighting

14   fact and it does run into this "code is law" issue.

15       On the 407 point, I won't belabor it.  I understand

16   the circuits have gone the other way on this defendant as the

17   party issue.  I note that those were not criminal cases, which

18   actually kind of makes an important difference, because a

19   victim in a criminal case is entitled to, like, restitution, so

20   to the extent there are policy concerns about, like, people not

21   doing things because they might, like, run themselves out on

22   the judgment later, like, some of these issues do apply in the

23   context of a victim in a criminal case.  And the text of 407

24   itself actually doesn't draw this distinction that's been drawn

25   in the circuits.

O3E1EISA

1          But I think what matters more for us is that on 407

2     grounds, some of the other policy implications in 407 highlight

3     that this type of evidence is normally of pretty minimal value

4     and is prejudicial anyway, which feeds into this 403 argument

5     which is really the heart of our case here.

6          THE COURT:  Okay.  And how does this use of the

7     after-the-fact terms of service fall into the categories that

8     would be prohibited under Rule 407?

9          MR. BURNETT:  Fall into the——

10          THE COURT:  If they're just using it to highlight the

11     fact that during the time of the alleged offense, there were no

12     terms of service that covers the things that are later

13     addressed.

14          MR. BURNETT:  I think it falls into three of the

15     categories.  So it falls into trying to prove negligence, prove

16     a product or design defect, and to prove the need for a warning

17     or instruction.  At least from like what it sounds like

18     Mr. Sheridan will be arguing, or some other things they'll be

19     trying to introduce, the point they're making is, well, Mango

20     should have seen this coming, they could have taken steps to

21     stop this, they, like, could have put a warning out or could

22     have prohibited this in the terms of service, which would have

23     decreased the chance of it happening.  So those are the buckets

24     it fits in.

25          THE COURT:  And your expectation of the way the

O3E1EISA

1    evidence is going to come in is that it's not going to be

2    disputed that at the time of the offense there were no terms of

3    service that would cover these types of things, or prohibit

4    them.

5            MR. BURNETT:  I don't think so, no.

6            THE COURT:  Okay.  Can I hear from whoever is going to

7    speak for Mr. Eisenberg, specifically on the relevance issue.

8    Government says there's really no need to bring this in and so

9    the prejudicial impact of allowing this testimony in would

10   substantially outweigh any probative value, especially given

11   that the government's not going to be even arguing that there

12   were terms of service that covered this or somehow it was

13   prohibited by the code or anything along those lines.

14           MR. KLEIN:  Your Honor, it's directly relevant, as we

15   discussed in our opposition to it.  A couple of key issues.

16   One is what Mango Markets' customers were thinking, who he was

17   trading with, who he's accused of making misrepresentations to,

18   goes to materiality there.  It also goes to what he might have

19   been thinking when he engaged with the protocol.  They're going

20   to put in evidence that obviously that he went on to Mango

21   Markets, that he conducted these trades, and it's going to come

22   in that there were no terms of service.  And I think it is

23   important to highlight what happened later because they're so

24   explicit later.  They're very explicit.  And I think they're in

25   one of our briefs.  They talk about a number of actions you

O3E1EISA

1  could take that would not be permitted.  And I think that is

2  important to highlight, and it shows that someone——and it is

3  directly relevant to his *mens rea*, willfulness, intent, what he

4  might have been thinking because they were so explicit later.

5  And I guarantee if those explicit terms had been in in the

6  first place, they'd be jumping all over them.  They do not like

7  that they put them in later.  That's too bad.  They came up

8  later in direct response to what happened here, we believe, and

9  that is directly relevant to showing that what he did was not

10  criminal, that it was understood, at least by him, that he was

11  not operating in a criminal mind-set.  There was no intent to

12  commit a crime; there was no willfulness.  So I think it is

13  really, really critical here, actually, that the later terms

14  come in, and I think it's really important and super relevant,

15  and I think the jury will find it very relevant, and again,

16  there may be some parameters about what we can argue and we can

17  see how it comes in, but we're not going to argue that they

18  should——this isn't an argument about restitution.  This is an

19  argument about whether he committed crimes.  So I don't

20  understand the restitution argument.  407 definitely does not

21  cover this.  It covers a party who's being sued, and it's for

22  policy reasons that are not present here.  And Mr. Eisenberg

23  deserves a chance to put on his defense.  And this is critical

24  to his defense.

25          THE COURT:  Right.  How is it critical?  The

O3E1EISA

government is saying that they're not going to argue that at

the time of the offense there were policies or protocols that

prohibited this, and you can argue all you want the same thing,

right?  They're not going to contest it; you can argue it.

What happens after the fact can't go to Mr. Eisenberg's intent

at the time of the offense.  All it can do really is to

highlight what the other evidence already shows.  And there is

a risk of some confusion of putting in later terms precisely

because it wasn't something that was in place at the time and

because of the government's concern that if there is too much

emphasis on these terms of service and the code, there may be

an issue of jury confusion, that what they're being asked to

determine is whether the code permitted this or whether there

were terms of service in place at the time that addressed this

particular issue.  That's the concern.  That's purely just

whether there's a 402, 403 issue.  I get your point on 407.  I

don't think that that applies here.  It's really just on

whether there's a concern about prejudicial impact or if risk

of confusion would substantially outweigh probative value here,

given that these terms weren't in place at the time of the

events.

MR. KLEIN:  We're not going to argue that he saw them

later, okay, to be clear.  We're not going to make that

argument.  And we're also not going to tell the jury, because

those terms were in there later, it means his conduct——we're

O3E1EISA

1    not going to do a "code is law" defense, right?  So their

2    prejudice concern can be dealt with in a jury instruction, and

3    very simply, that says——

4            THE COURT:  Give me the probative values.

5            MR. KLEIN:  Sure.  Because what's in his brain when

6    goes in there, you can draw an inference from what was in later

7    what the lack of terms would mean to somebody.  You can draw a

8    direct inference, because they're so explicit.  And the lack,

9    you can say, we can infer from very explicit terms that they

10   could have put in what somebody might think at the time they're

11   doing this when there are no terms.  And that's directly

12   relevant.  We're allowed to draw inferences just like they are.

13   And that's a fair inference to draw.

14           THE COURT:  Really what you're using this for is,

15   you're making concrete for the jury what you mean by there were

16   no terms of service at the time, by showing the jury, here's

17   what happened afterward, just so you can see what could have

18   been in place at the time but wasn't, all right?  Is that a

19   fair way to kind of put it?  Like you're saying, it's abstract

20   if we just say there were no terms of service and the jury

21   doesn't understand what that means, but when you show them what

22   terms of service could have been in place, by what they

23   actually did, that emphasizes to the jury the lack of the

24   terms——

25           MR. KLEIN:  Absolutely.  They're offering it in a

O3E1EISA

1    vacuum.  We all know what terms of service look like when we

2    sign anything.  It could be crazy rules in terms of service.

3    This is a very specific instance, with a very concrete lack of,

4    and later there was after this incident.  And I think it does

5    exactly what your Honor is saying.  It allows the jury to

6    understand what was happening here and puts a concrete——or puts

7    a pin in it, for our client.

8            THE COURT:  I'm going to deny the motion on that

9    understanding.  However, you have emphasized several of the

10   guardrails that you intend to follow in terms of what you are

11   not using this evidence for.  So I expect the government is

12   going to stand up and object if there is any abuse of those

13   guardrails, and I assume you understand what we're talking

14   about here in terms of the "code is law" argument——any

15   suggestion that the later terms of service would directly bear

16   on Mr. Eisenberg's intent at the time, those types of issues.

17   You understand that.

18           MR. KLEIN:  Absolutely, your Honor.

19           THE COURT:  Okay.

20           MR. BURNETT:  Your Honor, I just want to make sure I

21   understand that last point.  When you say any suggestion that

22   they would directly bear on Mr. —— I'm just trying to make sure

23   I understand what the inference is if it's not being——

24           THE COURT:  Let me be very clear.  My understanding is

25   that Mr. Eisenberg wants to put in the terms of service solely

O3E1EISA

1    to highlight the lack of terms of service during the time

2    period in question, and not to make some direct argument that

3    the later terms of service somehow maybe would have made it

4    illegal to do it afterwards but it wasn't illegal to do it

5    during the time of the offense.  That's an example.  It's

6    purely just to highlight for the jury the kinds of terms of

7    service that could have been implemented.

8            Let me just take a step back.  During the time of this

9    offense, there were no terms of service at all; is that right?

10            MR. BURNETT:  On Mango Markets, although I think, to

11    the point about highlighting what is possible, I'd say two

12    things.

13            So first of all, there were terms of service on two of

14    the other exchanges that Mr. Eisenberg used to manipulate the

15    price of Mango.  So to the extent the point is, well, the jury

16    needs a counterpoint to understand that there could be terms of

17    service that prohibit manipulation, they'll have those in

18    evidence because that was something that did exist at the time,

19    and you could draw that comparison there.

20            And second, they could also just ask a witness, you

21    could have had terms of service, right?  I assume they'll say

22    yes.

23            THE COURT:  Well, you could do those things, but the

24    limited way in which I'm foreseeing these later terms of

25    service being used here is just a clear way to make that point

1    to the jury.  And if that's all they're doing and they're

2    saying, okay, you didn't have terms of service at the time,

3    yeah, we didn't, and here are terms of service you put in after

4    this, which address this conduct, isn't that right, and if

5    that's essentially all that's being done, I don't know that

6    there could be any prejudice or if there's a risk of confusion

7    that would substantially outweigh that probative value, which

8    is to just show what they didn't have and then show what they

9    did have.  Understanding that a lot of the evidence and

10   testimony that's coming in is trying to translate for the jury

11   this unfamiliar world of what's happening in this crypto space,

12   okay?  And so I think in that context, it's potentially helpful

13   to show what this actual exchange did in the after-the-fact

14   time period, but recognizing the government's concerns about

15   the "code is law" arguments and any direct argument that is

16   being made concerning Mr. Eisenberg's intent.  Just thinking

17   about it, I'm not even sure what that argument would look like,

18   but I understand the relevance issue just being, they didn't

19   have them at the time and they adopted them later.  And if you

20   had a solid 407 argument, then I think it would be out.  But I

21   don't think that there's a solid 407 argument here, given the

22   law of all the other circuits.

23            MR. BURNETT:  So it can't go to the "code is law" and

24   it can't go to the defendant's——

25            THE COURT:  They're not going to make the "code is

O3E1EISA

1    law" argument.  If they make the "code is law" argument, then I

2    expect that you will object and it would be out.

3            MR. BURNETT:  But can it go to defendant's intent?

4            THE COURT:  I don't understand how it would go to the

5    defendant's intent, in any direct.  I said direct.  And this

6    goes back to what we were talking about before.  I think what

7    they're going to say is that there were no terms of service and

8    that that fact has a bearing on intent.  The government

9    recognized that.  So they were just highlighting that fact by

10   showing what they could have done by putting in the later terms

11   of service.  That's it.  I mean, maybe we're making too much of

12   this at this juncture.

13           MR. BURNETT:  Yeah.  I just expect it will be the

14   feature of an intent argument down the road, so I want to make

15   sure I know where its lines are.

16           THE COURT:  We'll police the lines.  I mean, this is

17   like with any motion *in limine*.  I don't believe there's a

18   basis to categorically exclude reference to the later terms of

19   service, but as issues arise, I'm sure that you will raise

20   them.

21           Next, the government's argument concerning

22   Mr. Eisenberg's partial repayment as a defense to the charged

23   crimes.  And as I understand it, Mr. Klein, I think that you're

24   not making the argument that partial repayment of any kind is a

25   defense to any of the alleged crimes, correct?

O3E1EISA

1          MR. KLEIN:  All we're saying is they're going to put

2    in evidence——

3          THE COURT:  First, are you making any argument that

4    partial or full repayment is an actual defense to the crimes in

5    question?

6          MR. KLEIN:  It's not an affirmative defense, it's

7    not——it's on a solo basis, a defense.  But they're putting it

8    in.  And can I go on, your Honor, or——

9          THE COURT:  Yes.

10          MR. KLEIN:  They're going to put in evidence about it,

11    they said that, and we need to be able to respond to it, and

12    that's what we're saying.  So if they're going to offer

13    evidence——which they said they are——about the repayment and

14    what it meant, the settlement negotiations that happened, then

15    we're going to be able to cross-examine on it and make argument

16    about it.

17          THE COURT:  Again, what's the benefit?  If it's in,

18    it's in, so what am I missing?

19          MR. BURNETT:  Well, they're trying to keep it out for

20    us.

21          THE COURT:  Maybe that question is better directed at

22    the government.  Are you going to put this stuff in?

23          MR. BURNETT:  Yes.  So let me kind of walk through

24    what the facts are on this piece of this.  That will help make

25    concrete how we envision in coming in and what we're arguing.

O3E1EISA

1    What we're trying to preclude is arguments about certain

2    inferences to draw from it.  So basically here's what happened.

3    So——

4            THE COURT:  Wait, wait.  Say that again.

5            MR. BURNETT:  Sorry.  We're looking to limit arguments

6    about certain inferences the jury should draw, should be able

7    to draw from any partial repayment.

8            THE COURT:  Okay.

9            MR. BURNETT:  So after Mr. Eisenberg's attack, he

10   begins negotiating with Mango's DAO, representatives of Mango's

11   DAO, as to some kind of resolution——or what is, in his mind, a

12   resolution.  I think the Mango people view it differently.  And

13   in that discussion, what eventually comes out of it is

14   Mr. Eisenberg agrees that he will return some portion of the

15   money, and in exchange, one of the things he gets is an

16   agreement from the Mango Markets users, theoretically, that

17   they will not press criminal charges against him.  And in a

18   text message to a friend of his that he is messaging with

19   around the same time, he refers to wanting to reach some kind

20   of deal so there are no "sympathetic victims."  So we plan to

21   introduce the partial repayment as part of the jury

22   understanding that story and in part because some of these

23   facts about what he says to the friend and, like, this part

24   about, you know, getting an agreement not to press criminal

25   charges, we think bear on his intent and on the willfulness

O3E1EISA

1    issue.  What we think is not permissible is for the defense to

2    argue to the jury that, well, because he made some repayment

3    and, like, intended to make some repayment, he acted in good

4    faith.  And the reason they can't make that good faith argument

5    based on this partial repayment is that case law in the Second

6    Circuit is very clear that a belief or an intent——a belief that

7    everything will work out fine, people will get their money back

8    after the fact, is not good faith and is not a defense to a

9    wire fraud charge or to a securities case, commodities fraud

10   charge.  So our point is not that they can't——the fact of the

11   payment will be in evidence.  What we are saying is that they

12   can't argue from the fact of repayment that you know he had or

13   acted in good faith because that is legally incorrect.

14        THE COURT:  Okay.  And what should we make of the

15   language from *Vincent*?  Which is not really explained, but it

16   seems to suggest that a partial recovery or it says, "A partial

17   recovery might be relevant to a defendant's intent to defraud."

18   And it doesn't explain that.

19        MR. BURNETT:  So two things.  First, obviously, it's

20   an out-of-circuit case, so the Second Circuit case law we think

21   is clear on this point.

22        THE COURT:  I don't need more references.  I just want

23   to know, what's the——

24        MR. BURNETT:  So actually, the sentence is clipped in

25   the brief.  So the full sentence says, "While a partial

O3E1EISA

1    recovery might be relevant to a defendant's intent to defraud,

2    Simpson's recovery does not advance the theory that Vincent

3    made an honest mistake." So I think that that main clause is

4    important because I think what the Second Circuit is getting

5    at, you might have a situation where you're like, oh, my god,

6    I'm so sorry, I didn't mean to get this, take it back, in which

7    case, like, sure, but that's like a really different situation

8    than we're talking about here.

9              THE COURT: I understand.

10             Okay. So Mr. Klein, I'll let you respond to all of

11   that. But as I understand the motion a little bit better now,

12   what they're saying is you can talk about the partial

13   repayment, and you can bring that up, and make clear to the

14   jury that there was a partial repayment and potentially that

15   bears, for instance, on, when the government is talking about

16   victims, you may want to raise the fact that there was at least

17   a partial repayment, and you'll take the bad with the good. As

18   the government points out, there are circumstances of that

19   partial repayment that you may not like. However, you should

20   not be permitted to make the argument that the later partial

21   recovery bears in any way on the intent to defraud for the

22   reasons that Mr. Burnett just identified. So what's the

23   response there?

24             MR. KLEIN: I mean, I disagree with that, your Honor.

25   I think we should be allowed to argue that. They're opening

O3E1EISA

1   the door wide open on this repayment issue.  They're going to

2   put in a lot of evidence apparently about it.  Obviously we

3   don't know exactly how it's coming in.

4            THE COURT:  I don't think there's an objection to

5   putting the evidence in; is that right?

6            MR. KLEIN:  Well, the objection is—

7            THE COURT:  Let me hear if there's any objection on

8   the evidentiary front.  As I understand the motion, what you're

9   really concerned about is an argument that would be made to the

10  jury.  You're not contesting that the evidence of partial

11  repayment can be brought in.

12           MR. BURNETT:  So we think it can come in as part of

13  completing the story in the way we're envisioning it.  I think

14  depending on how the Court views partial repayment is whether

15  or not it can support a good faith defense or not.  For

16  instance, if you were decide, like, they can argue good faith

17  from this, which we think is legally absolutely wrong, we may

18  not introduce the evidence, and then I don't think the defense

19  can introduce it because the point of introducing it would be

20  to make this good faith argument.

21           THE COURT:  Well, that's one point.  But not to take a

22  tangent here, but if you're going to talk about victims as

23  we've identified—and it seems like the government is going to

24  talk about victims—why wouldn't it be relevant that, just in

25  terms of the atmospherics, if you're going to use the term

O3E1EISA

1    "victim" to talk about those individuals who Mr. Eisenberg

2    allegedly intended to take money or property from, why wouldn't

3    it bear on that, to say, well, there's a partial repayment so

4    they were not victims in the sense that the jury might take

5    that term to mean?

6            MR. BURNETT:  Well, that would be legally wrong.

7    Under the Second Circuit law, a victim is someone whose

8    property was taken under the wire fraud statute, or intended to

9    be taken.  Whether or not they later got that property back is

10   not legally relevant to their status as a victim.  And it would

11   be confusing for the jury to make an argument otherwise.

12           THE COURT:  So your argument is that's the only thing

13   that partial repayment could be relevant to, absent completing

14   the story if you put the other parts of the negotiation into

15   evidence.

16           MR. BURNETT:  Right, to rebut this victim thing, it is

17   precisely making a legal argument that the Second Circuit has

18   not allowed.

19           THE COURT:  Okay.  So then turning back to Mr. Klein.

20   Again, it's based on this question and whether you're going to

21   bring up this argument that partial repayment under these

22   circumstances bears on intent to defraud.  So are you going to

23   make that argument or not?

24           MR. KLEIN:  Yes, your Honor.

25           THE COURT:  Okay.

O3E1EISA

```
 1              MR. KLEIN:  And your Honor, they plan to argue——and
 2      they put it in many briefs, many filings——that our client
 3      borrowed this money and had no intent to repay.  And lo and
 4      behold, there was a repayment that was happening.  And so
 5      they're going to argue that he had no intent to pay, that that
 6      was his intent, and then there is a repayment, and then they
 7      say that the intent of that repayment is something else, we
 8      need to be able to comment on that.  It would be crazy.  We
 9      need to be able to respond to that evidence, both that he had
10      no intent ever to repay at the start, and then what they think
11      his intent was by doing that.  So we need to be able to respond
12      to both of those things through argument, based on what the
13      evidence shows, based on what comes in, based on the facts.
14              THE COURT:  And give me what that argument would look
15      like.
16              MR. KLEIN:  I don't know exactly, your Honor, but it
17      could be something like, well, the government's told you that
18      he had no intent ever to repay, and then a few days later he
19      started negotiating a way to get money back.  It ended up
20      turning into something like this——I don't want to forecast our
21      whole defense, but I can see arguments coming out like that.
22      Because they're going to put that in to show he's guilty, to
23      show his intent at the time he allegedly committed these
24      actions.  They're going to use that evidence.  We should be
25      allowed to use it for the purposes I've put forth, both to show
```

O3E1EISA

1    he didn't borrow with no intent to repay but also that what he

2    intended by any of it is not something malicious or showing

3    that his intent was criminal at the start.

4             THE COURT:  So Mr. Burnett, just hypothetically, let's

5    say that before the fact Mr. Eisenberg's intent was to expose

6    vulnerabilities in Mango Markets and then execute on this but

7    that his intent was always to repay and make the Mango Markets

8    customers whole, and one way you know that that was a real

9    intent that he had at that time is the fact that he actually

10   did after the fact repay money that would help make the Mango

11   Markets customers whole.  Wouldn't it be relevant to the

12   tentative fraud in the way that maybe *Vincent* foresaw under

13   those circumstances?

14            MR. BURNETT:  No, your Honor, because the intent to

15   repay is the intent to repay the loan he took out, not intent

16   to negotiate a separate settlement where he gets different

17   terms.  The repayment is just a fundamentally different thing

18   that he's doing here than the repayment under the borrow.  It's

19   not like he just put the money back in Mango Markets' platform

20   to repay the loan that he had taken out.  He negotiated a

21   separate agreement with Mango DAO, separate terms.  It's more

22   akin to like a separate out-of-court settlement, not like

23   repaying a loan.

24            THE COURT:  Well, you told me that the victims here

25   included the customers and it wasn't just the platform or DAO,

O3E1EISA

1    right?

2                MR. BURNETT:  That's correct.  But the reason the

3    customers ultimately get paid whole is because Mango Markets

4    itself chips in.

5                THE COURT:  That's the reason.  But just the repayment

6    of those customers, this is only relevant to intent, and I'm

7    just saying, even if it were through some other mechanism——I'll

8    give an example.  The borrowed funds come out, he takes them,

9    and then he's like, oh, there was a mistake, you gave me these

10   funds, you shouldn't have given them to me, so then he

11   contacted DAO and says, okay, I'm going to give this to you

12   directly, I'm not going to repay the loan because there would

13   be some technical issues doing that, let me give it to you

14   directly, give the customers their money back directly, their

15   crypto directly, and that's just how we're going to do it.

16   That doesn't make a difference.  Or you can argue that it does.

17   But it still bears on the issue of intent at the time of the

18   offense.

19               MR. BURNETT:  So I don't think——I think it might be a

20   different situation where he was, like, returning 100 cents on

21   the dollar to repay everyone.  We're talking like 50 cents on

22   the dollar.

23               THE COURT:  Look, you can make this argument.  Look,

24   whether it is a strong argument or one that would be persuasive

25   is another issue, and for all the reasons that you yourself are

O3E1EISA

1    bringing in this story to show that there was intent going the

2    other direction, Mr. Klein says, I understand that, I'm going

3    to deal with that, but I want the freedom of movement to make

4    my arguments related to intent.  And there is case law support,

5    some case law support to do that, pointing to the *Vincent* case.

6    I understand that the Second Circuit in cases like *Sindona* has

7    indicated that this evidence will many times have scant

8    probative value, but here it is at least an articulated

9    argument with some probative value, so I'm going to deny the

10   motion on this ground.  And obviously, again, we're going to

11   police things during trial.  So if there's an argument that

12   goes out of bounds, you can obviously raise an objection to any

13   of these issues.  But I think I'm going to deny it at this

14   time.

15          All right.  So the last issue turns on self-serving

16   exculpatory statements.  So I think the idea here is that the

17   government's going to bring in some statements by

18   Mr. Eisenberg; there are other statements that, Mr. Klein, you

19   would like to bring in, but you run into a hearsay problem.  I

20   think you didn't argue the hearsay issue in your briefing.

21   Unless I missed something.  What you said was that there's a

22   rule of completeness issue and so what you really want is just

23   some sort of designation of the statements that are being

24   brought in and so you can properly designate any corresponding

25   statements that would fit the rule of completeness; is that

O3E1EISA

1    fair?

2              MR. KLEIN:  Yes, your Honor.  We're basically

3    operating in a vacuum.  So when we see what statements they

4    want to put in in their exhibits, we'll look at them, we'll

5    evaluate whether there are other statements that would be

6    necessary to comply with the rule of completeness, or if

7    there's a hearsay exception, we may have other statements.  But

8    we're really focused on the rule of completeness for the

9    purposes of this, and so we just don't know what their

10   statements they're going to offer in are, and we'll look at

11   those, and they may have a thread of a text exchange or email

12   exchange, and they may put in three sentences and we think a

13   fourth one is necessary for context, and your Honor can rule on

14   that.

15             THE COURT:  Do you have a proposal on how we would do

16   this?  I'd like to accommodate this issue, and I'll hear from

17   both sides.  And I'd also like to avoid any kind of disruption

18   during the trial where we have to have sidebars and take the

19   jury out of the room to deal with these types of things.  It

20   seems like the kind of thing you can deal with in advance,

21   possibly at the final pretrial conference.  So if you have a

22   suggestion, do you want to talk to the government and figure

23   out a protocol here?

24             MR. KLEIN:  I'll just tell you my suggestion right

25   now, your Honor, and we can talk to them too for sure.

O3E1EISA

1          Typically what I've seen is they'll give us the

2    statements, they'll highlight what they're going to put in from

3    the exhibit, like here's a thread, because sometimes you get an

4    exhibit with just a giant thread and you don't know what part

5    they're going to put in.  They would highlight the statements

6    they're going to put in, we'll look at it, and we'll let them

7    know if we have a counterdesignation.  Sort of like with the

8    grand jury transcript case they referenced.  We get their

9    exhibits next week, I believe, the 25th.  We're happy to start

10   that process earlier if they have those things ready.  We're

11   happy to meet with them afterwards and discuss a process.  But

12   I agree with your Honor; we should be able to do this in

13   advance of trial, and if there are disputes, you could rule on

14   it before the jury would be brought out.

15          And we have something, your Honor——and if there is a

16   statement that we see the need to put in to put in that

17   context, we can inform them at that time.  So there's a world

18   in which they put in this statement that's on Twitter, for

19   example, and our client, at the exact same moment, is writing

20   another statement on some other social media platform or some

21   other thing that adds necessary context to explain what he was

22   saying, but we just don't know what they're doing yet.

23          THE COURT:  Okay.  So how do we move forward?

24          MR. BURNETT:  Your Honor, if I may, we're producing

25   our exhibits on the 25th.  This is a case where there are a

O3E1EISA

1    number of statements but it's, like, not really a huge

2    statement case.  I think it's going to be a pretty discrete

3    number.  I think either the——I think by the Monday of

4    trial——that is, the day of jury selection——we should exchange

5    counterdesignations they want to give.  That should be plenty

6    of time that we'll be able to address it the morning before the

7    witness goes on who that evidence would be coming in through.

8    I imagine we're going to be talking about a pretty limited set

9    of stuff here.

10          THE COURT:  And we can deal with that on the Monday,

11   if that works, Mr. Klein, for your side?

12          MR. KLEIN:  That works for us, your Honor.

13          THE COURT:  So let's handle it that way.

14          So the motion itself will be denied without prejudice,

15   with the understanding that we will have this procedure, and

16   the main issue is going to be rule of completeness and context.

17   Again, I'm not hearing how the statements would independently

18   be admissible as offered by Mr. Eisenberg under the hearsay

19   rules, and there's been no argument made.  I think there was an

20   argument made that they would not be admissible under 803(3),

21   and I have not heard any reason why they would be.

22          MR. KLEIN:  Your Honor, we haven't decided——we don't

23   know what their statements are and what we'll need to offer,

24   and when we see that, we may come forward and say, here's——

25          THE COURT:  Okay.  Without prejudice.

O3E1EISA

1          MR. KLEIN:  Yeah.  Here's some statements we want to

2     offer and here's our hearsay objection, and your Honor can rule

3     on it.

4          THE COURT:  Okay.  All right.  Anything else on

5     motions *in limine* before we shift to the expert motions?

6          MR. BURNETT:  No, your Honor.

7          MR. KLEIN:  No, your Honor.

8          THE COURT:  Okay.  So now let's go to on the motions

9     to exclude expert testimony.

10          So let's start with Mr. Sheridan.  I'll just make a

11     general comment that in terms of just the qualifications of

12     these experts—so when I say these experts, I'm referring to

13     Mr. Sheridan, Dr. Montgomery, and Mr. Jain—they're qualified

14     as is required under Rule 702.  I've reviewed their CVs, and

15     they have the experience to opine in the subject matter areas

16     that are outlined in the disclosures.  However, I understand

17     that there are particular parts of the disclosures that the

18     parties are focusing on and there may be arguments that, as to

19     those particular issues, they may fall outside the witness's

20     expertise, but we'll handle that as we walk through the

21     motions.

22          So let's start with Mr. Sheridan.  And maybe on

23     this—I don't know who's going to handle it.  Mr. Davis?  So

24     let's start as to the issue of testimony as to intent.  Which

25     parts of Mr. Sheridan's disclosure are you focused on there?

O3E1EISA

 1          MR. DAVIS:  So, your Honor, I think on this, there's

 2   two parts in particular.  The one is as to the Mango Markets

 3   designers' intent when creating the protocol; and the second is

 4   as to Mr. Eisenberg's intent when making these trades.  And I

 5   can point you to the places in their notice that directly speak

 6   to this.

 7          So the first is as to point one, which is,

 8   Mr. Sheridan should not be able to give an opinion or leave the

 9   jurors with an impression about what the Mango Markets'

10   designers intended.

11          THE COURT:  Agreed.

12          MR. DAVIS:  And so on page 2 of his disclosure——

13          THE COURT:  And I'm looking at document 80-2.

14   January 12, 2024, disclosure; is that the right one?

15          MR. DAVIS:  Yes, your Honor.  I'll call that one

16   January 12th disclosure.  So starting with

17   paragraph 2——specifically, this is in bullet two, starting with

18   the word "specifically," he will explain that the protocols are

19   designed to, in some instances, enable conduct, in others to

20   prevent it.

21          The next sentence is, "Though technically feasible, at

22   the time of the trades at issue, Mango Markets had no terms of

23   service beyond its code.  It only gave a warning to users.

24          And then if we go down further to the last paragraph,

25   Mr. Sheridan is expected to opine that the trades allegedly

O3E1EISA

1    executed by Mr. Eisenberg were not prohibited by the Mango

2    Markets protocol, including the Mango DAO as well as the

3    Solana.  So I think what the jury is left with with this

4    opinion——and the wording of the disclosure is obviously

5    important, but that's not what we're getting at here.  What

6    we're getting at here is what is the opinion he's going to say

7    on the stand and what is the jury going to be left with, which

8    is that Mr. Sheridan's going to be opining about what the

9    intent was of those protocols, as I understand it, that the

10   intent was to allow certain conduct or prohibit certain

11   conduct; and going one step further, to allow the trades at

12   issue or forbidding the trades at issue, and that is something

13   that is improper for three independent reasons.  So the first

14   is——

15          THE COURT:  I got you.  It's not coming in.  But I

16   understand that Mr. Eisenberg is not going to make that

17   argument.

18          So who's going to cover that on the defense side?

19   Mr. Greenspan; is that right?

20          MR. GREENSPAN:  Yes, your Honor.

21          THE COURT:  Okay.  All right.  So you're not going to

22   make that argument, right?

23          MR. GREENSPAN:  No, we're not, and I think we were

24   pretty clear on that in our papers.

25          THE COURT:  As I understand it, it's almost like a

O3E1EISA

1    wordsmithing thing with the disclosure.  Like, you don't need

2    to say that it was designed to do something because the way

3    that you put it in your brief is, the testimony just goes to

4    how Mango Markets' code worked in practice.  No issue with

5    that, right?

6            MR. DAVIS:  No, your Honor.  And I think this is

7    exactly the point, which is, I understand and totally take

8    counsel at their word they're not going to make this argument,

9    but where the problem comes in is if they get their witness on

10   the stand who is now expert to talk about why the protocol was

11   in place, to talk about the intent of Mango Markets and leave

12   the jury with that impression.  So it's really important.  The

13   wordsmithing in the notice flows through to what he is actually

14   permitted to testify about.

15           THE COURT:  As I understand the disclosure, aside from

16   the wordsmithing issue that obviously the disclosure says

17   "design," and that could be understood in a couple different

18   ways, as I understand——and Mr. Greenspan, you can correct me if

19   I'm wrong——the only testimony is going to be, here's how it

20   worked, okay?  And that's it.  It worked this way.

21           The why, I agree with you.  I don't know that

22   Mr. Sheridan has any expertise in the why of why any of these

23   things were put in place.  That's a question that can be asked

24   to a Mango Markets witness if they're put on the stand, but I

25   don't see anything in the disclosure that says that they're

O3E1EISA

going to inquire and that Mr. Sheridan's going to testify as to

the why.  He's going to say, this is how the code worked in

practice; in practice, this either allowed or did not allow X,

Y, or Z, which he can testify about given his experience in

cryptocurrency and blockchain and all the other credentials

that he has.  But outside of that, I don't think he's going to

testify about anything along the lines of what you're talking

about concerning intent.  If that's——

          MR. DAVIS:  That's generally fine, with one caveat, on

allow and prohibit.  That's kind of a separate basis.  But I

agree with you.  I think the——I'm not trying to speak past the

Court in any way.  The way this sentence is written is that

he's going to explain that the protocols are designed to do

something.  That's what the notice says.  And that speaks to

the intent behind the protocols.  And as long as that's off the

table and instead it comes in the way the Court is suggesting,

which is, here's how this works, let me explain to you the

complicated——

          THE COURT:  That's a wordsmithing thing, as I get it.

But I'll ask Mr. Greenspan:  Any issue with that?  Because I

think that that is the source of the government's objection,

but it seems like a wordsmithing thing.

          MR. GREENSPAN:  Yeah, no objection to that, and we

noted in our papers, they also used the words "designed to do

something" in exactly the same way with Mr. Jain's disclosure,

O3E1EISA

1    and so long as Mr. Jain doesn't testify about the Mango

2    Markets' intent, it will be irrelevant in the battle of

3    experts.

4            THE COURT:  That's fair.  If Mr. Jain was to testify

5    that Mango Markets was designed to do something, that would be

6    subject to that same concern, fair?

7            MR. DAVIS:  Agreed.  In that he does not know——

8            THE COURT:  No one's going to talk about the system

9    being designed to do something, which is unnecessary anyway if

10   what we're talking about is just how it worked.

11           MR. DAVIS:  One factual clarification.  What my friend

12   in opposition just mentioned was a part of a notice where

13   Mr. Jain is going to talk about how USDC was designed, and

14   that's just the features of USDC, which is completely proper.

15           THE COURT:  Why don't you just say what the features

16   of USDC are.

17           MR. DAVIS:  Totally agree.

18           THE COURT:  And part of the issue here——let me take a

19   step back——is that we have these disclosures, and look, you

20   know, I came at this from the civil side, where we had Rule 26

21   reports, where everything is contained in the report, and you

22   know exactly what the expert is going to say and how they're

23   going to say it.  And so I can just strike things, I can let

24   certain things in; there's no speculation about it.  Here, we

25   have the disclosures, and on both sides, they're vague in

O3E1EISA

1    various respects, and so we're trying to think about what the

2    testimony might look like coming in, which makes this

3    enterprise a little difficult.  So I'm going to give you some

4    guideposts, and I will expect the parties to follow them.

5         The first guidepost is that no one's going to say that

6    the system was designed to do something because of the

7    government's, their concern that it goes to issues of third

8    parties' intent.  And so we can resolve that.  I don't think

9    there's any dispute about doing that.  Agreed?

10        MR. DAVIS:  That's what the government's request was

11   and so we totally appreciate that.

12        And point taken off this.  I think we are trying to

13   work within the framework here, different from the civil

14   context, where you have an expert deposition before the

15   *Daubert*s and you're doing it, but we have these notices.

16   That's the point of the detailed notice that we have.

17        And so if I may, I'm going to go on to the second

18   point which the Court raised, which was, what's the second part

19   of the intent-based opinion?

20        THE COURT:  Yes.  This is the analog of the "code is

21   law" argument, because it says prohibited.

22        MR. DAVIS:  So there's the prohibitive point, but then

23   I think——I believe the Court first asked what are the other

24   intent arguments that we're concerned about, and that's on

25   page 30, where they have noticed that Mr. Sheridan is going to

O3E1EISA

1    say that the trades were strictly the utilization of market

2    mechanics without code violations, and simply by saying that

3    and framing these trades and the hypothesizing about

4    Mr. Eisenberg's intent behind making the trades at issue, that

5    is impermissible in the same way that talking about Mango

6    Markets' intent is impermissible.  Mr. Sheridan is not an

7    expert on Mr. Eisenberg's intent and should not be able to

8    opine on that.

9            THE COURT:  Okay.  And Mr. Greenspan, I understood

10   that to just be a title of a heading and then underlying that,

11   that was the proposed subject of Mr. Sheridan's testimony.  Am

12   I wrong about that?  Is he going to say, let me talk to you

13   about how Mr. Eisenberg strategically utilized market mechanics

14   here without a code violation?

15           MR. GREENSPAN:  No.  That's exactly right, your Honor.

16           THE COURT:  Okay.  So he's not going to say that.  And

17   I agree with you it would be improper for Mr. Sheridan to

18   testify concerning strategic utilization of market mechanics

19   without code violation.  He can testify concerning the market

20   mechanics and whether or not what Mr. Eisenberg did was

21   consistent with the code, and whether modifications to the code

22   were undertaken or not.  Those are things that Mr. Sheridan

23   could testify to.  But as to the intent issue that you're

24   raising concerning strategic utilization, that's not going to

25   be something that Mr. Sheridan is going to be permitted to

O3E1EISA

1    testify about.

2              MR. DAVIS:  Thank you, your Honor.  And in the same

3    way, the next sentence under that heading, that the alleged

4    trades on Mango Markets utilized authorized functionalities,

5    highlighting systemic vulnerabilities, that again speaks to the

6    intent of the trades, and that should be prohibited for the

7    same reason, that it's not in Mr. Sheridan's expertise and also

8    is irrelevant.

9              THE COURT:  Well, let's put the vulnerabilities issue

10   to the side, because it raises a separate argument that the

11   government is making.  But are you pointing specifically to a

12   phrase like utilize, authorize, functionalities?

13             MR. DAVIS:  No, your Honor.  I'm highlighting the next

14   sentence, which is this Highlighting Systemic Vulnerabilities.

15   Like, it speaks to the purpose of the trades, which, again, is

16   in what's in Mr. Eisenberg's head.

17             THE COURT:  I agree with that.  Let's put a pin in

18   that one for a second because it raises all sorts of other

19   issues as well.  So I hear you.  We'll get to that particular

20   issue.  Here, I'm really concerned with, what are the other

21   ways in which the verbiage in this disclosure is imprecise,

22   because I really think that that's what it is for a lot of

23   these issues.  Like, does the government have an issue with the

24   use of the words "prohibited" or "authorized," because I don't

25   know how else you're going to really talk about this stuff

O3E1EISA

1    without saying that.

2            MR. DAVIS:  Certainly prohibited, and I say yes, this

3    does come down to wording, but they're not small things.  We're

4    now talking about an expert standing up, you know,

5    getting——testifying, being sworn in as an expert and speaking

6    to the jury, and on the prohibited, this is kind of the data

7    point on the "code is law" argument that my colleague mentioned

8    earlier.  We were saying that, look, we totally get defendants

9    that were not making a "code is law" argument, but they

10   shouldn't be able to back-door it through an expert who is

11   going to be suggesting through their testimony that, hey, Mango

12   Markets could have had terms of service and they didn't, and

13   that's one of the proposed opinions in the notice, which

14   is——that Mr. Sheridan is going to say he could have——Mango

15   Markets could have written it in terms of service but they did

16   not and that the problem that——this conduct was allowed on the

17   protocol and not prohibited.  And now what the jury is left

18   with——

19           THE COURT:  I was with you as to everything you said

20   up to "prohibitive."  I thought the government's position was,

21   we understand that that kind of testimony would be relevant to

22   potentially intent.

23           MR. DAVIS:  Yes, your Honor, but not through an

24   expert.  The way it comes in is, it's going to come in through

25   lay testimony.  There's going to be not a dispute that the

O3E1EISA

1    trades were technologically feasible.  It's very different than

2    having an expert get up on the stand and say, hey, this was not

3    prohibited by the Mango Markets protocol, they could have

4    prohibited it but they did not.  So if the jury is going to be

5    allowed to hear that testimony, it is doing two things.

6    They're going to be in their minds thinking, we have this

7    expert saying that everything was okay with those trades.

8    That's very different from how this will come in through a lay

9    witness.  Second, they're going to be mapping on Mr. Sheridan's

10   view of "prohibited" to this Court's instructions about what is

11   prohibited and what the law, and that is improper.  And that's

12   why the gatekeeping function with expert testimony is different

13   from when it comes in through a lay witness.  The government

14   tried to be careful about, in their motion *in limines*, to say,

15   look, the type—the facts relating to this "code of law"

16   argument, we understand, are going to be coming in through,

17   like, lay witnesses.

18             THE COURT:  But wait.  So this goes back to a

19   discussion we had earlier.  The fact that these trades were

20   permitted, or whatever word you want to use, by Mango Markets

21   under its code, that can bear on the issue of intent, right?

22   Because a jury could say, well, if this were authorized by the

23   code and didn't involve, let's say, hacking, then I can make

24   some inferences that at least it's within the zone of something

25   that might not have been a willful violation of the law.  I

O3E1EISA

1    mean, that's an argument that they could make, right?  Is there

2    some case or authority that indicates that the only evidence

3    that can go to intent is the kind of, here's what the defendant

4    was actually thinking, but that's the only evidence that can go

5    to intent?  Is there a case like that?

6         MR. DAVIS:  No, your Honor.  And again, sorry for

7    backtracking a touch.  I do think that we are saying that,

8    look, this evidence is going to come in about the trades being

9    technologically feasible through lay witnesses.  The point

10   we're making with this particular motion is how it should come

11   in.  It should not come in through an expert saying what is

12   prohibited or not on the protocol and that by doing that, he

13   can't speak to the defendant's intent.

14        THE COURT:  He's just giving a technological

15   perspective on what was possible in the system.  It's really

16   just wordsmithing again.  I think it's the use of the word

17   "prohibited" that is really bothering me.

18        MR. DAVIS:  Agreed.  And if the Court is going to rule

19   that Mr. Sheridan cannot speak to what is prohibited or

20   allowed——and those words do concern the government——then that's

21   fine.

22        THE COURT:  You'd have to come up with a different

23   word, because I don't know what other word you'd use.

24        But let me ask Mr. Greenspan, do you have a solution

25   for us here?  Because I think the real issue is simply the use

O3E1EISA

1    of the word "prohibited."  Now I don't know that you need to

2    use that word.

3              MR. GREENSPAN:  Sure, your Honor.  My reading of the

4    disclosures is, it's pretty clear that Mr. Eisenberg——that the

5    trades executed were not prohibited by the Mango Markets

6    protocol, as well as the Solana blockchain.  I mean, I

7    think——it's hard for me to envision how this could be clearer,

8    that that word is being used in regards to the specific rules

9    of the exchange and not about some kind of closed law argument.

10             THE COURT:  You're not going to make any argument, or

11   Mr. Sheridan is not going to testify in any way, shape, or

12   form, that the prohibition under the terms of service or under

13   the lack of terms of service or whatever, the systems and

14   protocols that Mango Markets had in place, bear directly on

15   what was prohibited by the law or not, right?

16             MR. GREENSPAN:  That's right, your Honor, and I think

17   just as important, you know, in talking about this, just as

18   important as the word that we're saying——either "permitted" or

19   "not permitted" or "prohibited"——is the context.  I mean, he's

20   immediately after that explaining, what are we talking about.

21   And that is the rules of the exchange.  So I mean, as long as

22   it's cabined specifically to that, I can't envision the jury

23   being confused about what we're talking about.

24             THE COURT:  Okay.  Well, it needs to be cabined in

25   that way, and if it's not cabined in that way, I mean, you're

O3E1EISA

```
1    going to get a curative instruction which you don't want

2    because it's going to highlight precisely what the government

3    is arguing, that there is a sharp distinction between what is

4    prohibited by the Mango Markets system and what is prohibited

5    by law, which is the Court's duty to inform the jury of, okay?

6           MR. GREENSPAN:  Yes, your Honor.

7           THE COURT:  So this argument made in support of the

8    government's motion will be rejected.

9           Let me take a step back.  The motions to exclude these

10   experts' testimony in full are going to be denied as to the

11   three witnesses that we're talking about.  What we're really

12   doing is trying to establish guideposts for these witnesses

13   going forward, and I think that's everyone's understanding of

14   what's happening here.  Is that fair?

15          MR. DAVIS:  That's fair, your Honor.  May I ask one

16   clarifying question about this last ruling.

17          THE COURT:  Sure.

18          MR. DAVIS:  I just want to be clear.  Like, on

19   cross-examination, will the government be permitted to clarify

20   that Mr. Sheridan is not making a ruling about what laws apply?

21          THE COURT:  Yes.

22          MR. DAVIS:  Okay.  Thank you, your Honor.

23          THE COURT:  Okay.  Where is the next place, Mr. Davis,

24   that you want to take me?

25          MR. DAVIS:  I think that was the first three
```

O3E1EISA

1    arguments.  I think the next is trying——trying to focus on

2    Mr. Sheridan's purported victim-blaming opinions, in the

3    government's view, which——

4           THE COURT:  This goes back to the vulnerabilities

5    point and some of the related testimony concerning the audit;

6    there's other aspects to that.

7           MR. DAVIS:  Yes, your Honor.  And as to this, the

8    government has raised in its briefing a number of foundational,

9    relevance, and 702 issues as to why this shouldn't come in, but

10    more fundamentally, I don't think it is disputed by the defense

11    that victim blaming like this is not a defense to the crime.

12    It is not relevant in that sense.  It cannot go to a

13    defendant's intent to suggest that the victim was negligent or

14    should have stopped it in some way.  And so the government

15    moves to preclude these opinions for that reason.

16           THE COURT:  Okay.  What opinions are you talking

17    about, just so we're clear about it?

18           MR. DAVIS:  Yes, your Honor.

19         This is starting, your Honor, on page 4 of the

20    disclosure.  "Mango Markets could have implemented, through

21    terms of service addressing actions that were allowed by the

22    code but prohibited by the protocol policies."

23         Then, "The platform vulnerabilities acknowledgment"

24    paragraph, and "Lack of risk management and governance

25    framework" paragraph.

O3E1EISA

1          And then separately, going back to page 3, where he

2     says, "Losses are a natural consequence of Mango Markets having

3     created a token with little utility, because there was

4     therefore no other offsetting market or use for the token."

5     And noting "oracle" weaknesses and failure of Mango Markets to

6     manage those "oracle" weaknesses.

7          And so at the bottom of that paragraph on page 3,

8     which ends, "The inability of Mango Markets to effectively

9     manage these oracle pricing strategies and liquidity issues

10     unveiled critical deficiencies in the platform's risk

11     management and market stability framework."

12          THE COURT:  Okay.  So Mr. Greenspan, what is the

13     relevance?  Let me ask it this way.  The way the code worked in

14     practice, that's coming in.  Mr. Sheridan can testify about

15     that.  What is the relevance of testimony concerning

16     vulnerabilities and other consequences of Mango Markets'

17     structure?

18          MR. GREENSPAN:  First, coming back to, you know——one

19     of the things they said was, in the terms of service analysis,

20     they talked about the sentence, "Mango Markets could have

21     implemented through terms of service addressing actions——"

22          THE COURT:  That I think is fine.

23          MR. GREENSPAN:  I think you had ruled on that already.

24          THE COURT:  Yes.  There, you're almost saying that it

25     was feasible for them to do it, they just didn't do it, okay?

O3E1EISA

1    That's a separate issue.

2              MR. GREENSPAN:  That's right.

3              THE COURT:  Then I think the last two references that

4    Mr. Davis referred us to, which point to vulnerabilities in the

5    system and that, for instance, the losses were a natural

6    consequence of the way in which the system was structured, what

7    is the relevance of that kind of testimony?

8              MR. GREENSPAN:  Your Honor, I think that this

9    is—especially when we're talking about what's on page 4, I

10   mean, we're talking about information that was known publicly,

11   so this is information that either was known or could have been

12   known to Mr. Eisenberg through the Mango DAO and through

13   everyone else, and so—

14             THE COURT:  Well, I think we're on page 3.

15             MR. GREENSPAN:  Okay.  I'm sorry.  They highlighted

16   both a section on page 4 and a section on—

17             THE COURT:  Let me give you an example.  Because

18   again, I think we're going to have to do this through some

19   guideposts, and so I'll give you, "The inability of Mango

20   Markets to effectively manage these oracle pricing strategies

21   and liquidity issues unveiled critical deficiencies in the

22   platform's risk management and market stability framework."

23   What is the relevance of that proposed testimony?

24             MR. GREENSPAN:  Your Honor, I think that Mr. Sheridan

25   here is really just talking about the mechanics of what

O3E1EISA

1    happened and how it happened, and it provides the jury with an

2    explanation of why, you know, the trading led to the results

3    that it did.  This, to me, is just a purely factual explanation

4    of, you know, what the causal factors were for the way that the

5    trading resulted.

6         THE COURT:  Okay.  But you would agree that testimony

7    that the system was vulnerable or that it was unable to

8    effectively manage certain strategies, that that type of

9    testimony would not be relevant.  As I understand it, what

10   you're really saying is, we just want to say how things

11   happened in relation to the system, and we want to be able to

12   talk about that.  But you don't need to talk about

13   vulnerabilities or the inability of Mango Markets to do things,

14   because I think the government's concern there is that it would

15   be impermissible victim blaming.  So absent some separate

16   grounds for relevance, it should not be part of Mr. Sheridan's

17   testimony.  Again, I think this is really a wordsmithing thing,

18   but let's resolve the wordsmithing issue.

19        MR. GREENSPAN:  Yeah.  Your Honor, I think that's

20   exactly right.  I think it is a wordsmithing issue, and I agree

21   with you that the word "vulnerability" and "inability to

22   manage," I think both of those are not essential to the point

23   that we would like to deliver here, and I think, you know, we

24   will not elicit that sort of testimony.

25        THE COURT:  Okay.  Mr. Davis, help me out here in how

O3E1EISA

we resolve this, because it seems like with every issue,
there's not really a dispute at this time, but I understand the
government's concern that when Mr. Sheridan is on the stand,
there are issues that are going to come up that key into these
issues.  So what's the best way to resolve these in a way that
will provide proper guidance to the parties?

    MR. DAVIS:  Yes, your Honor.  And I have to say, two
initial reactions.  I think the Court understood that we asked
for the purported relevance for this testimony, and I have not
heard one.  And so for that reason, I think the best thing to
do is, we have identified these places in this opinion where
Mr. Sheridan purports to give his opinion about Mango Markets'
"inability to manage critical deficiencies."  I think from
"strategic utilization" gets——that entire bullet gets crossed
out.  This "platform vulnerability's acknowledgment," that
entire bullet and sub-bullet gets crossed out.  "The lack of
risk management and governance framework," that bullet gets
crossed out.  And I just have to say, like, I don't think this
is like a small wording thing.  I agree with you, you know, as
to the points certain words are——you know, we can wordsmith
around an issue.  If Mr. Sheridan is going to go up there and
say, Mango Markets had all these problems and basically had it
coming, and here's how.  They had critical problems, they were
alerted——without foundation, they were alerted of a potential
attack.  There's no relevance to any of that.  Mr. Sheridan's

O3E1EISA

1  opinion doesn't have any of and should generally be precluded.

2          THE COURT:  Why wouldn't it be relevant to a scheme to

3  defraud?

4          MR. DAVIS:  Because that's exactly what the cases say

5  it is not relevant to in the victim—blaming context.  In the

6  string of cases in the Eastern District of New York, victim

7  blaming, even highlighting that the victim was negligent, or

8  could have stopped it, that does not negate intent.  So that is

9  the exact opposite of what that string of cases said.  I don't

10  hear any dispute said.  And so for that reason, I think that

11  portion of the notice and any opinion about Mango Markets'

12  inability to manage critical deficiencies, lacking trade

13  restrictions, lacking governances, all of this, Mr. Sheridan's

14  opinion about all of that is irrelevant.

15          THE COURT:  Okay.  So just so I have it, it's the

16  bullet that starts, "Strategic utilization of market mechanics

17  without code violation"?

18          MR. DAVIS:  Yes, your Honor, that's one.  Then there's

19  platform vulnerabilities acknowledgment.  And then lack of risk

20  management, the last bullet in the notes.

21          THE COURT:  Okay.  And Mr. Greenspan, I'll give you an

22  opportunity to address the relevance particular to this "blame

23  the victim" or vulnerability issue, just so I understand what

24  your position is; or, if you tell me that you're not going to

25  elicit testimony on these three bullets, then we don't have an

O3E1EISA

1    issue here.

2              MR. GREENSPAN:  So it's very——I think we discussed

3    page 3, but they brought page 3 back up again.  I mean, the

4    first bullet under Strategic Utilization talks about no

5    manipulation of the code.  I think you've already ruled that

6    that's——I believe your Honor has ruled that that's relevant.

7    But they brought it up again.  So I don't think that there's

8    any reason to talk about that more.  I think they're really

9    talking about the next few bullets.

10             The next one——

11             THE COURT:  Well, let's not talk about the specific

12   language because I think I'm going to have to take this back

13   and issue a ruling just so everyone has clear guidance.

14             MR. GREENSPAN:  Fair enough.

15             THE COURT:  Their point is, there are some parts of

16   this that talk about how the system was vulnerable to an

17   attack, and they say that that is just not relevant to anything

18   that is going to come up at this trial.  You can talk about how

19   the code worked in practice, you can talk about what was

20   feasible or not under the code and the other aspects of the

21   system, but when you start talking about the fact that the

22   system was vulnerable to losses and vulnerable to an attack,

23   that goes to something that is inadmissible under the case law.

24   Do you agree with that and you're just not going to make that

25   argument, or do you have an argument for why that would be

O3E1EISA

1   relevant?

2          MR. GREENSPAN:  Understood, your Honor.  We do not

3   plan to blame the victims.  That's not the purpose of this.

4          But turning to page 4 and the Platform Vulnerabilities

5   Acknowledgment, this is information that was available to the

6   public.  And it was available to Mr. Eisenberg.  And so a lot

7   of these things, including, you know, the information about an

8   audit that was conducted in May of 2022, the Litepaper,

9   information about, you know, the fact that Mango Markets was—I

10  guess this is actually on page 5, but—that they were warned

11  about the specific possibility of a trade almost exactly—a

12  trading strategy almost exactly like the one—

13         THE COURT:  Why is that relevant?

14         MR. GREENSPAN:  Because it goes to—this is

15  information that was available both to the defendant, to Mango

16  Markets, and to everyone else, and the question here is the

17  materiality of the misrepresentations as well as the intent,

18  and the fact that—

19         THE COURT:  What misrepresentations are we talking

20  about again?  Maybe this is a better question for the

21  government.  I've heard a few references to misrepresentations

22  and materiality of those misrepresentations, but I don't see

23  anything in the papers that explains what those alleged

24  misrepresentations are.

25         MR. DAVIS:  Your Honor, this is the defendant

1    proffering this evidence and trying to seek an expert on this

2    grounds and saying it's material to some misrepresentation, so

3    the burden is on them to show that.  I was going to say, our

4    understanding is it's not relevant to materiality or intent.

5    We don't understand, truthfully, the materiality argument.

6    We'd be open to hearing what it is.  But what we've seen here

7    is now this idea that, in response to, here's the relevance,

8    the answer I heard was, this is publicly available and may have

9    been known by the public and by Mr. Eisenberg.  But that's not

10   what they're seeking to admit.  They're not seeking to admit

11   the underlying facts about their public availability.  They're

12   seeking to admit Mr. Sheridan's expert opinion about those and

13   what's relevant as to Mr. Sheridan's expert opinion about those

14   is to suggest to the jury that Mango Markets was at fault here

15   or Mango Markets had it coming, or that somehow the attack was

16   due to Mango Markets' lack of, I guess it's risk management and

17   governance frameworks, and that, your Honor, is irrelevant.

18            THE COURT:  All right.  Mr. Greenspan, do you have

19   something else for me?

20            MR. GREENSPAN:  Sure.

21            THE COURT:  Using that last example, when you're

22   saying the argument that Mango Markets was vulnerable to an

23   attack, which is the kind of thread through a lot of this, what

24   is that relevant to; the fact that they were vulnerable to an

25   attack, what could that possibly be relevant to?

O3E1EISA

1      MR. GREENSPAN:  Right.  Let me just——I want to clarify

2    one thing.

3      THE COURT:  Well, answer that question while it's in

4    my head, and then you can make your other point.

5      MR. GREENSPAN:  Yes, your Honor.  So the, you

6    know——there's this, you know——the misrepresentations involve

7    location, identity, intent to borrow, I mean, all of these

8    things, you know, at least if we talk about the March 2022

9    notification, are put out there, and, you know, the Mango

10   Markets DAO is aware that all of that is possible, and they

11   choose not to do anything about it.

12     THE COURT:  Well, their awareness of anything, how is

13   that relevant to the charges that are in the indictment?

14     MR. GREENSPAN:  The question is whether——

15     THE COURT:  Is there an element of reliance, like

16   reasonable reliance in a civil context?

17     MR. GREENSPAN:  No, your Honor, but there has to be

18   some materiality to those misrepresentations, both to the wire

19   fraud and, at least arguably for Count One, the commodities

20   fraud.

21     One other point that I want to make is that Mango

22   Markets itself is——at least to this point, has not been

23   identified as a victim.  The Mango DAO has been identified as a

24   victim and the customers have been identified as a victim.  So

25   to extent that there's some concern about a "blame the victim"

O3E1EISA

1    here, nobody has, you know——there's no blame here to the
2    customers, and this is about Mango Markets, not the DAO.
3         THE COURT:  Okay.  I understand the parties'
4    arguments, and I have the identified sections from the
5    government that they are challenging, and we will issue a
6    ruling on the "blame the victim" issue that the government has
7    asserted.
8         Mr. Davis, what's next in Mr. Sheridan's opinion, or
9    we can move to Dr. Montgomery?
10         MR. DAVIS:  I think that's it, your Honor.  I
11    think——obviously, we submitted a rebuttal expert notice for
12    Mr. Jain responding to certain opinions that Mr. Sheridan put
13    forth.  Many of those we sought to exclude today.  Looking
14    through them, I think many of them may be addressed by the
15    Court's forthcoming ruling on this pending victim-blaming
16    motion, but, you know, I'm happy to address that supplemental
17    response now if the Court wants, or we can wait till after
18    Dr. Montgomery's——
19         THE COURT:  Well, I think the Jain rebuttal is a
20    rebuttal to Dr. Montgomery's opinion, correct, in large part,
21    because it focuses on the issue of manipulation?
22         MR. DAVIS:  Yes.  So there's some of that too, and
23    then there is also to Mr. Sheridan or a weakness opinion as
24    well, so it's kind of a mixed rebuttal, but I defer to the
25    Court on how you want to address——

O3E1EISA

1    THE COURT:  Yes, it's interrelated because part of the

2    Oracle issue also touches on the possibility of manipulation

3    and the fact that the Oracle strategy was designed to prevent

4    manipulation, so I think it's related.  So let's talk about

5    Dr. Montgomery.

6         So first, on this comparison between conventional

7    swaps and the perpetuals that are at issue in this case, I

8    agree with you that Dr. Montgomery cannot offer some other

9    definition of "swap" because "swap" is defined in the CEA.  So

10   that's very clear.  And Mr. Greenspan, I don't understand that

11   Dr. Montgomery will be trying to redefine "swap" or opine on

12   even whether the perpetuals fall into the statutory definition

13   of "swap"; is that correct?

14        MR. GREENSPAN:  That's exactly right, your Honor.

15        THE COURT:  So why is there a disclosure that talks

16   about a comparison between the perpetuals and conventional

17   swaps?

18        MR. GREENSPAN:  Your Honor, this is directly in

19   response to the disclosure of Jain, or Jain is essentially

20   going to do exactly the same thing in comparing perpetual

21   futures and talking about them and how they are similar to──I

22   think he said products in traditional markets.  I'd have to

23   pull up the exact language.  But essentially we view this as

24   Jain is going to say why the perpetuals──

25        THE COURT:  Are similar.

O3E1EISA

1          MR. GREENSPAN:   ——are similar, and therefore, they're

2     going to argue are swaps, and we're going to say the opposite

3     through our expert.

4          THE COURT:  Mr. Davis?

5          MS. HUANG:  It's actually me, your Honor, for this

6     one.

7          THE COURT:  Okay.  Great.  Sorry about that.

8          MS. HUANG:  No worries.

9          I actually think that's an incorrect reading of the

10    disclosure, your Honor.  If you take a look, it's ECF No. 87,

11    page 4, with Mr. Jain.  In paragraph 3, he does, as

12    Mr. Greenspan notes, talk about how he is going to explain

13    about how, for example, various concepts and economics of

14    derivative contracts, futures contracts, spots exchanges, and

15    swaps and commodities in foreign exchange markets, and he'll

16    explain that similar products and concepts are often available

17    in the cryptocurrency market, including Mango Markets.

18         What they have done in their opposition here is they

19    tried to tie that to Mango's perpetuals as well.  If you see

20    actually in paragraph 5, where Mr. Jain makes it explicitly

21    clear that what he is doing is just include an analysis of the

22    characteristics, pricing, and economic features of a type of

23    product available to users of Mango Markets called a perpetual

24    futures contract.  So the link is quite different here.  It's

25    subtle, kind of, but it's actually distinctive in that they're

O3E1EISA

1    actually trying to make a comparison with what Dr. Montgomery

2    calls a conventional swap with the perpetuals, whereas here,

3    what Mr. Jain is doing is actually just presenting, for

4    example, what's available out there in the commodities field

5    and also then saying, here's what's available with Mango's

6    perpetuals.

7        THE COURT:  What's the relevance of that testimony

8    from Mr. Jain?

9        MS. HUANG:  The relevance here——

10       THE COURT:  Doesn't that run into the same problem?  I

11   understand that Mr. Eisenberg hasn't moved to exclude the

12   opening opinion from Mr. Jain, but he is contesting the

13   exclusion of Dr. Montgomery's similar——it may not be exactly

14   the same, but similar proposed testimony.  So why don't we just

15   get rid of both of them and we won't have an issue.

16       MS. HUANG:  The Court's indulgence for a second.

17       (Government counsel conferring)

18       MS. HUANG:  So, your Honor, I think the difference

19   here is, first of all, in terms of relevance, right, as your

20   Honor earlier noted, the jury is going to come in, this is

21   going to be an entirely new world for them, with Mango Markets,

22   with cryptocurrency, and so it's important for an expert to

23   come in, to explain to them what a perpetual futures contract

24   is and what the features are.  That's what Mr. Jain is trying

25   to do.

O3E1EISA

```
1              THE COURT:  If that's all he's going to do.  But I
2    don't think that's the concern.  I think the concern is that
3    he's going to say, well, there are these things in my line of
4    business outside of the cryptocurrency space and I deal with
5    swaps all the time, and guess what, like, they're also in the
6    crypto space; for instance, these MNGO perpetuals.  And as I
7    understand Dr. Montgomery's proposed testimony, he's just
8    saying, well, there are actually differences between MNGO
9    perpetuals and conventional swaps like you just heard about
10   from Mr. Jain.  That's the issue.
11             MS. HUANG:  I think it's going back to your Honor's
12   earlier point about the wordsmithing.  That's conventional,
13   right?  As your Honor noted earlier, you will be providing a
14   definition of "swaps," and hearing that kind of terminology as
15   conventional, this is what the standard, typical practice is,
16   that's the problem I think we have with that framing.
17             THE COURT:  And you're not going to be suggesting that
18   the perpetuals here or anything like them are similar to swaps
19   or other contracts that you might find in the noncrypto space,
20   right?  The kind of opposite of Dr. Montgomery's proposed
21   testimony.
22             MS. HUANG:  We're going to give your Honor kind of the
23   context, right, in the typical market of what it is, to give
24   the background so that the jurors are able to understand what a
25   perpetual is, but it's not the same in terms of here's the
```

O3E1EISA

1    typical standard, of what I see, and how this is similar or

2    dissimilar from that.  I think that's the difference here.

3              THE COURT:  Okay.  So I think the way it's going to

4    work is, Mr. Jain is going to testify with the understanding

5    that he's going to stay within those parameters, providing

6    background, the background on the industry and these

7    instruments, which is what I understand he is going to testify

8    about.  Then the government will be allowed to respond in kind.

9    However, in the vein of giving appropriate guideposts here,

10   neither side will be permitted to say that the perpetuals in

11   this case fall into a definition of "swap" or refer to a

12   definition of "swap" that is not contained in the statute at

13   all.  So they should not say, this is not a conventional swap;

14   and I think that that principal is consistent with Judge

15   Furman's decision in *Chastain*, which the parties have cited, in

16   which he provides additional guidance on what the parties

17   should do.  But it appears that that's not really going to

18   happen.  It's really a reaction to not knowing what Mr. Jain is

19   going to testify about.  But what he's going to testify about

20   is just, there are these types of instruments out there and

21   there are various instruments that are also in the crypto

22   space; and then Dr. Montgomery can fairly respond to that

23   opinion.  You're not taking the position that Dr. Montgomery is

24   paralyzed from responding to that opinion.

25             MS. HUANG:  Not at all, your Honor.  It's just, again,

O3E1EISA

 1    the conventional part, I think that threw us off a little bit

 2    here.

 3            THE COURT:  Okay.  And Mr. Greenspan, is there any

 4    reason why you need to refer to the other thing you're

 5    comparing the perpetuals to as conventional swaps?  I think the

 6    problem there, as Judge Furman recognized in *Chastain*, is that

 7    it may suggest to the jury a different definition of "swap"

 8    than is in the Commodities Exchange Act.

 9            MR. GREENSPAN:  No, your Honor.  If Mr. Jain refers to

10    the commodities exchange market, then Mr. Montgomery can refer

11    to them in the exact same way.

12            THE COURT:  And not refer to conventional swaps.

13            MR. GREENSPAN:  Yes, your Honor.

14            THE COURT:  Okay.

15            MS. HUANG:  Or traditional, your Honor.

16            THE COURT:  Or traditional swaps.  Neither

17    conventional nor traditional swaps.  We deal with the "swap"

18    definition in the Commodities Exchange Act.

19            Okay.  We've been going for like an hour and 45

20    minutes.  Does anyone need a break?

21            (Discussion off the record)

22            THE COURT:  So the next issue, I think, concerns this

23    issue of artificial price, which is a tough one.

24            So who's going to handle this from the government's

25    side?

O3E1EISA

1         MS. HUANG:  I'm going to handle everything related to

2    Dr. Montgomery, your Honor.

3         THE COURT:  Okay.  So what's the primary concern?  And

4    let's just get the disclosure out, and you can point me to the

5    particular language that the government has a concern about.

6         MS. HUANG:  Sure, your Honor.  And as your Honor

7    knows, there's three disclosures at this point relating—

8         THE COURT:  Now we're looking at the latest one,

9    right?

10         MS. HUANG:  Yes, the latest one.

11         THE COURT:  Which is February 26, 2024.

12         MS. HUANG:  Exactly, your Honor.  It's ECF 91-1.  And

13    we articulate this too in our *Daubert* motion as well, as well

14    as our letter on this too.  But the issue is that

15    Dr. Montgomery, when it comes to artificial price, he is both

16    defining it, which is encroaching on the Court's role here, and

17    then there are other issues with that definition, including

18    that, again, the Court should be defining "artificial price."

19    We also believe—

20         THE COURT:  What is the definition of "artificial

21    price"?

22         MS. HUANG:  Sure.  Your Honor, so in *Amaranth*, the

23    definition—it's, first of all, enumerated as an element, but

24    in terms of the definition of "artificial," and I think there's

25    some dispute with the parties too about what was done in

O3E1EISA

Phillips.  That was on the point of "artificial," not

"artificial price."  But I think they basically tried to

dispute that that was actually even defined.  But if your Honor

actually took a look at the actual jury instructions there,

further down, there are kind of the same language regarding

intent that we've discussed in our papers.

        THE COURT:  So in Phillips——and this is consistent

with cases like *Set Capital*——the term that is being defined is

"manipulative act," and then the definition of that term has a

bunch of different words that are used, almost like buzzwords.

Like "artificially affect the price," "inject false trading

signals, pricing signals," and then there's this issue of

open-market conduct being potentially within that category if

it is coupled with manipulative intent, right?

        MS. HUANG:  Exactly, your Honor.

        THE COURT:  Okay.  But is there a case that I can look

at that provides an authoritative definition——and the answer

might be there is not one——of what it means to have an

artificial price?

        MS. HUANG:  With the Court's indulgence, I can pull up

something with a little bit more references.

        THE COURT:  And I'll allow the government, if you want

to, you can put that in this paper form if it's going to take a

second.

        MS. HUANG:  One second, your Honor.

O3E1EISA

1           MR. GREENSPAN:  Your Honor, we cited the definition in

2    *In re Amaranth Natural Gas*, referring to the natural interplay

3    of supply and demand.

4           THE COURT:  That's also the definition given for

5    "manipulative act."  That's what I'm trying to understand.  Let

6    me put it this way.  There is not absolute lucid clarity as to

7    the definition of some of these terms.  But I'm really asking

8    this just so I understand what we're going to be dealing with

9    when we get down to the question of putting together jury

10   instructions.  Obviously, in *Phillips*, there was no definition

11   of "artificially affecting," which is the way that it was used

12   in the instructions, but there were some references to it,

13   wasn't there?

14          MR. BURNETT:  So just because I've been at this for a

15   while, unfortunately, so, I think they only did it that way in

16   *Phillips* because there's only what is a Count One charge here,

17   so we didn't actually need to show an artificial price, unlike,

18   with respect to Count Two in this case, where we do need to

19   show an artificial price, the Court didn't actually need to get

20   to like articulating the definition of "artificial price" as

21   opposed to "artificial price effect," or trying to inject an

22   artificial price signal, which is the manipulation part of

23   things.  I think as a practical matter, from our perspective,

24   they come pretty close to blending together, in the sense that

25   our definition of "artificial price" is a price that is set not

O3E1EISA

1    by natural——that is set by——sorry.  The price is artificial if

2    it is not set by the natural interplay of supply and demand but

3    is rather rigged or controlled by the acts of the manipulator.

4    And then as in *Phillips*, some ways the only way to distinguish

5    between an artificial price and a nonartificial price is the

6    scienter of the trader, and that is because artificial——whether

7    a price is artificial or not depends on whether it's set by

8    legitimate or illegitimate factors.  A motivation simply to

9    trade to control the price is not a legitimate factor.

10            THE COURT:  Okay.  That's helpful.  So it's very close

11   to the definition of "manipulative act."

12            MR. BURNETT:  That's right.  And I think my colleague

13   is pulling some of this up.  This——but I don't think there's

14   been a jury instruction to my knowledge.  Maybe there's been

15   one or two in like the Northern District of Illinois on this

16   point.  But I think there's some case law in the Northern

17   District of Illinois, I think it's like the *Kraft Food* cases,

18   where they give like a more extensive explanation of this term.

19   But basically the point is it's effectively the same as the

20   open market manipulation standard from *Set Capital*, where

21   the——if someone is rigging the price by intentionally engaging

22   in open market trading to control the price, that is an

23   artificial price.

24            THE COURT:  Okay.  So, Mr. Greenspan.

25            MR. GREENSPAN:  Your Honor, I think their version of

O3E1EISA

1    "artificial price" just swallowed the entire manipulation

2    count.

3              THE COURT:  Before you get to that, you at least agree

4    on the natural interplay between supply and demand; you agree

5    on that?

6              MR. GREENSPAN:  We do, your Honor.  We notice that

7    that was the definition they gave in their opening brief.  We

8    adopted it and said we didn't have a dispute with them.  We

9    cited cases that we thought supported that.  And that's the

10   definition that's also in Mr. Montgomery's disclosure.

11             THE COURT:  I just want to understand:  Do you agree

12   on that part of it, okay?

13             MR. GREENSPAN:  Yes, your Honor.

14             THE COURT:  Okay.  So let's get back to the

15   government.  You don't have an issue with Dr. Montgomery

16   opining that the trading conduct here was the reflection of the

17   interplay between supply and demand, right?  Because you agree

18   that that's part of the definition, which goes to the

19   underlying economics here, and so you're not complaining to the

20   extent Dr. Montgomery, in this paragraph, tries to define

21   "artificial price," just on that part?

22             MS. HUANG:  I think, your Honor, the issue is that

23   with that word "natural," right, because here what we are

24   saying is that he did it with manipulative intent, that

25   he—that this is artificial because of his intent here.  That's

O3E1EISA

1   I think the daylight between the two of us——

2           THE COURT:  I understand that issue.  But I'm saying,

3   let's say for the moment that Dr. Montgomery did not refer to

4   artificial price, he just didn't use that term, but opined,

5   based on his economic expertise, on the nature of the

6   instruments here, the lack of cash flows, and the fact that

7   open-market trading activity would be the reflection of supply

8   and demand in the market or based on his experience and his

9   review, and stop there.  Okay.  Under those circumstances, you

10  would not have an objection to Dr. Montgomery's opinion; is

11  that fair?

12          MS. HUANG:  As long as the "natural" part isn't in

13  there, I think we would be——but it's just simply supply and

14  demand, because he's——

15          THE COURT:  So you're saying that, yeah, on

16  cross-examination, you can confirm that there were other

17  aspects of the inquiry that Dr. Montgomery did not address

18  because he's not qualified to address them because he's coming

19  in as an economics expert, right?  So within the field of his

20  expertise, as to the components of what would go into the

21  artificial price inquiry, there's not an objection to

22  Dr. Montgomery covering all those things, fair?  If I put it

23  that way?  Meaning that he can talk about the lack of cash

24  flows, he can say——he's just saying that that means that

25  there's no fundamental value but that's just his

O3E1EISA

1    characterization of when there's not a lot of cash flow and he

2    says, based on that, the market trading activity would be a

3    reflection of supply and demand, and that's the substantive

4    part of Dr. Montgomery's opinion.

5            MS. HUANG:  And I think, your Honor, just to be——

6            THE COURT:  And there's no issue with that.

7            MS. HUANG:  Yeah.  I just wanted to clarify.  This is

8    simply describing; for example, there's no labeling of it being

9    natural, no labeling of the artificial price.

10           THE COURT:  There's no reference here to natural, so I

11    don't think there's——

12           MS. HUANG:  I think it's in their——in his disclosure

13    documents, there were references to natural interplay of supply

14    and demand.

15           THE COURT:  Okay.  And the concern there is that

16    "natural interplay" would——the alternative is an artificial

17    price?

18           MS. HUANG:  Yes, your Honor.  If you take a look at——

19           THE COURT:  I've got the reference.

20           Okay.  So then what we're talking right now is the

21    second bullet.

22           MS. HUANG:  Yes, your Honor.

23           THE COURT:  Okay.  So just if we were to strike the

24    second——

25           MS. HUANG:  The "natural" there; that is, "the natural

O3E1EISA

interplay of supply and demand," and makes that the result of

the interplay of supply and demand on the open market.

THE COURT:  Okay.  And then do you have an issue with,

"On the open-market, absent wash trades is not artificial"?

MS. HUANG:  Yeah, with the label "artificial," your

Honor.

THE COURT:  Right.  So basically you're saying that if

we just had the first sentence and then the second sentence

in──I mean, this is like wordsmithing, but I really want to

understand the dimensions the government's argument here.  I'm

not trying to wordsmith this disclosure.  I'm trying to

understand precisely what it is that's being objected to so I

understand that "natural interplay of supply and demand" is an

issue and the references to "artificial price," and the reason

for both of those objections is that it would usurp the Court's

role in instructing the jury as to what the definition of

"artificial price" is, which includes, among other things,

market activity that would, under either circumstances, be

permitted but it's coupled with manipulative intent; is that

fair?

MS. HUANG:  That's fair, your Honor.

THE COURT:  Okay.  So Mr. Greenspan, help me out here.

MR. GREENSPAN:  Sure, your Honor.  I mean, I think

we're──we've──you know──because we ended up having multiple

rounds of briefing on this, you know, we sort of went round and

O3E1EISA

```
 1    round in circles, but the——basically the position we have
 2    is——and some of this is going to be addressed in the
 3    instructions——is that *Amaranth* makes clear and a number of
 4    other cases make clear that manipulation has four elements.
 5    One of them is artificiality and another is intent.  Those are
 6    separate elements.  And the government's definition is that
 7    artificiality subsumes intent; and in fact, it subsumes all
 8    four of the elements.
 9              THE COURT:  But why is Dr. Montgomery even qualified
10    to testify as to artificiality, as it's understood under the
11    case law definition of that element?  He's an economics expert
12    so let him talk about economics, meaning that all the
13    underlying testimony that supports whatever conclusion you are
14    going to ask the jury to reach on the elements of the offense,
15    I'm not even hearing that there's an objection to any of that.
16    It's really that when Dr. Montgomery is opining as to the
17    ultimate standard, that's something that he does not have any
18    expertise to offer an opinion on, it's potentially confusing to
19    the jury, and it potentially usurps the Court's role in
20    instructing the jury as to what the law is, and for those
21    reasons, there's no reason to get there, and certainly on a
22    402, 403 argument, I don't see how the risk of confusion would
23    not substantially outweigh the probative value, given that all
24    the underlying arguments are coming in; all the underlying
25    economic testimony, what the instruments are, how they operate,
```

O3E1EISA

```
1    that's all coming in.

2              MR. GREENSPAN:  Fair enough, your Honor.

3              So the ultimate——just so I understand, the ultimate

4    resolution here is we're going to strike the word "natural" and

5    we're going to strike "is not artificial" from the second

6    bullet point?

7              THE COURT:  Right.

8              MS. HUANG:  I think there were other references.

9              THE COURT:  There's other references to "artificial

10   price" and "cannot be artificial" and "was not artificial."

11   Just a way of redoing that where he says, look, like, there

12   were no cash flows so anything that happened with this

13   particular instrument was going to either jack up the price or

14   lower the price, and it's a thin market so it was going to have

15   an impact on the price, and that's what I saw when I reviewed

16   these instruments.  And then you in argument obviously will

17   take that testimony and then make permissible arguments based

18   on, you know, how can we figure out the instructions here.

19             MR. GREENSPAN:  Understood.  We have no objection to

20   that, your Honor.  Thank you.

21             THE COURT:  From the government's side, any issues,

22   any remaining issues with that particular strand of the

23   argument?

24             MS. HUANG:  I think, your Honor, we put this

25   underneath the hood of the artificial price aspect, but for
```

O3E1EISA

example, we——and this is going back to actually *Daubert* motion,

not the more recent materials, but we talked about, for

example, how Dr. Montgomery's analysis, he doesn't actually

account for the dramatic increase in the Mango Perps because of

Dr. -- because of Mr. Eisenberg's trading.  We cited a bevy of

cases there to kind of show why that's problematic, and makes

his opinion here unreliable.

          And then also on the——on his kind of position

regarding Mango being thin and illiquid, there's no work that's

being shown by his part of how he has a basis to state that.

It's just kind of simply said.

          THE COURT:  Well, isn't it fairly obvious that where

there's a thin market with intermittent order flow, it is going

to have potentially large swings based on trading that's of

sizeable volume?  I mean, I think that what he's saying is

that——well, what he actually says is a thin market, as referred

to by Dr. Mordecai, is——a market with de minimis and/or

intermittent order flow.  When a market is thin, it is

vulnerable to large price swings, particularly when a sizeable

transaction is made.  And I take it that Dr. Montgomery will

back that up with some economic understanding of when a market

is thin, that means that there's not that much trading, so if

there's going to be a big order that comes in, that will have a

more dramatic impact on that particular instrument than it

might if there is a huge market for, a very thick market for a

O3E1EISA

particular item.  Is that fair, Mr. Greenspan?

MR. GREENSPAN:  Yes, it is.  Thank you, your Honor.

THE COURT:  Okay.  So I understand the government's concern, but I think that that basis will be furnished, and if not, then you can certainly object during Dr. Montgomery's testimony.

MS. HUANG:  Thank you.

THE COURT:  And I think that those last two arguments you raised go to the weight of Dr. Montgomery's testimony and not the threshold admissibility.

Anything else with respect to Dr. Montgomery?

There were two additional issues that the Court identified.  One was potential testimony concerning the intent of traders in financial markets to conceal their trading strategies, and as to that, as I understand the testimony, Dr. Montgomery is going to opine, based on his industry knowledge and his education, experience that, given the realities of the trading market and the fact that when a strategy is implemented, it may disclose then the ends of the trading strategy might be defeated.  It is just industry practice to conceal certain types of strategies.
Mr. Greenspan, am I more or less on the right page there?

MR. GREENSPAN:  That's exactly right, your Honor.

THE COURT:  Okay.  And maybe the government can explain what the nature of the objection is to Dr. Montgomery

O3E1EISA

1    providing that kind of testimony.  Is it based on his lack of

2    trading experience or another concern?

3              MS. HUANG:  Well, your Honor, first of all, I think we

4    were obviously concerned about the language there, where he

5    specifically talking about contingent strategies, we wanted to

6    make sure that he is not actual opining on the intent and

7    motives of these traders, given that there's a lot of case law

8    stating that an expert cannot, you know, read minds and go into

9    that.

10             But actually, related to the qualification point——and

11   this is kind of, I think, as your Honor has seen, we've now had

12   three disclosures and there's been kind of a moving target.

13   And I think, you know, we can go into it too about how I

14   believe that the positions here, the opinions, have actually

15   evolved as we've raised issues, and that really kind of raises

16   questions to us about exactly what Dr. Montgomery is going to

17   testify on and what his basis is.  And here, this is——they say

18   here that Dr. Montgomery, while he's not a trader, he has

19   extensive experience in "management of investment portfolios."

20   However, if you actually look at what he has experience in,

21   that's not what it says.  In his CV, what it says is that he

22   also has provided analysis on issues related to the management

23   of investment portfolios, and investment companies.  That's not

24   the same as actually managing them.

25             THE COURT:  You're not questioning Dr. Montgomery's

O3E1EISA

1  experience and background in financial economics, securities,

2  and valuation generally?  I mean, isn't this fodder for

3  cross-examination if Dr. Montgomery is testifying about things

4  and they don't squarely fall within the metes and bounds of his

5  professed experience?  Because we have an expert with these

6  types of credentials, and a point that would be fairly evident

7  if you had any experience in financial economics, it seems like

8  Dr. Montgomery's background, including work as an economist for

9  the Federal Reserve Board, President's Council of Economic

10  Advisors, and the International Monetary Fund would give him

11  enough of a background to opine on some of these issues,

12  general issues on what trade——what would be reasonable to

13  expect in terms of people's trading strategies.

14         On your point about intent, I take that point, and

15  again, consistent with the other points that we've made here,

16  Mr. Greenspan, you will make sure that when Dr. Montgomery is

17  testifying, he may testify as to industry practice concerning

18  strategies, he should not veer into speaking about the intent

19  of those other traders or anything of that kind; is that clear?

20         MR. GREENSPAN:  Crystal clear.  Thank you, your Honor.

21         THE COURT:  Okay.  Does that address the government's

22  concern?  You're going to be able to cross-examine

23  Dr. Montgomery if you don't feel that his qualifications meet

24  whatever testimony he offers on the stand.  But I think for

25  purposes of Rule 702, he meets the standard for sufficient

O3E1EISA

1    qualifications.

2            MS. HUANG:  Thank you, your Honor.

3            THE COURT:  Okay.  And last, there's one additional

4    point, which is, testimony concerning that "many US

5    dollar-denominated instruments considered part of the US money

6    supply are issued by private entities, so issuance by a private

7    entity and therefore not a unique characteristic of

8    cryptocurrency which is offered as a response to testimony from

9    Mr. Jain.  Or at least that's what is suggested by

10   Mr. Eisenberg.  And that particular testimony is that USDC is

11   different from the US dollar, including that it is issued by a

12   private entity.  And the defense says that if that statement

13   and that testimony is not offered by Mr. Jain, then they would

14   consider withdrawing the testimony identified by the

15   government.

16           MS. HUANG:  So, your Honor, I think this kind of goes

17   back to what we were earlier talking about with Mr. Jain as

18   well.  This is again trying to explain to the jurors about what

19   USDC is and what the features of it are.  So it's comparing it

20   to the US dollar there.  What they're trying to do now, though,

21   is trying to drag in US dollar-denominated instruments, which

22   there's a whole breadth of what that actually encompasses, and

23   also, of course, as we noted in our brief, especially with what

24   they cited too and given Dr. Montgomery's experience at the

25   Federal Reserve, that just makes it into a trial within a trial

O3E1EISA

1   that would involve monetary policy, all of these confusing

2   issues that have no actual relevance or bearing on this case.

3              THE COURT:  Okay.  And the argument that you're making

4   is a 402, 403 argument?

5              MS. HUANG:  Yes, your Honor.

6              THE COURT:  Okay.  Mr. Greenspan, what's the relevance

7   of this testimony?

8              MR. GREENSPAN:  Your Honor articulated it well, and I

9   think it's a discrete point, and I actually don't think that it

10  would get into any of those concerns that the government is

11  talking about.

12              The government has said that USDC is different from

13  the US dollar.  It stressed that one of the differences, and I

14  think the point that they're trying to make is that it goes to

15  the medium of exchange argument that your Honor ruled was still

16  alive on for trial.  And Jain's——Mr. Jain's notice highlights

17  the fact that it's privately issued, and Mr. Montgomery——or

18  Dr. Montgomery is simply showing that the fact that it's

19  privately issued is essentially meaningless.

20              THE COURT:  Wait.  Do that again for me, because you

21  referenced a medium of exchange argument, and I just want to

22  make sure I understand.  You certainly have a position

23  concerning medium of exchange, but that has not been addressed

24  in any way in these briefs.  And so is that the relevance of

25  this testimony?  As I understood it, as articulated in the

O3E1EISA

briefs, the sole relevance of this testimony was as rebuttal
for testimony that is going to be offered by Mr. Jain; is that
fair?

MR. GREENSPAN:  That's right.  It's going to rebut
Mr. — you know, we view this as—and, you know, again, it's
like reading tea leaves here.  Your Honor talked about—we're
looking at pretty limited disclosures.  But our understanding
was that Mr. Jain was going to try to put daylight between USDC
and the US dollar, in part to rebut the argument that
Mr. Eisenberg has advanced about USDC serving as a medium of
exchange and that going to the contract of sale.

THE COURT:  Okay.  So what's the relevance?  Again,
we're going to get into whether Mr. Jain should be talking
about any of this stuff.  So why is Mr. Jain offering his
opinion and does he need to?  If you withdraw that opinion,
there's going to be no basis for Dr. Montgomery to respond to
anything.

MS. HUANG:  Your Honor, if they give up the opposition
on the dollar point, then I think we're good.

THE COURT:  Okay.  Then it's out.  Mr. Jain's not
going to have that testimony.

MR. BURNETT:  Wait, wait, wait.  I want to make sure
we're clear by "give up."  So the reason it's in there is
because there was extensive discussion during the motion to
dismiss about the defense saying USDC is effectively the same

O3E1EISA

thing as the dollar.  If they're not going to make that

argument at trial, then Mr. Jain doesn't need to testify to

that point, but I'm not hearing that from the defense.  So if

that's the representation of the defense, fine, but otherwise——

THE COURT:  I don't know that it is.  But we had

motions *in limine* here, and this is not one of the motions *in*

*limine* that was raised, right?  I assume that the parties would

have——

MR. BURNETT:  It wasn't raised because we assume

they're making it and this is our position; this is our

introducing evidence on that point.

THE COURT:  Mr. Greenspan, the offer is on the table

that if you're not presenting this medium of exchange argument

at trial, then Mr. Jain will not testify on the differences

between USDC from the dollar and then Dr. Montgomery need not

testify as to the similarities.

MR. GREENSPAN:  I'm sorry to say that's not an offer

we can accept.  I mean, that's been and continues to be an

important part of our defense.  And if Mr. Jain wants to opine

on it and try to disprove our defense, I think we're entitled

to have an expert rebut that.

THE COURT:  Okay.  That's fine.

So what we're going to do for purposes of this motion

is Mr. Jain is going to be permitted to testify, and we will

see what the bounds of Mr. Jain's testimony are and then that

O3E1EISA

1    will define the contours of what Dr. Montgomery, in fairness,

2    is able to do in response that would be fairly responsive to

3    Mr. Jain's testimony.  But I understand the daylight between

4    the two statements as they are identified in the disclosures,

5    but I agree with Mr. Greenspan that we're going to have to see

6    how the testimony comes in and what the scope of it is to

7    understand what Dr. Montgomery is either permitted or not

8    permitted to do.  So on that basis, the motion on those grounds

9    will be denied.

10          Mr. Burnett, it seemed like you wanted to raise a

11    deeper point here.

12          MR. BURNETT:  Just one.  So I think there's some kind

13    of more fundamental issues with Mr. Montgomery's proposed

14    testimony here, but just like as a practical trial mechanics

15    thing I'm thinking through, like, whether──so waiting for

16    Mr. Jain to testify and then deciding what Mr. Montgomery can

17    do puts us in a little bit of an awkward spot, because if we

18    want to embed responses to what Mr. Montgomery is going to say

19    into Mr. Jain's testimony, we can't do that without knowing

20    what Mr. Montgomery is going to potentially say, so I'm just

21    wondering if maybe we could have like another round of kind of

22    more specific briefing on this, like either during trial or in

23    advance of Mr. Jain testifying, or we could get a little bit

24    more guidance, you know, out early so we can decide kind of how

25    far Mr. Jain will go on this, if there are things about

O3E1EISA

1    Mr. Montgomery's testimony that he'll be allowed to say that

2    Mr. Jain will want to address.

3            THE COURT:  Let me ask Mr. Greenspan:  If Mr. Jain

4    does not testify as to this issue, then Dr. Montgomery is not

5    going to testify as to the issue either, is that fair, or is he

6    going to testify as to this regardless of what Mr. Jain does?

7            MR. GREENSPAN:  No, that's absolutely right.  This is

8    strictly for rebuttal purposes.

9            THE COURT:  Okay.  So what's the issue?  Why do we

10   need further rounds of briefing?

11           MR. BURNETT:  The reason we need further rounds of

12   briefing is, depending on what Mr. Montgomery is allowed to say

13   on rebuttal, there might be rebuttals to that rebuttal that we

14   would build into Mr. Jain's testimony, but we can't predict

15   that without knowing what he's going to be allowed to say.

16           THE COURT:  Well, this is what we're going to do.  So,

17   I mean, you've had Dr. Montgomery's disclosure.  I mean, I

18   understand you've objected to it on 402 and 403 grounds, but

19   you've had the disclosure.  So then wouldn't it have been

20   appropriate for the government to identify any supplemental,

21   further rebuttal from Mr. Jain they would want to include?  Why

22   do we need further rounds of this is what I'm trying to

23   understand.

24           MR. BURNETT:  Well, I think the extent to which

25   this——we delve into this topic is going to depend somewhat on——

O3E1EISA

1          THE COURT:  You have the disclosures as they stand, so

2     you can see the disclosures.  I understand your objection on

3     402, 403 grounds.  I'm saying that I'm not accepting that

4     objection for purposes of the *Daubert*, at this stage.  You can

5     obviously make any objections you want during the trial.  But

6     you know what the defense is proposing that he will testify to.

7     And so if there's some further statement, you could certainly

8     submit a letter, make an application for a further supplement

9     from Mr. Jain, and the defense can then come back and object to

10    that disclosure if they want to.  I think that's the proper

11    course.  I don't think any further rounds of anything is

12    necessary.

13         MR. BURNETT:  Thank you, your Honor.  I'm just trying

14    to game out the extent to which we need to get into, like, what

15    is the US money supply as calculated by the Fed, which I think

16    is kind of like a fundamental part of this and is very

17    different than any of the issues the jury would have to deal

18    with.

19         THE COURT:  Sure.  I imagine that there will be

20    further applications in this case.  So you can make a further

21    application and then the defense can object if they need to.

22         Okay.  Anything else on that?

23         MR. BURNETT:  No, thank you.

24         THE COURT:  Okay.  Anything else concerning

25    Dr. Montgomery?

O3E1EISA

1          MS. HUANG:  Nothing from the government, your Honor.

2     Thank you.

3          THE COURT:  Okay.  So then the last item on the agenda

4     is the motion to exclude the rebuttal testimony, the current

5     rebuttal testimony of Mr. Jain.  So I guess my question is—I

6     don't know who's going to handle this on the government's side.

7          Mr. Davis?  Okay.

8          So if Dr. Montgomery is not testifying as to

9     artificial price, then how is it that Mr. Jain can testify as

10    to the manipulation of price using those terms?

11         MR. DAVIS:  So again, just to frame here, we moved to

12    preclude a bunch of Mr. Sheridan's opinions that are the

13    predicate for this rebuttal testimony, but if Mr. Sheridan is

14    going to be permitted to put forward this idea that there's—a

15    low liquidity was the reason for this attack and that it was a

16    natural consequence that this attack was going to take

17    place—and we've gone over the reasons why that could be

18    precluded—then we need to be able to meet that with rebuttal

19    testimony.  So here, he's not talking about whether there was

20    actual manipulation of the trades at issue or opining on the

21    actual trades at issue here.  Mr. Jain's response is basically,

22    if he wants to say that, look, low liquidity leads to these

23    natural losses, Mr. Jain is going to say that's not—there's a

24    number of things that go into the ability to manipulate prices.

25         THE COURT:  So if that testimony that you identified

O3E1EISA

1   that the Court is going to issue a ruling on, providing

2   guidance on those I believe three bullets——

3              MR. DAVIS:  Yes.

4              THE COURT:  If that were out, especially as to the

5   particular statements that you identify, then what is left of

6   what you would be proffering in terms of Mr. Jain's rebuttal

7   testimony?

8              MR. DAVIS:  I don't think he would have anything to

9   rebut to at that point.  If those——if Mr. Sheridan is not

10  permitted to make these victim-blaming arguments that we've

11  identified, including the low liquidity argument, and also the

12  Oracle weaknesses argument that we've identified, I don't think

13  we have anything to rebut to.  I'm looking at my colleagues to

14  see if that's wrong, but that's my understanding.

15             THE COURT:  Okay.  Then we'll deal with

16  Mr. Eisenberg's motion to exclude rebuttal testimony from

17  Mr. Jain at the same time that we deal with those three bullets

18  that you have identified in Mr. Sheridan's argument.

19             MR. DAVIS:  I think that's totally fine.  We had three

20  different rebuttal points.  And just to clarify, the last one

21  also is something we addressed because it is rebuttal, which

22  is——

23             THE COURT:  Okay.  So just make sure I'm with you.

24             MR. DAVIS:  Yeah.

25             THE COURT:  What you just said in terms of being gone,

O3E1EISA

1    those parts of the Sheridan report being out, that applies to

2    rebuttal opinion 1A and rebuttal opinion 1B.

3    MR. DAVIS:  Yes, your Honor.  Which is like subsection

4    A and B in our response letter.

5    THE COURT:  Okay.  And rebuttal opinion 2.

6    MR. DAVIS:  Yes.  So now this is——this goes to a point

7    at which I think we also have clarity on now, so I'm trying to

8    think in realtime how——

9    THE COURT:  It's going to be out.  So——

10   MR. DAVIS:  Having heard that——I was reading the room.

11   THE COURT:  Yeah.

12   MR. DAVIS:  So it's out.  Understood.  But we've

13   clarified that we will be able to cross this——

14   THE COURT:  It's going to be out, so okay.  But the

15   Court will address the outstanding issues in Mr. Sheridan's

16   report as well as rebuttal opinion 1A and 1B from Mr. Jain's

17   report.

18   Okay.  Mr. Davis or anyone on the government's side,

19   anything else that we need to address in terms of the motions

20   *in limine* and *Daubert* motions?  And if you can, just a

21   second——I know everybody's been here for a long time——anything

22   else that we can productively do today?

23   MR. DAVIS:  Nothing on the motions or *Daubert*.  We

24   have a couple logistical things, but happy to hear from the

25   Court first.

O3E1EISA

1    THE COURT:  Mr. Greenspan or Mr. Klein, anything on

2    your end for these motions?

3    MR. KLEIN:  Nothing on motions.  We have logistical

4    things also.

5    THE COURT:  Thank you.

6    Mr. Davis, I'll let you go first.

7    MR. DAVIS:  We understand from the Court's individual

8    rules the trial schedule is 9 to 2 that we're here, and we're

9    just trying to game out our witnesses showing up on time and

10   all that.

11   THE COURT:  You know, that's what we have tried, but

12   we may go to a conventional trial day, just the usual.  What

13   would the parties prefer?  Would the parties prefer the Judge

14   Furman protocol?

15   MR. DAVIS:  Yes, your Honor.  Yes, your Honor.

16   MR. KLEIN:  Yes, your Honor.

17   THE COURT:  Okay.  We'll stick to it.  We aim to

18   please here.

19   MR. DAVIS:  Thank you, your Honor.

20   THE COURT:  We'll do that.

21   Any other issues?

22   MR. DAVIS:  I'm sure there will be other issues, but

23   not today, your Honor.

24   THE COURT:  Of course.

25   Mr. Klein.

O3E1EISA

|1| MR. KLEIN:  Your Honor, the jury instructions are
|2| currently due on the 20th, and, you know, we've got tied into
|3| obviously dealing with this hearing and preparing additional
|4| round of briefing.  We'd like a——and your Honor asked us to be
|5| careful about asking for extensions, but we would like a brief
|6| extension on that.  We have a hearing on the 26th at our
|7| pretrial conference, so we want to make sure the Court has them
|8| in advance, but the 20th is next Thursday, and we do want to
|9| spend time going through them with our client, and there's been
|10| some rulings here and things we want to process in terms of how
|11| we put them together.  So could we have till the——
|12| THE COURT:  24th?
|13| MR. KLEIN:  Yes, your Honor.
|14| THE COURT:  Yes, that's fine.
|15| MR. DAVIS:  No objection.
|16| MR. KLEIN:  And we'll split——and we can do the voir
|17| dire Thursday, the verdict form.  Just the jury instructions.
|18| THE COURT:  That's acceptable to the Court.
|19| All right.  Anything else from your side?
|20| MR. DAVIS:  One moment, your Honor.
|21| Nothing from the government, your Honor.  Thank you.
|22| THE COURT:  All right.  Anything else, Mr. Klein?
|23| MR. KLEIN:  Nothing, your Honor.
|24| THE COURT:  All right.  I really appreciate everyone's
|25| attendance here and the good argument on both sides.  Thank you

O3E1EISA

1    very much, and we will have our rulings out on the remaining
2    issues here.
3                ALL COUNSEL:  Thank you, your Honor.
4                THE COURT:  Thank you.  We're adjourned.
5                              o0o

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25