

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

April 2, 2024

**By CM/ECF**

Hon. Arun Subramanian
United States District Court
500 Pearl Street
New York, NY 10007

Re:   **United States v. Avraham Eisenberg, 23 Cr. 10 (AS)**

Dear Judge Subramanian:

The Government writes in response to the Court's March 29, 2024 orders (the "March 29 Orders") regarding anticipated legal issues that warrant addressing before the beginning of trial. This letter addresses the following topics, some of which go beyond those topics identified in the March 29 Orders: (1) the willfulness instruction and the application of *Apprendi* to the affirmative defense in 7 U.S.C. § 13(a)(5); (2) the materiality instruction; (3) the "in connection with" instruction; (4) the definition of "commodity"; (5) the instructions for the "swap" exceptions on which the defense plans to proceed at trial; (6) the defense's proposed extraterritoriality instruction; and (7) the description of the offenses in the jury instructions.

### I.     The Defense's Proposed Instructions on Willfulness are Incorrect.

With respect to Count One, the Court should instruct the jury on "willful" conduct as defined in the Government's proposed charge, and it should not instruct the jury that a finding of willfulness is required on the other charges. The defense's proposed charges are erroneous because they improperly require the jury to conclude that the defendant had "knowledge that his conduct was unlawful" and because the defense proposes to inject a willfulness requirement into the wire fraud statute.

### A.     Willfulness in the CEA Does Not Require Knowledge that Conduct Was Unlawful.

The parties agree that 7 U.S.C. 13(a)(5) of the Commodities Exchange Act ("CEA") criminalizes "willful" violations of regulations. The Second Circuit has long held that a conviction under substantially similar securities fraud statutes, such as 15 U.S.C. § 78ff, does not require proof that a defendant knew he was acting unlawfully. That law applies equally to the CEA.

The Second Circuit's decision in *United States v. Kaiser* resolved this issue. 609 F.3d 556 (2d Cir. 2010). The defendant in *Kaiser* challenged his conviction on the grounds that the Court failed "to instruct the jury that 'willfulness' requires knowledge of illegality." *Id.* at 568. The Circuit rejected that argument, finding that willfulness does not "require[] proof that the defendant

knew that his actions were illegal." *Id.* In reaching that conclusion, the Court relied in part on the fact that the securities-fraud laws allow the defendant to "raise the defense that he did not know the law to avoid imprisonment." *Id.* The Court concluded that this provision precluded a separate requirement that, for a conviction, the defendant needed to "kn[ow] he was violating the law." *Id.* The Second Circuit recently reaffirmed *Kaiser*, upholding a securities-fraud instruction that defined willfulness as acting "with a bad purpose, rather than innocently." *United States v. Petit*, No. 21-543, 2022 WL 3581648, at *4 (2d Cir. Aug. 22, 2022).

The decision in *Kaiser* is consistent with prior Circuit precedent and decisions in other Circuits and would therefore be erroneous. *See, e.g.*, *United States v. Dixon*, 536 F.2d 1388, 1395 (2d Cir. 1976) ("A person can willfully violate an SEC rule even if he does not know of its existence."); *United States v. Tarallo*, 380 F.3d 1174, 1188 (9th Cir. 2004) ("Under our jurisprudence, . . . 'willfully' as it is used in § 78ff(a) means intentionally undertaking an act that one knows to be wrongful; 'willfully' in this conduct does *not* require that the actor know specifically that the conduct was unlawful."); *United States v. O'Hagan*, 139 F.3d 641, 647 (8th Cir. 1988) ("Courts that have interpreted 'willfully' in [78ff] have reached the same conclusion that we reach in this case: 'willfully' simply requires the intentional doing of the wrongful acts— no knowledge of the rule or regulation is required."). It is also consistent with longstanding decisions from the Circuit and Supreme Court that, "[w]hen used in a criminal statute, [willfulness] generally means an act done with a bad purpose." *United States v. Screws*, 325 U.S. 91, 101 (1945); *accord United States v. George*, 386 F.3d 383, 393-94 (2d Cir. 2004) (explaining that "the criminal statutory *mens rea* term 'willful'" is interpreted "to require only the minimum *mens rea* necessary to separate innocent from wrongful conduct").[1]

Since *Kaiser*, courts in this District have routinely instructed juries that willfulness requires proof the defendant acted with a wrongful purpose. For example, in *United States v. Lumiere*, Judge Rakoff instructed the jury that, with respect to both wire fraud and securities fraud, to act "willfully" means "to act voluntarily and with an improper purpose." 16 Cr. 483 (Dkt. 61). This is consistent with a long line of District Court instructions. *See, e.g.*, *United States v. Hild*, 19 Cr. 602 (RA) ("To act willfully means to act voluntarily and with a wrongful purpose."); *United States v. Cole*, 19 Cr. 869 (ER) (same).

The defense's proposed instruction is not reconcilable with *Kaiser* and the long line of decisions applying that precedent. In support of its instruction, the defense cites *United States v. Kukushkin,* for the position that the defendant must act with "knowledge that his conduct was unlawful." 61 F.4th 327, 332 (2d Cir. 2023). But that reliance is doubly misplaced: For one, *Kukushkin* was addressing the willfulness element in the Federal Election Campaign Act—not the securities or commodities laws. *Id.* at 329. That distinction is important because the Second Circuit in *Kaiser* held that its willfulness decision was based in part on the "unique statutory language" in the securities fraud laws, which are mirrored in the CEA. 609 F.3d at 556. Moreover,

---

[1] The decision in *United States v. Kosinski*, 976 F.3d 135 (2d Cir. 2020) (which Judge Liman followed in *United States v. Phillips*), does not require a different result. *Kosinski* followed a line of insider-trading cases that "seemed to endorse a higher standard for willfulness." *Kaiser*, 609 F.3d at 569. The Second Circuit in *Kaiser* confined *Kosinski* to that slice of the law, reasoning that one who commits fraud is differently situated that one who commits insider trading. *Id.*

the question presented in *Kukushkin* was whether the Federal Election Campaign Act required a heightened willfulness instruction "similar to the chare provided for certain tax crimes." 61 F.4th at 330. The Circuit rejected that argument, and its characterization of willfulness was otherwise dicta. This Court should not read *Kukushkin* to have, *sub silentio*, overruled *Kaiser*—something that would have required the action of the full Court of Appeals.

The defense's proposed instruction also magnifies a problem that this Court identified during the final pretrial conference. During that proceeding, this Court inquired about how a jury was supposed to understand the meaning of a "wrongful" or "bad purpose" in the Government's proposed instruction. Juries, however, have been applying that standard in this District for years, and it is not hard to see how: Every day, people assess in their lives whether others have made an innocent mistake or acted with a bad purpose. Anyone who has been bumped on the subway has made a decision about whether it was an accident or an act of malice. The Government's proposed instruction simply has them apply that common sense to the courtroom, as required by the law. By contrast, the defense's proposed instruction asks the jury to perform an unfamiliar analysis. People in their everyday lives do not analyze whether others have acted knowing that their conduct is generally unlawful. It is the defense's instruction, then, that has the jury perform the more indeterminate analysis.

Finally, if this Court adopts the defense's view of willfulness (which it should not), it should not give the defense's proposed instruction as written. The defense proposes instructing the jury that willfulness means acting with "intent to do something the law forbids," without any qualifying language specifying what that means. That instruction, for instance, does not make clear that the defendant did not need to know about the particular law he violated, or that a mistake of law is not a defense. If the Court does not adopt the Government's instruction, it should at a minimum give an instruction similar to the one affirmed in *Kukushkin*.

### B. *Apprendi* Does Not Require a Different *Mens Rea* Analysis.

As explained above, the CEA makes it a felony punishable by up to 10 years' imprisonment for "willfully" violating any regulation, including Rule 180.1. 7 U.S.C. § 13(a)(5). The law also contains an affirmative defense, stating: "[N]o person shall be subject to imprisonment . . . for the violation of any rule or regulation *if such person proves* that he had no knowledge of such rule or regulation." *Id.* (emphasis added); *see United States v. O'Hagan*, 521 U.S. 642, 677 n.23 (1997) (characterizing analogous language in the securities-fraud laws as an "affirmative defense").

In the March 29 Orders, this Court asked the parties to address whether, in light of *Apprendi v. New Jersey*, 530 U.S. 466 (2000), the Government needed to prove the defendant's knowledge of the relevant rule or regulation (here, Rule 180.1) in order for him to be subject to a term of imprisonment. The Government respectfully submits that the answer is no.

In *Apprendi*, the Supreme Court held that "[i]t is unconstitutional for a legislature to remove from the jury the assessment of facts that increase the prescribed range of penalties to which a criminal defendant is exposed." *United States v. Gonzalez*, 420 F.3d 111, 123 (2d Cir. 2005). The text of § 13(a)(5) makes clear that such a situation is not present here. Willfully violating a regulation, by itself, exposes the defendant to up to 10 years' imprisonment. The

affirmative defense that the defendant did not know about the relevant regulation *decreases* the exposure. *Apprendi*, therefore, does not apply.

Consistent with that reasoning, the Second Circuit has held that *Apprendi* does not apply to affirmative defenses. For example, in *United States v. Lizalde*, the Second Circuit rejected the argument that *Apprendi* required the defense to be able to raise, and the Government to disprove beyond a reasonable doubt, a duress defense. 38 F. App'x 657, 659 (2d Cir. 2002). The Circuit has similarly held that proof of certain sentencing factors that can reduce a term of imprisonment were akin to an "affirmative defense," and therefore did not need to go to a jury under *Apprendi*. *See United States v. Snype*, 44 F.3d 119, 149 (2d Cir. 2006). These decisions are consistent with rulings from other Circuits, including a decision of the Ninth Circuit finding that the provision of the securities-fraud laws that mirrors § 13(a)(5) does not violate the Sixth Amendment. *See United States v. Tarallo*, 380 F.3d 1174 (9th Cir. 2004); *see also, e.g.*, *United States v. Brown*, 276 F.3d 930 (7th Cir. 2002) ("*Apprendi* leaves undisturbed the principle that while the prosecution must indeed prove all the elements of the offense charged beyond a reasonable doubt, the legislation creating the offense can place the burden of proving affirmative defenses on the defendant."); *United States v. Contreras*, 536 F.3d 1167 (10th Cir. 2008) (same). The logic of these decisions applies to § 13(a)(5) and requires keeping it an affirmative defense, even after *Apprendi*.

### C. Willfulness is Not Required to Prove Wire Fraud.

Finally, the defense is wrong to inject willfulness into the *mens rea* instruction for wire fraud. The Indictment does not include the word "willfully" for that Count, and for good reason: the word appears nowhere in the text of the wire fraud statute. Instead, consistent with the language of the law, the applicable *mens rea* for wire fraud is "specific intent to harm or defraud the victims of the scheme." *United Stats v. Rybicki*, 354 F.3d 124, 150 (2d Cir. 2003); *see also United States v. Gole*, 21 F. Supp. 2d 161, 167-68 (E.D.N.Y. 1997) ("'Willfully' appears nowhere in the mail fraud statute . . . ."). Multiple Circuits have, accordingly, rejected the argument that the jury must find willfulness to convict under the wire-fraud statute. *See United States v. Blagojevich*, 794 F.3d 729, 739 (7th Cir. 2015) ("The wire-fraud statute requires a specific intent to defraud but not willfulness or any other proxy for knowledge of the law."); *United States v. Dockray*, 943 F.2d 152, 156 (1st Cir. 1991) (holding that "willfulness" is "not synonymous with the intent to defraud requirement in the mail and wire fraud statutes"); *United States v. DiRoberto*, 686 F. App'x 458, 461 (9th Cir. 2017) ("The mail and wire fraud statutes to not require proof of willfulness.").[2]

Moreover, while the Second Circuit has not itself addressed whether proof of willfulness is required to establish wire fraud, it has long held that wire fraud does not require proof that the defendant intended to break the law. *See United States v. Porcelli*, 865 F.2d 1352, 1358 (2d Cir. 1989) (rejecting due process claim that defendant "had no notice that his conduct was illegal" because "[t]he specific intent required under the mail fraud statute is . . . not the intent to violate a statute"); *United States v. Weiss*, 930 F.2d 185 (2d Cir. 1991) (in mail fraud prosecution, affirming

---

[2] Although, as noted above, courts in this District have included a willfulness instruction as to a wire fraud account where the Government has chosen to include an allegation of willfulness in the indictment, *see, e.g.*, *Lumiere*, No. 16 Cr. 483 (Dkts. 6 ¶ 23 & 61), that is not the case here.

preclusion of defendant's testimony regarding whether he "intended to commit a crime" because it was "not relevant" and "not dispositive of any element of the charges"). As a result, applying the defense's proposed willfulness instruction to the wire-fraud Count would not only be at odds with the text of the law, it would also be inconsistent with settled precedent.

## II.     Materiality is Not an Element of Manipulation Under Count One, and the Defense's Materiality Instruction is Wrong.

Turning to materiality, the defense is wrong to include a materiality instruction with respect to the first prong of commodities fraud, which requires proving the defendant used a "manipulative device, scheme, or artifice to defraud." 17 C.F.R. § 180.1(a)(1). Moreover, the defense's proposed materiality instruction for commodities fraud and wire fraud is wrong because it significantly misstates the law, particularly regarding the materiality of deceptive conduct that influences non-discretionary decisions.

### A. There is No Freestanding Materiality Element to the Manipulation Prong of Commodities Fraud.

The defense is wrong to require proof of materiality with respect to the manipulation prong of Count One. 7 U.S.C. § 9(1) makes it unlawful to "use or employ" any "manipulative device or contrivance in contravention of CFTC regulation. The statute does not restrict the prohibition to "any *materially* manipulative" or "*materially* deceptive" device or contrivance, e, a notable distinction given that other provisions of the same statute include explicit materiality requirements. *See, e.g.*, 7 U.S.C. § 9(2) (prohibiting making a "false or misleading statement of a material fact to the Commission").

When the CFTC implemented § 9(1) through Rule 180.1, it did not incorporate a materiality element in the "manipulation" prong of its regulation. Instead, it broadly prohibited "any manipulative device, scheme, or artifice to defraud." 17 C.F.R. § 180.1(a)(1). That is notably different from the second prong of Rule 180.1, which prohibits making "any untrue or misleading statement of *material* fact" or omitting "a *material* fact necessary" to make a statement not misleading. *Id.* § 180.1(a)(2) (emphasis added). This distinction reflects a judgment to require proof of materiality with respect to misstatements or omissions, but not with respect to manipulative trading activity. This decision makes sense because proving manipulation necessarily involves proof of an effort to alter prices—whether through open-market trading or other schemes—and the CFTC reasonably could have made the judgment that this requirement dispenses with the need to separately prove materiality.

The defense's request to add a materiality element to the manipulation prong is an improper rewriting of Rule 180.1. In the context of criminal enforcement of the securities-fraud laws—which are persuasive authority for interpreting Rule 180.1—courts have consistently read the different subsections of Rule 10b-5 to have independent meaning. Juries, for example, are routinely instructed that the jury need not find that a defendant violated each subsection of Rule 10b-5 to be found guilty. *See* 3 Modern Fed. Jury Instructions Criminal P 57.03 ("It is not necessary for the government to establish all three types of unlawful [conduct]."). Extracting the word "material" from one subsection and applying it to terms found in other subsections would

begin to collapse the various categories of misconduct into one. There is no statutory home for the defense's proposed new element.[3]

As support for adding a materiality element, the defense relies on the jury instructions in *United States v. Phillips*, 22 Cr. 138 (LJL), which required proof of materiality for manipulation charged under Rule 180.1(a)(1). But that decision was an outlier. In the context of manipulation cases applying the first prong of Rule 10b-5, courts have routinely refrained from including a separate materiality instruction, and the Second Circuit has upheld those instructions. In *United States v. Elgindy*, No. 02 Cr. 589 (RJD), for example, the District Court instructed on a manipulation theory of violating Rule 10b-5, but did not include a separate materiality instruction with respect to that theory. *See Id.* at Tr. 8786 (instructing the jury only on the meaning of "material fact" in connection with insider trading). The Circuit went on to affirm those instructions. *Royer*, 549 F.3d at 899. In *United States v. Tuzman*, the District Court did not instruct the jury on materiality as it related to the alleged manipulative scheme. No. 15 Cr. 536 (PGG). The same was true for the District Court's manipulation instructions in *SEC v. Lek Securities Corp.*, No. 17 Civ. 1789 (DLC), Dkt. 556—instructions that the Second Circuit went on to affirm. *S.E.C. v. Vali Mgmt. Partners*, 2022 WL 2155094, at *1-2 (2d Cir. June 15, 2022).

Finally, because of the manner in which "manipulation" is defined in the law and instructed to the jury, there can be no doubt that the prohibited conduct is of significance even in the absence of a materiality instruction. When a manipulative scheme exists, it is, by definition, calculated to interfere with prices in markets that Congress has acted to protect. The Second Circuit made this point in *United States v. Royer*, concluding that "[f]ailure to disclose that market prices are being artificially depressed operates as a deceit on the market place and is an omission of material fact." 937 F.2d 823, 829 (2d Cir. 1991) (quoting *United States v. Charnay*, 537 F.2d 341, 351 (9th Cir. 1976)). Thus, if the jury finds that a manipulative scheme existed, it has found conduct that Congress and the CFTC concluded was significant enough to forbid.

**B. The Defense's Proposed Materiality Instruction is Confusing and Legally Wrong.**

Regardless of whether the Court decides that materiality is an element of manipulation in Count One, this Court should not adopt the defense's proposed materiality instruction. That instruction includes language about investment decisions that are unnecessary and confusing in the context of this case. And it includes a legally incorrect description of how to assess materiality in situations when a decisionmaker's discretion is constrained.

---

[3] *United States v. Neder*, which found a materiality element in the wire-fraud statute, does not lead to a different conclusion. 527 U.S. 1 (1999). That decision relied on the use of he phrase "scheme or artifice to defraud" in the wire-fraud statute, which does not appear in Section 6(c)(1). *Id.* at 22-24. Moreover, Rule 180.1(a)(1) refers to 'any manipulative device' in addition to "scheme" and "artifice to defraud," and so cannot be said to merely incorporate the terms of the wire-fraud statute eithers. Rather, as all appear to agree, the term "manipulate" is a term of art that connotes "intentional or willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 199 (1976). This differentiates manipulation from common-law fraud and wire fraud.

The defense's proposed instruction is split into two paragraphs: one that provides a general materiality definition, and the other that applies that to materiality in the context of constrained discretion. The first paragraphs provides an incorrect and confusing definition of materiality in the context of this case. That paragraph states that a fact is material if it "would have been significant to a reasonable investor's investment decision." That is confusing in the context of this case because the defendant's fraudulent scheme was not targeted solely at investors or investment decisions. Rather, the defendant's scheme was material both because (1) it sent a false price signal to investors trading in the MNGO-USDC market about the relative value of those cryptocurrencies; and (2) it misled Mango Markets and its users, who were defrauded by the defendant using that artificially inflated price to withdraw huge amounts of cryptocurrency from the Mango Markets while misrepresenting his intention to borrow those assets. The phrase "investor" and "investment decision" in the defendant's materiality instruction is confusing when applied to this context, where at least some of the relevant materiality inquiry centers on the decision to allow a loan, not make an investment.

Nothing in the CEA or the wire-fraud statute requires the defense's framing of the materiality instruction. The wire-fraud statute, of course, applies to many situations where "investors" and "investment decisions" are not relevant concepts. And the CEA's anti-fraud provisions are not limited to fraud in connection with investment decisions. *See, e.g.*, 76 Fed. Reg. 41,398, 41,406 (Rule 180.1 "reach[es] all manipulative or deceptive conduct in connection with the purchase, sale, solicitation, execution, pendency, or termination of any swap."). It would be inappropriate to use the materiality instruction to, in effect, narrow the reach of both laws.

The Government's formulation of the materiality standard is more appropriate for this case. The Government's proposed instruction explains that a "material fact is one that "a reasonable person would have considered important in making a decision." That instruction is legally accurate and allows the parties to explain how the standard applies to this case, and the jury to apply it to the facts. If the Court is inclined to give a more specific instruction, it could consider this alternative phrasing, adapted from the materiality instruction in *United States v. Phillips*, No. 22 Cr. 138 (LJL):

> A scheme to defraud must be material, which means the deceptive conduct must the natural tendency to influence or be capable of influencing the actions of a person who was a target of the scheme. Here, the targets of the defendant's alleged scheme were participants in the MNGO-USDC spot market, as well as Mango Markets and its users.

> That does not require proof that another person was actually deceived or lost money or property as a result of the deceptive conduct, so long as there is proof that the scheme to defraud was at least capable of affecting the conduct or decisions.

(Tr. 1353.) This proposal accurately states the law of materiality, but is more appropriately adapted to the case than the defense's proposed instruction.

Separately, the second paragraph of the defense's materiality instruction is legally incorrect in three different respects. That portion of the instruction states:

Relevance and materiality are not synonymous.  The burden is on the Government to show that a given misstatement or omission would not only have been relevant but also that it was capable of influencing a decision or action that a proven victim could have made.  If you find that discretion of that victim was limited, including by contract, or that it otherwise could not act upon a given misrepresentation, then that misrepresentation is immaterial and cannot form the basis for the government satisfying this element.  Likewise, the deceit must affect the very nature of the bargain itself, such as by creating a discrepancy between benefits reasonably anticipated because of the misleading representations and the actual benefits which the defendant delivered, or intended to deliver.

The first legal error in this paragraph is the reference to a "proven victim" and marrying he materiality inquiry to "that victim."  This implies that the Government must prove there was an actual victim, which is legally wrong.  The Government does not need to prove any actual victim—success of the scheme is not required.  *See United States v. Jabar*, 19 F.4th 66, 77 (2d Cir. 2021) ("Proof of actual injury to the victim is not required . . . .").  This framing also implies that there must be a convergence between the person or entity that is deceived and the ultimate victim who loses money, which is also legally incorrect: the law "does not require a convergence between the parties intended to be deceived and those whose property is sought in a fraudulent scheme." *United States v. Greenberg*, 835 F.3d 295, 306 (2d Cir. 2016).

The second legal error in this proposed paragraph is that it incorrectly implies that, if the discretion of a decisionmaker is constrained, misrepresentation or deception to that decisionmaker cannot be material.  Specifically, the proposed instruction states: "If you find that discretion of [the] victim was limited, including by contract, or that it otherwise could not act upon a given misrepresentation, then that misrepresentation is immaterial and cannot form the basis for the government satisfying the element."

This is a legally erroneous view of how materiality works in the context of constrained discretion.  Limitations on discretion are not fatal to materiality.  Instead, when a decisionmaker's discretion is constrained, materiality depends on whether the deceptive conduct would have made a difference to the decision, taking those constraints into account.

The decision in *United States v. Rigas*, 490 F.3d 208 (2d Cir. 2007), is instructive.  There, a bank offered loans, the interest rates for which depended, in part, on the loan's leverage ratio. *Id.* at 233-36.  Interest rates were set by a contractual formula, such that a loan's leverage ratio needed to be above a certain amount before the interest rates went up.  *See id.*  For example, loans with leverage ratios of between 1.0 and 4.9 would have the same interest rates, whereas loans with leverage ratios above 5.0 would have higher rates.  *See id.*  Defendants were charged with bank fraud for falsifying loan applications to obtain lower interest rates.  Assessing materiality, the Second Circuit held that, because the bank's discretion about interest-rate levels was constrained, the misrepresentations were material only if "the fraudulent leverage ratio resulted in the [borrowers] being in a different interest category than they would have been had he accurate leverage ratio been reported." *Id.* at 235.  The Court went on to find that the Government proved

materiality with respect to one count, where it showed the falsification changed the defendant's interest-rate category, but not to another count, where the Government lacked such proof.  *Id.*

*Rigas* shows that, contrary to the defense's proposed instruction, restrictions on a decisionmaker's discretion do not automatically render a misrepresentation immaterial.  The decision also comports with common sense.  Suppose a bank had a website that automatically issued home loans, the size of which were based on the home value the borrower inputted to the system.  If a borrower inputted a falsely inflated home value, and as a result got a larger loan that he otherwise would have, that misrepresentation is not immaterial because the website was programmed to issue a loan based on whatever number the borrower put in.  Rather, as in *Rigas*, because the misrepresentation affected the outcome, it was material.  Similarly, imagine a computer program requires a person to input certain login credentials to ensure only certain people can access the site.  If someone used stolen login information to gain access, it would not be immaterial because the computer program automatically allowed the person in once the proper credentials were inputted.  To the contrary, as in *Rigas*, because the misrepresentation would affect the outcome, it would be material.  *See, e.g.*, *United States v. Khalupsky*, 5 F.4th 279, 291 (2d Cir. 2021) (upholding fraud conviction based on using stolen login credentials); *SEC v. Dorozhko*, 574 F.3d 42, 50-51 (2d Cir. 2009) (allowing fraud claim to proceed on fraudulent access theory).  Under the defense's view, however, none of these misrepresentations would be material, simply because the conduct of the decisionmakers (the computer programs) were constrained.

The defense's erroneous materiality instruction would be seriously prejudicial for the Government.  For example, the defendant was able to steal cryptocurrency off of Mango Markets by operation of the program's code.  But that is because he fed the code misleading information that led to a different result.  The defendant, among other things, misrepresented that he was "borrowing" from Mango Markets, and the amount he was able to borrow depended on fraudulently inflating the value of his assets on the platform.  The fact that the code's discretion was constrained such that it allowed him to take huge sums of cryptocurrency by virtue of those misrepresentations does not make the misrepresentations immaterial.  To the contrary, it shows they were material because he could not have obtained the cryptocurrency without the lies.  This is just like the Count in *Rigas* where there was proof that, under the contracts, the misrepresented leverage ratio resulted in a lower interest rate, and like the loan and login examples above.

To provide a correct legal instruction on constrained decisionmaking that will be useful in the context of this case, the Government respectfully requests that the Court should instruct the following:

> You have heard that Mango Markets operated based on code that determined whether, and how much, users could borrow and withdraw from the platform.  In assessing materiality, you may consider whether the allegedly manipulative and deceptive conduct resulted in the defendant being able to borrow and withdraw more cryptocurrency from Mango Markets than he would have been able to absent the allegedly deceptive conduct.

This proposed instruction comports with *Rigas* and will helpfully direct the jury how to the issue of constrained discretion in this case.  The defense's proposal, by contrast, misstates the law.

The third legal error in the second paragraph of the defense's materiality instruction arises in the last sentence of that paragraph. There, the defense proposes instructing: "[T]he deceit must affect the very nature of the bargain itself, such as by creating a discrepancy between the benefits reasonably anticipated because of the misleading representations and the actual benefits which the defendant delivered, or intended to deliver."

This proposed sentence is not a materiality instruction, and it would be legal error to give it. The passage the defense relies on comes from *United States v. Binday*, 804 F.3d 558 (2d Cir. 2015). There, the Circuit was explaining that, in right-to-control cases under the wire-fraud statutes, whether a misrepresentation was fraudulent and had capacity to harm depended on whether he "purported victim received he full economic benefit of its bargain." *Id.* at 568-70. The Circuit sentence the defense cherry picks was not defining materiality, particularly outside the context of he now-defunct right-to-control theory. Accordingly, the defense's proposed sentence does not appear in materiality instructions in this District, and adding it here would only introduce a confusing and legally incorrect gloss on the materiality standard.

### III. The Court May Provide Additional Guidance on the "In Connection With" Element, But the Defense's Proposal is Legally Wrong.

In the March 29 Orders, the Court inquired about whether there is a more specific way to define "in connection with" for the jury. To that end, the Government proposes that the Court should adopt the Government's proposed "in connection with" instruction and provide some additional guidance about applying that instruction to the case. The Court should not, however, adopt the defense's proposed instructions, which are legally incorrect.

### A. Additional Guidance on the "In Connection With" Element.

The Government's instruction on the "in connection with" element is as follows:

The requirement that the fraudulent conduct be "in connection with" a "swap," or contract of sale of a "commodity" is satisfied so long as there was some nexus or relation between the allegedly fraudulent or manipulative conduct and the swap or contract of sale of a commodity. A fraudulent scheme may be "in connection with" a "swap" or a contract of sale of a "commodity" if you find the scheme coincides with a "swap" or a contract of sale of a "commodity," or if the scheme's accomplishment necessarily involves a "swap" or a contract of sale of a "commodity." The manipulative scheme need not relate to the purchase or sale of the swap.

That proposed instruction is legally correct and in line with the applicable regulation, as well as Supreme Court and Circuit precedent. *See* 76 Fed. Reg. at 41,405 (interpreting "in connection with" broadly); *see, e.g.*, *SEC v. Zandford*, 535 U.S. 813, 822 (2002) (defining "in connection with" as "coincide[s]"); *D'Addario v. D'Addario*, 75 F.4th 86, 96 (2d Cir. 2023) (defining fraud "in connection with" the purchase or sale of a security as fraud that "necessarily allege[s], necessarily involve[s], or necessarily rest[s] on" such a purchase or sale).

Courts in this District also routinely give instructions on the "in connection with" element that track the Government's proposal, and juries do no struggle to apply those instructions. *See, e.g.*, *United States v. Goel*, No. 22 Cr. 396 (PKC), Trial Tr. 1180 (instructing in an insider trading case that "[a] scheme to defraud is 'in connection with' a security if you find the alleged conduct 'touched upon' a securities transaction."); *United States v. Cole*, No. 19 Cr. 869 (ER), Trial Tr. 2772-73 ("[I]n connection with a purchase or sale of securities is satisfied so long as there was some nexus or relation between the allegedly fraudulent conduct and the sale or purchase of securities."); *United States v. Milton*, No. 21 Cr. 478 (ER), Trial Tr. 3205 ("'[I]n connection with' . . . is satisfied so long as there was some nexus or relation between the allegedly fraudulent conduct and the sale or purchase of securities. Fraudulent conduct may be 'in connection with' . . . the purchase or sale of securities if you find that the alleged fraudulent conduct coincided with a securities transaction."); *United States v. Lavidas*, No. 19 Cr. 716 (DLC), Trial Tr. 1020 ("A scheme to defraud is 'in connection with' a security if you find the alleged conduct 'touched upon' a securities transaction."); *Elgindy*, No. 02 Cr. 589 (RJD), Trial Tr. 8846 ("Fraudulent conduct may be 'in connection with' the purchase or sale of securities if you find that the alleged fraudulent conduct touched upon a securities transaction."). Model instructions suggest using the same type of language. 2B Fed. Jury Prac. & Instr. § 62:11 (6th ed.). Modern Federal Jury instructions includes a similar instruction. 3 Modern Federal Jury Instructions-Criminal § 57.03 (2023) ("The 'in connection with' aspect of this element is satisfied if you find that there was some nexus or relation between the allegedly fraudulent conduct and the sale or purchase of securities. Fraudulent conduct may be 'in connection with' the purchase or sale of securities if you find that the alleged fraudulent conduct 'touched upon' a securities transaction.").

Given the weight of authority supporting the Government's proposed instruction, the Government believes that the Court should not replace it. Instead, if the Court would like to provide additional guidance to the jury on the element, it should do so in the form of a short supplemental instruction stating the following:

> Let me provide you with some additional guidance in applying this element here. Here, the Government has alleged that MNGO Perpetuals are "swaps." In assessing this element, you should consider whether the defendant's allegedly fraudulent and manipulative scheme necessarily involved MNGO Perpetuals. The Government has also alleged that the defendant's sales of USDC for MNGO were "contracts of sale" of commodities. In determining whether the defendant's allegedly fraudulent and manipulative scheme was in connection with those sales, you should consider whether that scheme necessarily involved those sales.

This proposed paragraph will help clarify and simplify the jury's task by concretizing the general "in connection with" instruction, without departing from settled law and longstanding practice.

**B.  The Defense's Proposed Instruction is Wrong.**

The defense's proposed instruction on the "in connection with" element begins similar to the Government's, instructing the jury that "[a] scheme is 'in connection with' a swap or contract of sale if it has some meaningful relationship to or coincides with a swap or contract of sale, or if

the scheme's accomplishment necessarily involves a swap or contract of sale." The defense's proposed instruction, however, goes on to misstate the law in two important respects: First, it erroneously creates a "purchase or sale" requirement that is not present in the CEA. And second, it narrows the "in connection with" element to only those situations when deception related to the "value of [a] pledged swap or commodity."

The first legal error arises in the proposed instruction that, "the Government must prove that the alleged fraud rested on the purchase or sale of a swap or of a commodity." This language comes from the wrong statute. The defense's basis for that sentence comes from *D'Addario v. D'Addario*, 75 F.4th 86 (2d Cir. 2023), which was applying the securities-fraud laws. While those laws are often a useful analogy for Rule 180.1, they diverge with respect to the issue here: the securities-fraud laws apply to fraud "in connection with the purchase or sale of any security," 15 U.S.C. § 78j, but there is no equivalent "purchase or sale" language in the relevant provisions of the CEA, 7 U.S.C. § 9(1); *see also Prime Int'l Trading v. BP PLC*, 937 F.3d 94, 107 (2d Cir. 2019) ("There is nothing in Section [9(1)'s] text suggesting it focused on 'purchase and sales' . . . in the United States . . . ."). It would be error to add a requirement to the CEA that Congress declined to put into the statute.

The second legal error in the defense's proposed instruction appears in the next sentence, which states: "[T]he deception must relate to the value of the pledged swap or commodity itself and not some other asset or issue." This is not a correct statement of the law because it incorrectly narrows the inquiry to focus on value. In the securities-fraud context, the Supreme Court and Circuits across the country have consistently held that the "in connection with" requirement does not require deception about value. *See, e.g.*, *United States v. O'Hagan*, 521 U.S. 642, 652 (1997) (misappropriation insider trading satisfies "in connection with"); *United States v. Khalupsky*, 5 F.4th 279, 290-91 (2d Cir. 2021) (fraudulently obtaining information to trade satisfies "in connection with"); *AT Brod & Co. v. Perlow*, 375 F.2d 393, 395-96 (2d Cir. 1967) (fraud about intent to repay margin on securities trade satisfies "in connection with"); *United States v. Kendrick*, 692 F.2d 1262, 1264-66 (9th Cir. 1982) (fraudulently pledging customer's securities for loan satisfies "in connection with"). Indeed, if Congress had wanted to limit fraud prosecutions to deception about value, it could have written far more direct language than the phrase "in connection with."

In support of its position, the defense cites *Chemical Bank v. Arthur Andersen*, 726 F.2d 930 (2d Cir. 1984). But that decision does not create the defense's proposed "value" rule. There, the Second Circuit held that pledging securities as collateral for a loan was a "purchase or sale" under the securities laws, but that the alleged fraud in the case was not "in connection with" that pledge because "no misrepresentations were made" about the securities. *Id.* at 944-45. This does no mean that, to satisfy the "in connection with" requirement, there needed to be a misrepresentation about the value of the securities. Such a misrepresentation would have been sufficient, but so would have been another misrepresentation, such as a lie about ownership of the securities. *See Kendrick*, 692 F.2d at 1264-66.

In fact, just two years after *Chemical Bank* was decided—more than thirty-five years ago—the Second Circuit clarified that *Chemical Bank* does not have the reach now claimed by the defendant. In *SEC v. Drysdale*, the Second Circuit explained that the failure to meet the "in

connection with" requirement in *Chemical Bank* was not a result of the fact that the misrepresentations did not concern the value, nature, or investment characteristics of the securities at issue, but rather because the securities at issue in *Chemical Bank*—which were merely collateral for a transaction that the victim was fraudulently induced to enter—were too remotely connected to the conduct. 785 F.2d 38, 41-42 (2d Cir. 1986). In *Drysdale*, by contrast, "securities were transferred as a direct result of a misrepresentation," and therefore the misrepresentations were in connection with the purchase or sale of securities, even though the misrepresentations went to the financial health of a party to the transaction, not the characteristics of the securities themselves. *Id.* at 42-43. Indeed, as the court observed in *Drysdale*, the conclusion that misrepresentations need not go to the value of the securities themselves to be "in connection with the securities" was not only consistent with Supreme Court and Second Circuit precedent, *id.* at 42 (citing *AT Brod*, 375 F.2d 393, and *United States v. Naftalin*, 441 U.S. 768 (1979)), but indeed with the reasoning in *Chemical Bank* itself, which distinguished its own reasoning from a case in which misrepresentations induced a pledge of stock, *Drysdale*, 785 F.2d at 43 (discussing *Chemical Bank*, 726 F.2d at 944, and *Weaver v. Marine Bank*, 637 F.2d 157, 159-60 (3d Cir. 1980)). Consistent with this law, "judges in this District have repeatedly rejected the contention that the alleged fraud or misrepresentations must relate to the value of the securities purchased or sold," *Uni-World Capital LP v. Preferred Fragrance Inc.*, No. 13 Civ. 7204 (PAE), 2014 WL 3900565, at *9 (S.D.N.Y. Aug. 8, 2014), and the Supreme Court itself has made clear that "neither the SEC nor this Court has ever held that there must be a misrepresentation about the value of a particular security in order to run afoul of" Section 10(b), *Zandford*, 535 U.S. at 820. There is, then, no basis to conclude that *Chemical Bank* created a "value" rule for the "in connection with" requirement.

Finally, the last sentence of the defense's materiality instruction is also wrong because it incorrectly focuses on a "commodity." The sentence states: "[T]he deception must relate to the value of the pledged swap *or commodity* itself and not some other asset or issue." (Emphasis added.) That is a clear mischaracterization of the statute. Rule 180.1 prohibits fraud and manipulation in connection with a "contract of sale of a commodity," not fraud in connection with a "commodity." The jury should not be given an instruction that does not square with the statute.

## IV.   The Defense's Definition of "Commodity" is Legally Wrong.

Moving to issues beyond those identified in this Court's March 29 Order, the Government also respectfully requests that this Court reject the defense's definition of "commodity." Per the defense's instructions, to prove that USDC is a commodity, the Government must prove "that USDC had a futures market at the time at issue (October 11, 2022)." That is legally wrong for two reasons: First, the Government does not need to prove that there were futures traded in USDC, but rather that USDC is a virtual currency and there were futures traded in virtual currencies. And second, even if were true that the Government must show that USDC had a futures market, futures do not need to have been trading on October 11, 2022, but rather any time before or after that date.

The CEA defines "commodity" to include a host of enumerated products, as well as "all other goods and articles . . . and all services rights and interests . . . in which contracts for future delivery are presently or in the future dealt in." 7 U.S.C. § 1a(9).

Here, the relevant category of goods is not USDC in particular, but rather virtual currencies, defined as "a digital representation of value that functions as a medium of exchange, a unit of account, and/or a store of value." *See* "Digital Assets," *available at* https://www.cftc.gov/ digitalassets/index.htm; *cf.* 6 U.S.C. § 681(18).  Congress defined commodities under the CEA categorically, rather than by type, brand, or manufacturer.  For example, Congress included "rice," "wheat," "livestock."  7 U.S.C. § 1a(9).  It did not separately identify types of rice (basmati or white) or kinds of livestock (cows or hogs).  Outside the context of cryptocurrency, courts have interpreted this framing to determine whether particular products are commodities based on whether they fall into a class in which futures are traded, rather whether there are futures traded in that particular product.  This issue has risen primarily in the context of cases related to natural gas, where "courts have repeatedly rejected arguments that a particular type of natural gas was not a commodity because that specific type was not the subject of a futures contract." *CFTC v. My Big Coin Pay, Inc.*, 334 F. Supp. 3d 492, 497-98 (D. Mass. 2018) (collecting cases).

Adopting this reading of the statute, numerous District Courts in this District and elsewhere have concluded that "virtual currencies" as a class are commodities, without requiring each type of virtual commodity to have ongoing futures trading. *See, e.g.*, *CFTC v. McDonnell*, 287 F. Supp 3d 213, 228 (E.D.N.Y. 2018) ("Virtual currencies can be regulated by CFTC as a commodity."); *My Big Coin*, 334 F. Supp. 3d at 498 (same); *United States v. Reed*, No. 20 Cr. 500 (JGK), 2022 WL 597180, at *3-*4 (S.D.N.Y. Feb. 28, 2022) (same).  The decision in *My Big Coin* reached that conclusion over the defendant's objection that the particular coin at issue lacked an active futures market.  334 F. Supp. 3d at 498.  So long as that particular cryptocurrency was a type of "virtual currency," that was sufficient to treat it as a commodity. *Id.*

Consistent with these decisions, the CFTC has repeatedly issued regulatory guidance and enforcement decisions finding that virtual currencies are commodities, without regard to whether the particular virtual currency at issue has a futures market. *See generally* 85 Fed. Reg. 37,734, 37,741 (2020) (explaining the CFTC's regulatory approach with respect to virtual currencies).

The defense's proposed instruction does not follow the text of the CEA, or this body of case law and regulatory actions.  Its proposed language would have the jury assess whether USDC is a commodity by asking if there are futures traded in that particular product.  The authority on this subject, however, uniformly points to a different analysis: the jury should determine whether there are futures traded in virtual currencies (as defined by the Court) and then decide whether USDC is a virtual currency.  Accordingly, the Court should reject the defense's instruction and instruct the jury as follows:

> A "commodity" is any good, article, service, right, or interest in which contracts for future delivery are dealt.  A "contract for future delivery," which is also called a "futures contract," is an agreement to buy or sell a particular commodity at a specific price in the future.

> To prove that USDC is a commodity, the Government must prove beyond a reasonable doubt that USDC is a virtual currency, and that there are contracts for future delivery dealt in virtual currencies.  A virtual currency is a digital asset that

is any digital representation of value or unit of account that is used as a form of currency.

Separately, the defense is also wrong to propose instructing the jury that the Government must prove "that USDC had a futures market *at the time at issue* (October 11, 2022)." (Emphasis added.) This instruction is at odds with the text of the statute, which does not limit the applicable timeframe to the specific date of a crime. Contrary to the defense's proposal, the CEA defines commodity as any number goods or interests "in which contracts for future delivery are presently or in the future dealt in." 7 U.S.C. § 1a(9). The word "presently" is susceptible to at least three readings: (1) the time of the enactment of the statutory language; or (2) the time of the event in question; or (3) the present moment. But the inclusion of "or in the future" unambiguously means that, whatever "presently" means, the scope of "commodity" is not limited to what is happening in that particular moment. This forecloses the defense's proposed instruction.

## V.      The Court Should Issue a Proper Instruction Regarding the Retail Commodity Transaction Exception to the Definition of "Swaps."

In the March 29 Orders, this Court inquired about "[w]hether there are three exceptions to the definition of swap that the jury needs to be instructed on." The Government understands that the defense is proceeding only on one exception to the definition of swap—the exception for retail-commodity transactions. The defense's instruction on that exception, however, misstates the law and requires significant modification. This section explains the errors in the defense's instruction and proposes a revised instruction on swaps and the relevant exceptions.

### A.  The Defense's Initial Proposal

The defense's proposal with respect to swaps and the relevant exceptions reads, in relevant part, as follows:

> For purposes here, the term "swap" means an agreement between parties that provides for payment based on the occurrence, or non-occurrence, of a financially consequential event.

> It is not sufficient if you find that Eisenberg engaged in a manipulative scheme in the MNGO spot market. You must also find that such a scheme was in connection with a swap. Furthermore, for purposes of this case, there are three exceptions to the definition of swap, that cannot satisfy this element. The first is a security-bases swap that is based exclusively on the price of a single security. Here, a security means any investment contract in a governance token. An "investment contract," in turn, involves an investment of money in a common enterprise with profits to come solely from the efforts of others, regardless of whether the enterprise is speculative, or whether there is a sale of property with intrinsic value. The second exception relates to retail commodity transactions, which for purposes of this case are offers to sell commodities on a leveraged basis to individuals with under $5 million in discretionary investments. The third exception involves assets that

involve no transfer to a counterparty of a financial risk of a future change in value
of an underlying asset.

The Government understands that the defense no longer plans to proceed with the argument that
MNGO Perpetuals are excluded as security-based swaps.  The Government also understands that
the defense will not proceed on its "third exception" because it is not an exception at all, but is
instead a sentence based on another type of product that *is* a swap.  That leaves only the exception
for retail commodity transactions.

## B. The Defense Misstates the Law With Respect to the Retail Commodity Transaction Exception to the Definition of "Swaps."

This Court should reject the defense's proposed instruction on retail commodity
transactions because it has three significant legal errors: First, the instruction omits that the
exception applies only to an agreement, contract, or transaction in a commodity.  Second, the
instruction incorrectly fails to focus on the particular transactions at issue, and instead suggests
that the exception applies if MNGO Perpetuals were offered to *any* retail investors.  And third, the
instruction omits that it does not apply to mixed swaps.

Understanding the retail commodity transaction exception requires beginning with the
definition of "swap."  The CEA begins by enumerating a set of products that qualify as swaps.  *See*
7 U.S.C. § 1a(47)(A).  The statute then lists a number of "exclusions" from "[t]he term 'swap.'"
*Id.* § 1a(47)(B).  One of those exclusions is for an "agreement, contract, or transaction described
in . . . section 2(c)(2)(D)(i) of this title."  *Id.* § 1a(47)(B)(i).

That referenced section is titled "[r]etail commodity transactions."  The first clause reads
as follows:

Except as provided in clause (ii), this subparagraph shall apply to any agreement,
contract, or transaction in any commodity that is—

(I) entered into with, or offered to (even if not entered into with) a person that is
not an eligible contract participant or eligible commercial entity; and

(II) entered into, or offered (even if not entered into), on a leveraged or margined
basis, or financed by the offeror, the counterparty, or a person acting in concert with
the offeror or counterparty on a similar basis.

7 U.S.C. § 2(c)(2)(D)(i).  An "eligible contract participant," as relevant here, includes "an
individual" with investment assets "in excess of" either $10,000,000 or $5,000,000 "and hwo
enters into the agreement, contract ,or transaction in order to manage the risk associated with an
asset owned or liability incurred, or reasonably likely to be owned or incurred by the individual."
7 U.S.C. § 1a(18)(A)(xi).

The second clause of § 2(c)(2)(D), which is referenced in the first clause of that subsection,
contains a list of exceptions, identifying transactions that are not retail commodity transactions.
That list includes: (I) "an agreement, contract, or transaction" described in certain other provisions

of 7 U.S.C. § 2(c); (II) "any security"; and (III) contracts of sale that "result[] in actual delivery within 28 days" or "create[] an enforceable obligation to deliver between" certain buyers and sellers. *Id.* § 2(c)(2)(D)(ii).

Despite this multifaceted statutory structure, the defense's proposed instruction on the retail commodity transaction exception is one, vague sentence stating: "The second exception relates to retail commodity transactions, which for purposes of this case are offers to sell commodities on a leveraged basis to individuals with under $5 million in discretionary investments." This instruction is wrong for at least three reasons relevant to this case.

1. The "Transaction in a Commodity" Error

First, the defense's instruction is wrong because it ignores an important predicate: a retail commodity transaction must be an "agreement, contract, or transaction in any commodity." 7 U.S.C. § 2(c)(2)(D)(i). This is doubly important in this case. For one, it is not clear why the MNGO Perpetual in this case is an "agreement, contract, or transaction *in* [a] commodity." (Emphasis added.) Rather, the MNGO Perpetual is a bet on the *relative value of* MNGO and USDC, as calculated by a pricing oracle is essentially a measure of trading prices on other platforms. For this exception to apply, then, the jury would need to find that a MNGO Perpetual is a transaction in a commodity, rather than in the relative value of two products. Moreover, even setting aside that issue, a retail commodity transaction must be in a *commodity*. For this exception not apply, then, the jury will have to, at a minimum, find that USDC is a commodity, which is important because such a decision would also mean that the defendant's sales of USDC for MNGO were contracts of sale of a commodity. The defense's instruction, however, completely ignores these threshold issues.

2. The Categorical-Approach Error

Second, the defense's proposed instruction wrongly suggests that, if any MNGO Perpetuals are offered to retail investors, then the MNGO Perpetual at issue in this case is not a "swap." That is legally wrong, and at odds with the CFTC's enforcement actions, the text and regulatory guidance surrounding § 2(c)(2)(D)(i), and the structure of the statute. Instead, the proper focus is on the particular transaction at issue, so if the MNGO Perpetual here was between eligible contract participants, it is not a retail commodity transaction.

As explained above, a retail commodity transaction must be "entered into with, or offered to (even if not entered into with), a person that is not an eligible contract participant" ("ECP") on a leveraged or margined basis. 7 U.S.C. § 2(c)(2)(D)(i). The text and structure of the relevant statutes require this transaction-by-transaction analysis. To begin, the first sentence of § 2(c)(2)(D)(i) speaks in the singular, referring to any "agreement, contract, or transaction in any commodity that is . . . ." This directs an analysis focused on each transaction (here, the MNGO Perpetual at issue in the case), as opposed to a class of transactions (such as all MNGO Perpetuals on Mango Markets).[4]

---

[4] The "offer" language in the statute also supports this interpretation. Under § 2(c)(2)(D)(i), if a deal is both (1) offered to a retail investor and (2) offered and accepted by an ECP, then the deal

The rest of § 2(c)(2)(D)(i) also calls for a transaction-by-transaction approach. Subsection (I) states that the transaction must be entered into with or offered to a person that is not an "eligible contract participant" or "eligible commercial entity." Whether a party is an "eligible contract participant" or an "eligible commercial entity" can only be assessed with respect to the specific transaction at issue. For example, as noted above, the CEA defines ECP to include any person with over $10 million in investment assets *or* over $5 million in investment assets "who enters into the agreement, contract or transaction" for certain risk-management purposes. 7 U.S.C. § 1a(18)(xi). That means, for purposes of § 2(c)(2)(D)(i), it is impossible to tell whether an agreement is entered into or offered to an ECP without looking into the specific purposes of the transaction for the relevant person. This can only be done on a transaction-by-transaction basis.

Similarly, subsection (II) of § 2(c)(2)(D)(i) requires the particular transaction at issue be entered into or offered "on a leveraged or margined basis, or financed by the offeror, the counterparty, or a person acting in concert with the offeror or counterparty on a similar basis." Again, determining whether financing came from the offeror, counterparty, or a "person acting in concert" with one of those two demands a transaction-by-transaction analysis.

The exceptions to § 2(c)(2)(D)(i) also make clear that the statute recalls for analyzing each transaction standing alone. As explained above, one enumerated exception is for contracts of sale that "result[] in actual delivery within 28 days." 7 U.S.C. § 2(c)(2)(D)(ii)(III)(aa). It is, of course, impossible to know whether a transaction resulted in actual delivery without looking at the specifics of the transaction. The CFTC's regulations on this provision reflect that case-by-case analysis: On multiple occasions, the CFTC has interpreted this provision to require a "functional approach" that examines not only the terms of an agreement, but how the parties performed. 78 Fed. Reg. 52,426, 52,428 (2013); *accord* 85 Fed. Reg. 37,734, 37,737-38 (2020). This is only consistent with an interpretation of § 2(c)(2)(D)(i) that looks at each transaction individually.

Another exception to § 2(c)(2)(D)(i) further illustrates the point. The statute also states that retail commodity transactions do not include contracts of sale that "create[] an enforceable obligation to deliver between a seller and a buyer that have the ability to deliver and accept delivery" in connection with their "line[s] of business." 7 U.S.C. § 2(c)(2)(D)(ii)(III)(bb). There is no way to perform that analysis without looking at the particular buyer and the particular seller in the particular transaction.

Other provisions of 7 U.S.C. §2(c)(2) also use similar "entered into or offered to" language as § 2(c)(2)(D)(i) and plainly call for transaction-by-transaction analyses. For example, § 2(c)(2)(B)(i) addresses certain foreign-currency agreements that are "offered to, or entered into with, a person that is not an eligible contract participant." That section goes on to list exclusions for certain "counterpart[ies]" or "person[s] offering to be the counterparty," *see id.*—an analysis that only makes sense if the "entered into" or "offered to" test is done on a transaction-by-transaction basis. This reinforces that the retail-commodity test articulated in § 2(c)(2)(D)(i) requires looking at the particulars of each transaction.

---

is a retail commodity transaction with respect to the former, and a swap with respect to the latter. This is the only way to give distinct meaning to the phrase "entered into" in the statute.

Moreover, the defense's interpretation of § 2(c)(2)(D)(i) is at odds with how the CFTC has regulated and enforced the statute.  As explained above, the CFTC has issued guidance in the context of the "actual delivery" exception that requires a transaction-by-transaction analysis of whether something qualifies as a retail commodity transaction.  *See* 78 Fed. Reg. 52,426, 52,428 (2013); 85 Fed. Reg. 37,734, 37,737-38 (2020).  In addition to that guidance, the CFTC has taken numerous enforcement actions that are inconstant with the defense's proposed instruction.  If the defense's approach were correct, then any time a cryptocurrency exchange sold perpetuals in a way that made them available to retail investors, those perpetuals would not qualify as "swaps."  But that is the exact opposite of the CFTC's enforcement actions.

The CFTC has found that cryptocurrency exchanges that offer perpetuals violate the laws pertaining to swaps, even when those exchanges also offer them to retail customers.  For example, in *CFTC v. HDR Global Trading Ltd.*, the CFTC took regulatory action against a cryptocurrency platform that offered perpetuals to both retail and institutional customers.  20 Cv. 8132 (LTS), 2022 WL 1421479, at *3 (S.D.N.Y. May 5, 2022).  The case resulted in a judicially approved consent decree, with the defendant admitting to *both* unlawfully offering a facility for trading swaps and (as to the retail customers) unauthorized retail commodity transactions.  *Id.* at *5.  Similarly, in *CFTC v. Zhao*, the CFTC took regulatory action against an executive of a cryptocurrency platform that offered perpetuals to both retail and institutional customers.  23 Cv. 1887 (MSS), 2023 WL 10448932, at *4-*6 (N.D. Ill. Dec. 14, 2023).  The case resulted in a judicially approved consent decree, with the defendant admitting t both unlawfully offering a facility for trading swaps and (as to retail customers) unauthorized retail commodity transactions.  *See id.* at *8-9.  These decisions are consistent with other enforcement actions finding perpetuals are swaps even when some are offered to retail customers.  *See, e.g.*, *In re Deridex*, No. 23-42, 2023 WL 5937236 (CFTC Sept. 7, 2023); *In re Opyn*, No. 23-40, 2023 WL 5937238 (CFTC Sept. 7, 2023).  These CFTC's actions are impossible to square with the defense's proposed instruction.

In sum, the text, structure, and regulatory background of § 2(c)(2)(D)(i) show that it requires a transaction-by-transaction analysis.  Because the particular MNGO Perpetual transaction at issue in this case was consummated, and not merely offered, the question for the jury is whether it was entered into by an eligible contract participant.  If the answer is "yes," then the retail-commodity exception does not apply.

### 3. The Mixed-Swap Error

Finally, the defense's proposed instruction is legally wrong because it omits a relevant exception for mixed swaps.  The CEA excludes from the definition of retail commodities transactions "any security."  7 U.S.C. § 2(c)(2)(D)(ii)(II).  The term "security," in turn, encompasses the meaning of the term "security" in the Securities Act and the Securities Exchange Act.  *Id.* § 1a(41).  The definition of "security" in those statutes includes a "security-based swap," 15 U.S.C. 78c(a)(10), which in turn includes "mixed swap[s]," *id.* § 78c(a)(68).  A mixed swap is, in brief, any swap based on the value of a security and one or more "interest or other rates, currencies, commodities, instruments of indebtedness, indices, quantitative measures, other financial or economic interest or property of any kind."  *Id.*

As a result, if a MNGO Perpetual is a mixed swap, it is not a retail commodity transaction. That exception, however, appears nowhere in the defense's proposed instruction.

### C. The Government's Proposed Instructions Regarding Swaps.

In light of the defense's identification of the exceptions on which it would like instructions, the Government proposes revising the portion of its proposed instruction regarding swaps (within "Request No. 8: Count One – Commodities Fraud – Second Element") as follows:

> The second element of commodities fraud is that the defendant committed his scheme in connection with either (1) a "contract of sale" of a commodity in interstate commerce, or (2) a "swap." The Government need only prove the alleged scheme was in connection with one of these two things, not both.

> Here, the Government has argued that the defendant's alleged sales of USDC to purchase MNGO were contracts of sale of a commodity in interstate commerce. The Government also contends that the MNGO Perpetuals involved in the alleged scheme were "swaps."

> Let me define the relevant terms for you, beginning with the phrase contract of a sale of a commodity. A "contract of sale" is a sale or an agreement to sell, so a contract of sale of a commodity is a sale of, or agreement to sell, a commodity.

> Now let me define "commodity." A "commodity" is any good, article, service, right, or interest in which contracts for future delivery are dealt. A contract for future delivery, also known as a "futures contract," is an agreement to buy or sell a particular commodity at a specific price in the future.

> Here, the Government contends that USDC is a "commodity." To prove that USDC is a commodity, the Government must prove beyond a reasonable doubt that USDC is a virtual currency, and that there are contracts for future delivery dealt in virtual currencies. A virtual currency is a digital asset that is any digital representation of value or unit of account that is used as a form of currency.

> Now I will turn to swaps. As a I mentioned earlier, the Government contends that the MNGO Perpetuals involved in the alleged scheme were swaps. A "swap" includes any agreement, contract, or transaction that provides for payment based on the occurrence, or non-occurrence, of a financially consequential event. It also includes any agreement, contract, or transaction that provides for an exchange of payments based on the value of one or more rates, commodities, indices, or other property that transfers, in whole or in part, the risk of changes in value of the things underlying the swap, without actually exchanging those things.

> If you find that the MNGO Perpetuals involved in the alleged scheme were swaps, there is one exception that can make them no longer "swaps" for purposes of Count One. It is called the retail commodity transaction exception. This exception applies only if you find that USDC is a commodity. If you make such a finding, the retail

commodity exception also does not apply if the Government proves any of he following beyond a reasonable doubt:

First, the MNGO Perpetuals involved in the alleged schemes were not agreements, contracts, or transactions in USDC;

Second, the defendant was both the buyer and seller of MNGO Perpetuals involved in the alleged scheme, and he either had more than $10 million in investable assets, or had more than $5 million in investable assets and enters the agreement, contract, or transaction to manage risk; or

Third, MNGO is a security. MNGO is a security if the Government proves beyond a reasonable doubt that MNGO was an investment of money, in a common enterprise, with the expectation of profits to be derived from the efforts of others. If there was a reasonable expectation that holders of MNGO tokens would have significant control in creating profits, then profits would not be considered to be derived from the efforts of others. But if the reasonable expectation is that MNGO token holders would be passive, then profits would be considered derived from the efforts of others.

If you find the Government has proved beyond a reasonable doubt any of these here things, the retail commodity transaction exception to swaps does not apply. However, if the Government has not proven any of these three things beyond a reasonable doubt, then the exception applies, MNGO Perpetuals cannot be swaps, and you should proceed on Count One only if the Government has proven beyond a reasonable doubt that the defendant's sales of USDC for MNGO were contracts of sale of commodities.

The Government's proposed instruction, unlike the defense's, accurately reflects the law regarding the swap exception for retail commodity transactions. This Court should, therefore, reject the defense's instruction in favor of the Government's proposal.

## VI.   The Defense's Extraterritoriality Instruction is Wrong.

The defendant was in the United States when he committed the charged offenses. Nonetheless, the defense proposes instructing the jury on extraterritoriality and proposes an instruction that relies heavily on case law from the wrong part of the CEA. The Court should reject that proposed instruction.

The first glaring error in the defense's proposed instruction is that it purports to apply to all of the charged offenses, yet draws only on concepts from the CEA. Those concepts plainly do not apply to Count Three, which is wire fraud. To prove a domestic application of the wire-fraud statute, the Government need only prove that some "use of the . . . wires in furtherance of a scheme to defraud" took place in the United States. *United States v. Napout*, 96t3 F.3d 163, 180 (2d Cir. 2020). Accordingly, if the defense insists on an extraterritoriality instruction, this Court should instruct the jury that, if the Government has proved beyond a reasonable doubt that the defendant

used wires in the United States in furtherance of the scheme charged in Count Three, there is a sufficient connection to the United States.

The defense's proposed instruction also has a significant legal error in the instruction about domestic applications of the CEA. The defense's proposal states that, for a domestic application of the CEA, conduct relevant to the focus of the statute must have occurred in the United States. The instruction then goes on to state: "

> Whether trading has taken place in the United States depends on where buy and sell orders are matched; in other words, where the server is located on which the matching takes place. This is true even if one or both of the parties to a trade is in the United States at the time of trading, if the trading takes place on a foreign exchange that matches the orders abroad, that is conduct that took place outside of the United States.

This instruction makes it seem like, if the defendant was *in the United States* when he committed his crime, it may nonetheless not involve a domestic application of the CEA if his trades matched on servers outside the country.

That instruction is wrong under binding Circuit precedent and relies on the wrong part of the CEA. The Second Circuit has held that the "focus" of Section 6(c)(1) for determining a domestic application of the statute is "on rooting out manipulation and ensuring market integrity—not on the geographical coordinates of . . . transaction[s]." *Prime Int'l Trading Ltd. v. BP PLC*, 937 F.3d 94, 107-08 (2d Cir. 2019). This is because Section 6(c)(1), unlike the securities-fraud laws, does not have a "purchase or sale" requirement. *Id.* When applying this standard, the Second Circuit has, therefore, looked to whether the fraudulent or manipulative conduct occurred, which can include where trades match, but also includes where the defendants were located at the time of the scheme. *See In re Platinum & Palladium Antitrust Litig.*, 61 F.4th 242, 268 (2d Cir. 2023) (finding domestic application of CEA appropriate where collusive activity occurred).

The defense's focus on where trading is matched relies on case law from the wrong part of the CEA. Section 22 of the CEA confers a "private right of action" to individuals for certain violations, including violations of Section 6(c)(1). *Prime Int'l*, 937 F.3d at 102. To be eligible for that private right of action, the plaintiff must have engaged in an enumerated transaction. *See* 7 U.S.C. § 25(a)(1). The defense's instruction comes from case law finding that, for a domestic application of the private right of action provision, the transaction must have occurred in the United States. *Prime Int'l*, 937 F.3d at 104-05. That case law is plainly inapplicable here, where the Government is not asserting a private right of action.

If the defense insists on an extraterritoriality instruction, and there is a factual basis at trial for one, the Government respectfully requests the Court instruct the jury that, if the Government has proven that the defendant committed his allegedly manipulative and fraudulent actions while in the United States, then there is a sufficient connection to the United States. This is legally correct and avoids the need for a complicated instruction on what is a simple issue. At a minimum, the Court should not give the instruction that the defense has proposed.

## VII.   The Description of the Charged Offenses.

In responding to the March 29 Orders, the Government realized that the description of the defendant's crime that the Government submitted in its requests to charge was narrower than intended.  Specifically, in Request No. 2, the Government proposed summarizing the offenses as follows:

> Count One charges the defendant with committing commodities fraud by engaging in a scheme to fraudulently steal cryptocurrency from the cryptocurrency exchange known as Mango Markets, including through market manipulation that deceptively inflated the value of his assets and by misrepresenting his intentions to borrow cryptocurrency from the platform.   Count Two charges the defendant with committing swap manipulation by artificially inflating price of MNGO perpetuals on Mango Markets.  And Count Three charges the defendant with committing wire fraud by engaging in a scheme to fraudulently steal cryptocurrency from Mango Markets, including by deceptively misrepresenting the value of his assets on Mango Market and misrepresenting his intentions to borrow cryptocurrency from the platform.

Similar language appears introducing each of the three counts.

This description of the offense omitted some aspects of the allegedly fraudulent schemes, such as the defendant's use of another person's identity and his creation of an artificial position on Mango Markets by trading with himself.  Because the Government will have an opportunity to argue the case to the jury in its summation, the Government does not believe an overly long description of the offense is necessary.  Accordingly, rather than adding to the instruction above, the Government proposes replacing it with the following, simpler formulation:

> Count One charges the defendant with committing commodities fraud by engaging in a fraudulent and manipulative scheme to steal cryptocurrency from Mango Markets.   Count Two charges the defendant with committing commodities manipulation by artificially inflating the price of certain MNGO Perpetuals on Mango Markets.  And Count Three charges the defendant with committing wire fraud by engaging in a fraudulent scheme to steal cryptocurrency from Mango Markets.

Consistent with this revision, the Government also proposes simplifying the descriptions at the beginning of the instructions for each Count to conform with this new instruction.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney


by: __/s/_____
    Thomas Burnett
    Peter Davis
    Assistant United States Attorneys
    (212) 637-1064 / 2468

    Tian Huang
    Special Assistant United States Attorney
    (202) 598-2523