**TALKIN, MUCCIGROSSO & ROBERTS, L.L.P.**
ATTORNEYS AT LAW
40 EXCHANGE PLACE
18TH FLOOR
NEW YORK, NEW YORK 10005

(212) 482-0007 PHONE
(212) 482-1303 FAX
WWW.TALKINLAW.COM
EMAIL: INFO@TALKINLAW.COM

MARYLAND OFFICE:
5100 DORSEY HALL DRIVE
SUITE 100
ELLICOTT CITY, MD 21042

410-964-0300

NEW JERSEY OFFICE:
2500 PLAZA 5
HARBORSIDE FINANCIAL CENTER
JERSEY CITY, NJ 07311

201-342-6665

April 2, 2024

Honorable Arun Subramanian
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

**VIA ECF**

        Re:    <u>United States v. Avraham Eisenberg</u>
              23 Cr. 10 (AS)

Dear Judge Subramanian:

    Defendant Avraham Eisenberg respectfully submits this letter in accordance with the Court's March 29, 2024 Orders (Dkts. 123-124) regarding disputes between the parties relating to the proposed jury instructions. The parties met and conferred telephonically twice—on March 30 and March 31—to discuss areas of potential agreement.

    **I.**    <u>**Willfulness Instruction**</u>

    The parties have two disagreements regarding the willfulness instruction. First, as to Count One (Commodities Fraud), while both the government and defense agree that willfulness is an aspect of scienter that the government must prove, they disagree on whether the definition revolves around an intent to act in an unlawful manner (the defense) or immorally (the government). And second, regarding Count Three (Wire Fraud), the defense proposes an instruction on willfulness identical to its Count One willfulness instruction, the government contends that willfulness is not applicable to wire fraud and that the Count Three jury instruction should not include willfulness.

    The defense's proposed instruction (Dkt. 100 at 27) states: "To act 'willfully means to act with bad purpose, and with knowledge that his conduct was unlawful. The [g]overnment must prove that Mr. Eisenberg acted with an intent to do something the law forbids, that is to, with bad purpose either to disobey or disregard the law." In significant divergence, the government's proposal states (Dkt. 101 at 15), "To act 'willfully means to act voluntarily and with bad purpose."

Hon. Arun Subramanian
Page 2

      Both the Sand instructions and the Second Circuit support the defense instruction over that of the government, which is virtually unsupported by the any court in this Circuit. The defense instruction, and, in particular, the concept of unlawfulness, is taken directly from the Sand Instructions.[1] The Second Circuit has explicitly and repeatedly endorsed the Sand instruction, including the requirement that the government must prove that a defendant act with an unlawful purpose.

      In *United Stats v. Kosinski*, 976 F.3d 135, 153 (2d Cir. 2020), a securities fraud case, the Second Circuit affirmed the district court's verbatim use of the Sand willfulness instruction, quoting the Supreme Court for the proposition "that, 'as a general matter, when used in the criminal context, a 'willful' act is one undertaken with a bad purpose.' In other words, in order to establish a willful violation of a statute, the [g]overnment must prove that the defendant that the defendant acted with knowledge that his conduct was unlawful.'" *Id.* (quoting *Bryan v. United States*, 524 U.S. 184, 191-92 (1998); *see also*, *e.g.*, *United States v. Winston*, 558 F.2d 105 (2d Cir. 1977) (defining willful as "[a]n evil motive to accomplish that which the statute condemns "a voluntary, intentional violation of a known legal duty."); *United States v. Cassese*, 428 F.3d 92, 98 (2d Cir. 2005) ("[I]n order to establish a violation of the securities laws, the [g]overnment must show that the defendant acted willfully [which] this Court has defined [] as a realization on the defendant's part that was doing a wrongful act **under the securities laws**. . . in a situation where the knowingly wrongful act **involved a significant risk of effecting the violation that has occurred**.") (emphasis added and citations omitted); *United States v. Pelz*, 433 F.2d 48, 54 (2d Cir. 1970) (same) (Friendly, J.). The Second Circuit clarified that willfulness was not the equivalent of a mistake of law defense and did not require knowledge of the "specific law that one is violating," unlike certain provisions of the tax code. *Id.* at 154. Even more recently, in an illegal campaign contribution case, the Second Circuit reaffirmed that unlawfulness is the gravamen of willfulness, approving an instruction that, in essence, instructed that "to have found that Defendants acted willfully, the jury had to conclude beyond a reasonable doubt that they intentionally did something that the law forbids, the opposite of good faith." *United States v. Kukushkin*, 61 F.4th 327, 334 (2d Cir. 2023).

      The government's reliance on *United States v. Dixon*, 536 F.2d 1388, 1395 (2d Cir. 1976) and *United States v. Petit*, 2022 WL 3581648, at *4 (2d Cir. 2022), is misplaced. Those cases are consistent with the determination in *Kosinski* that knowledge of the specific statute or rule violated is unnecessary, as long as the defendant knew of the general unlawfulness of his conduct. Likewise, in *United States v. George*, 386 F.3d 383, 393 (2d Cir. 2004), another case cited by the government, the Second Circuit noted that while the district court's instruction that willfulness required that a defendant have "a bad purpose to disobey or disregard the law" and "must have been aware of the generally unlawful nature of his act" was inapplicable to the particular statute at issue (criminalizing false statements in passport applications), it would "perhaps [be] appropriate as a definition of "willful in other contexts, *see*, *e.g.*, *Bryan*, 524 U.S. at 190, *Winston*, 558 F.2d at 107-09."

      The government's announced position at the March 28, 2024 conference illustrated the

---

[1] "To act 'willfully' means to act knowingly and purposely, with an intent to do something the law forbids, that is to say, with bad purpose either to disobey or to disregard the law." 3 Modern Federal Jury Instructions-Criminal P. 57-24.

Hon. Arun Subramanian
Page 3

untenable vagueness of the standard for which it advocates. In response to the Court's question "What does 'wrong' mean?" the government replied that "'wrongful' means he understood that what he was doing was . . . generally wrongful in the moral sense." Tr. 9:15-22. It appears then that the government is taking the position that the jury should delve into Mr. Eisenberg's sense of morality and determine whether he has acted in violation of his own principles. And, more generally, that the jury must make this evaluation of the moral sensibility of every defendant in at least all criminal securities and commodities fraud cases. Alternatively, the government is suggesting that the jury determine the criminal culpability of the defendant based on an undefined general sense of morality. Such a position demonstrates the shear unworkableness of the government's position that wrongfulness, which it cannot define, be the basis for the definition of willfulness.

The standard set by the Second Circuit for securities fraud cases is thus consistent with the Sand instruction. As this Court has noted, legal precedent from securities fraud is generally applicable to commodities fraud as well. Thus, in *United States v. Phillips*, 22 Cr. 138 (S.D.N.Y. Oct. 24, 2023), Judge Lewis Liman gave an instruction on commodities fraud that included the direction that willful meant "with a purpose to disobey or disregard the law." Mr. Eisenberg respectfully submits that this Court should give the jury a similar instruction on Count One in this case.

The Sand instructions for wire fraud, 2 *Modern Federal Jury Instructions-Criminal* P. 44.5, include an instruction on willfulness that is identical to that on securities fraud, and the Court should therefore include willfulness in the wire fraud instruction given in this case. While it is true that the term willful does not appear in the wire fraud statute, willfulness has been broadly interpreted by judges in this District to be a necessary component of the specific intent to defraud required under 18 U.S.C. § 1343. In *United States v. Middendorf*, 2019 WL 4254025 (S.D.N.Y. Sep. 9, 2019), the district court, pointed out that "some version of the Sand instruction on willfulness is frequently given by judges in the Southern District of New York in wire fraud cases" and thus elected to instruct the jury on willfulness over the government's objection.

And while Judge Oetken elected to modify the definition of willfulness in that instruction, he did so because there was a dearth of legal precedent confirming that the Sand instruction was the correct definition of "willfulness." That is no longer the case, as *Kosinski* has specifically endorsed the Sand willfulness definition for financial fraud.

The only in-Circuit authority cited to the contrary by the government is *United States v. Gole*, 21 F. Supp. 2d 161, 167-68 (E.D.N.Y. 1997). But even in *Gole*, Judge Korman noted that "invocation of the word 'willfully' in mail fraud instructions has, over time, become widespread," recognizing that both the Sand instruction and that he had given the 'bad purpose to disobey or disregard the law' charge on numerous occasions in the past, even where willfulness is not an element of the offense." *Id.* Judge Korman nevertheless chose not to give that instruction in *Gole* because he found the definition "confusing." Twenty years later, when he authored *Kosinski* on behalf of the Second Circuit, Judge Korman appears to have dispelled his past confusion and endorsed the inclusion of willfulness in his detailed explanation of the legal requirements of the wire fraud jury instruction.

Hon. Arun Subramanian
Page 4

The Sand wire fraud instruction on willfulness is particularly appropriate here in order to conform the instruction on commodities fraud and wire fraud. No doctrinal rationale exists for having different scienter requirements for commodities fraud and wire fraud when the both are (nearly identical) fraud charges and relate to the exact same conduct. Mr. Eisenberg therefore believes that his proposed willfulness charge in both Counts 1 and 3 should be given to the jury.

### II. Defense in 7 U.S.C. § 13(a)(5)

Should the Court give the defendant's requested instruction for Count 1 regarding willfulness, Mr. Eisenberg does not presently intend to assert at trial the defense in 7 U.S.C. § 13(a)(5).[2] Defendant requests that the Court permit him to reserve his right to assert the defense in the event that a different instruction is given, that he testifies, and/or at sentencing in the event of conviction.

With regard to the Court's supplemental Order, Dkt.124, the Second Circuit appears to have held that burden of proof with respect to the provision in 15 U.S.C. § 78ff(a), which is analogous to the provision in 7 U.S.C. § 13(a)(5), remains on the defendant. *See United States v. Kaiser*, 609 F.3d 556, 568 (2d Cir. 2010) ("A defendant may raise the defense that he did not know the law to avoid imprisonment.").

### III. Relevance of Market Participant's Ordinary Assumptions

Market participants' ordinary assumptions are irrelevant to any issue the government is required to prove at trial and should therefore be excluded under FRE 402. And even if they were marginally probative, the confusion to the jury of introducing subject understanding of the market to prove an objective standard would vastly outweigh the minimal probative value, requiring exclusion under FRE 403.

The parties agree that an objective standard is used to determine whether a deception would have been material and that the civil concept of justifiable reliance is inapplicable. *Compare* Dkt. 100 at 25 *with* Dkt. 101 at 9. The defense instruction, which is based on the instruction given in *Phillips*, includes, "A material fact is one that would have been significant to a reasonable investor's investment decision." Dkt. 100 at 25. The standard is thus patently objective, even if it involves a universe of reasonable persons confined to the investment platform (Mango Markets) at issue.

Courts have long held that subjective beliefs and intentions are irrelevant where the applicable standard is objective. *See, e.g., United States v. Bayless*, 201 F.3d 166, 133 (2d Cir. 2000) ("Reasonable suspicion is an objective standard; hence, the subjective intentions or motives of the officer making the stop are irrelevant); *Stechauner v. Smith*, 852 F.3d 708, 715 (7th Cir. 2017) ("Because custody is determined by an objective standard, the subjective beliefs of the suspect and police officers are irrelevant."); *Mendez v. Poitevent*, 823 F.3d 326, 332 n. 7 (5th Cir.

---

[2] "[N]o person shall be subject to imprisonment under this paragraph for the violation of any rule or regulation if such person proves that he had no knowledge of such rule or regulation."

2016) ("Plaintiffs dispute that Poitevent actually believed he was threatened. But the proper inquiry is an objective one; Poitevent's subjective beliefs are irrelevant.") (internal quotations and citations omitted).

The government's proposal to ask hypothetical questions of witnesses regarding their personal beliefs and assumptions about the market would invite chaos and confusion. It could create a competition between the parties to find the most individuals willing to testify regarding subjective views supporting that side. Moreover, the jury is likely to be confused about whether the standard is subjective and could convict on the basis of subjective views that may be outliers and not indicative of reasonable market assumptions. The Court should therefore exclude such testimony.

### IV. Definition of "In Connection With"

The Court also requested that the parties address how to define "in connection with," including whether there is more specific language than "coincide with" that can be used in the definition. Dkt. 123 at 2. The "coincide with" language appears to have originated from the Supreme Court's decision in *SEC v. Zandford*, 535 U.S. 813, 821 (2002). The "coincide" requirement is met where claims of injury (or potential injury) "'necessarily allege', 'necessarily involve,' or 'rest on' the purchase or sale of" covered assets. *Romano v. Kazacos*, 609 F.3d 512, 522 (2d Cir. 2010) (quoting *Dabit v. Merrill Lynch, Fenner & Smith, Inc.*, 395 F.3d 25, 48 (2d Cir. 2005)); *see also Daddario v. Platt*, 75 F. 4th 86, 96 (2d Cir. 2023).

As the Court noted in the Order and Opinion denying Mr. Eisenberg's motion to dismiss, *Chemical Bank v. Arthur Andersen & Co.*, 726 F.2d 930 (2d Cir. 1984), stands for the proposition that the alleged deception must bear some relationship to the value of the covered asset in order to meet "in connection with" requirement. Dkt. 67 at 7. Similarly, there is "'a distinction between [i] misrepresentations with respect to the value of a security, and [ii] misrepresentations with respect to a party's intention to comply with a particular agreement.'" *Rodgers-King v. Candy Digit. Inc.*, 2024 WL 382092, 2024 U.S. Dist. LEXIS 17920, at *9 (S.D.N.Y. Feb. 1, 2024) (quoting *Lankau v. Luxoft Holding, Inc.*, 266 F. Supp. 3d 666, 671 (S.D.N.Y. 2017)). "A fraudulent misrepresentation or omission is not made 'in connection with' [] a 'purchase or sale of a covered [asset]' unless it is material to a decision by one or more individuals (other than the fraudster) to buy or to sell a 'covered [asset].'" *Chadbourne & Parke LLP v. Troice*, 571 U.S. 377, 387 (2014).

As the Court seems to note, the government's proposed instruction is thus insufficient. There must be a nexus between the alleged deception and the covered asset—in this case, the swap or contract of sale. The defense has proposed such an instruction on pages 30-31 of its proposed instructions.

### VI. Exceptions to the Definition of "Swap" (Count One)

The CEA lists a number of enumerated exceptions to the definition of "swap." *See* 7 U.S.C. § 1a(47). The defense requested that the jury be instructed as to three such exceptions to the definition. After review of the government's charge and applicable law, Mr. Eisenberg

submits that only the exception relating to retail commodities transactions requires an instruction as an exception.

The third enumerated "exception" in the proposed defense instruction related to transactions in which no risk is involved. This request was framed as an exception because the defense believed the government to be pursuing a theory of swap defined in 7 U.S.C. § 1a(47)(A)(ii) relating to the occurrence or nonoccurrence of a financially consequential event. The government's instructions, however, make clear that it wishes the jury be instructed in accordance with 7 U.S.C. § 1a(47)(A)(iii), and the government's proposed definition includes transfer of risk as part of the definition of "swap." Thus, the previously requested portion of the instruction is not necessary.

Similarly, the defense withdraws its request for an instruction on security-based swaps. Mr. Eisenberg does not intend to rely on this theory at trial. Because "mixed swaps" are an "exception to the exception"—i.e., they carve out a subsection of security-based swaps that are covered by the CEA—Mr. Eisenberg believes that an instruction on mixed swaps is no longer necessary.

Mr. Eisenberg does request that the jury be instructed regarding retail commodities transactions. The statute states that "[t]he term 'swap' does not include any . . . agreement, contract, or transaction described in section . . . 2(c)(2)(D)(i) of this title." 7 U.S.C. § 1a(47)(B)(i). Thus, retail commodity transactions are not swaps. And while retail commodity transactions may be covered by the CEA, the government did not place Mr. Eisenberg on notice in the indictment or otherwise that it would pursue such a theory and doing so at trial would be a constructive amendment of the indictment. Thus, the jury should be instructed that retail commodities transactions are not "swaps."

### VII. Materiality Required for Manipulative Device (Count One)

Materiality is and has long been a seminal element of fraud both in civil and criminal cases and without regard to the type of fraud alleged, including in securities and commodities fraud cases. *See Neder v. United States*, 527 U.S. 1, 22 (1999) ("[T]he common law could not have conceived of 'fraud' without proof of materiality.") (citation omitted); *CFTC v. McDonnell*, 287 F. Supp. 3d 213, 226 (E.D.N.Y. 2018) (requiring materiality for commodities manipulation claim). The government apparently takes the position that materiality applies only to false statements and misleading omissions charged under 17 C.F.R. § 180.1(a)(2) and not to manipulative schemes and artifices to defraud charged under 17 C.F.R. § 180.1(a)(1). Notably, the government has not, and, the defense believes, cannot cite any authority for this proposition. The government took the same position several months ago in *United States v. Phillips* and lost. 22 Cr. 138 (LJL), at 16 (S.D.N.Y. Oct. 24, 2023). The outcome here should be the same.

In a seminal case, the Supreme Court in *Neder*, 527 U.S. at 23, held that materiality applied to "a scheme or artifice to defraud" for purposes of the mail, wire, and bank fraud statutes. *See also See United States v. Rybicki*, 354 F.3d 124, 146 n.20 (2d Cir. 2003) (en banc) (explaining that materiality is embedded in "the phrase 'scheme or artifice to defraud'" (internal citation omitted)). In so holding, the Supreme Court rejected the government's argument that materiality was not

required because it was not stated explicitly in the fraud statute. The Court made this holding that because materiality was so thoroughly ingrained in the common law understanding of fraud at the time of the drafting of the statutes, "we must ***presume*** that Congress intended to incorporate materiality unless the statute otherwise dictates." *Neder*, 527 U.S. at 23. Under *Neder*, commodities fraud must also necessarily require materiality, regardless of the category of deception charged, because Congress has not stated otherwise.

Doctrinally, there is also no compelling explanation for the government's position. The government's theory is that the alleged market manipulation was done to deceive victims by sending a false signal to the market. There is no logical reason why such a theory of deception should not require materiality. In other words, if the theoretical false pricing was insignificant, either because of its minute size or because it otherwise could not have affected the actions of any counterparty, criminal culpability should not attach. That is particularly true in a case like this, where the exact same deception requires materiality to prove wire fraud—under a statute, 18 U.S.C. § 1343, that also does not explicitly call for materiality.

The "in connection with" requirement presents in the commodities and securities fraud statutes has also been interpreted to require materiality. The Supreme Court held in the securities context that "in connection with the purchase or sale of a covered security" imposes a requirement that the alleged fraudulent conduct be "material to a decision by one or more individuals (other than the fraudster) to buy or to sell a 'covered security.'" *Troice*, 571 U.S. at 387. The Supreme Court explained that "[t]he phrase 'material fact in connection with the purchase or sale' suggests a connection that matters," and "a connection matters where the misrepresentation makes a significant difference to someone's decision to purchase or to sell a covered security." *Id.* at 387-88; *see also United States v. McLellan*, 959 F.3d 442, 458-59 (1st Cir. 2020) ("[T]he alleged fraud must reach a certain threshold of materiality to be deemed made 'in connection with' a transaction in securities" (quoting *Troice*, 571 U.S. at 387-88).)

For these reasons, Mr. Eisenberg respectfully requests that the Court instruct the jury that materiality is an element of commodities fraud. Mr. Eisenberg further requests that the Court instruct the jury that materiality is its own element because whether the alleged deceptions were material appears to be one of the primary areas of dispute in this case.

### VIII. Definition of Commodity (Count One)

Mr. Eisenberg objects to the government's instructions on "commodity" and "contract of sale." Dkt. 101 at 11. The government's instructions fail to inform the jury which asset the government believes (and which it does not believe) to be a commodity. The jury should be instructed that the government is not alleging that MNGO is a commodity and that their role is to assess whether USDC was a commodity and whether the alleged deception/s were in connection with a contract of sale of USDC (not MNGO).

Hon. Arun Subramanian
Page 8

The parties agree in essence that the relevant definition of commodity requires proof of the existence of a futures market. Dkt. 100 at 30; Dkt. 101 at 11; 7 U.S.C. § 1a(9).[3] We disagree, however, it seems on which asset must have a futures market.

Mr. Eisenberg takes the straightforward position that for USDC to be a commodity, the government must prove that USDC specifically meets the statutory definition and had a futures market at the time of the alleged trading, October 11, 2022. The government, in its opposition to the motion to dismiss, represented that USDC was "a virtual currency in which futures are traded." Dkt. 36 at 12. However, the discovery, exhibits, and witness statements disclosed to date indicate that the government has no evidence of such a futures market and could not meet this burden.

Instead, the government apparently will take the position that as long as it proves the existence of a futures market for any virtual currency of its choosing, it will also have proven that all cryptocurrencies are commodities, including USDC. Under the government's theory, it need not show any similarity between the asset that has a futures market and USDC, other than that both are virtual currency.

Mr. Eisenberg briefed the severe problems with this position in his memorandum of law in support of his motion to dismiss. *See* Dkt. 28 at 12. In sum, no court in the Second Circuit has ever deemed a cryptocurrency without a futures market a commodity under the CEA. Nor has the CFTC issued any regulations that would include cryptocurrency within the definition of commodities.

Only one out-of-circuit case had ever held a token lacking a futures market to be a commodity, and that was in a civil case in response to a motion to dismiss. S*ee CFTC v. My Big Coin Pay, Inc.*, 334 F. Supp. 3d 492, 496-98 (D. Mass. 2018). *My Big Coin* has been criticized as giving "CEA §1a(9) a dubious reading that threatens to render the commodity definition a nullity . . . Instead, the statute means what it says: [o]nly goods in which futures contracts are dealt are commodities; other goods are not." James M. Blakemore, *New Things Under the Sun: How the CFTC is Using Virtual Currencies to Expand its Jurisdiction*, 15 Ark. L. Rev. 205, 243 (2020).

Indeed, the reasoning of *My Big Coin* is highly unpersuasive. That district court states that the statute defines "'commodity' generally and categorically," not specifically. This holding is blatantly inaccurate. The definition specifies, for instance, five specific types of fats and oils, nine types of grain, including "grain sorghums, and specifically includes "frozen concentrated orange juice." 7 U.S.C. § 1a(9). Conversely, the statute excludes specific items like onions and

---

[3] Section 1a(9) states: "The term 'commodity' means wheat, cotton, rice, corn, oats, barley, rye, flaxseed, grain sorghums, mill feeds, butter, eggs, Solanum tuberosum (Irish potatoes), wool, wool tops, fats and oils (including lard, tallow, cottonseed oil, peanut oil, soybean oil, and all other fats and oils), cottonseed meal, cottonseed, peanuts, soybeans, soybean meal, livestock, livestock products, and frozen concentrated orange juice, and all other goods and articles, except onions (as provided by section 13-1 of this title) and motion picture box office receipts (or any index, measure, value, or data related to such receipts), and all services, rights, and interests (except motion picture box office receipts, or any index, measure, value or data related to such receipts) in which contracts for future delivery are presently or in the future dealt in.

motion picture box office receipts. In support of its reading that the definition of commodity is meant to be categorical, the *My Big Coin Court* notes that it includes "'livestock' as a commodity without enumerating which particular species are the subject of futures trading." 334 F. Supp. 3d at 496. Initially, the point is wrong because there is no indication that livestock are designated commodities because Congress specifically included them in the statutory definition—perhaps because one or more species had a futures market and perhaps not. Moreover, different species of domestic farm animals have obvious similarities, including that many different species are often raised together on the same farm and subject to the same market forces.

By contrast, My Big Coin and Bitcoin—which the court found had a futures market—have very little in common. For example, one Bitcoin is worth approximately $65,000, while My Big Coin likely traded at a small fraction of a dollar. Likewise, different cryptocurrencies may be on different blockchains, be technologically distinct, and have entirely different uses. USDC and Bitcoin are good examples. USDC is a stablecoin pegged to the dollar, which is meant to facilitate transaction and resides on proof of stake blockchains. By contrast, Bitcoin allows for speculative investment and can fluctuate wildly in value[4] and lives on a proof of work blockchain.[5]

*My Big Coin* also relies on a series of cases involving natural gas, in which courts have held that because of the existence of futures contracts for natural gas at one particular hub and the fact that natural gas is fungible and may move freely throughout a national pipeline system, it is not necessary to show that the particular natural gas at issue passed through the hub. *Id.* at 497. For the reasons stated above, natural gas that is identical to other natural gas and passes through the same system is a poor comparison for the (ever-growing) universe of different types of virtual currencies.

The government's definition of commodity is made all the more problematic by its insistence that a medium of exchange, like USDC, can substitute for the targeted asset or service and bring virtually any purchase on the internet completed with a virtual currency into the ambit of the CEA. The defense discussed this issue in detail in the motion to dismiss Reply. *See* Dkt. 37 at 4-6, 16-17.

---

[4] *See* price chart: https://www.coindesk.com/price/bitcoin/

[5] Proof of work (PoW) and (PoS) are consensus mechanisms used by networks to validate transactions. "PoW involves users solving complex computational puzzles to add new blocks to the blockchain. By contrast, PoS allows users to validate transactions base on the number of coins they hold and are willing to 'stake' for the network's security." *Proof of Work (PoW) vs. Proof of Stake (PoS): what's the difference?* available at https://www.coinbase.com/nl/learn/crypto-basics/proof-of-work-pow-vs-proof-of-stake-pos-what-is-the-difference?utm_source=google_search_nb&utm_medium=cpc&utm_campaign=9943088770&utm_content=100067298945&utm_term=&utm_creative=580583551384&utm_device=c&utm_placement=&utm_network=g&utm_location=9067609&gad_source=1&gclid=Cj0KCQjw2a6wBhCVARIsABPeH1tBonNEGOaMMzkDBJ7VTLyHOsDuEPDkO0yVEfX9sz6iAWV10X2gYs4aAilGEALw_wcB.

A troubling scenario emerges under the government's strained theory. If in the next few years, online service providers like Hulu allow subscribers to pay for the service in cryptocurrency—hardly a farfetched notion, given that Hulu gift cards are already available for purchase with cryptocurrency—such contracts would be deemed contract of sale. In the event that a subscriber chose to share access to the account with another individual outside of her household, she could be prosecuted for commodities fraud and imprisoned for up to twenty years.

For the reasons stated above, the government's contract of sale theory is untenable. Should it reach the jury, the jurors should be instructed that to convict, among other things, the government must prove that USDC has a futures market and that the contracts of sale were for USDC. That is, USDC must have been the asset at the heart of the transaction and not merely a medium of exchange.

### IX. Attempted Commodities Manipulation

Mr. Eisenberg objects to the government's request to charge the jury regarding attempted commodities manipulation. The government has never advanced a factual basis to support such a charge and the charge would only serve to confuse the jury into potentially convicting on a theory not actually advanced or proven by the government. In its factual recitation of the case in the government's opposition to the motion to dismiss and in support of its motions *in limine*, the government stated in no uncertain terms the theory that Mr. Eisenberg successfully manipulated the market. Indeed, the government has never articulated any other theory of market manipulation.

The defense understands that the government intends to press for an attempt instruction because the government believes there to be a possibility that the jury will find the government's proof insufficient regarding price artificiality. However, should that occur, no valid basis for the jury to convict Mr. Eisenberg on an attempt theory exists for two reasons. Initially, in such a scenario, the government would be unable to prove that Mr. Eisenberg had the requisite intent to manipulate the price of MNGO Perpetuals. According to the government, Mr. Eisenberg's trading—consistent with his intent—raised the price of MNGO in the spot market and, as a result, the price of MNGO Perpetuals to a sufficient level to allow him to withdraw essentially all of the collateral deposited on Mango Markets. If the allegedly inflated price of MNGO Perpetuals, which the government contends was the very price Mr. Eisenberg intended to achieve, was found to be insufficient to create an artificial price, then he did not have an intent to manipulate the price of the swap. *See CFTC v. Amaranth Advisors, LLC*, 554 F. Supp. 2d 523, 532 (S.D.N.Y. 2008) ("To establish intent, it must be proven that the accused acted (or failed to act) with the purpose or conscious object of causing or effecting a price or price trend in the market that did not reflect the legitimate forces of supply and demand.") (citation omitted).

For similar reasons, in such a scenario, Mr. Eisenberg would have a legal impossibility defense. A defense of legal impossibility is a "situation [] where the actions set in motion by defendant even if carried out ***as he desires***, would not constitute a crime." *United States v. Boisvert*, 499 Fed. App'x 101, 103 (2d Cir. 2012). In the government's scenario necessitating the attempt instruction, Mr. Eisenberg was able to set the price of MNGO at the desired level, but the

jury deemed that that price was not artificial, and the action therefore could not constitute a crime. Therefore, no viable attempt theory exists, and the instruction should not be given.

### X. Definition of Artificiality in Count Two

The government's definition of artificiality in Count 2 continues to suffer from the same fundamental problem present in the government's previous positions taken regarding this element. Artificiality and intent are separate elements. Indeed, the government acknowledges as much by charging them as separate elements. Nevertheless, the government again resorts to a definition that relies upon intent. The government requests an instruction that defines "the natural interplay of supply and demand" as "people buying and selling for legitimate reasons." Dkt. 101 at 20. The government then builds on this definition to state that a "factor is not legitimate" when there is "an individual buying and selling to control or distort a price." *Id.* Putting these two things together, the government asks for an instruction that it must prove that "the defendant traded with an intention to control or distort the price, rather than for a legitimate reason." *Id.*

None of the authority cited by the government speaks to artificiality being defined by "legitimate reasons" or "intent to control." Nor is the government's language consistent with the concepts in the relevant cases. Instead, the government is once again attempting "to read out the artificial price element of the *Amaranth* test by collapsing it into the subjective intent requirement." The Court should instead give the defense instruction, which adheres to both the concepts and language of the relevant cases. *See* Dkt. 100 at 34-35.

### XI. Venue

The government and the defense agree that Count Three (Wire Fraud) requires a wire transmission in the District. The defense thus proposes the following instruction:

"In order to establish venue for the wire fraud charge in Count Three, the government must prove the defendant caused any interstate wire, such as an e-mail, phone call, or financial transaction to be transmitted into or out of the district. The wire need not itself be criminal so long as it was transmitted or caused to be transmitted as part of the scheme. Transmission of the wire need not have been taken by the defendant so long as the transmission was a foreseeable part of the crime that you find he committed."

### XII. The Government's Theory of Deception (Count One)

The defense has requested from the government a clear statement on whether it is limiting its theories of deception to those articulated in its proposed instructions but has not yet received a response. Mr. Eisenberg requests that the government articulate its theories of deception at or before the upcoming conference and that the instructions to the jury include a complete recitation of the government's alleged deceptions.

━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━

Thank you for Your Honor's consideration of this letter.

Hon. Arun Subramanian
Page 12

        Respectfully submitted,

        *Noam Greenspan*
        Noam Greenspan
        Sanford Talkin

        – and –

        Brian Klein
        Ashley Martabano
        Riley Smith
        Waymaker LLP

cc:    AUSA Thomas Burnett (by ECF)
        AUSA Peter Davis (by ECF)
        SAUSA Tian Huang (by ECF)