O3SBEISC

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                          23 Cr. 10 (AS)

5   AVRAHAM EISENBERG,

6

7              Defendant.

8                                          Conference
    ------------------------------x
9
                                           New York, N.Y.
10                                         March 29, 2024
                                           1:00 p.m.
11

12  Before:

13
                         HON. ARUN SUBRAMANIAN,
14
                                           District Judge
15
                              APPEARANCES
16
    DAMIAN WILLIAMS
17       United States Attorney for the
         Southern District of New York
18  BY:  PETER J. DAVIS
         THOMAS S. BURNETT
19       TIAN HUANG
         Assistant United States Attorneys
20
    BRIAN E. KLEIN
21  SANFORD N. TALKIN
    NOAM B. GREENSPAN
22       Attorneys for Defendant

23
    Also Present: Special Agent Brandon Racz
24

25

O3SBEISC

        (Case called)

 1              THE DEPUTY CLERK:  Counsel, note your appearances.

 2              MR. DAVIS:  Good afternoon, your Honor.  Peter Davis,

 3      Thomas Burnett and Tian Huang for the government, and I'm

 4      joined at counsel table by Special Agent Brandon Racz.

 5              MR. KLEIN:  Good afternoon, your Honor.  Brian Klein

 6      with Avraham Eisenberg and co-counsel Sam Talkin and Noam

 7      Greenspan.

 8              THE COURT:  Okay.  Good afternoon.  And, Mr. Klein,

 9      we've squared everything away so that Mr. Eisenberg can speak

10      with his parents after the conference?

11              MR. KLEIN:  Yes, we did, your Honor.  We appreciate

12      the Court's assistance and government's help too.

13              THE COURT:  And the Court has made some inquiries with

14      the facility, and the hope is that by some time next week at

15      least they'll be in a position to recommence having social

16      visits.  Please let me know if there is any further

17      difficulties or some lack of information, or if there's any way

18      that I can help because I think that there was some surprise

19      that there were some issues at the facility that the Court had

20      not been apprised of.  And so if those continue, let me know.

21              MR. TALKIN:  Yes, your Honor.  Thank you.  I just want

22      to let you know, we've been in touch with the government.  We

23      do have some concern about his access to his computer and

24      using.  Government is trying to help us out.  If there's an

O3SBEISC

1   issue, we'll file a letter.  We're on top of that.  Thank you.

2           THE COURT:  That's a good way to start the conference.

3   So the one thing, we have sometime.  Sometimes these

4   conferences happen the day before trial begins or a couple of

5   days before.  We've got a week.  To the extent that there are

6   issues that I can help with, get them to me during this time

7   when we have it so that we're not in a position where we have

8   to waste the jury's time dealing with these issues; or there's

9   not something that just comes up or we could have taken care of

10  it and it poses a difficulty during trial.  Okay.

11          All right. Let's start with, let me ask the government

12  if there have been any plea offers, and we can start there.

13          MR. DAVIS:  So, your Honor, the answer as to this case

14  there's been no normal plea offers made to Mr. Eisenberg.

15          THE COURT:  Okay.  Any questions that defense counsel

16  has along those lines or anything they wanted to raise?

17          MR. KLEIN:  No, your Honor.

18          THE COURT:  Okay.  So then let's proceed to the

19  government's motion *in limine*.  On the first issue raised as to

20  the interrogatories on the verdict form.  I take it given

21  Mr. Eisenberg's response that there's no issue -- the issue

22  that was presented in the government's motion is not an issue.

23  At this point it becomes a question for the Court as to which

24  route it will take in terms of fashioning the verdict form, but

25  I'll hear from the government if they think that there is still

O3SBEISC

1   a remaining issue to be resolved on a motion *in limine*.

2           MR. BURNETT:  Which particular, on the verdict form

3   issue?

4           THE COURT:  On the verdict form issue, I understand

5   Mr. Eisenberg is saying, look, we're just trying to make clear

6   that you have to be unanimous as to one of the things that

7   enumerated in the regulation, which I think the government

8   agrees to because that's reflected in the government's jury

9   instructions.  They're not trying to make the argument that the

10  means need to bare a unanimous finding.

11          MR. BURNETT:  If that's the Court's understanding,

12  then the government is comfortable with that.

13          THE COURT:  Is that also defense's understanding.

14          MR. GREENSPAN:  Your Honor, we're comfortable with

15  that.  Yes, that's our understanding.

16          THE COURT:  So then the Court will resolve that issue,

17  and it has both sides' positions on that.  So the second issue.

18  Now the other issue that the defendant raises in the response

19  to the motion *in limine* concerns a variance from the

20  indictment.  I take it that that's being raised almost as a

21  shot across the bow to the government, and not for something

22  for me to resolve at this juncture?

23          MR. GREENSPAN:  I wouldn't use that term, but, yes,

24  your Honor.  We're flagging the issue in the similar way to

25  some of the motion*s in limine* that the government raised as to

O3SBEISC

1  sort of percolating issues that, should they become relevant

2  later on, the discussion is already been started.

3         THE COURT:  To be clear, what I'm concerned with

4  primarily at this juncture is making sure that if there are

5  issues that are going to be presented or are going to bubble to

6  the surface during openings or during the examinations of

7  witnesses, those are the issues that we should take up right

8  now.  If you are forecasting that you're going to have a good

9  argument for dismissal of the charges before trial, I get you,

10  and you probably are trying to forecast that to prevent the

11  government from doing anything during the case that would put

12  them in that situation.  I understand.  I'm going to remind you

13  like ten times to try to get in as many of these issues so that

14  I can resolve them before trial as possible.  Understand that

15  on the variance issue.

16         So let's talk about the SEC and CFTC complaints.  I

17  think the ball is in your court Mr. Talkin or Mr. Klein,

18  whoever wants to address it.

19         MR. KLEIN:  Yes, your Honor.  They had emailed us on

20  Monday and asked us about that.  We were considering it.  They

21  filed their motion.  We do not plan to offer the CFTC and SEC

22  complaint at this time into evidence.  Obviously they could

23  open the door in some way or do something at trial where we

24  would revisit it, but that's not our intention right now, so we

25  don't plan to offer that.

O3SBEISC

1          THE COURT:  Okay.  And in your mind, what would that

2     opening of the door look like?

3          MR. KLEIN:  I'm not sure exactly, your Honor.  But

4     maybe they asked a question of a witness about the SEC or

5     something, and therefore it becomes relevant to the

6     cross-examination; or they ask something about the CFTC.  It's

7     hard for me to imagine it, but I'm just trying to think somehow

8     those three letter names come up in some way by the witness.

9          THE COURT:  You've preserved all your rights in this

10    regard, so that prong of the motion *in limine* will be granted

11    on consent; with the understanding that if the government opens

12    the door, then the Court will take up the issue at that time.

13    So that leaves the October 24, 2018 tweet.

14         MR. KLEIN:  Yes, your Honor.  We received their --

15    this will explain it -- their exhibit list and witness list on

16    Monday.  And we are going through that and piecing together --

17    they are excerpts of statements that they allege were made by

18    our client to do our rule of completeness analysis.  We're

19    actively working on that.  There's lots of proposed exhibits on

20    this, lots of statements they would intend to offer.  The way

21    we would see that tweet coming in right now would be in some

22    sort of rule of completeness argument.  We're not there yet,

23    your Honor.  There's literally dozens and dozens and dozens of

24    statements.  So I don't have an argument now for that, but we

25    are working on that actively to figure out if we would intend

O3SBEISC

1    to offer that under the rule of completeness.

2             We would let them know that, the government know that.

3    And then if they agree or disagree, if they agree great, we

4    don't have to come to the Court.  But if they disagree, we

5    would flag that for the Court.  And I understand you want to

6    flag as many issues as possible before trial.  To that regard,

7    I'll just go pass that one exhibit.  If there are other rule of

8    completeness issues that come up, we're going to meet and

9    confer with the government hopefully early next week or

10   mid-next week and try to resolve any disputes with them.  And

11   if we can't, we would bring it to the Court's attention to try

12   to resolve it before the jury comes in.

13            THE COURT:  Okay.  As to this issue, I will deny

14   without prejudice the motion as to the tweet understanding that

15   the parties are going to discuss this and present it.  And if

16   there's any other ground other than the rule of completeness,

17   then, Mr. Klein, then you will raise that with the Court.

18            MR. KLEIN:  Yes, your Honor.

19            THE COURT:  Motion to quash was denied based on the

20   understandings and limitations expressed in Mr. Eisenberg's

21   letter.  So let me open the floor.  I'll hear from the

22   government first on any other legal issues that I may have

23   missed that have bubbled to the surface and that the Court

24   should resolve at this juncture.  I have a list of some things

25   that I wanted to cover as well.

O3SBEISC

1          MR. DAVIS:  So, your Honor, nothing outstanding that's

2     currently briefed before the Court, unless I'm missing

3     something.  But we're happy to hear from the Court.  We have a

4     set of issues too, but they're not as substantive as what we've

5     been discussing.

6          THE COURT:  Rebuttal expert.  Mr. James' first

7     opinion.  Are you planning to --

8          MR. DAVIS:  No, your Honor.  Just to be clear, what

9     was his in rebuttal notice, the final rebuttal notice that

10    Mr. James provided.

11         THE COURT:  Okay.  Understood.  Let me turn to

12    Mr. Klein.  Anything again in the vein of general legal issues

13    that the Court needs to attend to right now?

14         MR. KLEIN:  No, your Honor.  We have some procedural

15    stuff too.  I think we all have the same things to discuss.

16         THE COURT:  Okay.  Let me turn back to the government.

17    So help me with, what is "willfulness" mean in this context?

18    And just as a backdrop, I've gone through the parties' request

19    to charge.  I haven't seen anything -- I have a couple of

20    things I want to talk about, but what I'm really searching for

21    are things that are going to present issues and objections

22    during openings in the examination of witnesses.  There's not a

23    lot that I've seen, but I want to put that in your mind so that

24    if you've seen things and you understand that there are

25    disputes that are going to be presented because people are

O3SBEISC

 1  going to be arguing the case in ways that are inconsistent with

 2  the parties' request to charge, let me know so I that can

 3  resolve those issues in advance of the beginning of trial.

 4  With that backdrop, let me ask the government, what does

 5  "willfulness" specifically mean in this context?

 6          MR. BURNETT:  In our view "willfulness" only applies

 7  in the commodities fraud count, so Count One.  In the context

 8  of that count it means that the defendant understood that what

 9  he was doing was wrong.

10          THE COURT:  Does that require knowledge of

11  unlawfulness?

12          MR. BURNETT:  No.

13          THE COURT:  So that is a dispute between the parties?

14          MR. BURNETT:  That's correct.

15          THE COURT:  There is case law that indicates that at

16  least -- well, what does "wrong" mean?  Because there are cases

17  that use "wrongful" and "unlawful" in the same breath.  How do

18  I understand those cases?

19          MR. BURNETT:  I think "wrongful" means he understood

20  that what he was doing was -- it could include "unlawful."

21  That's a subset of wrongfulness, but it also includes generally

22  wrongful in the moral sense as well.  It's broader than the

23  term unlawful.  And this is important.  I think the case law in

24  the Second Circuit has really only interpreted "wrongful" to

25  mean knowledge that the defendant -- what the defendant was

O3SBEISC

1    doing was unlawful in a couple narrow circumstances.  One is in

2    the context of like insider trading like in a tipper chain.

3    And the other is in the context of like tax cases basically.

4    And otherwise the Second Circuit has held that "wrongful" is

5    the appropriate instruction.  I'd also add that I actually

6    think there's an extra layer of incorrectness to the

7    instruction that the defense is proposing beyond the unlawful

8    point.

9            And that's that, I think it is clear under even courts

10   that have given an unlawful instruction that a mistake of law

11   is not a defense.  Instead, the defendant just needs to

12   generally have a sense or have a knowledge that what they were

13   doing was unlawful.  And I think we can and would like to

14   submit a letter on this if it's something the Court wants to

15   resolve ahead of trial.  But it's important because this is, I

16   think, really crystalized in the Commodities Exchange Act in

17   the provision.  I think it's Section 9.1 that lays out all the

18   potential violations of the Commodities Exchange Act.  And that

19   provision there says that a willful violation of a regulation

20   is criminal.  And then a further subsection down says that it

21   is an affirmative defense to jail time, but not to the felony

22   if the defendant can prove that they didn't know about the

23   existence of the law or regulations with which they've been

24   charged.

25            THE COURT:  Which is my next question which is, is

O3SBEISC

1    that at play here?

2                MR. BURNETT:  I don't know if that's something that

3    the defense intends to invoke, but I think for the purposes of

4    this willful instruction, I think that's very powerful.  The

5    mistake of law or not having knowledge of the CEA or the

6    application of the CEA to this particular case or this fact

7    pattern is not a defense to the felony charge, otherwise that

8    jail provision would have no effect or meaning.

9                THE COURT:  Well, there's three levels.  There's the

10   tax context, like kind of knowledge of the actual provision

11   which is reflected perhaps in this defense that's in 7, U.S.C.

12   13 (a)(5).  There's that.  There's the general unlawfulness of

13   the conduct.  And then there's wrongfulness that is even

14   broader than generally something being unlawful.  And you're

15   saying that last one?

16               MR. BURNETT:  Yes.

17               THE COURT:  Okay.  Mr. Klein, do you have a position

18   or whoever, Mr. Greenspan.

19               MR. GREENSPAN:  I think the government suggestion that

20   we write on this is one that we would second.  You've seen I

21   think our proposed instructions.  We believe "willfulness" is

22   an element or a part of the intent element in both wire fraud

23   and commodities fraud.  It's in the same charge.  We can cite

24   to a number of district courts, courts in this district that

25   have given that charge.  I think it's typically given, maybe

O3SBEISC

1    always given.  And as to the issue of "wrongfulness" in this

2    moral sense, I don't think that's the law.  I also think it's

3    extremely difficult to qualify or define what a moral sense is.

4    I don't think that's a workable standard.  And in terms of -- I

5    think some of what the government was getting at was mistake of

6    law.  Mistake of law is not the instruction that we gave.  We

7    gave an instruction about the general lawfulness and

8    understanding of that.  And those are two very different

9    things, and so I think the nuance of this makes it worth having

10   a written submission about it.

11           THE COURT:  I agree.  So let's circle that.  And if

12   there's other things, then we can put it all in the same track.

13   I agree that we'll need some letters on that.  Mr. Greenspan,

14   at this present time is this defense that's in the statute

15   being invoked, because it would require a jury finding.  And so

16   I would think that the normal conduct would be to put it in

17   front of the jury in connection with everything else?

18           MR. GREENSPAN:  If your Honor would indulge us, I

19   think we'd like to give you a formal answer to that in our

20   letter.

21           THE COURT:  Okay.  We'll roll it up there.  Okay.

22   Back to the government.  On page six of the government's

23   request to charge, this is what it says, Because market

24   participants ordinarily assume that prices, such as the prices

25   of cryptocurrency or perpetuals, are determined by the natural

O3SBEISC

1    interplay of supply and demand.  An act is manipulative if it

2    is designed to deceive or defraud others by sending a false

3    pricing signal to the market.

4            So are market participants ordinary assumptions

5    relevant in this case?  And the reason I ask this is because we

6    had a lengthy discussion about a blame the victim defense and

7    how that wasn't part of this case, and I get that.  But would

8    the expectations of the participants on an exchange like Mango

9    Markets be relevant if that informs what their assumptions

10   would be about normal trading activity on that exchange.

11           MR. BURNETT:  I think the language you're citing is

12   one that, at least in our view, it's been in a number of

13   instructions, in *Phillips*.  It was also in the instruction that

14   Judge Cote gave in the *Set Capital* case is that -- what that is

15   instructing the jury is that -- effectively giving the jury an

16   explanation for the reason why legally manipulation is fraud.

17   It's essentially giving the jury, like, the statute is enacted

18   on this assumption that people in markets assume that prices

19   are set by the natural interplay of supply and demand.  And

20   that's why controlling a price can be -- it can be a false act

21   when it's not fully disclosed to other members of the market.

22   So we think that's something that should be in the instructions

23   itself.  I don't think the expectation of the parties one way

24   or another, or expectation of market participants can defeat

25   that legal premise, that is the premise of the statute.

O3SBEISC

             THE COURT:  I wouldn't call it a legal premise.  It's

just the premise of the proposed instruction with the

defense -- does the defense agree as to that predicate for the

instruction?

             MR. GREENSPAN:  No, the defense does not agree.

             THE COURT:  All they're saying is, that is an

incorrect assumption in this context.  Because it is incorrect

in this context, they're just saying, you can argue that it is

and they want to argue that it's not.  So it seem to be in play

for the purposes of the case.  That doesn't affect anything

that we've discussed in terms of the motions *in limine*.  I

agree with the government that the blame the victim defense,

the vulnerabilities of the system, that's not relevant to

anything.  However, if they wanted to show that participants in

this market fully understood that any trade that happened could

be natural supply and demand, or it could be trading strategy.

It could be people trying to make a quick buck.  It could be a

number of different things.  That would seem to be an argument

that they could make that would be relevant.  This is the type

of issue because I foresee this coming up that I want to make

sure we're on the same page about.

             MR. BURNETT:  On that point then, in terms of what the

government is able to do with witnesses.  This is something

that also came up I think sort of with respect to materiality

in the *Phillips* case is, the proper way for the government to

O3SBEISC

1    refute or answer that sort of factual contest by the defense is

2    to put a specific hypothetical to the witnesses or the market

3    participants that, this is effectively, Do you expect when you

4    trade in these markets, do you expect that the price is going

5    to reflect manipulative conduct by another market participant,

6    which is effectively the materiality. I just want to make sure

7    that -- cause I know there's some sensitivity around the

8    wording.

9        THE COURT:  I think as phrased there would be problems

10    with that question coming from the government.  You're saying

11    like a properly phrased question that just goes to this issue?

12        MR. BURNETT:  Yes, a properly phrased question that

13    goes to the issue.  Maybe we'll have to brief what a properly

14    phrased question would look like.  Cause in the embedding

15    materiality hypotheticals, that is one exception where you are

16    allowed to put the actual issue in front of the witness,

17    because otherwise there's no real way for us to get at the

18    point.

19        THE COURT:  So maybe the parties should talk about

20    what this is going to look like, and this can be put into the

21    letter.  Because I think this is going to be something that is

22    going to come up, so I would like to have some clarity.

23    Mr. Greenspan or Mr. Klein if anyone wants to be heard on the

24    defense side.

25        MR. GREENSPAN:  Your Honor, I think you correctly

O3SBEISC

1    understood our position, which is that we would object to a

2    question like that. We think that it actually gets at a number

3    of things that we talked about as being inappropriate for

4    expert testimony. We think it would be improper for the same

5    reasons for lay witnesses to testify that way.

6            THE COURT: Mr. Burnett, I understood when you

7    describing why this is part of the instruction. That you're

8    just saying this is the background that courts give because

9    under normal circumstances it's kind of accepted, so it's not

10   something that you're trying to prove.

11           MR. BURNETT: So if the defense tries to disprove it,

12   we will need to prove it to the jury. So I think that was what

13   was --

14           THE COURT: What I think they're trying to disprove I

15   suppose is the ultimate question of price artificiality, like

16   what does this mean in this context. They're trying to say in

17   this specific context, it's not an artificial price because of

18   the expectations of people in the market. I mean that's what

19   they're ultimately trying to do.

20           MR. BURNETT: What I'm saying is that to rebut that

21   argument, we need to ask them, is your expectation that the

22   price will not be set by someone intentionally trying to drive

23   the price up.

24           THE COURT: I think this is something I'll take

25   submissions on, and we'll set a schedule for that. As you

O3SBEISC

forecasted, Mr. Burnett, I had the same question on

materiality, so I think you're correct that the same sort of

issue is raised there.

        One question on materiality.  The instruction

references a reasonable person.  Is that a reasonable person

similarly situated to the alleged recipient of the

misrepresentation, meaning that when we're talking about who

the reasonable person here is, is it just a reasonable person

like out on the street; or is it a reasonable person who would

be trading on Mango Markets or in the position of the Mango

Markets DAO, something of that kind?

        MR. BURNETT:  I think it's a reasonable person like in

the context of the universe we're dealing with here, as opposed

to someone off the street.

        THE COURT:  Okay.  So again, same sort of question

raised.  If that's true, then wouldn't it matter if, for

instance, there was evidence that people knew and did not care

about this type of conduct in this context.  Because if the

materiality question focuses on what would be important to a

reasonable person in that situation, then it seems like

evidence -- it seems like maybe there's a wider birth for the

evidence than possibly when we were discussing the motions *in

limine* the Court appreciated.  Because there is some way in

which the person receiving the communication, what they viewed

as either important or not important would be relevant under

O3SBEISC

1    the government's proposed instructions.

2            MR. BURNETT:  I think what people think is important

3    or is not important is relevant under our proposed

4    instructions.  I think that's different from some of the issues

5    that we were discussing in the motion *in limine Daubert* section

6    because that goes to what someone should have thought about,

7    which is a pure, like, negligence theory.

8            THE COURT:  Agreed.  Understood.  Again, I'm really

9    telling the parties this because these issues have not been

10    raised.  And I know, I know we tried to provide guidepost and

11    provide these issues on the motions *in limine*.  I'm telling you

12    the way I'm seeing this now so as you think about putting your

13    case together and you know these issues are going to come up,

14    you come tell me so that we can hash it out not in the presence

15    of the jury, and we'll certainly make time for that.

16            In connection with the swap.  This is something that

17    we've talked about, Mr. Burnett, before.  It doesn't have to be

18    fraud or manipulation with respect to a counter-party to the

19    transaction.  That was just the situation in *Phillips*, and

20    that's why it was presented in that manner?

21            MR. BURNETT:  That's right.

22            THE COURT:  Both sides seem to recognize that

23    "coincides" is a word that's used in the case law, but what

24    does that mean?  Because obviously "coincides" could be, it

25    just happens to coincide with it, but I take it that the case

O3SBEISC

1     law means something more than that.

2              MR. BURNETT:  So our view is that in the context of

3     this case, the "coincide" is that misrepresentation with

4     connection to the value of the swap is used to obtain the

5     proceeds from Mango Markets.  It used as collateral for the

6     loan that Mr. Eisenberg took out.  So that's our view.  In

7     terms of like -- I'm giving a sort of factual description here

8     because the case law where the "coincides" comes from is sort

9     of resisted a more concrete definition of "coincide," so I'm

10    reluctant to kind of say something that the courts haven't

11    here.  But I think it's a jury question on how that term

12    applies to the facts here and whether we meet that or not.

13             THE COURT:  I get it.  One of the issues that I have

14    generally with some of these instructions is that they almost

15    purport to be very detailed.  But when you get to the bottom of

16    it, the word -- the thing that the jury is trying to determine

17    is sort of indeterminate or vague.  Like what is a "legitimate"

18    or what is an "artificial price."  And here when does fraud or

19    manipulation coincide with a swap, which can mean different

20    things.  And so it would be helpful if there are -- there's

21    something more concrete that I can provide to the jury.

22    Because the way you're addressing it based on the facts that

23    the government expects to prove, that is more concrete.  But

24    then the instruction that the government is asking me to

25    provide is fairly vague, which I think poses some difficulties

O3SBEISC

1    in this context, especially given the unique factual

2    situation -- not so unique, but more unique than a case that

3    might have been brought decades ago.

4           MR. BURNETT:  I think one way to handle it might be,

5    we talked a lot I think at the motion to dismiss stage about

6    the *Chemical Bank* case, whereas the loan is effectively like

7    some sentence that articulates the holding of that, how using

8    something as collateral.  Basically, I'm being inarticulate.

9    We could find a way to articulate a legal standard to put in

10   there that would be a legal rule that we think meets the facts

11   or is more a fit with the facts.

12          THE COURT:  I agree, and so I may make some proposals

13   to the parties on some specific words to use here.

14          MR. GREENSPAN:  Your Honor, if I may.

15          THE COURT:  Of course.

16          MR. GREENSPAN:  I would just point to, I'm sure the

17   Court has seen our proposals, but I think we tried to do some

18   of that at the bottom of page 30 and top of 31 of our

19   proposals.  Like the government cited, the *Chemical Bank* case

20   as requiring in connection with language related to the value

21   of the pledge swap or commodity itself and not other assets.

22   And we also noted that the "coincide" language seems to be

23   qualified by -- that it has to have some meaningful

24   relationship with the swap or the contract of sale.  So I note

25   your concern.  We had the same concern, and we think that there

O3SBEISC

1  is some language in the case law that the "coincide" language

2  is too vague and allows for far too sweeping a definition of

3  "in connection" with and is qualified by those things.

4          THE COURT:  Yeah.  And I'm not hearing any

5  disagreement really between your position and Mr. Burnett's

6  position.  So maybe the parties can talk and come up with a

7  language that both sides can live with.  Because I think the

8  example that you gave is pretty much the example the government

9  proffered as well.  So it may be that you can just come up with

10  language that puts a little bit more meat on the bones than

11  just coincides.

12          MR. GREENSPAN:  We'll discuss that with them, your

13  Honor.  Thank you.

14          THE COURT:  In the context of what is artificial.

15  Again for the government, it means not legitimate, and so is

16  there another word that we can use other than "not legitimate?"

17  I understand that's been used, but what does that mean?

18          MR. BURNETT:  I think what our intent was, was that

19  the rest of the paragraph on the definition of artificial would

20  inform what legitimate -- not what is legitimate, but what is

21  not legitimate.  Which in this case not legitimate is prices

22  that are set by the intention of a trader to hit a particular

23  price.

24          THE COURT:  Okay.

25          MR. BURNETT:  Essentially rigged prices.

O3SBEISC

1          THE COURT:  This is my second grievance with -- not

2     with either's side position, but because it is perhaps a little

3     bit more difficult to pin down just a specific thing as it

4     might be in some other context, there are more words which can

5     help clarify, but may also serve to confuse the jury in terms

6     of exactly what it is they're trying to find.  And that's why I

7     have some issues saying, well, it's false pricing signal.  And

8     then saying, it's natural supply and demand.  Or as the defense

9     puts it, basic supply and demand.  So I like to come up with

10    just one word.  Here is what you're trying to find, and have it

11    be something that's more objective and discernible than

12    legitimate or not legitimate.

13         As a general matter, this case is about whether the

14    conduct here was legitimate or not, but we have to put

15    something further behind it.  So I raise that -- I need to

16    think about what's the best way to kind of see if we can get

17    some more clarity on this, and I'm going to think about it

18    while we're going through the rest of this.  But we have a

19    letter that's coming from the parties, and I may ask the

20    parties to really put their heads together and come up with a

21    single set of instructions noting their disagreements, and

22    maybe that's the best way for me to take it there.  Okay.

23         Last issue on the instructions that I have, and then

24    I'll open it up for anything that the parties have.  And these

25    are issues that I think I just want to understand now because

O3SBEISC

1   they might come up during the course of the openings or

2   examinations.

3          Mr. Greenspan in the request to charge, I think you

4   have three different reasons why you don't think the swaps here

5   are covered by the CEA.  Is that right, that there are three

6   different ways?

7          MR. GREENSPAN:  That's correct, your Honor.

8          THE COURT:  The government identifies the one way to

9   make swaps.  Are you planning to provide on all three?

10         MR. GREENSPAN:  At this time we are, your Honor.  And

11  we noted the mix swap issue in defining the security base swap

12  around that.  We are aware that that is an exception to the

13  exception if you will.

14         THE COURT:  Understood.  I'll turn it over.

15  Government, anything else on the request to charge?  And then

16  while you're speaking I'll try to think of logistically how

17  we're going to do this in a way that's going to allow you to

18  prepare for trial and do everything you need to do, but then I

19  need to get down more of these instructions.  What I'd like to

20  do is be in a position to send both sides -- here's my proposal

21  on the instructions -- by next week on Thursday or Friday so

22  that you can see them.  And that way if there's some glaring

23  issue I was going to argue this to the jury, and now it's

24  inconsistent with what you put in these instructions, you'll

25  have time to do that.  But anything substantive on the

O3SBEISC

1    instructions based on this discussion that you'd like to raise?

2                MR. BURNETT:  Yes.  One substantive point what you were

3    just discussing, and then maybe a logistical proposal based on

4    what happened in *Phillips*.  On what you were discussing, this

5    is kind of defense's three exception to swab.  One of those

6    three exceptions they list is actually just the definition of

7    what a swap is again.  It's like not a statutory exception.

8    And the other one, at least on everything I've read in the case

9    law in that statute is actually not an exception, it's an

10   inclusion.  It's just they have the statute backwards.  So I

11   might ask that we write on that or this is something we resolve

12   beforehand because I think it's just legally deeply confusing

13   and wrong.

14               THE COURT:  We're going to include this in our letter

15   that we're putting together a list of items for.  If it's

16   something that they're going to argue that it doesn't fit

17   within the definition, then they can make that argument as

18   oppose to presenting it as sort of out from the definition.

19               MR. BURNETT:  That was one.  On the logistics.  The

20   way this works in *Phillips* was I think Judge Liman took

21   basically the two sets of instructions that we proposed.  He

22   took a letter that each party submitted on, kind of not here

23   are my general request to charge objections, but here are the

24   objections on sort of the most core things, like artificial

25   price, willfulness, that are likely to come up in an opening;

O3SBEISC

1    and did kind of what you're suggesting, gave the parties sort

2    of an indicative, here is what I'm thinking of doing.  We had a

3    chance then to have a conference about it so Judge Liman could

4    then adjust if he felt appropriate before trial so we get kind

5    of a crack at the instructions.  He wasn't committing that that

6    was going to be the exact wording he used later, but that's how

7    the process went.

8              THE COURT:  That seems like a great approach.

9    Mr. Greenspan?

10             MR. GREENSPAN:  We second that.  We think that's a

11   good approach.

12             THE COURT:  Okay.  So can the parties meet and confer

13   and get their letters in by say Tuesday at five?

14             MR. BURNETT:  Yes, your Honor.

15             MR. GREENSPAN:  Yes.

16             MR. BURNETT:  Just to make sure I understand.  As I

17   was envisioning what would go in those letters is if there's

18   agreement we reach, we'll put that.  If there's disagreement

19   we'll say here is our legal position.  We won't like submit new

20   jury instruction.

21             THE COURT:  No new jury instructions.

22             MR. GREENSPAN:  Your Honor, if I may bring up one

23   issue.  I don't know if it needs to go into one of the letters

24   or not.  One area of disagreement, we sort of touch on this in

25   the beginning is, the defense believes that materiality is an

O3SBEISC

element that goes to any and all types of deception in Count

One.  It seems that the government believes that materiality

does not apply to manipulation, and so I think that's an area

of disagreement.

THE COURT:  You can put that in the letter.  Anything

else from the government on the request to charge?

MR. DAVIS:  Not on the request, your Honor.

THE COURT:  One issue that was raised, Mr. Greenspan

or Mr. Klein, whoever wants to address it in terms of how Count

Two is labeled, whether it's commodities manipulation or swap

manipulation.  Is there still an issue there?

MR. GREENSPAN:  Your Honor, I think there is.  And we

feel strongly that the statute is called commodities fraud and

commodities manipulation.  And if the jury gets a copy of the

indictment and sees that and they're given a verdict sheet and

an instruction that calls it something else, we think there's

confusion there.

THE COURT:  Is there a reason to deviate from what was

in the indictment?

MR. BURNETT:  Only that I actually think it would be

less confusing because only the swap part of Count Two is

what's being pursued so it helps focus the jury on I think what

is an undisputed aspect of the case, that swap is what is being

manipulated or alleged to being manipulated. That's it. that's

not a major issue for us.

O3SBEISC

1          THE COURT:  If it's not, I would say as a technical

2     matter I agree with the government.  There's no actual title to

3     this particular provision, right?

4          MR. BURNETT:  That's right, no.

5          THE COURT:  And you are not actually arguing that a

6     commodity is at issue in Count Two?

7          MR. BURNETT:  Correct.

8          THE COURT:  So a technical matter, you're just trying

9     to make clear that it's not a commodity that's at issue in

10    Count Two.  It's a swap?

11         MR. BURNETT:  That's right.

12         THE COURT:  But if it's not an issue for the

13    government --

14         MR. BURNETT:  If the defense feels strongly.

15         THE COURT:  I heard a lot of strong feelings.

16         MR. GREENSPAN:  Passion by here, your Honor, passion.

17         THE COURT:  So we'll do that.  And Mr. Klein or

18    Mr. Greenspan, anything else relating to the instructions?

19         MR. GREENSPAN:  No, your Honor.  Thank you.

20         THE COURT:  Now let's talk about -- well, Mr. Davis.

21    I feel like you have some issues you want to raise.

22         MR. DAVIS:  I'm happy to.

23         THE COURT:  I'm getting to more of the logistical

24    issues.

25         MR. DAVIS:  Okay.  In kind of the basket of things

O3SBEISC

1    trying to preview issues down the road.  We were served with a

2    Touhy request for testimony from a law enforcement officer by

3    the defense.  We requested a supplemental notice from the

4    defense.  We haven't received one yet.  I raised this because

5    as it stands right now, we have both notice and substantive

6    issues with the request, and we would likely want to be in a

7    position to raise those before trial and move to quash that

8    request.  So that's one issues that not right for today I don't

9    think, but we just wanted to put that on the Court's radar.

10           The second is in the category of good news I think.

11   We've been working with defense and have been circulating draft

12   stipulations which would have the effect of eliminating a

13   number of small custodial witnesses of this trial.  So far we

14   haven't finalized them yet, but our understanding is that we're

15   going to reach agreement on these stipulations that would allow

16   us to cut a number of custodial witnesses from the trial.  So

17   we haven't been prepping those witnesses or trying to bring

18   them here for trial in light of that.

19           The third is another issue that we want to raise that

20   might come up during trial for the Court's awareness.  We

21   received on Monday, we did an exhibit exchange per the Court's

22   scheduling order.  We received approximately maybe less than 10

23   defense exhibits, which of course is totally fair.  And at this

24   stage the defense doesn't need to disclose to us what they in

25   their minds have as impeachment that they will use solely for

O3SBEISC

1    the purpose of impeaching witnesses.  But we worry that what

2    that category is of impeachment is going to be read too

3    broadly.  That there might be things that are in that category

4    that should be disclosed to us as either potential exhibits or

5    not impeachment at all.  That's one of the issues that we

6    wanted to just flag for the Court.  That we have received ten

7    exhibits.  That's it.  And I don't know if there's anything

8    else to say on that matter, but that's just one issue that

9    might come up down the road.

10          THE COURT:  This is like the reverse shot across the

11    bow.  It's like when there's a friend that you're fighting with

12    and so you tell your other friend something that you want the

13    other friend to hear, but you don't want to talk to that friend

14    directly.

15          MR. DAVIS:  We're all friends here.  In the most

16    friendly way possible, the impeachment does not mean everything

17    that exist.

18          THE COURT:  I think they heard you.

19          MR. DAVIS:  I have logistical things on my list about

20    the first day of trial and the jury selection process.

21          THE COURT:  We'll get to that.  So on the Touhy

22    request, where are we on that, and when are we in a position to

23    address any objections?

24          MR. KLEIN:  Your Honor, my friend there didn't explain

25    that they just sent us their objection yesterday and ask us to

O3SBEISC

1  respond immediately.  We had other things on our plate.  We

2  probably disagree with them, but we are looking at their email

3  and their position and we'll talk to them and see.  Our request

4  is for the special agent here to be available to testify.  And

5  the reasons are basically people may get on the stand, who the

6  government puts on the stand and may say things differently

7  than what they told the government when they were meeting with

8  them.  The special agent is usually the note taker and writer.

9  We'd want him available if we needed to impeach them.  Another

10  reason we articulated to them is that we may put him on the

11  stand to -- and this is perfectly appropriate -- to inquire

12  about how they conducted this investigation and the failures in

13  it.  And we'll talk to them about this.  And if we need to come

14  back to the Court and get you to intercede, we will.

15          THE COURT:  Okay.  Understood.  As soon as you can

16  reach a resolution, bring it to the court.  If there are any

17  objections, I will handle it.  Anything else from the defense

18  side on kind of the vein of general logistical or here's what's

19  coming next type issues?

20          MR. KLEIN:  There is one.  Your Honor, we have been

21  going through the exhibit list and we are piecing things

22  together for the rule of completeness.  There is one category

23  of exhibits I would just flag that we are likely going to

24  object with and talk to the government about.  And those

25  exhibits are press releases and a complaint our client filed.

O3SBEISC

1    We think they should not come in.  We want to understand the

2    government's theory, we'll talk to them about that.  But that's

3    something I want to just put out.  That's an example of

4    something we may need a ruling on from you.

5        THE COURT:  These are press releases from after --

6    give me the timeframe.

7        MR. KLEIN:  I don't have the exhibits in front of me,

8    but they're purported tweets by our client and then attaching

9    press releases to them.  Like he would tweet and then say like

10   re-tweet a press release about a case.  And the other is a

11   civil complaint he filed in Puerto Rico, so we're going to look

12   at those, and then we'll talk to the government about it.

13       THE COURT:  Okay.  Sounds good.  Anything else on the

14   defense's side?  All right.  So if there's nothing else in

15   terms of disclosures, 3500 material and exhibits, where are we

16   in terms of making sure those are exchanged?

17       MR. DAVIS:  Thank you, your Honor.  Quickly as to

18   exhibits.  I think we -- both sides exchanged them Monday night

19   at this point.  As to 3500.  We made our initial disclosure on

20   the deadline by the Court, and I've been making nightly

21   disclosures since then as new things come up and as we get new

22   material.  For the 26.2 material, we have received in an

23   initial batch from the defense for -- I think we received a

24   couple of documents on that.  I'll let them speak to that.  The

25   only thing we -- might I have one second, your Honor.

O3SBEISC

1          So, your Honor, we will have a couple of witnesses who

2     we are creating summary charts for, so as those become

3     available we'll be producing those to defense.

4          THE COURT:  And Mr. Klein?

5          MR. KLEIN:  We produced our Rule 16, 26.2 on the

6     Court's deadline and provided our two exhibits which your Honor

7     might not be surprised are the terms of service later and the

8     lack of terms originally.  And we think we've complied with all

9     our obligations with the exhibits at this point we intend to

10     introduce.  So I think we're in a good spot.

11          THE COURT:  Okay.  And the parties should just take a

12     look at my individual practices.  And there's some provisions

13     in there in providing those materials to the Court and provided

14     those in electronic form.  If you have any questions about how

15     to do that, you can talk with Mr. Hernandez.  He will get you

16     the answers.  Same thing goes for the exhibit list, which the

17     way we're going to do it, you'll furnish that to the Court with

18     the appropriate columns, and we will keep updating that as we

19     go through trial so everyone is on the same page in terms of

20     what's been offered and admitted.

21          In terms of the list of everybody who's involved in

22     this case who we need to square away with the venire.  When are

23     the parties going to be in a position to give us that list?

24          MR. KLEIN:  Your Honor, we exchanged witness list, so

25     I think we can come together and put in a group email.

O3SBEISC

1          THE COURT:  Can I get that by next Thursday?

2          MR. KLEIN:  Yes.

3          THE COURT:  Let's go to Mr. Davis on jury selection

4    and trial procedure.

5          MR. DAVIS:  No, your Honor.  We reviewed the Court's

6    individual rules.  We understand the Court does the struck

7    panel method.  The parties conferred briefly beforehand for the

8    Court's consideration we think three alternates might be

9    appropriate for this case if that works for the Court.  I think

10   the way we understand the process will work is that will need

11   us to qualify 32 or so.  It's in the rules.

12         THE COURT:  What's the reason for having three?

13         MR. DAVIS:  I think it's standard practice to have

14   three alternates in a case like this.  We anticipate going a

15   week.  We might lose a juror, an alternate, a juror for

16   sickness or other reasons, so just to make sure we have enough

17   by the end of trial we think three is appropriate.

18         THE COURT:  Let me take a step back.  Do we have a

19   better estimate as to the time for trial here. I think

20   initially we scheduled three weeks.

21         MR. DAVIS:  Yes, your Honor.  I think in light of a

22   number of the stipulations that we hoped to reach, we hope that

23   we can get our case done within a week.  So if we open on

24   Tuesday, pick a jury Monday, open Tuesday, and start witnesses

25   on Tuesday, my hope is the government's case is done by Monday,

O3SBEISC

1    and then there will be a defense case if any after that.

2              THE COURT:  Okay.  Mr. Klein, does that seem

3    consistent with your expectations?

4              MR. KLEIN:  It does.  I mean, we've got a lot of

5    exhibits, but we're taking them as their word that's how fast

6    they'll get through.  And our case will be a day or two

7    depending on who testifies.

8              THE COURT:  Did you have any question on jury

9    selection, how it will work?  It's outlined.  If the parties

10   have questions, they should let me know.  We do simultaneous

11   peremptories immediately after we get the requisite number of

12   potential jurors and alternates.  That's something to be

13   mindful of, and we do that right on the spot.

14             MR. KLEIN:  Your Honor, if I can make a suggestion or

15   two comments.

16             THE COURT:  Of course.

17             MR. KLEIN:  One, we talked to the government before

18   about -- they've given a witness list, but we don't know who

19   they're going to call or what exact exhibits.  And we suggested

20   to them that 48 hours in advance of the first day of testimony

21   they tell us the witnesses expected and expected exhibits so

22   that we'll have time and then we can also comply with your rule

23   if something comes up that we're not expecting, a meeting

24   beforehand.  And then at the end of each day, trial day, they

25   tell us their next day witnesses and exhibits.  So it will be

O3SBEISC

1  48 hours before the first day, Monday, sorry Tuesday, and then

2  the evening of or whatever.

3          THE COURT:  Mr. Davis, any objection to that?

4          MR. DAVIS:  That's fine by us.  Obviously with the

5  caveats that things change, witness schedules all that.  But

6  that's fine by the government.

7          THE COURT:  Do you know at this time who your first

8  couple of witnesses are going to be?

9          MR. DAVIS:  I don't think we're in a position to say

10  that right now.  I think we're working on that and coming up

11  with finalizing it, but we might be finalizing that up until a

12  few days before trial.

13          THE COURT:  But you don't have any objection to the

14  schedule that Mr. Klein outlined?

15          MR. DAVIS:  No, your Honor.

16          THE COURT:  Disclosure.  Let's talk a little bit about

17  the days of -- Mr. Talkin.

18          MR. TALKIN:  One jury selection issue, and it doesn't

19  matter to the defense which way you would like to do this, but

20  I just wanted to be consistent.  It's always an awkward

21  situation when you introduce the parties and you have a

22  criminal defendant there, whether he's supposed to stand or not

23  stand.  I just want to have that in place that he does exactly

24  what the lawyers do, whichever they prefer, the marshals

25  prefer.  What I don't like is kind of like a differentiation of

O3SBEISC

1    what he's allowed to do as opposed to the attorneys.

2              THE COURT:  You have a proposal on that?

3              MR. TALKIN:  I think when you introduce everyone,

4    everyone just stands.  We'll stand as a group, and obviously

5    the government will stand as a group.  And they say, so they

6    can see us and see if they recognize us.  That's generally what

7    I've seen done, and generally what I think is okay with the

8    marshals.

9              THE COURT:  That's fine with me.

10             MR. TALKIN:  Thank you.

11             THE COURT:  After the first day -- so the first day

12   we'll start at 9:30.  We'll proceed with jury selection.  It

13   may take all day, but the parties should be prepared to get to

14   openings and we should have one witness here just in case if we

15   fly jury selection.  I don't think that's going to happen, but

16   just be ready to do that.

17             On the second day and until we get to summations,

18   we'll be going from popular request nine to 2:30 with half hour

19   break that will be strictly enforced.  Once we get to summation

20   and deliberation, we may go longer.  We have the clothing order

21   for Mr. Eisenberg.  Has counsel discussed with Mr. Eisenberg

22   whether he wants to be present at any sidebars?

23             MR. TALKIN:  No, your Honor.  I'll discuss it with

24   him, but my inclination, and I always do it, it creates a

25   circus that is not beneficial to the client when he attends

O3SBEISC

1    sidebar, so I'll confirm that with my client just so you know

2    where we're coming from.  I don't think that's going to be an

3    issue here.  We'll let the lawyers handle it, and I'll confirm

4    that with the Court prior to trial.

5        THE COURT:  Mr. Eisenberg, it's your right to be there

6    if you want to be there, but you talk to your counsel about

7    that.  Do we know right now whether there's going to be

8    demonstrative in openings?  Again, sometimes we have this

9    conference a couple of days in advance so we have a better

10    sense of that.

11        MR. DAVIS:  We don't know at this stage, your Honor.

12        THE COURT:  Make sure to disclose those consistent

13    with the individual practices.  Do it the night before that way

14    you can send an email in and we can come in early.  What we're

15    going to do is, so on the first day we're starting at 9:30,

16    second day starting at nine.  If I get an email the night

17    before or a letter indicating that there's an issue to be

18    resolved, then we will start 30 minutes in advance of that

19    time.  So if there's an issue to be solved, on the first day

20    we'll all come in nine.  Starting on the second day, 8:30 so we

21    can resolve everything so it will be crystalized at that point

22    so both sides should know what's happening on that particular

23    day, and that goes with demonstratives.

24        Any demonstratives being used in openings or

25    examination should be disclosed the evening before.  If there's

O3SBEISC

an objection, we can resolve it in the morning.  Is the rule

going to be invoked by both sides, per rule exclusion, and

who's going to be left?

          MR. KLEIN:  Your Honor, I did want to say that we

would like to have our experts available to be here and listen

to other witnesses, including the opening.  We're going to need

them potentially to help form cross-examination questions and

hear their opening.  We don't oppose their experts being here

at the same time either or whenever they want them during

trial.

          THE COURT:  That's not a problem for me, so unless

it's an issue for the government, but the parties should meet

and confer on that.  If there's an objection, then I'll resolve

it.

          MR. DAVIS:  Your Honor, can we discuss that issue and

get back to the Court?

          THE COURT:  Absolutely.  That's why it's great to do

this a week in advance.  We can hammer all these issues out.

In terms of AV.  I think either one side or maybe both sides

have scheduled walk-throughs with the courtroom AV, so you

should understand how it works.  Do a dry run, make sure that

you're handy with the technology in the courtroom and let us

know if you have any questions.

          That's it on my end, so I'll open it up for any

additional questions or any other issues that the parties want

O3SBEISC

1    to raise.

2            MR. DAVIS:  Judge, may I have one minute.

3            (Counsel conferred)

4            MR. DAVIS:  Your Honor, we're truly in logistics now.

5    For opening, I think we would ask that the podium be moved to

6    the center.  I'm not sure if that's okay with the Court or how

7    to logistically do that.  I just want to preview that issue, or

8    a shorter podium.  I've seen done before.

9            THE COURT:  The problem is that we can't move it back

10   and forth.  So for present purposes, assume it's going to be

11   there.  If there's a way for us to move it back and forth, then

12   we'll look into that.  Anything, Mr. Klein?

13           MR. TALKIN:  Your Honor, I agree with the government.

14   We'll talk about a way.  In the past there's kind of temporary

15   stanchion just for the opening.

16           THE COURT:  Where do you want it?

17           MR. TALKIN:  In the middle.  In other words, you're

18   addressing the jury squarely instead of the one all the way

19   down there.  You're kind of looking around.

20           THE COURT:  I got you.  Basically you're saying that

21   right where all the wires are going in you want it somewhere

22   right there?

23           MR. TALKIN:  Yeah.

24           MR. BURNETT:  I think the Court has short portable

25   podiums and you can put the screen up on top so the person can

O3SBEISC

1    see the screen, but you don't have to actually move the podium.

2         THE COURT:  If there's anything that I've figured out

3    in this job, there's nothing that Mr. Hernandez can't do.  I

4    think we'll be able to figure out something that will make both

5    sides happy.

6         Anything else?  The parties should talk to each other

7    and make sure that transcripts are ordered just as a reminder

8    to the parties.  Anything else, Mr. Klein?

9         MR. KLEIN:  We're just submitting these letters.

10   Sounds likes you may want to meet with us to talk about all

11   this stuff, the jury instruction letter, as well as other

12   things.  We're starting on Monday.  Did we want to set aside

13   sometime on Friday?  I'm not saying we need a final, final

14   pretrial conference.  Sounds like we might need to come back

15   since we have calendars with witnesses and prep. I just wanted

16   to flag that.

17        THE COURT:  That's a good point, so let's do it on

18   Friday.  Here's the question, can we do it remotely?  Because

19   if that makes it easier for both sides now, if Mr. Eisenberg

20   wants to appear, if that's logistically possible, he's okay

21   with it from MDC.  MDC can do it.  If it's not possible, then

22   we can do it live, but it's a great suggestion.

23        MR. TALKIN:  Your Honor, what I'll do is, I'll talk to

24   the government.  I think we can arrange him appearing remotely,

25   and I think he'd appreciate not being dragged down an extra

O3SBEISC

1   day. It's a tough travel for every defendant, so we will work

2   on that.  If that's a fail, we'll get back to you.

3              THE COURT:  Mr. Hernandez, is there a slot on Friday

4   that we can use?

5              THE DEPUTY CLERK:  One moment, your Honor.

6              THE COURT:  Let's do it on the earlier side in case

7   there's are any other issues we're not running into the end of

8   the day.  Like 10 a.m. works, Mr. Hernandez.  10 a.m. on

9   Friday, April 5th.  We're planning on doing it.

10             MR. GREENSPAN:  Your Honor, I think that tech

11  walk-through is Friday at 11.  I think that probably gives us

12  enough time.  I just wanted to put that on the Court's notice.

13             THE COURT:  Let's do it 9:30.  Wait.  If you're doing

14  the tech walk-through, aren't you going to be here?

15             MR. GREENSPAN:  We will.

16             MR. TALKIN:  Not all of us, your Honor.

17             THE COURT:  I'm doing this remotely to help the

18  parties because I know people are going to be running around,

19  and you don't necessarily want to be here, so I'll do it

20  remotely or I'll do it here.  Let's plan on doing it remotely

21  at 9:30 on Friday, April 5th, and we'll put that on the docket.

22  If for whatever reason it's better to just do it in person, we

23  can handle it that way as well.  Okay.

24             Anything else from the government?

25             MR. DAVIS:  No, your Honor.

O3SBEISC

1          THE COURT:  Anything else from the defense?

2          MR. KLEIN:  No, your Honor.

3          THE COURT:  Well, thank you, everyone for coming in.

4  And I understand Mr. Eisenberg is going to utilize the space

5  here.  Is that correct?

6          MR. KLEIN:  Yes, your Honor.

7          THE COURT:  If you need any help or anything else, you

8  can let Mr. Hernandez know.  Thank you.

9          (Adjourned)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25