**TALKIN, MUCCIGROSSO & ROBERTS, L.L.P.**
ATTORNEYS AT LAW
40 EXCHANGE PLACE
18TH FLOOR
NEW YORK, NEW YORK 10005

(212) 482-0007 PHONE
(212) 482-1303 FAX
WWW.TALKINLAW.COM
EMAIL: INFO@TALKINLAW.COM

MARYLAND OFFICE:
5100 DORSEY HALL DRIVE
SUITE 100
ELLICOTT CITY, MD 21042

410-964-0300

NEW JERSEY OFFICE:
2500 PLAZA 5
HARBORSIDE FINANCIAL CENTER
JERSEY CITY, NJ 07311

201-342-6665

April 14, 2024

Honorable Arun Subramanian
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

**VIA ECF**

                                          Re:     <u>United States v. Avraham Eisenberg</u>
                                                        23 Cr. 10 (AS)

Dear Judge Subramanian:

       Defendant Avraham Eisenberg respectfully submits this letter in accordance with the schedule set by the Court during trial proceedings, and in response to the government's April 13, 2024[1] letter, Dkt. 145, regarding the issues of mixed swaps under the Commodities Exchange Act ("CEA") and the meaning of the term "price" for purposes of Commodities Manipulation (Count 2). For the reasons set forth below as well as those presented on the record on April 12, 2024, Mr. Eisenberg's Federal Criminal Rule 29 motion ("Rule 29 Motion) should be granted and a judgment of acquittal entered as to Counts 1 and 2.[2]

     **I.**       <u>**"Swap" Definition**</u>

       For the reasons stated in the Rule 29 Motion and those explained below, the record lacks sufficient evidence, even after all inferences are credited to the government, to find that the government has met its burden to prove that the MNGO Perpetuals are "swaps." The CEA is therefore inapplicable to this case, and the commodities counts must fail.

       The government must first prove that the MNGO Perpetuals were swaps under 7 U.S.C. § 1a(47). The government has requested, and the Court has proposed an instruction under both subsections (ii) and (iii). Initially, the government has never proposed a theory, let alone pointed

---

[1] The government's letter is inadvertently dated April 11, 2024. (Let. at 1.)
[2] Count 3 should also be dismissed for all the reasons the defense discussed during the Rule 29 Motion hearing.

Hon. Arun Subramanian
Page 2

to evidence, of any financially consequential occurrence or non-occurrence to satisfy subsection (ii). The government also lacks sufficient evidence to support an instruction on subsection (iii). That subsection, in sum and substance, involves a transfer of the risk of the change of value of the asset/s underlying the swap without actually exchanging those assets. The government takes the position that USDC is a fundamental part of the MNGO Perpetual. Because the beneficial ownership of USDC is exchanged through the protocol, the government's swap theory fails.

Even assuming for the purposes of argument that the government was able to meet its burden with respect to proving that the MNGO Perpetuals were swaps under 7 U.S.C. § 1a(47), the Perpetuals, at least initially, would fall into the exception in subsection (x) for security-based swaps because the government appears to take the position that it will not contest (for purposes of this case) that MNGO is a security.[3] The government must therefore prove that the MNGO Perpetuals are "mixed swaps" under 7 U.S.C. § 1a(47)(D) for Counts 1 and 2 to survive.

As Judge Oetken explained in *CFTC v Archegos Capital Mgmt. LP*, 2023 WL 6123102, 2023 U.S. Dist. LEXIS 166409, at *7 (S.D.N.Y. Sep. 19, 2023),

> Pursuant to Title VII of the Dodd-Frank Act, Congress allocated regulatory authority to the SEC over 'security-based swaps' and the CFTC over 'swaps.' *See* 15 U.S.C. § 8302(b). The agencies hold joint authority over 'mixed swaps.' 15 U.S.C. § 8302(a)(8). Congress also directed the agencies, in consultation with the Federal Reserve, to adopt rules further defining each term. 15 U.S.C. § 8302(d)(1). The agencies did so via a joint rulemaking ('the Joint Release') promulgated on August 13, 2012. Further Definition of "Swap," "Security-Based Swap," and "Security Based-Swap Agreement"; Mixed Swaps; Security-Based Swap Agreement Recordkeeping, 77 Fed. Reg. 4820848264 (August 13, 201).

*Id*.

In addition to the position it has taken on MNGO, the government implicitly acknowledges the lack of viability of its previous position that the oracle settlement price would render the MNGO Perpetual a mixed swap. There can be little doubt that the oracle settlement price is a narrow-based security index, which is treated statutorily as the equivalent of a security. *See* 7 U.S.C. § 1a(35); 15 U.S.C. § 78c(a)(68). As relevant here, the statutory definition of a "narrow-based security index" is an index with nine or fewer component securities. *See Archegos*, 2023 WL 6123102; 7 U.S.C. § 1a(35); 15 U.S.C. § 78c(a)(55)(B). Mr. Hermeda, the CEO of Switchboard, repeatedly testified that the oracle, which he helped design, was a mathematical formula of multiple price inputs reported out as an index price. *See, e.g.,* Tr. 451, 452, 459, 462.

The government is left with two theories of things—1 or more interest or other rates,

---

[3] The government's letter appears to reserve the right to change its position should the Court offer an instruction that is not "similar" to that proposed by the government. Given that the charge conference is expected to take place tomorrow, April 15, 2024, with the jury expected to be instructed the following day, the defense requests that the Court seek further clarity from the government regarding this position.

Hon. Arun Subramanian
Page 3

currencies, commodities, instruments of indebtedness, indices, quantitative measures, other financial or economic interest or property of any kind other than a narrow-based security index—on whose value the MNGO Perpetual was based.  The first is USDC.  But the evidence in the records is overwhelming that USDC was nothing more than a stand-in for the dollar used to settle the MNGO Perpetual.  Mr. Hermeda testified that any difference between USDC and USD (and USDT) was so infinitesimal that it was of no consequence, which is how the Mango Oracle could aggregate prices reported in USDC (Serum), USD (FTX), and USDT (Ascendex), and report them out as an index price in USD.  Tr. 472, 480.  He further stressed the lack of distinction between USDC and USD by pointing out that anyone with a Circle or Coinbase account could redeem USDC for dollars one-for-one at any time.  Tr. 473.  Similarly, Dr. Mordecai testified that during the applicable time period, the values of USDT, USDC, and dollars were essentially identical.  Tr. 791.  Moreover, Mr. Hermida's testimony that the oracle settlement price was reported in dollars, Tr. 480, which were then settled on Mango Markets in USDC without any price conversion proves the lack of any meaningful distinction between USDC and dollars.

The government refers to the fact that USDC was simply a stand-in for the dollar as "a red herring," and offers up a faulty comparison to FX swaps involving the dollar or another currency pegged to the dollar.  Let. at 3.  Such swaps would be designed to trade on the exchange rate, i.e., the difference in strength of the currencies.  There is no evidence in the record that Mango Markets or its users paid any attention to or did any calculation based on the relative strength of the US dollar/USDC.  Despite the government's best efforts to infuse USDC into the value of the MNGO Perpetual, even its main expert, Dr. Mordecai (on direct), made clear that the Perpetual is based on the change in price of MNGO (not USDC) and that USDC is nothing more than a settlement mechanism.  In describing the long position of a MNGO Perpetual, Dr. Mordecai testified that "as the MNGO token goes up in value, if you're long that, you experience gains, your account wins, provided that it's rising above the price at which you executed the original contract."  Tr. 660.  Notably, in addition to the fact that even its experts could not articulate a basis for USDC serving as anything other than a medium of settlement or exchange,[4] the government fails to point to any evidence that the value of USDC was understood by anyone who created, contributed to, or used Mango Markets that the value of USDC served as a basis for the MNGO Perpetual.

The government's USDC-based theory of mixed swaps mirrors the contract of sale theory it previously advanced.  The government would have the Court and the jury believe that when one buys a cup of coffee, they are selling dollars in exchange for buying the coffee.  That view is unsupportable.  Even though dollars can be used to buy a cup of coffee (and any number of other goods and service) the ***basis*** of these things does not depend on the value of the dollar.  The government's theory would also essentially swamp the security-based swap exception and make almost every security-based swap a mixed swap.  As noted in *Archegos*, "the category of mixed swaps is intended to be a 'narrow' one, covering only a 'small subset of Title VII instruments." 2023 U.S. Dist. LEXIS 166409, at *10 (quoting Joint Release at 48291).  The government's theory is anything but narrow and thus inconsistent with the law.

---

[4] The government's only references to the record in support of its position are to testimony from Mr. Hermida that the oracle drew primarily from exchanges that did not report in USDC and to testimony from Mr. Jain involving a hypothetical pairing of Bitcoin and Ethereum.  *See* Let. at 3.

Hon. Arun Subramanian
Page 4

Finally, the government asserts that the funding rate cannot be a narrow-based security index "because a funding rate is not an 'index.'" (Let. at 3.) The government cites no legal precedent or evidence in the record in support, instead relying on the dictionary definition of "rate." *Id.* But the government does not dispute that the funding rate was a computation based upon a differential calculated against an index (the oracle settlement price) or that it was comprised exclusively of securities (the price of MNGO on the three exchanges computed into an oracle price and the mid-price of the MNGO Perpetual[5]). Indeed, this is confirmed by the Mango Markets documentation the government put into evidence, which states:

> Funding is computed continuously as the daily difference in the index price and the current book price (current mid price). Funding is paid out roughly every 5 seconds. The calculation is as follows:
>
> book_price = (bid + ask) / 2
> diff = clamp(book_price / index_price - 1, -0.05, 0.05)
> time_factor = (now - last_updated) / FUNDING_PERIOD
> funding = diff * time_factor * contract_size * index_price.

GX-1011 at 45-46 (Calculating the Funding Rate).

The government's assertion that the funding rate cannot be an index because an index "refers to a basket of securities," Let. at 4, is inconsistent with the statutory definition. Index is defined as "an index or group of securities, ***including any interest therein or based on the value therefrom***." 15 U.S.C. § 78c(a)(68)(E) (emphasis added). The plain language of the statute contemplates interests in an index or thing based on their value. The funding rate is a payment stream based on the value of a group of securities and indices and thus fits within the definition.

Because the government has provided insufficient evidence either that the Mango Perpetuals are "swaps" at all or "mixed swaps," Mr. Eisenberg moves for judgement of acquittal on Counts 1 and 2. In the alternative, he requests the following instruction (redlined against Court's latest Proposed Jury Charge):

> **2. Count One – Commodities Fraud: Second Element – Swap**
>
> The second element of commodities fraud is that the defendant committed his fraudulent act in connection with a "swap." Here, the government contends that the MNGO Perpetuals involved in the alleged scheme were "swaps."
>
> A "swap" includes ~~any agreement, contract, or transaction that provides for payment based on the occurrence, or non-occurrence, of a financially consequential event. It also includes~~ any agreement, contract, or transaction that provides for an exchange of payments based on the value of one or more rates, commodities,

---

[5] A security-based swap is treated as a security under the securities and commodities laws. *See* 15 U.S.C. § 78c(a)(10).

indices, or other property that transfers, in whole or in part, the risk of changes in value of the things underlying the swap, without actually exchanging those things.

### 3. Count One – Commodities Fraud: Second Element – Swap Covered by the Commodities Laws

If you find the government has proven beyond a reasonable doubt that MNGO Perpetuals are "swaps" as I defined that term a moment ago, you must then determine whether they are "swaps" that are covered by the commodities laws.

To find that MNGO Perpetuals are swaps covered by the commodities laws, you must find beyond a reasonable doubt at least one of the following:

First, that MNGO Perpetuals are based, in part, on the value of USDC, *and* that USDC is a currency or a financial or economic interest or property of any kind other than a "narrow-based security index, which I will define ~~;~~momentarily, OR

Second, that MNGO Perpetuals are based, in part, on any rate, index, or quantitative measure other than the price of MNGO or of a "narrow-based security index."

A "narrow-based security index" is an index or group of nine or fewer securities, including any interest therein or based on the value therefrom. A "security" is an investment of money, in a common enterprise, with the expectation of profits to be derived from the efforts of others.

If you find one of these two things beyond a reasonable doubt, then MNGO Perpetuals are swaps covered by the commodities laws. If you find that the government has not proved either of these two things beyond a reasonable doubt, then you should acquit Mr. Eisenberg as to Count One.

## II. Market Price

The Second Circuit has established that the focus for market manipulation claims must be on the "market price" of the asset at tissue. In *ATSI v. Communs., Inc. v. Shaar Fund, Ltd.*, the Second Circuit, analyzing the securities statues for the purposes of defining artificial price in the context of market manipulation, adopted the Seventh Circuit's focus on capital market efficiency and stated that "[t]he efficient capital market hypothesis, as adopted by the Supreme Court, posits that 'the ***market price*** of shares traded on well-developed markets reflects all publicly available information.'" 493 F.3d 87, 100 n.4 (2d Cir. 2007) (emphasis added) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 226 (1988)). The Second Circuit further elaborated that "market rigging [] seeks a market where 'competing judgments of buyers and sellers as to the fair price of the security brings about a situation where the ***market price*** reflects as nearly as possible a just price.'" 493 F.3d 87, 100-101 (2d Cir. 2007) (emphasis added)[1] (quoting *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1466 (2d Cir. 1996); *see also Basic Inc.*, 485 U.S. at 246. The singular focus on market price as the touchstone price for market manipulation claims has thus been established for

decades.

Perhaps because of the clear authority regarding the central importance of the "market price," the government now seeks, without explanation, to refer to the market price for MNGO Perpetuals as "reference price."[6]  Let. at 4.  Similarly, the government's expert, Dr. David Mordecai, resisted without any explanation the use of the term "market price," insisting instead on the use of the term "prevailing venue price."  Tr. 784.  But, regardless of the government's attempts at shifts in wordplay, the concept is clear.  Market price is the accepted term in the law, and it refers to the prevailing price at which the asset at issue can be purchased.  Because of the near-total lack of evidence regarding the MNGO Perpetual market price, the government has not proven any of the four elements of market manipulation stated in *In re Amaranth Natural Gas Commodities Litig.*, 269 F.R.D. 366 (S.D.N.Y. 2010), and the Court should enter judgment of acquittal.

Despite the fact that the government lacks any authority contradicting the above precedent that the price on which market manipulation claims must focus is the prevailing price at which the regulated asset traded, the government now seeks to prosecute Mr. Eisenberg on a theory that he manipulated a different price, the settlement price of the MNGO Perpetual, and not the MNGO Perpetual's market price.[7]  This theory of market manipulation finds no support in the law, and the authority cited in the government's case, which does not relate to an asset that had distinct settlement and market prices, is inapposite.

The CFTC's Adjudicatory Opinion in *In the Matter of Anthony K. DiPlacido*, CFTC Dkt. No. 2008, 2008 CFTC LEXIS 101 (Nov. 5, 2008), is inapplicable.  In *DiPlacido*, the defendant was a floor broker on the New York Mercantile Exchange who on four occasions placed trades in electricity futures late in the trading period in an effort to artificially push the close/settlement price up/down at the request of a client.  DiPlacido's client thereafter profited by exercising options based on the manipulated close/settlement prices.  DiPlacido was charged and held liable for manipulating the settlement price of electricity futures, which were assets covered by the CEA.

By contrast, Mr. Eisenberg is not charged with manipulating the spot market for MNGO, which the government has conceded for purposes of this cases is not a commodity.[8]  The

---

[6] The government and its witnesses used "reference price," Tr. 563, 603, and "reference value," Tr. 386, somewhat differently at trial.  Special Agent DeCapua stated that "it is the reference price that determines whether or not the contract is in the money, whether if you're on the long side when the value of Mango goes up, the perp contract has value.  If it goes below the reference price, it loses value."  (Tr. 603.)  While Mr. Jain believed the term "order book mid price" more accurate, he conceded that that "could be referred to as a market price."  (Tr. 331.)

[7] The government baldly states that it "has introduced evidence showing that the defendant intentionally and artificially inflated both [the market and settlement] prices."  (Let. at 4.)  It points to no such evidence or otherwise offers any explanation for this plainly unsupported position.

[8] The Court has further ruled that, under the facts of this case, the government could not prove that USDC was a commodity, and, therefore, the government's contract of sale theory is no longer viable.

government, instead, alleges that Mr. Eisenberg manipulated the price of the MNGO Perpetuals on Mango Markets. The relevant price here must be the market price to purchase or sell contracts of MNGO Perpetuals on Mango Markets. *DiPlacido* does not hold otherwise.

The government points out that *DiPlacido* distinguished the holding of this Court in *Vitanza v. Bd. of Trade of N.Y.*, No. 00 Civ. 7393, 2002 US Dist. LEXIS 4499 (SDNY Mar. 18, 2002), and that the Second Circuit appeared to affirm the distinction in a footnote in an unpublished decision, *DiPlacido v. CFTC*, 364 F. App'x 657, 660 n.1 (2d Cir. 2009). But *DiPlacido*'s distinction of *Vitanza* is inapplicable for the reasons stated; namely, *Vitanza*, like this case, involved separate settlement and market prices. *Vitanza*, in granting a motion to dismiss a civil market manipulation claim, held that "the settlement price is not the value of the contract itself or the value of the commodity underlying the contract." *Id.* at *19. The same is true in this case (but was not so in *DiPlacido*).

*Three Crown Ltd. Pship. v. Caxton*, 817 F. Supp. 1033, 1042 (S.D.N.Y. 1993), upon which *Vitanza* relied, is similarly supportive of Mr. Eisenberg's position. There the defendants were alleged to have manipulated Treasury notes which impacted plaintiff's positions in the futures markets for Treasury bills and Eurodollars. The court, in dismissing the case, held that "Treasury bills (not Treasury notes) are the commodities underlying the Treasury bills futures markets and eurodollars are the commodities underlying Eurodollar futures markets." *Id.* at 1043.

The government fails to address the holding of either *Vitanza* or *Three Crowns*, stating only that those cases should be disregarded because of *DiPlacido*, which, for the reasons above, shared negligible factual similarity to either case, distinguished the cases. Furthermore, the government says that these cases are inapplicable because they relate to the CEA's private of action, without offering a word of explanation for why this distinction is meaningful.

Because the government failed to establish that Mr. Eisenberg could have, specifically intended to, or did cause an artificial market price for MNGO Perpetuals, judgement of acquittal as to Count 2 should be entered. The government's failure of proof is specifically acute with regard to the intent element, which is present in both the market manipulation and attempted market manipulation charges. The evidence in the case overwhelmingly proved that the success of Mr. Eisenberg's trades and his ability to withdraw funds from the platform did not depend at all on the market price, and there is no evidence that Mr. Eisenberg ever used the market price to monetize his position by closing it.

In the event that the Court wishes to reserve decision on the Rule 29 Motion regarding Count 2, Mr. Eisenberg respectfully requests that the jury be instructed that the "market price" is the price against which they should evaluate the four elements of Count 2.

The rule of lenity, when considered in conjunction with the arguments raised above, also mandates that Counts 1 and 2 be dismissed. "[A]mbiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." *Rewis v. United States*, 401 U.S. 808, 812 (1971) (citations omitted). The rule "is premised on two ideas: First, a fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed; second, legislatures and not courts should define criminal activity." *Babbit v. Sweet*

Hon. Arun Subramanian
Page 8

*Home Chapter of Communities for a Great Oregon*, 515 U.S. 687, 704 n.18 (1995) (citations and internal quotations omitted).   The Indictment alleges a novel and expansive interpretation of the CEA, as has been fully detailed above.  Expanding criminal liability to the alleged conduct would involve a "sweeping expansion of federal criminal jurisdiction in the absence of a clear statement by Congress" in violation of the rule of lenity.  *See Cleveland v. United States*, 531 U.S. 12, 24 (2000); *see also Banki*, 685 F.3d at 109 (applying rule in vacating convictions for violating Iran sanctions and explaining that "[t]he rule of lenity requires ambiguous criminal laws to be interpreted in favor of the defendants subjected to them").

⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯

For the reasons stated above, Mr. Eisenberg's Rule 29 Motion should be granted. Thank you for Your Honor's consideration of this letter.

Respectfully submitted,

*Noam Greenspan*

Noam Greenspan
Sanford Talkin

– and –

Brian Klein
Ashley Martabano
Riley Smith
Waymaker LLP

cc:   AUSA Thomas Burnett (by ECF)
      AUSA Peter Davis (by ECF)
      SAUSA Tian Huang (by ECF)