O48VEIS1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4              v.                        23 Cr. 10 (AS)

 5   AVRAHAM EISENBERG,

 6              Defendant.                Trial

 7   ------------------------------x
                                         New York, N.Y.
 8                                       April 8, 2024
                                         9:50 a.m.
 9

10   Before:

11                  HON. ARUN SUBRAMANIAN,

12                                        District Judge
                                          -and a jury-
13
                         APPEARANCES
14

15   DAMIAN WILLIAMS,
          United States Attorney for the
16        Southern District of New York
     PETER J. DAVIS
17   THOMAS S. BURNETT
     TIAN HUANG
18        Assistant United States Attorneys

19   WAYMAKER LLP
          Attorneys for Defendant
20   BRIAN E. KLEIN
     ASHLEY MARTABANO
21   RILEY SMITH
          -and-
22   TALKIN MUCCIGROSSO & ROBERTS, LLP
     SANFORD N. TALKIN
23   NOAM B. GREENSPAN

24   Also Present:  Brandon Racz, FBI
                    Ryan Sears, Paralegal Specialist-USAO
25                  Jonathan Oshinsky, Paralegal Specialist-USAO
```

O48VEIS1

1        (Case called)

2        THE DEPUTY CLERK:  Can the parties, starting with the

3    government, please state their appearances for the record.

4        MR. DAVIS:  Good morning, your Honor.

5        Peter Davis, Thomas Burnett and Tian Huang, for the

6    government.  And I'm joined at counsel table by Ryan Sears,

7    Jonathan Oshinsky and Special Agent Brandon Racz.  And

8    Mr. Sears and Mr. Oshinsky are our paralegal specialists.

9        Thank you.

10       THE COURT:  Good morning.

11       MR. KLEIN:  Good morning, your Honor.

12       Brian Klein with Mr. Talkin, Sam Talkin, Avraham

13   Eisenberg, Ashley Martabano from my firm, and Riley Smith and

14   Noam Greenspan.

15       THE COURT:  Good morning to everyone.

16       So there are a few matters which I just wanted to

17   raise which I believe we can pick up after jury selection.

18   I'll see if we can figure out what that noise is before we get

19   started today.  So just to run through a few of these issues

20   and then I'll turn to the parties to see if anything is

21   remaining.

22       So first, Mr. Eisenberg asked for an additional

23   question to be asked relating to Israel.  And so what I will do

24   is on question 49 in the jury questionnaire, where Israel is

25   raised, my proposal was to add:  If there's anything relating

O48VEIS1

```
1    to Israel or the fact that the defendant is of Israeli descent,

2    if that's accurate.  That would, I think, get to the point that

3    the defense was raising.  If that's not accurate, then I can

4    modify that, but that would be my proposal.

5              MR. KLEIN:  Your Honor, do you want us to be heard on

6    that now?

7              THE COURT:  Yes.

8              MR. KLEIN:  I think, your Honor, one of the issues

9    with that is the government is putting on evidence, or intends

10   to, about Judaism and its practices.  And we are concerned

11   about the unfortunate onset of a lot of antisemitism.  So

12   discussing Israel, we think, is important, but we think the

13   reason why we included in our proposal a discussion of Judaism

14   was to get at that too because they can't be separate.

15             THE COURT:  Why don't I just ask Israeli or Jewish

16   descent.

17             MR. KLEIN:  Your Honor, that does it for us.

18             THE COURT:  Okay.

19             Okay.  Next, I have the evidentiary objections as well

20   as the government's responses.  We'll pick that up after jury

21   selection today.  One matter with respect to the 13(a)(5)

22   defense for the defense, as I understand it, at the present

23   juncture, given the Court's proposed instruction on

24   willfulness, the defense is not planning to assert the

25   affirmative defense in 13(a)(5); is that correct?
```

O48VEIS1

1          MR. KLEIN:  Yes, your Honor.

2          THE COURT:  And it's not your position at this time

3    that -- it's not your position at all that the Sixth Amendment

4    applies to that defense, that it requires the proof to be made

5    by the jury beyond a reasonable doubt.

6          MR. KLEIN:  Yes, your Honor.

7          THE COURT:  Okay.

8          Next, on the issue that we raised at the conference

9    concerning USDC as a commodity, Mr. Burnett, you had mentioned

10   that at the time of the offense or beforehand, there were, in

11   fact, futures contracts for USDC.  You had given a description

12   of what those were, and then there was a lot of shaking of

13   heads from the defense side.

14         So can I just have some more clarity on what it is you

15   were referring to as the contracts for future delivery in USDC.

16         MR. BURNETT:  Sure, your Honor.

17         So we expect our expert will testify that there were

18   contracts for future delivery in USDC from between, I think,

19   approximately February 2022 until August 2022 that were offered

20   by an entity called Eqonex, E-Q-O-N-E-X, ended in August '22

21   because that company went out of business.

22         THE COURT:  Okay.  Those are contracts in USDC.

23         MR. BURNETT:  It was physically settled Bitcoin USDC

24   futures.

25         THE COURT:  Okay.  So what does that mean?

O48VEIS1

1    Physically --

2              MR. BURNETT:  Physically settled means that at the end

3    of the contract, one side gives over Bitcoin, the other side

4    gives over USDC.

5              THE COURT:  So is the futures contract, it involves

6    the pair of those cryptocurrencies.

7              MR. BURNETT:  The pair, that's right.

8              THE COURT:  Okay.  How would that be a contract for

9    future delivery -- if the statutory definition is interest in

10   which contracts for future delivery are presently or in the

11   future dealt and the interest is USDC, how does that fit the

12   bill?

13             MR. BURNETT:  Because the USDC is being dealt in the

14   future as part of the contract.  One party promises to deliver

15   USDC in the future, the other party promises to deliver Bitcoin

16   in the future.

17             It's like imagine if you had a contract that said:  In

18   the future, I'm going to give you corn and you're going to give

19   me gold.  That would be both a gold and a corn future, because

20   both corn and gold are being in the future dealt.  It's the

21   same thing with Bitcoin and USDC.

22             THE COURT:  Okay.

23             What is the defense's position on that?

24             MR. GREENSPAN:  Your Honor, I think the analogy at the

25   end was flawed.  The proper analogy is if you were doing a

O48VEIS1

1    contract for sheep or wheat in dollars, right.  And the only

2    pairing here that USDC serves is that it's settled in USDC.

3    Even the exhibits themselves which, you know, we can show you,

4    make it clear that the futures are futures of Bitcoin.  They

5    say that explicitly.

6           THE COURT:  Okay.  Well, look, you have the proposed

7    jury instruction on the commodity definition.  At the present

8    time I don't have an application from the defense to preclude

9    that prong of the government's claim.  So is the defense

10   planning to make such a motion?  Because otherwise there's

11   nothing for me to really do.

12          The evidence would come in at the appropriate

13   juncture; you could make a motion.  But right now I have no

14   motion.  So what's the defense's plan at this point?

15          MR. GREENSPAN:  That's fair, your Honor.

16          The way we envisioned it, we marked the objection to

17   the exhibits themselves.  It's the only evidence that would,

18   you know, be of this.  And if those exhibits were denied, then

19   our plan was to say, you know, there's no evidence of this and

20   would make a motion.

21          THE COURT:  For me to understand those objections as

22   they're raised, I think I would need a letter just outlining

23   the defense's position, because I think it's a pure legal

24   question as to whether this type of futures contract would

25   satisfy the statutory definition.  And I could rule on the

O48VEIS1

```
 1    objections on the fly, but I think that's not going to be
 2    really helpful for anyone.  I think it will be more helpful if
 3    I have a letter that actually outlines your position, and the
 4    government can certainly respond.
 5              MR. GREENSPAN:  That's fair.  We'll put that letter
 6    in.
 7              THE COURT:  Okay.
 8              Any issues that we need to take up before jury
 9    selection, Mr. Burnett or Mr. Davis?
10              MR. DAVIS:  No, your Honor.
11              THE COURT:  Mr. Klein, on your side?
12              MR. KLEIN:  Your Honor, there's one thing is we've
13    been getting rolling exhibits and rolling demonstratives.  And
14    the government did identify its three witnesses for tomorrow,
15    who are Jim Farrell; one of their purported experts Jain; and
16    someone from Mango Labs, Brian Smith or someone who was
17    involved in Mango, not sure precisely.
18              One of our issues is, your Honor, and there's a couple
19    with this, but for Brian Smith in particular, the government
20    has given us exhibit ranges for Mango, and it's dozens upon
21    dozens upon dozens upon dozens of exhibits.  And we understand
22    his testimony though is only going to be 30 or 45 minutes.  We
23    asked the government to let us know if they can give us some
24    exhibits that he might be trying to offer in so that we could
25    raise objections in advance.  Because it's hard for us to parse
```

O48VEIS1

1    out what they might possibly be, because there are just so much

2    Mango exhibits.  The government has responded that that's not

3    required, they are not required to do so.

4         I understand technically they aren't required to do

5    so, but your Honor has asked us to try to raise issues in

6    advance to deal with them outside the jury.  And with so many

7    Mango exhibits, we just can't get to that with him.  And so I

8    would ask that the government let us know -- it could be at the

9    end of the day even, just so we could raise these issues in the

10   morning with your Honor, what those exhibits are that they are

11   going to offer in through him.

12        And then the issue with Farrell, who is from AscendEX,

13   there is a narrow range of exhibits there, so we don't have a

14   problem with that.  So I'm just trying to, you know, be

15   efficient with the Court's time.  There's about 12 exhibits for

16   him.

17        And then with Jain, last night we got a lot of

18   demonstratives.  They initially identified some exhibits as

19   being his.  And so we just need to know that we're get getting

20   the final demonstratives.  I understand things could change in

21   the morning, there might be one or two, but we just want to

22   have clearly identified what are the demonstratives that they

23   are going to put in through their expert, which I think we are

24   entitled to know.

25        And then also, what are the exhibits they think they

O48VEIS1

 1    are going to offer through the expert, because that's a

 2    different category of type of witness than a factual witness or

 3    a lay witness.

 4              THE COURT:  That's fair.

 5              So Mr. Burnett or Mr. Davis?

 6              MR. DAVIS:  Judge, may I have one moment?

 7              (Counsel conferred)

 8              MR. DAVIS:  So, Judge, we're amenable to the

 9    following.  We are also of the view we want things to go

10    smoothly in front of the jury.  So here's our proposal:

11              At the end of the trial day — so, for instance, like

12    at the end of the day today or so — we can highlight what we

13    expect the exhibits we'll be putting in through each witness.

14    We're obviously meeting with the witnesses even tonight and

15    we'll be doing so throughout trial.

16              So with all the caveats that you're used to me saying

17    at this point, which is things change and etc., what we'd ask

18    is that the defense also identify for us their impeachment

19    materials that they are intending on putting through to

20    impeaching our witnesses with in the same vein, that way we're

21    avoiding issues as well.  So if they could do that at the same

22    time that we're doing that, that would be also helpful.

23              THE COURT:  Well, let's take the first part of that.

24              So, Mr. Klein, just taking the part about the

25    government showing -- letting you know what they anticipate the

O48VEIS1

```
 1    exhibits to be, I think that answers your issue.  You
 2    understand that things may change when a witness is on the
 3    stand and there may be additional exhibits that are raised.
 4    But does that answer your issue?
 5          MR. KLEIN:  That would address our concern, your
 6    Honor, yes.
 7          THE COURT:  Okay.
 8          And then as to the demonstratives, you're not going to
 9    be modifying those overnight, right?
10          MR. DAVIS:  I don't think so, Judge.
11          THE COURT:  Okay.  So you'll have the demonstratives
12    as well.  So I think that answers your two issues.
13          As to impeachment evidence, that's usually something
14    that's not disclosed in advance.
15          MR. DAVIS:  Neither are the exhibit lists that we're
16    putting through our witness.  So I think if we're in this idea
17    of fairness and transparency, it's only fair --
18          THE COURT:  Well, no.  The exhibits are disclosed.
19    And the objection is that they were disclosed, but there was
20    such a volume of them, that effectively it's no disclosure.  So
21    they are asking for some -- a modified treatment in this case
22    because there were so many documents relating to only a couple
23    of witnesses, you have no idea what the disclosure is.
24          As to impeachment evidence, there is no disclosure
25    requirement and so it's a little bit different.
```

O48VEIS1

| | |
|---|---|
| 1 | But I'm not going to require the defense to disclose |
| 2 | their impeachment material.  I think we have a good agreement |
| 3 | as to how we're going to proceed so that we can avoid these |
| 4 | issues moving forward, and the Court is here to answer any |
| 5 | objections. |
| 6 | And look, if something is used and there's clearly -- |
| 7 | if there's some improper conduct — I don't know what it would |
| 8 | be right now, but if there is, then you can raise it with the |
| 9 | Court. |
| 10 | MR. DAVIS:  Of course.  Thank you, Judge. |
| 11 | THE COURT:  Okay. |
| 12 | Anything else, Mr. Klein? |
| 13 | MR. KLEIN:  One more thing, your Honor.  And this goes |
| 14 | to the openings tomorrow.  We've asked the government to -- |
| 15 | we've entered into a couple of stipulations with the government |
| 16 | to help the trial move more efficiently and on authentication. |
| 17 | One thing we've asked them to consider is a |
| 18 | stipulation about the date of Mr. Eisenberg's arrest, and that |
| 19 | that's when he learned about the arrest warrant and the |
| 20 | complaint against him, that it was under seal until that point. |
| 21 | And then he learned about it on December 26, 2022. |
| 22 | The government is considering that.  I just want to |
| 23 | raise it because we plan to open and mention some of that.  It |
| 24 | is important to us to talk about.  We don't think those facts |
| 25 | are contested.  The government has indicated they are |

O48VEIS1

1    considering it, and they'll let us know.  We're hoping we have

2    that resolved by the end of the day.

3            THE COURT:  Okay.  Well, let's see if you can resolve

4    it by the end of the day; otherwise, if there's an issue to

5    raise with the Court, let me though.  But it seems like if

6    you're doing what you should be, which is letting the other

7    side know what you're planning to do, so I expect if there's an

8    objection to anything you're saying, that it can be raised in

9    advance and certainly should not be raised in the middle of

10   openings, if it's an issue that's literally been talked to

11   about between the parties.

12           Okay.  Anything else?

13           MR. KLEIN:  Nothing from the defense, your Honor.

14           THE COURT:  Okay.

15           So, Mr. Hernandez, I understand we're going to call

16   down and see if we can get our venire up here.

17           THE DEPUTY CLERK:  Yes, your Honor.

18           THE COURT:  So it may take a little while to get the

19   venire up here.  And Mr. Hernandez, you're going to need to

20   adjust people in the courtroom.

21           Okay.  So Mr. Hernandez is going to move some of you

22   around and we'll take care of that.  And we'll be back shortly

23   and get started with jury selection.  Thank you very much.

24           (Recess)

25           (Jury selection commenced and concluded)

O48VEIS1

1          (Jury present)

2          THE COURT:  Okay.  Just everyone at ease for the next

3    couple of minutes or so.  We're going to come back.

4          Just to give you a little sense of what's going to

5    happen, we're going to have you sworn in as a jury.  And there

6    are some preliminary instructions that I need to give you.  I

7    am not going to give you those at 4:45 p.m., don't worry.  So

8    we're going to swear you in.  There's just some contact

9    information that Mr. Hernandez is going to need from you in the

10   back and you'll be excused for today.

11         Our start time for tomorrow will be 9 a.m., so I'll

12   ask you to be here at 8:45 a.m.

13         Just some of the reminders.

14         We're going to have a compressed day to try to get you

15   out each day by, at the very latest, 3 p.m., so that you can do

16   everything else you need to.  So try to bring in a breakfast.

17   We'll have light refreshments back there in the jury room for

18   you to enjoy.  So we will have some things, but it's going to

19   be impossible for you to get out of here with one 30-minute

20   break and come back and take care of that.  So make sure to

21   bring lunch, bring breakfast, anything that you need.  And

22   you'll be able to use anything we have in the jury room.  And

23   we'll try to make things as comfortable for you as we can.

24         Mr. Hernandez here, as he has been doing all day, is

25   your guide and he will be helping you with anything that you

O48VEIS1

| 1 | need.  And so you can take it from there with Mr. Hernandez's |
| 2 | help. |
| 3 | Okay.  So, Mr. Hernandez, are we prepared and ready to |
| 4 | swear in the jury? |
| 5 | THE DEPUTY CLERK:  Yes, we are, your Honor. |
| 6 | THE COURT:  All right. |
| 7 | (A jury of 12 and three alternates was impaneled and |
| 8 | sworn) |
| 9 | THE COURT:  All right.  So tomorrow we will start with |
| 10 | some preliminary instructions and we will proceed to opening |
| 11 | statements and the commencement of this trial. |
| 12 | For now, I will just tell you this: |
| 13 | During the trial, you are not to discuss this case |
| 14 | with anyone, nor are you permitted for anyone to discuss it |
| 15 | with you.  This includes posting anything on the internet about |
| 16 | the case, whether it be on personal blogs, if those exist, |
| 17 | Facebook or Twitter, X, or Threads.  Until you retire to the |
| 18 | jury room at the end of the case to deliberate, you simply are |
| 19 | not to talk about this case with anyone, including your spouse |
| 20 | or partner, family or close friends.  Do not even discuss the |
| 21 | case with each other until you begin your actual deliberations |
| 22 | at the end of the trial. |
| 23 | Second, please do not while you are serving as jurors |
| 24 | in this trial have any conversations with the parties, the |
| 25 | attorneys, or any witnesses in this case, whether in the |

O48VEIS1

courtroom, in the hallways, in the elevators, outside, or
anywhere else.  By this I mean not only avoid talking about the
case, do not talk at all even to say good morning or to
acknowledge any of these people.  Someone seeing a jury in
conversation with a party lawyer or witness might think that
something improper was being discussed.  To avoid even the
appearance of impropriety then, avoid any such contact or
conversations.  So I can tell you that when the parties,
lawyers, or witnesses pass you in the halls without even
acknowledging your presence, they do not mean to be rude, they
are simply following my instructions.

         Third, do not read or listen to anything outside the
courtroom that relates to this case in any way.  Similarly, you
are not to allow anyone to speak to you about this case.  And
just to put underscore, do not search about this case, don't
try to look up on the internet what's going on or any of the
things that you've heard about, any of the folks on that long
list, don't try to look up any of that.

         If you are approached by anyone to speak about this
case, politely, but firmly, tell them that the judge has
directed you not to do so.  And if any person seeks to contact
you about this case, you are required to report the incident
promptly to me by sending me a note to my courtroom deputy,
Mr. Hernandez.

         Also, be sure that I am informed that any person that

O48VEIS1

1    comes into this courtroom — this is a public trial, so that

2    could happen.  But it's important that you let all of us know

3    if any of that happens.

4        Fifth, I know that many of you use cell phones,

5    smartphones, social media, the internet, and other tools of

6    technology.  You must not use these tools to communicate

7    electronically with anyone about the case.  I'm going to be

8    telling you like 100 times during the case.  I apologize in

9    advance, but so much of what we do in life today is searching

10   about things on the internet to try to learn more.  And for

11   this case it is important that you do not do that; that you pay

12   attention to the evidence and arguments as presented by the

13   parties here.

14       Do not form any opinion until all the evidence is in.

15   A case can only be presented step-by-step, witness-by-witness,

16   until all the evidence is before you.  Keep an open mind until

17   you start your deliberations at the end of the case.

18       With that, I know I've kept you a long time, it's

19   4:50, I promised I'd get you out by 5.

20       So what Mr. Hernandez is going to do is going to join

21   you back in the jury room for just a second to get your contact

22   information.  And then he's going to allow you to leave for the

23   day, while the parties and the Court discuss some matters so

24   that we can get ready for tomorrow.

25       You have the immense thanks of the Court for bearing

O48VEIS1

| 1 | through this very long day.  And again, if any issues come up |
| 2 | and you need any help, please ask Mr. Hernandez, all right? |
| 3 | So right now I'm going to ask you to join |
| 4 | Mr. Hernandez. |
| 5 | Mr. Hernandez, is the jury room open? |
| 6 | THE DEPUTY CLERK:  Yes, it is, your Honor. |
| 7 | THE COURT:  Okay.  So if you could -- could you just |
| 8 | lead them out there and could everyone rise for the jury. |
| 9 | (Jury not present) |
| 10 | THE COURT:  Please be seated. |
| 11 | All right.  Any issues that either side wants to raise |
| 12 | other than the exhibit and questioning objections that were |
| 13 | raised by the defense? |
| 14 | Mr. Burnett or Mr. Davis? |
| 15 | MR. DAVIS:  No, your Honor. |
| 16 | THE COURT:  Okay.  So I'll turn to Mr. Klein. |
| 17 | So I've received -- anything else other than the |
| 18 | exhibit objections? |
| 19 | MR. KLEIN:  No, your Honor. |
| 20 | THE COURT:  Okay.  So how do the parties think best to |
| 21 | handle these pending objections? |
| 22 | MR. KLEIN:  Your Honor, we filed something, I don't |
| 23 | know if you saw it obviously in the middle of the voir dire, |
| 24 | about the issue of the 800 series exhibits.  I understand those |
| 25 | are things related to a witness the government intends to call |

O48VEIS1

1    tomorrow.  So that may be something we'd want to take up today

2    for sure.  The government has indicated to us in other

3    conversations there are certain things they want to address

4    because it might affect their opening in terms of our

5    objections.

6              THE COURT:  Okay.  So why don't you -- well, I don't

7    have a copy of the letter just because it came in right now.

8    Do you have an actual copy that I can --

9              MR. KLEIN:  Your Honor, unfortunately we forgot to

10   bring one back over here, so we don't have an extra copy.

11             THE COURT:  Tell me what the nature of the objection

12   is.

13             MR. GREENSPAN:  Your Honor, this is the conversation

14   we had this morning.  And your Honor noted there wasn't a

15   motion on the record about the Eqonex, I believe it's

16   pronounced, whether those documents are relating to futures of

17   Bitcoin or whether they actually show there's a futures market

18   for USDC.  So we put in a letter on that.

19             THE COURT:  Okay.  And which exhibit numbers are they?

20             MR. GREENSPAN:  I believe they are 885 to 889.

21             THE COURT:  Okay.  Is this an issue that's going to

22   affect the openings?

23             MR. BURNETT:  Not the opening, although it will affect

24   a witness, Mr. Jain, who's testifying tomorrow.

25             THE COURT:  Okay.  So what I'm going to do is because

O48VEIS1

1    we don't have a copy of the letter here, is let's meet here at

2    8:30, and we'll figure it out at that time.

3              MR. BURNETT:  Okay.

4              THE COURT:  Putting those exhibits to the side, I have

5    reviewed the defendant's letter.  Why don't we start with the

6    lines of questioning.

7              So the three lines of questioning that were raised

8    have to do with questions concerning manipulation to fact

9    witnesses, issues relating to a ransomware negotiator, and the

10   third issue has to do with a legal obligation to repay.

11             So as I understand the government's response, you are

12   not going to ask questions about any legal obligation to repay

13   to the Mango Markets' witnesses; is that correct?

14             MR. DAVIS:  No legal opinion from those witnesses.

15             THE COURT:  It's going to be questioning relating to

16   the operation of the system?

17             MR. DAVIS:  Yes, your Honor, and what borrowing means,

18   what those obligations entail.

19             THE COURT:  From a technological standpoint.

20             MR. DAVIS:  Correct.  What the users are agreeing to

21   do.

22             THE COURT:  Not from a legal standpoint.

23             MR. DAVIS:  They are not making a legal call about

24   what was legally required.

25             THE COURT:  Okay.  So I understand that defendant's

O48VEIS1

objection was that questions were going to be asked about a

potential legal obligation to repay arising from those

transactions.  As I understand it, that's not going to be

asked.  And if it is asked, I will expect you to stand up and

object.

MR. KLEIN:  Your Honor, can I add one point to that?

We have a concern, and I appreciate that, but that

they may ask questions like, Were you obligated?  And it may

sound like -- like did the contract -- did the smart contract

obligate you to do something?  And it may -- the way the

question's phrased, it may turn out that it sounds like they

are giving a legal opinion about something or they are

answering actually in a way that would interfere with that.

And so that's sort of the basis for our concern there.

It's hard to know without knowing exactly what the

question is, of course, and how the witness is going to answer

it.  But that was what we were trying to front.

THE COURT:  Okay.  And can the government put any

additional color on the nature of the questioning?  I'm not

asking you to say what you're going to be asking; but as I

understand it, there was a borrowing function on the platform.

And so questions are going to be asked about the borrowing

function.  And related to that, it's just a question of so it's

a borrowing function; then there would be some technological

mechanism for repayment on that borrowing process?

O48VEIS1

1          MR. DAVIS:  Yes, your Honor.

2          For example, we could ask a witness:  When the user

3    borrows from the platform on Mango Markets, what obligations

4    does that user have with respect to collateral?  And then that

5    would -- they would just answer that question.  That's not a

6    legal opinion; that's like how the platform works.  And so

7    that's what we intend to ask and elicit.  That's not a legal

8    opinion at all; that's just kind of what it means to borrow on

9    the platform.

10          THE COURT:  Let me ask the defense:  How are they

11    supposed to ask questions about the technological operation of

12    the platform while avoiding the objection that you're raising?

13    Because I understand the nature of the objection is that

14    because of the words being used — and we've covered a lot of

15    ground in this area — that there is a thin line between

16    questions that would go on the legal side to questions that are

17    just trying to probe into how the system literally operates on

18    the ground.

19          MR. KLEIN:  Your Honor, we don't mind questions and we

20    don't object to questions about what happened or what did the

21    interface say.  So like how did the platform look when you went

22    on the website; and did you click a button that said borrow

23    maybe.  Obviously they can talk about that.  It's when you use

24    words like "obligation" and did you then have an obligation to

25    do something, or did that mean you had the intent to repay,

O48VEIS1

which is one of the questions they've been asking their

witnesses when they've been interviewing and preparing them for

testimony.  We think that infringes upon -- it goes right to

our concern that it's going to sound like that's the law to the

jury and, you know, that's our basis of our objection.  So it

is a fine line, your Honor, we acknowledge that.  And there's

a -- we'll have to carefully pay attention to the questions.

But the way it's been described in what we've seen, we

have great concerns that to the jury the questions are going to

sound like they are asking the witness.  And some of these

witnesses are the people who program the system or set it up or

may say that they helped run it.  And it may sound like, well,

then you have this legal obligation to repay.

THE COURT:  I think that one way to -- look, we'll

take the questions as they come.  I'll instruct the government

to steer clear, to the extent possible, from these questions

about legal obligation.

For instance, you could ask questions from a

technological standpoint, what's happening with this particular

function.  That way, if a witness does respond saying that

there was an obligation, it would be clear that that's their

understanding of how the system is working, as opposed to some

legal conclusion based on that they would now be permitted to

answer.  But I'm not going to, at this stage, confine the types

of questions that you're going to ask.

O48VEIS1

1    So I'll overrule the objection and we'll take it as it

2    comes tomorrow.

3    MR. DAVIS:  That's fine, your Honor.

4    I think, look, a lot of this is wording choices that

5    we're just going to have to deal with.

6    THE COURT:  So mind the wording choices so we can try

7    to avoid this.  And then we'll take the questions as they come

8    and I'll hear the objections as the questions are asked.  I

9    don't think there's any other way for me to handle this, unless

10    the parties see a path forward.

11    MR. KLEIN:  Your Honor, there's also one on page 2 of

12    their letter motion, the government notes that it does not

13    intend to ask people about terms that are at issue in this

14    case.  But actually one of their exhibits is a terms of service

15    from AscendEX, who's one of their first witnesses.  And in that

16    terms of service, it has a definition of "manipulation."

17    So we're worried that they're offering into evidence

18    something that the jury could see and they might even pull up

19    on the screen and show them how AscendEX defined

20    "manipulation."  And that's like a legal document, and that

21    could cause, again, the same type of confusion for the jury.

22    Because they have not heard your instructions on that yet.  And

23    now they are seeing a document; and the lawyer who they are

24    going to call is going to talk about terms of service that is a

25    legal document and explain what AscendEX understood to be

O48VEIS1

| | |
|---|---|
| 1 | manipulation.  I don't know if they intend to do that, but we |
| 2 | would have concerns about that coming in.  They could redact |
| 3 | that in some way, but that is a concern of a specific exhibit |
| 4 | that I wanted to point out. |
| 5 | THE COURT:  Okay.  Well, then, you'll need to raise |
| 6 | that in the morning, because I don't have that objection before |
| 7 | me.  I haven't seen that exhibit.  I would need to see it and |
| 8 | have an objection made as to that exhibit, and I'll entertain |
| 9 | it. |
| 10 | MR. KLEIN:  Yes, your Honor. |
| 11 | THE COURT:  Mr. Burnett. |
| 12 | MR. BURNETT:  Your Honor, on both this AscendEX point |
| 13 | and also the borrow point, I think what's important from the |
| 14 | government's perspective — and this goes to a theme we've kind |
| 15 | of had throughout many of these motions — is that what we're |
| 16 | trying to get at is what people expected of different actions |
| 17 | on different platforms, right. |
| 18 | So with respect to "borrow," it's important for the |
| 19 | government to establish that people who used or set up Mango |
| 20 | Markets expected that borrowing entailed a person doing certain |
| 21 | things, like maintaining certain collateral ratios, paying |
| 22 | interest, and either maintaining that and maintaining that |
| 23 | until they ultimately repay the loan.  Same with respect to |
| 24 | AscendEX, which was one of the, kind of, platforms that |
| 25 | filtered into the pricing oracle that's at issue here.  It's |

O48VEIS1

```
 1    important from the government's perspective that this platform

 2    had terms of service that prohibited manipulation.  And that

 3    set people's expectations about the types of things that would

 4    filter into the price that was being set for Mango USDT.

 5              So just as you're thinking about policing these

 6    questions, I think it's important from the government's

 7    perspective not to be confined to saying how technologically

 8    does this operate.

 9              THE COURT:  That's fair.  And so I think you've given

10    some useful guidance there, which is if you're talking about

11    expectations, then the questions can be framed at those

12    expectations.

13              I think the objection was really to questions that

14    were asking about obligations, which I think is a loaded term.

15              So again, these are the same type of word terminology

16    issues that we've addressed before.  But I think that if you

17    were asking questions about expectations of the people who are

18    running the system, that can be potentially inbound in the way

19    that questions about legal obligations or obligations might

20    raise some concerns.

21              MR. BURNETT:  Thank you, your Honor.

22              THE COURT:  Okay.

23              All right.  And then we'll take up the exhibit — which

24    I haven't seen — when there's an objection that's been raised

25    and I have a copy of the exhibit.
```

O48VEIS1

| | |
|---|---|
| 1 | As to the other points, what is the relevance of any |
| 2 | questioning to Mr. Durairaj concerning the hostage negotiator |
| 3 | or ransomware negotiator?  It's unclear to me what that goes |
| 4 | to. |
| 5 | MR. DAVIS:  I think two points on this, and we |
| 6 | outlined it in our letter. |
| 7 | One, it goes to his mental state during the time when |
| 8 | he was negotiating after the attack. |
| 9 | THE COURT:  Whose mental state? |
| 10 | MR. DAVIS:  The witness, Mr. Durairaj. |
| 11 | THE COURT:  Why is that relevant? |
| 12 | MR. DAVIS:  Because Mr. Durairaj is going to be |
| 13 | explaining to the jury why he is speaking a certain way with |
| 14 | Mr. Eisenberg, why he is agreeing to certain terms with |
| 15 | Mr. Eisenberg.  And important context for that is that |
| 16 | Mr. Durairaj believed that Mr. Eisenberg could at any point |
| 17 | turn off -- you know, stop communicating and run off with $100 |
| 18 | million.  And so looking at his actions and words during that |
| 19 | time period, it's important for the jury to understand |
| 20 | Mr. Durairaj is viewing this as such a serious situation with |
| 21 | no leverage, that he's consulting with a ransomware negotiator. |
| 22 | And -- sorry, Judge. |
| 23 | THE COURT:  No, no, please continue. |
| 24 | MR. DAVIS:  To the extent that defense counsel is |
| 25 | going to cross-examine him on how Mr. Durairaj was speaking |

O48VEIS1

about Mr. Eisenberg or trying to appease Mr. Eisenberg in the

days after the attack, I think it's important for the

government to meet that with the true fact that Mr. Durairaj

did not view this as an arm's-length negotiation.

And to the extent that the defense is going to stand

up and say this settlement that happened was an arm's-length

settlement, and that this is just some dispute between two

parties, I think the government should be in a position to

dispute that and say, Look, here's one piece of evidence that

shows that's not how Mr. Durairaj viewed it at all.

THE COURT:  Okay.  I'm going to sustain the objection

as to questioning on the ransomware negotiator or eliciting

that testimony.

However, for the reasons that you've addressed, it may

be that on cross-examination, if there is a suggestion that

Mr. Durairaj negotiated this in an arm's-length transaction,

that on redirect he'd be able to establish that he had

counseling from a ransomware negotiator, and that was the

situation that he was in.

MR. DAVIS:  Understood, your Honor.

Similarly on opening, if the defense opens on this

being an arm's-length negotiation, I think that would open the

door as well.

THE COURT:  I think that's -- hold on.

I think this is a subject that is going to be out on

O48VEIS1

openings.  You can address it with Mr. Durairaj.  You can

certainly -- see, here's the thing:  You can certainly express

that Mango Markets felt that they were under siege; they were

in a situation that was a crisis situation; they didn't know

what to do.  All of those things, all of the advice that was

given by the negotiator can be something that's expressed

without mentioning the ransomware negotiator, hostage

negotiator, whatever you call it.  That's where the prejudicial

impact is from.  I don't believe that that needs to be elicited

unless the door is open on cross-examination.

So it's not going to be something that's going to come

out in openings.  And we'll see on cross-examination if they've

opened the door wide enough for you to introduce that

testimony.  For instance, if Mr. Durairaj were to say, No, I

was really -- I was in a crisis situation.  I didn't know what

to do.  And they're hammering him on cross-examination or using

impeachment exhibits to show that no, it wasn't that bad, that

would seem to be a situation where, you know, despite the

prejudice, they've opened the door for the government to raise

issues on the ransomware negotiation.

All right.  That leaves the manipulation issue on the

questioning.

Okay.  So I think we've been down this road before.

So the question really here is what kind of questions

are you going to be asking witnesses about manipulation in that

O48VEIS1

1    sense?

2         MR. DAVIS:  Judge, I can speak for certain witnesses.

3    I want to think carefully.  I don't anticipate asking questions

4    about manipulation or asking for witnesses to take a view on

5    whether the conduct constituted manipulation.

6         I think what we're concerned about is when certain

7    witnesses are speaking about this incident and asked about it,

8    they slip into describing it in the ordinary way they would

9    describe this conduct, which is as manipulative or something

10   like that.  And I think that's a fair characterization of what

11   their viewpoint is.  And so we're not trying to ask for a legal

12   opinion on manipulation.

13        THE COURT:  I understand the concern.  You're not

14   going to be asking questions about a term that, as we've gone

15   back and forth, is a term of art that has all sorts of other

16   terms that courts have used to describe it in terms of the

17   legal definition.

18        Your point is there might be a witness who just lapses

19   into using that term.  If that happens, then the defense can

20   ask for an instruction where I can instruct the jury that

21   manipulation in this context is a term that I will define for

22   the jury.  And while witnesses may have referred to something

23   as manipulative, they are to pay attention to my definition and

24   not any label that a witness applies to it.  And I will take

25   that objection if it is made.  But let's try to avoid that by

O48VEIS1

1  focusing on what's happening on the ground.

2          For instance, you can certainly ask questions about

3  the underlying factual questions that undergird manipulation.

4  And we've gone back and forth on what those things are.  But I

5  understand the concern.  You can't prevent a witness from just

6  using that term at some point because it's a widely used term.

7          MR. DAVIS:  Your Honor, this isn't in the category of

8  just we're not trying to do that.  But if it happens, we wanted

9  to at least alert the Court to it.  And I think the way the

10  Court has approached this makes sense for the government.

11          THE COURT:  Okay.

12          Anything else from the defense on this issue?

13          MR. KLEIN:  Your Honor, no.  But this is likely to

14  come up tomorrow when they call Jim Farrell, who is the

15  AscendEX general counsel, who, my understanding is, they are

16  going to ask questions that could elicit that.  And we'll just

17  monitor it very closely.  That goes to the terms of service I

18  was mentioning, which is Exhibit 1512, which we will bring

19  tomorrow morning and show your Honor and be ready to discuss.

20          THE COURT:  Okay.

21          Mr. Burnett.

22          MR. BURNETT:  I can speak to that, because I've spoken

23  with Mr. Farrell to try and navigate around this issue.

24          So right now what we're planning to do is Mr. Farrell

25  at one point in his direct examination, we'll put in the terms

O48VEIS1

1    of service and identify the stay covered manipulation.

2    Mr. Farrell will then go talk about some other subjects and

3    ultimately will come back to the day of the attack.

4         Mr. Farrell will describe what he saw the day of the

5    attack.  And we've instructed him not to use terms like

6    "artificial" or "manipulation" in the context of what he saw on

7    the day of the attack.  He'll say they froze the account.  He

8    won't say the reason why they froze the account.  And then

9    he'll say that several weeks later, Mr. Eisenberg came forward

10   and claimed that he was the owner of that account.

11        So I think it's necessary for the story and for this

12   expectation point that the terms of service come in, and that

13   Mr. Farrell be able to describe factually what he saw and what

14   they did.  But we've been careful to instruct him to navigate

15   around like saying these terms or saying, We froze the account

16   because of this particular provision in the terms of service.

17        THE COURT:  You're not going to be asking him, Okay,

18   well, this terms of service has manipulation in it.  Well, what

19   does that mean?  What does that prevent?  And does it apply

20   here?  You're not going to be asking --

21        MR. BURNETT:  The plan was to put it up on the screen

22   and have him basically read the three sentences that define

23   "manipulation" in the terms of service, but not give any, like,

24   characterization of it beyond what the terms of service say.

25        THE COURT:  Okay.  So if once you've offered it and

O48VEIS1

1    it's been admitted into evidence, you'll have him read just

2    what it says, and then you'll move on to the other matters that

3    you are addressing.

4            MR. BURNETT:  Right.  Because from our perspective,

5    what's relevant is that this was something that was up on the

6    platform for other people who use the platform and for people

7    who relied on that platform in the oracle to see.  So what the

8    words are is relevant, not what his interpretation is.

9            (Continued on next page)

O48Ceis2

```
1          THE COURT:  But you're not going to be asking
2    Mr. Farrell what his view of manipulation is, whether
3    Mr. Eisenberg's conduct counts as manipulation, anything along
4    those lines?
5          MR. BURNETT:  No.
6          THE COURT:  So I'll turn to the defense.  That seems
7    to steer clear of the type of issue that you raised in your
8    objection.  I understand you have an objection to the exhibit
9    coming in.  We will hear that in the morning.  Any further
10   issues to address along these lines?
11         MR. KLEIN:  No, your Honor.
12         THE COURT:  So then let's turn to some of the
13   exhibits.  I'm going to run through these and then the parties
14   can focus on any particular one that they want to.  Basically
15   the dividing line here, there are certain exhibits that appear
16   to relate to other incidents, potential unlawful conduct or
17   affairs, and there are ones that are plausibly related to this
18   incident and Mr. Eisenberg's potential intent in the days,
19   months, weeks before the incident, and that's the line that the
20   Court sees.  And so, I'll give you these rulings, but I'm happy
21   to hear the parties, whether it's today or in the morning
22   tomorrow or any other appropriate juncture if there are any
23   issues here.
24         So on GX 101, the objection is sustained on 402, 403,
25   and 404(b) grounds.
```

O48Ceis2

1          On 102, the objection is sustained for the same

2     reason.

3          On 103, 104, and 403, the objection is sustained.

4          Now, as to 105, 106, 300, 301, 310, 800, 800A, 801,

5     801A, 802, and 802A, and you're going to have to check me to

6     make sure I got those numbers right, these seem to -- I want to

7     hear if there's any particular ones that the defense feels

8     strongly about, I want to hear a proffer of relevance from the

9     government.  But as to these particular exhibits, they seem to

10    go to not Mr. Eisenberg's knowledge of the law and what conduct

11    either falls under the law or falls outside of it.  So even if

12    it's not strictly speaking the particulars of the offense at

13    issue, it would seem to be relevant, especially given the high

14    standard of willfulness that the defense has argued for, and

15    which the Court in its proposed jury charge was prepared to

16    essentially adopt in terms of Count One.

17          So, let me stop there and get any reactions from the

18    parties, because I know that was a lot of exhibits there.

19          MR. BURNETT:  So I can keep track, can you go through

20    a little more slowly the numbers you read off.  I was trying to

21    write, but I lost track.

22          THE COURT:  Absolutely.  105, 106, 300, 301, 310, 800,

23    800A, 801, 801A, 802, and 802A.

24          MR. BURNETT:  Which ones were the sustained

25    objections?

O48Ceis2

1          THE COURT:  101, 102, 103, 104, and 403.

2          I think what makes sense, because there were a lot of

3     exhibits that were in the defendant's letter, so it may make

4     sense for me to run through these.  In the morning, if there

5     are particular ones you want to focus in on, then we can do it.

6     There's going to be a lot of these that neither side has an

7     issue with.  And so, we'll have a focused number of these

8     exhibits that we can run through.  If we don't get through it

9     in the morning, I'm not sure a lot of these are going to be

10    day-one exhibits.  We can pick it up at the end of the day

11    tomorrow or the following day.  So let me give you the

12    remaining issues here.

13          GX 107 and 113.  My understanding is that there's no

14    ruling requested.  The defense was just flagging a potential

15    Rule of Completeness issue that the parties are still

16    discussing.  So no issue there.

17          GX 108, I'm reserving decision on these.  There was

18    some reference to a Rule of Completeness issue based on a later

19    occurring text that would provide clarity to the situation, but

20    I don't think the Court was furnished with those texts.  So as

21    to 108, if the defense wants to provide those remaining texts,

22    then we can evaluate the Rule of Completeness objection.

23          On 109, that objection is sustained.

24          On 111, that objection is sustained.

25          MR. BURNETT:  Sorry, your Honor.  So 109, my

O48Ceis2

1   understanding was it wasn't even an objection.  It was just a

2   completeness argument.

3             THE COURT:  Right.  I have to look at that exhibit.

4             Have things been worked out as to Government Exhibit

5   109.

6             MR. BURNETT:  I apologize.  When you say "sustained as

7   to 109," you mean that that Tweet would come in as part of

8   completing?

9             THE COURT:  Yes.

10            MR. BURNETT:  Okay.

11            THE COURT:  111 is sustained.

12            114 is sustained.

13            115, I believe the parties are discussing a

14  stipulation here.  This concerns whether Mr. Eisenberg was the

15  owner of a particular wallet and the parties were discussing a

16  stipulation.  Has that been resolved?

17            MR. KLEIN:  Not yet, your Honor.  We brought it up.  I

18  think we are waiting to hear back from the government.  We will

19  follow up this evening on the ones we are hopefully trying to

20  reach a resolution without the Court.

21            MS. MARTABANO:  I believe the government provided new

22  versions of 115 late last night and we haven't had a chance to

23  look at those and discuss a stipulation.

24            THE COURT:  We'll reserve on 115.

25            On 116 and 201, that's reserved pending a stipulation

O48Ceis2

1   on the email address.

2           313, no ruling is requested.  It's my understanding

3   there's an issue with authenticity and potentially a Rule of

4   Completeness issue, but nothing that's been raised that's ripe

5   for the Court to decide.

6           No ruling has been requested as to 400, 501, or 502.

7           No ruling has been requested as to 401 and 404.

8   Again, most of these are Rule of Completeness issues where the

9   parties are still discussing.

10          Exhibit 405 is overruled.

11          Exhibit 502A is overruled.

12          Exhibit 609 and 609A are overruled.

13          The 700 series, no ruling has been requested, but some

14  issues may come up.

15          And as to 820, this is sustained.  I believe this is

16  the Waves complaint.  So while there may be documents that were

17  in Mr. Eisenberg's possession concerning the underlying Waves

18  issues which might be relevant to intent, I don't believe that

19  the Waves complaint, which was drafted by lawyers and would

20  raise a host of additional issues would come in.  There's a

21  bunch of prejudice that is possibly raised by possibly bringing

22  that in.  The probative value is limited by the fact that it's

23  a lawyer-driven document.  So I'll sustain that objection.

24          As to 860, this is the podcast clip.  The objection is

25  sustained.

O48Ceis2

1           We've dealt with the government questioning.

2           So I've run through those, but we haven't really dug

3   deep into the substance.  So what I'll ask the parties to do is

4   figure out which of those exhibits they want to focus on, I'll

5   have them up here on my screen so that we can run through them

6   in the morning.  Then there may be some of these that the

7   parties will kind of live with the Court's ruling.  For

8   instance, on the podcast clip, I am unlikely to be changing my

9   determination on the podcast clip, but as to some of these

10  other ones, if you can raise them in the morning, we can run

11  through them.  I'm happy to run through especially critical

12  ones at this time if they're going to bear on openings, and we

13  can certainly do that, but it might be more efficient for the

14  parties to say I got these five we ran through yesterday and we

15  would like to run through them quickly in the morning.  It

16  might just be a more efficient use of everyone's time.  But

17  Mr. Burnett.

18           MR. BURNETT:  One clarification.  The Waves complaint

19  one, there was kind of a cross-reference in the chart to both

20  the Waves complaint, which was 820, but then there was a Google

21  document that Mr. Eisenberg kind of himself wrote that's

22  related to the Waves complaint.

23           THE COURT:  I'm pretty sure I overruled that

24  objection.  I believe --

25           MR. BURNETT:  Sorry.

O48Ceis2

1          MS. MARTABANO:  It's 609, 609A.

2          MR. BURNETT:  Sorry.  Got my numbers out of order.  So

3    understood on that.

4          Let me talk with folks here quickly to make sure

5    there's nothing else I need to bring up here now.

6          MS. MARTABANO:  Your Honor, we do have copies of our

7    proposed supplements for 108, 401, and 404, if the Court would

8    like them now or we can email them.  We have physical copies

9    for you and the government.

10          THE COURT:  Why don't you email them so we don't end

11    up losing them on the way to chambers.

12          MR. BURNETT:  I guess maybe one question about the

13    thought process behind 114, which might help us.  So 114, I

14    think as the version of it that went to you was a lengthy chat

15    because it was the full chat between Mr. Eisenberg and this

16    person named Dmitriy.  There is a narrower portion of that

17    exhibit we could offer where I think it covers all the portions

18    that show Mr. Eisenberg obtaining this bochen.clean@gmail

19    account that does not get into some of the sanctions issues

20    that appear elsewhere in the chat.  Was the sanctions issue

21    kind of animating the Court's concern?

22          MR. TALKIN:  Judge, I think we're confusing exhibits

23    here.  I think that's 116 that we're working on stipping out

24    that issue.

25          THE COURT:  I thought 114 had to do with let's rob

O48Ceis2

1    a --

2              MR. BURNETT:  Sorry.  I apologize.  I meant 116.

3              MR. TALKIN:  116 we're still trying to resolve.

4              MR. BURNETT:  This is a good sign I should come back

5    with stuff in the morning.

6              THE COURT:  Anything from either side before we -- and

7    we'll take these issues up at 8:30 in the morning.

8              MR. KLEIN:  Your Honor, we'd ask our client be

9    permitted to have some snacks that we brought.  The marshals

10   need your permission.

11             THE COURT:  So ordered.  If you need a written order

12   or anything else, we'll be happy to get it for you.

13             THE MARSHAL:  Thank you, your Honor.

14             MR. DAVIS:  Judge, if I may, just so I understand the

15   Court's ruling on this hostage ransomware point.  The way I

16   understand, this doesn't affect openings.  Basically, the door

17   opening analysis would only happen if, on cross examination of

18   Mr. Durairaj, the defense opens the door?

19             THE COURT:  Yes.

20             MR. DAVIS:  Understood.

21             THE DEPUTY CLERK:  The Court is having issues

22   accessing the 3500 materials that were submitted on the USAFX.

23   It seems to be an issue not with the documents themselves, but

24   the Court is having trouble accessing, actually getting into

25   the account, despite having the username and password already

O48Ceis2

```
 1   set up.  I'm not sure if the government has any alternate

 2   proposals of a way we can deal with that.

 3          MR. DAVIS:  We can try to put it on the drive.  With

 4   USAFX, is it a problem on our end?

 5          THE DEPUTY CLERK:  It seems to be a login issue, that

 6   we're having trouble resolving that problem.

 7          MR. DAVIS:  We can try to fix this issue.  We can also

 8   get a drive for the Court.

 9          THE COURT:  Let's get a drive and take care of it that

10   way.

11          Any further issues to address before we adjourn?

12   Mr. Davis?

13          MR. DAVIS:  Nothing for now, Judge.  Thank you.

14          THE COURT:  By the way, I think we had it right on the

15   math.  I didn't want to raise it.  Even Ms. Goldberg is like,

16   don't raise it, but it bothered me.

17          MR. DAVIS:  It's certainly fair to raise.

18          THE COURT:  Because I think if 29 takes you to 35,

19   that is seven.  But we did it the old fashioned way.  Still

20   managed it.

21          MR. DAVIS:  That's fine.  I deserve it.

22          THE COURT:  No one's fault.  It was bothering me.  I

23   sat there and done that elementary grade math a hundred times

24   and it came out the same way.  I wanted to make sure I wasn't

25   missing something.
```

O48Ceis2

1                Thank you everyone for your great work today.  I

2       really appreciate it.  We'll see everyone back here tomorrow at

3       8:30 a.m.

4                (Adjourned to April 9, 2024 at 8:30 a.m.)

5                                    * * *

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25