O49Ceis1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                        23 Cr. 10 (AS)

5    AVRAHAM EISENBERG,

6                   Defendant.           Trial

7    ------------------------------x
                                         New York, N.Y.
8                                        April 9, 2024
                                         8:30 a.m.
9

10   Before:

11                  HON. ARUN SUBRAMANIAN,

12                                       District Judge
                                         -and a jury-
13
                           APPEARANCES
14

15   DAMIAN WILLIAMS,
          United States Attorney for the
16        Southern District of New York
     PETER J. DAVIS
17   THOMAS S. BURNETT
     TIAN HUANG
18        Assistant United States Attorneys

19   WAYMAKER LLP
          Attorneys for Defendant
20   BRIAN E. KLEIN
     ASHLEY MARTABANO
21   RILEY SMITH
          -and-
22   TALKIN MUCCIGROSSO & ROBERTS, LLP
     SANFORD N. TALKIN
23   NOAM B. GREENSPAN

24   Also Present:  Brandon Racz, FBI
                    Ryan Sears, Paralegal Specialist-USAO
25                  Jonathan Oshinsky, Paralegal Specialist-USAO

O49Ceis1

1              (Trial resumed; jury not present)

2              THE COURT:  Welcome back.  So I think we got a few

3      issues to pick up before we have the jury join us.

4              So the first issue that we should address is

5      Government Exhibit 1512.  Who's going to handle this from the

6      government's side?

7              MR. BURNETT:  I will, your Honor.

8              THE COURT:  Just lay out for me, what's the relevance

9      here, especially of highlighting the manipulation language from

10     the AscendEX agreement.  Maybe you can start with what AscendEX

11     is and how does it figure into the case.

12             MR. BURNETT:  Of course.  So, AscendEX is a

13     cryptocurrency trading platform.  The pricing oracle on Mango

14     Markets is the oracle that set the price for the perpetual that

15     was manipulated here, looked to three different cryptocurrency

16     exchanges in order to drive the price that it was going to use.

17     AscendEX was one of the three exchanges.  So, on the day of the

18     attack, Mr. Eisenberg went onto AscendEX where he dramatically

19     pumped up the price of the Mango token.  So that's how it kind

20     of fits into the scheme.

21             The terms of service then are extremely relevant and

22     really essential to the government's case for a few different

23     purposes.  So, first, it shows what people's expectations were

24     about the types of trading activity that would occur on

25     AscendEX, which was being filtered in to the pricing oracle.

O49Ceis1

1    That's important because we expect other witnesses -- one other

2    witness will testify that part of the reason centralized

3    exchanges like AscendEX was chosen for this oracle because they

4    have anti-manipulations protections and rules in place, which

5    was part of what was going to protect the integrity of the

6    pricing oracle.  So it's central to proving like the fraudulent

7    piece of the scheme there.

8            It's also extremely important because as it was kind

9    of previewed during the original round of motions in limine

10   here, the defense intends to make a deal of the fact that Mango

11   Markets did not have service at the time of the attack here

12   and, in fact, has expressed their intention to offer terms of

13   service that were created after the fact, even though those

14   weren't available at the time.  So the fact that there were

15   terms of service on other platforms that Mr. Eisenberg used and

16   those terms of service prohibited the type of conduct that he

17   was engaged in are important both going to his mental state and

18   also to rebutting this inference that Mr. Eisenberg cared in

19   any way about whether there were or were not terms of service

20   on Mango Markets.

21           Obviously, the fact that it defines "manipulation" and

22   also defines "fraudulent practices" is important because if the

23   terms of service didn't say anything about that, then it

24   wouldn't go one way or the other in terms of people's

25   expectations about what would happen on AscendEX or

O49Ceis1

1    Mr. Eisenberg's mental state.

2              To the extent there's any concern about the definition

3    of "manipulation" overlapping with or conflicting with this

4    Court's legal instruction, I think this Court should do what I

5    think the Second Circuit blessed in the -- I think it was the

6    *DeCandia* case we cited in connection with our letter briefing

7    over the weekend about the kind of lay use of the term

8    "manipulation," which is just give a limiting instruction

9    telling the jury that at the end of the day, "manipulation"

10   will be a legal term for you to decide that I will instruct you

11   on.  You should listen to what my instruction is on the term

12   "manipulation" as it pertains to the charges in this case.

13   This document is being introduced for purposes other than the

14   legal definition of "manipulation."

15              THE COURT:  Okay.  Thank you.

16              Who's going to address this from the defendant's side?

17              MR. KLEIN:  Your Honor, me, Mr. Klein.

18              Our concern about this exhibit is manifold.  One is if

19   you look at 413 on page 4, it does provide a definition of

20   "market manipulation."  This exhibit is coming in through the

21   general counsel of AscendEX, Mr. Farrell, who will be

22   testifying about this, which is a legally driven document that

23   I believe he was involved drafting.  Then it actually defines

24   "market manipulation" according to AscendEX here.

25              The limiting instruction I don't think would meet or

O49Ceis1

1    stop the jury from having confusion because this definition is

2    not the legal definition, it's just the definition AscendEX on

3    its own came up with.  And I think Mr. Burnett plans to have

4    him even read this into the record.  And there's a whole host

5    of other things listed under "Marketplace Conduct and Rules."

6          And I think the government can still get its point

7    across by asking him, which I understand they do intend to do,

8    did you freeze his account because he violated your terms of

9    service.  And that would get the point across, the same point

10   they're trying to make.

11         As to the connection to another witness down the road,

12   I don't know who that witness is or what they're going to say

13   and whether there's a foundation for that or anything, so I

14   can't speak to that yet.  But I can see this document itself,

15   which is fine print, "Marketplace Conduct and Rules," 413, and

16   there's a host of things they claim to prohibit and definitions

17   for them.  And I worry would so confusion be unduly

18   prejudicial.  There's limited probative value to having a

19   witness read in a definition of "market manipulation" who's a

20   general counsel and a lawyer.  I think that's just going to

21   confuse the juror --

22         THE COURT:  And to make sure that I'm clear,

23   Mr. Burnett, the witness is not going to be asked what the

24   meaning of the contract or the meaning of the terms in the

25   manipulation definition, what that is; right?

O49Ceis1

1          MR. BURNETT:  That's right.  It would be better for me

2     to read it as opposed for the witness to read it, I'm happy to

3     do that, but we can't have an exhibit come in that we have to

4     hide from the jury.

5          THE COURT:  No, I understand that.

6          To the extent there's a concern that the witness is

7     the general counsel who drafted the contract, and so that he

8     might somehow say this is this term and this is what I meant

9     when I drafted it, there's nothing like that that's going to

10    come in?

11         MR. BURNETT:  No.

12         THE COURT:  I'm going to overrule the objection to

13    this exhibit.  I agree with the government, it is highly

14    probative on issues such as the fraud aspect of the scheme,

15    materiality, and especially given that the defense plans to

16    emphasize the lack of terms of service on Mango Markets, given

17    this was one of the platforms on which Mr. Eisenberg made his

18    trades, and it did have terms of service that had various

19    provisions, I think that overwhelms any potential juror

20    confusion.

21         And so, the objection, as I understand it, under

22    Rule 403, is not well taken.  However, I will give a limiting

23    instruction and tell the jury after the exhibit goes in that,

24    to the extent that it has any definition or refers to

25    "manipulation," the jury should follow my instructions on the

O49Ceis1

1    meaning of that term and not what is contained in any of the

2    exhibits.  That's exhibit 1512.

3         On the hypothetical questions, which I understand is

4    something that may come up today, I've reviewed the

5    government's letter.  *Cuti* comes up in a slightly -- so, just

6    to set the stage.  The government's refers the Second Circuit's

7    decision in *Cuti*, which indicates that hypothetical questions

8    to the government's witnesses is permitted under certain

9    circumstances.  That case refers to a number of other cases

10   that indicate that it is especially useful and permitted in the

11   context of fraud.  And *Cuti* itself, the fact pattern is a

12   little bit different than this case because I think there, the

13   withheld facts are the facts that were assumed by the witness,

14   had been admitted into evidence.  And so, it was just the

15   slightly different fact scenario.  However, the cases that *Cuti*

16   refers to, in particular, the Tenth Circuit's decision in Ore,

17   which, in turn, relies on the Fourth Circuit's unpublished —

18   although the Tenth Circuit says that its reasoning was highly

19   persuasive — decision in *Dukes*, I think match almost exactly

20   the two questions the government intends to ask.

21        And so, my inclination is to overrule any objection to

22   those two questions as long as they're stated the way they're

23   laid out in the government's letter, but I'll hear from the

24   defense.

25        MR. KLEIN:  Your Honor, we maintain our previous

O49Ceis1

1    objection and have an additional objection, which is I don't

2    think they have the foundation for these questions for the

3    witnesses, at least the witness they're going to do today.

4            So these questions depend on the person actually being

5    involved in the transaction or somehow trading that day.  And

6    so, their first witness -- one of the witnesses today,

7    Mr. Smith, from what I understand, was not trading that day or

8    not involved in the market and only learned after the fact

9    about the incident.  And so, if you're asking a witness a

10   hypothetical question about would you have done something, that

11   assumes that they were somehow aware of it at the time or

12   somehow involved at the time, or as this witness, from what I

13   know and from the 3500 material, learned about this after the

14   fact, was not trading that day, was not transacting on the

15   platform that day.

16           THE COURT:  To be clear, turning back to some of the

17   cases that the government relies on, in those contexts,

18   questions were asked to investors who were the alleged deceived

19   parties, and those investors were asked, for instance, whether

20   certain representations would be material or not.  You're

21   saying that's different than what's at issue here because the

22   witness that is being asked these questions is not the person

23   who at that time would have either relied or not relied on the

24   represented conduct?

25           MR. KLEIN:  Exactly, your Honor.

O49Ceis1

```
1          THE COURT:  Mr. Burnett, is that right or wrong?
2    Mr. Davis
3          MR. DAVIS:  Your Honor, that's factually incorrect and
4    legally wrong.  Factually, we expect the testimony today will
5    be that Mr. Smith had approximately $10,000 worth of
6    cryptocurrency on the platform at the time of Mr. Eisenberg's
7    crime.  So he is in a position to answer this question exactly.
8    So the factual premises is wrong and that kind of ends the
9    defendant's argument.
10          But going back to what this Court said earlier about
11    the materiality standard, which, of course, is an objective
12    one, the Second Circuit and the cases we've cited expressly
13    allow us to ask these questions and that's exactly what we
14    intend to do.
15          THE COURT:  But putting aside the $10,000 in
16    cryptocurrency, is there any other basis to put Mr. Smith in
17    that category of people that it would matter what his views
18    were, if that makes sense.  Meaning that -- do you understand
19    what I'm saying?  I understand he's got the $10,000 in crypto,
20    so you think as a factual matter, there's no issue of
21    foundation.  Putting that to the side, given his role with
22    Mango Markets, at the time of the alleged offense, if he had
23    known about the hypothetical conduct, is there something else
24    that he could have done to have either prevented Mango users
25    from losing funds, some other basis for foundation on a factual
```

O49Ceis1

1   level?

2           MR. DAVIS:  I think I take it to mean could he have --

3   like, was he consulting with Mango at the time?

4           THE COURT:  Is there some other way in which it would

5   have been the tie to something different happening if the

6   represented facts had been different?

7           MR. DAVIS:  So, your Honor, I think the primary basis

8   is he was an investor, like a person with deposits.

9           THE COURT:  And you're going to elicit that testimony

10  before these questions are asked?

11          MR. DAVIS:  Correct.  Yes, your Honor.

12          THE COURT:  So I'll overrule the objection on

13  foundation grounds, as well.

14          MR. KLEIN:  Your Honor, I have a question that's sort

15  of related to that.  In reading your rules, I saw that you

16  don't want speaking objections.  I understand that.  If

17  someone's objecting, do we just say "objection," or do we put,

18  "Objection, hearsay"?

19          THE COURT:  If I ask you for additional explanation,

20  if I ask for grounds, you should try to limit it to one or two

21  words, if possible, so we don't have a speaking objection.  In

22  rare circumstances, if you need to get more deep in the woods,

23  you can ask for a sidebar, but let's try to limit those as much

24  as possible.

25          MR. KLEIN:  Understood, your Honor.

O49Ceis1

```
1          And they proffered how they're going to bring it in,
2     but it may come in differently and I may still want to object
3     at that moment.
4          THE COURT:  And I will, if it comes at that time, I
5     will understand your objection to be along these lines, but if
6     the message isn't getting across, then you can certainly give a
7     little bit more detail, and if we need a sidebar, we'll take
8     it.
9          MR. KLEIN:  Yes, your Honor.
10         THE COURT:  So those are those two issues.
11         Do we need to, at this time, get into the 800 series
12    documents and any remaining exhibits from yesterday or is that
13    something we should take up at a later recess?  Is that going
14    to come up in the first couple witnesses?
15         MR. BURNETT:  So the 800 documents will come up with
16    the third witness today.  It's kind of like lateish or midway
17    through the third witness.  My expectation is that will be
18    after the 11:30 break, but it is going to come up today.
19         THE COURT:  So Mr. Hernandez, where are we with the
20    jury?  Are they here?  If you can go check and we'll continue
21    our discussion here.  I just don't want to keep them waiting if
22    we can avoid it.
23         I have, I think juror No. 6, Ms. Martinez informed the
24    courtroom deputy that her niece was a victim of domestic
25    violence.  She wasn't sure if she was supposed to mention it
```

O49Ceis1

1    yesterday, but she wanted to bring it to the Court's attention.

2    So I'll ask the parties if, given that information, if either

3    side would like to inquire further with Ms. Martinez.  If so,

4    then we can certainly have counsel and we can have Ms. Martinez

5    join us in the robing room and have a further inquiry with her.

6              So anything from the government?

7              MR. BURNETT:  No, your Honor.

8              THE COURT:  Mr. Klein?

9              MR. KLEIN:  No, your Honor.

10             THE COURT:  Thank you very much.

11             And we'll enter this into the record of the case just

12   so we have it there.

13             All right.  On the 800 series, who's going to address

14   this from the government's side?

15             MR. BURNETT:  I am, your Honor.

16             THE COURT:  As I understand it, there are three

17   objections made.  You're not going to be able to authenticate

18   these exhibits.  They're all inadmissible hearsay.  How are you

19   going to get them in?  And then there's a 402, 403 objection.

20   Maybe you can walk me through what your plan is with these

21   documents.

22             MR. BURNETT:  Sure.  So I think like the easiest one

23   to focus on -- because all we really need is to get one of

24   these documents in.  So set aside the way back machine

25   documents.  One of the documents and two of the documents we

O49Ceis1

1    planned to offer are public press releases that are announcing

2    the launch of this future.  I think we're able to get that in

3    because it's coming in through our expert witness K.K. Jain.

4    Under Rule 703, experts are allowed to rely on hearsay to the

5    extent something they would normally rely on in their field,

6    and we expect Mr. Jain will say that, as someone who like works

7    in finance, one of the ways that you like figure out what types

8    of products are out there to invest in is by figuring out like

9    what the press releases have been that said about, you know, a

10   product coming out and like how it works.

11            THE COURT:  Well, doesn't that mean he can rely on the

12   document, that the document itself would not come into

13   evidence?

14            MR. BURNETT:  I think under -- I can't remember if

15   it's 704 or if it's part of 703.  Basically, the document --

16   we'd be fine with him just testifying for starters.

17            And second, I think the document can come in if it

18   would be helpful to the jury under, I think it's 704, but I'm

19   drawing a blank on the number right now.  That's the

20   admissibility issues.

21            THE COURT:  Which exhibit are you referring to?

22            MR. BURNETT:  That would be --

23            THE COURT:  Is it 897?

24            MR. BURNETT:  I believe that's right, your Honor.

25            THE COURT:  This is titled, crypto exchange Eqonex

O49Ceis1

1    expands suite of professional trading products with launch of

2    dated futures.

3              MR. BURNETT:  That's right, 897.

4              THE COURT:  Okay.  So you're going to put this

5    document in, even though this document says that a dated

6    futures contract enables users to enter into a binding

7    agreement to buy or sell the underlying asset, in this case

8    BTC.

9              MR. BURNETT:  The key is there three bullets below on

10   the second page.  They talk about how it's a BTC USDC future

11   the way it's traded.

12             THE COURT:  Right.  In the bullets, and I think this

13   is the defense's argument, when there's a reference to USDC,

14   that is the settlement price, meaning the price of the futures

15   contract, which is for the underlying asset being Bitcoin, or

16   in some of these other documents Ethereum or one of these other

17   cryptocurrencies.  So how do we deal with that, especially

18   given the hearsay issue?  It's almost like these three issues

19   kind of are tied up together because if you had someone from

20   Eqonex who is here and you ask that witness, what is it that

21   you were selling, it is, I think from the defendant's

22   perspective, likely that that person would say, oh, these were

23   Bitcoin futures contracts.  Were they futures contracts in

24   USDC?  No, that was the price, and we used that instead of cash

25   because cash has hedging risks and other concerns, and so we

O49Ceis1

1    used USDC instead.  But we don't have that person and, instead,

2    we have someone who doesn't have any personal knowledge of

3    these documents, who -- and I'll take a look at rule 704, but

4    my usual understanding is that an expert can just rely on

5    whatever that expert wants to rely on within reason, but then

6    the opinion is the only thing that's actually in the record.

7    And so, it raises a number of concerns in the Court's mind.

8         MR. BURNETT:  So unlike whether documents come in

9    versus just testimony, I think we have a basis to put the

10   documents in, but if it's just testimony, we're okay with that,

11   too.  So I think the 402-403 piece is kind of the crosscutting

12   issue.

13        THE COURT:  I don't know that that's right because the

14   thing that has to be established is that at or before the time

15   of the offense, there were futures contracts in USDC.  And I

16   understand there's a dispute between the parties as to whether

17   it matters whether -- what weight the two things have in a pair

18   transaction.

19        But isn't that the thing that has to be in evidence?

20   And how is your expert going to opine on that thing that he has

21   no personal knowledge about?

22        MR. BURNETT:  Our understanding, your Honor, the way

23   703 works is the expert can testify as to things the expert

24   would rely on and what the expert learned through their

25   research and work on the case, and really the hearsay question

O49Ceis1

1    is whether the underlying document that they relied on can come

2    in.

3              I'd add, this is basically what the defense's expert

4    is doing, as well, to the extent Mr. Sheridan is going to be

5    talking about here's how Solana works, here's how Mango Markets

6    works, here's how other things work.  They're all relying on

7    hearsay to talk about that.  That's what experts do, they do

8    research on things and they talk about that.  So I think the

9    expert can describe what the expert has learned through his

10   research, and the rub of the admissibility issue is as to the

11   underlying document, not as to the testimony about what he

12   learned.

13             THE COURT:  Understood.

14             Who's going to address this from the defendant's side?

15             MR. GREENSPAN:  I will, your Honor.

16             THE COURT:  So the government says, look, there's at

17   least this document, 897, that whether it comes in or whether

18   Mr. Jain uses this as the basis of his opinion, that's enough

19   from the government's perspective.  What's your response?

20             MR. GREENSPAN:  I think you adequately summarized our

21   letter, but the response is that Mr. Jain has no foundation for

22   this opinion.  If you look at the documents, I think -- sorry,

23   there's a bit of a feedback here.  The key document is 889,

24   which is really the only document that shows anything about

25   what these futures actually were, and it shows that the asset

O49Ceis1

1   is clearly stated as Bitcoin Ethereum, or anything else, it's

2   not USDC.  The price is $30,000, it's clearly the price of

3   Bitcoin.  The price is listed in U.S. dollars, the dollar sign

4   is in front of it.  There's absolutely no question from the

5   documents that these are Bitcoin futures.  The press release

6   says that, the other documents say that.  The other exhibits

7   that the government had in its packet say the same thing.  The

8   testimony just has no basis whatsoever.

9        THE COURT:  Well, isn't the basis going to be the

10  expertise of the expert and understanding based on his

11  knowledge of the financial markets what these types of

12  documents would represent in terms of the nature of the

13  security?  And how is that different from what your experts

14  will do when they take the stand?

15       MR. GREENSPAN:  I don't expect our experts to give

16  totally unfounded opinions.  That's, in our view, what this is.

17  They gave us the documents that show what he's relying on and

18  they say the exact opposite.  I mean, there was clearly no USDC

19  futures markets.  Their documents essentially prove that.

20          In addition to the unreliability of these documents,

21  there's a further issue which came up yesterday, wasn't really

22  discussed and isn't in our letter, which is that Eqonex went

23  out of business in August 2022.  It didn't even exist at the

24  time of the facts at issue.  And so, there's the further

25  question of whether this is even relevant.

O49Ceis1

1          I know that in the Court's current proposed

2   instruction, a commodity in the past before the events would

3   qualify, but I think that question hasn't really been resolved

4   with any sort of discussion among the parties.

5          THE COURT:  Well, I don't know if there's any case law

6   on that particular issue, but the statutory language indicates

7   that contracts for future delivery are presently, or in the

8   future, dealt.  And so, that would seem to indicate that it's

9   dealt at the time of the offense or before the time of offense

10  that would count.  And the government had argued that it

11  doesn't make a lot of sense to use the exact time of the

12  offense because then what do you do if there were no contracts

13  dealt at 10:12 a.m. as opposed to 9:12 a.m.?  You'd have to

14  figure out what that line is, which I don't think there's any

15  evidence to support that in the record.  But I understand the

16  argument --

17         MR. GREENSPAN:  If I may --

18         THE COURT:  Let me ask the government:  Is there any

19  other evidence that you have, other than these documents, that

20  would support a futures market and USDC at or before the time

21  of the offense?

22         MR. BURNETT:  I think one of the issues that might be

23  going on here is what the meaning of -- what it means to have a

24  futures market in USDC.  And so, I think addressing that might

25  help clarify the way this should go.

O49Ceis1

1              What I understand the expert will testify is that

2     these were BTC/USDC futures, which means that what would happen

3     is someone would enter into an agreement to -- based on the

4     value of Bitcoin USDC at some specified date in the future,

5     that time would pass.  So say three months passed and you get

6     to the settlement time, there would be a mechanism that the

7     exchange had to find what the price was, the BTC/USDC price was

8     at the settlement time, and then the parties, using that kind

9     of pricing tool, would settle in Bitcoin.

10             So basically, if Bitcoin had gone up relative to what

11    the contract value was, one side would give over Bitcoin, and

12    if Bitcoin had gone down relative to USDC, the person would

13    give over Bitcoin.

14             So our expert will not testify that USDC was handed

15    over.  What our expert will testify is that this is a USDC

16    future because this operates the same way that basically

17    cash-settled futures are.  Basically, what happens is, it's a

18    Bitcoin-USDC future that is settled with the exchange of

19    Bitcoin.

20             The best example would be like CME right now, so the

21    Chicago Mercantile Exchange has Bitcoin U.S. dollar futures,

22    and that's based on the relative value of Bitcoin and the U.S.

23    dollar at the end of the futures period.  The way the exchange

24    happens is the parties just exchange dollars, they don't

25    exchange Bitcoin, but that's clearly a future in Bitcoin, even

O49Ceis1

1    though Bitcoin isn't getting exchanged at the end of the day,

2    it's just a cash settled future in Bitcoin.

3             THE COURT:  In that example, would dollars be

4    commodity?

5             MR. BURNETT:  No, but that's not because dollars or

6    like things being exchanged, it's because dollars have like a

7    special carving out through like the treasury acts from

8    being --

9             THE COURT:  Absent the carve-out, you would say, yeah,

10   dollars are --

11            MR. BURNETT:  Yeah.  So, for instance, this I think

12   comes up in the context of like -- so basically foreign

13   currency is a -- foreign currency is very clearly a commodity

14   under the Commodities Exchange Act.  So if this were like a

15   Bitcoin, like Hong Kong dollar contract, then yes, Hong Kong

16   dollars, like a commodity in that context, even though that is

17   a currency that is pegged to the dollar.

18            THE COURT:  Let me ask you, you have these -- so I got

19   you in terms of what the explanation is going to be.  My

20   concern is that the basis for saying, well, here, let me tell

21   you what these things are, is that the basis for that is like a

22   couple of websites.  And it's impossible for the Court, looking

23   at these websites, to understand exactly what the nature of

24   these transactions was.  And so, you would think that under

25   normal circumstances, you would have someone from one of these

O49Ceis1

1    platforms come in and just say, here's what was trading in

2    2022, let me just tell you about it, okay, you're off the

3    stand, and the expert says, well, I heard the testimony of that

4    witness and I have these documents, for instance, a prospectus

5    or other summary that outlines the parameters of the

6    transaction, so now let me tell you what that is.  And I think

7    that's essentially what your expert would plan to do, except we

8    don't have those intermediate links.  All we have are these

9    website pages, which some of them are just like pretty top

10   line, they're pretty generic as to what's going on.

11           And so, I understand the concern from the defense is

12   this seems like kind of a scenario where the hearsay rules have

13   to be rigorously enforced because, otherwise, your expert can

14   say whatever he wants as to what was trading in 2022 based on

15   very little -- a thin basis.  And what is anyone be supposed to

16   say about that?

17           MR. BURNETT:  I think this is a weight question, and

18   the expert is allowed to testify as to what they've learned

19   based on their -- the expert's research.  And if the defense

20   thinks that these documents don't support what the expert's

21   testimony is, even if I can't put them in, the defense is

22   certainly free to use them to cross examine the expert about

23   how they have no real basis for the opinion.

24           THE COURT:  If these documents are out in the sense

25   that your expert can't do what you're planning on, would USDC

O49Ceis1

1    be out as a commodity in this case?

2              MR. BURNETT:  So, yeah, I think the only way USDC

3    would be in is the commodity would be if this Court were to

4    revisit and adopt the CFTC's definition of what a commodity is,

5    which looks at the virtual currency.

6              THE COURT:  Understood.  I'm going to think about this

7    and we'll pick it up at the lunch break.

8              MR. BURNETT:  Just on the virtual currency point, if

9    the Court is open to reconsidering that, even if not deciding

10   it right now, but deciding it down the line, I'd just ask that

11   we know at the break because there are other exhibits we have

12   about virtual currencies having a futures trading market back

13   at this time that we could easily put in, but I just don't want

14   to not have a foundation for an instruction later.

15             THE COURT:  Understood.  Understood.  I will let you

16   know on that.

17             Anything else before we bring the jury in?

18             MR. KLEIN:  Your Honor, two quick things from the

19   defense.  We noticed in your rules you want us to refer to

20   people by their formal names.  Is it okay in opening and

21   closing if we refer to our client as "Avi" or "Avraham" instead

22   of "Mr. Eisenberg"?

23             THE COURT:  Yes.

24             MR. KLEIN:  The second is we plan to reference one of

25   their witnesses.  We want to just confirm that Victor Li is

O49Ceis1

1    still going to be called.

2           MR. BURNETT:  I don't think we'd know at this point

3    for sure if he will or will not be called.  He's on our witness

4    list, but we can't be forced to commit to a witness down the

5    road.

6           THE COURT:  Based on what you know now, is it likely

7    he's going to be called?  That's all I'm asking.  Let's just

8    try to reduce an issue of juror confusion if we can,

9    understanding that you're not going to be tied to anything that

10    you say, but just based on what you know right now, do you plan

11    to call him?

12           MR. BURNETT:  I'd say right now it is more likely we

13    will not call him than we will call him.

14           THE COURT:  Anything else before we bring the jury in?

15           MR. KLEIN:  That was it, your Honor, from the defense.

16           THE COURT:  Anything else, Mr. Burnett?

17           MR. BURNETT:  No, your Honor.  Actually, just a minute

18    for a bathroom break?

19           THE COURT:  Yes.

20           (Recess)

21           Who's opening for the government?

22           MS. HUANG:  I am, your Honor.

23           THE COURT:  And who's opening for the defense?

24           MR. TALKIN:  I am, your Honor.

25           (Continued on next page)

O49Ceis1

1          (Jury present)

2          THE COURT:  Welcome back, members of the jury.  I hope

3   you had a good evening and were able to catch some of the recap

4   of the eclipse.  Again, I apologize for having you in here when

5   it actually happened.

6          So I'm going to give you just some brief preliminary

7   instructions before we get started today and then we're going

8   to have opening statements and proceed with there trial.  Some

9   of this is going to be repetitive from what you heard

10  yesterday, but it is so vitally important, so I apologize in

11  advance for repeating myself.

12         Members of the jury, now that you have been sworn as

13  you were yesterday, I'm going to give you some brief

14  instructions to help you prepare for this trial.

15         To begin with, you are here to administer justice in

16  this case according to the law and the evidence.  You are to

17  perform this task with complete fairness and impartiality and

18  without bias, prejudice, or sympathy for or against any of the

19  parties.  It will be your duty to find from the evidence what

20  the facts are.  You and you alone will be the judges of the

21  facts.  You will then have to apply those facts to the law as

22  the Court will give it to you.  You must follow that law

23  whether you agree with it or not.

24         Nothing the Court may say or do during the trial is

25  intended to indicate or should be taken by you as indicating

O49Ceis1

1    what the verdict should be.  The evidence from which you find

2    the facts will consist of the testimony of witnesses,

3    documents, and other things received into the record as

4    exhibits, as well as any facts that the parties agree to or

5    stipulate to or that the Court may instruct you to find.

6              Now, certain things are not evidence and must not be

7    considered by you.  I will list them for you now.

8              First, statements, arguments, and questions by lawyers

9    are not evidence.  Nor are my own statements to you evidence.

10   Only the answers given by the witnesses and the documents

11   admitted as exhibits are evidence.

12             Second, objections.  You probably heard them on TV,

13   you've seen them on TV.  Objections to questions are not

14   evidence.  The lawyers have an obligation to their clients to

15   make an objection when they believe evidence being offered is

16   improper under the rules of evidence.  You should not be

17   influenced by the Court's ruling on an objection.  If the

18   objection is sustained, ignore the question.  If it is

19   overruled, treat the answer like any other.

20             If you are instructed that some item of evidence is

21   received for a limited purpose only, you must follow that

22   instruction.

23             Third, testimony that the Court has excluded or told

24   you to disregard is not evidence and must not be considered.

25             Finally, anything you may have seen or heard outside

O49Ceis1

the courtroom is not evidence and must be disregarded.  You are
to decide the case solely on the evidence presented here in the
courtroom.

          Now, when you are determining the facts, keep in mind
that there are two kinds of evidence: direct and
circumstantial.  Direct evidence is direct proof of a fact,
such as the testimony of an eyewitness.  Circumstantial
evidence is proof of facts from which you may infer or conclude
that other facts exist.  The word "infer" or the expression "to
draw an inference" means to find that a fact exists from proof
of another fact.  An inference is to be drawn only if it is
logical and reasonable to do so and not by speculation or
guesswork.

          In deciding whether to draw an inference, you must
look at and consider all the facts and the light of reason,
common sense, and experience.  Whether a given inference is or
is not to be drawn is entirely a matter for you, the jury, to
decide.  Circumstantial evidence does not necessarily prove
less than direct evidence, nor does it necessarily prove more.

          Here's an example to help you think about the
difference between direct and circumstantial evidence.  Now,
assume that when you came into the courthouse this morning the
sun was shining and it was a nice day outdoors.  Also assume
that the courtroom blinds were drawn and you could not look
outside.  Assume further that as you were sitting here, someone

O49Ceis1

walked in with an umbrella that was dripping wet, and then a
few moments later someone else walked in with a raincoat that
was also dripping wet.  Now, because you could not look outside
the courtroom and you could not see whether it was raining and
because no witness has testified that it is raining, you'll
have no direct evidence of that fact, but on the combination of
facts that I have asked you to assume, it would be reasonable
and logical for you to conclude that it was in fact raining.
That's all there is to circumstantial evidence.  You infer on
the basis of reason, experience, and common sense from one
established fact the existence or the nonexistence of some
other fact.

        Now I'll give you further instructions on these as
well as other matters at the end of the case, but keep in mind
that you may consider both types of evidence.

        Now, one of your most important tasks as jurors is to
evaluate the credibility of the witnesses who will testify
before you.  That is how truthful and believable they are.
Listen carefully as each witness testifies during both direct
and cross examination, and consider whether the witness is
telling the truth.

        Now, it will be up to you to decide which witnesses to
believe, which witnesses not to believe, and how much, if any,
of a witness's testimony to accept or reject.

        Now, how do you decide what to believe and what not to

O49Ceis1

| | |
|---|---|
| 1 | believe?  You are to listen to the witnesses, observe their |
| 2 | testimony, and then decide as you would decide such questions |
| 3 | in your own life.  Did they know what they were talking about? |
| 4 | Were they candid, honest, open, and truthful?  Did they have a |
| 5 | reason to falsify, exaggerate, or distort their testimony? |
| 6 | Sometimes it's not what a witness says, but how he or she says |
| 7 | it that may give you a clue as to whether or not to accept that |
| 8 | witness's version of an incident or an event as credible and |
| 9 | believable.  In short, the way a witness testifies may play an |
| 10 | important role in your reaching a judgment as to whether or not |
| 11 | you can accept the witness's testimony as reliable. |
| 12 |     Now, you may hear from law enforcement officials in |
| 13 | this case.  The fact that a witness may be employed as a law |
| 14 | enforcement official does not mean that his or her testimony is |
| 15 | deserving of greater or lesser weight than that of an ordinary |
| 16 | witness. |
| 17 |     Now, a few words about your conduct as jurors.  This |
| 18 | is the part that's going to be repetitive, but it is so very |
| 19 | important. |
| 20 |     First, during the trial, you are not to discuss this |
| 21 | case with anyone, nor are you to have anyone discuss it with |
| 22 | you.  This includes posting anything on the internet about the |
| 23 | case, whether it be on personal blogs, Facebook, Twitter, X, or |
| 24 | Threads.  Until you retire to the jury room at the end of the |
| 25 | case to deliberate, you simply are not to talk about this case |

O49Ceis1

with anyone, including your spouse or partner, family, or close
friends.  Do not even discuss the case with each other until
you begin your actual deliberations at the end of the trial.

Second, please do not, while you are serving as jurors
in this trial, have any conversations with the parties, the
attorneys, or any witnesses in this case, whether in the
courtroom, in the hallways, in the elevators, outside, or
anywhere else.  By this, as I explained yesterday, I mean not
only avoid talking about the case, do not talk at all even to
say good morning or to acknowledge any of these people.
Someone seeing a juror in conversation with a party, lawyer, or
witness might think that something improper was being
discussed.  To avoid even the appearance of impropriety then,
avoid any such contact or conversations.  So I can tell you
that when the parties, lawyers, and witnesses pass you in the
halls without even acknowledging your presence, they do not
mean to be rude, they are simply following the Court's
instructions.

Third, do not read or listen to anything outside the
courtroom that relates to this case in any way.  Similarly, you
are not to allow anyone to speak to you about this case.  If
you are approached by anyone to speak about it, politely but
firmly tell them that the Judge has directed you not to do so.
If any person seeks to contact you about this case, you are
required to report the incident promptly to me by sending me a

O49Ceis1

1    note through my courtroom deputy, Mr. Hernandez.

2              Also, be sure that I am informed if any person that
3    you know comes into this courtroom.  This is a public trial, so
4    this could happen, but it is important that you do not hear
5    from them what may have happened in the court while the jury
6    was not present.  If you should see a friend or relative come
7    into court, please send me a note again through Mr. Hernandez
8    at your first opportunity.

9              Fourth, do not try to do any research or make any
10   investigation about the case or the issues presented by this
11   case.  For example, do not go onto the internet tonight and
12   research any matters relating to this case.  Do not call up
13   your lawyer friends to ask about the type of matters at issue
14   in this case.

15             Fifth, I know that many of you use cellphones, we all
16   use cellphones and the internet and other tools of technology.
17   You must not use these tools to communicate electronically with
18   anyone about the case.  This includes your family and friends.
19   You may not communicate with anyone about the case on your
20   cellphone, through email, text messaging, Twitter, Threads, any
21   blog or website, any internet chatroom or by way of any other
22   social networking websites, including Facebook, LinkedIn, and
23   YouTube.

24             Finally, do not form any opinion until all the
25   evidence is in.  A case can be presented only step by step,

O49Ceis1

1    witness by witness until all the evidence is before you.  Keep

2    an open mind until you start your deliberations at the end of

3    the case.

4            Now, you are permitted to take notes during the trial.

5    Mr. Hernandez has given each of you a notepad and pen, I see

6    those in your hands.  Please write your name on the cover of

7    the pad.  If you do take notes, please do so only in these

8    pads.  Remember that any notes you take are for your use only

9    and they are only to be used as an aid for your memory.  Your

10   memory controls.  If you do take notes, be careful not to get

11   so involved in taking notes that you are not listening to the

12   evidence.

13           Once you are in your deliberations, if there is a

14   disagreement between one juror's notes and another juror's

15   notes or between one juror's notes and another juror's

16   recollection, you can ask to have the court reporter read back

17   the testimony or to have that portion of the transcript sent to

18   you, for it is the official court transcript that controls, not

19   any particular juror's notes.

20           During the course of the trial, exhibits will be

21   received into evidence.  They will be marked by exhibit number.

22   If there is an exhibit that you are interested in seeing during

23   your deliberations, write down the exhibit number in your

24   notes.  At the end of trial as you begin your deliberations, we

25   will provide each of you with a list of all the witnesses who

O49Ceis1

1   testified during the trial as well as a list of all the

2   exhibits that have been received into evidence so that you can

3   ask us if you want to look at something.

4          We're now going to begin the trial.  As I told you

5   earlier, the trial is expected to be done no later than the end

6   of next week.  We'll begin each day here at 9:00 a.m.  Please

7   be on time.  To help ensure that we start on time, please be in

8   the jury room by 8:45.  You all did that today, I appreciate

9   that.  And we'll have some refreshments as we had this morning.

10          Now, let me tell you how the trial will proceed.

11   First, we'll have opening statements from the parties.  An

12   attorney for the government will make an opening statement,

13   then an attorney for the defendant will do so.  The opening

14   statements are neither evidence nor argument.  They are simply

15   outlines of what the attorneys believe the evidence will show,

16   and they are given to help you follow the evidence as it is

17   presented.

18          After the opening statements, the government will

19   present its case.  The government will call its witnesses, and

20   after each witness testifies, counsel for the defendant will

21   have an opportunity to examine the witness.  If that witness is

22   also one of the witnesses the defendant will call on, the

23   defendant may also examine that witness on matters relevant to

24   its defense so that the witness does not have to testify twice.

25          Following the government's case, the government will

1    rest.  The defendant will then have the opportunity to present

2    a defense case should he choose to do so.  The defendant is

3    under no obligation to present a defense.  The burden remains

4    at all times on the government to prove the elements of each

5    offense beyond a reasonable doubt.  Should the defendant

6    present a defense case, any remaining defense witnesses will

7    testify and the government will have the opportunity to cross

8    examine them.

9            After the evidence is completed and all sides have

10   rested, the attorneys will give their summations.  This is the

11   opportunity for the lawyers to summarize the evidence and to

12   give their closing arguments.  Following the summations I will

13   give you instructions on the law.  You will then finally retire

14   to deliberate on your verdict.

15           You have a tremendously important task as jurors.  It

16   is to determine the facts.  You, and not the Court, are the

17   sole judge of the facts.  The Constitution itself recognizes

18   your unique role in our system of justice.  So please pay

19   careful attention to the witnesses and evidence received at

20   trial as well as my instructions on the law.

21           We'll now begin with counsel's opening statements.

22   Ms. Huang.

23           MS. HUANG:  Thank you, your Honor.

24           Ladies and gentlemen, good morning.  Let me tell you

25   about a scam that goes something like this:  A con artist finds

O49Ceis1                    Opening – Ms. Huang

a target, someone with money.  The con artist tells that
victim, I'd like to borrow some money from you, I have this
diamond ring, you can hold onto it until I pay you back.  The
victim sees the diamond sparkle, takes it, and lends the conman
the money.  But when the victim looks past the sparkle, the
victim realizes that the diamond ring is a fake, worthless
plastic.  Then the conman disappears, leaves the victim with
the diamond, and runs off with the money.

          This case is a modern twist on that basic scam.  That
man, Avraham Eisenberg, the defendant, he ran the scam.  His
target, a cryptocurrency exchange called Mango Markets.  He
didn't use a fake diamond ring, but instead artificially
inflated the price of cryptocurrency by over 1,000 percent in
just around 20 minutes to make it look like he had something
really valuable.  And then, once he convinced Mango Markets
that he owned a lot of cryptocurrency, he stole its money.  He
used an asset with a fake and artificial value that he had
created to con Mango Markets into allowing him to borrow over
$110 million of cryptocurrency.  But ladies and gentlemen, he
wasn't really borrowing, he was stealing.  Avraham Eisenberg
ran off with the crypto.  And when the defendant did this, he
committed fraud and market manipulation.

          Before carrying out the crime, he searched words like
"fraud" and "market manipulation" on his computer.  And during
the crime, when he put his plan, his scheme into motion, he hid

1    his true identity by pretending to be a Ukrainian woman.

2              And finally, after the crime, well, the day after he

3    had the loot in his pocket, he fled the country.  This opening

4    is the government's chance to tell you about what we expect

5    you'll see during this trial.  Let me start with telling you

6    about what we expect the evidence will show.  You'll see each

7    step of the defendant's fraud, therefore in total.

8              Step 1, he found a target.  The defendant set his

9    sights on Mango Markets.  Mango Markets is a place where people

10   trade cryptocurrency and other financial products based on

11   cryptocurrencies.  You'll hear a lot of details about

12   cryptocurrencies during the trial, but the important thing here

13   is that cryptocurrencies can be valuable, really valuable.  The

14   defendant chose Mango Markets as a target because it had a big

15   vault of cryptocurrency, a vault worth over $110 million.

16             That was all the cryptocurrency that customers had put

17   on the platform to trade.  Mango Markets also let people borrow

18   from that vault.  People could borrow cryptocurrency as long as

19   they had assets on the platform.  Think about it kind of like a

20   bank.  People can get a loan from a bank, but they need to put

21   something up so the bank can take that back if the loan isn't

22   paid.  It was the same on Mango Markets.  People could borrow

23   cryptocurrency, but they needed to put up assets that Mango

24   Markets could take if they didn't pay the loan back.  For the

25   defendant, Mango Markets and its willingness to lend money made

O49Ceis1                     Opening - Ms. Huang

1    it an easy target, a pot of money sitting there for the taking.

2         Which takes us to step 2, the plan.  The defendant

3    needed to figure out how to get his hands on the cryptocurrency

4    in that vault.  Now, remember the example I gave you at the

5    beginning, the conman there used a fake diamond ring to get the

6    loan.  The defendant here needed his fake diamond ring.

7         So what was the plan?  It had two parts.  First, he

8    was going to make a fake asset on Mango Markets, and second, he

9    was going to manipulate the price of that asset to make it seem

10   super valuable.

11        Let's start with that first part, the fake trade.

12   Mango Markets let people place bets on whether the value of a

13   cryptocurrency was going to go up or down.  The defendant

14   decided he was going to place a huge fake bet, a fake bet with

15   himself.  He created two accounts on Mango Markets.  He used

16   one account to make a huge fake bet with the other about the

17   value of a cryptocurrency called Mango, and if the value of

18   that cryptocurrency mango went up, the value of the account

19   that had bet on Mango would go up, too.  But, ladies and

20   gentlemen, this wasn't a real bet.  The defendant was on both

21   sides of it, he was betting with himself, and Mango Markets

22   didn't know he was on both sides of that fake bet.

23        Which brings me to the second part of the plan, the

24   manipulation.  That fake bet he made would only look like a

25   diamond ring if the price of Mango went up, if it went way up.

1    So the defendant planned to make the price of Mango go up.  He

2    planned to pump it.  You'll see that was the word, the very

3    word he actually used when he was planning, "pump."  The

4    defendant planned to pump up the value of Mango so the fake bet

5    he took on Mango Markets would look like a huge winner, like a

6    really valuable asset.  Then he'd be able to use that fake bet

7    to trick Mango Markets into lending him the cryptocurrency he

8    wanted to get his hands onto.  That was the fake diamond ring.

9         Which takes us to step 3, the execution of the con.

10   You'll hear that the defendant planned the scheme for weeks,

11   but it took him less than an hour to carry out the entire

12   scheme, less than an hour to run away with over $110 million

13   worth of cryptocurrency.  He started out by taking steps to

14   hide himself.  He took over a cryptocurrency account that was

15   in the name of a Ukrainian woman and he created other anonymous

16   accounts.  Those are what he used to carry out the scheme, not

17   accounts in his own name.

18        Then he made the fake bet.  He used two accounts on

19   Mango Markets to make a huge fake bet on the value of the

20   cryptocurrency called Mango.  Ladies and gentlemen, when I say

21   huge, I mean huge.  This fake bet was over 100 times bigger

22   than any recent bet on Mango Markets.

23        Next, he pumped up the price of Mango.  He went up and

24   bought tons and tons and tons of Mango to make the price of

25   Mango go way, way up.  And it worked.  You'll hear that it went

O49Ceis1                          Opening - Ms. Huang

1    up over 1000 percent in just around 20 minutes.  Over 1,000

2    percent in just around 20 minutes.  That gave the defendant his

3    fake diamond ring.  Because the price of Mango went way up, the

4    account that had bet on the value of Mango going up now looked

5    super valuable.  It looked like a beautiful diamond ring.

6              So the defendant carried out the con.  He went onto

7    Mango Markets and selected the option to borrow cryptocurrency,

8    putting up that fake bet as his collateral.  Just like that

9    conman used the ring to get the loan, the defendant used the

10   fake bet to borrow from Mango Markets.  And he took everything,

11   all of the cryptocurrency that there was to borrow, emptied

12   that vault.

13             Now you'll see that this wasn't really borrowing, this

14   was stealing.  The defendant knew that his fake bet wasn't

15   valuable, he knew that the price of Mango would crash once he

16   stopped buying it.  So the defendant took everything he

17   borrowed off of Mango Markets as fast as he could.  He ran off

18   with that money.

19             (Continued on next page)

20

21

22

23

24

25

O49VEIS2                         Opening – Ms. Huang

1          MS. HUANG:  That way, when he stopped manipulating the

2     price of Mango and it came crashing back down, Mango Markets

3     was left just holding his worthless fake bet, that fake plastic

4     ring.

5          Which leads us to our fourth and final step, the

6     getaway.  Right after carrying out this scheme, the defendant

7     left the country.  He knew he had just done something wrong, so

8     he fled.  You'll see that just hours after stealing everything

9     from Mango Markets, the defendant bought a plane ticket to

10    leave the country.  It was for a flight leaving the very next

11    day.  This was a getaway.

12         You'll see that he left in a hurry; that he researched

13    what security he would have to go through while leaving the

14    country.  He was trying to get out of the country as fast as he

15    could.  And he made it, managing to get out of the country less

16    than 24 hours after his heist.  And once he was safely out of

17    the country, the defendant tried to make sure he'd get away

18    with the crime.

19         Now, remember, the defendant had over $110 million

20    worth of cryptocurrency from Mango Markets.  That money

21    belonged to the people who used Mango Markets, ordinary

22    customers.  But for the defendant, that was his leverage.

23    Keeping his identity hidden, the defendant anonymously reached

24    out to Mango Markets.  He told them he would return some of the

25    cryptocurrency, but only if Mango Markets and all of its

O49VEIS2                    Opening – Ms. Huang

1    customers promised not to freeze his stolen funds and not to,

2    quote, pursue any criminal investigations.  That was his

3    leverage.  I'll give some of the money back, but you can't

4    report me to the authorities.

5            This put Mango Markets in an impossible position.  And

6    ultimately, Mango Markets agreed to his demands, even though it

7    left the defendant with tens of millions of dollars worth of

8    stolen funds.  And Mango Markets had to use its own money to

9    make sure all its customers were made whole.

10           The defendant thought he had it made; that he had

11   bought himself out of trouble; that he had gotten away with it.

12   But a few months later, when he came back to the United States,

13   he was arrested and charged with committing the crimes that

14   you're going to consider in this trial:  Fraud and market

15   manipulation.

16           So that's what the evidence will show.

17           How will you hear and see it?

18           Well, first you'll hear from the victims.  You'll hear

19   from the customers of Mango Markets who couldn't access their

20   funds when the defendant stole everything from the platform.

21   You'll hear from the people who work on Mango Markets, who will

22   tell you how the defendant tricked Mango Markets into giving

23   him the cryptocurrency.  And you'll hear from other witnesses

24   who will explain all sorts of financial terms to you.  But at

25   the end of the day, keep your focus on that huge fake bet, the

1   defendant's fake diamond ring.

2           You'll also see the data that lays out the scheme.

3   Those records will show you how the defendant set up this fake

4   bet on Mango Markets.  They will show you that he pumped up the

5   value of Mango by over 1,000 percent to make one side of that

6   fake bet look like a winner, and that he used another person's

7   identity to do it.  And they will show you how he stole from

8   the platform.

9           And finally, you will see the defendant's private

10  words and actions that showed that he knew what he was doing

11  was wrong, words and actions that he never thought would end up

12  in a courtroom.

13          You will see that he sent messages about planning the

14  scheme, messages in which he talked about how he was looking

15  for a target and planned to pump the price of Mango.  You will

16  see the searches that he ran on his computer before he put his

17  scheme into action, where he looked up words like "fraud" and

18  "market manipulation."  And you will see the proof that he

19  booked a flight out of the country just mere hours after

20  committing the crime.

21          You will see and hear a lot about cryptocurrency and

22  computer programs.  But at the end of the day, what that man,

23  the defendant, did, boils down to something far older than

24  computers and cryptocurrency:  You'll see that it was fraud.

25          Now, the evidence that I've just outlined won't come

1   in chronological order.  Instead, it will come in piece by

2   piece, and different witnesses will tell you different parts of

3   what happened.

4          And at the end of this trial, we will have another

5   opportunity to speak to you about how all those pieces fit

6   together.  But between now and then, I'm going to ask you to do

7   three things:

8          First, pay attention to the evidence.

9          Second, listen to the judge's instructions on the law.

10         And third, use your common sense, the same common

11  sense you use in your everyday lives.

12         If you do those three things, you'll see that the

13  evidence is consistent with only one verdict:  That the

14  defendant, Avraham Eisenberg, is guilty.  Thank you.

15         THE COURT:  All right.  Mr. Talkin.

16         MR. TALKIN:  Thank you.

17         Good morning, everybody.

18         THE JURY:  Good morning.

19         MR. TALKIN:  After hearing that, I can understand how

20  sitting here someone would think taking $100 million in under

21  an hour, something must be wrong here.  That doesn't happen in

22  the real world.  But that's exactly it.  Mango Markets and our

23  client, Avi Eisenberg, they weren't operating the world of

24  traditional finance, they were operating in the world -- they

25  were operating in the sector of cryptocurrency that is

O49VEIS2                      Opening - Mr. Talkin

1    highly -- that has high risk, is highly speculative, where

2    people go in with their eyes open and they do it because they

3    know they can get a high return in a short period of time,

4    sometimes astronomical.

5          And it's in this world that Avi Eisenberg executed a

6    successful legal trading strategy.  And what the government

7    left out of their opening, in order to execute that strategy,

8    that trading strategy, Avi Eisenberg risked 13 million of his

9    own dollars.  This was a risk by him.  All of that was at risk.

10   And during this trading strategy, at any moment, whether it was

11   in five minutes, 30 minutes or an hour, he could have lost

12   everything.

13         It was not a sure bet, and it wasn't a secretive bet.

14   Because you're going to learn that the bet he made was right

15   there for everyone to see.  Anybody who used Mango Markets

16   could see the large bet on one side, could see the large bet on

17   the other side, and could act accordingly.  It was no secret.

18   It was no sure thing.  It was a legitimate trading strategy,

19   and one that carried a ton of risk.

20         Every trade has a winning side, every trade has a

21   losing side.  That's the nature of the business.  But it's

22   important to remember being on the winning side of a trade,

23   that's not illegal, no matter how big the win, no matter how

24   fast the win.  It is not illegal to execute a trade that is to

25   your benefit.

O49VEIS2                          Opening - Mr. Talkin

1          I want to briefly go through some of the terminology

2    you're going to hear during this trial.  Some you heard during

3    the government's opening.  And I will be brief with it and then

4    I'm going to let you know how some of it applies to the legal

5    concepts you're going to hear from the judge at the end of the

6    trial.

7          But I have to remind you, whatever I say about the

8    law, it really doesn't matter; it's the individual sitting up

9    there that will give you the law and you will follow the law as

10   he tells you.

11         And then I will finally touch on a few of the facts

12   and evidence that you heard about during the government's

13   opening and that you will hear about during the trial.

14         So I guess a good place to start is Mango Markets.

15         Mango Markets is not a person, it's not a company,

16   it's not an organization.  It is computer programs that run on

17   the internet.  It is a series of what are called smart

18   contracts.  Smart contracts are virtual electronic contracts.

19   And these contracts execute on something called the blockchain.

20   And the blockchain is really nothing more than a public ledger

21   that everyone can see that shows which transactions the smart

22   contracts are executing, including those executed by Avi

23   Eisenberg.

24         A commodity and a swap, you're going to hear both of

25   those terms.  I'm not going to even begin to try and define

O49VEIS2                         Opening - Mr. Talkin

1  those for you, and I'm very glad that the judge will be the one

2  to do that.

3          But what's significant about that is remember, and

4  it's very important, the Mango token is not a commodity and you

5  will hear no evidence to the contrary.  Additionally, because

6  of that, you will hear many contorted and stretched arguments

7  from the government.  You will see evidence that they tried to

8  produce to try to convince you that, sure, the Mango token

9  isn't a commodity.  But guess what?  There's something called

10  USDC, United States Dollar Coin.  That's a commodity.  The

11  evidence will show you that it is not.

12          Well, the Mango perpetual, that's the bet we're

13  talking about.  That's something called a swap.  The evidence

14  is going to show you that it's not a swap.  And because that's

15  what the evidence is going to show you, the government can't

16  even get out of the gate on the first two counts of this

17  indictment.  And what I mean is Avi Eisenberg is not guilty of

18  either of the commodities counts that you'll hear charged to

19  you right away, before we analyze the evidence any further.

20          Another term you're going to hear is "borrow."  Now,

21  that's not a new term in the world of finance.  But how it's

22  used in this case is very different.  And it's very important

23  for you to understand what the evidence says about a borrow;

24  because it refutes everything the government just said in their

25  opening argument.

1          First of all, the loan is permissionless.  It does not

2     require any identification.  It does not require an email, a

3     Social Security number, an address.  Of course, the trade he

4     made was anonymous, because that's exactly what Mango Markets

5     touted, they touted themself as permissionless.  You can come

6     here and be anonymous.  Yet the government wants to argue that

7     that's something untoward, something that shows he was hiding

8     his identity.

9          There is no investigation of the borrower's

10    creditworthiness; in other words, there's no underwriting.  It

11    doesn't matter -- not only doesn't it matter who you are, it

12    doesn't matter what your financial situation is.  There is no

13    ending term to the loan or to the borrow, as we call it.  It

14    can go on forever.  And because of that, there is obviously no

15    ending date.

16         And most importantly is the loan is executed pursuant

17    to a detailed agreed-upon smart contract that handles the

18    collection of a debt and, in doing so, it totally excludes --

19    it totally excludes the intent of the borrower to repay the

20    loan, and here's what I mean by that:

21         The evidence is going to show you that these loans are

22    automatically paid back.  There's a process in place.  The

23    first thing that happens is that the collateral is taken, the

24    collateral that allowed the individual to take the borrow is

25    taken away.  And if for some reason that doesn't cover the

O49VEIS2                        Opening - Mr. Talkin

1    balance of the loan, there's an insurance fund on Mango
2    Markets, and that insurance fund will pay the balance.  And if
3    that doesn't happen, it's known by everyone on Mango Markets
4    and agreed upon that the balance will be spread out among
5    everyone on the Mango Markets.  But entirely absent from that
6    is anything where the borrower has to profess that they have an
7    intent to repay the loan.  And that's critically important.
8    Because a lot of the government's case, as you're going to hear
9    from the evidence, relies on the lack of intent to repay.
10            But I'm telling you right now, the lack of intent to
11   repay has nothing whatsoever to do with this case, and the
12   evidence shows you that.  Because the government — and I know
13   this becomes obvious, but the government is saying, and they
14   will say to you and they'll try to have evidence that will show
15   you, that the lack of intent to repay was something called an
16   omission or a misrepresentation, something that Mr. Eisenberg,
17   Avi Eisenberg, was obligated to tell everybody.  But in
18   reality, it doesn't even exist.  And you'll see that the
19   government is basing their case on an obligation that doesn't
20   exist.  And I don't think you need me to tell you that an
21   obligation that doesn't exist doesn't create an obligation at
22   all.
23            I want to briefly touch on some of the evidence you're
24   going to hear in this trial, some of which was talked about by
25   the government.

1            The government says that Mr. Eisenberg conducted this
2    transaction anonymously.  I told you, first of all, of course
3    he did because that's what Mango Markets wants you to do.
4    You'll see their paperwork and everywhere, permissionless,
5    permissionless, permissionless.  No KYC.  That's a term you'll
6    learn, know your client.  Zero.  They tout that.

7            But more importantly, what the government didn't tell
8    you is that these transactions, the money for them that he
9    risked, came in the way -- an account at Circle — and you'll
10   learn about Circle — that was in his name.  It was there for
11   everyone to see, Avraham Eisenberg.  And the money went out, it
12   went through that same account in the name of Avraham
13   Eisenberg.

14           Now, we're not here to argue about the facts right
15   now.  But I use that as an example of why the judge tells you
16   you have to keep an open mind till you hear everything.  It's
17   easy to make conclusions.  I'm one of those people, I have to
18   admit to it.  You hear something and that's it.  That's why
19   being a juror is a tough job.  It's a little counterintuitive.
20   But the judge this morning told you, the way to approach a
21   trial — and this is a time in your lives that those just aren't
22   words, those are of the utmost important to you, to the
23   government, and to Avi Eisenberg.

24           The government touched on some chats and words of Avi
25   Eisenberg.  I ask you along that same vein, keep an open mind.

O49VEIS2                        Opening - Mr. Talkin

Because when you look at the whole chat, you look at the

context in which they were said.  And you look at his actions.

You will see that not only are those chats not incriminating,

they show you that he did not have an intent to deceive or

defraud.  They show you that he did not have an intent to

commit a crime.

          And his leaving the country similarly shows you his

lack of intent to commit a crime or the belief that he had done

any conduct that was illegal.  Because when Mr. Eisenberg

bought his ticket to leave, it was well after he had already

been identified as the individual who made this trade, and it

came well after -- in the same public Discord chats and the

same public media chats he was being threatened.  And it came

after he had discussions where he had discussions with Mango

Markets.  And it came after he made a decision to let things

cool off.

          And then he came back, under his own name, in a ticket

purchased in advance with his own credit card.  And he came

back to the same place he left from.  And he came back after --

he didn't just give some money back to Mango Markets, he gave

back $67 million.  The evidence is going to show you that.  And

that's -- again, consider that when you figure out what his

intent was.  Because intent in this case is critically

important.

          And when you look at the evidence and you examine it,

O49VEIS2                        Opening – Mr. Talkin

1    it's going to be clear to you that Mr. Eisenberg did not have

2    an intent to commit a crime.  It's going to be clear to you

3    that Mr. Eisenberg was simply making a trade.

4           He does not deny he did any of the trades that the

5    government says he did.  He does not do that.  He does not deny

6    that he made a profit.

7           But he denies that he committed a crime.  And the

8    reason for that is that he did not.

9           At the end of this case you're going to see that

10   Mr. Eisenberg did nothing more than execute a winning trade.

11   And you're going to see that he's not guilty of any of the

12   charges.

13          That you for your time.

14          THE COURT:  Thank you, Mr. Talkin.

15          Is the government prepared to call its first witness?

16          MR. DAVIS:  Yes, your Honor.

17          The government calls Brian Smith.

18          THE COURT:  You may proceed.

19          MR. DAVIS:  Thank you.

20    BRIAN SMITH,

21        called as a witness by the Government,

22        having been duly sworn, testified as follows:

23          MR. DAVIS:  Judge, may I proceed?

24          THE COURT:  You may.

25

O49VEIS2                              Smith - Direct

```
 1    DIRECT EXAMINATION
 2    BY MR. DAVIS:
 3    Q.  Good morning, Mr. Smith.
 4              What do you do for work?
 5    A.  I am the chief operating officer of a software development
 6    company.
 7    Q.  Can you tell us a little bit about what you do as a chief
 8    operating officer for a software development company.
 9    A.  Help with internal operations, as well as general strategy,
10    and also interface with our external clients and stakeholders.
11    Q.  And what kind of things do you do when you interface with
12    your external clients?
13    A.  Help sell them on some of the products we have, as well as
14    answer any questions, and generally just keep good relations
15    with them.
16    Q.  Are you familiar with something called Mango Markets?
17    A.  I am.
18    Q.  What is Mango Markets at a high level?
19    A.  It is a trading platform that operates on the blockchain.
20    Q.  What are some examples of things you can trade on Mango
21    Markets?
22    A.  So you can do spot trades.  So an example of that would be
23    if you had some Bitcoin and you wanted to exchange it for a
24    different digital asset, like Ethereum, then you can exchange
25    the Bitcoin for Ethereum on the platform.
```

O49VEIS2                              Smith – Direct

1    Q.  Can you trade any other types of cryptocurrencies on Mango

2    Markets?

3    A.  Yes.  It had a variety of assets across the digital assets

4    spectrum.

5    Q.  And how are you familiar personally with Mango Markets?

6    A.  I was a contributor to the platform.

7    Q.  What kinds of things did you contribute to the platform?

8    A.  I helped monitor its financial position, think about

9    investments of the community treasury, and help communicate

10   those issues to the community.

11   Q.  And when you say "community," what do you mean by that?

12   A.  There were a network of users, contributors, investors, and

13   just other people around the project.

14   Q.  So let's come back to that.

15        Besides contributing, did you personally use Mango

16   Markets?

17   A.  I did.

18   Q.  And how did you personally use Mango Markets?

19   A.  I used it for trading spot assets, as well as other assets

20   that are available for trading there and deposited capital into

21   the platform.

22   Q.  Got it.

23        So when you say deposited capital into the platform,

24   can you explain to us what that means.

25   A.  That to enable trading, you needed assets within the

O49VEIS2                        Smith - Direct

1   platform.

2   Q.  And what types of assets did you deposit into the platform?

3   A.  U.S. dollar equivalents, as well as other digital assets,

4   like Bitcoin, Ethereum, or Solana.

5   Q.  All right.  I want to direct your attention to a particular

6   period of time, October 2022.  How many assets did you

7   personally have on Mango Markets during that time?

8   A.  Roughly, $10,000 worth.

9   Q.  Now, focusing on that time period, was there a time when

10  you were unable to access those funds?

11  A.  Yes.

12  Q.  What happened?

13  A.  The operations of the platform were paused.

14  Q.  How did you learn that the operations of the platform were

15  paused?

16  A.  I read about it on social media.

17  Q.  Was the platform still functioning in this time?

18  A.  It was not.

19  Q.  Could you access your funds at all?

20  A.  I could not.

21  Q.  All right.  Let's come back to that time period in a little

22  bit.

23         I want to talk about your contribution work for Mango

24  Markets.  When did you begin contributing to Mango Markets?

25  A.  In the fall of 2021.

1    Q.  And you mentioned some previously, but can you give the

2    categories of issues you contributed on?

3    A.  Yes.  It was typically financial matters.  So kind of

4    monitoring how they were spending money, as well as what money

5    they were earning.  And then kind of talking about investments

6    from the community treasury.  And then just helping to

7    communicate all of those issues to the broader community.

8    Q.  Got it.

9            And when you say "they" in that sentence, who are you

10   referring to?

11   A.  So there's, just as I said, a community of stakeholders

12   that were organized in kind of a group known as a decentralized

13   autonomous organization.

14   Q.  Now, is the decentralized autonomous organization also

15   called a DAO; is that correct?

16   A.  Correct.

17   Q.  Can you explain what that means?

18   A.  Yes.  It's just like a lot of community groups where it's a

19   democratic process, people own the native token of the Mango

20   protocol, and proposals can go up to vote, and the community

21   uses that token to vote on whether a proposal should pass or

22   not.

23   Q.  So let's talk about the native token.  Can you explain what

24   the native token of the Mango protocol was?

25   A.  Yes.  It was a token created kind of at the genesis of the

O49VEIS2                           Smith - Direct

 1    project, and it was freely traded.  And so anyone could buy or
 2    sell that token.  And then it was used to govern the decisions
 3    of the project.
 4    Q.  And what was that token called?
 5    A.  It was called the Mango token or MNGO.
 6    Q.  Okay.  So that's the Mango token.
 7            You mentioned also voting; is that right?  Can you
 8    explain what types of things were voted on and how that worked?
 9    A.  Yeah.  So there were a lot of votes that went to the DAO.
10    Some were more substantive matters, like whether they should
11    invest the treasury in some function or how fees on the
12    protocol should be set.  And then there's also a lot of, you
13    know, smaller votes that were more kind of operational in
14    nature.
15    Q.  Did you have any role in drafting the actual code for Mango
16    Markets?
17    A.  I did not.  I am not a software developer.
18    Q.  Are you still contributing to Mango?
19    A.  I am not.
20    Q.  When did you stop contributing to Mango?
21    A.  September of 2022.
22    Q.  And at the time you were accessing -- you were unable to
23    access your funds, were you still contributing to Mango?
24    A.  I was not.
25    Q.  I want to turn now to some basics about the Mango platform.

O49VEIS2                          Smith - Direct

1            First off, have there been multiple versions of Mango

2       Markets?

3       A.   There have.

4       Q.   I want to focus again on this time period of October 2022.

5            What version of Mango Markets was in place during that

6       time?

7       A.   Version 3.

8            MR. DAVIS:  Judge, may I approach the witness with

9       some exhibits?

10           THE COURT:  You may approach.

11      Q.   Mr. Smith, I'm handing you a binder with what's been marked

12      for identification as Government Exhibits 1011 and 900.  You

13      can take a look at those documents for a second and let me know

14      when you've reviewed them.

15      A.   Okay.

16      Q.   What are those documents?

17      A.   Exhibit 900 is showing the home page of the Mango Markets

18      website.  Exhibit 1011 is the documentation for the Mango

19      platform.

20           MR. DAVIS:  Your Honor, at this time I'd like to read

21      a stipulation into the record.

22           If we could please pull it up and publish it to the

23      jury when I read it, if the Court would permit.  It's

24      Government Exhibit 1701.

25           THE COURT:  Any objection?

O49VEIS2                          Smith - Direct

1              MR. KLEIN:  No, your Honor.

2              THE COURT:  Okay.  It may be published to the jury.

3              MR. DAVIS:  Thank you, your Honor.

4              So this stipulation reads:  The parties hereby agree —

5       and then I want to focus on paragraph 3:

6              Government Exhibits 900, 902 through 1002, 1004

7       through 1007, and 1009 through 1011 are true and correct copies

8       of records maintained by Mango Labs.

9              And if we can go to page 2, please.

10             It is further agreed that this stipulation, marked as

11      Government Exhibit 1701, is admissible and may be received in

12      evidence as an exhibit at trial.

13             At this point, your Honor, the government offers this

14      stipulation, Government Exhibit 1701, Government Exhibit 900,

15      and Government Exhibit 1011 into evidence.

16             THE COURT:  No objection?

17             MR. KLEIN:  No objection.

18             THE COURT:  Those exhibits will be admitted.

19             (Government's Exhibits 900, 1011, 1701 received in

20      evidence)

21             MR. DAVIS:  All right.  Can we please take down the

22      stipulation.  And can we publish to the jury what's in evidence

23      as Government Exhibit 900.

24      BY MR. DAVIS:

25      Q.  Mr. Smith, can you just explain to us what we're looking at

O49VEIS2                          Smith - Direct

1   on this screen.

2   A.  Yes.  So if you went to the Mango Markets home page, you

3   would see this.  And it's kind of the entry point for where you

4   could actually enter the platform and begin using it.

5   Q.  And do you see where it says "long and short everything"?

6   A.  Yes.

7   Q.  Can you please read that and the text beneath it.

8   A.  Yes.  Long and short everything.  Lightening fast.  Near

9   zero fees.  Permissionless.

10  Q.  And what does "permissionless" mean in this context?

11  A.  That it is structured as a smart contract on the blockchain

12  and so that anyone can access it.

13  Q.  All right.  So I'm going to take a step back.

14       If I were a user and I wanted to start trading on

15  Mango Markets, what would I do?

16  A.  Via this interface, you could click one of the "start

17  trading" buttons, and then you would connect your wallet, and

18  that enables you to interact with the blockchain.

19  Q.  And when you say "connect your wallet," what do you mean by

20  that?

21  A.  A wallet is how you hold assets on a blockchain.  And so

22  you need to interface from the wallet to what particular

23  protocol you're using in order to interact with that.

24  Q.  Got it.

25       So the user has an account and has a wallet.

O49VEIS2                          Smith - Direct

1          Now, I want to talk about how a user can do trades on

2    Mango Markets.  So what are the types of things a user can do

3    once they have an account?

4    A.   Yeah.  So the most basic version is kind of spot asset

5    trading.  Like I said, you can trade Bitcoin for Ethereum or

6    Solana.  There is also a product called perpetual trading.

7    Q.   Let's take these, please, in turn.

8          MR. DAVIS:  Can we please turn to page 2 of Government

9    Exhibit 900.

10   Q.   Mr. Smith, can you please read the text on this screen.

11   A.   Every market cross-collateralized, trade spot margined in

12   perpetual futures markets, permissionless and all on-chain.

13   Q.   All right.  So let's talk about spot trades first.

14          What's a spot trade?

15   A.   Yeah.  So it's just a classic exchange of digital assets.

16   So if you had $500 of Bitcoin, you wanted $500 worth of

17   Ethereum, then you would enter an exchange and you would lose

18   your Bitcoin and then, after that, own the Ethereum.

19   Q.   Got it.

20          So what are the users exchanging in a spot trade?

21   A.   They are trading the underlying assets from one to another

22   at a given price.

23   Q.   Got it.

24          And in the example you just gave, you named two

25   assets.  Can you name them again please?

O49VEIS2                        Smith - Direct

1    A.  Yes.  The example I gave was trading Bitcoin for Ethereum,

2    which are two --

3    Q.  Sorry.  What are those two things?

4    A.  Yes.  Those are like the two most commonly traded digital

5    assets in the crypto industry.

6    Q.  All right.  So that's spot trading.

7         I want to talk about perpetual futures markets.

8         What's the difference between a spot trade and a

9    perpetual future?

10   A.  A perpetual future is a synthetic instrument which is meant

11   to speculate typically on future price fluctuations, but you

12   don't own the underlying asset.

13   Q.  All right.  So taking a step back, if I was a Mango user

14   and I wanted to enter into a perpetual future, what am I

15   betting on?

16   A.  If you're buying a perpetual, like, for instance, Bitcoin,

17   then you'd be betting that the price of Bitcoin will go up.

18   Q.  And in that example, let's say a user buys a perpetual

19   based on Bitcoin, how does that person make money?

20   A.  Assume the price of Bitcoin goes up, the price of the

21   perpetual generally tracks the underlying asset.  And so then

22   if you bought $500 worth of Bitcoin, the Bitcoin price doubled,

23   then your investment in the perpetual is also likely to double,

24   roughly.

25   Q.  Got it.

1          So what about the person who sold the perpetual, how

2    does that person make money?

3    A.   Typically, they are making the opposite bet, and so they

4    would be betting that the price should go down.  So like

5    shorting the price of the asset that they are trading.

6    Q.   All right.  We talked about two types of trades, spot

7    trades and perpetual trades.  I want to talk about another

8    concept now called collateral.

9          What is collateral on Mango Markets?

10   A.   That is roughly the value of your portfolio in the

11   platform.  And it can be used to take on leverage or borrow

12   assets within the platform.

13   Q.   So let's start with what are the types of things that can

14   be collateral for a Mango Markets user?

15   A.   Mango accepted a very wide variety of assets as collateral

16   within the platform.

17   Q.   Can you please give us some examples of what could be

18   collateral in Mango Markets?

19   A.   Yeah.  So in addition to the assets that I talked about

20   before, like Bitcoin and Ethereum, it can also be lesser-known

21   crypto assets, including the native Mango token or other tokens

22   that are common on the Solana blockchain.

23   Q.   How would a winning perpetual position affect the user's

24   collateral on Mango Markets?

25   A.   So generally if the -- you know, you would be having more

1    value on a winning perpetual position, and then that would

2    translate into more collateral available in the platform.

3    Q.  All right.  So that's collateral.

4          I want to talk about borrowing now.  Could users

5    borrow on Mango Markets?

6    A.  Yes.

7          MR. DAVIS:  All right.  Can we please turn to page 3

8    of this exhibit.

9    Q.  Do you see, sir, where it says "don't sell, utilize"?

10   A.  Yes.

11   Q.  Could you please read this page to the jury.

12   A.  "Don't sell, utilize.  Earn interest on deposits and take

13   out fully collateralized loans against existing assets.  The

14   Mango protocol's risk engine allows you to withdraw borrowed

15   capital when you need."

16   Q.  All right.  So let's break down this first sentence.

17          It references deposits.  Do you see that?

18          All right.  What's a user's deposits on Mango Markets?

19   A.  Those are any assets that they would deposit, that they

20   would insert into the platform.

21   Q.  All right.  And do you see where it says:  "Take out fully

22   collateralized loans against existing assets"?  Do you see

23   that?

24   A.  Yes.

25   Q.  All right.  Let's break that down into two.

O49VEIS2                          Smith - Direct

1        What's a fully collateralized loan?

2    A.  That means that the value of the assets in the Mango

3    platform are valued -- are greater than what you are taking out

4    of the program.

5    Q.  And let's talk about existing assets.  What does taking out

6    a fully collateralized loan against existing assets mean?

7    A.  That just means whatever assets you have within the

8    platform.

9            MR. DAVIS:  All right.  Can we please turn to page 10

10   of this exhibit, please.

11   Q.  All right.  Do you see at the bottom here it says "maximum

12   capital efficiency"?

13   A.  Yes.

14   Q.  Could you please read the gray text underneath that

15   heading.

16   A.  "Every market is cross-collateralized.  Mango's risk engine

17   let's you utilize all your assets and derivative contracts as

18   collateral."

19   Q.  What does it mean to utilize all your assets and derivative

20   contracts as collateral?

21   A.  That when the platform is assessing the value of your

22   portfolio, it looks at every single thing that you have in the

23   platform, including any spot assets that you deposit or open

24   perpetual positions.

25   Q.  And how does the amount of a user's collateral on Mango

1    Markets impact their ability to borrow?

2    A.  In general, the more collateral you have, the more you can

3    borrow.

4    Q.  So if a user's value of a perpetual position were to go up,

5    how would that impact the user's ability to borrow from the

6    platform?

7    A.  That would increase their ability to borrow.

8    Q.  Now, I want to talk about collateral and borrowing.

9              When someone borrows from the platform, what is that

10   user expected to do with respect to collateral?

11   A.  They are generally expected to keep the collateral value

12   positive and, if not, they will be liquidated.

13   Q.  And when you say "collateral value positive," what does

14   that mean?

15   A.  Just the aggregate value of their portfolio relative to any

16   borrowings they have.

17   Q.  And when someone borrows from the platform, what is that

18   user expected to do with respect to interest payments?

19             MR. KLEIN:  Objection.

20             THE COURT:  Overruled.

21   A.  Interest payments are automatically applied to any

22   outstanding borrowings by the program.

23             MR. DAVIS:  All right.  Let's turn to page 6.

24   Q.  Do you see the box that says "liquidator program"?

25   A.  Yes.

O49VEIS2                         Smith - Direct

1    Q.  Can you please read that to the jury.

2    A.  "Liquidators protect the capital of lenders.  They help

3    ensure the protocol funds stay safe even when the markets move

4    quickly and borrowers default."

5    Q.  Are you familiar with liquidators on Mango Markets?

6    A.  Yes.

7    Q.  How do they help ensure that protected funds stay safe?

8    A.  They are a mechanism that if your collateral drops too

9    much, then they take over the position and sell it to ensure

10   the protocol remains solvent.

11   Q.  Have you had any experience with liquidation?

12   A.  Yes, I have been liquidated on Mango.

13   Q.  And why did that happen?

14   A.  I didn't maintain my collateral.

15   Q.  Does someone with funds on the protocol, would it matter to

16   you if you knew someone was borrowing from the platform without

17   intending to maintain collateral?

18          MR. KLEIN:  Objection.

19          THE COURT:  Overruled.

20   A.  Yes.

21   Q.  Why would that matter to you if someone was borrowing from

22   the platform without intending to maintain collateral on the

23   platform?

24          MR. KLEIN:  Objection.

25          THE COURT:  Overruled.

O49VEIS2                          Smith - Direct

1  A.  Because all assets on the platform are aggregated across

2  users.  And so if there's a scenario where one user defaults

3  and the protocol incurs a loss, that can result in cascading

4  losses to all users on the platform.

5  Q.  So what risks would that present to users' funds?

6  A.  That type of behavior means that you could have socialized

7  losses and be unable to recover the assets that other users

8  deposited into the program.

9           MR. DAVIS:  All right.  Can we turn back to page 3,

10 please.

11 Q.  Now, you read this before, but could you read the second

12 sentence, please.

13 A.  "The Mango protocol's risk engine allows you to withdraw

14 borrowed capital when you need."

15 Q.  All right.  Do you see where it says "withdraw borrowed

16 capital"?

17 A.  Yes.

18 Q.  What does it mean to withdraw borrowed capital from Mango

19 Markets?

20 A.  That you can take assets that you borrowed outside of the

21 platform.

22 Q.  If a user withdraws borrowed capital from the platform,

23 does the platform have access to it anymore?

24 A.  It does not.

25 Q.  Where do those funds go?

1              MR. KLEIN:  Objection.

2              THE COURT:  That's sustained.

3   Q.  Okay.  So we talked about perpetuals a little bit earlier.

4   I now want to ask you about how perpetuals were priced on Mango

5   Markets.

6              When a user wants to borrow, wants to buy a perpetual,

7   how is the purchase price set?

8   A.  There are typically other traders on the books, and you

9   would be matched against other -- other trades on the order

10  books for your execution price.

11  Q.  You mentioned order books.  What's that?

12  A.  That just means there's bids and asks at various prices,

13  like any traditional stock exchange or other kind of market.

14  Q.  And on Mango Markets, who's making those bids and asks?

15  A.  Any user can do those.

16  Q.  All right.  So after someone buys a perpetual and another

17  user sells a perpetual, how is it determined who is winning or

18  losing that bet?

19  A.  Prices typically reference something called an oracle.

20  Q.  And generally, what's an oracle?

21  A.  An oracle is intended to be a composite price that

22  represents kind of the aggregate fair market value of an asset.

23  So it's typically aggregating prices across a variety of other

24  venues to put a market-wide perspective on what pricing should

25  be.

O49VEIS2                         Smith - Direct

1    Q.  When you say "other venues," what do you mean by that?

2    A.  It could be other places on other blockchains that this

3    trades, or also there's something -- centralized venues that

4    are exchanges like Coinbase, and so referencing those prices.

5    Q.  Would it matter to you if you knew that a person was

6    intentionally moving the price of perpetuals on Mango Markets?

7            MR. KLEIN:  Objection.

8            THE COURT:  Overruled.

9    A.  Yes.

10   Q.  Why would it matter to you if you knew that a person was

11   intentionally moving the price of a perpetual on Mango Markets?

12           MR. KLEIN:  Objection.

13           THE COURT:  Overruled.

14   A.  It means the market is not operating efficiently.  And it

15   also means that that's kind of not normal user behavior.  And

16   so intentionally moving a price would raise red flags about

17   what that person's intentions are.

18   Q.  And what risks would that present to other users on Mango

19   Markets?

20   A.  The same --

21           MR. KLEIN:  Objection.

22           THE COURT:  That's overruled.

23   A.  The same risk I mentioned earlier, where all assets are

24   aggregated in the platform.  And so any sort of losses to one

25   user can result in cascading losses that impact all users.

O49VEIS2                          Smith – Direct

1    Q.  All right.  I want to direct your attention to October 11,

2    2022.

3            And remind us, were you still contributing to Mango at

4    that time?

5    A.  I was not.

6    Q.  What, if anything, happened on Mango Markets that day?

7    A.  There was an incident where more capital was pulled out of

8    the program than remained in the program, and so it became

9    insolvent.

10   Q.  When you say "insolvent," what does that mean?

11           MR. KLEIN:  Objection.

12           THE COURT:  It's overruled.

13   A.  That users were owed more capital than was available in the

14   platform to pay them out.

15   Q.  After that happened, was the platform still functioning?

16   A.  It was not.

17   Q.  At that point in time, could you access the funds that you

18   had on Mango Markets?

19   A.  I could not.

20   Q.  Approximately how long were you unable to access your funds

21   on Mango Markets?

22   A.  Roughly one to two weeks.

23   Q.  Did there come a time when you were reimbursed for your

24   funds?

25   A.  Yes.

1  Q.  Who decided to reimburse you for your funds?

2  A.  There were several votes put up to the DAO.

3  Q.  And when you say "the DAO," what do you mean?

4  A.  The community that voted on these proposals in the native

5  token.

6  Q.  How much did the Mango DAO pay to make users whole?

7  A.  Approximately $42 million.

8          MR. DAVIS:  All right.  Can we take down this exhibit,

9  please.  I want to publish what's in evidence as Government

10 Exhibit 1011.  Can we turn to page 2.

11 Q.  Mr. Smith, can you generally describe what this document

12 is.

13 A.  Yes.  It's referred to as documentation, but you can think

14 of it as a user manual for people that use the Mango platform.

15 Q.  All right.  I want to turn to page 126 of this document.

16 Before we dive into this, one question:  Is this document

17 public?

18 A.  Yes.

19 Q.  Who can access it?

20 A.  It's on the internet for anyone to access.

21 Q.  And do you see the top of this document, it says "General

22 FAQ"?

23 A.  Yes.

24 Q.  What does this mean?

25 A.  Just general frequently asked questions that users may have

O49VEIS2                          Smith - Direct

1    about the platform.

2    Q.  All right.  I want to focus on one of these questions.

3              Do you see where it says:  "What prevents someone from

4    borrowing funds, withdrawing, and running away with it?"?

5    A.  Yes.

6    Q.  Could you please read that for the jury.

7    A.  "Our system checks deposits, positions, and borrows

8    accounts to ensure that an individual cannot withdraw more than

9    their equity, calculated by the value of deposits plus the

10   value of open orders, minus the value of borrows."

11   Q.  Was it important to you that someone cannot borrow funds,

12   withdraw them, and then run away with it?

13   A.  Yes.

14   Q.  Why is it important --

15             MR. KLEIN:  Objection.

16             THE COURT:  It's overruled.

17   Q.  What would happen to the platform if someone could borrow

18   funds, withdraw them, and run away with it?

19             MR. KLEIN:  Objection.

20             THE COURT:  Overruled.

21   A.  If you could withdraw more than the capital that you put

22   in, then, like I said earlier, the platform would end up owing

23   more money to its users than it held in the platform.  And so

24   that all users would take losses.

25             MR. DAVIS:  Judge, may I have one moment?

O49VEIS2                        Smith - Cross

1          THE COURT:  You may.

2          (Counsel conferred)

3          MR. DAVIS:  Judge, no further questions at this time.

4          THE COURT:  Thank you.

5          Mr. Klein.

6          MR. KLEIN:  Yes, your Honor.

7   CROSS-EXAMINATION

8   BY MR. KLEIN:

9   Q.  Good morning, Mr. Smith.

10  A.  Good morning.

11  Q.  Where do you work now?

12  A.  Chetu Labs.

13  Q.  And what is that?

14  A.  It is a software development company.

15  Q.  What kind of software does it develop?

16  A.  Software in the crypto space.

17  Q.  And specifically, what kind of software in the crypto

18  space?

19  A.  Infrastructure for trading.

20  Q.  So you're still involved in the trading activity on the

21  crypto space?

22  A.  As an infrastructure provider.

23  Q.  You own Mango tokens?

24  A.  Yes.

25  Q.  How many Mango tokens do you own?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O49VEIS2                          Smith - Cross

1    A.   Roughly 100,000, I think.

2    Q.   How did you get those Mango tokens?

3    A.   I received a grant in return for my contributions to the

4    community.

5    Q.   And when did you get that grant?

6    A.   I don't recall exactly, but I think it was at some point

7    during 2022.

8    Q.   And did you purchase other tokens separate from that?

9    A.   Yes.

10   Q.   When did you purchase those?

11   A.   I don't know.

12   Q.   How many tokens did you purchase?

13   A.   I don't know.

14   Q.   You still own those tokens?

15   A.   Some of them, but I don't know exactly.

16   Q.   Is it 10,000 tokens?  Can you give an estimate?

17   A.   Probably less than 10,000 tokens.

18        For context, I think the position is worth -- you

19   know, token, not very much money.

20   Q.   When did you buy those tokens?

21   A.   Periodically.

22   Q.   Did you purchase any tokens in the initial token sale or

23   distribution?

24   A.   I did not.

25   Q.   And you, yourself have used Mango Markets?

O49VEIS2                          Smith - Cross

1    A.  Yes.

2    Q.  Now, there are various versions, rate?

3    A.  Yes.

4    Q.  Version 1, Version 2, Version 3, now there's a Version 4?

5    A.  Yes.

6    Q.  And you use Version 3?

7    A.  I did.

8    Q.  What kind of transactions can you conduct on Mango Markets

9    Version 3?

10   A.  Many different types of trades.

11   Q.  Walk me through them.

12   A.  I don't remember the details of any specific trade, but I

13   bought Solana on the platform; I deposited Ethereum into the

14   platform.  I used it frequently.

15   Q.  Did you conduct futures transactions?

16   A.  I did.

17   Q.  And did you use a VPN to do that?

18   A.  I don't recall.

19   Q.  Do you recall that futures transactions, you needed to use

20   a VPN to log into Mango Markets?

21   A.  That is not the case.

22   Q.  Do you recall that nominally U.S. citizens were not

23   permitted to conduct future transactions through Mango Markets?

24   A.  I do not believe that is the case.

25   Q.  Did you do perpetuals?

O49VEIS2                          Smith - Cross

```
1    A.  I thought you meant by futures, perpetuals.

2    Q.  Okay.  I wasn't sure -- so you did perpetuals?

3    A.  That's correct.

4    Q.  This is in 2022?

5    A.  Yes, during 2022.

6    Q.  Version 3?

7    A.  Yes.

8    Q.  Can you walk through, for the jury and me, what you did as

9    a contributor in a little more detail.  When did you actually

10   start contributing?

11   A.  It was in the fall of 2021.

12   Q.  Did you have another job at that time?

13   A.  I did not.

14   Q.  And how did you find Mango Markets?  How did you learn

15   about Mango Markets?

16   A.  Social media.

17   Q.  And had you traded crypto before?

18   A.  Before I began --

19   Q.  Contributing to Mango Markets.

20   A.  Yes.

21   Q.  Okay.  So you started in the fall of 2020.  What were the

22   first couple things you did as a contributor?

23   A.  There were biweekly calls for the community.  And so that's

24   how I kind of got my entry point, is I joined those calls and

25   discussed things on the calls and shared ideas.
```

O49VEIS2                        Smith - Cross

1    Q.  And when you say "contributions," what were your

2    contributions other than listening in on calls?

3    A.  So I helped to track, as I said, the expenses, the

4    emissions of the MNGO token, as well as the fees generated by

5    the protocol.  So that was one element of what I did.

6    Q.  And Mango Markets is an open source protocol; correct?

7    A.  Yes.

8    Q.  What does "open source" mean?

9    A.  The code is freely available for anyone to breed or access.

10   Q.  Anyone in the world?

11   A.  Yes.

12   Q.  All right.  So what else did you do as a contributor?

13   A.  Mango had a substantial treasury of assets.  And so I also

14   frequently consulted with other parties about whether those

15   assets should be invested in particular ways.

16   Q.  Did you write articles about Mango Markets?

17   A.  I don't know if I would say it's an article, but I gave

18   updates to the community for a period of time.

19   Q.  Did you write blog posts?

20   A.  It was on Medium, yes.

21   Q.  And what is Medium, for the jury?

22   A.  It's just a site for posting blogs or articles.

23   Q.  And those articles are open to the public, not just the

24   Mango Markets community?

25   A.  That's correct.

O49VEIS2                          Smith - Cross

1   Q.  You know what a cryptocurrency exchange is, right?

2   A.  Yes.

3   Q.  And have you heard the term CeFi?  C-E-F-I.

4   A.  Not especially.

5   Q.  You heard the term DeFi?

6   A.  Yes.

7   Q.  What is DeFi?

8   A.  Decentralized finance.

9   Q.  What does that mean to you?

10  A.  That means typically projects that operate on the

11  blockchain as opposed to in a centralized manner.

12  Q.  And by "centralized manner," you mean run by a company,

13  right, or a person?

14  A.  Yes.

15  Q.  So there are a number of cryptocurrency exchanges that are

16  centralized, aren't there?

17  A.  Yes.

18  Q.  Run by companies?

19  A.  Yes.

20  Q.  Coinbase is an example?

21  A.  I think so.

22  Q.  Do you have a Coinbase account?

23  A.  I do.

24  Q.  You're aware that they are a publicly traded company?

25  A.  I am.

O49VEIS2                              Smith – Cross

1  Q.  Okay.  And there's other centralized exchanges, right, like

2  Kraken?

3  A.  Yes.

4  Q.  Binance?

5  A.  Yes.

6  Q.  At one point FTX even?

7  A.  That is true.

8  Q.  You know about Solana too, right?

9  A.  I do.

10  Q.  What is Solana, can you let the jury know?

11  A.  Solana is a crypto network that enables the execution of

12  code.

13  Q.  Is it another type of blockchain?

14  A.  Yes.

15  Q.  Is it the blockchain that Mango Markets ran on?

16  A.  It was.

17  Q.  Okay.  And you mentioned Bitcoin.  That's another type of

18  blockchain?

19  A.  Yes.

20  Q.  That's separate from Solana?

21  A.  Yes.

22  Q.  You mentioned Ethereum.  That's another type of blockchain?

23  A.  Yes.

24  Q.  Separate from Solana?

25  A.  Yes.

O49VEIS2                        Smith - Cross

1   Q.  And Solana was launched in 2020, right?

2   A.  I don't know the details.

3   Q.  Okay.  Was it launched after Bitcoin?

4   A.  Yes.

5   Q.  After Ethereum?

6   A.  Yes.

7   Q.  And those two, Bitcoin and Ethereum, are two of the more

8   popular ones, right?

9   A.  That's correct.

10  Q.  And so Solana was a newer blockchain relative to those?

11  A.  Yes.

12  Q.  I want to talk about Mango Markets for a moment.

13          You're very familiar with Version 3, right, of Mango

14  Markets?  You used it?

15  A.  Generally familiar, yes.

16  Q.  You were a contributor, right?

17  A.  To Mango community, yes.

18  Q.  And contributed to Version 3 when it was out there?

19  A.  As I said, I'm not a software developer, so I contributed

20  no code to Version 3.

21  Q.  Understand.  I'm not going to ask you -- you didn't

22  contribute code, but you contributed in other ways?

23  A.  But not specifically to that program.

24  Q.  Okay.  But you contributed to Mango Markets when Version 3

25  was out there, right?

O49VEIS2                         Smith - Cross

1   A.  Yes, I was a contributor while Mango V3 was live.

2   Q.  And you used Version 3, right?

3   A.  Yes.

4   Q.  So you're familiar with Version 3?

5   A.  Sure.

6   Q.  So let's talk about Mango Markets Version 3.

7           No company controlled that, right?

8   A.  No.

9   Q.  No individual person; correct?

10  A.  No.

11  Q.  It's what's called permissionless, right?

12  A.  Yes.

13  Q.  You called it permissionless earlier, didn't you?

14  A.  I was reading from the website.

15  Q.  But the website, which you helped, were involved in, Mango

16  Markets community calls it permissionless, right?

17  A.  Yes, it said that.

18  Q.  And that means that anybody can access Mango Markets?

19  A.  To my knowledge, yes.

20  Q.  It's also self-enforcing, isn't it?

21  A.  Yes.

22  Q.  One second.

23          I'm going to talk to you for a moment about

24  transacting on Mango Markets.  The prosecutor walked you

25  through the home page for Version 3, right?

O49VEIS2                              Smith - Cross

1    A.  Yes.

2    Q.  So you're familiar with the website?

3    A.  Generally.

4    Q.  You used it.

5        There was a website for Version 3, that's how you

6    accessed it, right?

7    A.  Sometimes.

8    Q.  How else did you access it?

9    A.  There are a variety of ways to access the program besides

10   the website.

11   Q.  Okay.  I'm going to take you to -- oh, sorry.  And the

12   website address for Version 3 was trade.mango.markets; correct?

13   A.  I believe that was the actual trading portal.  But the

14   website that we looked at the front page earlier I think was

15   just mango.markets.

16   Q.  Let's go to the trading portfolio.

17        MR. KLEIN:  Your Honor, I would like to take Mr. Smith

18   to the front page of the trading portfolio to ask a few

19   questions about it.  So I'd like to display that to Mr. Smith,

20   but not the jury for a moment.

21        THE COURT:  You may.

22        MR. DAVIS:  Is there an exhibit number?

23        MR. KLEIN:  I'm not offering any exhibit right now;

24   I'm about to though.

25        THE COURT:  Can the government see what's being put up

O49VEIS2                          Smith - Cross

1    on the screen for everyone except the jury?

2              MR. DAVIS:  Yes.

3              THE COURT:  Okay.

4    BY MR. KLEIN:

5    Q.  It's a little hard to see, but you are at trade -- oh there

6    we go, trade.mango.markets; correct, Mr. Smith?

7    A.  That appears to be the address.

8    Q.  And we're going to click on English here.

9    A.  Okay.

10   Q.  So this is the first screen that pops up.  Do you see that?

11   A.  Yes.

12   Q.  I'm going to show you what's marked as Government Exhibit

13   1010.

14             MR. KLEIN:  I don't know if you can split screen.  I

15   have a physical copy, too.

16             Your Honor, may I approach?  This is going to be

17   faster.

18             THE COURT:  You may approach.

19   Q.  Mr. Smith, I'm showing you what's marked as Government

20   Exhibit 1010.

21             MR. KLEIN:  We're going to pop up 1010.  Can you see

22   it, Mr. Davis?

23             MR. DAVIS:  I see it.  Thank you.

24   Q.  Do you see Government Exhibit 1010?

25   A.  I do.

O49VEIS2                           Smith - Cross

1   Q.  And what we're showing you on the website live is the same;

2   correct?

3              MR. KLEIN:  This isn't in evidence, Judge.  I just

4   wanted him to see that it is the same thing.  I'm not going to

5   offer it into evidence.

6              THE COURT:  I understand.  You may proceed.

7   Q.  You see Government Exhibit 1010, which has been

8   authenticated in the stipulation that Mr. Davis just read to

9   you?  Do you see that exhibit in front of you, the paper

10  exhibit?

11  A.  Yes.

12  Q.  Do you see what's on your screen?

13  A.  Yes.

14  Q.  That's the same thing; correct?

15  A.  Yes, they appear to be the same.

16             MR. KLEIN:  Your Honor, I offer Government Exhibit

17  1010 into evidence.

18             MR. DAVIS:  No objection.

19             THE COURT:  It will be admitted.

20             (Government's Exhibit 1010 received in evidence)

21  Q.  Now, you see there's a --

22             MR. KLEIN:  Please display Exhibit 1010.  Actually,

23  can I --

24             THE COURT:  Well, you're displaying Exhibit 1010, not

25  the --

O49VEIS2                              Smith - Cross

1            MR. KLEIN:  Yes, that's what I meant.  I want to be

2       clear.  Sorry.  Yes.  Is that up for the jury to see now?

3            May we publish it to the jury, your Honor?

4            THE COURT:  You may.

5       Q.  Let's talk about this for a second, Mr. Smith.

6            This is the opening page of the trading platform for

7       Mango Markets Version 3.  Let's start at the top.

8            What does it say?

9       A.  "Welcome to Mango V3."

10      Q.  Okay.  And then you cut down, it describes Mango Markets.

11      And then what does it say, the V3 protocol, can you read that

12      for the jury please?

13      A.  "The V3 protocol is in public beta.  This is unaudited

14      software.  Use it at your own risk."

15      Q.  And then there's a checkbox where you can check and say:

16      "I understand and accept the risk."  Correct?

17      A.  Correct.

18      Q.  Thank you.

19           MR. KLEIN:  So now I'm going to take that down.  Let's

20      turn to Exhibit 900.

21      Q.  I'm going to walk through the process of conducting a

22      trade.  And you, again, conducted trades on Mango Markets

23      Version 3.

24           So the first step you mentioned was -- was it the

25      first or second step to connect your crypto wallet?

O49VEIS2                        Smith - Cross

1   A.   Once you went to the trading page, then that's typically

2   the first step.

3   Q.   And the wallet could have different types of tokens, it

4   didn't just have to have Mango; correct?

5   A.   Correct.

6   Q.   There were a number of tokens that you understand trade on

7   Mango Markets?

8   A.   Correct.

9   Q.   And when I say "trade," I mean perpetuals or spot trade, do

10  you understand that?

11  A.   Yes.

12  Q.   So the next step after that, I believe, is didn't you

13  deposit some of that token or cryptocurrency into the DeFi

14  protocol; is that right?

15  A.   Typically, if you're creating a new account, then yes.

16  Q.   Is that the smart contract at that point?  You're putting

17  the tokens into the smart contract?

18  A.   If you're depositing assets, then you're moving them from

19  your wallet into the smart contract, but still controlled by

20  your wallet.

21  Q.   What's a smart contract?

22  A.   It is just a computer program that runs on a blockchain.

23  Q.   Okay.  And then when you deposit those tokens onto the

24  Mango Markets into the smart contract, it doesn't ask you where

25  those tokens are from, does it, the smart contract?

1   A.   Provided they are from your address, then that's like the

2   only check that I'm aware of.

3   Q.   So it doesn't ask you if those tokens are stolen?

4   A.   Not to my knowledge.

5   Q.   Doesn't ask you your name?

6   A.   Not to my knowledge.

7   Q.   Doesn't ask you your address?

8   A.   No.

9   Q.   Doesn't ask you why you want to deposit those tokens?

10  A.   No.

11  Q.   Doesn't ask you what you plan to do with them, the next

12  step at that point?

13  A.   No.

14  Q.   You don't have to even name yourself when you conduct a

15  trade on Mango Markets, do you?

16  A.   I don't believe you do.

17  Q.   You don't have to -- so you don't have to identify yourself

18  at all; you can conduct as many trades you want, you don't have

19  to identify yourself?

20  A.   That's correct.

21  Q.   And again, there's no approval to use it, it's

22  permissionless; correct?

23  A.   Yes.

24  Q.   It doesn't ask you how long you want those funds to be in

25  there, does it?

O49VEIS2                        Smith - Cross

1    A.  I don't think so.

2    Q.  It doesn't -- so when you deposit -- let me step back for

3    one second.

4         When you go and do a borrow transaction — let's talk

5    about a borrow transaction for a moment — it doesn't ask you

6    questions about that either.  Does the smart contract ask you

7    anything?

8    A.  I mean, there are a variety of checks before you can

9    withdraw from the program.

10   Q.  But does it ask you -- when you deposit into the account,

11   does it ask you -- or when you deposit -- sorry.  One second.

12        (Counsel conferred)

13   Q.  So there is no term on a borrow in Mango Markets, is there?

14   A.  What do you mean by --

15   Q.  You could borrow the funds forever, as long as you

16   maintain -- right?

17   A.  I mean, that depends on a variety of things.

18   Q.  But you could, correct?  If you maintain -- if your

19   collateral is maintained, you could borrow forever?

20   A.  I would say you can borrow indefinitely provided that

21   you're paying ongoing interest and maintaining your collateral

22   requirement.

23   Q.  There's no set repayment schedule, is there?

24   A.  Separate payments for what?

25   Q.  Set repayment schedule.

O49VEIS2                          Smith - Cross

1    A.  Oh, there is not.

2    Q.  You don't have to sign a document, do you?

3    A.  No.

4    Q.  You don't have to say why you're borrowing the funds, do

5    you?

6    A.  Provided that you meet the other requirements, then --

7    Q.  You don't have to say why; there's no question that says

8    why are you borrowing these funds?

9    A.  That is correct.

10   Q.  In fact, the smart contract doesn't even ask you about

11   repayment, does it?  There's no specific question from the

12   smart contract about repayment, is there?

13   A.  I don't follow what you're saying.

14   Q.  Does the smart contract send you a message that says, Are

15   you going to repay this?

16   A.  It does not.

17   Q.  Let me move on and talk about perpetuals for a moment.

18            There is no expiration date on a perpetual trade, is

19   there?

20   A.  There is no expiration on a perpetual market typically.

21   Q.  You could hold your perpetual forever potentially?

22   A.  Indefinitely.

23   Q.  Let me talk about the day of Mr. Eisenberg's trades.  You

24   mentioned you had some funds on the platform?

25   A.  That is correct.

O49VEIS2                          Smith - Cross

1   Q.  You didn't trade that day, did you?

2   A.  I don't think so.

3   Q.  And you didn't deposit those funds that day, did you?

4   A.  No.

5   Q.  Deposit them how far back?

6   A.  I mean, probably more than months ago -- or months prior to

7   the incident.

8   Q.  Months prior.

9           You didn't know Mr. Eisenberg at the time you

10  deposited those funds?

11  A.  I did not.

12  Q.  You didn't know he was going to conduct any trades on

13  October 11th, did you?

14  A.  I did not.

15  Q.  Now, the day of Mr. Eisenberg's trades, you mentioned you

16  learned something happened on Mango Markets; correct?

17  A.  I learned about the incident that day, yes.

18  Q.  Did you say that Mango Markets was -- did you say paused or

19  what was the word you used?

20  A.  Operations were paused for the platform.

21  Q.  Let's talk about the pause.

22          That day -- and you were following the news that day?

23  A.  Somewhat.  But there was a lot of news going on, so not all

24  of it.

25  Q.  The Mango Markets was paused because the community created

O49VEIS2                          Smith - Cross

1   software to pause Mango Markets; correct?

2   A.  I don't really follow that question.

3   Q.  You don't recall?

4   A.  I don't follow the way that you're framing that question.

5   Q.  Mr. Eisenberg didn't pause Mango Markets, did he?

6   A.  No.

7   Q.  The community paused Mango Markets; correct?

8   A.  Yes.

9          MR. KLEIN:  One moment, your Honor.

10         (Counsel conferred)

11  Q.  Were you in Utah when you deposited those funds into Mango

12  Markets?

13  A.  I have no idea.

14  Q.  You weren't here in Manhattan or New York?

15  A.  I don't know.

16         (Counsel conferred)

17         MR. KLEIN:  I have one more set of questions, your

18  Honor.

19  Q.  I want to show you Government's Exhibit 900.

20         MR. KLEIN:  This is in evidence, so I want to publish

21  it to the jury, your Honor.

22         THE COURT:  You may.

23         MR. KLEIN:  Your Honor, our computer is frozen.  I

24  apologize.  I'll ask the government --

25  Q.  I want to show you Exhibit 900.

O49VEIS2                          Smith - Cross

```
1              MR. KLEIN:  Can you please turn to page 10.
2    Q.  Do you remember when the prosecutor showed you page 10?
3    A.  You mean earlier in this --
4    Q.  Yes.
5    A.  Yes.
6    Q.  He showed you the bottom part; correct?
7    A.  Yes.
8    Q.  I want to show you now the top part.
9              What does it say at the top?
10   A.  "Completely permissionless."
11   Q.  And what's next?
12   A.  "No KYC.  No personal information held.  All data is
13   on-chain."
14   Q.  You can stop there for a moment.
15             What does no "KYC" mean?
16   A.  "KYC" stands for know your customer.  It is a check that
17   some financial institutions do if you're interacting with them.
18   Q.  And so that means they don't ask things like your address,
19   your name, what country you're in, where you live, things like
20   that?
21   A.  Correct.
22             MR. KLEIN:  Nothing further, your Honor.
23             THE COURT:  Redirect?
24             MR. DAVIS:  Can we leave that up, actually, on that
25   page.
```

O49VEIS2                          Smith - Redirect

 1    REDIRECT EXAMINATION

 2    BY MR. DAVIS:

 3    Q.  Mr. Smith, remember when counsel just asked you about the

 4    phrase "completely permissionless"?

 5    A.  Yes.

 6    Q.  Did you understand completely permissionless to mean that

 7    anything was permitted on the platform?

 8    A.  No.

 9    Q.  Why not?

10    A.  I think there are certain things that are kind of obvious

11    that you shouldn't do to abuse or steal from the platform.

12    Q.  I want to step back for a second.

13          Do you remember when defense counsel asked you about

14    centralized exchanges?

15    A.  Yes.

16    Q.  Who runs the smart contract for Mango Markets?

17    A.  It is operated autonomously on the Solana blockchain.

18    Q.  Who makes decisions about the code for Mango Markets?

19    A.  The DAO is involved in approving those types of changes.

20    Q.  How does the DAO approve changes for the code, for

21    instance?

22    A.  It will make votes that are then implemented directly into

23    the code.

24    Q.  I want to pull up now what was shown to you as Government

25    Exhibit 1010.

O49VEIS2                              Smith – Redirect

1          MR. DAVIS:  Can we pull that up, please.

2     Q.  Do you remember when counsel asked you about this on

3     cross-examination?

4     A.  Yes.

5     Q.  All right.  Do you see where it says this is unaudited

6     software?

7     A.  Yes.

8          MR. DAVIS:  I'd like to pull up Government Exhibit

9     1011, if we could, and do it side-by-side.

10    Q.  Now, can you remind the jurors what Government Exhibit 1011

11    is?

12    A.  This is the documentation page that is similar to a user

13    manual.

14         MR. DAVIS:  And can we go to page 3.

15    Q.  And was this in effect for V3, this user manual?

16    A.  Yes.

17    Q.  Can you read where it says "audit."

18    A.  "Neodyme, one of the leading auditing firms in the Solana

19    space, recently reviewed Mango.  At the time of writing,

20    September 2nd, 2022, critical and high priority issues were

21    either addressed or acknowledged.  You can download their full

22    report here with a link to a PDF."

23         MR. DAVIS:  All right.  We can take down the right

24    side of the screen for a second.

25    Q.  Going back to Government Exhibit 1010, do you remember when

1  counsel asked you about where it says "use at your own risk"?

2  A.  Yes.

3  Q.  And where counsel asked you where you checked, "I

4  understand and accept the risks"?

5  A.  Yes, it's checked on the screenshot.

6  Q.  Did you interpret understanding and accepting the risks to

7  mean that anything was allowed on the platform?

8          MR. KLEIN:  Objection.

9          THE COURT:  It's overruled.

10 A.  I did not.

11 Q.  Why not?

12 A.  Because I think there is no intention of enabling people to

13 manipulate the platform such that you could drain funds and

14 inflict losses on other users unnecessarily.

15         MR. DAVIS:  Judge, may I have one moment?

16         THE COURT:  You may.

17         (Counsel conferred)

18         MR. DAVIS:  Nothing further, your Honor.  Thank you.

19         THE COURT:  Mr. Klein, anything further?

20         (Counsel conferred)

21         MR. KLEIN:  One second.  Just one or two things.

22 RECROSS EXAMINATION

23 BY MR. KLEIN:

24 Q.  Permissionless goes to a number of things.  But I want to

25 focus you on the smart contract.  Those are things that run the

O49VEIS2

1    trades on Mango Markets; correct?

2    A.  Yes.

3    Q.  And there are certain inputs that go into a smart contract;

4    correct?

5    A.  Yes.

6    Q.  And the concept of permissionless means that you don't need

7    permission to put your inputs into the smart contract; correct?

8    A.  I'm not sure that's true, but that's a very broad

9    generalization, so I'm not exactly sure what you're asking.

10   Q.  Anyone can engage with Mango Markets and use the smart

11   contract, right?  It's permissionless.

12   A.  Yes.  User accounts are permissionless.

13           MR. KLEIN:  Nothing further.

14           THE COURT:  All right.  Thank you very much,

15   Mr. Smith.

16           (Witness excused)

17           THE COURT:  The government may call its next witness.

18           MR. BURNETT:  The government calls James Farrell.

19           MR. TALKIN:  Your Honor, before we call the next

20   witness, can we take a very brief break?

21           THE COURT:  Very brief.

22           MR. TALKIN:  Very brief.

23           THE COURT:  Yes.  Let's take ten minutes, come back at

24   11:25.  Because we're taking this little break, I think we're

25   going to take our lunch break at noon.  So let's try to make

O49VEIS2

1      some progress before we go to lunch.

2              All right.  So we'll come back in ten.

3              All rise for the jury.

4              (Jury not present)

5              THE COURT:  All right.  We'll be back in in ten.

6              MR. TALKIN:  Your Honor, I apologize.  Mr. Eisenberg

7      was holding on for a while, so he really needed to go.

8              THE COURT:  Understood.

9              MR. TALKIN:  I know it's an inopportune time.

10             (Recess)

11             (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O49Ceis3

1              THE COURT:  We ready to go?

2              MS. HUANG:  The government's ready, your Honor.

3              MR. KLEIN:  Yes, your Honor.

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O49Ceis3                          Farrell - Direct

1          (Jury present)

2          THE COURT:  Please be seated.

3          Mr. Hernandez, will you swear in the witness.

4    JAMES FARRELL,

5        called as a witness by the Government,

6        having been duly sworn, testified as follows:

7          THE DEPUTY CLERK:  Can you please give your first and

8    last name to the Court, and spell your first and last name.

9          THE WITNESS:  Sure.  My name is James Farrell,

10   J-A-M-E-S F-A-R-R-E-L-L.

11   DIRECT EXAMINATION

12   BY MR. BURNETT:

13   Q.  Good morning, Mr. Farrell.

14   A.  Good morning.

15   Q.  Where do you currently work?

16   A.  I work for HD Consulting Service LLC.

17   Q.  Does that company provide employees for a particular

18   company?

19   A.  Correct.  We provide services employees for the AscendEX

20   group of families, most specifically our Romanian operational

21   entity, AscendEX Technology.

22   Q.  Is it okay just to keep things simple if I call that group

23   of companies AscendEX for today?

24   A.  That's fine.

25   Q.  How long have you worked with AscendEX?

O49Ceis3                        Farrell - Direct

1   A.  Roughly two years.

2   Q.  Where do you work from?

3   A.  I work out of our offices in Midtown Manhattan.

4   Q.  What's your job?

5   A.  I'm the general counsel for HD Consulting.

6   Q.  Can you give the jury a sense of your primary

7   responsibilities.

8   A.  Sure.  So, as the primary in-house lawyer, I do everything

9   from advising on regulatory issues, litigation, contracts, HR

10  issues, drafting agreements.  Basically the run-of-the-mill

11  soup-to-nuts to make our operations run.

12  Q.  Let's start by talking by bit about AscendEX and its

13  operations.

14          What kind of company is AscendEX?

15  A.  AscendEX is a centralized custodial cryptocurrency

16  exchange.

17  Q.  What does that mean?

18  A.  What that means is that we provide a venue or a platform

19  where people can deposit cryptocurrencies and then trade

20  cryptocurrencies on our platform, and then withdraw them to

21  whatever various other cryptocurrency exchanges or private

22  accounts they want to.

23  Q.  You mentioned that you work out of Midtown Manhattan; is

24  that right?

25  A.  That's correct.

O49Ceis3                        Farrell - Direct

1    Q.  Are there other people who run AscendEX who work in New

2    York City with you?

3    A.  Correct.  So, roughly two-thirds of the people who provide

4    work to support AscendEX's operations are located in New York

5    City.  That includes both of the cofounders of the company as

6    well as legal compliance, HR, about half of our programmers,

7    our entire finance team, and about half of our sales team.

8    Q.  So I want to talk a bit about how people use AscendEX.  How

9    does someone sign up to get onto the platform?

10   A.  There are two entryways onto our platform.  We have both a

11   mobile app and a website, but they effectively both lead you to

12   the same place, which is our digital asset trading platform.

13   Q.  What does someone need to do before they can start using

14   the platform to trade currencies?

15   A.  Two things.  First, they need to register as a user, which

16   involves logging onto the system, providing certain

17   information, agreeing to our terms of service.  Then, in order

18   to be able to utilize the platform, they need to have

19   cryptocurrencies deposited with us and held by us.  So they

20   need to arrange to transfer cryptocurrencies from wherever they

21   currently are to a custodial wallet we maintain.

22   Q.  Let's break that apart a little bit.  I think one of the

23   things you mentioned is that users need to agree to something;

24   is that right?

25   A.  Correct.  When they log on and establish a user account,

O49Ceis3                          Farrell - Direct

1   they agree to the terms of service for how our exchange

2   operates and what they agree to do and how they agree to act.

3          MR. BURNETT:  Mr. Sears, if you can show to the Court,

4   the parties, and the witness what's been marked as Government

5   Exhibit 1512.

6   Q.  Do you recognize this document, Mr. Farrell?

7   A.  Yes, I do.

8   Q.  What is it?

9   A.  This is the terms of service for our platform that was in

10  effect from September of 2021 until about May of 2023.

11         MR. BURNETT:  The government offers 1512.

12         THE COURT:  It will be admitted.

13         (Government's Exhibit 1512 received in evidence)

14         MR. BURNETT:  Mr. Sears, if you can publish that for

15  the jury and zoom in on the top part that says, "Terms of

16  Service."

17  Q.  Mr. Farrell, just to help orient everyone, when were these

18  in effect?

19  A.  This version of the terms of service was in effect from

20  September 29, 2021 until about sometime around May or so of

21  2023 when I did an update to them.

22  Q.  Were these publicly available on AscendEX's website?

23  A.  Yes, they were.

24  Q.  I'm going to have you look at just a few terms and just

25  read certain terms.  I'm not going to have you explain them.

O49Ceis3                          Farrell - Direct

1    Okay?

2    A.  Sure.

3    Q.  Let's start on page 1 and go to section 1.6, which is about

4    two-thirds down the page.  You see where it says, "Accessing

5    AscendEX"?

6    A.  I do.

7    Q.  Could you read that sentence, please.

8    A.  Sure.  You acknowledge and agree that you are not permitted

9    to enter or try to access any restricted area of any system or

10   network of AscendEX, or any AscendEX service provider, under

11   any circumstances, or perform any functions that are not

12   authorized by these terms.

13            MR. BURNETT:  Now let's go down to page 4, please,

14   Mr. Sears.  Do you see, there is a section titled "Marketplace

15   Conduct Rules."  If you could highlight that and just the first

16   paragraph under it, Mr. Sears.

17   Q.  Could you read first just the first paragraph under

18   "Marketplace Conduct Rules."

19   A.  You acknowledge and agree to abide by the marketplace

20   standard of conduct rules ("marketplace conduct rules")

21   enforced by the company, which are designed to prevent the use

22   of AscendEX for disruptive or manipulative conduct, or

23   deceptive practice, including, but not limited to, disruptive

24   trading and price manipulation.  We take our marketplace

25   conduct rules very seriously and it is our policy to take all

O49Ceis3                        Farrell - Direct

the necessary steps to prohibit manipulative conduct or
deceptive practices.  The following are strictly prohibited on
AscendEX.

Q.  We're not going to go through all of the prohibited
practices, I just want to walk through the first three.

        What's the first one called?

A.  The first one is called market manipulation.

Q.  Could you read that, please.

A.  Sure.  Any disruptive trading in or manipulation of the
AscendEX marketplace whatsoever is strictly prohibited by the
company.  Orders placed on AscendEX for the purpose of
generating unnecessary volatility, or creating a condition in
which prices do not or will not reflect fair market values are
prohibited.  If you or any related party make or assist in
placing any such order, or in any way assist directly or
indirectly in carrying out any plan or scheme for the placing
of any such order for the purposes of generating unnecessary
volatility or affecting market prices, you and any related
party will be deemed to have engaged in an act detrimental to
AscendEX.  Based upon the severity of the market manipulation,
there will be a fine of up to 2 million USDT.

        MR. BURNETT:  Let's scroll down to the next paragraph,
please, Mr. Sears.  And you can group the next two paragraphs
together, if you wouldn't mind.  Sorry.  Just the 4.13.2 and
4.13.3.

O49Ceis3                          Farrell - Direct

1    Q.  Do you see 4.13.2?

2    A.  I do.

3    Q.  What's that titled?

4    A.  Fraudulent Acts.

5    Q.  Could you read that sentence, please.

6    A.  Neither you nor any related party shall engage or attempt

7    to engage in any fraudulent act, or engage or attempt to engage

8    in any scheme to defraud, deceive, or mislead in connection

9    with or related to any order or trade, or any other activity

10   related to AscendEX or the platform services.

11   Q.  Finally, if you could read the title and the substance of

12   4.13.3.

13   A.  Sure.  4.13.3 Violation of Applicable Laws and Regulations.

14   Neither you nor any related party shall engage in conduct that

15   is in violation of any applicable laws and regulations.

16           MR. BURNETT:  Thank you, Mr. Sears.  You can take this

17   exhibit down, please.

18   Q.  So let's go back now to the account creation and

19   registration process.

20           When someone creates an account on AscendEX, what, if

21   anything, shows up to the folks in the New York City office?

22   A.  When someone creates an account in AscendEX, the

23   information is captured in what is called our management

24   portal, which is available to and reviewed by the people in the

25   New York office.

1  Q.  What do employees in the New York office use the management

2  portal for?

3  A.  A variety of purposes depending upon what your role is.

4  So, as someone who is in the legal function, what I'm generally

5  using it for, is to find out who our users are, what type of

6  trading they're doing, and to take from it any information

7  responsive to things such as government requests or subpoenas

8  or actions that we're thinking of taking with respect to users.

9  Our finance team will look at it to figure out what

10  transactions were done on the platform and whether the

11  accounting of those transactions and the credits and debits to

12  each individual user trader account are correct based on the

13  trading activities.

14  Q.  We'll come back to that point in just a moment, but let's

15  keep walking through the setup process.

16          After someone has created an account, how can they get

17  cryptocurrency onto your platform?

18  A.  Sure.  The way that they get cryptocurrency onto our

19  platform is they either buy it from someplace else, you know, a

20  service such as like Moonpay that basically exchanges Fiat

21  cards here, real money for cryptocurrency, or they already own

22  cryptocurrency and they maintain it in either a private wallet

23  or on a different exchange account, and they transfer that

24  cryptocurrency to the custodial wallet that we maintain for

25  trading on our platform.

O49Ceis3                    Farrell - Direct

1    Q.  So when someone makes a deposit, where does it go?

2    A.  It goes into a custodial wallet or series of wallets that

3    we maintain that hold all of our users' assets in effectively a

4    collective group.

5    Q.  How does AscendEX keep track of deposits?

6    A.  We have an internal accounting system that is married to

7    our transaction reporting.  So when someone sends

8    cryptocurrency from an external wallet to our wallet, that

9    transaction is associated with a particular user.  Our internal

10   accounting system then credits that user's account with

11   whatever type of an amount of cryptocurrencies were set.

12   Q.  What, if any, role do the folks in the New York office have

13   in managing that deposit process?

14   A.  Two major aspects.  The first thing is all of the deposits

15   are reviewed by our finance team and our development team when

16   they come in.  Then there's also a daily reconciliation that's

17   done for all deposits, all withdrawals, and all trades to make

18   sure that what's reflected in our computer system matches up

19   with what is on the internal ledger that we maintain.

20   Q.  Now, once a user has cryptocurrency on the AscendEX

21   platform, what kind of things can they do?

22   A.  Primarily two things.  First, they can trade

23   cryptocurrencies.  So we list cryptocurrencies, we do it in

24   what's known as a pair.  So we will list and say, you know, you

25   can agree to buy or sell a certain type of cryptocurrency

1    valued against a different one.  The second thing is we have

2    various opportunities for people to take the cryptocurrency

3    that they have being held by us and use it to earn

4    interest-type payments through certain activities such as

5    staking and things like that.

6    Q.  Let's focus on the trading aspect.

7         How does AscendEX keep track of people putting in bids

8    to buy or offers to sell different types of cryptocurrencies?

9    A.  Sure.  We maintain what's called a centralized order book.

10   So every time a user places a buy offer or a sell offer, that's

11   reflected on our platform in both, you know, the series of the

12   transactions as well as a graphic which shows how many people

13   and at what amounts people are willing to buy a certain

14   cryptocurrency and how many people at what amounts are willing

15   to sell that same cryptocurrency.

16   Q.  What ultimately determines the price of a particular

17   cryptocurrency pair on AscendEX at any point in time?

18              MR. TALKIN:  Objection.

19              THE COURT:  Sustained.

20   Q.  How do those bids and offers result in transactions on the

21   platform?

22              MR. TALKIN:  Objection.

23              THE COURT:  That's overruled.

24   A.  We have what's called a smart order routing engine.  What

25   that does is that looks at all the people who have offered to

O49Ceis3                        Farrell - Direct

1    buy a certain cryptocurrency at the price that they designated
2    and all the people who want to sell the same, and if there are
3    any matches in terms of people who want to buy at a price and
4    people who want to sell at a price, the smart order routing
5    engine matches those two things together and executes the
6    transaction.
7    Q.  Now, when a trade actually happens, how does AscendEX keep
8    track of that?
9    A.  Sure.  So when our smart order routing engine says, you
10   know, user A has agreed to sell this token to user B in
11   exchange for a certain countervailing token from user B, that
12   gets reflected in our internal ledger.  So our internal ledger
13   which is synced to this will show a debit of one token from
14   user A, a credit of that token to user B, and then the flip
15   side of that transaction, as well.
16   Q.  What happens to the actual cryptocurrency?
17   A.  Well, because all of the cryptocurrencies are sitting in a
18   custodial wallet that we maintained, it's kind of similar to a
19   bank vault if you're just transferring assets between accounts.
20   So the assets don't actually move out of the vault because all
21   you're doing is internally moving it from one person's account
22   to another.  So on our internal ledger, it's showing a movement
23   of those cryptocurrencies, but because they're all held in the
24   centralized wallet, nothing is actually moving in that.
25   Q.  Now, what role, if any, do employees in New York have in

O49Ceis3                        Farrell - Direct

managing that ledger that keeps track of who owns what?

A.  So, every day, there's what's called a trade reconciliation report or reconciliation report.  That is reviewed by the development team in New York to make sure that the systems are working correctly, that all of the transactions appear to be reflected in the internal ledger.  It's also reviewed by the finance time in New York for basically the same purpose, to make sure that our systems are syncing and we capture all the trades.  It seems that all the right amounts have been credited to all the right users.  And then the compliance people who are in New York also review that to see if there are any concerning patterns or observations from that trading data that might lead them to start doing further questions or investigate some pattern or practice of trading.

Q.  How does that compare to similar processes outside the cryptocurrency context?

A.  I mean, it's roughly very akin to what a broker does in a traditional securities vault.

Q.  Now, finally, how can people withdraw cryptocurrency from AscendEX?

A.  When people want to withdraw cryptocurrency from AscendEX, they instruct us through the platform that they want to withdraw.  They give us the address of the wallet that they want this sent to, whether it's a private wallet that they maintain on a chain or whether it's a wallet associated with

O49Ceis3                         Farrell - Direct

1   another cryptocurrency exchange.  That request is then reviewed

2   by the finance team in New York, and they approve or reject it.

3   If they approve it, the transaction is then executed by the

4   development team in New York who do the physical act of

5   instructing the wallet to transfer from our custodial wallet to

6   whatever the destination wallet set by the user is.

7   Q.  We'll focus on a time in October 2022 in a few minutes, but

8   before we get there, I want to talk about some data of the type

9   you've been testifying about.

10          Have you, before trial, had a chance to review what

11  was marked as Government Exhibits 1500 through 1513?

12  A.  Yes.

13  Q.  Where were those materials from?

14  A.  Those were materials that were produced the -- from

15  AscendEX's records at my request.

16  Q.  Were the records made and kept as part of AscendEX's

17  regular business?

18  A.  They were.

19  Q.  Was the data in those records made at or recorded at near

20  the time of the events at issue?

21  A.  They were.

22          MR. BURNETT:  The government offers 1500 to 1513.

23          THE COURT:  Any objection?

24          MR. KLEIN:  No.

25          THE COURT:  They will be admitted.

O49Ceis3                          Farrell - Direct

1              (Government's Exhibits 1500 through 1513 received in

2    evidence)

3              MR. BURNETT:  Let's start by taking a look at

4    Government Exhibit 1513, please, Mr. Sears.  And this can go to

5    the jury, as well.  Let's zoom in on just the top section.

6    Q.  Now, what type of document are we looking at here?

7    A.  Sure.  So this is the user information search section from

8    our management portal that I was talking about earlier.

9    Q.  Do you see at the kind of first substantive line, there's a

10   section titled "Account ID" at the top?

11   A.  Yes.

12   Q.  What is an account ID?

13   A.  So, when a user establishes an account on AscendEX, what we

14   do is we assign that user a unique user identification number

15   that is associated with that user's account.  That and the

16   email that the user provides are what we use to track all of

17   these transactions and kind of make sure that we're reflecting

18   all transactions into the appropriate accounts.

19   Q.  What are just the last three digits of the user account for

20   this particular account?

21   A.  Sure.  238.

22             MR. BURNETT:  Let's scroll down a bit, Mr. Sears to

23   the section entitled, "User Information."

24   Q.  What is in this section of the management portal?

25   A.  Sure.  So this shows a lot of key information that is

O49Ceis3                        Farrell - Direct

1   associated with this particular unique user and user ID number.

2   Q.  Do you see there's a section titled "email"?

3   A.  Yes.

4   Q.  It's a little incomprehensible, but let's focus on what's

5   after "at" sign of that email.  What's there?

6   A.  Opayq.com.

7   Q.  How does this email section get populated on the management

8   portal?

9   A.  This is the email that the user provided when they signed

10  up on our platform that then got associated with the user ID

11  number over in the right side of this document.

12  Q.  Do you see there's a section called "nationality"?

13  A.  Yes.

14  Q.  Could you explain what that section grabs, what information

15  goes in there?

16  A.  Sure.  When a user first signs up on our platform,

17  depending upon -- sorry.  Let me scratch that.

18       When a user initially signs up on our platform, if all

19  they are doing is providing an email or phone number, then

20  they're assigned what's called a KYC level of zero, which

21  limits their ability to do certain activities on our platform.

22  When they first sign up, what is captured in that nationality

23  field is the location of the ISP from which they say that they

24  are registering this account.

25  Q.  So where does the ISP for this particular account come

1   from?

2   A.  Poland.

3   Q.  Sorry.  That phrase, ISP, what does that mean?

4   A.  Excellent question.  I honestly don't know what the

5   abbreviation stands for.  It's like internet service something

6   or other.  Basically, what it is, it is the unique server

7   located throughout the world from which you are logging onto a

8   computer system.

9   Q.  We're not going to go through all the details here, just

10  want to look at one last thing in the second column where it

11  says, "account create time."  Do you see that?

12  A.  Yes.

13  Q.  According to this, what date was this account created?

14  A.  October 11, 2022.

15  Q.  And do you see, it looks like a timestamp after that?

16  A.  Correct.

17  Q.  What time zone is that timestamp in?

18  A.  That is recorded in UTC time, which is I think the time at

19  which the international dateline exists.  It's roughly 5 hours

20  ahead of New York time.

21  Q.  Now, is UTC time the sort of standard way that AscendEX

22  keeps track of time across all its documents?

23  A.  It is.

24  Q.  So we're going to take a look at a couple more documents

25  here starting with 1503 next.

1          Do you recognize this document?

2    A.  I do.

3    Q.  What kind of information is in this document?

4    A.  So, this information was all of the orders, whether buy or

5    sell, for the Mango USDT pair on a certain range of dates that

6    includes the account or user ID, their order ID, the status,

7    whether it was a buy or a sell, quantity, price, et cetera.

8    Q.  Let's walk through a few parts of this.  Starting with

9    column B, it's titled "account."  What information is there?

10   A.  That's the account of the user who placed that particular

11   order listed in either the user ID or the email that is

12   associated with that user ID when the user signed up for that

13   account.

14   Q.  Do you recognize this email that's showing up in some of

15   the rows here?

16   A.  Sure.  That's the same one from the previous Government

17   Exhibit of the user information section that's affiliated with

18   the opayq.com user ID.

19   Q.  Let's go over to column F.  You see that says, "symbol"?

20   A.  Yes.

21   Q.  What does that mean?

22   A.  As I said earlier, when we list cryptocurrencies, we list

23   the cryptocurrency against another reference asset, almost

24   always, one which is designed to maintain a fixed value of $1.

25   This column represents the MNGO, which was the Mango

O49Ceis3                       Farrell - Direct

1  cryptocurrency with the other reference pair being USDT, which

2  is commonly referred to as Tether, which is a stable coin that

3  is designed to maintain a one U.S. dollar fixed value.

4  Q.  Finally, can we take a look at I, J, and K.  What's in I,

5  J, and K?

6  A.  Sure.  So I and J represent the quantity and price at which

7  that order was filled, and then K represents the time and date,

8  again in UTC, at which that particular order was filled.

9  Q.  So from this document, is it possible to tell all Mango

10  USDT trading activity on AscendEX for the dates and times that

11  are listed on the spreadsheet?

12  A.  It is.

13  Q.  Finally, if you could just go, there's a first tab here on

14  the spreadsheet.  What type of information is in this tab?

15  A.  Sure.  So this was a report that reflected the volume of

16  trading in the Mango USDT pair on 15-minute intervals from June

17  1st of 2022 through December of 2022.

18  Q.  I'd just like to look at one last data document, Government

19  Exhibit 1502.  Start over on the first tab going to the green

20  arrow on the left.

21          What information is on this tab, just at a high level.

22  A.  Sure.  So this was the order activity, the buy and sell

23  orders that were placed by the account that is listed in column

24  B.

25  Q.  And do you see that there are tabs after that, they're

O49Ceis3                         Farrell - Direct

1   labeled October 2022 daily SOD snapshot in September and on?

2   A.  Yes.

3   Q.  What types of information are in those tabs?

4   A.  I believe that those tabs were the daily transactions for

5   those periods of time.

6   Q.  So from this document, can you derive the total prices and

7   quantities of Mango and USDT trading on AscendEX's order book

8   for each of these months?

9   A.  Correct.

10          MR. BURNETT:  Now, I know we wanted to pause at 12:00.

11  This is a natural break point or we can keep moving forward.

12          THE COURT:  How much time do you have left?

13          MR. BURNETT:  I'd say probably 10 minutes.

14          THE COURT:  Let's keep going.

15          MR. BURNETT:  Mr. Sears, if you could take this

16  document down.

17  Q.  I want to shift away from the data now and focus your

18  attention on October of 2022.  Was the Mango token available

19  for trading on the AscendEX platform back then?

20  A.  It was.

21  Q.  And what cryptocurrencies did it typically trade against?

22  A.  It only traded against USDT or Tether.

23  Q.  Did there come a time on October 11th, 2022 when you

24  learned anything about trading in the Mango token on AscendEX?

25  A.  I did.  I got a call that evening from a person who was in

1    charge of our client services group.

2    Q.  Let's set the stage a bit.  Where were you?

3    A.  I was at my home working on something, and online on my

4    work computer.

5    Q.  Who, if anyone, reached out to you?

6    A.  The head of our client services, who was located in New

7    York.

8    Q.  What did that person flag for you?

9            MR. KLEIN:  Objection.

10           THE COURT:  Sustained.

11   Q.  So, what did you do after that person reached out to you?

12   A.  Sure.  So, he had asked me specific questions about --

13           MR. KLEIN:  Objection, your Honor.

14           THE COURT:  Yes.

15           MR. BURNETT:  Your Honor, may I approach?

16           THE COURT:  You may.

17           (Continued on next page)

18

19

20

21

22

23

24

25

1          (At the sidebar)

2          MR. BURNETT:  Your Honor, we're not introducing this

3   for a hearsay purpose, it's to get him from point A to point B

4   on the narrative.  What happens is he's going to testify that

5   someone told him that there was trading activity on an account

6   and they're putting a freeze on it, and then he's going to say

7   that he triggered them to take a number of investigative steps,

8   and then he reviewed data.  It's going to exploit what he saw

9   in the data about the trading.  I can't get him from point to A

10  to point B if he can't answer, I talked to someone that

11  triggered me to do something.  This is classic non-hearsay.

12  You can't just can ask questions on a direct examination if you

13  don't have this kind of evidence.

14         THE COURT:  What's the defendant's response?

15         MR. KLEIN:  He can say as a result of that call, I

16  went and did this.  He's going to sit up here and say what the

17  call was that's reiterating the hearsay.

18         THE COURT:  He's saying it's not being put in for a

19  hearsay purpose, it's not for the truth of the matter of what

20  was conveyed to him.  It's the fact of what was conveyed that

21  then triggered him to take certain steps.  And so, he's not

22  putting it in for a hearsay purpose.  You're right that it is a

23  statement from a declarant who was not here.

24         MR. KLEIN:  It wasn't clear where he was going with

25  that.  Initially, he did ask what he said.

O49Ceis3                          Farrell - Direct

1          THE COURT:  I think he tried to redirect and the

2    witness kind of gave the back story to connect the dots.  And

3    so, I think it's fine.  So you can proceed.

4          MR. BURNETT:  Thank you.

5          (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O49Ceis3                          Farrell – Direct

1              (In open court)

2    BY MR. BURNETT:

3    Q.  Mr. Farrell, let's go back to the phone call you received.

4    What did that person tell you?

5    A.  He told me that he had learned about unusual trading in the

6    Mango USDT pair and wanted to know what to do next.

7    Q.  What did you direct him to do?

8    A.  I told him to take certain steps to find out a little bit

9    more information about the trading, and if that information

10   indicated that the trading was unusual or atypical, then we

11   should take a certain type of remedial action against that

12   user's account.

13   Q.  Did you, yourself, end up reviewing data about the trading

14   that had been flagged?

15   A.  Yes.

16   Q.  Can you describe what you saw in that trading data?

17   A.  Sure.  The volume in a very limited period of time was

18   atypical, which had driven the price of the cryptocurrency up

19   significantly and it was a significant deviation from the price

20   at which that same cryptocurrency was trading on other

21   exchanges that had more liquidity or more willing buyers and

22   sellers.

23   Q.  Was your team able to identify the account that was

24   responsible for that trading?

25   A.  Yes.

O49Ceis3                          Farrell - Direct

1  Q.  Let's go back to Government Exhibit 1513.  Which account

2  was responsible for the trading?

3  A.  If you blow it up, I can give the user ID.  It is the

4  account reflected on Government Exhibit 1513.

5  Q.  What, if anything, did your team do with that account after

6  you identified this trading activity?

7  A.  Sure.  So Dimitriy was the head of client services who had

8  called me with that question.  He instructed our development

9  team to freeze the account.

10 Q.  So let's go to the section titled "Account Modifier

11 Records."  What does that entry in account modify records

12 reflect?

13 A.  Sure.  So that reflects that one of the people in our

14 development team put a freeze on this account at 2:53:46, UTC

15 time, on October 12th, 2022.  Then, in the note section, it

16 says, "per Dimitriy."

17 Q.  Did there come a time when someone eventually claimed

18 ownership over this account?

19 A.  Yes.

20 Q.  About how long after the freeze went into effect?

21 A.  Approximately one month later.

22 Q.  Are you aware of who claimed ownership over it?

23 A.  Yes.

24 Q.  How?

25 A.  Mr. Eisenberg commenced an arbitration against AscendEX

1    over the fact that the assets in this account had been frozen.

2              MR. BURNETT:  Thank you.  No further questions, your

3    Honor.

4              THE COURT:  This is an appropriate breaking spot for

5    our short midday break.  I'll give you the full 30 minutes.  So

6    we'll be back at let's say 12:45 p.m.  I'll give you the same

7    instruction that I've given you now a couple times, which is

8    don't talk about the case with each other, don't try to look up

9    anything about the case, don't talk to anyone down here.

10   Otherwise, have a great, but brief lunch.  We'll be back at

11   12:45.

12              (Continued on next page)

1         (Jury not present)

2         THE COURT:  Mr. Farrell, you understand you'll be

3    coming back after the break and you'll still be under oath.  So

4    you should not have any discussions with anyone about anything

5    having to do with this case, including the lawyers at the

6    government's table.

7         Do you understand that?

8         THE WITNESS:  Understood.

9         THE COURT:  So you can leave the stand right now.

10        THE WITNESS:  Thank you.

11        (Witness not present)

12        THE COURT:  Okay.  Before we talk about the series 800

13   exhibits, anything else that the government wanted to raise?

14        MR. BURNETT:  No, your Honor.

15        THE COURT:  Anything from the defense side?

16        MR. KLEIN:  No, your Honor.

17        THE COURT:  In terms of exhibit 1512, Mr. Klein, I

18   understood when you said no objection subject to the prior

19   objection, that was referring to 1512?

20        MR. KLEIN:  Yes, your Honor.

21        THE COURT:  Does the defense request that I give a

22   limiting instruction to the jury when we come back from the

23   break?

24        MR. KLEIN:  Yes, your Honor.

25        THE COURT:  The instruction that I would give would

O49Ceis3                          Farrell – Direct

1    be, you were shown a document that made reference to the terms

2    "manipulation" and "fraud."  You should not follow any

3    definition of these terms from that document.  Instead, I will

4    provide you with the legal definitions of these terms.  It is

5    those definitions and only those definitions that you should

6    follow in this case.

7              Any issue with that?

8              MR. KLEIN:  Your Honor, do you mind if I look at it

9    during the break a little bit?  I would say maybe, "those terms

10   and any other terms," because they did talk about a few other

11   aspects in 1413.

12             THE COURT:  If you're tweaking it, take a look at it

13   over the break.

14             Let's talk about the series 800 exhibits.

15             Mr. Burnett, other than the use of those exhibits with

16   Mr. Jain and the Rule 703 issue that you raised, is there any

17   other basis for admission of Government Exhibits 885 through

18   899?

19             MR. BURNETT:  I don't think so, your Honor.

20             THE COURT:  Is there any other evidence that you have

21   that would suggest that there was a futures market for USDC at

22   or before the time of the offense?

23             MR. BURNETT:  Other than those documents and the

24   testimony of this witness, no.

25             THE COURT:  So given that, I am going to -- so here's

O49Ceis3                        Farrell - Direct

the deal.  Under Rule 703, it would potentially be proper for
an expert to base his opinion on documents such as the press
release identified at Government Exhibit 897.  It may also be
proper for an expert to opine on the nature of a product being
offered and how that investment product worked, as that would
be an opinion based on the expert's specialized knowledge.
However, a party cannot call an expert simply as a conduit for
introducing hearsay under the guise that the testifying expert
used the hearsay as the basis of his testimony.  That's from
*Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 136 (2d Cir.
2013).

         The appropriate way to adduce factual details of
specific past events is, where possible, through persons who
witness those events.  That's the same case.  As such, the
government cannot use an expert to introduce that the product
was available on a particular date.  For the date of the
product's availability, the expert would not be applying any
expert knowledge, but would just be a conduit for introducing
hearsay.  So there would need to be separate evidence in the
record that would establish that the particular instrument as
to which the expert might opine as to their operation were in
fact in the market and traded at or before the time of the
offense.  As we've just discussed, there is no such evidence.

         So, Mr. Jain should not be testifying as to when any
particular instruments were transacted that may have been

O49Ceis3                      Farrell - Direct

1    reflected in any of the documents in GX 885 through 899, and

2    those documents are excluded.

3          The question that remains is whether there's any

4    remaining basis for the government to claim that USDC is an

5    actionable commodity in this case, and the Court does not see

6    any other basis.

7          There are two potential arguments that the government

8    could make.  One is that in 7 U.S.C. 1a(9), the use of "in the

9    future dealt" could refer to time periods after the offense in

10   question happened.  The Court does not believe that that's a

11   plausible interpretation of the statute applied, especially in

12   the criminal context.  Whether a thing is a commodity I think

13   fairly and properly under the statute depends on the time of

14   the offense or some time before the offense occurred, and not

15   at some hypothetical time period in the future, even sitting

16   here today, which would draw into the statute's ambit any

17   number of different items.  Anything could be a commodity

18   because if someone could just imagine in their mind that,

19   hypothetically, in the future, it could be traded in a futures

20   market.

21         The second argument that the government has made is

22   that the definition of "commodity" operates at the categorical

23   level.  The government has pointed to various parts of the

24   statute where things like corn, natural gas is referenced in

25   one of the cases cited by the government or other items are

O49Ceis3                        Farrell - Direct

1    arguably defined at the categorical level.

2            Just taking that piece of the argument, even defining

3    what the category is is not very clear and would not be a

4    straightforward exercise.  To give one example, one of the

5    commodities that is laid out in the statute is frozen

6    concentrated orange juice.  So that's a very narrow and

7    specific category.  Why not orange juice?  Why not fruit juice?

8    Why not oranges or fruits?  There's really not any guidance how

9    the categories would be applied in this context.

10           Ultimately, the Court doesn't need to take that step

11   because the statute says for anything that Congress did not

12   actually lay out in the statute would fall into the definition.

13   At that level, the definition of commodity turns on a very

14   simple inquiry, which is whether the thing at issue is a

15   service or interest in which contracts for future delivery are

16   presently or in the future dealt with.  That is a clear signal

17   that the inquiry is at the level of the particular thing that

18   is being called a commodity and not at some categorical level.

19   That is a fair and proper interpretation of the statute as it

20   reads, but certainly as applied in the criminal context, the

21   Court believes the rule of lenity would demand, to the extent

22   there was an ambiguity, would resolve that ambiguity in the

23   defendant's favor.

24           And so, for those reasons, unless the government has

25   another basis to define or have USDC treated as a commodity,

O49Ceis3                          Farrell - Direct

the Court would preclude any evidence or argument along those
lines.

        Just to clarify, the evidence relating to the
transactions would seem to be relevant whether or not the USDC
is a commodity argument is in the case or not because the USDC
sales for MNGO are related to the ultimate conduct with respect
to the MNGO perpetuals that are at issue in this case.  So it's
not really a question of whether any evidence that would be
properly admissible is in the case or not.  Really, it's a
question of whether the contention and argument that USDC is a
commodity, and thus that, under the statutory provisions that
we've discussed, there's a contract of sale of a commodity in
interstate commerce that would be relevant for purposes of a
separate basis for liability should remain in or not.

        I'll stop there.

        Mr. Burnett, any further issues to discuss?

        MR. BURNETT:  No, your Honor.  Just on the lenity
point.  I think an important contextual piece here on the
categorical approach is the fact that there is like an
implementing agency for this particular rule -- for this
particular statute, the CFTC, and that entity has spoken
repeatedly on applying a categorical approach and how that
should apply in the context of cryptocurrencies.

        So I think to the extent there might be a lenity issue
where there's silence from the agency, the fact that they have

O49Ceis3                      Farrell - Direct

1   filled in here with counsel in favor of deferring to the

2   approach that the agency has taken on this question.

3           THE COURT:  To be clear, I think it's a proper

4   interpretation of the statute, that the analysis does not

5   proceed on a categorical level, so I referenced the rule of

6   lenity in the alternative.

7           Let me ask you a question, because there was a

8   reference to a website that then provided the definition --

9   referenced another regulation that used the virtual currency

10  term.  And so, just so I understand the regulatory context, is

11  there an actual regulation that says for purposes of defining

12  what is a commodity under 7 U.S.C. 1a(9), virtual currencies

13  count as a commodity.

14          MR. BURNETT:  My understanding the way the CFTC has

15  gone through this is by regulating through -- in the first

16  instance went through it by regulating through CFTC enforcement

17  actions.  So it's the enforcement method by which they're

18  regulating, not the formal rule making method.  And so, there's

19  a decision that the agency made that laid down that rule, and

20  then that was referenced in subsequent rule making, which is

21  what I think you were referring to, that the parties cited with

22  respect to the actual delivery exception.

23          THE COURT:  There's no regulation that says commodity,

24  as defined in the statute, include virtual currencies defined

25  in the way that you pointed out in the regulation at issue.

O49Ceis3                         Farrell - Direct

1          MR. BURNETT:  I think there is in two respects.

2    First, the actual delivery regulation is a regulation that does

3    say that, it's primarily addressing a different topic, but it

4    does say that in the regulation.

5          And second, I guess this sort of like a -- I don't

6    know how you think about legislation regulation points, but the

7    agency can do regulation through enforcement.  So the fact

8    they've made an enforcement -- the commission itself has issued

9    an enforcement opinion saying we think this is a commodity is

10   regulation.

11         THE COURT:  But you would agree that 17 C.F.R. 180.1,

12   as well as the statutory provision on Count Two, both of those,

13   when they use the term "commodity," are referring to the

14   statutory definition that we've been talking about; right?

15         MR. BURNETT:  Yes.

16         THE COURT:  Understood.

17         Anything further from your side?

18         MR. BURNETT:  No, your Honor.  I think we'll have

19   to -- this will probably just affect kind of -- like the

20   flowchart we have going at this point for Count One, but we can

21   update that.

22         THE COURT:  Understood.

23         Anything from the defense?

24         MR. KLEIN:  Your Honor, I didn't write down fast

25   enough your proposed instruction.  I apologize.

O49Ceis3                          Farrell - Direct

1              THE COURT:  Sorry.  I didn't hear that.

2              MR. KLEIN:  Never mind, your Honor.

3              THE COURT:  Nothing further?  Okay.  So we'll be back

4     at 12:45.

5              (Luncheon recess)

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O49Ceis3                              Farrell - Direct

```
 1                          AFTERNOON SESSION

 2                             12:57 p.m.

 3              (In open court; jury not present)

 4              THE COURT:  I understand there was an issue the

 5    parties wanted to address?

 6              MR. BURNETT:  Yes, your Honor.  We have what I think

 7    is an agreed upon set of small edits to the limiting

 8    instruction.

 9              THE COURT:  Do you have it in writing?

10              MR. BURNETT:  I have it in chicken scratch.  If I read

11    it, though, is there a way you have a version of it that you

12    can follow along with our proposal?

13              THE COURT:  Yes.

14              MR. BURNETT:  So, it would change to:  You were shown

15    a document, GX 1512, that made reference to terms like

16    manipulation and fraud.  Then we would propose cutting the

17    second sentence and replacing it with, that document and its

18    terms were not offered to define the relevant law in this case.

19    Instead, and then just finishes what your instruction was.

20              THE COURT:  And so, just in terms of order of

21    operations, jury's going to come back, give the limiting

22    instruction, then bring Mr. Farrell back?

23              MR. BURNETT:  That's fine with us.

24              MR. KLEIN:  Your Honor, sorry, just one suggestion.  I

25    didn't talk to the government about it, I apologize, but that
```

O49Ceis3                           Farrell – Direct

1    document and the testimony about it, because he actually did

2    testify about it, he hadn't read into it, it was just entered.

3              THE COURT:  All he did was read in the terms.  I don't

4    believe he offered any testimony other than simply reading

5    literally the words in the document.  So it might be a little

6    confusing to suggest that he had offered some testimony,

7    because as I understand it, it's the document and its terms,

8    which is what his testimony was.  I don't want to suggest to

9    the jury that there had been some testimony that he vouched for

10   something that was in the contract when he actually did not

11   vouch for anything.  He just literally read the terms of it.

12   If you want me to modify it, it might do more violence than --

13             MR. KLEIN:  You're right, your Honor.  I don't, no.

14             THE COURT:  Let's bring the jury back in.

15             (Continued on next page)

16

17

18

19

20

21

22

23

24

25

O49VEIS4                          Farrell - Cross

1          (Jury present)

2          THE COURT:  All right.  Please be seated.

3          Welcome back.  And to the folks on the top row, I

4    didn't want you to -- I know there's a big wall right there, so

5    I wanted to make sure that you were able to see without hurting

6    your necks.

7          Before we get started again, during the testimony you

8    were shown a document, Government's Exhibit 1512, that made

9    reference to terms like "manipulation" and "fraud."  That

10   document and its terms were not offered to define the relevant

11   law in this case.  Instead, I will provide you with the legal

12   definitions of these terms.  And it is those definitions — and

13   only those definitions — that you should follow in this case.

14   Okay?

15         All right.  Can we get Mr. Farrell back.

16         Welcome back, Mr. Farrell.

17         THE WITNESS:  Thank you, Judge.

18         THE COURT:  You understand you're still under oath?

19         THE WITNESS:  Yes, I do.

20         THE COURT:  All right.  Mr. Klein, you may proceed.

21         MR. KLEIN:  Yes.  Thank you, your Honor.

22   CROSS-EXAMINATION

23   BY MR. KLEIN:

24   Q.  Mr. Farrell, I want to talk to you about Government Exhibit

25   1512, the terms of service.

1              MR. KLEIN:  Those are already admitted, your Honor.  I

2     want to put those on the screen.

3              THE COURT:  You may.

4     Q.  I want to talk to you about these terms of service for a

5     moment.  I'm going to direct your attention to the very top of

6     the terms of service, the first couple sentences.

7              Mr. Farrell, do you see those first couple lines?

8     A.  I do.

9     Q.  Okay.  These terms disclose that the digital assets are

10    high-risk assets, doesn't it?

11    A.  That's what it says; correct.

12    Q.  And that the digital asset market is new and unproven;

13    correct?

14    A.  Correct.  That's what it says.

15    Q.  You helped draft these terms?

16    A.  Not this version, no.

17    Q.  But you are involved in the terms of service at your

18    company?

19    A.  Yes, I am.

20    Q.  And it also says that there may be frequent price

21    volatility; correct?

22    A.  Correct.  That's what it says.

23    Q.  Now, these terms also describe AscendEX as a Romanian

24    company; is that correct?

25    A.  That's correct.

O49VEIS4                          Farrell – Cross

1    Q.   AscendEX is a Romanian company; correct?

2    A.   AscendEX Technology S.R.L., the owner and operator of the

3    exchange, correct, yes, it is.

4    Q.   So the exchange is a Romanian company; correct?

5    A.   Again, the company that owns and operates the exchange is a

6    Romanian company, yes.

7    Q.   Okay.  So let me talk to you a little bit about that.

8             Was it originally a Singaporean company?

9    A.   The parent company was always a Singapore company when the

10   exchange was founded in 2018.  In 2021, the Singapore parent

11   company transferred the operations and ownership of the

12   exchange and platform to a newly created Romanian company,

13   AscendEX Technology S.R.L.

14   Q.   So customers are customers of the Romanian company?

15   A.   Correct.

16   Q.   Okay.  And people who engage with the exchange, they use

17   the website?

18   A.   Correct.  That's one way.

19   Q.   What are some other ways?

20   A.   The mobile app.

21   Q.   So there's a mobile app and the website; correct?

22   A.   Correct.

23   Q.   Okay.  And on those it's listed as a Romanian company;

24   correct?

25   A.   I do not know of anything on the app; but again, they both

O49VEIS4                          Farrell - Cross

1    link to the same terms of service.

2    Q.  Now I'm focused not on the terms of service, sorry.

3    A.  Sure.

4    Q.  You're familiar with the website and the app?

5    A.  Generally speaking, yes.

6    Q.  They don't list the U.S. location, do they?

7    A.  Not that I'm aware of.

8    Q.  They don't disclose a New York office, do they?

9    A.  No, but the AscendEX S.R.L. does not have a New York

10   office.

11   Q.  So AscendEX, okay, doesn't have a U.S. office.  And what

12   company do you work for?

13   A.  HD Consulting Service LLC.

14   Q.  And that's the company with the New York office?

15   A.  Correct.

16   Q.  And you talked with the prosecutors about a bunch of

17   functions that happened in the New York office; correct?

18   A.  Correct.

19   Q.  Those are not disclosed on the website or on the app, are

20   they?  Like, you don't disclose compliance is reviewed in New

21   York or the wallets are stored in New York, right?

22   A.  For compliance, that's correct.  I do not know what we

23   might have on the website regarding wallet locations.

24   Q.  You're not aware of it saying there are wallets in New

25   York, are you?

O49VEIS4                          Farrell - Cross

1    A.  I'm not aware, but I also don't know what's on every screen

2    of the website.

3    Q.  Okay.  I'm talking about the Romanian company AscendEX.

4    What's its actual name?

5    A.  Sure.  It's AscendEX Technology S.R.L.

6    Q.  So do you work for that company?

7    A.  I perform services for that company pursuant to a services

8    agreement between AscendEX S.R.L. and HD Consulting, as well as

9    board resolutions by S.R.L. and powers-of-attorney by S.R.L.

10   Q.  And the other people in the U.S. work for HD Consulting;

11   correct?

12   A.  It depends on the person.  So we -- everyone in New York is

13   an employee of HD Consulting.  Some of the people within HD

14   Consulting have similar things, as I do, in terms of board

15   resolutions, authorizing them to do certain specific activities

16   on behalf of S.R.L., or powers-of-attorney granting them

17   additional authority to act on behalf of S.R.L.

18   Q.  But AscendEX is a Romanian company?

19   A.  S.R.L., correct.

20   Q.  In connection with this case, AscendEX, the Romanian

21   company, produced documents; correct?

22   A.  That is correct.

23   Q.  And that was in response to a government subpoena?

24   A.  Correct.

25   Q.  And because it's a Romanian company, did the government

1  have to use a treaty process or anything?

2  A.  They did not, no.

3  Q.  And you were the person who actually were the custodian of

4  records; correct?

5  A.  Correct.

6  Q.  And you filled out a custodian of records form; correct?

7  A.  Correct.

8  Q.  And on that form you listed yourself as the general counsel

9  of AscendEX Technology S.R.L. a Bucharest Romanian company;

10  correct?

11  A.  That's correct.

12  Q.  Let me go back to the terms of service for a moment.

13       All right.  So these are on the company's website and

14  app?

15  A.  Correct.

16  Q.  And the company doesn't -- how many pages are the terms of

17  service?

18  A.  You can tell from the exhibit.  I don't know offhand

19  because, again, when things are on a website, they are

20  basically more of a scrolling as opposed to page break, page

21  break, page break.

22  Q.  Well, I'll tell you, these are about eight pages.  Sound

23  about right?

24  A.  Sure.

25  Q.  This is small font, isn't it?  Can you read that on your

O49VEIS4                          Farrell - Cross

1    screen?

2    A.  If I get a lot closer, yes.

3    Q.  I have to get my reading glasses.

4           But it's small font; correct?

5    A.  Correct.

6    Q.  And it's eight pages long.

7           How long do you think it would take someone to read

8    these terms?

9    A.  If they read them the way --

10   Q.  I'm asking how long it takes them to read the entire terms.

11   A.  Fifteen, 20 minutes.

12   Q.  Okay.  Do you monitor how long people look at the terms?

13   A.  I do not personally, no.

14   Q.  Does AscendEX?

15   A.  I am not aware of whether we do or don't.

16   Q.  You don't even keep track if people read these, do you?

17   A.  Well, the way that we keep track --

18   Q.  No, I'm not asking that question.

19          You keep track of people reading this?

20   A.  Somewhat, yes.

21   Q.  That's not an answer.

22          Do you keep track of people reading -- that people

23   read these?

24          MR. BURNETT:  Asked and answered a number of times.

25          THE COURT:  It's overruled.

O49VEIS4                        Farrell - Cross

1    A.  Okay.  Me personally, no.

2    Q.  Does AscendEX keep track of people -- that people read

3    these?

4    A.  What AscendEX keeps track of is that the users verify that

5    they did.

6    Q.  That's not my question.

7         Is it tracking people actually read these?

8    A.  I'm not aware whether we do or do not.

9    Q.  I'm going to turn now for a moment to the arbitration we

10   talked about.

11   A.  Sure.

12   Q.  You recall discussing that with the prosecutor?

13   A.  Yes.

14   Q.  All right.  You learned about an arbitration my client had

15   filed against AscendEX?

16   A.  Correct.

17   Q.  That was in November 2022?

18   A.  Sounds about right, yes.

19   Q.  Would it help refresh your memory if I showed you his first

20   email to AscendEX?

21        MR. BURNETT:  Objection.

22        THE COURT:  It's overruled.

23   A.  Sure.

24        MR. KLEIN:  I'd ask that Mr. Smith, if you could pull

25   up GX-601.

O49VEIS4                         Farrell - Cross

1    Q.  Mr. Farrell, I'm going to ask you to look on your screen.

2    A.  Sure.

3           MR. KLEIN:  This is not being shown to the jury, your

4    Honor.  It's just to refresh his memory.

5           THE COURT:  Understood.

6    Q.  Would you please take a moment to read that email.

7    A.  Sure.

8    Q.  Does that refresh your memory that my client reached out to

9    AscendEX in early November 2022?

10          MR. BURNETT:  Objection.  It's a different question.

11          THE COURT:  That's overruled.

12   A.  No, because I've never seen this before.

13   Q.  You do remember that my client reached out to AscendEX in

14   early November to bring an arbitration against AscendEX;

15   correct?

16   A.  Correct.

17   Q.  And he used his name, Avraham Eisenberg or Avi Eisenberg?

18   A.  He did, on the arbitration filing, which was how I became

19   aware that an arbitration was filed against us.

20   Q.  Okay.  And that filing is --

21          MR. KLEIN:  I'm not offering this in evidence, your

22   Honor.

23   Q.  So that's an arbitration filing with an arbitrator in

24   Singapore, right?

25   A.  That is correct.

O49VEIS4                        Farrell - Cross

1   Q.  And that's because your terms of service have a Singapore

2   arbitration provision; correct?

3   A.  Correct.

4   Q.  And on the arbitration, my client identified himself by his

5   name?

6            MR. BURNETT:  Objection.

7            THE COURT:  This document doesn't need to be on the

8   screen unless you're trying to refresh the witness's

9   recollection.  So let's take it down from the screen.  You can

10  ask your questions.

11  Q.  Do you recall that he identified himself by his name on the

12  arbitration filing?

13  A.  Correct.  He filed the petition, his name.

14  Q.  You recall that he gave an email address?

15  A.  Yes, I do.

16  Q.  Do you recall that he gave a U.S. telephone number?

17  A.  No, I actually don't.

18  Q.  Would it refresh your memory if you reviewed the

19  arbitration filing?

20  A.  Sure.

21            MR. KLEIN:  Your Honor, may I show him that?

22            THE COURT:  Yes.

23  A.  Okay.

24  Q.  Does that refresh your memory they provided a U.S.

25  telephone number?

049VEIS4                          Farrell - Cross

1   A.  Sure.  There's a U.S. telephone number on the petition.

2   Q.  And do you recall the email address he gave?

3   A.  I do not off the top of my head.  I know it was something

4   like thimessolution@gmail or something like that.

5   Q.  Would it refresh your memory of the email address if I

6   showed you the arbitration?

7   A.  Yes.  It's avi@thimessolutions.com.

8   Q.  And he also provided an address in Israel?

9   A.  Correct.

10  Q.  So you had his name, his telephone number, address

11  submitted in Israel, and an email address for him; correct?

12  A.  Correct.

13  Q.  And this was a voluntary filing he filed against AscendEX.

14  You didn't sue him; correct?

15  A.  Correct.  He filed the arbitration petition.

16  Q.  And he was seeking the funds that were held in that account

17  that the prosecutor was talking about, wasn't he?

18  A.  Correct.  He was seeking the funds that we had frozen.

19  Q.  One last set of questions.

20          You talked about freezing the account.  Do you

21  remember that?

22  A.  Yes, sir.

23  Q.  That was an account that had traded on AscendEX, right?

24  A.  Correct.

25  Q.  An account that was used to buy the Mango token with USDC;

O49VEIS4                          Farrell - Redirect

1    correct?

2    A.  Correct.  I think he sold some, too.

3    Q.  That was a spot market trade?

4    A.  They were all spot market trades, yes.

5    Q.  And you -- on a spot market, you can make or lose money;

6    correct?

7    A.  Correct.

8              MR. KLEIN:  Nothing further.

9              THE COURT:  All right.  Redirect, Mr. Burnett.

10             MR. BURNETT:  Yeah, just a little bit.  Thanks.

11   REDIRECT EXAMINATION

12   BY MR. BURNETT:

13   Q.  Mr. Farrell, do you recall that you were asked a few

14   questions about the Romanian entity is the parent to some of

15   the AscendEX companies?

16   A.  Yes.

17   Q.  How many people who actually run AscendEX work in Romania?

18   A.  There is only one person who is listed as an officer of the

19   Romanian entity.

20   Q.  And back in '22, how many people were running AscendEX from

21   the New York office?

22   A.  In 2022, approximately 75 to 80.

23   Q.  Do you recall you were asked a number of questions about

24   whether there were notices about where AscendEX was located on

25   the website?

O49VEIS4                          Farrell - Redirect

1    A.  Yes.

2              MR. BURNETT:  At this time, your Honor, the government

3    would like to display just for the parties and the Court and

4    the witness a stipulation which is Government Exhibit 1702.

5              THE COURT:  Okay.

6              MR. BURNETT:  This is a stipulation between the

7    parties regarding a number of documents.  Part of the

8    stipulation includes that 1702 may be admitted as evidence.  So

9    the government would offer 1702 right now.

10             THE COURT:  Any objections?

11             MR. KLEIN:  No.

12             THE COURT:  All right.  It will be admitted.

13             (Government's Exhibit 1702 received in evidence)

14             MR. BURNETT:  And if you could publish -- actually, we

15   don't even need to publish it for the jury.

16             One of the messages or the subparts here says:

17   Government Exhibits 600 through 613, including their subparts,

18   are true and correct copies of records produced by Google LLC

19   for the Google account 613ike@gmail.com.  And I'd like to offer

20   Government Exhibits 606 and 607.

21             THE COURT:  Those will be admitted.

22             (Government's Exhibits 606, 607 received in evidence)

23             MR. BURNETT:  All right.  Mr. Farrell, could you --

24   sorry.  Mr. Sears, could you please pull up Government

25   Exhibit -- actually, starting off with Government Exhibit 1613,

O49VEIS4                        Farrell - Redirect

1    please, which is already in evidence.  And just for the -- if

2    you could zoom in on the user information section again.

3    BY MR. BURNETT:

4    Q.  And just to refresh everyone, what's the end of this email

5    address here?

6    A.  Opayq.com.

7    Q.  And what's just the first three letters of that string of

8    letters?

9    A.  Jq6.

10   Q.  All right.

11          MR. BURNETT:  Now, Mr. Sears, if you could pull up

12   Government Exhibit 606.

13   Q.  What do you see in the "from" line here?  Just the first

14   word.

15   A.  Sure.  The from is AscendEX.

16   Q.  And then what's the "to" line?

17   A.  The jq6@opayq.com email that we just saw in the user

18   document earlier.

19   Q.  And do you see that -- what's the subject line of the

20   email?

21   A.  The subject line is "AscendEX Deposit Confirmation."

22          MR. BURNETT:  And Mr. Sears, if you could just blow up

23   the bottom two lines where it says copyright, and there's an

24   address.

25   Q.  What city is that address in?

O49VEIS4                          Farrell - Recross

1    A.  New York City, New York.

2                MR. BURNETT:  And let's turn to Government Exhibit

3    607.

4    Q.  Who is this email from and who's it to?

5    A.  So it's from indirectly the -- sorry.  It's from AscendEX

6    to the jq6@opaq.com email address.

7    Q.  What's the subject line?

8    A.  "AscendEX, please verify your email."

9    Q.  Do you see an address on the bottom there as well?

10   A.  Correct.

11   Q.  Where is that address?

12   A.  That's a New York City, New York address.

13               MR. BURNETT:  Thank you.

14               No further questions, your Honor.

15               THE COURT:  All right.  Any recross?

16               MR. KLEIN:  Just very quickly, for the same exhibits.

17   RECROSS EXAMINATION

18   BY MR. KLEIN:

19   Q.  You didn't send those emails, did you?

20   A.  No, I did not.  That was our support team.

21   Q.  You didn't know if anyone actually read those emails, do

22   you?

23   A.  No I do not.

24   Q.  You know nothing about those emails other than just looking

25   at them now; correct?

O49VEIS4                              Jain - Direct

1   A.  Correct.

2            MR. KLEIN:  Nothing further.

3            THE COURT:  All right.

4            Thank you very much, Mr. Farrell.

5            THE WITNESS:  No problem.  Thank you, your Honor.

6            (Witness excused)

7            THE COURT:  The government may call its next witness.

8            MR. BURNETT:  The government calls Kapil Jain.

9    KAPIL JAIN,

10       called as a witness by the Government,

11       having been duly sworn, testified as follows:

12   DIRECT EXAMINATION

13   BY MR. BURNETT:

14   Q.  All right.  Good afternoon, Mr. Jain.

15   A.  Good afternoon.

16   Q.  What's your work background in?

17   A.  Sure.  So my work background is I was a hedge fund manager

18   for many years.  And I traded futures, currencies, and other

19   complex financial instruments.  I taught at Stanford

20   University.  I taught a graduate program, master's and Ph.D.

21   students, in futures, derivatives, and complex quantitative

22   trading strategies.  Thirdly, I was a blockchain researcher and

23   ran a blockchain start-up and research group.  And fourthly, I

24   am a consulting expert in matters such as these proceedings.

25   Q.  How did you get involved in this case?

O49VEIS4                        Jain - Direct

1   A.  I was asked to participate based on my consulting expertise

2   and expert testimony expertise.

3   Q.  What are you here to testify about?

4   A.  I'm here to talk about blockchains, futures, perpetuals,

5   and how these markets work, in an effort to help the Court and

6   the jury understand these products.

7   Q.  All right.  So we'll get to that substance in a little bit,

8   but first I want to start with your background.

9           Where did you go to college?

10  A.  I did my undergraduate college at Dartmouth College in

11  Hanover, New Hampshire.

12  Q.  What did you major in there?

13  A.  I majored in math and engineering.

14  Q.  Have you received any graduate degrees?

15  A.  I have.

16  Q.  What and from where?

17  A.  I received a graduate degree from Stanford University in

18  financial mathematics.

19  Q.  What did that program involve?

20  A.  That program involved advanced graduate work and research

21  in applied math as is relevant to financial markets,

22  derivatives, futures, and other complex markets.

23  Q.  Let's shift gears now from your education to your work

24  experience.  You mentioned that you spent time in the hedge

25  fund world; is that right?

O49VEIS4                         Jain - Direct

1    A.   That's right.

2    Q.   What was your first finance job?

3    A.   My first finance job was with a quantitative hedge fund

4    called D.E. Shaw & Company, which managed trading strategies on

5    behalf of sophisticated investors.

6    Q.   What kind of things did you do there?

7    A.   So I created computer models and did research on financial

8    markets, and I traded instruments such as derivatives, futures,

9    and options.

10   Q.   You've used the word "derivatives" a couple times.  What is

11   a derivative?

12   A.   Sure.  So a derivative is a type of financial product that

13   derives its value from another asset.  So a simple example

14   might be a stock could be a financial asset.  A derivative

15   might be an option on that stock or a futures on that stock.

16   And derivatives in particular have quantitative modeling

17   aspects and attributes to them.

18   Q.   What did you do after D.E. Shaw?

19   A.   After D.E. Shaw, I worked at Perry Capital, which was

20   another very large hedge fund that managed sophisticated

21   institutional investor money.

22   Q.   What was your role there?

23   A.   It was a similar role.  I managed portfolios of derivatives

24   and other complex financial instruments and strategies.

25   Q.   And finally, what did you do after Perry Capital?

O49VEIS4                        Jain - Direct

1    A.  I was a member of Citigroup, and I ran a group called Citi

2    Principle Strategies, which was an internal hedge fund of

3    Citigroup.  And again, I ran similar types of strategies on

4    futures and derivatives.

5    Q.  At Citi, how much money approximately were you responsible

6    for managing?

7    A.  More than a billion dollars.

8    Q.  And how many people did you oversee?

9    A.  More than three dozen traders.

10   Q.  Did you stay in sort of the traditional finance industry

11   after Citi?

12   A.  After Citigroup, that's when I decided to go back to

13   academia, and I took a position at Stanford on the faculty.

14   Q.  Why switch into academia?

15   A.  Well, a couple of reasons.

16        Number one, I had been blessed with a financial career

17   in Wall Street, and I wanted to give back and help train and

18   teach the future generations that were interested in learning

19   about these topics.

20        And number two, I wanted to be involved in research

21   and the cutting edge of research that was coming out of

22   academia.  And that research included things like AI and

23   blockchain.

24   Q.  What program did you run when you were at Stanford?

25   A.  Sure.  The program was called The Mathematical and

O49VEIS4                        Jain - Direct

1   Computational Finance Program.

2   Q.  What kind of courses and topics did that program cover?

3   A.  Sure.  So that program taught graduate level — so master's

4   students and Ph.D. students — that were engineering,

5   engineering students.  And the topics range from -- well,

6   courses that I taught included a course called Hedge Fund

7   Management; I taught a class called Statistical Arbitrage,

8   which is a very particular type of trading strategy; I taught a

9   class called Computational and Financial Mathematics; I taught

10  another class called Artificial Intelligence in Financial

11  Technologies.  And that was a project class that also included

12  a heavy amount of blockchain course work.

13  Q.  Now, about how long were you at Stanford for?

14  A.  Four years.

15  Q.  Where did you go after that?

16  A.  After that, one of my research projects at Stanford was

17  looking at innovative new ways to create better blockchains.

18  And so I left Stanford to create a start-up to try and

19  commercialize one of the ideas our research team had about

20  blockchains.

21  Q.  Just give a little bit of a summary of what that start-up

22  did.

23  A.  Sure.  It was called nCent Labs.  And it was actually a

24  pretty simple premise.  If you look at, for example, the

25  internet, the internet ended up having huge tech companies:

O49VEIS4                         Jain - Direct

1    Facebook, Google, and whatnot.  And they've grown considerably

2    large in their value.  But if you think about it, all of the

3    users of these products contribute the value that causes them

4    to grow.

5              And so our project was to try to think of a better way

6    to create a computer network where the users control their own

7    value to a greater degree rather than just giving up that value

8    to large companies.

9    Q.   Now, in addition to the academic and private sector work

10   that you've talked about, have you done advisory work before?

11   A.   I have.

12   Q.   What types of advisory work?

13   A.   Well, I would say there's two main categories of advisory

14   work.  One is what I would call pure consulting work, which I

15   advise organizations such as Freddie Mae and Freddie Mac, which

16   are in the U.S. the two large housing finance authorities,

17   including the FHFA, which is the regulatory authority that

18   regulates them.

19             I've advised the Fed, both the New York, as well as

20   the San Francisco Federal Reserve Bank.

21             I've advised IMF World Bank, and other large entities

22   that were government entities.

23             I've also advised large tech companies:  Microsoft,

24   Nvidia and others.

25             And the third category of my consulting work has been

O49VEIS4                    Jain - Direct

with young start-ups.  Maybe you might not have heard of the

names of them, but some of my former students started up

companies and other folks with start-up companies, and I like

to help them out.

Q.  Have you ever worked on litigation before in connection

with your consulting practice?

A.  I have.  So separate from my -- what I call pure

consulting, I also do expert witness work.  And in that expert

witness work, I've advised, again, government organizations, so

the Securities and Exchange Commission, which is a U.S.

regulator; the CFTC, the Commodities and Futures Trading

Commission, which is another regulator in the U.S.; the DOJ,

such as in this matter; the FTC, the Federal Trade Commission;

and other government organizations, in addition to private-side

client work.  And this would be large Fortune 100 companies, as

well as other private entities, like blockchain companies and

hedge funds.

Q.  Broadly speaking, what types of cases have you gotten

involved in?

A.  Sure.  So I like to get involved in cases where I think my

background and my experience can be helpful in explaining

complex financial concepts so that people can make better

decisions.

          MR. BURNETT:  At this time the government moves to

qualify Mr. Jain as an expert.

O49VEIS4                          Jain - Direct

1              THE COURT:  Any objection?

2              MR. KLEIN:  No.

3              THE COURT:  Okay.

4              He'll be qualified under Rule 702.  You may proceed.

5              MR. BURNETT:  Thank you, your Honor.

6    BY MR. BURNETT:

7    Q.  So before we move further ahead in your testimony, I just

8    want to ask a few preliminary questions about your role and

9    involvement in this case.

10             To your knowledge, have you met any of the witnesses?

11   A.  I have not.

12   Q.  Have you met the defendant?

13   A.  I have not.

14   Q.  Have you reviewed a full set of evidence about all of the

15   allegations that are at issue here?

16   A.  So I have not reviewed a full set of information about the

17   allegations.

18   Q.  Why not?

19   A.  It was not part of my mandate or my role to be asked that.

20   Q.  Did anyone help in your preparation for this case?

21   A.  I did receive help.

22   Q.  From who?

23   A.  I received help from consultants at the Battle Group, which

24   is an economic consulting firm which assists me in my expert

25   witness reports and testimony.

O49VEIS4                          Jain - Direct

1    Q.  Are you personally compensated for the work that the Battle

2    Group folks do?

3    A.  I am not.

4    Q.  Are you being compensated for your own time on this case?

5    A.  I am.

6    Q.  At what rate?

7    A.  My government rate is 995 per hour.

8    Q.  Does the amount that you get paid depend in any way on the

9    opinion that you offer here?

10   A.  It does not.

11   Q.  And does the amount that you get paid depend in any way on

12   the outcome of the trial?

13   A.  It does not.

14   Q.  Now, before we move ahead, have you previously reviewed

15   what was marked as Government Demonstratives 1800 to 1829?

16   A.  I have.

17   Q.  Will those help you present your testimony to the jury?

18   A.  They will.

19           MR. BURNETT:  So at this time, the government just

20   asks permission to be able to use 1800 to 1829 as

21   demonstratives, but not as exhibits.

22           THE COURT:  Any objection?

23           MR. KLEIN:  Your Honor, one second.

24           May I just talk to the prosecutor?

25           THE COURT:  Yes.

O49VEIS4                      Jain - Direct

 1              (Counsel conferred)

 2              MR. KLEIN:  No objection, your Honor.

 3              THE COURT:  All right.  You may proceed.

 4              MR. BURNETT:  All right.  So let's move ahead and

 5   start with pull up government demonstrative 1800.

 6   BY MR. BURNETT:

 7   Q.  All right.  So let's start out with basic concepts and

 8   terminology.

 9              Are you familiar with something called a blockchain?

10   A.  I am.

11   Q.  What's a blockchain?

12   A.  So a blockchain is a type of computer network.  And it's

13   characterized by an aim to be a decentralized type of design of

14   a computer network.

15              So in contrast, for example, you think of the

16   internet.  We talked about the internet having centralized

17   companies — such as Microsoft or Amazon — serving web pages to

18   individuals.  Well, a blockchain is an aim to create a

19   different kind of computer network where it's more

20   decentralized and the users are more involved in the operation

21   of the network.

22   Q.  Is there more than one type of blockchain?

23   A.  There are.

24   Q.  What are some names of prominent blockchains that are out

25   there?

1    A.  Sure.  So the most -- perhaps the most prominent blockchain

2    is Bitcoin.  And there are other blockchains that have

3    subsequently gained in popularity, including Ethereum, Solana.

4    And there's really many, many thousands of blockchains.

5    Q.  How do people interact with and do things on a blockchain?

6    A.  Well, blockchains are a special type of design of a

7    computer network that are transactional in nature.  So in

8    general, one transacts with a blockchain with a type of

9    transaction.  And that's the primary way to interact with a

10   blockchain.

11   Q.  Are there ways for people to see those transactions that

12   happen on the blockchain?

13   A.  There are.  In fact, one of the unique properties of a

14   blockchain is that the entire transaction history, not just of

15   the transactions that individual person does with the network,

16   but all the transactions in the network are, in general,

17   publicly available.

18   Q.  What are some tools that people can use to see transactions

19   on a blockchain?

20   A.  Sure.  So the market has come up with tools and simple ways

21   for individuals to visualize all the transactions on a

22   blockchain.  For example, Ethereum has a website called

23   Etherscape, that one can go on a website and observe different

24   transactions on a blockchain.  But there's many visualization

25   tools that are out there.  And in fact, individuals, if you're

O49VEIS4                          Jain - Direct

1    an expert user, you may be able to even download those

2    transactions to your computer and visualize them using Excel or

3    if you're able to write computer code, using a computer program

4    to be able to visualize them.

5    Q.  Now, when you say that transactions are recorded and

6    publicly viewable on the blockchain, does that mean things like

7    people's names, their addresses, their phone numbers are

8    available for anyone to see?

9    A.  Right.  So blockchains typically have this property where

10   the transactions are viewable, but the data, the PII, the names

11   and whatnot, are not viewable.  They are sort of abstract

12   addresses.

13   Q.  And when you say "abstract addresses," can you just

14   describe what you mean by that?

15   A.  Sure.  So if you see a transaction between party A and

16   party B, on a blockchain, instead of saying -- instead of

17   seeing, you know, party A was Joe Smith, and party B was Jane

18   Smith, instead, the only information you have about party A is

19   a long string of characters that are kind of not recognizable.

20   So it would be a long string of characters and numbers.

21   Q.  Now, are you familiar with a type of crypto asset commonly

22   called cryptocurrency?

23   A.  I am.

24        MR. BURNETT:  Let's pull up government -- actually,

25   sorry.

1   Q.  What is cryptocurrency?

2   A.  So cryptocurrency is a colloquial name for a crypto asset.

3   And since we said before, most blockchains, the way that they

4   are designed is one interacts with them by transacting.

5   Typically, a crypto asset is linked to a blockchain, and that's

6   the mechanism by which one can transact with the blockchain, by

7   transacting that crypto asset.

8           Now, colloquially they are called cryptocurrencies or

9   tokens sometimes.

10  Q.  Are there different types of cryptocurrencies?

11  A.  Absolutely.

12  Q.  Can you give the jury a sense of how many just on an order

13  of magnitude basis?

14  A.  Oh, more than ten thousand, and there's new ones being

15  created every day.

16  Q.  What are some prominent types of cryptocurrencies?

17  A.  Sure.  So before we mentioned blockchains.  The Bitcoin

18  blockchain has the Bitcoin cryptocurrency or crypto token.

19  Ethereum, additionally, has Eth or Ether as their crypto token.

20  Solana typically has its own cryptocurrency token as well.  And

21  there are many others.

22  Q.  Let's just take a look at an example.

23          MR. BURNETT:  Mr. Sears, can you pull up Government

24  Exhibit 802.

25          THE COURT:  Demonstrative or exhibit?

1          MR. BURNETT:  Sorry, sorry.  Demonstrative 1802.

2     Q.  And what's blown up on the screen here?

3     A.  Right.  So what we see here, the logos of many different

4     types of crypto tokens.  And the two large ones that are

5     highlighted are BTC, which stands for Bitcoin; and ETH, which

6     stands for the ether token on the Ethereum network.

7     Q.  And what are some things that typical cryptocurrency users

8     do with cryptocurrencies like Bitcoin or Ethereum?

9     A.  Sure.  So a typical user could buy a cryptocurrency; a

10    typical user, once they have that cryptocurrency, could

11    exchanges it for another cryptocurrency; and he could also sell

12    it to receive U.S. dollars.

13    Q.  Are you familiar with something called a governance token?

14    A.  I am.

15    Q.  What's a governance token?

16    A.  So a governance token is a specific category of

17    cryptocurrencies.  And governance tokens are characterized by

18    the fact that the holder of a token -- so if that token was

19    acquired or that user holds a token, that token allows the user

20    the rights to participate in the governance of the project that

21    was issued by the token.

22          And by that I mean they have a say or a vote in some

23    of the main decisions of that project.  They have a say in the

24    vote, for example, of how the treasury of a project is used.

25    So if a project has a large treasury, those funds are spent on

1    various sorts of initiatives and they can vote on them.

2    Q.  Are you familiar with something called a cryptocurrency

3    exchange?

4    A.  I am.

5    Q.  What's a cryptocurrency exchange?

6    A.  So a cryptocurrency exchange is a place — and by "place" I

7    mean a virtual digital place — that a user can go to buy

8    cryptocurrencies and transfer cryptocurrencies into other

9    cryptocurrencies, to trade cryptocurrencies.

10   Q.  Are there different types of cryptocurrency exchanges?

11   A.  There are.

12          MR. BURNETT:  Let's take a look at Government

13   Demonstrative 1803.

14   Q.  All right.  So one half of the screen says centralized

15   exchange, the second half says decentralized.  Let's start on

16   the left side.

17          What's a centralized exchange?

18   A.  Sure.  So a centralized exchange is an exchange that's

19   operated by a central company that's operating the exchange.

20          So an example might be you go to Fidelity or to

21   Robinhood or Coinbase or Binance.  These are names that are

22   large companies that offer as part of their products exchange

23   services.  And again, they are run by companies and so it's a

24   centralized exchange.

25   Q.  Now, turning to the other side of the screen, what's a

O49VEIS4                         Jain - Direct

1    decentralized exchange?

2    A.   So a decentralized exchange essentially has the similar

3    exchange features as a centralized exchange.  However, it's

4    characterized by the fact that instead of being operated by a

5    company like Fidelity, it's operated by a decentralized smart

6    contract, that is, a piece of computer code that lives on a

7    blockchain.  And that computer code facilitates the same sorts

8    of transactions or similar sorts of transactions to achieve

9    exchange functionality that one might expect in a centralized

10   exchange.

11   Q.   Now, in your experience in the context of decentralized

12   exchanges, is there typically still some entity that is in

13   charge of managing and running a smart contract?

14   A.   Well, the smart contract that runs a decentralized exchange

15   typically lives on a blockchains, on a particular blockchain.

16   And there typically is an organization or what's called a DAO,

17   which is a decentralized organization, that typically has

18   oversight and development responsibilities, other sorts of

19   responsibilities, for ensuring the exchange operates according

20   to how the market expects it to.

21   Q.   So I want to shift gears now from exchanges to the process

22   of buying and trading cryptocurrencies.

23           Can people buy cryptocurrency with dollars?

24   A.   They can.

25   Q.   What are some of the places people can go to exchange their

1  dollars for cryptocurrency?

2  A.  Sure.  So some of the centralized exchanges that we

3  mentioned before offer this service.  So you could go to, for

4  example, fidelity.com or robinhood.com or Coinbase.  And if you

5  deposit — just like you do a bank deposit, you can bank deposit

6  U.S. dollars into those accounts.  And then once you have the

7  U.S. dollars in those accounts, you can use those U.S. dollars

8  to buy Bitcoin or other sorts of crypto assets.

9  Q.  Let's take a look at an example.

10          MR. BURNETT:  I'd like to pull up Government

11  Demonstrative 1804.

12  Q.  Do you recognize this screenshot?

13  A.  I do.

14  Q.  Where is it from?

15  A.  So this is from a crypto exchange called Binance.  So you

16  can see the Binance logo in the upper left-hand corner.  And

17  this would be an example of a screen that a user might see when

18  they want to buy a crypto.

19  Q.  So what can people do on this page?

20  A.  So on the left-hand side of the page it suggests some hot

21  cryptos.  And it gives you their prices, so you can get some

22  basic pricing data.

23          And on the right-hand side you'll see there's a toggle

24  window, buy and sell.  And so this would be a screen that

25  allows the user to load in an order in order to buy, in order

O49VEIS4                          Jain - Direct

1    to sell.  In this case, in order to buy.

2    Q.  What are you buying with in this example?

3    A.  Sure.  So in this case, the user is putting together a

4    hypothetical order to buy Bitcoin by spending U.S. dollars.  So

5    the user aims to spend 1,000 U.S. dollars to buy Bitcoin.  And

6    based on the prices that Binance has in its system at the time,

7    it's offering that for $1,000, you can receive back .01462116

8    Bitcoin.  So clearly the price of Bitcoin here is larger than

9    1,000 U.S. dollars.

10   Q.  When someone has cryptocurrency, they've purchased it, can

11   it be traded for other types of cryptocurrency?

12   A.  Sure.

13   Q.  What's it typically called when someone trades one

14   cryptocurrency for another cryptocurrency?

15   A.  So typically that's referred to as a spot trade, where

16   you're changing one currency to another currency.

17   Q.  All right.  So let's look at a simplified example on

18   Government Demonstrative 1805.

19        At a high level, what type of transaction does this

20   diagram depict?

21   A.  Sure.  So as we mentioned before, this is a spot trade.

22   And this trade is set up to be a trade between Bitcoin and

23   Ethereum, between these two parties, the lady on the left and

24   the man on the right on the demonstrative.

25   Q.  So let's walk through the spot trade from the perspective

1    of the woman on the left.

2              What's that person selling?

3    A.   So the woman on the left is selling Bitcoin and, in

4    particular, .05 of a Bitcoin.

5    Q.   What's that person getting back?

6    A.   In return, she is receiving one ETH or one Ethereum token.

7    Q.   Now, do you see at the bottom there's a section labeled

8    price 0.05BTC/ETH?

9    A.   Sure.

10   Q.   What does that mean?

11   A.   So that's essentially the price of Bitcoin relative to

12   Ethereum.  So based on the price, that would set the ratio of

13   how much Ethereum she could get for her .05 Bitcoin.

14   Q.   And why is the price expressed that way, the BTC/ETH?

15   A.   It's really just a quoting convention.  But really it's the

16   ratio -- the key concept is it's the relative value between

17   Bitcoin and Ethereum.

18   Q.   All right.  So let's go from this diagram to how spot

19   trading actually works on cryptocurrency exchanges.

20              What ultimately determines the relative value of two

21   cryptocurrencies on an exchange?

22   A.   Right.  So the relative value of a cryptocurrency on an

23   exchange always boils down to essentially the supply/demand of

24   a particular cryptocurrency pair — so in this case, Bitcoin

25   versus Ethereum — at a particular exchange, at a particular

1    time.  So if the timings change, the supply/demand could

2    change; if you have the same time but different exchanges, the

3    supply/demand could change; and if you have different

4    cryptocurrencies, different tokens that you're looking at, the

5    supply and demand can be different.

6            So the key point here is it's set based on the supply

7    and demand of a given token pair, at a given exchange, at a

8    given time.

9    Q.  Are you familiar with something called an order book?

10   A.  I am.

11   Q.  What's an order book?

12   A.  So an order book is a table that lists out essentially the

13   supply and demand of buy orders and sell orders in an exchange.

14   Q.  So let's take an example.  If someone wanted to place an

15   order to sell Bitcoin for ETH, like that spot diagram we were

16   looking at, how would they do that on an order book?

17   A.  Sure.  So you would sell the asset that you'd like to sell.

18   And you would put that, what they call offer, the price at

19   which you'd be willing to sell it at, into the order book.  And

20   it's the job of the exchange to keep track of all of the orders

21   in the order book.  And whenever there's a buyer and a seller

22   that have an agreement in terms of the price and the volume, it

23   will create a trade.

24   Q.  Would that order necessarily end up as a trade?

25   A.  No, it wouldn't necessarily end up as a trade because, for

O49VEIS4                              Jain - Direct

1    example, if a user just bid too low or is asking as a seller

2    for a very, very high offer, there might not be somebody else

3    on the other side of the trade that wants to take that deal.

4    So really an order book is a mechanism by which large groups of

5    people can negotiate with one another and come up with a good

6    deal, fair deal.

7                MR. BURNETT:  Let's go to Government Demonstrative

8    1806 to look at an example.

9    Q.  Where does this web page come from?

10   A.  So this is a screenshot from Binance again.

11   Q.  And what type of web page is this on Binance?

12   A.  This is a spot trading screen.

13   Q.  Now, do you see it says "ETH/BTC" at the top left?

14   A.  I do.

15   Q.  What does that tell you about the type of market that this

16   is showing information about?

17   A.  Right.  So this is the first of the three items that we

18   talked about.  It's a particular cryptocurrency pair; so here

19   we're talking about ETH and Bitcoin.

20   Q.  Now, do you see that on the left-hand side of the screen

21   there's a whole bunch of red numbers and then green numbers

22   below that?

23   A.  Sure.

24   Q.  What's that?

25   A.  So what we're looking at on the left side is a

O49VEIS4                          Jain - Direct

1    visualization of a table that essentially is a snapshot into

2    the order book at this particular moment in time.

3           So as you can see at the green on the bottom, these

4    are bids, meaning users who have put in a bid to buy.  And you

5    can see some of the bids are higher.  So .05013 is the

6    highest -- yup, thanks for the zoom-in.  Is the highest bid.

7           As you can see, there are other orders in the book

8    where people have bid lower than that, all the way down to

9    .05001.  So that represents people that have put in bids into

10   the order book.

11          Conversely, the list at the top in red are the sells;

12   so people who put in sell orders at various prices in the order

13   book.  And those bids and those offers are being run by --

14   being organized by the exchange.  And it's the job of the

15   exchange to keep this order book functional, up to date, and to

16   the extent that there's a matching trade, it will produce a

17   transaction.

18   Q.  Do you see that there's one bigger red number right in the

19   middle between the green and the red?

20   A.  I do.

21   Q.  What does that mean?

22   A.  So that represents the last trade that was transacted

23   between parties operating this order book.

24   Q.  Now, the screenshot that we've been looking at here is from

25   Binance; is that correct?

O49VEIS4                          Jain - Direct

1    A.   Yes.

2    Q.   Are there other types of -- other places to trade

3    cryptocurrencies like the same Ethereum/Bitcoin pair we've been

4    looking at?

5    A.   Sure.

6    Q.   In your experience, are the prices of cryptocurrency pairs

7    necessarily the same across different exchanges at the same

8    time?

9    A.   No, no, they are not.  This is an important point.  They

10   are not necessarily the same because, remember, you have to

11   look at an individual pair — so Ethereum/Bitcoin — at a

12   location at a particular point in time.

13          So, for example, if we looked at Ethereum/Bitcoin at

14   the same time, but across different exchanges, there could be

15   different supply/demand on different exchanges which could

16   cause variations in the pricing.

17   Q.   Why could there be different supply and demand conditions

18   on different exchanges?

19   A.   Well, there just happen to be different buyers and sellers

20   that showed up to that particular exchanges, at that particular

21   time, for that particular asset.

22   Q.   All right.  So I want to shift gears now.

23          MR. BURNETT:  And Mr. Sears, if you could pull up

24   Government Demonstrative 1807.

25   Q.   And I want to focus on a particular type of cryptocurrency.

O49VEIS4                        Jain - Direct

1               Are you familiar with the term "stablecoin"?

2      A.   I am.

3      Q.   What's a stablecoin?

4      A.   So a stablecoin is a type of crypto -- token cryptocurrency

5      that has a special design.  And the design of a stablecoin is

6      advertised to be pegged to an asset like the dollar.

7      Q.   When you say "pegged," what do you mean by that?

8      A.   Meaning it's designed or advertised to try to maintain a

9      value of one U.S. dollar.

10     Q.   Let's talk about two different types of stablecoins.  Do

11     you see there's one kind of circle logo blown up at the top of

12     the screen here?

13     A.   I do.

14     Q.   What's that the logo for?

15     A.   So that's USDC.

16     Q.   What is USDC?

17     A.   So USDC is a stablecoin that's issued by an entity called

18     Circle, that's a U.S. onshore entity.

19     Q.   When you say U.S. onshore entity, what kind of entity is

20     Circle?

21     A.   I believe it's an LLC or a corporation.

22     Q.   What does Circle advertise as the stable value of USDC?

23     A.   One dollar.

24     Q.   Now, the other logo below that, the kind of green pentagon,

25     do you recognize that logo?

O49VEIS4                          Jain - Direct

1    A.  Yes.

2    Q.  What's that for?

3    A.  That's for USDT, which is issued by Tether, which is an

4    offshore entity.

5    Q.  What does Tether advertise as the value of USDT?

6    A.  One dollar.

7    Q.  From your experience, are you familiar with the financial

8    structures that underlie USDC and USDT?

9    A.  I am.

10   Q.  All right.  Let's go to Government Demonstrative 1808, and

11   start with USDC.

12          Broadly speaking, what's the financial arrangement

13   underlying that cryptocurrency USDC?

14   A.  Right.  So broadly speaking, USDC is a reserve

15   collateralized stablecoin.  So there's a lot of buzz words

16   there.  But what it really means is that there is a fund that

17   holds U.S. dollars in reserve; and that U.S. dollar reserve

18   fund acts as the collateral for the tokens it then issues.

19          So as you can see by the demonstrative, there's

20   dollars flowing through to the issuer.  The issuer sort of

21   keeps those dollars in a vault and issues tokens, these blue

22   tokens.  In exchange, the tokens are said to be collateralized

23   by that dollar reserve.

24   Q.  Now, that reserve, is it actually just dollars sitting in a

25   vault?

O49VEIS4                          Jain - Direct

A.   It's invested in money market funds and cash and cash-like
equivalents that earn interest.
Q.   Theoretically, what's the economic effect of having a
reserve like this on the market value of the tokens USDC?
A.   Right.  So the economic effect of having this collateral
fund to act as reserves is to give the market confidence that
their tokens are actually backed by a dollar.  Absent the
reserve, the market may have greater skepticism that the tokens
that they hold that are being represented or advertised as
being worthy of a dollar are actually backed by a dollar.  So
it's meant to be a market confidence anchoring mechanism.
Q.   Now, turning to USDT, are you familiar with the financial
structure underlying that cryptocurrency?
A.   I am.
Q.   Without getting into too much of the details, how does it
compare to USDC?
A.   So USDT is also advertised as a reserve-backed
collateralized stablecoin.
Q.   So let's switch now from the kind of theoretical discussion
about how these work to the practical.  Do USDC and USDT trade
on cryptocurrency exchanges?
A.   They do.
Q.   What determines their prices on those exchanges?
A.   Again, it's going to be the same answer every time.  What
determines the price is going to be the supply and demand of

1    the particular token, on the particular exchange, at the

2    particular time.

3    Q.  From your experience, are USDC and USDT always actually

4    worth a dollar on cryptocurrency exchanges?

5    A.  They are not.

6            MR. BURNETT:  Let's take a look at Government Exhibit

7    1358, which we should just show to the parties and the witness

8    at this point, and the Court.

9    Q.  Do you recognize this?

10   A.  I do.

11   Q.  Now, at a high level, what is it?

12   A.  So it's a chart showing the price in U.S. dollars of the

13   aforementioned USDC and USDT coins.

14   Q.  And does this chart summarize voluminous data about

15   underlying prices?

16   A.  It does.

17           MR. BURNETT:  The government offers 1358.

18           THE COURT:  Any objection?

19           MR. KLEIN:  Objection.

20           THE COURT:  You have an objection?

21           MR. KLEIN:  Objection.  Sorry, your Honor.

22           THE COURT:  Okay.  Let's do sidebar.

23           (Continued on next page)

24

25

Jain - Direct

1              (At sidebar)

2              MR. KLEIN:  Your Honor, my apologies for not raising

3     this earlier.  I noticed the time frame is much broader.  And

4     we're really focusing on a discrete time frame.  It shows a lot

5     of discrepancies early on for both of those assets apparently.

6     What we're focused on is the time period in question.

7              So I'm fine with the exhibit, but in a more narrow

8     time frame

9              THE COURT:  So you're making a 402/403 argument?

10             MR. KLEIN:  Yes, your Honor.

11             MR. BURNETT:  We're not just focused on the time

12    period at issue; we're focused on the way the value of USDC and

13    USDT works not just within the 15 minutes of the trading.  And

14    that's what the chart is meant to illustrate.

15             THE COURT:  For what reason?

16             MR. BURNETT:  To help the jury understand that the

17    value of a USDC Mango swap has two components:  The value of

18    the USDC and the value of the Mango.  Oftentimes, the value of

19    USDC may be a dollar, sometimes it's not; but what matters is

20    that the value of the USDC is a component of this, not whether

21    at a particular moment USDC was trading at a dollar or not

22    trading at a dollar.

23             THE COURT:  This goes to establishing that it was --

24    that these were mixed swaps?

25             MR. BURNETT:  Yes.  This goes to the medium of

O49VEIS4                    Jain – Direct

1    exchange point the defense has been raising, which I actually

2    don't think has any legal basis.  But to the extent they are

3    going to raise it and say USDC is just a dollar, this shows

4    this is not, in fact, just a dollar.

5              THE COURT:  Understood.

6              The objection will be overruled.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    (In open court)

2                    THE COURT:  You may proceed.

3                    MR. BURNETT:  The government offers 1358.

4                    THE COURT:  It will be admitted.

5                    (Government's Exhibit 1358 received in evidence)

6                    MR. BURNETT:  And Mr. Sears, with the Court's

7      permission, if you could please publish this to the jury.

8      BY MR. BURNETT:

9      Q.  All right.  So if everyone can see this, let's just orient

10     ourselves first.

11                   What is on the left-hand side of this chart?

12     A.  Sure.  The left-hand side is showing price in U.S. dollars.

13     So one equals one dollar, the .9 is equal to 90 cents, and so

14     forth.

15     Q.  What is the time period that this chart covers?

16     A.  So from October 2018 to February 2024, expresses daily time

17     points.

18     Q.  What's the blue line that's moving around here?

19     A.  So the blue line is the daily price points of USDT, Tether.

20     Q.  And how about the orange line, what's that?

21     A.  USDC or Circle.

22     Q.  What does this chart show about the typical market price of

23     USDC and USDT over time relative to the dollar?

24     A.  Right.  So this shows that while you said there are some

25     periods in which it is generally stable across the one-dollar

O49VEIS4                          Jain - Direct

1   level, there are time periods where USDT and USDC both diverge

2   with respect to one another and also on an absolute basis from

3   that dollar level.

4   Q.  And I want to talk now about the economics behind what

5   we're seeing in this chart.

6            Could you explain why, from an economic perspective, a

7   token like USDC or USDT that's backed by reserves might not

8   actually trade for a dollar on the market?

9   A.  Right.  So, again, all boils back to supply and demand.  So

10  supply and demand of this particular token, at that particular

11  time, on those exchanges.  So, for example, there might be more

12  sellers than buyers in that order book.  And that causes the

13  price to be depressed.

14           And typically, there are time periods where the prices

15  spike down, when there are so-called crises of confidence

16  moments in the market; periods of time where market

17  participants have less confidence or faith in the financial

18  mechanisms and the financial accounts of these types of

19  entities.  And that would cause less confidence to show up in

20  the order books of exchanges and, therefore, prices to transact

21  at lower than a dollar.

22           (Continued on next page)

23

24

25

1          MR. BURNETT:  Mr. Sears, you can take this exhibit

2    down, please.

3    Q.  I want to shift away from stable coins now.

4          A few minutes ago, you talked about a type of trading

5    called spot trading.  Do you recall that?

6    A.  I do.

7    Q.  Is spot trading the only type of cryptocurrency out there?

8    A.  It's not.

9    Q.  What are other types of trades that are commonly available

10   on cryptocurrency exchanges?

11   A.  So other types of trading include futures trading,

12   perpetuals trading, and other types of complex trading, such as

13   options and other derivatives.

14   Q.  We're going to build to perpetuals trading, but I want to

15   start with futures trading.

16   A.  Sure.

17   Q.  Now, broadly speaking, are you familiar with what futures

18   are and how they're traded?

19   A.  I am.

20   Q.  How are you familiar with them?

21   A.  Well, I traded both traditional futures as crypto futures

22   in my previous professional roles as a money manager, in

23   addition to having taught both traditional and block trade

24   futures.

25   Q.  What is a future?

1  A.  So, a future is a transaction to buy and sell something,

2  but unlike a spot transaction where two parties agree to buy or

3  sell something immediately, a future is a contract to do that

4  transaction at some point in the future.  So there's some

5  agreed upon future date in which we agree to do a transaction,

6  but we enter into it now.

7  Q.  Let's look a simple diagram starting with government

8  demonstrative 1809.  This diagram is titled "Gold Futures

9  Trading."  I want to start on the left side of the screen.

10  Before getting into the details of the transaction, what is on

11  the left side of the screen?

12  A.  On the left side of the screen, we see the woman at the top

13  who seeks to deliver gold in three months and receive money for

14  that, receive $2,000 for that in three months.

15  Q.  So what is the woman on top promising to do in three

16  months?

17  A.  So the woman at the top is promising to deliver one ounce

18  of gold or sell one ounce of gold for $2,000 three months from

19  now.  So the contract is entered into today, but the

20  transaction occurs three months from now.

21  Q.  Let's move from the left side of the screen, then three

22  months pass, and we go to the right side of the screen.  What

23  happens after three months?

24  A.  So three months pass by.  Now, the terms of the contract

25  must be fulfilled on the expiration date.  So three months have

1  passed, that's the expiration date.  Now the woman on the top

2  must sell one ounce of gold and receive $2,000 in exchange for

3  that.

4  Q.  Now, what if, at the time of this exchange, so three months

5  later, the price of gold is higher than $2,000 an ounce, say

6  it's gone up to $2,500 an ounce?

7  A.  The point of entering into a futures contract is it's a

8  binding contract.  And so, regardless of what the spot price of

9  gold is three months later, she still must honor that $2,000

10 price.  So she has to sell her gold for $2,000 in three months.

11        Now, in this narrative that you outlined, if the price

12 of gold is $2,500, unfortunately that's an unlucky outcome for

13 the lady at the top because she's forced to sell a piece of

14 gold that otherwise would be worth $2,500, but she has to get

15 $2,000 for it.  So it's bad news for the lady at the top and

16 good for the gentleman at the bottom if the price moved up.

17 Q.  Conversely, if the price moved down to say $1,500 an ounce,

18 who wins and who loses?

19 A.  Again, that would be bad news for our gentleman at the

20 bottom because he's forced to pay $2,000 for an asset that's

21 now only worth $1,500 for an asset, and it would be good news

22 for our lady at the top because she can sell her gold for

23 $2,000, even though the spot worth of that is only $1,500.

24 Q.  Now, this shows the parties actually exchanging gold for

25 cash at the end of the three-month period; correct?

O49Ceis5                          Kapil - Direct

1    A.   Correct.

2    Q.   Are there other ways that a future can settle up?

3    A.   Yes.  So, in this particular demonstrative, we show that

4    three months later, the parties exchanged the gold and

5    exchanged the cash.  That's known as physical settlement.

6    There's another mechanism of settlement called price settlement

7    or cash settlement in which there's not a two-party exchange of

8    items, there's just one party pays the other for the

9    difference.

10   Q.   Could you explain how that would work in a situation like

11   we have here where the price of gold went up to $2,500 an

12   ounce?

13   A.   Sure.  So, in the scenario where the price of gold went up

14   to $2,500, essentially, the gentleman at the bottom would have

15   a $500 profit and the lady at the top would have a $500 loss.

16   So, essentially, what would happen if this contract was -- if

17   it was specified in the contract terms as a cash settle or a

18   price settled contract, is the gentleman at the bottom would

19   make a one-time, one-way payment or -- sorry.  The woman at the

20   top would make a one-time, one-way payment of $500 to the

21   gentleman at the bottom so that they settle up their profit.

22   Q.   So let's bring this back to cryptocurrencies now.  Are

23   there futures for cryptocurrencies?

24   A.   There are.

25   Q.   At a high level, how do those work?

O49Ceis5                           Kapil - Direct

1   A.  Mechanically, they work similar to the example we described
2   here.
3   Q.  Let's go to government demonstrative 1810, take an example.
4   We're going to use the same Bitcoin and Ethereum payer that we
5   used for our spot trading example.  Okay?
6   A.  Okay.
7   Q.  Can you explain what the futures agreement is on the left
8   side of the screen?
9   A.  Sure.  So this is very similar to the prior example, so
10  that it's a futures contract.  In this futures contract, the
11  lady at the top agrees to deliver or sell one Bitcoin.  In
12  exchange, she's getting 20 Ether in return.  The transaction is
13  not entered into today, the contract's not entered into today,
14  but the transaction will take place four weeks afterwards.
15  Q.  All right.  So four weeks pass, and what happens?
16  A.  So four weeks pass, now the contract must be settled.  So
17  the terms of the original contract are executed and the woman
18  at the top delivers a Bitcoin and receives 20 Ether in return.
19  Q.  Now, what would happen if Bitcoin was worth more than 20
20  Ether after four weeks?
21  A.  The relative value of Bitcoin relative to Ether went up.
22  That would be great news for our friend at the bottom because
23  he's receiving a Bitcoin that's worth more than it was when he
24  entered into the contract.
25  Q.  How about the flip side?

O49Ceis5                         Kapil - Direct

A.   Flip side, it would be worse for the seller, the lady at
the top.
Q.   Now, in this example here, the parties are actually
exchanging Bitcoin and Ethereum at the end of the day; correct?
A.   Correct.
Q.   Is that the only way that a cryptocurrency future can
settle?
A.   No.  So this would be another example of a physical
settlement where the physical tokens are changing hand.
Another way that one could settle would be a price-based or a
cash-based settlement where, again, the difference in value is
computed and one of the parties makes a one-way, one-time cash
payment to make the other party whole.
Q.   So I want to switch gears now.  And you mentioned that
another product people trade on cryptocurrency platforms are
called perpetuals; is that right?
A.   That's correct.
Q.   Are you familiar with perpetuals and how they work?
A.   I am.
Q.   How are you familiar with them?
A.   I've, again, researched them and taught them.
Q.   So let's -- we'll dive into the details of how they work in
a minute, but let's start with an overview with government
demonstrative 1811.
             At a very high level, what is a perpetual and what are

1    the key features of a perpetual?

2    A.   Right.  So a perpetual has some attributes.  You can think

3    of them as somewhat similar to a futures contract, but they're

4    different in that, number one, there's no predetermined

5    settlement date.  So in the past examples, in the example of

6    gold, the transaction would settle three months from now or

7    four weeks from now.  In the case for perpetual, you know, the

8    word "perpetual" sort of means it exists in perpetuity until

9    the contract is terminated.  So it's sort of *ad hoc* continuing

10   contract.

11        The second aspect of a perpetual is that a perpetual

12   is distinct from the actual assets that underlie it.  So a

13   perpetual could be, for example, in the last example, Bitcoin

14   and Ethereum, it could reference Bitcoin and Ethereum in the

15   perpetuals contract; however, it does not actually cause an

16   exchange of the underlying assets.

17        And finally, a perpetual has multiple sources of value

18   in addition to simply the relative value changes in the assets.

19   There's some technical and other financial cash flows that

20   occur incident to the design and execution of a perpetual,

21   which we can talk about.

22   Q.  We're going to go through these points in the form of an

23   example.  Let's go to government demonstrative 1812.  This is

24   titled "Perpetuals Creation."

25        Before you get into any details, what's the point of

O49Ceis5                          Kapil - Direct

1    this slide that the jury should be focused on?

2    A.  Well, so, this is just walking through an example of a

3    perpetual contract, the types of things we need to know, and

4    the types of things the parties need to agree on before a

5    contract can be created.

6    Q.  Now, let's start on the left side of the screen.  Do you

7    see it's titled "(bid)"?

8    A.  Yes.

9    Q.  What does that mean?

10   A.  So the buyer, or the bidder, is seeking to go long, the

11   perpetual.  In this case, the perpetual is on Bitcoin, BTC, and

12   the relative value of Bitcoin relative to USDC, which, again,

13   is a crypto token.  The buyer, or the bidder, seeks to go, what

14   they say, long.  They seek to profit if that relative value

15   increases.

16   Q.  Now, under "Position," do you see there's an entry that

17   says "Bid"?

18   A.  I do.

19   Q.  It says 70,000 USDC/Bitcoin?

20   A.  Correct.

21   Q.  What does that mean?

22   A.  That's the price at which she's willing to bid into the

23   order book to create this perpetual.  So she's willing to pay

24   up to 70,000 USDC per Bitcoin as the perpetual opening creation

25   price.

O49Ceis5                          Kapil - Direct

1   Q.  Now, does that mean that this person is actually offering
2   to pay 70,000 USDC per Bitcoin right now?
3   A.  No.  So, again, this is a perpetual, so it's a kind of
4   derivative.  So the derivative has a reference price and
5   there's an underlying Bitcoin market that this is referencing.
6   So she's trying to create or bid on a perpetual, and that's
7   distinct from her trying to bid on Bitcoin.  That would be a
8   separate kind of transaction.
9           So, although this perpetual references Bitcoin, it has
10  an entry price of Bitcoin, it does not actually purchasing
11  Bitcoin or transacting in the underlying Bitcoin.
12  Q.  Now the third data entry under the left side is size,
13  10 Bitcoin.  What does that mean?
14  A.  So 10 Bitcoin, it's just a size multiplier.  It just
15  multiplies the contract by 10 in terms of its value and its
16  movements.  So it references as an underlier 10 Bitcoin.  But
17  again, she's not actually purchasing 10 Bitcoin, she's entering
18  into a contract that references 10 Bitcoin.
19  Q.  Fundamentally, what is the person on the left betting?
20  A.  Fundamentally, the person on the left is going long or
21  betting that Bitcoin is going to appreciate relative to USDC.
22  In particular, she's betting that it's going to appreciate to
23  some value more than 70,000 USDC per Bitcoin.
24  Q.  Let's move from the left side of the screen to the right
25  side.  What is this person, the seller, betting?

O49Ceis5                         Kapil - Direct

1    A.  So the seller is betting the opposite.  In trading

2    parlance, you would say he's a short.  So, the seller is

3    entering into the perpetual with the idea that BTC will fall

4    relative to USDC.  So the opposite position as the long.  In

5    this particular example, he's said to have matching terms,

6    meaning the price at which he's willing to enter into the

7    perpetual references the same Bitcoin price, 70,000 USDC, and

8    he's also matched in the stocks.  He's also willing to do this

9    contract referencing 10 Bitcoin as the underlying asset size.

10   Q.  To be clear, is this seller offering to exchange any

11   Bitcoin or USDC at the time of the transaction?

12   A.  No.  No.  So this is a perpetual contract that, and the

13   contract terms references Bitcoin and USDC and the size and the

14   entry price.

15   Q.  Let's go to government demonstrative 1813.  How does this

16   bid and this offer actually result in a trade?

17   A.  Sure.  So, one might recall before, when we were looking at

18   the order book, various bids and various offers go into the

19   order book, and when they match, it's the job of the exchange

20   to create a trade, create a deal.

21         And so, in this case, because both of them have the

22   same -- they're willing to enter into the perpetual at the same

23   price, the same reference price, 70,000 USDC, and the same

24   size, they would enter their respective orders into an exchange

25   and it's the exchange's job to notice that they have matched

O49Ceis5                          Kapil - Direct

1    positions and it would create a deal or create a contract.  And

2    so, you know, that's represented in this contract here.

3            And so, the deal is we have a contract.  The starting

4    value of that contract is 70,000 USDC per BTC, and the

5    amounting size of the underlying is 10.  And the woman on the

6    left is the long part of the contract, so she's aiming to

7    profit if Bitcoin rises relative to USDC, and the gentleman on

8    the right is the short, the short side of the contract, who

9    intends that the price go down relative to USDC and Bitcoin.

10   Q.  Let's go to government demonstrative 1814.  Now, when you

11   were introducing perpetuals, you referred to the idea that

12   perpetuals have multiple sources of value; correct?

13   A.  They do, correct.

14   Q.  Now, let's walk through those.  You have labeled here value

15   source No. 1, change in the relative value of underlying

16   cryptocurrencies.  Can you explain what that means?

17   A.  Sure.  And that's what we meant by the long and the short.

18   So, essentially, the long position refers to if the change of

19   the cryptocurrency's relative value goes up, the long benefits,

20   and if the change in the relative value of the cryptocurrencies

21   go down, the short benefits.  So that's what I mean in terms of

22   the change of the relative value of the cryptocurrencies.  That

23   is, the prices can move.

24   Q.  For value source 2, you have the funding rate.  What's the

25   funding rate?

1    A.   Right.  So the funding rate is a little bit technical and

2    it concerns the operation of the perpetual, but there is a

3    notion of an oracle.  An oracle is a type of price that is

4    taken from third-party sources, and the oracle acts as a

5    reference price.

6              Similarly, there is a mid price for the actual

7    perpetual, the trading price of the perpetual.  And the funding

8    rate is a payment that's made based on the difference of the

9    two.  We'll have to walk through an example to see how it

10   works.  Essentially, it's a kind of mechanism to anchor the

11   price of the perpetual to third-party independent benchmarks.

12   Q.   It's a lot to cover, but let's break it into kind of

13   bite-size portions here, starting with the first value source.

14   If we could turn now to government demonstrative 1815.  So

15   right now we're just focusing on value source 1, the relative

16   value of the cryptocurrencies.  Do you see there's a long

17   position and a short position listed out here on the left side

18   of the screen?

19   A.   I do.

20   Q.   Do you recognize those positions?

21   A.   I do.

22   Q.   From what?

23   A.   This is the contract that was created in the last

24   demonstrative.

25   Q.   So what's the long and the short position here?

O49Ceis5                        Kapil - Direct

1    A.   So the one on the top is the long, the gentleman at the

2    bottom is the short, and the contract was entered into with a

3    starting reference value of 70,000 USDC per Bitcoin and a size

4    of 10 Bitcoins, which just summarizes the contract terms on the

5    left.

6    Q.   Let's move from the left side of the screen to the middle

7    of the screen.   Do you see there is a bar there that has 70,000

8    USDC per Bitcoin?

9    A.   Sure.

10   Q.   What does that mean?

11   A.   That's just the price.

12   Q.   And how does that compare to the original reference price

13   in the contract?

14   A.   Right.   So, as of this moment in time, the price is the

15   same as the reference price that we opened the contract into.

16   And so, nothing's happened.

17   Q.   So let's go to the right side.   Do you see there are two

18   boxes, one along the long position, one along the short

19   position, and they're both called "Unsettled Gain Loss"?

20   A.   Correct.

21   Q.   What does "Unsettled Gain Loss" mean in this context?

22   A.   Well, in this context, nothing's happened to the price.

23   Therefore, neither party has a profit or a loss.

24   Q.   All right.   So let's walk through some different examples

25   here.

1          MR. BURNETT:  Mr. Sears, if you can go to government

2    demonstrative 1816.

3    Q.  All right.  Let's start by focusing on the middle of the

4    screen.  That yellow bar, has anything changed about it?

5    A.  Sure.

6    Q.  What's changed?

7    A.  So now the yellow bar shows a 5,000 USDC increase in the

8    price of Bitcoin relative to USDC.

9    Q.  So it's 75,000 USDC compared to the 70,000 USDC reference

10   price; correct?

11   A.  Correct.

12   Q.  Let's look over to that gain/loss section, starting with

13   the long position.  What effect did that increase in the price

14   of Bitcoin, relative to USDC, have on the unsettled gain and

15   loss?

16   A.  So, this is great news for our friend, the woman at the

17   top, the long, because she was long at an entry price of

18   70,000, a reference price of 70,000, and she gained 5,000 per

19   Bitcoin.  And so, we see here unsettled gain is 50,000 USDC.

20   So that's the 5,000 per Bitcoin gain that she received on the

21   price, and the position is for 10 Bitcoin.  So 5,000 times 10

22   would equal 50,000 USDC.  So she's in a gain of 50,000 USDC

23   based on the market prices and the fact she was long.

24   Q.  Let's make sure we're clear about where that multiplier

25   comes from.  How much did the price of USDC per Bitcoin

O49Ceis5                              Kapil – Direct

1    actually go up?

2    A.  5,000.

3    Q.  Why did her gain go up by 50,000 as opposed to just 5,000?

4    A.  Because the initial contract was not struck for one

5    Bitcoin, but for 10 Bitcoin.  So if you see on the box to the

6    right, right below her, the size was 10 Bitcoin.  So that 10

7    Bitcoin acts as a multiplier that just magnifies the gains of

8    the winning party and magnifies the losses of the losing party

9    proportionately.

10   Q.  If that size had originally been, say, 100 Bitcoin instead

11   of 10 Bitcoin, what would that do to the gain and the loss?

12   A.  Right.  So if you increase the size by a factor of 10, it

13   just magnifies the gains-loss by 10.  So in this example, if it

14   was 100 Bitcoin, she would have about an unsettled gain of

15   500,000 USDC.

16   Q.  Let's turn now from the trader on the top to our friend on

17   the bottom.  What position is he in now?

18   A.  Right.  So bad news for the gentleman at the bottom.  He

19   had the opposite position, he was short.  So the shorts are

20   betting the prices are going to go down, but the price went up,

21   so he has to pay.  And again, he's down 5,000 on the price and

22   the contract was for 10 Bitcoin.  So his overall loss is

23   negative 50,000 USDC.

24   Q.  Now, I want to focus on one thing here.  Alongside both

25   parties, it says, "Unsettled Gain/Loss"?

1    A.   Correct.

2    Q.   Can you explain what the "unsettled" part means?

3    A.   Sure.  So -- and again, this is a little bit technical.

4    This is another kind of value source, but because the perpetual

5    is outstanding, perpetually outstanding, there needs to be a

6    procedure in which the loser pays the winner at some point, and

7    that's called the settlement procedure.  And so, timing of the

8    settlement procedure is another factor or another value lever

9    that affects the overall economics of a perpetual contract.

10   Right now, they have not settled their balances, so they're

11   just wearing these unsettled balances of 50,000 or negative

12   50,000, but there's a mechanism in the contract where the

13   winning party could force the losing party to pay up.  And, for

14   example, the woman at the top could compel the gentleman at the

15   bottom to settle the balance, in which case both of those

16   accounts will go to zero, she would receive a payment for the

17   $50,000 that she's owed, and then the contract would continue

18   on with $7,500 as being the new reference price.

19   Q.   If one party were to force the other party to settle, what

20   do they actually exchange?

21   A.   Well, they exchange USDC.

22   Q.   Do they exchange Bitcoin?

23   A.   No.

24   Q.   Now let's look at one more example on this value point.  If

25   we can go to government demonstrative 1817.  Let's start by

1    focusing on the yellow bar again in the middle.  What's

2    happened to the price now?

3    A.   Right.  So this is the opposite scenario where the price

4    went down from 70,000.  And so, this is good news for our

5    friend, the short at the bottom, and bad news our friend, the

6    lady at the top, who was long.

7    Q.   What happens to the unsettled gain/loss for the short

8    position on the bottom?

9    A.   So, because the price went down and the short was on the

10   side of the contract that the price would go down, he

11   experiences a gain of 5,000, the 70,000 entry price minus the

12   65,000 USDC current price.  So the gain of 5,000 times the size

13   of 10 BTC equals the short having an unsettled gain of 50,000

14   USDC.  Conversely, the long has the opposite, negative 50,000

15   USDC loss.

16   Q.   Now, I want to focus on this yellow bar that you've been

17   using to talk about the price of the perpetual.  Okay?

18   A.   Sure.

19   Q.   In the context of perpetuals, where does that price

20   typically come from?

21   A.   Sure.  And this is a little bit of a technical point to try

22   and walk through, so I'm just going to try and pause and

23   explain it.  There is a mechanism in the contracts in which the

24   contract needs to know a price to mark the position for the

25   purposes of settlement.  It needs to know exactly which price

O49Ceis5                      Kapil - Direct

1    to use to compute the unsettled gain or the unsettled loss.

2    That price comes from something called an oracle, or an oracle

3    price.  That oracle is an attempt to look at or sample

4    third-party independent pricing sources and come up with some

5    kind of average that both parties can have some reasonable

6    expectation to agree would be a fair price to settle against.

7    Q.  Why is a oracle needed to set the price of perpetuals?

8    A.  Well, both parties need to have belief that their position

9    is going to be marked fairly for the purposes of settling up

10   their cash balances.  And so, the oracle is meant to take

11   independent third-party sources and, again, come up with some

12   kind of trusted third-party neutral source of pricing.

13   Q.  So let's look at a demonstrative example of how these

14   oracles work starting with government demonstrative 1818.  So

15   it looks like there are -- or what are the three things listed

16   on the side here, labeled exchange 1, exchange 2, and exchange

17   3?

18   A.  So those graphics are just meant to represent different

19   exchanges, different third-party exchanges that are a source of

20   pricing information.

21   Q.  When you say "exchanges," do you mean cryptocurrency

22   exchanges?

23   A.  That's right, exchanges that have this USDC-Bitcoin pair

24   trading.

25   Q.  What's the price listed next to each exchange?

O49Ceis5                    Kapil - Direct

1    A.  Well, remember we talked about before, prices are always a

2    function of supply and demand of a particular cross pair

3    currencies, in this case, USDC Bitcoin, at different

4    exchange -- at a particular exchange.  So here, we have three

5    different exchanges at the same time.  So if this is the same

6    time, essentially what we're seeing is different exchanges

7    reporting three different prices based on where those

8    individual exchanges see the price of USDC Bitcoin at that

9    particular time.

10   Q.  So let's add the oracle in now with government

11   demonstrative 1819.  So what role does the oracle serve in a

12   perpetual?

13   A.  So the oracle serves the role of sampling the various input

14   exchange prices and using a mechanism or an algorithm or code

15   to essentially compute an oracle price.

16   Q.  So could you just use this diagram as an example of what

17   the oracle was doing to take these three different prices on

18   three different exchanges and come up with one price for the

19   perpetual?

20   A.  Sure.  So -- well, as an aside, oracle design is a very,

21   very rich field of research, and there's many different ways

22   oracles can have algorithms to compute an oracle price.  For

23   example, one could take the average.  If one just took the

24   average here, it would equal 7100.  One, for example, could

25   kick out the highest and lowest extreme value, but there's

O49Ceis5                         Kapil - Direct

1    different ways and different methodologies people use to create

2    oracles.

3    Q.   In this example, what price does the oracle come up with?

4    A.   It kind of comes up with an average price, 7100.  71,000.

5    Q.   All right.  So let's go back to our home base value slide

6    with government demonstrative 1820.  So we've covered this

7    first value source, the change in the relative value of the

8    cryptocurrencies.  Let's switch now to value source number 2,

9    the funding rate.  Could you summarize again, before we walk

10   through the example, what the funding rate is?

11   A.   Sure.  So, we've established there's an oracle.  The oracle

12   is constantly publishing an oracle price, and that's meant to

13   be a third-party kind of reliable price.  Separately, we have

14   the price at which the perpetuals are trading at in the order

15   book of the perpetuals.  And so, oftentimes, as a shorthand,

16   people take the mid price or the middle of the bid in the ask.

17   If you recall, there was an order book and there was a bunch of

18   bids and there was a bunch of asks, and if you take the middle

19   of them, that's what's called the mid price.  So sometimes the

20   mid price deviates from the oracle price.  And essentially, the

21   funding rate is a mechanism that causes these prices to

22   converge by creating transfer payments between the two sides,

23   the longs and the shorts, depending on which side is to be

24   gained from the deviation between the oracle price and the mid

25   price in the order book.

O49Ceis5                       Kapil - Direct

1    Q.  Let's use some visuals to walk through how that works

2    starting with government demonstrative 1821.  All right.  So,

3    let's just focus on the bottom half of the slide for the

4    moment.  Do you recognize what we're seeing on the bottom half

5    of the slide here?

6    A.  I do.  That's the oracle from the prior example.

7    Q.  So this is the oracle that produced the price of 71,000

8    USDC per Bitcoin?

9    A.  That's correct.

10   Q.  All right.  Now, there's another icon at the top here

11   that's labeled "The Order Book Mid Price."  Could you explain

12   what that means?

13   A.  Right.  So, again, the order book mid price is separate

14   from the oracle price, so the oracle price we got by computing

15   these third-party averages.  There's a separate order book for

16   the perpetuals.  The order book that we entered our buys and

17   sells into to create the perpetual.  So that order book is also

18   going in real time.  The mid price on the order book is what's

19   being reported as the 70,000 USDC.  So again, if you take the

20   best bid that's sitting in the order book and the best offer

21   that's sitting in the order book and you average the two to

22   find the middle of them, that's what they're using as a proxy

23   for the mid price of the order book.

24   Q.  And those bids and offers, is that like the bids and offers

25   we saw on that slide showing the creation of the perpetual,

1    that reference price?

2    A.   Yeah, that's right.  And that's going to move around by the

3    supply and demand that's in the order book.

4    Q.   Now, why might the order book mid price be different from

5    the oracle price?

6    A.   It's the same exact explanation because the reason is

7    prices vary based on the supply and demand of a given

8    instrument, at a given time, at a given place, at a given

9    exchange.  And so, the order book is one place where there's

10   prices and these three exchanges are -- constitute other venues

11   where there's supply and demand and the oracle is trying to

12   average all of them.  But the key here is they're not the same

13   place.  And so, as a result, there's going to be different

14   supply and demand and, therefore, different prices.

15   Q.   So let's bring that back to the funding rate now.  In this

16   example, the oracle price is higher than the order book mid

17   price; right?

18   A.   That's correct.

19   Q.   So under the funding rate, who pays whom in this situation

20   when the oracle is higher than the mid price?

21   A.   This is a perfect example of why the funding rate exists.

22   Right now, the oracle price is 71K; however, the order book mid

23   price is only 70K.  So the order book mid price, the price in

24   the order book is 1,000 cheaper than the oracle price.  So as a

25   result, the mechanism needs an incentive for the longs to bid

1   up the order book price, so it converges to the oracle price.

2   So this funding payment ends up being a payment that the shorts

3   pay to the longs to induce those two prices to converge.  So

4   it's a separate payment, it's a separate value stream other

5   than just the prices, the relative prices.  This is a separate

6   payment that, in this case, the shorts would make to the longs

7   so as to induce those rates to converge, those prices to

8   converge.

9   Q.  Let's look a vitalization of that.  If we could go to

10  government demonstrative 1822.  So we have our -- who do we

11  have as our two parties here again?

12  A.  Same parties as when we entered into our contract.  The

13  woman at the top is the long and the gentleman at the bottom is

14  the short.

15  Q.  See there's a black line in the middle of the screen that's

16  labeled "Oracle"?

17  A.  Yes.

18  Q.  What's that designed to represent?

19  A.  So that just shows the oracle price.

20  Q.  And do you see there is a blue dotted line that's labeled

21  "Order Book Mid Price"?

22  A.  Correct.

23  Q.  What's that designed to represent?

24  A.  That's meant to show the oracle -- I'm sorry.  The order

25  book mid price, the mid price on the perpetuals order book and

O49Ceis5                              Kapil - Direct

1    it just moves around.

2    Q.  So when the order book mid price is above the oracle price,

3    who makes payments?

4    A.  So, if the order book mid price is above the oracle, that

5    means the order book is rich to the oracle.  And essentially,

6    the longs would pay the shorts to induce more sellers to make

7    those prices converge.

8    Q.  And what is the long paying?

9    A.  The long would pay the funding payment.

10   Q.  Is that USDC, the tokens we were talking about?

11   A.  Yes.  So this is a separate payment than the payment that's

12   due to the changes in prices or the value string, one.  This is

13   a separate payment that's entirely related on the difference

14   between the order book mid price and the oracle price.

15   Q.  All right.  Now let's look at the other example where the

16   blue dotted line dips below the oracle price.  When that

17   happens, who pays whom?

18   A.  Sure.  So in this example, which is what we had in the last

19   slide, the mid price is trading cheap to the oracle, so that

20   means the mechanism produces an incentive for there to be more

21   longs.  So the short pays the longs in an effort to induce the

22   prices to converge.

23           MR. BURNETT:  Your Honor, I'm just mindful of time.  I

24   think now is kind of a natural break point.

25           THE COURT:  All right.  So we will continue tomorrow.

O49Ceis5                     Kapil - Direct

1    Thank you.

2              So we are done for today.  We're nine minutes behind

3    schedule, but we're still on pace.  So I will see everyone here

4    tomorrow.  Again, be here by 8:45 a.m. at the latest so that we

5    can get promptly started at 9:00.  Thank you very much for all

6    your hard work today.  And you can head back to the jury room

7    and you can leave your notepads back there.  Please don't take

8    them home.

9              I'll repeat my instructions that I've given you about

10   five times.  No talking, no research of any kind, don't talk to

11   any of the parties, and be well.  We'll see you tomorrow.

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

O49Ceis5                          Kapil - Direct

```
 1                  (Jury not present)

 2                  THE COURT:  Please be seated.

 3                  Mr. Jain, you'll remain under oath.  So you're not to

 4     have conversations with anyone concerning your testimony or

 5     this case, and that includes all the lawyers on the

 6     government's side.  Okay?

 7                  THE WITNESS:  Of course.

 8                  THE COURT:  All right.  We'll see you tomorrow.

 9                  THE WITNESS:  Thank you, your Honor.

10                  (Witness not present)

11                  THE COURT:  Mr. Burnett, first of all, how much longer

12     do you think you have with Mr. Jain?

13                  MR. BURNETT:  Probably 15 to 20 minutes.  Not a whole

14     lot left.

15                  THE COURT:  And who do you have next?

16                  MR. BURNETT:  It will be Tyler Shipe.

17                  THE COURT:  And after that?

18                  MR. BURNETT:  I think it will be Chris Hermida after

19     that.

20                  THE COURT:  How long for both of those witnesses?

21                  MR. DAVIS:  Shipe would be probably a bit over an hour

22     for direct.  Mr. Hermida's direct is probably somewhere in that

23     half-hour ballpark, to be a little conservative.

24                  THE COURT:  Who's after that?

25                  MR. BURNETT:  After them would be Mr. Molina from FTX.
```

049Ceis5                          Kapil - Direct

1    I'd say that's probably a 15ish-minute witness, and then it

2    would be Special Agent Kudirka, who's probably another

3    10-minute person.  My guess with cross examinations, that will

4    probably take us to the end of the day.

5            THE COURT:  Not holding you to it, but how many

6    witnesses after that?

7            MR. BURNETT:  So the next witness would probably be

8    Special Agent DeCapua.  In terms of total witnesses for the

9    rest of the case, we have to talk as a group based on how stuff

10   came in today.  Think we're still definitely on track for us to

11   finish our case at some point on Friday.

12           THE COURT:  Okay.  Understood.

13           So what issues should we productively take care of now

14   that will bear on exhibits or testimony tomorrow?  I'll turn

15   first to Mr. Talkin or Mr. Klein on your side.

16           MR. KLEIN:  Your Honor, they're going to give us those

17   exhibits for those witnesses.  We don't have them necessarily

18   yet.  Once we get those, we will -- like, we did try to flag

19   them.  I apologize about that exhibit earlier, but it came in

20   late last night.  We obviously had a lot of other things.

21           THE COURT:  That's fine.  And so, from the government.

22           MR. BURNETT:  So there are a few things from yesterday

23   that I think might make sense to tee up for today.

24           So, the first one relates to the Waves complaint that

25   the court excluded.  I think -- totally understand the thinking

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

1    on excluding the complaint itself.  I think, from the
2    government's perspective, it's important for the jury -- the
3    jury will have the Google document.  There was Government
4    Exhibit 609.  But I think, from the government's perspective,
5    because we have to prove knowledge of unlawfulness and the
6    Google document doesn't get into, like, laws or anything like
7    that, it's important for us to be able to establish that there
8    was in fact a lawsuit based on the thoughts that Mr. Eisenberg
9    was putting in that Google document and that that lawsuit was
10   based in part on the Commodities Exchange Act.
11          We think one way to establish that without actually
12   introducing the complaint would be to introduce, for example,
13   like the civil cover sheet from that docket because that would
14   show there was a lawsuit between Avraham Eisenberg and the
15   folks he identifies in the Google doc.  And it shows that there
16   were claims, including under the Commodities Exchange Act for
17   manipulation without including all of the -- like texts of the
18   complaint or any of the texts of the complaint, which is what
19   our understanding was the Court found problematic from a 403
20   perspective.
21          THE COURT:  Mr. Klein, or whoever is going to handle
22   that from your side.
23          MS. MARTABANO:  Your Honor, I believe that the one
24   issue is that exhibit 609, the metadata shows that it's
25   actually from December 24 of 2022.  So it doesn't show that he

O49Ceis5                        Kapil - Direct

1    knew or had reached that conclusion prior to that time.  So I

2    don't think that that's a fair point.

3            On the complaint, again, the civil cover sheet is

4    likely to include, you know, the type of claims in the

5    descriptions, and that is just going to invite a trial within a

6    trial.  I think this touches on, you know, things already

7    raised today by the government in its opening statement about

8    the search records and his Tweets and other things that sort of

9    get into the potential complexity of the government's

10   regulation in this space.

11           And the government has been seeking to preclude

12   Mr. Eisenberg from presenting any evidence about the regulatory

13   uncertainty in this case because one arguable interpretation of

14   these exhibits is to say, actually, he was researching this

15   because each of these was different and there wasn't clarity.

16   And the SEC brings cases in this space and the CFTC brings

17   cases in this space, and the DOJ bring cases in this space.

18   And, in fact, in good faith, I couldn't tell what would be

19   illegal or not.  Instead, they're just seeking to say, well, he

20   looked at this and that establishes that he knew, when, in

21   fact, it doesn't establish that.

22           In addition to that, each of those cases --

23           THE COURT:  Sorry to interrupt, but I just want to

24   make sure that I'm following everything you're saying.

25           So first of all, document 609 was one of the documents

O49Ceis5                          Kapil - Direct

1    that I indicated I would overrule the objection on; right?

2              MS. MARTABANO:  Yes, your Honor.

3              THE COURT:  And you're saying that this document was

4    actually from December of 2022?

5              MS. MARTABANO:  Based on exhibit 609A, which purports

6    to be its metadata, yes, your Honor.

7              MR. BURNETT:  I can actually give some color on that.

8    So because it's a Google doc from his computer or from his

9    Gmail, there are like multiple different versions.  There is a

10   version we produced last night that was from October 8th, 2022,

11   not from December 24th, 2022.  So, the version of the Google

12   Docs that we can offer, which is identical, other than the

13   metadata, is from before the attack.  But also, more

14   importantly, the lawsuit he filed was from July 2022, which

15   is --

16             THE COURT:  I've got you.  I'm just trying to work

17   this.  I just wanted to make sure there wasn't a further issue

18   on exhibit 609 that I did not detect.

19             So you're going to make that change to 609A?

20             MR. BURNETT:  Yes.

21             THE COURT:  So it reflects a date that would be before

22   the time of the alleged offense?

23             MR. BURNETT:  Yes.

24             THE COURT:  Now, I interrupted you.  I'm so sorry.

25             609, I believe we've addressed that.

1          As to the complaint, the government says, well, there

2     was a complaint that was filed and it corresponds to 609 in

3     terms of what it's talking about.  So what if the government

4     was just to put in the cover sheet showing what came of the

5     types of things that Mr. Eisenberg was discussing in this

6     document without getting into any of the attorney designations

7     of anything?  So why doesn't that solve the issue or does it

8     raise the same problems?

9          MS. MARTABANO:  I think it raises similar problems.  I

10    think that it doesn't map exactly onto it.  In fact, it's

11    talking about the fraud, but it's not the same as the civil

12    complaint.  I think in addition to that, as we wrote into our

13    papers, it would imply -- it would open up a trial within a

14    trial about why it's the same or different than the case at

15    hand here.  And it would involve privileged discussions between

16    Mr. Eisenberg and his lawyer, which include things as to why

17    certain claims were included and whether Mr. Eisenberg was even

18    aware that his lawyer had styled claims in a certain way at the

19    time that that complaint was filed.

20         MR. BURNETT:  Actually, I can speak to that, too.

21         We just got from the court in the District of Puerto

22    Rico -- we had litigated to get an affidavit Mr. Eisenberg

23    filed in that case.  We just got it I think last night.  And

24    that affidavit, he says, I read the complaint, I understand

25    everything that's in it, and it's all factually accurate, among

O49Ceis5                            Kapil - Direct

```
 1   other things.  We're continuing to review the affidavit.  So
 2   the idea that Mr. Eisenberg, like, didn't know what his lawyers
 3   were doing --
 4              THE COURT:  What was the date of that affidavit?
 5              MS. MARTABANO:  Your Honor, just one second.
 6              (Pause)
 7              MS. HUANG:  It was July 1st, 2022, your Honor.  We
 8   just got this at 11:20 this morning.
 9              THE COURT:  It was not on the public docket?
10              MR. BURNETT:  No, it was under seal.
11              THE COURT:  And you're going to introduce that
12   document into evidence?
13              MR. BURNETT:  We haven't had the chance to even read
14   it.
15              I think, just to answer the point that Mr. Eisenberg
16   maybe didn't even know what was in the complaint is just
17   demonstrably false.
18              THE COURT:  Hypothetically speaking, if that were to
19   be put in, and you would be able to establish that there need
20   not be any inquiry into attorney-client privileged
21   communications or anything else concerning the underlying basis
22   for the complaint because you have a document submitted with a
23   court from the defendant that indicates that he had read and
24   understood what had been submitted as reflected in the
25   complaint.
```

1                MR. BURNETT:  That's right.  And I think you can't use

2       the fact that there are privileged communications behind your

3       public statement as a shield for your public statements.

4                THE COURT:  Well, I think that the argument is that a

5       complaint is just put in by the lawyers and sometimes the

6       clients won't know exactly what's in the complaint.

7                MR. BURNETT:  Sure.  I think the affidavit solves

8       that.

9                THE COURT:  That's what I'm getting to.

10               So, from the defense side, in light of that, it seems

11      like unless you have another argument as to the affidavit why

12      that wouldn't connect the dots in a way that would avoid the

13      objection on attorney-client privilege, the government is still

14      offering to not put in this complaint, but rather put in the

15      civil cover sheet.  And so, I'll just leave that with you.

16               I think that I was with you, but if there's actually a

17      document that is in a court docket and there's not some other

18      problem with it because, again, maybe you have not seen this,

19      it was just obtained last night, so there may be some other

20      issues.  I'm happy for you to raise those with me.  Assuming

21      there is no other issues, it would seem like there would not

22      need to be any inquiry underneath the surface of the complaint.

23      But can you tell me if I'm missing something here?

24               MS. MARTABANO:  Thank you, your Honor.  We're not

25      aware of it, we have not seen it, so we do need a chance to

1    arrive it.

2            As I understand it from a quick colloquy here, the

3    affidavit actually predates the complaint filing.  And so,

4    there may be privileged communications that reflect that edits

5    were made after that time of the affidavit.  And so, we just

6    don't know.  And so, it may still invade the privilege and we

7    haven't seen the affidavit ourselves.

8            THE COURT:  Is it possible for the parties to reach a

9    stipulation that there was this document and it ultimately

10    became a case filed in this court with these claims, period,

11    and then be done with it?  I mean, in terms of giving the

12    context for the underlying Google doc, which would be coming

13    in.

14            MR. BURNETT:  I think it could be, but we just need to

15    read the affidavit first to see if there's other --

16            THE COURT:  Let's pick this up in the morning, take a

17    look at these documents, and we'll figure it out.

18            MS. MARTABANO:  Yes, your Honor.  Thank you.

19            THE COURT:  So what's next?

20            MR. BURNETT:  That was one piece.  The next is

21    Government Exhibit 111, which was the exhibit that referenced

22    Mr. Eisenberg's plans to be in Puerto Rico of Sukkot.  So that

23    one, I think we're not asking right now to just put it in cold.

24    What I want to have the Court -- we wanted to flag and have the

25    Court keep an open mind to was basically the government's

1    thought process here was that after Mr. Eisenberg was arrested,

2    we had a conversation with his attorneys — I can't remember if

3    it was these attorneys or his previous attorneys — about the

4    flight risk.  They said, well, Mr. Eisenberg wasn't fleeing the

5    country, he had traveled to Israel because he had plans to like

6    celebrate Sukkot there, which is why we thought this exhibit

7    was important to if that argument comes in, rebut the idea he

8    had -- that the reason for the travel was for a holiday, not

9    for flight.  So I don't think the opening that Mr. Talkin gave

10   has opened the door to that argument.  But to the extent that

11   like the defense suggests there was some other reason for the

12   trip, I think we would ask the Court to reconsider our ability

13   to put this in because it clearly establishes that he planned

14   to be in Puerto Rico for the holiday prior to his attack.

15            THE COURT:  Mr. Talkin, didn't you say that the reason

16   for the trip was to cool things off?

17            MR. TALKIN:  Yes.

18            THE COURT:  I didn't think you made any argument.

19            MR. TALKIN:  I don't think they're saying that, but to

20   put this to rest, we're not going to argue he didn't go there

21   to celebrate a religious holiday.

22            MR. BURNETT:  That should put that to bed then.

23            There are a few Rule of Completeness issues that were

24   teed up already that we think we would like to address, but

25   they affect whether we would want to put certain pieces of

1    evidence in or not.  I think, from our perspective, like 108,

2    404, and I guess 401, too, are the ones that come to mind as

3    the ones that we think are worth addressing now.

4              THE COURT:  Here's the question: did I get the

5    completing statements, because that was one of the issues --

6              MR. BURNETT:  I think Ms. Martabano sent them in last

7    night.

8              MS. MARTABANO:  Yes, your Honor, in the wee hours,

9    1:00 or 12:00 a.m.

10             THE COURT:  What are those numbers?

11             MR. BURNETT:  So the exhibit numbers were 108, 404,

12    and 401.

13             When you sent them in, were they marked as exhibits?

14             MS. MARTABANO:  In the file title, it will say,

15    "exhibit 401 proposed supplement," "exhibit 108, proposed

16    supplement."  And exhibit 108, we had to use just a PDF marked

17    with a highlighter.

18             THE COURT:  Is it possible for someone to put these on

19    the screen?  Because I want to see if we resolve these now as

20    opposed to waiting for tomorrow.

21             MR. BURNETT:  If you can put 108 up first so as to

22    compare what the defense is doing.

23             THE COURT:  This is the original?

24             MR. BURNETT:  Yes, this is the government version.

25             THE COURT:  Can I see the proposed completing

O49Ceis5                          Kapil - Direct

1    statements.

2              MS. MARTABANO:  Mr. Smith can show them.

3              MR. DAVIS:  Judge, if I may be excused for the rest of

4    this conference?

5              THE COURT:  Yes, you can go.

6              MS. HUANG:  Your Honor, I'm going to ask, as well.

7              THE COURT:  Yes, you may.

8              Is there anything else or is that it?

9              MS. MARTABANO:  For 108, that's the whole requested

10   provision.

11             THE COURT:  How would this satisfy under the Rule of

12   Completeness?  There's obviously a period of time between the

13   two sets of statements.  So maybe you can connect the dots for

14   me.

15             MS. MARTABANO:  Yes, your Honor.  The beginning of the

16   chat is obviously suggesting that he's overseas and the

17   government has already discussed in its opening statement that

18   he fled and he wasn't there for a long period of time until he

19   came back.  For us, he came back in December.  This is part of

20   him coming back.  And this bears on the fact that he was

21   staying over there and he had been having a rough couple of

22   months.  We have other chats that will establish that he was

23   facing threats.  And so, to the extent the government is

24   purporting to claim that he was staying there for nefarious

25   reasons or because he was hiding from some kind of enforcement,

O49Ceis5                         Kapil - Direct

1   we think this provides color to the fact that he has been

2   struggling, you know, for the past several months with the

3   outcome of what's happened.  So, just a little bit of extra

4   color in light of the government's position that, you know, he

5   was over there just to flee and to hide from this until he

6   thought he was safe to come home.  We believe he stayed in part

7   because there were threats made against him.  And as Mr. Talkin

8   referenced in his opening statement, I mean, he was waiting for

9   some things to just cool off and for the threats to die down

10  before he came back.

11            THE COURT:  Okay.

12            MR. BURNETT:  It's just not a Rule of Completeness.

13  That's just a different argument that the defense wants to make

14  to characterize the statement.  This is a statement from months

15  later.  The Rule of Completeness, as we laid out in our

16  briefing, is for a narrow purpose to prevent like a misleading

17  use or to contextualize words as it's used.  There's no way

18  what he was saying two months later could be necessary to not

19  make what he said in October misleading.

20            THE COURT:  I agree.  Even under a broader view of

21  completeness, I'm not sure that these statements would fit

22  under the rule.  But I agree with the government that there is

23  a narrower purpose than is intend under Rule 106, and I don't

24  think this comes close to meeting that standard.  So we will

25  overrule the objection to exhibit 108 as it was originally

O49Ceis5                          Kapil - Direct

1    presented.

2            Let's move to -- so you said 401 and 404.

3            MR. BURNETT:  We'll start with 404.  That's what I had

4    flagged as the more pressing thing for us.

5            Mr. Sears, if you could open up Column I so it

6    expands, double-click it.

7            And so, what this is, just so you understand, your

8    Honor, you have to read this from the bottom up.  I think when

9    we present it, we'll try and flip it around for the jury, but

10   the bottom message is the first in time.

11           THE COURT:  Okay.

12           MR. BURNETT:  And the messages that have -- do you see

13   Column H has sender ID.  The messages that begin with 289 are

14   Mr. Eisenberg, and the messages that begin 624 are the

15   counterparty.

16           THE COURT:  Okay.

17           MR. BURNETT:  So, for context, the government is

18   intending to introduce this just for the point that

19   Mr. Eisenberg was referring to what he had done as a pump, and

20   how he could have pumped the price even lower and still managed

21   to make a lot of money off of it, which goes to his knowledge

22   that his intent to manipulate and intent to create an

23   artificial price.

24           THE COURT:  Understood.  Is there a completing

25   statement or is this just an objection to the admission of this

1  document?

2            MS. MARTABANO:  No, your Honor, there's a completing

3  statement.  For some reason, the computers are all frozen, but

4  we do have physical copies.

5            THE COURT:  I have the email now.  Maybe that helps

6  things.

7            MS. MARTABANO:  Your Honor, the way that we've

8  presented it in the email, we did reverse it four times so it's

9  listed in chronological order for the ease of reading.  We've

10  just put in the chat identifier in addition to the date so as

11  to simplify.

12            You'll see that our proposed additions are the yellow

13  highlights, and they are on either side of the government's

14  proposed exhibit.  So immediately preceding and after.

15            THE COURT:  I'm sorry.  This is exhibit 401; right?

16            MS. MARTABANO:  404, is the shorter one.

17            THE COURT:  Can you explain why this would be a proper

18  completing statement or these statements?

19            MS. MARTABANO:  Sure.  It goes to show both who this

20  person is and what their opinion was.  It shows that very well

21  executed plan, "I was impressed with how you did this."  This

22  is someone who was part of the Mango teams who advised from the

23  beginning and received tokens and saying he's worked and

24  consulted on different exchanges, he's deeply thought about

25  this different system and market structure.  It provides, you

1    know, and he says, yeah, exactly, it was a million dollar USDC

2    position and the Mango position size would have been like

3    a-hundred million Mango instead of five-hundred million.  So it

4    provides context, that last part might have actually been

5    Mr. Eisenberg, but it just provides context to them trying to

6    say, you know, making out here like it was just a pump and

7    that's it.  That's not the full context of what they're

8    discussing.  And I think to try and excise it and to take out

9    the fact that this person is in fact discussing what happened

10   with him and saying, you know, that was a well executed play,

11   not that was an illegal manipulation of the market is highly

12   relevant to the discussion that's happening here since they

13   want to say, oh, it's all about him pumping the market.  In

14   fact, this is being described by the very person who was

15   advising Mango as a well executed play.

16        MR. BURNETT:  Your Honor, I think a few things.

17        So, first of all, the fact that the person purports to

18   have advised Mango does not mean they were currently advising

19   Mango or even that it's true.  The idea that some other random

20   Twitter user's perspective on whether it was like a cool pump

21   or not and whether Mango was like a good platform or not is

22   pure hearsay and the definition of not relevant, let alone not

23   completing.  The defense could never put on just a Tweet, for

24   instance, from someone claiming that they are from Mango

25   Markets saying that, like, this was an awesome hack and, like,

O49Ceis5                        Kapil - Direct

1    Mango markets totally had it coming.  They can't use Rule 106

2    to put in basically that the platform was bad when the narrow

3    purpose for which the statement is being admitted is just to

4    show Mr. Eisenberg's intent to pump the price.

5            THE COURT:  Well, yeah, but I think the argument

6    that's being made is that the reason he said that depends in

7    part on the conversation he was having moments earlier.

8            MR. BURNETT:  But, your Honor --

9            THE COURT:  Hold on.  Literally moments earlier.  Let

10   me just break it apart because you said a few things there.

11   The mere fact that there's another individual's statements

12   being made that may be completing in the sense of not making

13   the statements that are sought to be admitted misleading are

14   from another person doesn't matter for Rule 106, right, because

15   the text of the rule says any other statement can come in if,

16   in fairness, it ought to be considered at the same time the

17   adverse party may do so over hearsay objection.  So just that

18   technical piece of it doesn't take it out of the Rule of

19   Completeness.

20           MR. BURNETT:  That makes sense, your Honor, but I

21   think what the issue is is that the fact that this statement

22   from the other person is what made Mr. Eisenberg comfortable

23   enough to say, yeah, I pumped the price, does not -- it doesn't

24   complete the statement.  It's like in a context of like a gang

25   conversation of someone -- like a gang member comes up to

1    someone and says like, oh, hey, like, I heard you, like,

2    dropped that guy.  He, like, totally had it coming.  Then the

3    person responds, like, oh, yeah, I shot him.  Like, it's not

4    completing to have the person say the victim had it coming

5    beforehand.  It's just -- it's context for why he was

6    comfortable saying it, but that's not actually completing in

7    any meaningful or probative way.

8         What is relevant here was Mr. Eisenberg saying he was

9    pumping, and this preamble to that conversation does not make

10   that -- it's not misleading.  He's still saying he was pumping

11   with or without this part involved.  The only addition that

12   this highlighted part adds is some guy who purports to be

13   associated with Mango Markets at some point in the previous

14   time as basically saying Mango had it coming.

15        THE COURT:  I understand that.  I do think -- well,

16   let me ask you this: you don't think that chopping this

17   conversation down to what's in white here, that the yellow

18   portion would not at least provide context on the discussion

19   that comes after it, meaning the Rule of Completeness is how we

20   refer to it, but the actual rule is called "related statement"

21   or "remainder of a related statement."  The standard is other

22   statements that, in fairness, ought to be considered at the

23   same time.

24        I agree with you, and this is why I overruled the

25   objection on the last document.  When you have documents that

O49Ceis5                              Kapil - Direct

1    are months apart that are barely talking about the same thing,

2    that's not the type of completing statement that we would think

3    of.  This, I understand the defense is saying, well, look, if

4    you're putting in part of this conversation and, in fact, if

5    you're especially trying to emphasize part of this

6    conversation, then let's at least get the full context of what

7    was being said in this conversation where you are in fact

8    trying to put in statements not only from Mr. Eisenberg, but

9    also the individual who he was speaking to.  So if you're

10   trying to do both of those things, then, in fairness, the other

11   parts of the conversation should be discussed and addressed at

12   the same time.

13           So I'm going to sustain the objection to the original

14   exhibit, and unless there's any further issues, this version of

15   it can be the one that's used or if you can figure out another

16   way to present this that the parties can agree on.

17           MS. MARTABANO:  Thank you, your Honor.

18           THE COURT:  So that's 404.  And now we have 401.

19           MS. MARTABANO:  Yes, your Honor.

20           401 is very similar to 404.  These are messages

21   literally immediately preceding the submission by the

22   government.  They similarly provide context to the portion that

23   the government has edited and is seeking to provide.

24           THE COURT:  So I'm looking at -- so I'm looking at the

25   modified documents of Mr. Burnett.  Do you want to just tell me

O49Ceis5                              Kapil - Direct

1    what this document is being offered for.

2                MR. BURNETT:  Yeah.  So, the main point that it's

3    being offered for is that Israeli, like the -- if you go to the

4    second page, to the second to last message from Mr. Eisenberg,

5    he says, significant capital, 10 million collateral deposited

6    to multiple Mango accounts $2 million to $3 million to

7    manipulate the underlying spot markets, which shows clearly his

8    intent to manipulate the underlying spot market.

9                (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O49VEIS6

1          MR. BURNETT:  I think for starters, there are a few

2     things going on with the addition.  For starters, the messages

3     that we had marked were from the 20th.  And if you notice, like

4     some of this conversation that the defense is adding in is from

5     the 17th, the 15th, the 12th.  So we have like a multiple-day

6     separation problem.

7          The other thing, which I'm not sure if defense is

8     still doing -- or asking for is this, like, link that's here.

9     So if you look on the second page, there's like --

10          MS. MARTABANO:  Tom, we withdraw that.

11          MR. BURNETT:  You withdraw.  Okay.  So you're not

12     looking to put in that link; you're just looking to put in the

13     yellow part here.

14          MS. MARTABANO:  Yes.

15          MR. BURNETT:  Got it.  Okay.  Well, that takes care of

16     that issue.

17          MS. MARTABANO:  And I would note that at least a

18     portion of the yellow is from the same day, same conversation.

19          MR. BURNETT:  I don't have any particular issue with

20     the rest of the 10/20 part coming in, it's the stuff in the

21     days before.

22          THE COURT:  Okay.  So we don't have an issue with the

23     October 20th material.  That will come in.  And so what's the

24     argument against kind of similar to the first document that we

25     looked at?  The rule of completeness doesn't allow everything

O49VEIS6

1    on a particular subject to come in.  And these other

2    communications are from at least three days earlier; in one

3    case, eight days earlier, as you get earlier into the

4    conversation.  So how would that fit under the standard that

5    applies under the rule of completeness?

6         MS. MARTABANO:  Well, your Honor, it's all clearly

7    talking about the same incident and the same purported article

8    or blog post.  It appears to us that this person is interested

9    in -- they have written about and they intend to keep writing

10   about.  It obviously -- I mean, he's asking Mr. Eisenberg

11   directly about the allegations, is this your Discord account,

12   you know.  And doing the math on --

13        THE COURT:  The thing that you, I imagine, are focused

14   on, and it seems like the government doesn't have an objection

15   to, are the communications on the 20th that include the

16   questions about Mr. Eisenberg's involvement in the refund

17   that's currently being voted on.

18        MS. MARTABANO:  That's correct, your Honor.  That is

19   certainly our priority.  We think that the rest of the messages

20   also provide context; because, again, it's the same person.  At

21   the very least, it explains -- the top message just gives

22   context to who this person is and why they are interacting.

23        THE COURT:  I actually think this is a rare case where

24   the additional parts of the discussion might cause more

25   confusion.  But they're certainly not tightly related to these

1    statements being offered and necessary to provide context.  I

2    think that there's a fair argument that for the communications

3    on the 20th, that those are necessary to understand the

4    statements being offered, including because some of those

5    statements refer back up to some of those statements.

6            So if you look at what the government was seeking to

7    admit, it indicates one message, it says, I helped negotiate

8    the settlement as per my statement.  The terms agreed upon are

9    in the proposal you linked, which is then a reference up to one

10   of the communications that I think the government is

11   comfortable coming in.  That's the proper, I think, domain for

12   the rule of completeness.  But I think the other ones are out.

13           So I will permit the addition of the statements that

14   are on the 20th, and otherwise the other remaining statements

15   are not proper under the rule of completeness.

16           MR. BURNETT:  Just so I don't mess this up when we put

17   this in, you guys are not at this point -- you're not trying to

18   have us admit the thoughts on $110 million Mango exploit

19   article?

20           MS. MARTABANO:  Sorry, what was that?

21           MR. BURNETT:  You're not making a motion to have us

22   include the thoughts on 110 million --

23           MS. MARTABANO:  No, that's the link that --

24           MR. BURNETT:  Okay.  Got it.  Okay.

25           THE COURT:  Okay.  Those are those three.

O49VEIS6

1          What's next?

2          Mr. Talkin, I thought you were taking off.

3          MR. TALKIN:  I was just taking a break.

4          MR. BURNETT:  Sam just loves watching this.  This is

5    his favorite.

6          So on the rule of completeness topic, I guess like the

7    only other thing is there were a number of search histories and

8    things that we plan to admit that were flagged.  And the

9    defense's letter is, Hey, they may have a completeness

10   objection to.  We need to put those in at the same -- the

11   completeness in at the same time as we offer the exhibits.  So

12   I ask that we have -- we just got to know what those are going

13   to be and if it's going to happen.

14         MS. MARTABANO:  We can get those to you hopefully by

15   tonight, Tom.

16         MR. BURNETT:  Okay.  That sounds good.

17         You know what?  That might be it for me.

18         MS. MARTABANO:  I think on those, we would just ask

19   for a proffer.  In the opening statement today the government

20   referenced, He ran these searches, he ran these searches.  If

21   that's all they intend to put in, I think that we're fine with

22   that.

23         If they intend to say that, you know, He was running

24   these searches, just as I said earlier with respect to the

25   first exhibits we were starting with, 609, you know, especially

O49VEIS6

1    with his tweets and some of the searches he's looking at or the

2    press releases he's finding, it does raise the issue of what he

3    would have understood.

4            If the government is going to argue he read these

5    articles, therefore he understood that his actions were

6    governed by the CEA and he was on notice under the CEA, we

7    would take issue with that.  If they're only seeking to say he

8    ran these searches, I think that that's fine, and we'll come up

9    with any potential supplement.  But it would help us guide our

10   supplemental if you --

11           MR. BURNETT:  We definitely intend to argue that the

12   things you read show that he knew what he was doing was wrong

13   and unlawful.  That's the point.

14           MS. MARTABANO:  And I think, your Honor, there, it

15   gets to what we were saying earlier.  It does create this issue

16   of a trial within a trial.

17           None of these cases are Mr. Eisenberg's case on all

18   fours.  In fact, you have SEC cases, DOJ cases, CFTC cases,

19   which most of us would argue are -- actually show that there's

20   regulatory uncertainty here and inconsistency.  And if there's

21   inconsistency for us as lawyers, then how is Mr. Eisenberg, as

22   a layperson, supposed to be attributed with knowledge that he

23   knew that these articles that he purportedly read would

24   establish that his conduct was illegal under the CEA?

25           As I understand it, like I said, the government has

O49VEIS6

1    sought to preclude us from even bringing up any arguments of

2    regulatory uncertainty or the fact that there wasn't clarity

3    out there that this would be governed by the CEA.

4           So they want it both ways.  They want to say, He read

5    these unrelated articles and he knew; but they won't let us

6    argue that, in fact, they show that he might not have

7    understood that at all.

8           THE COURT:  I thought the way you put it was an

9    excellent point to be made to the jury.  I don't understand

10   what the -- you wouldn't have an objection to counsel's

11   argument on -- all you can do is put these exhibits in; you

12   can't do that much with it.

13          You may argue that he knew what he was doing and the

14   law is really clear, whatever you're going to argue.  But that

15   was a pretty -- that was a compelling rendition of what the

16   defendant's position is as to those documents that can be made

17   to the jury in response, right.  You're not taking a position

18   that anything that counsel just mentioned is something that

19   can't be said to the jury, right?

20          MR. BURNETT:  No.  And to be clear, I think like what

21   we had moved on was that there can't be evidence of regulatory

22   stuff or arguments about regulatory uncertainty that aren't

23   tethered to some foundation of Mr. Eisenberg seeing something

24   or not seeing something.

25          THE COURT:  He saw an article that said no one knows

1    what's happening under the commodities Exchange Act.

2            MR. BURNETT:  Right.  If there's a foundation for him

3    seeing that, then that's fine.  We're putting in stuff to the

4    contrary.

5            THE COURT:  Just to be clear, in terms of the

6    arguments to be made by counsel, they are absolutely going to

7    argue that it was so unclear that the fact that he was looking

8    at some articles is totally irrelevant to anything.  And you'll

9    take the contrary view.  You'll say, Well, he was obviously

10   keeping up to date on everything; he was tracking what was

11   happening in the law.  And so we can assume that he understood

12   what was going on.

13           MR. BURNETT:  That's right.  And obviously his

14   knowledge of the CEA in particular does not matter, even under

15   this Court's instruction.  So we obviously think there's some

16   issues with the framing the defense has, but they can make what

17   arguments they want to make.

18           THE COURT:  Okay.  So hopefully that helps in terms of

19   the argument issue.  But I understand, as it presently stands

20   as to -- and to be clear, you are referring to the documents as

21   to which I overruled the objection from yesterday.

22           MS. MARTABANO:  Yes.  You said you would be open to a

23   proffer from the government, and then we saw your orders and we

24   sent an email.

25           THE COURT:  Yes.  And you're making a 402/403

O49VEIS6

1    objection pending some proffer.

2              MS. MARTABANO:  Exactly.

3              THE COURT:  Okay.  So taking these documents as a

4    category, Mr. Burnett, I understand they are all from before

5    the time of the offense.  So can you just give us a proffer

6    what the relevance is?  You've already touched on it, but just

7    so we're clear about it.

8              MR. BURNETT:  Sure.  The relevance is that we need to

9    prove that Mr. Eisenberg generally knew that his conduct was

10   unlawful.  And the fact that he had previously searched a

11   number of cases where there were either regulatory actions

12   related to market manipulation or fraud in the cryptocurrency

13   space or open market manipulation, in the case of the *Phillips*

14   case that he cited, show that Mr. Eisenberg was very well aware

15   that it was generally unlawful for him to engage in market

16   manipulation or the types of fraudulent acts that he did.

17             THE COURT:  What about the argument that all of those

18   other cases, the press releases, everything, they may have

19   happened before the time of the offense, and so were known to

20   Mr. Eisenberg, but they are not the same stuff?  They are all

21   different kinds of acts.

22             MR. BURNETT:  I think that is a standard that is

23   literally -- unless he searches, If I do this, will -- right,

24   what he did and not happened yet, it would be impossible for us

25   to meet that standard.  That goes to weight; it doesn't go to

O49VEIS6

1    the admissibility of the evidence or the unfairness of offering

2    it.

3            THE COURT:  Right.  So let me give you an example.

4    Let's say *Phillips*.  How does *Phillips* play into knowledge or

5    willfulness as it would be relevant to this case?

6            MR. BURNETT:  Sure.

7            THE COURT:  Understanding that it doesn't need to be

8    the exact same thing in the exact same circumstances, but --

9            MR. BURNETT:  Sure.  The *Phillips* indictment that

10   Mr. Eisenberg quoted from on his Twitter account charged a

11   person with wire fraud and commodities fraud in connection with

12   a scheme that involved manipulating the spot market in order to

13   achieve a desirable result under a particular option contract

14   that that person had, which is, from the government's view,

15   highly analogous to the situation we have here, where

16   Mr. Eisenberg manipulated the spot market of an asset in order

17   to get a win or in order to manipulate the price of a swap that

18   he had in connection with the Mango Markets trades.

19           THE COURT:  Okay.  Understood.

20           Okay.  So I think in these circumstances, given that

21   the objection is just on 402/403 grounds, I don't think for

22   admissibility purposes the potential prejudice or jury

23   confusion substantially outweighs the probative value of these

24   documents.  However, as I think we've clarified, counsel will

25   be permitted to argue exactly as counsel has very artfully

O49VEIS6

1    argued, that these other documents that Mr. Eisenberg may have

2    been searching for, including any search histories, that sort

3    of thing, just have no relevance here and don't bear on his

4    knowledge, especially given the legal uncertainties surrounding

5    the commodities space.

6            MS. MARTABANO:  Thank you, your Honor.

7            I think we may ask the Court to consider that there be

8    some kind of instruction, that these are not identical facts.

9    Or if the government won't stipulate to that, just something so

10   that the jurors can understand that none of those are the same.

11   And I'm offering that to avoid the issue of a trial within a

12   trial, of us needing to bring up the specifics of every single

13   case.  There's like four or five of them at least that are

14   cited.

15           THE COURT:  Are these documents coming in through one

16   of the FBI agents?

17           MR. BURNETT:  Yes.

18           THE COURT:  Okay.  So I think the way it would

19   normally work is you can cross-examine the FBI agent as to any

20   documents that are admitted through that agent.

21           MS. MARTABANO:  Okay.  As long as your Honor is okay

22   with us getting that deep into the weeds on it, that's fine.

23           THE COURT:  If the government is putting in the

24   statements through a particular witness, then you are free to

25   cross-examine that witness as to those statements.  That is how

O49VEIS6

1    it works.

2              MS. MARTABANO:  Thank you, your Honor.

3              MR. KLEIN:  Your Honor, there are other things in the

4    record that we could pull and offer into evidence that would

5    show he was looking at other articles and showing other things,

6    not going to the truth, but to the state of mind.

7              So I think if this is coming in, these four, we should

8    be entitled to go to the discovery and pull the other articles

9    that we have in discovery that show -- because they've selected

10   just the ones they like, obviously.  And there's other ones in

11   there that we could actually put into evidence that would show

12   this wasn't just a single focus on these indictments; there

13   were actually a lot of other articles looked at.

14             MR. BURNETT:  Mark exhibits then.

15             THE COURT:  Yes.  I'm happy to look at anything that

16   you provide me and make a determination as to whether they

17   would be admissible or not.

18             I understand what you're saying.  You're saying there

19   was an issue that came up previously where there were

20   statements made after the time of the offense.  And so there

21   wasn't a way for the defense to get in those statements other

22   than through the rule of completeness.  I think you're talking

23   about something different, which is literally at the same time

24   of these searches.  There were other searches that might point

25   in the opposite direction, but go solely to state of mind, not

O49VEIS6

1    to the truth of any matter in those particular documents.  And

2    so I'm happy to take a look at those and see if they fit under

3    the exception.

4            MR. KLEIN:  Thank you, your Honor.

5            MS. MARTABANO:  Thank you, your Honor.

6            THE COURT:  Okay.  Again, there were so many exhibits

7    that were objected to that we've talked about them in

8    categories.  And I want to make sure that if there are any

9    particular ones that the defense takes special issue with,

10   like, for instance, I just questioned the government concerning

11   the *Phillips* document.  But if there's something where you say,

12   I understood what you said, Judge.  But there's like these five

13   documents that are way off base because they just literally

14   have nothing to do with what's going on here, then isolate

15   those and raise those in the morning so that we can just figure

16   out -- because I don't want -- I did this as a way to

17   streamline things; but I want to make sure everyone understands

18   I did not do that to the exclusion of, Hey, there's a document

19   that we really want you to take another look at because it's

20   different than the ones that you put into that category.

21           MS. MARTABANO:  Thank you, your Honor.

22           MR. KLEIN:  Your Honor, Mr. Davis is sending us the

23   exhibits, prospective exhibits for tomorrow in about half hour

24   or an hour.  And we will go through that with that in mind and

25   forward it onto the chambers, like we did with 1512.

O49VEIS6

```
1                  THE COURT:  Okay.

2                  MR. KLEIN:  Are we meeting tomorrow then -- it sounds

3      like we should plan on meeting --

4                  THE COURT:  8:30.

5                  MR. KLEIN:  8:30.

6                  THE COURT:  We'll see you here.

7                  And we need to actually be here at 8:30.  I know that

8      there's sometimes unavoidable delays, but I think -- no, not

9      that anyone was responsible for this, but I think we got

10     started at something like 8:45.  It's hard to not get started a

11     little bit late.  So try to be here a little bit early so we

12     can really make use of that 30 minutes.

13                 MR. KLEIN:  Your Honor, our client wasn't here on

14     time.  That was the issue, the bus --

15                 THE COURT:  No.  That's what I assumed and it's

16     nobody's fault.  I'm just trying to make sure that we can

17     maximize time.  Because I want to give the parties the time

18     they need to raise all the issues that they have to.

19                 MS. MARTABANO:  Thank you, your Honor.

20                 MR. BURNETT:  Just on this unlawfulness point that

21     we've been discussing here, as I understand the instruction

22     that the Court intends to give, it's that the person --

23     Mr. Eisenberg needs to know that his conduct is generally

24     unlawful, not that he violated like a particular statute.

25     There's been a lot of emphasis from the defense on framing of
```

O49VEIS6

1    it.  He's got to know it's the CEA; he's got to know it's the

2    CEA.  I just want to make sure or flag, like if that is the

3    line of cross or like the argument, that he's got to know it's

4    the CEA, we're going to be asking for a supplemental

5    instruction that that's just -- that that's not true.

6        THE COURT:  Well, I don't think the parties got that

7    deep in the weeds.  And when we were talking about the jury

8    instructions, you raise a fair point.

9        I guess my question for you is so what did Judge

10    Friendly mean in *Dixon*, when he said it means generally

11    unlawful under the securities laws?  I think that's the way it

12    was put in *Dixon*, which I don't think anyone said that that's

13    wrong.  I mean it goes back and forth between is it *Kaiser* and

14    then finally *Kosinski* that comes after it.  But I may be

15    getting the names wrong.

16        MR. BURNETT:  Even the cases that have come out the

17    non*Kaiser* way on willfulness have not required knowledge of the

18    specific statute.

19        THE COURT:  That I agree.  That I agree.  It's not the

20    specific statute.

21        I think what you had said was is it generally -- does

22    this show knowledge under -- that it was unlawful under the

23    commodities laws or the analogue of the securities laws.

24        MR. BURNETT:  I think it's generally unlawful.  If he

25    thought that it was unlawful under the securities laws, but,

O49VEIS6

1    like, whoops, it was unlawful under the Commodities Exchange

2    Act, that's like a classic mistake of law defense that's only

3    available in the narrow circumstance where it is like a tax

4    case.

5              THE COURT:  You may be right.

6              On what we agree on, I don't believe it is the rule or

7    regulation, because that's an affirmative defense at least as

8    to Count One and not being raised here.  So it's not that.

9              And so as to how much broader it gets, I agree with

10   you that the suggestion from the cases are that it's generally

11   unlawful, meaning it's unlawful conduct under some law is my

12   understanding of what we're talking about here.  You don't need

13   to show that it's unlawful under this specific title of the

14   U.S. Code as opposed to this specific title of the U.S. Code.

15   I think that's correct.

16             But I'll hear the parties if there's some authority

17   that says it's either narrower or broader than that.  But I

18   think -- and maybe a way to understand what was happening in

19   *Dixon* is that if it was unlawful, it would not have been -- it

20   would only have been unlawful in that area of the law, which is

21   why the case was written in that way.

22             MR. BURNETT:  Right.

23             Like, I think a good example would be if someone

24   commits like classic fraud and involving a security, and they

25   know that, like, fraud is wrong and a crime, but have no idea

O49VEIS6

1    about the existence of the securities laws.  It's not a

2    defense; it's like, Well, I knew fraud was illegal, but I

3    didn't know about the applicability of the securities laws

4    here.

5            THE COURT:  Now that we've had this colloquy, from the

6    defense side, does anyone disagree about this?  Because I think

7    that what -- the line of disagreement on the instructions was

8    between wrongful, as like an immoral purpose, and unlawful as a

9    clear dividing line.  And so the Court resolved that, resolved

10   that for purposes of the proposed jury charge, to include an

11   instruction on unlawfulness.

12           I think the government is now raising an issue of

13   whether that -- whether the defense plans to argue that if

14   Mr. Eisenberg did not know that this particular conduct was

15   unlawful under the Commodities Exchange Act or as to specific

16   rules and regulations, that then that does not satisfy the

17   intent requirement.

18           Is the defense planning to argue either of those two

19   things?

20           MR. GREENSPAN:  No, your Honor.  We're satisfied with

21   the Court's instruction, and we didn't ask for an instruction

22   on any specific law or even any specific category of law.

23           I think the way that this has come up is just, you

24   know, the CEA is the applicable law.  We're not saying that he

25   had to know the CEA was the law that was breached, but it's

O49VEIS6

```
 1    just in context.  I don't think we've made the argument that I
 2    think the government is attributing to us.
 3              THE COURT:  If the CEA comes up, then I'm sure it
 4    would come up just in context, because some of those articles
 5    and press releases are talking about it.
 6              MR. BURNETT:  I just want to make sure, if we have
 7    future debates about these articles or these tweets --
 8              THE COURT:  If we don't have any --
 9              MR. BURNETT:  This was manipulation under the
10    securities laws, so it can't be relevant to his knowledge about
11    manipulation.
12              THE COURT:  That's why I asked the question.
13              But we get to have that back-and-forth over Second
14    Circuit case law over the last 40 years, which is always fun,
15    but does not appear to be an issue.
16              MR. BURNETT:  Can't seem to get away from these legal
17    issue cases.
18              THE COURT:  Okay.  So anything else from either side?
19              MR. BURNETT:  The defense party just needs to drop
20    this crazy willfulness.
21              THE COURT:  Anything else from the government?
22              MR. BURNETT:  Nothing else.
23              THE COURT:  Anything else from the defense?
24              MR. KLEIN:  No, your Honor.
25              THE COURT:  All right.  Thank you very much.
```

O49VEIS6

1          Really appreciate it.

2                  (Adjourned to April 10, 2024, at 8:30 a.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                         INDEX OF EXAMINATION

2      Examination of:                              Page

3       BRIAN SMITH

4      Direct By Mr. Davis  . . . . . . . . . . . . .93

5      Cross By Mr. Klein . . . . . . . . . . . . . 114

6      Redirect By Mr. Davis  . . . . . . . . . . . 134

7      Recross By Mr. Klein . . . . . . . . . . . . 136

8       JAMES FARRELL

9      Direct By Mr. Burnett  . . . . . . . . . . . 140

10     Cross By Mr. Klein . . . . . . . . . . . . . 176

11     Redirect By Mr. Burnett  . . . . . . . . . . 187

12     Recross By Mr. Klein . . . . . . . . . . . . 190

13      KAPIL JAIN

14     Direct By Mr. Burnett  . . . . . . . . . . . 191

15                        GOVERNMENT EXHIBITS

16     Exhibit No.                               Received

17      900, 1011, 1701  . . . . . . . . . . . . . .99

18      1010   . . . . . . . . . . . . . . . . . . 125

19      1512 . . . . . . . . . . . . . . . . . . . 143

20      1500 through 1513  . . . . . . . . . . . . 153

21      1702   . . . . . . . . . . . . . . . . . . 188

22      606, 607 . . . . . . . . . . . . . . . . . 188

23      1358   . . . . . . . . . . . . . . . . . . 220

24

25
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300