O4BCeis1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4               v.                        23 Cr. 10 (AS)

5   AVRAHAM EISENBERG,

6               Defendant.               Trial

7   ------------------------------x
                                         New York, N.Y.
8                                        April 11, 2024
                                         8:53 a.m.
9

10  Before:

11                  HON. ARUN SUBRAMANIAN,

12                                       District Judge
                                          -and a jury-
13
                          APPEARANCES
14

15  DAMIAN WILLIAMS,
         United States Attorney for the
16       Southern District of New York
    PETER J. DAVIS
17  THOMAS S. BURNETT
    TIAN HUANG
18       Assistant United States Attorneys

19  WAYMAKER LLP
         Attorneys for Defendant
20  BRIAN E. KLEIN
    ASHLEY MARTABANO
21  RILEY SMITH
         -and-
22  TALKIN MUCCIGROSSO & ROBERTS, LLP
    SANFORD N. TALKIN
23  NOAM B. GREENSPAN

24  MORRISON & FOERSTER LLP
         Attorneys for Mango Labs
25  BY:  MICHAEL BURSHTEYN

O4BCeis1

| | |
|---|---|
| 1 | (Trial resumed; jury not present) |
| 2 | THE COURT:  We'll do a little lightning round here. |
| 3 | So the first thing is on 116.  I'm still not even |
| 4 | clear why 116 is coming in.  What's the point of this text |
| 5 | thread? |
| 6 | MR. BURNETT:  It's to establish Mr. Eisenberg's |
| 7 | ownership over the bochen.clean@gmail.com account on FTX which |
| 8 | was used to do the scheme. |
| 9 | THE COURT:  And the defense objects saying that |
| 10 | nothing else in that document has any probative value.  So I |
| 11 | understand it's in a document, but why should any other part of |
| 12 | that document come in? |
| 13 | MR. BURNETT:  We shortened -- we had proposed a |
| 14 | shortened version, which just has that part of it coming in. |
| 15 | My understanding is that the defense no longer had an objection |
| 16 | on that ground.  What they wanted to do was add a few rows to |
| 17 | show some contracts about the bochen.clean account, and that's |
| 18 | what the dispute is right now. |
| 19 | THE COURT:  Ms. Martabano, is that correct? |
| 20 | MS. MARTABANO:  That's correct, your Honor.  When the |
| 21 | government's opening suggested that Mr. Eisenberg didn't have |
| 22 | proper access to the bochen.clean account from the bochen.clean |
| 23 | individual side of things, we wanted to bring in this contract |
| 24 | which shows he did have a legal document purchasing the right |
| 25 | to that account.  And so, it's on the same day, it's 13 minutes |

O4BCeis1

1    earlier.  So we just think it's relevant.  And it's also -- it

2    completes the documents, which they've attached as 116A, B, C,

3    and D, which cite to the passwords relating to this exact same

4    account.

5            THE COURT:  To be clear, that would be your versions

6    of 116 and 116A?

7            MS. MARTABANO:  Yes.  And just for consistency, we

8    would have them rename their current A through D to B through E

9    so it's in chronological order.

10            THE COURT:  That's what we're going to do.  So we'll

11    use your 116, 116A, and then conform the government's

12    designations on the exhibits.

13            MS. MARTABANO:  Thank you, your Honor.

14            THE COURT:  Let's go to the email early this morning.

15    First on 502A --

16            MS. MARTABANO:  And I believe that's the only one,

17    your Honor.  The government confirmed this morning it's fine on

18    119 and 405.

19            THE COURT:  As to 502A, the redactions have to do with

20    404(b).

21            MS. MARTABANO:  Which was on this list, yes, your

22    Honor.

23            THE COURT:  So those redactions, so the redacted

24    version of this exhibit will be the one that's used.

25            MS. MARTABANO:  Thank you, your Honor.

O4BCeis1

1          THE COURT:  And then 119, there's no issue there?

2          MR. BURNETT:  So the only thing there was the defense

3    had proposed adding like a search he has for crypto tax

4    lawyers, which we don't think is completing of anything.  So we

5    would propose removing that addition.

6          THE COURT:  So the completeness objection proposal is

7    still live as a dispute between the parties?

8          MR. BURNETT:  That's correct.

9          THE COURT:  So we'll use the version with the

10   additional line proposed by the defense.  And you have that

11   version with the additional line?

12         MR. BURNETT:  We do, yes.

13         THE COURT:  And that leaves us with 405.

14         MR. BURNETT:  405, we agreed to the defense's

15   addition.  We need to create that expanded exhibit, but that

16   wouldn't be until after the break, if we get to it at all

17   today.

18         THE COURT:  Why shouldn't exhibit 405 just be out for

19   failure to comply with 404(b)(3)?

20         MR. BURNETT:  So, your Honor, it's not 404(b)

21   evidence, it's actually sort of the opposite.  It serves two

22   purposes.  There was originally an objection to this.  I think

23   the Court overruled it at the beginning of the case.  What this

24   document shows is two things:

25         So first, it shows that Mr. Eisenberg, when he knows

O4BCeis1

how to comply with a bug bounty program when he wants to

actually do a bug bounty program, which rebuts the idea he was

seeking like a bounty in the Mango case as opposed to doing

something different because there's a process to be followed --

THE COURT: Any 404(b) evidence has to be relevant to

the case in question. I take it that it's relevant to a number

of things — plan, intent, lack of mistake, you name it. It

follows into a number of things in that category.

What became clear when I was reading this email, and

it was suggested before, but because of the way the objections

had been raised, which is in a letter that just kind of set out

the rule numbers, this particular issue did not come to the

forefront, which is that the defense's claim is that prior to

trial and up to the present point I gather, there was not

proper notice under Rule 404(b) as is required where the

government is supposed to, in writing, prior to trial, not only

identify the documents that it proposes to put in under 404(b),

but identify the particular reasons under 404(b) that that

evidence would be relevant to. The only exception is if, for

good cause, I was to excuse you from that requirement, but

that's never happened.

MR. BURNETT: So, your Honor, the reason we didn't

provide notice is, as at least as I've always understood it and

litigated it, in other cases, 404(b) would apply for

introducing evidence of bad acts, but 405 is not a bad act. In

O4BCeis1

1    fact, it's a good act.

2            THE COURT:  Well, it doesn't say that.  It says

3    evidence of any other crime wrong — which they got you there —

4    or act is not admissible to prove a person's character in order

5    to show that on a particular occasion, the person acted in

6    accordance with that character.  This evidence may be

7    admissible for another purpose, such as proving motive,

8    opportunity, intent — you got that covered.  In a criminal

9    case, the prosecutor must provide reasonable notice of any such

10   evidence that the prosecutor intends to offer at trial, et

11   cetera, et cetera.

12           Let me just make sure we're on the same page.

13   Ms. Martabano, the government says this only applies to bad

14   acts.  What we're talking about now isn't a bad act, it's

15   literally just a conversation with somebody else that there's

16   nothing bad about it.  So why doesn't that fall outside of the

17   scope of 404(b)?

18           MS. MARTABANO:  We think it suggests, your Honor, that

19   he has a pattern of making trades or seeking bounties, which

20   the government has suggested are at times inappropriate.

21           In addition, you'll note Mr. Eisenberg doesn't respond

22   until November 2nd and this email doesn't start until after the

23   date in question.  So it also doesn't bear on whether he in

24   fact knew at the time of October 11th anything about complying

25   with a bug bounty properly.

O4BCeis1

1          And also, often, people associate hackers with the

2     suit with seeking bug bounties.  It does suggest, you know,

3     he's on the character of someone who might hack or otherwise

4     seek to pursue a bug bounty extortionately after the fact,

5     which is what they suggested, likened his current activities

6     to.

7          THE COURT:  You agree with Mr. Burnett 404(b) only

8     applies only to bad acts and not other acts?

9          MS. MARTABANO:  I think the statute of it is bad acts

10    or other acts, as your Honor just read.  I feel -- sorry to

11    misstate.  It's really just character evidence, not just --

12         THE COURT:  Mr. Burnett, do you have a case or

13    authority that indicates that 404(b) applies only to,

14    quote-unquote, bad acts?  I don't even know how you would try

15    to figure out what's a bad act or not, but is there some

16    authority that says that the rule text should be read in that

17    light?

18         MR. BURNETT:  So I don't have it off the top of my

19    head, your Honor.

20         THE COURT:  I'm going to exclude exhibit 405.

21         Now, Ms. Martabano, I don't believe in that list of

22    the long email that the Court issued some categorical rulings

23    on, I don't believe there were other 404(b) documents that the

24    Court overruled your objection as to.  However, you should

25    check and you should raise those objections if you have the

O4BCeis1

1    same objection, which is not so much that it's not relevant

2    under one of the permitted uses, but that the proper notice

3    wasn't afforded, and then I'll hear that objection.  You have

4    to let me know that's the objection being made.  And so, an

5    exception to the Court's usual practice, if that's the nature

6    of the objection, then it can just be objection, 404(b), and

7    I'll understand the objection that's being made.

8            MS. MARTABANO:  Thank you, your Honor.

9            THE COURT:  So one last question, because I'm sure

10   this is going to come up, but Mr. Burnett, at the beginning of

11   the day yesterday, we talked briefly about the Jupiter, FTX,

12   and Switchboard terms of use.  As to the Switchboard terms of

13   use, you had indicated conduct went through Switchboard, and we

14   can put this in through a later witness, he — meaning

15   Mr. Eisenberg — visited the Switchboard website a number of

16   times in preparation for the attack, and part of the terms of

17   service say it applies to both Switchboard partners and to

18   people who use and visit the website.  That testimony did not

19   come in through Mr. Hermida.

20           And so, one, is that testimony going to come in?

21           MR. BURNETT:  So the testimony that he visited the

22   website or the testimony that —

23           THE COURT:  He visited the Switchboard website a

24   number of times in preparation for the attack, and that part of

25   the terms of service say it applies to both Switchboard

O4BCeis1

1    partners and to people who use and visit the website.  Maybe

2    that's reflected in the terms of use itself.

3         MR. BURNETT:  So the terms of use, Mr. Hermida read

4    the paragraph:  By using this website, you agree to the terms

5    of service and that said applies to that -- Special Agent

6    La Grange, who will testify either at the end of the day today

7    or beginning of the day tomorrow, depending on how the pace of

8    things goes, will show web history for Mr. Eisenberg's phone

9    that show he visited the website a number of times both on the

10   day of the attack and before.

11        THE COURT:  Understood.

12        And is that also the case for the FTX terms of use?

13        MR. BURNETT:  So, the FTX terms of use, I can't

14   remember if they apply to people who use accounts or use

15   accounts and visit the website, but in either event, the

16   evidence will show that Mr. Eisenberg both had FTX accounts in

17   his own name and was the user of the bochen.clean@gmail.com FTX

18   account, which was the account that was registered and was used

19   for this particular scheme.

20        THE COURT:  All right.  Now, let's just assume for the

21   moment, put aside intent, which I suppose if -- let me use an

22   example.  As to AscendEX, the testimony from Mr. Farrell was

23   that you go on, you use the site, you have to click that you

24   read the terms of service, and he read the parts of the terms

25   of service.  So in addition to anything else, there would be an

O4BCeis1

1    argument from the government that it would be relevant

2    potentially to Mr. Eisenberg's intent.  Understood.  Is that

3    the same with respect to Switchboard and FTX in the

4    government's view?

5            MR. BURNETT:  So, that's true as to -- that's the same

6    as to Switchboard -- well, there is an intent inference as to

7    Switchboard and FTX terms of service, as well.  I think we also

8    made the separate point about -- and this is something that

9    Mr. Hermida talked about yesterday, that part of the reason

10   that certain websites, particularly AscendEX and FTX were

11   selected as inputs to the oracle was because they were big

12   centralized exchanges that had, like, anti-manipulation

13   procedures in place.  So this also goes to the expectations of

14   the people who are creating the oracle for Mango Markets and

15   users of Mango Markets about the types of inputs that would be

16   feeding into the oracle apprise for the perpetual.

17           THE COURT:  I don't believe there was any testimony

18   from Mango Markets that they had any awareness of any terms of

19   use that anyone else had.  Does it have to be them?  That's

20   what I'm trying to figure out, is let's say that there is no

21   evidence that Mr. Eisenberg had any idea about any terms of use

22   for Switchboard, let's use that example.

23           MR. BURNETT:  I think it would still matter and I

24   think it would matter for the reason -- so Mr. Hermida said he

25   was involved in creating the Switchboard -- creating the Mango

O4BCeis1

1   perpetual oracle with the Mango team and the Switchboard team

2   and the -- he didn't say the terms of service, but he said that

3   the centralized exchanges were selected because they had

4   anti-manipulation protections and, like, there are places where

5   you'd expect fair orderly markets to happen.

6       THE COURT:  Anyone from the defense side, would you

7   like to be heard?

8       MR. GREENSPAN:  Sure, your Honor.  I think addressing

9   the data that's coming in, from our review of the evidence, the

10  data doesn't show anything indicating that Mr. Eisenberg saw

11  the Switchboard terms of use.  Just the fact he visited the

12  website and had terms of use, undated terms of use that we

13  don't even know if they were on there at the time, that doesn't

14  mean he saw them or that in any way went to his intent.  So I

15  think the introduction of those terms was quite misleading to

16  the jury.

17      MR. KLEIN:  Your Honor, the evidence they have about

18  Switchboard, the visit is to the explorer, which doesn't have

19  the terms of service on it.  It's actually just a list.  If you

20  go there, you can go there now, it just lists different assets

21  that are available.  So they literally have no evidence that he

22  saw this.  The one link they put is to the explorer, so it's

23  completely misleading.

24      THE COURT:  I think the government is saying that it's

25  not only relevant to intent, it's relevant to materiality.

O4BCeis1

1    They're saying, assume for the moment that Mr. Eisenberg didn't

2    see any of this, although they're saying that they have that

3    foundation.  However, they're saying it's independently

4    relevant to materiality because Mr. Hermida said he was

5    involved in creating the perpetuals and he used Switchboard,

6    had these terms of service.  It goes to the expectations of the

7    ordinary -- the person of ordinary intelligence who would be

8    under the objective standard of materiality would be looking at

9    in determining whether something was important or not.

10         MR. KLEIN:  Your Honor, that would go to who he

11   negotiated with and who signed up Switchboard, which was not

12   Mr. Eisenberg.  That was the Mango Labs team or the Mango

13   Markets contributors.

14         So the agreement, if you look at it, is between the

15   user, and the user is the Mango Markets website or lab.

16   Mr. Eisenberg did not run that.  There's no dispute on that.

17   So they have an agreement between two businesses, and then

18   they're saying now somehow Mr. Eisenberg is on notice between

19   this agreement.

20         Their only proof of that is a visit to a website that

21   is the explorer, not the terms.  So they're basically trying

22   to -- it's going to be completely misleading to the jury.

23   They're not going to put in any evidence, I'm aware of, that

24   anybody else ever saw these terms of service.  All they have is

25   Mr. Hermida saying we entered into an agreement with Mango

O4BCeis1

1    Markets and this is the terms of service, but that's what Mango

2    Markets says, it's not with any of the users.

3        THE COURT:  You're saying that even if Mr. Eisenberg

4    didn't see these, they don't have evidence that anyone from

5    Mango Markets saw it either?

6        MR. KLEIN:  Yeah, there's nobody.

7        THE COURT:  So if it's intent, Mr. Eisenberg has to --

8    there at least needs to be an argument that he saw it.  You can

9    argue that he didn't actually see it, but they're saying that

10   if he had to sign up for the website and everyone who signed up

11   for the website, it was literally there on the website, they

12   can make the argument that you can infer knowledge from that

13   basis, then it becomes an issue of weight as opposed to

14   admissibility; right?

15       MR. KLEIN:  Exactly, your Honor, it's a weight.

16       THE COURT:  So that's that.

17       I take it you're saying that even if we just looked at

18   materiality, that's from the other side.  So you have to have

19   something that focuses on Mango Markets, and what they

20   understood or expected based on -- and have a reasonable basis

21   for that, which is lacking, as I take it, for at least the

22   Switchboard terms of use.

23       MR. KLEIN:  They have no users and they have nobody

24   from Mango Markets, Mango Labs, or anybody saying we entered

25   into this agreement.  So all they have is one person saying

O4BCeis1

1    there was an agreement and we don't even know who it was with.

2              THE COURT:  Mr. Burnett, just briefly, we can pick

3    this up a little bit later.

4              MR. BURNETT:  You have someone who is the CEO of

5    Switchboard who said I was involved with the Mango Markets team

6    in creating this oracle, and I think it's relevant to setting

7    the expectations of the marketplace and what people were

8    thinking -- I'm sorry.  Not what people were thinking.  But how

9    people would expect an oracle -- a Switchboard oracle would be

10   used, that Switchboard itself also has anti-manipulation rules

11   and terms of service, as well.  I think what we're asking here

12   is a reasonable person in the position of Mango Markets or its

13   users, not Mango Markets in particular.

14             And here, the question is like, what's the expectation

15   or what's the expectation of people who are saying, okay, Mango

16   Markets is using the Switchboard oracle, should I be expecting

17   that the Switchboard oracle is going to get manipulated or not,

18   should I be expecting that the inputs to the Switchboard oracle

19   are going to be manipulated or not.  And one way, one piece of

20   evidence that the market's expectations are, well, you know, I

21   think Switchboard is going to be reporting non-manipulated

22   prices is that both Switchboard, FTX, and AscendEX had terms of

23   service that would prohibit people who were using those

24   platforms or using those services from manipulating them.

25             THE COURT:  Okay.  So, just to like break it down into

O4BCeis1

1    really simple terms.  It's almost like if the defense -- the

2    defense's argument is somehow this market operated differently

3    than normal markets with normal understandings, saying you are

4    able to come back and show, no, on the actual Switchboard that

5    was operating the oracle, they had terms of use as you might

6    expect in a normal market.  And so, those normal market

7    understandings apply here.  And so, we should consider those

8    when we're thinking about what the ordinary investor in the

9    position of Mango Markets would have expected.

10             MR. BURNETT:  Exactly.  And to that point, your Honor,

11   the defense opened on, crypto is crazy, prices go nuts, it's

12   not really regulated like a traditional industry is.  And I

13   think this is all important to understate for the jury to

14   understand that there are actual expectations and rules in

15   these market places and people expect those will govern

16   behavior.

17             THE COURT:  To be very clear, from your perspective,

18   it would not matter whether Mr. Eisenberg saw or didn't see

19   these, or whether Mango Markets and its users were aware or not

20   aware of these?

21             MR. BURNETT:  Right, because materiality is an

22   objective standard.  So you're asking what someone -- what a

23   reasonable market participant in the shoes of Mango Markets or

24   in the shoes of the user would see.  This isn't a reliance

25   case, it's not a civil case.

O4BCeis1

1          THE COURT:  I would say two things for present

2    purposes and then we'll bring in the jury.  But one, if do you

3    have this additional information that you were saying, like,

4    through a witness, you were going to establish that there were

5    visits to the Switchboard website, then, you know, that's

6    something that the Court will consider in trying to figure out

7    if that document can be further used in this case.

8          And as to the FTX terms of use, I mean, I think you

9    need to -- before you put that in, there needs to be a good

10   foundation laid for why, at the very least on intent, because

11   there I think you are saying that it goes to the issue of

12   intent; right?

13         MR. BURNETT:  I think that would be both intent and

14   the same market expectation point because, as Mr. Hermida

15   testified, the reason they selected FTX as one of these things

16   was because it had anti-manipulation.

17         THE COURT:  I'm going to scrutinize it closely, so I'm

18   just putting you on notice that before the terms of service

19   come in, there should be good foundation on, whatever the

20   foundation is for why it's relevant to the case, it should come

21   in before you try and introduce that document.

22         MR. BURNETT:  Okay.  Because it might affect the order

23   of the witnesses that we put in.  And so, for instance, I think

24   Mr. Molina will testify that Mr. Eisenberg had many accounts on

25   FTX and he will also testify that there was this

O4BCeis1

1    bochen.clean@gmail.com account.  Our original plan had been to

2    put the FTX terms of service in after that.  We could have

3    DeCapua go first, who would also establish that Mr. Eisenberg

4    was using the bochen.clean account.  It depends.  We could take

5    them out of order --

6            THE COURT:  You should do what you're going to do.

7    I'm just telling you that -- I mean, I think you should

8    understand that when you put it in, the defense is going to

9    object, and I've now told you kind of not the concern, but I do

10   believe it's like a sensitive issue.  I think from your

11   perspective, you should put in all of that foundation first

12   before you try to introduce the terms.

13           MR. BURNETT:  Okay.  Thank you.

14           MR. KLEIN:  Your Honor, can I have one last --

15           THE COURT:  I didn't see you because you're over there

16   on the side.

17           MR. KLEIN:  There's no chair here, your Honor, so I'm

18   a little lower than usual.

19           One last point.  The only evidence about what Mango

20   Markets people expected so far is exhibit 1010, I believe,

21   where it says, "use at your own risk."

22           THE COURT:  Well, 1010, I think 1010 is what the

23   government would say shows the opposite.

24           MR. KLEIN:  Sorry.  It's 1011.  It just says, "use at

25   your own risk."

O4BCeis1

1          THE COURT:  Is that all it says?

2          MR. BURNETT:  There is an exhibit that says use at

3     your own risk.  I don't think the fact that it says "use your

4     own risk" defeats all expectations.  In fact, that would prove

5     the reason for needing this evidence to come in.

6          THE COURT:  Well, what's the link, I think is

7     Mr. Klein's --

8          MR. GREENSPAN:  Your Honor, I think what we were

9     trying to say is exhibit 1011 has specific warnings about the

10    potential that the oracle could be manipulated.  So the notion

11    that individual users, none of whom, as far as we know, have

12    ever seen the Switchboard terms of service are relying on terms

13    of service they haven't seen when they've been specifically

14    warned not to rely on them, I think just defies logic.

15         MR. BURNETT:  I don't have in mind the exact wording

16    of what they're referring to, but I actually think it shows the

17    opposite.  Terms of service and other things, it is often the

18    case that companies will, like, effectively disclaim to people,

19    like, hey, there are risks of using our thing or like, you

20    know, crime may happen on our platform.  Like, if you sign up

21    for a bank, it will do the same thing, but that doesn't mean

22    that people's expectations are that the crime won't happen,

23    manipulation won't happen.  Even if they're warned, there's a

24    possibility that something could happen, right.  There's the

25    difference between what people expect versus what they know is

O4BCeis1

1    possible out there.  Anytime you walk out on the street, you

2    know it's possible someone's going to rob you.  It doesn't mean

3    you expect someone is going to rob you.

4                THE COURT:  Okay.  Understood.  Let's bring the jury

5    in --

6                MS. HUANG:  Just to kind of end things on a positive

7    note, your Honor.  I just wanted you to know that defense

8    counsel kindly let me know that they have no objections to the

9    Mordecai demonstratives and exhibits, which are quite lengthy.

10   So I plan to have those bulk admitted at the beginning so

11   things run a little more smoothly.

12               MR. GREENSPAN:  And one more agreement on the

13   record --

14               THE COURT:  Great.

15               MS. HUANG:  We're working.  We're working.

16               MR. GREENSPAN:  Your Honor ruled on the FTX exhibits

17   that if and when the jury asks for them, information not

18   related to the accounts at issue will be redacted.  And we

19   struck an agreement on that, not just for the FTX documents

20   that we discussed, but for all FTX documents that are going to

21   come in.

22               MR. DAVIS:  Meaning the FTX documents coming through

23   this next witness?

24               MR. GREENSPAN:  Correct.

25               MR. DAVIS:  That's correct.

O4BCeis1

1          MR. KLEIN:  And one more, your Honor.  I'm sure the

2     government would agree, we have a stipulation, again, if the

3     FTX terms come in, although we object to them, that we would do

4     the same kind of limiting instruction, because there is

5     60-something pages of them.  I prepared it for your Honor.

6          THE COURT:  Great.  I was going to ask, because I had

7     the transcript up here.

8          MR. KLEIN:  I prepared it, highlighted it.  I don't

9     know what they would focus on if they come in.  So I would just

10     edit that and --

11          THE COURT:  Edit it, have it ready, you can give it to

12     me and I'll deliver the instruction.

13          MR. DAVIS:  Judge, last thing.  Just for this next

14     witness, there's not going to be a dispute of exhibits that I'm

15     going to be admitting, which is 1202 through 1219, and 1246 to

16     1249 at the top.  Additionally, defense counsel asked us to

17     stipulate to one of the FTX documents and we have agreed to

18     stipulate to 1201.  So I'll be offering that, as well.

19          THE COURT:  Mr. Hernandez, let's bring the jury in.

20          THE DEPUTY CLERK:  Yes, your Honor.

21          THE COURT:  Thank you.  Can we have Mr. Molina back on

22     the stand.

23          (Witness present)

24          (Continued on next page)

25

O4BCeis1                         Molina - Direct

1              (Jury present)

2              THE COURT:  Welcome back, members of the jury.  It's a

3     little gloomy outside, but not here in the courtroom.  Not

4     raining here.  So thank you, again, for all your hard work thus

5     far.  We are still on track, so I'm pleased to announce.

6              Mr. Davis, when you're ready.

7              MR. DAVIS:  Thank you, your Honor.  The government

8     recalls Nils Molina.

9              THE COURT:  Mr. Molina, you're still under oath.

10             Do you understand?

11             THE WITNESS:  Yes.

12             THE COURT:  Mr. Davis, you may proceed.

13             MR. DAVIS:  The government offers 1202 through 1219,

14    1246 through 1249, and 1201 by agreement.

15             MR. GREENSPAN:  No objection.

16             THE COURT:  Those exhibits will be admitted.

17             (Government's Exhibits 1202 through 1219, 1246 through

18    1249, and 1201 received in evidence)

19     NILS MOLINA, resumed.

20    DIRECT EXAMINATION CONTINUED

21    BY MR. DAVIS:

22    Q.  Mr. Molinari, how are you?

23    A.  Good.

24    Q.  Where we left off yesterday is we were talking about KYC

25    and user data.  Can you remind us, what is KYC data at FTX?

O4BCeis1                    Molina - Direct

1    A.  KYC data is data that identifies the user or the individual

2    using the account on FTX.

3    Q.  And the user data that FTX maintains that we talked about

4    in the government exhibits, can you tell about particular

5    users' deposits through that data?

6    A.  Yes.

7    Q.  What about account log-in's?

8    A.  Yes.

9    Q.  Are you able to learn about a particular user's filled

10   trades at FTX?

11   A.  Yes.

12   Q.  Can you explain to the jury what a filled trade is?

13   A.  When a trade is made on FTX, each side of the trade is

14   written to the database as a fill.  If two users trade against

15   each other, each user will have a fill representing the trade.

16   Q.  Could you also learn about pricing data in users' trades?

17   A.  Yes.

18   Q.  What about withdrawals from an FTX user's account?

19   A.  Yes.

20   Q.  Was one of the accounts referenced in these government

21   exhibits the bochen.clean@gmail.com account?

22   A.  Yes.

23   Q.  I want to talk about KYC data for a minute.

24            By looking at this KYC data, could you also learn how

25   many accounts a particular user has at FTX?

O4BCeis1                          Molina - Direct

1    A.  Yes.

2              MR. DAVIS:  Can we start by please publishing

3    Government Exhibit 1209.

4    Q.  Mr. Molina, what is this document?

5    A.  This is textual KYC data submitted by a user to FTX.com as

6    the user was completing the KYC process.

7    Q.  Mr. Molina, can you read the full legal name?

8    A.  Natalia Bochenkova.

9    Q.  What was the country code for this user?

10   A.  POL.

11   Q.  Do you know what that stands for, by chance?

12   A.  Poland.  Yes.

13   Q.  And who enters this data?

14   A.  The user.

15             MR. DAVIS:  Can we please publish Government Exhibit

16   1212.

17   Q.  Is this more KYC data for the same user?

18   A.  Yes.

19   Q.  And who enters this data?

20   A.  The user.

21   Q.  Do you see where it says "account purpose"?

22   A.  Yes.

23   Q.  Can you please read that to the jury.

24   A.  Account purpose, capital name, maintenance.

25             MR. DAVIS:  Could we now pull up Government Exhibits

O4BCeis1                      Molina - Direct

1    1246 and 1247 side-by-side.

2    Q.  Mr. Molina, is this more KYC information for the same

3    account?

4    A.  Yes.

5    Q.  What are we looking at?

6    A.  These are two images submitted by the user when the user

7    was doing the KYC process on FTX.com.

8         MR. DAVIS:  We can take those down.

9         Can we pull up Government Exhibit 1206.

10   Q.  What's this document showing?

11   A.  This is textual KYC information submitted by a user when

12   the user was doing the KYC process on FTX.

13   Q.  And what's this user's full name?

14   A.  Avraham Eisenberg.

15   Q.  And what's the country code?

16   A.  CAN.

17        MR. DAVIS:  Could we please pull up Government Exhibit

18   1203 and 1205.

19   Q.  What is this?

20   A.  These are two images submitted by the same user to FTX.com

21   when the user was doing the KYC process.

22        MR. DAVIS:  We can take down these government

23   exhibits.

24        Can we please pull up Government Exhibit 1219.

25   Q.  Would this document show you how many accounts a particular

1    user has?

2    A.  Yes.

3    Q.  Approximately how many accounts did Mr. Eisenberg have at

4    FTX under his own name, Avraham Eisenberg?

5    A.  17 accounts.

6    Q.  How many accounts were under the name

7    bochen.clean@gmail.com?

8    A.  One account.

9    Q.  For the accounts with the first and last name Avraham

10   Eisenberg, can you tell what the related email address is?

11   A.  Yes.

12   Q.  Do you mind reading the last few digits of that email

13   address.

14   A.  PC3@opayq.com.

15         MR. DAVIS:  Can we go to Government Exhibit 1249.

16   Q.  Do you see this document in front of you, Mr. Molina?

17   A.  Yes.

18   Q.  What is this document?

19   A.  These are support messages related to support tickets for a

20   specific user on FTX.com.

21         MR. DAVIS:  Can we go to row 43, please.

22   Q.  Do you see the email address for this particular

23   correspondence?

24   A.  Yes.

25   Q.  Is it the same email address we were discussing earlier?

O4BCeis1                          Molina - Cross

1    A.   Yes.

2    Q.   Could you please read the text of this message.

3    A.   Hi.   This was accepted last year.   As you have changed your

4    policies without notification, please allow me to withdraw my

5    account balance immediately.   Thank you.

6            MR. DAVIS:   May I have one moment, your Honor?

7            THE COURT:   Yes, you may.

8            (Pause)

9            MR. DAVIS:   No further questions at this time.

10           THE COURT:   Mr. Greenspan.

11           MR. GREENSPAN:   Thank you, your Honor.

12   CROSS-EXAMINATION

13   BY MR. GREENSPAN:

14   Q.   Good morning, Mr. Molina.

15   A.   Good morning.

16   Q.   You were asked about Government Exhibit 1212 and 1206, and

17   those were textual information that you said was input by the

18   user.   Can you tell from those exhibits which user put that in?

19   A.   Yes.

20   Q.   You can tell from 1212 who input that?   Should we put that

21   on the screen for you?

22   A.   Sure.

23   Q.   Can you show the jury where it indicates what user put in

24   this information?

25   A.   So, there are two points.

O4BCeis1                      Molina - Cross

1          First point from the information on the text

2    information on the exhibit is consistent with the user

3    information on the other exhibits, which suggests it's the

4    user.

5          The second point is that I was able to confirm that

6    this was the same user because of the location that the text

7    file was found in.  The location of the text file was found in

8    is not shown on the image, but it was a folder that was unique

9    to the user.

10   Q.  So you were able to confirm that the same user put in the

11   information in 1212 and 1206; right?  Is that your testimony?

12   A.  I don't remember 1206.

13          MR. GREENSPAN:  Can you put up 1206, Mr. Smith.

14   A.  Oh, no, these are two different users.

15          MR. GREENSPAN:  Thank you.  You can take that down.

16          Mr. Smith, can you put up Government Exhibit 1219,

17   please.

18   Q.  Mr. Molina, did FTX at this time allow something called

19   subaccounts?

20   A.  Yes.

21   Q.  What are subaccounts?

22   A.  A given user on FTX can have multiple subaccounts.  Each

23   subaccount may hold -- holds different balances, may hold

24   different coins in it.

25   Q.  So when we look at column D, for example, we see the words

O4BCeis1                        Molina - Cross

1  "main" and "sub."  Does "sub" in column D mean that it's a

2  subaccount?

3  A.   If it says sub, it's a subaccount.

4  Q.   So, for example, if we look at row 19, we see "sub" in

5  column D, and in column G, we see "Avraham Eisenberg"?

6  A.   Yes.

7  Q.   So that's a subaccount; right?

8  A.   Yes.

9  Q.   So some of the 17 accounts that you said Mr. Eisenberg had

10  were actually subaccounts of a main account; right?

11  A.   Of those 17 accounts, one of them is called a main account

12  and the other ones are not called main accounts.  You could

13  call all 17 subaccounts or just 16 subaccounts and one main

14  account.  I don't think there was -- the subaccount was

15  formally defined, but 16 are subaccounts and one is a main

16  account.

17  Q.   Understood.  So we have 17 accounts, but there's only one

18  main account, the rest are all subaccounts?

19  A.   There's one main account, yes.

20          MR. GREENSPAN:  No further questions, your Honor.

21          THE COURT:  Any redirect?

22          MR. DAVIS:  No, your Honor.

23          THE COURT:  Thank you very much, Mr. Molina.  You may

24  leave the stand.

25          THE WITNESS:  Thank you.

O4BCeis1                          DeCapua - Direct

 1              (Witness excused)

 2              THE COURT:  The government may call its next witness.

 3              MR. BURNETT:  The government calls Special Agent Joel

 4    DeCapua.

 5     JOEL DeCAPUA,

 6         called as a witness by the Government,

 7         having been duly sworn, testified as follows:

 8              THE DEPUTY CLERK:  Can you please provide the Court

 9    your first and last name, and spell your first and last name.

10              THE WITNESS:  My name is Joel DeCapua.  First name IS

11    spelled J-O-E-L, last name D-e-C-A-P-U-A.

12    DIRECT EXAMINATION

13    BY MR. BURNETT:

14    Q.  Good morning, Special Agent DeCapua.

15    A.  Good morning.

16    Q.  Where do you work?

17    A.  At the Federal Bureau of Investigation.

18    Q.  How long have you been at the FBI for?

19    A.  This is my 15th year.

20    Q.  Are you part of a specific group at the FBI?

21    A.  I am.

22    Q.  What group is that?

23    A.  So it's called Squad CY3.  We investigate cyber crimes,

24    primarily cyber criminal investigations.

25    Q.  During your time at the FBI, have you done any work related

O4BCeis1                        DeCapua - Direct

1    to cryptocurrencies?

2    A.  I have.

3    Q.  Just generally speaking, what types of

4    cryptocurrency-related work have you done?

5    A.  So, my first cryptocurrency case was about 10 years ago.

6    In general, when working cyber crime, have you to trace ill

7    gotten gains.  And with cyber criminals, their currency of

8    choice is cryptocurrencies.  So working if in the line of work

9    that I do, I've had to trace a lot of cryptocurrency and get a

10   lot of experience in that realm.

11   Q.  Have you done any work on a case related to an exchange

12   called Mango Markets?

13   A.  I have.

14   Q.  What work did you do?

15   A.  So, I was asked to look at some documents and trace some

16   cryptocurrency through various blockchains and to create a

17   presentation for this trial to explain the movement of funds.

18   Q.  What time period did you focus on?

19   A.  It was one day.

20   Q.  What day was that?

21   A.  It was October 11th, 2022.

22   Q.  Just broadly speaking, what types of sources did you rely

23   on in your tracing analysis?

24   A.  So transaction records provided by cryptocurrency

25   exchanges, account opening documents provided by cryptocurrency

O4BCeis1                         DeCapua - Direct

1    exchanges, and information from public blockchains, such as the

2    Solana, the Ethereum blockchain, and the Tron blockchain.

3    Q.  Beyond performing that tracing analysis, have you done any

4    other work investigating this case?

5    A.  No.

6    Q.  So I'd like to start by -- so before you testified, did you

7    have a chance to review blockchain data that was marked as

8    Government Exhibits 1400 to 1451?

9    A.  Yes.

10   Q.  Was that true and authentic records of data from blockchain

11   explorers?

12   A.  It is.

13           MR. BURNETT:  The government offers 1400 to 1451.

14           MR. TALKIN:  No objection.

15           THE COURT:  Those exhibits will be admitted.

16           (Government's Exhibits 1400 through 1451 received in

17   evidence)

18           MR. BURNETT:  Mr. Sears, if you could please show the

19   witness and the parties only, and flip through Government

20   Exhibits 1351 to 57.

21   Q.  Special Agent DeCapua, do you recognize the exhibits you

22   have just been shown?

23   A.  I do.

24   Q.  What are they?

25   A.  So, it's a Power Point presentation, it's a number of

O4BCeis1                      DeCapua - Direct

1    slides that I prepared the numbers that went into these slides.

2    It represents generally the flow of funds that happened on

3    October 11, 2022.

4    Q.  And do these charts summarize otherwise voluminous data and

5    records that you reviewed?

6    A.  Yes.

7            MR. BURNETT:  The government offers 1351 to 57.

8            MR. TALKIN:  No objection.

9            THE COURT:  These exhibits will be admitted.

10            (Government's Exhibits 1351 through 1357 received in

11    evidence)

12            MR. BURNETT:  Let's start by showing the jury and the

13    witness Government Exhibit 1351.

14    Q.  Now, before we get looking into the specific data, I just

15    want to have you help orient everyone.  Do you see there's a

16    kind of box --

17            MR. BURNETT:  Oh, you don't have it up.  For the jury,

18    too, please.  There we go.

19    Q.  To help orient the jury, could you explain -- you see

20    there's a box at the top left?

21    A.  Yes.

22    Q.  What is that, what's the information up there?

23    A.  So at the very top is the day that we're looking at,

24    October 11, 2022, and just underneath it is the slice of time

25    relevant to this specific slide.

O4BCeis1                          DeCapua - Direct

1   Q.  And you see there are a number of different colored little

2   wallet-looking icons?

3   A.  I see that.

4   Q.  What does each of those icons represent?

5   A.  So each icon represents a different virtual currency

6   wallet.

7   Q.  Do you see that some of the wallets have just something

8   that says "wallet" underneath them followed by a string of

9   either numbers or letters?

10  A.  I do.

11  Q.  When something like that appears, what does that mean?

12  A.  So cryptocurrency wallets, they use these unique strings of

13  numbers and letters to identify specific wallets.  Instead of

14  putting the entire cryptocurrency wallet address, which can be

15  quite long, we just use the last five.  That was sufficient to

16  uniquely identify each wallet that we're going to talk about.

17  Q.  And do you see that a few of these wallets have sort of a

18  logo inside of them, and instead of having a string of numbers,

19  have "Avraham Eisenberg" or "bochen.clean@gmail.com"

20  underneath?

21  A.  I do.

22  Q.  What does that information reflect?

23  A.  So some of the cryptocurrency wallets were associated with

24  a cryptocurrency exchange.  And by reviewing the documents

25  provided by those cryptocurrency exchanges, we can see the

O4BCeis1                         DeCapua - Direct

1    names of the people who opened those accounts.

2    Q.  So I want to start by focusing on the blue wallet with kind

3    of a round icon in the middle.  Do you see that?

4    A.  I do.

5         MR. BURNETT:  Mr. Sears, if you can zoom in on that

6    just for a moment.

7    Q.  What's that account?

8    A.  So that account represents the Circle account associated

9    with the name Avraham Eisenberg.

10        MR. BURNETT:  Mr. Sears, if you could quickly pull up

11   Government Exhibit 1701, which is a stipulation that's already

12   in evidence.

13        Government Exhibit 1701 states in point 2 that

14   Government Exhibits 1100 through 1105 are true and correct

15   copies of records kept and maintained by a company called

16   Circle.  Without reading everything, it's for a Circle account

17   registered to Avraham Eisenberg, with the email address

18   green@timessolutions.com afterwards.

19        So the government offers 1100 to 1105.

20        THE COURT:  Any objections?

21        MR. TALKIN:  No, your Honor.

22        THE COURT:  Those exhibits will be admitted.

23        (Government's Exhibits 1100 through 1105 received in

24   evidence)

25   Q.  So let's start by taking a look at Government Exhibit 1104.

O4BCeis1                          DeCapua - Direct

1    Is this one of those Circle records?

2    A.   Yes, it is.

3    Q.   What kind of record is this?

4    A.   It would be considered account opening documentation.

5    Q.   And what's the name for this account?

6    A.   It's Avraham Eisenberg.

7    Q.   Is this the account information that you used for that

8    Avraham Eisenberg wallet that you labeled on your chart?

9    A.   It is.

10   Q.   Did Circle produce a photograph in connection with this

11   account?

12   A.   They did.

13            MR. BURNETT:  Let's take a look at Government Exhibit

14   1102, please.

15   Q.   What do you see up here on the screen?

16   A.   This is a photograph of a passport.

17   Q.   Is that associated with the same Circle account we were

18   just looking at?

19   A.   It was.

20   Q.   Do you see the name on the passport?

21   A.   I do.

22   Q.   What's that?

23   A.   It's Avraham Mayer Eisenberg.

24            MR. BURNETT:  Let's take that down and put back up

25   Government Exhibit 1351.

O4BCeis1                        DeCapua - Direct

1    Q.   Now, these records that we were looking at that helped you

2    identify this is the Avraham Eisenberg account.  Where did they

3    come from again?

4    A.   They came from the cryptocurrency exchange Circle.

5    Q.   Was that information publicly available?

6    A.   No.

7    Q.   Was this Avraham Eisenberg account labeled publicly as an

8    Avraham Eisenberg account to outside users?

9    A.   No.

10   Q.   So what would this account show up as if it was involved in

11   transactions on the blockchain?

12   A.   So, it depends on which blockchain explorer you look at.

13   At best, it will show up as just a wallet associated with

14   Circle, but sometimes it will show up as just a random

15   cryptocurrency address.

16   Q.   Now, have you reviewed transaction data for this Avraham

17   Eisenberg Circle account?

18   A.   I have.

19   Q.   So we're not going to go through all the transaction data,

20   but can you just describe at a high level what is transaction

21   data from an exchange like Circle?

22   A.   Transaction data is going to show the deposits into the

23   cryptocurrency exchange.  Whether it is someone transferring

24   money from a bank account or transferring some type of other

25   digital asset, it's going to show withdrawals similarly to a

O4BCeis1                      DeCapua - Direct

1    bank account or to some other virtual currency wallet, and it's
2    going to show the transactions, the buys, the sells, the
3    trading that goes on within that particular exchange.
4    Q.  So were you able to use that information to track flows of
5    cryptocurrency into and out of that Circle account?
6    A.  I was.
7    Q.  So let's start.  Do you see there are two wallets to the
8    left of the Circle account?
9    A.  I see those.
10   Q.  Let's start with the bottom one.  Do you see that's labeled
11   wallet 81FB9?
12   A.  I do.
13   Q.  What does that 81FB9 mean?
14   A.  It's just the last five characters of the cryptocurrency
15   address.
16          MR. BURNETT:  At this time, the government is going to
17   read a stipulation between the parties that will subsequently
18   be offered into evidence.
19          The parties stipulate that Avraham Eisenberg owned and
20   controlled the cryptocurrency wallet that ends in 81FB9.
21          MR. TALKIN:  No objection.
22          THE COURT:  That stipulation is accepted.
23   Q.  Now, what did the records you reviewed showed happened from
24   that 81FB9 wallet on October 11th?
25   A.  It transferred cryptocurrency into the Avraham Eisenberg

O4BCeis1                          DeCapua - Direct

1    Circle wallet.

2    Q.  About how much?

3    A.  It was about 13,116,000 USDC.

4    Q.  At around what time?

5    A.  It was 8:49 Eastern Time.

6    Q.  And just to kind of make this more efficient going forward,

7    is that information about the transfer listed out above the

8    arrow?

9    A.  It is.

10   Q.  There was another wallet, as well, that's on the top-left

11   of the screen; correct?

12   A.  Yes.

13   Q.  What did that wallet do at about 2:47 a.m.?

14   A.  It transferred cryptocurrency into the Avraham Eisenberg

15   Circle wallet.

16           MR. BURNETT:  All right.  Take that down.

17           Mr. Sears, if you could zoom in on the transaction

18   from the Circle wallet to the wallet labeled KUUVP.

19   Q.  So after that Circle wallet got the cryptocurrency from

20   those two accounts, what happened with them?

21   A.  So, it transferred cryptocurrency to a secondary wallet.

22   Q.  And was that wallet on an exchange?

23   A.  No.

24   Q.  What does it mean when it says, wallet KUUVP on here?

25   A.  So, again, wallet addresses are long strings of numbers and

O4BCeis1                          DeCapua - Direct

1   letters.  And so, these are just the last five characters in

2   that specific Solana wallet address.

3   Q.  About how much went over to that wallet from the Circle

4   account?

5   A.  It was about 14,179,000 USDC.

6   Q.  Was that about between 8:54 a.m. and 3:39 p.m.?

7   A.  That's correct.

8   Q.  Were you able to track what happened to the cryptocurrency

9   from there?

10  A.  I was.

11          MR. BURNETT:  So let's now move ahead, Mr. Sears, to

12  the next transaction on the series and zoom in on the wallet

13  KUUVP to the bochen.clean.

14  Q.  So I want to start with this wallet on the right.  That has

15  like a little icon in the middle of it.  What is that icon for?

16  A.  That icon is just the -- it's the icon for a cryptocurrency

17  exchange called FTX.

18  Q.  And that's labeled as wallet bochen.clean@gmail.com;

19  correct?

20  A.  That's correct.

21  Q.  Why does it have that label on it in your chart?

22  A.  Because the person that registered that specific wallet at

23  FTX used that email address to register.

24  Q.  Have you reviewed data about this bochen.clean@gmail.com

25  account?

O4BCeis1                        DeCapua - Direct

1    A.  I have.

2             MR. BURNETT:  Let's take a look at Government Exhibit

3    12 -- sorry.  Let's just show the witness Government Exhibit

4    1215A.

5    Q.  Do you recognize this?

6    A.  I do.

7    Q.  What kind of data is this?

8    A.  This is account opening documentation for the FTX account.

9    Q.  At which FTX account?

10   A.  The one associated with that email address we saw,

11   bochen.clean@gmail.com.

12            MR. BURNETT:  The government offers 1215A.

13            THE COURT:  Any objection?

14            MR. TALKIN:  No, your Honor.

15            THE COURT:  The exhibit will be admitted.

16            (Government's Exhibit 1215A received in evidence)

17            MR. BURNETT:  Let's publish this for the jury, please.

18   Q.  Now, how are you able to identify this as the user

19   information for the bochen.clean account?

20   A.  How am I able to --

21   Q.  Sorry.  Do you see column A?

22   A.  I do.

23   Q.  What's column A labeled?

24   A.  It says user ID.

25   Q.  What's the user ID there?

O4BCeis1                        DeCapua - Direct

1    A.  It's a user, and then there's a pike character, and then

2    it's bochen.clean@gmail.com.

3              MR. BURNETT:  Let's scroll over to row Q or column Q.

4    If we could just turn that, wrap that text, please, Mr. Sears.

5    Q.  Now, do you see there's a city and country information

6    here?

7    A.  I do.

8    Q.  Are what's the city and country information?

9    A.  Warszawa, Poland POL.

10   Q.  And do you see there is text labeled, "full legal name"?

11   You can probably see it in the top part of the screen over

12   here.

13   A.  I do.

14   Q.  What's the full legal name on this account?

15   A.  It's Natalia Bochenkova.

16             MR. BURNETT:  We can take this down, Mr. Sears, and go

17   back to 1351.?

18   Q.  While we're waiting for that to come up, was there

19   information from FTX that allowed you to track deposits going

20   into that FTX account?

21   A.  Yes.

22   Q.  How could you do that?

23   A.  So, there was essentially a spreadsheet provided by FTX

24   that listed all the deposits going into that particular

25   account.

O4BCeis1                         DeCapua - Direct

1  Q.  And what did that spreadsheet show about deposits going

2  into the account on October 11th, 2022?

3  A.  So it showed 12.5 million USDC being deposited from that

4  intermediary account ending KUUVP into the FTX account.

5  Q.  Now, before we move to the next step here, I want to ask

6  you a little bit more about this bochen.clean account on FTX,

7  if you investigated whether there was a connection between this

8  account and Mr. Eisenberg?

9  A.  Yes.

10 Q.  How did you do that?

11 A.  So, several ways.  One is by looking at the forensic report

12 from a cellphone associated with Eisenberg, and it shows this

13 particular email address showing up in that -- it was on the

14 cellphone.

15 Q.  So I'm going to have you take a look at what's been marked

16 as Government Exhibit 116 and its accompanying attachments.  Do

17 you recognize this document?

18 A.  I do.

19 Q.  Where does this document come from?

20 A.  So it's from a forensics report that was generated by

21 forensic software used by the FBI.

22         MR. BURNETT:  The government offers 116 and its

23 subparts.

24         MR. TALKIN:  No objection.

25         THE COURT:  The exhibit will be admitted.

O4BCeis1                          DeCapua - Direct

1           (Government's Exhibit 116 received in evidence)

2           MR. BURNETT:  If we could publish this for the jury,

3     please.

4     Q.  Now, do you see there's a green bubble at the top of the

5     screen?

6     A.  I do.

7     Q.  Do you see that it says "from" at the top of it?

8     A.  I do.

9     Q.  What's the name listed there?

10    A.  It says Dimitriy.

11    Q.  Oh, sorry.  On the green bubble.

12    A.  I'm sorry.  It says Avraham Eisenberg.

13    Q.  And within that, there's like a sub "from."  Do you see

14    that?

15    A.  Do I.

16    Q.  Do you understand like why it nests like that on the report

17    you're looking at?

18    A.  Generally, it means it's a response to an original message.

19    Q.  All right.  And could you read the first two lines of text

20    here.

21    A.  Hello dear sir.  Docs and sim will be sent by this address;

22    right.

23    Q.  Do you see a name listed under there?

24    A.  I do.

25          MR. BURNETT:  Pull out of that, please.

O4BCeis1                    DeCapua - Direct

1   Q.  And could you read -- do you see there are two blue bubbles

2   next?

3   A.  I do.

4   Q.  Who are those blue bubbles from, what's the name listed

5   there?

6   A.  It says Dimitriy.

7   Q.  Could you read those, please.

8   A.  Okay, thanks.  Prepared company purchase agreements for

9   both companies.  Previous one and today's one already signed by

10  our side.

11          MR. BURNETT:  And if we could go to the next page,

12  please.

13  Q.  Do you see that there are two attachments there?

14  A.  I do.

15  Q.  And after those two attachments, how does Mr. Eisenberg or

16  the Avraham Eisenberg phone number respond?  Just the first

17  line there.

18  A.  Thanks.

19          MR. BURNETT:  If we could scroll down, Mr. Sears, to

20  our PDF page numbers.  It's going to be 78 and 80 if you look

21  at the bottom right-hand corner.

22  Q.  Now, if you look at the bottom blue message here --

23          MR. BURNETT:  And blow that up.

24  Q.  -- do you see there's a "from" message embedded here?

25  A.  I do.

O4BCeis1                          DeCapua - Direct

1    Q.  Who's that from?

2    A.  From Avraham Eisenberg.

3    Q.  What does that say?

4    A.  And can you get me the FTX and Binance log-in's.

5    Q.  How does Dimitriy respond?

6    A.  Sure.  I will send you accesses to accounts and resources

7    today's evening, tomorrow a.m.

8            MR. BURNETT:  Let's go ahead to the next page.

9    Q.  Now, can you read just the next two messages here, the

10   green and the blue one.

11   A.  Dimitriy says, now is okay, right.  And Avraham Eisenberg

12   replies, yes.  And then Dimitriy replies, okay.

13           MR. BURNETT:  If we can go to the next page,

14   Mr. Sears.

15   Q.  Do you see at the top here in the first bubble, there is an

16   attachment from Dimitriy?

17   A.  I do.

18   Q.  What's that attach -- what's the file name of that

19   attachment?

20   A.  It's bochen.PDF.

21   Q.  Have you been able to see this PDF in the report?

22   A.  Yes.

23           MR. BURNETT:  Mr. Sears, if we can pull up the PDF,

24   which I think is probably logged as 116A right now in our

25   system.  Sorry.  It would be 116B.  Nope.  Could you go to C,

O4BCeis1                    DeCapua – Direct

1    then.  Apologies.  One more, D.  Hold on just a sec, apologize.

2    Let's try E now.  Apologies.  Changed this around at the last

3    minute, defense here.  I think you guys might have stripped it

4    out.  Just bear with us here.

5             THE COURT:  Let's figure it out.  I won't put the

6    white noise on.

7             (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O4BVEIS2                          DeCapua - Direct

1          MR. BURNETT:  Apologies.  Mr. Sears, if you can pull

2   up -- we have on your screen as 116A, and then we'll correct

3   the numbering in a minute.

4   BY MR. BURNETT:

5   Q.  Is this the PDF document that was sent from Dmitriy to

6   Mr. Eisenberg?

7   A.  It is.

8   Q.  Now, do you see there's something at the top that says

9   Bochen Spzoo?

10  A.  I do.

11  Q.  What's the director listed there?

12  A.  It says Bochenkova, Natalia.

13  Q.  What's the email listed?

14  A.  Bochen.clean@gmail.com.

15  Q.  And if you look down the page, you see there's a section

16  labeled FTX --

17  A.  I do.

18  Q.  -- the user name?

19         And what's the user name listed there under FTX?

20  A.  It's bochen.clean@gmail.com.

21         MR. BURNETT:  All right.  Thank you, Mr. Sears.  You

22  can put this aside and 116 aside.

23         And I'd like to take a look at another document just

24  for the witness at the moment.  Could you please show him

25  document 1218A.

O4BVEIS2                      DeCapua - Direct

1   Q.  Do you recognize this document?

2   A.  I do.

3   Q.  What is it?

4   A.  These are records provided by FTX.

5   Q.  And what type of records are they?

6   A.  It is data associated with the bochen.clean@gmail.com

7   account.

8           MR. BURNETT:  The government offers 1218A.

9           MR. TALKIN:  No objection.

10          THE COURT:  1218A will be admitted.

11          (Government's Exhibit 1218A received in evidence)

12          MR. BURNETT:  All right.

13          If we could show this for the jury, please.

14  Q.  Now, do you see that the spreadsheet is titled "Login

15  Records"?

16  A.  I do.

17  Q.  What type of data is in this spreadsheet?

18  A.  It's going to be the records for when a user logs into the

19  FTX website.

20          MR. BURNETT:  Mr. Sears, if you could scroll over.

21  Q.  Do you see there's a section titled "created at" and "IP"?

22  A.  I do.

23  Q.  What does IP mean?

24  A.  So it stands for internet protocol address.  And it's

25  basically a unique number that identifies any computer on a

O4BVEIS2                          DeCapua - Direct

1   specific network.

2           MR. BURNETT:  Now, Mr. Sears, if you could highlight

3   the rows 46362 and 46363.

4   Q.  What's the date for these entries here?

5   A.  It's October 11, 2022.

6   Q.  And is that the same date that you were tracking on your

7   chart?

8   A.  It is.

9   Q.  And what's the IP address here, if you could just read it

10  out?

11  A.  It's 138.199.59.200.

12  Q.  All right.  I'll have you keep that in mind while we pull

13  up one of the records from Circle, Government Exhibit 1101.

14          MR. BURNETT:  If we could publish 1101 for the jury,

15  please.

16  Q.  Now, is this from that Avraham Eisenberg Circle account we

17  were looking at a minute ago?

18  A.  It is.

19  Q.  And do you see that there are a number of entries here also

20  on the chart for October 11, 2022?

21  A.  I do.

22  Q.  And do you see there's an IP address on that same date

23  accessing the Avraham Eisenberg Circle account?

24  A.  I do.

25  Q.  How does that IP address compare to the IP address that was

O4BVEIS2                          DeCapua - Direct

1   accessing the bochen.clean account on FTX on the same day?

2   A.  It's exactly the same.

3   Q.  All right.  So let's go back to Government Exhibit 1351

4   now, that's the timeline.

5          Were you able to track whether cryptocurrency moved

6   out of that bochen.clean FTX account?

7   A.  I was.

8   Q.  How were you able to track that?

9   A.  So two different ways.  I was able to look at the records

10  provided by FTX and see the outflows.  And then I was able to

11  confirm those transactions by looking at the public blockchain.

12  Q.  We'll get into the details in a second, but at a high

13  level, what did you find?

14  A.  So I found that it sent value to two different wallets,

15  Solana wallets that are depicted here in this slide.

16  Q.  When you say Solana wallet, what do you mean by that?

17  A.  So Solana is a type of blockchain.  And you can send

18  various types of cryptocurrencies to Solana wallets.  And in

19  this case, both of these wallets depicted here in pink are

20  Solana blockchain wallets.

21  Q.  All right.  Let's start with the arrow going up out of the

22  FTX account.  How much cryptocurrency went to that wallet?

23  A.  It was approximately five million USDC.

24  Q.  At around what time?

25  A.  It was 3:47 p.m.

O4BVEIS2                    DeCapua - Direct

1   Q.  And that wallet has this kind of 9DJU number at the end of
2   it.  What does that mean?
3   A.  Just the last five digits of the wallet address.
4   Q.  And there's another arrow going down, correct, out of the
5   FTX account?
6   A.  Yes.
7   Q.  Which wallet is that going to, what's the moniker for that
8   wallet?
9   A.  So it's, again, just the last five digits.  It's S2NQM.
10  Q.  How much went there?
11  A.  It was approximately 5,524,000 USDC.
12  Q.  And that's about 3:34 to 48 p.m.; correct?
13  A.  That's correct.
14  Q.  Let's keep following the bouncing ball now.
15          At a high level, what happened to the cryptocurrency
16  that went into both of these accounts?
17  A.  So from these two accounts, it was then transferred to two
18  different Solana wallets associated with a company called Mango
19  Market.
20  Q.  All right.  So let's start with the transfer from the DJU
21  wallet.
22          MR. BURNETT:  Mr. Sears, if you could blow up that
23  transfer, please.
24  Q.  All right.  So how much went out of that DJU wallet?
25  A.  It was just under five million USDC.

O4BVEIS2                          DeCapua - Direct

1    Q.  Where did it go to?

2    A.  It went to a Mango Market wallet.

3    Q.  And just for keeping track of things going forward, is

4    anything with a mango inside of it a Mango Market wallet?

5    A.  Yeah, with the fruit -- the icon of the fruit.

6    Q.  And what was the kind of last five digits associated with

7    that wallet?

8    A.  MKFFX.

9    Q.  All right.  Were you able to look at records from Mango

10   Markets to confirm that a cryptocurrency went into this

11   account?

12   A.  I was.

13           MR. BURNETT:  Let's show Government Exhibit 919, which

14   is already in evidence.

15   Q.  Do you recognize this?

16   A.  I do.

17   Q.  What is this?

18   A.  This is a record provided by Mango Market depicting

19   deposits into that specific wallet.

20   Q.  That KFFX wallet?

21   A.  Yes.

22   Q.  And how much went in there?

23   A.  So there were two transactions that total just under five

24   million USDC.

25   Q.  All right.  Let's go back to the chart now, 1351.

O4BVEIS2                          DeCapua - Direct

1           Or, sorry, before we go there, how much -- was there

2    any cryptocurrency left in the DJU wallet after that transfer?

3    A.  Can you show me that slide again?

4    Q.  Oh, yeah.  Sorry.

5           MR. BURNETT:  Ryan, if you could pull up 1351, please.

6    A.  No.

7    Q.  So let's go down to the bottom transaction from that NQM

8    account to Mango Markets.

9           MR. BURNETT:  If you could blow that up, please,

10   Mr. Sears.

11   Q.  Now, this is 6:08 to 6:18 p.m.  How does that compare to

12   the time of the last transfer?

13   A.  It's similar.

14   Q.  And how much went from the NQM wallet onto Mango Markets?

15   A.  So there was 5,000,100 USDC transferred.

16   Q.  And what was the kind of label or account number for that

17   wallet on Mango Markets where it went?

18   A.  Last five was RNJNA.

19   Q.  All right.  And were you also able to see that transfer

20   show up on Mango Markets when the money went in?

21   A.  I was.

22          MR. BURNETT:  Let's go to Government Exhibit 915.

23   Q.  What page are we looking at here?

24   A.  So, again, this is deposit records provided by Mango for a

25   different wallet than the one we looked at before.  This one is

O4BVEIS2                         DeCapua - Direct

1    for the wallet ending RNJNA.

2    Q.  And what do you see in terms of deposits going into this

3    account?

4    A.  Like the one before it, I see two different deposits

5    totaling 5,000,100 USDC.

6              MR. BURNETT:  All right.  Let's go back to 1351,

7    please.  Now, I want to focus on just one last part of this

8    chart.  Mr. Sears, if you could highlight the section from

9    wallet ARN9T to the wallet opayq.com.

10   Q.  Now, that purple wallet on the right has like -- it looks

11   like a little mountain icon in it.  What's that reflect?

12   A.  It's the icon for a type of cryptocurrency exchange called

13   AscendEX.

14   Q.  And why is that wallet labeled opayq.com?

15   A.  So according to account registration documents for this

16   particular wallet, the email used to register for it was this

17   really long and random email.  But the very last -- like the

18   domain, everything after the "at" symbol was opayq.com.

19             MR. BURNETT:  Let's take a look quickly at those

20   records.  If we could show Government Exhibit 1513, which is

21   already in evidence.  Mr. Sears, if you could zoom in on the

22   user information section again.

23   Q.  Do you see there's an email address section here?

24   A.  I do.

25   Q.  Is that the email address you are referring to ending in

O4BVEIS2                        DeCapua - Direct

1    opayq.com?

2    A.   It is.

3    Q.   What's the nationality listed here, by the way?

4    A.   Poland.

5              MR. BURNETT:  All right.  Mr. Sears, let's go back to

6    1351.

7    Q.   What's the transaction that happened into that AscendEX

8    account?

9    A.   The wallet ARN9T sent approximately 110,000 USDT.

10   Q.   All right.  Have you seen information about those transfers

11   show up in any accounts belonging to Mr. Eisenberg?

12   A.   Yes.

13   Q.   I'm going to show you what's been marked as Government

14   Exhibit 613.  Do you recognize this?

15   A.   I do.

16   Q.   What is it?

17   A.   This is the type of information that Google will provide in

18   response to a subpoena or a court order from the U.S.

19   government.

20             MR. BURNETT:  The government offers 613?

21             MR. TALKIN:  No objection.

22             THE COURT:  613 will be admitted.

23             (Government's Exhibit 613 received in evidence)

24             MR. BURNETT:  And if we could publish this for the

25   jury, please.

O4BVEIS2                          DeCapua - Direct

1   Q.  See this is a document titled "Google Subscriber
2   Information"?
3   A.  Yes.
4   Q.  What kind of information, broadly speaking, is in this type
5   of document?
6   A.  It's going to be the information when a specific Google
7   user signs up for a new account.  It asks for your name, date
8   of birth, backup email, phone number, that type of information.
9            MR. BURNETT:  And if we could, Mr. Sears, zoom in on
10  the first basically paragraph of text.
11  Q.  What's the name on this account?
12  A.  It's Avraham Eisenberg.
13  Q.  What's the email address?
14  A.  613ike@gmail.com.
15           MR. BURNETT:  And if we could now go to Government
16  Exhibit 1702, which is a stipulation that's already in
17  evidence.  And if we could scroll down to the second page,
18  please.  Let's zoom in on paragraph 5.
19  Q.  The first sentence here says:  Government Exhibits 600
20  through 613, including their subparts, are true and correct
21  copies of records produced by Google LLC for the Google account
22  613ike@gmail.com.
23           Is that the same email address you just read on the
24  subscriber information?
25  A.  It is.

1           MR. BURNETT:  Let's take a look at two of those

2      records from the 600 series, 606 and 608 side-by-side.

3      Q.   What's the "from" on both of these?

4      A.   So the "from" is AscendEX, and then there's an email

5      address.

6      Q.   What's the "to"?  What did you recognize that email address

7      in the "to" line?

8      A.   I do.

9      Q.   What do you recognize it from?

10     A.   That's the email address that was used to register

11     AscendEX, AscendEX account we looked at.

12     Q.   What's the title of both -- or the subject of both of these

13     emails?

14     A.   Deposit confirmation.

15          MR. BURNETT:  Let's go back to Government Exhibit 1351

16     now.

17     Q.   I want to summarize just where we've ended up.  So this

18     part of the chart covers until 6:20 p.m.; correct?

19     A.   That's correct.

20     Q.   So by that point, about how much was in each of the two

21     Mango Markets accounts?

22     A.   So one had just under five million USDC, and the other one

23     had just over five million USDC.

24     Q.   How much was in that NQM account, the one on the bottom

25     that funded the Mango Markets account?

O4BVEIS2                          DeCapua - Direct

1    A.  It was a little over 500,000 USDC.

2    Q.  About how much was left in the FTX account?

3    A.  It was somewhere in the neighborhood -- it was over two

4    million USDC.

5    Q.  And about how much was in that AscendEX account?

6    A.  110,000 USDT.

7           MR. BURNETT:  All right.  Let's move ahead to

8    Government Exhibit 1352.

9    Q.  Let's first start with the top left.  We're still on

10   October 11th here; correct?

11   A.  That's correct.

12   Q.  What's the time period we're looking at now?

13   A.  It's between 6:20 p.m. and 6:45 p.m. Eastern Standard Time.

14   Q.  About 25 minutes after we just left off?

15   A.  That's correct.

16   Q.  Now, there are two -- you see how at the top half of the

17   screen there's like a mango logo and it's kind of shaded in

18   orange?

19   A.  I do.

20   Q.  What's that meant to reflect?

21   A.  So everything above that line that's kind of shaded in

22   orange reflects wallets associated with Mango Market.

23   Q.  How about everything below that line that's in the gray?

24   A.  Everything below is associated with nonMango Market

25   accounts.  In particular, the AscendEX account that we already

O4BVEIS2                          DeCapua - Direct

1   saw, the FTX account that we already saw, and then the Solana
2   account that we also already saw ending in QM.
3   Q.  Got it.
4           So let's just recap.  So you've pulled across to this
5   shade on the gray part the AscendEX wallet, the FTX wallet, and
6   that NQM wallet; correct?
7   A.  That's correct.
8   Q.  Each of those had funds left over in it?
9   A.  Yes.
10  Q.  Above on the Mango Markets side, what are these two Mango
11  Markets wallets?
12  A.  These are the two Mango Market wallets that had
13  approximately five million USDC in them.
14  Q.  And those are the ones that have been funded from the
15  transfers through the Circle account; correct?
16  A.  That's correct.
17  Q.  All right.  Now, there are these two kind of white boxes
18  next to the Mango accounts.  Before we get into the details,
19  could you describe what those white boxes reflect.
20  A.  The white boxes reflect the specific trades that are
21  associated with each of those two different Mango Market
22  accounts.
23  Q.  So let's start with the one on the bottom, the RNJNA one.
24  Is that account involved in a trade where it's buying or
25  selling?

O4BVEIS2                        DeCapua - Direct

1   A.  Buying.

2   Q.  What type of product was that account buying?

3   A.  Something called a Mango perp.

4   Q.  And do you see there's some kind of big numbers next to

5   Mango perp?

6   A.  I do.

7   Q.  What are those numbers?

8   A.  Those are the quantities.

9   Q.  So about 3.8 million in one transaction, 222.6 in another,

10  and 261.7 million in the third?

11  A.  That's correct.

12  Q.  Now, each of those has an "at" sign and then it says .0382.

13  Do you see that?

14  A.  I do.

15  Q.  What does that reflect?

16  A.  That is the reference price for that specific perp

17  contract.

18  Q.  Now, were you able to compare that to the contracts that

19  the other Mango Markets wallet was involved in?

20  A.  I was.

21  Q.  Describe that comparison.

22  A.  I mean, they are the same contract.  It's just one is on

23  the sell side of that contract, and the other one is on the buy

24  side of that contract for all three.

25  Q.  So the top wallet, that KFFX wallet, that one is selling;

O4BVEIS2                          DeCapua - Direct

1    correct?

2    A.   Correct.

3    Q.   What product is it selling?

4    A.   Mango perp.

5    Q.   And the size and price of those Mango perpetuals, how does

6    that compare to the size and price of the perpetuals that the

7    other wallet was buying?

8    A.   They are the same.

9    Q.   Now, let's pull up -- were you able to look at data on

10   Mango Markets to see this transaction?

11   A.   I was.

12        MR. BURNETT:   Let's take a look at Government Exhibits

13   916 and 920 side-by-side.   If we could just zoom in a little

14   bit bigger.   Thank you.

15   Q.   Let's start with the RNJNA wallet.   That's on the left;

16   correct?

17   A.   That's correct.

18   Q.   What do like the little green boxes there show?

19   A.   So the little green boxes show which side — whether it's

20   buy side or sell side — that that particular trade represents.

21   Q.   And does this also show the size and the price that you

22   recorded on your chart?

23   A.   It does.

24   Q.   All right.   Let's go to the other side now, the KFFX

25   wallet; correct?

O4BVEIS2                        DeCapua - Direct

1    A.  That's correct.

2    Q.  We can zoom in there.

3           What's the side listed here?

4    A.  It's sell.

5    Q.  And are those the same size and price that you have listed

6    out in your chart?

7    A.  It is.

8           MR. BURNETT:  Let's go back to 1352, please.

9    Q.  Now, it looks like next to the two wallets you've added

10   icons that say long and short; correct?

11   A.  Correct.

12   Q.  Which one is the long account?

13   A.  The long account is the one on the bottom that ends RNJNA.

14   Q.  What does "long" mean in this context?

15   A.  When you're long a position, it means that you benefit from

16   an increase in price.

17   Q.  And which one is the short position?

18   A.  The short position is the sell side; it's associated with

19   Mango wallet ending MKFFX.

20          MR. BURNETT:  All right.  So let's go ahead now to the

21   next exhibit, Government Exhibit 1353.

22   Q.  What's the date here?

23   A.  Again, it's October 11th, 2022.

24   Q.  What's the time period?

25   A.  It's between 6:20 p.m. and 6:45 p.m.

O4BVEIS2                      DeCapua - Direct

1   Q.  Now, is that the same 25-minute time period as the last
2   slide we looked at where the perpetual got set up?
3   A.  Yes.
4   Q.  All right.  Now, I want to focus on what's happening here,
5   starting with the accounts on the gray, so at the bottom.
6        Let's start with the AscendEX account.  What does this
7   show the AscendEX account was buying between 6:20 and 6:45
8   p.m.?
9   A.  It was buying Mango.
10  Q.  How much Mango did it buy over that time period?
11  A.  It was a little over 1,053,000.
12  Q.  How much did it have to sell in order to buy that Mango?
13  A.  74,538 USDT.
14  Q.  Now, do you see there's a white box next to those numbers
15  you were just reading?
16  A.  I do.
17  Q.  Without getting into the numbers just yet, what is the data
18  that's in the white box?
19  A.  It conforms to, for that specific exchange, AscendEX, the
20  beginning price of these trades, and then the ending price of
21  these trades as the trades are made through this time period.
22  Q.  So what was the low -- during this -- what, this is about a
23  little over 15 minutes of buying; correct?
24  A.  That's correct.
25  Q.  What was the low price during that 15 minutes of buying?

O4BVEIS2                        DeCapua - Direct

1    A.  It was .04 USDT to Mango.

2    Q.  And what was the high price?

3    A.  .455.

4    Q.  All right.  Let's go down to the next wallet.

5         Which wallet is this one?

6    A.  This is the FTX wallet that we already discussed.

7    Q.  Now, just to keep track here, what time period are we

8    focused on now?

9    A.  So it's 6:26 p.m. to 6:40 p.m.

10   Q.  Still about 15 minutes?

11   A.  That's correct.

12   Q.  How much did that FTX wallet buy during that period?

13   A.  It was 16,036,000 Mango, a little bit over that.

14   Q.  How much USDC did it sell to make those purchases?

15   A.  1,231,000, approximately, USDC.

16   Q.  Over that 15-minute period, what was the low price?

17   A.  It was .038.

18   Q.  And what was the high price?

19   A.  It was .156.

20   Q.  About five times?

21   A.  Approximately, yes.

22   Q.  Now let's go to the last wallet here, the NQM wallet.  What

23   time period are we focused on here?

24   A.  Between 6:26 p.m. and 6:44 p.m.

25   Q.  Basically, that same 20-minute window we were looking at

O4BVEIS2                          DeCapua - Direct

1    for the other two?

2    A.  That's right.

3    Q.  How much did this wallet buy?

4    A.  So it bought a little over 3,480,000 Mango.

5    Q.  How much did it sell?

6    A.  It sold about 750,000 USDC.

7    Q.  What was the low price during that period?

8    A.  So in particular for Serum DEX, the low price was .086.

9    Q.  Sorry.  I apologize.  I should clarify.

10           What program was this wallet buying through?

11   A.  So it was buying through something called Jupiter

12   Aggregator.

13   Q.  What is Jupiter Aggregator?

14   A.  It's a place on the Solana blockchain that you can swap

15   different cryptocurrencies.

16   Q.  And what types of sources of liquidity does Jupiter

17   Aggregator let people access?

18   A.  From other decentralized exchanges.

19   Q.  So you have Serum DEX labeled in this box here.

20           What is Serum DEX?

21   A.  It's a decentralized exchange.

22   Q.  Why did you focus on Serum DEX?

23   A.  So I was asked to focus on just the three particular places

24   that fed into the oracle used by Mango Market.  And so Jupiter

25   Aggregator, it filled transactions and multiple places, but the

O4BVEIS2                          DeCapua - Direct

1    one I focused on was just Serum DEX because that one was the
2    one used by the oracle.
3    Q.  Now, during that about 20 minutes of buying, what was the
4    low price on Serum DEX?
5    A.  It was .086.
6    Q.  And the high price?
7    A.  It was .867.
8    Q.  That's going up by about ten times; correct?
9    A.  About, yeah.
10   Q.  All right.
11          Now, let's shift our focus from the gray part to
12   what's happening on Mango Markets, so in that orange part of
13   the screen.  There's a big white box there.  What's that white
14   box meant to reflect?
15   A.  So the white box reflects the change in price according to
16   the Mango Market -- according to the oracle used by Mango.
17   Q.  Now, what time period were you focused on here?
18   A.  It was the time period in the upper left, 6:20 p.m. to 6:45
19   p.m.
20   Q.  While all of that buying was happening on those other
21   exchanges, what happened to the price of Mango perpetuals on
22   Mango Markets?
23   A.  It rocketed.
24   Q.  What did it go from, what was the low?
25   A.  It was .038.

O4BVEIS2                        DeCapua - Direct

1    Q.   What did it go to?

2    A.   .455.

3    Q.   What percentage increase is that?

4    A.   It was almost 1,100 percent.

5    Q.   Now, have you also looked at data on the prices that

6    perpetual contracts were trading for on Mango Markets during

7    this time period?

8    A.   I did.

9    Q.   I'm going to show you what's been marked as Government

10   Exhibit 993A.  Do you recognize this chart?

11   A.   I do.

12   Q.   What is it?

13   A.   This is data provided by Mango Market that reflects the

14   order book for the Mango perps.

15   Q.   Have you filtered it to focus on a particular time period?

16   A.   Yes.

17              MR. BURNETT:  The government offers 993A.

18              MR. TALKIN:  No objection.

19              THE COURT:  993A will be admitted.

20              (Government's Exhibit 993A received in evidence)

21              MR. BURNETT:  All right.  If we could publish this for

22   the jury.  And if you wouldn't mind zooming out a little bit,

23   Mr. Sears.  Maybe zoom in a little more.  Perfect.  If we could

24   scroll up to the top, please.

25   Q.   All right.  So let's just get ourselves oriented here.

O4BVEIS2                        DeCapua - Direct

1          What type of data is this that we're looking at?

2    A.   It's transactional data associated with Mango Market.

3    Q.   Do you see column C has like a date and time?

4    A.   I do.

5    Q.   What is the beginning date and time in this chart?

6    A.   So it's October 11th, 2022, and then there is a military

7    time stamp there, 22:23:44.

8    Q.   What is that in Eastern time?

9    A.   So it's going to be negative 4.  So that brings it to

10   18:23.

11   Q.   So transfers to 6:23?

12   A.   It is 6:23 Eastern time.

13          MR. BURNETT:  And if you could scroll down to the

14   bottom here.

15   Q.   What's the last time entry here?

16   A.   It's 6:37 Eastern time.

17   Q.   All right.  So we're looking at the window of 6:23 to 6:27

18   p.m.  And why did you focus on that window for this chart?

19   A.   Because that was the relevant time period that the -- I was

20   asked to look at.

21   Q.   Does that line up with the time period that was on the

22   chart you were just looking at?

23   A.   It does.

24          MR. BURNETT:  All right.  Now, let's scroll back up to

25   the top, Mr. Sears.

O4BVEIS2                          DeCapua - Direct

1    Q.   Do you see in column G it says "maker"; column I, it says

2    "taker"?

3    A.   I do.

4    Q.   What kind of data are in those entries there?

5    A.   So those are going to be the addresses of the two sides of

6    this particular transaction.

7    Q.   Each of the perpetual transactions happening on Mango

8    Markets?

9    A.   Yes.

10             MR. BURNETT:  Let's actually -- if you could highlight

11   rows 152, 153, and 154.

12   Q.   Now, do you see in column G, the last four or five digits

13   on each of -- on those three accounts?

14   A.   I do.

15   Q.   Do you recognize those?

16   A.   I do.

17   Q.   What are they?

18   A.   They are the last five digits associated with one of the

19   specific accounts that we were discussing.

20   Q.   And do you see in column I the last five digits there?

21   A.   I do.

22   Q.   And do you recognize those?

23   A.   I do.

24   Q.   What are those?

25   A.   It's the last five of the other account that we were

O4BVEIS2                          DeCapua - Direct

1    referencing.

2    Q.  Are those the perpetual trade that you plotted out on your

3    chart?

4    A.  Yes.

5            MR. BURNETT:  Now, Mr. Sears, if you could keep going

6    over to the right here.

7    Q.  What's the price for these transactions that are

8    highlighted?

9    A.  It's .0382.

10   Q.  Now, using this chart, can you see how prices of matched

11   perpetual trades changed on Mango Markets between 6:23 p.m. and

12   6:37 p.m.?

13   A.  Yes.

14   Q.  All right.  So what do the prices start out at at 6:23

15   p.m.?

16   A.  It's .0382.

17           MR. BURNETT:  And let's scroll down to the bottom of

18   the page.

19   Q.  What are they at the bottom of the page?

20   A.  It's .314.

21   Q.  What ballpark percentage increase is that from 6:23 to

22   6:37?

23   A.  So I did the math the other day.  It turns out to be a

24   little over 700 percent.

25           MR. BURNETT:  All right.  So let's take this down now

O4BVEIS2                          DeCapua - Direct

1    and pull up 1353 again.

2    Q.  All right.  We're going to move ahead to the next slide.

3    But before we do, I just want to reorient.  So we're looking at

4    6:20 to 6:45 here; correct?

5    A.  That's correct.

6    Q.  And that's the period when the Mango perpetual price -- the

7    oracle price was going up and those prices were going up on the

8    trades you saw; correct?

9    A.  That's right.

10           MR. BURNETT:  Let's move to the next slide, which is

11   Government Exhibit 1354.

12   Q.  What's the date here?

13   A.  It's, again, October 11th, 2022.

14   Q.  What's the time period?

15   A.  It's between 6:20 p.m. and 6:45 p.m.

16   Q.  So are we still in that same 25-minute window that you were

17   focused on in the last slide?

18   A.  Same window.

19   Q.  All right.  Let's focus on the RNJNA wallet.  Which

20   position did that wallet have?

21   A.  It was the long position.

22   Q.  And how would that position benefit?

23   A.  So the long position raises in value if the price of the

24   Mango perpetual raises in value.

25   Q.  What was happening with the price of the Mango perpetual

O4BVEIS2                          DeCapua - Direct

1    during this 6:20 to 6:45 period?

2    A.  It increased by over 1,000 percent.

3    Q.  Now, what does this line from the RNJNA wallet to the 2NQM

4    wallet show?

5    A.  So it shows that during this time period, from 6:29 to

6    6:45, there was borrow and withdrawal transactions from the

7    long side Mango wallet.  And this reflects that movement of

8    funds.

9    Q.  All right.  So let's walk through -- there are a bunch of

10   different entries here with time stamps on them.  What do those

11   reflect?

12   A.  So each specific entry reflects amount of cryptocurrency

13   that was borrowed from Mango and then withdrawn to a separate

14   account outside of Mango.

15   Q.  All right.  So let's start by just looking at the first

16   one.  What happened at 6:29 p.m.?

17   A.  There was a borrow and withdrawal of 50 million USDC.

18   Q.  And I want to compare this to something.

19          MR. BURNETT:  Mr. Sears, if you could pull up our

20   chart that was marked at Government Exhibit 1351 side-by-side

21   here.

22   Q.  Now, we started out back with the Circle wallet at the

23   beginning here, correct, on 1351?

24   A.  That's correct.

25   Q.  And how much cryptocurrency had gone into that Circle

O4BVEIS2                        DeCapua - Direct

1   wallet about -- at the beginning of this whole series of
2   transactions we have been following?
3   A.   It was 14,100,000, a little bit over.
4   Q.   All right.  And in one transaction alone at 6:29 p.m., how
5   much cryptocurrency was withdrawn from Mango Markets to that
6   2NQM account?
7   A.   50 million USDC.
8            MR. BURNETT:  Now, let's focus just on 1354 again,
9   please.  I'm sorry, Mr. Sears, if you can just have 1354.
10  Q.   All right.  So we won't walk through every one of these
11  transactions, but what were some of the types of
12  cryptocurrencies that were withdrawn between 6:29 p.m. and 6:45
13  p.m.?
14  A.   You had USDC, USDT, you had Solana, you had Mango.
15  Q.   And let's, for instance, look at the USDC.  So there was a
16  50 million USDC we saw withdrawn at 6:29.  How much USDC and
17  USDT was withdrawing at 6:41?
18  A.   So it was 2,807,721 USDC, and then 3,266,426 USDT.
19  Q.   Just one more.  At 6:45, how much Mango was withdrawn?
20  A.   So it was a little over 32,409,000 Mango.
21           MR. BURNETT:  All right.  Now, let's move ahead to
22  Government Exhibit 1355.
23           MR. TALKIN:  Your Honor, can we have a quick break?
24           THE COURT:  Yes, you may.
25           MR. TALKIN:  Thank you.

O4BVEIS2                          DeCapua - Direct

1          THE COURT:  All right.  It's 10:35.  Let's come back

2     at 10:50.

3          (Jury not present)

4          MR. TALKIN:  Just so you know, it was a request for a

5     bathroom break for our client.

6          THE COURT:  No, I understand.

7          All right.  We'll be back at 10:50.

8          And you understand that you're still going to be under

9     oath, and so no conversations with anyone about your testimony,

10    no conversations with the government, nothing.

11         THE WITNESS:  Got it.

12         THE COURT:  Be back in 15.  Thank you very much.

13         (Recess)

14         THE COURT:  All right.  Can we get Agent DeCapua on

15    the stand again.

16         MR. KLEIN:  Your Honor, one thing before we start up.

17         THE COURT:  Yes.

18         MR. KLEIN:  Your Honor, at the beginning you read an

19    instruction that law enforcement testimony is treated as

20    everything else.  We would just ask that after he's done or the

21    government rests, that you give that instruction again.

22         MR. BURNETT:  Your Honor, I don't think there's any

23    reason to re-give the instruction.  It was at the beginning, it

24    will be I think again in the actual instructions.  I think

25    you'll be treating this witness differently to give a separate

O4BVEIS2                    DeCapua - Direct

1   instruction in the middle of his testimony or right after his

2   testimony.

3           THE COURT:  I'm not going to give the instruction now.

4           I think even from the defense's perspective, I don't

5   know that you want to highlight the fact that it is a law

6   enforcement official who would potentially be entitled to

7   greater weight because of that status.  And so I don't know

8   that that benefits anyone.

9           But in any event, I've given it at the beginning,

10  we're giving it again at the end.  I think that those are the

11  appropriate places to say it.

12          MR. KLEIN:  Yes, your Honor.

13          THE COURT:  Okay.

14          Can we have the witness back on the stand.

15          (Jury present)

16          THE COURT:  You understand you're still under oath?

17          THE WITNESS:  I do.

18          THE COURT:  All right.  Mr. Burnett, you may proceed.

19          MR. BURNETT:  All right, Mr. Sears.  Let's bring back

20  up Government Exhibit 1354, which is where we left off.

21  BY MR. BURNETT:

22  Q.  All right.  Now, the time period that we focused on for the

23  last three slides, what time period was that?

24  A.  It was between 6:20 p.m. and 6:45 p.m. on the day of

25  October 11, 2022.

O4BVEIS2                           DeCapua - Direct

1          MR. BURNETT:  Let's go ahead now to Government Exhibit

2     1355.

3     Q.  How has the time period shifted here?

4     A.  So we're moving forward in time a little bit.

5     Q.  What's the time range the slide focuses on?

6     A.  It's between 6:45 p.m. and 7:06 p.m.

7     Q.  All right.  So basically the next 20-minute increment here?

8     A.  Thereabout, yeah.

9     Q.  Now, before we get into the details, broadly speaking, what

10    happened over that 20-minute increment?

11    A.  So what happened here is those three different

12    cryptocurrency exchange accounts that we talked about, they

13    started selling Mango, resulting in the price of the Mango perp

14    to drop by a ton.

15    Q.  All right.  So let's start with the FTX wallet.

16         MR. BURNETT:  And actually, Mr. Sears, if you could

17    pull up Government Exhibit 1353, please.

18    Q.  Now, just to remind everyone, that FTX wallet, how much

19    Mango had it bought?

20    A.  A little over 16 million.

21    Q.  And what was the time range where that buying occurred?

22    A.  It was between 6:26 p.m. and 6:40 p.m.

23    Q.  Let's go ahead to 1355 now.

24         What happened between 6:48 p.m. and 7:05 p.m. with

25    that wallet?

O4BVEIS2                          DeCapua - Direct

1              MR. BURNETT:  Mr. Sears, if you wouldn't mind

2     highlighting it, please.

3     A.   So all that Mango that it had purchased, it was now being

4     sold off.

5     Q.   How much did that FTX wallet sell?

6     A.   16,036,150 Mango.

7     Q.   How much USDC did it get back in return?

8     A.   It was 404,430 USDC.

9     Q.   And that white box, what type of information is in that

10    white box again?

11    A.   This is the price of Mango associated with the FTX records.

12    So when the selling began, it was .045 USD to Mango.  And then

13    by the time the selling stopped, on FTX it was .021 USD Mango.

14             MR. BURNETT:  Just to get a reference point,

15    Mr. Sears, could you pull up 1353 side-by-side.

16    Q.   What had been the high price on FTX before the selling

17    started?

18    A.   .156.

19    Q.   By the time the selling was done what was it down to?

20    A.   .021.

21             MR. BURNETT:  Now, let's actually keep these up

22    side-by-side, Mr. Sears.  Could you blow up the NQM series of

23    transactions on both accounts here.

24    Q.   All right.  Let's start by looking on the right-hand side.

25    That was the buying; correct?

O4BVEIS2                          DeCapua - Direct

1    A.  Can you repeat that?

2    Q.  Let's start by looking at the right-hand side.  Was that

3    the buying of the Mango?

4    A.  Yes, buying of the Mango.

5    Q.  Okay.  How much did it buy -- how much did it buy?

6    A.  It was 3,480,259 Mango.

7    Q.  When did that buying end?

8    A.  6:44 p.m.

9    Q.  Now, let's go over to the left-hand side.  This is the

10   selling; correct?

11   A.  That's correct.

12   Q.  How much Mango is being sold here?

13   A.  20 million Mango.

14   Q.  At what time?

15   A.  At 6:49 p.m.

16   Q.  Now, could you explain if this account only bought about

17   three and a half million Mango, how was it selling 20 million

18   Mango at 6:49?

19   A.  So I believe this account had some Mango in it that it

20   didn't particularly sell through Jupiter Aggregator -- or that

21   it didn't purchase through Jupiter Aggregator.

22        MR. BURNETT:  Let's go back to pull up 1354, please.

23   Q.  These were the borrows and withdrawals, correct, to the NQM

24   account?

25   A.  Yes, yes, of course.

O4BVEIS2                         DeCapua - Direct

1          MR. BURNETT:  If you blow up the last line of 6:45.

2     Q.  How much Mango was borrowed off of Mango Markets and

3     withdrawn into that 2NQM account at 6:45?

4     A.  32,409,565 Mango.

5          MR. BURNETT:  Let's go back to having 1355 and 1353 up

6     side-by-side.

7     Q.  Now, let's focus on the Serum DEX box on the right-hand

8     side, so 1353.  By the end of the buying, how high was the

9     price on Serum DEX for Mango?

10    A.  By the end of the buying, it was .867 USDC to Mango.

11    Q.  Now let's go over to the selling part.  By the end of the

12    selling, how low was the price on Serum DEX?

13    A.  It was .031 USDC to Mango.

14    Q.  And finally, let's look at AscendEX, on the right-hand side

15    first.  How much Mango had been purchased --

16         MR. BURNETT:  Sorry, the top entry, Mr. Sears.

17    Q.  How much Mango had been purchased through that AscendEX

18    account?

19    A.  It was 1,053,287 Mango.

20    Q.  When did that buying end?

21    A.  It ended at 6:45 p.m.

22    Q.  Let's go over to the left-hand side, 1353, you see the

23    AscendEX entry then?

24    A.  I do.

25    Q.  When is that from?

O4BVEIS2                         DeCapua - Direct

1    A.  6:47 p.m.

2    Q.  And what did the AscendEX wallet do at that time?

3    A.  It sells 847 Mango.

4    Q.  What was the price down to already by the time of that

5    sale?

6    A.  So it was .05783 USDT to Mango.

7    Q.  All right.  So let's now focus on 1353 in that big white

8    box.  That was for the Mango perpetual price; correct?

9    A.  That's correct.

10   Q.  What had that price gone up to by 6:45 p.m.?

11   A.  So according to the oracle pricing, it was .455.

12            MR. BURNETT:  All right.  Now, let's take that down.

13   And we can just focus now on 1355, Mr. Sears.  We can drop 1353

14   away.

15   Q.  Over that period of selling from 6:45 p.m. to 7:06 p.m.,

16   what happened to that Mango perpetual price on Mango Markets?

17   A.  It crashed.

18   Q.  What did it start at?

19   A.  It started at .41.

20   Q.  What did it get down to?

21   A.  .019.

22   Q.  And how big a drop was that in percentage terms?

23   A.  It was a little over 95 percent.

24   Q.  Now, I'm going to show you what's been marked as Government

25   Exhibit 993B.

O4BVEIS2                           DeCapua - Direct

1           Do you recognize this document?

2               MR. BURNETT:  Mr. Sears, if you could scroll over too.

3  A.   Okay.  This is the order book.  These are records of orders

4  from Mango Market.

5  Q.   And is this a subset of a particular time of the Mango

6  perpetual order book on Mango Markets?

7  A.   It is.

8               MR. BURNETT:  The government offers 993B.

9               MR. TALKIN:  No objection.

10              THE COURT:  993B will be admitted.

11              (Government's Exhibit 993B received in evidence)

12              MR. BURNETT:  All right.  So let's publish this for

13  the jury, please.

14  Q.   All right.  Have you seen this type of data before in your

15  testimony?

16  A.   I have.

17  Q.   Where did we talk about it earlier?

18  A.   So we talked about it in a few minutes in our timeline

19  prior when we were looking at the Mango perp transactions

20  during the time frame where Mango was being purchased.

21  Q.   And so that was the spreadsheet you looked at that went

22  from 6:23 p.m. till about 6:37 p.m.; is that right?

23  A.   That's correct.

24  Q.   Now, what is different about this slide?  What time period

25  does this cover?

1   A.  It just moves forward in time by a few minutes.

2   Q.  And let's start at the top.  What time does that start at?

3   A.  So this is 6:46 p.m.

4           MR. BURNETT:  And if you scroll all the way down to

5   the bottom, Mr. Sears.

6   Q.  What time does it end at?

7   A.  So it is the conversion -- can you go back up to the top?

8           All right.  6:46 to 7:06 p.m.

9   Q.  All right.  Why focus on 6:46 to 7:06?

10  A.  Because that was the time period when the selling was

11  taking place.

12  Q.  All right.  So from the spreadsheet, can you tell how the

13  price of perpetual transactions on Mango Markets changed over

14  this period when the selling was happening?

15  A.  You can.

16          MR. BURNETT:  All right.  Let's scroll up to the top.

17          And Mr. Sears, if you could scroll over to the column

18  K and highlight that.

19  Q.  What's that labeled?

20  A.  Price.

21  Q.  What does the price start out at at the beginning of this

22  timeline that we're looking at?

23  A.  .06.

24          MR. BURNETT:  If we can scroll down to the bottom.

25  Q.  What does it get to by the end?

O4BVEIS2                        DeCapua - Direct

1    A.  .0243.

2            MR. BURNETT:  All right.  So we can take this down.

3            And let's go back to 1355 now, Mr. Sears.

4    Q.  All right.  So a few minutes ago we had focused on the long

5    perpetual position, right?

6    A.  Correct.

7    Q.  I want to shift your attention now to the short position.

8    Which wallet had the short position?

9    A.  It was the wallet at the top, the one colored orange with

10   the last five MKFFX.

11   Q.  And what would have to happen for that wallet to benefit?

12   A.  The price of Mango would have to drop below the reference

13   value.

14           MR. BURNETT:  And just to pull it up, if you could go

15   to, I think it's 1352, please, Mr. Sears.

16   Q.  What was the reference value for these contracts?

17   A.  .0382.

18           MR. BURNETT:  And if we could go back to 1355.

19   Q.  What did the price drop to by the end of the selling?

20   A.  .019.

21   Q.  Below that .0382 number?

22   A.  Yes.

23           MR. BURNETT:  All right.  So let's go ahead to the

24   next slide, 1356.

25   Q.  What time slice is this slide looking at?

O4BVEIS2                        DeCapua - Direct

1    A.  It's between 6:48 p.m. and 7:06 p.m.

2    Q.  How does that compare to the last slide you just looked at?

3    A.  It was approximately the same, a little bit after.

4    Q.  All right.  And what was happening with the price of

5    perpetuals on Mango Markets during this period?

6    A.  It was crashing.

7    Q.  What happened with that short position wallet, the KFFX

8    wallet, while the price was crashing?

9    A.  So it started gaining value.

10   Q.  And what did that wallet do?

11   A.  So it made borrow and then withdrawal transactions from

12   various cryptocurrencies from Mango Market, and then withdrew

13   it to a separate Solana wallet.

14   Q.  All right.  So what was the first step in the withdrawal

15   chain?  Where did the money go from Mango Markets to?

16   A.  So first it went to this intermediary Solana wallet which

17   we've already seen before ending Z9DJU.

18   Q.  And where did it go after hitting that DJU wallet?

19   A.  Then it went to another Solana wallet that we've already

20   talked about before, which is ending S2NQM.

21   Q.  And is that the same wallet that also received the borrows

22   and withdrawals from the long position?

23   A.  Yes.

24   Q.  Now, in this white box here there are a number of different

25   entries listed.  What does each of those reflect?

O4BVEIS2                        DeCapua - Direct

1   A.  It reflects specific cryptocurrencies that were borrowed

2   from Mango Market and then transferred to these separate Solana

3   wallets.

4   Q.  So just to take an example, at 6:56 what was withdrawn?

5   A.  So there was three different cryptocurrencies -- at 6:56

6   p.m. you're asking?

7   Q.  Yes, 6:56.

8   A.  So there's three different cryptocurrencies:  GMT, USDC,

9   and Mango.

10  Q.  All right.  All right.  Now, let's move ahead on our

11  timeline to Government Exhibit 1357.

12          What time period are we looking at now on this chart?

13  A.  It's between 7:01 p.m. and 7:28 p.m. that same day.

14  Q.  All right.  I want to start by focusing your attention on

15  the pink wallet, that NQM wallet.  What had that wallet

16  received over the course of the transactions that we've been

17  looking at?

18  A.  So at this point that's the wallet that had all of those

19  buy side borrow and withdrawals and sell side borrow and

20  withdrawals.

21  Q.  All right.  Now, what happened at about 7:01 p.m., what

22  went into that account?

23  A.  So there was a transaction from the FTX wallet.

24  Q.  Of what?

25  A.  It was the FTX wallet associated with

O4BVEIS2                          DeCapua - Direct

1    bochen.clean@gmail.com.

2    Q.   And what did that wallet send over?

3    A.   1,049,584 USDC.

4    Q.   Now, after that cryptocurrency from the borrows and from

5    the FTX wallet got to the NQM wallet, what did the NQM wallet

6    do?

7    A.   So it -- well, first, it exchanged some of that USDT for

8    USDC.  And then from there, it sent value to the Circle wallet

9    that we already discussed that was associated with Avraham

10   Eisenberg.

11                (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O4BCeis3                        DeCapua - Direct

1   BY MR. BURNETT:

2   Q.  How much -- approximately how much USDC went to that

3   Avraham Eisenberg Circle wallet?

4   A.  It was a little over 57,519,000 USDC.

5   Q.  What time period?

6   A.  It was between 7:14 p.m. and 7:27 p.m.

7   Q.  Now, that 2NQM wallet had received cryptocurrencies that

8   were different types than USDC also; correct?

9   A.  Correct.

10  Q.  What happened with that non-USDC cryptocurrency?

11  A.  It just stayed in that wallet.

12  Q.  Now, did the USDC that went to the Avraham Eisenberg Circle

13  wallet stay in that Circle wallet?

14  A.  No.

15  Q.  What happened to it?

16  A.  So it was transferred to two separate wallets that were on

17  different blockchains from Solana.

18  Q.  Do you recognize those wallets?

19  A.  I do.

20  Q.  What do you recognize them from?

21  A.  So in the very first slide we looked at, these are the two

22  wallets that seated the Circle wallet associated with Avraham

23  Eisenberg.  They're the ones that sent value initially

24  beginning this process.

25  Q.  Just take a look at that.

O4BCeis3                      DeCapua - Direct

1          MR. BURNETT:  If we could pull up Government Exhibit

2     1351 side-by-side.

3     Q.  What were the two first wallets that started out this whole

4     chain of transactions that we've been following?

5     A.  There was wallet ending ARN9T and wallet 81FB9.

6     Q.  And where does the cryptocurrency end up at the end of your

7     transaction tracing on October 11th?

8     A.  In those two wallets.

9     Q.  If we could focus just on 1357, and I want to focus on the

10    times of those transactions.  How long did the USDC that went

11    to the Circle wallet stay in that Circle wallet?

12    A.  Not very long at all.

13    Q.  How do you know that?

14    A.  Because I can look at the Circle records and see

15    specifically when the value came in and then when it was

16    transferred out.

17    Q.  What happened to the cryptocurrency after it got to that

18    ARN9T and the 81FB9 wallet?

19    A.  So once it went to these two separate wallets, then they

20    were involved in another transaction which actually converted

21    the cryptocurrency from USDC to other types of Stablecoins.

22    One was Die coin, I believe, and the other one was maybe USDD,

23    but I'm not 100 percent sure.  It's a Stablecoin that is known

24    for being decentralized.

25         MR. BURNETT:  No further questions, your Honor.

O4BCeis3                          DeCapua - Cross

1             THE COURT:  Mr. Talkin.

2             MR. TALKIN:  Thank you.

3   CROSS-EXAMINATION

4   BY MR. TALKIN:

5   Q.  Good morning.

6   A.  Good morning.

7             MR. TALKIN:  Can we pull up 1351, please.

8   Q.  You're looking at Government Exhibit 1351, it's one you

9   talked about a few moments ago.  You remember that; right?

10  A.  I do.

11  Q.  And just looking at this, there are really three wallets

12  that have names attached to them, so to speak.  That would be

13  the Circle wallet you see there on the left-hand side; right?

14  A.  That's right.

15  Q.  And you have all the FTX wallets that has a bochen.clean

16  attached to it; right?

17  A.  That's correct.

18  Q.  Then the AscendEX wallet, which has the opayq, it has the

19  email attached to it?

20  A.  Right, an email.

21  Q.  Other than that, they're all -- you just said they're just

22  identified by numbers; right?

23  A.  Correct.

24  Q.  And the reason for that is even the wallets that you've

25  identified from FTX and Circle and AscendEX, as they appear in

O4BCeis3                         DeCapua - Cross

1    public, they all have -- you call them random numbers, but
2    they're all identified by a series of numbers; correct?
3    A.  So that's true.  Again, I testified that my -- it depends
4    on what blockchain explorer you're looking at.
5    Q.  But as far as these are concerned -- well, most, most of
6    these wallets in public appear by numbers, not by names;
7    correct?
8    A.  Correct.
9    Q.  And part of your job, that you probably spent a lot of
10   time, you look at number wallets and you try to connect them to
11   people?
12   A.  That's correct.
13   Q.  Is that right?  I'm sorry.
14   A.  That is right.
15   Q.  When you do that, one of the first things you do is look
16   for a centralized exchange because they are the most
17   forthcoming with information; right?
18   A.  Yes, a regulated U.S.-based U.S. exchange in particular.
19   Q.  And Circle is one of those; right?
20   A.  Correct.
21   Q.  So it was fairly easy for you to find the information that
22   enabled you to say, "wallet, Avraham Eisenberg" on this chart?
23   A.  Yes.  I didn't do that in particular, but in general, I
24   just reviewed the documents.
25   Q.  I'm sorry.  You're right.

O4BCeis3                          DeCapua - Cross

1          For a colleague that went and did this endeavor, it

2     would have been fairly easy for them to connect the name with

3     the wallet using Circle records?

4     A.   It would have required a grand jury subpoena.

5     Q.   And that's it?

6     A.   Correct.

7     Q.   Now, there's other decentralized exchanges where that's a

8     much more difficult process; right?

9     A.   Correct.

10    Q.   And there's a lot of other decentralized exchanges where

11    that's a more difficult process?

12    A.   I don't know how many decentralized exchanges there are.

13    There's certainly more than one or two.  So there are other

14    decentralized exchanges where that is a more difficult process.

15         MR. TALKIN:  Now, if we could go to 1354, please.

16    Q.   1354 shows all of the long money after all of the long

17    cryptocurrency that was gained in the long wallet -- let me

18    back up.

19         Your testimony was you went through, with Mr. Burnett,

20    a long string of transactions, and ultimately, the money that

21    was -- excuse me.  The cryptocurrency that was obtained through

22    those transactions from the long side went into this wallet

23    that ends RNJNA; correct?

24    A.   Can you repeat that.

25    Q.   Yes, I will.

O4BCeis3                          DeCapua - Cross

1          Let's go back.  Let's go back to 1351.

2          Looking down at the far-right corner, the bottom-right

3    corner of the document, you have an account RNJNA; correct?

4    A.  Correct.

5    Q.  And that had $5 million put into it; right?

6    A.  USDC.

7    Q.  USDC put into it?

8    A.  That's right.

9          MR. TALKIN:  Now let's go back to 1354.

10   Q.  This is after all the transactions had taken place on

11   Mango; correct?  That's the period of time we are at?

12   A.  So for the buy transactions, it's after the buy

13   transactions took place, but I do believe there is a little bit

14   of overlap, so as the borrow withdrawing was happening, there

15   was more buy transactions.  So there's a little bit of overlap.

16   Q.  For the most part, this is where the cryptocurrency went or

17   the USDC?

18   A.  So it's where a little over 5 million USDC went, that's

19   correct.

20   Q.  So then looking at 1354, 1354 transferred, at those periods

21   of time, 50 million USDC and then several other

22   cryptocurrencies into NQM; right?

23   A.  That's correct.

24         MR. TALKIN:  Then we can look at 1357, please.

25   Q.  Here we see NQM account transferring all of the money we

O4BCeis3                          DeCapua - Cross

1    just spoke about, all the current cryptocurrency we just spoke

2    about back into the wallet that's labeled Avraham Eisenberg;

3    correct?

4    A.  So not all of it, just USDC.

5    Q.  All the USDC, it's going into that account; right?

6    A.  I'm not sure if it's all the USDC.

7    Q.  Less than 2 million from the short; isn't that right?

8    A.  I'm sorry.  What's the question?

9    Q.  Almost all is going into the --

10   A.  Of the USDC.

11   Q.  Correct.

12          And that's the same Circle wallet that you were able

13   to associate with the name Avraham Eisenberg; correct?

14   A.  That's correct.

15   Q.  So the decision by who did these transactions was to send

16   the 50-plus -- $57 million into a centralized exchange account;

17   correct?

18   A.  Yes.  It was USDC, though.  It wasn't dollars.

19   Q.  I apologize.  I keep saying dollars.

20   A.  It's fine.

21   Q.  So the transaction between NQM and the Circle account was

22   direct, as we see it here?

23   A.  Yes.

24   Q.  It didn't go first into any type of wallet that has extra

25   privacy, did it?

O4BCeis3                          DeCapua - Cross

1    A.   No.

2    Q.   Those type of wallets exist; correct?

3    A.   They do exist.

4    Q.   The cryptocurrency that was in NQM, there was no attempt to

5    transfer that into any kind of a privacy point of

6    cryptocurrency, was it, before it made it into the Circle

7    wallet?

8            MR. BURNETT:  Objection.  Foundation.

9            THE COURT:  Overruled.

10   A.   So I'm still thinking about the question you just asked me,

11   and I'd like to clarify that the one I --

12           THE COURT:  Hold on.  Just answer the questions being

13   asked.

14           Why don't you restate the question so the witness can

15   answer.

16   Q.   The USDC that went from NQM wallet, as it's pictured here,

17   went directly into the Circle wallet that's labeled -- that the

18   Eisenberg Circle wallet?

19   A.   That's correct.

20   Q.   You're familiar with privacy enhanced wallets; correct?

21   A.   I am.

22   Q.   That's a technique that's used by individuals to obscure

23   the trail of cryptocurrency?

24           MR. BURNETT:  Objection.

25           THE COURT:  Overruled.

O4BCeis3                          DeCapua - Cross

1    A.  It is, but I don't know if you can use it for USDC.

2    Q.  But there are other methods to obscure the transaction,

3    isn't there?

4    A.  Yes.

5    Q.  There's many, isn't there?

6    A.  So I don't know for USDC because it's a little bit

7    different than a traditional cryptocurrency.

8    Q.  But you'll agree with me that the person that made this

9    transaction easily could have taken steps to obscure the source

10   of these funds, of the USDC?

11   A.  I can't say that it could easily.

12   Q.  Let me take that word out of it.  It could have been done?

13   A.  I'm not sure with USDC because USDC is a little bit

14   different than most other types of cryptocurrencies.

15   Q.  Have you ever heard of a mixer?

16   A.  I have.

17   Q.  It could be placed in a mixer, can't it?

18   A.  So, I'm thinking of the mixers that I'm familiar with, and

19   I'm not sure if USDC is one of the types of cryptocurrencies

20   that could be used with a mixer.

21   Q.  How about a tumbler?

22   A.  So, in general, mixers and tumblers -- the nomenclature,

23   it's the same thing.

24   Q.  What is a mixer?

25   A.  So, in general, it's a service on the intent where one can

O4BCeis3                         DeCapua - Cross

1     bring a certain type of cryptocurrency, usually Bitcoin, and

2     deposit it into this service, and then it will obfuscate the

3     subsequent steps of the transaction in order to get the Bitcoin

4     back out in some other wallet.  It's intended to make it

5     difficult for someone like me who's trying to trace Bitcoin so

6     I can't trace the steps to see where it went.

7     Q.  And a tumbler, you say, is a similar type device?

8     A.  Correct.

9     Q.  You will agree with me, whether it can happen for USDC or

10    not, in this particular transaction we're looking at on 1357,

11    none of those techniques were used to obscure the identity of

12    the funds?

13    A.  That's correct.

14          MR. TALKIN:  Can we go back to 1351 again, please.

15    Q.  Again, looking at this series of transactions, if you were

16    trying to -- as an investigator is trying to find out where the

17    funds came from, they would go backwards and trace backwards.

18    So, when I mean "backwards," let's start at just the FTX

19    wallet, you would go backwards to the Eisenberg wallet;

20    correct?

21    A.  So if I started with the FTX wallet?

22    Q.  Yes.

23    A.  The things I would look at is going to be the account

24    opening documentation of FTX.  If I want to answer the question

25    of where is this money coming from, then I would trace it, the

O4BCeis3                           DeCapua – Cross

1    next step backwards in the Solana blockchain, which would bring

2    me to the KUUVP wallet, and one more step back from that will

3    bring me to the Circle wallet associated with Avraham

4    Eisenberg.

5    Q.  And you looked at the KUUVP wallet?

6    A.  Correct.

7    Q.  And that is not in one of these obscuring wallets we talked

8    about, is it?

9    A.  No, it's just the Solana wallet.

10   Q.  A regular Solana wallet?

11   A.  That's correct.

12            MR. TALKIN:  Can we pull up 993B, please.

13   Q.  Now, this is a list of transactions that you looked at on

14   direct examination; correct?

15   A.  Yes.

16   Q.  When we started -- when I started talking to you, we were

17   talking about public information versus actual names.  In other

18   words, you were talking about the Eisenberg wallet denomination

19   on your chart, that wasn't known to the public; correct?

20   A.  The Circle exchange Eisenberg, correct, it would have just

21   shown up as a random wallet or, depending on the blockchain

22   explorer you're using, it might come back to Circle.

23   Q.  In particular to here, it would have showed up just like it

24   does in column G on this spreadsheet?

25   A.  The Circle wallet in particular?

O4BCeis3                         DeCapua - Cross

1    Q.  Not the Circle wallet in particular.  All.

2    A.  All wallets?

3    Q.  Correct.

4    A.  So it depends on what side of the transaction it's on.

5    Q.  There's two sides, there's the maker and the taker; right?

6    A.  Can you scroll to the left a little bit on this

7    spreadsheet.

8         Yeah, so there's the maker and the taker.  I see those

9    two columns.

10   Q.  So you see there that the -- and then you have the address

11   all the way in B?

12   A.  Correct.

13   Q.  So you don't see in this 993B, you don't see any names, do

14   you?

15   A.  No.

16   Q.  You don't see any particular identifications of the

17   wallets, do you?

18   A.  I don't.  Well, particular identifications.

19   Q.  Particular, other than by numerical sequence.

20   A.  Correct, I don't see any.

21        MR. TALKIN:  Sorry to jump around like this, but can

22   we now go to 1357.

23   Q.  Now, looking back at the Circle wallet identified as

24   Eisenberg, it went in after the USDC went into that wallet, it

25   then went into two other wallets; correct?

O4BCeis3                          DeCapua - Cross

1    A.   That's correct.

2    Q.   And again, between those, looking at the first one where it

3    went to the wallet ARN9T, in this particular instance, there

4    was no use of any device to obscure the transaction?

5    A.   No.

6    Q.   And looking at the one on the bottom, the 30 million USDC,

7    the wallet 81FB9, there was no use of any device to obscure the

8    transaction?

9    A.   There was not.

10   Q.   It's fair to say through all the transactions you looked at

11   here, and I'm talking about the transactions from wallet to

12   wallet, not the names of the wallets, but from wallet to

13   wallet, there were no attempts whatsoever to obscure the

14   identity of the wallet?

15   A.   So speaking to my experience of how --

16   Q.   That's not my question.  My question is:  Did that happen

17   or not?  And if you can't answer, you can't answer.

18   A.   There was no mixers or tumblers that were used.

19   Q.   As part of your investigation and review of these

20   transactions, you actually looked at the Mango perpetual

21   transactions that are the subject matter of your testimony;

22   correct?

23   A.   I did.

24   Q.   And you're aware that none of those perpetual transactions

25   were ever closed?

O4BCeis3                         DeCapua - Cross

1    A.   That wasn't something -- I vaguely recall reviewing Mango

2    records, but it wasn't the -- like, that's not -- it wasn't

3    part of my direct -- I didn't prepare to answer any questions

4    related to whether or not those contracts were closed.

5    Q.   But you prepared to talk about the price of those

6    transactions; correct?

7    A.   The reference price, correct.

8    Q.   And when the reference price -- what do you mean by "the

9    reference price"?

10   A.   So it's the -- on the face value of the perp contract, it

11   is the reference price that determines whether or not the

12   contract is in the money, whether if you're on the long side

13   when the value of Mango goes up, that perp contract has value.

14   If it goes below the reference price, it loses value.

15            MR. TALKIN:  1355, please.

16   Q.   You have a price in the upper right-hand corner that went

17   down 95.37 percent.  Are you referring to the reference price

18   there?

19   A.   So that is going to be the oracle price.

20   Q.   Correct.  There is a difference between the reference price

21   and the oracle price; correct?

22   A.   I'm not 100 percent sure.

23   Q.   Well, you looked at the Mango perpetuals in preparation of

24   your testimony here today; correct?

25   A.   That's correct.

1   Q.   And doing that, you looked at how those transactions work,

2   in other words, what the prices are?

3   A.   That's correct.

4   Q.   And you realized that there's more than one price that's

5   applicable to those Mango perpetuals?

6   A.   So my focus was on the reference price, the stated price on

7   the particular Mango perp contract.

8   Q.   So the stated price, or what you're calling the reference

9   price, is the equivalent of the oracle price; correct?

10  A.   Again, I don't know.

11  Q.   But when you say that you're talking about the price of the

12  Mango, you're not sure what price you're talking about?  Is

13  that your testimony?

14  A.   So, no.  When we're talking about the reference price on

15  written on the Mango perp contract, that's one thing.  If

16  you're talking about what is up in the upper right-hand corner

17  here listed under Mango-perp, that is the prices as reflected

18  in the oracle.

19  Q.   And those are two different prices?

20  A.   I don't understand what the question is.

21  Q.   Sure.  Is the reference price and the oracle price the same

22  price?

23  A.   So the reference price is fixed.  The oracle price will

24  change depending on the input from the various exchanges.

25  Q.   So based on the analysis you just gave me, you just

O4BCeis3                        DeCapua - Cross

1   described two different prices, didn't you?

2   A.  Sure.

3   Q.  So I'm going to ask you the question again.

4          There's two different prices for the Mango perpetual;

5   correct?

6   A.  For the Mango perpetual contracts that we discussed, those

7   three matching contracts, there's one reference price.

8   Q.  And there's one reference price --

9   A.  The value of those contracts variates depending on the

10  price that is listed in the oracle.

11  Q.  In preparing to testify, did you look at, during this

12  period, the relevant period of time, how much it cost to buy

13  the perpetual on the contract?

14  A.  No.

15  Q.  Did you look at what the oracle prices were?

16  A.  During the time periods where the buying and the selling

17  was taking place?

18  Q.  Right.

19  A.  I did.

20  Q.  And when you say "a perpetual," you testified some of the

21  perpetuals became long.  You remember that; right?

22  A.  So there was the buy position in the perpetual contract --

23  Q.  Some of that -- I'll change the term.  Some of the buys,

24  you gave a value to; correct?

25  A.  I'm not sure what you're referring to.

O4BCeis3                          DeCapua - Cross

1   Q.  On your direct testimony, you talked about longs and

2   shorts; right?

3   A.  Correct.

4   Q.  And you talked about prices of longs and shorts, didn't

5   you?

6   A.  I talked about the relative value change.

7   Q.  The relative value change was to the contract price;

8   correct?

9   A.  Correct.

10  Q.  And the contract price is not the oracle price; correct?

11  A.  Correct.

12  Q.  So, now getting back to --

13          MR. TALKIN:  If we can look at 1104, please.

14  Q.  This was the front page of the Circle account information

15  that either you or one of your colleagues obtained?

16  A.  That's correct.

17  Q.  And you reviewed the Circle account?

18  A.  I did.

19  Q.  And you see on the upper right-han corner, it says

20  "suspended," at the upper left-hand corner, it says,

21  "suspended"?

22  A.  I see that.

23  Q.  And you're aware that Mr. Eisenberg, in November of '22,

24  filed an arbitration with Circle to get some of his money back

25  that was suspended?

O4BCeis3                              DeCapua - Cross

1   A.  I'm not aware of that.

2   Q.  You didn't see that in the records that you reviewed?

3   A.  No.

4           MR. TALKIN:  So now I want to take a look at 1356.

5   Q.  This is, we were talking about the short a few minutes ago.

6   Do you remember that?

7   A.  I do.

8   Q.  This is kind of toward the end of the list of transactions

9   you described on direct examination?

10  A.  Yes.

11  Q.  And you'll see that the cryptocurrency in the short wallet

12  went into this DJU wallet; correct?

13  A.  Correct.

14  Q.  And then it went into the NQM wallet?

15  A.  Correct.

16  Q.  So, all of the cryptocurrency that was from the long and

17  the short ultimately ended up in the NQM wallet; correct?

18  A.  Correct.  Everything that was borrowed/withdrawn from Mango

19  Markets ends up in the wallet ending S2NQM.

20  Q.  When you say borrow/withdrawn, do you know whether or not

21  those funds were actually borrowed?

22  A.  So, according to the Mango Markets records that I looked

23  at, it says that they were borrowed.

24  Q.  Do you know whether they were withdrawn or not?

25  A.  So, according -- and again, I just -- I reviewed the

O4BCeis3                         DeCapua - Cross

1   documents provided by Mango Markets, and looking at them, I can
2   see that the actual -- it says that they were withdrawn.  And
3   then, when I look at the Solana blockchain, I can confirm that,
4   I can see the actual transfers of the different
5   cryptocurrencies.
6   Q.  And when you went through those transfers of
7   cryptocurrencies, you followed the trail from the beginning to
8   the end of what you testified here about today; correct?
9   A.  Correct.
10  Q.  And as part of that, you realized that around 50 million of
11  the USDC, before it left the Mango platform, was settled.  Did
12  you see that in the transactions?
13  A.  Can you repeat that again.
14       MR. TALKIN:  Sure.  If we could pull up -- it's
15  probably easier for you to see this 3510004.  Please only show
16  it to the witness.
17       The reason I'm doing this, the exhibits are small and
18  we can blow it up you four.
19       Can you see that there?  Is it there for you?
20       Can we now go to page 9.  If you could blow it up for
21  him so he could see it.
22       I'm more concentrating on the typing below the black
23  squares.  Could you please show him so he can refresh his
24  recollection, the other pullout, and then go to the next.
25  Q.  Are you able to see that?

O4BCeis3                    DeCapua - Cross

1    A.  I am.

2    Q.  So you know what that is; right?  Don't tell me.  I just

3    want to make sure you know what it is.

4    A.  So, I recognize it as a screenshot that I made.  It's part

5    of my notes.

6    Q.  Correct.

7           MR. TALKIN:  Let's go down to the bottom there, the

8    short typed line.

9    Q.  So, just so we know what we're talking about this, this is

10   your notes about the Solana account taking approximately

11   50 million USDC; correct?

12   A.  Correct.

13   Q.  And right above that, this is your notes about that amount

14   being settled from the P&L; correct?

15   A.  Correct.

16   Q.  The settling in the P&L is something that happens on the

17   Mango Markets website; correct?  Or the protocol?

18   A.  So, I'm not 100 percent sure.  The reason this is in my

19   notes is because when I was going through the Solana -- every

20   single transaction for this particular wallet, I was just going

21   transaction by transaction and taking a screenshot of the data

22   from the Solana blockchain.

23   Q.  So what you're saying is you looked at what happened to the

24   USDC on the Solana blockchain; correct?

25   A.  Correct.

O4BCeis3                         DeCapua – Cross

1  Q.  And this is your notes from those from that research;

2  correct?

3  A.  Yes.

4  Q.  And what we ascertain from your research is that whatever

5  the number, an amount of USDC was settled in the P&L; correct?

6  A.  So I'm not sure what you mean by the word "settled."

7          MR. TALKIN:  If we can --

8          MR. BURNETT:  Objection to the use of the document,

9  your Honor.

10          MR. TALKIN:  Your Honor --

11          THE COURT:  Let's have a brief sidebar.

12          (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

 1                    (At the sidebar)

 2              THE COURT:  What are you doing with the document?

 3              MR. TALKIN:  I'm going to move it in.

 4              THE COURT:  On what basis?

 5              MR. TALKIN:  This is -- it shows, it's his -- it shows

 6     the transactions and what his analysis was of the transaction.

 7              MR. BURNETT:  We'll object.  It's an out-of-court

 8     statement --

 9              MR. TALKIN:  It shows the code that he's testified

10     about.

11              MR. GREENSPAN:  It shows the settlement program was

12     wrong.

13              THE COURT:  Well, you haven't answered the question of

14     how are you getting that in?  Are you moving it in as a prior

15     inconsistent statement or extrinsic evidence of a prior

16     inconsistent statement?

17              MR. TALKIN:  The problem is it's small.  I want to

18     just ask him the questions and have him answer.

19              THE COURT:  That's how you do it.  If there is

20     something inconsistent in the document, is there some other

21     basis to gets those notes in?

22              MR. TALKIN:  Not at the end.

23              MR. BURNETT:  And I objected because if he wants to

24     get an "I don't recall" and refresh his recollection, he can do

25     that, but he has the document up on the screen and is talking

O4BCeis3                        DeCapua - Cross

1    through it in front of the jury.

2            THE COURT:  He's trying to avoid talking through it.

3            That's why I didn't understand what you were trying to

4    do.  Are you trying to have him make a statement that then you

5    would impeach?

6            MR. TALKIN:  Trying to make a statement that that's

7    what happened.

8            THE COURT:  What is what happened?

9            MR. TALKIN:  That the P&L was settling.  He reviewed

10   this transaction, it happened, and part of the transaction was

11   that the P&L was settled, and that's in his notes and that's

12   what happened.

13           THE COURT:  You have to take the notes down, ask him

14   the questions.  If you want to, then you use the notes to

15   refresh his recollection.  You're entitled to do so.  If he

16   denies something that is reflected in his notes, then you can

17   move it in if you have grounds to under the rules.  If there's

18   some other basis to get it in, then let me know.

19           MR. BURNETT:  These are his notes that have

20   screenshots.  If they want to put in a code in their own case,

21   they can do that.

22           THE COURT:  Why wouldn't the statement be admissible

23   as a statement of a party opponent?

24           MR. BURNETT:  He's not a party opponent.  He's just a

25   witness from the FBI.

O4BCeis3                        DeCapua – Cross

1           THE COURT:  He's an agent.

2           MR. BURNETT:  Agent statements are not --

3           THE COURT:  An agent under the statement by a party

4    opponent rule.

5           MR. BURNETT:  Statements by law enforcement officers

6    don't bind the government in a way that makes it subject to the

7    party opponent rule because they're not agents in that sense.

8    He's a law enforcement officer, but he's not an agent for the

9    sense of the rule in terms of anything an agent says can then

10   be used against the government in court as a statement by the

11   government.

12          THE COURT:  I mean, just applying the common law

13   definition of "agent," can the agent who investigated the case

14   that you're in charge of be considered an agent under that

15   understanding?  I don't think the rule refers to agents in the

16   sense of government agents.  He's talking about just agents.

17          MR. BURNETT:  I don't think his statements are -- he

18   has the ability to act as a common law agent for the Department

19   of Justice in that way.  He didn't investigate the case, he did

20   this narrow piece of testimony for this tracing analysis, but I

21   would ask that we do briefing on this issue if you want because

22   this has significant implications for the department as a

23   whole.

24          THE COURT:  That application has not been made.  So

25   let's do it the way -- as of right now, I don't hear you --

O4BCeis3                          DeCapua - Cross

1              MR. TALKIN:  I'm going to re-work the questions.

2              THE COURT:  Perfect.  Thank you.

3              (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O4BCeis3                           DeCapua - Cross

1              (In open court)

2              THE COURT:  Mr. Talkin, you may proceed.

3              MR. TALKIN:  Thank you.

4   BY MR. TALKIN:

5   Q.  Do you know what a settled P&L is?

6   A.  No.  I'm assuming -- I think I know what P&L stands for.

7   Q.  Let's start with that.  P&L stands for what?

8   A.  I think it stands for profit and loss.

9   Q.  And a settled P&L, I'm asking you, do you know what a

10  settled profit and loss is?

11  A.  So, no.

12  Q.  That's fine.

13             And when you were preparing to testify, you prepared

14  notes, and in your notes, you identified a transaction as a

15  settled P&L.  Do you remember that?

16  A.  I do.

17  Q.  And that was in reference to USDC on the Mango protocol;

18  correct?

19  A.  I don't know.  It happened right before the --

20  Q.  Are you saying you don't remember or you don't know?

21  A.  You can try showing me my notes again.

22             MR. TALKIN:  I'm going to, thank you.

23             If we can show 3510004, page 9.

24  Q.  I'm going to ask you to refresh your recollection.  Take

25  your time, read it.  I know it's small.  Just a technology

O4BCeis3                          DeCapua - Cross

1   issue there.  If you can, we'll try to blow it up more for you.

2             MR. TALKIN:  Could you please do your best to blow it

3   up for him.  Thanks.

4             THE WITNESS:  If you can blow up the actual blockchain

5   explorer information.

6             MR. TALKIN:  Is that above?

7             THE WITNESS:  It's below.

8   A.  Yeah, so this was just the name of the program that was --

9             THE COURT:  Hold on for a second, Mr. DeCapua.  Right

10  now, counsel is asking you just to review the document, see if

11  it refreshes your recollection, and then he's going to ask you

12  some further questions.  Take as much time as you need.

13            Then, Mr. Talkin, you can proceed.

14  Q.  Is your recollection now refreshed?

15  A.  Can you also blow up the part just above this that's also

16  part of the blockchain explorer?

17  Q.  Absolutely.  Is that what you wanted?

18  A.  Yes.

19  Q.  So, looking at this -- well, not looking at this.  Let me

20  ask you, during your analysis, you observed that at 22:29 UTC

21  time, the settled P&L program on the Mango Markets protocol was

22  called; correct?

23  A.  On the Solana blockchain.  That program, the Mango Markets

24  program settled P&L was called on the Solana blockchain.

25  Q.  But that -- I'll ask the question again.

O4BCeis3                          DeCapua - Cross

1          On the Solana blockchain, at 22:29 UTC time, on

2     October 11th, the settle P&L program was called?

3     A.  Correct.

4     Q.  And that was in reference to an amount of USDC?  I know you

5     need to look again.

6               MR. TALKIN:  Can you show him now.

7     Q.  Do you remember that or not?

8     A.  I didn't see any reference to a specific amount of USDC.

9     Q.  Can we agree on the cryptocurrency, it was USDC?  We'll

10    show it to you again.  Would it help?

11    A.  It's highly complex data and there's a lot to it.

12              MR. TALKIN:  Go ahead.

13    A.  So it's going to be just above that, the screenshot just

14    above that and just the whole thing.  Then, could you show me

15    the screenshot that's just below that.

16    Q.  Does that refresh your recollection?

17    A.  It does.

18    Q.  So the settled P&L on the blockchain was called regarding

19    USDC; correct?

20    A.  So I didn't see references to USDC in that specific

21    transaction.  What we're looking at here is a separate

22    transaction.

23              MR. TALKIN:  Can we go back out.  Can we highlight the

24    words, please.

25    Q.  So I just want to do the time.  The separate transaction

O4BCeis3                          DeCapua - Cross

1    you're talking about is a withdrawal of USDC; correct?

2    A.  $50 million worth, yes.

3    Q.  And right before that, the transaction immediately before

4    that was the settled P&L; correct?

5    A.  The transaction before that one, yes.

6    Q.  So you had transaction and not the -- when I say

7    "transaction," first, the settled P&L; correct?

8    A.  Correct.

9    Q.  And then you had the withdrawal?

10   A.  Correct.

11   Q.  Of USDC?

12   A.  Yes.

13   Q.  And this code that you see here is a fair and accurate

14   representation of the code as you saw it when you did your

15   research; correct?

16   A.  Code?

17   Q.  I might be using the wrong term.

18              MR. TALKIN:  Show him the top part, the black.

19   Q.  To you, it's instructions, code, computer.

20   A.  So what this is, this is raw blockchain data that is

21   presented using the Solana blockchain explorer called

22   Solana FM --

23   Q.  I'll change my question.

24              What you're looking at here is a fair and accurate

25   representation of the data, blockchain data as it existed when

O4BCeis3                        DeCapua - Cross

1    you reviewed it in preparing to testify here today; correct?

2    A.   That's correct.

3    Q.   And is that fair to say about all of the data, blockchain

4    data that's on this one page?

5    A.   Yes.

6              MR. TALKIN:  Your Honor, I offer this.  I believe it's

7    defense exhibit 50.

8              MR. BURNETT:  Objection.

9              THE COURT:  I'll reserve decision on that.

10             Were you planning to ask this witness any further

11   questions about the items that you're offering into evidence?

12             MR. TALKIN:  No, your Honor.

13             THE COURT:  Then I'm going to reserve decision on

14   that.

15             Any further questions?

16             MR. TALKIN:  Just a couple.  I'm looking for one note

17   I made and I think I got the answer already.  Yes, that's all.

18   Thank you, your Honor.

19             THE COURT:  Mr. Burnett.

20             MR. BURNETT:  Thank you.

21             MR. TALKIN:  Your Honor, there is one more question.

22   I apologize.  I couldn't find the piece of paper, I put it

23   down, and of course it's right in front of me.

24             Sorry, Mr. Burnett.  I apologize.

25             Can we pull up 116, please, as it's in evidence.

1   BY MR. TALKIN:

2   Q.  You're looking at Government Exhibit 116.  You remember

3   that, that was the chat about bochen?

4   A.  I do.

5   Q.  And you talked on direct examination about the content of

6   the chat, obviously not the whole thing, selected sections?

7   A.  That's correct.

8   Q.  And when you reviewed this, you were able to find and look

9   at PDFs that were embedded within the chat?

10  A.  That's correct.

11  Q.  I'm going to ask that you look at what's marked as, I think

12  it's 116A.

13          MR. TALKIN:  Your Honor, I just have to see if that

14  came into evidence yet.

15          MS. HUANG:  It did.

16          MR. TALKIN:  My understanding or I now know that 116A

17  is in evidence.  And if we could please show that to the

18  witness.  I really apologize doing this to you, Mr. Smith.

19  Before we get to that, can we go to 116 and go to page 74.  At

20  the bottom there, if you can blow up a little bit of the bottom

21  bubble.

22  Q.  Do you see something, it says, prepared company purchase

23  agreement for both companies, previous one and today's one,

24  already signed on our side.  Do you see that?

25  A.  I do.

O4BCeis3                         DeCapua - Cross

1          MR. TALKIN:  Can we go to the next page, Mr. Smith.

2     Q.  Then you see attachments there; correct?

3     A.  I do.

4     Q.  One of those attachments is, which I will now again show

5     you, is 116, with the help of Mr. Smith, and now back to where

6     we started here.  You recognize that; right?

7     A.  So I haven't looked at this.

8     Q.  It's in evidence, so let's just talk about it.  You

9     recognize -- I just want to go down to the bottom third of it,

10    and you see that we're talking about -- you see the word

11    "bochen" there?

12    A.  I do.

13    Q.  And you see "Poland," that it's a Polish address?

14    A.  Yes.  Country, Poland, I do see that.

15    Q.  And you also see at the bottom, it says, "company is with a

16    full nominee."  Do you see that?

17    A.  I see that.

18    Q.  Now let's go up to the top of the document, top half of the

19    document, you'll see this agreement is between an organization

20    known as Eternity Law International LLC?

21    A.  I see that.

22    Q.  And Avraham Eisenberg?

23    A.  That's correct.

24    Q.  Giving an address in Puerto Rico; correct?

25    A.  Correct.

O4BCeis3                        DeCapua - Cross

1   Q.  And this, I'm going to ask you to take a second and review

2   the document.  I want you to have the opportunity to know what

3   you're talking about.  So go ahead, please.

4               (Pause)

5               You just tell me when you're ready.

6               (Pause)

7   A.  Okay.

8               THE COURT:  Mr. Talkin, what we're going to do now is

9   we're going to take our midmorning, midday break and we're

10  going to come back because we're having a couple delays here

11  and I think we can probably streamline things over the break.

12              It's around 12:10, so let's come back at 12:40.

13              Mr. DeCapua, you're still going to be under oath.  So

14  make sure you don't speak with anyone on the government's side

15  and don't speak to anyone about your testimony or this case.

16              THE WITNESS:  Understood.

17              (Continued on next page)

18

19

20

21

22

23

24

25

O4BCeis3                        DeCapua - Cross

1           (Jury not present)

2           THE COURT:  We'll see you back at 12:40.

3           (Witness not present)

4           Mr. Talkin, what were you trying to do with that

5    document?

6           MR. TALKIN:  Your Honor, what I was trying to

7    establish is that there was a call for a settled P&L and that

8    that was the transaction that happened right before the

9    withdrawal of the USDC.  That's it.

10          THE COURT:  Is the key issue being the withdrawal?

11          MR. TALKIN:  The settlement in combination with the

12   withdrawal.

13          THE COURT:  And so, how does the code fragment come

14   into evidence?

15          MR. TALKIN:  Well, the code is the actual settlement

16   and withdrawal.  So, it comes into play if it's shown to

17   another witness, it can be analyzed.

18          THE COURT:  I don't understand that basis.  I

19   understand the argument for why it might be relevant, I just

20   don't understand how it's coming into evidence.  Doesn't that

21   count as hearsay?  It's a code portion, but does that take it

22   out of hearsay?

23          Mr. Burnett, what's the government's position here?

24          MR. BURNETT:  Our view is that the issue is what

25   they're offering is like an excerpt of code that's part of the

O4BCeis3                      DeCapua - Cross

1    agent's notes or reflects the agent's like screen-grabbing

2    code, like writing notes about it and then code.  If they want

3    to put in code through, like, their own witness with just the

4    code, I think that might be admissible.  Our issue is that this

5    is -- that they're putting in basically the witness's notes

6    that are, like, incorporating screenshots of code.

7             THE COURT:  You don't have any substantive objection

8    to them putting in the code?

9             MR. BURNETT:  If they want to put on a witness and put

10   in the code and say here's the code, I think that's fine, yeah.

11            THE COURT:  Your objection is that it's coming along

12   with the notes?

13            MR. BURNETT:  Right.

14            THE COURT:  Why wouldn't the notes come in?  The only

15   note of substance on the page is the reference to a withdrawal,

16   which, why wouldn't that come in as a prior inconsistent

17   statement given that, at length on the government's direct

18   examination, it referred to the amounts that are being

19   discussed as being borrows/withdrawals, whereas in the

20   document, it's referred to as a withdrawal?

21            MR. BURNETT:  It's not inconsistent because I think he

22   was -- I didn't hear him disagreeing with Mr. Talkin, and the

23   borrows that he was referring to on direct were coming from

24   like the Mango Markets webpage, which shows everything being

25   borrowed.

1          I don't think it's actually inconsistent for there to

2     have been a settlement and withdrawal and also for Mango

3     Markets to register that as a borrow, and that's what the Mango

4     Markets documents, like, actually reflect, which is why they

5     show a 54 million USDC borrow.

6          THE COURT:  If on examination Mr. Talkin establishes

7     that he's referring to that as a borrow, then at that point, he

8     would be able to attempt to put in this document through

9     Rule 613, at which point the page can come in.

10         MR. BURNETT:  If that thing in the notes were what he

11    was referring to as "the borrow," I think that would be right.

12    I think the agent will testify and I think already has that his

13    borrowing -- his borrowing chart was coming from a different

14    set of data, which is from Mango Markets.

15         THE COURT:  Mr. Talkin, you have two options here.  I

16    don't hear an objection to just the code pieces coming in.  So

17    if that's your intent, then I think you can get those in one

18    way or the other.  I'm not hearing a substantive objection on

19    that.  If you wanted to get the page in with the notes, then

20    you would have to go through the steps to try to get it in

21    through 613.

22         MR. TALKIN:  Your Honor, first of all, the source --

23    well, backing up.  I think that it's admissible under 807 as

24    the residual hearsay exception clause.  This is publicly

25    available.

O4BCeis3                        DeCapua – Cross

1          THE COURT:  I hear you there.  I mean, that could be a

2    basis.  Again, if you just struck out the portions of the

3    notes, then I might even just agree with you because there's no

4    actual objection to the code coming in.

5          MR. TALKIN:  Your Honor, he testified to those, so

6    we'll have no problem doing that.  The record is made on those

7    aspects anyway, so I think that's fine.

8          THE COURT:  So you're not trying to get in the actual

9    notes?

10         MR. TALKIN:  Correct.

11         THE COURT:  So, easy enough.

12         Anything else from the government's side?

13         MR. BURNETT:  No, your Honor.

14         THE COURT:  Anything from the defense?

15         MR. KLEIN:  No, your Honor.  But we just redact that

16   out and then mark it DX 50?

17         THE COURT:  There's probably a better way to do this.

18   I'll let it in on the basis that it's been addressed.  There's

19   no substantive objection to the code coming in.  And so, at

20   that point, this may be one of the narrow cases where the

21   residual exception would come into play.  I think the parties

22   could probably talk over the break and work it out as to how it

23   could come in so maybe it doesn't have to awkwardly be put in

24   in the context of redacted notes, which I think the government

25   would have a fair complaint, might be prejudicial in terms of

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O4BCeis3                          DeCapua - Cross

1      the jury just seeing redactions on a document that appears to

2      be someone's notes.

3                MR. KLEIN:  That's why I thought 807 would apply here.

4                MR. BURNETT:  I guess code doesn't strike me as

5      hearsay because it's not a statement, it's just something that

6      makes something function.  But I think separate and apart from

7      that, they could just go get the code, screen-grab themselves,

8      and we'll put that into evidence.  I don't know why it needs to

9      be like the excerpt from our witness's notes.

10               THE COURT:  That's what I'm trying to figure out.

11               Do you have the code, Mr. Talkin?

12               MR. TALKIN:  Yes, we do, but we have it right here

13     ready to go in.

14               THE COURT:  Just do it in the right way.  Let's avoid

15     an issue where you have parts of someone's notes coming into

16     evidence.  You can do it just like we've done some other things

17     in this case.  There's no disagreement.  Let's do it the right

18     way and get it in.

19               MR. TALKIN:  We will.  That's fine.

20               THE COURT:  That's why I asked whether you were going

21     to ask additional questions about the code, but you said you

22     were not.

23               MR. TALKIN:  No.

24               THE COURT:  And you did not.  And so, there's no issue

25     with timing here in terms of getting it in?

O4BCeis3                          DeCapua – Cross

1              MR. TALKIN:  That's correct.

2              THE COURT:  Let's handle it that way.

3              Any further issues?  All right, we'll see you back

4     12:40.

5              (Luncheon recess)

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O4BCeis3                          DeCapua – Cross

|    |                                                                         |
|----|-------------------------------------------------------------------------|
| 1  |                     AFTERNOON SESSION                                    |
| 2  |                        12:46 p.m.                                       |
| 3  |          THE COURT:  All right.  We ready to go?                        |
| 4  |          MR. KLEIN:  Defense is ready, your Honor.                      |
| 5  |          THE COURT:  Let's get the witness back on the stand.           |
| 6  |          MR. TALKIN:  Just two more minutes.                            |
| 7  |          THE COURT:  Mr. Burnett, are we falling behind here            |
| 8  | now or are we still on track?                                           |
| 9  |          MR. BURNETT:  I anticipate we will be done by the              |
| 10 | break tomorrow.                                                         |
| 11 |          THE COURT:  Okay.                                               |
| 12 |          MR. TALKIN:  Two minutes.                                       |
| 13 |          THE COURT:  Are you going to have a bunch of witnesses         |
| 14 | on a carousel testifying --                                             |
| 15 |          MR. BURNETT:  Some are five-minute people and I think          |
| 16 | we're not going to be calling one of the people who would have          |
| 17 | been more time.                                                         |
| 18 |          THE COURT:  All right.  Understood.                            |
| 19 |          MR. BURNETT:  Carousel would be fun, though.                   |
| 20 |          THE COURT:  Mr. Talkin, you ready?                             |
| 21 |          MR. TALKIN:  I'm ready.                                         |
| 22 |          MR. KLEIN:  Can I have 15 minutes, Judge?                      |
| 23 |          THE COURT:  No.  Denied.                                        |
| 24 |          Is that the instruction?                                       |
| 25 |          MR. KLEIN:  It's for the next witness.                         |

O4BCeis3                           DeCapua – Cross

1              THE COURT:  We'll take it up with the next witness.

2              MR. KLEIN:  Your Honor, may I approach?

3              THE COURT:  Yes.

4              MR. KLEIN:  Your Honor, can you read my handwriting?

5              THE COURT:  Yes.

6              MR. KLEIN:  You're one of the few people.

7              THE COURT:  Well, I have a 7 and 9-year-old, so I have

8      good practice.

9              MR. KLEIN:  I have a 9 and 6, so I'm right there with

10     you.

11             (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O4BCeis3                              DeCapua – Cross

1              (Jury present)

2              THE COURT:  Mr. DeCapua, you understand you're still

3      under oath?

4              THE WITNESS:  I do.

5              THE COURT:  Mr. Talkin, you may proceed.

6              MR. TALKIN:  Thank you, your Honor.  Just a few more

7      questions.

8              If we could pull up just the contract portion where we

9      left off.  Mr. Smith, if we could just highlight the middle of

10     the page.

11     BY MR. TALKIN:

12     Q.  Just to get you back, before you left, this is the purchase

13     agreement that we were talking about.  I'm going to point you

14     to a couple more parts.  Starting with, if you see a couple

15     lines down, it says, seller is selling the company in Poland

16     with opened three bank accounts.  Do you see that?

17     A.  I do.

18     Q.  And then going down to the bottom there, it says, remote

19     control nominee director and shareholder services included.

20     You see that, as well; correct?

21     A.  I do.

22             MR. TALKIN:  I want to go to the top of the second

23     page, if you can highlight first above the letter A.  Could you

24     highlight the first quarter there, first third of the page.

25     That's perfect.  Thank you.

O4BCeis3                        DeCapua - Cross

1    Q.  Here, you just see a little more language, also, the

2    seller's agent will assist buyer with additional versions of

3    two crypto sources, FTX.com and Binance for 500 USD per

4    verification.

5           MR. TALKIN:  Then if we can go to the next paragraph.

6    Q.  Also, in future, the seller's agent can directly provide

7    the buyer with additional services for an extra price, such as

8    visit nominee to the bank, verifications of some crypto

9    sources, recover of SIM card should be discussed case by case.

10          MR. TALKIN:  Finally, just highlight letter A.

11   Q.  That says the seller is willing to sell and the purchaser

12   is willing to buy 100 percent of the ownership of the company.

13   You see that; right?

14   A.  I see all that.

15          MR. TALKIN:  Mr. Sears, if I can ask you to do me a

16   favor and pull up that other portion of 116.  Mr. Sears has it

17   because we don't have it ready.

18   Q.  I just now want to go back.  You recognize at least some of

19   the terms in that contract on this portion of 116 that you

20   talked about earlier on direct examination; correct?

21   A.  I do.

22          MR. TALKIN:  Nothing further.  Thank you.

23          THE COURT:  Redirect.

24          MR. BURNETT:  Thank you, your Honor.

25          Mr. Sears, could we start by pulling up Government

O4BCeis3                    DeCapua - Redirect

1    Exhibit 1357.

2    REDIRECT EXAMINATION

3    BY MR. BURNETT:

4    Q.  Do you recall you were asked a number of questions about

5    the transfer of USDC back to this wallet, it's Circle in

6    Mr. Eisenberg's name?

7    A.  I do.

8    Q.  What happened to that USDC within minutes of it reaching

9    that Circle account?

10   A.  So, as soon as it reached the Circle account, within

11   minutes, it was transferred to two different wallets.

12   Q.  Do you recall that you were asked about whether there was

13   any obscuring technology or securing techniques used in the

14   course of that transfer?

15   A.  I recall that.

16   Q.  Now, what happened to that USDC when it got to those

17   accounts?

18   A.  So, once it got to the two separate accounts, then it was

19   actually swapped for another Stablecoin that is not USDC.  I

20   think it was Die coin was one of them and USDD was the other

21   one.

22   Q.  From your experience in law enforcement, does that swapping

23   of coins out of USDC into other tokens have significance?

24   A.  So, yes.

25   Q.  Why is that?

O4BCeis3                          DeCapua - Redirect

1    A.  So, USDC is a centralized Stablecoin.  It is -- it's

2    controlled by a company called Circle.  And so, with proper

3    legal authorization, we can go to Circle and we can freeze

4    USDC.  Circle, Tether are two examples of centralized

5    Stablecoins that the U.S. government can intercede.

6    Decentralized Stablecoins are -- it's not something -- I have

7    no knowledge of being able to go and interdict any of that

8    value.

9    Q.  Now let's switch topics.

10        MR. BURNETT:  Mr. Sears, could you pull up Government

11   Exhibit 1354.

12   Q.  Do you recall you were asked a number of questions about

13   this borrows -- the borrows and withdrawals out of this long

14   account into the NQM wallet?

15   A.  I do.

16   Q.  And you were asked questions about code with respect to

17   some USDC withdrawals; is that right?

18   A.  That's correct.

19   Q.  Now how, in the code that you reviewed, do all of these

20   withdrawals show up?  What are they labeled as when money is

21   coming off of Mango Markets to this account?

22   A.  So in the Solana blockchain, you're asking?

23   Q.  That's correct.

24   A.  I don't remember specifically, but it was something very

25   obvious.

O4BCeis3                        DeCapua – Redirect

1    Q.  Is there a distinction in that code between when it's

2    borrowed before versus when it's not borrowed before?

3    A.  I would have to look at my notes.

4         MR. TALKIN:  Objection, your Honor.

5         THE COURT:  Sustained.

6    Q.  Now, when you identified what was borrowed, what were you

7    relying on for that?

8    A.  I was relying on the Mango Markets documents.

9         MR. BURNETT:  Let's take a look at Government Exhibit

10   914.

11   Q.  Is this the document you're referring to?

12   A.  Yes.

13        MR. BURNETT:  Now, Mr. Sears, do you see there's a row

14   at the top of balances labeled "USDC" down below at balances.

15   If you could highlight, grab all the way across there, please.

16   All the way across to the end, please.

17   Q.  Under USDC balances, do you see borrows?

18   A.  I do.

19   Q.  How much is listed there in borrows?

20   A.  54,441,450.70 USDC.

21   Q.  Do you see a repay option button there at the end?

22   A.  I do.

23        MR. BURNETT:  No further questions, your Honor.

24        THE COURT:  Mr. Talkin, anything further?

25        MR. TALKIN:  Very quickly.

O4BCeis3                          DeCapua - Recross

1           If we could pull up 1357 again, please.

2    RECROSS EXAMINATION

3    BY MR. TALKIN:

4    Q.  We just talked about 1357 and you talked about how some of

5    the cryptocurrency was swapped out.  Do you remember that?

6    A.  I do.

7    Q.  All of that happened after the cryptocurrency was sent back

8    into the Circle wallet; correct?

9    A.  Correct.

10   Q.  So that had no effect whatsoever on your ability to

11   identify that wallet as being Avraham Eisenberg's; correct?

12   A.  So, I can't speak for tracing backwards --

13   Q.  No, what I'm saying is you testified that the money that

14   came out of the Circle account in two directions, that money

15   was eventually swapped.  Remember that?

16   A.  Yes.

17   Q.  All of that happened after it was already in

18   Mr. Eisenberg's Circle account.  You agree with me; right?

19   A.  That's correct, yes.

20   Q.  So when you're investigating this, finding out that it was

21   swapped after you already knew what account it is really has no

22   significance as far as identifying the owner of the account,

23   does it?

24   A.  So, I think it would have significance if you're trying to

25   work your way backwards from these two wallets --

O4BCeis3                         Kudirka - Direct

1    Q.   But in this case, you weren't?

2    A.   Correct.

3    Q.   So it had no significance in this case?

4    A.   In terms of tracing the money from Mango Markets to the

5    Circle account, that has no significance.

6              MR. TALKIN:   Thank you.

7              THE COURT:   Thank you very much, Mr. DeCapua.

8              (Witness excused)

9              The government may call its next witness.

10             MS. HUANG:   The government calls Special Agent Lili

11   Kudirka.

12    ELIZABETH KUDIRKA,

13        called as a witness by the Government,

14        having been duly sworn, testified as follows:

15             THE DEPUTY CLERK:   Can you please provide to the Court

16   your first and last name and spell your first and last name.

17             THE WITNESS:   Elizabeth Kudirka, E-L-I-Z-A-B-E-T-H,

18   Kudirka is K-U-D-I-R-K-A.

19   DIRECT EXAMINATION

20   BY MS. HUANG:

21   Q.   Good afternoon, Special Agent Kudirka.   Could you please

22   tell us where you work?

23   A.   I work for the Federal Bureau of Investigation.

24   Q.   What is your title there?

25   A.   I'm a special agent.

O4BCeis3                          Kudirka - Direct

1    Q.  How long have you worked at the FBI?

2    A.  Since 2015.

3    Q.  Are you part of a specific group there?

4    A.  Yes.

5    Q.  What group is that?

6    A.  I work on a money laundering facilitation squad, and I am

7    also a member of the virtual currency response team.

8    Q.  What does that group do?

9    A.  The virtual currency response team supports cryptocurrency

10   investigations throughout the entire FBI.

11   Q.  And are you familiar with a company called FTX through your

12   work?

13   A.  Yes.

14   Q.  How are you familiar with it?

15   A.  I investigated them.

16   Q.  As part of your investigation, did you review the FTX

17   websites?

18   A.  Yes.

19   Q.  Around when did you review it?

20   A.  November of 2022.

21   Q.  So not October 11th, 2022, but a few weeks later?

22   A.  Yes.

23   Q.  And did you save records from that website?

24   A.  Yes.

25   Q.  Did that include terms of service for FTX users?

O4BCeis3                          Kudirka - Direct

1   A.  Yes.

2   Q.  I'd like to show you what's been marked as Government

3   Exhibit 1236.

4           MS. HUANG:  Just to Special Agent Kudirka for right

5   now.

6   Q.  Do you recognize this document?

7   A.  Yes.

8   Q.  What is it?

9   A.  It's the FTX terms of service.

10  Q.  And how do you recognize it?

11  A.  I saw this document on their website.

12          MS. HUANG:  Your Honor, the government now offers

13  Government Exhibit 1236.

14          MR. KLEIN:  Objection.

15          THE COURT:  Sustained.  I think we need more

16  foundation on that.

17          MS. HUANG:  Court's indulgence for a second.

18          MR. DAVIS:  Your Honor, may we approach, sidebar.

19          THE COURT:  Yes.

20          (Continued on next page)

21

22

23

24

25

O4BCeis3                              Kudirka - Direct

1              (At the sidebar)

2              MR. DAVIS:  Judge, may I be heard briefly on this?

3              THE COURT:  Yes, of course.

4              MR. DAVIS:  I understand from the Court's comments

5    from the beginning of today's proceeding you wanted additional

6    foundation as to Mr. Eisenberg's awareness of the FTX terms of

7    service, and we believe that through Mr. Molina, who introduced

8    a line chat that was attributed to Mr. Eisenberg's account in

9    his own name where he referenced FTX policies in that line

10   provides that foundation.  It shows that Mr. Eisenberg was

11   aware of FTX policies and that provides the foundation that

12   Mr. Eisenberg was familiar with FTX policies, including these

13   terms of service and would allow us to be admitted into

14   evidence.

15             THE COURT:  What's that testimony?  Just remind me.

16             MR. DAVIS:  Yes, your Honor.  This is Government

17   Exhibit 1249 at line 43.  This was a user comment from

18   Mr. Eisenberg's account to FTX where Mr. Eisenberg says, in

19   substance and in part, you have changed your policies on this,

20   I want to withdraw all my money from FTX.

21             THE COURT:  Okay.

22             MR. DAVIS:  That is the basis for the foundation that

23   Mr. Eisenberg was aware of FTX policies, including these terms

24   of service.

25             THE COURT:  Are those policies concerning margin

O4BCeis3                        Kudirka - Direct

1    accounts?  Is that included in this document?  Because as I

2    remember it, that's the conversation that was being had.

3              MR. DAVIS:  I think --

4              THE COURT:  I may have that wrong.  There's some sort

5    of aspect of the trading relationship --

6              MR. DAVIS:  We don't -- I'm sorry, your Honor, for

7    interrupting.  I don't think there was testimony about -- I

8    think it's we're arguing the fair inference from

9    Mr. Eisenberg's own use of policies, that he's familiar with

10   them and including whatever was at issue in those user chats,

11   but those policies would clearly include the terms of service.

12   He was reviewing them because he was arguing that FTX had

13   changed them as a basis for withdrawing money from his account.

14   We think that's a fair inference to give you the foundation you

15   need to give you these terms of service.

16             THE COURT:  Let me make sure I understand

17   Mr. DeCapua's testimony.  Did he testify that Mr. Eisenberg had

18   accounts on FTX?

19             MR. DAVIS:  Mr. DeCapua testified, I believe, to the

20   bochen.clean's activity on FTX.  I don't think he -- I mean,

21   that account is, rest assured, to Natalia Bochenkova.  The

22   government's position it was used by Mr. Eisenberg, and

23   Mr. DeCapua testified that the money from that account was

24   transferred to the Circle account in Mr. Eisenberg's own name.

25   And so, we don't understand the defense to be disputing that

O4BCeis3                          Kudirka - Direct

1    these trades were made by Mr. Eisenberg or that he was

2    operating that account.  Indeed, they put Mr. Eisenberg behind

3    the company that gave him the password for this account, so we

4    don't understand that to be disputed, Judge.

5          THE COURT:  So putting aside Mr. Molina's, that

6    excerpt from the chat -- who's handling this for the defense.

7    Mr. Klein.  So why is it an adequate foundation -- so as I

8    understand it, Mr. DeCapua testified and it's not really

9    disputed by the parties that Mr. Eisenberg had, directly or

10   indirectly, an account on FTX, these terms of service govern

11   accounts on FTX, the date on the document is prior to the time

12   of the alleged offense, and the witness just testified that she

13   went to the site and saw this document shortly after the time

14   of the offense.  So now we're just talking about how this

15   document could be potentially relevant for admissibility

16   purposes, you're going to attack it in terms of the weight of

17   the document on the grounds of intent.  At least the

18   government's submission is that it bears on Mr. Eisenberg's

19   intent.

20         MR. KLEIN:  Your Honor, two things.  I would just like

21   to know the date of that chat he's referencing because these

22   terms are dated nominally in May.

23         MS. HUANG:  May 11th, 2020.

24         MR. KLEIN:  And the agent went on in November, so I

25   don't know when this chat was.

O4BCeis3                        Kudirka - Direct

1          MR. DAVIS:  I believe it was from -- I don't know, so

2   I don't want to represent what the actual date from the chat

3   was, but it's on the document.  We can go check that right now.

4          MS. MARTABANO:  We don't see a date on there.  We

5   might just not comprehend it.

6          MR. DAVIS:  March of 2022.

7          MR. KLEIN:  So that is months before these terms of

8   service that they intend to offer in.

9          THE COURT:  Right.  But I don't know that that's the

10  relevant issue.  I think, as I understand it, and you can

11  correct me if I'm wrong, Mr. Eisenberg's potential knowledge of

12  these terms of service come in two directions through

13  Mr. Molina's testimony, that as of that March 2022 chat in

14  which he indicates that he was aware of policies.  But, more

15  important for the Court is Mr. DeCapua's testimony that as of

16  the date of the offense, Mr. Eisenberg had accounts on FTX, and

17  as I -- I mean, I've reviewed exhibit 1236, and it applies to

18  users on the website.  And so, if he's using the website and

19  it's on the website and applies to users of the website, I

20  think at that point it crosses the bar from admissibility to

21  becoming an issue of weight at that point.

22         MR. KLEIN:  Just so I understand, there are two bases.

23  Is the March basis out now because that conversation is from

24  March and now we're just focused on the second part?

25         THE COURT:  I think it's both of them together.

1          MR. KLEIN:  So the first component of that, which is a

2     March chat about policies that relate to margins, there were

3     clearly different terms of service if you just take their

4     deference of the document on its face.

5          THE COURT:  Right, but he's says he's aware of FTX's

6     policies generally.  And so, that's, at least for admissibility

7     purposes, this is all grounds for cross examination.  I'm here

8     to say that a reasonable basis to establish that there is a

9     potential link to a relevant issue in this case, such that it

10    would not be a danger of unfair prejudice or jury confusion

11    that would substantially outweigh the probative value.  So that

12    is what I'm trying to figure out.

13         MR. KLEIN:  I'm going to maintain my objection.  This

14    is not the hill I want to die on, your Honor, but I think we

15    maintain our objection and I hear what you're saying and we're

16    going to maintain our objection.

17         THE COURT:  The objection will be overruled.

18         MR. DAVIS:  Thank you, your Honor.

19         (Continued on next page)

20

21

22

23

24

25

O4BCeis3                          Kudirka - Direct

 1                    (In open court)

 2                    THE COURT:  Ms. Huang, you may continue.

 3                    MS. HUANG:  Your Honor, do I now have permission to

 4       publish this document to the jury?

 5                    THE COURT:  You do.  It's exhibit 1236?

 6                    MS. HUANG:  Yes, your Honor.

 7                    THE COURT:  That will be admitted.

 8                    (Government's Exhibit 1236 received in evidence)

 9                    MS. HUANG:  Thank you.

10       Q.  Special Agent Kudirka, can you just say what the title is

11       of this document?

12       A.  FTX Terms of Service.

13       Q.  Is there a date on it?

14       A.  Yes.

15       Q.  What is the date?

16       A.  May 13th, 2022.

17                    MS. HUANG:  Mr. Oshinsky, if you can go to the 14th

18       page of this document.

19       Q.  Do you see that there's a section that's "13, restricted

20       activities"?

21       A.  Yes.

22       Q.  Can you read the "in connection to," and the 13.1.2.

23       A.  In connection with your use of the services, you agree that

24       you will not provide false, inaccurate, incomplete, out of

25       date, or misleading information.

O4BCeis3                          Kudirka - Direct

1    Q.  Can you also read 13.1.4.

2    A.   Engage in any illegal activity, including, without

3    limitation, illegal gambling, money laundering, fraud,

4    blackmail, extortion, ransoming data, and the financing of

5    terrorism, other violent activities, or any prohibited market

6    practices.

7            MS. HUANG:   Mr. Oshinsky, can you pop out of that.

8    And this continues onto the next page.  You can flip to the

9    next page.

10   Q.  Can you please read 13.1.13.

11   A.   Yes.  Engage in any activity which, in our reasonable

12   opinion, amounts to or may amount to market abuse, including,

13   without limitation, the carrying out of fictitious transactions

14   or wash trades, front running, or engaging in disorderly market

15   conduct.

16   Q.  And just the one right below that.

17   A.   Engage in any behavior, which is unlawful, violates the

18   terms, or is otherwise deemed unacceptable by FTX trading in

19   its sole discretion or.

20            (Continued on next page)

21

22

23

24

25

O4BVEIS4                       Kudirka - Cross

```
1   BY MS. HUANG:
2   Q.  And beyond preparing to testify at this trial, have you
3   done any other work on this Mango Markets investigation?
4   A.  No.
5            MS. HUANG:  No further questions.
6            THE COURT:  Thank you very much.
7            Mr. Klein.
8            MR. KLEIN:  Yes, your Honor.
9   CROSS-EXAMINATION
10  BY MR. KLEIN:
11  Q.  Good afternoon.
12  A.  Good afternoon.
13  Q.  So you got these terms of service on a totally unrelated
14  investigation, right?
15  A.  Yes.
16  Q.  Did you know anything about these terms of service other
17  than the screen grab you did here?
18  A.  There are other -- a few other portions that I'm familiar
19  with, but the pages that were shown I'm also familiar with.
20  Q.  You're just familiar with the document itself, right?
21  A.  Yes.
22  Q.  Okay.  And you did that in November?
23  A.  November of '22.
24  Q.  Okay.  So you don't know if my client ever read these, do
25  you?
```

O4BVEIS4

1  A.  I don't.

2  Q.  Don't know if anyone ever affiliated with them read these,

3  do you?

4  A.  I don't.

5  Q.  You don't know if anyone had to click on these to use FTX,

6  do you?

7  A.  I don't.

8  Q.  You don't know if anyone -- my client had to click on

9  these?

10 A.  I don't.

11 Q.  You don't know if FTX ever even cared to enforce these, do

12 you?

13 A.  I don't know.

14         MR. KLEIN:  Nothing further.

15         MS. HUANG:  Nothing further from the government, your

16 Honor.

17         THE COURT:  Okay.  Thank you very much, Ms. Kudirka.

18         (Witness excused)

19         MS. HUANG:  The government now calls Dr. David

20 Mordecai.

21         THE COURT:  Before you do that, I'll just tell the

22 jury once again, as done a couple of times:  During

23 Ms. Kudirka's testimony you were shown a document, Government's

24 Exhibit 1236, that made reference to terms like "market abuse"

25 and "fraud."  That document and its terms were not offered to

O4BVEIS4                          Mordecai - Direct

1    define the relevant law in this case.  Instead, I will provide

2    you with the legal definition of these terms; and it is those

3    definitions — and only those definitions — that you should

4    follow in this case.

5            With that, Ms. Huang, you may proceed.

6     DAVID K. A. MORDECAI,

7         called as a witness by the Government,

8         having been duly sworn, testified as follows:

9            MS. HUANG:  Your Honor, before we start, at this time

10   the government would like to offer what's been marked as

11   Government Exhibits 1300 through 1302 as demonstratives; and

12   then 1303, 1304, 1306, 1308, 1309, 1312 through 1314, 1320

13   through 1322, 1328 through 1313, and 1341 through 1343 as

14   exhibits.

15           MR. GREENSPAN:  No objection, your Honor.

16           THE COURT:  Okay.  So the documents that you

17   identified as being offered as exhibits will be admitted, and

18   you may use the demonstratives.

19           MS. HUANG:  Thank you, your Honor.

20           (Government's Exhibits 1303, 1304, 1306, 1308, 1309,

21   1312 through 1314, 1320 through 1322, 1328 through 1313, 1341

22   through 1343 received in evidence)

23   DIRECT EXAMINATION

24   BY MS. HUANG:

25   Q.  Good afternoon, Dr. Mordecai.

O4BVEIS4                          Mordecai - Direct

1    A.  Good afternoon.

2    Q.  Where do you currently work?

3    A.  I have a number of professional and academic appointments.

4         I am the president of Risk Economics Inc., a firm I

5    cofounded in 1998.  I am co-managing member and chief scientist

6    of Numerati Partners, LLC, which is a technology testing firm,

7    commercialization firm I founded -- I cofounded in 2012 at the

8    same time or contemporaneous with the industrial laboratory

9    that I cofounded at NYU Courant Institute of Mathematical

10   Sciences.  I also am a visiting scholar at Courant NYU.

11        And I am an adjunct professor of econometrics and

12   statistics at the University of Chicago Booth School of

13   Business, where I got my doctorate.

14        I also have a role with FinTech Innovation Lab here in

15   New York, which is a bank and asset management-led technology

16   accelerator, where I'm assigned just in residence.  But that's

17   more of a courtesy role.  I don't get paid for that.

18   Q.  And just at a high level, what is your background in?

19   A.  I'm an industrial scientist.  I'm going to move up so that

20   I -- I'm an industrial scientist with about four decades of

21   experience straddling academia and industry.  And that is

22   industrial economics, industrial statistics largely applied

23   across many industries, but usually in the context of financial

24   instruments, financial markets, and financial institutions.

25   Q.  And just turning your attention to this case, have you been

1   provided market data relating to trading on Mango Markets and

2   other cryptocurrency exchanges?

3   A.  I have.

4   Q.  And that occurred on or around October 11th, 2022?

5   A.  That is correct.

6   Q.  And were you asked to provide an expert opinion about the

7   market impact of this trading?

8   A.  I was.

9   Q.  We'll come back to that in detail soon, but let's first

10  talk about your educational background.

11  A.  Certainly.

12  Q.  Where did you go to college?

13  A.  I went to the Kings College in Briarcliff Manor, New York.

14  Q.  And what was your major there?

15  A.  Religion and -- comparative religion and philosophy.

16  Q.  And did you continue your education after that?

17  A.  I did.

18  Q.  How many graduate degrees did you receive?

19  A.  Two.

20  Q.  What was the first one?

21  A.  Master's of business administration, an MBA from NYU.  It

22  wasn't called Stern School at that time, it was just GBA down

23  by the American Stock Exchange.  It is now the Stern School of

24  Business and nicer digs, Washington Square Park.

25  Q.  And around when was that?

1  A.  I started in '85 and finished in '87.  I was working as a

2  banker at the time, but I managed to pull that off while I was

3  working.

4  Q.  What was the second graduate degree you received?

5  A.  In '93, I started my Ph.D. at the University of Chicago.

6  Q.  And what was that Ph.D. in?

7  A.  My concentrations are econometrics and mathematical

8  statistics, as well as a branch of economics called industrial

9  organization.

10  Q.  Around when did you receive that Ph.D.?

11  A.  So I completed my course work and qualifiers three years

12  in, about '96; did my exams and everything, and then started

13  working on my dissertation while I was working back in

14  industry.  And so I defended -- I proposed and defended my

15  dissertation in 2004.

16  Q.  And earlier I think you talked about how you hold --

17  currently hold an academic appointment at the University of

18  Chicago?

19  A.  Yes, I was invited in 2022 to come back as an adjunct

20  professor.

21  Q.  And do you currently teach?

22  A.  I do.  I'm currently teaching a course with two other

23  professors, so I come in alternate weekends to Chicago, on

24  valuing and financing storage and transmission capacity on the

25  electricity grid.  So I use various types of instruments

1    related to electricity markets to figure out how do you value

2    investments that make the grid more stable as it becomes more

3    unstable.

4    Q.  And have you also worked in the financial services

5    industry?

6    A.  I have.

7    Q.  Are you familiar with an entity called Swiss Re?

8    A.  Swiss Re.  Yes, very, very familiar.

9    Q.  What is Swiss Re?

10   A.  So Swiss Re is one of the two largest reinsurance companies

11   in the world.  About half of its business historically has been

12   in U.S., and the other half is the rest of the world.  And they

13   compete with Munich Re for being the largest.

14   Q.  And how are you familiar with Swiss Re?

15   A.  I worked there for almost three years.

16   Q.  Around when was that?

17   A.  I was invited to join Swiss Re by the retiring vice

18   chairman of the Federal Reserve, Roger Ferguson, when he became

19   the head of financial services at Swiss Re.  And so I was

20   originally invited to be a senior adviser to him in his

21   capacity, as well as the eight people that run the firm, the

22   executive committee.

23        I stayed on as Roger went on to go to TIAA to become

24   CEO.  I remained and ran a global group called Relative Value

25   Market Strategies.  A lot of multisyllabic stuff there.  I'm

O4BVEIS4                         Mordecai - Direct

1    sorry.

2    Q.  Can you just give us a sense of what your roles and

3    responsibilities were at Swiss Re?

4    A.  Yes.  I oversaw a lot of strategic investment.  I was

5    involved in anything that was sort of unusual and exotic,

6    including some of the early tokenization instruments that might

7    be applied in banking or reinsurance.

8            But the Relative Value Market Strategy Group was set

9    up to work with all of the different profit centers, all the

10   different business lines at Swiss Re, and be able to value

11   their reinsurance liabilities on a market consistent basis with

12   the investment assets in their reserves.  Basically, the

13   reserves they use to pay claims.

14           And so I created a group of quantitative folks that

15   would work with the businesspeople to come up with that, but

16   also come up with hedging strategies, financing strategies,

17   anything we could do to mitigate some of these exposures.

18   Q.  And prior to your work at Swiss Re, did you hold other jobs

19   in the financial services industry?

20   A.  I did.

21   Q.  Without going to the details of all of your positions

22   there, could you just describe the nature of your prior work in

23   that industry?

24   A.  One could call it -- I always work with something called

25   credit or secured transactions or exotic instruments related to

1    those things that would combine them in different ways.  My

2    first ten years was structured credit as a banker; I was

3    formally credit trained to analyze companies, industries,

4    different kinds of financial facilities and make sure that the

5    money got paid back.

6         I then also have -- I was a rating agency official

7    running three ratings practices for one of the big three rating

8    agencies.  I worked for the senior management of AIG in a very

9    similar role to the one I had at Swiss Re prior to 9/11.  And

10   six weeks before 9/11, I joined a large multi-strategy, highly

11   leveraged fixed income arbitrage hedge fund, and ran half their

12   reported assets throughout the market calamity that followed

13   9/11 into sort of 2003, when I decided to take some time off,

14   work with stability units and finish my dissertation.

15   Q.  Now, Dr. Mordecai, have you done any research related to

16   financial markets?

17   A.  I have.

18   Q.  Just broadly speaking, what are some of the topics that

19   research is on?

20   A.  Credit derivatives, weather derivatives, which is pretty

21   important in my current course.  All kinds of what are called

22   exotic hybrid instruments that would combine different types of

23   financial or economic indicators.

24        More recently, I have an entire pipeline of papers

25   that are coming out on things like robotics and artificial

O4BVEIS4                          Mordecai - Direct

1    intelligence.  I teach a course -- co-teach a course at NYU Law

2    on statistical analysis of those kinds of things.  So I've got

3    a few papers posted on that now, and I've got another 14 or 15

4    I have to review and make sure they're right before I'm going

5    to let them go out.

6    Q.  And just to put a fine point on that, has your research

7    involved analyzing data in trading and trading --

8    A.  That's all day, every day.

9    Q.  Have you published any articles or other publications

10   related to that research?

11   A.  Yes.  I've done things in insurance, reinsurance, as I

12   said, whether derivatives, credit derivatives.  I was the

13   editor -- the founding editor-in-chief of the *Journal of Risk*

14   *Finance* for probably almost eight years.  I'm still on their

15   executive advisory editorial board.  But I basically

16   peer-reviewed every article for every issue that came out four

17   times a year from 1998 to 2004.

18   Q.  And about how many publications have you published?

19   A.  I have no idea.  Because there's the proprietary stuff I

20   can't talk about, and then there's stuff I published, or the

21   stuff that's been posted and printed, I can't keep them

22   straight.

23   Q.  Switching directions a little bit, have you also worked on

24   litigation before, Dr. Mordecai?

25   A.  Yes.

1    Q.  Has that included both criminal and civil litigation or one

2    of the two?

3    A.  This is my first criminal matter.  All the rest has been

4    civil litigation.

5    Q.  Have you ever testified in support of a defendant?

6    A.  Yes, I've done both plaintiff and defendant work.

7    Q.  How about in support of the government?

8    A.  I have.

9           MS. HUANG:  Your Honor, at this time the government

10   moves to qualify Dr. Mordecai as an expert.

11          MR. GREENSPAN:  No objection.

12          THE COURT:  Dr. Mordecai is qualified as an expert

13   under Rule 702.

14          MS. HUANG:  Thank you, your Honor.

15   BY MS. HUANG:

16   Q.  Dr. Mordecai, before we get into the substance, I'd like to

17   just ask you a few questions about your involvement in the

18   case.

19          To your knowledge, do you know any of the witnesses?

20   A.  No.

21   Q.  Have you ever met with the defendant?

22   A.  No.

23   Q.  And just broadly speaking, what types of materials did you

24   work on in this case?

25   A.  Price data, trade volume or flow data, orders, contract

1    numbers, those kinds of things.

2    Q.  And did anyone help you with your analysis of the data in

3    this case?

4    A.  Yes.

5    Q.  Who was that?

6    A.  I had a staff member at Risk Economics, Inc.; and I had a

7    team at an organization called Analysis Group provide me with

8    quantitative support.

9    Q.  Let's start with Analysis Group.  What is Analysis Group?

10   A.  It is a large firm comprised of 1,000 professionals with

11   backgrounds in economics, finance, statistics, data science.

12   They do work on everything from life sciences through

13   antitrust, financial disputes, international arbitration

14   disputes.  They were actually worked for Pfizer during COVID on

15   getting the FDA approval for the vaccine.

16   Q.  And you also referenced Risk Economics, Inc.  What is that?

17   A.  Yes.  I think I mentioned earlier it's a firm I cofounded

18   at the beginning when I was asked to basically be the

19   editor-in-chief of the *Journal of Risk Finance*.  So originally

20   it was providing oversight on the *Journal of Risk Finance*, as

21   it was a publication of your money journals and institutional

22   investor journals.  Over time, it evolved into a mini version

23   of Analysis Group.

24   Q.  And are you being --

25   A.  In other words, the mini me for Analysis Group.

1   Q.  Are you being compensated for the time that you work on

2   this case?

3   A.  I am.

4   Q.  And what is that rate you're being compensated at?

5   A.  My current hourly rate applied to this case is $1,125 an

6   hour.

7   Q.  And about how many hours have you worked on this case?

8   A.  Not including today, I'm going to say it's a ballpark 125,

9   maybe more, maybe a little less.

10  Q.  And Dr. Mordecai, does the amount that you get paid depend

11  in any way on the opinions that you give here today?

12  A.  Absolutely not.

13  Q.  How about on the outcome of the case?

14  A.  No.

15  Q.  All right.  Let's dive in.

16  A.  Sure.

17  Q.  Based on your review of the materials in this case, are you

18  familiar with Mango Markets?

19  A.  I am.

20  Q.  And you're aware that users on Mango Markets could trade

21  what's called perpetual futures contracts?

22  A.  I'm aware that that's one of the instruments that they were

23  granted access to, yes.

24  Q.  And did Mango Markets offer a way for its users to bet on

25  the relative value of Mango or MNGO and USDC?

1    A.  It did.

2    Q.  What was that product called?

3    A.  The MNGO USDC perpetual future.

4    Q.  Okay if we just call that MNGO or Mango perpetual?

5    A.  I'm happy calling it MNGO-PERP, if you want, which is

6    perpetual, not perpetrator.

7    Q.  Easier for the jury.

8         Dr. Mordecai, are you familiar with the terms "long"

9    and "short" --

10   A.  I am.

11   Q.  -- as applied to Mango perpetuals?

12   A.  As applied to -- both generally and specifically as applied

13   to Mango perpetuals.

14   Q.  So could you just explain, if I'm long on the Mango

15   perpetual, under what circumstances would the position increase

16   in value?

17   A.  If you're long, the MNGO to USDC perpetual contract, it's

18   the ratio, right.  So you've got MNGO as the numerator, and

19   you've got USDC, which is pegged to the dollar as a

20   denominator.  So as the MNGO token goes up in value, if you're

21   long that, you experience gains, your account wins, provided

22   that it's rising above the price at which you executed the

23   original contract.

24   Q.  So now take another side.  If I'm short the Mango

25   perpetual, under what circumstances would the position increase

1   in value?

2   A.  Your expectation in taking that action is you're looking to

3   obtain gains in your short account as the price falls from that

4   original price below.  But you still have the same ratio.

5   You've got MNGO token in the numerator; you've got USDC in the

6   denominator.  And now you're making money as it falls below

7   whatever the initial price was.

8   Q.  Dr. Mordecai, have you --

9   A.  Or you're posting gains.  I don't like calling that making

10  money, because it ain't money yet.  It's gains.

11  Q.  Dr. Mordecai, have you reviewed data on two Mango Markets

12  accounts, purchases of Mango perps on October 11th, 2022?

13  A.  Could you repeat the question please?

14  Q.  Sure.  Have you reviewed data on two Mango Markets accounts

15  transactions of Mango perps on October 11th, 2022?

16  A.  Yes.

17          MS. HUANG:  Okay.  Mr. Oshinsky, can we please put up

18  what's already in evidence as Government Exhibit 931.

19  Q.  And Dr. Mordecai, do you recognize this document?

20  A.  I do.

21  Q.  And this is a Mango Markets -- document of a Mango Markets

22  account ending in RNJNA?

23  A.  Yes.  And a set of trading records associated with that

24  account.

25          THE COURT:  Dr. Mordecai, could you maybe just move in

1    a little closer to the mic.

2            THE WITNESS:  I've never had people tell me that I'm

3    too quiet.  But thank you, sir.

4            THE COURT:  And just slow down just a little bit.

5            THE WITNESS:  Yes.

6            Could you tell my wife that I'm actually not that

7    loud?

8            THE COURT:  You can put in an application.

9    BY MS. HUANG:

10   Q.  All right, Dr. Mordecai.

11   A.  Yes.

12   Q.  What kind of trades did this accounts make?

13   A.  It made buy trades or long side trades.

14   Q.  And at what price were these perpetuals purchased?

15   A.  At a price of -- call it 3.8 cents approximately.

16   Q.  And on what date were these perpetuals purchased?

17   A.  October 11th, 2022.

18   Q.  And earlier you just testified about long and short

19   positions.

20   A.  Correct.

21   Q.  What position is being taken here?

22   A.  This is a long side position in this account.

23   Q.  And what does holding a long position mean here?

24   A.  As we mentioned earlier, as the MNGO token price increases

25   relative to the USDC dollar price, the account would accrue

1  gains.  The account begins to win as it crosses above 3.8

2  cents.

3  Q.  Right.

4        MS. HUANG:  Let's take that down and put up Government

5  Exhibit 1300 just to aid the jury as a demonstrative.

6  Q.  Dr. Mordecai, what's the title of this chart?

7  A.  "Stylized Perpetual Futures Economics Long Side."

8  Q.  And do you see at the bottom on the X axis there's a list

9  of numbers there?

10  A.  I do.

11  Q.  What do those numbers reflect?

12  A.  Those are the price of MNGO tokens per U.S. Dollar Coins,

13  so you could say per dollar, because the U.S. Dollar Coin is

14  designed to be pegged to the U.S. dollar.

15  Q.  And at the left there on the Y axis, you see it says

16  "payoff"?

17  A.  I do.

18  Q.  What does that mean?

19  A.  That's the payoff in U.S. Dollar Coin terms.  So what that

20  means is you're observing the gains or losses accruing to this

21  long side position based on where the MNGO price moves relative

22  to the price in which you entered the trade at 3.8 cents.

23  Q.  And you see there's a diagonal blue line?

24  A.  Yes.

25  Q.  As well as this horizontal black line with little ticks on

1    it?

2    A.   Correct.

3    Q.   And it intersects right there?

4    A.   Yes.  Correct.

5    Q.   What does it mean where it intersects?

6    A.   We call that the break-even point.  That's a point where

7    you enter the trade.  So now any variation in price, any

8    movement in price, is what results in the incurring of losses

9    or gains.

10   Q.   And at what price is that break-even point, approximately?

11   A.   Approximately 3.8 cents.

12   Q.   Okay.  So on the vertical -- sorry.  The diagonal blue line

13   to the left there, what does that represent?

14   A.   Anybody that remembers their old geometry classes, it's

15   upward sloping line, right, at 45 degrees.  I'm not giving

16   anybody PTSD, am I?

17          It is basically that as that line crosses the black

18   line moving from the left to the right with increases in the

19   MNGO token price, those are gains.  You're accruing gains to

20   that account.

21          MS. HUANG:  So let's put Government Exhibit 931

22   side-by-side with this.

23   Q.   Dr. Mordecai, what's the relationship between the last

24   exhibit and this chart?

25   A.   This is the record of buys that result in the cumulative

O4BVEIS4                          Mordecai - Direct

1  position.  And on the right is what we call the payoff profile

2  of that cumulative position.

3           MS. HUANG:  Okay.  We can take that down.

4           Let's now put up Government Exhibit 926 that's already

5  in evidence.

6  Q.  And Dr. Mordecai, do you recognize this document?

7  A.  I do.

8  Q.  And what is it?

9  A.  This is trading records for the account that ends in MKF,

10  capital F, small f, capital X.

11  Q.  And what kind of trades did this account make?

12  A.  These are all sells.

13  Q.  And just like we saw for the last account profile, the

14  price here also is .0382?

15  A.  Correct.

16  Q.  And the sales also were on October 11, 2022?

17  A.  Correct.

18  Q.  And are the trades here taking a long or short position?

19  A.  This is a short account.

20  Q.  And what does holding the short position mean here?

21  A.  It means that if prices rise above 3.8 cents, this account

22  incurs losses.  If prices fall below 3.8 cents, this account

23  incurs gains.  So you've got opposing -- between the last

24  and -- the long and the short, you've got these two opposing

25  win or lose relationships that are exact mirrors of each other.

1    MS. HUANG:  Let's just take that down for now and put

2    up Government Exhibit 1301, again, as a demonstrative.

3    Q.  What's the title of this chart, Dr. Mordecai?

4    A.  "Stylized Perpetual Futures Economics Short Side."

5    Q.  Is this just like that long side chart we just saw, but

6    with a different diagonal line direction?

7    A.  Your 45-degree diagonal line now has a negative slope, it's

8    going in the opposite direction.

9    Q.  So this time on this chart, where would a short position

10   holder make a profit?

11   A.  The short position holder now makes a profit as the MNGO

12   token price declines below this 3.8 cent break-even point.

13   Q.  What about a loss?

14   A.  The loss is if the MNGO token price appreciates or

15   increases above the 3.8 cent break-even point.

16        MS. HUANG:  And let's put this side-by-side with

17   Government Exhibit 926.

18   Q.  And just to make sure we get this right, Dr. Mordecai, can

19   you again explain what's the relationship this time between

20   this chart and the last exhibit?

21   A.  As we saw with the last pair of charts, in this particular

22   case the left chart is the sell trades that result in the

23   cumulative short side position that responds to the MNGO price

24   changes with the curve or what I call the kind of payoff

25   profile that declines as the price rises and increases as the

O4BVEIS4                          Mordecai - Direct

```
 1    price falls.
 2              MS. HUANG:  We can take those down.
 3              Mr. Oshinsky, can you please show Government Exhibit
 4    1302 as a demonstrative.
 5    Q.  Dr. Mordecai, what's the title of this chart?
 6    A.  "Stylized Perpetual Futures Economics Net Long and Short
 7    Positions."
 8    Q.  And what's the relationship between the two previous charts
 9    we just saw and this one?
10    A.  In this one, the net position, if it were held, say,
11    between -- held by one entity or one principal, means that that
12    entity, when you put those two accounts together, have no
13    market exposure to the price change in the MNGO tokens relative
14    to U.S. Dollar Coin.
15    Q.  Now, Dr. Mordecai, let's assume the same person is behind
16    both of those accounts, and the value of MNGO goes up relative
17    to USDC.  What effect does it have for that person who's behind
18    both of those accounts?
19    A.  It goes up you said?
20    Q.  Yes.
21    A.  No effect.  The net effect is zero.  No loss, no gain in
22    either direction.
23    Q.  So by being behind both of these accounts, does the account
24    holder gain exposure to MNGO or USDC?
25    A.  They have no exposure to the market movements of MNGO
```

O4BVEIS4                          Mordecai - Direct

1    relative to USDC.

2    Q.  And are there any costs to taking these positions?

3    A.  There are transactions costs.

4    Q.  And just taking into account those costs, what is the

5    expected total return then if you owned both of these

6    positions?

7    A.  You're negative.  Because you've put on a pair of

8    positions; you've paid to do so, but you have no exposure to

9    the market to harvest any returns to recoup what you paid.

10   Q.  All right.  Let's back up and talk about the Mango

11   perpetual.

12       Dr. Mordecai, did you review trading data on the Mango

13   perpetual on October 11th, 2022, and the several months before

14   that?

15   A.  Yes.

16   Q.  And how did the size of the trading of the Mango perpetual

17   on October 11th, 2022 compare to the trading of the Mango

18   perpetual in about the three months before that?

19   A.  So we're talking about contract volumes.  The contract

20   volumes around October 11th and October 12th were magnitudes of

21   order larger than the prior contract volumes in the previous

22   months.

23       MS. HUANG:  All right.  Let's show Government Exhibit

24   1304, this time as an exhibit.

25   Q.  Dr. Mordecai, what's the title of this chart?

A.  "Number of MNGO-PERP Contracts on Mango Markets."  And it's
July 12, 2022 to October 10, 2022, three months prior to and
including October 10, 2022.
Q.  And those dates you just said, that's reflected on that X
axis at the bottom there?
A.  Those dates are -- span the X axis, that's correct,
horizontal.
Q.  Do you see the Y axis, the vertical --
A.  Yes.
Q.  -- to the left?
        What do those numbers there represent?
A.  Those are outstanding contracts of MNGO-PERP in millions of
contracts.
Q.  And when you say "outstanding contracts," does that also
mean that there's a long and short pair together?
A.  Correct.
Q.  And what is the scale there on the left?
A.  This is millions.  So you're looking at everything from
zero to 1.8 million at the height of that vertical axis.
Q.  So let's take a look at October 10th, 2022, the last date
on this chart.  About how many millions of outstanding
MNGO-PERP contracts were there?
A.  Less than 600,000.
Q.  And let's just take a look at the broader picture here for
the three months we have.  What's the highest number of

1    outstanding Mango perp contracts?

2    A.  Less than 1.6.  Looks like maybe -- could be talking 1.5

3    and change.

4          MS. HUANG:  Now, let's go to Government Exhibit 1303.

5    Q.  Dr. Mordecai, what's the title of this chart?

6    A.  "Number of MNGO-PERP Contracts on Mango Markets."  July 12,

7    2022 to now October 12, 2022; so three months prior and

8    including -- up to and including October 10th -- I'm sorry,

9    October 12th, 2022.

10   Q.  This is like the last chart we saw on the X axis, but it

11   now includes October 11th and October 12th?

12   A.  Two additional days.

13   Q.  And you see the numbers on the Y axis on the left?

14   A.  I do.

15   Q.  And just like in the last exhibit, it's outstanding

16   contracts in millions?

17   A.  Correct.

18   Q.  But this time what's the scale?

19   A.  The increments now go up to 600 million.  So it is, you

20   know, many orders of magnitude larger than a scale that was up

21   to 1.8.

22         MS. HUANG:  Now, Mr. Oshinsky, can you put 1304 to the

23   left of 1303, side-by-side.

24   Q.  Now, Dr. Mordecai, on the left is what we just were looking

25   at right before this chart on the right.

1           How is the chart on the left represented on the chart

2    on the right?

3    A.  It's actually still there, you just can't see it.  The

4    magnitude of the increase on the 11th was so large that now the

5    little squiggles of variability are hidden; they are subsumed

6    in that straight line that goes across the bottom.  Because

7    it's just -- it's like looking at something from being up in a

8    jet, you know, 35,000 feet.  You can't make out where's my

9    house, right.

10          It's a similar situation.  The variability in the

11   contracts are so swamped by the size of what happens, that even

12   though that variability exists, you wouldn't make it out to

13   visual inspection.  And, in fact, even statistically there

14   would be some challenges.

15          MS. HUANG:  Now, let's take down 1304 and just focus

16   on 1303.

17   Q.  Dr. Mordecai, on October 11th, 2022, about how many

18   millions of outstanding Mango perp contracts are there?

19   A.  Well, as I said, previously, a glance says something less

20   than 500, but a footnote actually says 488.8 million, of which

21   488.3 million, or 99.9 percent, were contracts entered into by

22   the two accounts we discussed earlier.

23   Q.  Great.

24          MS. HUANG:  Now, let's just zoom into October 11th,

25   2022.  Mr. Oshinsky, can you please show Government Exhibit

O4BVEIS4                          Mordecai - Direct

1    1306.

2    Q.  Now, Dr. Mordecai, what's the title of this chart?

3    A.  "Number of MNGO-PERP Contracts on Mango Markets."

4    10/11/22 -- or I should say October 11th, 2022, so we don't

5    have excessive numbers and numbers getting tossed around.

6          It's 6 to 7 p.m., so it's a one-hour snapshot of

7    trading on -- in this particular instrument.

8    Q.  And on the left there, it's still outstanding contracts in

9    millions from zero to 600?

10   A.  Correct.

11   Q.  And at the bottom there, it's now time that's being shown?

12   A.  It is -- it is five-minute increments over a one-hour time

13   period.

14   Q.  And that one hour is from 6 to 7?

15   A.  Correct.

16   Q.  And what does that gray box there represent?

17   A.  That gray shaded vertical area is the time around 6:25,

18   when the number of outstanding contracts precipitously increase

19   or spike up from, you know, under a million, going to one

20   million eight type of thing, up to 488 million in a, you know,

21   almost a very short span of time.

22   Q.  And what trading activity in what two accounts could

23   account for that, for the most part?

24   A.  As shown in footnote number three, it's the two accounts

25   MKFFX and RNJNA.

1    Q.  The two accounts we just talked about a little earlier?

2    A.  The two accounts we talked about previously.

3    Q.  Do you see that there's also this blue line?

4    A.  Yes.

5    Q.  What is that blue line showing?

6    A.  That blue line traces the precipitous increase in the

7    outstanding MNGO-PERP contracts.

8    Q.  And at around 6:25 it starts to shoot up?

9    A.  Yes, it does.

10   Q.  And what caused that line to shoot up?

11   A.  Well, the trades that we observed in the previous slides.

12   We saw the trading records.

13   Q.  Those two accounts?

14   A.  Yes.

15          MS. HUANG:  Now, we can take that down.

16   Q.  Let's talk about how the price of the Mango perpetual was

17   calculated.

18          Dr. Mordecai, are you aware that Mango Markets used

19   something called the oracle from a company called Switchboard

20   to determine the Mango perpetual price?

21   A.  I'm aware of the pricing calculator referred to as the

22   oracle.

23   Q.  And how do you know that?

24   A.  I know that because of some prior testimony and just

25   general knowledge of the field.

1              MS. HUANG:  Let's take a look at Government Exhibit

2     1308.

3     Q.  Dr. Mordecai, what's the title of this chart?

4     A.  "MNGO-PERP Hourly Maximum Oracle Price, July 12, 2022 to

5     October 12, 2022, three months prior to and including October

6     12, 2022."

7     Q.  And what are the dates on the bottom there, the range?

8     A.  Those are -- as they said, they start from July 12th and

9     extend all the way through October 12th of 2022.

10    Q.  And on the Y axis, what is that?

11    A.  That is the price that the oracle pricing calculator

12    generated on each of those time -- at each of those time

13    periods for MNGO relative to USDC.  We have hourly maximum

14    prices based on 30-second samples of the price all the way

15    through, which is why that line looks so smooth and continuous

16    with the little wrinkles in it.

17    Q.  And do you see that there's this purple magenta-colored

18    line there?

19    A.  There is.

20    Q.  What is that line reflecting?

21    A.  We call that the price trajectory or the price series

22    associated with the contract.

23    Q.  And what happens to that line on October 11th, 2022?

24    A.  It precipitously and dramatically increases.  It spikes up.

25    Q.  And it spikes up to what price?

1    A.  Approximately maybe even a little bit more than 45 cents.

2    Q.  And Dr. Mordecai, are you aware that the relevant sources

3    for the Mango perpetual oracle were FTX, AscendEX, and Serum

4    DEX?

5    A.  I am.

6    Q.  How do you know that?

7    A.  Based on testimony and my own analysis.

8    Q.  And have you reviewed any other portions of testimony from

9    this trial?

10   A.  No.

11   Q.  Now, Dr. Mordecai, as part of your work for this case, did

12   you also look at trading of Mango on FTX, AscendEX, and Serum

13   DEX on October 11, 2022?

14   A.  Could you repeat the question?

15   Q.  Sure.  As part of your work for this case, did you also

16   look at trading of Mango on FTX, AscendEX, and Serum DEX on

17   October 11, 2022?

18   A.  I did.

19   Q.  And did you look at trading as well before that date?

20   A.  I did.

21   Q.  Okay.  Let's start with FTX.

22           MS. HUANG:  Let's take a look at Government Exhibit

23   1312.

24   Q.  Now, Dr. Mordecai, what's the title of this chart?

25   A.  The title of this chart is "MNGO Maximum 15-minute Intraday

O4BVEIS4                        Mordecai - Direct

1    Purchase Volume at FTX."  And the subtitle is June 30th, 2022

2    to October 10th, 2022, approximately three-month snapshot prior

3    to and including October 10th, 2022.

4    Q.  And what does "maximum" mean here?

5    A.  Maximum -- so I'm going to give a little background, a

6    little context.

7            In the fields, this is called a typical day.  What it

8    means by a typical day is each incremental -- each time segment

9    on this chart represents that time segment for every single day

10   in the months here.

11           So you take this and you say, Okay, I'm going to take

12   day one in those months, and I'm going to look at those time

13   increments.  I'm going to take day two in those months, I'm

14   going to look at those time increments, all the way till you

15   get to the end date.  So you're just almost like overlaying one

16   day on the next day where they line up the time increments; so

17   each blue bar is a 13-minute segment.  And then you look for

18   the highest price.

19           So folks remember the -- I think there are folks that

20   are old enough, like me.  You remember when you'd have the

21   books, then you could peel the sides up and you could see

22   whether there it's an anatomy book or whether it's a map.  You

23   could almost say that I could take this and I could peel up or

24   look through and see the maximum price, and then know that that

25   was the highest price for that time increment on every single

1    day in that three-month period.

2    Q.  Thank you, Dr. Mordecai.

3         Just to make sure we all are on the same page here,

4    what does "intraday" here mean?

5    A.  Intraday means during the day.

6    Q.  And where it says "volume," what does that mean?

7    A.  Volume is the million of MNGO token.  So in this case,

8    we're not looking at the MNGO-PERP contracts anymore, we are

9    now looking at individual tokens that are being traded on these

10   other exchanges or these other trading venues.  And they call

11   this usually in the industry spot trades, which are different

12   from the futures trades.

13   Q.  And that's what's reflected on the left there, volume?

14   A.  And that's what the volume -- the actual MNGO tokens that

15   are traded in this spot market on FTX.

16   Q.  Now, just to make sure we're, again, all on the same page,

17   let's take a look at the 12 a.m., that blue bar there.  Can you

18   just explain to us what that is representing.

19   A.  That first vertical blue bar is the first 15 minutes, from

20   12 to 12:15, on every single day in that three-month period.

21        So that's the maximum price of trades in from 12 to

22   12:15, the maximum price across all three months, right, during

23   that instance of time for every single day during that -- of

24   that instance of time across all of the days in this time

25   series.

O4BVEIS4                         Mordecai - Direct

1    Q.  And what is the approximate volume being shown there?

2    A.  Without a more granular index, I really can't tell you.

3    It's tiny.  It's small relative to what else we see.  It's far,

4    far, far less than 500,000.  It's down to, you know -- maybe

5    it's less than 100,000.

6    Q.  All right.  So for this time period, from June 30th, 2022

7    to October 10th, 2022, what was the highest intraday volume of

8    MNGO at FTX?

9    A.  It is from 6:45 to 7 a.m., and it is approximately, I want

10   to say, like 2.7, 2.75 million tokens.

11        MS. HUANG:  All right.  Let's take that down and look

12   at Government Exhibit 1313 now.

13   Q.  Dr. Mordecai, what's the title of this chart?

14   A.  "MNGO Maximum 15-minute Intraday Purchase Volume at FTX."

15   And now it's the October 11th bochen.clean@gmail account, as

16   well as what we saw before, which is the maximum daily typical

17   day from June 30th, 2022 to October 10th, 2022, so the

18   three-month snapshot.

19        MS. HUANG:  All right.  Let's put this side-by-side.

20   Mr. Oshinsky, if we can put 1312 to the left.

21   Q.  Dr. Mordecai, what's the relationship between these two

22   charts?

23   A.  So the chart on the left is actually also included on the

24   right.  But on the right, there's been superimposed trading

25   volume in spot MNGO token trades for one account, and that's

O4BVEIS4                          Mordecai - Direct

1    the orange line.  So you can do now some kind of relative

2    comparison between what's the typical maximum look like during

3    this period, right, exactly as you see on the left; but with

4    this other thing added in, you end up with a very different

5    scale.

6    Q.  And between 6 and 7 p.m., just focusing on that orange

7    line, what was the maximum volume traded by that

8    bochen.clean@gmail.com account?

9    A.  Almost 14 million tokens.

10          MS. HUANG:  And —— okay.  Let's now take a look at

11   Government Exhibit 1314.

12   Q.  Now, Dr. Mordecai, what's the title of this chart?

13   A.  "MNGO Price and Purchase Volume at FTX."  And it is July

14   1st, 2022 to October 31st, 2022; so it's approximately four

15   months prior to and including 10/31/2022.

16   Q.  And what is the X axis there showing?

17   A.  Those are the time period dates from July 1st to October

18   31st, and they are approximately one—week intervals.

19   Q.  And you see the Y axis there, that's volume in millions of

20   Mango?

21   A.  Yes.  Zero to 150 million, tokens is the scale of that

22   axis.

23   Q.  And Dr. Mordecai, is this chart like the intraday charts we

24   previously saw reflecting a typical day for a time period?

25   A.  No.  This is a time series.

1          MS. HUANG:  So let's actually just put 1312

2     side-by-side with this, to the left.

3     Q.  Could you just explain to us what the difference is between

4     the chart on the left and the chart on the right?

5     A.  So the chart on the left is looking, as I said — I

6     mentioned before — at the intraday, within the day, volumes

7     that occur for every day in the corresponding, you know,

8     three-month period.

9          So like I said, it's that flip chart where you can see

10    through and see where the maximums are at every -- so, you

11    know, if you ate lunch every day at noon, and you wanted to

12    know the calories you consumed, what's the maximum number of

13    calories I consume during my 12 to 12:15 lunch, that's what

14    this is on the left, okay.

15         On the right, this is the price of your lunch, if

16    you're trying to now track what you spent over the four months,

17    this is the price of your lunch.  It's a very different notion,

18    right.

19         MS. HUANG:  Now, let's take down 1312 and focus on

20    1314.

21    Q.  So the previous one with intraday charts, we have the blue

22    bars.  Now we have yellow bars.  What do these yellow bars

23    reflect?

24    A.  Those are the daily total purchase volumes.  And they are

25    actually there for the entire time interval of months, but you

1  can't really make them out very well until you get to the

2  October 11th, 2022 date.

3  Q.  And Dr. Mordecai, what date has the highest volume shown on

4  this chart?

5  A.  It is the October 11, 2022.

6  Q.  And what is that purple line -- magenta purple line

7  reflecting there?

8  A.  That is the maximum posted daily price of the MNGO tokens.

9  Q.  And what date has the highest price shown on the chart?

10 A.  October 11th, 2022.

11 Q.  All right.  Dr. Mordecai, as you sit here today, given all

12 the analysis that you've done, can you offer any other reason

13 other than the bochen.clean@gmail.com purchases that would have

14 resulted in a Mango price increase that we see here on October

15 11, 2022?

16 A.  I cannot.

17 Q.  And what happened to the price after October 11th, 2022?

18 A.  Once the buying pressure dissipated from that account, the

19 price precipitously fell back to the original or actually lower

20 levels.

21 Q.  And based on your analysis of the data, what could you

22 attribute to that price decline?

23 A.  The cessation, if you will, or the stopping of those -- the

24 upward pressure from those buys from that account.

25 Q.  By "that account," you mean the bochen dot --

1  A.  The bochen, yes, correct.  The only account I've been

2  discussing in the last five minutes.

3  Q.  All right.  Let's move on to AscendEX.  And that was the

4  second platform that Switchboard oracle used?

5  A.  AscendEX, correct.

6  Q.  And just like with FTX, you also looked at Mango trading

7  date on October 11th, 2022?

8  A.  I did.

9  Q.  As well as for the few months before that?

10  A.  Spot trading, absolutely.

11        MS. HUANG:  All right.  Let's take a look at

12  Government Exhibit 1320.

13  Q.  Dr. Mordecai, what's the title of this chart?

14  A.  "MNGO Maximum 15-minute Intraday Purchase Volume at

15  AscendEX."

16        MS. HUANG:  And let's just pull up 1312 on the side,

17  which we've already seen, just to short-circuit things a little

18  bit here.

19  Q.  Dr. Mordecai, are these basically similar charts, but the

20  one on the right is for AscendEX?

21  A.  They are measuring the same thing but for different venues.

22  It's the same flip -- see-through flip chart looking for the

23  maximum.

24        MS. HUANG:  All right.  You can take 1312 down.

25  Q.  And so from May 31st, 2022 through October 10th, 2022, what

O4BVEIS4                          Mordecai - Direct

1   was the highest intraday volume of Mango on this index?

2   A.   During any 15-minute increment during those typical days in

3   here, the 15-minute increment that looks like around -- is that

4   4:30 or 4:45; is that right?  A.m.  Somewhere in there.

5        Oh, wait.  The highest is that one, if we trace that

6   one down.  It is about, I think, the 4:30 to 4:45.  Yeah, 4:30,

7   to 4:45.

8   Q.   Great.

9        MS. HUANG:  Let's take a look at Government Exhibit

10  1321.

11  Q.   Dr. Mordecai, what's the title of this chart?

12  A.   The "MNGO Maximum 15-minute Increment Intraday Volume at

13  AscendEX," October 11, 2022, associated with the opayq —

14  spelled O-P-A-Y-Q — .com 24-hour snapshot.  So that accounts

15  identifier.  Versus the 5/31 or -- sorry.  May 31st, 2022 to

16  October 10th, 2022 date range for the approximately four-month

17  snapshot, prior to and including October 10th, 2022.

18        So this is basically the maximums intraday that we

19  just looked at with a new data series overlaid.

20        MS. HUANG:  Now, let's put it side-by-side with 1320

21  on the left.

22  Q.   Again, can you just explain to us what the relationship is

23  between these two charts.

24  A.   So everything that's on the left is actually represented on

25  the right, except you've got this new information, this new

O4BVEIS4                         Mordecai - Direct

1    data.  And this new data shrinks the relative size of the

2    vertical blue bars because it's so large.  This pattern shows

3    up over and over again.

4            So the opayq purchase volume is so substantial that it

5    exceeds a million tokens in spot trades, buys.  And then you

6    see, of course, that means that the, you know, maximums that

7    exist that were observed before in the $160,000 range just look

8    like tiny little things.

9    Q.  And you see that orange line there?

10   A.  I do.

11   Q.  That's reflecting the opayq purchase volume?

12   A.  Yes, I do.

13   Q.  And between 6 and 7 p.m., what is the maximum volume traded

14   by that account?

15   A.  It's a little over a million.

16           MS. HUANG:  Let's take a look at Government Exhibit

17   1322.

18   Q.  What's the title of this chart?

19   A.  "MNGO Intraday Price and Purchase Volume at AscendEX."

20   Q.  And what's shown on the X axis here?

21   A.  This is the volume in millions of MNGO tokens.

22   Q.  And for what date is this showing?

23   A.  This is October 11th, 2022.  It's a 24-hour snapshot.

24   Q.  And what does the yellow line there represent?

25   A.  The yellow line is -- is the total purchase volume.

O4BVEIS4                          Mordecai - Direct

1    Q.  And at around what time do we see that yellow line peak?

2    A.  It spikes right up around the 6:25 period to just over a

3    million.

4    Q.  Now, the magenta purple line, what is that showing there?

5    A.  That's price.  And that's referenced by the right vertical

6    column -- vertical axis.

7    Q.  And what is the highest price shown on this chart?

8    A.  It's around 45 cents.

9    Q.  And around when did that happen?

10   A.  Contemporaneously or right at about the same time as the

11   spike-up in purchase volume.

12   Q.  Between 6 and 7 p.m.?

13   A.  Yeah.  Particularly around the 6:25/6:30-ish range, 6:25.

14   Q.  Dr. Mordecai, as you sit here today, given all the analysis

15   that you've done, can you offer any other reason other than the

16   opayq.com purchases that would have resulted in a Mango price

17   increase that we see here on October 11, 2022?

18   A.  I cannot.

19   Q.  And what happened to that price after October 11th, 2022?

20   A.  Once the upward price pressure dissipated, because there

21   was no longer these buy orders, it just -- it precipitously

22   fell to lower than the price prior to the buys.

23   Q.  All right.  Let's move on to the last platform, Serum DEX.

24              MS. HUANG:  Can we pull up 1328, please.

25   Q.  What's the title of this chart?

1  A.  "MNGO Maximum 15-minute Intraday Purchase Volume on Serum

2  DEX."

3  Q.  And what's the date time period?

4  A.  July 11th, 2022 to October 10th, 2022; so approximately a

5  three-month snapshot prior to and including October 10th, 2022.

6  Q.  And this is one of those typical day charts we've been

7  talking about?

8  A.  This is one of those typical day charts we've been talking

9  about.

10 Q.  All right.  So from July 11th, 2022, to October 10th, 2022,

11 what was the highest intraday volume of Mango at Serum DEX?

12 A.  5:45 to 6 p.m.

13 Q.  And what is the approximate volume there?

14 A.  A little over 1.8 million.

15       MS. HUANG:  Now, let's take a look at Government

16 Exhibit 1329.

17 Q.  What's the title of this chart?

18 A.  "MNGO Maximum 15-minute Intraday Volume at Serum DEX."  And

19 it includes an October 11th, 2022 24-hour snapshot for an

20 account with the identifier lower case S2, upper case N, lower

21 case Q, upper case M.  And then it includes the prior intraday

22 profile we looked at on the prior exhibit.

23 Q.  And is that reflected, that account, as to NQM in that

24 orange line there?

25 A.  Yes.  Correct.  The S2NQM is represented by the orange

O4BVEIS4                          Mordecai - Direct

1    line.

2    Q.  And when did that line hit its maximum volume?

3    A.  At around a little after 6.

4              MS. HUANG:  Let's take a look at Government Exhibit

5    1330.

6    Q.  Dr. Mordecai, what's the title of this chart?

7    A.  "MNGO Daily Price and Purchase Volume at Serum DEX."  And

8    it's July 11, 2022 to October 12th, 2022.

9    Q.  And those dates are reflected at the bottom of the X axis

10   there?

11   A.  They are.

12   Q.  And volumes on the Y axis?

13   A.  Correct.

14   Q.  And what does the yellow -- those yellow bars here reflect?

15   A.  The yellow bars are the daily total purchase volumes.

16   Q.  And what is the highest volume shown on this chart?

17   A.  The highest volume shown on this chart is approximately 20

18   million.

19   Q.  And on what date did that happen?

20   A.  October 11th, 2022.

21   Q.  And what was the purple line there showing?

22   A.  The purple line is showing the price of the

23   corresponding -- the corresponding time.

24   Q.  And what's the highest price being shown there?

25   A.  90 cents.

1    Q.  And on what date?

2    A.  That was also October 11th, 2022.

3    Q.  Okay.  Now, Dr. Mordecai, as you sit here today, given,

4    again, all the analysis that you've done, can you offer any

5    other reason other than the S2NQM purchases that would have

6    resulted in the Mango price increase that we see here on

7    October 11th, 2022?

8    A.  As I sit here today, based on all of the analysis I've

9    conducted over the last several months, I cannot.

10   Q.  And what happened to the price after that date?

11   A.  It precipitously fell to a lower level than it started out

12   prior to the buying pressure.

13   Q.  And based on your analysis of this data, what would you

14   attribute to that price decline?

15   A.  We would refer to this as a return to the equilibrium prior

16   to the intervention.  So prior to those buys, those outside

17   buys, there's a supply/demand response where it falls back to a

18   previous level and often below that level.

19   Q.  Now, earlier you testified that FTX, AscendEX, and Serum

20   DEX prices were used to calculate the Mango perp oracle price?

21   A.  Could you repeat the question?

22   Q.  Sure.  Earlier you testified that FTX, AscendEX, and Serum

23   prices of Mango were used to calculate the Mango perpetual

24   oracle price?

25   A.  That is correct.

1           MS. HUANG:  Let's pull up 1309.

2      Q.   What's the title of this chart?

3      A.   This is "MNGO-PERP Oracle Price," 10/11/22 or October 11,

4      2022, 24-hour snapshot.

5      Q.   And on the left there, that's showing the oracle price for

6      the Mango perp?

7      A.   It is.

8      Q.   And what is this purple line showing?

9      A.   This is the price path or the price series over -- this is,

10     again, an intraday, but this is not comparing multiple days,

11     this is just looking at this one day, from 12 a.m. to 12 a.m.

12     So it's a 24-hour period, right, of one day, what the price

13     behavior is.

14     Q.   And when does that purple line reach a peak on October

15     11th, 2022?

16     A.   Somewhere around 6:25.

17     Q.   And at what price?

18     A.   Little over 45 cents.

19          MS. HUANG:  All right.  Let's take that down.

20          Look at Government Exhibit 1341.

21     Q.   Dr. Mordecai, what's the title of this chart?

22     A.   "MNGO-PERP Long and Short Position Withdrawals on Mango

23     Markets," October 11, 2022, during the period 6:25 to 7 o'clock

24     p.m. ET, Eastern time.  And it's from the two original accounts

25     we looked at, the long account and the short account.  It's a

1    35-minute snapshot of both the gains and losses or wins -- the

2    wins and losses, as some people might want to say, in U.S.

3    Dollar Coin terms.  And then a series of vertical lines that

4    indicate when there were withdrawals that took place by those

5    two accounts.

6    Q.  And so that time period is reflected on the bottom, the X

7    axis there?

8    A.  Correct.

9    Q.  And then on the left there, can you just explain to us what

10   that's reflecting on the Y axis?

11   A.  So that is the long and short profit and loss positions.

12   If you remember, we had those crisscrossing diagonals, right.

13          So if we took that and we turned it so that now we've

14   got, you know, the longs and shorts on the left -- or what --

15   instead what we did, we just added those numbers in; we left it

16   the way it was and we added those numbers in.

17          But now we're looking over time, right.  What you see

18   is you could have a maximum of 250 million USDC in gains based

19   on this axis; you could have a maximum of 250 million in losses

20   on this axis.  And now what we're going to do is trace how each

21   account responds to the price changes in MNGO relative to U.S.

22   Dollar Coin.

23   Q.  Let's just break it down a little.  That blue line, what is

24   that showing there?

25   A.  That blue line is the profitability or the gains of the

1  long account.  And it's not just the gains because, frankly,

2  there's some teeny-tiny losses one can see way off on the

3  right.  So it's really the profit and loss position of the long

4  account.

5  Q.  And do you see how there's those black dotted lines there?

6  A.  Those vertical black dots, dotted lines, correct.

7  Q.  What are those lines reflecting?

8  A.  Those are instances in which tokens were withdrawn by the

9  owner of this account from the Mango Markets trading venue.

10 Q.  And the ones on the top, those were the ones that were

11 withdrawn on the long position when it was a profitable?

12 A.  Correct.

13 Q.  Let's take a look at that orange line now.  What is that

14 showing?

15 A.  The orange line is showing the offsetting profit and loss

16 position of the short account.  And when I say "offsetting," if

17 you notice, this just looks like reflections in a mirror, like

18 you were looking into a clear lake.  You can see the upside

19 down reflection of whatever is above it, right.

20         You've got the same thing here.  They are identical

21 positions, as we pointed out before, which would leave the

22 owner with actually no exposure.  And so we observe that again,

23 right, and so you're just tracing out when the short account is

24 incurring losses because MNGO price is above that original 3.8

25 cents.

O4BVEIS4                              Mordecai - Direct

1   Q.  All right.  Can we pull up -- sorry.

2              First, the black dotted lines there at the bottom,

3   what is that reflecting?

4   A.  Those are short position withdrawals that occur at the time

5   that the short position is actually profitable.  So it's

6   basically withdrawing coins as that short position shows gains,

7   paper gains, if you will.  That's a term from the markets.

8              MS. HUANG:  Let's take a look at government Exhibit

9   1342.  And actually, just for a second there, can we put the

10  two of those, 1341, side-by-side.

11  Q.  And Dr. Mordecai, it's a little smaller now, but can you

12  tell us what the title of the chart on the right is?

13  A.  Sure.  Summary of -- my 62-year-old eyes, still kind of

14  work a little bit.

15             "Summary of Long and Short Withdrawals for the Two

16  Accounts RNJNA and MKFFX."

17  Q.  And what's the relationship between the chart on the left

18  and in this chart on the right?

19  A.  So the chart on the left is superimposing, if you will, or

20  overlaying token withdrawals over the profit and loss

21  experience or profile over time of those two accounts.

22             The table on the right is providing information about

23  the withdrawals themselves, whether they were from the long or

24  the short account.  The amount or the quantity of borrowed and

25  what the value at which they were borrowed.  "Borrowed" meaning

1  withdrawn.  And then it gives you subtotals for the long and

2  short withdrawals, and then an overall total for both.

3          So we'd call this a tabular version, a table version

4  of the information -- some of the information on the left,

5  specifically the withdrawal information.  And "tabular" meaning

6  rows and columns.

7          MS. HUANG:  All right.  Let's focus on the table on

8  the left, but keeping both of these up.  Sorry.  You can keep

9  them both up, Mr. Oshinsky.

10 Q.  When it says "time" there, just to make sure we're all on

11 the same page, what does that mean?

12 A.  That is the time at which the withdrawal took place.

13 Q.  And when it says "token," what is that?

14 A.  That is the associated token which was withdrawn.

15 Q.  And the Mango perp position column, what is that?

16 A.  That is the fact that it's from the long account.

17 Q.  And do you see how for the long there's nine rows there for

18 the long?

19 A.  I do.

20 Q.  But then on the left there is only, I count, one, two,

21 three, four, five, six, seven withdrawals on the long position?

22 A.  On the long position or the short position?

23 Q.  On the long, if you see --

24 A.  Yes.

25 Q.  -- at the left.

O4BVEIS4                          Mordecai - Direct

1  A.  Right.

2  Q.  Can you explain to us why there's only seven lines?

3  A.  Ah, yes.  The vertical lines, some of them are so

4  overlapping that they look simultaneous.

5  Q.  So, for example, 6 and 7, those are both at 6:41 p.m.?

6  A.  Yes.

7  Q.  But just seconds apart?

8  A.  Correct.

9  Q.  And then "quantity borrowed," what does that reflect?

10  A.  That are the number of tokens.

11  Q.  And what does "value borrowed" reflect?

12  A.  That is the value of the number of tokens that had been

13  borrowed, the corresponding value.

14  Q.  And do you see how there is that total long withdrawals --

15  A.  So I'd just like to point out something that might help.

16        You notice the U.S. Dollar Coin, you borrowed 50

17  million, and it's $50 million?  You said it's pegged to the

18  dollar?  These other things have a different relative price to

19  the dollar; and so you don't get that same kind of match-up of

20  the number of tokens and the value associated with that number

21  of tokens.

22        I apologize for interrupting, but I just wanted to --

23  Q.  No worries.

24  A.  Yes, so you were saying?

25  Q.  You see where it says "total long withdrawals" there?

O4BVEIS4                          Mordecai- Cross

1    A.  I do.

2    Q.  What is that reflecting?

3    A.  Total long withdrawals is the total amount -- the total

4    value of the tokens withdrawn by the long account.

5    Q.  And total short withdrawals, what is that?

6    A.  The total value of the tokens withdrawn by the short

7    account.

8    Q.  And total withdrawals?

9    A.  130 million.

10   Q.  And that's from those two accounts?

11   A.  It's from those two accounts.  And so you'll notice because

12   of the profitability of the short account, when you look at the

13   left things, these are teeny-tiny things, was only able to

14   withdraw small amounts of tokens.  That was the way that the

15   withdrawal mechanism worked.

16   Q.  Thank you, Dr. Mordecai.

17          No further questions right now.

18   CROSS-EXAMINATION

19   BY MR. GREENSPAN:

20   Q.  Good afternoon, Mr. Mordecai.

21   A.  Good afternoon, sir.

22   Q.  I believe you referred to yourself as an industrial

23   scientist; is that right?

24   A.  I think that kind of captures all of my, sort of, diverse

25   roles, yes.

1  Q.  Is that a type of economist?

2  A.  It can be.  I mean, if you remember, Guinness Brewery had

3  statisticians and economists on staff that basically worked as

4  scientists.  That's why the beer is so good.

5  Q.  Do you consider yourself an economist?

6  A.  I do.  I'm trained as an economist, but I'm trained in many

7  other things as well.

8  Q.  Like you said, you have a diverse background, right?

9  A.  I do.

10 Q.  And some of that background is in banking and finance, is

11 that right?

12 A.  Banking, finance, insurance, reinsurance.  A lot of my

13 credit work in banking was around industrial processes and

14 nonrecourse project finance in industrial process companies.

15 So think about manufacturing, transportation, and so on; as

16 well as leverage buyouts, management buyouts of industrial

17 companies or financial companies.  So you become kind of this

18 bizarre synthesist.

19             THE COURT:  Okay, Dr. Mordecai, so a couple of things.

20             First of all, just slow down just a little bit.  And

21 just make sure that -- just answer the questions and then we

22 can move on.

23             THE WITNESS:  I will do that.  Thank you.

24             Born and bread New Yorker, you know how that is.

25             Thank you, sir.

O4BVEIS4                    Mordecai- Cross

1    BY MR. GREENSPAN:

2    Q.  Dr. Mordecai, you talked about working at Swiss Re, do you

3    remember that?

4    A.  I do.

5    Q.  Did you consider yourself a trader when you worked at Swiss

6    Re?

7    A.  I was not a trader, but I sat on the trading desk.  I

8    interacted with the traders.  When Roger Ferguson asked me to

9    join, he referred to it as reprise your AIG role on the care

10   and feeding of the people on the trading desk.

11   Q.  Are you a registered representative, sir?

12   A.  I have been.  I was a 763, both earlier in my career, and

13   they had me retake the test again at Swiss Re when I

14   established relative value market strategies.  I think I may

15   have also been asked to take another test, but I don't remember

16   if it happened or not.

17   Q.  Did you hold a 24 license?

18   A.  I believe that that was the one that we were considering at

19   the time, and I don't remember if I did it or not.

20   Q.  Are you a blockchain expert, sir?

21   A.  I have extensive experience with blockchain companies in my

22   role as scientist and residence for Fintech Innovation Lab,

23   which is co-run by the Partnership for New York City and

24   Accenture, and whose lead members are about 20 of the largest

25   banks in the world, 40 of the largest asset managers, 50 of the

1    largest reinsurers and insurers.

2                And I, as a result of that, have ended up on the

3    advisory committee of a firm called AlphaPoint as their science

4    adviser.  AlphaPoint is one of the largest full stack

5    software/hardware providers to trading venues.  I think there's

6    150 trading venues in 35 countries that use their software.

7    And Mike Novogratz of Galaxy Digital, former founder of a

8    couple -- a large P firm and a former partner at Goldman Sachs,

9    gave them their first outside investment of 15 million.

10               THE COURT:  Okay.  So I'm going to -- just so it's

11   clear, I think the question was:  Are you a blockchain expert?

12               THE WITNESS:  I guess the reason I answered --

13               THE COURT:  No, no.  Just listen.

14               Just try to answer the question.  If it's a yes/no

15   question, just try to give a yes/no answer.  If you can't, you

16   can say that you can't give a yes/no answer, and then counsel

17   will take it from there.  If Ms. Huang needs to let you clarify

18   or explain more about anything, then she'll have an opportunity

19   to do so.

20               THE WITNESS:  I shall do so.

21               THE COURT:  Okay.

22               THE WITNESS:  So I guess the easiest way --

23               THE COURT:  So hold on.

24               Mr. Greenspan.

25   BY MR. GREENSPAN:

1   Q.  Dr. Mordecai, we're just trying to streamline things.

2   A.  I understand.

3   Q.  The jury can get home and everybody else.

4   A.  I understand.  My hip-hop name is Loquacious D.

5   Q.  So the question was are you a blockchain expert, sir?

6   A.  I would say that the word "expert" I'm unsure how to

7   respond to.  I'd say I have extensive experience with the

8   distributed ledger technologies of which blockchain is a type,

9   as well as the consensus mechanisms underlying it and other

10  mechanisms.  And I have given extensive advice, experience,

11  analysis, or evaluation on blockchain technologies within

12  various financial institution and other contexts.

13          I've also sat on an American bar association committee

14  at the Uniform Laws Commission.  I've sat on a committee

15  involving NFTs and blockchain technology.

16  Q.  You're not a coder though, are you, sir?

17  A.  I've done extensive code review in various roles, including

18  my role at Fitch around insurance link securitization.

19          So whether or not I'm considered a coder is, again, a

20  matter of interpretation.  I have extensive familiarity with

21  different types of code.  But I don't sit around writing code.

22  Q.  Understood.

23          Have you ever traded crypto?

24  A.  I have never traded a crypto token.

25  Q.  And when did you first hear of Mango Markets?

1    A.  I don't remember if it was the first time I was interviewed

2    for the case or whether I just happened to read about it in the

3    news.  I don't really recall.

4    Q.  But it might have been when you were retained or seeking to

5    be retained for this case, right?

6    A.  The earliest time I remember -- but, again, I read fairly

7    extensively, and so I may have seen something in the news, I

8    don't know.

9    Q.  Have you ever previously offered testimony as an expert

10   about perpetual futures contracts?

11   A.  Do you mean with regard to cryptographic tokens?

12   Q.  I'm talking about what you refer to as perps or Mango

13   perps, but in any kind of --

14   A.  With regard to MNGO-PERPS or any cryptographic token-linked

15   perpetuals?

16   Q.  Correct.

17   A.  I've never done that before.

18   Q.  Have you ever used Mango Markets for any purpose?  I

19   understand you've never traded on it, but for anything?

20   A.  No.

21   Q.  Mango is a novel technology, wouldn't you say?

22   A.  I'm going to -- how are you using --

23   Q.  Mango Markets.

24   A.  How are you using the word "novel"?

25   Q.  You don't understand what the word "novel" means?

1    A.  I don't know how you're using the word "novel."

2    Q.  Why don't you try to answer the question.  Isn't Mango

3    Markets a novel technology?

4    A.  With respect to what?

5    Q.  Isn't that something actually you said to the government,

6    that you viewed it as a novel technology?  Do you remember

7    that?

8    A.  I do not ever remember saying that.  If you want to show me

9    when I said that, I would be happy to respond to that.

10   Q.  You don't remember saying that, that's the answer, right?

11   A.  I don't remember using the term "novel" in that context.

12   Q.  We saw a series of slides that the government walked you

13   through.

14   A.  Correct.

15   Q.  Did you create those slides?

16   A.  I worked on the exhibit in terms of responding to slides

17   that were produced under my oversight.

18   Q.  So other people created the slides; but you reviewed them,

19   you oversaw the process, right?

20   A.  I oversaw the process.

21   Q.  And that's with respect to all of the slides, right?

22   A.  Correct.

23   Q.  Do you understand the concept of permissionless in smart

24   contracts?

25   A.  I do.

O4BVEIS4                            Mordecai- Cross

1   Q.  And Mango Markets was permissionless, wasn't it?

2   A.  There is a range of categories that fall within permission

3   versus permissionless.  There are things like Bitcoin that are

4   far more permissionless than other forms.  It's actually a

5   fairly complicated categorization or classification.

6   Q.  Did you review documents in this case?

7   A.  Of what kind?

8   Q.  Did you review any documents in this case?

9   A.  Of what kind?

10  Q.  I think the question speaks for itself.  Did you review any

11  documents?  Were you provided any documents to review by the

12  government?

13  A.  I reviewed --

14  Q.  Hold on.  By the government, were you provided any

15  documents?

16  A.  I mostly worked off of the data produced and my own

17  understanding of the marketplace or my own review of things

18  that were publicly available.

19  Q.  You didn't review a light paper from Mango Markets?

20  A.  A what?

21  Q.  Light paper.

22  A.  I don't recall whether I did or not.

23  Q.  Do you know what a light paper is?

24  A.  I know -- a light paper, it's kind of like a white paper.

25  It's a descriptor.  You find most start-ups have, you know,

1    some version of trying to describe what they are.

2            They tend not to be as rigorous as the technical

3    papers I'm used to, which is why I'm saying in the work I've

4    done in the area on distributed ledger technologies and

5    blockchains for the insurance industry, I've been very precise

6    and very specific in all my documentation.

7    Q.   Okay.  So you don't know if you reviewed a light paper for

8    Mango Markets, though, right?

9    A.   I don't recall as I sit here whether or not I did.

10   Q.   Did you review any documentation about how Mango Markets

11   represents itself for the services it offers?

12   A.   I recall seeing some -- basically some Google-accessible

13   things or some Wayback Machine accessible things.  But if you

14   could be more specific, I could be more helpful with the

15   question.

16           MR. GREENSPAN:  Your Honor, it's 2:30 right now.

17   Would you like me to keep going?  This is a natural breaking

18   point.

19           THE COURT:  How much do you have left?

20           MR. GREENSPAN:  About 45 minutes, I think, with this

21   witness.

22           THE COURT:  Then we'll take our break for the day.

23           All right.  Day four in the books.  Thank you very

24   much, members of the jury.  I will see you back here tomorrow

25   at 8:45.

O4BVEIS4                          Mordecai- Cross

1          THE WITNESS:  Thank you, your Honor.  And I'll try to
2    be better behaved tomorrow.
3          THE COURT:  Dr. Mordecai, just hold on for a second.
4          THE WITNESS:  Oh, certainly.
5          (Jury not present)
6          THE COURT:  Please be seated.
7          Take a seat for a second.
8          So I said this a few times.  But if counsel is asking
9    you a yes/no question, you just say yes or no.  If you can't
10   answer it, let counsel know and then again, as I said,
11   Ms. Huang will have a chance to address anything on redirect
12   examination.
13         For both sides, if you are not getting responsive
14   answers, then I expect there to be an application to the Court.
15   Because I do not want to get involved on either side
16   unnecessarily.  And so if there's an issue, then both sides
17   should be bringing that to my attention moving forward.
18         But I think we all understand what we need to do.
19         Thank you very much, Dr. Mordecai.  We'll see you here
20   tomorrow.  And you understand you will still be under oath.
21   You are not to talk to anyone about this case or your
22   testimony, including anyone on the government's side.
23         THE WITNESS:  I'll try to improve tomorrow.  It's been
24   a while --
25         THE COURT:  No problem.  No problem.

1            THE WITNESS:  Thank you.

2            THE COURT:  Thank you very much.

3            (Witness excused)

4            THE COURT:  All right.  Mr. Talkin, you're up there.

5            MR. TALKIN:  I'll go first.

6            THE COURT:  You're on deck.

7            MR. TALKIN:  Your Honor, I'm just going to ask if I

8    can step out to the gallery for a minute and see if there's

9    going to be an issue to raise or not while you deal with the

10   next issue, if that's okay.

11           THE COURT:  Okay.  What is the next issue?

12           Anything from the government, other than the issue

13   that the Court issued an order about yesterday?

14           MR. DAVIS:  Nothing, your Honor.

15           THE COURT:  Anything, Mr. Klein?

16           MR. KLEIN:  I guess we'd want to know what's going to

17   happen tomorrow, your Honor, just in general the logistics.

18           THE COURT:  Okay.  So we have McCollum, Casey, Tonkin,

19   La Grange, and Durairaj.  That's who I have on my list.

20           So Mr. Davis, Mr. Burnett or Ms. Huang, do you want to

21   give us the batting order here?

22           MR. DAVIS:  Yes, your Honor.  After Dr. Mordecai, we

23   expect to call Mr. Casey, then Mr. Tonkin, and then Special

24   Agent La Grange.  They might be out of order due to some

25   scheduling with the witnesses, but those are our witnesses.

O4BCeis5

1          THE COURT:  So we're not going to hear from McCollum

2     or Durairaj?

3          MR. DAVIS:  That's correct, your Honor.

4          THE COURT:  Understood.

5          And now, Mr. Talkin, Mr. Klein.

6          MR. TALKIN:  Your Honor, that brings us, I guess, to

7     our next issue.  We don't know if we, the defense, are going to

8     call Mr. Durairaj.  However, I've been asking for really a

9     month, but intensively the last four days, the attorneys have

10    been here every day for Mr. Durairaj, would accept a subpoena

11    on his behalf and I have yet to get an answer.  The reason I'm

12    involving the Court in that is I know he's still under subpoena

13    with the government or was until they -- I know that decision

14    wasn't made until moments ago.

15         So, the problem is, I'm aware, from 3500, he's in New

16    York, I know he's not where he lives, but the defense will not

17    have an opportunity to serve him.  So unless -- I really don't

18    want to ask the government to disclose his location because

19    it's none of our business, other than I want to serve him with

20    a subpoena.  So I just want to lay that issue out.

21         I'm hoping that the attorneys will accept service, and

22    it will make it easy, and then we will be in contact with the

23    government and let them know of our ultimate decision whether

24    or not to have him testify.  That's something the defense

25    obviously is in reactionary mode and we're going to try to

O4BCeis5

1    figure out if that's in our client's best interest, but we

2    think it's a real possibility.

3              THE COURT:  And Mr. Davis, if Mr. Talkin elects to

4    call Mr. Durairaj in their case, how is that going to work in

5    terms of what you are going to do in your case before you rest,

6    if anything?  Maybe it has no impact.

7              MR. DAVIS:  It has no impact on the government's case,

8    your Honor.

9              THE COURT:  Okay.  So, if you have an application to

10   make, I will entertain it.  Let's try to makes that election

11   and figure it out as soon as possible.

12             MR. TALKIN:  I guess, your Honor, my application is,

13   and I'm doing this admittedly out of a little bit of ignorance

14   because I never had to do this before, I don't know if you can

15   order the lawyers to accept service.  I can say that they are

16   litigants in this courthouse, Mango Labs, as well as I believe

17   Mr. Durairaj either directly or, as they stated in their

18   paperwork, as someone who has signed off their rights to Mango

19   Labs.  So I don't know what the legal effect, I didn't think --

20   something I haven't had to research in the past, but I don't --

21   I would think there could be some precedent out there that you

22   can't avail yourself of the same court and then avoid service

23   in that court, as well.  Now, I'm not saying he's avoiding

24   service, but it's certainly putting the defense in a precarious

25   situation.

O4BCeis5

1          I know I threw that at you, your Honor.  I wish I

2     could cite a case in the way --

3          THE COURT:  What's the clock on this?

4          MR. TALKIN:  I think that if we called him, it would

5     probably -- we would request Monday just to be able to sit down

6     with him and judging by the time that we just heard from the

7     government.  So if that helps you with the timing, the problem

8     is --

9          THE COURT:  What I mean is, you have to serve

10    somebody.  The lawyers are here?

11         MR. TALKIN:  They are.

12         THE COURT:  In the courthouse?

13         MR. TALKIN:  They're here in the courthouse and I'm

14    happy to either -- if they agree, they'll accept it by email,

15    I'll email to one.  Or I'll ask them to stay put, I'll run down

16    to Wall Street, grab a subpoena and come back, get it signed,

17    and give it to them if that's what's necessary.

18         THE COURT:  Where are they?

19         MR. BURSHTEYN:  Your Honor, right here.

20         THE COURT:  Are you going to accept a subpoena?

21         MR. BURSHTEYN:  Your Honor, Mr. Talkin asked us just

22    now and asked him to follow up with cocounsel, who also

23    appeared in the case to discuss this matter.  We are just also

24    finding out about tomorrow's -- what witnesses the government

25    will call now.  So I'm not sure -- I don't understand the issue

O4BCeis5

```
 1    for the Court Mr. Talkin is raising.  He needs to call our
 2    cocounsel.
 3              THE COURT:  I think the issue for the defense is
 4    simply that they are concerned that, given the emergent way
 5    this is arising, they may not be able to call a witness that
 6    they would otherwise perhaps have an ability to call.  And so,
 7    they're trying to just get ahead of that issue.  I mean, is
 8    that fair, Mr. Talkin?
 9              MR. TALKIN:  That is fair.
10              THE COURT:  There's no legal nomenclature behind that.
11    I think that's essentially what you're doing.
12              MR. TALKIN:  Your Honor, just for the record, I did
13    just ask a minute ago for the fifth time.  So, I just want the
14    record to be clear on that.
15              THE COURT:  All right.  So you have your phone.  So
16    why don't you just step back there and try to figure this out
17    right now while we're sitting here talking about other stuff.
18              Mr. Burshteyn, let's see if we could figure this out.
19              MR. BURSHTEYN:  Thank you, your Honor.
20              THE COURT:  Mr. Klein, anything else?
21              MR. KLEIN:  Your Honor, I'm not sure how long the
22    government's case is going to continue.  We think we have about
23    45 minutes left.  I assume there will be redirect.  I'm trying
24    to piece together tomorrow because obviously we want to use the
25    jury's time efficiently.
```

O4BCeis5

1          THE COURT:  I think we're going to be done in the

2     morning, unless I'm missing something.

3          MR. KLEIN:  I agree, your Honor.

4          THE COURT:  I think we're going to be done in the

5     morning.  I would like to, if possible, have motions in the

6     afternoon.  If you really think you need the entire weekend to

7     do the motions --

8          MR. KLEIN:  I think we can do an oral Rule 29 in the

9     afternoon and we can call our first witness on Monday.

10          THE COURT:  That makes sense.

11          MR. KLEIN:  I can tell you now, we do plan to call a

12     witness.

13          THE COURT:  Understood.

14          Do you have a sense of who you're going to call?

15          MR. KLEIN:  Mr. Sheridan.  Obviously we're going to

16     need to talk to our client about his testimony, so we haven't

17     made that determination, but we appreciate the time to go

18     through that with him.

19          THE COURT:  Right now you believe your leadoff hitter

20     is going to be Mr. Sheridan?

21          MR. KLEIN:  Yes.  There is also another potential

22     witness.  We believe we'll be able to resolve with the

23     government without the Court's intervention, but there's an

24     issue about the Circle account we want to work through with the

25     government about how that got suspended and why.

O4BCeis5

1          Basically, just so your Honor knows, it was actually
2     the directive of the Department of Justice his account was
3     suspended, then he filed an arbitration, and then the
4     Department of Justice to Circle to un-suspend it without
5     telling my client.  So it was suspended right after the
6     incident.  And we have this in the 3500 they provided to us, so
7     the government disclosed this to us.  And then he filed an
8     arbitration with Circle on November 4th.  And then I think on
9     November --
10          MS. MARTABANO:  Your Honor, they requested his account
11     be frozen.  So whether they then, you know, suspended the
12     entire thing.  On November 16th -- on November 4th,
13     Mr. Eisenberg served them with an arbitration demand seeking to
14     un-suspend his account.  On November 16th, there is
15     correspondence between the government and Circle where they
16     basically say they would withdraw their request for Circle to
17     freeze his account because they're concerned that letting him
18     know might tip Mr. Eisenberg off to the fact that there was an
19     investigation.  So they sought to have Circle remove the
20     freeze.
21          MR. KLEIN:  We're not trying to go down a rabbit hole
22     with that, your Honor --
23          THE COURT:  I don't want to go down the rabbit hole.
24     I understand you're just indicating that in addition to
25     Mr. Sheridan, there is an additional witness.

O4BCeis5

| 1 | MR. KLEIN: And there is Mr. Durairaj, a possibility |

1          MR. KLEIN:  And there is Mr. Durairaj, a possibility

2    also.

3          THE COURT:  All right.  Understood.

4          You had another expert, as well, that you had

5    disclosed; is that right?

6          MR. KLEIN:  Yeah.  We're going to see how Mr. Mordecai

7    finishes up.  We may not need to call him now.  It's less

8    likely than not, is how I'll put it.

9          THE COURT:  I appreciate that.

10          Mr. Davis, did you have something to add?

11          MR. DAVIS:  Your Honor, if I could just ask, just

12    plane this out.  So defense case starts Monday, I hear at least

13    one witness, maybe two.  I would be very surprised if that goes

14    beyond Monday?

15          MR. KLEIN:  It shouldn't go beyond Monday, your Honor.

16          MR. DAVIS:  Does the Court have any views on

17    scheduling of closings/jury charge conference?

18          THE COURT:  It looks like, based on what I'm hearing,

19    that we're going to have charge conference maybe even Monday.

20    I think we should be able to do that.  But I understand there

21    is some variables.  So it would be Monday afternoon or, at the

22    very latest, Tuesday morning.  And so, we should be in a

23    position to proceed with closings on Tuesday afternoon.  Does

24    that work for everybody in terms of scheduling?

25          MR. DAVIS:  Yes, your Honor.

O4BCeis5

1          MR. KLEIN:  Works for the defense, your Honor.

2    Obviously all the caveats, but yes, that sounds like a good

3    plan.

4          THE COURT:  So in addition to those issues, one thing,

5    Mr. Klein, you had handed up the instruction that the defense

6    wanted me to read in the middle of witnesses coming up.  So I

7    wanted the record to reflect that after the introduction of

8    exhibit 1236, the Court received from the defense a proposed

9    instruction relating to that document and I issued that

10   document; correct, Mr. Klein?

11         MR. KLEIN:  That's right, your Honor.

12         THE COURT:  Related to that, the one thing that I did

13   note, I think that the instruction that you proposed to be read

14   after these exhibits focused on specific terms.  There is a

15   separate proposed conditional instruction that you propose

16   concerning terms of service that I think will be appropriate to

17   give.  Just give me a second so I can pull this up.  The

18   proposal was:  "You have heard evidence that Mr. Eisenberg's

19   trading activity violated the rules or terms of service of

20   certain cryptocurrency exchanges.  Evidence that Mr. Eisenberg

21   violated and exchanged rule or company policy is not sufficient

22   in and of itself to find him guilty of commodities fraud or any

23   of the other charged counts."

24         Now, I don't know that you want me to give that

25   particular charge at this point given -- because I don't even

1    think the government has put in those documents in the way that

2    you might have thought.  I think it's been a much more muted

3    presentation of those documents.  Now, that's not to say things

4    might be different in terms of how it's presented in closing,

5    but I'll ask you to, by tomorrow morning if you can, give me

6    what you want as your proposed instruction relating to the

7    terms of service because it might vary from that proposal.

8            MR. KLEIN:  Your Honor, did you make a final

9    determination on the Jupiter terms of service?  I think you

10   held that.

11           THE COURT:  That was out.  That was out, I believe.

12           MR. KLEIN:  That was out?

13           THE COURT:  Yes.

14           MR. KLEIN:  Thank you.  We'll revise that.  I agree.

15   We were thinking about that and talking about that the other

16   night.

17           THE COURT:  So then I think, Mr. Davis or Mr. Burnett

18   or Ms. Huang, on the mix swap issue, if you can walk the Court

19   through that.  And the reason I'm asking is, obviously we're

20   trying to put together, as I said, ball is in our court on the

21   jury instructions, we want to get that back to the parties, and

22   we just wanted to make sure we focus and had a full view on

23   this particular instruction.

24           MR. DAVIS:  Understood, your Honor.  And I think we're

25   coming from the same place, which is we want to make this as

1    straightforward for the jury as possible.

2              I have a few caveats before directly responding to the

3    Court's order, which is this might be an issue, if the Court

4    would permit, that would be easier for us to write, put in

5    writing to the Court, if you're thinking about providing a

6    different jury instruction than what we proposed.  But if the

7    Court could help us think about, in asking this question last

8    night, is the Court, in the Court's mind, thinking about a

9    different instruction than the mix swap instruction we had

10   previously submitted in our requests?

11             THE COURT:  I think, just to be candid so you

12   understand where the Court is coming from, the way that the

13   government had framed its proposed instruction started with a

14   conditional, "if the jury finds that MNGO is a security," which

15   seemed odd in terms of how to present it to the jury, because

16   usually it would start with I am instructing you that it is

17   this or that, and then make these further determinations, or

18   you must find this or that and then you make these further

19   determinations.  Because it's framed in that way, that

20   introduced a little bit of complexity.

21             Second, there's the question of what the other thing

22   is.  And given the nature of the definition, I think it would

23   help to provide the jury with some guidance similar to the

24   *Phillips* instructions, which did, at various points, say that

25   this exchange rate is this and there wasn't a dispute about

O4BCeis5

1    that.  I think that's helpful under these circumstances for the

2    jury if we can do something like that.

3         MR. DAVIS:  Totally agree.  I think, if I could take

4    those two questions in turn.

5         So the framing of our instruction is that way because

6    sitting here, we are agnostic as to whether MNGO was a

7    security.  So it's supposed to reflect that the jury does not

8    need to reach that issue if it finds certain things.  And so,

9    that framework of the instruction works for us.

10        As far as the Court's second question of what are

11   those things that could be in the definition, I think there's

12   three that could be --

13        THE COURT:  Don't you have to show that if it's not --

14   you have to prove it's a swap that falls under the definition.

15   So don't you have to prove what it is?  Meaning that you can be

16   agnostic, but you have to make a proof that it's one thing or

17   another that falls under the base definition of "swap" to then

18   go down the other -- not a rabbit hole, but connect the dots

19   between the different statutes.

20        MR. DAVIS:  Yes, your Honor.  I think we do.  As the

21   initial instruction on swap, I guess is the instruction

22   before --

23        THE COURT:  You give that definition.

24        MR. DAVIS:  Give that definition and then we're

25   responding to this mixed swap issue, and basically we are

O4BCeis5

1    framing this instruction in a way where it just doesn't matter

2    whether MNGO is a security or not because if the jury finds

3    what it's instructed to find, then it's a mixed swap and a swap

4    nonetheless.  And so, that's how we framed it and our thinking

5    about it here.  Of course, if the Court would like us to --

6        THE COURT:  Is the government taking the position that

7    it may not be a security?  Because the SEC seems to think it's

8    a security.

9        What I want to avoid and make sure that I am avoiding

10    is any type of suggestion that this is in the nature of an

11    affirmative defense or something that the defendant bears the

12    burden on.  It's the ambiguous way in which this is framed, and

13    I understand the difficulty.  That's why I'm trying to

14    understand just how to frame this in a way that makes clear it

15    is the government's burden to establish that it fits in this

16    definition, part of that definition is this.

17        MR. DAVIS:  Totally understand, your Honor.  And I'm

18    certainly not trying to be indirect --

19        THE COURT:  No, you're being very responsive.

20        MR. DAVIS:  If I could, if the Court would just permit

21    us to consult with our supervisors in the office, there's

22    multiple stakeholders in this question, as the Court has

23    recognized in its question.  So as to that first point, if I

24    could just ask for a brief reprieve to write on this issue in

25    short order.

O4BCeis5

1          THE COURT:  Sure.  You can take any position that you

2     want.  I'm just trying to make sure that I am doing this in the

3     right way.

4          MR. DAVIS:  To the second point.  And of course we're

5     also trying to together come up with an instruction that makes

6     sense that's legally correct and the jury will understand.  So

7     point taken on your second question.  I think our proposal for

8     that is the three items are USDC, the funding rate, and then an

9     oracle price based on USDC-based transactions.

10          THE COURT:  Wait, the funding rate, and then what's

11     the third thing?

12          MR. DAVIS:  An oracle price based on USDC-based

13     transactions.  It's an index.

14          If I could just direct the Court to the definition in

15     mixed swap, we think those fall into the definitions laid out,

16     which are commodity, currency, financial, or economic interest

17     or property of any kind, rate index quantity to measure other

18     than the price of MNGO.  As proposed in our initial instruction

19     to the Court, we think that definition captures the statute and

20     that these three things fall within the statute.

21          THE COURT:  How can it be USDC?  What is USDC?

22          MR. DAVIS:  Because it's property of any other kind, a

23     financial or economic interest or property of any other kind,

24     even if it's not a commodity.

25          THE COURT:  What if it's a security, which also

O4BCeis5

 1    there's some suggestion that the SEC takes the position that

 2    USDC may be a security.

 3            MR. DAVIS:  Your Honor, may I have one moment?

 4            THE COURT:  I'm asking this, and I realize that -- I'm

 5    asking you this.  It's not as if I put this in my order or gave

 6    you advance notice that I had this question.  Again, it's

 7    solely for the purpose of avoiding any juror confusion on this

 8    issue.

 9            MR. DAVIS:  Yes, your Honor.  And just to avoid

10    confusion on the answers I'm giving, if I can consult with

11    Mr. Burnett.

12            THE COURT:  Of course.

13            (Pause)

14            MR. DAVIS:  We have an initial reaction, if helpful,

15    which is we think it falls within this definition of an

16    interest of any kind and that the SEC's position on this

17    doesn't control.

18            In any event, we have two other proposals here that we

19    think fit, the funding rate and the oracle base price, the

20    oracle price based on USDC-based transactions.

21            THE COURT:  And the defense is on board with those

22    three?

23            MR. GREENSPAN:  No, not quite.  We wrote an

24    instruction that much more clearly tracks the language of the

25    statue's better instruction, but if they want to write on this,

O4BCeis5

1    we're happy to see what they write and we're going to respond

2    to in writing.  We disagree with them on a series of levels on

3    this.

4         THE COURT:  Mr. Davis, how much time do you need?

5    Obviously you're getting ready to for further testimony

6    tomorrow.

7         MR. DAVIS:  We're not trying to jam up anyone involved

8    here.  If there could be a time over the weekend that we could

9    file this, even Saturday, that would be appreciated so we can

10   get through the trial day tomorrow.

11        THE COURT:  Of course.

12        MR. DAVIS:  Of course, if the Court --

13        THE COURT:  I hate to intrude on your weekend, but --

14        MR. DAVIS:  What weekend, your Honor?

15        THE COURT:  That's probably the first time it's been

16   said in this courthouse.  I really do, but I think, given

17   everyone's interest in trying to keep the case moving forward,

18   let's say Saturday by 5:00?

19        MR. DAVIS:  That works for the government, your Honor.

20        MR. GREENSPAN:  Can we respond by Sunday at 5:00?

21        THE COURT:  I hate to intrude on your Sunday, but

22   yeah, sure.  I think it's in everyone's interest for this to

23   happen and for us to have some time before we have a charge

24   conference for us to take a look at the parties' submissions.

25        Mr. Greenspan, in the same way I was unfair to the

O4BCeis5

1    government, just given what we discussed, any further thoughts

2    on the two issues raised in the Court's order from yesterday?

3    I understand you had a proposal that the Court will consider,

4    but any further thoughts on either of those issues?

5          MR. GREENSPAN:  Absolutely.  I mean, I think it's

6    critical to understand whether Mango is a security or not.  I

7    don't see any way around the jury making that determination.

8    It follows stepwise with the definition, first of all.  I mean,

9    if it's a swap, the next question is, is it a security-based

10   swap, and there's no way to determine that without making that

11   determination about Mango.  I mean, I don't think that the

12   exceptions they're giving are the things that would qualify to

13   a mixed swap.  I don't think any of them come close to

14   satisfying it.  So we'll see what they have to say, but to your

15   point, I can't see us agreeing.

16         THE COURT:  What is your legal position on what the

17   other things would be?  I mean, there's two sides to every

18   swap.  You are certainly taking the position that MNGO, at

19   least for purposes of this case, is a security; is that

20   correct?

21         MR. GREENSPAN:  That's correct.

22         THE COURT:  So what's on the other side?

23         MR. GREENSPAN:  Obviously, the retail commodity

24   transaction is out, so this is the sole exception now.

25         We don't think that that commodity plays any role, the

O4BCeis5

1    value of USDC plays any role in valuing the perpetuals, so we

2    don't think that qualifies.  And we think that the funding rate

3    and the oracle price are clearly narrow based security indexes.

4    That's why we provided a definition of that to clearly track

5    the statute.

6              THE COURT:  And as we addressed before, I mean, your

7    position is that USDC is a commodity, but it's out of the case

8    as a commodity for the reasons we previously discussed; right?

9              MR. GREENSPAN:  Correct.

10             THE COURT:  So we'll take a look.  Thank you for that.

11   We'll take a look at the parties' submissions.

12             Anything further from the government?

13             MR. DAVIS:  No, your Honor.

14             THE COURT:  And Mr. Talkin, any resolution of that

15   issue?

16             MR. TALKIN:  Discussions are further and I'm hopeful

17   to resolve it.  I think we're almost there.

18             THE COURT:  Good news.  Always good to end on a high

19   note.

20             So tomorrow we do not need to be here, unless I'm

21   hearing something, at 8:30.  Well, at 8:45, that's how we've

22   been doing it.  Obviously, if there are things that come out

23   overnight, please let the Court know.  Thank you very much.

24             (Adjourned to April 12, 2024 at 8:45 a.m.)

25                            * * *

O4BCeis5

```
 1                      GOVERNMENT EXHIBITS

 2    Exhibit No.                                   Received

 3     1202 through 1219, 1246 through 1249, . . . . 524

 4              and 1201

 5     1400 through 1451   . . . . . . . . . . . . . 534

 6     1351 through 1357   . . . . . . . . . . . . . 535

 7     1100 through 1105   . . . . . . . . . . . . . 537

 8     1215A   . . . . . . . . . . . . . . . . . . . 543

 9     116   . . . . . . . . . . . . . . . . . . . . 546

10     1218A   . . . . . . . . . . . . . . . . . . . 551

11     613   . . . . . . . . . . . . . . . . . . . . 558

12     993A   . . . . . . . . . . . . . . . . . . . . 570

13     993B   . . . . . . . . . . . . . . . . . . . . 584

14     1236   . . . . . . . . . . . . . . . . . . . . 645

15     1303, 1304, 1306, 1308, 1309, 1312  . . . . . 649

16              through 1314, 1320 through

17              1322, 1328 through 1313, 1341

18              through 1343

19

20

21

22

23

24

25
```

1                          INDEX OF EXAMINATION

2    Examination of:                                   Page

3     NILS MOLINA

4    Direct By Mr. Davis  . . . . . . . . . . . . 524

5    Cross By Mr. Greenspan . . . . . . . . . . . 529

6     JOEL DeCAPUA

7    Direct By Mr. Burnett  . . . . . . . . . . . 532

8    Cross By Mr. Talkin  . . . . . . . . . . . . 592

9    Redirect By Mr. Burnett  . . . . . . . . . . 633

10   Recross By Mr. Talkin  . . . . . . . . . . . 636

11    ELIZABETH KUDIRKA

12   Direct By Ms. Huang  . . . . . . . . . . . . 637

13   Cross By Mr. Klein . . . . . . . . . . . . . 647

14    DAVID K. A. MORDECAI

15   Direct By Ms. Huang  . . . . . . . . . . . . 649

16   Cross By Mr. Greenspan . . . . . . . . . . . 695

17

18

19

20

21

22

23

24

25

                     SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300