O4CCeis1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4              v.                        23 Cr. 10 (AS)

 5   AVRAHAM EISENBERG,

 6              Defendant.                Trial

 7   ------------------------------x
                                          New York, N.Y.
 8                                        April 12, 2024
                                          8:52 a.m.
 9

10   Before:

11                  HON. ARUN SUBRAMANIAN,

12                                        District Judge
                                           -and a jury-
13
                          APPEARANCES
14

15   DAMIAN WILLIAMS,
          United States Attorney for the
16        Southern District of New York
     PETER J. DAVIS
17   THOMAS S. BURNETT
     TIAN HUANG
18        Assistant United States Attorneys

19   WAYMAKER LLP
          Attorneys for Defendant
20   BRIAN E. KLEIN
     ASHLEY MARTABANO
21   RILEY SMITH
          -and-
22   TALKIN MUCCIGROSSO & ROBERTS, LLP
     SANFORD N. TALKIN
23   NOAM B. GREENSPAN

24   Also Present:  Brandon Racz, FBI
                    Ryan Sears, Paralegal Specialist-USAO
25                  Jonathan Oshinsky, Paralegal Specialist-USAO
```

O4CCeis1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O4CCeis1

1          (Trial resumed; jury not present)

2          THE COURT:  What do we have to take up?  I know that

3     the parties apparently have resolved the attorney-client issue.

4     So is it just exhibit 401?

5          MR. TALKIN:  That's right, your Honor.  We also, just

6     so the Court knows, we are going to be able to serve that

7     subpoena.  I'll get it signed today.  That's taken care of

8     itself, as well.

9          THE COURT:  Great.

10         As to the completeness issue, I think the government

11    requested to be heard on that.  So, Mr. Davis, do you want to

12    take that up?

13         MR. DAVIS:  Yes, your Honor, if I may.  I'd like to

14    make a couple of points on this particular document.

15         THE COURT:  Can someone put it up on the screen.

16         MR. DAVIS:  Can we pull up Government Exhibit 401, the

17    full exhibit.

18         THE COURT:  While we're waiting, Mr. Talkin, I think

19    in your email you referenced exhibit 109, as well.

20         MR. TALKIN:  Yes.

21         THE COURT:  I may have, but I don't recall this issue

22    coming up with respect to that exhibit when I initially gave my

23    guidance on the objections.  Maybe I did.  Just refresh my

24    memory on the issue.  You don't need to go back and see if we

25    picked it up.  I'm happy to address it again if we need to.

O4CCeis1

1          MS. MARTABANO:  Yes, your Honor.  Exhibit 109, they

2     asked a question -- so the other participant in the chat asked

3     a question and Mr. Eisenberg said something to the effect of

4     can't say more or I'm about to release a statement that should

5     address it.  We sought to have that statement added in for

6     completeness.  It was a Twitter statement.  We didn't argue

7     about it.  Your Honor just ordered it I think at the start of

8     our hearing on it maybe on Monday.

9          That same statement is referenced in the government's

10    current exhibit 401.  We thought it was coming in through 109.

11    They have withdrawn 109 and are not planning to use it.  And

12    so, the statement is actually referenced twice in 401 and it's

13    basically Mr. Eisenberg saying, I can't say more than my

14    statement and as referenced in my statement.  So we're just

15    seeking to have the statement added in through 401.

16          THE COURT:  Thank you.

17          Mr. Davis.

18          MR. DAVIS:  Thank you, your Honor.  I want to take a

19    step back here because this evidentiary point is a critical one

20    for the government to receive a fair trial in this case.  I

21    want to start with some legal principles that I think will set

22    the stage for this current dispute.

23          First, the Tweets themselves, I don't hear any

24    argument from the defense.  They are inadmissible hearsay if

25    offered by the defendant.  They cannot be offered in the

O4CCeis1

1    defendant's case.  That's where we're going to start with this.

2    I hear the only reason for supplementing is a Rule 106.  On

3    this point, I would point the Court to two opinions that I

4    think are directly controlling here.  The first is

5    Judge Rakoff's opinion in *United States v. Lumiere*, which is

6    249 F. Supp. 3d 748, 2017.  The second is *United States v.*

7    *Campos*.  That's a Second Circuit case reviewing an order and

8    affirming by Judge Caproni.

9            I'll start with just the principle in the Second

10   Circuit case, which is then just fleshed out a little bit.

11           THE COURT:  What's the citation?

12           MR. DAVIS:  763 F. App'x 97, and that's a 2019 Second

13   Circuit case.

14           THE COURT:  I may have gotten this wrong.  763 --

15           MR. DAVIS:  763 F. App'x 97 is what I have.  I have a

16   printed copy, as well.

17           THE COURT:  I have it.

18           MR. DAVIS:  Thank you, your Honor.  On the last page

19   of that -- I'm happy to wait for the Court.

20           THE COURT:  Why don't you direct me to the portion --

21           MR. DAVIS:  Page 101 is a 106 objection.  The Court

22   holds here, the district court rejected *Campos*' assertion that

23   all recordings were one long continuous recording, and goes on

24   to say the government offered its excerpts for a limited

25   purpose, the falsity of the assertion that the fraudulently

O4CCeis1

1    obtained cars were for personal rather than business use.  In

2    substance, the district court concluded that *Campos* could not

3    use the completeness rule as an end run around the hearsay

4    rule.  And then the Court affirms that decision.

5                THE COURT:  Got it.

6                MR. DAVIS:  So that's the background principle of how

7    106 can't be used as an end run around the hearsay rule.

8                And then here in the Judge Rakoff opinion in 2017 --

9                THE COURT:  Can you give me that citation?

10               MR. DAVIS:  Yes, your Honor.  249 F. Supp. 3d 748.

11   That's a 2017 opinion.  And the relevant page, it starts at

12   *758.

13               THE COURT:  Okay.

14               MR. DAVIS:  And so, if I can direct the Court to --

15   there's a couple of key portions here.  But first, the Court

16   sets the stage that the government introduced portions of a

17   recording to show what Plaford and Lumiere did.  Beginning in

18   2017, they mismarked securities held by the credit fund by

19   having -- and then it goes on to describe the conduct.  It

20   said, the admitted portions of the recording thus did no more

21   than introduce historical facts about the mechanics and scope

22   of the scheme.  By contrast, the portions of the recording that

23   Lumiere argues were improperly excluded are post hoc attempts

24   by Lumiere to minimize his own culpability by explaining that

25   at least some facets of the scheme seem superficially

O4CCeis1

1    legitimate.  The Court goes on in that to rule that that's not

2    a proper use of the Rule of Completeness.

3         In the next paragraph, it gives an example and says,

4    the legal principle that controls here.  Instead, that

5    statement, like all the others Lumiere sought to introduce,

6    offered context only insofar as they represented Lumiere's

7    self-serving attempts to shoehorn after-the-fact justifications

8    for his actions into his descriptions of his actions.

9         And I want to pause there.

10        THE COURT:  Got it.

11        MR. DAVIS:  Let's turn now to the facts.  That's our

12   legal principles.  Now let's turn to the facts of what is in

13   dispute here.

14        THE COURT:  What's the date of this exhibit?

15        MR. DAVIS:  Government Exhibit 401 is a chat from

16   October 20th, 2022.  So approximately nine days or so after the

17   attack.  And this is -- let's just read aloud my line.

18        Just so the Court is clear, the sender with the last

19   digits ending in 42 -- I think that's 7; is that right?  That's

20   the defendant.  The sender with ID ending in 026 is another

21   party.

22        THE COURT:  Okay.

23        MR. DAVIS:  Your Honor, may I point out a couple

24   highlights of this.  This is in contrast of the other exhibit,

25   Government Exhibit 109, which I'm not sure the Court -- it

O4CCeis1

1    strikes me this morning the defense has represented that the

2    Court ruled on Rule of Completeness for that exhibit, but maybe

3    that's not right.

4           THE COURT:  We discussed a number of exhibits, this

5    may have happened, but it just didn't jump out at me because I

6    know this was a big issue that had been raised and I don't

7    recall focusing in on that particular issue.  However, that's

8    not to say it didn't happen.

9           MR. DAVIS:  Totally understand.  I'm not trying to say

10   otherwise.  I also don't have a memory as I sit here today, but

11   what I'm prepared to do is do the following:

12          THE COURT:  109's not coming in, so --

13          MR. DAVIS:  109's not coming in, but I can distinguish

14   109 --

15          THE COURT:  Forget about 109, we'll just focus on

16   this.  So shortly after the time of the alleged offense --

17          MR. DAVIS:  He is asked, can you clarify your

18   involvement.  And then he says, hi, I cannot comment on the

19   record beyond the existing statement, but I can help you

20   clarify in background.  Let me know if that's okay.

21          So then the person agrees to that arrangement where

22   they will have a private off-the-record conversation.  And then

23   the next reference, he said, importantly, the sentence says,

24   I'm important in getting the facts straight.  The defendant

25   then says, I helped negotiate the settlement, the terms are

O4CCeis1

1      agreed, describes those terms.  Then says, for the bounty, in

2      quotes, the amount note that the accounts in question were

3      funded with a bit over $10 million to start.  So it's not

4      accurate.  He's still currently describing the scheme with

5      important admissions.  Then he says, $35 million is closer to

6      accurate, but I can't give any detailed breakdown or number on

7      the record unfortunately.  He talks about open source reporting

8      that says that $3 million was spent buying on Mango and says

9      you can do the math.  He goes on to say, this says two to three

10     million spent on the spot by a Mango advisor.  They're just

11     estimating based on volumes.  He says, significant capital,

12     $10 million in collateral deposited in multiple Mango accounts,

13     two to three million to manipulate the underlying spot markets

14     on and off chain.

15              Here's why I'm highlighting these points.  The

16     defendant is not denying the conduct in private at all, he is

17     confessing to it here.  He is not referring to the statement in

18     order to say, no, that statement, that's the truth, and he is

19     doing the opposite.  So to allow the defense, through a Rule of

20     Completeness, to allow them to get in the cover story through

21     this is exactly what these cases stand for the opposite

22     proposition.

23              THE COURT:  And in Lumiere, give me the compare and

24     contrast with Lumiere.  Were the statements that were put in --

25     I'm seeing this case for the first time, so just help me with

O4CCeis1

1    this.

2         MR. DAVIS:  Yes, your Honor.  So just going back a

3    little bit before.  This is what Judge Rakoff describes.  The

4    government introduced limited portions of the recording to show

5    what Plaford and Lumiere did beginning in 2011.  They mismarked

6    securities held by the credit forum by having budget brokers

7    back up made-up prices that Lumiere gave them.  The admitted

8    portions of the recording thus do no more than introduce simple

9    historical facts about the mechanics and scope of the

10   mis-marketing scheme.  By contrast, what they're seeking to

11   introduce are post hoc attempts by Lumiere to minimize his own

12   culpability by explaining that at least some facets of the

13   scheme seemed superficially legitimate.

14        That's the comparison, your Honor, and I want to step

15   back for one second when the Court's prepared.

16        (Pause)

17        THE COURT:  So the analog is in Lumiere, the portions

18   that were offered by the government included the defendant's

19   characterization of the scheme.

20        MR. DAVIS:  Yes, your Honor.

21        THE COURT:  Including, for example, "Chris had been

22   mismarking shit since the beginning."

23        MR. DAVIS:  Yes, your Honor.

24        THE COURT:  So the mere fact that, and to put it in

25   the context of this exhibit, you're saying even if the defense

O4CCeis1

1    were to argue that his characterization of the offense in the

2    lines that you cited is coming in, it's not a proper

3    completeness argument to say, well, then he gets to put in his

4    explanation that it's innocent just as in Lumiere.

5              MR. DAVIS:  Yes, your Honor.  In this chat, he is

6    admitting that what he Tweeted was a cover story.  So to allow

7    the defense to admit that would be in furtherance of that cover

8    story.  That is why the Court holds that the context that would

9    be offered is a self-serving attempt to shoehorn after-the-fact

10   justifications for his actions into his descriptions of his

11   actions.  That's exactly what the Court's looking at.

12             To put a finer point on it, your Honor, in defense's

13   opening at page 92 of the transcript, the defense opened on,

14   "the defendant engaged executed winning trades."  That's what

15   he said.  That's what the defense said.  They should not be

16   able to introduce straight-up hearsay to support that.  They

17   made that choice to make that call, but they do not have

18   admissible evidence to support it.

19             THE COURT:  Okay.  Thank you.

20             Mr. Talkin or Ms. Martabano, whoever is going to

21   handle this.

22             MR. TALKIN:  Your Honor, I'll take this.  A couple

23   important factual issues.

24             First of all, since those cases, 106 — I'm just

25   pulling it up — has been amended.  Then, pertinent part, at the

O4CCeis1

1    end, it says, the adverse party may do so over hearsay's

2    objection, and that's in reference to fairness.

3            Second of all, the critical line in this, the

4    significant capital and semicolon, $10 million in collateral, I

5    think is the second to bottom line there, your Honor.  That is

6    Mr. Eisenberg quoting an article by an individual known as

7    @Austerity_Sucks, who was very involved in Mango.  It's taken

8    word for word.  Those are not his own words.  It's taken word

9    for word from an article --

10            THE COURT:  Take a step back.  Your sole objection to

11    the introduction of exhibit 401 is on Rule of Completeness

12    grounds; right?

13            MR. TALKIN:  Well, I think we're discussing a separate

14    issue here.  The reason to get -- there's two issues, I guess,

15    that have arisen.  One, Rule of Completeness.  If you want me

16    to deal with that first, I'll deal with that first, but the

17    second, and I think it's related to this because the Rule of

18    Completeness is they're attributing statements to him that he

19    didn't even make.  And based on that and based on their

20    attributing within -- in other words, they're making

21    attributions to his statements without letting the statements

22    that he's making be explained, and the explanation lies in

23    those Tweets.  Excuse me.  In the statements that happened to

24    be in the Tweets.  And it happens not once, but twice.

25            THE COURT:  I'm losing you a little bit.  You're

O4CCeis1

1   saying that there are quotes that are from another source?

2              MR. TALKIN:  Correct.

3              THE COURT:  Which lines in 401 are those quotes?

4              MR. TALKIN:  It's a quote, it's the second to last

5   line.

6              MS. MARTABANO:  Your Honor --

7              MR. TALKIN:  That's the Tweet --

8              MS. MARTABANO:  So in line 20, there's a link.

9              THE COURT:  Yes.

10             MS. MARTABANO:  The government does not seek to offer

11  that link, but, in fact, that link is the source of the quote

12  that is in the significant capital quote.  So they're seeking

13  to put in evidence and suggest that that is a statement

14  affirmatively made by our client when, in fact, that statement

15  is a literal copy-and-paste from the article that is linked in

16  line 20.

17             On top of that, his only statement in response to

18  "what can you comment on that" is the Tweet that we are seeking

19  to admit.  So we were not seeking to admit that

20  @Austerity_Sucks article because it was not until today that I

21  understood that the government was going to be saying that that

22  was literally attributable to Mr. Eisenberg based on their

23  proffer right now.

24             So they had offered this in, they never sought to

25  include the article, and they had, at least not as far as I can

O4CCeis1

1    recall, never said to us that the significant capital line was

2    actually going to be portrayed as something Mr. Eisenberg said

3    and meant when it's clear that he says, you know, open source

4    reporting says this, a link would be handy.  He provides that

5    link and says, this says two to three million spent on this,

6    they're just estimating based on volumes.  So all three of

7    those messages relate to the article that the government has

8    not sought to include.  And again, we weren't seeking to

9    include that because I didn't realize they were going to argue

10   that that line was attributable --

11            THE COURT:  So you're making two arguments.  One is a

12   402, 403 argument, and you're separately making at least one

13   completeness argument?

14            MS. MARTABANO:  Yes, your Honor.

15            THE COURT:  You're making two completeness arguments.

16   Meaning, are you saying there's two things that you would add?

17   One would be the Tweet.  It doesn't need to be his statement.

18            MS. MARTABANO:  Correct.  I believe we had originally

19   written on this statement and we agreed to withdraw it based on

20   our discussions.

21            THE COURT:  So there's two things you would add for

22   Rule of Completeness grounds, one is Mr. Eisenberg's Tweet, the

23   other is the @Austerity_Sucks Tweet.

24            MS. MARTABANO:  I think that's right if they are going

25   to seek to maintain that that's a quote made by Mr. Eisenberg

O4CCeis1

1    as opposed to just a copy and paste.

2              THE COURT:  The 402, 403 argument is that it's not his

3    statement?

4              MS. MARTABANO:  Correct.

5              THE COURT:  It's not that it's not relevant if it was

6    his statement?

7              MS. MARTABANO:  Correct.  But it's not his statement.

8    Based on Mr. Davis' argument just now, they're seeking to claim

9    that it is and it's an admission by him, which, again, I

10   actually didn't understand that that was going to be their

11   position until just now.  So I think that that also weighs even

12   more so in favor of including his actual statement.

13             THE COURT:  Mr. Davis, just on that limited point, the

14   one about this being a quote from that Tweet.

15             MR. DAVIS:  Yes.  On that point, our understanding was

16   the defense was not seeking to introduce that second article.

17             And second, this idea that it's not his statement, he

18   adopts this statement.  He is the person who writes these

19   words.  There is no dispute about that.  If they want to argue

20   to the jury that somehow this is a quote, they need evidence

21   for it.  He adopts it.  If they want to say, oh, no, he was

22   just quoting it, he was just quoting it, then they can, but

23   that's a jury argument.  He adopted the word "manipulate."

24   That's his word.

25             THE COURT:  If I agree with you on the 402, 403

O4CCeis1

1    argument, you're not opposing their putting in the Tweet?

2              MR. DAVIS:  The Tweet -- these are two separate

3    issues.

4              THE COURT:  No.  The @Austerity_Sucks Tweet.  You said

5    it's a jury argument.  So if Ms. Martabano or anyone else on

6    the defense side wants to say that he was quoting something,

7    they need to be able to present the thing --

8              MR. DAVIS:  Happy for them to say he was quoting the

9    article, for sure.  Let them argue that to the jury.

10             THE COURT:  They got to show the thing.

11             MR. DAVIS:  So happy to agree what part of that

12   article should come in under Rule of Completeness.  We had

13   previously understood they didn't do this.  And for them to say

14   when the word "manipulate" is used in this document is just

15   Mr. Eisenberg direct quoting, when he used quotes in other

16   contexts, didn't use it there, feel free to argue to that.

17             THE COURT:  So the 402, 403 objection is overruled.  I

18   don't think it matters whether an individual is quoting someone

19   else.  As Mr. Davis points out, he's at the very least adopting

20   a quote and then relaying it to another person as a statement.

21   And so, I don't think the quoting aspect of it means that it's

22   not admissible as a potential statement by the defendant.  So I

23   don't think that distinction negates the admissibility of those

24   lines.  Any remaining arguments that would be made go to the

25   weight that should be attributed to those statements, which I'm

O4CCeis1

1    sure the defense will point out.

2              As to that 106 completeness issue, you are free to put

3    in that that Tweet, whatever portion of that Tweet reflects

4    those statements so that you can present to the jury fairly

5    that Mr. Eisenberg was quoting from another Tweet.  And so, you

6    can certainly do that.  I think that's a fair completeness

7    argument that you are making.

8              So that resolves those two issues.

9              Now we have the remaining issue about Mr. Eisenberg's

10   Tweet.

11             MS. MARTABANO:  Yes, your Honor.

12             THE COURT:  Let's say for the moment -- let me ask

13   you, Mr. Davis, the difference between this case and Lumiere

14   would be that there are actually references in this document to

15   this statement.  And so, if he's saying, "well, I can't comment

16   because I've got this statement," that's at least a little bit

17   misleading or yearning for context, the jury is going to wonder

18   what that statement is.  Why are you even putting in this part

19   of the document?  That's my question.  If we're just focusing

20   on this end of the document, why don't you put in the end of

21   the --

22             MR. DAVIS:  We're happy to cut that part of the

23   document.

24             THE COURT:  So cut that part of the document, because

25   I think that at least addresses part of this.

O4CCeis1

1                So which lines do you need to put in?

2                MR. DAVIS:  We can start at line 12.

3                THE COURT:  Well, you can't start at line 12.

4                MR. DAVIS:  I'm sorry.  That's wrong.  13 is where we

5    would want to start, your Honor.

6                THE COURT:  Now, Ms. Martabano, they're putting in 13

7    to 24, then take it from there.

8                MS. MARTABANO:  Yes, your Honor.  Your Honor has

9    actually already ruled on this because I believe that's exactly

10   what they initially sought to include.  We moved on Rule of

11   Completeness grounds to include the earlier Tweets in this

12   because it provides necessary context, talking about your

13   involvement in the refund and the settlement that you helped

14   negotiate.  Your Honor agreed to add those in as proper context

15   under Rule 106.  And so, that's how we landed with the current

16   version of 401.

17               And I think our position would be that cutting, again,

18   for the reasons we argued to get the original top of this chat

19   added, absolutely provides context to what he's talking about

20   here.  I think, again, they always wanted it to just be for the

21   bounty amount, that the accounts in question would be funded a

22   bit over $100 million.

23               In fact, the top of the Tweet, at the top of the chat,

24   exhibit 401, is literally Mr. Eisenberg explaining some of his

25   math and providing in context.  It's very important that this

O4CCeis1

1      was a refund to users.  The government doesn't like that fact,

2      but the reality is, it is a refund to users that they are

3      talking about and that is very important for the jury to

4      understand.  That is why we sought to have that portion added

5      because it's literally discussing the math that they're seeking

6      to admit, and it explains what that math is about.  So that's

7      why we wanted the top in.

8              And then we think, obviously, the full context is I

9      helped negotiate this settlement.  Even though they're now

10     saying you're free to put in the fact that this is a direct

11     quote from someone else, they're still seeking to argue that

12     Mr. Eisenberg adopted that quote.

13             And to the extent the jury wants to accept that he

14     adopted that quote, the jury should be aware of what his full

15     position was.  That is absolutely context to how and why he was

16     then discussing these other articles.  I don't think it's fair

17     for the government to say, oh, he adopted someone else's quote,

18     but we're not going to let you put in what he said himself,

19     which is referenced in two places in this exhibit.

20             THE COURT:  Do you have the Tweet?

21             MR. DAVIS:  I have a copy, your Honor.  May I

22     approach?

23             THE COURT:  Yes, you may.

24             MR. DAVIS:  It's my only copy, so hope I get it back.

25             THE COURT:  So this whole thing is the Tweet?

O4CCeis1

1           MR. DAVIS:  That's what they want to put in.

2           THE COURT:  Okay.  Ms. Martabano, as between putting

3    in just lines 13 through 24 or the full document without

4    Mr. Eisenberg's statement, which would the defense prefer?

5           MS. MARTABANO:  As between 13 to 24 and the whole --

6           THE COURT:  And in both of those situations, the lines

7    that you would want to put in from the @Austerity_Sucks Tweet

8    would come in, because I do believe that would be required

9    under the Rule of Completeness.

10          MS. MARTABANO:  I think we would prefer the full 401

11   as currently in to just the limited, because I think the

12   limited is even more misleading.

13          THE COURT:  Understood.

14          And who is this going to come in through?

15          MR. DAVIS:  Today's witness.

16          THE COURT:  So we have Dr. Mordecai is going to finish

17   up.  Who's next?

18          MR. DAVIS:  We'll have Mr. Casey and Mr. Tonkin, and

19   then I think we'll end the day with the summary witness.

20          THE COURT:  You're going to end the day with the

21   witness --

22          MR. DAVIS:  Yes, your Honor.  That's right.

23          THE COURT:  Understood.

24          I've heard the parties' arguments.  I want to think

25   about this a bit, I think we have a little time.

O4CCeis1

1          I appreciate it, Mr. Davis.  Do you need this back?

2          MR. DAVIS:  I do, your Honor.  But may I make one

3   point before we break on this issue?

4          THE COURT:  Yes.

5          MR. DAVIS:  On the second Tweet, that is actually an

6   article, the @Austerity_Sucks article, it's a long article, so

7   we can work out redactions.  And so, I understand the defense

8   wants to argue this was copied and pasted, so we're happy to

9   come up with a document that shows this is an article.

10         THE COURT:  That should be easy, title, and --

11         MR. DAVIS:  Yeah.

12         THE COURT:  Anything else before we bring the jury in?

13  Restroom break?

14         MR. DAVIS:  Is that okay, your Honor?

15         THE COURT:  Yes.

16         (Recess)

17         Let's get Mr. Mordecai back on the stand.

18         (Witness present)

19         Good morning.  Welcome back.

20         THE WITNESS:  Thank you.

21         MR. KLEIN:  Your Honor, our client stepped out for one

22  second.

23         THE COURT:  So we will wait for one second.

24         Ms. Martabano, given you have some time here, if there

25  is a case that you want to submit to the Court relevant to this

O4CCeis1

1   106 issue, I'm happy to receive it.

2              MS. MARTABANO:  Thank you, your Honor.

3              MR. DAVIS:  Your Honor, I would also point the Court

4   to our letter — I think it was over the weekend — on this issue

5   outlining the case law.  I forget at this point what day that

6   was --

7              THE COURT:  No, I've got it.

8              MR. DAVIS:  Thank you, your Honor.

9              (Continued on next page)

O4CCeis1                         Mordecai - Cross

1              (Jury present)

2              THE COURT:  Welcome back, members of the jury.  I am

3      pleased to inform you that we are ahead of schedule.  We're

4      starting late, we're starting late, but we're still ahead of

5      schedule.  If only that's the way it always worked, but at

6      least here, that's how it's working.  And that reflects the

7      diligent efforts of the parties on both sides and who

8      appreciates your service here and wants to make things as

9      streamlined as possible.

10             With that, Dr. Mordecai, you understand you're still

11     under oath?

12             THE WITNESS:  I do, sir.

13             THE COURT:  All right.  Mr. Greenspan, you may

14     proceed.

15             MR. GREENSPAN:  Thank you, your Honor.

16      DAVID K. A. MORDECAI, resumed.

17     CROSS-EXAMINATION CONTINUED

18     BY MR. GREENSPAN:

19     Q.  Good morning, Dr. Mordecai.

20     A.  Good morning, sir.

21             MR. GREENSPAN:  Can you pull up what's been marked

22     DX 50 and just show it to the witness, please.

23             Your Honor, I move this in via stipulation with the

24     government.

25             THE COURT:  Any objection?

O4CCeis1                           Mordecai - Cross

1                  MS. HUANG:  No objection, your Honor.

2                  THE COURT:  DX 50 will be admitted.

3                  (Defendant's Exhibit 50 received in evidence)

4                  MR. GREENSPAN:  You can publish that.  And then we can

5       take it down.  Thank you.

6       Q.  Dr. Mordecai, you started at the beginning of your

7       testimony on direct just explaining the mechanics of the Mango

8       perpetual.  Do you remember that?

9       A.  I remember discussing the -- how the MNGO-PERP contracts

10      result in either a long or short leverage position.

11                 MR. GREENSPAN:  Mr. Smith, can we pull up government

12      demonstrative 1300, please.  And this can be shown to the jury.

13      Q.  Do you see what's on your screen, Dr. Mordecai?

14      A.  I do.

15      Q.  So there's a point at which the blue line crosses this

16      black line in the middle.  Do you see that?

17      A.  Yes.  Correct.

18      Q.  .038 or 38 cents; is that right?

19      A.  Correct.  No, 3.8 cents.

20      Q.  You're right, 3.8 cents.  Thanks for the clarification.

21                 That point, I think it was circled on the direct

22      examination.  Did you refer to that as the reference price or

23      the index price?  What was the term you used?

24      A.  I called it a break even point.  That was the point at

25      which the positions were originally executed or entered into.

O4CCeis1                          Mordecai - Cross

1   Q.  If I refer to that as the "reference price," will you

2   understand what I'm saying?

3   A.  I would prefer we not use that term because "reference

4   price" has a lot of meanings in many derivatives contexts and

5   I've never used it in the context of this case in that way.

6   Q.  You would like to use the word "break even point"?

7   A.  Why not just call it the initial price, the initial price

8   of the contract?

9   Q.  That's fine.  Let's do "initial price."  Okay.

10          The initial price of the contract here is 3.8 cents.

11  Okay?

12  A.  Correct.

13          MR. GREENSPAN:  You can take that down, Mr. Smith.

14  Q.  So let's do a hypothetical to sort of walk through the way

15  the Mango perpetual works.  So let's say I buy a $100 Mango

16  perpetual, and this initial price is 10 cents.  Okay?  You got

17  me?

18  A.  So you're saying -- what does the $100 relate to?

19  Q.  $100 of contracts of Mango perpetuals at an initial price

20  of 10 cents.  Do you follow?

21  A.  First of all, do you mean that it's 10 cents of the MNGO

22  token price, one for one relative to U.S. dollar coin price of

23  a dollar?

24  Q.  We just defined the word "initial price."  The initial

25  price, 10 cents.

O4CCeis1                         Mordecai - Cross

1    A.  I'm just trying to be helpful.  Okay.  So you said you

2    bought a $100 notional; correct?

3    Q.  Correct.

4    A.  That $100 notional is of a ratio between -- is it 10 cents

5    of MNGO per dollar, U.S. dollar coin for a total notional

6    exposure of $100?

7    Q.  Correct.

8    A.  Okay.

9    Q.  Okay.  Now the Mango perpetual allows leverage; right?

10   A.  The leverage is built into the very thing we just talked

11   about.

12   Q.  Correct.

13   A.  To some degree, aside from a structural leverage in the

14   pledging of any margin --

15   Q.  Dr. Mordecai, please, just answer my questions.  Okay?

16   A.  I try --

17   Q.  I just asked you -- hold on, please.

18         The Mango perpetual allows for leverage; right?

19   A.  I'm going to try to answer as completely and succinctly as

20   I can.

21         The MNGO instrument you're calling the Mango perpetual

22   has its own intrinsic or inherent leverage through the

23   relations we just talked about.  I'm saying that's aside from

24   additional leverage that may come through a margining

25   arrangement.

O4CCeis1                           Mordecai - Cross

1   Q.  I'm not interested in the additional leverage through a

2   margin arrangement, I'm just interested in how it works.  And

3   that leverage is at four times; correct?

4   A.  The structural leverage is four times, which is why I

5   brought that up.

6   Q.  So the structural leverage is four times --

7   A.  You asked me about the inherent leverage in the instrument.

8   Those are two separate things.  They both are relevant here and

9   that's why I don't want to confuse the jury or confuse the

10  Court by mixing and matching in a way that doesn't make any

11  sense.

12  Q.  So the profits and losses that you described yesterday,

13  they're multiplied by that factor of four; correct?

14  A.  The structural leverage allowed through margining is a

15  factor of four.  The inherent leverage in the price

16  relationship between the numerator and the denominator of the

17  contract is additional inherent leverage.  And that's not --

18  that's on top of the four.  That's an additional source of

19  leverage called risk-based leverage, which was a focus of my

20  dissertation.

21  Q.  So if I've got my $100 PERP with my 10-cent breakeven

22  price, the price of Mango has now moved from 10 cents to

23  2 cents, what's my profit or loss?

24  A.  So you're talking about a short position?

25  Q.  I'm sorry.  I'm talking about a long position and it's

O4CCeis1                        Mordecai - Cross

1   moved from 10 cents to 2 cents.  What is my profit or loss?

2   A.  If you have a long position at 10 cents and you've lost

3   80 percent of that 10 cents; right?

4   Q.  Right.

5   A.  You now have that 80-percent loss multiplied time the

6   additional structural leverage of four to one.

7   Q.  Right.  So what's the total?

8   A.  You're looking at a loss on its own.  If you don't have an

9   offsetting account, which is very important to the facts in

10  this case, you have --

11  Q.  I'm not asking you about an offsetting account.  Let's

12  stick to the hypo.  What is the loss?

13  A.  The loss in isolation for just this one account is

14  80 percent of the change, the difference in that ratio from

15  10 cents per dollar to 2 cents per dollar; right?

16  Q.  Right.

17  A.  So that's 6 cents per dollar; right?

18  Q.  No.  It started out at 10 cents.

19  A.  It went to 2.  I'm sorry.  8 cents per dollar loss.

20  Q.  Right.

21  A.  Multiplied through the $100 notional size, times whatever

22  external margin there is, which is four to one.

23  Q.  So the total loss is $320, right?  80 times 4?

24  A.  That's correct.

25  Q.  So my initial position was at $100, I've lost $320, so now

O4CCeis1                          Mordecai - Cross

1   my P&L is negative $220; right?

2   A.   That's one way to look at it, yeah.

3   Q.   So now, I don't think you discussed this concept on direct,

4   but are you familiar with the concept of liquidation on Mango

5   Markets?

6   A.   I'm familiar with liquidation generally and I have some

7   familiarity with the fact that there was a liquidation policy

8   with regard to Mango Markets.

9   Q.   So given that familiarity, fair to say that I'm now open to

10  the possibility of liquidation with my negative $220 position

11  in P&L?

12  A.   Ordinarily, one would be exposed to a liquidation event if

13  it occurs.

14  Q.   If I was fully liquidated, how much would I lose?

15  A.   You would crystalize in that one account barring the other

16  account, you'd crystalize the loss in that account.

17  Q.   And I'd lose $100; right?  I'd put in $100, and if I'm

18  fully liquidated, I lose all $100; right?

19  A.   Well, hold on a second.  You're liquidated with, you said

20  an 80-percent loss; correct?

21  Q.   Correct.

22  A.   So then that means there is something left over in just

23  that isolated account, given the fact you want me to talk about

24  just that isolated account.

25  Q.   If I'm fully liquidated at my $220 P&L, what's left over?

O4CCeis1                          Mordecai - Cross

1    A.  As it relates to this case, I'd have to look at both

2    accounts --

3    Q.  No, there's only one account.  This is a hypothetical, you

4    understand?  We'll get to the accounts.

5    A.  Right.

6    Q.  Which were more than $100, they were at $5 million.  I

7    think it should be clear I'm talking about a hypothetical with

8    $100.  I want to explain to the jury how it works and then we

9    can come back.

10            So let's just assume one account.

11   A.  Yeah.

12   Q.  And I think if you need me to repeat it, we can go back

13   through the steps, but I think you know how we got to a

14   negative $220 loss?

15   A.  You had a $100 notional exposure?

16   Q.  Right.

17   A.  You've asked me to ignore the four-to-one leverage through

18   margin; correct?

19   Q.  I'm asking you just about the four-to-one leverage inherent

20   in the Mango Markets perpetual, the Mango perpetual.

21   A.  That is based on the structural leverage that's being

22   permitted through the margining.

23   Q.  We just talked about, you agreed with me that a loss of $80

24   would have the four times leverage, and it would be a loss of

25   $320.  Do you remember that testimony?

O4CCeis1                          Mordecai - Cross

1    A.   I remember saying there's inherent risk-based leverage tied

2    to the relationship and the price movements with that exposure,

3    and then I say there may also be structural leverage based on

4    the amount margin you put up relative to what the actual

5    exposure is.

6    Q.   Let's just stick to the facts that I've given you.  Okay?

7    A.   Okay.

8    Q.   So given those facts, we've lost $320 and it's a negative

9    P&L of $220; right?

10   A.   I agree with the arithmetic as you have framed this

11   particular hypothetical.

12   Q.   Great.  That's all I'm asking.

13            So now, given that arithmetic and given what you know

14   about liquidation on Mango Markets, if I get liquidated to the

15   fullest extent the liquidation can happen, how much is left?

16   A.   It's very difficult for me to answer the hypothetical as

17   you're asking because there's always the arithmetic, but it's

18   so divorced from the actuality, the reality of the facts in the

19   case.

20   Q.   I'm not asking about the facts in the case, I'm asking only

21   about how Mango Markets works.

22   A.   I can't divorce that from the facts of the case, sir.

23   Q.   You can't come up with a hypothetical and answer questions

24   like that without --

25   A.   No, I can't tell a lie.  I swore to --

O4CCeis1                         Mordecai - Cross

```
 1              THE COURT:  No, there's no telling anyone a lie.  If
 2   you can answer the question --
 3   Q.  Look, you're telling me --
 4              THE COURT:  Mr. Greenspan.
 5              MR. GREENSPAN:  I'm sorry, your Honor.
 6              THE COURT:  If you can answer, just give the answer.
 7   A.  As I sit here, it is very difficult for me to answer that
 8   question as you've posed it.
 9   Q.  But I think you'd agree with me that I can't lose more than
10   $100 that's in my account; right?
11   A.  Generally speaking and my knowledge of institution --
12   institutions, I don't actually agree with you.  You can lose
13   more because you can remain on the hook for additional losses.
14   Q.  Where in the Mango Markets documentation do you get that
15   position?  What's your basis for that?
16   A.  My basis for that is my knowledge of derivative markets
17   across many, many different markets.
18   Q.  I just want to know where, based on what you know about
19   Mango Markets and what documents in Mango Markets have you
20   reviewed that tells you you can lose more than the money you
21   put in initially.
22   A.  I would need to go back and research the Mango Markets
23   documentation.  There are other reasons I think that this is
24   still applicable to Mango Markets, and I can share them if
25   you'd like me to.
```

O4CCeis1                              Mordecai - Cross

1    Q.  Sure.  Go ahead.

2    A.  The fact that there was a negotiation afterwards between

3    the parties about withdrawals suggests to me that there was

4    still a notion --

5    Q.  Whoa.  Whoa.  Whoa.  Again, I think you're talking about

6    facts that have nothing to do with my hypothetical.

7    A.  Okay.  So, to the extent that there are facts of the case

8    that are not about your hypothetical, again, really aren't for

9    me to answer this question.

10   Q.  You can't answer a question about whether a $100 position

11   can be liquidated over $100?  Is that your testimony?

12   A.  My testimony is I'm not going to speculate with bit and

13   piece facts about something that I take very seriously and that

14   I do for a living while under oath.

15   Q.  I appreciate that you take it seriously.  I do, too.

16              Is it the case you don't know how Mango Markets works?

17   A.  That is not case.  I am not going to create a hypothetical

18   that would mischaracterize or misconstrue how it works in

19   actuality, particularly as it relates to the facts of this

20   case.

21   Q.  So what is the total amount that someone can lose, if their

22   initial steak is X, can they lose 2X, 3X?  How does that work?

23   A.   In terms of these types of contracts, so the perpetual

24   forwards or perpetual futures are basically what one calls

25   symmetrical loss.  You've got unlimited loss on either side or

O4CCeis1                          Mordecai - Cross

unlimited gain on either side.  Because these are not options,
you could lose far more than your investment.  You could be on
the hook for far more than your investment.  And that is, in
fact, the way it works.  Anyone that's even watched trading
places --
Q.  No.  No I'm not interested in trading places, I'm
interested how this works.  We're going to be here all day if
we start talking about things that don't have to do with the
case.  Okay?  So please just answer my questions.  Is that
okay?
A.  I will answer your question to the best of my ability given
the question you're asking.
Q.  So, again, returning to the scenario, I have a negative
$220 balance, I only put in $100.  So what's the mechanism by
which I'm obligated to pay the extra $120 that I didn't put in?
Is there a collections agency that comes to my house?  How does
that work?
A.  Well, I can tell you how it works in general.
Q.  No.  No.  No.  The case is about Mango Markets, you've been
put up as an expert on Mango Markets, you've been qualified to
do that.  I think the jury needs to understand how Mango
Markets works.

        So, my question to you is:  On Mango Markets with a
Mango perpetual, if there's a negative P&L, let's say it's
negative $220, and the initial investment, the only investment

O4CCeis1                          Mordecai - Cross

in the account, forget about other accounts, you've heard this

account is $100, after that $100 is liquidated, what's the

mechanism by which Mango Markets makes me pay another 120?

A.  For me to answer that question, I would have had to study

that as part of my scope of assignment, and because it was not

part of my scope of assignment, I'm not going to speculate as I

sit here today.

Q.  Fair enough.  So that's just beyond the scope of what you

know about Mango Markets; is that right?

A.  It's beyond the scope of what I've been asked to analyze

and, therefore, I would not begin to piecemeal and provide ad

hoc points of view outside the scope of my assignment.  I would

need to do more analysis.

        MR. GREENSPAN:  Mr. Smith, could we put up government

demonstrative 1302.  This is in evidence.  It can be shown to

the jury.

Q.  So I think you described this and another exhibit as being

mirrors of each other, like looking into a lake.  Do you

remember that?

A.  I do.

Q.  So isn't it fair to say that this assumes that for every

profit in a long position, the offsetting short position ends

up having to pay off, as you say, the exact same amount?

A.  Payoff is simply the -- so, could you repeat the question.

I want to give you a yes or no.

O4CCeis1                         Mordecai - Cross

1   Q.  Let's define the term.  What is payoff?  I think you wanted

2   to define that.

3   A.  Payoff, as it's on this exhibit, is basically the profit

4   and loss accruing to a respective account.

5   Q.  In other exhibits, you used the terms "profit" and "loss,"

6   but here you use the term "payoff."  Why the difference?

7   A.  I think this is just the way in which the exhibit was

8   produced.  There is not a difference here in terms of a U.S. --

9   in my understanding, there's no difference here between the

10  U.S. dollar coin payoff in this graph and the profit and loss

11  generally speaking or exceptionally speaking as labeled in the

12  other graph.

13  Q.  You'd agree with me that "payoff," as a lay term, means

14  something that you have to actually pay; right?

15  A.  Not necessarily.  You'll find this term in a textbook where

16  it doesn't necessarily mean that.  And I don't mean --

17  Q.  I think I asked you as a lay term, and maybe you don't know

18  what it means as a lay term, but as a lay term, a "payoff"

19  means something you have to pay off; right?

20  A.  In the context of general use, terms like "payoff" have

21  many different interpretations based on context, which is why I

22  do tend to -- I shy away from them often.  As I said yesterday

23  when you were asking me a couple questions, this was a way of

24  trying to be intuitive on this graph.

25  Q.  So you think that the word "payoff," which means profit and

O4CCeis1                        Mordecai - Cross

loss and is used differently on other graphs, is more intuitive

than just saying "profit and loss" here?

A.   I'm not saying it's more intuitive or less.  That

mischaracterizes my last answer.  I just said this is an

intuitive way to describe what I also called wins and losses or

gains and losses accruing to each of these two accounts.

Q.   But gains and losses, and what is reflected in account I

think we just covered, can be different than what somebody

actually ends up having to pay; right?

A.   There are many different details, mechanics that are

related to what ultimately ends up becoming an obligation.

It's very important it be considered in the context of the

facts and circumstances, which is why I was reluctant to go and

overspeculate or surmise on your hypothetical.

Q.   Well, this is your chart and this is the word you used, and

you used the word "payoff," and you have it reflecting a payoff

that's exactly even on the short and the long positions, and

you just testified to me that you don't know if somebody has a

negative position, if that would actually be collected.

         So isn't it possible that this chart is misleading?

A.   What I think is your questions are misleading.  I think the

chart explains what it's intended to explain.

Q.   Let's go back to it.  So you said if that $100 had a $320

loss, and so it incurred a negative $220 profit and loss, you

didn't know if you'd only lose $100 that would actually have to

O4CCeis1                              Mordecai - Cross

1   be paid or if there was some mechanism for collecting the whole

2   thing, right, that was beyond the scope of your examination.

3   Do you remember that?

4   A.   In this particular assignment for this case, I was not --

5   Q.   Do you remember the testimony?  That's the question.

6   A.   I remember.

7   Q.   I need you to answer my questions.

8   A.   I remember saying something to that effect, yes.

9   Q.   Thank you.

10            So, you don't know if -- let's say because there's no

11  numbers on the payoff column, let's say we had the same

12  hypothetical, and in that hypothetical, there's a short side

13  that made $320; right?

14  A.   Could you repeat the question.

15  Q.   Yes.  Do you remember there was a negative profit and loss

16  on the long side of negative $320?  You remember that?

17  A.   I do.

18  Q.   And so, on the short side, there was a profit, a win as you

19  called it, of $320; right?

20  A.   And they're offsetting or they're not quite offsetting?

21  Q.   They're offsetting, there's a trade, there's a short side

22  and a long side.  The long side has a loss of $320 profit and

23  loss.

24  A.   Okay.

25  Q.   The short side would therefore have a gain of $320 of

O4CCeis1                          Mordecai - Cross

1    profit; right?

2    A.   That's pretty much identical to what I was describing.

3    Q.   Yeah, it is identical to what you're describing.  But the

4    other part of what you're describing is you don't know -- I

5    mean, we do know that the person who has a profit of $320, in

6    this case, the short side would be able to get $320; right?

7    A.   Could you repeat the question.

8    Q.   Yes.  The $320 profit, remember, on the short side; right?

9    You follow?

10   A.   Okay.

11   Q.   That person is owed $320; right?

12   A.   To the extent that there's a gain in the short account,

13   that account is entitled to, at some point, based on the

14   mechanics of the platform or the trading venue, if all the

15   things are met, all the requirements are met to harvest,

16   attempt to harvest the gain, whether that is an actual

17   harvesting of a gain or just simply temporary borrows a

18   different question.

19   Q.   Well, can't that short side that has a gain of $320, can't

20   that short side withdraw that gain as profit, putting

21   everything else, putting borrows aside?

22   A.   Not necessarily.

23   Q.   Why not, why could a position that has a profit not

24   withdraw its profit?

25   A.   I could very easily explain that, since this is a

O4CCeis1                          Mordecai - Cross

hypothetical, with regard to a home loan.  I could see

appreciation in my house, I could take out an equity line on

that appreciation in that house, I can withdraw those funds and

spend them, but even though I have the paper profit because of

the appreciation gain on my house, those funds are not free and

clear, they still have a relationship to the original

collateral value that is being advanced against the profit --

increased profitability, increased profit of that asset.

Q.  Okay.  So you're saying you need to leave some collateral?

Is that what you're saying, in the position?

A.  I'm saying that withdrawing against a collateral is not the

same thing as completing a trade.  When you complete a trade

and you collapse and close everything out, what's then left

over is called the residual value is your ultimate terminal

profit.  What you described, there is no terminal profit, yet,

I'm just withdrawing against an increased collateral value.

Q.  Let's get to the terminal profit.  So you've got a $320

P&L; right?

A.  In your hypothetical.

Q.  In my hypothetical on the short side.  Okay.  Can you

accept that?

A.  I will accept that for the purpose of your hypothetical.

Q.  Perfect.  Now, I want to withdraw some or all of my $320;

right?  How much can I withdraw as profit, not as a borrow, as

profit?

O4CCeis1                        Mordecai - Cross

A.  It's a borrow based on an increased size that's referred to
as profit on the P&L.  This is why yesterday I said stop
calling it money.  It's a paper profit.  It's not money until
you complete all legs of the trade and collapse the trade down,
and I haven't seen any evidence of that in my review of this,
which is why --
Q.  Are you saying that I can't settle the position without
closing the contract?
A.  I am saying that, in my experience, in my 40 years of
experience, the settling of the position requires all legs of
the trade to have been closed.  That's what's called covering
the position, at which point, what's left over after all the
leverage and everything else is done, what's left over is your
free and clear profit.  I've seen no evidence of that in this
case.
Q.  That's your testimony of how it works on Mango Markets with
Mango Markets perpetuals or the Mango perpetual?
A.  That's my testimony of how, in my experience, it works with
any exotic instruments, derivatives, spot leverage trades, and
my knowledge of this --
Q.  That includes the perpetual, because that's what we're
talking about.  That's all I need to know.
A.  In my analysis of this, informed by my background, I would
expect the exact same thing to apply here.
          MR. GREENSPAN:  Mr. Smith, can we put up Government

O4CCeis1                              Mordecai - Cross

1    Exhibit 1011.  This is in evidence.  Let's go to page 113.

2    Actually, let's start with page 1.

3    Q.  Have you reviewed this document?  And if you want, we can

4    scroll through some pages.

5    A.  I don't know if I've reviewed this document.

6    Q.  You don't know.  Would it be helpful to look at more pages

7    or --

8    A.  It would be helpful to look at more pages.

9           MR. GREENSPAN:  Can we look at the next page.  Let's

10   go, next page --

11   A.  Could I take a minute to address what's on the page?

12   Q.  Of course.  Feel free to page.

13           (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

O4AAAEIS2                          Dr. Mordecai - Cross

1            MR. GREENSPAN:  If we could go to the next page?

2    A.  This is not a document that I recall reviewing although

3    many of the concept and principles mentioned in first few pages

4    I am familiar with.

5    Q.  You don't recall if you've reviewed this document?

6    A.  No.

7            MR. GREENSPAN:  Mr. Smith, could we go to page 113.

8            (Pause)

9            MR. GREENSPAN:  Take a moment to review this and let

10   me know when you are ready.

11           (Pause)

12           THE WITNESS:  I saw that.

13   Q.  Have you reviewed this before?

14   A.  I have not.

15   Q.  Okay.  So Mango Markets allows one, a perp to settle the

16   PNL of this perp and move the profit or loss from the perp into

17   their USDC token balance; do you see that?

18   A.  I do.

19   Q.  So a Mango Markets user who owns a perp position can settle

20   if they want, right?

21   A.  That is not how I would interpret this based on my

22   experience.  And given the fact that I've not reviewed the

23   entire docket, I don't know if it's appropriate to come to that

24   conclusion.  And I can explain why if you'd like me to.

25   Q.  Sure.  Go ahead.

O4AAAEIS2                        Dr. Mordecai - Cross

1    A.   First of all, back office settled and reconciliation

2    occurs.  That does not necessarily mean you've completely wound

3    the trade that means that every -- settle that's why there's

4    a -- called in traditional mark.  All that means is you are

5    settling PNL with regard to the mark on this position at this

6    particular point in time then there's been some kind of

7    transaction or transfer to some other ledger, some other

8    account but that is not -- Actually, what this would mean in my

9    opinion out of context and particularly because the first two

10   pages you showed me talk about cross collateralization and

11   cross default which is something they've worked with since

12   1983, so I do not think that this thing, take out isolation

13   means he what you are suggesting it means I were to go through

14   a document and identify it properly.

15            (Pause)

16   Q.   Dr. Mordecai, coming back to the notion of settlement, can

17   a Mango Markets user settle whenever they want?

18   A.   Settle what?

19   Q.   Settle their PNL of the perpetual.  Can they settle

20   whenever they want?

21   A.   Of all of their positions on the venue or what?

22   Q.   Settle the PNL within the given perpetual contract that is

23   at issue?

24   A.   I would need to answer that question, the context of what

25   I've already said.  Settlement has many different meanings in

1  the context of reconciliation.

2  Q.  What I'm talking about, the meaning as it's used in the

3  Mango Markets documentation that we're looking at right here.

4  Can they settle their PNL and move the profit and loss from the

5  perp market into the USDC token balance when ever they want?

6  A.  You keep saying you and when ever you want.  As I read this

7  based on my experience.

8  Q.  I said the user account user.

9  A.  I cannot tell that from this slide.

10  Q.  You couldn't know from your knowledge of Mango Markets,

11  right?

12  A.  I can say fairly confidently that whatever the user may

13  ultimately be able to do, this particular statement to me

14  appears to be more about the mechanics of how the internal PNL

15  account structure works and what, relative to what the user

16  may -- on the user interface which is mentioned in the third

17  line.

18  Q.  But my question to you is, you agree that this talks about

19  the fact that there is some sort of settlement that allows for

20  the moving of profit and loss from the perpetual market into

21  the USDC token balance?

22  A.  Well, what you said notionally makes some sense in the

23  following way.  This talks about the mechanics of settling PNL

24  with regard to profit and loss occurrences in an account.  That

25  internally among the internal accounts profits and loss from

O4AAAEIS2                          Dr. Mordecai - Cross

1    accounts can move into a U.S. dollar coin token balance.

2            Then the next line says that internal reconciliation

3    transfer and settlement internally between the U.S. dollar

4    token balance, if you will, subaccount or call it whatever we

5    will ledger internal ledger and the PNL position instrument

6    internal ledger.  Next line does not have an impact on our

7    overall open position and overall health and defined Mango

8    Markets.  This is not -- your question to me seems to be about

9    whether or not the user has the right to cash and carry.  I

10   have to tell you whether or not --

11   Q.  That's not the question I asked you.  Let me ask it again.

12   If you don't understand, tell me and I will try to clarify.

13   A.  Okay.

14   Q.  I said does the user of Mango Markets, the person who has

15   this perpetual position, is that person able to settle that,

16   their PNL balance and move the profit or loss from the

17   perpetual market into theirs USDC token balance?

18   A.  I cannot answer that question appropriately as I sit here

19   based on how it's framed.

20   Q.  That's fine.

21   A.  Based on how it's framed, there are too many.

22   Q.  I understand.  So my question to you then is, can

23   settlement in the meaning that it's given in the Mango

24   Markets's documentation, can settlement occur when ever the

25   user wants or is there some other schedule?  And if you don't

O4AAAEIS2                          Dr. Mordecai - Cross

1   know, just tell me you don't know.

2   A.  That would require more analysis since it was outside my

3   original scope.

4   Q.  It is outside your scope.  So, you don't know?

5   A.  I'm saying -- could you repeat the question and I'll try to

6   see if I could do any better.

7   Q.  Dr. Mordecai, please, try to listen to my questions, okay?

8            THE COURT:  Hold on, counsel.  I'll give the

9   instructions.  If you have an application to make, you can make

10  it to the Court.  Otherwise, please proceed.

11           MS. HUANG:  Can we have side bar please?

12           THE COURT:  Yes, you may.

13           (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

O4AAAEIS2                              Dr. Mordecai - Cross

1            (side bar)

2            MR. GREENSPAN:  Your Honor, this witness on direct

3    testified as an expert on Mango and Mango Markets.  He seems

4    not to actually have expertise in that he doesn't seem to have

5    reviewed the materials that are foundational to that and I move

6    to strike as an expert.

7            THE COURT:  Okay.  Well, that motion is denied.

8    However, you can make a motion.

9            I think the problem here is that you are not getting

10   responsive answers to your questions.  And the appropriate

11   course is to make objections and you can move to strike answers

12   that he has given.  And if you want to reprize your motion to

13   strike him as an expert after your cross-examination or at a

14   later juncture, I am happy to entertain it.  But based on what

15   I've seen so far, the issue is really you are asking him

16   hypothetical questions and he is not answering in a responsive

17   way or a concise way.  So you don't need to give him

18   instructions but if you seek guidance from the Court and --

19           MR. GREENSPAN:  Of course.

20           THE COURT:  Does the government have --

21           MR. BURNETT:  I'm not going to try to defend the

22   conciseness of the witness's answers.  I think part of the

23   issue is as the witness has said a number of times, a lot of

24   those questions are outside the scope of what he was asked to

25   as a part of the project he wasn't -- and he as from the Mango

O4AAAEIS2                          Dr. Mordecai – Cross

Market he is tendered an expert in certain areas of economics
and all his testimony on direct was about the effect of certain
trading on the value of certain perpetual position.

          I think Mr. Greenspan, I don't want to interrupt his
cross-examination.  I think he keeps asking broad questions,
we're going to get nothing answers because he doesn't know.

          THE COURT:  Well, I don't know that that's a fair
characterization of the witness's testimony either.  I think
that to this point intentional or unintentionally, the witness
is evading some of the questions either on subjects that he has
provided testimony on direct-examination and I think that the
jury can evaluate that and make their determination as to the
witness' credibility.

          But the important point I think is that application
needs to be made to the Court to, if you want to get answers
and then again, if we do come to a point where you are asked
questions that are within the scope of the witness's expertise
and what has been proffered you, you are free to reprize your
motion to strike him as an expert but I don't think we've
gotten there yet.

          (Continued on next page)

O4AAAEIS2                    Dr. Mordecai - Cross

1              (In Open Court)

2              THE COURT:  Mr. Greenspan, you may proceed.

3              MR. GREENSPAN:  Thank you, your Honor.

4    Q.  Coming back to the question, is there a timing mechanism,

5    if you know -- Sorry if you've answered this -- but is there a

6    timing mechanism, if you know, on when a user can settle?  Can

7    they settle whenever they want or some schedule for it?  I

8    don't remember if you said you don't know.

9    A.  I can't say under what contingencies or conditions, certain

10   of these actions are alluded as I sit here today.  These things

11   are typically fairly involved.  And so based on circumstances,

12   I need to understand exactly what we are talking about.  I

13   guess the answer is I cannot answer that today as I sit here,

14   that particular question.

15   Q.  So if you don't know how settlement works, then fair to say

16   you don't know exactly how withdrawals happen on Mango Markets?

17   A.  I don't believe that was what I said.  I said to you that

18   you asked me about something specific with regard to a timing

19   mechanism on settlement.  I said there may be conditions as to

20   how the timing mechanism applies to different facts and

21   circumstances.

22   Q.  I would not then go to a general you don't know anything

23   about any of that stuff.  I don't think it's appropriate.  I

24   think it mischaracterizes my answer fair to say that one would

25   need to settle a profit or loss before one could withdraw a

O4AAAEIS2                              Dr. Mordecai – Cross

1    profit for something like the Mango Markets.

2    A.  I do not agree.

3    Q.  So how does one withdraw a profit with settling the

4    position?

5    A.  I didn't say it was an actual ultimate.  It was I said very

6    individual payoff profit.  You've got to, recorded incurred

7    profit to an account based on the movement.  This happens in

8    repo markets all the time.  I've worked in repo markets for

9    years.

10             THE COURT:  Strike, the witness's last answer will be

11   stricken and the jury is to disregard it.

12             Mr. Greenspan.

13             MR. GREENSPAN:  Thank you, your Honor.

14   Q.  My question is about the Mango Markets and your testimony

15   about the withdrawals.  You remember you testified about that

16   on direct?

17   A.  Yes.

18   Q.  Do you remember that?

19   A.  I do.

20   Q.  If you are testifying about concept of withdrawals, how

21   would one withdraw from their PNL without borrowing just a

22   withdrawal without settling a position?

23   A.  Since I interpret the withdrawals based on my analysis as

24   effectively a borrow, this is a difficult question to answer as

25   you've posed it.

O4AAAEIS2                          Dr. Mordecai - Cross

1   Q.  Your testimony is that the only way that someone can

2   withdraw from a Mango Markets out of their profit and loss is

3   to borrow?

4   A.  What I said was, based on the analysis of facts and

5   circumstances observed and based on the token withdrawals

6   that -- I see your head shaking, so I'm going to stop.

7   Q.  Let me ask the question again.  Is there a mechanism by

8   which someone whose Mango Markets position with a profit and

9   sufficient collateral such that the account is healthy, do you

10  know what that term means?

11  A.  I'm familiar with the --

12  Q.  The account is healthy.  This individual has a Mango

13  Markets position.  I'm not talking about any specific one you

14  looked at yesterday and it has a positive PNL and it's a

15  healthy account.  Is there a way for that user to withdraw from

16  Mango Markets without borrowing the funds?

17  A.  Given the way you've set up your question as a hypothetical

18  effectively without any of the specific details from the case

19  in isolation with a positive PNL, funds may be withdrawn.

20  Q.  Without borrowing, right?  That was the question.

21  A.  If in fact none of the other facts from this case are

22  applicable to your question, then in that isolated incident I

23  would say one can certainly withdraw without borrowing

24  depending on what other transactions you may or may not have

25  done on the venue that may be outstanding at the time.

O4AAAEIS2                              Dr. Mordecai - Cross

1   Q.  Just getting back to a very simple question, it is possible
2   to withdraw from Mango Markets in a way other than just
3   borrowing, right?
4   A.  In the absence of other factors that may influence whether
5   the answer is yes or no, yes, if you lay out of those other
6   things and you got a long position and as all you've got you
7   can withdraw when effectively ending up in a borrowing position
8   or having some remaining obligation.
9   Q.  Let's take a situation, the users put in a hundred dollars,
10  okay, to open the perpetual position, okay?  Okay?
11  A.  I'm just thinking about your questions.  I understand so
12  far.
13  Q.  Okay.  And the position is healthy.  Can you explain to the
14  jury what "healthy" means?
15  A.  Healthy means that the position is not in a negative or
16  close to maybe going negative level of solvency, that the
17  particular account is not facing some kind of an adverse state.
18  Q.  Would it be fair to say that it has sufficient collateral;
19  is that another way of putting what you just said?
20  A.  It has adequate collateral to continue to function as an
21  account.
22  Q.  Right.  So this account is healthy, has adequate
23  collateral.  The initial stake was a hundred USDC, okay?  Good
24  so far?
25  A.  Yes.

O4AAAEIS2                          Dr. Mordecai - Cross

1    Q.  And the user wants to withdraw a hundred USDC's, not a

2    borrow, right?

3    A.  Absent any other facts with the withdrawal of hundred USDC

4    that was deposited it certainly can withdraw that.  It's not

5    incompetent.

6    Q.  Now let's go back to the scenario where there's a profit in

7    the account.  Let's take the short account and it's a 320

8    profit on a hundred dollars initial stake okay?

9    A.  Okay.

10   Q.  That person, that user can withdraw more than $100 without

11   borrowing, right?

12   A.  Provided there are no other encumbrances then and it's free

13   and clear, then they certainly could monetize their profit

14   provided there are no other encumbrances, it's free and clear.

15   Q.  Turning back to the concept of liquidation, liquidation

16   doesn't appear on any of your slides, right?

17   A.  It does not.

18   Q.  And liquidations is an important part of how Mango Markets

19   work, right?

20   A.  Liquidation is an important part of how any trading venue

21   would function.

22   Q.  You chose to omit that from your slides, fair?

23   A.  I wasn't asked questions specific to liquidation events.

24   Q.  So the government didn't ask you to include liquidation?

25   A.  It wasn't part of my original scope of assignment.

O4AAAEIS2                          Dr. Mordecai - Cross

1   Q.  But it was to look at those two accounts that you talked
2   about, the long position and short position that you analyzed,
3   right?
4   A.  I was, my original assignment was to look at the offsetting
5   profits being long/short position the existing obligation and
6   the withdrawal events.
7   Q.  You are aware, are you not, that that long position that
8   you looked at suffered 209 partial liquidations?
9   A.  That is actually not something I particularly focused on.
10  Q.  Do you know if it suffered any liquidations?
11  A.  As I state here, I can't recall what I know about
12  liquidation events.
13  Q.  You don't know if it was liquidated at all?
14  A.  That was not part of my scope of assignment.
15  Q.  That's a short position that short position was open to
16  liquidation almost immediately right after the trading started?
17  A.  Could you maybe rephrase what you mean by "open to
18  liquidation".
19  Q.  Let's take a look at one of your charts.  You don't deny
20  that there are liquidations on the long side?  You don't know
21  whether --
22  A.  I did not focus as part of my assignment on the liquidation
23  events.
24  Q.  Another way is answering no.
25  A.  As I sit here, no, I can't really answer that no.

O4AAAEIS2                        Dr. Mordecai – Cross

1          MR. GREENSPAN:  Can we pull up Government Exhibit 1341

2    Mr. Smith please.

3          (Pause)

4          MR. GREENSPAN:  I apologize.  I think we have a

5    slightly different version.  Can we take this down.  Can the

6    government put up Government Exhibit 1341 please, if you would.

7          (Pause)

8    Q.  This is Government Exhibit 1341 and you were asked about

9    this on direct; do you remember that?

10   A.  I do.

11   Q.  The blue is the long position and the orange is the short

12   position, right?

13   A.  Correct.

14   Q.  So if we look at 6:30 p.m. on the short position the orange

15   it's got a PNL of more than negative 4100 million, right?

16   A.  Correct.

17   Q.  Fair to say, that's open to liquidation at that point?

18   A.  Again, I don't remember the specific rules about when a

19   liquidation occurs.

20   Q.  You don't know if an account that has a negative $100

21   million balance can be negative, $100 million loss can be

22   liquidated?

23   A.  What I do not know is the mechanism, the timing of

24   mechanism for liquidation and whether the timing for the

25   mechanism, as well as I don't know the specific rules whether

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    that liquidation given the short period of time that transpired

2    during which it was a negative whether it was enough time for

3    liquidation.

4    Q.  You just don't know if at any of the points from 6:25 to 7

5    o'clock this short position, you don't know if it could have

6    been liquidated --

7    A.  I would need to have a thorough visibility into and do

8    analysis of how the architecture was operating or intended to

9    operate between 6:27.

10   Q.  Sitting here today though, do you know whether that account

11   could be liquidated between 6:25 and 7 o'clock?  Do you know

12   that sitting here today?

13   A.  I'm not going to be able to answer that question as I sit

14   here, no, for reasons I started stating.

15   Q.  Okay.  So you don't know whether in fact that short

16   position was liquidated, do you?

17   A.  As I told you, liquidation events mechanics were not within

18   the scope of the assignment I was engaged for by the

19   government.

20   Q.  Fair to say that if this account was liquidated, it would

21   change the way your picture looked?

22   A.  I would have to say that the realized losses, realized PNLs

23   would probably have a different, would create a different path

24   here.  This, as I said, these are I call these kind of paper,

25   paper PNL, the actual realized what you might call real money

1    PNL, what the liquidations would likely be different from this.

2    Q.  Fair to say that your graph would be different if this

3    account was liquidated and you were asked to consider that; is

4    that fair to say?

5    A.  I'd have to say all equal under your hypothetical, outside

6    from the facts that I've studied, if there may be other things

7    that affect that but it's not unreasonable to think that a

8    graph like this would change if you added in additional

9    information for things like liquidation because then account

10   balances would all change.  A lot of things would change but I

11   don't have enough information to tell you how.

12   Q.  I understand that you don't know exactly how it would

13   change but I'm not sure I understand what's not unreasonable to

14   say is.  My question is would the graph look different?  Do you

15   understand that question?

16   A.  I do.  And my answer is it would look different.  We just

17   don't know how it would look different because all of the other

18   facts are pertinent right because set of liquidations might

19   affect many things on the graph, not just the orange line.

20   Q.  Right.  But you didn't look at that.  But this is what you

21   are and it would look different if there were liquidations.

22   A.  It would look different.  It's an empirical question as to

23   whether that difference makes this worse or better.

24   Q.  What do you mean by "worse or better"?

25   A.  It depends on facts and circumstances.  That's all I'm

O4AAAEIS2                        Dr. Mordecai - Cross

1    saying.  It's an empirical question subject to study.

2    Q.  It's an empirical question?

3    A.  Subject to study.  Subject to analysis, subject to study

4    suggest additional data that would be consistent with the kinds

5    of questions you are asking.

6    Q.  It's an empirical question subject to study an analysis

7    whether if there were liquidations you accurately reflected

8    them on your graph?

9    A.  That's, you asked me a question as to whether the graph

10   would look different, right?

11   Q.  Then you said it would be better or worse and I asked --

12   A.  I said no.  I said whether it is better or worse, different

13   how it's different, what else changes is going to be subject to

14   additional information, right, and I can't tell you

15   specifically how it would be different.  It's reasonable to

16   think it would differ.

17   Q.  If liquidation occurred, then it isn't fully accurate, is

18   it?

19   A.  This graph is accurate for the things it's meant to

20   demonstrate.  If you are bringing other facts and circumstances

21   in, I would --

22               MR. GREENSPAN:  Move to strike.

23               THE COURT:  Was there an application?

24               MR. GREENSPAN:  Move to strike.

25               THE COURT:  The motion is granted.  The witness's last

O4AAAEIS2                         Dr. Mordecai - Cross

1    answer will be stricken.  The jury is to disregard it.

2    Q.  Let me ask the question again, Dr. Mordecai.

3         If liquidation in fact occurred, then that graph isn't

4    fully accurate, is it?

5    A.  Currently, yes.  If liquidations occurred, there would be a

6    graph that could be, a graph could be built that would show

7    liquidation impacts on the PNL.

8         MR. GREENSPAN:  You can take this down, Mr. Smith.

9         (Pause)

10   Q.  So I'm going to call the price at which one could purchase

11   contracts of perpetuals on Mango Markets, the market rate, will

12   you accept that term, the market price?

13   A.  I would refer to it differently since the venue is one of

14   many venues.  So I would refer to it as the venue's price,

15   available price.

16   Q.  You won't understand fee.  If I use the term market price

17   you won't understand what that is?

18   A.  It has a different meaning to me.

19   Q.  So we'll go with venue price; is that the one you want?

20   A.  I'll go with prevailing venue price.

21   Q.  Okay.  The prevailing venue price is the price at which a

22   user could buy a Mango Markets contract, right?

23   A.  The prevailing menu price for purpose of this discussion;

24   that is correct.

25   Q.  Okay.  And you don't have a prevailing venue price anywhere

O4AAAEIS2                              Dr. Mordecai - Cross

1   in your slides, do you?

2   A.  It is -- I don't refer to it as a prevailing venue price.

3   Q.  Now do you prefer to it in of your slides?

4   A.  Slides at which the price, the contracts was executed could

5   be the prevailing menu price because, obviously, the contract

6   executed at that price.

7   Q.  And which of your exhibits has the contract, the price at

8   which the contract was executed?

9   A.  Well, the exhibits that showed the buys and sell order that

10  a column related to price of the contract at inception at its

11  inception and that is the price I referred to.

12  Q.  Okay.  Do you have any exhibits showing how that the

13  prevailing venue price, how that moved over time?

14  A.  I have -- it's implicit in the trajectory of the PNL but I

15  don't have it explicitly as stated.

16  Q.  Listed in projection of PNL?

17  A.  The path of PNLs because I don't believe profits and losses

18  occur based on the change in price between MNGO and USDC.

19  Q.  What is the PNL based on how is that calculated?

20  A.  It would be the difference in the -- well, generally

21  speaking, it is the difference in the Oracle price delivered at

22  a particular point in time on ratio between the MNGO token, the

23  Oracle price to that relevant to --

24  Q.  Base, it's as based on?

25  A.  Based on price calculation and coming over Oracle.

O4AAAEIS2                           Dr. Mordecai – Cross

1    Q.   The Oracle price is not the same price as these are two

2    different prices, right?

3    A.   Not necessarily.

4    Q.   Not necessarily.  They can be different but not always?

5    A.   My understanding of MNGO or the Mango trading venue is that

6    it takes in a price feed from the Oracle and that becomes

7    prevailing price at which trades can be executed and also the

8    prevailing price at which accounts PNLs are calculated.

9    Q.   So the prevailing venue price and the Oracle price are the

10   same?

11   A.   Whether there's an additional normalization or any other

12   kind of adjustments paid, I don't recall as I sit here today.

13   So I would say, it's approximately correct.

14   Q.   Okay.  Approximately, correct.  And are you familiar with

15   something called the "funding rate"?

16   A.   I am familiar with funding rate.

17   Q.   What is the funding rate.

18   A.   The funding rate, generally speaking, although, I did not

19   specifically focus on that for my scope of assignment, is rates

20   set by the venue to try to provide incentives to maintain the

21   overall health of the platform in terms of supply and demand

22   for focus.

23   Q.   Isn't -- funding rate to close gaps between that prevailing

24   funding price and Oracle price; isn't that what it's for?

25   A.   Within the context of trying to maintain the balance of

O4AAAEIS2                        Dr. Mordecai - Cross

1    deposits representative to withdrawals or borrows.  It's meant

2    to effectively provide a clearing mechanism to preserve the

3    solvency of trading venue given the arrival of different

4    withdrawals, deposits and changing rules.

5    Q.  Let me try to be clear about this.  Isn't the reason that a

6    perpetual market has a funding rate -- isn't the reason for

7    that to close the gap that exists between or that can exist

8    between the prevailing venue price and the settlement price;

9    isn't that what it's for?

10   A.  That is one purpose.

11   Q.  So if it's purpose, then they're not the same price, right?

12   A.  That is one purpose.

13   Q.  So if it's one purpose, then they are not the same price

14   and the answer you gave me a moment is inaccurate, right?

15   A.  The answer I gave a moment ago is an answer to the question

16   you asked a moment ago.  And as I suggested, there are a lot of

17   factors involved and those factors involve many different

18   functions that take place on the platform, not just that one

19   contract.  There is the borrow.  All these other supply and

20   demand forces that have to be --

21            MR. GREENSPAN:  Your Honor, I move to strike.

22            THE COURT:  Granted.  The witness's last answer will

23   be stricken.  The jury is to disregard it.

24   Q.  If the funding rate exists at least in part to close the

25   gap between the prevailing venue price and the Oracle price,

O4AAAEIS2                          Dr. Mordecai - Cross

1   doesn't that mean they have to be different at times?

2   A.  At times they do have to be different and I believe I said

3   that previously and that's why I said "approximate".

4   Q.  When you said "approximate" it you means sometimes the same

5   and difference, it's different?

6   A.  Correct.

7            MR. GREENSPAN:  Mr. Smith, could put up Government

8   Exhibit 13308.  This is in evidence.

9            (Pause)

10           MR. GREENSPAN:  If you could highlight and pull out

11  please the notes and sources at the bottom.

12           Note says:  The Mango Markets USDC Oracle price

13  indicates the number of USDC required to purchase one unit

14  Mango as posted to switchboard.

15  Q.  Do you see that?

16  A.  I do.

17  Q.  Isn't it the case that the switchboard Oracle reported

18  prices in USD and not in USDC?

19  A.  I don't recall.

20  Q.  I believe on direct you talked about being shown a

21  transcript of testimony shown earlier in trial from switchboard

22  CEO Mr. Hermida; do you recall that?

23  A.  I recall looking at something.  I don't remember what

24  particular part of the testimony.

25  Q.  You haven't seen a portion of his transcript where he

O4AAAEIS2                        Dr. Mordecai - Cross

1    testified the Oracle price was reported and in U.S. dollars,

2    USDC?

3    A.   I don't recall.  I think I was shown a specific excerpt,

4    no.

5    Q.   Is it your belief that the switchboard price is reported in

6    USDC?

7    A.   I don't recall as I sit here, no.

8    Q.   Did you write this?

9    A.   I reviewed and edited it and made comments on it.

10           MR. GREENSPAN:  Let's pull up Government Exhibit 1309

11   please Mr. Smith.

12           (Pause)

13           MR. GREENSPAN:  And if we could pull out the notes

14   again.

15   Q.   This note three is the same notoriety?

16   A.   It is.

17   Q.   Do you know who wrote this before you reviewed it?

18   A.   A member of my team.

19   Q.   Then you reviewed and OK'd it, right?

20   A.   I reviewed, may have asked some questions about it and I

21   concluded that it was reasonably accurate for the purposes.

22   Q.   What does "reasonably accurate" mean?

23   A.   Well, first of all, switchboard is the functionalities for

24   the Oracle pricing and the contract relationship between USDC

25   and MNGO are a one-to-one relationship with regard to token to

O4AAAEIS2                          Dr. Mordecai - Cross

1    token.  .

2    Q.  But USDC and U.S. D aren't the same thing, right?

3    A.  There is a USDC token that is pegged to the U.S. dollar, as

4    there's USDT token that's pegged to the U.S. Treasury.

5    Q.  So for your purposes, if USDCT and USDC are pegged to

6    dollar, they're based, you can interchangeable about the

7    dollar, right?

8    A.  USDT is pegged Treasury, U.S. Treasury.  USDC is pegged to

9    dollar currency.  They have a close, a economy -- relationship.

10   Q.  For your purposes, fair to say that USDC, USDT and U.S.

11   dollar are close enough in value that they're interchangeable

12   to you?

13   A.  I think interchangeable is overstating.  I would say that

14   they have close a relationship as I said before.  And the focus

15   here was on the MNGO to USDC relationship.

16   Q.  If I represent to you the Oracle price is in U.S. dollars

17   and USDC, does that make your footnote inaccurate?

18   A.  It makes it approximate.  There's proportional relationship

19   that's quite close.

20   Q.  Good enough?

21   A.  That's close.

22            MR. GREENSPAN:  Okay.  Let's take this down please.

23            Could we put up Government Exhibit 1314, please.

24            (Pause)

25            MR. GREENSPAN:  Pull out the footnotes again.

O4AAAEIS2                          Dr. Mordecai - Cross

1              (Pause)

2    Q.   Again, here Footnote Two refers to the price Mango over

3    USDC; do you see that?

4    A.   Footnote number two, correct.

5    Q.   And if you go forward it is priced as posted FTX; do you

6    see that?

7    A.   I do.

8    Q.   FTX also reports that the prices in U.S. dollars, does it

9    not.

10   A.   I cannot recall as I sit here now.

11   Q.   But if it's the case, if that does report prices it's

12   dollars, same analysis as before, it would be close?

13   A.   The tracking error between USDT, USDC and dollars was

14   something I examined and analyzed and they're very close

15   together.

16   Q.   Okay.  So you looked, when you say tracking error, you

17   looked at the, how close they were in value at this time?

18   A.   Over a time series.

19   Q.   And what was that time series?

20   A.   I don't recall.  I do remember doing that earlier just to

21   understand the nature of dynamics.

22   Q.   Was that time series, did that encompass the time in

23   question for your slides?

24   A.   Some of it might have been a general literature view of

25   research has been done in the area.  Some of it may have been

O4AAAEIS2                          Dr. Mordecai - Cross

1    from calculation I asked my team to do.  I don't remember which

2    I am thinking of now and I also don't recall over what specific

3    time period.

4    Q.  Understood.  Can you proximate it though?  What that time

5    series was?

6    A.  I wouldn't want to just read something in the record I

7    wasn't sure about.

8    Q.  You can't approximate?

9    A.  I probably wouldn't try to do that.

10   Q.  Let's take a look at the source.  Number one says FTX

11   historical Mango data from it has a planning series here color,

12   size and price; do you see that?

13   A.  I do.

14           MR. GREENSPAN:  Let's take this down and put up

15   Government Exhibit 200.

16           (Pause)

17           MR. GREENSPAN:  One moment, your Honor?

18           (Pause)

19           THE COURT:  Mr. Greenspan, how much time do you have

20   left?

21           MR. GREENSPAN:  About 15/20 minutes.

22           THE COURT:  Okay.  You may proceed.

23           MR. GREENSPAN:  Okay.

24   Q.  Is this the document that you relied on, the source in that

25   previous document?

O4AAAEIS2                          Dr. Mordecai – Cross

1  A.  Could you show me the timestamp -- the stamp on the other
2  one.
3  Q.  You want to see the previous one?
4  A.  Yes.
5           MR. GREENSPAN:  Sure.
6           THE WITNESS:  Could you put them side-by-side if you
7  want.
8           (Pause)
9           MR. GREENSPAN:  Let's put up Government Exhibit 1314
10 please.
11          (Pause)
12          MR. GREENSPAN:  Could we now put back Government
13 Exhibit 120 please.
14 Q.  Is that the source document?
15 A.  It appears to be.
16 Q.  If we look over at Column D, do you see the market ticker?
17 A.  I do.
18 Q.  Do you see Column F, the quote currency ticker?
19 A.  I do.
20 Q.  Those are in U.S. dollars, right?
21 A.  It appears so.
22          MR. GREENSPAN:  Let's take that down please.
23          (Pause)
24          MR. GREENSPAN:  Let's put up please, Mr. Smith,
25 Government Exhibit 1306.

O4AAAEIS2                          Dr. Mordecai - Cross

1              (Pause)

2    Q.  Do you remember testifying about this on

3    direct-examination?

4    A.  I do.

5    Q.  You testified about the volume going up in that gray period

6    around 6:25 p.m.; do you remember that?

7    A.  I do.

8    Q.  The volume never goes down, right, on this chart after it

9    goes up to its peak?

10   A.  Not on this chart.  Although, it did on others.

11   Q.  On other charts that you've produced in this case?

12   A.  Yes.

13   Q.  And which exhibit is that?

14   A.  I believe you had one of them up earlier.  You had several

15   of them up earlier.

16   Q.  Something I showed you earlier today.

17   A.  I thought I just saw it a few minutes ago, unless my memory

18   is failing.

19   Q.  Do you recall what that exhibit looked like?  I'd love to

20   put it up?

21   A.  If you'd like to click backwards you'll probably run into

22   it.

23              MR. GREENSPAN:  Permission to approach, your Honor?

24              THE COURT:  You may.

25              (Pause)

O4AAAEIS2                     Dr. Mordecai – Cross

1   Q.  Dr. Mordecai, what I've just handed you is a pact of your

2   exhibits.  You could page through those and tell me which one

3   you'd like me to put up.

4              (Pause)

5   A.  I'm looking specifically for --

6              THE WITNESS:  I'm trying to explain, your Honor, I'm

7   not trying to be non-parsimonious.

8              THE COURT:  Well, hold on.  The only question is what

9   documents you need to have up.

10             (Pause)

11  A.  Well, I'm going to give one example.

12  Q.  What would you like me to put up?

13  A.  There are others but if you look at 1329.

14             MR. GREENSPAN:  Can we put up 1329 please, Mr. Smith.

15             (Pause)

16  A.  So this overlays --

17             THE COURT:  Well, hold on.

18             Mr. Greenspan, do you have a question?

19  Q.  Dr. Mordecai, this is a chart showing the volume at Serum

20  DEX, right?

21  A.  It is.

22  Q.  And the volume at Serum DEX is the volume of trading in the

23  Mango token in the spa market, right?

24  A.  That is correct.

25  Q.  So this isn't the volume of trading of Mango Markets --

O4AAAEIS2                           Dr. Mordecai - Cross

1    A.   That is also correct.

2    Q.   And the chart I previously showed you was a chart of

3    trading of Mango Markets contracts on Mango Markets, right?

4    A.   Correct.

5    Q.   So this isn't the same?

6    A.   It is not the same thing.

7    Q.   Do you still think that there's a chart that shows selling

8    sometime later of the Mango Markets on Mango Markets?

9    A.   I may be recalling some analysis I did that did not end up

10   as an exhibit.  So it's hard for me to recall right now.  I

11   don't see it in the deck I've been given.

12   Q.   The analysis that you are referring to, is that something

13   you would have given to the government.

14   A.   It may have just been some of my own -- not my own.  The

15   teams work that I maybe asked them.

16   Q.   Let's just establish, it sounds to me like you are

17   speculating.  Are you show that you did this analysis?

18   A.   I'm not sure.  So I'm going to save as I sit here I can't

19   be sure.

20             MR. GREENSPAN:  Let's take down 1329 please.

21             (Pause)

22             MR. GREENSPAN:  Let's put up Government Exhibit 1341,

23   please, Mr. Smith.

24             (Pause)

25             MR. GREENSPAN:  Let's take a look at -- would you

1    mind, Mr. Oshinsky highlighting the notes and pulling that out.

2    Thanks for your help.

3            (Pause)

4    Q.  So looking at the source document here, number two, it

5    talks about the two accounts.  Let's take a look at number one.

6            Source number one says MNGO-PERP Oracle price dating

7    from DOJ 63 column base Oracle price, right?

8    A.  It does.

9            MR. GREENSPAN:  Mr. Oshinsky, could you put up

10   Government Exhibit 992.

11           (Pause)

12   Q.  Is it the source data for the Government Exhibit 1341 we

13   just looked at if you know?

14   A.  Could you flip back so I can compare the numbers please.

15           MR. GREENSPAN:  Mr. Oshinsky, is it possible to flip

16   back?

17           (Pause)

18   A.  I think I've internationalized it enough to be able to talk

19   about it because we're focusing on Source Number Two.

20   Q.  Source Number One.

21   A.  Okay.  So this is the price data source.  Okay.  Got it.

22   Q.  Is that what we looked at, Mango Markets Oracle price data,

23   just a moment ago when we had Exhibit 992 up on the screen?

24   A.  If I could ask you to go back to that one.

25   Q.  Sure.  That's fair.

O4AAAEIS2                          Dr. Mordecai - Cross

1           (Pause)

2           THE WITNESS:  Could I ask you to either expand the

3    column so I can read the titles or click on the titles so I can

4    at least read them.

5           (Pause)

6    A.  Based on my general recollection, this does appear to be

7    the same or similar source.

8           MR. GREENSPAN:  Okay.  Can we put Exhibit 1341 back

9    up.

10          (Pause)

11   Q.  So the calculations in the document were really just based

12   on the price of Oracle at any given time and value of the

13   initial position on the long and short side, right?

14   A.  That's reasonable.

15   Q.  And as we discussed earlier, it didn't take into account

16   things like liquidation, right?

17   A.  The PNL did not reflect liquidation in this exhibit.  It

18   does show liquidation events, shows withdrawal events,

19   doesn't --

20   Q.  It shows did those withdrawal events have any effect on the

21   way the long and short PNL was calculated?

22   A.  These were meant to simply show timing calculation.  It was

23   not showing a capital response.  This is not based on what's

24   left in the account.  So the answer is conditionally it doesn't

25   show that but it was never intended to show that.

O4AAAEIS2                          Dr. Mordecai – Cross

1    Q.  It doesn't show and it was never intended?

2    A.  It was certainly intended to overlay timing of events,

3    timing of withdrawals.

4    Q.  There is no question pending.

5    A.  I'm sorry.

6              MR. GREENSPAN:  I move to strike that.

7              THE COURT:  Do you have a motion?

8              MR. GREENSPAN:  Yes.  I am sorry.

9              THE COURT:  Okay.  The motion is granted in part as to

10   the witness's answer after what's left in the account, period.

11             MR. GREENSPAN:  Thank you, your Honor.

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

O4CCeis3                          Mordecai - Cross

1              MR. GREENSPAN:  Is the government able to display

2     Government Exhibit 50?

3              THE COURT:  Because I'm reading the real time, it

4     looks like that's not the right cutoff, it would be after the

5     following sentence.  So after it was never intended to show

6     that, period.

7              MR. GREENSPAN:  Can we put up -- thank you, Mr. Smith.

8     Q.  If you can take a moment to take a look at this,

9     Dr. Mordecai.  After you've had a moment, let us know and we'll

10    show you the second page.

11             (Pause)

12             Can we flip to the second page?

13    A.  Yes, go ahead.

14             (Pause)

15    Q.  Have you had enough time to review the document, sir?

16    A.  I'm surveying the document as a snippet of commands.

17    Q.  This is computer code; right?

18    A.  This is a snippet of command line returns, log data.  I

19    don't have enough here to contextualize it, but it is

20    basically -- comes across more like log responses and metadata

21    than actual code commands.

22    Q.  From what you see here, these log responses you call them,

23    you see that on line 4, there's something on program logged,

24    Mango, colon, settle, P&L.  Do you see that?

25    A.  I see that.

O4CCeis3                          Mordecai - Cross

1    Q.  Fair to say that the program was run to settle the P&L of

2    this particular account?

3    A.  It shows a log entry or log response or return, indicating

4    some form of a settlement of P&L took place.  But, again -- I'm

5    going to stop there.

6    Q.  But you don't know which account this relates to; right?

7    A.  Not as I sit here for the answer to this particular answer,

8    I did not review this in any detail.  And I also don't know

9    what the term "settle P&L" as a log return actually means in

10   context.

11   Q.  That's beyond the scope of your expertise; fair to say?

12   A.  It's beyond the scope of the review that I've done because

13   I didn't review this code base.

14   Q.  If you had more time with this now, would you be able to

15   interpret that or is that something that would just be beyond

16   your scope right now?

17   A.  It's beyond the scope from my assignment.  I'd need to

18   understand the definitions within the code base and then

19   understand the metadata and what the logs will return.  There's

20   a lot more to it than just glancing through.

21           MR. GREENSPAN:  Okay.  Take that down.  Thank you.

22   Q.  Let's take a look at Government Exhibit 1342.  Do you

23   remember testifying about this document on direct, sir?

24   A.  I do.

25   Q.  In the final column, it says, "value borrowed."  Do you see

O4CCeis3                         Mordecai - Cross

1    that?

2    A.  I do.

3    Q.  It totals it up, and at the very bottom, it says "total

4    withdrawals," right?

5    A.  It does.

6    Q.  Earlier we established that withdrawals aren't necessarily

7    the same as borrows; right?

8    A.  We had -- could you rephrase the question, because I want

9    to answer it accurately.

10   Q.  You remember earlier we talked about somebody withdrawing

11   their own funds if their account was healthy, and you said that

12   wouldn't be a borrow?

13   A.  I believe that mischaracterizes what I said.

14   Q.  If someone withdrew their own funds and their account was

15   healthy, would that be a borrow?

16   A.  My answer, as I recall it before --

17   Q.  I'm asking the question fresh.  You don't have to worry

18   about the answer from before.

19        If someone had a healthy account and their P&L

20   exceeded their initial deposit, it was healthy and they took

21   some or all of their initial deposit, would that be a borrow?

22   A.  Conditionally, if "healthy" meant an otherwise unencumbered

23   with regard to the venue, then yes a simple withdrawal is a

24   simple withdrawal.  The answer then is conditionally yes,

25   subject to other factors.

O4CCeis3                         Mordecai - Cross

1    Q.  But here, you concluded that borrow and withdrawal were the

2    same; right?

3    A.  Given -- yes, I did, for reasons I can easily state.

4              MR. GREENSPAN:  Let's take a look at, if you could,

5    Mr. Smith, expand out the source at the bottom.

6    Q.  Do you see the source here, Dr. Mordecai?

7    A.  I do.

8              MR. GREENSPAN:  Let's display, if you will, please,

9    Mr. Smith, Government Exhibit 932.

10             Sorry.  Switched back to Mr. Oshinsky.  Thank you.

11   Q.  Do you see this document, Dr. Mordecai?

12   A.  I do.

13   Q.  This is one of the two source documents for Government

14   Exhibit 1342; right?

15   A.  In order to not waste time, I will accept that for --

16   Q.  This document doesn't say anything about borrows, does it?

17   A.  There is nothing on the current page that says anything

18   about borrows.

19   Q.  At the top, there is this account name that ends in RNJNA;

20   right?  You see that?

21   A.  You know what, I have to restate my answer.

22             On the lower -- on the upper left side in the column,

23   there is an icon for a borrow page.  How it's related to this

24   page would require --

25   Q.  That icon appears not to be selected, right, the icon next

O4CCeis3                          Mordecai - Cross

1    to account is highlighted and appears to be selected; right?

2    A.  This is only displaying account information for this

3    account.

4    Q.  And then we have this account name and some account

5    identifying information here in the top left-hand corner and

6    below that, sort of two rows, we've got a series of oval

7    buttons, and the third one over says "withdrawals," and that's

8    highlighted; right?

9    A.  Correct.

10   Q.  And then below that, it says "nine withdrawals," right?

11   A.  There are nine rows.

12   Q.  Fair to say these are withdrawals, sir?

13   A.  Correct, it says "withdrawals."

14   Q.  And it doesn't say anything about borrows; right?

15   A.  Not on this page.

16   Q.  This is the long account; right?

17   A.  Based on my recollection, I believe this to be the long

18   account, yes.  Actually, yes, it is the long account.

19          MR. GREENSPAN:  If we could put up Government Exhibit

20   923, please.

21   Q.  If you could study it, this is the short account; right?

22   A.  Correct.

23   Q.  And the same thing here, "withdrawals" is highlighted, it

24   says "10 withdrawals," and there are indeed 10 rows; right?

25   A.  Correct.

1    Q.  And it doesn't say anything about borrows; right?

2    A.  Not on this page.

3          MR. GREENSPAN:  So let's go back to 1342.  If we look

4    back at the source, please.

5    Q.  You sourced two documents, those are the two documents we

6    just looked at; right?

7    A.  Correct.

8    Q.  And there were columns in those documents, date, asset,

9    quantity, and value; right?

10   A.  Correct.

11   Q.  So there were no columns about "borrow" and there was no

12   information on those pages about "borrow" in your sources;

13   right?

14   A.  Not explicitly stated on those particular pages.

15         MR. GREENSPAN:  Nothing further.  Thank you.

16         THE COURT:  Thank you.

17         Ms. Huang.

18         MS. HUANG:  Very, very briefly, your Honor.

19         Mr. Oshinsky, could you please pull back up Government

20   Exhibit 932.

21   REDIRECT EXAMINATION

22   BY MS. HUANG:

23   Q.  Dr. Mordecai, you were just shown this by Mr. Greenspan;

24   correct?

25   A.  Yes, correct.

O4CCeis3                          Mordecai - Redirect

1    Q.  You were told to look at the withdrawals?

2    A.  I was.

3    Q.  And that there weren't any "borrows" shown on this page?

4    A.  That is correct.

5           MS. HUANG:  Mr. Oshinsky, could you please now show

6    Government Exhibit 914.  Actually, hold on for one second here.

7    Q.  This account is to the RNJNA account; is that correct?

8    A.  Correct.

9           MS. HUANG:  Can we go to Government Exhibit 914,

10   Mr. Oshinsky.

11   Q.  Dr. Mordecai, this is also for the RNJNA account?

12   A.  Correct.

13   Q.  And it shows "borrows" here, if you see at the bottom?

14   A.  It does.

15   Q.  And, for example, for USDC, you see where it says "USDC"

16   there?

17   A.  I do.

18   Q.  And how many borrows are shown there?

19   A.  54,441,450.7.

20          MS. HUANG:  No further questions, your Honor.

21          THE COURT:  Thank you very much.

22          MR. GREENSPAN:  If you can leave that document up.

23          THE COURT:  Mr. Greenspan, do you have a further

24   examination?

25          MR. GREENSPAN:  Yes, your Honor, just on this

O4CCeis3                          Mordecai - Recross

1    document.  Or I suppose one other document.  I'll be quick.

2    RECROSS EXAMINATION

3    BY MR. GREENSPAN:

4    Q.  Remember you said that if someone had a healthy account,

5    they could take their own money out and it wouldn't be a

6    borrow?

7    A.  You said that and I conditionally agreed under very, very

8    specific conditions.

9    Q.  Well, wasn't it the case that this account was healthy at

10   the time and that 5 million USDC had been placed in the

11   account?  Withdrawing that wouldn't be a borrow; right?

12   A.  I'm sorry.  Could you repeat that question.

13   Q.  Sure.  Do you remember that there was 5 million USDC used

14   to open this account?  Do you remember that?

15   A.  At its very inception?

16   Q.  At its very inception, roughly, I don't know, 20 minutes

17   before this?  I'm sorry.  Let me withdraw that question.

18        Do you remember that there was $5 million at inception

19   used to open this account?

20   A.  I do.

21   Q.  Do you remember that this account balance at the time of

22   this USDC, this top withdrawal was healthy?  Do you remember

23   that?

24   A.  I don't remember what the exact health rating was for the

25   account at the initial borrow instant, if that's what you're

O4CCeis3                          Mordecai - Recross

1   asking me.

2           MR. GREENSPAN:  Let's take a look at Government

3   Exhibit 1341.

4   Q.  The initial borrow, as you call it, the initial withdrawal.

5   Sorry.  Let me withdraw the question and start over.

6           The initial withdrawal is this black dotted line that

7   happens just before 6:30 p.m.; right?

8   A.  That is correct.

9   Q.  This is the long account and it has a profit of over

10  100 million USDC; is that right?

11  A.  It shows a paper -- what I called a paper profit or a P&L

12  incurred of over 10 million based on --

13  Q.  This account is clearly healthy; right?

14  A.  I can't necessarily agree with that.  The health rating

15  covers a lot of things.

16  Q.  What information do you have that this account would have

17  been unhealthy?

18  A.  I didn't make the statement that the account was unhealthy.

19  What I actually said was as to whether the account -- the

20  actual -- I cannot testify at this time as to the actual state

21  of the account with regard to the health rating as it is

22  specifically calculated.

23  Q.  Why not?

24  A.  Because I don't have the information in front of me to do

25  so.

O4CCeis3                          Mordecai - Recross

1    Q.  What information would you need?

2    A.  I would need to review other things that I don't have in my

3    hands right now.

4    Q.  What things would you need to review, sir?

5    A.  I'd need to look at the actual health rating calculation as

6    implied under the practices and policies of the Mango Markets

7    venue under these facts and circumstances.

8    Q.  You understand how health ratings in Mango perpetuals work;

9    right?

10   A.  I can recall a general understanding right now, I could

11   certainly say more specifically, but without having the

12   information in front of me, I'm not going to veer outside of my

13   lane, so to speak.

14   Q.  If you had the underlying data, you could make a health

15   calculation about whether this account was healthy when it had

16   100-plus-million profit at approximately 6:29 p.m.; right?

17   A.  I would need to do an analysis of the policies and

18   practices that applied to the health rating at the time that

19   this occurred in order to do so.

20   Q.  Let's ask it as a hypothetical.  Hypothetically, let's

21   assume that this account was healthy, understanding that you

22   haven't definitively testified about that, but let's assume it

23   for the moment.  If this account was healthy, wouldn't that

24   long account be able to withdraw the 5 million USDC not as a

25   borrow?

1              MS. HUANG:  Objection, your Honor.  Scope.

2              THE COURT:  Overruled.  But let's close this line of

3    inquiry quickly.

4    A.  If you could repeat the question, please.

5    Q.  Hypothetically, assuming that this account was healthy, and

6    as we see here, it has a profit of over 100 million USDC at

7    6:29 p.m. when it makes this initial withdrawal, wouldn't at

8    least 5 million USDC be not a borrow?

9    A.  Not necessarily.

10   Q.  Please expand.

11             MS. HUANG:  Objection, your Honor.

12             THE COURT:  Is that your last question?

13             MR. GREENSPAN:  Sure.

14             THE COURT:  Okay.  You want to ask it again.

15             MR. GREENSPAN:  Yes.

16   Q.  So why is it that this account, hypothetically healthy at

17   6:29 p.m. with a P&L of over $100 million and an initial

18   contribution of 5 million USDC, why is it that that 5 million

19   USDC could not be withdrawn as something other than a borrow?

20             MS. HUANG:  Your Honor, that's a different question.

21   Objection.

22             THE COURT:  Overruled.

23   A.  At the account level, the mechanism may permit that

24   withdrawal.  Given the facts, overall facts and circumstances

25   of this case and the relationship between this account and

O4CCeis3                          Mordecai - Recross

1    other accounts --

2              MR. GREENSPAN:  Move to strike, your Honor.

3              THE COURT:  That's denied.

4    A.  The relationship between the two accounts owned by one

5    entity, okay, undisclosed that that one entity owned both

6    accounts, given the fact that the document you put up and asked

7    me about talked about cross collateralization, cross default as

8    part of the mechanism applied in Mango Markets says that the

9    implicit health of the overall relationship of those two

10   accounts, given the offset, means that that positive P&L in the

11   long account is offset by the negative P&L in the short

12   account.  And so, the overall position of that principal entity

13   that owns both accounts is actually not healthy.  So, from an

14   account level, it looks healthy.  From an actual solvency and

15   health of the overall platform because of that principle, I

16   would not consider that to be healthy.  That was my answer.

17   You asked me for an answer, that was my answer.

18             MR. GREENSPAN:  Your Honor, I renew my application to

19   strike.

20             THE COURT:  That's denied.

21             MR. GREENSPAN:  No further questions.

22             THE COURT:  All right.  Ms. Huang, anything else?

23             MS. HUANG:  Nothing further, your Honor.

24             THE COURT:  Thank you very much, Dr. Mordecai.

25             THE WITNESS:  Thank you, sir.

1           (Witness excused)

2               THE COURT:  The government may call its next witness.

3               MS. HUANG:  The government calls John Casey, your

4       Honor.

5               MR. TALKIN:  Your Honor, without interrupting the

6       proceedings, may I step out for a moment?

7               THE COURT:  Would the jury like a break at this

8       time --

9               Ms. Huang what time are we looking at?

10              MS. HUANG:  Depending how long the cross is, this

11      should be five minutes.

12              THE COURT:  Okay.  If it's okay with the jury,

13      Mr. Talkin is going to step out, but I always want to make sure

14      to extend the jury the same courtesy.  I think you will

15      appreciate it if we can keep moving and then we'll take our

16      break very shortly.

17              MR. KLEIN:  Your Honor, I'm going to do the cross.

18      It's going to be longer than five minutes.  I don't want the

19      jury to be upset with me from holding them back from using the

20      facilities.

21              THE COURT:  Everyone prepared to proceed at this time?

22      Anyone need a break right now?

23              JUROR:  I would.

24              THE COURT:  Let's take a short break and we'll do a

25      little bit more and take our midmorning break.  So let's come

O4CCeis3                          Mordecai – Recross

1    back in 10.

2                 (Jury not present)

3                 (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O4CCeis3                              Mordecai - Recross

1              THE COURT:  Do we have anything to address?

2              MR. DAVIS:  No, your Honor.

3              (Recess)

4              THE COURT:  Let's bring in the witness.

5              (Witness present)

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury present)

2          THE COURT:  Mr. Hernandez, will you please swear in

3    the witness.

4     JOHN CASEY,

5         called as a witness by the Government,

6         having been duly sworn, testified as follows:

7          THE DEPUTY CLERK:  Can you please provide the Court

8    your first and last name, and spell your first and last name.

9          THE WITNESS:  Yes.  My name is John Casey, J-O-H-N

10   C-A-S-E-Y.

11   DIRECT EXAMINATION

12   BY MS. HUANG:

13   Q.  Good morning, Mr. Casey.  Can you just adjust your mic so

14   it's in front of you so the jury can hear you loud and clear.

15   A.  Yes.  Is this better?

16   Q.  Yes.  Perfect.  Thank you.

17          Mr. Casey, are you familiar with Mango Markets?

18   A.  It is a crypto program.

19   Q.  Did you use Mango Markets?

20   A.  Yes.

21   Q.  Did you have money on Mango Markets?

22   A.  Yes.

23   Q.  So directing your attention to October 11th, 2022, about

24   how much money did you have on Mango Markets?

25   A.  About $2,000.

O4CCeis3                          Casey - Direct

1    Q.  And did there come a time when you were unable to access

2    that money?

3    A.  Yes.

4    Q.  When was that?

5    A.  October 11th, 2022.

6    Q.  And where were you when that happened?

7    A.  I was at Poughkeepsie, New York.

8    Q.  And are you familiar with something called Discord?

9    A.  Yes.

10   Q.  What is that?

11   A.  It is a chat app.

12   Q.  And did you use Discord?

13   A.  Yes.

14   Q.  Including did you discuss what happened on October 11th,

15   2022 on Mango Markets?

16   A.  Yes.

17   Q.  What was your username on Discord?

18   A.  Ogjenk.

19        MS. HUANG:  Mr. Oshinsky, can you show the witness

20   what's been marked Government Exhibit 817.

21   Q.  Mr. Casey, do you recognize this document?

22   A.  Yes.

23   Q.  What is it?

24   A.  This is a screenshot of my messages on Discord.

25        MS. HUANG:  At this time, your Honor, the government

O4CCeis3                          Casey - Direct

1    offers Government Exhibit 817 into evidence.

2              THE COURT:  Objection?

3              MR. KLEIN:  No objection.

4              THE COURT:  Exhibit 817 will be admitted.

5              (Government's Exhibit 817 received in evidence)

6              MS. HUANG:  Thank you, your Honor.

7              Mr. Oshinsky, can we please publish this to the jury.

8    Q.  Let's start from the bottom.  Mr. Casey, that ogjenk,

9    that's you, your message?

10   A.  Correct.

11   Q.  Starting, can you tell us from the bottom up what the time

12   and date is there?

13   A.  So the date is October 11th, 2022 at 6:48 p.m.

14   Q.  And what is that chart you're showing there?

15   A.  That is a screenshot of a chart from Trading View, showing

16   the price of Mango in comparison to USD.

17   Q.  Why did you capture that chart at the time?

18   A.  Can you repeat that.

19   Q.  Why did you capture this chart, why were you displaying

20   this chart?

21   A.  I was confused at what was going on.

22   Q.  Now let's look up at the chat above.  Can you state the

23   date and time for that one?

24   A.  Yes.  That is October 11th, 2022, 7:05 p.m.

25   Q.  What did you write there?

O4CCeis3                          Casey - Direct

1    A.  I wrote, I cannot withdraw right now.

2    Q.  What couldn't you withdraw?

3    A.  My crypto assets from Mango Markets.

4    Q.  Where were you when you wrote this?

5    A.  Poughkeepsie, New York.

6            MS. HUANG:  Can we go to the top message.

7    Q.  What was the date and time for that one?

8    A.  That was October 11th, 2022, 7:41 p.m.

9    Q.  Can you read that message.

10   A.  Yes.  I said, is this similar to what happened when Cope

11   spiked up on Mango months ago.

12   Q.  What is Cope?

13   A.  Cope is another cryptocurrency.

14   Q.  What happened with it?

15   A.  The price of Cope had spiked up and plummeted down similar

16   to the bottom screenshot.

17   Q.  Mr. Casey, did you suffer any losses when Cope spiked up?

18   A.  No.

19   Q.  Did you suffer any losses on Mango Markets on October 11th,

20   2022?

21   A.  Yes.

22   Q.  So was the impact of what happened with Cope with the spike

23   several months ago on Mango similar to what happened on Mango

24   Markets on October 11th, 2022?

25           MR. KLEIN:  Objection.

O4CCeis3                          Casey - Cross

1              THE COURT:  Overruled.

2   A.  Can you repeat that.

3   Q.  Sure.  Was what happened with Cope, in terms of the spike,

4   similar to what happened on Mango Markets on October 11th,

5   2022?

6   A.  In reference to the spike?

7   Q.  Sorry.  No.  In terms of we talked earlier about your

8   losses.

9   A.  Yes.  The impact was not similar.

10             MS. HUANG:  No further questions, your Honor.

11             THE COURT:  Cross examination, Mr. Klein.

12             MR. KLEIN:  Yes, your Honor.

13  CROSS-EXAMINATION

14  BY MR. KLEIN:

15  Q.  Good morning, Mr. Casey.

16  A.  Good morning.

17  Q.  When did you first start using Mango Markets?

18  A.  Sometime in 2021.

19  Q.  And how did you use Mango Markets?

20  A.  I deposited cryptocurrency onto it.

21  Q.  Do you remember what cryptocurrency you deposited onto

22  Mango Markets?

23  A.  I remember I deposited Mango.

24  Q.  Where did you get your Mango?

25  A.  I purchased Mango.

1    Q.   Where?

2    A.   On an exchange.

3    Q.   Do you remember which one?

4    A.   No.

5    Q.   And then what did you do with your Mango on Mango Markets?

6    A.   I just had it deposited there.

7    Q.   Never traded on Mango Markets?

8    A.   Not with the Mango, no.

9    Q.   Did you do any other trades on Mango Markets?

10   A.   I also deposited some Solana, and I did not trade

11   frequently on Mango.

12   Q.   Did you engage in perpetual trading?

13   A.   I don't recall.

14   Q.   Futures trading?

15   A.   I don't recall.

16   Q.   Did you log into Mango with a VPN?

17   A.   I don't recall.

18   Q.   Do you know what a VPN is?

19   A.   I do.

20   Q.   What is VPN?

21   A.   It's a verified private network.

22   Q.   What does that mean to you?

23   A.   I'm not sure.

24   Q.   Is it a way to have your IP address reflect from somewhere

25   else, maybe not the place you're actually sitting in front of

O4CCeis3                          Casey - Cross

1  your computer?

2  A.  That may be one use of VPN.

3  Q.  And you do know that Mango Markets had geo blocking;

4  correct?

5  A.  I'm not sure of that, no.

6  Q.  You don't remember that?

7  A.  No.

8  Q.  When you did your trading on Mango Markets, did it ask you

9  where you got your Solana?

10  A.  I don't recall.

11  Q.  What do you recall about your trading on Mango Markets?

12  A.  I'm not sure.  I don't understand the question.

13  Q.  Well, you conducted some trades on Mango Markets; correct?

14  A.  Yes.

15  Q.  So what kind of trades -- do you recall any types of trades

16  you did?

17  A.  Yeah.  I recall swapping Solana into USDC.

18  Q.  And did you do any other types of trades?

19  A.  I don't recall offhand.

20  Q.  And when you purchased your Mango, you owned Mango; right?

21  A.  Yes.

22  Q.  And you bought that because you wanted it to increase in

23  value; correct?

24  A.  I don't want to speculate right now.  I'm --

25  Q.  I'm not asking you to speculate.  I'm asking you when you

O4CCeis3                         Casey - Cross

1   purchased your Mango, you hoped it would increase in value;

2   right?

3   A.  Correct.

4   Q.  You didn't contribute to Mango Markets, right, you just put

5   your cryptocurrency on the Mango; right?

6   A.  Correct.

7   Q.  You were aware that other people were contributing to

8   Mango; correct?

9   A.  Are you talking about in code?

10  Q.  Yeah.  Other people were providing code; right?

11  A.  Yes.

12  Q.  Other people were posting blogs about it; right?  You were

13  a user, but there were other people contributing to the Mango

14  Markets; right?

15  A.  Yes.

16  Q.  And you, in those efforts, if Mango Markets became a big

17  success, your Mango token could increase in value, right, if

18  more people started using Mango Markets, the Mango token could

19  be more valuable?

20  A.  That's a possibility.

21  Q.  Do you know what an oracle is?

22  A.  A what?

23  Q.  An oracle.

24  A.  I think I'm a little familiar.  For price.

25  Q.  Have you ever heard of Switchboard?

O4CCeis3                          Casey - Cross

1    A.  I think I have.

2    Q.  When you went on Discord, it was on October 11th; right?

3    A.  Correct.

4           MR. KLEIN:  Can I put up Government Exhibit 817,

5    please.

6    Q.  This was the exhibit the prosecutor showed you; right?

7    A.  Correct.

8    Q.  Now it says here you can't withdraw it at that moment.  You

9    were ultimately able to withdraw your cryptocurrency; right?

10   A.  After a DAO vote was passed.

11   Q.  What was the DAO vote?

12   A.  The DAO vote was to give money back so that they can refund

13   the people who couldn't withdraw.

14   Q.  And you got refunded; right?

15   A.  I did.

16   Q.  And you mentioned Cope in here?

17   A.  Yes.

18   Q.  Cope was an incident months before; right?

19   A.  Yeah.  I don't remember what month specifically.

20   Q.  I'm not asking you what month right now.  But it was an

21   incident that occurred before this incident; right?

22   A.  Correct.

23   Q.  And what do you remember about Cope?

24   A.  I don't know exactly what the situation was.  That's why I

25   was asking in the Discord.

O4CCeis3                        Casey - Cross

1    Q.  Did you have any memory at the time back in October what it

2    was or did you --

3    A.  I know that Cope was a cryptocurrency and I knew that there

4    was some problem that happened with Cope on Mango Markets.

5    Q.  And beyond that, did you know anything at the time?

6    A.  I don't know the specifics.

7    Q.  You didn't vote on the DAO vote?

8    A.  I don't recall voting, no.

9    Q.  And then after you got your funds back, did you use Mango

10   Markets anymore?

11   A.  I don't recall.  I'm pretty sure I got off of it.

12            MR. KLEIN:  Thank you.

13            THE COURT:  Any redirect?

14            MS. HUANG:  None, your Honor.

15            THE COURT:  Thank you very much, Mr. Casey.  You're

16   good to go.

17            (Witness excused)

18            Government may call its next witness.

19            MS. HUANG:  The government next calls Oliver Tonkin,

20   your Honor.

21    OLIVER TONKIN,

22        called as a witness by the Government,

23        having been duly sworn, testified as follows:

24            THE DEPUTY CLERK:  Can you please provide the Court

25   your first and last name, and spell your first and last name.

1          THE WITNESS:  My name is Oliver Tonkin.  So that's

2     O-L-I-V-E-R, my surname is T-O-N-K-I-N.

3     DIRECT EXAMINATION

4     BY MS. HUANG:

5     Q.  Good morning, Mr. Tonkin.

6     A.  Good morning.

7     Q.  Can you please tell us where you currently live.

8     A.  I live in London in the UK.

9     Q.  What is your educational background after high school?

10    A.  So I graduated from a university in the UK in 1995.  I

11    spent two years at law school in the UK.  And then more

12    recently, I got an executor MBA in the UK, as well.

13    Q.  Where did you work after getting your law degree?

14    A.  I qualified at a firm called Norton Rose, which is now

15    Norton rose Fulbright in London.

16    Q.  Are you still a practicing lawyer today?

17    A.  I am, yes.

18    Q.  What is your current job?

19    A.  I'm the CEO of a business called BCB Group.  We're a London

20    based provider of payment services and trading services for the

21    digital asset industry.

22    Q.  Mr. Tonkin, are you familiar with something called Mango

23    Markets?

24    A.  I am, yes.

25    Q.  How are you familiar with Mango Markets?

O4CCeis3                           Tonkin - Direct

1    A.  So I was a depositor into Mango Markets version 3 between

2    November '21 and October '22.

3    Q.  Why did you deposit your funds on Mango Markets?

4    A.  So I, in 2021, I sold some shares, some stock in my

5    company.  I was paid some of that money in U.S. dollars, and I

6    had no means to hold it in a bank account because I'm a Brit,

7    it's hard to get a U.S. dollar bank account.  Because I'm

8    reasonably crypto comfortable, I elected to receive those funds

9    in USDC, so that's like with USD.  And then I was looking for a

10   home for that and, for those funds, to earn some kind of return

11   on them.  So for a period after I got my USDC, I invested those

12   funds in a platform called RVA, which is a different platform.

13   The returns on that platform at the time weren't great, so I

14   was looking for an alternative home for my USDC.  A friend of

15   mine recommended a number of other platforms, which Mango was

16   one.  So I, having, you know, had a look, I checked it out.  I

17   then moved my funds out of RVA onto Mango.

18   Q.  When was that that you first began using Mango Markets?

19   A.  November '21.

20   Q.  And about how much money did you say you had on Mango

21   Markets?

22   A.  So in terms of USDC, I deposited about 122,000 thousand

23   USDC.

24   Q.  Earlier when you talked about rates, can you explain what

25   you mean by rates?

1  A.  So when one deposits into a different platform, you're paid

2  a reward, a yield, if you like, for putting your money into a

3  platform.  It's akin to an interest rate.

4          MS. HUANG:  Mr. Oshinsky, can we put up Government

5  Exhibit 1601 just for the witness.

6  Q.  Mr. Tonkin, do you recognize this document?

7  A.  I do.

8  Q.  What is it?

9  A.  It's a report of a transaction that I initiated where I

10 transferred my USDC from my own wallet onto the Mango Markets

11 DAO.

12         MS. HUANG:  Your Honor, the government offers

13 Government Exhibit 1601.

14         MS. MARTABANO:  No objection.

15         THE COURT:  Exhibit 1601 will be admitted.

16         (Government's Exhibit 1601 received in evidence)

17         MS. HUANG:  Mr. Oshinsky, if you can publish that to

18 the jury.

19 Q.  Just to situate us here Mr. Tonkin, do you see where it

20 says "timestamp"?

21 A.  I do, yes.

22 Q.  Can you tell us what the timestamp is?

23 A.  November 21st, 2021.

24 Q.  And what's the significance of that date?

25 A.  That was the date on which I moved my funds from my wallet

1   onto the Mango DAO.

2          MS. HUANG:  If we can actually get out of that,

3   Mr. Oshinsky.

4   Q.  Further below, it says, "interact with program"?

5   A.  Yep.

6   Q.  Can you just read those two lines there.

7   A.  Sure.  Interact with program, Mango Markets version 3,

8   transfer from 24122682.641163 USDC.

9   Q.  What do those two lines mean?

10  A.  So that was the -- obviously the amount that I moved, the

11  122 number, and it was me moving it from my wallet, as I said,

12  onto version 3, which it was at the time of the Mango Markets

13  protocol.

14         MS. HUANG:  We can pull those down, Mr. Oshinsky.

15  Q.  Mr. Tonkin, as a user of Mango Markets, are you aware of

16  what a Mango perpetual is?

17  A.  Yes, I am.

18  Q.  Would it matter to you if you knew that a person was

19  intentionally moving the price of perpetuals on Mango Markets?

20         MS. MARTABANO:  Objection, your Honor.

21         THE COURT:  Overruled.

22  A.  It would matter to, yes.

23  Q.  Why would it matter to you?

24  A.  Because obviously that puts at risk my funds if someone can

25  manipulate that price.  It puts my funds at risk as a

1   depositor.

2   Q.  Can you just kind of outline for us what kind of risks

3   those are?

4   A.  So if somebody were to move the --

5           MS. MARTABANO:  Objection.

6           THE WITNESS:  So am I good or --

7           THE COURT:  No.  Hold on.  Sorry, Mr. Tonkin.

8           While I'm looking at this, you might just want to slow

9   down just a little bit.

10          THE WITNESS:  Sure.

11          THE COURT:  It's overruled.

12          THE WITNESS:  I can carry on, yeah?

13  A.  Yeah.  So if somebody can manipulate the price of a Mango

14  PERP, they could potentially inflate the value of the

15  collateral that they hold on the DAO, and obviously withdraw

16  funds for the value of that collateral, which, again, puts my

17  funds as a depositor at risk.

18  Q.  Let's now turn to October 11th, 2022, Mr. Tonkin.  Did you

19  have funds on Mango Markets on that date?

20  A.  I did, yes.

21  Q.  About how much?

22  A.  About 124,000 USDC at the time.

23  Q.  And did there come a time when you were unable to access

24  those funds?

25  A.  Yes.  So I woke up one morning in London and accessed the

O4CCeis3                        Tonkin - Direct

1    platform, and I could see that my funds were there, but

2    something had gone wrong.  There was something unusual, let's

3    say, about how the platform looked at the time.  So I tried to

4    withdraw funds, I pressed withdraw on the screen, which would

5    normally have given me the option to move my funds out of the

6    DAO back into my wallet, I wasn't able to do that.

7    Q.  And just to situate us, when you said early in the morning,

8    do you have a date for that?

9    A.  My goodness, was it the 11th, maybe the 12th of October.

10   Q.  If that was morning UK time --

11   A.  Morning UK time, it would have been either very early

12   morning in New York or very late at night on the other side,

13   west coast.

14   Q.  Let's show you what's been marked Government Exhibit 1603.

15           Mr. Tonkin, do you recognize this document?

16   A.  I do.

17   Q.  What is it?

18   A.  So this was a screenshot that I took of my account on

19   version 3 of Mango Markets as it appeared on the 12th of

20   October.

21   Q.  But this screenshot was taken recently?

22   A.  Yes, it was, yes.

23   Q.  Can you just kind of walk us through when it says "account

24   value" there --

25           MS. HUANG:  Sorry.  Apologies, your Honor.

1              The government now moves for Government Exhibit 1603

2     into evidence.

3              THE COURT:  Any objection?

4              MS. MARTABANO:  No, your Honor.

5              THE COURT:  Exhibit 1603 will be admitted.

6              (Government's Exhibit 1603 received in evidence)

7              MS. HUANG:  Mr. Oshinsky, let's publish that to the

8     jury so they know what I'm talking about.

9     Q.  Mr. Tonkin, where it says "account value" there, can you

10    tell us what that means?

11    A.  So that was the value of my deposit on the Mango DAO on the

12    date of the event or the day after the event, UK time.

13    Q.  And you discussed how you had deposited USDC, and you see

14    there's a USDC row there?

15    A.  Yep.

16    Q.  And you see how there's deposits?

17    A.  Yep.

18    Q.  And there's the same number approximately?

19    A.  Yep.

20    Q.  Do you see how there's a deposit/borrow APR column?

21    A.  I do.

22    Q.  Can you explain to us what that column is representing

23    there?

24    A.  So, under normal circumstances, that would be the interest

25    rates that either you earn -- that's the annualized interest

1  rates that you earn either as a depositor, which is in green,

2  or if you were borrowing from the DAO, in red.

3  Q.  And can you tell us what the interest rate was at that time

4  for USDC?

5  A.  Well, on the screen here, it's 300 percent, both to deposit

6  and to borrow.

7  Q.  And that's for October 11th, 2022?

8  A.  Correct.

9  Q.  Was that the rate you were typically getting?

10 A.  It was not.

11 Q.  What was rate you were typically getting?

12 A.  Anywhere between 1 and 3 percent annualized.

13 Q.  Do you know why that rate would have gone from your typical

14 1 to 3 percent on Mango Markets up to 300 percent?

15 A.  It would have suggested --

16         MS. MARTABANO:  Objection, your Honor.  A yes or no

17 would be fine, your Honor.

18         (Continued on next page)

19

20

21

22

23

24

25

O4AAAEIS4                    Tonkin - Direct

1          THE COURT:  I was going to suggest that -- answer to

2     that question, yes or no.

3          THE WITNESS:  What was the question again?  Sorry.

4  Q.  My question was, do you know why your typical one to four

5  percent rose to three?

6  A.  Yes.

7  Q.  Tell us why?

8  A.  So that was the rates as they are here would have indicated

9  that the Dow was effectively one hundred percent utilized.  So

10 all deposit available funds had been withdrawn and were being

11 utilized by one or more borrowers.

12 Q.  And earlier you testified about how you couldn't withdraw

13 your funds from Engle market?

14 A.  Correct.

15 Q.  What was your reaction when you couldn't access your funds?

16 A.  Concern, dismay, confusion.

17 Q.  Was that a significant amount money for you?

18 A.  Yes, it is, yes.

19 Q.  What was your understanding of what happened to all the

20 users funds on the Mango Markets platform?

21          MS. MORTABANO:  Objection.

22          THE COURT:  You are referring to his understanding at

23 the time?

24          MS. HUANG:  Yes, your Honor.

25          THE COURT:  It's overruled.

O4AAAEIS4                    Tonkin - Direct

1    A.  At the time I saw these rates?

2    Q.  Yes.

3    A.  Well, I mean I did do some further investigation on the

4    platform itself and it did become clear that all the funds had

5    been withdrawn.  As to why --

6            THE COURT:  Hold on.

7            Why don't you ask another question.

8    Q.  Can you explain to us why?

9    A.  What I could see because there were.  I have a shot more of

10   it, of the other charts of the various assets that are

11   available.  What I did see was the price of the MNGO token

12   which is the native token of platform had late that night, my

13   time, spiked a lot for a short period of time and then going

14   down again.  So that obviously led me to do some further

15   investigation.  I then discovered based on some wider

16   reading --

17           THE COURT:  Hold on.  Do we have an objection?

18           MS. MORTABANO:  Yes, your Honor.

19           THE COURT:  Okay.  The objection is sustained.

20           Ms. Huang.

21           MS. HUANG:  Thank you, your Honor.

22   Q.  Mr. Tonkin, as someone with funds on the Mango Markets

23   protocol, would it have mattered to you if you knew that

24   someone was borrowing from the platform without intending to

25   maintain collateral or interest?

O4AAAEIS4                          Tonkin - Direct

1              MS. MORTABANO:  Objection.

2              THE COURT:  Very brief side bar.

3              (Continue on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O4AAAEIS4                         Tonkin - Direct

1          (side bar)

2          MS. MORTABANO:  Your Honor, I think the question was

3     compound.  In addition to addressing issue, no conclusions,

4     they have presented him as an attorney you know, and they're

5     seeking to sort of suggest that he is the one who's had the

6     authority on all this, but also just confusing.  You said would

7     it have mattered to you, compound, if it was interest or this

8     or that.

9          MS. HUANG:  I think I was specifically using exact

10    wording of the letter we had submitted to you, literally, exact

11    phrasing.

12         THE COURT:  What is the question again?

13         MS. HUANG:  The question is would someone funding a

14    protocol -- and a follow up of why.

15         THE COURT:  The why is an issue I think with this

16    witness because you elicited that he had some legal training.

17    So I think that's the concern.  So tell me why it's not a

18    concern because I think Ms. Mortabano's point is that as a

19    lawyer, given that you've established that he has legal

20    training, is practicing as a lawyer, if he were to say why and

21    in response say because I was losing all my money, that would

22    be certainly within bounds.

23         If he is going to explain and I cut him off as he is

24    about to get into things he'd read, but if he is going to get

25    into, well, I thought it was this kind of conduct, that sort of

O4AAAEIS4                          Tonkin - Direct

1    thing, then I understand the nature of the objection.  So you

2    can have an offer of proof some different way but I think it's

3    a wide question.  You may get all the milage that you need by

4    asking that it did in fact matter to him because already did --

5    and I -- what's your response?

6            MS. HUANG:  Your Honor, I think specifically in the

7    defense's 3500 material he doesn't come from a legal angle,

8    just purely comes out -- as a.  In terms of him as using not

9    from the legal standpoint what his conduct means rather how

10   this affects him.

11           THE COURT:  How is this different from the prior line

12   of questioning?  You asked the why question before.

13           MS. HUANG:  That is about the Mango perpetuals.

14   That's one potential changing that -- this one is without the

15   intention to repay or maintain without the -- or interest.

16           THE COURT:  And your argument is that under -- and

17   other cases that that -- what issue does it go to?

18           MS. HUANG:  Material --

19           THE COURT:  Okay.  I am going to overrule the

20   objection.

21           MS. MORTABANO:  Your Honor, just one more.  The 3500

22   also him saying things that I think this was manipulation use

23   of official terms and saying there's even documents where he

24   says it wasn't a regulated market.  So I'm not sure how it

25   would apply.  So he has, I don't know which specific line of

O4AAAEIS4                      Tonkin - Direct

1    the 3500 she is talking about.  The 3500 certainly has him

2    commenting on things like the legal implication and why he felt

3    something was manipulative or not or anything like that.

4              So I just, I understand there may be one portion.  All

5    he says is what Ms. Huang has represented.  But I still think

6    there is a very big risk when she asks general questions he is

7    clearly speaking a thousand miles a minute, just know this and

8    kind of spewing.  So I just reiterate my concern he is getting

9    that are not --

10             THE COURT:  If you can modify the question just a

11   little bit to make sure that you are not going to risk

12   eliciting any sort of analysis or testimony from the

13   perspective of a lawyer, I think you preface the question by

14   saying "a user of Mango Markets" and maybe you could add and

15   solely in terms of funds or something of that nature that he

16   could really answer in that perspective and I'll overrule the

17   objection.

18             MS. HUANG:  Your Honor (Reading).

19             THE COURT:  Yes.  Okay.  Thank you.

20             (Continued on next page)

21

22

23

24

25

1          (In Open Court)

2          THE COURT:  Ms. Huang, you may proceed.

3          MS. HUANG:  Thank you, your Honor.

4   Q.  Mr. Tonkin, as someone with funds on Mango Markets'

5   protocol and I want this solely from your perspective as a

6   depositor, would it have mattered to you if you knew that

7   someone was borrowing from the platform without intending to

8   maintain collateral or pay interest?

9   A.  Yes, it would have bothered me.

10  Q.  Why?  And again, I want it solely from your perspective.

11  A.  Because if somebody borrows from a platform and they don't

12  effectively intend to repay the money or to keep collateral to

13  the extent of the wider depositors pool position, of course

14  that puts my funds at risk.  So, yes, it would have bothered

15  me.

16  Q.  And, Mr. Tonkin, did you eventually receive your funds

17  back?

18  A.  I did.

19  Q.  How long was it?

20  A.  I think about two weeks.

21  Q.  Who provided those funds to you?

22  A.  So it was a mixture.  So it was partly from the Mango own

23  treasury but it was also from funds which had been provided by

24  the individual responsible for the event who again, had

25  returned some funds to the Dow in order to facilitate a

1   repayment or invest the funds.

2   Q.  Could you just describe that time when you couldn't receive

3   these funds?

4               MS. MORTABANO:  Objection.

5               THE COURT:  Ms. Huang, could you rephrase that?

6               MS. HUANG:  Sure.

7   Q.  How would you describe this time when you couldn't access

8   your funds?

9   A.  For me personally it was --

10              MS. MORTABANO:  Same objection, your Honor.

11              THE COURT:  Yeah.  I think if you could -- I'll

12  sustain the objection but I think you just need to make it a

13  little bit more specific as to what you are referring to.

14  Q.  Now would you describe that two-week period or so when you

15  couldn't access your funds on Mango Markets?

16              MS. MORTABANO:  Same objection.

17              THE COURT:  I'll overrule the -- I think if you just

18  are more specific about what you mean by "describe a time

19  period".

20  Q.  How did you feel during this time?

21  A.  I felt concerned.  As I said, I'm not poor, but $124,000 to

22  lose is a material amount money for me.  So I was concerned.

23  It was unsettling.  I was worried and felt a little powerless,

24  frankly.

25              MS. HUANG:  No further questions.  Thank you.

1          THE COURT:  Thank you, Ms. Huang.

2          Ms. Mortabano?

3          MS. MORTABANO:  Yes, your Honor.  Thank you.

4   CROSS-EXAMINATION

5   BY MS. MORTABANO:

6   Q.  Good morning, Mr. Tonkin.

7   A.  Hi.

8   Q.  Thank you for your time this morning.  I just wanted to get

9   a little bit more into what your company, BCG Group does.  I

10  believe you described a provider of business accounts --

11  A.  BCG.

12  Q.  Yes.

13  A.  Yes.

14  Q.  Could you just explain a little bit more to the jury --

15  A.  Sure.  So it's business.  It's we operate out of London,

16  Paris and Switzerland.  So we provide settlement role

17  effectively some of the very large OTC desk exchanges.

18  Liquidity providers they use our platform to settle their

19  trades with each other.  And that's fear currency, not crypto.

20  But we also provide other trading services.  So for an exchange

21  services again to the industry, crypto trading.  So to the

22  crypto trading.  If someone wants to provide either or Bitcoin,

23  whatever, they can do it through us.  And we also do custody

24  services as well.

25  Q.  Thank you.  Who are the BCG Group's customers generally?

O4AAAEIS4                    Tonkin - Cross

1    Are they individuals or corporations?

2    A.  They are all corporations.

3    Q.  And when you onboard your corporate clients, do you ask

4    their company names?

5    A.  Yes.

6    Q.  Do you ask for their country or their state of residence?

7    A.  Yes.

8    Q.  Do you ask for any other corporate documents such as taxi

9    identifying --

10   A.  All that stuff, yeah.  All the standard and all the right

11   type stuff that you'd expect.

12   Q.  Can you explain for that jury what AML is.

13   A.  And anti-money laundering.  It will be --

14          MS. HUANG:  Objection, your Honor.

15          THE COURT:  Overruled.

16   A.  Evidence of who you are, where you are incorporated,

17   directors are, who your ultimate beneficial owners, who your

18   owners are, what business, what your business model is, flow of

19   funds is, all that kind of stuff.

20   Q.  Do you require any written agreements with your customers?

21   A.  Yes.

22   Q.  What kinds?

23   A.  There will be terms and conditions of service.  There'll be

24   a trading agreement where people trade.  There'll be a custody

25   agreement where people want to hold crypto with us.  That kind

1   of thing.

2   Q.  And are those documents provided physically to your

3   customers and they have to sign them or just click through

4   them?

5   A.  No.  We do electronic signing as a rule.

6   Q.  Did Mango Markets have anything like that when you

7   deposited your crypto in November 2021?

8   A.  There was nothing that I had to sign, no.

9   Q.  Were there requirements that you provide your name?

10  A.  I don't believe so, no.

11  Q.  Any kind of identification?

12  A.  No.

13  Q.  Your address?

14  A.  No.

15  Q.  Your income?

16  A.  No.

17  Q.  Your assets?

18  A.  No.

19  Q.  You didn't have to sign any documents as I believe you just

20  said?  Did they have any terms of service that you had to agree

21  to?

22  A.  Nothing that I had to agree to, no.

23  Q.  Did they require any information about the source of your

24  funds that you were going to be depositing with Mango Markets?

25  A.  They did not.

1  Q.  Do you require any kind of information at BCG?

2  A.  Yes.

3  Q.  What kind of information do you require relating to source

4  of fund?

5  A.  It'll typically be --

6         MS. HUANG:  Objection, your Honor.

7         THE WITNESS:  Sorry.

8         THE COURT:  Overruled.

9  A.  So from the context of a corporate, it'll be maybe

10  financial statements, bank statements, that kind of thing.

11  Q.  Okay.  I assume if you had a client who had funds that

12  looked like they may be from stolen funds, would you allow them

13  to deposit with you?

14         MS. HUANG:  Objection, your Honor.

15         THE COURT:  Overruled.

16         MS. HUANG:  Could we please approach, your Honor.

17         THE COURT:  Yes.

18         (Continued on next page)

19

20

21

22

23

24

25

1              (side bar)

2              MR. DAVIS:  I fail to see what the relevance is of

3    this witness's own businesses practices and procedures.  It

4    appears what counsel is trying to do is a comparison between a

5    random company and Mango Markets.  I don't see the relevance of

6    that at all.

7              Point Two is defense counsel being concerned about the

8    witness's being a legal expert.  Now we are a getting into

9    terms such as AML and continuing to ask about practices.  I

10   don't understand the real advantage of this.

11             THE COURT:  Counsel?

12             MS. MORTABANO:  Your Honor, we are not the ones who

13   are trying to compare Mango Markets to traditional finance over

14   and over and over.  All of these terms map on to Mango Markets.

15   The government is the one saying that this was commodities

16   fraud, perpetuals are futures, all that.  Their position is to

17   constantly compare them to traditional finance.  It is relevant

18   when they are talking about what a belief may or may not have

19   understood about what was required on the Mango Markets, the

20   intent of whatever user terms, their understanding that people

21   would be depositing funds with the intent to repay.  That there

22   is a big distinction between organized finance, which in fact

23   requires that you have written agreements with intents to

24   repay, written representations about who you are, recourse

25   against those individuals which you do not have against anyone

O4AAAEIS4                    Tonkin - Cross

1  at Mango Markets.  So those distinctions matter to the jury

2  when they have continued to argue -- well, people were putting

3  their money in and they expected things to be repaid, that

4  expectation --

5          THE COURT:  I got it.  You are saying that this goes

6  to materiality.

7          MS. MORTABANO:  Yes.

8          THE COURT:  And you are not going to ask the witness

9  as to any legal or legal adjacent matter?

10          MS. MORTABANO:  No.

11          THE COURT:  You are getting, as I understood it,

12  counsel was asking about the surface level, like what was

13  required.  And if you do, if there was an objection to

14  questions you got deeper into that, then I would sustain those

15  objections for the reasons that counsel saying.

16          In terms of why these questions are relevant, given

17  that this witness has been presented as a witness on

18  materiality, I think it's fair and given that his employment

19  and the circumstances under which he became like earned the

20  USDC that he then deposited and bank -- or elicit on direct

21  examination it's fair at this level for defense to inquire as

22  to those issues.  So the objection is overruled.

23          (Continued on next page)

24          (In Open Court)

25  BY MS. MORTABANO:

1  Q.  I believe we were getting into the facts that BCG requires

2  a lot of documentation both written and signed with its

3  customers when they are engaging in crypto exchange

4  transactions and other transactions with you; is that a fair

5  characterization?

6  A.  Well, we're a regulated business, so yes.

7  Q.  Okay.  Again, Mango Markets didn't require any of those

8  things from you when you deposited your USDC?

9  A.  No.

10  Q.  And you didn't have any kind of written agreement with

11  Mango Markets, no contract that you signed with them?

12  A.  No.

13  Q.  In theory could you have put funds that were stolen onto

14  Mango Markets?

15  A.  Could I?

16  Q.  Yes.

17  A.  Well, no, because I haven't stolen any funds.

18  Q.  Not to impugn you, Mr. Tonkin, but there was no question

19  asked by Mango Markets of, are these stolen funds or even a

20  warning that said stolen funds cannot be deposited?

21  A.  That's not how Dows work.

22  Q.  How did you understand the Dow to work?

23  A.  Well, at a high level or a more minor level, I can give you

24  a high level.

25  Q.  That would be great.

O4AAAEIS4                        Tonkin - Cross

1    A.   So.  The way Dows work is you have depositors who deposit

2    funds and you also have borrowers.  You can either borrow funds

3    against funds they've deposited, the collateral or they can

4    trade on the platform again with funds that they deposited on

5    that platform.

6    Q.   Thank you.  When you deposited your funds did you make any

7    verbal promises to do anything to Mango Markets with respect to

8    your funds?

9    A.   Any verbal promises?

10   Q.   Yes.

11   A.   Well, no.  There was no one to speak to, so no.

12   Q.   Exactly.  Did you make any written promises to Mango

13   Markets?

14   A.   No.

15   Q.   I assume just to confirm it, didn't ask you to make --

16   A.   No.

17   Q.   You were depositing your funds for liquidity pools, is that

18   right, just earning an interest rate?

19   A.   Yes.

20   Q.   You didn't make any specific verbal or written

21   representation with your USDC when you deposited in 2021?

22   A.   No, I did not.

23   Q.   Did that change at this point in time between 2021 and when

24   you went through your funds?

25   A.   No.

O4AAAEIS4                    Tonkin - Cross

1   Q.  Do you remember, did you happen to click through any kind
2   of terms service, pop-up or any kind of warning on the Mango
3   page?
4   A.  I don't recall that, no.
5           MS. MORTABANO:  Okay.  Mr. Smith, if we could show the
6   jury and Mr. Tonkin GX 1010.
7           (Pause)
8   Q.  Looking at that website --
9   A.  It may have.  I don't recall it.  If you say it was there,
10  I believe you.
11  Q.  Okay.  That says you know if you look at version three,
12  protocol is in public beta.  This is unaudited software.  Use
13  it at your own risk.
14  A.  Yep.
15  Q.  Do you remember knowing that when you --
16  A.  I do remember the version three was in early stage, yes.
17  Q.  Do you see that there's a check box that says I understand
18  and accepts the risks.
19  A.  Yep.
20  Q.  Looking at that, would you understand that you need to
21  check that in order to move forward?
22  A.  I would say so, yes.
23  Q.  Is it safe to assume that if you moved forward you most
24  likely saw that and checked it.
25  A.  That's a safe assumption to make, yes.

1   Q.  I want to talk a little bit about your experience in

2   crypto.  Do you personally use other exchanges?

3   A.  Yes, I do yes.

4   Q.  Which ones have you used?

5   A.  I've used several, Bit Stamp.  I've used Cracken.  I've

6   used Coin Base, Crypto.com.  Those would be the ones.

7   Q.  Okay.  I'm going to walk you through those.  For Bit Stamp

8   do you remember where were there terms of service that you had

9   to agree to to be part of that?

10  A.  Yes.

11  Q.  Did you read those terms of service?

12  A.  Probably.

13  Q.  Probably?

14  A.  Well, I mean you see them, you scan them and you just click

15  yes.  I would have glanced at them, yes.

16  Q.  Same for Cracken?

17  A.  Yeah.

18  Q.  Same for Coin Base?

19  A.  Yes.

20  Q.  Same for Crypto.com?

21  A.  Yes.

22  Q.  You had mentioned that the USDC that you put into Mango

23  Markets you'd gotten from selling stock in your business when

24  you were paid in U.S. dollars?

25  A.  Correct.

O4AAAEIS4                          Tonkin - Cross

1    Q.  You could have simply switched that into British pounds?

2    A.  I could have.

3    Q.  Why didn't you?

4    A.  Well, at the time the pound wasn't having a great time of

5    it on the foreign exchange market.  So I was reluctant at the

6    time to take pounds.  And I was going to wait and see what was

7    going to happen to the markets before I repatriated those funds

8    into pounds.

9    Q.  You didn't want to stuff them into a mattress?

10   A.  I did not.

11   Q.  You mention that you didn't have a U.S. bank account and it

12   would be kind of hard to get.  Could you explain that?

13   A.  It's just very hard for a non U.S. resident getting a U.S.

14   dollar bank account isn't very easy.  So it's just not very

15   easy.  I don't know what else to say.

16   Q.  So you converted them to USDC and you deposited them into

17   Aveh protocol.  I believe you said you thought that was about a

18   half a percent?

19   A.  Rates at this time were quite low.  They fluctuate

20   everyday.  Generally, they were pretty low yeah.

21   Q.  And you wanted to earn some kind of return on you are USDC?

22   A.  Yeah.

23   Q.  You were looking for a better rate.  How did you learn

24   about Mango Markets?

25   A.  Well, I have friends in the industry.  So we kind of talk

O4AAAEIS4                       Tonkin - Cross

```
 1   and I just asked, does anyone know of any interesting protocols
 2   which one can use and this was one and Mango was one of them
 3   that AML mentioned.
 4   Q.  Did you pick Mango because it had a higher interest rate?
 5   A.  Yes.
 6   Q.  Was there anything else about Mango that made you choose
 7   Mango?
 8   A.  Not in particular.  There was, it's on the -- Solana
 9   protocol.  I think it's a really interesting system.  So that
10   was an attraction.
11   Q.  Okay.  But it being on the Solana protocol meant you
12   actually had to take a couple extra steps to switch it?
13   A.  I did.
14   Q.  Can you briefly else tell us what those steps were?
15   A.  Aveh operates on the Ethereum protocol.  So when you
16   acquire USDC it's wrapped in Ethereum.  So you can use it on
17   ELC 20 or Ethereum based platforms because Solana base, I had
18   swapped my Ethereum back to USDC for Solana wrap USDC and then
19   do that.
20   Q.  About how long did that take you?
21   A.  A few minutes.
22   Q.  And I think that you mentioned that at the time Mango had
23   somewhere between a one and three percent interest rate?
24   A.  Yeah.
25   Q.  You don't remember more?
```

O4AAAEIS4                          Tonkin - Cross

1    A.  I don't remember.  It did fluctuate.  As I said, it was

2    typically between about one a three.

3    Q.  Even one percent is still two times what you would have

4    been getting at Aveh, right?

5    A.  Yeah.

6    Q.  What, if any, research did you do other than that

7    conversation with your friend before you signed on to Mango

8    Markets?

9    A.  So I, the platform, I looked at the there's kind of a Q and

10   A page near the -- dot stock.  I am sure you talked about it

11   earlier in discussion.  Yes, the stamps, there's Q and A --

12   other people, two of the Mango guys.  That was what I did.

13          MS. MORTABANO:  Okay.  Mr. Smith, if you could bring

14   up GX 1011, already admitted into evidence.

15          (Pause)

16   Q.  Mr. Tonkin, I believe this is one of those documents that

17   is on DOCCS Mango Markets.

18   A.  It's blank right now but if you go down.

19          MS. MORTABANO:  So it's a cover page.  Then if you can

20   scroll down, Mr. Smith, to page one.

21          (Pause)

22   A.  That looks this would be the version three one, which isn't

23   available any more but that looks familiar.

24          MS. MORTABANO:  If I could direct to you page 110.

25   Q.  Mr. Tonkin, this page mentions liquidations.

O4AAAEIS4                          Tonkin - Cross

1    A.   Yes.

2    Q.   Did you mention anything about liquidations on the Mango

3    Markets platform?

4    A.   At a high level, yes.

5             MS. MORTABANO:   That first paragraph and the second

6    heading we could blow that up says:   Every bank account must

7    have a health above zero.   If it slips below zero liquidators

8    can start liquidated the account until the init health is above

9    zero.   The liquidator will force-ably cancel all open orders

10   before paying off any liabilities in the account and

11   withdrawing the assets (defined as positive perp balances or

12   token deposits).   The liquidator earns the liquidation fee

13   which differs for each spot asset and perp contract.

14   Q.   Did I read that correctly?

15   A.   I believe so, yes.

16             MS. MORTABANO:   If I could get the paragraph right

17   below that.

18             (Pause)

19             MS. MORTABANO:   If at the end of the liquidated

20   instruction the account has no assets but still has liability,

21   then the account is placed under bankruptcy.

22   Q.   Is that correct?

23   A.   Yes.

24   Q.   So for the liquidations was your understanding based on

25   this document or your experience, that once an account was

O4AAAEIS4                       Tonkin - Cross

1    eligible for liquidation there was no recourse?  You couldn't

2    as the person being liquidated say wait, wait, but I intend to

3    repay and stop it; is that right?

4    A.  That's one interpretation of it, yes.

5    Q.  There's no sort of repo man that you can fight with and

6    there's no bank that you can say wait, please, don't liquidate

7    me?

8    A.  Again, that's a reading of it, yeah.

9    Q.  Okay.  You'll notice that in the next sentence this says:

10   During bankruptcy the liquidator continues offsetting

11   liabilities but receives USDC from the insurance fund.

12           So is your understanding that if an account went into

13   bankruptcy, meaning there was no collateral left and they were

14   liquidated, in fact, the insurance funds set up by Mango

15   Markets is what would then pay the balance of that debt?

16   A.  That's what it says, yeah.

17   Q.  Then says if there's no more USDC in the insurance fund

18   there will be socialized loss event.  What did you understand

19   socialized loss event to be?

20   A.  If you say it's a shortfall, all depositors bear a pro rata

21   share of that loss.

22   Q.  Mango Markets had three options in place if someone's

23   collateral was liquidated.  First, if they went into a

24   negative -- first, they took all the person's collateral that

25   is on the protocol, correct?

1   A.  Yeah.

2   Q.  After that they then went to the insurance fund on the Dow,

3   correct?

4   A.  That's what it says, yes.

5   Q.  After that they would then do a socialized loss event if it

6   was necessary which is basically sharing the loss among the

7   user?

8   A.  Yes.

9   Q.  No where in here does it say they're going to sue the

10  bankrupt person.  They don't know who that is, right?

11          MS. HUANG:  Objection, your Honor.

12          THE COURT:  Sustained.

13  Q.  Is there any way that they can have any recourse against

14  the bankrupt account beyond that liquidation as far as you

15  understood it?

16          THE COURT:  You may need to rephrase your question.

17  Q.  Did you understand that Mango had any way to identify, let

18  alone pursue the loss itself from the person who had a bankrupt

19  account according to these documents and your understanding at

20  this time?

21          MS. HUANG:  Objection, your Honor.

22          THE COURT:  Overruled.

23  A.  Unless somebody actually revealed themselves later, no.

24  Q.  And based on this document, this doesn't contemplate one

25  being revealed later or even pursuing them according to the

1   language here?

2           MS. HUANG:  Objection, your Honor.

3           THE COURT:  That's sustained.

4   Q.  Turning to page 111 of this document, this describes the

5   insurance fund and in fact advertises to users the Mango

6   Markets' program as a $70 million Dow controlled treasury or

7   insurance on version three deposits when bankrupt accounts --

8   A.  That's what that says, yes.

9   Q.  Were you aware of that $70 million Dow in the insurance

10  fund when you deposited into Mango Markets?

11  A.  The 70 million number, I was aware that the fund existed,

12  yes.

13  Q.  Would you have considered 70 million to be a significant

14  insurance fund in terms of value?

15  A.  Based on the assets that were deposited at the time, yes.

16          MS. MORTABANO:  Moving on to next page, 112.

17          THE COURT:  Ms. Mortabano, how much time do you have

18  left?

19          MS. MORTABANO:  Maybe ten minutes.

20          THE COURT:  Okay.  We'll we will --

21          MS. MORTABANO:  Hopefully less, your Honor.

22          If you could just blow-up the entire portion.

23  Q.  Mr. Tonkin, you can review it.  Mr. Tonkin, if you could

24  take a look at this socialized loss and just confirm this is

25  your understanding of how the socialized loss system worked.

O4AAAEIS4                    Tonkin - Cross

1    A.  Yep.

2              MS. MORTABANO:  Great.  You can take that down

3    Mr. Smith.  Thank you.

4    Q.  Mr. Tonkin, you didn't do any trading on Mango Markets

5    platform, correct?

6    A.  I did not.

7    Q.  Do you have any understanding of how MNGO-PERP worked?

8    A.  I had a high-level understanding.  I'm not a professional

9    trader as such.  So I knew enough but not at a granular level

10   no.

11   Q.  Sorry.  When you deposited your USDC did you receive Mango

12   tokens?

13   A.  No.

14   Q.  You never owned any Mango token?

15   A.  No.

16   Q.  I believe that you discussed with the government that the

17   Mango Markets founders provided their perspective --

18             MS. HUANG:  Objection.

19             THE COURT:  That's sustained.

20             MS. HUANG:  Objection, your Honor.

21             THE COURT:  You may need to rephrase your question.

22             MS. MORTABANO:  Thank you, your Honor.

23   Q.  Mr. Tonkin, were you part of the Mango discord?

24   A.  At the time of October '22, yes, I was.

25   Q.  When did you join the Mango discord?

O4AAAEIS4                    Tonkin - Cross

1   A.  I am going to say earlier that year.

2   Q.  Okay.  On the day in question, October 11, October 12,

3   given the time change were you sleeping when --

4   A.  I was sleeping, yes.

5   Q.  So you only learned about it after the fact?

6   A.  I learned about it at about eight a.m. that morning UK

7   time.

8   Q.  You weren't actively trading on the platform when that

9   happened?

10  A.  No.

11  Q.  You mentioned that you had approximately $124,000 on the

12  platform and you were ultimately made whole?

13  A.  I was, yes.

14  Q.  I believe you initially deposited around $122,000 on the

15  platform and withdrew $124,000?

16  A.  That's correct.

17  Q.  I just have a few more.

18          Have you ever met Mr. Eisenberg?

19  A.  No.

20  Q.  Spoken to him on the phone?

21  A.  No.

22  Q.  Over Zoom?

23  A.  No.

24  Q.  What's App?

25  A.  No.

1   Q.  Text?

2   A.  Nope.

3   Q.  E-mail?

4   A.  Nope.

5   Q.  Discord?

6   A.  Nope.

7   Q.  Any way?

8   A.  Nope.

9   Q.  Has he ever made any representations to you directly?

10  A.  He has not.

11          MS. MORTABANO:  No further questions, your Honor.

12          THE COURT:  Thank you.  Ms. Huang.

13          MS. HUANG:  Very, very briefly, your Honor.

14          Mr. Smith, can you please pull up Government Exhibit

15  1011 please.

16          (Pause)

17  REDIRECT EXAMINATION

18  BY MS. HUANG:

19  Q.  Mr. Tonkin, this is what you reviewed a little earlier ago?

20  A.  Yes.

21  Q.  You remember earlier you talked about reviewing the

22  frequently asked questions?

23  A.  Yes.

24          MS. HUANG:  Can we turn to page 126 of this document.

25          (Pause)

O4AAAEIS4                    Tonkin - Redirect

1    Q.  Mr. Tonkin, are these the FAQs you were talking about?

2    A.  Yes.

3    Q.  Were the FAQs used to help you understand what is expected

4    on the platform?

5    A.  Sorry.  What to expect.  Yes, yes, yes.

6              MS. MORTABANO:  Objection.

7              THE COURT:  Overruled.

8    Q.  Mr. Tonkin, can you just read the question and answer for

9    the "What Prevents Someone"?

10   A.  What represents someone from borrow funds, with drawing and

11   running away with it?  Our system checks deposits, positions

12   and borrows accounts to ensure that an individual cannot

13   withdraw more than the equity calculated by val deposits, plus

14   val especially orders, minus val (borrows).

15             MS. HUANG:  Thank you, Mr. Tonkin.  No further

16   questions.

17             MS. MORTABANO:  No further questions, your Honor.

18             THE COURT:  Okay.  Thank you very much.

19             THE WITNESS:  Thanks a lot.  Thank you.

20             THE COURT:  All right.  Well, I've eaten into your

21   promised time and I recognized that.  So I'll give you little a

22   bit on this end.  So we'll come back at 1:20.  So let's say

23   1:30.  Just to be generous, take a little extra time.

24             Thank you, members of the jury.  we are still making

25   excellent time and we're doing very well.  So I think we'll

1  take a little bit extra time right now.  Come back at 1:30.

2              All rise for the jury.

3              (Jury not present)

4              THE COURT:  All right.  Please be seated.

5              Ms. Huang or whoever wants to address it, I gave the

6  jury until 1:30 with the expectation that we'd be able to

7  finish on time given who we have left.  If that's not right,

8  let me know.

9              MR. BURNETT:  I expect the direct for Special Agent

10 LeGrange to be where someone half an hour and 45 minutes

11 depending on how fast she reads.  Basically, I don't know how

12 long cross is but that should put us on track to finish today.

13             THE COURT:  Is that your final witness?

14             MR. BURNETT:  Yes.

15             MR. TALKIN:  I do not expect the cross to be very long

16 with that witness.

17             THE COURT:  Okay.  Any issues other than Exhibit 401

18 to address before we break?

19             MR. DAVIS:  No other issues before the break.

20 Unfortunately, because this is our next witness, that really

21 plays in how we have to rearrange documents in the next little

22 bit but of course we will adjust to whatever the Court sees

23 fit.

24             THE COURT:  Now, well, let me ask you a question, if I

25 were to accept the defendant's completeness objection, would

1    you then reduce that exhibit or would you put it in with just

2    the addition?  I'm trying to understand the timing here and you

3    don't have to make a definite at this time.  I just want to

4    understand.

5           MR. DAVIS:  Yes, your Honor.  If the Court rules that

6    the Tweet needs to be included, we will not introduce that

7    exhibit.  So let me just ask you a question.  Then I'm going to

8    think about this just during our break, which is so let me take

9    a step back.

10          So, Ms. Mortabano, were there any cases that you

11   wanted me to consider before I render my decision?

12          MS. MORTABANO:  I confess, your Honor, I have not had

13   chance to look at it.  We have someone in California.

14          THE COURT:  We've got like ten minutes and then

15   Mr. Davis.

16          So here is the issue that I'm struggling with because

17   I'm with you on Lumiere and Campos.  I see the standard.  No

18   end run and the hearsay rule.  I understand than that.  And I'm

19   even with you for most of the content of Exhibit 401.  The one

20   thing that's a little bit troubling to Court is that the

21   specific line that comes out of the, at least the defendant

22   submits comes out of the article.  And I'm with you that he is

23   putting it out there in the Tweet so that he is at least

24   arguably adopting that statement.  So I'm again, still with

25   you.  The statement as to why that statement is relevant, it

1    seems to be his use of this term "manipulation", which as we've

2    been going back and forth in this case numerous times is a

3    legal term of art.

4           So if that statement is coming in, in fairness under

5    Campos and all of these cases, wouldn't it be a proper

6    completing statement to put in the Tweet that is referenced in

7    that exact conversation given that he is telling the person who

8    he just referred to the statement, you know, he is saying it's

9    manipulation, but wouldn't that be a proper conclusion for the

10   jury to also understand that at that same time he referred the

11   other participant in the conversation to Tweet that expressed

12   his view whether it's believable or not, that it was not a,

13   that he did not believe his actions were not real.  So just

14   help me with that.

15          MR. DAVIS:  I want to be crystal clear about the

16   Tweets.  The link before he uses the word "manipulate" in an

17   article.

18          THE COURT:  I understand that.  That's where the

19   defendant says he is getting that language from austerity sucks

20   Tweet.  I'm saying that you are putting it in.  I think like in

21   terms of that line because he is using the term "manipulation"

22   and because you believe it's highly probative to the

23   characterization of his conduct, it would be irrelevant because

24   it shows his understanding of what he was doing, right?  And

25   that goes to manipulative intent which is one of the key issues

1    in this case.

2              I'm saying that why wouldn't it be not just kind of

3    end run around the hearsay rule and not just kind the Lumiere

4    situation to put in the Tweet that he references in the same

5    conversation where says everything that I did was totally

6    legal.

7              MR. DAVIS:  Two responses to that.  First, to that

8    particular sentence does more than just use the manipulate, it

9    describes the conduct that he did -- two to three million

10   dollars to manipulate the underlying markets.  And so that's

11   point one.  And the reason that's important is because this

12   puts it even more on all fours.  This is exactly what Judge

13   Rakoff was talking about.

14             In that case, the paragraph we read together, the

15   difficulty was trying to put in a separate recording where he

16   said something to the effect of like, I didn't know it was his

17   own exculpatory sentences.  Take for example, his statement

18   that platforms explanation of marks kind of made sense.  That's

19   exactly what the Court is suggesting here, that there is a

20   separate writing where the defendant is taking a separate view

21   where everything he did was innocent.

22             THE COURT:  That wasn't the statement in Lumiere.

23   However, the reasoning in the decision did not address that

24   particular issue because the way Judge Rakoff characterized

25   what was going on the other parts of the statement in being put

1    in simply gave historical facts about what happened.  And so in

2    that context it would not be a proper completion to put in

3    self-serving statements about intent.  That's at least how it

4    was characterized when you get down to what the ruling was.

5         MR. DAVIS:  At page 758, this is how the Court

6    describes it.  The government introduced limited portions of

7    this recording to show what -- did.  Beginning in 2011, a

8    mismarked security held by the credit fund by adding gross

9    ledger brokers -- What it said in this case when they're

10   talking about his marking and parroting back made up prices the

11   language, is equally important to intent in this case as it is

12   here.

13        THE COURT:  Are you disputing that that line is quoted

14   from the article?

15        MR. DAVIS:  Not at all, your Honor.

16        THE COURT:  It's different in at least that way as

17   well because the probative value of the statement is reduced by

18   the fact that it is quoted, at least from the defendant's

19   perspective.

20        MR. DAVIS:  I agree that it seems like a jury issue to

21   decide.  But one more arrow on like the probative side here.

22   If we go up into the chat, he uses quotes for the bounty

23   amount.  He uses quotes.  The defendant uses quotes in that.

24   It's showing the difference between what he is saying publicly

25   which is false and exculpatory and what he is saying privately.

1        So to the extent you can read into his quote, he

2    quotes an article and he doesn't say look, this article says

3    here is the capital amounts.  I didn't manipulate anything.

4    What he says is he is copies it exactly and says this is

5    accurate.  So he adopts it.  They want to argue that this is

6    just him quoting and copying and pasting and don't read too

7    much in.  They should totally argue that to the jury.  But we

8    should be able to argue that is not what happened here.  The

9    defendant is making a private confession to the crime and he is

10   not -- meanwhile, he shouldn't be able to get into a public

11   exculpatory statement that's classic hearsay.

12        THE COURT:  Well, yeah, but at the time of Lumiere, as

13   I think defendant argues that at that time the rule itself did

14   not say that the completing statement could be put in over a

15   hearsay objection, although that is the understanding.  And so

16   now the rule explicitly says that.  So saying that it's hearsay

17   doesn't are like change things.  Really, the only question is

18   is it necessary to make the statements that are put in not

19   misleading or to put them in necessary context.  I think you

20   would agree with me that is a fair statement of what the rule

21   of completeness means in the context?

22        MR. DAVIS:  I would, your Honor.  But just to be

23   clear, the rule I was offering about hearsay was directed from

24   the quoted case.

25        THE COURT:  I agree with you.  I think they're trying

1    to say if it's not that, then it's an end run around the

2    hearsay rule.  I'm with you a hundred percent.  I am saying

3    that very narrow if you weren't putting in those last lines, I

4    think that you're correct that putting in the Tweets would not

5    be a proper completing statement.  At that point all you really

6    have is that there's been a reference to a statement but

7    there's been nothing about the statement that is put in in this

8    document.  It's really the fact that you are putting in, on

9    your view, his characterization of his conduct as manipulation.

10    And so I think that the argument, the reason why it fits into

11    the rule is because if you have him saying to someone this was

12    manipulation to which you are going to say that shows that he

13    is like admitting the crime, isn't it proper to make that not

14    misleading or to put it in proper context that to that same

15    person he directed them to Tweet saying, I've consulted with

16    lawyers and everything I said was legal.

17            MR. DAVIS:  I totally understand.  I am not trying to

18    pushback.

19            THE COURT:  You should pushback.

20            MR. DAVIS:  I just want to make clear, I think that

21    goes to the difference between two exhibits that we've

22    discussed.  The first one was, I think it was 109.  The other

23    issue that is initially raised, in that signal chat it was a

24    private conversation and the sender says something like, heard

25    it was you behind -- The defendant responds -- Now that is

O4AAAEIS4                    Tonkin - Redirect

1    directing a statement saying no, no he is denying here and then

2    he is going, look, I actually agree.  Point taken on rule

3    completeness there and we're not offering.  Here, that's not

4    what he says.  He says I cannot comment on the record beyond

5    the existing statement but I can help clarify on background.

6    That's different.

7              THE COURT:  I'm agreeing with you on that.  That's

8    what I already said that I think you are right as to like those

9    parts of the statement.  It's only the last part that it's like

10   actually the other part.  It's the part that doesn't refer to

11   the statement directly but it's all in the same conversation.

12   So I'm with you.

13             For instance, if you were to say let's put in the

14   document without those couple last statements because you

15   wanted show the historical facts about what Mr. Eisenberg was

16   saying to someone he conducted, then I would want to think

17   about this and make sure I get it right but I would probably

18   overrule the objection being made.  It's really -- and that's

19   why I wanted to focus you on that very last part of the

20   conversation where he says you want to put in that's

21   manipulation and he is calling it manipulation.  He is using

22   that term, which is a legal term of art.  And so it's a legal

23   term of art, isn't it a proper completion that in the same

24   conversation he directs someone to a Tweet that is about his

25   legal characterization of what he did?

O4AAAEIS4                    Tonkin - Redirect

1          MR. DAVIS:  I totally take the Court's point.  If I

2    could just briefly respond on this?

3          THE COURT:  Yes.

4          MR. DAVIS:  I would say it's different in this

5    context.  We are now talking about multiple different

6    principles that come up in the case which is a lay witness' use

7    of the word "manipulation".  We are in the third category of

8    people who have used the word "manipulation".  The defendant's

9    use of the word manipulation, that is separately analyzed.

10   That is not the government calling a witness to testify.  That

11   is the defendant's own words and he adopted this.

12         Now again, if they want to say, look, he is just

13   parroting back this thing, I have to say it's fair for them to

14   argue and that goes to the weight of the evidence.  But we are

15   allowed to argue the alternative, which is, look, he copied and

16   pasted this sentence.  He adopted it.  He didn't say, look, it

17   wasn't manipulation.  He didn't say -- he said this is what I

18   did.  And that's a direct statement from the defendant.  That's

19   a chat under his account.  And we should be allowed to argue to

20   the jury the probative value of that.

21         So I think it's different on a number of different

22   respects.  So if a calls -- the legal term to use the legal

23   term and manipulation and what' we've been trying to police

24   that through a trial.  But it's different with the defendant's

25   own words.

O4AAAEIS4                    Tonkin - Redirect

1          MS. MORTABANO:  Your Honor, if I could Mr. Davis

2    pretty much said it for us.  He said he adopts this language

3    and you know, if he had put in context right after that saying,

4    I don't adopt it, then okay it would be proper.  He put it in

5    context at the start by saying I can't speak to you other than

6    a statement I've already provided and then he says here is some

7    public background information.  All right.  So it's literally

8    Mr. Davis is suggesting that the fact that he didn't resay

9    right afterward, I actually don't agree with this in public.

10   Let me refer to you again to my statement is what should decide

11   it.  This just does not make my sense -- I have not read

12   Lumiere -- is that there the statement that they were seeking

13   to introduce wasn't actually mentioned on the face of the

14   recording or the exhibit as marked by the government which

15   obviously here it does.  So we think that is a distinguishing

16   point.

17          And Mr. Klein may have some additional law on this

18   point that I have not.

19          MR. KLEIN:  Your Honor, I found one recent case here

20   in the Southern District.  It's United States v. Htut and 2023

21   Westlaw 4399049.

22          THE COURT:  OK.

23          MR. DAVIS:  If counsel would be so kind as to submit

24   that.  I know doesn't --

25          THE COURT:  I'm sensitive to the process --

O4AAAEIS4                           Tonkin – Redirect

1             MR. DAVIS:  This objection was raised at 6:30 a.m. by

2      the defendant.  We filed a letter over the weekend.  Your

3      Honor, I'm happy to read this case but that's all I would like

4      to review it and see it, but the Court is ready to rule I

5      understand.

6             THE COURT:  I'll give you time to read the case.  So

7      we will come back after the break and then we can hopefully

8      resolve this issue.  Thank you.

9             (luncheon recess)

10            (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O4CCeis5

AFTERNOON SESSION

1:35 p.m.

THE COURT:  Are we prepared to proceed or do people
need a few minutes?

MR. BURNETT:  Think we're okay from the government's
side.

THE COURT:  Mr. Greenspan, we ready to go?
Mr. Talkin?

MR. TALKIN:  Yes.

THE COURT:  One additional question, Mr. Burnett.  We
had this discussion yesterday about Mr. Eisenberg using the
Switchboard platform.  Is Agent La Grange, is that who is going
to have that testimony?

MR. BURNETT:  Yes.

THE COURT:  Pursuant to Rule 106, the defendant moves
to admit his own Tweets that were referenced in a chat that the
government is admitting into evidence at exhibit 401.  The
motion to admit those Tweets on the basis of Rule 106 is
granted.

Rule 106 requires admission of so much of a statement
or recording as necessary to explain the admitted portion to
place it in context, or to avoid misleading the trier of fact,
or to ensure a fair and impartial understanding of the admitted
portion.  That's *United States v. Lumiere*, 249 F. Supp. 3d 748,
757 (S.D.N.Y. 2017).  Courts in this circuit have refused to

O4CCeis5

1    admit, under Rule 106, statements that offer context only

2    insofar as they represent the defendant's self-serving attempts

3    to shoehorn after-the-fact justifications for his actions into

4    his descriptions of his actions.  That's also from *Lumiere*.

5    The chat here contains the defendant's inculpatory statements

6    or statements he adopted, including a statement describing his

7    conduct as manipulation, which is, as the Court has said, a

8    legal term of art.  Earlier in the same chat, the defendant

9    refers the person he's chatting with to a statement he made on

10   Twitter, or X.  In those Tweets defendant says that he believes

11   all his actions are legal.

12          The Court finds these Tweets must be admitted to

13   ensure a fair and impartial understanding of the admitted

14   portion.  They provide context for the manner in which the

15   defendant was using the word "manipulation."  Indeed, in

16   arguing the defendant adopted the statement about manipulation,

17   which was a quote from an article, the government emphasized

18   the defendant did nothing to distance himself from that

19   characterization of his actions.  But the fact that the

20   defendant had earlier in the same conversation referred the

21   person he's chatting with to the statement, reflecting his

22   belief that his actions were lawful does in fact provide the

23   distance that the government says is lacking.

24          In support of its argument that defendant's Tweets

25   should not be admitted, the government cites *Lumiere* and *United*

O4CCeis5

1    *States v. Campos*.  Neither case is directly on point.  In

2    *Lumiere*, the statements that had been admitted dealt with the

3    facts of what the defendant did.  Indeed the Court underlined

4    that word in its ruling.  The Court further noted that even if

5    a credulous jury might agree that the statement that was sought

6    to be admitted showed that the defendant was acting in good

7    faith, it neither explained nor has relevance to the bare

8    historical facts the government introduced, which is the way

9    the Court characterized the statements being introduced by the

10   government.  Here, the statements the government is admitting

11   relate to the defendant's intent and knowledge.  Moreover the

12   statements show the defendant characterizing his conduct using

13   a legal term of art that is at the heart of this case.  That

14   too distinguishes this case from *Lumiere*.

15           In *Campos*, the government had introduced six excerpts

16   from 8 hours of 30 recorded conversations.  The Second Circuit

17   found that the district court did not abuse its discretion in

18   precluding defendant from introducing more of the recordings,

19   emphasizing the fact that the district court rejected

20   defendant's assertion that all the recordings were one long

21   continuing conversation.  The district court had also explained

22   that the government had introduced the recordings for a limited

23   purpose, the falsity of an assertion.  Here, the Tweets were

24   referenced in the same statement that the government seeks to

25   introduce, and the government is introducing statements going

O4CCeis5

1    to the defendant's knowledge and intent, exactly the same

2    things that the excluded statements relate to.

3              That's the ruling on exhibit 401.

4              Any further issues to address before the jury comes

5    in?

6              MR. DAVIS:  No, your Honor.  Thank you.

7              MR. TALKIN:  Just that Mr. Eisenberg needs to run to

8    the restroom real quick.

9              THE COURT:  Okay.

10             MR. TALKIN:  Thank you, your Honor.

11             THE COURT:  While we're waiting, so we have one last

12   witness, the government will rest, we'll let them go for the

13   day, and then we'll have motions.

14             MR. KLEIN:  Yes, your Honor.  Is there going to be a

15   little break between the government resting and us coming back

16   to the Rule 29 motion?  15, 20, 30 minutes just to square away

17   our notes?

18             MR. GREENSPAN:  45.

19             MR. KLEIN:  45, hour, two hours.

20             MS. MARTABANO:  Monday.

21             MR. KLEIN:  We can do it today, we just need a little

22   time to absorb the testimony.

23             THE COURT:  We'll be done at 2:30 and we'll start with

24   arguments at 3:00.

25             Mr. Hernandez, let's bring the jury in.

1          (Jury present)

2              THE COURT:  Welcome back.

3              Mr. Burnett, you may call your next witness.

4              MR. BURNETT:  The government calls Special Agent

5    La Grange.

6     TAYLOR LA GRANGE,

7          called as a witness by the Government,

8          having been duly sworn, testified as follows:

9              THE DEPUTY CLERK:  Can you please provide the Court

10   your first and last name, and spell your first and last name.

11             THE WITNESS:  Yes, Taylor T-A-Y-L-O-R, La Grange,

12   L-A G-R-A-N-G-E.

13   DIRECT EXAMINATION

14   BY MR. BURNETT:

15   Q.  Good afternoon, Special Agent La Grange.

16   A.  Good afternoon.

17   Q.  Where do you work?

18   A.  FBI New York.

19   Q.  How long have you worked there for?

20   A.  Approximately three and a half years.

21   Q.  Is there a particular group that you're a part of now?

22   A.  I currently work on the securities fraud squad.

23   Q.  About how long have you been on that squad for?

24   A.  About five months.

25   Q.  What did you do before that?

O4CCeis5                          La Grange- Direct

1   A.   I worked counterintelligence matters.

2   Q.   In preparing to testify today, have you reviewed certain

3   documents and communications from this case?

4   A.   Yes.

5   Q.   And how did you get those documents?

6   A.   I received the documents from Special Agent Brandon Racz

7   and yourself.

8   Q.   Other than reviewing those documents you received from me

9   and Special Agent Racz, have you had any role in investigating

10  this case?

11  A.   No.

12  Q.   Now, I'd like to show you what's been marked as government

13  demonstrative 1830.  Will this help in your testimony today?

14  A.   Yes.

15          MR. BURNETT:  The government seeks permission to use

16  demonstrative 1830.

17          MR. TALKIN:  No objection, your Honor.

18          THE COURT:  You may use demonstrative 1830.

19          MR. BURNETT:  Before we publish this for the jury, one

20  housekeeping matter.  The government offers 608, which we

21  showed yesterday, but forgot to admit at the time.

22          MR. TALKIN:  Also no objection.

23          THE COURT:  Exhibit 608 will be admitted.

24          (Government's Exhibit 608 received in evidence)

25          MR. BURNETT:  Mr. Oshinsky, if you could please

O4CCeis5                          La Grange- Direct

1    publish this for the jury to take a look at.

2    Q.   What are we looking at here?

3    A.   This is a timeline of the documents that I reviewed.

4    Q.   What year did everything happen in?

5    A.   In 2022.

6    Q.   Let's walk our way through this document.  What's the first

7    date?

8    A.   July 6, 2022.

9    Q.   What's the entry there?

10   A.   Eisenberg lawsuit.

11            MR. BURNETT:  At this point, I'd like to read a

12   stipulation between the parties, which is Government Exhibit

13   1704, which the government offers at this time.

14            THE COURT:  Any objections?

15            MR. TALKIN:  No, it's a stipulation.  No objection.

16            THE COURT:  Okay.

17            (Government's Exhibit 1704 received in evidence)

18            MR. BURNETT:  If we could show that to the jury,

19   please, and blow up the first paragraph 1, the numbered

20   paragraph 1.

21            The stipulation is on or about July 6, 2022, Avraham

22   Eisenberg, through his lawyers, filed a lawsuit in the United

23   States federal court, in Avraham Eisenberg v. Numeris Ltd.,

24   Sasha Ivanov, and DOES 1-10, with the case captioned in the

25   District of Puerto Rico.  Avraham Eisenberg sued the defendants

O4CCeis5                         La Grange- Direct

1    for, among other things, price manipulation, in violation of

2    the Commodities Exchange Act, Title 7, United States Code,

3    Section 9(1), civil conspiracy, fraudulent misrepresentation,

4    fraudulent inducement, dolo, negligent misrepresentation,

5    conversion, unjust enrichment, promissory estoppel, equitable

6    estoppel, indebitatus assumpsit.

7              Take that down and go back to our timeline.

8    Q.  I'd like to show you a document that comes a little later

9    on this timeline, but it's a document that's Government Exhibit

10   609.  Do you see that from October 8th?

11   A.  Yes.

12             MR. BURNETT:  At this time, the government offers

13   exhibit 609 and its attachment, 609A.

14             THE COURT:  Any objection?

15             MR. TALKIN:  No further objection, your Honor.

16             THE COURT:  Exhibit 609 and 609A will be admitted.

17             (Government's Exhibits 609, 609A received in evidence)

18             MR. BURNETT:  Before we show this exhibit to the jury,

19   let's take a look at another stipulation, which is 1702,

20   please.  If you could scroll to the second page.

21             If you look at No. 5, this says that Government

22   Exhibit 600 through 613 — so I'm including exhibit 609 — is a

23   true and correct copy of a record produced by Google for the

24   Google account 613IKE@gmail.com.

25             If we could very quickly take a look at Government

O4CCeis5                      La Grange- Direct

1    Exhibit 613, please.

2            If we could publish this for the jury.  It's already

3    in evidence.

4    Q.  Special Agent La Grange, do you see this is Google

5    subscriber information?

6    A.  Yes.

7    Q.  What email is it for?

8    A.  613IKE@gmail.com.

9    Q.  What's the name associated with this account?

10   A.  Avraham Eisenberg.

11   Q.  Let's go back to 609, which is from this account, and I'd

12   like to take a look at this document with the jury, please.

13           Could you read the first sentence there.

14   A.  Sasha Ivanov is committing a $500 million fraud in market

15   manipulation.

16   Q.  Now, that name, Sasha Ivanov, do you recognize that from

17   anywhere?

18   A.  Yes.

19   Q.  Where do you recognize it from?

20   A.  From the previous document we reviewed.

21   Q.  From the stipulation about the lawsuit?

22   A.  Yes.

23           MR. BURNETT:  If you could zoom in on the paragraph

24   that says high level description of the fraud.

25   Q.  Could you read that paragraph please.

1    A.  High level description of the fraud.  Sasha and other

2    parties created a lending platform on the Waves chain called

3    Vires Finance, and an Algo Stablecoin, called USDN, that could

4    be created by locking up the Waves token.  For example, if

5    Waves was $50, you could spend one Waves to the contract and

6    receive 50 USDN.  They hardcoded the value of the USDN on the

7    platform to $1 and allowed borrows of USDC and USDT against it.

8    They spent tens of millions of dollars buying up Waves so that

9    the price went up from single digits to a high of $60.  They

10   then turned those Waves into USDN at this inflated price and

11   borrowed about 550M of USDC and USDT against their USDN that

12   they had enticed to lend on buyers.  They then stopped paying

13   interest, reducing the max APY from 80 percent to 0 percent.

14   Q.  If we could take that down, do you see there is a section

15   called "Specific Fraudulent Actions"?

16   A.  Yes.

17   Q.  Can you read the first bullet point on there.

18   A.  Market manipulation of the Waves coin.

19   Q.  Let's go back to Government Exhibit 1830, or government

20   demonstrative 1830.  I'd like to move up to September 1st.  Do

21   you see there is an entry there that's labeled "Tweet"?

22   A.  Yes.

23   Q.  What does that mean?  Where does that document come from?

24   A.  Tweet comes from Twitter.

25   Q.  I'm going to show you Government Exhibits 800 and 800A.

1          MR. BURNETT:  If we can have them go side by side.

2    Q.  Do you recognize these?

3    A.  Yes.

4    Q.  How do you recognize them?

5    A.  I recognize the one on the left, the Tweet, because I

6    reviewed the Twitter account associated with Avraham Eisenberg.

7    Q.  Are these true and accurate copies of a Tweet and the

8    article linked in that Tweet?

9    A.  Yes.

10          MR. BURNETT:  The government offers 800, 800A.

11          MR. TALKIN:  No objection.

12          THE COURT:  These documents will be admitted.

13          (Government's Exhibits 800, 800A received in evidence)

14          MR. BURNETT:  Let's start with Government Exhibit 800

15   for the jury, please.

16   Q.  You said this is a Tweet; correct?

17   A.  Yes.

18   Q.  What's the name associated with the Twitter account?

19   A.  Avraham Eisenberg.

20   Q.  What's the date?

21   A.  September 1st, 2022.

22   Q.  Can you read what the message says, not the picture, just

23   the message?

24   A.  Guess what happened next.

25          MR. BURNETT:  And scroll to the next page, please.

1  Q.  What does that message say?

2  A.  If you guessed, he dumped $725 million USD to buy ZAR and

3  to low liquidity right before midnight on Christmas.  You win.

4  Q.  Do you see there's a link here that says justice.gov?

5  A.  Yes.

6  Q.  I'm going to have you take a look at Government Exhibit

7  800A.  What relationship is there between that link and this

8  article that we just pulled up?

9  A.  That link brings you to this press release.

10 Q.  And what's the title of the press release?

11 A.  Cofounder and chief investment officer of London based

12 hedge fund charged with FX market manipulation and fraud.

13 Q.  What's the date?

14 A.  September 1st, 2022.

15 Q.  Could you read the first two paragraphs of this press

16 release here.

17 A.  Damian Williams, the United States Attorney for the

18 Southern District of New York, and Michael J. Driscoll, the

19 Assistant Director0In-Charge of the New York Field Office of

20 the Federal Bureau of Investigation announced the unsealing of

21 an indictment charging Neil Phillips, the cofounder and chief

22 investment officer of a hedge fund based in the United Kingdom,

23 with conspiracy to commit commodities fraud, conspiracy to

24 commit wire fraud, commodities fraud, and wire fraud in

25 connection with a scheme to artificially manipulate the United

O4CCeis5                          La Grange- Direct

States dollar, South African rand (ZAR) exchange rate to
fraudulently trigger a $20 million payment under a barrier
options contract.  Phillips was arrested in Spain earlier this
week at the request of the United States.

     U.S. Attorney Damian Williams said, as alleged, Neil
Phillips, the cofounder and chief investment officer of a
prominent UK hedge fund, manipulated the FX market in order to
unlawfully obtain millions of dollars in payments for his hedge
fund under an options contract.  Market manipulation is
pernicious in all of its forms and today's charges are a
reminder that the Southern District of New York will
steadfastly investigate and prosecute such activity whether it
occurs in the equity market, the FX market, or elsewhere in the
financial system.

     MR. BURNETT:  Let's take that down and go back to
demonstrative 1830, please.

Q.  When's the next entry from?

A.  September 21st, 2022.

Q.  That one's labeled Discord message.  What does that mean?

A.  It's a message from the Discord messaging application.

     MR. BURNETT:  Let's go ahead to that message, which is
Government Exhibit 502, and just have the witness take a look
at this point.

Q.  Where does this come from?

A.  This comes from the Discord messaging app.

1            MR. BURNETT:  The government offers 502A.

2            MR. TALKIN:  No objection.

3            THE COURT:  502A will be admitted.

4            (Government's Exhibit 502A received in evidence)

5            MR. BURNETT:  If we could display that for the jury,

6    please.

7    Q.  What is Discord?

8    A.  Discord is a messaging application.

9    Q.  Now, let's just orient ourselves a bit here.  Do you see

10   column D, it has timestamp written there?

11   A.  Yes.

12   Q.  What day are these messages from?

13   A.  September 21st, 2022.

14   Q.  Do you see there's a username alongside a lot of the

15   messages?

16   A.  Yes.

17   Q.  What's that username?

18   A.  Avraham Eisenberg #5451.

19   Q.  I'm going to have you read through these messages.  I'd

20   like to start by having you read from rows 2 through row 23.

21   A.  I'm looking at low cap coins listed on lending markets.

22   The idea is you buy a ton, massively increase the price, and

23   borrow on lending to lever.  The most important question is,

24   how much liquidity shows up to dump if I randomly ten times the

25   price.  Example, BAL, MNGO.  Look at liquidity and volume for

1    those.  You don't need to sell.  You can just let the loan

2    stand.  If you spend 5M and can borrow 10M.  Well, I'm prepared

3    to spend good money.  Question is risk.  Look at those two

4    coins.  For BAL, liquidity is pretty high on chain.  20M only

5    moves it to a $20 range of 4X.  15M moves it to $14 range for

6    almost 3X.  If I do that and wait until chain link updates how

7    much would have dumped.  MNGO has much lower liquidity, but

8    lower limits, so I need to pump it a lot more to be profitable.

9    MNGO is like 400K volume.  I'm happy to pump 2M in, but it's

10   risky if you move price up 10X.

11   Q.  Who was the author of all those messages?

12   A.  Avraham Eisenberg.

13   Q.  Let's keep going ahead to rows 38 to 49.

14   A.  But look at MNGO, literally no liquidity.  Can't even buy

15   100D worth.  MNGO is good if I can pump it on low liquidity.

16   If I can move it 4X, I can probably make money.  10X better.

17   At 4X, their standing asks, not many though.  MNGO has a

18   lending market.  I need to math it out.  If you help, I'll get

19   you a cut once I succeed.  Don't want you touching the markets

20   though, no.

21   Q.  And who wrote all those messages?

22   A.  Avraham Eisenberg.

23   Q.  Finally, let's take a look at rows 54 to 65.

24   A.  First question is viability.  Eyeballing MNGO books, what

25   happens if I spend 250K.  Does it move to 20C and stay there

1    for a while.  We can pull borrows.  But I don't think there's

2    many levered positions.  The thing is, after 10 to 20 percent,

3    there's just no orders.  So I have little idea what happens

4    there.  Either it's ghost town and I can 1,000X it or the

5    sellers show up.  Anyway, heading to lunch now.  The MNGO chart

6    looks primed for a pump too.  I bet some MMs will join the

7    party.  Need an FTX account.

8              MR. BURNETT:  Let's go back to demonstrative 1830,

9    please.  Let's move from September 21st to the Tweet that's

10   listed on the 26th.  I'm going to show you 801 and 801A just

11   for the witness for the moment, please.

12   Q.  Do you recognize these?

13   A.  Yes.

14   Q.  Where are they from?

15   A.  The one on the left is from Twitter.

16   Q.  How about the one on the right?

17   A.  The one on the right is a press release.

18             MR. BURNETT:  The government offers 801, 801A.

19             MR. TALKIN:  No objection.

20             THE COURT:  These documents will be admitted.

21             (Government's Exhibits 801, 801A received in evidence)

22             MR. BURNETT:  Let's start by taking a look at

23   Government Exhibit 801.

24   Q.  What's the name on this Twitter account?

25   A.  Avraham Eisenberg.

1   Q.  And do you see there is another link here at the very top

2   to justice.gov?

3   A.  Yes.

4   Q.  When is this Tweet from?

5   A.  This Tweet is from September 26th, 2022.

6   Q.  Have you clicked that link?

7   A.  Yes.

8              MR. BURNETT:  Let's take a look at Government Exhibit

9   801A.

10  Q.  What's the relationship between this article and that link?

11  A.  This article is what pulls up when you click on the link.

12  Q.  What's the title here?

13  A.  Three men charged with international market manipulation

14  scheme.

15  Q.  Now let's take a look at the first paragraph.  What does

16  that say?

17  A.  Newark, New Jersey, an indictment unsealed today charges

18  three men with orchestrating a large-scale market manipulation

19  scheme related to two publicly traded companies u.S. Attorney

20  Phillip R. Sellinger announced.

21  Q.  Let's read the last paragraph on this first page here.

22  A.  From 2014 through September 2022, Patten, Coker Sr., and

23  Coker Jr. conspired to enrich themselves through a scheme to

24  manipulate securities prices via a pattern of coordinated

25  trading, which injected inaccurate information into the

1    marketplace, creating false impressions of supply and demand

2    for these securities.

3          MR. BURNETT:  Let's go back to 1830, please.

4    Q.  We just looked at Mr. Eisenberg's Tweet from the 26th.  We

5    move ahead to the 28th, see there's another Tweet there?

6    A.  Yes.

7          MR. BURNETT:  The government offers 802 and 802A.

8          MR. TALKIN:  No objection.

9          THE COURT:  They'll be admitted.

10          (Government's Exhibits 802, 802A received in evidence)

11          MR. BURNETT:  Let's start by publishing Government

12    Exhibit 802 for everyone, please.

13    Q.  What's the name on this Twitter account?

14    A.  Avraham Eisenberg.

15    Q.  What's the date?

16    A.  September 28th, 2022.

17    Q.  And what's the text of the Tweet?

18    A.  SEC going after our market maker for manipulating trading

19    volume and price of crypto securities.

20    Q.  See there's another link there?

21    A.  Yes.

22          MR. BURNETT:  802A please.

23    Q.  What's relationship between that article and that link?

24    A.  This is the article that pulls up when you click on the

25    link.

O4CCeis5                          La Grange- Direct

1    Q.  Could you read the title here.

2    A.  SEC charges the hydrogen technology corporation and its

3    former CEO for market manipulation of crypto asset securities.

4    Q.  I'd like you to take a look at the second paragraph.  Do

5    you see at the end, the fourth line down, there's a sentence

6    that begins "the complaint further alleges"?

7    A.  Yes.

8    Q.  Just read that, please.

9    A.  The complaint further alleges that, after distributing the

10   token in those ways, Kane and Hydrogen hired Moonwalkers, a

11   South-Africa based firm, in October 2018, to create the false

12   appearance of robust market activity for Hydro through its use

13   of its customized trading software, or "bot," and then selling

14   Hydro into that artificially inflated market for profit on

15   Hydrogen's behalf.  Hydrogen's allegedly reaped profits of more

16   than $2 million as a result of the defendants' conduct.

17   Q.  Let's move back to 1830.  We've made it out of September

18   now, so let's start in on October, with October 6th.  Do you

19   see there's an entry there that's titled search/web history

20   (phone)?

21   A.  Yes.

22   Q.  What does that mean?

23   A.  That's a search and web history for Mr. Eisenberg's phone.

24          MR. BURNETT:  Now, I'd like to read a stipulation now.

25   First I'll offer Government Exhibit 1702A.

1              MR. TALKIN:  No objection.

2              THE COURT:  Admitted.

3              (Government's Exhibit 1702A received in evidence)

4              MR. BURNETT:  This is a stipulation that Government

5    Exhibits 117A through 122A, 123 and 124 are true and correct

6    copies of the data extracted cellphone 1B2, which, according to

7    stipulation 1702, is a cellphone seized from Mr. Eisenberg.

8              At this point, the government offers 117A through

9    122A, 123 and 124.

10             MR. TALKIN:  No objection.

11             THE COURT:  Those exhibits will be admitted.

12             (Government's Exhibits 117A through 122A, 123, and 124

13   received in evidence)

14   Q.  Let's start by taking a look at -- this says Government

15   Exhibit 117, but we're actually going to take a look at 117A,

16   which was just offered.  We'll see a few of these, so I want

17   you to help orient everyone.  Where does the data in this

18   document come from?

19   A.  The data in the document comes from Mr. Eisenberg's phone.

20   Q.  And what type of data is displayed in this document?

21   A.  This is search and web history.

22   Q.  Have you reviewed the search and web history to make sure

23   the material actually comes from the cellphone?

24   A.  Yes.

25   Q.  Now, do you see column A, what type of information is in

O4CCeis5                        La Grange- Direct

1  column A?

2  A.  The date and time.

3  Q.  Now, column B, what type of information's there?

4  A.  The title of the website visited.

5  Q.  And how about column C, what type of information's there?

6  A.  This is either the web history address or the search term

7  entered.

8  Q.  And just on that point, do you see there are some entries

9  where there's a blank for the title, but there's some text in

10 column C?

11 A.  Yes.

12 Q.  What does that indicate?

13 A.  That indicates that he searched the text in column C, but

14 didn't go into that website.

15 Q.  So let's take a look at just a few examples of entries from

16 this website.  Starting with the web history, what's the title

17 of the website visited in row 2?

18 A.  Overview Mango Markets.

19 Q.  How about row 3?

20 A.  Health overview Mango Markets.

21 Q.  And the URL, what's the beginning of the URL for that

22 website?

23 A.  Docs.mango.markets.

24 Q.  How about row 4?

25 A.  Beginner tips Mango Markets.

O4CCeis5                          La Grange- Direct

1   Q.  Later that day in row 7, what's the website visited there?

2   A.  Home Jupiter Aggregator.

3   Q.  How about row 9?

4   A.  Switch borrowed board.

5   Q.  And row 11?

6   A.  Switchboard.

7   Q.  After these Mango searches -- Mango website visits, do you

8   see there are two searches at the bottom in rows 17 and 18?

9   A.  Yes.

10  Q.  What were the texts of those searches?

11  A.  Oracle manipulation BSC Venus, and then oracle manipulation

12  XPS Venus.

13          MR. BURNETT:  Let's go back to government --

14  demonstrative 1830, please.

15  Q.  So we just covered October 6th.  Let's take October 7th and

16  October 8th back to back.  Those are exhibits 118A and 119A;

17  correct?

18  A.  Yes.

19  Q.  Start with October 7th, which is 118A?

20  A.  Yes.

21  Q.  Is this another one of these search and web history

22  documents?

23  A.  Yes.

24  Q.  Just to go through a couple of the websites visited, what's

25  row 2 say?

O4CCeis5                          La Grange- Direct

1    A.  Technical intro to Mango Markets.

2    Q.  How about row 5?

3    A.  Audit Mango Markets.

4    Q.  Row 12?

5    A.  Mango DAO.

6    Q.  And row 17?

7    A.  Switchboard.

8    Q.  Now Government Exhibit 119A was for the next day, October

9    8th; correct?

10   A.  Yes.

11          MR. BURNETT:  Let's go ahead to Government Exhibit

12   119.  If we can scroll over.

13   Q.  Same search and web history type page again?

14   A.  Yes.

15   Q.  What's the first search that appears in row 2?

16   A.  Statute of limitations conversion.

17   Q.  And what's the title of the website that's visited after?

18   A.  Statute of limitations conversion Google search.

19   Q.  Then what's the next search in row 4?

20   A.  Statute of limitations market manipulation.

21   Q.  And the next one, row 5, it's a long URL, but could you

22   read the phrase after the equal sign?

23   A.  Statute of limitations market manipulation.

24   Q.  And if you look down to row 7, do you see there's another

25   title of a website visited there?

1  A.  Market manipulation under federal U.S. law, U.K. and U.S.

2  explained.

3  Q.  Now, row 9, do you see there's a search there?

4  A.  Yes.

5  Q.  What was searched in row 9?

6  A.  Elements of fraud.

7  Q.  Now how about row 10, what's the search result?

8  A.  Elements of fraud Google search.

9  Q.  Row 11?

10  A.  Fraud Wikipedia.

11  Q.  Row 13?

12  A.  Mango Markets.

13  Q.  And how about row 14?

14  A.  Securities trader sentenced to 18 months in prison for

15  market manipulation scheme that netted more than $17 million in

16  illicit profits.

17          MR. BURNETT:  Let's go back to Government Exhibit

18  1830, please, demonstrative.

19  Q.  So we just looked at October 7 and 8.  October 11 is the

20  next entry on your chart; correct?

21  A.  Yes.

22  Q.  Here there are a few summary charts listed; correct?

23  A.  Yes.

24  Q.  Just to help keep everyone oriented, let's take a quick

25  look at Government Exhibits 1352 and 1353 side by side, which

1    are two of those summary charts.  What was the date labeled on

2    these summary charts?

3    A.  October 11th, 2022.

4         MR. BURNETT:  If we could take a look back at 1830.

5    Q.  There a web history entry for Government Exhibit 318.  Do

6    you see that?

7    A.  Yes.

8         MR. BURNETT:  Now, according to stipulation 1702A,

9    Government Exhibit 318 is a true and correct copy of data

10   extracted from the computer, which, according to 1702, was

11   seized from Mr. Eisenberg.  So I'll offer 318.

12        MR. TALKIN:  No objection.

13        THE COURT:  Admitted.

14        (Government's Exhibit 318 received in evidence)

15        MR. BURNETT:  If we could display 318 for the jury,

16   please.

17   Q.  Where does this come from?

18   A.  This comes from Mr. Eisenberg's computer.

19   Q.  What's the title here?

20   A.  Mango Markets.

21   Q.  And the URL?

22   A.  Trade.mango.markets/borrow.

23   Q.  Do you see there is a "this visit" timestamp?

24   A.  Yes.

25   Q.  What does that say?

O4CCeis5                          La Grange- Direct

1    A.   October 11, 2022 at 10:01 p.m. UTC.

2    Q.   What is that converted back to Eastern Time?

3    A.   6:00 p.m., approximately.

4             MR. BURNETT:  So we can take that down and let's take

5    a quick look at one more exhibit from this date, if you look

6    at -- actually, sorry.  Let's take a look at Government Exhibit

7    120A.

8    Q.   Is this a search history from October 11th?

9    A.   Yes.

10   Q.   And just looking at a few of these, do you see row 4?  What

11   does that say?

12   A.   Switchboard.

13   Q.   6?

14   A.   Mango Markets.

15   Q.   Row 9?

16   A.   AscendEX cryptocurrency trading platform, Bitcoin, and

17   Crypto Exchange.

18   Q.   How about row 15?

19   A.   Home Circle.

20   Q.   And row 20?

21   A.   Home Jupiter Aggregator.

22   Q.   Let's look back to 1830 and move ahead to the day after

23   this happened.  So the charts and the web history we were just

24   looking at was from October 11th; correct?

25   A.   Yes.

1    Q.  Let's move to the next day, October 12th.  Do you see

2    there's a Gmail entry there?

3    A.  Yes.

4    Q.  And that was Government Exhibit 604?

5    A.  Yes.

6    Q.  And as you read in the stipulation earlier, that was the

7    613IKE@gmail.com?

8    A.  Yes.

9    Q.  Who was the named owner of that account?

10   A.  Avraham Eisenberg.

11             MR. BURNETT:  Let's take a look at Government Exhibit

12   604.

13             Sorry the government offers 604.

14             MR. TALKIN:  No objection.

15             THE COURT:  It's in.

16             (Government's Exhibit 604 received in evidence)

17             MR. BURNETT:  Let's have it to the jury, please.

18   Q.  If you look at the top of the email here, who is it from?

19   A.  United Airlines Incorporated.

20   Q.  What is the subject?

21   A.  Your United reservation for Tel Aviv is processing.

22   Q.  What's the date and time?

23   A.  October 12th, 2022, at 2:30 p.m. UTC.

24   Q.  What is that converted back to Eastern Time?

25   A.  It would be 10:30 a.m., approximately.

O4CCeis5                         La Grange- Direct

1    Q.   You see it says, thank you for choosing United, at the

2    bottom it has a purchase summary?

3    A.   Yes.

4    Q.   So let's take a look at the next page.  Now, under trip

5    summary, what's the first leg of the trip?

6    A.   San Juan to New York, Newark, New Jersey.

7    Q.   How about the next leg of the trip?

8    A.   New York, Newark, New Jersey, to Tel Aviv, Israel.

9    Q.   What's the scheduled depart date?

10   A.   October 12th, 2022.

11   Q.   Now, did this particular reservation have a return flight,

12   too?

13   A.   Yes.

14   Q.   What was the date of that return flight?

15   A.   October 24th, 2022.

16          MR. BURNETT:  All right.  So let's go back to 1830,

17   please.

18   Q.   And do you see there's more search and web history from the

19   phone also from October 12th?

20   A.   Yes.

21          MR. BURNETT:  Let's take a look at Government Exhibit

22   121A, please.

23   Q.   What's the date of the information on this page?

24   A.   October 12th, 2022.

25   Q.   So the same day as that flight?

O4CCeis5                              La Grange- Direct

1   A.  Yes.

2   Q.  Now, the row No. 2, what's the search there?

3   A.  Newark international flight layover security.

4   Q.  How about row 5?

5   A.  Requirements for international flight.

6   Q.  No. 9?

7   A.  Israel flight requirements.

8   Q.  And how about down to row 16?

9   A.  Newark international flight layover security.

10  Q.  Now see there's a Google search web result in row 19?

11  A.  Yes.

12  Q.  What's that?

13  A.  Market manipulation criminal Google search.

14  Q.  How about the next entry?

15  A.  Individual indicted for market manipulation conspiracy.

16  Q.  The one after that?

17  A.  Market manipulation criminal.

18  Q.  How about the entry down on row 23?

19  A.  Market manipulation criminal elements.

20  Q.  And 24?

21  A.  Market manipulation criminal elements.

22  Q.  25?

23  A.  Criminal and regulatory enforcement of market manipulation

24  spikes publications and presentations Arnold and Porter.

25          MR. BURNETT:  All right.  Now let's look at government

O4CCeis5                       La Grange- Direct

1  demonstrative 1830, please.  Now we'll offer Exhibit 310, but I
2  don't think we have to take a look at it right now.
3        MR. TALKIN:  No objection.
4        THE COURT:  It's admitted.
5        (Government's Exhibit 310 received in evidence)
6  Q.  We'll move ahead to October 16th, you see there's another
7  search web history here?
8  A.  Yes.
9        MR. BURNETT:  Let's look at 124, please, from the
10  16th.
11  Q.  Now, I know this is a different format, but what type of
12  data is on this page?
13  A.  It's web and search history from Mr. Eisenberg's phone.
14  Q.  So the same type of data we've been looking on the
15  spreadsheets?
16  A.  Yes.
17  Q.  What is the searched item -- you see there's the searched
18  items on the left and there's a description on the right?
19  A.  Yes.
20  Q.  Starting with No. 1, what's the searched item?
21  A.  List of Israel extraditions.
22  Q.  If we can scroll further down to row 4.
23  A.  Extradition from Israel Office of Justice programs.
24  Q.  And how about row 8?
25  A.  Extradition the Office of the State Attorney.

1          MR. BURNETT:  All right.  Let's go back to 1830 now.

2     Q.  We'll take a look at one last email, which is Government

3     Exhibit 612, which was another one of those exhibits from the

4     series in the 613IKE@Gmail belonging to an Avraham Eisenberg?

5     A.  Yes.

6          MR. BURNETT:  The government offers 612.

7          MR. TALKIN:  No objection.

8          THE COURT:  It will be admitted.

9          (Government's Exhibit 612 received in evidence)

10         MR. BURNETT:  Let's show Government Exhibit 612 to the

11    witness and the jury, please.

12    Q.  What source is this email from?

13    A.  United Airlines.

14    Q.  And you see the subject?

15    A.  Your reservation has been canceled.

16    Q.  Now, what reservation was being canceled in this email?

17    A.  Mr. Eisenberg's return flight.

18         MR. BURNETT:  We can take that down and go back to

19    1830, please.

20    Q.  Now, there are two entries in November, one from the 9th

21    and one from the 18th; correct?

22    A.  Yes.

23    Q.  Now those are both labeled "chat phone," correct?

24    A.  Correct.

25    Q.  What does that mean?

O4CCeis5                          La Grange- Direct

1    A.   They are text messages from the phone, from Mr. Eisenberg's

2    phone.

3    Q.   Was that a phone seized from Mr. Eisenberg according to

4    Government Exhibit 1702, the stipulation?

5    A.   Yes.

6              MR. BURNETT:   So the government offers exhibits 112

7    and 110.

8              MR. TALKIN:   No objection, your Honor.

9              THE COURT:   They'll be admitted.

10             (Government's Exhibits 112, 110 received in evidence)

11             MR. BURNETT:   Let's take a look at Government Exhibit

12   112, please.

13   Q.   Just to help orient everyone, you see it says, "Signal

14   messages Android" up top?

15   A.   Yes.

16   Q.   What does that mean?

17   A.   It means this is from the Signal messaging application.

18   Q.   And the first message in blue.  What are the last four

19   digits of that phone number?

20   A.   8642.

21   Q.   And what's the message written out here?

22   A.   Hey, it's Avraham.

23             MR. BURNETT:   Mr. Oshinsky, if you wouldn't mind

24   zooming in kind of on the text part of this side of the slide

25   all the way down so we can make it a bit bigger.  Thank you.

O4CCeis5                          La Grange- Direct

1    Q.  Why don't you read the messages in blue and I'll read the

2    messages in gray.  Okay?

3    A.  Yes.

4            Hey, it's Avraham.

5    Q.  Hey.  Well, FTX has taken you out of the news, lol.  This

6    shit is crazy.

7    A.  Yeah, kept wanting to dump 50M into FTT or something, but

8    didn't end up trading.  Too unclear.

9            MR. BURNETT:  Let's go to the next page and blow up

10   the text again.

11   Q.  Where you live, dog?

12   A.  Puerto Rico.

13   Q.  All right.

14   A.  Hanging out internationally until stuff blows over, though.

15           MR. BURNETT:  All right.  Let's take that down and go

16   to Government Exhibit 110.

17   Q.  Is this another Signal message from the cellphone seized

18   from Mr. Eisenberg?

19   A.  Yes.

20           MR. BURNETT:  Go to the next page, please.

21   Q.  Now, just to orient everyone, do you see there are a few

22   blue messages?

23   A.  Yes.

24   Q.  What's the last four digits of the phone number on those

25   blue messages?

1    A.  8642.

2    Q.  How does that compare to the blue messages in the last set

3    of chats we were just looking at?

4    A.  It's the same sender.

5             MR. BURNETT:  Let's do the same thing, why don't we

6    blow up the just the text on the first half of these messages

7    for now.

8    Q.  Almost at your apartment, be available if you can.  Mission

9    accomplished.  You had two easy, one heavy probably tungsten,

10   emoji, I dropped it inside.  He asked when you're ing back

11   because your lease is up at the end of the month.  I said I

12   don't know.

13   A.  Lease is up middle of January, I think.  What do you mean?

14   Q.  You received two packages.  It was laying in the hallway.

15   I dropped the packages inside your apartment.

16   A.  Ah, thanks.

17   Q.  One package was open?

18   A.  Ordered a bunch of food and then had to leave quickly.

19             MR. BURNETT:  All right.  Let's go back to 1830,

20   please.

21   Q.  Let's take a look now, there are a few more entries in

22   December from the 6th, the 13th, and the 20th?

23   A.  Yes.

24   Q.  So let's start with the 6th.  That's another search and web

25   history from the phone; correct?

O4CCeis5                              La Grange- Direct

1    A.  Yes.

2    Q.  Is that Mr. Eisenberg's phone?

3    A.  Yes.

4          MR. BURNETT:  All right.  Let's take a look at

5    Government Exhibit 122.

6    Q.  What kind of document are we looking at here?

7    A.  This is searched items from Mr. Eisenberg's phone.

8    Q.  And each of these has the same description; correct?

9    A.  Yes.

10   Q.  What does it say?

11   A.  FBI surveillance.

12   Q.  What's the date on that?

13   A.  December 6th, 2022.

14   Q.  Now, I believe the -- let's go ahead to -- sorry, back to

15   1830, please.  The next search and web history exhibit was from

16   about a week later on the 13th; correct?

17   A.  Yes.

18          MR. BURNETT:  Let's take a look at Government Exhibit

19   123.

20   Q.  Is this another one of these searched item logs?

21   A.  Yes.

22   Q.  What's the searched item for all of these entries?

23   A.  Otison prison.  Or Otisville prison.

24   Q.  I apologize.  What does search 1 say?

25   A.  Otison prison.

O4CCeis5                              La Grange- Direct

1    Q.  How about search 3?

2    A.  Otisville prison.

3    Q.  And 4?

4    A.  Otisville prison.

5    Q.  As a law enforcement officer, are you familiar with what

6    Otisville prison is?

7    A.  Yes.

8    Q.  What is it?

9    A.  It's a federal correctional facility in New York that

10   primarily houses white collar criminals.

11           MR. BURNETT:  Let's take this down and go back to

12   1830.

13   Q.  The last entry here is from December 20th, correct?

14   A.  Yes.

15   Q.  And it's another email in that 600 series; is that right?

16   A.  Yes.

17   Q.  Does that mean it's from the 613IKE@Gmail account

18   subscribed to Avraham Eisenberg?

19   A.  Yes.

20           MR. BURNETT:  Let's take a look at 610.

21   Q.  Who's this email from?

22   A.  Iberia.

23   Q.  What's the subject?

24   A.  Confirmation of booking.  P7PZG to San Juan, de Puerto

25   Rico.

1          MR. BURNETT:  If we scroll down to the booking

2     details, a little further down.

3     Q.  What's the departure and arrival information here?

4     A.  Tel Aviv, Israel, to Madrid, Spain, and to San Juan to

5     Puerto Rico.

6     Q.  What day was it scheduled to arrive at San Juan, Puerto

7     Rico?

8     A.  December 26th, 2022.

9          MR. BURNETT:  Finally, at this point, the government

10    will offer another stipulation between the parties, which is

11    Government Exhibit 1703.

12         THE COURT:  The stipulation will be accepted.

13         (Government's Exhibit 1703 received in evidence)

14         MR. BURNETT:  That stipulation reads:  Mr. Eisenberg

15    was arrested on criminal charges upon his arrival at San Juan

16    International Airport in Puerto Rico on December 26th, 2022.

17    Law enforcement had previously obtained a court authorized

18    sealed arrest warrant.  Consistent with the court order, the

19    arrest warrant was not made public until after he was arrested.

20         No further questions, your Honor.

21         THE COURT:  Cross examination?

22         MR. TALKIN:  Briefly, your Honor.

23    CROSS-EXAMINATION

24    BY MR. TALKIN:

25    Q.  Good afternoon.

O4CCeis5                          La Grange - Cross

1   A.  Good afternoon.

2             MR. TALKIN:  Can we pull up exhibit 604, please.  If

3   we could highlight the top there, the to-and-from section,

4   please.

5   Q.  Looking at the top of 604, you see the email with United

6   Airlines that you discussed on direct examination, dated

7   October 12th, 2022.  You see that?

8   A.  Yes.

9   Q.  And you see the "to" and the "from" there?

10  A.  Yes.

11  Q.  And the "from" is from United Airlines?

12  A.  Yes.

13  Q.  And then it says "masked."  Do you see that?

14  A.  Yes.

15  Q.  And then going all the way to the right, that email is

16  @opayq.com; correct?

17  A.  Yes.

18  Q.  And in your professional endeavors, you have run into those

19  type of emails before, opayq emails, haven't you?

20  A.  I have not.

21  Q.  Have you ever run into masked emails?

22  A.  Yes.

23  Q.  And masked emails are emails that show that they mask the

24  true email of an individual and it gets forwarded from the

25  masked email address to the actual email address; correct?

O4CCeis5                              La Grange - Cross

1   A.  Yes.

2   Q.  And in your experience, there's been people who have used

3   that when they don't want their identity to be found; correct?

4              MR. BURNETT:  Objection.

5              THE COURT:  Overruled.

6   A.  Yes.

7   Q.  And you've also, in your experience, found that people use

8   those emails when it doesn't really matter whether they want

9   people to find their identity; correct?

10  A.  Yes.

11             MR. TALKIN:  I now want you to go to -- can we go to

12  page 3 of the exhibit.  If we could highlight the middle under

13  "travelers."

14  Q.  You see there under this section "travelers," there's a

15  name, Avraham Eisenberg?

16  A.  Yes.

17  Q.  So it's fair to say that the individual that's traveling

18  here is not masking his identity in this reservation, is he?

19  A.  Other than the email address with the masked email.

20  Q.  Right.  Other than the -- but it really doesn't make a lot

21  of sense to -- if your intention is to hide your email, your

22  name, it doesn't make a lot of sense to use a masked email for

23  that purpose and then decide to travel in your own name, does

24  it?

25  A.  Correct.

1              MR. TALKIN:  I'm sorry, Mr. Smith.  If we could go

2       back to the top of the first page and highlight the "to,"

3       "from" again.

4       Q.  The date that this reservation -- the time and date that

5       this reservation was confirmed by email and made was on October

6       12th, 2022; correct?

7       A.  Yes.

8       Q.  At 2:30 p.m.?

9       A.  Yes, UTC.

10      Q.  UTC.  And I know this is going to sound like a silly

11      question, but that is certainly after October 11th of 2022;

12      correct?

13      A.  Yes.

14              MR. TALKIN:  I now want to go to 610.  If we can just

15      look at the date, the top.

16      Q.  And the date here, this is when -- I think you described it

17      as the return flight of Mr. Eisenberg was booked; correct?

18      A.  Yes.

19      Q.  And that was booked on 12/20/2022; correct?

20      A.  Correct.

21      Q.  And you're aware that Mr. Eisenberg was arrested at the

22      airport in Puerto Rico on 12/26/2022; correct?

23      A.  Yes, according to the stipulation, yes.

24      Q.  According to the stipulation.

25              MR. TALKIN:  I just want you to go halfway down the

O4CCeis5                        La Grange - Cross

1   page, and you go to booking details, please.

2   Q.   You see there, the passenger's name is Avraham Eisenberg?

3   A.   Yes.

4   Q.   Again, not concealing his identity; correct?

5   A.   Correct.

6   Q.   Also giving the FBI a six-day heads up that he's coming

7   back?

8   A.   I don't know exactly what he was thinking, but --

9   Q.   Certainly a possibility, isn't it?

10  A.   Yes.

11          MR. TALKIN:  And then I want to go to page 3, the

12  payment methods.  Highlight that, payment details.

13  Q.   Again, this was paid with a Visa credit card?

14  A.   Yes.

15  Q.   During your investigative duties, you have found that

16  you're able to find credit card records pretty easily?

17  A.   Generally, yes.

18  Q.   And the credit card, name of the credit card holder here is

19  Avraham Eisenberg?

20  A.   Yes.

21          MR. TALKIN:  If we can go to 604, please.

22  Q.   And this was the cancellation of the flight you talked

23  about earlier; correct?

24  A.   This is the initial booking.

25          MR. TALKIN:  I'm sorry.  I looked at the wrong -- 612.

1    Thank you for correcting me.

2    Q.  This is the cancellation of the flight that you talked

3    about earlier; correct?

4    A.  Yes.

5    Q.  And this was done on October 23rd of 2022?

6    A.  Yes.

7    Q.  And the email it was sent to is the same opayq.com?

8    A.  Yes.

9           MR. TALKIN:  And let's go to page 2.

10   Q.  There you have the traveler details?

11   A.  Yes.

12   Q.  And our traveler's name is Avraham Eisenberg?

13   A.  Yes.

14          MR. TALKIN:  Can we go to 117A, please.

15   Q.  Before I ask you these questions, I'm going to warn you

16   that my copy does not have the numbers down the left, so I'm

17   doing my best, but if I miss by one, please, let me know.  I

18   just want to look at No. 9.  That's an entry that you talked

19   about on direct examination for Switchboard?

20   A.  Yes.

21   Q.  If you look to the right, it says,

22   https:/switchboard.xyz/explorer.  Do you see that?

23   A.  Yes.

24   Q.  That indicates that that search was done through the

25   Switchboard explorer; correct?

O4CCeis5                       La Grange - Cross

1    A.  I don't know.

2    Q.  Can you tell from that entry whether or not the person who

3    did that search looked at the terms of service for Switchboard?

4    A.  I don't know.

5           MR. TALKIN:  If we could go to two down.

6    Q.  Same question, can you tell whether the person who did that

7    search looked at the terms of service for Switchboard?

8    A.  I don't know.

9    Q.  And then No. 13, that's something called a risk calculator

10   Mango Markets.  Do you see that?

11   A.  Yes.

12   Q.  And that's on the same list of documents you talked about

13   before or website from docs.mango.markets?  Do you see that?

14   A.  Yes.

15   Q.  Do you know what the risk calculator is?

16   A.  No.

17          MR. TALKIN:  If we can go to 120, please.  I think

18   No. 4.

19   Q.  Same question, can you tell whether that individual looked

20   at the terms of service of Switchboard when they did that

21   search?

22   A.  I don't know.

23          MR. TALKIN:  And then let's go down to, I think it is

24   18.

25   Q.  And that's another search for risk calculator; correct?

O4CCeis5

1    A.  It appears so, yes.

2    Q.  And that's dated 10/11/22 at 2:15 p.m. UTC time?

3    A.  Yes.

4              MR. TALKIN:  Nothing further.  Thank you.

5              THE COURT:  Any redirect?

6              MR. BURNETT:  No, your Honor.  I'm not 100 percent

7    sure if I actually offered 610.  So just in case, the

8    government offers 610 right now, which we showed.

9              MR. TALKIN:  No objection.

10             THE COURT:  610 will be admitted, if it wasn't.

11             (Government's Exhibit 610 received in evidence)

12             Thank you very much, Ms. La Grange.

13             THE WITNESS:  Thank you.

14             (Witness excused)

15             THE COURT:  Does the government have any further

16   witnesses?

17             MR. BURNETT:  No, your Honor.  The government rests.

18             THE COURT:  Members of the jury, we are 11 minutes

19   late, so I apologize for that, but we are done for the day.

20   We'll be back here on Monday at to start at 9:00 a.m.  We are,

21   as I anticipated, on track at least, but we'll take care of

22   some matters and be back here on Monday.  And thank you very

23   much.  Have a great weekend.  And again, thank you so much for

24   your hard work and diligence thus far.  Really appreciate it.

25             (Continued on next page)

O4CCeis5

1           (Jury not present)

2           MR. TALKIN:  Your Honor, during the government's

3    direct, there was pieces of evidence that had been objected to

4    previously.  I did not want to reiterate those others.  I said

5    no objection.  I just want the record to be clear that our

6    prior objections are standing, we just don't object again in

7    front of the jury.

8           THE COURT:  And to be clear, you mean the prior

9    objections that had been overruled; right?

10          MR. TALKIN:  Correct, the ones that were fully vetted

11   by the Court and overruled.

12          THE COURT:  Okay.  Understood.

13          Anything further?

14          MR. DAVIS:  Just a couple of more logistical

15   questions, if now is the time, if the Court's okay with that?

16          THE COURT:  Why don't we -- does it make sense to take

17   that up after the motions, because I know, Mr. Klein, you asked

18   for some time and I don't want to keep us here too late.  So

19   why don't we --

20          MR. KLEIN:  Can you give me -- we may be ready.

21          THE COURT:  While we're doing that, Mr. Davis.

22          MR. DAVIS:  Just a few matters, your Honor.

23          The defense yesterday said that they were going to

24   call Mr. Sheridan as a witness on Monday.  We'd ask the Court

25   to inquire about the status of 26.2 material and any

O4CCeis5

1    demonstratives or exhibits they intend to introduce to

2    Mr. Sheridan.

3             And then there's a couple other logistical matters of

4    that.  We haven't received anything in a few weeks from the

5    defense about what his prospective testimony will be.  The

6    government obviously has a notice, the third supplemental

7    notice as governed by this Court's rulings on the motions in

8    limine.  So we would be strictly policing that, his testimony.

9             And then I have one more issue, unless the Court has

10   questions about that.

11            THE COURT:  Mr. Klein.

12            MR. KLEIN:  We're aware of our obligations.  We have

13   and will continue to comply with them in terms of 26.2 and the

14   other things.  I don't have anything to say other than that,

15   your Honor.

16            THE COURT:  Okay.  So, is there any further inquiry,

17   Mr. Davis?  I think he said to the extent they have relevant

18   materials, they will furnish those to the government.  If the

19   government has an objection because they have missed a

20   deadline, then you will let me know.

21            MR. DAVIS:  That's fine, your Honor.  Thank you.

22            MR. KLEIN:  Your Honor, we have one or two things

23   before we get to the Rule 29.  We just need 15 minutes.  So

24   should we take up our few things after the Rule 29 or would you

25   like to hear them now or what's best for the Court?

O4CCeis5

1                    THE COURT:  I'm happy to proceed here.  If you want to

2        take the time to prepare, then that's fine.

3                    MR. KLEIN:  Could we have 15 minutes, your Honor?

4                    THE COURT:  Yes, we'll come back at 3:00.

5                    MR. KLEIN:  Thank you, your Honor.

6                    (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  Please be seated.

2          All right.  Mr. Klein, do you have an application?

3          MR. KLEIN:  Yes, your Honor.  One quick question

4     before we start, Mr. Greenspan is going to do the Rule 29

5     motion.  I understand your Honor was holding back a ruling.

6     Maybe I have it wrong but about the switchboard terms of

7     service till after Mr. LeGrange testified and we were just

8     wondering if you had reached a ruling on that.

9          THE COURT:  Do you want to renew?

10          MR. KLEIN:  We want to renew or application to keep

11     out of switchboard terms of service and also the related

12     testimony.  They did not establish the connection and any

13     connection to our client at all.  The only thing they offered

14     in through Ms. LaGrange was visit to a website

15     switchboard/explorer.PYZ.  The terms of service are not listed

16     on this link.  They don't pop up but they didn't have any

17     evidence to show one way or the other what that indicated other

18     than switchboard/explorer, which does not say terms of service.

19     So is there is no evidence tying my client, Mr. Eisenberg, to

20     those terms of service and Mr. Hermida's testimony provides

21     none either.  So we would ask that those be excluded.

22          THE COURT:  Okay.  Mr. Burnett.

23          MR. BURNETT:  Mr. Hermida testified.  And the terms of

24     service made clear that they applied to switchboard users and

25     also people who visit terms service.  Special Agent LaGrange

O4CAAEIS6

1    put forward, it was clear that Mr. Eisenberg visited the

2    switchboard website numerous times.  So they clearly applied to

3    him.  I think the jury could draw the inference that he either

4    viewed them or he didn't care about them and even if he didn't

5    care them, that itself would be relevant to the rebutting -- on

6    Mango was somehow relevant to Mr. Eisenberg's state of mind. I

7    think it goes to a broader materiality point about marketing

8    expectations of what we would expect from a switchboard Oracle.

9    How it would be used and whether it would or would not be

10    manipulated because it is a public document that any user of

11    Mango Markets or otherwise could look at to see and understand

12    what to expect about what was an appropriate use of that

13    Oracle.

14           THE COURT:  And for that second argument is it focused

15    on mother-in-law, let's assume for a moment that there was no

16    testimony from Mr. Hermida about his involvement in setting up

17    the perpetual and how it was going to be priced.  It happened

18    to be however, that switchboard was the other platform that was

19    going to be used.  And separately, Mr. Eisenberg used the

20    platform however, so just on the materiality point, is that

21    enough for, are you still able to bring in the switchboard

22    terms of use?

23           MR. BURNETT:  We think materiality is enough to bring

24    in the question is what would a reasonable person in the shoes

25    of Mango Markets or its users expect when they're interacting

O4CAAEIS6

1    with the Mango Markets's platform?  And because the switchboard

2    Oracle is the Oracle that is used to get the price on Mango

3    Markets platform, the public terms of service about how

4    switchboard Oracles are used, should inform what a reasonable

5    person using Mango Markets or Mango Markets itself would expect

6    of that Oracle.  So I don't think we need specific testimony

7    for a user or Mango Markets witness.

8         Yes, I looked at this terms of service to establish

9    that if it was like a private terms of service like a private

10   convert station that would be different story but because

11   Mr. Hermida testified this is a public document, that makes the

12   difference there.

13        THE COURT:  And also would potentially go to the

14   broader argument that for lack of a better term, Mango Markets

15   was sort of like the wild west.  There was nothing governing

16   anything of this.  Well, part of that landscape included the

17   other platforms that were feeding in Mango Markets and if those

18   had terms of service that were more similar to conventional

19   markets, then that bears on materiality, possibly, the basic

20   questions of manipulation and to rebut the conditions that's

21   been raised concerning lack of terms of service on Mango

22   Markets itself.

23        MR. BURNETT:  That's right.  And to that point

24   Mr. Hermida testified that he is actually involved in creating

25   that or Oracle for Mango Markets and this terms of service

O4CAAEIS6

1    issue the manipulation and manipulation practice was in fact

2    one of the reasons they chose for FTX and AscendEX Oracle.

3            THE COURT:  Mr. Klein, anything further?

4            MR. KLEIN:  Just that the user is Mango Markets, not

5    in the read of terms use, I believe you are right.  There are

6    terms used.  That's user.  It can't be like Mango Markets used

7    switchboard Oracle and then that -- things in Mango Markets

8    that people saw but the user in this case is Mango Markets.

9            THE COURT:  Yeah.  This is just a point about the

10   document because I know that Mr. Greenspan focused on language

11   that defined user in the terms of use.

12           And Mr. Burnett, I think you had indicated that it

13   actually applies more broadly than that.

14           MR. BURNETT:  We could pull up the document right now.

15           THE COURT:  Do you want to just pull it up, if you

16   can?

17           MR. BURNETT:  Yes.  I think it's 1512.

18           (Pause)

19           MR. BURNETT:  Third paragraph in the all caps.

20   They're all caps, third paragraph.  By using this web set or

21   our services you accept and are bound by these terms and

22   conditions.

23           The next paragraph says, you may not use our website

24   or services and then -- the way they're defining "users" just

25   doesn't show up.

O4CAAEIS6

1        THE COURT:  Is there an actual definition of upper

2    case user.

3        MR. BURNETT:  If you scroll down further, let's see.

4    It only defines user as counter-party to the agreement.

5        THE COURT:  Okay.

6        MR. BURNETT:  But if the -- look at the second

7    paragraph it says by use of this website its users agrees and

8    accepts to be bound by the terms of --

9        THE COURT:  Okay.  Understood.  So I will overrule the

10   objection for the reasons explained by the Court.

11        And, Mr. Burnett, I believe it's relevant to several

12   issues in this case in addition to potential bearing on

13   Mr. Eisenberg and goes to materiality.  It goes to potentially

14   to what manipulation would be in this context as well as to

15   rebut the defense that has been repeatedly raised that Mango

16   Markets itself in isolation had no terms of service during the

17   relevant times in question and that it's relevant to show that

18   other platforms that were related to the transactions that are

19   at issue in this case did have terms of use that would have

20   applied in connection with Mr. Eisenberg's conduct.

21        So for those reasons, I don't believe that the

22   prejudice effect or confusion to the jury or any of the other

23   factors identified under Rule 401 would substantially

24   outweighed the probative value of the document and so remain

25   admitted.

O4CAAEIS6

1          Anything further before Mr. Greenspan?

2          MR. GREENSPAN:  Ready to proceed.

3          THE COURT:  Okay.

4          MR. GREENSPAN:  Thank you, your Honor.

5          The defense moves under Criminal rule 29(A) for a

6   judgment of acquittal.  That rule dictates that upon a

7   defendant's motion, the Court must "enter a judgment of

8   acquittal of any offense in which the evidence is insufficient

9   to sustain a conviction.  When evaluating Rule 29 motions the

10  Court "must view the evidence in the light most favorable to

11  the government, crediting every   inference that could have

12  been drawn in the government's favor.  That's United States v.

13  Torres.  604 F.3d 58, Pin site 66 Second Circuit 2010.

14          Initially, I'll like to start with Counts One and Two

15  and start with sort of the jurisdictional issue of this EA,

16  which applies to both.  So with respect to those, I should say

17  with respect to Count One, the Court has already ruled that

18  USDC is not a commodity and so therefore the government's

19  contract of sale theory as to jurisdiction for Count One fails.

20          THE COURT:  If I could just ask you to pause there

21  because I think at the end of the trial day yesterday, I may

22  have misattributed a position to you and I just want to make

23  sure that things are clear because I think probably because it

24  was late in the day, I said your position is USDC is a

25  commodity and then I think you may have said also because it's

O4CAAEIS6

1    late in the day, correct.  But I take it that your position has

2    been that USDC is not a commodity.

3            MR. GREENSPAN:  Yes, your Honor.  If I said that, that

4    was due to --

5            THE COURT:  I apologize for that but I want to make

6    sure the record is clear.

7            MR. GREENSPAN:  Absolutely.  For that reason, I think

8    we also discussed in our position that the RICO commodity

9    transaction is no longer and issue for the same reason.

10           THE COURT:  I apologize.  Please proceed.

11           MR. GREENSPAN:  Thank you, your Honor.

12           So because there is no contract of sale theory the

13   jurisdictional theory for both Counts One and Two is now

14   essentially the same and that is that the Mango Professionals

15   were swaps.  The term "swaps" as the Court knows and has

16   discussed is defined at 7 U.S.C. 1A Subparagraph 47.  The

17   government has provided two theories under Subparagraph 47 for

18   why it believes there are swaps, the Mango Markets.  None of

19   those, we submit, was at all proven and there's insufficient

20   evidence as to both at this point.

21           The first is ii, which talks about payment in the

22   event of a financially consequential occurrence or not.  The

23   perpetual by its very name exists indefinitely.  There is no

24   occurrence or nonoccurrence that's been proven.  Unlike

25   traditional futures contracts there is not a specifically

O4CAAEIS6

contemplated occurrence.  There's no expiration.  So their very
essence, what they are, is antithetical to the definition in
subparagraph ii.

Turning to the other theory, which is under iii 7
U.S.C. 7A47 iii.  The perpetuals also failed to meet that
definition.  That definition involves a transfer of financial
risk of an underlying asset without the exchange of that asset.

So starting at the end first, the underlying assets
here according to the government's theory is the Mango USDC
perpetual.  The USDC portion of that is exchanged.  At least
the ownership interest of it is exchanged and therefore that's
one reason why it doesn't meet the element other the definition
under subparagraph iii.

The second goes to the testimony that was elicited
from Dr. Mordecai yesterday.  He stated that Mr. Eisenberg had
no exposure to the market.  In other words, he had no risk
because he is party to both the long and the short sides of the
perpetual.  If there is no transfer of risk, then and there's
been no testimony otherwise, then it can't be a swap.  So it
fails for that reason too.

But even if the government could meet one of these two
prongs, it's theory under the perpetual would still fail to be
a swap for CEA because the government hasn't met its burden to
show that it wasn't a security based swap, one of the specific
exceptions.  And that's at 7 U.S.C. 1A 47x.

O4CAAEIS6

1          The perpetual here is based on the value of either a

2    single security, mainly Mango or on the value of a mix of

3    securities and narrow based securities indices and securities

4    indices and securities based swaps are discussed in CFTC, the

5    Arkegos capital 2023 Westlaw 622, Westlaw 2022.

6          So, initially, the government -- in this case I'm

7    referring SEC in the complaint against Mr. Eisenberg -- has

8    taken the position that Mango is a security and that's as

9    applied to the very acts in this case.  It's brought that case

10   in this courthouse.  It would be fundamentally unfair for the

11   government to prosecute Mr. Eisenberg in two cases on the basis

12   of fundamentally and diametrically opposed positions.

13         Moreover, Mango is a security because it meets the

14   elements of the test for what a security is.  And under the

15   definition of investment contract as discussed in SEC v. Howe

16   328 U.S. 293.  Mango is a --

17         THE COURT:  You are thinking about whether it's a

18   security or not, that's the portion of the very long definition

19   of security that you would focus the Court on, investment

20   contract?

21         MR. GREENSPAN:  Yes.

22         THE COURT:  Okay.

23         MR. GREENSPAN:  Mango is a common enterprise.  Mr. --

24   described an ICO in which $70 million was raised and placed in

25   an insurance fund for the use of that enterprise.  Mango had a

O4CAAEIS6

1    light paper that was discussed at various times.  It's also in

2    the record, along with other documentation, at GX 1011.  That

3    was disseminated publicly.  It was used to educate and attract

4    the investing community.  And it was done to encourage people

5    to buy Mango as part of the ICO.  And afterward that was

6    successful.  Tens of millions of dollars were raised.

7         Numerous witnesses, including Mr. Case described the

8    manner in which investors bought Mango and they did so to

9    benefit themselves through the rise in the value of Mango and

10   they did so on the back of the work of others.  Mr. Casey,

11   along with number of others, described how they invested in

12   Mango but they didn't actually work for Mango.

13        So Mango Markets was built by a number of people but

14   they were referred to a Mango contributors.  Two of them

15   testified.  Mr. Shites and Mr. Smith and they allowed investors

16   buy the Mango tokens on both the primary and secondary

17   exchanges, and those people speculated on the price of Mango.

18        No work or effort was required by those Mango

19   purchasers.  It was purely -- there is no testimony or wise.

20   There's been no evidence in the record that anyone, let alone

21   the broad investing public, purchased Mango for any purpose

22   other than as investments, and certainly not for any government

23   rights.  Not a single witness has testified about any vote of

24   consequence and any use of government rights by them or by

25   anyone else.  The only testimony about why people brought Mango

O4CAAEIS6

1      and got involved in Mango was about their wish to make money.

2             Because Mango is a security the perpetual was a

3      security based swap.  The government has insinuated at least,

4      if not outright claimed that they believed that Mango is

5      therefore a mixed swap.  And the definition of mixed swap is

6      under subparagraph 47(D) but there's been no evidence of this.

7             Yesterday the government pointed to the funding rate

8      in its discussion with the Court.  But the funding rate does

9      not make the security based swap a mixed swap because the

10     funding rate is a narrow based security index.  The definition

11     of narrow based security index is 7 U.S.C. 1A35.  A narrow

12     based security index is specifically carved out as something

13     they can cause a security based swap to become a mixed swap.

14            THE COURT:  Can you give me a little bit more detail?

15     So "narrow based security index", where do I look to understand

16     what that term means?

17            MR. GREENSPAN:  We should start with index.  What is

18     an index?  An index is a group of securities including any

19     interest therein or based on the value thereof.  And that's

20     defined in the securities laws in 15 U.S.C. 78 (C) (A) (68)

21     (E).  And what makes an index narrow based is that it has nine

22     or fewer component securities.  The funding rate clearly

23     qualifies.  It's based on the value of the Oracle settlement

24     price.  That Oracle settlement price is based on the value of

25     Mango.  And as discussed, Mango's security.

1              The other basis for the funding rate is the mid price

2    of the bids and the asks for Mango Perpetual itself.  And add

3    as discussed, Mango perpetual is a securities based swap.

4    Securities based swaps are defined as securities under the same

5    statute, 15 U.S.C. 78 (C) (68).  So because the funding rate is

6    an index it's based on two securities it's narrow based

7    security index and it cannot make the perpetual a mixed swap.

8              The government's other argument yesterday was that the

9    perpetual is based on the Oracle settlement price.  That too is

10   a narrow based securities index.  The same definition of index

11   applies.  Mr. Hermida testified that the Oracle is known as an

12   index broadly in the community and it fits the statutory

13   definition as well.  It reports the price of Mango, which as

14   discussed in a security and it does so on three different

15   exchanges.  So it's an index.  It's composed of security and

16   there are fewer than nine of them.  It fits the definition.

17             Finally, the government has suggested that the

18   perpetual depends on the value of USDC.  There's been no

19   evidence of that and all the evidence has been not contrary.

20   The only effect USDC has on the purpose is that it's settled

21   and that's it.

22             The government's own witnesses, including Mr. Hermida

23   and Dr. Mordecai made clear that USDC is nothing more than a

24   medium of exchange.  At times they confused it with a dollar.

25   They all basically said that is the equivalent of a dollar.

O4CAAEIS6

Dr. Mordecai said today he has studied it and that the relevant time there was essentially no difference between U.S.C. and the dollar.  Mr. Hermida testified that it could be exchanged at any time for a dollar if anyone had a circle account.

So the value of the perpetual depended on Mango. That's security depended on that going up and down but it didn't depend on the value of USDC in any discernable way.

THE COURT:  If it's based on USDC, would you concede that it's a mixed swap or do you have an argument even if the perpetuals are based on USDC?

MR. GREENSPAN:  It has to be based on the value of USDC, which is a slightly different thing, but I do have one argument about that as well.

THE COURT:  Okay.

MR. GREENSPAN:  But one point I want to make just so I don't forget, I want to address this government theory about selling USDC into the market, which the defense finds strained. We think it would be like saying that in order to buy a cup of coffee this morning you sold dollars.  The coffee really don't intend on value of your dollar.  It depends on the value of the coffee.

So to the Court's point -- and this comes back to a point I made about the definition of swap to begin with -- the ownership in USDC is exchanged.  And so the USDC doesn't really fit in the definition of swap to begin with.  So under the

O4CAAEIS6

1    general definition of swap, something that is exchanged cannot

2    be the basis of a swap and it cannot be the basis of a mixed

3    swap either.

4            Judge Oetken pointed out in the Arkegos case that I

5    cherry-picked a short time ago that a mixed swap must have a

6    reference that is subject to CFTC authority, that the USDC is

7    not such a reference and the perp has no other such reference.

8    Because there is no jurisdictional basis for the application of

9    the CEA the defense believes that Counts One and Two should be

10   dismissed.

11           Turning to -- I am going to take these a little bit

12   out a order and start with the commodity manipulation.  We

13   think that's the most straightforward count for dismissal at

14   this time.  The government has discussed the commodities

15   manipulation count on several occasions that being akin to an

16   antitrust statute, very powerful but also very narrow.  And I

17   say it's very powerful because the intent requirement is very

18   particular and it's very different than the other two statutes

19   charged here and in general in the criminal law.

20           The government has offered no proof regarding the

21   manipulation of the market price of the perpetual.  The market

22   price of the perpetual is the price at which one can buy and

23   sell the perpetual on Mango Markets.  And there's absolutely no

24   question in the case law that is what's required for market

25   manipulation.  Instead, the government's case has full focused

O4CAAEIS6

on the purported manipulation of the settlement price and
that's clearly insufficient.

          There's not been a single witness who discussed if any
detail any changes to the price of the perpetual, the market
price that is, on Mango Markets.  The only evidence at all of
what the price even was came if through Agent DeCapua
yesterday.  It was mentioned only briefly.  Initially it seemed
that Agent DeCapua wasn't sure what that price was and he
certainly had no substantive discussion about, how it changed
or what caused that.

          There's also been plenty of evidence that the
settlement price, the Oracle price, that is, and the market
price are different.  And a number of witnesses have discussed
the funding rate.  And the purpose of a funding rate which is
to establish that these two prices which are different and can
spread apart and to try to get them to narrow.  That is the
entire purpose of the funding rate.  It's a key component of
the perpetual in one way in which the perpetual is different
from a normal futures contract.  And so the government's focus
entirely on the Oracle settlement price has essentially been
irrelevant to this count.

          The Second Circuit has defined the price as a market
price for a market manipulation claims that uses that term in
ATSI communications v. Shar 497 F.3d 87.  And there's been two
case that have focused specifically on the distinction between

1    the settlement price and market price and we'd like to point

2    the Court to those.

3            The first is Vitanza v. Board of Trade of New York.

4    It's cited at 2002 Westlaw 424, 699.  That's an S.D.N.Y case

5    from 2002.  The second is Three Crown Limited Partnership v.

6    Caxton, 817 F.Supp 1033.

7            Vitanza in particular discussed the distinction and

8    rejected a CEA claim based on settlement price.  three Crowns

9    involved the distinguishing the alleged manipulation of

10   Treasury bill and their underlying treasury notes.  But the

11   upshot of both cases is the same.  The focus has to be on the

12   market price of the supposed commodities or swap.  And that

13   distinction applies --

14           THE COURT:  Can you just crystalize it for me what the

15   difference is.  And are you saying that it may be that the

16   market price was altered as a result of what the government is

17   alleging but they haven't put in evidence of that?  Or are you

18   saying just it's just a matter of like undisputed fact that the

19   market price was not altered?  Can you just help me understand

20   the difference between the two prices and I want to make sure I

21   understand your argument.

22           MR. GREENSPAN:  Sure.  So the settlement price is the

23   Oracle price.  The settlement price is that price that we saw

24   Switchboard generate as a result of the -- there was a little

25   more complicated mathematically but the medium of the price FT

O4CAAEIS6

and that price is reported and is used to settle he Mango

perpetual.  So it affects the value but not the price itself.

The market price of the Mango Professional is the price at

which one can by contracts of the Mango Professional and Mango

Markets.

THE COURT:  That's the distinction and that is the

latter thing, the government simply did not put in any evidence

as to that price being affected by the defendant's conduct.

MR. GREENSPAN:  I think there is -- I start by saying

I think there is a brief mention of it in Agent DeCapua's

slides.  The testimony was unclear as to whether Special Agent

DeCapua really even understood what it was saying in the

slides.  So I wouldn't go as far, I think it's too bold to --

so there is no evidence at all.  I think looking at the

elements helped here and I specifically, the fourth element and

this is the specific intention to cause an artificial market

price, this is the fourth element in the Amarant test.  Amarant

is 730 -- all of the evidence in this case suggested that

success of Mr. Eisenberg's alleged trading didn't depend on the

market price at all.  The value of his positions depended

entirely on the settlement price.  So there would be and could

be no intent to manipulate the market price.  It didn't matter

to him at all.  That, I think, is undisputed.

He simply didn't care about it.  And one way that we

can see that is and this came up with Dr. Mordecai today.  He

O4CAAEIS6

1    never sold any of the perpetuals so.  He didn't profit off of

2    that.  Dr. Mordecai spent a fair amount of time looking for a

3    slide in which any of those contracts have been closed out, and

4    he wasn't able to find one.

5         So while there was some lack of clarity with Dr.

6    Mordecai initially on whether he understood the difference

7    between the settlement price or the Oracle price and market

8    price and candidly there's been a lot of confusion over how

9    those terms have been defined and Dr. Mordecai was very

10   reluctant to use the word "market price", he preferred

11   "prevalent venue price" but I think he was referring to the

12   same concept.  Prevailing venue price; thank you.

13        And ultimately, I think he did agree that those prices

14   were different and I think the evidence shows that they have to

15   be at least potentially different.  That's the entire reason a

16   funding rate exists.  The funding rate exists to address the

17   problem of those two prices being different and to try to close

18   the gap.

19        Mr. Jain, the government's expert, discussed that as

20   the purpose for funding rate.  So that came in through his

21   testimony.  So just summing up on that and coming back to the

22   Amarant test, because there's been this dearth of testimony at

23   all or evidence about the market price, all four of the

24   elements have not been met.

25        The first is that there's been no testimony about

O4CAAEIS6

1    Mr. Eisenberg's ability to cause a different market price.

2    There's been no testimony that there was an artificial market

3    price.  The government never established how the market price

4    changed.  Even if they showed that there was a different market

5    price, they didn't establish that it was artificial in some

6    way, did not reflect forces of supply and demand.

7            Dr. Mordecai who seemed to be their expert on issues

8    manipulation, didn't address it at all.  It wasn't in a single

9    one of his slides.  And similarly, the government failed to

10   prove that if the market price was artificial, that

11   artificiality was or could have been caused by Eisenberg.

12   There was no evidence at all about that.

13           So we believe that all four of the elements of Amarant

14   and in particular, the specific intent element of Amarant, all

15   failed and Count Two should be dismissed.

16           We also believe there's no reasonable expectation

17   that's been established of a non-artificial price.  But

18   primarily we rely on this issue of the market price.  So

19   turning to the fraud counts and I'll try to take those in

20   general together.  That's Count One, the commodities fraud

21   count and Count Three, which is wire fraud.  And the key case

22   for us in this presentation is United States v. Regis 490 F3rd

23   208.  I know the government has written on that and the Court

24   has had some mission on that case.  And it really involves the

25   lack of ability to make a decision in general under a contract

O4CAAEIS6

1    theory that binds a party or potential victim and makes any

2    misrepresentation or deception not material.  So it's a

3    materiality issue.  But let me take these first by what we

4    think is the government's theories of deception.

5         The first one is an amalgamation of location and

6    identity.  This is the theory that Mr. Eisenberg

7    mis represented where he was logging-in from and what his

8    identity was.  Obviously, there was no requirement of any kind

9    of identity as Mango Markets.  The only identity potential

10   misrepresentation was related to FTX and the use of a nominee

11   account.  There was plenty of evidence of why that wasn't

12   deceptive, including that FTX, there was no evidence that it

13   cared or that in any way this misrepresentation affected

14   anything that it would have or could have done.  And there was

15   also no evidence that these misrepresentations affected any of

16   the potential victims.  There is no testimony about and there

17   was no documentation.

18        There was also plenty of evidence the other way that

19   U.S. users routinely used basically all of these exchanges that

20   at least purported to ban or block U.S. users and there was

21   testimony about VPNs and the use of those.  So there really was

22   no evidence of materiality with regard to location and

23   identity.

24        Also, specifically with the issue of identity, we want

25   to turn the Court's attention to Regent's Office Supply.  That

O4CAAEIS6

1    case is at 421 F.2d 1174.  It's a Second Circuit case.  And the

2    Pin site I believe is 1180.  Basically, that case stands for a

3    counter-party getting exactly what it bargained for.  There is

4    really in evidence that FTK or AscendEX lost anything, that

5    they didn't get what they bargained for or was misled by these

6    supposed misrepresentations.

7        As to Mango Markets, the contract itself was

8    permission-less.  So that was a topic that came up with

9    multiple witnesses.  Mango Markets didn't ask for and in a sort

10   of robotic way didn't care about the identities, location,

11   really or anything else about a potential user.  So this issue

12   of location and identity had no effect, whatsoever, on Mango

13   Markets.  And the Mango Markets's users all knew that as well.

14       Turning to the second form of deception, an obligation

15   to repay or maintain collateral, there's been no evidence of a

16   requirement of that.  And one thing I should stop here and note

17   here is from the defense's perspective, each of the four

18   theories of perception is a theory of omission.  And while

19   omissions of course are valid theories of deception, they do

20   require something a little more than just affirmative

21   misrepresentation.  That is either a duty or a scenario in

22   which that fact omitted makes something else or other things

23   that were convoyed, makes the omission somehow material.  And

24   in the case of the obligation to repay, there was no evidence

25   of any such requirement or anything that would have triggered

O4CAAEIS6

1    this sort of factual duty to disclose anything about repayment

2    or collateral.

3            I would like to point the Court to Government Exhibit

4    1011 which was discussed at some length today, and that's a

5    section of the Mango Markets documentation that deals with

6    liquidation and it set out a stepwise series of events of

7    exactly how Mango Markets deals with what they call bad debt.

8    And it goes through the liquidation of the collateral.  Then

9    they turn to the insurance fund.  And then if that fails, it

10   goes to socialized losses.  There's no discussion there or

11   anywhere else on Mango Markets about a requirement to repay.

12   There's also no discussion there or anywhere else about a

13   requirement to maintain collateral.

14           So there were individuals who gave subjective

15   hypothetical views of why these sorts of things were relevant

16   to them but we believe that that testimony was irrelevant

17   because there was no obligation that was violated to make their

18   particular view in the hypothetical at all meaningful,

19   actionable and material.  And on that point, there was no

20   evidence that anyone could have or would have done anything

21   differently if Mr. Eisenberg had disclosed anything about his

22   repayment intentions or collateral maintenance intentions.

23           The third theory of misrepresentation involved, I

24   think what the government called, the artificial creation of

25   perpetuals.  And that is Mr. Eisenberg taking both the long and

O4CAAEIS6

1   the short.  Frankly, the defense isn't really certain who the

2   government believes was actually deceived or could have been

3   deceived by this.  The actual positions themselves were fully

4   disclosed and available for view on the Mango Markets's

5   website.  No witness testified about being deceived by this or

6   being potentially deceived by this or about any decision they

7   could have or would have made or any influence that the same

8   individual being on both sides of the perpetuals, any influence

9   it had on them and there's also no evidence at all that it

10  moved the price.  So which goes back to the market price

11  discussion we had earlier.  But there's really no materiality

12  argument that we are aware of for that third misrepresentation

13  on the artificial creation of the perpetuals.

14        Then the fourth and final theory is the market

15  manipulation theory.  Again, we come back to Regis and there

16  was no deception of the contract.  The contract -- and this is

17  the smart contract on Mango Markets -- believed it owed

18  Mr. Eisenberg $100 million at time of his first withdrawal

19  because it believed it did under its own terms.  So any

20  information that he provided to it for its purposes was true.

21  The contract had no authority not to execute.  It was a smart

22  contract.  It was permission-less and it was bound to do

23  exactly that which it did.  So the notion that it was

24  materially altered in some way or could have been is just

25  unsupported by the evidence.

O4CAAEIS6

1          So those are the four theories of deception.

2     Generally, across both the commodities fraud and wire fraud, we

3     think this was insufficient evidence of knowledge, willfulness

4     and fraudulent intent, as we've discussed at length multiple

5     times, there was no terms of service on Mango Markets and we

6     don't think that there's been sufficient evidence to show for

7     either of those two statutes which are slightly different but

8     mostly similar that the requisite intent was met here.

9          And just one final point on the commodities fraud

10    count, we also don't believe that the government presented

11    sufficient evidence that the Mango spot trading was in

12    connection with the swap and we have discussed and the Court

13    has discussed a length, the Chemical Bank case which is we

14    believe the controlling case on that.

15          So one final point I'd like to make about venue, the

16    defense believes that there's been insufficient evidence of

17    venue.  The primary evidence we believe has been about

18    AscendEX.  AscendEX having an office of sorts in New York

19    through company called HD, which had a convoluted and unusual

20    arrangement with AscendEX and that seems that a number of

21    employees there had contracts with AscendEX.  Although,

22    AscendEX was very clear that it itself it not a U.S. company

23    and it was not a U.S. company and it was very important to it,

24    the servers of AscendEX, there's no evidence that they were in

25    New York.  There is no evidence of any wire coming into New

O4CAAEIS6

1   York.  And on the wire point as we've discussed with the Court,

2   the wire fraud count specifically requires a wire.  So that's

3   the one way in which that count for venue purposes is a little

4   different from the other two.

5       There is some evidence about individuals at AscendEX

6   looking at reports and things of that nature regarding the

7   events at issue.  All of that we believe happened after the

8   fact.  Venue has to be in furtherance of a charged defense.

9   And so that act in furtherance has to be in the Southern

10  District of New York.  And we'll site Sovoda for that, 347 F.3d

11  41.

12      Turning to two other people who described some

13  connection to New York, Mr. Casey who testified today said he

14  didn't know anything about the trading until after it was over.

15  So we believe that there's nothing that he testified to that

16  was in furtherance of the charged offenses.  And Mr. Hermida

17  testified, I believe he lived in New York but also didn't

18  testify to having taken any actions that furthered the charged

19  offenses.  And we're not aware of any other evidence relating

20  to Switchboard, including that there were notes in New York we.

21  Don't believe there is any evidence of that.

22      For that reason too, we think that venue is sufficient

23  as to those charges and for all of those reasons, we move for a

24  judgment of acquittal.

25      THE COURT:  All right.  Thank you, Mr. Greenspan.

O4CAAEIS6

1              Who is going to address the motions from the

2       government side?

3              MR. GREENSPAN:  Sorry.  One second your Honor.

4              (Pause)

5              MR. GREENSPAN:  Thank you, your Honor.

6              THE COURT:  All right.  Mr. Davis.

7              MR. DAVIS:  Thank you, very much.

8              Starting with the standard and I'm happy to field any

9       questions the Court may have because where we are at this stage

10      of the case is the burden is on the defense in this motion and

11      it's a burden that is incredibly high, one that my colleague in

12      our position referenced at the beginning and carries a heavy

13      burden.  And this Court must give full the right of the jury to

14      determine credibility, weigh the evidence and draw justifiable

15      inferences of fact.  I think what you heard from Mr. Greenspan

16      which are a number of points, of disagreements for the jury.

17      so I have a few points to hit.  I mean Mr. Greenspan just

18      outlined a number of issues for us to address but I'm happy to

19      start with the Court's questions if there's something on the

20      Courts mind or if the Court is going to reserve, I'll be very

21      brief

22             THE COURT:  Well, the only question I had was on the

23      mixed swap issue because it is related to the jury

24      instructions, as well and so given that it has been now

25      crystalized from Mr. Greenspan what their position is on that

1    issue, perhaps, you could give me the government's take.

2                MR. DAVIS:  Yes, your Honor, briefly.  I think this is

3    going to be again in our letter to the Court tomorrow at five

4    p.m. even more crystal than what I'm going to say right now.

5                THE COURT:  I understand.

6                MR. DAVIS:  Here is where we are.  So, Mr. Greenspan

7    ticked off the subsections of 7 U.S.C. I think it's 47(i), on

8    the payment of interest and consequence, our view the funding

9    rate qualifies under that subsection.  That's the transfer that

10   happens on a consequence event and it is constantly happening

11   throughout the life of perpetual.  As to the transfer of

12   financial risk, that's Mango USD issue that we flagged before

13   USDC. Excuse me.  So that's a transfer of risk and MNGO is not

14   actually exchanging hands.  So we think we cleared that

15   hurdle -- brings us to the mixed -- again, we are going to get

16   back the Court.

17               THE COURT:  Understood.

18               MS. HUANG:  I think along the lines of where we were.

19   Yesterday we provided three alternative basis for this issue

20   USDC, the funding rate and the Oracle index based on USDC based

21   securities.  We think that goes all qualify, as under the mixed

22   swap analysis and then that's what we intend to argue.

23               THE COURT:  Okay.  Understood.

24               MR. GREENSPAN:  Your Honor, could I just add one more

25   point?  We also don't think that it's been proven sufficiently

O4CAAEIS6

1  Mr. Eisenberg at the time of the offense was in the United

2  States.  And so we also believe for extra territoriality

3  reasons Rule 29 is appropriate.

4          MS. HUANG:  Your Honor, you saw the ticket today

5  booking his flight within hours of the scheme for Puerto Rico

6  and that evidence is beyond a reasonable doubt proof that he

7  was there but it certainly meets Rule 29 standard duty to give

8  to the jury.

9          THE COURT:  Understood.  The Court will reserve on

10  defendant's motion and will consider it further.

11          Anything else, Mr. Klein, on the defendant's side?

12          MR. KLEIN:  Yes.  Just a couple quick things, your

13  Honor.  One is, as the government asked us, we would ask them,

14  they didn't call Mr. Durairaj.  We just want to remind, ask

15  that they, I don't know if they met with him.  Something

16  happened that caused them not to call him.  But if there is any

17  Brady material or anything we should get in discovery, we

18  haven't received any materials about him some time.  We just

19  ask that we're making a discovery request for Brady materials

20  there.

21          The other issue is I think we'll be able to work it

22  out but we have sent them a stipulation related to circle issue

23  we discussed the other day, which is the count suspension.  I

24  know I was busy.  I'm not saying they need to respond

25  immediately but if we don't reach an agreement on the circle

O4CAAEIS6

1    stip, we would need to call an assistant United States attorney

2    to testify to that fact because she is the one who instigated

3    the suspension and caused it to be -- I just wanted to let you

4    know those are the two we see happening over the weekend for

5    us.  We will notify them about our witnesses.  We are going to

6    meet with Mr. Eisenberg.  Right now we do expect to call

7    Mr. Sheridan on Monday.  That continues to be our expectation.

8    He would be our first witness.  We are a considering

9    Mr. Durairaj, who is now under subpoena, who would be first by

10   the way if we call Mr. Durairaj.  We've agreed to call him

11   first.  And then we'll be meeting with Mr. Eisenberg and

12   discussing the possibility of him testifying and we'll notify

13   the parties by Sunday evening, Sunday early afternoon, your

14   Honor.  We have to go meet with him.  It's not so easy.  So

15   that is, I just wanted to give the Court and the government a

16   preview of what's happening.

17          (Continued on next page)

18

19

20

21

22

23

24

25

O4CCeis7

1          THE COURT:  All right.  Mr. Burnett.

2          MR. BURNETT:  Our witnesses totally understand that

3    they need all the time they need for the call on Mr. Eisenberg.

4    As to the call on the other witnesses, could we get that by

5    like 5 o'clock Saturday as opposed to 5 o'clock Sunday?

6          MR. TALKIN:  That's fine.  I was speaking about our

7    client when I said that.

8          MR. KLEIN:  We're fine with 5 o'clock on Saturday.

9    It's just, for Mr. Eisenberg, we need more time.

10          THE COURT:  Mr. Davis.

11          MR. DAVIS:  Just very briefly as to the defendant's

12    request as to exculpatory materials as to Mr. Durairaj.  I will

13    note I have produced to defense our last meeting notes with

14    him, which I believe was Sunday.  And so, they have everything

15    that I have.  And my understanding --

16          THE COURT:  I just took it as Mr. Klein talking to

17    you.  So I wasn't even --

18          MR. DAVIS:  I'll sit down.

19          THE COURT:  If anyone has an application along these

20    lines, you'll let me know.

21          MR. KLEIN:  We just don't talk directly anymore.  We

22    just talk to you.

23          THE COURT:  So we are going to send you right now for

24    this afternoon the proposed jury charge to what we discussed.

25    There is a proposed instruction on the mix swap issue.

O4CCeis7

However, it's essentially a placeholder.  I understand the

parties are going to be putting in papers over the weekend on

that particular issue, but take a look at the proposed jury

charge.  Obviously, if there are other issues, we will address

them either before or during the charge conference.  You have

the proposed verdict form, so let's get back to the Court on

that so that we can have a smooth charge conference.

        And so, in terms of the timing, I think we're still on

the same track that we'll either have the charge conference in

the afternoon Monday or first thing on Tuesday, and then we

should be prepared to proceed with closings on Tuesday.

        MR. DAVIS:  That's our understanding, too, your Honor.

        THE COURT:  If there's nothing further, everyone, have

a great weekend and I'll see you on Monday.  Thank you very

much.

        (Adjourned to April 15, 2024 at 8:30 a.m.)

                        * * *

```
 1                    INDEX OF EXAMINATION

 2   Examination of:                          Page

 3    DAVID K. A. MORDECAI

 4   Cross By Mr. Greenspan . . . . . . . . . . 749

 5   Redirect By Ms. Huang  . . . . . . . . . . 807

 6   Recross By Mr. Greenspan . . . . . . . . . 809

 7    JOHN CASEY

 8   Direct By Ms. Huang  . . . . . . . . . . . 817

 9   Cross By Mr. Klein . . . . . . . . . . . . 821

10    OLIVER TONKIN

11   Direct By Ms. Huang  . . . . . . . . . . . 827

12   Cross By Ms. Mortabano . . . . . . . . . . 843

13   Redirect By Ms. Huang  . . . . . . . . . . 862

14    TAYLOR LA GRANGE

15   Direct By Mr. Burnett  . . . . . . . . . . 879

16   Cross By Mr. Talkin  . . . . . . . . . . . 911

17                   DEFENDANT EXHIBITS

18   Exhibit No.                            Received

19    50   . . . . . . . . . . . . . . . . . . 750

20                   GOVERNMENT EXHIBITS

21   Exhibit No.                            Received

22    817  . . . . . . . . . . . . . . . . . . 819

23    1601 . . . . . . . . . . . . . . . . . . 829

24    1603 . . . . . . . . . . . . . . . . . . 833

25    608  . . . . . . . . . . . . . . . . . . 880
```

1    1704    . . . . . . . . . . . . . . . . . 881

2    609, 609A    . . . . . . . . . . . . . . 882

3    800, 800A    . . . . . . . . . . . . . . 885

4    502A  . . . . . . . . . . . . . . . . . 888

5    801, 801A    . . . . . . . . . . . . . . 890

6    802, 802A    . . . . . . . . . . . . . . 892

7    1702A    . . . . . . . . . . . . . . . . 894

8    117A through 122A, 123, and 124    . . . . . . 894

9    318    . . . . . . . . . . . . . . . . . 899

10    604    . . . . . . . . . . . . . . . . . 901

11    310    . . . . . . . . . . . . . . . . . 904

12    612    . . . . . . . . . . . . . . . . . 905

13    112, 110    . . . . . . . . . . . . . . . 906

14    1703    . . . . . . . . . . . . . . . . 911

15    610    . . . . . . . . . . . . . . . . . 918

16

17

18

19

20

21

22

23

24

25