O4FMEIS1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4                v.                        23 Cr. 10 (AS)

 5   AVRAHAM EISENBERG,

 6                Defendant.                Trial

 7   ------------------------------x
                                           New York, N.Y.
 8                                         April 15, 2024
                                           8:55 a.m.
 9

10   Before:

11                   HON. ARUN SUBRAMANIAN,

12                                         District Judge
                                           -and a jury-
13
                           APPEARANCES
14

15   DAMIAN WILLIAMS
          United States Attorney for the
16        Southern District of New York
     PETER J. DAVIS
17   THOMAS S. BURNETT
     TIAN HUANG
18        Assistant United States Attorneys

19   WAYMAKER LLP
          Attorneys for Defendant
20   BRIAN E. KLEIN
     ASHLEY MARTABANO
21   RILEY SMITH
          -and-
22   TALKIN MUCCIGROSSO & ROBERTS, LLP
     SANFORD N. TALKIN
23   NOAM B. GREENSPAN

24   Also Present:  Brandon Racz, FBI
                    Ryan Sears, Paralegal Specialist-USAO
25                  Jonathan Oshinsky, Paralegal Specialist-USAO
```

O4FMEIS1

1              (Trial resumed; jury not present)

2              THE COURT:  Ms. Huang, who is going to address from

3      your side the issues with the Sheridan disclosure?

4              MS. HUANG:  I will, your Honor.

5              THE COURT:  Where are we at?  Have we come to any

6      further understandings.

7              MS. HUANG:  I think the issues are as outlined in the

8      parties' letters.  Essentially, I think -- overall, there is --

9      the theme, I think, your Honor is going to hear from us over

10     and over in this is a lot of these opinions that Mr. Sheridan

11     now wants to provide are things that should have been disclosed

12     much, much earlier.  There is no reason whatsoever that they

13     were held up at this point, and obviously that puts the

14     government in an awkward position because we now have to --

15     last night at 8 p.m., after the Court's order, learned for the

16     first time about many of these areas and have to really kind of

17     now deal with that.

18              I think the only one that was kind of arguably close

19     in terms of like timing was their argument, for example, that

20     they needed to rebut Dr. Mordecai and Mr. Jain's testimony

21     regarding certain demonstratives and exhibits.  It was only

22     from your Honor's actual order that they specified that what

23     they cared about actually wasn't Mr. Jain from their

24     supplemental disclosure.  It was regarding Mr -- Dr. Mordecai,

25     rather, and it was specifically on the topics of partial

O4FMEIS1

1    liquidations and funding payments.  As the Court probably

2    remembers, Dr. Mordecai specifically testified that as to

3    liquidations, that was an area that was outside the scope of

4    his testimony.  He was not looking into that whatsoever.  Mr.

5    Greenspan asked him over and over and that was his response.

6        So it feels really like the defense is putting up a

7    straw man here saying, this was an area that he touched on when

8    really it was an area that they kind of opened the door on.

9    And now, with no warning until literally 8 p.m., 8:08, I

10   believe, actually they let us know that this is something that

11   they want their expert to testify on.

12       THE COURT:  Understood.

13       Who is going to address this from the defendant's

14   side?

15       MR. KLEIN:  Me, your Honor.

16       THE COURT:  What's going on here?  I think the

17   government makes a fair point that prior to last night at 8

18   p.m., these opinions that are specified in the supplemental

19   disclosure were not previously disclosed.  The subject matter

20   may have been previously included, arguably, in some of the

21   prior disclosures.  The opinions themselves were not included

22   in any prior disclosure, as far as I can see.

23       To give you an example, when you were talking about

24   the repayment parameters and how that operated, you relate that

25   back to the disclosure concerning changes to the Mango Markets

O4FMEIS1

1  platform.  That's the subject matter.  But the opinion itself

2  was not previously disclosed.  Maybe you can shed some light on

3  this.  If I'm wrong about it, I have all your disclosures right

4  here.  I'm happy to take a look.  I want to understand why

5  there isn't a timeliness problem, and then we can talk about

6  the consequences of that.

7         MR. KLEIN:  Yes, your Honor.

8         Do you want me to take them in turn, or I can talk

9  about each of them?  Do you want me to focus on that one you

10  just mentioned?

11         THE COURT:  Let's start from just basics first.

12  Mr. Sheridan -- literally this that you have written in the

13  supplemental disclosure, this is what he is going to say,

14  right?

15         MR. KLEIN:  There are other things that we previously

16  disclosed.  This was out of an abundance of caution where they

17  think there are new topics, and we wanted to disclose that.

18         THE COURT:  It's not topics.

19         When Mr. Sheridan is asked questions relating to these

20  areas, what he is going to say is literally what's stated here

21  in the disclosure, right?  I understand the words will be a

22  little bit different, but this is what he is going to testify

23  to and nothing else within these areas.

24         MR. KLEIN:  Yes.  The plan is for him to talk about

25  the two repay-bad-debt proposals and to explain the mechanics

O4FMEIS1

1    of them.

2                    THE COURT:  What's the relevance of that?

3                    MR. KLEIN:  A couple of things, your Honor.

4                    Right now the jury has only seen those slides and

5    doesn't understand necessarily how they actually operated or

6    the timing of them.  They have testimony that the second vote

7    was approved shortly after but not how shortly.  They also

8    don't know when the first vote was put up, which was within a

9    few hours of my client's trade, not days, literally I think

10   three hours.

11                   THE COURT:  What's the relevance of that?

12                   MR. KLEIN:  It goes directly to the heart of this case

13   that he didn't have intent to like steal something from the

14   Mango Markets users that these withdrawals happened and

15   immediately he was negotiating in a settlement.  That goes

16   right to his mental state, within three hours of this

17   happening.

18                   THE COURT:  Why wasn't that in one of your prior

19   disclosures?  There is two prior disclosures.  Why wasn't that

20   specified in the prior disclosures if it goes to the heart of

21   your case?  I think that's the government's primary submission

22   here, is that whether or not they agree with you that it bears

23   on intent, it's not in these prior disclosures, and we had two

24   of them.  I bent over backwards to allow the defense to put in

25   the supplemental disclosure the last time which the government

O4FMEIS1

1    had an issue with, let you put it in.  We considered it and

2    this is not in there.

3            MR. KLEIN:  Your Honor, I think a couple of things

4    happened along the way.

5            One is -- just so you know, when we got a witness list

6    of witnesses from the government on March 25, it included

7    witnesses who -- we would have brought in this evidence, just

8    to be very clear.  And then the way the case developed, these

9    facts became more prominent and more focused.  So I understand

10   that we maybe could have been a little bit clearer back on

11   January 12 and that this precise language was not in our

12   disclosure on January 12, but I think all along it has been

13   very clear that Mr. Sheridan was going to talk about the

14   mechanics of how Mango Markets operated and the mechanics of

15   Avi, our client's trades and things that flowed from that.

16   This is not like we are talking about FTX or AscendEX.  We are

17   not going off into some total lark.  We are really focused on

18   squarely on what he did and how Mango Markets operated.

19           THE COURT:  Mr. Sheridan is not going to -- this is

20   where I think it's really important to avoid any prejudice to

21   the government.  He's literally just going to be saying, here

22   is when it happened.  The money went back here.  He is not

23   going to be saying:  And you can infer from this that people at

24   Mango Markets thought this or you can infer from this that

25   Mr. Eisenberg didn't have an intent.  He is not going to do any

O4FMEIS1

1    of that.  He is literally just going to say, these are bare

2    facts and really the issue is just that, otherwise, you would

3    not have a witness for these facts to just come through.

4           MR. KLEIN:  Yes, your Honor, that's absolutely right.

5    You made it very clear at our hearing on March 25, he can't

6    talk about the things you just mentioned, our client's intent,

7    what's in the head -- even what's in the heads of the people

8    who designed the protocol.  It's a technical thing, these

9    votes, the timing, and you need an expert to look at the code

10   and look at the protocol to see this.  That's why we had Mr.

11   Sheridan.

12          THE COURT:  Aren't the base documents in the record so

13   you can make the argument on closing, regardless of whether Mr.

14   Sheridan testified about it or not?

15          MR. KLEIN:  The base documents are, and they were put

16   in the by the government.  So that's one thing also, just to be

17   clear.

18          THE COURT:  What expertise?

19          MR. TALKIN:  Can I just have one second?

20          THE COURT:  Yes, you may.

21          MR. KLEIN:  Sorry, your Honor.

22          THE COURT:  What is Mr. Sheridan's expertise that he

23   adds to this?  That's what I'm trying to understand -- the

24   documents -- I want to make sure that neither side is

25   prejudiced here.  The documents are in the record, so on

O4FMEIS1

1    closing you can certainly make the argument you are making

2    right now, that the repayment was proposed within hours of the

3    actual incident and for that reason that negates the intent

4    that the government is trying to prove. I got that, that

5    argument.

6            How does he lend any kind of expertise to this?

7            MR. KLEIN: Two points on that, your Honor.

8            First, the exact timing isn't in. The testimony is

9    shortly -- after Mr. Talkin asked: Was it within hours? The

10    witness wasn't sure. He just said shortly after, within days.

11    Just to be sure, that isn't precisely in.

12            Two, you need someone who is able to look at the code

13    and then translate that and then say this was posted when, and

14    that's Mr. Sheridan. There is an expertise there. Your Honor

15    talked about it. Jurors aren't able -- I can't read code.

16    Jurors aren't going to be able to understand code. That's

17    where the expertise is, your Honor.

18            THE COURT: Is Mr. Sheridan able to read code?

19            MR. KLEIN: Yes, he is. He looked at the code, and he

20    can see that. He will testify along those lines.

21            Ms. Martabano is the one doing his direct. She can

22    share the questions in advance with your Honor if you have

23    concerns about the precise line of questioning.

24            THE COURT: I think that if the government, and if Ms.

25    Huang was to make an application to *voir dire* the witness on

O4FMEIS1

1    his capability and ability to examine code and comprehend what

2    it means, then that would be a fair request made by the

3    government.  If that's the reason why it's important to have

4    him testify, because he can understand code and he has enough

5    to cross the threshold on Rule 702, then we can address that.

6            That's the first area.

7            MR. TALKIN:  Your Honor, just one more fact as far as

8    in relation to the discussions you just had with Mr. Klein.  We

9    are going to bring in Mr. Eisenberg's computer searches, and in

10   there is one that went to proposals, and it circumstantially

11   will show the time of the proposal.  We were talking about

12   timing and everything.  And I want the Court to be aware of

13   that fact because it seemed like it would or could affect your

14   analysis, and I did not want you not to have that when you were

15   saying to him about the timing and the argument.

16           MR. KLEIN:  That's not through Mr. Sheridan, to be

17   clear.  That's through a separate witness, summary-type witness

18   like the government uses, a private investigator who is

19   bringing in certain exhibits.

20           THE COURT:  That's a subject of separate objections

21   that the government has raised.

22           MR. KLEIN:  Yes, your Honor.

23           THE COURT:  Let's figure this out, and then we will

24   move to Mr. Dwyer.

25           MR. TALKIN:  Those objections have been resolved.

O4FMEIS1

1          THE COURT:  They have been resolved.

2          Then is Mr. Sheridan going to be relying on any of

3     that?

4          MR. TALKIN:  No.  You had said that there was -- we

5     were talking about the arguments and how it might affect your

6     decision.  I just wanted you to have -- let you know that that

7     was coming so that can be factored in too.

8          THE COURT:  How would you propose that it be factored

9     in?  I'm just missing something.

10          MR. KLEIN:  In our favor, your Honor.

11          MS. HUANG:  Your Honor, I think it is because in that

12     case there is no need for Mr. Sheridan, right, because there is

13     the timing that your Honor has noted.  The specific question

14     that they have said that they wanted to propose to Mr. Sheridan

15     is to just get the timing of those proposals in.  It sounds

16     like Mr. Dwyer can do that.

17          Also, your Honor, if I can just note, for I think all

18     of these areas too, one of the things that they have addressed

19     is that Mr. Sheridan has relied on 3500 material provided by

20     the government.  There is obviously a double hearsay issue

21     there because it's the statement of whatever witness and it's

22     the notes of the government on those statements.  That's yet

23     another issue.  We don't know specifically how Mr. Sheridan has

24     relied on what specific materials.  They have just broadly

25     listed it.  That's another category.

O4FMEIS1

1           MR. KLEIN:  Your Honor, we are talking about the

2    DeCapua testimony.  We put that in there out of an abundance of

3    caution.  He has looked at the 3500 materials.  This specific

4    testimony is not based on them.  The prosecutor is welcome to

5    ask and inquire what his basis for his knowledge is.  That's

6    regular cross-examination.

7           THE COURT:  These three areas, how many questions do

8    you actually have on this?

9           MR. KLEIN:  Ms. Martabano has prepared his direct.

10          THE COURT:  If it's like --

11          MR. KLEIN:  It's not that many questions, your Honor.

12          MS. MARTABANO:  On the repayment proposals, it's less

13   than a page of large font.

14          On the other topics -- I think, because of the Court's

15   earlier ruling, as we understood it, we do tie most of his

16   testimony to his understanding of the computer code and how if

17   the computer code bears out what's in the document.  So, for

18   example, the government has put in GX-1011, which refers to --

19   they describe it as a foundational document for Mango Markets

20   and has tons of information about how the protocol was meant to

21   function.  They have shown the FAQ section.  They have shown

22   lots of it.

23          And for us we want to be able to say with Mr.

24   Sheridan, does the code match that?  So if you've looked at the

25   code, does it actually match what that says?  This says, if you

O4FMEIS1

1      run out of your collateral, then you will be liquidated.  Does

2      the code say that?  Or does just the document say that?

3             It is sort of tying the computer code because I think

4      it's apparent to everyone in the room that we will be arguing

5      that the code really did control here.  If the code and the

6      documents, if there is a discrepancy between the code and the

7      documents, then it's important to know what the code said.

8             So my plan is mostly to walk him through much of the

9      Mango Markets documentation to say, is this how it works

10     according to the code?  Is this also how it works according to

11     the code?  My understanding is we had already litigated the

12     fact that he would be speaking strictly to how the code worked

13     and how things would execute, and I do think that that is

14     something that an average juror would not comprehend.

15             MS. HUANG:  Your Honor, I think that's yet another new

16     disclosure.

17             MR. BURNETT:  There is just no way we could possibly

18     prepare for that.  They would need to actually list out the

19     differences that they plan to opine on.

20             MR. KLEIN:  Your Honor, it has always been clear he

21     was going to testify and opine about how the smart contract

22     operated and what was permissible without going to the intent

23     of the designers or the intent of our client.  He is navigating

24     that road, and we have been very careful to follow the Court's

25     prior order and make sure that the questions stick to that

O4FMEIS1

1    path, and that is the path he is going to be on throughout that

2    testimony.

3              So the smart contract portion has clearly has been

4    predisclosed, ruled on, and accepted within the parameters the

5    Court gave on the March 25 hearing and following order.

6              The last part about Dr. Mordecai's testimony, we

7    always noticed that it could develop based on what happens at

8    trial because we don't know what exhibits they are going to

9    offer in advance.  We got them a week ago.  They switched them

10   out constantly throughout their process, including the

11   demonstrative, for Mr. Mordecai in particular.

12             They are welcome to get up and the end and say:

13   Dr. Mordecai told you he wasn't looking at this, and we will

14   say:  That is not how it actually worked.  That just goes to

15   the argument at the end.

16             If they want time to call Dr. Mordecai or Jain as

17   rebuttal experts, they can do that.  They have noticed that.

18   If they want to call those people back, they can do that

19   tomorrow, as far as we are concerned.  We are not going to

20   object to that.

21             But this is really critical evidence, and we have

22   already noticed it and the Court ruled it.  How the smart

23   contract operated is something Dr -- Mr. Sheridan has always

24   been noticed to talk about.  That's what he is going to talk

25   about along the narrow pathway your Honor gave, which we were

O4FMEIS1

1    fine operating with it.

2         THE COURT:  The issue is that -- I think there is

3    problems on both sides.  The problem from the government's

4    perspective is that when we went through this exercise at

5    length previously, when there was a disclosure that was as

6    generic as how the code functioned, there could have been a

7    request at that juncture for a further disclosure to explain

8    what Mr. Sheridan was going to say in particular as his

9    opinions on how the code operated or did not operate, which we

10   didn't have.

11        There was a motion on *Daubert* grounds to preclude

12   testimony which the Court entertained, but there didn't seem to

13   be an issue as to whether what was in the disclosure, just as a

14   technical matter under Rule 16, was sufficient and whether

15   there should be a further disclosure if the testimony was going

16   to be allowed.  Because then we could have gotten all of this

17   squared away months -- a month ago maybe.  The last disclosure

18   was January 12, so this could have gotten squared away before.

19        From your perspective, I think you do have an issue

20   that the Rule 16 disclosures that were furnished do not meet

21   the substance of the rule.  It doesn't actually state the

22   opinions that Mr. Sheridan is going to offer, which leaves the

23   government in a quandary.

24        But Ms. Martabano, these three areas, which seem to be

25   the crux of the issue here, you're saying that what are we

O4FMEIS1

1    talking about, like 15 minutes?

2              MS. MARTABANO:  Yes, your Honor, I think that's right.

3              THE COURT:  Why shouldn't we have Mr. Sheridan take

4    the stand right now, and you can run through those questions,

5    so at least the government knows what you are going to raise.

6              Because what I want to avoid is that you call Mr.

7    Sheridan and it's sidebar after sidebar because it actually

8    wasn't what's stated here.  It was way outside of those

9    parameters.  That's what I think we are going to do.  I want to

10   make sure that there is not anything else that we need to do

11   when Mr. Sheridan is here.

12             Second issue, is he going to be relying on

13   Mr. Eisenberg's statements in any way, shape, or form?

14             MR. KLEIN:  No, your Honor.  This is -- the government

15   didn't know what he was talking with Mr. Eisenberg about, but

16   he can testify to that when he gets up there.  He is not

17   relying on the statements.

18             It was like two conversations.  One was just

19   introducing themselves.  Second one had just a technical thing

20   to help Mr. Eisenberg review the discovery.  So this is not

21   substantive.  He is not basing any opinion on Mr. Eisenberg's

22   statements to him.  Ms. Martabano can elicit that testimony

23   when he is up there.  It's a nothing.

24             THE COURT:  Ms. Huang, what are your reactions?  My

25   intent, my thinking right now, is to have Mr. Sheridan take the

O4FMEIS1

1   stand, Ms. Martabano can ask whatever questions she has, you

2   can inquire as to Mr. Sheridan's qualifications, or if there

3   are other issues that you just want to flesh out, and then we

4   will run it back from the top when Mr. Sheridan testifies in

5   front of the jury, absent some further issues.

6         Because at this point I think it's fair, if there is

7   testimony that Ms. Martabano seeks to elicit that is outside of

8   even this supplemental disclosure, then that will be precluded.

9         Ms. Huang, what's your reaction to that?

10        MS. HUANG:  Just one second, your Honor.

11        MR. BURNETT:  I think we are fine with that proposal,

12   your Honor.  I think we would ask that he cover not just the

13   first three topics, but all four topics that they identified in

14   the supplement, particularly --

15        THE COURT:  I'm sorry.  I missed the fourth one.

16        MR. BURNETT:  Particularly because that one doesn't

17   even have an explanation of what his basis is for that.  There

18   are like some other subsidiary foundational issues that we will

19   want to raise after he testifies; for instance, this like

20   whiskeyfries link he talks about.

21        THE COURT:  Those are just the topics, and then there

22   are some exhibit issues.

23        MR. BURNETT:  Right.  Although to the extent that his

24   basis for testifying on the topic is the exhibit, then I think

25   knocking out the exhibit would likely knock out the topic.

O4FMEIS1

1          THE COURT:  Now we go back to what we explored with

2     Mr. Jain, which is that, if he's relying on some code, even if

3     it would not be admissible, maybe they can't put it into

4     evidence.  But if he says, I reviewed this code and based on my

5     review of the code I came to these expert conclusions based on

6     my experience and expertise, and then he explains to the jury

7     certain aspects -- certain opinions, wouldn't that be proper

8     under Rule 703?

9          MR. BURNETT:  I think the issue, at least with respect

10    to this main document we are focused on, it's not code.  It's

11    basically, there was like some people on Discord.  We are

12    talking about a place where you could find Mango data.  It

13    seems like he found it on Discord, clicked on it, and just like

14    accepting it as true and correct Mango data; not like data as

15    in code data, like data as in trading data, so this is like --

16    it's not a code thing.  It's just purely inauthentic and

17    hearsay.

18          THE COURT:  Let's figure that out.

19          Anything else other than the whiskeyfries document?

20          MR. BURNETT:  The whiskeyfries one is the main one.

21    They are going to show a price chart, it seems, and talk about

22    pricing.  He was never noticed to talk about pricing, but we

23    have also never received the underlying data, which is a

24    prerequisite for admission under 1006.  We also have no basis

25    to challenge the hearsay or the authenticity of that data.

O4FMEIS1

1          THE COURT:  This is the 1006 document that I guess

2     Mr. Mordecai had -- you had disclosed.  He just never used it.

3          MR. BURNETT:  Sorry.  This is different.  This is the

4     exhibit they planned to offer.  I think it's DX-62.  It's like

5     a pricing chart about data -- it is theoretically from FTX and

6     AscendEX because we never actually received the underlying data

7     and that data, as I understand it, doesn't come from FTX and

8     AscendEX.  It comes from like other websites.  But we have not

9     gotten what those other materials are.  They have not produced

10    them to us.

11         MR. KLEIN:  Your Honor, that last part is not

12    accurate.

13         MR. BURNETT:  It is true.  You sent me a link to a

14    website, but that website does not have the data, and I do not

15    have the ability to like put code in to pull the same query you

16    do.

17         MS. HUANG:  We specifically requested the steps that

18    they took to get that data, and they have not provided that.

19         THE COURT:  I have the whiskeyfries document.  I have

20    DX-62.

21         MR. BURNETT:  The last point, your Honor, is, this

22    Court had previously ruled that the defense cannot do the line

23    of examination about the audit because it's effectively a

24    victim-blaming exercise.  The defense now seems like they plan

25    to do that.  The only basis they have is the fact that they, on

O4FMEIS1

1    cross-examination, asked Brian Smith about the risk -- like the

2    do-you-accept-the-risk page in Government Exhibit 1010, which

3    refers to the code being unaudited.  On redirect Mr. Davis

4    simply showed not the audit, but the fact that there was a page

5    on Mango Markets that said the code had been audited as of

6    September 2022.

7            We don't think the defense can force the door open to

8    a full victim-blaming exercise that this Court has already

9    found was irrelevant, and this Court's ruling on the audit

10   should stand and shouldn't be reopened.

11           THE COURT:  I agree with that.  I don't believe that

12   the government opened the door.  And the way that this happened

13   was, the defense put on Exhibit 1010, I believe, that mentioned

14   the word unaudited.  All I recall the government did was to

15   refer to a page that mentioned the audit without inquiring as

16   to the circumstances of the audit and without making any

17   representations whatsoever concerning the scope of the audit,

18   what it did.  I think it was really just to meet the

19   defendant's argument on the word unaudited by showing that in a

20   document that Mango Markets had, there was a reference to an

21   audit.  I don't think that that small point would open the door

22   to now a new examination of what the audit was, which would

23   then require the government to respond.  And for the reasons we

24   explored on *Daubert* motions, I think it would be prejudicial

25   and with little probative value, if any, to bring that issue

O4FMEIS1

1    in.

2           Mr. Klein.

3           MR. KLEIN:  They put in that exhibit, though, 1011,

4    originally that references the audit.  We didn't put that

5    exhibit in.  They put in an exhibit that references an audit.

6    They put that into play.  We didn't offer that 1011 in.  That

7    document that shows the audit -- and I guarantee you in close

8    they are going to bring that up.  They are going to bring that

9    up in close, and that's an incomplete story.  That's completely

10   unfair to us.

11          If they put in 1011, that references an audit, we are

12   going to show 1010, everyone knows it's in our close, and then

13   they are going to get up and say, well, you can see what he's

14   referring to as his audit here.  That leaves us completely in

15   the dark to explain to the jury what that audit was, and I

16   think that's an important point.

17          If they are not going to raise that audit in the

18   close, then maybe we are in a different place, but I believe a

19   hundred percent they are going to raise that and say that's

20   what it was referring to.

21          THE COURT:  That's a fair question.  The government

22   may raise the audit, right.  If Mr. Klein, or whoever is

23   closing for the defense, is going to talk about this software

24   being unaudited, then I imagine the government is going to

25   raise the audit to show that was not true, right?  You have not

O4FMEIS1

1    prepared your closing yet or finished preparing it.

2            MR. BURNETT:  We have not prepared or finished on that

3    point.  I don't think we would be putting it in like

4    affirmatively, and certainly there is nothing to talk about

5    substantively in the audit, because the audit is not in

6    evidence.  If they say it's unaudited and we'd say, but in fact

7    it was audited, I don't know, but if it's the difference

8    between keeping this testimony out and letting it in, we would

9    be happy to walk away from that argument on cross-examination.

10            We would have done our case differently had we known

11    that like just putting in the user manual, which says edit on

12    one page of 180, would open the door to a full line of cross or

13    line of examination on an expert that was already precluded.

14            MR. KLEIN:  There is actually a link in that document

15    to the audit, your Honor.

16            MR. BURNETT:  But the audit is not in evidence.

17            MR. KLEIN:  I want to be clear, on that page there is

18    a link to the actual audit.

19            THE COURT:  What is Mr. Sheridan going to say about

20    the audit?

21            MS. MARTABANO:  He is really just going to testify

22    that it doesn't mean like a full financial audit, and I think

23    it's the average juror who doesn't spend their time in crypto

24    or in code may not realize what the significance is of a code

25    audit.

O4FMEIS1

1        You may have fixed the code, and that may mean that

2   your code functions exactly as you intend it to and that's

3   fine.  But we would just want to clarify, it doesn't mean that

4   there has been some sort of SEC equivalent audit.  We are not

5   really even planning to get into the weeds on the audit; just

6   more, they reference an audit, they say that it is audited

7   here, but what does that audit actually cover?  It covers the

8   code.  I think we would say, could you tell us categories of

9   things that it wouldn't cover.  Because, obviously, the

10  riskiness of the platform --

11        THE COURT:  That it didn't cover.  You said wouldn't.

12        MS. MARTABANO:  That it didn't.  I was the trying to

13  be more general to stay away from the specific things within

14  that audit, but I'm happy to ask specifically what didn't it

15  cover.  Based on the Court's prior ruling, I was trying to take

16  away from that.

17        THE COURT:  Let's have Mr. Sheridan take the stand and

18  let's address these four points.  To the extent the government

19  has inquiry about these two exhibits, let's talk about those,

20  and then let me think a little bit about this audit issue.

21        MR. HUANG:  Your Honor, on Exhibits 63 and 64, we also

22  had issues with those.  Those appear to be vote tallies from

23  the various Mango DAO votes.  The defendant hasn't provided any

24  foundation for authenticating those documents.

25        THE COURT:  Why are those relevant at all?

O4FMEIS1

1          MS. MARTABANO:  I think with Exhibit 64, we would just

2     use it to refresh his recollection as to the specific time of

3     the two proposals.  We don't intend to offer it.

4          THE COURT:  63 and 64 are not coming in evidence.

5          MR. KLEIN:  Correct.

6          THE COURT:  Then we are left with 62, whiskeyfries,

7     and we will pick up the audit.  We have these four issues.  So

8     let's do it.  Because we are burning jury time.

9          MR. KLEIN:  Your Honor, before we start today, there

10    was one or two other things we wanted to discuss.  One is very

11    quick, and I just wanted to flag that.

12         THE COURT:  Let's do this, because this is going to

13    raise some other issues.

14         Let's get Mr. Sheridan outside of the presence of the

15    jury.

16         MR. KLEIN:  Your Honor, can I raise one before we put

17    Mr. Sheridan on?  Sorry.  It's really quick.

18         THE COURT:  OK.

19         MR. KLEIN:  We just wanted to briefly reopen the Rule

20    29 for like 30 seconds.  There are two little points that we

21    wanted to make clear.  It will take 30 seconds for me to say

22    them on the Rule 29.

23         THE COURT:  It looks like we have 30 seconds while we

24    get Mr. Sheridan.

25         MR. KLEIN:  In reopening the Rule 29, we wanted to say

O4FMEIS1

 1   that there is no evidence of an interstate wire to meet the

 2   wire fraud element there.

 3           And then as to the attempt for Count Two, we also

 4   think that would fail for the reasons we discussed for the

 5   other elements for Count Two, and that's it.

 6           THE COURT:  Understood.  The Court will reserve

 7   decision under Rule 29(b).

 8           (Continued on next page)

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O4FCeis2                          Sheridan - Direct

 1    JEREMY SHERIDAN,

 2         called as a witness by the Defendant,

 3         having been duly sworn, testified as follows:

 4    DIRECT EXAMINATION

 5    BY MS. MARTABANO:

 6    Q.  Mr. Sheridan, can you tell us about your experience in

 7    particular as it relates to your abilities to read computer

 8    code and understand it?

 9    A.  My experience is based on my training and certifications

10    in -- as an information security officer and as a certified

11    security manager through Carnegie Mellon University, and the

12    information systems and control association, as well as my

13    experience within criminal investigations as a Secret Service

14    agent.

15    Q.  And you have the ability to just read computer code from

16    GitHub?

17    A.  I have the ability to read it, yes.

18    Q.  You don't write computer code?

19    A.  I do not write computer code, I'm not a coder, I'm not a

20    software developer.  Depending on the code in question -- there

21    are obviously a large number of different computer codes.

22    Depending on the code in question, I can read it and have a

23    sense of its intended function.  I cannot audit, I cannot write

24    it, I cannot conduct security and bug identification on it.

25    Q.  And you worked with a team at FTI while you were preparing

O4FCeis2                          Sheridan - Direct

1    for your testimony?

2    A.  Yes, ma'am.

3    Q.  And do they have the ability to read and understand

4    computer code?

5              MR. BURNETT:  Objection.

6              THE COURT:  It's overruled.

7    A.  Yes, ma'am.

8    Q.  And did you work with them in understanding the Mango

9    Markets computer code?

10             MR. BURNETT:  Objection.

11             THE COURT:  It's overruled.

12   A.  Yes, ma'am.

13             THE COURT:  What's the nature of the objection?

14             MR. BURNETT:  If he's relying on what someone at FTI

15   told him about what code said or did, that's hearsay.  The

16   person from FTI should testify, not him.

17             THE COURT:  Understood.  I'll overrule that.

18   Continue.

19   Q.  With respect to the Mango Markets code, did you review it

20   to see whether the commands in the code matched up with the

21   Mango Markets documentation in this case?

22   A.  I reviewed it in conjunction with my team.

23   Q.  And do you have the ability to explain to the jury how

24   those two things are connected so the language of the Mango

25   Markets documentation, for example, GX 1011, which I believe

O4FCeis2                        Sheridan - Direct

1   you've seen in this case, and the code that is deposited at the

2   Mango Markets version 3 repository on GitHub?

3   A.  I'm sorry.  The question is, can I relate that exhibit --

4   Q.  Can you sort of translate the computer code to say, yes,

5   this is what it says or, no, this isn't what it says in terms

6   of how commands are called, how the contract is set up, how the

7   borrows and collateral work as compared to -- obviously there

8   are verbal representations in GX 1011, but are you able to read

9   the code and say, yep, the code comports with that, yes, the

10  code comports with that?

11  A.  I'm able to read the code for its intent in terms of

12  specific code functions and detailed code execution, that I

13  relied on the team for.

14  Q.  When you say "intent," what do you mean by that?

15  A.  The general description of the code as written code base

16  and what it relates to in terms of its function.

17  Q.  So not the intent of the programmer, but in fact what a

18  line of code is meant to do?

19  A.  From a function sense, yes.

20          THE COURT:  Can you walk me through the distinction

21  that you're drawing.  Take any example you want.  Where did the

22  line between what you can do stop and then what you have to

23  rely on your team for?

24          THE WITNESS:  So the way code is written, there are

25  certain calls within the code that I can identify if it's

calling a user or a bid or an ask, a specific reference to a

function, but in terms of specific lines of code that are

syntax or require specific character input, that will result in

an error because it's not entered correctly and code that is

more data centric related to the nuance of writing requirements

as opposed to reading requirements of the code.  That is what I

relied on my team for.

THE COURT:  So give me the back and forth between you

and your team when this arose during your analysis.

THE WITNESS:  So there were questions surrounding

borrows versus withdrawals.  We went into the code to see if we

could find areas within the code related to specific amounts of

a settlement or an area of code that identified whether a

transaction was a borrow or a withdrawal.  And so, we could see

within the code -- I could see within the code settlement

functions, borrow functions, withdrawal functions, but the

specificity of what that borrow did in terms of amount or how

to write, where to point that code specifically within the

smart contract and to the blockchain, those were beyond my

capabilities.  So the team would have to tell me, yeah, this

doesn't call for a specific amount of this, this doesn't

identify a specific amount or this code base doesn't -- this

points to a certain location within the smart contract or

towards the Solana blockchain.  There's specific terminology

within Mango Markets, smart contracts, and the Solana

O4FCeis2                          Sheridan - Direct

1    blockchain that I don't know because it is specific to those

2    individual protocols and they have a deeper knowledge of that

3    level of code than I do.

4            THE COURT:  And then when they gave you the answers to

5    whatever questions you had, what would you do with those

6    answers?  Meaning, you asked those questions, they fill in the

7    gaps, and then what do you do?

8            THE WITNESS:  I would review the answers related to

9    the Mango Markets documentation.  What I am more familiar with,

10   which is the blockchain explorers to see blockchain

11   transactions from individual wallet address, and plain language

12   text in terms of date, transaction time, amount, and ensure

13   that those two aligned.

14           THE COURT:  Okay.  Ms. Martabano, you may proceed.

15           MS. MARTABANO:  Yes, your Honor.

16           Does your Honor want me to cover -- I believe the

17   topics that are not in dispute, like basic blockchain

18   background and Solana background?

19           THE COURT:  Let's go through these four categories

20   now.

21           MS. MARTABANO:  Okay.

22   BY MS. MARTABANO:

23   Q.  How can you access the Mango Markets smart contracts?

24   A.  It's publicly available on GitHub.

25   Q.  And for a user who's seeking to interact with or transact

1    with Mango Markets, what ways are there for them to access the

2    blockchain and the protocol?

3    A.   There's two primary ways.  One is through the Mango Markets

4    user interface, and there are more technical ways to approach

5    it through user-inputted code and API access.

6    Q.   What is a user interface?

7    A.   It's a graphical interface.  Typically, a website is common

8    terminology.

9              MS. MARTABANO:  Your Honor, I'm going to skip forward

10   to the specific defendant's trades, if that's okay.  If you'd

11   like me to go back to some of the more general topics that I

12   don't think are in dispute, I'm happy to.

13             THE COURT:  Let's keep it moving.

14             MS. MARTABANO:  Okay.

15   Q.   When you think about GX 1011, which is the document --

16             MS. MARTABANO:  Mr. Smith, if you could bring that up

17   so that the witness could see it.

18             We've talked about parts of that document that include

19   the risk calculator.  This is just going to be summary.  If you

20   want more detail, just let me know.

21   Q.   The risk calculator, how liquidations work, how the

22   insurance fund works, and how the socialized loss works and a

23   settled P&L works, if I were to walk you through each of those,

24   does the risk calculator work as it's described?

25             MS. MARTABANO:  It's page 100, Mr. Smith, in the

O4FCeis2                          Sheridan - Direct

1    document.

2                MR. BURNETT:  Objection.  Foundation.

3                THE COURT:  Mr. Sheridan, did you review this document

4    in preparing for your testimony?

5                THE WITNESS:  Yes, sir.

6                THE COURT:  What did you do?

7                THE WITNESS:  I read the document and compared it to

8    our findings on our blockchain analysis, used as it relates to

9    the risk calculator.  We experimented with the risk calculator

10   with the inputs and trading activities that occurred in this

11   case as executed by Mr. Eisenberg, we input those exact data

12   points into the risk calculator.

13               THE COURT:  Ms. Martabano, you may proceed.

14   Q.  And this document describes it as the -- with the risk

15   calculator, you can estimate your health ratio by simulating

16   changes to an accounts, token deposits, borrows, prepositions,

17   and pricing can be useful to help traders develop strategies

18   based on their project of market movements, which may be

19   simple, such as changing the price of a token or, more complex,

20   such as developing a delta neutral strategy.

21               In your experience with the risk calculator, did it

22   enable you to do that?

23   A.  I just want to read the paragraph to ensure -- this is what

24   you just read?

25   Q.  Yes.

O4FCeis2                          Sheridan - Direct

1    A.  Sorry.  So, the second sentence, we didn't develop

2    strategies, but we simulated changes to the account token,

3    deposits, borrows, prepositions, and pricing.

4    Q.  Did the risk calculator function as described in this

5    document when you used it, even if you didn't use it to develop

6    trade strategies, does it function as described in the

7    document?

8    A.  Yes, ma'am.

9    Q.  You mentioned that you put in Mr. Eisenberg's exact

10   parameters.  Did you receive any warnings or any notifications

11   as to the outcome of what the trade might do to the protocol?

12          MR. BURNETT:  Objection.  Relevance.

13          THE COURT:  You can answer.

14   A.  We did not.

15   Q.  Moving on to the liquidations page, which is page 110 in

16   the document.  Mr. Sheridan, please read this to yourself.  I'm

17   going to walk you through what some of the terms in here mean,

18   you'll see some of the terms are in gray and look like they're

19   sort of in very old-school computer font.  I'd like to walk you

20   through what you understand those terms to mean.

21   A.  Yes, ma'am.

22   Q.  Under the second heading, it says, "liquidations."  It

23   says:  "Every Mango account must have a maint_health above

24   zero."  What does "Mango account" mean in that line?

25   A.  A Mango account is an individual deposit of cryptocurrency

1    that users have assigned to them to be able to conduct trading

2    activities on the Mango platform.

3    Q.   What kind of information is associated with Mango accounts

4    on Mango Markets?

5    A.   Mango accounts associated -- it's the account identifier,

6    which is a cryptographic hash, and the account balance, the

7    assets and liabilities within the account.

8    Q.   So the code doesn't ask for an individual's name?

9    A.   No, ma'am.

10   Q.   No location?

11   A.   No, ma'am.

12   Q.   Their intention about the trade that they're engaging in?

13   A.   No, ma'am.

14   Q.   Does it ask them about other accounts they might have on

15   the platform, other wallets they might have on the platform to

16   link them?

17   A.   No, ma'am.

18   Q.   So the only data covered there is the wallet that it's

19   linked to and the account number that's generated by the

20   protocol itself?

21   A.   Can you repeat that question.  Sorry.

22   Q.   Correct me if I misunderstood you, but the only information

23   is the wallet that was connected to create the account and then

24   just the random crypto hash number generated that becomes the

25   account identifier?

O4FCeis2                        Sheridan - Direct

1    A.  And what's contained in the account would be the other

2    category.

3    Q.  So if you deposit the amounts deposited in that wallet?

4    A.  Or your liabilities, not just deposits, but positions,

5    liabilities, all assets and liabilities related to that

6    account.

7    Q.  And it then says, every Mango account must have a

8    maint_health above zero.  What is maint_health?

9    A.  That is maintenance health that is the collateral ratio

10   that is required to continue trading activities on the

11   protocol.

12   Q.  It says, if it slips below zero, liquidators can start

13   liquidating the account until the init_health is above zero.

14   What is that?

15   A.  Initial health is the collateral ratio required to open the

16   account.

17   Q.  And is that different from the maintenance health?

18   A.  Yes, ma'am.

19   Q.  How?

20   A.  It's a higher collateral ratio requirement.  The initial

21   health requirement is a 120 percent collateral ratio, the

22   maintenance health is a 110 percent collateral ratio.

23   Q.  If liquidation has started on your account, the only way to

24   stop more liquidation is to actually bring yourself up not just

25   at a maintenance level, but all the way to the initial health

1  level?

2          MR. BURNETT:  Objection.  Foundation.

3          THE COURT:  I mean, foundation, leading.

4          MS. MARTABANO:  Sorry, your Honor.  I don't intend to

5  be leading when the jury is here.  I was just trying to move us

6  through.

7  Q.  Can you explain, if you start liquidating, how is it that

8  you can stop liquidation?

9          MR. BURNETT:  Objection.  Foundation.

10          THE COURT:  Well, we've got to move this forward.

11          MR. BURNETT:  If the point was to help us understand

12  what his code basis is and how he's comparing it, there's kind

13  of no questions here that elicit that.  We can wait until my

14  cross, we can go straight to my cross and I can ask him about

15  this stuff too.  It's not helpful if he's just him reading the

16  document.

17          THE COURT:  Why don't you ask a few foundational

18  questions.

19          MS. MARTABANO:  Sure.

20  Q.  Mr. Sheridan, what is your understanding of the Mango

21  Markets protocol and these documents based on?

22  A.  What is my understanding based on?

23  Q.  Yes.

24  A.  My training, experience, review of the documents provided

25  in discovery from defense and the government, as well as

O4FCeis2                        Sheridan - Direct

1    independent research on analysis of the trades in question.

2    Q.  And did that include this particular document?

3    A.  Yes, ma'am.

4    Q.  And what about, did you review any computer code?

5    A.  Yes, ma'am.

6    Q.  And what's your basis for understanding what the terms --

7    sort of the terms in the gray awkward writing, where does that

8    come from?

9    A.  The description that was provided through the Mango Markets

10   user guide, as well as the analysis of the trades here, and

11   review of the collateral assets and liabilities, and how

12   liquidations occurred relative to maintenance health and

13   initial health.

14   Q.  If you could expand on your understanding of how

15   liquidation works, what is that based on?

16   A.  Liquidation is based on the maintenance health of an

17   individual account and --

18   Q.  Sorry to stop you.  What is your understanding of the

19   liquidation based on, anything additional to things we've

20   already discussed?

21   A.  Not additional to what we've already discussed.

22   Q.  When you worked in the risk calculator, did it warn you

23   that a liquidation would happen?  Like when you were testing

24   out the code in the risk calculator, did you have an

25   experience -- tell us about your experience about the code and

O4FCeis2                           Sheridan - Direct

1    how it worked and why that did or didn't impact your ability to

2    understand what's going on on the protocol?

3    A.   Is this question in relation to the risk calculator?

4    Q.   Yes, but as it would bear on sort of any experience that

5    you have interacting with the protocol.  You mentioned the risk

6    calculator, if there are other experiences with version 3 of

7    the protocol.

8    A.   So my experiences with version 3 are to go to the version 3

9    user interface on Mango Markets, to observe the functionality

10   of the user interface, and the different ways in which a user

11   could interact with it, and also, as stated, utilize the risk

12   calculator to see what outputs would be generated by different

13   trading inputs.  I did review the -- specifically the

14   settlement functions that were called by Mr. Eisenberg and the

15   code associated with those in order to help assist, if I could,

16   on identifying some of the information we were trying to

17   determine from that settlement function.

18   Q.   And what did your review of those functions tell you?

19   A.   When you say those functions --

20   Q.   The settle functions, the withdrawal functions, the ones

21   you were just mentioning, what did they allow you to conclude

22   about Mr. Eisenberg's trades?

23   A.   Well, speaking to the settlement function specifically, it

24   helped inform us about the $50 million withdrawal in terms of

25   timing, how that may be considered within the P&L settlement

O4FCeis2                        Sheridan - Cross

1    category, as well as what information was available through a

2    code level analysis to see if we could find those pieces of

3    information we were looking for.

4            MS. MARTABANO:  Your Honor, avoid offer that as

5    sufficient basis to give his basic computer background on what

6    these terms mean and how they function.  If you'd like me to

7    inquire further, I'm happy to.

8            MR. BURNETT:  May I inquire?

9            THE COURT:  You may.

10   CROSS-EXAMINATION

11   BY MR. BURNETT:

12   Q.  Good morning, Mr. Sheridan.

13   A.  Good morning, sir.

14   Q.  You talked about liquidations with Ms. Martabano a few

15   minutes ago; right?

16   A.  Yes.

17   Q.  What specific code did you view about liquidations?  You.

18   A.  I did not review specific code on liquidations.

19           MR. BURNETT:  The government moves to exclude all

20   testimony about liquidations in the code from Mr. Sheridan.

21           THE COURT:  Ms. Martabano.

22           MS. MARTABANO:  Your Honor, we disclosed he would be

23   working with the team, much like Dr. Mordecai and the Brattle

24   Group.  We do not have Dr. Mordecai and the Brattle Group's

25   underlying work papers.  He has been working hand in hand with

O4FCeis2                          Sheridan - Cross

1    FTI, which was disclosed, and he has reviewed that data such

2    that he feels sufficiently educated by them and by his work in

3    the code.

4              MR. BURNETT:  I could ask more if you need more.

5              THE COURT:  So the issue is --

6              So you didn't review the code underlying the

7    liquidation function; right?

8              THE WITNESS:  I reviewed the liquidation transactions

9    and the data of the transactions.

10             MR. BURNETT:  I can jump in there, too.

11             THE COURT:  Go for it.

12   BY MR. BURNETT:

13   Q.  That's the Whiskey Fries document that you produced;

14   correct?

15   A.  Yes, sir.

16   Q.  And your team at FTI, what they did was they went on

17   Discord and found a Discord chat for Mango Markets; right?

18   A.  Yes, sir.

19   Q.  And they found a link in that Discord chat; right?

20   A.  Yes, sir.

21   Q.  And you clicked the link and downloaded some data from it;

22   right?

23   A.  That's how -- the link was to the data that we downloaded

24   after inputting the wallets associated with Mr. Eisenberg, yes.

25   Q.  Right.  But you haven't talked to a single person at Mango

1    Markets about whether that data is like the real deal; right?

2    A.  We did not interview Mango Markets.

3    Q.  And you don't know if those are materials that are

4    regularly kept in Mango Markets' course of business because you

5    haven't talked to anyone at Mango Markets about it; correct?

6    A.  So I just want to clarify.  The materials, we pulled the

7    materials.  We used the link to go to their dataset.

8    Q.  But you don't know if it's their dataset.  You're assuming

9    it's their dataset because it appeared on a Mango Markets

10   Discord; correct?

11   A.  Yes, sir.

12        MR. BURNETT:  So I'd move to exclude any testimony

13   based on that.  There's no foundation for the data that he's

14   relying on.  It's either authentic or is satisfying any of the

15   hearsay exceptions.

16        MS. MARTABANO:  Your Honor, if I may inquire further.

17   I feel like Mr. Burnett has misled the Court as far as what

18   this download came from.  We provided the government, last

19   night at 5:15, documents relating to proof of who the

20   individuals were, the fact that they were in the Discord as

21   both admins and team members of Mango, which is the way things

22   go in this space.  One of them is literally the lead coder for

23   Mango, Maximilian.  And in these Discord chats we turned over,

24   they reflect the fact that these individuals have been asked

25   questions by users saying, I'm looking for my data from my

O4FCeis2                         Sheridan - Cross

transactions, and team members of Mango say, you can get all of

your download history at this link.  You can check for your

tax -- for downloading version 3 account data for tax/records,

check out the same link.  Is there a way to download

transactions from V3 still.  I found a link, but I got an

error, offline for maintenance.  And then a member, who's a

team member and I believe an admin, two of the three are

admins, provides the same link.  So you have two admins and

another team member -- two admins who are also team members and

then another team member in Discord's official channel saying,

when you need your data, this is where to get it from.  They

are consistent in it, the government knows that.  We sent that

to them yesterday.  And Mr. Burnett is representing that FTI

went on and, you know, did no due diligence, didn't check, had

no basis to believe there was any kind of reliability in this

data.  These are Mango individuals representing that it is

their data that their users can do for tax records, right.  I

mean, I just think that --

            MR. BURNETT:  Your Honor, the problem is not --

            THE COURT:  Hold on.  Hold on.

            So Mr. Burnett, your motion to exclude is as to what?

            MR. BURNETT:  It's as to the documents that were

downloaded and as to the testimony that would be based on those

documents, because Mr. Sheridan testified that his knowledge of

liquidations doesn't come from the code, it comes from these

O4FCeis2                          Sheridan - Cross

1    things that he's downloaded from the internet.

2              THE WITNESS:  Your Honor, may I clarify one --

3              THE COURT:  No.

4              So the liquidations, that's what this is specific to?

5              MR. BURNETT:  Yes, it will move to settlement next,

6    but liquidations for starters.

7              THE COURT:  I'm going to exclude Mr. Sheridan's

8    testimony as to liquidations, both for the substantive reasons

9    that Mr. Burnett has identified, but also for procedural issue,

10   which is that neither Mr. Sheridan's opinions, nor the bases

11   for them, were previously disclosed.  I don't believe that they

12   were even disclosed in yesterday's supplemental disclosure,

13   which is why we're running to this issue on the morning of

14   testimony.  That is a plain violation of Rule 16.  For that

15   reason, Mr. Sheridan's testimony will be excluded on that

16   issue.

17             MS. MARTABANO:  Your Honor, on the record, we

18   disclosed a version of the chart that is exhibit 62 and the

19   link to that data as required on March 25th.  The government

20   has had it since then.  They did not raise it until this

21   weekend.  So we have not updated the disclosures, but they did

22   have that document in the documents we provided as things our

23   experts would be relying on.  They chose not to challenge it

24   until this weekend.  The same is true as the bad debt

25   repayments.  Those were in our disclosures, as well.

O4FCeis2                          Sheridan - Cross

1             THE COURT:  Mr. Burnett, you want to respond to that.

2             MR. BURNETT:  Two things.  It was disclosed to us as

3     part of materials that Mr. Sheridan looked at.  It wasn't

4     marked as an exhibit.  Because it wasn't marked as an exhibit

5     and it wasn't within the scope of what he previously disclosed

6     he was going to testify about, we didn't think much of it.  We

7     thought, okay, you pulled some data from the internet and he

8     looked at it, nothing really to see here.  We didn't learn

9     until last night and now this morning that he is actually

10    planning to offer that exhibit into evidence and he's planning

11    to opine on liquidations.  We had the spreadsheet, but our

12    scope of understanding with the import of and what they were

13    going to try and do with it didn't crystalize until last night

14    and now sitting here today.

15            THE COURT:  It all comes back to these disclosures,

16    which were woefully deficient.  Even in yesterday's disclosure,

17    there was another last-minute opportunity to specifically

18    identify Mr. Sheridan's opinions and the bases for them, and

19    even that disclosure does not address what Mr. Sheridan's

20    opinions are going to be on this particular issue.

21            In addition, there are these other issues that

22    Mr. Sheridan did not review the code relating to this function.

23    Even if he did to answer specific nuance questions about the

24    code, he would need to consult with his team at FTI because

25    he's unable to do that.  So it raises a host of issues, which

O4FCeis2                          Sheridan - Redirect

1    is precisely why the rules contain this disclosure requirement,

2    so that these issues can be addressed in connection with the

3    Daubert motions that we spent a lot of time on.

4              So let's move on.  What's the next issue,

5    Ms. Martabano?

6              MS. MARTABANO:  Yes, your Honor.

7              Turning to page 111 of the document, Mr. Smith.

8    REDIRECT EXAMINATION

9    BY MS. MARTABANO:

10   Q.  Mr. Sheridan, what's your understanding of the insurance

11   fund available on Mango Markets version 3?

12   A.  The insurance fund is an amount of assets held in reserve

13   by the DAO in order to pay for accounts that become liquidated,

14   but there are not enough assets on the platform through the

15   liquidation process to cover the total liabilities.

16   Q.  And is the use of the insurance fund automatic after

17   there's been a liquidation that has emptied an account of all

18   of its collateral and other assets?

19             MR. BURNETT:  Objection to foundation.

20             THE COURT:  Can you ask a few additional questions to

21   establish foundation.

22             MS. MARTABANO:  Sure.

23   Q.  What is your understanding of the insurance fund based on?

24   A.  My understanding of the insurance fund is based on the

25   Mango Markets documentation.

O4FCeis2                    Sheridan – Redirect

1   Q.  Which documentation specifically?

2   A.  The user guide.

3   Q.  And did it involve any review of Mango Markets' smart

4   contracts in order to understand how the insurance fund would

5   be implemented?

6   A.  The insurance fund implementation is not a smart contract

7   function.  That is a determination of the DAO to use the

8   insurance fund for those purposes.  How the insurance fund is

9   distributed would be within the smart contracts in terms of a

10  functionality, but it's a DAO decision to use the insurance

11  fund.

12          MR. BURNETT:  Same objection regarding foundation.

13          THE COURT:  It's overruled.  You may proceed.

14          MS. MARTABANO:  Thank you, your Honor.

15  Q.  Here it says the insurance fund will pay off losses.  Does

16  that suggest that the DAO needs to be involved in insurance

17  funds payouts?

18  A.  No, ma'am.

19  Q.  So when you said earlier the DAO was involved, what was

20  your basis for that?

21  A.  The DAO controls the overall treasury of which part the

22  insurance fund is a part.  So the insurance fund will pay that

23  out, provided there's no objections from the DAO.

24  Q.  Moving to the next page of the document, what is your

25  understanding of socialized losses and what is it based upon?

O4FCeis2                          Sheridan - Redirect

1    A.  My understanding of socialized losses are that these are

2    losses that will occur to Mango Markets' users if, in a

3    liquidation event, the account cannot be brought back to its

4    proper health balance and there are still outstanding

5    liabilities on the account that are not covered by individual

6    liquidators or the insurance fund.  In that case, the

7    socialized losses will occur across all other users to pay off

8    the remaining liabilities of the account.

9    Q.  Based on your review of the code and the documents in this

10   case, when will the socialized losses kick in?  Is it automatic

11   or is it not?

12   A.  Yes, that would be an automatic function of the smart

13   contract.

14   Q.  And you mentioned in your testimony that there was

15   occasionally what -- it was when the liquidation was complete.

16   Is there any way -- how does the liquidation happen, as you

17   understand it, such that it's deemed complete?

18   A.  The liquidation is complete when the account balance health

19   becomes -- reaches the necessary threshold of the maintenance

20   health.

21   Q.  I see.  So there may not be a complete liquidation of an

22   account if somehow either funds are deposited or the

23   maintenance health comes back up, then the liquidation would

24   stop?

25   A.  Yes, or there's no other assets left in the account.

O4FCeis2                          Sheridan - Redirect

1   Q.  I see.  In that case, the maintenance health isn't coming

2   back?

3              MR. BURNETT:  Objection.  Leading.

4              MS. MARTABANO:  Happy to rephrase, your Honor.

5              THE COURT:  Is this the level of inquiry that you --

6              MS. MARTABANO:  Yes.

7              THE COURT:  On this particular issue?

8              MS. MARTABANO:  Yes, your Honor.

9              THE COURT:  Let's move to the next one.

10  Q.  Does the Mango Markets contract code ask people for their

11  names?

12  A.  No.

13  Q.  Does it ask them for their jobs?

14  A.  No.

15  Q.  Does it ask them for their income?

16  A.  No.

17  Q.  Does it ask them what they're going to do with their money?

18  A.  No.

19  Q.  Does it ask them about any assets that aren't affiliated

20  with their account?

21  A.  No.

22  Q.  Could a smart contract be programmed to ask that,

23  technically?

24  A.  Technically.

25  Q.  Is that true for all of those questions I asked you —

O4FCeis2                         Sheridan - Redirect

1    income, location, job?

2    A.  A smart contract would ask for basically "if then"

3    information.  So it would ask for that information in a binary

4    sense, yes.

5          MS. MARTABANO:  At this point, your Honor, I'd like to

6    get into some of the rebuttal of Dr. Mordecai, really having

7    him explain what we think Dr. Mordecai's chart said so that we

8    can understand it a little bit better and point out where there

9    are pieces missing.

10          THE COURT:  Okay.

11          MS. MARTABANO:  If we could show GX 1302.

12   Q.  Mr. Sheridan, do you recognize what's already been admitted

13   as GX 1302?

14   A.  Yes, ma'am.

15   Q.  What do you recognize it to be?

16   A.  This was a graph that was presented during the government's

17   expert witness testimony.

18   Q.  The title of this slide is, "Stylized Perpetual Futures

19   Economics."  What does the X axis say?

20   A.  There are price points on the X axis.

21   Q.  And for what perpetual?

22   A.  This is for -- this is both long and short, according to

23   the graph.

24   Q.  And is it for Mango perpetual or another kind of perpetual,

25   Bitcoin perpetual?

O4FCeis2                        Sheridan - Redirect

1   A.  I'm sorry.  It's the Mango USDC perpetuals involved in this

2   case.

3   Q.  And based on your understanding of the documents in the

4   case, what does "payoff" mean, if you know?

5   A.  So, in the documents, "payoff" is used as it relates to

6   referral accounts.  It is generally not used in the context of

7   perpetual positions.

8            MR. BURNETT:  Objection.  There's no -- it's not

9   rebutting anything from Dr. Mordecai to say what "payoff" means

10  in documents.  Mr. Mordecai explained what "payoff" means.

11  It's just ships passing in the night.

12           THE COURT:  I think this is more in the way of just

13  setting the stage, but for what?

14           MS. MARTABANO:  Correct, your Honor.

15           THE COURT:  What is this --

16           MS. MARTABANO:  What's the crux of it?

17           THE COURT:  Yes.

18           MS. MARTABANO:  If I may lead a little bit for

19  expediency purposes.

20  Q.  This chart purports to show the long and the short, as you

21  mentioned; is that correct?

22  A.  Yes.

23  Q.  And this just shows them perfectly mirroring each other --

24           THE COURT:  Hold on.  Hold on.  Can't do it this way.

25           Mr. Sheridan, you've seen this graph before?

O4FCeis2                        Sheridan – Recross

1          THE WITNESS:  Yes, sir.

2          THE COURT:  What's your testimony about this graph,

3     what opinions are you prepared to offer about this graph?

4          THE WITNESS:  My opinion is that as it relates to the

5     short position, this indicates it would be a continued loss

6     potentially, a non-ending loss event.  Whereas, in reality, a

7     short position, if there are no longer assets in the position

8     on the negative axis as it goes from top-right to bottom-left

9     would not continue forever.  It will eventually, once the

10    assets are depleted, stop, and this seems to indicate that

11    these can continue forever.

12         THE COURT:  You're not an economist; right?

13         THE WITNESS:  No, sir.

14         THE COURT:  What's your background that gives you the

15    expertise to offer an opinion along those lines?

16         THE WITNESS:  Background based on how the Mango

17    Markets perpetuals work.

18         THE COURT:  So purely a technical analysis?

19         THE WITNESS:  Yes, sir.

20         THE COURT:  You're not offering any opinion about

21    economics or anything else?

22         THE WITNESS:  No, sir.

23         THE COURT:  Mr. Burnett, do you have any inquiry?

24    RECROSS EXAMINATION

25    BY MR. BURNETT:

O4FCeis2                          Sheridan - Recross

1    Q.  Where does that technical background come from?  Did you

2    review the code for the perpetuals?  You.

3    A.  I'm sorry?

4    Q.  Did you personally review the code for how perpetuals work

5    on Mango Markets?

6    A.  I reviewed the code, parts of the code personally and in a

7    team effort with other members of my team.

8    Q.  Which part of the information you're relying on was you and

9    which part came from your team telling you stuff?

10   A.  I didn't make distinctions of "this part's you," "this

11   part's me."

12   Q.  I'm asking you to make that distinction.

13   A.  I can't do that, sir, because we looked at code in various

14   contexts as it relates to this context.  We looked at it -- I

15   looked at it individually and collectively, but I didn't parse

16   out, I'm going to look at this piece by myself over the course

17   of the several weeks we've been analyzing this.  I don't have

18   specific code sections or snippets that I analyzed

19   independently versus --

20   Q.  Fair to say there are important things about the code that

21   you wouldn't have understood if someone from your team hadn't

22   told you what they said?

23   A.  There are levels of detail that I needed my team to tell me

24   about, yes, sir.

25            MR. BURNETT:  We move to exclude that testimony on the

O4FCeis2                          Sheridan - Recross

ground that he cannot distinguish which is his knowledge and

his expertise versus what someone at FTI is telling him and he

is just regurgitating, which is hearsay, and also something

that he's clearly not qualified to opine on.

THE COURT:  The basis for the testimony can come in

the form of a conversation with his team or another individual.

That's under Rule 703.  The question is whether then he's

taking that base information and applying his expertise to then

offer an opinion that is his opinion born of his own experience

or review of the materials.

That's what I'm trying to figure out.  I'm not even

understanding from the testimony what the relevance is of any

of what Mr. Sheridan is going to say.  That's what I don't

understand.  I don't understand why this is becoming an issue

where we've taken an hour of the jury's time to go into any of

these issues, which do not seem to go to the heart of any of

the issues before the jury.  I mean, if the basic thing that

Mr. Sheridan is going to testify about is simply reiterating

and emphasizing the points that the defense has already made

about what the aspects of this platform are or aren't, which is

I think fairly within the prior disclosures, then great, but

the things we're getting into now seem far afield of

Mr. Sheridan's expertise and also not really relevant to

anything.  This is extremely problematic, especially coming in

the way it is.

O4FCeis2                        Sheridan - Recross

1          Have we covered everything that is within these topics

2     or is there anything else, Mr. Burnett?

3          MS. MARTABANO:  The only thing would be walking

4     through Mr. Eisenberg's trades, which we believe is fairly

5     disclosed, that he would be walking through the technical

6     process of Mr. Eisenberg's trades, but the government takes

7     issue with that.

8          THE COURT:  And then as to the repayment of the bad

9     debt, what does Mr. Sheridan need to get on the stand and say

10    what the time of all these things are if the evidence is

11    already in the record?  What expertise is he adding to that?

12         MS. MARTABANO:  He has the specific times and how

13    close in time it is, and we think that obviously it's relevant

14    that, within hours of this transaction happening, before

15    there's been any outing or any discussion of Mr. Eisenberg as a

16    person, he comes forward and says, I'm making a proposal to

17    repay the DAO, and that includes obviously the fact that part

18    of the point of that is to make users whole.  We think that

19    that specific timing is very important.  We also think that the

20    specific --

21         THE COURT:  But is that in the record?  That's what

22    I'm trying to understand, because --

23         MS. MARTABANO:  That exact time is not currently in

24    the record.  The government has argued, as I understand it,

25    that Mr. Talkin has been handling it more, that a mere web

O4FCeis2                         Sheridan - Recross

1       visit may not be sufficient to establish what someone did.  And

2       so --

3                    THE COURT:  But he doesn't have expertise on the

4       historical facts of what occurred.  This is precisely the issue

5       that we addressed with Mr. Jain, and I excluded that testimony

6       because he can't just put in this happened at this time, this

7       happened at another time where it has no independent basis for

8       admissibility.  That has nothing to do with his expertise and

9       it would be an end run around the hearsay rule.  If you've got

10      documents in the record that make clear that aren't being

11      objected to, they're going to be in front of the jury, you're

12      going to have the opportunity at closing to get into them.

13                   Is that all on topic 1 that Mr. Sheridan is going to

14      be getting into, just the timing of all this?  If I'm missing

15      something, let me know, but it seems like there's no expert

16      opinion here.

17                   MS. MARTABANO:  On the timing issue, he and the team

18      at FTI pulled code, as I understand it.  But, correct me if I'm

19      wrong, Mr. Sheridan, if I'm mischaracterizing it.  Related to

20      almost all of the proposals that were ever put forth on the DAO

21      to pull data relating to who proposed it, what wallet was

22      associated with it, what the name of the proposal was, what the

23      time of the proposal was, whether it was accepted, how the vote

24      went.  So they pulled that independent data in order to be able

25      to say this is the timeline of the proposals.

1          THE COURT:  What else do we have in addition to the

2     issues you've addressed within these four categories?  There's

3     the fourth bullet concerning GX 914 and 928.  Those go to

4     specific trades?

5          MS. MARTABANO:  Yes, your Honor.  It's really that

6     these exhibits that the government put in, which are stale from

7     December 15th.  One of them is old and stale, one of them is

8     more current and it's explaining what the meaning of these

9     documents is.

10          MR. BURNETT:  Objection.

11          THE COURT:  You don't want the witness to be here

12     while she's --

13          MR. BURNETT:  I don't want her telling the witness

14     what to say.

15          THE COURT:  That's fair.  We don't need to get into --

16     let me take a step back.

17          Mr. Burnett, do you have any further inquiry for this

18     witness?

19          MR. BURNETT:  I have inquiry on this topic, on GX 914

20     and I have inquiry on -- I think it was pretty clear from his

21     description of what he can and can't do about the code, that he

22     needed to rely on his team to tell him what the code was saying

23     about the actual numbers on trades and what was being settled

24     and what was being borrowed.

25          So to the extent they're going to walk through and

1    he's going to say Mr. Eisenberg settled this, borrowed this,

2    settled this, borrowed that, I think we need to know and I

3    would like to voir dire him on what his basis is for that

4    because if he's just relaying facts that are supposedly coming

5    from FTI, but he did not have the capability to do, that's not

6    applying his expertise, it's just relaying the hearsay from

7    someone at FTI who's not in front of the Court and who we don't

8    have the opportunity to either cross examine or put materials

9    in front of.

10            THE COURT:  Mr. Martabano, subject to this issue, have

11   we basically covered the waterfront within these four topics?

12            MS. MARTABANO:  Yes, your Honor, with the documents,

13   it would just be explaining the documents to the jury the two

14   exhibits that the government put in, 914 and 932.

15            THE COURT:  Mr. Burnett, you can proceed with your

16   voir dire and then we'll take a little break and I'll think

17   about this for a few minutes.

18   BY MR. BURNETT:

19   Q.  Let's start with this, 914.  You signed the notice that

20   went out yesterday, correct, Mr. Sheridan?

21   A.  Yes, sir.

22   Q.  And that notice says you will testify that 914 and 928

23   reflect data relating to Mr. Eisenberg's account on December

24   15, 2022.  That's the first part; right?

25   A.  Again, are they being pulled up so --

O4FCeis2                         Sheridan - Recross

1              MR. BURNETT:  Why don't we pull up 914.

2    Q.  Do you see that?  This is 914; correct?

3    A.  Yes, sir.

4    Q.  And to get the December 15th part, you're just reading the

5    date that's under the account value; correct?

6    A.  Yes, sir.

7    Q.  Now I want to talk about the next part.  You say that they

8    do not reflect how Mr. Eisenberg's accounts would have looked

9    at the times of the trades in GX 932.  That's what you said

10   your opinion is going to be?

11   A.  Yes, sir.

12   Q.  You did not review this account as of October 11, 2022;

13   correct?

14   A.  Our review of the account was based on inputting the

15   information we received through the link previously discussed

16   to see account transactions, and we did verify those

17   liquidation events.  My expertise is in blockchain tracing, so

18   I verified those events through blockchain explorers and how

19   the assets moved.

20   Q.  I'm asking you a simple question.  You didn't look at this

21   screen as of October 11th yourself; correct?

22   A.  I'm sorry.  I misunderstood.  I did not look at the screen

23   on October 11th, no.

24   Q.  So what's your basis for saying you knew how the screen

25   would have looked on October 11th?

O4FCeis2                          Sheridan - Recross

1    A.   Because you can see how the accounts -- the transactions on

2    October 11th using blockchain analytics and blockchain

3    explorers to track and trace the funds that show fund movement,

4    fund balances, and other activity on the blockchain.

5    Q.   Did you specifically look at -- which things would have

6    been different about those?

7    A.   Different about?

8    Q.   The screen, you said it would have been different.  What

9    would have been different about it?

10   A.   It would have shown different borrows, withdrawals,

11   balances, values.

12   Q.   What would the numbers have looked like?  What would they

13   have been?

14   A.   That would have been represented in the other exhibit.

15   Q.   What other exhibit?

16   A.   The one that shows October 11.

17   Q.   What other exhibit that shows October 11?

18   A.   The one from -- I don't know the exhibit number, sir.

19   Q.   Give me a description.  What are you talking about?

20   A.   There is a screenshot of these accounts with a date from

21   October 11th, if I recall.

22            MS. MARTABANO:  It's 932.

23   Q.   You can take a look, 932.  This is a different page; right?

24   A.   It is a different page, but it shows, in my opinion, a more

25   accurate representation of the accounts because it is from the

O4FCeis2                    Sheridan - Recross

1    date in question.

2    Q.   How do you even know it's from the date in question?

3    A.   The date is listed under the withdrawal column on the left.

4    Q.   Isn't it true that the dates under that withdrawal column

5    on the left list the date of the withdrawal, not the date the

6    screenshot is taken?  That's why they're all different times;

7    right?

8    A.   Yes, but that's --

9    Q.   So you don't know when this screenshot was taken; right?

10   A.   I don't know when the screenshot was taken.

11   Q.   You're just asserting it was taken on October 11, but you

12   have no idea?

13   A.   I don't know when the screenshot was taken.  My analysis,

14   though, is based on not the date of the screenshot, but the

15   date of the transactions that are listed.

16   Q.   What other data did you rely on?  Tell me specifically what

17   you looked at to know what that screenshot, 914 looked like on

18   October 11th.

19   A.   We validated these transactions using blockchain analysis

20   and explorers to --

21   Q.   No buzzwords.  Tell me what you actually looked at.

22   A.   We went on the blockchain and looked at these

23   transactions --

24   Q.   You could see the borrows on the blockchain?

25   A.   You could see transactions.  They're not listed as borrows

O4FCeis2                         Sheridan - Recross

1    or withdrawals.  You can see transactions.

2    Q.  Exactly.  You can't tell what's borrowed or what's just a

3    borrow and what's a borrow and withdraw on the blockchain;

4    correct?

5    A.  So you can tell, there's two functions that are listed

6    within blockchain explorers.  It will list a borrow as a 1 or a

7    0.  So you can tell when a function is not a borrow by the 0,

8    and you can tell when a function could be a borrow by the 1.

9    Q.  And can you show me, what's the document that shows your

10   analysis of what was borrows and what wasn't borrows as of

11   October 11th?

12   A.  I don't have that document as it relates to this

13   screenshot.

14   Q.  Were you even able to do this or was this something FTI

15   folks told you?

16   A.  I'm able to conduct blockchain analysis.

17   Q.  I understand you're saying blockchain analysis, but what

18   specifically did you look at to know what was borrowed and what

19   wasn't borrowed that supports your opinion that 914 was not as

20   it looked on October 11th?

21   A.  I looked at all transactions related to these wallets

22   through a blockchain analysis tool to see how the transactions

23   were conducted in terms of the values, amounts, times, and

24   other functions.

25   Q.  Which tool?

O4FCeis2                        Sheridan - Recross

1    A.  Solscan, Solana FM, and XRAY.

2    Q.  You know that all those records from Solscan and Solana FM

3    are already in the record; right?  Can you point me to any one

4    that goes into this borrow, not borrow point you're making?

5    You were sitting here through trial.  You know they're in

6    evidence.

7    A.  Yes, sir.  The challenge is there isn't a definitive --

8    those logs are contained within Mango Markets' logs.  I can

9    show you, if you pull up DX 50 I believe is the exhibit.

10   Q.  Actually, I have an easier way to get about this.  You, in

11   preparing to testify, looked at a number of articles that were

12   about the attack; right?

13   A.  Yes, sir.

14   Q.  And some of those articles were published right after the

15   attack happened; right?

16   A.  Yes, sir.

17   Q.  Some of them had the exact same screenshot that shows up in

18   the 914 from just a day after it happened, don't they?

19   A.  I don't remember.  Can you show me 914.

20          MR. BURNETT:  Why don't we pull up 914.

21   Q.  You can see the borrows listed out here, you can see the

22   account information at the top.  Why don't we take a look at --

23          MR. BURNETT:  If we can pull up side by side,

24   Mr. Sears, that @Austerity_Sucks article, thoughts on the

25   $110 million Mango Markets exploit.  Sorry, we can stick with

O4FCeis2                          Sheridan - Recross

1   this one.  This one is fine.  We'll look at the other one.

2   Q.  This is what you looked at decoding Mango's

3   vulnerabilities?

4   A.  Yes, sir.

5   Q.  That was published October 12, 2023?

6   A.  Yes, sir.  2022.

7   Q.  2022, right.  So the day after the attack, not even a day

8   after the attack?

9   A.  Yes, sir.

10          MR. BURNETT:  Mr. Sears, can we scroll down the page

11  here, couple pages.

12  Q.  You can see a screenshot there of a borrow and withdrawal

13  page?

14  A.  Yes, sir.

15  Q.  You can see the data all is exactly the same as the data

16  that's on this December 15 chart; right?

17  A.  I can crosswalk it.

18  Q.  Go ahead.  Take your time.

19  A.  I have faith that -- I don't need to crosscheck you.  If

20  you're telling me the data is the same, then I'm willing to

21  accept that.  I see the first USDC transaction is the same

22  amount.  I don't have reason to doubt you, sir.

23  Q.  Let's take a look at the other one, the @Austerity_Sucks

24  article.

25          THE COURT:  Let's stop this right now.

O4FCeis2

1          Is there anything else, Ms. Martabano, or is that what

2     is in this supplemental disclosure?

3          MS. MARTABANO:  That's it, your Honor, other than what

4     we discussed about the proposals at the end, the repayment

5     proposals.

6          THE COURT:  And as to the repayment proposals, as I

7     understand it -- well, let's address this in a second.

8          Mr. Sheridan, thank you very much.  You can leave the

9     courtroom.

10          (Witness excused)

11          MR. BURNETT:  Formally, just to make the record, we

12     move to exclude that last testimony for lack of foundation.

13     He's just repeating buzzword blockchain analysis without any

14     explanation.  This is a new opinion.  We would have more time

15     to actually pull through the data he looked at if it was

16     something that we knew about ahead of time, but clearly, he's

17     just saying stuff.

18          THE COURT:  In the disclosures, did you have the basis

19     for Mr. Sheridan's opinion that he offered, that the screenshot

20     would not have accurately reflected the trades as they would

21     have been reflected on October 11th, and if you had just done

22     the tracing analysis, you could figure that out?

23          MR. BURNETT:  The only disclosure we've ever received

24     is the one bullet point we got last night in this from the

25     Court, and even that one doesn't have the explanation for basis

O4FCeis2

1    in it.

2              MS. MARTABANO:  Your Honor, we only received these

3    when the government proffered them, so that's why he hasn't

4    done additional analysis on them.  They came into evidence last

5    week.  We questioned them when they came into evidence as

6    unreliable and backdated.  It was not until just now that

7    Mr. Burnett offered an exhibit that has been labeled, but

8    sought to be excluded and not offered by the government, which

9    is in itself hearsay.  He's showing a photo that's a screenshot

10   in an article that is not in evidence to justify that his

11   postdated exhibit is in fact current and was current at the

12   time.  So there isn't evidence that actually establishes that

13   this particular document was current or matches what it would

14   have looked like at the time.  And showing something that is

15   not in evidence that he has not previously proffered to us as a

16   basis for 914, their case is closed to now say, well, no, we do

17   have a basis for it when we got there, 914, a week ago.  There

18   may have been an earlier version, but these were things that we

19   didn't even have at the time of the disclosure.

20             MR. BURNETT:  Few things.  We've had that exhibit

21   marked all the way out to the exhibit deadline.  Second, if

22   they want to make the point that the exhibit in 914 is dated

23   December 15th, that's perfectly fine and they're able to do

24   that.  The problem is saying that it wouldn't have looked this

25   way back on October 11th.

O4FCeis2

1          And that is where the issue lies, because all we have

2     here, we have no actual basis from this expert or supposed

3     expert in this about how he knew what it looked like back then,

4     other than him saying the word "blockchain explorer" over and

5     over again.  We actually need to see the blockchain data that

6     he is relying on to understand what he's even talking about

7     here.  This is not an adequate foundation.  He's just making

8     stuff up.

9          MR. KLEIN:  Your Honor, he's not making stuff up.

10    That's ridiculous.

11         THE COURT:  The issue is:  Do you have any authority

12    that says that this kind of undisclosed opinion, because it's

13    in rebuttal of the government's witnesses, for any other

14    reason, would be permissible?  Because if Mr. Sheridan were

15    going to testify that at the time, October 11th, using tracing

16    tools, his account would have looked differently than what was

17    reflected in the public domain, then that would seem to be

18    something that you would have to disclose — here's what

19    Mr. Sheridan is going to say and here's what he looked at, and

20    the government could go look at it.  Maybe it's true he's

21    saying all these things and he's right about it, but this is

22    the day before testimony.

23         Ms. Martabano, you referred to the fact the government

24    has rested its case.  I think that's the problem, because

25    they've rested their case.  If you had made it right when 914

O4FCeis2

1    was used or back at the exhibit deadline when it was disclosed,

2    if there was some disclosure that Mr. Sheridan was going to

3    provide this type of testimony and give the basis for it, then

4    the government could look at it.  That's the issue.

5        MR. KLEIN:  Your Honor, they didn't disclose who was

6    going to put in these exhibits until the day before.

7        THE COURT:  It doesn't matter who's going to put the

8    exhibits in.  What matters is you believe there was an exhibit

9    that was proposed by the government that was inaccurate and you

10   wanted to make a point about that.  So once you know you want

11   to make a point about that, you can go through the steps that

12   we've gone through.

13       As I said, the Court has been very lenient with

14   allowing these supplemental disclosures, but it's the morning

15   of testimony, the jury has been sitting there for over an hour

16   and a half, and we are right now understanding what the

17   testimony is through an elaborate voir dire.  It may be

18   unprecedented that I'm even entertaining that kind of inquiry

19   at this stage rather than saying this is all out.  That's what

20   I'm trying to understand, is there any authority that you can

21   cite to the Court that would suggest that this is permissible

22   under Rule 16?

23       MR. KLEIN:  Yes, your Honor.  We put it at the end of

24   our letter.

25       THE COURT:  I've got your letter here.  This is

O4FCeis2

*Rosario*?

MR. KLEIN: Yes. Sometimes, of course, this does happen, the defense is put in a position that is difficult, and we do appreciate the Court's accommodations along the way, but there's a *Rosario* case in *Washington v. Schriver*. Basically, sometimes this happens and the defense should be given a little more wiggle room because these things go to the core of what's happening here, and reasonable doubt.

So the government has put in this exhibit -- Mr. Sheridan was very clear on his basis. Blockchain analytics, which we would get into in his direct, is the study of how blockchain works. It's just what DeCapua did. It's the exact same thing, it's the same kind of thing. He was looking at the transactions. He said himself he went back and looked at them to see how they were coded and what they were, zeros and ones, and he would explain that to the jury, and this is inaccurate.

And so, that is an important piece of testimony that completely undermines their theory. It goes to the heart of their theory. They opened with this as a $110 million borrow. They put up an exhibit that claims to show that from December, and then he actually looked at the analytics which is in his expertise, goes in and says, hey, that's not how it was coded. We said all along he was going to talk about how these trades are coded. Now he's just putting it to an exhibit. We always

O4FCeis2

1  disclosed he was going to talk about what his trades look like,

2  whether they are enabled and how they happened.  That's been

3  disclosed since day one.  All he's doing is talking about

4  within the frame of this exhibit.  Mr. Burnett is free to cross

5  examine him like he did, and they're also free to call a

6  rebuttal expert.  We're fine if they want to call back

7  Dr. Mordecai or Mr. Jain to refute this.  There isn't

8  refutation, though, and they're trying to get it in through

9  this.

10            He wasn't using just buzzwords.  To be clear, he

11  literally said, I went in to look at the code, I examined the

12  analytics for each of these transactions, and what I saw was

13  zeroes and ones.  That's very specific, your Honor, and that's

14  something a jury could not do, period.  That's the exact kind

15  of technical expertise that an expert is needed for, and he

16  should be permitted to talk about this because they're going to

17  close and say these were all borrows, when they weren't, and

18  that goes to the heart of this matter.  And Mr. Eisenberg

19  deserves his chance to have that be heard in front of this

20  jury.

21            We wish things would have played out a little

22  differently.  We're in the position we are in, they put up

23  their witnesses, we're reviewing their exhibits as they come

24  in, we're working with our expert, and now he's ready to

25  testify about something.  This is totally fair game.

O4FCeis2

1          MR. BURNETT:  Your Honor, if I may just respond.

2          It's been clear since we filed the complaint in this

3     case that the government's theory of the case has been that

4     Mr. Eisenberg borrowed $110 million worth of cryptocurrency, it

5     was in the complaint, it was in the indictment, it's been in

6     every letter we've written to the Court, every motion we've

7     written to the Court, it's been crystal clear all along.  If

8     the defense was going to argue that these were not in fact

9     borrows and to provide some code basis or blockchain basis for

10    that, they've known all along that that's something they needed

11    to and should have done and should have disclosed.  The

12    argument that it's been the heart of the case is exactly why it

13    should have been disclosed earlier on.

14          The fundamental problem we have here is other than

15    Mr. Sheridan getting on the stand and saying, well, it's in a

16    blockchain explorer somewhere, we don't even have the

17    underlying documents that he is relying on.  I can't cross

18    examine him on what data he looked at to do those things

19    because they never even produced it.  All we have is this one

20    sentence now and Mr. Sheridan's assertion on the stand that if

21    you look, you'll find it.  That's not the way expert disclosure

22    is supposed to work, it's deeply unfair, and we can't go get a

23    new expert in the code right now at this stage of trial.  This

24    is something they knew all along.  If it's an argument they

25    wanted to make, they needed to notice it.  Fairness is just as

O4FCeis2

1    important for government as it is for the defendant in criminal

2    cases, and it's not fair for the defense to effectively sandbag

3    something that if they knew was going to be a heart of their

4    case earlier on, they should have given notice on when they had

5    multiple opportunities to do so before trial.

6          MR. KLEIN:  Your Honor, if you don't let him talk

7    about 914, he still can talk about what he did when he reviewed

8    the code and were these transactions enabled and what they

9    looked like.  That's always been the heart of his testimony.

10   They've been on notice of that from day one.  To say he can't

11   get up and say, hey, Mr. Eisenberg did some transactions and I

12   looked at the blockchain, this is what they looked like, this

13   is what the code permitted, this is how they were coded —

14   that's been very clear.  We've always said he's going to talk

15   about what was enabled and what was not enabled and how the

16   smart contract performed.  This goes to how a smart contract

17   performs.  This goes to what was enabled, what was permissible.

18   And so, this has always been -- if you say he can't talk about

19   the 914, then he'll just talk about it in general.  The

20   testimony still should come in.

21         THE COURT:  In the prior disclosures, did Mr. Sheridan

22   indicate that he could testify about Mr. Eisenberg's trades?

23         MR. KLEIN:  Yes, and your Honor ruled on March 25th

24   that he could talk about them.

25         THE COURT:  Point me to where the disclosure, because

O4FCeis2

1    I'm looking at the January 12th, 2024 disclosure, but I also

2    have the October 30th disclosure.

3         MR. KLEIN:  Sorry.  He will testify that Mango

4    Markets -- there's a couple components to this, your Honor.

5    So, one part was we disclosed that he would testify that Mango

6    Markets was designed to enable conduct and others and prevent

7    it.  So that talks about how it worked, what was enabled and

8    what could be prevented.  Then we also talked about -- you

9    specifically said, at the March 14th hearing, he could testify

10   concerning the market mechanics and whether or not what

11   Mr. Eisenberg did was consistent with the code, and whether

12   modifications to the code were undertaken or not.  He was going

13   to talk about what was enabled, what he did was consistent with

14   the code, and just explain what it looked like.

15        THE COURT:  That's true, but on the particular

16   question of whether there were borrows as opposed to

17   withdrawals, that is not something that was within that scope

18   of what you just said.

19        MR. KLEIN:  But that's how the code is enabled.  The

20   code is set up a certain way.  All he's saying is, this is what

21   the code permitted you to do and this is what it looked like.

22   When I look at it, I see this transaction -- by the way, the

23   blockchain is public, your Honor.  We can't just print out a

24   giant blockchain and bring it in and dump it on them.  They

25   have the access to the public ledge the same way we do.  And

O4FCeis2

1    so, that's not something -- to disclose the blockchain -- they

2    didn't disclose the blockchains for DeCapua's testimony when he

3    did all his tracing.

4          MR. BURNETT:  We actually did.  We printed out every

5    single exhibit that he relied on.

6          (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O4FMEIS3

1    MR. KLEIN:  He printed out the exhibits, but you

2    didn't say the Blockchain is a massive Blockchain.  They didn't

3    give us the entire Blockchain.  So he's relying on a publicly

4    available Blockchain that is disclosed as a basis, and he's

5    basically doing what we understood he was permitted to do,

6    based on the March 25 hearing with your Honor.

7        I don't know what we would have done differently

8    because we thought he could always talk about the smart

9    contracts, how it worked, and Mr. Eisenberg's trades, how they

10   performed it through the smart contract.

11       THE COURT:  Understood.  We are going to take 15

12   minutes.  We are going to come back.  I'll tell you what we are

13   going to do, and then we will proceed with the testimony.

14       (Recess)

15       THE COURT:  Ms. Martabano, as to the first bullet

16   concerning the repayments, my understanding is that Mr.

17   Sheridan is going to do a little more than just recount the

18   chronology of what occurred.  Is that correct?

19       MS. MARTABANO:  Yes.  Based on data that they pulled

20   from the proposals from the Blockchain to see when exactly

21   things were done and by whom.  He's not going to get into by

22   whom.

23       THE COURT:  He is not going to say by whom.  He is not

24   going to say what people thought, what they were doing, what

25   they were imagining.

O4FMEIS3

1          MS. MARTABANO:  No.

2          THE COURT:  That is a proper subject of his testimony

3     to that limited extent.

4          As to the contracts and the code and what it was doing

5     and not doing, here is the issue, is that if Mr. Sheridan is

6     relying on other people and they are the ones who did the work

7     and he is merely recounting their opinions, then that is

8     inadmissible under, I think, clear law in this district in

9     circuit courts around the country everywhere.

10         The only testimony that would be admissible as his

11    opinion would be if he did the work, told people what to do,

12    added his experience, had a basis for his own opinion, if he

13    could do the work himself, if given enough time.  Those are the

14    types of ways in which an expert can rely on the work of a

15    team, and you can expect that on cross-examination the

16    government is going to hit that issue hard.

17         So this is a larger issue than just what was in the

18    supplemental disclosure, because if it turns out that Mr.

19    Sheridan is sitting here but actually it's the team at FTI that

20    did all the work and figured out what the code meant and that's

21    really all that Mr. Sheridan is reciting, and he is being put

22    on just because he has law enforcement background, that's going

23    to be a big problem for you because I could exclude his entire

24    opinion at the end of the day.  You should be mindful of that

25    as you're doing your direct to make sure that you are eliciting

O4FMEIS3

1    a foundation for every opinion that he's putting in.

2              With that, I am going to limit you to what's stated in

3    this supplemental disclosure to the extent you're addressing

4    all these issues.

5              As to the response to Dr. Mordecai, my understanding

6    is that Mr. Sheridan is just offering, again, an opinion about

7    how the code works.  He's only referencing Dr. Mordecai's

8    exhibit to just give the context of why he's opining what he's

9    opining.

10             Is that fair?

11             MS. MARTABANO:  Yes, your Honor.

12             THE COURT:  As to the last issue, which is the GX-914,

13   I don't think he has any reliable basis to be talking about

14   what that screenshot is or was not.  If you can have him

15   testify just based on his code analysis and his Blockchain

16   analysis as to what his understanding was of what was going on

17   on October 11, that's fair.  I don't think that he needs to

18   bring in the screenshot or explain that it was inaccurate,

19   because he simply has no basis to do that.

20             As to the audit, how many questions do you have about

21   the audit?  Because here is the issue that comes -- this is not

22   how it was initially presented.  You say the software was

23   unaudited.  The government then points to a reference in the

24   FAQs to this audit.  That presentation of the audit would be

25   relevant to, among other things, materiality, to show that

O4FMEIS3

1    investors in Mango Markets had access to that audit, they

2    looked at it and it would inform their expectations.

3            So I think it's problematic to have the government to

4    have referred to that FAQ document, referring to the audit, and

5    not have anyone be able to explain what it did or did not

6    cover.  I'll give you some leeway there, but, as I understand

7    it, all you are going to say is, at a very general level, was

8    it an audit of this, as opposed to this?  And that's it, right?

9            MS. MARTABANO:  Yes, your Honor.  What a code audit

10   means.

11           THE COURT:  You are just saying the subject matter.

12   You are not getting into the actual analysis to show what the

13   audit did or didn't, because that would blow the door open in a

14   way that I don't think the government has in its

15   cross-examination.  That's what we will do with the audit.

16           Mr. Burnett, any further issues?  You were grabbing

17   the microphone.

18           MR. BURNETT:  Just on the audit, on cross am I allowed

19   to point him to particular things in the audit that were

20   covered?

21           THE COURT:  You can do that.  The defense wants it in.

22           Again, Ms. Martabano, you know that the more you open

23   that door, the more the government is going to walk through it.

24   Just to be clear, as I understood it, when we had our long

25   colloquy, you are just pointing out this audit pertained --

O4FMEIS3

1    give it to me.  What does the audit talk about?

2              MS. MARTABANO:  It's just a code audit.  It doesn't

3    mean that it solves every potential problem that Mango, as it

4    was coded, could have created.  Obviously, for example an

5    oracle problem or any kind of outside issue that wasn't

6    strictly, does this code do what it's intended to do and does

7    it have any bugs in it.  I just think that it's important for

8    the jury to understand that a code audit strictly looks at, is

9    this contract working the way it was programmed to work and

10   not --

11             THE COURT:  He is not going to talk about why it's

12   important.  He is literally just going to say, it was a code

13   audit that was about how the code works and were there any bugs

14   in it.  He did not cover any issues regarding Mango Markets'

15   protocol.

16             MS. MARTABANO:  Correct.

17             THE COURT:  Move on.

18             Am I missing anything else, Mr. Burnett?

19             MR. BURNETT:  No, your Honor.

20             THE COURT:  I'll just say, I have an issue with why we

21   are here in this context.  And as I said before, I think the

22   issue is that the disclosures from the defendant were woefully

23   deficient.

24             On the other hand, the government did not insist on a

25   more fulsome disclosure at the outset.  There is a little mud

O4FMEIS3

1    on everyone's face I think in this issue.  So the Court has

2    tried to handle this in a way that would preserve the

3    defendant's rights while avoiding unfair prejudice to the

4    government.

5            Let's proceed, and we will take any objections as they

6    come.

7            MR. BURNETT:  One question, your Honor.

8            Mechanically, if we want to raise an objection to

9    exclude an opinion, is the proper time to do that while he's on

10   direct or after we have crossed him on it, for this like relied

11   on FTI and not his own analysis point?

12           THE COURT:  I don't know that we are going to be able

13   to do it without your cross-examination.  If we need to have an

14   instruction be delivered to the jury after the fact, then we

15   can go ahead and do that.

16           MR. BURNETT:  Thank you.

17           MS. MARTABANO:  Your Honor, I just wanted to clarify.

18   The limitations are based on just those three categories, and

19   sort of the other categories about how Blockchain works, how

20   cryptocurrency works, those were not challenged and those are

21   fair game still.

22           THE COURT:  Those were in the prior disclosures.

23           The only thing that you should be mindful of is, on

24   this issue that the government has raised of reliance on FTI,

25   that seems to be a crosscutting issue.  So if there are other

O4FMEIS3

1    aspects of Mr. Sheridan's testimony where he is going to be

2    relying on the code, then you can expect that the government is

3    going to raise an objection and say that that is an

4    impermissible inadmissible opinion unless Mr. Sheridan

5    furnishes some other basis for why he was in control of the

6    analysis, added his expertise, so it's a proper opinion coming

7    from him.

8              MS. MARTABANO:  Yes, your Honor.

9              THE COURT:  Mr. Hernandez, at long last, let's have

10   the jury come in.

11             MR. KLEIN:  Your Honor, the other witness today is a

12   private investigator.  We were going to call the investigator

13   first, who Mr. Talkin is going to lead the direct on so that

14   Ms. Martabano has a moment to go through her outline and make

15   sure she is capturing your Honor's rulings.

16             THE COURT:  Let's do it that way.  Let's proceed.

17             (Jury present)

18             THE COURT:  Welcome back, members of the jury.

19             I have to apologize for you because, obviously, I know

20   that you have been back there in the jury room for a little

21   bit.  We were not taking a break.  We were working hard to see

22   if there are ways that we could further streamline the case,

23   and I'm happy to let you know that we have found some ways to

24   shorten this up, so I think that we are making excellent

25   progress.

1          My expectation is that we will be able to have

2     closings, if not tomorrow, then on Wednesday, so we are ahead

3     of schedule, and we are exactly where we need to be.  Thank you

4     very much for all your patience.

5          With that, Mr. Talkin, you may call your first

6     witness.

7          MR. TALKIN:  Thank you, your Honor.  The defense calls

8     Ronald Dwyer.

9          THE COURT:  I assume someone is getting Mr. Dwyer?

10         MR. TALKIN:  Yes.

11         THE COURT:  I just want to make sure we are not

12    sitting here longer than we need to.

13         MR. TALKIN:  Thank you for the hint.

14

15    RONALD DWYER,

16         called as a witness by the Defendant,

17         having been duly sworn, testified as follows:

18         MR. TALKIN:  May I inquire, your Honor.

19         THE COURT:  You may.

20    DIRECT EXAMINATION

21    BY MR. TALKIN:

22    Q.  Good morning, Mr. Dwyer.  Tell the jury what you do for a

23    living.

24    A.  I'm a private investigator.

25    Q.  How long have you been doing that?

1   A.  Twenty-nine years.

2   Q.  Prior to that, what did you do?

3   A.  I was a police officer and a detective with the city police

4   department.

5   Q.  New York City?

6   A.  Yes.

7   Q.  What was your rank or grade when you left the New York City

8   Police Department?

9   A.  Detective.

10  Q.  Did there come a time when you became involved working for

11  the defense in the United States v. Avi Eisenberg?

12  A.  Yes.  Recently.

13  Q.  What were you charged with doing in this case?

14  A.  Looking over some of the discovery material.

15  Q.  Specifically, which discovery material did you look over?

16  A.  I looked at some Cellebrite records.  I believe they were

17  from a phone designated as 1B2, and I think it's Government

18  Exhibit DX-70.

19  Q.  Did you look at any other devices, or at least the data

20  from any other devices?

21  A.  I looked at HTML records from a laptop that is purported to

22  belong to the defendant.

23  Q.  You mentioned a Cellebrite records.  Can you please

24  describe very briefly what a Cellebrite record is or what

25  Cellebrite is?

1    A.  Cellebrite is a computer software that allows an individual

2    to download all of the records from a cell phone, pictures,

3    text messages, emails, web browsing history.  Just everything

4    in the phone comes out into a report that is clear, concise,

5    and organized.

6    Q.  In this case did you look at any particular Cellebrite

7    report?

8    A.  Yes.  For the phone I mentioned, the 1B2.

9              MR. TALKIN:  Your Honor, if I can ask just the witness

10   be shown DX-70.

11             THE COURT:  You may.

12   Q.  While we are doing that, the Cellebrite report that you

13   looked at in this case, what was that in reference to, meaning,

14   you just listed off a category of items a Cellebrite report can

15   report, but which one did you look at in this particular case?

16   A.  This was an extraction report of websites that were looked

17   at on this phone.

18   Q.  Is this report all that you saw on the computer or just

19   what appears in the report?  Is this report a subset of the

20   entire computer?

21   A.  Yes.

22   Q.  This report that you are looking at, DX-70, is that a fair

23   and accurate representation of the report that you looked at

24   earlier and in your preparation and investigation in this case?

25   A.  Yes.

O4FMEIS3                        Dwyer - Direct

1              MR. TALKIN:  Your Honor, I would offer DX-70 into

2      evidence.

3              THE COURT:  Objection?

4              MR. DAVIS:  No.

5              THE COURT:  That will be admitted.

6              (Defendant's Exhibit 70 received in evidence)

7      Q.  I just want to go through a couple of entries, Mr. Dwyer,

8      just starting with entry number 1.

9              THE COURT:  Do you want to publish it?

10             MR. TALKIN:  Yes.  Please publish.  Thank you.

11     Q.  The first entry, if you could just read to the jury what

12     the title is.

13     A.  SEC.gov.  SEC charges self-described promoter with microcap

14     market manipulation scheme.

15     Q.  What date of that search?

16     A.  12/6/2022.

17     Q.  And at what time?

18     A.  2:49 p.m. UTC time.

19     Q.  Now, I am going to take you all the way to the last page of

20     that document, which would be page 11.

21             MR. TALKIN:  If we can highlight number 41, first.

22     Q.  Starting on the left, can you please read for the jury what

23     this entry is about.

24     A.  It's a Mango DAO.  It's a website:

25     Https:\\apprealms.today/dao/mngo/proposal --

1    Q.  You don't have to read the numbers.  Thank you.

2          What date and time was that entry?

3    A.  October 12, 2022, at 3:01 a.m.

4    Q.  I want to go right above it, number 40.  That's the same

5    URL that was searched, but I just want you to tell the jury

6    what the date and time of that search was.

7    A.  This is October 12, 2022, at 4:14 a.m. UTC time.

8          MR. TALKIN:  If we could go to number 39, which is at

9    the bottom of the previous page.

10   A.  This one is:  Karlstack, substack,

11   https:\\karlstack.substack.com\.  Date is 10/12/2022 and time

12   is 5:24 a.m. UTC time.

13         MR. TALKIN:  If we can go to the previous page and to

14   number 34.

15   A.  This says:  Carlito on Twitter "scoop.  Who was the hacker

16   that stole more than 100 million U.S. dollars from @Mango

17   Markets last night.  Karlstack has some answers."

18   Q.  You don't have to read the site, but just please tell the

19   jury what the time and date of that was.

20   A.  This is October 12, 2022, at 1:40 p.m. UTC time.

21   Q.  Now, we started with out your testimony about this document

22   by going to a search about an SEC charging an individual.

23         Is it fair to say that throughout this document there

24   are numerous similar searches that took place after October 11

25   of 2022?

O4FMEIS3                          Dwyer - Direct

1    A.  Yes.

2            MR. TALKIN:  We can take that exhibit down.

3    Q.  Now, I want to show you what has been marked Defendant's

4    Exhibit 30D.

5            MR. TALKIN:  Mr. Smith, just Mr. Dwyer, please.

6            This is a 60-page document.  If you can just leaf

7    through a couple more pages for him.

8    Q.  Do you recognize this document?

9    A.  Yeah.  This is another document that I looked through from

10   the discovery.

11   Q.  Where was the information on these documents?  You talked

12   about you did some HTML.  Can you explain to the jury where you

13   looked at these and the difference of the HTMLs to the

14   documents you see here.

15   A.  These were documents that were from the laptop -- the

16   chrome history of the laptop of the defendant.

17   Q.  These documents that you are looking at, other than them

18   not being HTML and them being PDFs, are they a fair and

19   accurate representation of the documents you reviewed from the

20   chrome history of the defendant's laptop?

21   A.  Yes, they are.

22           MR. TALKIN:  Your Honor, I will offer DX-30D.

23           THE COURT:  Any objection?

24           MR. DAVIS:  No, your Honor.

25           THE COURT:  It will be admitted.

1          (Defendant's Exhibit 30D received in evidence)

2          MR. TALKIN:  This is a 60-page document, so obviously

3    we are not going to go through the whole thing, but if we can

4    go to the first page.

5    Q.  Looking at the first page, is it fair to say that this

6    document --

7          MR. TALKIN:  If we can go to this visit and duration.

8    You can blow up the whole top, if it's easier.  Thank you,

9    Mr. Smith.

10   Q.  Just looking at the second-to-bottom line, this visit, is

11   it fair to say that this URL visit is identifying a visit that

12   took place on October 11, 2022, at 10:46 p.m.?  Is that fair to

13   say?

14   A.  Yes, it is.

15   Q.  And now I want to go to the last page.

16         The time on this is 10/12/22 at 2:14 p.m.  You see

17   that?

18   A.  Yes.

19   Q.  You've had an opportunity to look at all 60 documents.  Am

20   I accurate when I say that all of the visits that are

21   identified in between in those 60 pages start with the time you

22   said on page 1 and end with the time you stated on the last

23   page?

24   A.  Yes.

25   Q.  You'll see on the bottom of this page it says:  Duration, 0

1    seconds?

2    A.   Yes.

3    Q.   Do you have any idea how that's calculated?

4    A.   No, I don't.

5    Q.   Just so we understand what site was looked at, looking at

6    the page that's in front of you, it says title.

7            Do you see that?

8    A.   Yes.

9    Q.   And the title is Discord, Mango, Mango Markets.

10           You see that?

11   A.   Yes, I do.

12   Q.   There is actually a picture of a mango there?

13   A.   Correct.

14   Q.   So that's on all 60 pages?

15   A.   Yes.

16   Q.   I now want to show you some very small parts of the

17   Discord -- of the Mango Discord checks.

18           MR. TALKIN:  I will start with 30A.  Please show it to

19   the witness.

20   Q.   You said that you looked at some of the discovery in this

21   case.  Did this document come from some of the discovery that

22   you looked at in the case?

23   A.   Yes, it did.

24   Q.   Is this from the Discord, the Mango Markets Discord?

25   A.   Yes.

O4FMEIS3                          Dwyer - Direct

1    Q.  Is this snippet from the Mango Discord a fair and accurate

2    representation of a snippet that you looked at prior to

3    testifying today?

4    A.  Yes, it is.

5             MR. TALKIN:  Your Honor, I'll offer 30A into evidence.

6             THE COURT:  Any objection?

7             MR. DAVIS:  No, your Honor.

8             THE COURT:  30A will be admitted.

9             (Defendant's Exhibit 30A received in evidence)

10   Q.  Mr. Dwyer, could you please read the time stamp and the

11   contents.

12   A.  Year is 2022, October 12, 4:16.  The contents:  I have a

13   friend who lost a lot of money in this hack.  He's literally

14   threatening to kill the guy if he's identified.  Laugh out

15   loud.

16            MR. TALKIN:  Can we show Mr. Dwyer 30B, please.

17   Q.  Same question for 30B.  Is this a fair and accurate

18   representation of a snippet from the Mango Markets Discord that

19   you reviewed prior to testifying today?

20   A.  Yes, it is.

21            MR. TALKIN:  I'll offer 30B, your Honor.

22            THE COURT:  Any objection?

23            MR. DAVIS:  No, your Honor.

24            THE COURT:  30B will be admitted.

25            (Defendant's Exhibit 30B received in evidence)

O4FMEIS3                        Dwyer - Direct

1   Q.  Mr. Dwyer, would you please read it to the jury.

2   A.  Year is 2022, October 12, 10:29.  Contents are:  I am in

3   PR.  Wonder if that guy is still here.

4   Q.  You can't interpret the end of that, can you?

5   A.  No, I cannot.

6            MR. TALKIN:  Can we show 30C, please, Mr. Smith.

7   Q.  Is that a fair and accurate representation of a different

8   snippet from the Mango Discord chat that you reviewed prior to

9   testifying today?

10  A.  Yes, it is.

11           MR. TALKIN:  Your Honor, I will now offer 30C into

12  evidence.

13           THE COURT:  30C will be admitted.

14           (Defendant's Exhibit 30C received in evidence)

15  Q.  Again, please read, starting from the top to the bottom,

16  both the time stamp and the contents of both entries.

17  A.  Time stamp is 2022, October 12, 11:44.  Contents:  I think

18  the best thing to do is threaten the hacker.

19           Next entry on the time stamp is 2022, October 12,

20  11:44, and the contents is:  With violence.

21  Q.  Thank you, Mr. Dwyer.  I think that's it.

22           MR. TALKIN:  Your Honor, let me just check my notes

23  for one second.

24           Thank you.  Nothing further.

25           THE COURT:  Cross-examination.

O4FMEIS3                        Dwyer - Cross

1           MR. DAVIS:  Thank you, your Honor.

2     CROSS-EXAMINATION

3     BY MR. DAVIS:

4     Q.  Good morning, Mr. Dwyer.

5     A.  Good morning.

6           MR. DAVIS:  Can we pull up Defense Exhibit 30A,

7     please, and if I can ask Mr. Smith to do that because we don't

8     have copies.  Appreciate it.

9     Q.  Mr. Dwyer, you remember speaking about this Discord?

10    A.  Yes.

11    Q.  Can I ask you a question about this.  The user name

12    exuent3745, do you see that?

13    A.  Yes.

14    Q.  Do you know this person's name?

15    A.  I do not.

16    Q.  You don't know this person's age, correct?

17    A.  Correct.

18    Q.  You don't know this person's location, correct?

19    A.  I do not.

20    Q.  You said the date was October 12, 2022, correct?

21    A.  That's what the time stamp says, yes.

22    Q.  And you were not sitting with Mr. Eisenberg on October 12,

23    2022, correct?

24    A.  I was not.

25    Q.  You have no idea whether he saw this message, correct?

O4FMEIS3                          Dwyer - Cross

 1   A.  I do not.

 2              MR. DAVIS:  Can we go to Defendant's Exhibit 30B.

 3   Q.  This is a user name SIU#3920.

 4              Do you see that, sir?

 5   A.  Yes.

 6   Q.  You don't know this person's name, correct?

 7   A.  I do not.

 8   Q.  You don't know this person's location, correct?

 9   A.  I do not.

10   Q.  And you see the time stamp is October 12, 2022?

11   A.  Yes.

12   Q.  You were not sitting with Mr. Eisenberg on October 12,

13   2022, correct?

14   A.  I was not.

15   Q.  You don't know whether Mr. Eisenberg saw this message,

16   correct?

17   A.  I do not.

18   Q.  Let's talk about 30C.

19              This is user name ICHI0707.

20              Do you see that?

21   A.  Yes, sir.

22   Q.  You don't know this person's name, correct?

23   A.  I do not.

24   Q.  You don't know this person's location, correct?

25   A.  I do not.

O4FMEIS3                          Dwyer - Cross

1   Q.  You were not sitting with Mr. Eisenberg on October 12,

2   2022, correct?

3   A.  I was not.

4   Q.  You have no idea whether he saw this message, correct?

5   A.  Correct.

6          MR. DAVIS:  We can take that down.

7          Why don't we pull up Defense Exhibit 70.  Can you we

8   please go to line 35.  Thank you, Mr. Smith.

9   Q.  Do you remember speaking about this on direct examination,

10  sir?

11  A.  Yes.

12  Q.  You didn't visit this website, correct?

13  A.  I did not.

14  Q.  You don't know what this website is at all, correct?

15  A.  Correct.

16  Q.  I'd like to show you Government Exhibit 1003, please.

17          You have never seen this document before, correct?

18  A.  I did not see this.

19  Q.  Can you please read the first sentence.

20  A.  Hi, all.  The Mango treasury has about 70 million U.S. DC

21  available to repay bad debt.

22  Q.  Can you please read the next sentence.

23  A.  I propose the following:  If this proposal passes, I will

24  send the MSOL, SOL, and MNGO in this account to an address

25  announced by the Mango team.  The Mango treasury will be used

1    to cover any remaining bad debt in the protocol, and all users

2    without bad debt will be made whole.

3            Continue?

4    Q.  I'll pause you there for a second.

5            In your review of this post, the person didn't

6    identify themselves by name, correct?

7    A.  Correct.

8    Q.  I want to now look at the last sentence.  Can you read

9    starting with:  By voting for this proposal.

10   A.  By voting for this proposal, Mango token holders agree to

11   pay this bounty and pay off the bad debt with the treasury and

12   waive any potential claims against accounts with bad debt, and

13   will not pursue any criminal investigations or freezing of

14   funds once the tokens are sent back as described above.

15   Q.  This is an anonymous post, correct?

16   A.  It appears to be.

17           MR. DAVIS:  Let's now go back to Defense Exhibit 70.

18   We can go to line 34, please.

19   Q.  Do you remember speaking about this website on direct?

20   A.  Yes.

21   Q.  Can you please read under the second column starting with:

22   Carlito on Twitter.

23   A.  Carlito on Twitter:  Scoop.  Who was the hacker that stole

24   more than 100 million U.S. dollars from @Mango Markets last

25   night?  Karlstack has some answers.

O4FMEIS3                          Dwyer - Cross

1   Q.  What was the time of this visit?

2   A.  October 12, 2022 at 1:40 p.m.

3   Q.  That's in UTC time, correct?

4   A.  That's correct.

5   Q.  I want to show you Government Exhibit 604, please.

6          MR. DAVIS:  Can we scroll down to page 2 of this,

7   please.

8   Q.  This is a flight being booked from San Juan that ends up in

9   Israel, correct?

10  A.  Yes.

11  Q.  And the date is October 12, 2022?

12  A.  Yes.

13         MR. TALKIN:  Can we go back to the top of the email,

14  please.

15  Q.  This email was sent on October 12, 2022 at 2:30 p.m. UTC,

16  correct?

17  A.  Yes.

18  Q.  That's less than an hour after the post and website visit

19  we just discussed in DX-70, correct?

20  A.  Correct.

21         MR. DAVIS:  We can take that down.

22         We can go back to Defendant's Exhibit 70.

23  Q.  Now, you reviewed search history and web history for

24  Mr. Eisenberg, correct?

25  A.  Yes.

O4FMEIS3                         Dwyer - Cross

1   Q.  And you went over searches that he did after October 11,

2   2022, correct?

3   A.  Correct.

4            MR. DAVIS:  Now, in Defense Exhibit 70, if we can

5   please pull it up.  Go to line 5.

6   Q.  Can you please read what is in the second column for line

7   5.

8   A.  Securities trader sentenced to 18 months in prison for

9   market manipulation scheme that netted more than $17 million in

10  illicit profits.

11  Q.  Now, this was after October 11, 2022, correct?

12  A.  Yes.

13  Q.  But the defendant also searched for this before October 11,

14  2022, correct?

15  A.  I'd have to see that.

16            MR. DAVIS:  Let's go to Government Exhibit 119A,

17  please.

18  Q.  You see row 2?

19  A.  Yes.

20  Q.  That's a search for statute of limitations conversion,

21  correct?

22  A.  Correct.

23  Q.  That's on October 8, 2022, correct?

24  A.  That's correct.

25  Q.  That's before October 11, is that correct?

O4FMEIS3                          Dwyer - Cross

1    A.  Yes, it is.

2            MR. DAVIS:  Can we go to line 4.

3    Q.  He searches for statute of limitations market manipulation,

4    correct?

5    A.  Correct.

6    Q.  That's before October 11, 2022, correct?

7    A.  Correct.

8            MR. DAVIS:  Can we go down to line 9.

9    Q.  That's a search for elements of fraud, correct?

10   A.  Correct.

11   Q.  That's on October 8, 2022, correct?

12   A.  Yes, it is.

13           MR. DAVIS:  Can we go to line 11.

14   Q.  That's the Wikipedia page for fraud, correct?

15   A.  Yes.

16   Q.  That was visited on October 8, 2022, correct?

17   A.  Correct.

18           MR. DAVIS:  Can we go to the last line.

19   Q.  This is the same post we just read, correct?

20   A.  Yes, it is.

21   Q.  That's from October 8, 2022, correct?

22   A.  Correct.

23   Q.  Mr. Eisenberg searched a lot of manipulation terms that you

24   went over in DX-70 before October 11, correct?

25   A.  Correct.

O4FMEIS3                        Dwyer - Cross

1          MR. DAVIS:  Let's go to Government Exhibits 800 and

2    800A.

3    Q.  This is Mr. Eisenberg's tweet from September 1, 2022,

4    correct?

5    A.  Yes.

6          MR. DAVIS:  Can we go to page 2.

7    Q.  You see it cites to a Justice Department news release?

8    A.  Yes.

9          MR. DAVIS:  Can we now pull up Government Exhibit

10   800A.

11   Q.  Can you please read the title of this press release.

12   A.  Cofounder and chief investment officer of London-based

13   hedge fund charged with FX market manipulation and fraud.

14   Q.  What's the date on this document?

15   A.  September 1, 2022.

16         MR. DAVIS:  We can take that down.

17         Can we pull up Government Exhibit 801.

18   Q.  This is a tweet from Mr. Eisenberg from September 26, 2022,

19   correct?

20   A.  Correct.  I don't see 2022 on this.  I may be missing it.

21   Q.  Can you read where it says under justice.gov what it says?

22   A.  James Patten, 63, of Winston Salem, North Carolina; Peter

23   Coker, Sr., 80, of Chapel Hill, North Carolina; and Peter

24   Coker, Jr., 53, of Hong Kong, China.  What's a retirement

25   without a bit of fun, friendly fraud.

O4FMEIS3                              Dwyer - Cross

1    Q.  Can you read the post underneath.

2    A.  Three men charged with international market manipulation

3    scheme.

4           MR. DAVIS:  Can we pull up Government Exhibit 1704,

5    please.

6    Q.  Could you please read the first sentence under paragraph 1.

7    A.  Starting with on or about July 6?

8    Q.  Yes, please.

9    A.  On or about July 6, 2022, Avraham Eisenberg, through his

10   lawyers, filed a lawsuit in the United States federal court in

11   *Avraham Eisenberg v. Numeris LTD --*

12          MR. TALKIN:  Your Honor, I object to this one.  This

13   is beyond the scope of the direct examination.

14          THE COURT:  It's overruled.

15   Q.  Do you see where it says, Avraham Eisenberg sued the

16   defendants for, among other things, price manipulation in

17   violation of the Commodities Exchange Act, Title 7, United

18   States Code, Section 91?

19          Do you see that, sir?

20   A.  Yes.

21          MR. DAVIS:  Can we please pull up Government Exhibit

22   609.

23   Q.  Do you see the first sentence where it says, Sasha Ivanov

24   is committing a $500 million fraud and market manipulation?

25   A.  Yes.

O4FMEIS3                          Dwyer - Cross

1    Q.  That's the Sasha Ivanov that was sued by Mr. Eisenberg in

2    July of '22, correct?

3    A.  I don't know that.

4    Q.  It's the same name, correct?

5    A.  It's the same name.

6            MR. DAVIS:  So let's now go to the second paragraph.

7    Q.  Do you see where it says high-level description of the

8    fraud?

9    A.  Yes.

10   Q.  I am going to read a sentence in the middle of that

11   paragraph, starting with, they spent tens of millions of

12   dollars.  OK?

13   A.  Yes.

14   Q.  They spent tens of millions of dollars buying up waves so

15   that the price went up from single digits to a high of 60.

16   They then turned those waves into USDN at this inflated price

17   and borrowed about 550 million of USDC and USDT against their

18   USDN that they had enticed to lend on buyers.

19           Did I read that correctly?

20           MR. DAVIS:  Can we zoom out for a second.

21   A.  Yes.

22   Q.  Do you see where it says specific fraudulent actions?

23   A.  Yes.

24   Q.  Can you read number 1.

25   A.  Market manipulation of the waves coin.

1          MR. DAVIS:  No further questions, your Honor.

2          THE COURT:  Mr. Talkin.

3   REDIRECT EXAMINATION

4   BY MR. TALKIN:

5   Q.  Mr. Dwyer, based on what you reviewed to testify today, is

6   it fair to say that Mr. Eisenberg reviewed several cases

7   regarding manipulation and fraud after December 11 of 2022,

8   correct?

9          MR. DAVIS:  Objection.

10         THE COURT:  You may need to rephrase the question or

11  ask some foundational questions first.

12  Q.  Based on the information that's in evidence on DX-70,

13  Defendant's Exhibit 70, you had testified on direct examination

14  that there was numerous searches.  What was the general tenor

15  of most of those searches that you saw on this document?

16  A.  Fraud and manipulation.

17         MR. DAVIS:  Objection.

18         THE COURT:  Overruled.

19  Q.  What was the time period, before or after October 11, 2022?

20  A.  After.

21  Q.  And on cross-examination you were asked about a lot of the

22  same type of searches that happened before October 11, 2022,

23  correct?

24  A.  Correct.

25  Q.  Before you heard about them today, did you know anything

O4FMEIS3

1    about those, meaning, before you saw them in evidence here

2    today, did you know anything about that they were in the

3    evidence of this trial?

4    A.   Yes.

5              MR. TALKIN:  Nothing further.  Thank you.

6              THE COURT:  Mr. Davis, anything further?

7              MR. DAVIS:  No, your Honor.  Thank you.

8              THE COURT:  Thank you very much, Mr. Dwyer.

9              (Witness excused)

10             THE COURT:  Mr. Talkin, you may call your next

11    witness.

12             MR. TALKIN:  Thank you.

13             At this time we have a stipulation that we have agreed

14    with the government, if I can move it into evidence.  It is

15    identified, even though it's on the defense case because of the

16    timing, as a Government Exhibit 1705.  For purposes of

17    identification for the jury, should they want to hear it, we

18    will call it the same thing, if that's OK with the Court.

19             THE COURT:  The stipulation will be admitted.

20             (Government Exhibit 1705 received in evidence)

21             MR. TALKIN:  Thank you.  I am going to read the

22    stipulation into evidence now.

23             It is hereby stipulated and agreed, by and between the

24    United States of America, by Damian Williams, United States

25    Attorney for the Southern District of New York, Assistant

O4FMEIS3

United States Attorneys Thomas Burnett and Peter Davis, and

Special Assistant United States Attorney Tian Huang, of

counsel, and the defendant, Avraham Eisenberg, by and through

his counsel, Brian Klein and Sanford Talkin, that:

Avraham Eisenberg had an account at Circle Internet

Financial Limited, which I'll call Circle for the rest of this

reading, which is identified in GX-1104 and hereafter known as

Mr. Eisenberg's Circle account.

Circle is a U.S.-based company with headquarters in

Boston, Massachusetts.  Law enforcement learned that about 57

million USDC, all of which was traceable to the October 11,

2022 events on Mango Markets, was deposited into

Mr. Eisenberg's Circle account, but the majority of those funds

were soon after converted to tokens on the Ethereum and Tron

Blockchains sent to decentralized exchanges and then converted

to other cryptocurrencies, including DAI and USDB, which law

enforcement did not believe it could seize.

As of October 12, 2022, Mr. Eisenberg's Circle account

had remaining only about 500,000 USDC, and, at law

enforcement's request, that same day, Circle suspended

Mr. Eisenberg's circle account, without disclosing to him that

it was suspending it at law enforcement's request.

On November 4, 2022, Mr. Eisenberg, while still

outside the United States, served Circle with an arbitration

demand seeking to unsuspend that account.

O4FMEIS3

1          On November 6, 2022, after conferring with law

2    enforcement, Circle unsuspended Mr. Eisenberg's Circle account

3    without disclosing that it was doing so at law enforcement's

4    request.

5          Given the relatively small amount, about 500,000 USDC,

6    still remaining in Mr. Eisenberg's Circle account, as compared

7    to the original deposits of 57 million USDC on October 11,

8    2022, that were traceable to the October 11, 2022 events on

9    Mango Markets, law enforcement requested that the account be

10   unsuspended because they were concerned that if that were not

11   done and the arbitration proceeded, Mr. Eisenberg would learn

12   that law enforcement was investigating him and that he would

13   flee from prosecution, for example, by not returning to have

14   the United States, and/or convert the Mango Market funds that

15   are attributed to him to other kinds of cryptocurrency or

16   locations outside the government's reach.

17         It is further stipulated and agreed that this

18   stipulation that I just read can go into evidence identified as

19   Government Exhibit 1705, dated April 15.

20         Thank you, your Honor.

21         THE COURT:  The defense may call its next witness.

22   What we are going to do here is go for about 20 minutes.  Then

23   we will take our midday break.

24         MS. MARTABANO:  Yes, your Honor.

25         The defense call Mr. Jeremy Sheridan.

O4FMEIS3

1    Your Honor, while we wait for the witness, can we have

2    a brief sidebar to clarify a ruling you made earlier?

3    THE COURT:  Yes, you may.

4    (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O4FMEIS3

1           (At sidebar)

2           MS. MARTABANO:  We just wanted to raise, obviously, we

3     have not had a chance to speak to Mr. Sheridan to tell him he

4     has been limited, so he is not going to be aware of the Court's

5     ruling.  I am going to do my best to keep it very narrow and

6     tight, but we just wanted to raise if there is a way that you

7     prefer that we either let him know -- I don't want to draw

8     objection after objection after objection because he doesn't

9     realize that there has been a limitation.

10          THE COURT:  What was the limitation, just to be clear

11    what we are talking about?

12          MR. KLEIN:  Your Honor, you limited some of the scope

13    of the direct based on the proffered testimony.  Our questions

14    have been narrowed to reflect your rulings.  It's possible he

15    could stray by accident.  We just don't want your Honor to get

16    mad at him because he's not aware of his rulings.

17          THE COURT:  I understand.  We will take it as it

18    comes.  Thank you.  I appreciate it.

19          (Continued on next page)

20

21

22

23

24

25

```
 1              (In open court)
 2   JEREMY SHERIDAN,
 3        called as a witness by the Defendant,
 4        having been duly sworn, testified as follows:
 5   DIRECT EXAMINATION
 6   BY MS. MARTABANO:
 7   Q.  Good morning, Mr. Sheridan.  Can you tell us how you got
 8   involved in this case?
 9   A.  Good morning, ma'am.  My firm, FTI Consulting, was
10   contacted and retained by defense counsel based on our
11   expertise in digital asset currency.
12   Q.  I want to start with your background.  You just mentioned
13   FTI.  Is that where you currently work?
14   A.  Yes, ma'am.
15   Q.  What do you do there?
16   A.  I lead our investigative teams within the Blockchain and
17   digital assets practice.
18   Q.  How many people approximately do you oversee?
19   A.  There is about -- there is 32 in the practice.  Those
20   specifically focus on investigations are six.
21   Q.  About how long have you been engaged in the Blockchain and
22   cryptocurrency analysis space?
23   A.  Since 2019.
24   Q.  And how long have you been involved in cybersecurity and
25   other cyber crime issues?
```

1  A.  Since 1997, when I started my federal career.

2  Q.  Can you give me a sense of the type of clients you assist

3  at FTI.

4  A.  It runs the spectrum.  In the investigative missions that

5  we have, we do track and trace for both plaintiffs and

6  defendants of victims of fraud, theft, scam, and abuse, as well

7  as entities, whether it's exchanges or other participants in

8  the digital asset industry who are issuers or accused of not

9  protecting those who have suffered fraud theft, scam, or abuse.

10  We also do valuation through track and trace and price analysis

11  of cryptocurrency assets.  That often comes into play for

12  securities determinations as to whether or not an individual

13  token violates securities laws.

14  Q.  Thank you.

15       You kept mentioning that you do track and trace.  Can

16  you just explain to the jury what that means.

17  A.  Track and trace refers to identifying a digital asset or

18  cryptocurrency on a specific Blockchain, tracking its movement,

19  its flow of funds, and how it moves from individual owner to

20  individual owner.

21  Q.  I would like to take a step back to go to your education.

22       What's your highest level of education?

23  A.  I have a master's degree in public administration.

24  Q.  Where is that from?

25  A.  University of Arizona.

O4FMEIS3                         Sheridan - Direct

1  Q.  Do you have an underlying bachelor's degree?

2  A.  I have a bachelor's degree in criminal justice from

3  University of Arizona.

4  Q.  What was your first position in your career after you

5  received your MPA?

6  A.  I was a secret service agent for the U.S. Secret Service.

7  Q.  What did you do as a secret service agent?

8  A.  As most people know, we are known for our protective

9  mission, but we also have an investigative function where we

10  investigate financial crimes and protect payment systems.  So

11  throughout an agent's career they will phase in and out of

12  those two different respective mission sets.

13          My first assignment was in Arizona conducting criminal

14  investigations related to financial crimes.

15          (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1    BY MS. MARTABANO:

2    Q.  And after you did those criminal investigations, how long

3    were you in that particular position?

4    A.  Approximately four years.

5    Q.  And after those four years, where did you move in the

6    Secret Service?

7    A.  I was on President Bush's protective detail in the

8    Presidential Protective Division.

9    Q.  How long were you in that position?

10   A.  About four years.

11   Q.  Were you doing investigation at the same time then or were

12   you strictly --

13   A.  Strictly protection.

14   Q.  After those four years, what was your next position with

15   the Secret Service?

16   A.  I was in an administrative role in headquarters.

17   Q.  What were you doing in that role?

18   A.  It was an HR function.

19   Q.  And after that?

20   A.  I was assigned to President Obama's detail, again, under

21   the Presidential Protective Division, this time as a

22   supervisor.

23   Q.  How many people did you oversee?

24   A.  Approximately 22.

25   Q.  After you were done supervising for president Obama, what

1  was your next position with the secret self?

2  A.  Bounced back into the investigative role as a supervisor

3  within the Los Angeles field office.

4  Q.  What kind of investigative cases were you looking into?

5  A.  So, those that are under our statute requirement, again,

6  financial payment systems, counterfeiting, credit card fraud,

7  as well as protective cases, protective intelligence threats

8  against people we protect.

9  Q.  I see.  So threats against the president?

10  A.  Yes, ma'am.

11  Q.  How long were you in the LA position?

12  A.  Approximately three years.

13  Q.  And after that, what position did you move to?

14  A.  Back to protection.  I was on then Vice President Joe

15  Biden's detail as a supervisor.

16  Q.  How long were you in that position?

17  A.  Approximately two years until the transition of

18  administrations to the Trump Administration.  I then assumed

19  the Special Agent in Charge position of Vice President Mike

20  Pence detail because I was on the vice president's detail.

21  Q.  After that, what was your next position?

22  A.  So then I went back into the investigations.  I was the

23  Deputy Assistant Director within the Office of Investigations

24  right oversight of a portfolio of offices, approximately 20

25  offices covering the northeast region and mid-north region of

1   the country, overseeing their criminal investigative

2   operations.

3   Q.  Were you doing any cryptocurrency or blockchain work at

4   that time?

5   A.  So that was around 2019 when I started the cryptocurrency

6   work, overseeing cryptocurrency investigations conducted by

7   field personnel, field agents within my portfolio of offices.

8   Q.  How long were you in that position?

9   A.  I was in that position for two years.

10  Q.  And after that?

11  A.  I was the assistant director for training positions and

12  legislative affairs positions.

13  Q.  And what do you do as the training director of legislative

14  affairs?

15  A.  Interact with congressional members for initiatives related

16  to the Secret Service.

17  Q.  Can you give me an example?

18  A.  One of the major issues we did was an overtime salary

19  determination for our uniformed personnel.  So I advocated for

20  that bill to be included in the legislative agenda and

21  advocated for its passage.

22  Q.  Were you working directly with members of Congress or the

23  Senate?

24  A.  That's correct.

25  Q.  What was your position after that?

O4FCeis4                         Sheridan – Direct

1   A.   Became the assistant director for the Office of

2   Investigation for the Global Secret Service Investigative

3   Mission.

4   Q.   Please tell us what that entails.

5   A.   So that entails, similar to the Deputy Assistant Director,

6   I had oversight of a specific section of the United States.

7   The Assistant Director has oversight for the Global

8   Investigative Mission for all offices throughout the world.

9   That includes strategy operations, as well as administrative

10  budgetary and other work as it relates to investigations.   It

11  involves oversight of all criminal investigations.

12  Q.   And can you tell me what cryptocurrency or blockchain

13  experience you had in that role.

14  A.   Because cryptocurrency and digital assets had become the

15  payment method and means for illicit activity predominantly in

16  areas of concern related to ransomware and other network

17  intrusion-type cases which we handle, I became involved in

18  oversight of those investigations, judicial action related

19  to -- and judicial action related to those investigations.

20  Q.   At that time, did the Secret Service have any kind of task

21  force or dedicated team working on cryptocurrency and

22  blockchain investigations?

23  A.   No, not dedicated.  And that was one thing I did in my

24  position, was to establish the agency's first dedicated illicit

25  finance and digital asset tracing team within our headquarters.

O4FCeis4                         Sheridan - Direct

1    Somewhat of a cheesy name, we called it the Crypto Knights.

2    It's bad.  So I developed the strategy, the funding, the

3    staffing, the training, and the operational agenda for that

4    team.

5    Q.  And were you involved in the training that you developed

6    for the team?

7    A.  I did not deliver the training, but I received the training

8    as a vetting and applicability determination, and then approved

9    that training for our personnel.

10   Q.  And how many crypto or blockchain investigations did you

11   partake in either as a supervisor or directly in that role?

12   A.  The investigations I was involved in were in a supervisory

13   position.  I didn't quantify them.  I would say there were,

14   directly that rose to my level because of where I was at a

15   supervisor level, I would say in the two years I was there,

16   probably 15 to 20 a year.

17   Q.  Can you tell us what your final position was at the Secret

18   Service?

19   A.  I retired as the Assistant Director.

20   Q.  When was that?

21   A.  I retired in 2021.

22   Q.  In your capacity as a Secret Service agent, did you ever

23   testify before Congress?

24   A.  I testified before Congress on three separate occasions.

25   Q.  Can you tell me about those?

1    A.  Twice in front of the House of Representatives and once in

2    front of the U.S. Senate.

3    Q.  If you could tell me about the first time you testified for

4    the House of Representatives.

5    A.  So the first time was related to the use of cryptocurrency

6    in financing terrorism.

7    Q.  And when was that?

8    A.  That would have been in 2021.

9    Q.  And what was your next time testifying in front of Congress

10   and what was it about?

11   A.  Next time was also House of Representatives.  This one was

12   focused on ransomware and the use of cryptocurrency to

13   facilitate ransomware activities.

14   Q.  And were they hiring you as an expert witness or just fact

15   witness, kind of asking you questions about how things are

16   done?

17   A.  It's designated as expert testimony.

18   Q.  If you know, could they pick from anyone they wanted in the

19   federal government, or out, to come in and testify before

20   Congress?

21   A.  Yes, ma'am.

22   Q.  How do you know that?

23   A.  As displayed by all other expert witnesses they use, it

24   runs the spectrum of public and private sector participants.

25   Q.  And I believe you got one more to cover your testimony in

O4FCeis4                    Sheridan - Direct

1    the Senate.  What was that about?

2    A.  That was also related to cryptocurrency and its use in

3    ransomware activities.

4    Q.  Approximately when was that?

5    A.  Also in '21.

6    Q.  You're no longer with the Secret Service, but do you still

7    work with lawmakers in their capacity and in your capacity as

8    an expert in crypto?

9    A.  Yes, ma'am.  I meet regularly with congressional staff, as

10   well as less frequently congressional members themselves

11   related to cryptocurrency regulatory and legislative

12   considerations.

13   Q.  Could you explain a little bit more about those regulatory

14   and legislative communications.

15           MR. BURNETT:  Objection.

16           THE COURT:  It's overruled.

17   A.  One of the biggest challenges facing the cryptocurrency

18   industry, it's almost become a cliché at this point, is the

19   concern for regulatory clarity.  What that means is --

20           MR. BURNETT:  Objection.  Move to strike.

21           THE COURT:  That motion is granted.  The witness's

22   last answer will be stricken.

23           Ms. Martabano, you may proceed.

24           MS. MARTABANO:  Thank you, your Honor.

25   Q.  After your nearly 25 years at the Secret Service, what was

O4FCeis4                         Sheridan - Direct

1  your next job?

2  A.  After I retired, I worked for a private cryptocurrency

3  company, a crypto custodian which held crypto assets called

4  PrimeTrust.

5  Q.  And what did you do there?

6  A.  I was the vice president of regulatory affairs.

7  Q.  And as the vice president of regulatory affairs, what were

8  some of your job duties?

9  A.  My job was to communicate externally from the company to

10  legislators, regulators, law enforcement entities about what

11  the company was doing to comply and operate within regulatory

12  and legislative frameworks.

13  Q.  So at that time, you weren't personally doing any kind of

14  blockchain analytics or tracing?

15  A.  No.

16  Q.  Why did you leave the company?

17  A.  The company was facing significant financial difficulties.

18  The "why" was almost concurrent that FTI contacted me from a

19  recruiting standpoint to be -- however, I was going to be laid

20  off as part of our financial difficulties because we were

21  reducing the number of force.  So it was literally the same

22  week.  I left because FTI called, but we were also reducing the

23  personnel.

24  Q.  Is PrimeTrust still in business?

25  A.  No, ma'am.

O4FCeis4                          Sheridan - Direct

1   Q.   What happened?

2   A.   So another cliché in crypto is, "Not your keys, not your

3   crypto," which means if you don't have the private key to

4   access a cryptocurrency wallet, that cryptocurrency contained

5   within that wallet is impossible to retrieve.  We had a very,

6   very high dollar value asset in cryptocurrency contained within

7   a wallet that we could not access.  And quite literally

8   overnight, that wallet went from an asset to a liability and we

9   did not have the funds to absorb that liability.

10  Q.   What, if anything, was your involvement in maintaining

11  those keys or the loss thereof?

12  A.   I had no involvement in the custody or financial

13  maintenance of those wallets.

14  Q.   And PrimeTrust, you went to FTI, I believe you just

15  mentioned?

16  A.   Yes, ma'am.

17  Q.   I apologize, but I'm going to take you through a bunch of

18  your certifications that relate to blockchain and

19  cryptocurrency.  If you can tell me what certifications you

20  have that relate to the blockchain and cryptocurrency space.

21  A.   Yes, ma'am.  Three certifications from the Blockchain

22  Council as a blockchain expert, cryptocurrency auditor,

23  cryptocurrency expert.  I have two forensic tool

24  certifications.  What these are, it's a proprietary tool by a

25  company called Chainalysis that allows you to search

O4FCeis4                      Sheridan - Direct

1   cryptocurrency transactions on the blockchain.  There are tools

2   called Reactor, I have the Chainalysis Reactor certification,

3   as well as a higher designation called the Chainalysis

4   Investigative Specialist Certification.  I also have -- those

5   are specific to more technical aspects in terms of the policy

6   and other considerations related to the blockchain.  I have a

7   blockchain for business certificate from Columbia University

8   Executive Education.

9   Q.  And are you a certified smart contract auditor?

10  A.  I am.

11  Q.  And who certified you in that?

12  A.  Also the Blockchain Council.

13  Q.  What does that entail?

14  A.  So that entails reviewing smart contracts to understand

15  underlying code and be able to evaluate the code for functional

16  purposes.

17  Q.  How long does it take to get that certification?

18  A.  I believe the course is around 16 hours, and there's a

19  certification exam associated with it.

20  Q.  Do you have any other certifications related to security or

21  leadership so it's not strictly crypto, but others from your

22  investigative history?

23  A.  So I have two other cybersecurity certifications, one from

24  Carnegie Mellon University, which is the Chief Information

25  Security Officer certificate.  I have the Certified Security

1    Information Manager from the Information Systems Audit and

2    Control Association, and I have two certifications from the

3    General Information Insurance Certificate Program related to

4    strategic leadership policy and cybersecurity considerations.

5    Q.  I think I've covered anything, but anything I forgot?

6    A.  No, ma'am.

7    Q.  Do you give speeches about crypto?

8    A.  Yes, ma'am.

9    Q.  Can you give us a general sense of some of those.

10   A.  Both at industry conferences as well as professional

11   conferences.  Some examples of the industry conferences are the

12   digital asset summit here in New York, as well as it's called

13   Money 2020.  It's an industry trade show for the cryptocurrency

14   industry.  It happens annually in Las Vegas.  The professional

15   conferences I've spoken at include the International

16   Association for Financial Crimes Investigators, as well as the

17   Cambridge Symposium on Economic Crime in London.

18   Q.  And have you done any media appearances or do you have any

19   publications related to the blockchain or Cryptospace?

20   A.  Yes, ma'am.  I've been interviewed on CoinDesk TV.  On two

21   occasions, I have written several blogs and industry white

22   papers related to the industry.

23   Q.  Can you tell us what CoinDesk TV is.

24   A.  It is a dedicated cryptocurrency news outlet.

25   Q.  And have you written on the CFTC and any lawsuits against

O4FCeis4                         Sheridan - Direct

1    DAOs?

2    A.  I was interviewed for an article on that subject.

3    Q.  Why do you do all this cryptocurrency work?

4    A.  I have a personal fulfillment from working in the industry,

5    I think the industry is going to be transformative in many

6    ways, I think the technology is going to be transformative in

7    many ways, I think it will revolutionize finance in many ways,

8    and I find great satisfaction to be a part of that type of

9    advancement in technology.

10   Q.  Do you own any cryptocurrency personally?

11   A.  Yes, ma'am.

12   Q.  What tokens generally, not quantities, but which tokens do

13   you own?

14   A.  I have Bitcoin, Ethereum, Solana, USDC, and MANA.

15   Q.  So you have personal experience with trading all of those?

16   A.  Yes, ma'am.

17   Q.  And the last thing I'd like to cover before we get into the

18   substance here, have you ever given prior expert testimony

19   either in trial or at depositions?

20   A.  Yes, ma'am.

21   Q.  And can you tell me about that.

22   A.  I testified in the FTX bankruptcy case and I provided

23   deposition in a criminal case, the United States Securities and

24   Exchange Commission v. Putnam.

25   Q.  And you were qualified and proffered as an expert in those

O4FCeis4                          Sheridan – Direct

1    cases?

2    A.  Yes, ma'am.

3              MS. MARTABANO:  At this time, the defense moves to

4    qualify Mr. Sheridan as an expert.

5              MR. BURNETT:  Your Honor, the government preserves its

6    continuing objection.

7              THE COURT:  Subject to those objections, the witness

8    will be qualified under Rule 702.

9              MS. MARTABANO:  Thank you, your Honor.

10   Q.  Mr. Sheridan, what did you do to prepare --

11             THE COURT:  Hold on.  Since we're at now past 12:00,

12   is this a good breaking point for us?

13             MS. MARTABANO:  Yes, your Honor.

14             THE COURT:  Let's take a break.  Let's come back at

15   12:40.

16             (Continued on next page)

17

18

19

20

21

22

23

24

25

O4FCeis4                          Sheridan - Direct

1                    (Jury not present)

2                    THE COURT:  Mr. Sheridan, you will continue to be

3         under oath.  You understand you're not to speak to anyone about

4         this case or your testimony, including anyone on the defense

5         side?

6                    THE WITNESS:  Yes, sir.

7                    THE COURT:  With that, have a nice short lunch and

8         we'll see you back here at 12:40.

9                    THE WITNESS:  Yes, sir.

10                   (Witness not present)

11                   THE COURT:  Anything further to take up before we come

12        back?

13                   MR. DAVIS:  Yes, your Honor.  One matter.  We

14        understand this might be the defense's last witness.  And so,

15        if now's a good time, we think the Court should allocute the

16        defendant on his absolute right to testify and the defense

17        should make a decision on about whether that's going to happen.

18                   THE COURT:  Mr. Talkin, is that correct, that this is

19        your last proposed witness?

20                   MR. TALKIN:  Yes, it is, your Honor.

21                   As far as the defendant testifying, we had informed

22        the government over the weekend that our intention is that he

23        will not testify and he's ready to be allocuted on that.

24                   After I informed the government of that, something

25        came up where it wasn't -- I don't believe that changed the

O4FCeis4                          Sheridan - Direct

1    position, but it wasn't as solid as when I had spoken to him

2    about that, and I think that's the situation that we're in now.

3    I think Mr. Eisenberg wants to see how this witness plays out

4    before the final decision on that, but I can tell you that as

5    we sit here now, our intention is for him not to testify.

6              THE COURT:  Mr. Talkin, do you have any issues with my

7    inquiring of Mr. Eisenberg?

8              MR. TALKIN:  No.  Thank you, your Honor.

9              THE COURT:  Mr. Eisenberg, do you understand that you

10   have the right to testify in this case?

11             THE DEFENDANT:  Yes.

12             THE COURT:  And you understand that if you do not

13   testify, I will inform the jury that they are not to hold that

14   fact against you?

15             Do you understand that?

16             THE DEFENDANT:  Yes, your Honor.

17             THE COURT:  Do you believe you've had sufficient time

18   to discuss with your counsel the pros and cons of testifying?

19             THE DEFENDANT:  Yes, your Honor.

20             THE COURT:  Would you like to have further discussions

21   with counsel to finalize your decision on whether or not you

22   should testify in this case?

23             THE DEFENDANT:  I would like to have a discussion

24   after Mr. Sheridan finishes testifying.

25             THE COURT:  And Mr. Davis, is there any further

1    inquiry that you'd like me to make at this time?

2            MR. DAVIS:  No.  If the decision is not going to be

3    made, I think when the decision is made, we would just ask that

4    the Court confirm that this decision is absolutely his to make

5    and that he's making that decision completely on his own.  But

6    for now, this makes sense.

7            May I raise just one logistical question before we

8    continue?

9            THE COURT:  Yes.

10           MR. DAVIS:  If the defendant does intend to testify, I

11   think we had spoke to defense counsel about starting that

12   testimony on Tuesday, given that we were under the impression

13   that the defendant would not be testifying and I believe

14   counsel would also agree to that, but we wanted to put that to

15   the Court.

16           THE COURT:  I think that everyone will need some time

17   to prepare if Mr. Eisenberg testifies, so that proposal makes

18   sense.

19           So you should continue to speak with counsel, we'll

20   have time for you to do that after Mr. Sheridan's testimony and

21   during the break that we're about to have.  So you should do

22   that and make use of the time.

23           Anything else, Mr. Davis?

24           MR. DAVIS:  No.  Thank you, Judge.

25           THE COURT:  Anything else from the defense?

1          MR. TALKIN:  No.  Thank you, your Honor.

2          THE COURT:  All right.  We'll see everyone here at

3   12:40.

4          (Luncheon recess)

5          (Continued on next page)

1                        AFTERNOON SESSION

2                           12:54 p.m.

3            THE COURT:  Anything to pick up before Mr. Sheridan

4    takes the stand?

5            MR. BURNETT:  Yes, your Honor.  We had a chance to go

6    back and look at the *voir dire* transcript, and there's just

7    kind of one rule I want to raise and kind of preview, it's

8    going to be a basis of what some of our objections are going to

9    be to him.

10           So I know the Court pointed out that one thing the

11   government was able to explore was the extent to which

12   Mr. Sheridan was relying on his own knowledge versus FTI's

13   knowledge.  I wanted to point the Court to Federal Rule of

14   Evidence 705, which says that while an expert does not, on

15   direct examination, have to produce or show the basis for the

16   data underlying their testimony, they are required to do that

17   if asked on cross examination.

18           And that's, I think, particularly important because

19   when there was a line of the *voir dire* when I was questioning

20   Mr. Sheridan about an important point, and I asked him if he

21   could see the borrows on the blockchain, and he said you could

22   see the transactions, they're not listed as borrows or

23   withdrawals, you can see the transactions.  And then I said,

24   okay, so you can't see what's a borrow and what's a withdraw.

25   And then he responded, so you can tell there's two functions

O4FCeis4                    Sheridan - Direct

1    that will be listed within blockchain explorers.  It will list

2    a borrow as a 1 or a 0.  So you can tell when a function is not

3    a borrow by the 0 and you can tell when the function could be a

4    borrow by the 1.  I need to actually put the documents he's

5    talking about in front of him and ask him what's the 1 and

6    what's the 0 he's referring to, because I'm looking at

7    blockchain explorer data and I'm not seeing any ones and zeroes

8    in the stuff we're looking at.  If he's making this up, that's

9    a critical point we need to be able to cross examine him on.

10   If we don't have the data that he's talking about here as being

11   ones and zeros that shows borrows or not, I can't effectively

12   cross examine him, and I think 705 requires the disclosure of

13   that.

14            THE COURT:  Ms. Martabano, do you have a response?

15            MS. MARTABANO:  I don't know the specific piece of

16   code he is talking about.  I think it's perfectly fine for the

17   government to ask what blockchain data he's relying on.

18            MR. BURNETT:  I need the paper.

19            MS. MARTABANO:  I can't produce something I don't have

20   in front of me right here.

21            THE COURT:  Let me make sure I understand.  Are you

22   asking the Court for some relief now --

23            MR. BURNETT:  If I ask him what data he relied on, he

24   says I relied on like a transaction log from blockchain

25   explorer and I say where is that data and he says I don't have

1    it, I'm going to move to exclude him.

2            THE COURT:  Okay.  I understand.

3            Ms. Martabano, you understand that -- to just put

4    these rules together.  Rule 16 requires the opinions and the

5    basis for these opinions.  There also needs to be a disclosure

6    of all the documents that Mr. Sheridan relied on.  So if he's

7    providing testimony and then referring to some set of

8    documents, he's going to have to be able to point to what those

9    documents are in a way that Mr. Burnett can conduct his cross

10   examination.

11           MS. MARTABANO:  Yes, your Honor.  I believe he would

12   be able to direct him online to where it is.  Obviously, the

13   blockchain is public.  Using the blockchain explorers is

14   public.  It's something you can do from your computer.  I'm

15   obviously not an expert, so I can't do it myself, but I don't

16   think that we're going to have a printout of the blockchain to

17   hand to Mr. Burnett.  I am sure we could get one, but I don't

18   think we're going to have it right now.  So I think we would

19   ask at the very least to be given a chance to provide that to

20   him tonight because we did disclose very clearly that we would

21   be relying on the public Discord, the public blockchain, the

22   public smart contracts, and the data provided by the government

23   in this case, which was, as the Court knows, quite voluminous.

24           THE COURT:  How long is your direct examination?

25           MS. MARTABANO:  Probably another 30 minutes.

1          MR. BURNETT:  Your Honor, basically what they're

2     saying is go find the internet.  That's not what cross

3     examination is.  If he looked at something, he clearly should

4     have printed it out or saved it.  That's what the rule requires

5     him to do.

6          THE COURT:  Ms. Martabano, I just don't understand how

7     you think this is permissible.  Maybe help me out with just how

8     this works, because if Mr. Sheridan engaged in essentially a

9     tracing exercise, using data from the blockchain or any other

10    source, then, under normal circumstances, he would be required

11    to furnish that underlying information in connection with his

12    testimony.  Am I missing something?  If that was done, there

13    should be no issue here because Mr. Burnett would know what

14    he's referring to and he could ask him questions based on those

15    underlying bases.  Was that not done here?  What's going on?

16         MS. MARTABANO:  He did not provide a report to us that

17    was based on that.  I think it was in part of his research, as

18    I mentioned — and I can't speak for him, but this is my

19    understanding — that he was on the blockchain doing blockchain

20    research and looking.  He didn't -- we didn't ask him to trace

21    a specific transaction that he could then turn and show us.  My

22    understanding is that what he was testifying to earlier was

23    that the way the Mango blockchain works is that there's code

24    that represents a 0 or a 1 when something is either

25    withdrawn -- it relates to a toggle that I believe there's

O4FCeis4                          Sheridan - Direct

actually testimony about in the record, but I could be wrong.

When that toggle is on, it's a 1 because you can be borrowing.

When the toggle is off, nothing you pull out can be a borrow.

          THE COURT:  I get that and I get what he's going to

testify to.  I think Mr. Burnett's position is how am I

supposed to cross examine him about that if I don't have those

materials that he is using as the basis for his opinion.

That's a fair argument.  Again, the Court has bent over

backwards to help the defense navigate these disclosure

failures, but I think Mr. Burnett is fairly saying, I can't say

anything to him that would undermine his opinion if I don't

know what he relied on.  The most that he's going to be able to

say is that Mr. Sheridan can't point to that underlying basis.

          Mr. Burnett, am I missing something?

          MR. BURNETT:  No, that's exactly right.  Obviously, we

also think he only knows about the zero-one thing not from his

expertise, but because someone told it to him.  Separately, I

need to know what's actually a zero and what's actually a one,

and where he's seeing it to cross him on it.

          THE COURT:  So Ms. Martabano, do you have any sort of

authority that would permit Mr. Sheridan to testify without

disclosing the actual underlying factual basis of his opinion?

I think that's the question, is that he's going to offer

testimony not in any of his prior disclosures, for the first

time was in his disclosure that came out on Sunday, and even

O4FCeis4                    Sheridan – Direct

1    then wasn't laid out with any of the specificity that would

2    have given the government fair notice.  That came out during

3    the examination today.  So under these circumstances, do you

4    have any authority for me?

5                MS. MARTABANO:  I don't, your Honor, beyond what was

6    already submitted to the Court last night.

7                THE COURT:  We'll hear the testimony, but I'll

8    understand, Mr. Burnett, when you make the motion.  You can say

9    "motion to exclude" and I'll understand what you're talking

10   about.  I think that's the fair way to deal with this.

11               MR. BURNETT:  Thank you, your Honor.

12               THE COURT:  If something else comes out through the

13   testimony, some different circumstance, then we can entertain

14   it.  Otherwise, I understand the government's position.

15               Anything else?

16               MR. BURNETT:  Not from the government.  Thank you.

17               THE COURT:  Ms. Martabano, anything else?

18               MS. MARTABANO:  No, your Honor.

19               THE COURT:  If not, let's bring Mr. Sheridan, put him

20   back on the stand.

21               (Witness present)

22               Mr. Hernandez, we can get the jury.

23               THE DEPUTY CLERK:  Yes, your Honor.

24               (Continued on next page)

25

O4FCeis4                        Sheridan - Direct

1           (Jury present)

2           THE COURT:  Mr. Sheridan, you understand you're still

3    under oath?

4           THE WITNESS:  Yes, sir.

5           THE COURT:  Ms. Martabano, you may proceed.

6           MS. MARTABANO:  Thank you, your Honor.

7    BY MS. MARTABANO:

8    Q.  Mr. Sheridan, just before the lunch break, we were getting

9    into how you prepared to testify for trial today in addition to

10   your general background and education on this.

11          In connection with this case, what have you done to

12   prepare for your testimony here today?

13   A.  I reviewed the indictment, I reviewed the expert

14   disclosures of the government witnesses, I reviewed the

15   materials made available through discovery by defense and the

16   government.

17   Q.  And have you been sitting in trial, listening to the

18   testimony as it was offered?

19   A.  Yes, ma'am.

20   Q.  What kind of things did you look at in the discovery the

21   government provided to the defense and then provided to you?

22   A.  I looked at the Mango Markets user guide, reviewed the

23   Mango Markets website, reviewed the exhibits that demonstrated

24   the individual accounts owned by Mr. Eisenberg, and the

25   activity associated with those accounts.

1   Q.  And have you looked at any of the exhibits that were

2   admitted in trial?

3   A.  Yes, ma'am.

4   Q.  Are there any other types of things that you've reviewed or

5   researched?

6   A.  I researched the Mango Markets version 3 website itself

7   just to see how it functioned and operated.

8   Q.  Can you tell me what you did in connection with that.

9   A.  Accessed the user interface that connects to the Mango

10  Markets protocol and just operated the system as a traditional

11  website to see how the functionality was displayed and what

12  prompts and actions would be taken by the user and response by

13  the website.

14  Q.  And what, if any, publicly available data did you review?

15  A.  I reviewed the news articles associated with the case, as

16  well as the Mango Markets website itself that has their

17  documentation and their organizational information on it.

18  Q.  Did you review any of the Mango Markets Discord or any of

19  its social media?

20  A.  The Mango Markets Discord, yes, ma'am.

21  Q.  Is that public?

22  A.  Yes, ma'am.

23  Q.  Did you review the Mango Markets GitHub?

24  A.  Yes, ma'am.

25  Q.  Can you tell me what GitHub is?

O4FCeis4                          Sheridan - Direct

1    A.   GitHub is a public forum for code posting for a full

2    spectrum of entities, organizations, individuals.  It's meant

3    to be an information and sharing platform so that people can

4    test code, review codes, submit code for review by others, and

5    it is a way for organizations, such as Mango Markets, to

6    publish their code to the public.

7    Q.   And is it something that's visible to anyone?

8    A.   Yes, ma'am.

9    Q.   In Mango Markets' case?

10   A.   Yes, ma'am.

11        MS. MARTABANO:  I'm going to have Mr. Smith bring up

12   exhibit 118A that's already offered in evidence in this case.

13   Please show it to Mr. Sheridan first.

14   Q.   Mr. Sheridan, please take a look at this.

15        MS. MARTABANO:  Mr. Smith, now please publish this to

16   the jury.  Thank you.

17   Q.   Just have a very simple question for you based on this

18   exhibit.  Lines 6 through 11, they show the title Releases

19   Blockworks Foundation/Mango-v3, then they have different web

20   addresses on the column C under URL search.  Do you see that?

21   A.   Yes, ma'am.

22   Q.   Can you tell me, do those link to the GitHub for Mango

23   Markets that you were just referring to?

24   A.   The ones in column C, rows 6, 7, and 8 appear to.

25        MS. MARTABANO:  Mr. Smith, you can take that down.

1  Q.  Mr. Sheridan, have you ever looked at the Mango Markets

2  risk calculator?

3  A.  Yes, ma'am.

4  Q.  What is that?

5  A.  So Mango Markets offered a tool for potential traders to

6  enter trading input into what they call a risk calculator to

7  see the outputs of what their trading activities would be,

8  given the certain parameters of and specific parameters of a

9  specific trade.

10       MS. MARTABANO:  I'm going to show you what's been

11  admitted and marked as 117A.  And you can publish that to the

12  jury, as well, Mr. Smith.

13  Q.  You'll see there, I believe in line 13, it says, risk

14  calculator–Mango Markets.  Is that the website in column C

15  where you would find the risk calculator for Mango Markets?

16  A.  Yes, ma'am.

17       MS. MARTABANO:  You can take that down, Mr. Smith.

18  Q.  You had mentioned you're the director of the team at FTI

19  for I believe blockchain and crypto investigations.  Can you

20  explain how it is that you work with your team.  I believe you

21  said six people focused in particular in preparing for a case

22  such as this?

23  A.  Yes, ma'am.  I will direct their operations strategy

24  activities related to the circumstances and facts of the case

25  in order to identify the factual information, the evidentiary

information related to blockchain activities.  The blockchain

has immutable and permanent data.  So our role is to find that

data and provide it to the entity requesting it.  In this case,

defense counsel.

Q.  What do you mean when you say "immutable data on the

blockchain"?

A.  It is cryptographically encoded into a blockchain or

database or ledger so that it is permanent in record.

Q.  So the blockchain itself can't be changed.  Is that what

you mean?

A.  That is correct.

Q.  Can a smart contract be changed?

A.  Yes, ma'am.

Q.  Before we get to that in full, I know we talked about you

being certified as a smart contract auditor.  Can you read

computer code personally?

A.  I could read it from a functional perspective.  I'm not a

programmer, I am not a developer.  So my role in reviewing

computer code is to understand its operations, but not its

technical functionality as it relates to programming language.

Q.  And how did you come to that understanding, how did you

learn to read computer code?

A.  Through training and practice in cases such as this.

Q.  About how many years ago did you start learning to read

computer code?

1   A.  It was approximately 12 months ago.

2   Q.  And you mentioned you can't write computer code and you're

3   not a coder?

4   A.  That is correct.

5   Q.  I'd like to talk to you now about how much you're being

6   paid to be here today.

7           Are you being paid for your testimony today?

8   A.  I am paid my salary by FTI.

9   Q.  Is it a flat salary?

10  A.  Yes, ma'am.

11  Q.  So do you get the same salary whether you bill one hour to

12  this case or 500 hours to this case?

13  A.  Yes, ma'am.

14  Q.  And the same salary regardless of the substance of your

15  testimony here today?

16  A.  Yes, ma'am.

17  Q.  Same salary regarding the outcome of your testimony today?

18  A.  Yes, ma'am.

19  Q.  Do you know how much FTI is billing the defense for your

20  time?

21  A.  $910 an hour.

22  Q.  Does FTI get paid more based on the substance of your

23  testimony?

24  A.  No, ma'am.

25  Q.  Does FTI or you get paid more based on the results in this

O4FCeis4                          Sheridan – Direct

1    case?

2    A.  No, ma'am.

3    Q.  I'd like to turn -- I believe you had some interaction with

4    Mr. Eisenberg.  Want to get into that a little bit.

5           Do you know Mr. Eisenberg personally?

6    A.  No, ma'am.

7    Q.  Have you ever spoken with him?

8    A.  Yes, ma'am.

9    Q.  When was the first time you spoke with him?

10   A.  Wednesday of last week.

11   Q.  And what did you discuss?

12          MR. BURNETT:  Objection.  Sidebar, your Honor.

13          THE COURT:  Yes, sidebar.

14          (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

O4FCeis4                      Sheridan - Direct

1              (At the sidebar)

2              THE COURT:  I literally asked the question whether you

3     were going to elicit any discussions with Mr. Eisenberg and the

4     response was that you were not.

5              MS. MARTABANO:  It's just because we thought the

6     government planned to question him further about it, so we were

7     just -- if they're not going to question him about it, we're

8     happy to walk away from it.

9              THE COURT:  I don't know how you could come away with

10    that impression of the conversation.  Literally, we're in the

11    process of having a *voir dire* where the purpose was if you were

12    going to rely on those discussions, then everyone would have a

13    chance to inquire what those were.

14             MS. MARTABANO:  No, he's not relying on them.  It was

15    just to relay what we recommend to the Court.

16             THE COURT:  So, thank you for clarifying.  You do not,

17    you should not, and you may not inquire at this stage into

18    those discussions, because it's my understanding that he is not

19    relying on his conversations.

20             MS. MARTABANO:  He's not.

21             THE COURT:  He should not be testifying about those

22    discussions.

23             Anything further?

24             MR. BURNETT:  No.

25             THE COURT:  Okay.

O4FCeis4                     Sheridan - Direct

```
 1              (In open court)
 2    BY MS. MARTABANO:
 3    Q.  Mr. Sheridan, I'd like to talk to you about some background
 4    on the blockchain in general.  You've heard a lot about it in
 5    this case.
 6              Do you know what Solana is?
 7    A.  Yes, ma'am.
 8    Q.  What is it?
 9    A.  It is a publicly available blockchain that is, as with all
10    blockchains, an immutable ledger to record transactions.
11    Q.  Again, what do you mean by immutable ledger?
12    A.  So, blockchain technology, by its essence, is based in
13    cryptography that cannot be altered once it is recorded to the
14    ledger.
15    Q.  And is Solana similar to Bitcoin or Ether?
16    A.  So it's similar to the Bitcoin and Ethereum blockchains in
17    that they are all blockchains.  It has different functionality,
18    capabilities, and requirements.  Most notably, it is touted to
19    be faster in processing speed and cheaper in terms of cost of
20    transactions that are conducted on the blockchain.
21    Q.  How is that able to be the case?
22    A.  The way the blockchain is constructed, Solana blockchain is
23    constructed, there are several functions of the blockchain
24    code.  Specifically, it conducts simultaneous smart contract
25    processing activities so that they occur in concert with each
```

O4FCeis4                          Sheridan - Direct

other as opposed to, for example, the Ethereum blockchain does
them sequentially.  It also has more redundant features built
into it so that the notes that validate the transactions, if
one were to fail, the others would operate without
interruption.  It breaks down information packets that are
processed on the blockchain into smaller quantity of data,
which, again, makes it faster.  It also has a -- there's
something called a mem pool or a memory pool in which, in other
blockchains, most notably Bitcoin, the transactions to be
validated wait in a pool for a validator to pick them up and
validate them.  The Solana blockchain does not have that
waiting time.  It sends the validations to validators ahead of
that waiting period.  And at its core, the consensus mechanism
for the Solana consensus is the way a transaction is validated
by all of those participating in the blockchain.  Bitcoin uses
a proof of work consensus mechanism.  Ethereum uses proof of
stake.  Solana uses a combination of proof of stake and proof
of history, and that proof of history allows the transactions
to move more quickly on the blockchain.
Q.  Okay.  I've got a few followup questions from that.

        You mentioned it has more redundant features, it
breaks down packets to smaller size.  I just want to make sure,
when you said "it" there, you were talking about the Solana
blockchain as opposed to any others?
A.  Yes.

1    Q.  And when you mentioned "validation in the consensus

2    mechanism," what do you mean by "validation" or "validating

3    transactions"?

4    A.  So, all blockchains are recording data to the ledger.  That

5    data has to be confirmed and validated.  Different blockchains

6    use different methodologies in order to confirm that data to

7    ensure that the data is accurate.  That, for example, in the

8    case of financial transactions involving cryptocurrency and

9    individual cryptocurrency, cryptographic hash representing that

10   cryptocurrency isn't spent twice.  So, a spend or a financial

11   transaction has to be confirmed in that validation process.

12   Q.  And you mentioned consensus mechanisms.  Could you just

13   give us a little more detail about what that means.

14   A.  So the blockchain is a distributed ledger, which means

15   there are many entities involved.  It's not one central entity,

16   it's not one person or entity that has control over the

17   blockchain and the validating the data, that is done by all

18   participants on the blockchain in an open and transparent way.

19   So, to achieve consensus or agreement about that particular

20   transaction requires different methods to do that.

21   Q.  Do you know when the Solana blockchain was launched,

22   approximately?

23   A.  It was 2020.

24   Q.  Is that newer or older than Bitcoin or Ethereum?

25   A.  It is newer.

1  Q.  If you know, when was Bitcoin launched?

2  A.  The white paper was 2009.

3  Q.  Do you have experience with blockchains or exchanges that

4  allow the trading of products called perpetuals?

5  A.  Yes, ma'am.

6  Q.  Tell me about that experience.

7  A.  As part of my investigative duties with FTI, we handle

8  cases to identify funds, track funds, trace funds, provide

9  valuation, determine attribution for individual account holders

10  and associated amounts, and tracking those funds, tracking

11  those cryptocurrency assets or digital assets, as well as

12  assigning attributions who hold those assets or transfer or

13  receive those funds requires analysis that moves into

14  decentralized exchanges that operate with perpetual options for

15  them to trade in.

16  Q.  What's a decentralized exchange?

17  A.  A decentralized exchange is one that has no central entity

18  controlling, approving, managing activities.

19  Q.  For the perpetuals, are those positions that, I think you

20  said, involved leverage?

21  A.  I did not say leverage, but leverage is an option in

22  several decentralized exchange trading platforms.

23  Q.  Can you explain what that means.

24  A.  Leverage is a way to amplify your position in a perpetual.

25  A position in a perpetual is risk exposure to an asset payer

O4FCeis4                         Sheridan - Direct

1    and the relative price movement of an underlying asset to its

2    partner asset.  So if you are going to leverage a trade, you

3    can increase how much profit you earn.  If that price movement

4    moves in the positive, but it also increases your risk and

5    increases the amount you can lose if the price movement goes in

6    the other direction against your position.

7    Q.  And can a smart contract decide what levels of leverage it

8    will allow to be used in its perpetuals?

9    A.  Yes, ma'am.

10   Q.  How does that happen?

11   A.  It is written into the smart contract code.

12   Q.  So it could, for example, say maximum 2 leverage as opposed

13   to maximum 3 times leverage?

14   A.  Yes, ma'am.

15   Q.  Is it possible to code a smart contract so that it limits

16   the maximum transaction size for any given transaction?

17   A.  Yes, ma'am.

18   Q.  And how would that work, if there was a transaction limit

19   of let's say $100 and I entered into the contract that I wanted

20   a perpetual for $200, what would happen?

21   A.  The transaction would not be executed by the code.

22   Q.  Do you know what Mango Markets is?

23   A.  Yes, ma'am.

24   Q.  Does it run on Solana?

25   A.  Yes, ma'am.

O4FCeis4                         Sheridan - Direct

1   Q.  What is Mango Markets, as you understand it?

2   A.  It is a decentralized exchange trading platform that

3   operates on the Solana blockchain.

4   Q.  And is it a smart contract or is it something else?

5   A.  It is a smart contract application that runs on top of the

6   Solana blockchain.

7   Q.  And in terms of blockchains, what does a smart contract do

8   or what does it mean?  What is it?

9   A.  It executes the instructions that you program into the

10  contract.

11  Q.  Can you give us a little more detail?

12  A.  So, in the example of Mango Markets, the smart contract is

13  designed to provide opportunities to swap cryptocurrencies,

14  borrow cryptocurrencies, lend cryptocurrencies, open positions

15  in a perpetual futures contract, and so forth.

16  Q.  Is it automated?

17  A.  Yes, ma'am, the smart contract is automated.

18  Q.  In what way?

19  A.  Smart contracts are base of instructions that execute those

20  instructions that are programmed into the smart contract and

21  there are no ways to alter that in a discretionary sense once

22  the inputs to the smart contract are entered.

23  Q.  Have you heard the term self-enforcing?

24  A.  Yes, ma'am.

25  Q.  What does that mean to you?

1    A.  So, as it relates to smart contracts, they are a

2    self-enforcing and autonomous computer program that deliver the

3    outputs of any input that is put into them based on the

4    requirements of the smart contract.

5    Q.  Is the Mango Markets smart contract publicly available?

6    A.  Yes, ma'am.

7    Q.  How can someone view it or access it publicly?

8    A.  That would be on the GitHub links that we discussed

9    earlier.

10   Q.  Can you tell me what "permission list" means?

11   A.  As it relates to cryptocurrency, "permission list" means

12   there are no requirements for use.  Anyone can use it as long

13   as they can access the individual protocol or blockchain that

14   is being accessed.

15   Q.  You mentioned that Mango Markets is a smart contract based

16   decentralized exchange.  Is a perpetual, as that term is used

17   on Mango Markets, its own smart contract?

18   A.  Yes, ma'am.

19   Q.  What does that mean?

20   A.  So that means the trade that is entered into, the position

21   that is entered into with the perpetual smart contract is

22   executed by the parameters of the smart contract code for the

23   protocol.

24   Q.  So there's the main protocol smart contract and then my

25   trade, in and of itself, is a separate executing smart

O4FCeis4                              Sheridan - Direct

1   contract?

2   A.   It can be considered that based on the cryptography

3   involved in creating the individual trade.

4   Q.   Is there a better way to describe it?  I'm not the expert.

5   A.   I would call it -- I would call it a contract that's based

6   on the smart contract code in the cryptographic hash of the

7   individual transaction.

8   Q.   And tell me if it's true or not.  So you have a perpetual,

9   each individual's position is sort of its own subcontract.  Can

10  the terms of those, as far as the smart contract code, be

11  changed?  If I wanted to set up two different perpetuals, would

12  the same contract code control, but my inputs would make it

13  have different outputs?

14          MR. BURNETT:  Objection.  Form.

15          THE COURT:  I think you need to rephrase.

16  Q.   I'm trying to drill down sort of the distinction between

17  the two smart contracts and whether a perpetual always has the

18  same base code --

19          MR. BURNETT:  Objection.  Testifying.

20  Q.   And I'm just going to ask you:  Does the perpetual for any

21  given person have the same underlying code?

22          THE COURT:  The objection, let's resolve that first.

23  The objection is sustained.

24          Why don't you ask a new question, Ms. Martabano.

25          MS. MARTABANO:  Yes, your Honor.

O4FCeis4                          Sheridan - Direct

1    Q.   How can you access the Mango Markets smart contracts?

2    A.   Through the user interface or through direct code into the

3    blockchain itself.

4    Q.   What is a user interface?

5    A.   Basically a website.

6    Q.   Can a user interface be part of the blockchain or is it

7    always centralized?

8    A.   The user interface is centralized, it's not part of the

9    blockchain, it's how you access the blockchain.

10   Q.   Did Mango Markets have its own user interface?

11   A.   Yes, ma'am.

12   Q.   To your knowledge, was the main user interface available to

13   the public?

14   A.   Yes, ma'am.

15   Q.   And in your experience in all the investigations that

16   you've done with cryptocurrency and blockchains, how do the

17   majority of users interact with blockchains, via the user

18   interface or the more technical way you mentioned earlier?

19   A.   By the user interface.

20   Q.   Getting back to Mango Markets, what's the difference

21   between a decentralized exchange, which I believe you described

22   it as, and a centralized exchange?

23   A.   A decentralized exchange does not have one central entity

24   that controls it.  It is run by the smart contracts that are

25   established for the protocol and the instructions put within

O4FCeis4                          Sheridan – Direct

```
 1   those smart contracts.  A centralized exchange has a central
 2   entity that controls everything related to the transactions
 3   that utilize that exchange.
 4   Q.  Would a centralized exchange have a more traditional
 5   corporate structure?
 6   A.  Yes.
 7            MR. BURNETT:  Objection.
 8            THE COURT:  Overruled.
 9   A.  Yes, ma'am.
10            THE COURT:  Mr. Sheridan, if there's an objection,
11   just stop and then we'll resolve the objection and you can
12   continue.
13            THE WITNESS:  Yes, sir.
14   Q.  And did Mango Markets have a central corporate entity
15   running its exchange?
16   A.  Yes, ma'am.
17   Q.  What was that?
18   A.  I'm sorry.  Can you repeat the question.  I was --
19   Q.  Sure.  You had mentioned a centralized exchange often has a
20   centralized entity running it.  Does Mango Markets, as a
21   decentralized exchange, have a corporate entity running it?
22   A.  I apologize.  No, it does not.
23   Q.  To your knowledge, does the Mango Markets protocol have a
24   CEO or a president?
25   A.  No, it does not.
```

O4FMEIS5                           Sheridan - Direct

1    Q.  And does it have brokers or branch agents that you could

2    meet with or interact with?

3    A.  No, it does not.

4    Q.  I'd like to talk to you about how someone sets up an

5    account on Mango Markets.  Would you explain how someone would

6    go about doing that?

7    A.  Yes, ma'am.  The most common way is through the user

8    interface, the Mango Markets website as we have described.  You

9    have to create an account profile through that website, you

10   have to connect a cryptocurrency wallet to that profile, and

11   you have to deposit a minimum amount of cryptocurrency assets

12   into the account.

13   Q.  You mention creating an account profile.  What kind of

14   information is collected for the account profile?

15   A.  Basically, a user name that the individual user creates.

16   Q.  Is there any description of what kind of name it has to be?

17   A.  No.

18   Q.  Does it have to be tied to your actual identity?

19   A.  No.

20   Q.  And is there any other information in that?  So there is a

21   user name, any other pieces of information?

22   A.  No, no.

23   Q.  I think that you mentioned that you have to deposit money

24   from your Solana wallet?

25   A.  Yes, ma'am.

1    Q.  What is a wallet on a Blockchain?

2    A.  So a wallet is where your cryptocurrency assets are located

3    on the Blockchain.  It consists, usually, of a public key and a

4    private key.  Your private key is what allows you to access

5    those funds or the location of those funds on the Blockchain.

6    Q.  When you connect that Solana wallet, is that the wallet

7    you're actually using or does another wallet get created?

8    A.  So that's the wallet you use to fund the account, but once

9    you fund the account, a separate account is created.

10   Q.  And what would you refer to that as, a Mango Markets

11   wallet?

12   A.  It's generally referred to as the Mango Markets account.

13   Q.  I know we said the account profile only has those two

14   pieces.  Based on your review of the publicly available data,

15   your research in this case, and the code as you understand it,

16   does Mango collect any other information when a person creates

17   that account?

18   A.  No, ma'am.

19   Q.  For the user interface does it collect any data that the

20   smart contract itself doesn't?  So if I were interacting with

21   the API versus the user interface, is there a difference in the

22   data that's collected?

23   A.  The user interface will collect and identify IP address to

24   identify the location of or the geolocation of where the

25   individual is accessing the interface from.  But absent that,

O4FMEIS5                         Sheridan - Direct

1    there is no other information.

2    Q.  Directing you to version 3 of the protocol and of the

3    interface that would have interacted with that, did that

4    collect the IP information as well?

5    A.  Yes, ma'am.

6    Q.  Do you know what geoblocking is?

7    A.  Yes, ma'am.

8    Q.  What is it?

9    A.  It is a way in which a website or access point can prevent

10   access based on the geographic location of where the IP address

11   is registered.

12   Q.  Do you know whether Mango's user interface for version 3

13   had geoblocking in place?

14   A.  It did.

15   Q.  How do you know that?

16   A.  Based on research of materials and information in

17   experimenting with the Mango Markets website.

18   Q.  I think you already said this, but does the smart contract

19   collect your IP data if you interact with it directly on the

20   API?

21   A.  It does not.

22   Q.  Returning to account creation, does a person creating an

23   account have to speak to anyone?

24   A.  No.

25   Q.  Do they have to sign any documents?

O4FMEIS5                        Sheridan - Direct

1    A.  No.

2    Q.  In terms of the user interface that we were just talking

3    about, based on your understanding of smart contracts and your

4    experience with them and Blockchains in general, is it

5    possible, as I think you described here, that a user interface

6    may collect more data from a user than the smart contract

7    itself if you went through the API?

8    A.  That is possible.

9    Q.  And here you mentioned that the Mango UI collects IP data,

10   which the smart contract doesn't?

11   A.  That is correct.

12   Q.  Does the Mango UI collect any other data that the smart

13   contract doesn't?

14   A.  No, ma'am.

15   Q.  Last one on what it collects.  Do you know whether it

16   requires you to sign any kind of loan document or documentation

17   about what you are going to be doing with your money once

18   you've -- once you create your account and deposit it on the

19   protocol?

20           MR. BURNETT:  Objection.

21           THE COURT:  Overruled.

22   A.  It does not.

23   Q.  When was Mango Markets launched?

24   A.  Version 1 was launched in February of 2021.

25   Q.  And how many versions have there been total?

O4FMEIS5                           Sheridan - Direct

1  A.  It is currently on version 4.

2  Q.  We have been talking about version 3 for the transactions

3  in this case.  Are you familiar with that version?

4  A.  Yes, ma'am.

5  Q.  How are you familiar with it?

6  A.  That was the focus of our investigation.

7  Q.  We had talked earlier about how Blockchains were immutable,

8  and you just mentioned that these smart contracts have multiple

9  versions.  Can you explain the difference between a Blockchain

10 and a smart contract and how you can have versions of the smart

11 contact?

12 A.  The Blockchains are the instructions for the application or

13 for the activities that are run on top of the Blockchain.  The

14 Blockchain is the ledger that records the data.  The smart

15 contracts are the instructions that provide the data to be

16 recorded.

17         So the different versions -- version 1 was offered

18 basic functions, borrowing and lending of a certain quantity of

19 cryptocurrency tokens.  Version 2 also had borrowing and

20 lending functions, but a higher number of cryptocurrency

21 tokens.  Version 3 introduced more advanced trading

22 opportunities, such as perpetual contracts and leverage.

23 Q.  How are these changes to the code made?  How do you get

24 from version 1 to version 2?

25 A.  In the case of Mango Markets, there is a decentralized

O4FMEIS5                        Sheridan - Direct

1    autonomous organization, a DAO, and that DAO is the collection

2    of all users on the Mango Markets protocol, and users can

3    propose changes to the smart contract for different functions

4    or different activities, and vote on those proposed changes.

5    If those proposed changes are accepted and approved, then they

6    are implemented.

7    Q.   And you mentioned all the users.  Do you need to have any

8    kind of token or register or do anything to vote in the DAO?

9    A.   Yes.  Your voting weight, how much vote your vote is given

10   credit is based on the number of tokens you hold and present as

11   part of that vote.

12   Q.   Is that Mango tokens specifically or any --

13   A.   Making Mango tokens.

14   Q.   Do you know how Mango tokens came into existence?

15   A.   As part of prior to version 3 launch, there was a token

16   offering in order to raise funds for the DAO in which these

17   tokens were created by the Mango Markets entity and sold on the

18   open market.

19   Q.   So there was an entity at some point, but now it's

20   controlled by a DAO?

21   A.   Yeah.  The entity that -- someone has to write the smart

22   contracts.  Blockworks was the organization behind creating the

23   Mango Markets protocol and established it in terms of its

24   foundation.  In terms of its operations and running, it's

25   controlled by the DAO.  But Blockworks created the Mango

O4FMEIS5                          Sheridan - Direct

1    Markets token and issued it for sale.

2    Q.  I want to focus your testimony going forward on version 3,

3    unless I say otherwise.

4            When was version 3 launched?

5    A.  In August of 2021.

6    Q.  When, if ever, was version 4 launched to replace it?

7    A.  That would have been March of 2023.

8    Q.  Is version 3 still visible or accessible?

9    A.  Yes, ma'am.

10   Q.  How and in what capacity?

11   A.  You can still access version 3 through the same user

12   interface and operate its functionality with the exception of

13   actually executing on any type of trading activity.

14   Q.  So you can still access sort of the user interface for

15   Mango version 3?

16   A.  Yes, ma'am.

17   Q.  I believe we already talked about it, but the code base is

18   deposited in that GitHub link that we showed earlier on, I

19   think, Exhibit 118A?

20   A.  Yes, ma'am.

21   Q.  What did you do to look at the version 3?  I know you said

22   you opened up the user interface.  You mentioned that you

23   reviewed the code.  Is there anything else you did in reviewing

24   Mango Markets version 3 and learning to understand how it

25   worked?

1    A.  We put parameters into the risk calculator that is offered

2    on version 3, which is a tool in order to analyze trading

3    parameters based on certain inputs.  So we put that

4    information -- we put information into the risk calculator to

5    see how those trades would perform in terms of returns of

6    profits or losses.

7    Q.  Do you remember what the main URL was for the Mango version

8    3?

9    A.  I don't want to quote it because I don't remember exactly

10   what the URL was.  If you show it to me, it was on the Mango

11   Markets.com, and then some reference to the risk calculator

12   itself.

13   Q.  Sorry.  Not for the risk calculator, but for accessing the

14   user interface to trade.

15   A.  For Mango Markets version 3?

16   Q.  Yes.

17   A.  You can just go to -- at the time or now?

18   Q.  At the time.

19   A.  It's just Mango Markets.com and then access through there.

20   Q.  Is the link different now?

21   A.  The link is different now.

22   Q.  I would like to show you what has already been marked and

23   admitted into evidence as GX-1010.

24          MS. MARTABANO:  Mr. Smith, if you can publish that to

25   the jury as well.

1   Q.  Very quickly, Mr. Sheridan, do you see Exhibit 1010?

2   A.  Yes, ma'am.

3   Q.  What is it?

4   A.  This is the splash page that a user will receive when

5   accessing version 3 and prior to conducting trading activities.

6   Q.  What's a splash page?

7   A.  It's something that comes up without user request.  It can

8   happen any time on a website.  In this case it happens upon

9   access.

10  Q.  And you'll see on here it says:  The V3 protocol is in

11  public beta.  This is unaudited software.  Use it at your own

12  risk.  Then it has a check box next to:  I understand and

13  accept the risks.  Get started.

14          In your experience, on the website, do you have to

15  check that check box in order to access the main website?

16  A.  Yes, ma'am.

17  Q.  Turning to GX-1011 --

18          MS. MARTABANO:  Mr. Smith, just show it to Mr.

19  Sheridan at this point in time.  This has already been admitted

20  into evidence.

21  Q.  This is a long document.  Do you recognize it, or would you

22  like to flip through some of the pages?

23  A.  I recognize the document from a previous demonstration of

24  this document from previous witnesses, at least the cover page.

25  I am assuming the rest of it is the same.

O4FMEIS5                        Sheridan - Direct

Q.  Did you review a version of this document without the

government exhibit Bates stamp on it in preparing to testify in

this case?

A.  Yes, ma'am.

        MS. MARTABANO:  I'd like to direct you to page 100 of

the PDF, Mr. Smith, which bears a Bates label ending 18460, the

risk calculator.

Q.  Can you take a look at that and let me know what exactly is

the risk calculator.  I know you described earlier, it let's

you play around with the protocol.  But can you give us a

little bit more in-depth explanation of what the risk

calculator allows and specifically what parameters you can play

with.

A.  So, based on our experimentation with it, it will allow any

inputs related to a trade and it is intended to show you what

the consequences, either positive or negative, will be for

those trading inputs.

        So you can put in -- in the case of perpetuals, like

we are talking in this case, you can put in your investment,

you can put in your leverage, you can put in all sorts of

different circumstances surrounding that trading activity and

see what the results of that trading activity will be based on

price movement of the underlying price for those two assets

that you are putting into the perpetual contract.

Q.  Thank you.

1          MS. MARTABANO:  Mr. Smith, you can publish this to the

2     jury.

3     Q.  I believe that you said that you played around on the risk

4     calculator directly and others on your team did it.

5          Were they doing it at your direction?

6     A.  Yes, ma'am.

7     Q.  I think you just said that it works for perpetuals too.  So

8     if you were looking into pricing a perpetual and seeing what

9     the impacts would be, you could enter that through the risk

10    calculator?

11    A.  Yes, ma'am.

12    Q.  You mentioned that you guys actually did simulate some

13    different scenarios.  Can you tell us what scenarios you

14    simulated?

15    A.  We simulated the trading activity that was conducted by

16    Mr. Eisenberg.

17    Q.  What was the output at the time you did it?

18    A.  The output reflected using the inputs that played out.  The

19    output was reflected as -- in his long position, for example,

20    when we moved the price of the Mango token up, the long

21    position moved into a positive balance and received profits.

22    For the short position, when we moved the price of the Mango

23    token down, the profits for the short position similarly moved

24    up.  Same thing for the inverse.  If we showed for the long

25    position, if the price of the Mango token -- all of these

1    prices are relative to USDC.  If we showed the price of the

2    Mango token relative to USDC to go down, the long position

3    became lost funds or was in a lost state.  And for the short

4    position, if the price of the Mango token relative to USDC went

5    up, the short position, similarly, lost assets and became in a

6    lost state.

7    Q.  I know you mentioned that you did the same parameters that

8    were used as the trades in this case.  Did you also get to the

9    same large amount of profit or accrued funds in the loan?

10              MR. BURNETT:  Objection.

11              THE COURT:  Can you rephrase.

12              MS. MARTABANO:  Sure.

13   Q.  When you entered in the same numbers, what was the amount,

14   if you remember, of your account balance on the long when you

15   entered in the prices that were at issue in the case?

16              MR. BURNETT:  Objection.  There are lots of prices in

17   the case.  Just framing.

18   Q.  The maximum price of Mango --

19   A.  For example, with the long position, we entered into the

20   Mango price relative to USDC at .0382 cents.  We put in a

21   deposit of 5 million USDC.  We put in leverage of 3.7 as a

22   leverage.  We then moved the price of Mango relative to USDC

23   to, I believe it was 54 cents and 91 cents to see how that

24   position would react.

25   Q.  And how did it react?

1    A.  It went significantly positive.  I don't know if we reached

2    exactly the 488 million results that were demonstrated in the

3    actual trading activity, but we saw that the perpetual became

4    significantly what's referred to as in the money and

5    profitable.

6    Q.  And did you get any kind of warning that it would have a

7    broader impact on the protocol?

8    A.  No, ma'am.

9    Q.  Did you simulate this with the short too?

10   A.  Yes, ma'am.

11   Q.  Did it ultimately tell you that you were going to be

12   liquidated if you entered into that trade?

13   A.  No, ma'am.

14   Q.  What was the outcome?

15   A.  So for the short trade, in the positive, we moved the Mango

16   price to .02 cents, which was what was reflected in the actual

17   trading activity.  And, similarly, we received positive and

18   in-the-money return of assets.  We moved it into the negative

19   on the short position by making the Mango -- price of the Mango

20   token those same positive amounts, 54 cents, 91 cents, and the

21   short position was then below the health value and

22   significantly in a lost status.

23   Q.  Was there any warning other than you could see it was below

24   the health value?

25   A.  No, ma'am.  The health of the account turns red, and you

O4FMEIS5                          Sheridan – Direct

1  see that the account is not healthy.  That's the warning we

2  receive.

3  Q.  What do you understand the health ratio to be in Mango

4  Markets?

5  A.  The health ratio is the ratio of your collateral, so the

6  ratio between your deposits and positions divided by your

7  liabilities.

8  Q.  For Mr. Eisenberg's trades, what collateral did he have?

9  A.  His initial deposit of 5 million USDC in his long and just

10  shy of 5 million in his short.

11  Q.  He didn't have any other assets deposited in those accounts

12  sitting on the protocol?

13  A.  No, ma'am.

14  Q.  And I know we talked earlier about opening up an account.

15  Were the long and the short position created by Mr. Eisenberg

16  in the same account or were they in separate accounts?

17  A.  Separate accounts.

18  Q.  If they were in the same accounts and one of them went

19  below the health ratio, could the protocol take from the other

20  account, from the other position?

21  A.  If they were in the same account, yes.

22  Q.  Being in separate accounts, is that possible?

23  A.  No.

24  Q.  When your health ratio goes below the stated requirement,

25  what happens in Mango Markets protocol?

O4FMEIS5                        Sheridan - Direct

1    A.  The first thing that happens is that your account goes into

2    a liquidation status.

3    Q.  What does that mean?

4    A.  That means your account can be taken over by anyone willing

5    to liquidate it.

6    Q.  Do you know what those people are called?

7    A.  Liquidators or liquors.

8    Q.  Can that be anybody?

9    A.  Yes, ma'am.

10   Q.  When you become eligible for liquidation, is there anybody

11   you can seek clemency from?

12              MR. BURNETT:  Objection.

13              THE COURT:  Can you rephrase.

14              MS. MARTABANO:  Sure.

15   Q.  If you go into a negative health ratio and you're facing

16   liquidation, is there a person at Mango Market you can go to

17   and say, stop, wait, I am going to pay you back?

18              MR. BURNETT:  Objection.

19              THE COURT:  It's overruled.

20   A.  No, ma'am.

21   Q.  Is there any way for you to reach out to the liquidator who

22   is actually doing the liquidating to ask them to stop?

23   A.  No, ma'am.

24   Q.  Are you aware of any ways to stop a liquidation on an

25   account?

1    A.   There is only one way.

2    Q.   And what way is that?

3    A.   To add more assets into the account to raise the health

4    status of your account.

5    Q.   If an account is showing losses and it's liquidated, what

6    happens when the whole thing is liquidated if there are still

7    losses showing?

8    A.   The account will go into a bankruptcy state.

9    Q.   And what does that mean?

10   A.   It means there are no more assets contained within the

11   account to take by a liquidator.

12   Q.   What will happen on the protocol when that happens?

13   A.   An insurance fund established by the DAO will be used to

14   make the account -- make the account whole by issuing funds

15   from an insurance fund.

16   Q.   Do you remember, during this time period, the size of the

17   insurance fund of the DAO?

18   A.   $5 million.

19   Q.   5 million?

20   A.   Yes, ma'am.

21   Q.   I am going to direct you to page 111 of this document.

22   Should be Bates label ending 18470.  You can take a look at

23   that, Mr. Sheridan.

24        Does that refresh your recollection about what the DAO

25   insurance fund was valued at?

1    A.  Yes.  So throughout this document there are -- there were

2    pieces of information that, in my opinion, contradict or at

3    least appear in contradiction.  The insurance fund is one of

4    them.  Earlier in the document it's referenced -- if it's not

5    in the document, it's in the website, but it's referenced that

6    the insurance fund is $5 million.  So that would be an

7    automatic payment conducted by the protocol itself.  The $70

8    million treasury is the entire inventory of available funds for

9    the DAO for all purposes.  That could be used for insurance

10   payouts if a DAO vote is put forward to use those funds for

11   that purpose.

12   Q.  Do you know what happens if somehow the insurance fund gets

13   emptied on a transaction?  What happens next?

14   A.  The next step is what's called socialized losses.

15   Q.  And what is that?

16   A.  Socialized losses is a mechanism wherein all users of the

17   exchange who have assets on the exchange will be required to

18   repay the losses in equal amounts, and the protocol will take

19   their funds to repay those losses.

20           MS. MARTABANO:  Mr. Smith, if we could go forward one

21   page.

22   Q.  Is that what's reflected and disclosed here in this user

23   document?

24   A.  Yes, ma'am.

25           MS. MARTABANO:  Turning to yet the next page, 113,

1      Mr. Smith.

2      Q.  Top of this page says settle PnL.

3           What is settle PnL?

4      A.  Settle PnL is a way to withdraw profits or have losses

5      withdrawn from the account.  It's most often used in a profit

6      scenario where a user will settle their PnL to withdraw their

7      profit from a specific account.

8      Q.  Do you know what PnL stands for?

9      A.  Profit and loss.

10     Q.  It says here when you settle the PnL it moves the profit or

11     loss.  So you could settle even a negative balance?

12     A.  Yes, in theory.

13     Q.  Then it moves it into the USDC token balance, is that

14     right?

15     A.  Yes.

16     Q.  Were all trades on Mango Markets settled in USDC?

17     A.  All trades have USDC as their base token -- as their base

18     token, so profits are settled in USDC as the base token.

19          MS. MARTABANO:  Mr. Smith, if you could take us to

20     page 133.  It bears the Bates label 18493.

21     Q.  Digging in a little bit further on this PnL idea, it says:

22     What is my unsettled PnL.

23          Can you explain to me and the jury what an unsettled

24     PnL would be.

25     A.  Unsettled PnL is an account that is in a profit status that

1    has earned profit that has not withdrawn the profit from the

2    protocol.

3    Q.  I have a question for you about the broader functioning of

4    withdrawals on the protocol.

5            If I were to engage in a transaction and that

6    transaction got me such a big profit that if I settled it and

7    withdrew it, I would take all the liquidity out of the

8    protocol, what would happen if I tried to settle it if it was

9    just the exact amount of liquidity that was available in the

10   protocol.  Would I be able to take it out?

11           MR. BURNETT:  Objection, form, foundation.

12           THE COURT:  It's overruled.

13   A.  If you were trying to take your profit that exactly matches

14   the liquidity on the protocol?

15   Q.  Yes.

16   A.  Yes, you could take that out.

17   Q.  And if, while I was trying to do that, someone else tried

18   to take out just one USDC such that the protocol would not

19   have -- would be negative liquidity, would I be able to finish

20   my transaction?

21   A.  No.

22   Q.  Why not?

23   A.  Because your transaction exceeds the amount of liquidity

24   available left in the protocol.

25   Q.  Is it possible for me to settle my transaction and only

1  take out a part of it?

2  A.  Settle your profit and loss and only take out part?

3  Q.  Yes.

4  A.  Based on our analysis, yes.

5         MS. MARTABANO:  I'd like to turn now to page 125 of

6  the PDF.  Should be the Bates label ending 18485.

7  Q.  You see this is the FAQs.  What are FAQs?

8  A.  Frequently asked questions.

9         MS. MARTABANO:  Turning to the next page, Mr. Smith.

10 Q.  You'll see a FAQ that says:  Is Mango Markets code audited?

11 This says that it has been informally reviewed.  Is that

12 audited?

13 A.  Is informally reviewed audited?

14 Q.  Yes.

15 A.  I wouldn't consider that a formal audit.  It's a review.

16 Q.  Can you tell me what a white hat hacker team is?

17 A.  It's someone who is looking for errors in the code, bugs in

18 the code that would create vulnerabilities in a particular

19 protocol.

20 Q.  This FAQ asks about Mango Markets' code being audited.

21        MS. MARTABANO:  Mr. Smith, if you could turn to page 3

22 of this document.

23 Q.  What is this referencing, if you know?

24 A.  This is a reference to a more formal audit by a designated

25 audit company, Neodyme.

1    Q.  What kind of audit is it, if you know?

2    A.  This was a specific code audit to review the Mango Markets

3    smart contracts for errors in their code.

4    Q.  Can you tell us what a code audit is.

5    A.  Code is a set of computer instructions designed to carry

6    out a specific function.  If that code is improperly written,

7    it can create errors.  Or if there are elements of that code

8    that create vulnerabilities to the protocol itself or assets

9    controlled by the protocol, a code audit is intended to

10   identify those and recommend corrections for those.

11   Q.  So in simpler terms, does a code audit review it and say

12   the code is functioning as programmed?

13              MR. BURNETT:  Objection.

14              THE COURT:  Sustained.

15   Q.  What are the kind of problems that a code audit could

16   identify?

17   A.  Any type of functional error.  So you put an input in and

18   the code doesn't understand it, so it can't execute it.  Also,

19   any type of gaps in the code that would allow someone

20   unauthorized access or allow someone to access another person's

21   funds or artificially inflate their own account.  It's meant to

22   review if the code -- for lack of a better explanation, it's

23   meant to review, does the code work as designed.

24   Q.  Is it the same thing as a financial audit?

25   A.  I would not call it a financial audit.

1    Q.  Or a tax audit?

2    A.  No, ma'am.

3    Q.  It's not about the controls at a company or at a protocol?

4    A.  No, ma'am.

5    Q.  It's just limited strictly to the code?

6    A.  That's all they look at is the code.

7    Q.  Is it possible that a protocol could have other issues that

8    aren't identified by a code audit?

9    A.  Yes.

10   Q.  Generally speaking, what kinds of issues would those be, if

11   you could give us some examples?

12   A.  Those would be factors that influenced the protocol that

13   aren't contained within the code, but perhaps the code relies

14   on for information.  In trading protocols, that's most commonly

15   a pricing input, such as in oracle or other type of feed into

16   the code that the code itself does not control.

17   Q.  Mr. Sheridan, did you review the Mango Markets audit that's

18   linked here in this document?

19   A.  Yes, ma'am.

20          MS. MARTABANO:  Mr. Smith, if you could take this down

21   and take the screen away from the jury and show just Mr.

22   Sheridan Defendant's Exhibit DX-60.

23   Q.  Mr. Sheridan, we are showing you what has been marked for

24   identification by the defense as DX-60.  Please take a look at

25   this and let me know if you need Mr. Smith to advance it

O4FMEIS5                          Sheridan - Direct

1    several pages so you can get a better read.

2    A.  Can you advance it, please.

3            Next page.

4            This appears from the first three pages to be the same

5    document I reviewed in preparation for testimony.

6    Q.  So you recognize this document?

7    A.  Yes, ma'am.

8    Q.  And what is it?

9    A.  This is the results of the Neodyme audit conducted on Mango

10   Markets.

11   Q.  How do you know that?

12   A.  Because I reviewed this information in preparation for

13   testimony, and the contents of this document explain their code

14   review.

15   Q.  You believe that DX-60, as you reviewed it, is a true and

16   correct copy of the Neodyme audit referenced in GX-1011 that we

17   were just looking at?

18   A.  Yes, ma'am.

19           MS. MARTABANO:  Your Honor, I move to admit DX-60 into

20   evidence.

21           MR. BURNETT:  No objection.

22           THE COURT:  It will be admitted.

23           (Defendant's Exhibit 60 received in evidence)

24           MS. MARTABANO:  May I publish it to the jury, your

25   Honor?

O4FMEIS5                          Sheridan - Direct

 1              THE COURT:  You may.

 2              MS. MARTABANO:  Please publish it, Mr. Smith.

 3   Q.  I would like to turn to you page 3 of the document.

 4              Can you take a moment to review the introduction.

 5   This suggests that there was an audit -- how would you

 6   characterize this introduction to this report?

 7   A.  As a summary of their findings for the audit conducted

 8   between January and April of 2022.

 9   Q.  And it was of the Mango version 3, so the version we have

10   been talking about all day?

11   A.  Yes, ma'am.

12              MS. MARTABANO:  Mr. Smith, you can take that down.

13   Q.  We had talked about liquidation earlier.  If I only put $10

14   million into the platform, but I have a short that's 100

15   million under water, how much money can the protocol take from

16   me?

17   A.  $10 million.

18   Q.  It can't collect anything else from my account?

19   A.  No, ma'am.

20   Q.  Is there a collections process built into the code?

21   A.  Through liquidation.  The other -- any positive assets you

22   have on your code will be removed from your account.  Excuse

23   me.  Any positive assets you have within the protocol will be

24   removed from your account.

25   Q.  Just within that one account.  So if I had separate

1    accounts, it would just be from that one account?

2    A.  Yes, ma'am.

3    Q.  I'd like to turn you now to Mr. Eisenberg's trades, the

4    reason why we are all here, specifically about the perpetual

5    contracts he purchased.  We have talked about the long and the

6    short.  There has been other evidence offered in this case

7    which you have observed?

8         MR. BURNETT:  Objection.

9    Q.  Given how you have explained liquidation, what would happen

10   to the money in Mr. Eisenberg's accounts if his health scores

11   fell below zero?

12   A.  They would start to be liquidated.

13   Q.  And is that automatic?

14   A.  Yes, ma'am.

15   Q.  And I believe we have covered this, but based on your

16   review, is there a way in the code he could stop it other than

17   putting more assets in?

18   A.  That's the only way to stop liquidation.

19   Q.  I believe you mentioned before his 488.3 million perpetual

20   contracts.  Have you done Blockchain analytics to determine

21   whether he ever closed his perpetual positions?

22   A.  Yes, ma'am.

23   Q.  And what was the result of that?  Were they ever closed?

24   A.  No, ma'am.

25   Q.  Were they settled?

1    A.  No, ma'am.

2    Q.  How do you know that they were never closed?

3    A.  You can still access the protocol today and see those

4    accounts.

5    Q.  As you understand it, based on your research into his

6    transactions and your analytics of Mango Markets and the

7    Blockchain, would Mr. Eisenberg's long and short positions have

8    mirrored one another and completely offset each other in terms

9    of profit and loss?

10   A.  Not in complete synchronicity.

11   Q.  Why not?

12   A.  Because each individual count had liquidations that

13   occurred to it independent of the other.

14          MR. BURNETT:  Objection, your Honor.  Sidebar.

15          THE COURT:  All right.  Brief sidebar.

16          (Continued on next page)

17

18

19

20

21

22

23

24

25

O4FMEIS5                          Sheridan - Direct

1           (At sidebar)

2           MR. BURNETT:  Your Honor, we literally just had a

3   conference where you excluded testimony about what the

4   liquidations were in his account because his background and his

5   knowledge of that comes from the whiskeyfries document.  Our

6   understanding was the whiskeyfries document is not coming in,

7   and he is not allowed to testify about the facts he learned

8   from that because it's not authentic and hearsay.  He seems to

9   be doing exactly that.

10          THE COURT:  I thought this was a different point.

11          MS. MARTABANO:  It is a different point.  He is not

12  going to be getting into the details of that data.  That was

13  the end of it.  He is just testifying to the fact that they are

14  not a straight-line analysis that there are liquidations.  As

15  the Mango Markets code works, both liquidations and funding

16  payments are transferred between positions.

17          MR. BURNETT:  Your Honor, I would ask for a readback

18  because what he testified to were that there were liquidations

19  that weren't synchronous between the two, which is factual

20  testimony about theoretical testimony.  His basis for that

21  comes from only that whiskeyfries document.

22          MS. MARTABANO:  I'm happy to clarify or have it

23  stricken and clarify it on the record.  That's not what I

24  heard, but I'm happy to --

25          THE COURT:  I think he said that the liquidations were

O4FMEIS5                          Sheridan - Direct

1    not symmetrical between the two positions, and for that reason

2    they were not in perfect synchronicity, I think is the term

3    that he used.

4              And is the basis for that the whiskeyfries document?

5              MS. MARTABANO:  No.  It is based on his understanding.

6    I was asking him -- I don't know what his basis was, if that is

7    his precise answer.  I was asking him, based on how it works,

8    positions that appear to be offsetting will have liquidation

9    payments.  It doesn't even have to be specific to

10   Mr. Eisenberg.

11             THE COURT:  Are you asking further questions along

12   this line?

13             MS. MARTABANO:  No.  I just want that point.

14             THE COURT:  If that's your only question, I am going

15   to overrule the question and move on.

16             (Continued on next page)

17

18

19

20

21

22

23

24

25

1           (In open court)

2    Q.  Just one point of clarification, Mr. Sheridan, about an

3    earlier question.  You said he had never -- I believe you had

4    said he had never settled or closed the perpetuals, is that

5    correct, or were you talking about something else?

6           I'm not talking about settling a position, but just

7    closing out or selling off the perpetual positions that he had.

8    A.  He did not sell off his perpetual positions.

9    Q.  After Mr. Eisenberg opened the positions, what happened

10   next?

11   A.  After he opened the positions on Mango Markets, the account

12   values began to change based on changes in prices in the Mango

13   token.

14   Q.  And did there come a time at which Mr. Eisenberg removed

15   funds from the platform?

16   A.  Yes, ma'am.

17   Q.  Do you know how much he removed?

18   A.  Approximately $116 million.

19   Q.  And are you familiar with the sort of order of his

20   removals?

21   A.  Yes, ma'am.

22   Q.  And what was the first amount that he removed from the

23   platform?

24   A.  What we identified as a settlement of profit and loss of

25   $50 million.

O4FMEIS5                          Sheridan - Direct

1  Q.  And were you involved directly in doing that Blockchain

2  analytics and identifying the settlement that you just

3  referenced?

4  A.  Yes, ma'am.

5  Q.  What was that $50 million in, if I misheard you?

6  A.  USDC.

7  Q.  How long after the settlement was the withdrawal, if you

8  know?

9  A.  Approximately 17 seconds.

10  Q.  I think you said that Mr. Eisenberg withdrew around 110 or

11  $116 million.

12          When that was done, what happened to the protocol?

13  A.  The protocol at the time of removing the $116 million was

14  liquidating his long and short positions and attempting to

15  recover liquidity to cover the losses associated with the

16  amount.  His accounts collectively were in negative balance.

17  Q.  Did the protocol ever freeze at a given point because of

18  the liquidity that had been removed?

19  A.  The protocol was paused at a certain point.

20  Q.  And what is a pause?

21  A.  In this case it was a determination by the DAO -- excuse

22  me.  Not by the DAO; by the management team, the security

23  protocol team of Mango Markets to pause the protocol.

24  Q.  Who is the security team that you just referenced?

25  A.  It's the developers, the coders, the elements of Mango

1  Markets who create the protocol and administer functions on the

2  protocol.

3  Q.  Do you know how they did that, whether they had to write

4  code or take a vote or do anything like that?

5  A.  In order to pause the protocol, there was no vote.  It was

6  a decision not voted on by the DAO.  In terms of how

7  specifically that's done, I don't have that answer.

8  Q.  You mentioned that it was the Mango security council?

9  A.  Yes.  There are several terms, as I stated earlier, within

10 the Mango Markets documents.  There are different functional

11 elements within Mango Markets whose roles are not entirely

12 outlined.  So there is an upgrade council, there is a security

13 council, there is support team members.  Which one of those

14 specifically paused the protocol, I can't testify to.

15 Q.  Are you able to say whether Mr. Eisenberg was involved in

16 pausing the protocol?

17 A.  Mr. Eisenberg was not involved in pausing the protocol.  It

18 would have to be someone with designated rights by the protocol

19 to do such an action.

20 Q.  Do you know approximately what time that pause of the

21 protocol happened?

22 A.  I don't have the time off the top of my head.

23 Q.  After the trades and after the pause, what happened next on

24 the Mango Markets protocol?

25 A.  As it relates to this case?

O4FMEIS5                          Sheridan - Direct

1    Q.  Yes.

2    A.  There were proposals presented to repay the debt still

3    outstanding.

4    Q.  I'd like to show you and only the witness, Mr. Smith, an

5    exhibit that's already been offered and admitted as GX-1003.

6           Do you recognize this proposal, Mr. Sheridan?

7    A.  Yes, ma'am.

8    Q.  What is it?

9    A.  This was a proposal called repay bad debt which was

10   submitted to the DAO.

11          MS. MARTABANO:  Mr. Smith, if you could publish it to

12   the jury.

13   Q.  What is this proposal proposing?

14   A.  This proposal was to send Marinated SOL, SOL, and MNGO in

15   this account to an address announced by the Mango team.  It's a

16   request for approval for the Mango treasury to cover remaining

17   bad debt and bad debt to be viewed as a bug bounty or insurance

18   paid out of the Mango insurance fund.

19   Q.  I think you might have skipped over.  Does it also say that

20   all users without bad debt should be made whole?

21   A.  I'm sorry.  Did you want me to read this verbatim?

22   Q.  I just wanted to capture all the parts of the proposal.

23   A.  I apologize.  Yes.  And it proposed to make all users

24   without bad debt to be made whole.  As I stated, any remaining

25   bad debt will be viewed as a bug bounty and insurance that will

1    be paid out of the Mango insurance fund.  It continues to

2    state:  By voting for the proposal, token holders will agree to

3    pay for the bounty and pay off the bad debt with the treasury

4    and waive potential claims against accounts about bad debt and

5    not pursue any criminal investigations or freezing of funds

6    once the tokens are sent back.

7    Q.  In the course of your investigation and preparation in this

8    case, were you able to determine what time this proposal was

9    made?

10   A.  Yes.  It's in the -- I don't recognize it on this exhibit.

11   I know repay bad debt 2 has a time stamp.

12   Q.  Do you remember directing your team to identify the time of

13   the proposal?

14   A.  Yes, ma'am.

15   Q.  And were you able to do that with them?

16   A.  Yes, ma'am.

17   Q.  Do you remember what that time was?

18   A.  I don't off the top of my head.

19   Q.  If I have a document, could I refresh your recollection or

20   try to?

21   A.  Yes, ma'am.

22            MS. MARTABANO:  Mr. Smith, please remove this from the

23   screen and please remove the jury's access to the screen.

24            Please put up DX-64 and show it only to Mr. Sheridan.

25   Q.  Mr. Sheridan, why don't you take a look at that and let me

1   know if you can confirm what time that first proposal was made

2   and date, if you could.

3   A.  October 11 at 9:13, as listed on this sheet.

4   Q.  Is this Eastern time?

5   A.  Yes.

6          MS. MARTABANO:  You can remove that, Mr. Smith.

7   Q.  Going back to repay bad debt that we were just talking

8   about, Exhibit 1003, do you know whether that proposal was

9   approved?

10  A.  That proposal was not approved.

11  Q.  Was there a subsequent proposal?

12  A.  Yes, ma'am.  Repay bad debt 2.

13         MS. MARTABANO:  Mr. Smith, if you could show to Mr.

14  Sheridan and the jury what has already been marked and admitted

15  as GX-901.

16  Q.  Mr. Sheridan, what does this proposal reflect?

17  A.  This proposal is a second proposal that similarly lays out

18  suggestions for response to the events on October 11.

19  Q.  And does it list a long list of assets and an amount of

20  assets proposed to be returned?

21  A.  Yes, ma'am.

22  Q.  And you will notice, just at the bottom of that, it points

23  it will be sent to a wallet owned by the Mango upgrade council.

24         Is that the same council I think you were talking

25  about before?  I think you talked about it as the security

O4FMEIS5                     Sheridan - Direct

1    council?

2    A.  Yes, ma'am.  Again, I don't know which council paused the

3    protocol.  In this case the specific council is designated

4    related to this proposal.

5    Q.  Were you able, in your research and experience on this case

6    in conjunction with your team, to identify the date that this

7    was proposed?

8    A.  Yes, ma'am.

9    Q.  What day was that?

10   A.  That was -- I'm sorry.  Can you bring up the spreadsheet

11   again.  It's listed in the spreadsheet.  I just don't want to

12   give a bad date.

13   Q.  Sure.

14          MS. MARTABANO:  Mr. Smith, please take the view away

15   from the jury and bring back what's been marked as DX-60 for

16   Mr. Sheridan only.

17   Q.  Having looked at that, can you tell us what time it was

18   proposed?

19   A.  That would be October 14 at 4:17 p.m.

20   Q.  Eastern time?

21   A.  Yes.

22   Q.  Mr. Sheridan, do you know whether repay bad debt 2 was

23   ultimately approved?

24   A.  It was.

25   Q.  And after analyzing the Blockchain transactions that ensued

O4FMEIS5                          Sheridan – Direct

1    after that approval, do you know whether all of those tokens

2    were transferred as promised in the proposal?

3    A.  They were.

4    Q.  Do you know about how much that was worth at the time?

5    A.  Approximately $67 million.

6             MS. MARTABANO:  No further questions.

7             THE COURT:  Can we have counsel for a brief sidebar.

8             (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    (At sidebar)

2    THE COURT:  It looks like Ms. Martabano did not ask

3    certain questions that were relevant to some of the things that

4    came up.

5    My question for you is, to avoid any motions to

6    exclude, is there any information that, if furnished in the

7    next couple of hours, may provide you with that missing basis

8    that would then allow us to have a cross-examination where we

9    don't have to have a potential exclusion issue?

10    MR. BURNETT:  Two things, your Honor.

11    One is, Mr. Sheridan testified that there was a settle

12    of 50 million.  The rest was then followed by a withdrawal.

13    There is one exhibit that was put in during Mr. DeCapua's

14    testimony, which was DX-50, which refers to a settle that I

15    think he is referring to, but there is nothing in that that

16    mentions the amount of the settlement, 50 million.

17    To the extent there is any data of that he's relying

18    on for that 50 million number, that's one piece of it,

19    especially because during *voir dire* he testified he himself

20    couldn't identify things like numbers or amounts.  He needed

21    his FTI team to do it.  That's one.

22    Second, there are a number of times, and I don't know

23    if this was just his imprecision or was an argument he was

24    making, where he equated settling with withdrawing.  He made it

25    sounded like a settlement withdraws something.  The documents

1    very clearly say a settlement transfers money to your account

2    balance, which was not a withdrawal.

3           So if he is going to stand by the point that a settle

4    equals a withdrawal, we would ask for whatever the basis is for

5    that.  I don't know if he's making a code point or he is just

6    getting it wrong.

7           THE COURT:  Why don't we do this.  Why don't we start

8    tomorrow with your cross-examination.

9           You have heard the things that counsel thinks are

10   missing.  I'll give you the opportunity to turn that over.

11          Taking a step back, I think that based on what I

12   heard -- Mr. Sheridan's testimony presents many issues here

13   just in terms of just thinking about the probative value versus

14   any prejudice to the government to begin with.  I would like to

15   try to avoid these preclusion issues, if we can, so that if

16   there is absolutely no issue with his testimony coming in, then

17   you should acknowledge that this is -- I think this is

18   consistent with the Court's attempt to give the defense every

19   chance to put on its case, so that's why I'm doing this.  If

20   Mr. Burnett were to start his cross-examination, there is going

21   to be motions to preclude, and I want to see if we can avoid

22   that before we have to get into those issues.  Since we have

23   some additional time, that's why we will do it this way.

24          MR. DAVIS:  Judge, may I be heard very briefly on

25   that?

1           THE COURT:  Yes.

2           MR. DAVIS:  One procedural concern.  He is currently

3    on the stand about to be on cross-examination.  The defense

4    should not be able to talk to him about these issues.

5           THE COURT:  Absolutely.  They understand that.

6           MR. KLEIN:  We are not planning on talking to him.

7           THE COURT:  He needs to go to some secluded location.

8           MR. BURNETT:  So you know, right now, to the extent we

9    move to preclude anything beyond those two narrow points.

10          THE COURT:  I don't think he testified about anything

11   else.

12          MS. MARTABANO:  May we speak to the FTI team to get

13   the data?

14          THE COURT:  Let's go back and let the jury go.

15          (Continued on next page)

16

17

18

19

20

21

22

23

24

25

O4FCeis6

1              (In open court)

2              THE COURT:  So we're at 2:30.  We're going to adjourn

3    for the day.  We'll be back here tomorrow to get started at

4    9:00 a.m.  We're going to, again, try to make things a little

5    bit more streamline.  Still on pace to have closings probably

6    on Wednesday.  So we'll be able to give you the case after

7    closings and closing instructions.

8              Again, thank you so much for all your patience.  Enjoy

9    your afternoon.  We'll see you here tomorrow.

10              (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O4FCeis6

1           (Jury not present)

2           THE COURT:  So, just to finish off the discussion from

3   sidebar.  Ms. Martabano, you can retrieve information from FTI,

4   but you should explicitly tell FTI they are not to have any

5   conversations with Mr. Sheridan, and of course you should not

6   have any conversations with Mr. Sheridan.

7           MS. MARTABANO:  Yes, your Honor.

8           THE COURT:  Anything else relating to Mr. Sheridan's

9   testimony?

10          MR. BURNETT:  Not from the government.

11          THE COURT:  What are we thinking in terms of timing?

12  I understand that you wanted to wait until Mr. Sheridan's

13  testimony is complete to make an evaluation as to whether

14  Mr. Eisenberg is going to testify.

15          MR. TALKIN:  Your Honor, I respectfully submit --

16          THE COURT:  Hold on.  Mr. Sheridan.

17          THE WITNESS:  I'm assuming that means go?

18          THE COURT:  That means go.  You're still under oath.

19  Remember, as I told your counsel, they're not to talk to you,

20  you're not to talk to them, nobody talks to anybody.  Okay?

21          THE WITNESS:  Yes, sir.

22          Can I grab a folder?  Is that okay?  I left my folder,

23  my documents that I left --

24          THE COURT:  Yes, you can.

25          (Witness not present)

O4FCeis6

1          Mr. Talkin, continue.

2          MR. TALKIN:  Thank you, your Honor.

3          I think what we're going to do is we're going to talk

4   to our client again now.  I think the way, logistically, and

5   I'm not saying this would happen, but let's say he decided he

6   wanted to testify, based on my representations and the

7   necessities really of both parties, because it would be

8   unexpected, I think the rest of tomorrow would be that

9   preparation time because we won't have access to him late

10  tomorrow, so we would probably have to do that in the

11  courthouse.  So I think it makes sense for us to make that

12  decision in the morning after the cross, and then we'll either

13  be done and we could do the charge conference -- I'm just

14  suggesting here, Judge, I'm not trying to say what should

15  happen.  And then we do the charge conference and we then come

16  in and sum up the next day or we'll proceed to the testimony,

17  the following day and then summations.  So I just think there's

18  the practical problem -- if he was out, I think it would be a

19  lot easier to deal with.

20          THE COURT:  I want to make sure that you and

21  Mr. Eisenberg have enough time to thoughtfully think of that

22  question, and I'm going to allocute Mr. Eisenberg on that issue

23  at the appropriate juncture.

24          I take it from what you're saying is you prefer not to

25  do that now because Mr. Sheridan hasn't finished testifying, so

O4FCeis6

1    you can't evaluate?

2              MR. TALKIN:  Correct.  And I haven't had that

3    discussion with him since we had heard the testimony, so it's

4    really twofold.

5              THE COURT:  Are you able to do that now?

6              MR. TALKIN:  Yes, that part I can do now.

7              THE COURT:  So then there are two scenarios.  One

8    scenario is where we do closings starting Wednesday morning,

9    the other scenario is we do it on Thursday morning; right?

10             MR. TALKIN:  That's how I see it.

11             THE COURT:  Government have any issues there?

12             MR. BURNETT:  No, your Honor.

13             THE COURT:  The only issue is going to be our one

14   juror who is heading to Marrakesh on Friday, but we'll cross

15   that road when we get to it.  Maybe I can make a call to Delta

16   Airlines and figure out how to make some adjustments.  If the

17   parties are on board with that, I think that makes sense.

18             Ms. Goldberg, why don't you hand these out.

19             These are versions of the proposed jury charge with

20   line numbers that will hopefully help us when we're at our

21   charge conference.  There are very few differences between this

22   copy of the proposed charge and the one that you received on

23   Friday.  This is all subject to discussion at the charge

24   conference.

25             So the three changes are to remove "market" from

O4FCeis6

1    "market price" with respect to Counts One and Two based on the

2    government's submissions.  I considered both parties'

3    submissions.  The government, at least at the present time,

4    points to the lack of market price in the statutory text as

5    well as Second Circuit authority that indicates that the

6    definition of "price" is not as narrow as what the defendant is

7    contending in this case is the market price, while also arguing

8    that the settlement price would be a market price properly

9    understood, but given some of the submissions that the

10   defendant has made, there may be confusion that "market price"

11   has a more narrow definition that is not consistent with the

12   usage of "price" in the governing statute and regulations here.

13   So that has been changed.

14           Second, the government seeks to include an instruction

15   on disclaimers.  I view this as similar to the terms of service

16   issue, which is just that as with terms of service, we pointed

17   out, look, you can consider this, but it doesn't kind of govern

18   the outcome of the claim.  I used verbatim the defendant's

19   submission on the terms of service instruction, and the Court

20   simply integrated in an additional couple of lines on

21   disclaimers to make that same point that, as a matter of law,

22   it does not make any representations immaterial.  The jury

23   should simply consider that along with all the other evidence

24   in the case that they want to consider, which I think is a fair

25   instruction.  But again, I'll hear both sides on that.

O4FCeis6

1          As to mix swap, which is the subject of 400 letters

2     that I received from the parties, what I've proposed at least

3     is to include the theories, the base theories of how the

4     government contends the perpetuals are swaps, and then

5     essentially adopt the defendant's instructions as to including

6     narrow-based security index mainly because it puts that issue

7     in the instructions, the jury can make its determination, both

8     sides can argue whether it is or is not a narrow-based security

9     index, whether you're talking about the funding rate or USDC.

10          Now, one question I had for Mr. Greenspan.  So in the

11     proposed instruction, as to USDC, you had added the

12     clarification, "as long as USDC is not a narrow-based security

13     index."  Explain to me how USDC could be a narrow-based

14     security index.

15          MR. GREENSPAN:  Can you give me one second and let me

16     pull out our proposal?

17          THE COURT:  Sure.  I can tell you that that's exactly

18     what it says.

19          MR. GREENSPAN:  I'll take your representation on that.

20          THE COURT:  It's not addressed in your letter.  To set

21     the stage, in your letter, you indicate that USDC is a stand-in

22     for the dollar.  So, on that basis, it could not be something

23     that the swap is based on, and you give some examples about

24     that.  However, when it comes time to actually discussing the

25     proposed instruction, you leave USDC in there and simply say,

O4FCeis6

1    "as long as it's not a narrow-based security index."  I want to

2    make sure the Court was understanding the defendant's position

3    correctly.

4              MR. GREENSPAN:  I think we were struggling to find a

5    way to put narrow-based security index in.  We're not proposing

6    that USDC is a narrow-based security index.

7              THE COURT:  You're not taking the position that USDC

8    is a security here?

9              MR. GREENSPAN:  Correct.

10             THE COURT:  I just don't understand how it could be a

11   narrow -- if USDC is not a security, then it could not, unless

12   I'm missing something, be a narrow-based security index.  I

13   guess you could say, well, there's one security and it's an

14   index, so that one security, and so that's a narrow-based

15   security index.  That would be the way to do it.

16             If you're not taking the position that USDC is a

17   security, then it seems like the government's proposed

18   instruction on USDC, that part of it would be correct, and then

19   you, on the funding rate issue, would have the argument that

20   the rate is essentially a narrow-based security index based on

21   how that rate is put together, and both sides can make their

22   arguments on narrow-based security index.

23             MR. GREENSPAN:  That's right.  Thank you, your Honor.

24             THE COURT:  And no need for the government to have any

25   reactions to this.  We'll pick it up at the charge conference.

O4FCeis6

1    But anything as to any of the issues as I described them in two

2    seconds of detail?

3            MR. BURNETT:  No, your Honor.  That sounds good.  If

4    this is the way you're thinking about it, I think one thing we

5    may do is propose an instruction that defines the term

6    "interest" as we discussed in the letter last night because we

7    think that's important for the jury understanding what a

8    narrow-based security index is and the meaning of the term

9    "interest" there, but that would be a one-sentence addition.

10           THE COURT:  I'll hear everyone's suggestions on both

11   sides.  That's what the charge conference will be for.  I

12   expect both sides, as I mentioned in my email, to raise all

13   their objections, and we'll go page by page and get it done.

14           Anything else, Mr. Burnett?  Mr. Davis.

15           MR. DAVIS:  Just confirming, we're not summing up?  At

16   the earliest, Wednesday?

17           THE COURT:  You're not going to sum up tomorrow after

18   the charge conference.

19           Anything else from the defense?

20           MR. TALKIN:  None.  Thank you, Judge.

21           THE COURT:  Really appreciate it.  We're adjourned.

22   We'll be back here hopefully not at 8:30, but I'm going to have

23   everyone here ready at 8:30.

24           (Adjourned to April 16, 2024 at 8:30 a.m.)

25                                * * *

1                   INDEX OF EXAMINATION

2    Examination of:                        Page

3     JEREMY SHERIDAN

4    Direct By Ms. Martabano . . . . . . . . . . 977

5    Cross By Mr. Burnett . . . . . . . . . . . . 990

6    Redirect By Ms. Martabano . . . . . . . . . 996

7    Recross By Mr. Burnett . . . . . . . . . . .1002

8    RONALD DWYER

9    Direct By Mr. Talkin . . . . . . . . . . . .1032

10    Cross By Mr. Davis . . . . . . . . . . . . .1042

11    Redirect By Mr. Talkin . . . . . . . . . . .1052

12    JEREMY SHERIDAN

13    Direct By Ms. Martabano . . . . . . . . . .1058

14                 GOVERNMENT EXHIBITS

15    Exhibit No.                    Received

16     1705    . . . . . . . . . . . . . . . . . . .1053

17                 DEFENDANT EXHIBITS

18    Exhibit No.                    Received

19     70    . . . . . . . . . . . . . . . . . . .1035

20     30D    . . . . . . . . . . . . . . . . . .1038

21     30A    . . . . . . . . . . . . . . . . . .1040

22     30B    . . . . . . . . . . . . . . . . . .1040

23     30C    . . . . . . . . . . . . . . . . . .1041

24     60    . . . . . . . . . . . . . . . . . . .1124

25