O4GCeis1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4                v.                      23 Cr. 10 (AS)

5   AVRAHAM EISENBERG,

6                Defendant.              Trial

7   ------------------------------x
                                        New York, N.Y.
8                                       April 16, 2024
                                        8:53 a.m.
9

10  Before:

11              HON. ARUN SUBRAMANIAN,

12                                      District Judge
                                        -and a jury-
13
                          APPEARANCES
14

15  DAMIAN WILLIAMS
         United States Attorney for the
16       Southern District of New York
    PETER J. DAVIS
17  THOMAS S. BURNETT
    TIAN HUANG
18       Assistant United States Attorneys

19  WAYMAKER LLP
         Attorneys for Defendant
20  BRIAN E. KLEIN
    ASHLEY MARTABANO
21  RILEY SMITH
         -and-
22  TALKIN MUCCIGROSSO & ROBERTS, LLP
    SANFORD N. TALKIN
23  NOAM B. GREENSPAN

24  Also Present:  Brandon Racz, FBI
                   Ryan Sears, Paralegal Specialist-USAO
25                 Jonathan Oshinsky, Paralegal Specialist-USAO

O4GCeis1

1          (Trial resumed; jury not present)

2          THE COURT:  Good morning, everyone.

3          First off, on juror No. 7, as the Court informed the

4   parties, there was a serious emergency with juror No. 7, so she

5   will be excused.  We will put the email that we sent to the

6   parties as well as the parties' responses in the record as a

7   sealed court exhibit.

8          Do either of the parties want to be heard further on

9   that?

10         MR. BURNETT:  No, your Honor.

11         MR. KLEIN:  No, your Honor.

12         THE COURT:  Then let's move to the motion to strike.

13         Mr. Burnett, did the additional information that the

14   defense provided at 11:00 p.m. yesterday give the government

15   enough to do their cross?

16         MR. BURNETT:  Yes, we can do the cross.  I'm sorry if

17   I was unclear in the email.  I think what we were trying to do

18   is tee up, during cross, we planned to move to strike when we

19   get what we expect the answer will be.  So we don't need to

20   strike now if the Court is not inclined to, but I didn't want

21   to have a log jam when that happens.

22         THE COURT:  Understood.

23         What's the nature of the evidentiary -- what's the

24   evidentiary defect?

25         MR. BURNETT:  The evidently defect is Mr. Sheridan

O4GCeis1

1    testified that he saw in the code a settlement for 50 million

2    USDC.  The code is very clear that there was a settlement, but

3    nothing about the amount in that code.  So it was not possible

4    for him to have seen 50 million USDC settlement in the code.

5    So that's the evidentiary defect.

6            THE COURT:  So is it really just a Rule 702 objection

7    that, to the extent that he's offering an opinion as to the

8    $50 million in settled P&L, that's just an unreliable opinion

9    that should not be admitted under 702?

10           MR. BURNETT:  That's right, your Honor.  If we had

11   known about these opinions ahead of time and been able to

12   challenge them then, we would have done it ahead of time, which

13   was what -- obviously, we're in that position, so we're going

14   to do it now.

15           THE COURT:  Ms. Martabano, this seems like an

16   objective -- like something we can just determine.  So what's

17   the defense's position?

18           MS. MARTABANO:  Your Honor, I think we'll be able to

19   clarify either on cross or redirect that I assume he meant to

20   say that the withdrawal was 50 million and the settle, which is

21   the preceding one, didn't have a dollar amount.  I think that

22   is what he will tell Mr. Burnett.  Although, obviously, I

23   haven't spoken to Mr. Sheridan about it.  The documents

24   establish that the settle command does not have a dollar

25   amount, which is in the links that we sent to the government

O4GCeis1

1    last night, which Mr. Klein forwarded onto the Court.  It shows

2    clearly there was a settle command that does not have a dollar

3    amount associated, and the withdraw command 17 seconds later

4    has a $50 million amount next to it.  So that's what I expect

5    will happen.

6              THE COURT:  If this all gets cleaned up in that way,

7    would there be the need to strike a portion of the witness's

8    testimony?  I understand, because I was on the evidence

9    committee Rule 702 was amended, that the kind of blanket, it

10   goes to weight, not admissibility.  It's not something that

11   courts are supposed to do, but in this particular context, if

12   in fact as Ms. Martabano says, either the witness — or on

13   redirect or during your cross — it gets cleaned up in this way

14   so that the reliance on the code is limited to what the code

15   actually demonstrated, it seems, under those circumstances,

16   there would not be a need to strike any portion of the

17   witness's testimony.  It would be clear that the witness,

18   whether he misspoke or, you know, witnesses often clarify

19   things on further examination, but there would be no prejudice

20   to your side and no need to strike his testimony.  But help me

21   if there's some issue that I'm missing here.

22             MR. BURNETT:  So I think it will depend exactly how it

23   comes in and if we could get a representation from the defense

24   that they won't rely on that portion of his direct during their

25   closing.  Because our concern is -- I understand that witnesses

O4GCeis1

1    have a slip of the tongue or they misremember something, but

2    there was really a double down here in the questioning.  There

3    was the initial statement.  Then Ms. Martabano said, did you

4    see that on the blockchain, he said, yes.  Then she said, what

5    was the amount, he said, 50 million.  Then he said, what was it

6    in, it was in USDC.  So I think this was not like a slip of the

7    tongue, it was like something that was like elicited and then

8    doubled down on in multiple questions, and it would be

9    prejudicial to just leave that untouched in the record.

10        THE COURT:  Well, I take it that you're not going to

11    leave it untouched in your cross.  Let's see what the witness

12    says in response, because if he tripled down on this particular

13    statement, then you might have a viable motion to strike.  If

14    he cleans up his testimony, then it may present a different set

15    of circumstances.  But I understand the issue and thank you for

16    bringing it to the Court's attention so that it's not a lengthy

17    sidebar during cross examination.

18        MR. BURNETT:  Thank you, your Honor.

19        THE COURT:  Any further issues?

20        MS. MARTABANO:  Your Honor, we have a question as to

21    the exhibits that they sent to us at 3:30 in the morning last

22    night.  One appears to be a screenshot of I think a current

23    website, but it doesn't have a way to establish that it's tied

24    to the dates in question.  It comes similarly to the Exhibit

25    914 issue.  Like, I think they went online last night, printed

O4GCeis1

1  something out.  I don't know if they plan to offer someone to

2  explain how that was done or what it is.  Mr. Sheridan

3  obviously won't have created it, won't have relied on it.  So

4  we're just looking for some sort of foundation that suggests

5  it's not going to be confusing, you know, and that it's not

6  just hearsay for them to just print out and provide.

7        MR. BURNETT:  I'm happy to explain, if it will be

8  helpful.

9        THE COURT:  Yes.

10        MR. BURNETT:  So Mr. Sheridan, both in the testimony

11  that we've been talking about and other testimony, clearly

12  suggested -- and there was suggestions that these were not

13  borrows that Mr. Eisenberg was doing.  Mr. Sheridan's been

14  sitting in this trial all along, and one of the things he's

15  seen, because he's been sitting in the trial, was Government

16  Exhibit 318, which was a screenshot from Mr. Eisenberg's

17  computer that shows that during the time of the attack, he was

18  on the Mango borrows page.  Mr. Sheridan has testified that a

19  primary way that he, like, learned about the Mango Markets

20  system and how the Mango Markets UI works is because the Mango

21  Markets version 3, while you can't, like, do trades and things

22  on it now, is still up, the UI is still, like, active.  You can

23  still go to it and everything like that.

24        So what we're going to do is have Mr. Sheridan --

25  we're going to plug in the website, the borrows website, and

O4GCeis1

1    have him authenticate that Government Exhibit 19 I think 03,

2    which is what we marked last night, is the same thing that he's

3    seeing on that Mango Markets website, and then we'll offer it

4    to the jury.  We're not offering it for any -- that will be the

5    authentication, because he's going to be able to authenticate

6    that what he's seeing on the screen is the same thing that was

7    in the website.

8            And it's not hearsay because the point is not for the

9    truth of the matter asserted, the point is to show the jury

10   that that website is a landing page that has all of the

11   cryptocurrencies listed out with borrow buttons next to all of

12   the cryptocurrencies.  It's not the hearsay purpose, it's to

13   show what Mr. Eisenberg was sitting on during the attack was

14   the webpage that had all the borrow buttons on it.

15           THE COURT:  How is that not for the truth of the

16   matter?

17           MR. BURNETT:  Because there's no statement, your

18   Honor.  The borrow is just a command function.  There's no

19   statement on the page.

20           THE COURT:  Are you saying that the page is not

21   hearsay?

22           MR. BURNETT:  No, your Honor.  A webpage itself isn't

23   hearsay.  The content of a webpage can be hearsay if there's

24   something written on it.  The webpage is just the webpage.

25           THE COURT:  But isn't "borrow" written on the page?

O4GCeis1

1          MR. BURNETT:  It's a difference between a statement

2     and a command.  So a statement like "I borrowed this," that

3     would be a statement.  If there's a command function on a page,

4     like borrow, that's not a statement because it's not -- you're

5     not, like, stating anything.  It's just to show there's a

6     functionality available on the page.

7          THE COURT:  Am I missing something?  I thought the

8     entire premise of your wire fraud charge was that he borrowed

9     money and there was a statement.  The statement was that he was

10    borrowing money.  Wasn't that one of the statements you're

11    relying on?

12         MR. BURNETT:  That is, but we're not offering this to

13    show that he, like, clicked -- that he clicked the borrow

14    button or to show -- we're offering this to show that he was on

15    a page and that page had borrow buttons on it.

16         THE COURT:  So how is it not for the truth of the

17    matter -- you're showing him a borrow page to establish that it

18    says "borrow" because he was borrowing and not withdrawing

19    those cryptocurrency assets.  That would seem to be for the

20    truth of the matter asserted.

21         MR. BURNETT:  I think what -- I think what the

22    difference is, it's not the truth -- the part of hearsay is it

23    needs to be two things.  It needs to be a statement that's

24    offered for the truth of the matter asserted.  Here, we're not

25    offering a statement, we're offering a webpage that has a

O4GCeis1

functionality to borrow on it.  That's not a statement that's

on the page that's being offered for the truth.  It's not the

truth part, it's the statement part of the hearsay rule.

          And this is, I think -- I mean, if you look in the

rule, there's like a number of, in the commentary sections, I

believe, it goes into this point about you how, like,

automatically, like generated, like things or links that's not

a hearsay statement in the same way like a URL is not a hearsay

statement, it's like a command you can click on, it sends you

somewhere.  I think the analogy in this case would be both

parties offered extensive evidence about websites that had URLs

and links in them.  Those URLs are not hearsay.  What they are

is command functions.  They're not -- they're not statements.

          THE COURT:  Well, that's true.  But why are you

putting in the page again?

          MR. BURNETT:  We're putting in the page to show that

Mr. Eisenberg was sitting, during the attack, on a page that

had borrow buttons on it.

          THE COURT:  To establish that he in fact borrowed;

right?

          MR. BURNETT:  The inference that a jury could draw

from that is that he was borrowing, but the borrows themselves

are not statements.

          THE COURT:  The inference that you're seeking -- so,

really, what you're saying -- I mean, the crux of your position

O4GCeis1

1    that it's not for the truth of the matter asserted is that the

2    borrow buttons are functions and not statements?

3            MR. BURNETT:  Right.

4            THE COURT:  Because if they were statements, then you

5    would agree that you were putting in that exhibit for the truth

6    of the matter asserted and that it is hearsay.

7            MR. BURNETT:  Right.  It's there are two different

8    parts of the hearsay rule.  It needs to be a statement offered

9    for the truth.  We're not disputing the offered for the truth,

10   we're disputing it's not a statement point.

11           THE COURT:  Ms. Martabano, do you have a response to

12   that?

13           MS. MARTABANO:  Yes, your Honor.  I'm looking at

14   this -- first of all, there's no, like, time on this.

15           THE COURT:  Do you have this exhibit?

16           MR. BURNETT:  We can pull it up.  I think it's 1903.

17           MS. MARTABANO:  It's unclear to me.  Based on what

18   Mr. Burnett said earlier, it sounded like he was saying this

19   website is still live, so he just went on it and looked at it,

20   you know, as of last night.

21           MR. BURNETT:  And, your Honor, if I could --

22           THE COURT:  318, what's the difference between this

23   and 318?  Because 318 is in evidence.

24           MR. BURNETT:  So 318 is the page from -- we can pull

25   this up too so I don't have to try to fumble through describing

O4GCeis1

1    it.  318 looks like this from the computer.

2         MS. MARTABANO:  But Mr. Burnett, you're not

3    representing that this was the page on the date of that visit,

4    are you?

5         MR. BURNETT:  I'm representing that this is the borrow

6    page from V3.  He looked at a whole bunch of websites that are

7    the borrow pages -- that are the pages from the V3.  He

8    testified about them extensively.  We can deal with the

9    authenticity things, but I want to make sure we're getting the

10   hearsay point covered first.

11        THE COURT:  Walk me through what you're going to do

12   with 1908.

13        MR. BURNETT:  I'm going to show him 318, which is

14   already in evidence and he saw.  I'm going to ask him, what you

15   did in preparing to testify was you went to the version 3 of

16   the website, which is still up, the UI is still up and

17   available, which he did.  He testified to that extensively on

18   direct examination.  And he'll say, yes.  And I'll say, you can

19   in fact plug in the borrow information, you could plug in

20   website, you can plug in URLs and find things on that V3

21   website, which I expect he'll say yes to because that's what he

22   did to research for the case.  I'll say, you saw this link

23   here, let's plug that link into the website.  We'll plug that

24   link into the website, he'll see this page pop up.  I'll say,

25   did you see this page pop up.  I'll say, does this look like

O4GCeis1

1    one of the V3 webpages, which I expect he'll be able to say yes

2    to because there will actually be a red banner that we've

3    cropped off that will appear that will say this is the V3

4    version that was hacked, because we've been redacting that for

5    purposes of the trial, and that will authenticate that this is

6    the landing page that this link takes you to, and then we'll

7    offer it.

8              And on this hearsay point, I think it's important that

9    if you go to Rule 801 in the rules of evidence, it defines

10   "statement."  And the statement is defined to mean a person's

11   oral assertion, written assertion, or nonverbal conduct if the

12   person intended it as an assertion.  And a webpage like this

13   that just has borrow links is not any person's written or

14   non-written assertion.  It's just a webpage that has links on

15   it, and those links say "borrow" because you can click them to

16   borrow, but there's no assertion by any person on this webpage.

17             THE COURT:  Okay.  I don't think that this just has

18   functional buttons in the way that you're asserting.  I'm

19   looking at 801, which says, "statement" means a person's oral

20   assertion, written assertion, or nonverbal conduct if the

21   person intended it as an assertion.  And you would agree that

22   "person" would include corporate or institutional entities such

23   as Mango Markets; correct?

24             MR. BURNETT:  Yes, your Honor.

25             THE COURT:  This site, in addition to having

O4GCeis1

1  functional keys, says "borrow all assets." I mean, how is that

2  not a statement? It's right there at the top of the page.

3  That's not a functional link or a URL or a button. It says,

4  "borrow all assets." And then it's got labels, too, which have

5  to be the statements of Mango Markets that described to users

6  what is being represented on the page. That's a statement.

7  That's an assertion. It's the entity that's telling users on

8  this page, here's what you're seeing, here's what it means, and

9  that seems to fit under the definition of "statement."

10     I'm with you if there was just like code or just is

11  like little buttons that had no -- that were not intended to be

12  asserting anything, that would be one thing, but just like to

13  just take it down to like, you know, on the human level, like

14  if a user is sitting there looking at this page and they're

15  like trying to figure out like what it means, they're relying

16  on the statements that are depicted on the page, including,

17  like, Mango Markets saying "borrow." If you want to borrow,

18  you do this. Okay. You look at all these things.

19     You're right that the keys themselves and the

20  functions that are underlying those keys are not statements,

21  but there are statements on this page.

22     MR. BURNETT: So the reason I don't think that's

23  right, this goes to kind of like a little deep into like

24  hearsay land now. So there are -- the doctrine of verbal acts

25  is that an act, so an offer for something is not a statement.

O4GCeis1

1    So if I go up to you and say, hey, I'll offer to lend you this,

2    I'll offer to lend you $10, that offer is a verbal act, it's

3    not a statement.  So the fact that there is like something that

4    says, hey, here's USDC, you can click on this functionality to

5    borrow, that's a verbal offer, a verbal act to give you an

6    opportunity to borrow, but it's not itself a statement under

7    the hearsay rules.

8             THE COURT:  Okay.  But this page, the whole purpose of

9    this page is to communicate.  It's like a medium of

10   communication to users.

11            MR. BURNETT:  It's communicating offers to users to

12   borrow something, and that's a verbal act, not a statement

13   under the hearsay rules.

14            THE COURT:  Even if nonverbal conduct is covered as

15   under the definition of statement if the person intended it as

16   an assertion --

17            Okay.  Here's what I'm going to do.  Do you have any

18   grounds to get 1903 in if in fact I deem these to be

19   statements?

20            MR. BURNETT:  So if you think this is -- if you rule

21   this is hearsay, then I don't think we have any other basis to

22   put it in.

23            THE COURT:  That doesn't mean you can't use it to the

24   extent -- because what you're saying is that the witness went

25   to this page.  And so, to the extent that that bears on some

O4GCeis1

1    testimony that the witness gave, then you'd be able to use it.

2        Ms. Martabano, you're not saying that they can't use

3    it in connection with the testimony or are you saying that they

4    can't even use it if it's not shown to the jury and admitted

5    into evidence?

6        MS. MARTABANO:  I think a couple of things.

7    Obviously, we don't think it should be shown to the jury.  I

8    don't believe he testified that he went to the borrow page

9    specifically, the subpage of the borrow page.  He said

10   trade.mango.markets is still available.  So he may say that.  I

11   don't believe so, but I don't think he's testified to that so

12   far.

13       I think your Honor has captured our concern about the

14   statements being made here, but also, on top of that, it raises

15   a 403 issue of confusing.  There's no way to say that this is

16   what it looked like when Mr. Eisenberg traded.  They're seeking

17   to put in the fact that he visited this page to show what it

18   looks like right now.  And obviously, since Mr. Eisenberg's

19   trades, the platform, the numbers on the platform and the

20   availability on the platform have changed drastically.  That

21   was part of the argument over exhibit 914.  And the government

22   has not represented that this actually looks like the website

23   that Mr. Eisenberg was on.  And to us, the values on here are

24   obviously highly important.  So it's really going to be

25   misleading and confusing to the jury to suggest that this is

O4GCeis1

1    what it looked like when Mr. Eisenberg was on that page.  I

2    don't see that there's any way that Mr. Burnett or the

3    government could establish that this is what it looked like.

4    And given that, I just think all it's going to do is mislead

5    and confuse the jury.

6         To the extent they want to talk about the borrow or

7    withdraw, the zeros and ones, if that's what they're talking

8    about, that is a different portion of the website where I

9    believe the government may have already showed it, but you can

10   either toggle a borrow or a withdraw.  It's not that he went to

11   this website.

12        So I think, to sum up, obviously we believe that this

13   is hearsay and they're trying to get in the statements and

14   they're certainly going to argue the import of this document is

15   it was statements on a borrow page.  The page itself is stale.

16   There's no way for them to establish that this is what it

17   looked like then.  Because it is stale, it will confuse the

18   jury.  And because Mr. Sheridan wasn't the one who pulled this

19   up — and I don't believe he's testified that he's reviewed this

20   specific page as of now in the record — I think it will be that

21   much more misleading and confusing to the jury.

22        THE COURT:  And Mr. Burnett, just tell me again, why

23   are you putting in this page?

24        MR. BURNETT:  We're putting in this page because

25   Mr. Sheridan suggested during his testimony that Mr. Eisenberg

O4GCeis1

1    had not borrowed, but instead settled positions and withdrawn.

2    And the fact that Mr. Eisenberg was sitting for the entire time

3    of his attack on the page where there's the functionality to

4    borrow is strong evidence that he did not in fact do that.

5             THE COURT:  Understood.  So you are putting it in for

6    the truth of the matter asserted, you're just saying it's not

7    statement?

8             MR. BURNETT:  That's just our position.

9             THE COURT:  1903 will be excluded for that reason.

10   The Court is also sensitive to the 403 issues, but I think this

11   is hearsay.  They are statements, as I understand the document

12   and looking at the document, and as the government says, it is

13   putting it in for the truth of the matter asserted.  So 1903

14   will be excluded.

15            Anything else, Mr. Burnett?

16            MR. BURNETT:  No.  Just a quick restroom before we

17   start?

18            THE COURT:  Yes.

19            And we can get Mr. Sheridan back on the stand.

20            (Recess)

21            Can I see counsel and let's have the court reporter

22   back in the robing room.

23            (In the robing room)

24            So the issue that has come up is with respect to juror

25   No. 6.  So juror No. 6 had a serious medical issue come up last

O4GCeis1

1    night with a family member.  She thought it was okay.  It

2    appears that, based on some communication she's had this

3    morning, there may be some issues.  So Mr. Hernandez is going

4    to get juror No. 6.

5             (Juror present)

6             Good morning.  Come on in.  Take a seat.  So tell us,

7    it seems like something happened last night?

8             JUROR:  Yes.  So, it's either last night or early this

9    morning.  All I know is that when I woke up this morning, I

10   went into the bathroom, and in the garbage can, I see like a

11   whole bunch of blood, you know, tissues of blood in the garbage

12   can.  So I said, well, maybe my -- I called my youngest son

13   Cholo maybe had a nosebleed, but it's too much blood for like a

14   nosebleed, so I went into his room.  I have a photo, too, I can

15   show you of -- so I go into his room and I look at him and I

16   see like a gash and like a bump, and still like dried blood on

17   his forehead.  And I said -- I gently woke him up and I said,

18   Cholo, what happened.  And he said, I was coughing so much --

19   because I had to take him to the emergency room twice because

20   he has a cough, once on Saturday, then again on Monday.  And

21   they gave him a medicine and asthma medicine, but he said he

22   was coughing so much that he fell in the bathroom and woke up

23   on the floor.  So I said, are you okay.  He said, yeah, I'm

24   okay.  So I said, all right.  I took a picture of it.  I sent

25   it to my oldest son and to his girlfriend and I said this

O4GCeis1

1    happened to Cholo this morning, but I have jury duty.  So when

2    I came, I spoke with one of the jurors who's a nurse and she

3    said if he lost consciousness, it's better for him to go to the

4    emergency room and get his, you know, tell him to do a CT scan

5    and also to do a scan of his chest to see that the medicine is

6    not working.  I'm sorry, it's that --

7              THE COURT:  No.  No.  I'm so sorry you had to go

8    through this.  That's a horrible situation.

9              JUROR:  So I text him and I said, please get up and

10   go.  Are you okay to go because, if not, I'm going to leave.

11   He said, no, no, mom, please stay.  Then he texted when he said

12   are you available to come with me because I feel lightheaded.

13   I'm sorry.  I don't mean to put a monkey wrench on whatever,

14   but this is my son.  And I'm afraid, too, because we live in a

15   duplex, so even if I was to call my niece or somebody to say

16   here are the keys or somebody knocking on the door and they

17   don't have the top lock key, god forbid for him to fall down

18   the stairs because he feels lightheaded.

19             THE COURT:  So you need to go home to get your son?

20             JUROR:  Right.

21             THE COURT:  First of all, I'm really sorry that you

22   have to go through this.  I've been there.  You don't know,

23   there's a lot of unknowns and you want to make sure your family

24   gets medical attention as soon as possible.

25             If you could do me a favor and just wait outside the

O4GCeis1

1    door for just a second and I'll talk to the parties.

2              JUROR:  Sure.

3              (Juror not present)

4              THE COURT:  So I don't think there's anything to do

5    other than to excuse this juror, which will leave us with one

6    alternate, but I'm happy to hear from both sides to see if they

7    have any objections or issues.  I'm happy to inquire further

8    with this juror.

9              MR. DAVIS:  Nothing from the government, unless my

10   colleagues have anything to add.  She's in emotional distress.

11             MR. KLEIN:  She's clearly in emotional distress.  The

12   only concern, obviously, she should go and be with her son.  To

13   be very clear, that's our position.

14             The one juror is going to Marrakesh, so we'll be down

15   to one alternate.

16             MR. DAVIS:  So it looks like we're going to be on

17   schedule to close tomorrow.  And so, if we close tomorrow,

18   hopefully the jury has the case by Thursday.  I don't think --

19   we'll have one additional alternate for a juror who's headed

20   off to Marrakesh, but, obviously, I'm open to any and all

21   solutions.

22             THE COURT:  Well, I think that is the option.  Unless

23   someone has some other suggestion, I don't think that there's

24   any way.  I think it would be --

25             MR. KLEIN:  We have to let her go.  We're not opposing

O4GCeis1

1    that.

2            THE COURT:  That's the decision for this juncture and

3    we'll see what's going to happen.

4            Mr. Klein, has your client made a determination as to

5    whether he's going to testify or is he still thinking about it

6    and wants to see how Mr. Sheridan does?

7            MR. KLEIN:  We're in the same place as we were

8    yesterday.  That's where we are.  We think it's still unlikely,

9    but we'll have to talk to him after Mr. Sheridan gets done

10   previously.

11           THE COURT:  Understood.  Anything else?

12           MR. KLEIN:  One question, we're closing Wednesday

13   morning, you'd be charging and starting deliberations

14   Wednesday?

15           THE COURT:  Yes.

16           MR. TALKIN:  Your Honor, I have one scheduling thing,

17   but we can do it after.

18           THE COURT:  Okay.  Let's have Ms. Martinez come back

19   in.

20           (Juror present)

21           We are going to excuse you for cause because of this

22   very serious thing that happened.  I know that you need to be

23   with your son, so I wish you the best of luck.  Thank you so

24   much for all your service thus far.  I know that you're working

25   really hard and you were really invested in the case.  You even

O4GCeis1

1  came today, despite what happened.  Thank you for bringing it

2  to our attention because it's really important that you do so.

3  And so, everyone here wishes you the best of luck with your

4  son.  I'm sure everything will be okay, but it's best you go

5  and take care of him.

6         JUROR:  Thank you so much.  And I'm very sorry.

7         THE COURT:  No, I understand.  Don't worry about it.

8  Take care of your family, make sure everyone's safe.

9         JUROR:  Thank you so much.

10         THE COURT:  You're welcome.

11         (Juror not present)

12         MR. TALKIN:  Your Honor, based on what we heard in the

13  courtroom today about Exhibit 318, it seems like there was

14  going to be an argument that it's a website that my client was

15  on exclusively and that's not the case.  There are similar

16  documents within the computer that will refute that.  I think

17  what we can do is we can get those real quick, we can get this

18  done today, either work out a stipulation that they came from

19  the same computer that Mr. Dwyer testified or I can bring

20  Mr. Dwyer back this afternoon.  I just wanted to flag that

21  issue.  Right now, we're identifying what we want to turn in

22  the form to put into evidence and then we'll do that.

23         THE COURT:  From a scheduling standpoint, how are we

24  going to do this, because unless you have another witness,

25  you're going to rest; right?

O4GCeis1

1          MR. TALKIN:  That's why I'm telling you now with the

2     scheduling.  What I would do is say there's two ways we could

3     do it.  We can say that we rest with some type of conditional

4     rest in that there may be --

5          THE COURT:  No.

6          MR. TALKIN:  -- one more piece of evidence first thing

7     in the morning.

8          THE COURT:  No, next.

9          MR. TALKIN:  We're working on it now.  I think if

10    there's a stipulation in that it came from the computer which

11    it did -- the only vehicle would be call Mr. Dwyer again to say

12    it's the computer and here it is.  I don't think that's really

13    necessary.

14         THE COURT:  Mr. Burnett, how long is your cross?

15         MR. BURNETT:  My guess is half an hour.

16         THE COURT:  And then there's going to be some

17    redirect, so that will take us to -- what we'll probably do is

18    do an early break after Mr. Sheridan testifies.  That will give

19    you time to do two things, which is, one, speak to your client

20    and determine whether he wants to testify or not.  If not, then

21    we'll do the allocution, we'll figure that out.  During that

22    same period of time, someone should be figuring out this issue

23    and talking to the government so that we can come back and then

24    you could rest and then the government can let us know whether

25    it has any rebuttal case and we can proceed.  Make sense?

O4GCeis1

1          MR. TALKIN:  It does.  Thank you.

2          THE COURT:  Perfect.

3          (In open court)

4          Mr. Hernandez, let's get the jury.

5          (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury present)

2          THE COURT:  Welcome back, members of the jury.

3          Mr. Sheridan, you understand you are still under oath?

4          THE WITNESS:  Yes, sir.

5          THE COURT:  Mr. Burnett, you may proceed with

6    cross-examination.

7          MR. BURNETT:  Thank you.

8    JEREMY SHERIDAN, resumed.

9    CROSS-EXAMINATION

10   BY MR. BURNETT:

11   Q.  Good morning, Mr. Sheridan.

12   A.  Good morning, sir.

13   Q.  I want to start a bit with your role in this case.  OK?

14   A.  Yes, sir.

15   Q.  You were hired by the defense to testify and help them

16   prepare for trial, correct?

17   A.  We were initially hired by the defense to conduct the

18   Blockchain analysis of the trading activities associated with

19   Mr. Eisenberg's accounts.  It wasn't -- the first hire was not

20   directly to testify.  It was no conduct the analysis.

21   Q.  Since then you have been hired to testify?

22   A.  As a continuation, yes, sir.

23   Q.  And you interviewed with the defense before they hired you,

24   correct?

25   A.  Yes, sir.

O4GMEIS2                          Sheridan - Cross

1   Q.  Who did you interview with?

2   A.  Mr. Klein was there.  I don't recall who else was present.

3   Q.  Fair to say you wanted to get the job when you were

4   interviewing, right?

5   A.  Yes, sir.

6   Q.  Then they hired you and your firm, FTI, to work on this

7   matter, correct?

8   A.  Yes, sir.

9   Q.  You're billing at what?  I think it was $910 an hour,

10  right?

11  A.  For my time.  That's what my firm bills, yes, sir.

12  Q.  How many hours would you say you have spent on this case so

13  far?

14  A.  Roughly 80 to 100.

15  Q.  FTI also separately bills for work that other folks do,

16  correct?

17  A.  There are other members of my team who have different bill

18  rates.

19  Q.  What are some of those bill rates they are billing at?

20  A.  Another member of the team, there was a director and two

21  senior consultants.  The director rate -- I don't have the

22  exact numbers.  I can estimate.  I believe the director rate is

23  around $800 an hour and the senior consultants are around $600

24  an hour.

25  Q.  How much time would you say those folks at your firm have

1   billed on this case?

2   A.  The director, very little.  He is more in an administrative

3   management role.  The senior consultants were -- the ones that

4   performed more technical work related to the investigation,

5   their hours would be likely similar to mine.  I haven't checked

6   their hours.

7   Q.  Fair to say that since being hired you and the folks at FTI

8   have worked closely with the defense throughout the preparation

9   for the case and this trial?

10  A.  Yes, sir.

11  Q.  In fact, you personally have been working closely with the

12  defense throughout this trial, right?

13  A.  Yes, sir.

14  Q.  And you have been doing something a little bit different

15  than every other witness in this case, haven't you?

16  A.  Can you specify?

17  Q.  Sure.  You've been in the courtroom every delay day, right?

18  A.  Yes, sir.

19  Q.  Because you've been in the courtroom every day, you know

20  you're the only witness who has been in the courtroom every

21  day, correct?

22  A.  Yes, sir.

23  Q.  Because you've been in the courtroom every day, you've

24  gotten to see everything the defense has been doing in the

25  case, correct?

1    A.  Yes, sir.

2    Q.  So you were here for the defense's opening statements,

3    correct?

4    A.  Yes, sir.

5    Q.  You've been here for the defense's cross-examination of

6    every single witness, correct?

7    A.  Yes, sir.

8    Q.  In fact, even when the jury has left the room, you've

9    stayed around sometimes to see the arguments that the defense

10   has been making to the judge, correct?

11   A.  Yes, sir.

12   Q.  So you know every theme and every argument that the defense

13   has been making in this case, correct?

14   A.  I wouldn't say I know every theme.  I know the themes that

15   have been presented in court, sir.

16   Q.  You basically have been part of the defense team, right?

17   A.  I have been instructed by the defense team to carry out

18   activities, and I have carried out the activities they have

19   instructed me to do.

20   Q.  And you have watched them carry out their activities every

21   single day during trial, correct?

22   A.  I have observed them while I've been in the courtroom, yes,

23   sir.

24   Q.  Before the defense hired you, you had never used Mango

25   Markets, correct?

O4GMEIS2                          Sheridan – Cross

1    A.   That's correct, your Honor.

2    Q.   In fact, before this incident on October 11, 2022, had you

3    even heard of Mango Markets before?

4    A.   Yes, sir.

5    Q.   You never used it, though.

6    A.   No, sir.

7    Q.   You never had an account on the platform, correct?

8    A.   No, sir.

9    Q.   You never traded cryptocurrency on it, right?

10   A.   No, sir.

11   Q.   You never traded perpetuals, right?

12   A.   No, sir.

13   Q.   Never borrowed from Mango Markets?

14   A.   No, sir.

15   Q.   You certainly never had reviewed any of the code related to

16   Mango Markets before you were hired by the defense to start

17   working with them on this case, right?

18   A.   That is correct, sir.

19   Q.   So everything you have learned about Mango Markets has come

20   since you've been hired by the defense to start working with

21   them?

22   A.   Not everything.  I was aware of Mango Markets and the

23   trading activities at issue in this case, so I was aware of the

24   event.

25   Q.   Other than that general background and awareness of the

1    event.

2    A.  That is the extent of my knowledge prior to this.

3    Q.  Now, I want to talk about something -- you talked about a

4    distinction between centralized and decentralized platforms

5    during your direct examination.

6         Do you remember that?

7    A.  Yes, sir.

8    Q.  And one of the things you've learned is that Mango Markets

9    is a decentralized platform, correct?

10   A.  I was aware of that, again, as a general concept prior to

11   this official engagement.

12   Q.  And you testified that a decentralized platform, it works

13   through something called a smart contract?

14   A.  Yes, sir.

15   Q.  And that's basically just computer code, right?

16   A.  Yes, sir.

17   Q.  It's not so different from a software program; it just runs

18   on the Blockchain?

19   A.  I would make the distinction that it is different from a

20   software program in that smart contracts have different

21   functional execution than other types of software.

22   Q.  There are some functional differences, but basically it

23   does what a software does, you input information into it and it

24   does stuff with that information, correct?

25   A.  Yes, sir.

1    Q.  And that software program, the smart contract for Mango

2    Markets, is run by an entity called Mango DAO, correct?

3    A.  That's correct, your Honor.

4    Q.  So the folks at Mango DAO are the ones that create the code

5    for the smart contract to begin with, right?

6    A.  Yes, sir.

7    Q.  And they can make edits to it too, correct?

8    A.  So, yes.  To clarify, Mango DAO is the collection of all

9    users of Mango Markets.

10   Q.  And they are the ones who can update, change the software

11   program, that sort of thing, right?

12   A.  So everyone can suggest those changes and so forth, yes,

13   sir.

14   Q.  Fair to say that centralized exchanges also run on software

15   programs, correct?

16   A.  Yes, sir.

17   Q.  So in that case, instead of a DAO designing the software

18   program, it's the company designing the software program,

19   right?

20   A.  Yes, sir.

21   Q.  There is not someone at a centralized exchange, like

22   Robinhood or Charles Schwab or Binance, who is sitting there

23   actually approving every transaction, correct?

24   A.  That is correct, sir.

25   Q.  It runs similarly to the way the Mango Markets does, where

O4GMEIS2                        Sheridan - Cross

1   there is a software program and a group that's responsible for

2   the software program, correct?

3   A.  Similar with distinctions about a community element within

4   the DAO.

5   Q.  Right.  One is a company and the other is a community of

6   DAO members.  That's the distinction, correct?

7   A.  In a general sense, yes, sir.

8   Q.  And I want to talk a little bit now about how Mango Markets

9   worked.  When you wanted to learn about how Mango Markets

10  operated, one of the main places you turned to was the user

11  guide, correct?

12  A.  Yes, sir.

13  Q.  Fair to say that was an important place to understand how

14  Mango Markets worked and what it was supposed to do, right?

15  A.  Yes, sir.

16  Q.  So I want to take a look at some pages of that user guide.

17          MR. BURNETT:  If we can pull up Government Exhibit

18  1011, please.

19  Q.  This is the user guide we have been talking about, right?

20  A.  Yes, sir.

21          MR. BURNETT:  Let's go ahead to page 78 of the user

22  guide, please.

23  Q.  This here is the section that's about borrowing and

24  lending, correct?

25  A.  Yes, sir.

1  Q.  And this has basically a step-by-step guide for what you

2  got to do to borrow funds, right?

3  A.  This is the start of those instructions, yes, sir.

4  Q.  Right.  This user guide, this section generally tells

5  folks, here is what you have to do to borrow, right?

6  A.  Yes, sir.

7       MR. BURNETT:  Let's go ahead to page 79, so the next

8  page here.

9  Q.  And there is a sentence at the top that says:  The UI will

10  prompt you to select the assets that you wish to withdraw and

11  borrow and toggle "borrow funds" on.

12       Did I read that right?

13  A.  Yes, sir.

14  Q.  And do you see there is an image below that on the screen

15  that's an example of that borrow button?

16  A.  Yes, sir.

17  Q.  And that's the button that you have to press to represent

18  that you are borrowing funds, correct?

19  A.  Our research identified that's the button you press that

20  allows you to potentially borrow funds.

21  Q.  So that's one way you can borrow funds, right?

22  A.  That is one way you can borrow funds.

23  Q.  You got a signal to the platform that you are borrowing

24  funds if you want to borrow funds, correct?

25  A.  That's accurate.

1    Q.  Actually, you do that by like clicking this toggle, right?

2    You say you're borrowing.

3    A.  That's correct.

4    Q.  Now, we can agree that when a user borrows funds, they need

5    to have enough assets to support that borrow initially,

6    correct?

7    A.  They need to have enough assets in collateral as determined

8    by the protocol to borrow those funds.

9    Q.  Right.  The system won't let them borrow unless they have

10   enough assets to begin with to support that borrow, correct?

11   A.  That is correct.

12              MR. BURNETT:  So let's take a look at that.  We can go

13   back one page to 78.

14   Q.  Do you see there is a section that says:  Don't sell, just

15   utilize?

16   A.  Yes, sir.

17   Q.  In the second sentence, after under the hood it says:  The

18   Mango Markets risk engine permits users to take out fully

19   collateralized loans against any deposited assets, correct?

20   A.  Yes, sir.

21   Q.  And fully collateralized means you have to have enough

22   assets to do the borrow when you click that borrow button,

23   right?

24   A.  That's correct.

25   Q.  In fact, the Mango Markets smart contract will check to

O4GMEIS2                        Sheridan - Cross

1    make sure someone has enough assets before it let's them

2    borrow, right?

3    A.  Yes, sir.

4            MR. BURNETT:  Let's take a look at that.  We can go

5    down two pages to page 81.  If you could zoom in on the

6    screenshot here.

7    Q.  This is a screenshot of the confirm withdrawal page,

8    correct?

9    A.  Yes, sir.

10   Q.  And it says this includes borrows of, in this example,

11   100,000 USDC, right?

12   A.  Yes, sir.

13   Q.  So it's checking how much you're borrowing.  That's what

14   the system is doing.

15   A.  The check -- my interpretation would have already occurred.

16   This is the confirmation.

17   Q.  Got it.  Part of that confirmation is, it says there is an

18   account health check, correct?

19   A.  Yes, sir.

20   Q.  And part of what it's checking is the account value, right?

21   A.  Yes, sir.

22   Q.  That's to make sure you have enough assets to support that

23   borrow, correct?

24   A.  Yes, sir.

25   Q.  And part of what it's checking is the risk and the leverage

O4GMEIS2                    Sheridan - Cross

1    and the borrow value, right?

2    A.  My confusion is on the withdrawal versus borrow.  In this

3    screenshot, and this was a consistent theme in our

4    investigation, is identifying what was considered a withdrawal

5    and what was considered a borrow.  As you can see, the top says

6    confirm withdraw, but the borrow value is listed here.  So it's

7    difficult to make a distinction between a borrow and a

8    withdrawal.

9    Q.  Mr. Sheridan, we can agree this says includes borrow of

10   100,000 USDC, correct?

11   A.  Yes, sir.

12   Q.  So I think it's not so hard to make a distinction here to

13   understand that this is borrowing and then withdrawing, right?

14   A.  But the includes part is the challenge.  If you are about

15   to withdraw 100,000 -- the amounts equate, yes, sir.  The

16   withdrawal of 100,000 USDC, that includes the full amount of

17   that borrow, to me in this case would indicate that this full

18   amount is a borrow, yes, sir.

19   Q.  Right.  What this is showing is someone is borrowing

20   100,000 USDC and withdrawing 100,000 USDC, correct?

21   A.  Yes, sir, that's how I would interpret it.

22   Q.  Before it can do that, the system runs basically a credit

23   check on your account value to make sure you have enough assets

24   there to support that borrow before you can withdraw it.

25   A.  That's accurate.

1        MR. BURNETT:  Now, let's go down to page 108.

2        I apologize.  I sent you to the wrong spot, Mr. Sears.

3   Let's go to page 60.

4   Q.  To keep a borrow open on Mango Markets, a Mango Markets

5   user has to maintain enough collateral in their account,

6   correct?

7   A.  To keep a borrow open.  Can you clarify what you mean by

8   keep open?

9   Q.  Sure.  Why don't we deal with the documents.  At the bottom

10  here it says watch your health ratio, right?

11  A.  Yes, sir.  I see that.

12        MR. BURNETT:  If we can go to the top of the next

13  page, please.

14  Q.  This says at the top:  Once a position is opened, it must

15  maintain a health ratio above zero percent.  If an account

16  falls to zero percent, it will be liquidated and the funds will

17  be lost.

18        Did I read that right?

19  A.  Yes, sir.

20  Q.  What that means is, you need to maintain enough collateral

21  to keep your health high enough if you want to keep your borrow

22  open, right?

23  A.  Yes, sir.

24  Q.  Otherwise, you are going to get liquidated.

25  A.  Yes, sir.

1    MR. BURNETT:  Now, this shows up in a few other

2    places, right, so page 103, why don't we go down there.  If we

3    can zoom in on the bottom.

4    Q.  This says on the second line:  Maintenance health must be

5    kept above zero to avoid liquidation, correct?

6    A.  Yes, sir.

7    Q.  To keep that borrow open you have got to keep that health

8    up, right?

9    A.  Yes, sir.

10   MR. BURNETT:  Let's take this down.

11   Q.  I want to talk about liquidations, which you touched on, I

12   think, briefly in your direct examination, correct?

13   A.  Yes, sir.

14   Q.  Now, the basic point here is that if someone has losses,

15   they can lose their collateral, right?

16   A.  By losses you mean the assets that they have borrowed on

17   the collateral are in a negative state, yes.

18   Q.  So if they have lost money on a bet, the system can go grab

19   their collateral to cover those losses, right?

20   A.  Based on the health of their account, yes.

21   Q.  If you don't have enough assets, you can go bankrupt on the

22   platform, right?

23   A.  Yes, sir.

24   Q.  Fair to say that going bankrupt typically not a good thing?

25   A.  That's an accurate statement.

1  Q.  Now, you also talked about socialized losses on the

2  platform, correct?

3  A.  Yes, sir.

4  Q.  And basically what socialized losses are is, it means if

5  your losses are so big that you don't have enough collateral to

6  cover them and the insurance fund can't cover them, then

7  everyone else on the platform is stuck holding the bag for your

8  losses, right?

9  A.  Everyone else on the platform will be contributing funds to

10  cover those losses, yes.

11  Q.  Everyone else has to chip in to pay your loss?

12  A.  Yes, sir.

13  Q.  Now, there is a way to avoid liquidation on the platform,

14  right?

15  A.  Yes, sir.

16  Q.  You could put more money into the platform, right?

17  A.  Or reduce your borrows.

18  Q.  You can cut down on borrows or you can put money in

19  yourself, correct?

20  A.  Yes, sir.

21  Q.  Mr. Eisenberg didn't reduce his borrows or put money back

22  into the platform, did he?

23  A.  No, sir.

24  Q.  Let's shift gears now and talk about a different topic.

25        You testified on direct examination that when someone

1    starts using Mango Markets, they need to press a button that

2    says the platform is unaudited and, quote, I understand and

3    accept the risks.

4            Do you remember that?

5    A.  Yes, sir.

6    Q.  That was, I think, Government Exhibit 1010, or something

7    like that, the little screenshot, right?

8    A.  I remember the screen.  I don't remember the number.

9    Q.  Fair enough.

10           Now, that screenshot doesn't say what risks the person

11   is accepting, correct?

12   A.  No, sir.

13   Q.  And you are not here today testifying as a legal expert,

14   fair to say?

15   A.  Correct, sir.

16   Q.  So you are not testifying that by clicking a button that

17   says I accept the risks, every user of Mango Markets was giving

18   up protections of the criminal law, right?

19           MS. MARTABANO:  Objection.

20           THE COURT:  Overruled.

21   A.  Can you repeat the question, sir.

22   Q.  Sure.  You're not testifying that by clicking the button

23   that says, I accept the risks, every user of Mango, as a matter

24   of fact, was giving up the protections of criminal law, right?

25   A.  I'm not an attorney, sir, no.

1    Q.  You also understand that by the time of Mr. Eisenberg's

2    scheme in October 11 of 2022, the code actually had been

3    audited, right?

4    A.  Yes, sir.

5    Q.  And just to orient everyone, that's Government Exhibit

6    1011.  This is the user guide again, right?

7    A.  Yes, sir.

8    Q.  If we go to page 3, this is the audit section, right?

9    A.  Yes, sir.

10   Q.  Now, you were asked a few questions generally about how

11   code audits work on direct examination, right?

12   A.  Yes, sir.

13   Q.  But you weren't actually asked to go through the specific

14   things that this audit covered, were you?

15   A.  No, sir.

16   Q.  Let's take a look at Defense Exhibit 60.  This is the audit

17   that you looked at earlier, correct?

18   A.  When you say earlier, earlier in the trial?  I reviewed it

19   before trial and in trial, yes.

20   Q.  I apologize.  This is the one that's linked on that web

21   page, correct?

22   A.  Yes, sir.

23          MR. BURNETT:  Let's go ahead to page 3.

24   Q.  Now, here there is an introduction section, right?

25   A.  Yes, sir.

O4GMEIS2                        Sheridan - Cross

 1              MR. BURNETT:  Let's just orient everyone.

 2    Q.   This says in the first paragraph:  Mango engaged Neodyme to

 3    do a detailed security analysis of their on-chain Mango V3

 4    smart contract.  A thorough audit was conducted between January

 5    and April 2022.

 6              Right?

 7    A.   Yes, sir.

 8    Q.   And it says the audit revealed some vulnerabilities but

 9    that Mango has released a fix for all issues except one

10    informational finding in the second paragraph?

11    A.   Yes, sir.

12    Q.   Now, let's go ahead to page 5 of the audit.  Let's zoom in

13    on the first paragraph here.  This is the methodology section,

14    right?

15    A.   Yes, sir.

16    Q.   And under the methodology section it says -- let's keep

17    that blown up.  It says:  Neodyme's audit team, which consists

18    of security engineers with extensive experience in Solana smart

19    contract security, reviewed the code of the on-chain contract,

20    paying particular attention to the following.

21              And then it has got a list of stuff they paid

22    attention to, right?

23    A.   Yes, sir.

24              MR. BURNETT:  If we could go down to the fourth bullet

25    from the bottom, if you could highlight the fourth bullet from

O4GMEIS2                          Sheridan - Cross

1  the bottom, please.

2  Q.  One of the things they focused on was ruling out economic

3  attacks, correct?

4  A.  Can I see the paragraph above it, sir?

5  Q.  Sure.

6  A.  Yes, sir.  Sorry.  I just wanted to get the full context,

7  yes, sir.

8  Q.  One of the things that security team that did the audit was

9  focus on ruling out economic attacks, correct?

10 A.  Yes, sir.

11 Q.  Now, let's switch gears a little bit.  You also testified

12 about how Mango Markets had something called a risk calculator,

13 is that right?

14 A.  Yes, sir.

15         MR. BURNETT:  We can take this down, Mr. Sears.

16 Q.  Now, basically, the risk calculator is just a way to figure

17 out when the value of a position will go up and when the value

18 will go down and how that's going to affect your health on the

19 platform, right?

20 A.  Yes, sir.

21 Q.  And you inputted some trades into that platform,

22 particularly Mr. Eisenberg's long position one time and then

23 Mr. Eisenberg's short position another time, correct?

24 A.  Yes, sir.

25 Q.  And you couldn't input the long and the short position at

O4GMEIS2                        Sheridan - Cross

1    the same time, right, because the trades were against each

2    other?

3    A.   The risk calculator only allows you to enter one trade at a

4    time.

5    Q.   So you couldn't mash the two accounts together; you had to

6    keep them separate when you did the risk calculator?

7    A.   There were two separate entries, yes.

8    Q.   When you inputted that information, you saw that when Mango

9    went up relative to USDC, the value of Mr. Eisenberg's long

10   position went up, right?

11   A.   Yes, sir.

12   Q.   And the value of the short position went down, correct?

13   A.   We had to do it in a separate -- yes.

14   Q.   You had to do it separately because you can't do both

15   accounts together, right?

16   A.   Yes, sir.

17   Q.   And you also saw that when the value of Mango went down

18   relative to USDC, the value of the long position went down,

19   right?

20   A.   Sorry.  Say it one more time.

21   Q.   Sure.  When the value of Mango went down relative to USDC,

22   the value of the long position went down, correct?

23   A.   Yes, sir.

24   Q.   And the value of the short position would go up, right?

25   A.   Yes, sir.

O4GMEIS2                        Sheridan - Cross

1    Q.  And none of that is surprising, right?

2    A.  No, sir.

3    Q.  That's just what long and short positions do, right?

4    A.  That's correct.

5    Q.  Now, all that really showed you was that Mr. Eisenberg's

6    trades were possible on the platform, right, they could

7    technologically happen?

8    A.  That's correct.

9    Q.  And you haven't heard anyone suggest otherwise during

10   trial, have you?

11   A.  Suggest that these trades were not technologically

12   possible?

13   Q.  Right.  No one has made that argument, right?

14   A.  No, sir.

15   Q.  And, again, you're not testifying as a legal expert here,

16   correct?

17   A.  No, sir.

18   Q.  So you are not testifying that just because what the

19   defendant did was possible on the platform it was legal to do

20   on the platform.  That's not your testimony, right?

21            MS. MARTABANO:  Object.

22            THE COURT:  Overruled.

23   A.  I'm not an attorney, so I can't offer testimony on legal

24   determinations.

25   Q.  Now, let's just stay on that risk calculator for one more

O4GMEIS2                        Sheridan - Cross

 1  minute.

 2           You were asked if there was a warning that shows up on

 3  the risk calculator when you change the inputs around.

 4           Do you remember that?

 5  A.  Yes, sir.

 6  Q.  There is a warning of sorts, isn't there?

 7  A.  Can you be more specific?

 8  Q.  Sure.  When the account value is positive, things show up

 9  in green and it says your health is good or great on the

10  platform, right?

11  A.  That's correct.

12  Q.  When your account value goes down, things turn yellow and

13  they say you might be liquidated and it says your account value

14  is poor, right?

15  A.  Yes, sir.

16  Q.  And when things go really bad, the screen turns red and

17  says you are going to be liquidated, and your position is

18  either very poor or I think the word it used was wrecked,

19  right?

20  A.  I don't remember wrecked.  I remember the red indicator.

21           MR. BURNETT:  Why don't we show the witness Government

22  Exhibit 1907, just the witness.

23  Q.  Do you recognize this type of screen?  Do you recognize it?

24  A.  Yes.

25  Q.  Does this refresh your recollection that the screen turns

O4GMEIS2                          Sheridan - Cross

1   red and says wrecked when your account gets low enough?

2   A.  Yes, sir.

3          MR. BURNETT:  We can take that down.

4   Q.  Fair to say that things going from green to yellow to red,

5   some people interpret that as a warning to stop, right?

6   A.  I think that's accurate.

7   Q.  Now, I want to move on and clear up just a couple of things

8   from yesterday.

9          You testified about settling PnLs, one of the topics

10  of your testimony, correct?

11  A.  Yes, sir.

12         MR. BURNETT:  Let's take a look at Government Exhibit

13  1011 again.

14  Q.  This is back to that user manual again, right?

15  A.  Yes, sir.

16         MR. BURNETT:  And I want to go ahead to page 113.  You

17  can zoom in here just grab the text, please.

18  Q.  This is the section that talks about settling PnL on a

19  position, right?

20  A.  Yes, sir.

21  Q.  And this says in the first bullet that settling PnL moves

22  the profit or loss from the perp market into the USDC token

23  balance, correct?

24  A.  Yes, sir.

25  Q.  So the profit goes from the perp market into the Mango

O4GMEIS2                    Sheridan - Cross

1   Markets account, right?

2   A.  Yes, sir.

3   Q.  Going off the platform, it's going into the USDC balance in

4   your account on Mango Markets, correct?

5   A.  Yes, sir.

6   Q.  Do you see there is a warning at the bottom here?

7   A.  I see the warning, yes, sir.

8   Q.  And that warning says:  This can take up to 60 seconds to

9   complete when using this feature on the UI, right?

10  A.  Yes, sir.

11          MR. BURNETT:  Let's take this down, but I want to stay

12  on the subject of settlement.

13  Q.  You testified that you had reviewed code data about a

14  settlement on Mr. Eisenberg's long position, correct?

15  A.  Yes, sir.

16  Q.  And specifically you testified that you identified a

17  settlement of profit and loss in the amount of 50 million USDC,

18  correct?

19  A.  Yes, sir.

20  Q.  Because, Mr. Sheridan, you actually didn't see 50 million

21  USDC anywhere in that settlement, did you?

22  A.  No, sir.

23  Q.  That doesn't appear anywhere in the actual code, right?

24  A.  That's correct, sir.

25  Q.  So you did not see a settlement of 50 million USDC, right?

O4GMEIS2                         Sheridan - Cross

1    That testimony was wrong.

2    A.  I don't agree with that statement, sir.

3    Q.  You looked at a settlement, correct?

4    A.  Yes, sir.

5    Q.  Nothing in that settlement said 50 million USDC, correct?

6    A.  Yes, sir.

7    Q.  So saying that you saw a settlement and that the code

8    showed 50 million USDC was not accurate, right?

9    A.  Again, I disagree with that statement.

10   Q.  Why do you disagree with that?

11   A.  So the settlement function was called to the platform.

12   Seventeen seconds later there was a withdrawal of the $50

13   million.  By Mango Markets' own documentation, settlements have

14   to be done in the -- into USDC, so based on the timing of when

15   the settlement was called, when the withdrawal occurred, and by

16   the, I'll call it, round number as the overwhelming majority of

17   cryptocurrency transactions involve numbers that aren't even or

18   whole or round.

19        MR. BURNETT:  I am going to move to strike this

20   portion of the testimony, your Honor.

21        THE COURT:  It's overruled.

22   A.  A round number from an investigation standpoint, to me,

23   indicates a user-selected action versus an automated action by

24   the protocol.

25   Q.  Let me break that down.  We can agree from the document we

1   just looked at that settling does not withdraw tokens, right;

2   it just moves tokens to your account balance, right?

3   A.   That's accurate.

4   Q.   So clicking the settle does not withdraw that money, right?

5   A.   That's correct.

6   Q.   And you saw a settlement get clicked, right?

7   A.   Yes, sir.

8   Q.   But you didn't see the amount of that settlement, right?

9   Not in the code.  The code does not say anything about it.

10  A.   That's correct, sir.

11  Q.   So what you are doing is, you're assuming that because

12  later you saw a withdrawal that the settlement must have been

13  an equal amount to the withdrawal, right?

14  A.   I don't call it an assumption, sir.  I am trying to link

15  together the facts based on the data that I have.

16  Q.   But you don't actually have any code data about the size of

17  that withdrawal, correct?

18  A.   That is correct.

19  Q.   It could be 10,000 USDC, right?

20  A.   I don't have any data on it.

21  Q.   It could be 10 USDC, right?

22  A.   Again, based on the other pieces of information --

23  Q.   I'm just asking about the code, Mr. Sheridan.  From the

24  code you looked at, you don't know if it was one USDC, right?

25  A.   I don't know the amount.

O4GMEIS2                        Sheridan - Cross

1  Q.  You don't know if it was 50 USDC, right?

2  A.  I don't know the amount.

3  Q.  You don't know if it was 100 USDC, right?

4  A.  Correct, sir.

5  Q.  You can't tell that from the code, like you testified

6  yesterday, correct?

7  A.  My testimony yesterday was about the settlement function

8  and my connection of those other pieces of information.  I

9  cannot tell specifically from the code alone the amounts

10  involved.

11  Q.  You actually did have data about borrowing on Mango Markets

12  during this time period, didn't you?

13  A.  Can you -- in terms of amounts, can you be specific on the

14  data?

15  Q.  Sure.  You had access to the discovery in this case, right?

16  A.  Yes, sir.

17  Q.  You've been sitting here during trial, correct?

18  A.  Yes, sir.

19  Q.  So you saw data before trial about borrows on Mango Markets

20  and the amounts and the times of those borrows?

21  A.  Yes, sir.

22  Q.  And you saw data during trial about the amounts and the

23  times of those borrows in different accounts, right?

24  A.  Yes, sir.

25  Q.  But you didn't testify about any of that on your direct

1    examination with the defense, correct?

2    A.  When I was asked how much was taken off the platform, that

3    amount includes those borrows.

4    Q.  So we can agree then that there were borrows from

5    Mr. Eisenberg taking money off this platform?

6    A.  Yes, sir.

7    Q.  And on this point let's take a look.  You were here for

8    Special Agent LaGrange's testimony earlier, correct?

9    A.  Yes, sir.

10            MR. BURNETT:  Let's take a look at Government Exhibit

11   502A, which is already in evidence.

12   Q.  You saw Special Agent LaGrange testify that this was a

13   document from Mr. Eisenberg's Discord account, correct?

14   A.  I don't recall him saying that in testimony.  If that is

15   what you -- I was in and out of the courtroom, so --

16   Q.  You might have missed this one?

17   A.  I remember this document.  If you're asking me specifically

18   about where it's from, I don't --

19   Q.  Fair.  It says Discord at the bottom on the tab, right?

20   A.  Yes, sir.

21   Q.  And in the user name section it says Avraham Eisenberg with

22   a number next to it, right?

23   A.  Yes, sir.

24            MR. BURNETT:  Let's read rows 2 and 3 here, if we can

25   highlight them.

O4GMEIS2                          Sheridan - Cross

1    Q.  In 2 and 3 Mr. Eisenberg writes:  I'm looking at low cap

2    coins listed on lending markets.  The idea is buy a ton,

3    massively increase the price, and borrow on lending to lever.

4            Do you see that?

5    A.  Yes, sir.

6    Q.  We can agree that's a reference to borrowing, right?

7            MS. MARTABANO:  Objection.

8            THE COURT:  Sustained.

9            MR. BURNETT:  Let's go ahead to rows 54 to 57.

10   Q.  Here, this is the Avraham Eisenberg account writing again,

11   right?

12   A.  Yes, sir.

13   Q.  And here he writes:  First question is viability.

14   Eyeballing Mango books.  What happens if I spend 250K?  Does it

15   move 20 cents and stay there for a while?  We can pull borrows.

16           Did I read that right?

17   A.  Yes, sir.

18   Q.  Now, you also saw Special Agent LaGrange present Government

19   Exhibit 318, correct?

20   A.  I don't know of the number.

21   Q.  I apologize.  I'm just throwing exhibit numbers at you?

22           MR. BURNETT:  Here.  Why don't we go to Government

23   Exhibit 318 for the witness and the jury.

24           If we can zoom in on the box here.

25   Q.  This was a document, a search from Mr. Eisenberg's computer

O4GMEIS2                        Sheridan – Cross

1   that Special Agent LaGrange presented while you were watching
2   trial, correct?
3   A.  I don't remember this being presented.  I've been dealing
4   with other issues in other matters, so I've been stepping in
5   and out of the courtroom.
6   Q.  You have been dealing with defense stuff, but you weren't
7   watching the part where she was showing the borrow screen here?
8   A.  I don't remember this screen being presented at trial.
9   Q.  We can agree here that the title here says Mango Markets,
10  correct?
11  A.  Yes, sir.
12  Q.  And there is an URL.  That URL is to
13  HTTPS..trade.mango.markets/borrow.
14          Do you see that?
15  A.  Yes.
16  Q.  You have actually gone to visit the Mango Markets user
17  interface from the version 3 part of the program, correct?
18  A.  Yes.
19  Q.  You flipped through the pages there?
20  A.  Yes, sir.
21  Q.  That's how you got your understanding of this case, because
22  you hadn't used Mango Markets before, right?
23  A.  That's part of how I got the understanding of the case.
24  Q.  So you know there was a borrows page on Mango Markets,
25  correct?

O4GMEIS2                      Sheridan - Cross

1    A.   That's accurate, yes.

2    Q.   And that page is the one that had the place that you could

3    select all the different cryptocurrencies that you wanted to

4    borrow from, right?

5    A.   So I wasn't able to visit that page in my interaction with

6    the website, because there is limited functionality, but that's

7    a reasonable conclusion.  If you're asking me if I visited that

8    page, I did not visit that page.

9    Q.   I want to be sure.  Did you not visit it because you had

10   limited functionality?  You actually remember trying to find it

11   and you couldn't get here, or you just didn't visit it?

12   A.   I remember trying to conduct some actions on the site that

13   it wouldn't let you go to further steps.  I don't remember if

14   the borrow page was one of those or not.

15   Q.   We can agree there was a borrow page, right?

16   A.   I can agree with that, yes.

17   Q.   Let's look at the time.  You see there is this visit down

18   here at the bottom, second-to-last line?

19   A.   Yes, sir.

20   Q.   And now, the day and time there, it's October 11, 2022.

21   That's the day we have been focused on in trial, correct?

22   A.   Yes, sir.

23   Q.   And it's 10:01 p.m. UTC, right?

24   A.   That's correct.

25   Q.   That's starting at 6:00, right?

O4GMEIS2                         Sheridan - Cross

1    A.  6 p.m. Eastern.

2    Q.  And the duration is one hour and a little over a minute,

3    right?

4    A.  That's correct.

5    Q.  From 6 to 7 p.m. on October 11, right?

6    A.  Yes, sir.

7    Q.  And that's the time when Mr. Eisenberg was carrying out

8    this scheme, right, 6 to 7 p.m. on October 11, when he was on

9    this borrow page?

10   A.  The times are close.  I would have to look at the exact

11   timeline, but yes.

12   Q.  Right around there.

13   A.  Yes, sir.

14        MR. BURNETT:  Now, let's go back quickly to Government

15   Exhibit 1011 on this topic.

16   Q.  This is the user manual again, right?

17   A.  Yes, sir.

18        MR. BURNETT:  And we can go to page 135.

19   Q.  Do you see there is actually kind of a set of FAQs with

20   borrows here?

21   A.  Yes, sir.

22   Q.  And the last one is the one I want to focus on, right.  Do

23   you see it says:  How can I tell if I have borrows?

24   A.  I see that, yes, sir.

25   Q.  And there are a bunch of stars and it says:  In the

O4GMEIS2                    Sheridan - Cross

1   accounts tab, the balances table has a borrow column.  All spot

2   borrows will show up there.

3          Did I read that right?

4   A.  Yes, sir.

5   Q.  There have been account balances that have been entered in

6   this case that show borrows listed on them, right?

7   A.  That's correct.

8          MR. BURNETT:  We can take this down.

9   Q.  You've also seen data from Mango Markets about how borrows

10  changed on the platform between 6 and 8 p.m., when

11  Mr. Eisenberg was doing this attack, right?

12  A.  Yes, sir.

13         MR. BURNETT:  Let's take a look at Government Exhibit

14  1002, which is already in evidence.

15  Q.  This is data from Mango Markets about borrows on the

16  platform, correct?

17  A.  It's data that's labeled total borrows.  I don't know the

18  source.

19  Q.  Sure.  Why don't we take a look --

20         MR. BURNETT:  Mr. Sears, this might take a minute, but

21  could you go to transcript page 364.  If we could scroll up

22  just to orient.

23         MS. MARTABANO:  Your Honor, this being shown to the

24  jury.

25         MR. BURNETT:  Testimony that's already come in, your

O4GMEIS2                          Sheridan - Cross

1   Honor.

2           THE COURT:  It is not being shown to the jury at

3   present.  Do you have an objection?

4           MS. MARTABANO:  That was all I wanted to know, your

5   Honor.

6   Q.  You remember that Tyler Shipe was one of the Mango

7   witnesses and worked at Mango Markets?

8   A.  Yes, sir.

9   Q.  Does this refresh your recollection that Government Exhibit

10  1002 is a set of data from Mango Markets about transactions and

11  stats on the platform?

12  A.  Yes.

13          MR. BURNETT:  You can take this down and go back to

14  1002.

15  Q.  You can see we are on the tab for borrows, correct?

16  A.  Yes, sir.

17  Q.  We are going to do a little fun spreadsheet work here.

18          MR. BURNETT:  Mr. Sears, if you could create a table

19  here, please.

20  Q.  You see column A is date slash hour?

21  A.  Yes, sir.

22          MR. BURNETT:  You can filter that to get to October

23  11.

24  Q.  You see we are on October 11 now?

25  A.  Yes, sir.

O4GMEIS2                     Sheridan - Cross

1    Q.  Do you also see there column B is labeled symbol?

2    A.  Yes, sir.

3    Q.  And there it has -- it says AVAX at the top.  AVAX is a

4    type of cryptocurrency, right?

5    A.  Yes, sir.

6              MR. BURNETT:  Why don't we start with filtering for

7    USDC.

8    Q.  Now, in column D, do you see that it says total borrows for

9    USDC?

10   A.  Yes, sir.

11   Q.  Let's work through the day.  From the top of this slide it

12   starts out at about 41.4 million total borrows, right?

13   A.  Yes, sir.

14   Q.  If we scroll down, get down to the bottom, all the way

15   until 2100, that's about 5 p.m. it's at 41 million borrows of

16   USDC, right?

17   A.  Yes, sir.

18   Q.  You see, between 6:00, so 2200, and 7:00, it jumps from 41

19   to what ends up being 95.8 million borrows of USDC off the

20   platform, correct?

21   A.  Yes, sir.

22   Q.  So we can agree that the amount of USDC borrowed off of the

23   Mango Markets on October 11, between 7 and 8, increased by

24   about 54 million USDC, correct?

25   A.  According to this spreadsheet, yes.

O4GMEIS2                          Sheridan - Cross

1    Q.  According to the actual data from Mango Markets, right?

2    A.  Yes, sir.  The distinction, as I was stating earlier, is

3    that we tried to find --

4              MR. BURNETT:  Objection.  Move to strike, your Honor.

5              THE COURT:  The motion is granted.  The witness'

6    answer after the first sentence will be stricken.

7    Q.  Now, Mr. Sheridan, you can actually do this same exercise

8    for every type of cryptocurrency that Mr. Eisenberg borrowed on

9    October 11, right?

10   A.  Yes, sir.

11   Q.  Let's do some of them.  Why don't we do USDT next.  That's

12   Tether, right?

13   A.  Yes, sir.

14             MR. BURNETT:  Let's light that up.

15   Q.  We can see here -- you see that the screen is oriented to

16   USDT?

17   A.  Yes, sir.

18   Q.  And according to the Mango Markets documents, the total

19   borrows are about 2.6 million for most of the day here, right?

20   A.  Yes, sir.

21   Q.  And then you see that at 2100 it's 2.6 million still,

22   right?

23   A.  Yes, sir.

24   Q.  And by 2300 we are up to 5.9 million almost, right?

25   A.  Yes, sir.

O4GMEIS2                          Sheridan - Cross

1   Q.  So the borrows during that period, when Mr. Eisenberg was

2   carrying out his scheme, increased by about like 3.2 million

3   USDT, right?

4   A.  According to this spreadsheet, yes.

5   Q.  According to the Mango Markets data, right?

6   A.  Yes, sir.

7   Q.  Now, let's also take a look at Serum.  That was another

8   token you borrowed, right?

9   A.  Yes, sir.

10  Q.  And this is the page for Serum?

11  A.  Yes.

12  Q.  You can see again that borrows hover around somewhere in

13  the order of 550,000 for most of the day, right?

14  A.  Yes, sir.

15  Q.  And then there are 560,000 at 5 p.m., right?

16  A.  Yes, sir.

17  Q.  And by 8 p.m. they have jumped to 2.9 million, right?

18  A.  Yes, sir.

19  Q.  We can do this for Bitcoin too, that's another token that

20  he borrowed, right?

21  A.  Yes, sir.

22  Q.  Let's go to Bitcoin.  You can see that it stays -- we are

23  on the Bitcoin page now, right?

24  A.  Yes, sir.

25  Q.  You can see that borrows on this Bitcoin page are about 14

O4GMEIS2                         Sheridan - Cross

1    for most of the day, right?

2    A.  Yes, sir.

3    Q.  And you can see that they jump to 295 at the end of the

4    day, right?

5    A.  Yes, sir.

6    Q.  We can agree that Mango Markets data shows that during the

7    time when Mr. Eisenberg was carrying out his attack, these

8    borrows jumped by over 250 Bitcoin, right?

9    A.  Yes, sir.

10           MR. BURNETT:  Let's just do one last one.  Why don't

11   we do Mango, MNGO.

12   Q.  We are on the Mango page now?

13   A.  Yes, sir.

14   Q.  And you can see the total borrows there are about 530,

15   40,000 most of the day, right?

16   A.  Yes, sir.

17   Q.  And something changes at the end of the day, right?

18   A.  Yes, sir.

19   Q.  It jumps to 49.7 million by the end, correct?

20   A.  Yes, sir.

21   Q.  According to the Mango Markets data.

22   A.  Yes, sir.

23           MR. BURNETT:  No further questions, your Honor.

24           THE COURT:  Ms. Martabano.

25           MS. MARTABANO:  Yes, your Honor.  Thank you.

1          Mr. Smith, if we could pull up Exhibit 1002, which we

2     were just looking at with the jury.

3          Thank you, Mr. Sears.

4          If you could also sort for USDC on the borrows tab.

5          If you could scroll down to the 2200, 2300.

6     REDIRECT EXAMINATION

7     BY MS. MARTABANO:

8     Q.  Mr. Sheridan, while he's loading the data, do you remember

9     what time the settle command was called based on your work in

10    this case.

11    A.  I believe it was 2229, but I ask to refer to where it's in

12    documentation just to make sure I'm a hundred percent on that.

13    Q.  But it hasn't happened at 2200, is that right?

14    A.  That is correct.

15    Q.  And looking at the spreadsheet that's up on the screen, I

16    just wanted to point out, Mr. Burnett asked you that between 6

17    and 7 p.m. it went from 41 million to 100 million.  Can you

18    look at that and tell me, between 6 and 7 and 8 p.m., what was

19    the actual change?  At 2200 hours, before Mr. Eisenberg's

20    settle and before his withdrawal, how much were the total

21    borrows on the platform?

22    A.  Sorry.  There was a lot there.

23    Q.  Sure.  At 2200, the total borrow column shows what number?

24    A.  Total borrow shows 100.8 million.

25    Q.  So the increase from 41 million was between 21 and 2200

O4GMEIS2                        Sheridan – Redirect

1   before Mr. Eisenberg settled his position?

2   A.  That's correct.

3   Q.  And the difference between 2200 and 2300 is actually a

4   decrease of 5 million in the borrows, approximately?

5   A.  Approximately, yes.

6           MS. MARTABANO:  You can take that down.  Thank you,

7   Mr. Sears.

8   Q.  Mr. Burnett walked you through the settle command and the

9   withdrawal and sort of clarifying how much would have been

10  settled or would not have been.  And you, I believe, testified

11  that you -- the settle command didn't actually have an amount

12  next to it, is that correct?

13  A.  That's correct.

14  Q.  And the next command was the withdrawal command.

15          Did that have a number next to it?

16  A.  It did.

17  Q.  What was that number?

18  A.  Fifty million USDC.

19  Q.  And how soon after the settle command was that pulled?

20  A.  Seventeen seconds.

21  Q.  And I believe you said that in your investigative

22  experience round numbers like that actually aren't very common.

23  Can you explain that.

24  A.  Cryptocurrency tokens are often divided into fractions of

25  wholes, and cryptocurrency values fluctuate dramatically and

O4GMEIS2                        Sheridan – Redirect

1    are not calculated in whole dollar amounts.

2            So, in general, cryptocurrency transactions involve

3    portions of tokens in dollars and cents in terms of the

4    transactions that occur when a trade occurs or a purchase

5    occurs or a withdrawal occurs or borrow occurs.  It is an

6    unusual occurrence to see a whole round number without any --

7    certainly any cents attached, much less any variation in the

8    number itself.

9            (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O4GCeis3                        Sheridan - Redirect

1    BY MS. MARTABANO:

2    Q.  I know Mr. Burnett walked you through some of the

3    documentation for Mango Markets.  Based on that documentation

4    and your research in this case, I believe in order to withdraw,

5    do you first have to settle a position?  Can you explain how

6    that works?

7    A.  In order to withdraw a profit and loss position, you have

8    to settle it.

9    Q.  And do you have to settle at least the amount of your

10   withdrawal or how does that work?  If you have no other assets

11   on the platform, would you have to settle at least the amount

12   of that withdraw in order to take it out or would you have to

13   settle -- what would happen if you would settle less?

14   A.  You're talking a P&L settlement; correct?

15   Q.  Yes.  So if you did a P&L settlement and you didn't have

16   any other assets in that account and you sought to withdraw

17   more than you had settled, would that work?

18   A.  No, ma'am.

19   Q.  Why not?

20   A.  Because it's not considered profit and you don't have

21   profit assets in your account.

22   Q.  If you were able to withdraw the $100 million, safe to say

23   the settle was at least $100 million?

24            MR. BURNETT:  Objection.

25            MS. MARTABANO:  I'll rephrase, your Honor.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O4GCeis3                              Sheridan - Redirect

Q.   Safe to say that if you withdrew $50 million and you had no

other assets on the platform, you must have settled at least

$50 million from your P&L to be able to do that withdrawal?

          MR. BURNETT:  Objection.

          THE COURT:  It's overruled.

A.   If you're settling a $50 million P&L settlement, you have

to have at least $50 million of profit in your account.  Am I

answering your question?

Q.   A little bit.

          If you were able to withdraw $50 million, does that

mean you had to settle at least $50 million of profit before

you were able to withdraw that if you had no other assets in

that account?

A.   If you're able to withdraw the $50 million from your

account -- the challenge is profit and loss -- if it's a profit

and loss settlement, yes, that statement is accurate.

Q.   And from all the documentation you've seen and as

Mr. Burnett so rightly pointed out, when you've been in trial,

the evidence you've seen in trial, do they clearly show whether

the October 11th withdrawals were accompanied by borrows?

          MR. BURNETT:  Objection.  Sidebar.

          THE COURT:  Let's have a sidebar.

          (Continued on next page)

O4GCeis3                          Sheridan - Redirect

1             (At the sidebar)

2             THE COURT:  So, fir first of all, I'm giving you some

3    leeway with the leading questions just to get through this, but

4    you need to make the questions not leading.

5             MS. MARTABANO:  Yes, your Honor.

6             MR. BURNETT:  My main issue, your Honor, is she's now

7    leading her questions over from factual things into intruding

8    on the jury's function by asking, from all the evidence you've

9    seen, is this clear or not clear.  What she's trying to get the

10   expert to do is effectively testify whether there is or is not

11   reasonable doubt as to this particular point.  The expert can

12   testify to what he saw or didn't see, and it would allow him to

13   be here during trial, which has been fair, but he can't give a

14   broad characterization about what he thinks is clear or not

15   clear from the evidence at trial.

16            THE COURT:  And I don't know that you're trying to do

17   that.

18            MS. MARTABANO:  I wasn't.

19            THE COURT:  I think this goes along with the way the

20   question is phrased.  So what is the question?

21            MS. MARTABANO:  I'll rephrase.  Just based on the

22   evidence he has seen in the case.  Tom, you keep saying --

23            THE COURT:  Let me hear the full question.

24            MS. MARTABANO:  Has he seen any evidence that the

25   withdrawals were definitely accompanied by borrows or not.

O4GCeis3                    Sheridan - Redirect

1           MR. BURNETT:  It's the same --

2           THE COURT:  I think it's got to be a more focused

3    question because I think the issue that Mr. Burnett has is that

4    kind of broad characterization divorced from any particular

5    evidence that he is reviewing and expressing an opinion on does

6    seem to get to the ultimate issue is going to be placed in

7    front of the jury.  However, can you certainly ask him more

8    targeted questions as to the opinions he's given or the

9    evidence that he's reviewed and relied on in preparing his

10   opinion and ask him to explain the basis for his opinion, and

11   that's fair for you to do.

12          MR. BURNETT:  I think we'd just ask that this really,

13   since -- when the characterizations of clear and definite are

14   put into the question, it goes beyond a leading question into

15   just like a straight jury argument.  So in crafting these,

16   we'll be objecting any time there's a "clear" or "definite" or

17   predicate like that placed into these leading questions.

18          THE COURT:  I understand.  But your fundamental

19   objection is on the general characterization of having been in

20   the courtroom for the entire case, is there reasonable doubt as

21   to whether these are borrows or withdrawals, things like that?

22          MR. BURNETT:  Yeah, that's basically --

23          THE COURT:  I agree that the way the prior question

24   was phrased, it is very close to that, but I think that can be

25   resolved by rephrasing the way you're asking these questions.

O4GCeis3                          Sheridan – Redirect

1              MS. MARTABANO:  Yes, your Honor.

2              THE COURT:  Let's move.

3              (Continued on next page)

1           (In open court)

2    BY MS. MARTABANO:

3    Q.  Mr. Sheridan, I'm going to show you what has been marked as

4    Government Exhibit 120A.

5           MS. MARTABANO:  You can publish this to the jury,

6    Mr. Smith.

7    Q.  Please take a look at this, Mr. Sheridan.  It was

8    described, I believe, while you were hearing testimony that

9    this shows web visits and searches by Mr. Eisenberg pulled from

10   his computer on October 11th.  Please take a look.

11   A.  Yes, ma'am.

12   Q.  You were shown on cross examination exhibit 318, which

13   showed a link to viewing the borrow link at Mango Markets.  Is

14   that the link that was -- appears to be shown in line 6?  And

15   I'm just asking you if the URL is the same, not necessarily

16   that everything is identical.

17   A.  Yes, it appears to be the same URL.

18   Q.  And can you tell us what link was pulled at line 3?

19   A.  You want me to read the whole link or --

20   Q.  Just the description is fine.

21   A.  It's trade.mango.markets for Mango perpetuals.

22   Q.  And it's not the borrow?

23   A.  That is a different link.

24   Q.  And same for line 13?

25   A.  That's the same link as in line 3, trade.mango.markets for

1   Mango --

2   Q.  Same for line 16?

3   A.  That's the same as the previous two.

4   Q.  And 17?

5   A.  This is a link to the Blockworks foundation GitHub site for

6   Mango client version 3.

7   Q.  And line 18?

8   A.  This is a link for how to use the risk calculator.

9   Q.  Line 19?

10  A.  So to clarify, the previous link was for the tutorial on

11  the risk calculator.  This link is for the risk calculator

12  itself.

13  Q.  And finally, 23.

14  A.  This is Mango Markets documentation for version 2, the

15  overview of those documents.

16          MS. MARTABANO:  Thank you.

17          Mr. Smith, if you can take that down and bring up

18  GX 1011 and turn to page 133.

19  Q.  On 120A, do you know one way or another if someone is going

20  to open a perpetual position, can that be done from the borrow

21  page?  I know you testified you hadn't looked at it live at the

22  time, but do you know one way or another from your research on

23  the platform?

24  A.  Can you open a perpetual position from the borrow page?  My

25  testimony would be no, but I did not try to execute that

O4GCeis3                        Sheridan - Redirect

1    function.

2              MS. MARTABANO:  If you could bring up, Mr. Smith, what

3    is my P&L position, what is my settled P&L.

4    Q.  Please take a look and read this entire thing to yourself.

5    As far as when we were talking earlier about the settlement of

6    a P&L and withdrawing from the platform, can you explain to us

7    how, if you are able to withdraw, what your settlement -- the

8    minimum your settlement must have been at the time to

9    reflect -- if you have no other assets in your account and you

10   are going to withdraw, how does the settlement process work in

11   order to call the withdraw command?

12   A.  If you have no other assets in your account?

13   Q.  Right.  Other than the position that you are going to

14   partially settle or settle.

15   A.  If you have no other assets in your account and you are

16   looking to settle your profit and loss, your profit and loss

17   will be settled based on the account value.  If it's a profit,

18   the account value increase.  It will be settled in USDC to your

19   account balance, and then your withdrawal will be the level of

20   profit you have settled from that account.

21   Q.  And would you be able to withdraw, in the instance where

22   you don't have other assets sitting in your account, would you

23   be able to withdraw more than the value of your settlement?

24   A.  Not for a profit and loss settlement.

25             MS. MARTABANO:  Bringing down up to the last -- the

 1    bottom of this.

 2    Q.  For example, you buy one SOL perp at $100 using 1 BTC for

 3    collateral.  Now assume the oracle drops to $80.  If no

 4    settlements have happened yet on your account, you would show

 5    an unsettled balance of minus $20.  If you settle your balance,

 6    you will still have one BTC and your SOL perp position, but it

 7    will now borrow $20 USDC.  So if you had nothing in your

 8    account and you lost money and you settled it, is this

 9    suggesting you would then show a borrow, but not a withdrawal?

10    A.  That's correct.

11    Q.  I believe Mr. Burnett was asking you about the risk

12    calculator and your ability to simulate multiple trades or from

13    multiple accounts at one time on the risk calculator?

14    A.  Yes, ma'am.

15    Q.  I think you said there's no way to simulate multiple

16    transactions on the risk calculator at once; is that right?

17    A.  I may have gotten hung up.  I thought he was asking me

18    simultaneously.  That's how I was answering that question.

19    Q.  I see.  So you could do it, but just not both at the same

20    time?

21    A.  That's correct.

22    Q.  I think you testified yesterday about the fact that

23    separate accounts wouldn't settle against one another anyway;

24    is that right?  So if I had two separate accounts set up on

25    Mango Markets, you can't take the collateral from account A to

O4GCeis3                          Sheridan - Redirect

1    settle a position in account B?

2              MR. BURNETT:  Objection.  Leading.

3              THE COURT:  Overruled.

4    A.  Yes.

5    Q.  Can you explain that to us, if you remember that testimony.

6    A.  That's correct.  The accounts -- all accounts within that

7    individual account have assets assigned solely to that account.

8    So any activity that occurs with that account happen only

9    within that account.

10   Q.  Was there any requirement in the documentation that you've

11   reviewed -- or what, if any, requirement was there in the

12   documentation you reviewed that you link all of your accounts

13   on Mango Markets so that you tell Mango, hey, I've got multiple

14   accounts?

15   A.  There is no requirement.

16   Q.  Was there anything in those documents that would say you

17   couldn't have separate accounts that weren't linked?

18   A.  No, ma'am.

19   Q.  I believe Mr. Burnett asked you about the health

20   requirement and showed you pieces of GX 1011 where you could do

21   the toggling for withdrawal and not withdraw.  Can you explain

22   your understanding of the impact of that toggle when you could

23   toggle on borrow?

24   A.  So, the impact of the borrow as executed on the protocol

25   was something that we could not definitively, by our analysis

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O4GCeis3                        Sheridan - Redirect

1  and code, determine what was labeled a borrow versus a

2  withdraw.  What appears in the code is a borrow designation as

3  a 1 or a 0.

4  Q.  And what does the 1 or the 0 mean?

5           MR. BURNETT:  Objection.  Foundation.

6           THE COURT:  Ms. Martabano, can you ask some

7  foundational questions.

8           MS. MARTABANO:  Sure.

9  Q.  Can you tell us what you researched in the code without

10 telling us your conclusion and how you came to understand that

11 and based on your background, training, and the research you

12 did in this case.

13 A.  So our analysis of transactions was primarily done through

14 Blockchain explorers using -- pulling up the information on the

15 transactions as they reported to the Blockchain.  Within the

16 results of those searches, transactions were listed as either

17 "borrow 0" or a "borrow 1."  There was no other information

18 that we were able to identify in the code that listed anything

19 specifically designating a withdrawal as opposed to a borrow.

20 In order to try and clarify what "borrow 0" and "borrow 1"

21 meant, we contacted Mango Markets --

22           MR. BURNETT:  Objection.

23           THE COURT:  The overruled.

24 A.  We contacted Mango Markets development teams and inquired

25 about the "borrow 1," "borrow 0" designation.

O4GCeis3                          Sheridan - Redirect

1              MS. MARTABANO:  Your Honor, is that sufficient to ask

2      what they --

3              MR. BURNETT:  Sidebar, your Honor.

4              THE COURT:  Quick one.

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O4GCeis3                        Sheridan – Redirect

1              (At the sidebar)

2              MR. BURNETT:  So I think we're getting into the

3      heartland of the problem area that we had talked about

4      yesterday where Mr. Sheridan, for starters, is very

5      conspicuously using "we" whenever he's talking about this

6      because he's talking about what the FTI team did.  And now

7      we've added an additional level of hearsay where it sounds like

8      he's about to testify based on what some unspecified Mango

9      developer who is unclear if he talked to or an FTI person

10     talked to or told them about zeros and ones.  So not only is

11     this outside of his expertise, and therefore not an admissible

12     area of inquiry, it also relies on multiple nested levels of

13     hearsay and expertise for other people, which clearly he was

14     not capable of doing himself.  We also have not received any of

15     the underlying bases about either a zero or one point or the

16     supposed call with Mango developers.  So we have no way to

17     cross examine on this point, which is a 705 problem.

18             THE COURT:  Ms. Martabano, let me just make sure I

19     understand.  So essentially, he's leader of the team, and so he

20     knows that there is a borrow/withdraw function.  And so, he

21     goes and asks his team, go find me the code basis for the

22     borrow and the code basis for the withdraw function.  What I

23     understand his testimony is, it's that his team returned back

24     and then said, well, we have this specification of the borrow

25     function as two designations, there's a "borrow 0" and a

O4GCeis3                          Sheridan - Redirect

1    "borrow 1."  Those seem to equate to both the borrows and

2    withdrawals.  There's no separate withdrawal designation in the

3    code.

4              MS. MARTABANO:  Correct.

5              THE COURT:  And so, he is using his expertise at the

6    higher level of the code to say, I know how smart contracts

7    work, and so, I want to figure out what the separate basis for

8    the withdraw function is so that if there is a linkage between

9    that code and ultimately the smart contract transaction that

10   leads to either a borrow or withdraw, I'm trying to figure that

11   out.  And so that's what he's testifying to; right?

12             MS. MARTABANO:  Right.

13             THE COURT:  As to that issue, the thing I'm concerned

14   about is this underlying evidentiary that the government says

15   they just don't have what he looked at.  And so, they can't

16   actually cross examine this witness on the basis of the

17   underlying factual predicate.  So even if I'm with you on the

18   Rule 702 and the fact he's relying on his team for some of

19   this, even if I was with you on that part of the inquiry,

20   there's a basic fairness point that the government doesn't have

21   that underlying material.  So help me out with that.

22             MS. MARTABANO:  Sure.  Really, what I'm getting at

23   is -- I can't remember which page of GX 101 was showed that had

24   the withdraw, it was a borrow instead of withdraw of $100,000.

25   I think we can avoid this by pulling up that.  The issue here

1    is the government presented on cross a suggestion of a

2    screenshot that if you're clicking withdraw and you have that

3    borrow toggled and you're automatically doing a $100,000

4    withdrawal and it is $100,000 borrow, our understanding, based

5    on Mango Markets documents and their research is that it won't

6    always be the case that, just because you say I would agree to

7    borrow, that your whole position is a borrow.  So the protocol

8    works such that if I have $1,000 in my account and I want to

9    withdraw $1,500, the first thousand is my balance, not a

10   borrow.  It's not a full $1,500 borrow.  And I think it's

11   confusing based on what Mr. Burnett showed because he showed

12   where the borrow and the withdrawal were equal, and we're just

13   trying to establish that that will not always be the case.

14        THE COURT:  I'm with you.  I understand what you're

15   doing.  I'm saying that just in the way that the government

16   provided you with those exhibits so that you could inquire,

17   cross examine their witnesses, et cetera, they don't have the

18   underlying code base that the expert is now referring to that

19   his team gathered.  That's the issue that I'm trying to figure

20   out.

21        MS. MARTABANO:  That code base is public at GitHub,

22   which I believe the government knows and was disclosed as a

23   source of their analysis.  It's a Mango Markets code that he's

24   been testifying about that's come in to evidence through the

25   government's links, through everything.

O4GCeis3                        Sheridan - Redirect

1              MR. BURNETT:  There are multiple levels here.  First

2    we, need the specific code they're talking about.  Second, he's

3    very explicitly testified he couldn't figure it out from the

4    code.  So what he did is went and called Mango developers,

5    which we never received any disclosure about any notes about

6    who he talked to, what that conversation was, whether he was

7    part of the conversation, whether it was a conversation with

8    somebody at FTI or somebody at FTI that told him about the

9    conversation.  So we don't only not have the code that he's

10   talking about, we also don't have this conversation that he's

11   talking about.  The Court bent over backwards the other day to

12   let this guy talk about areas that were far beyond what they

13   initially disclosed.

14             So it's deeply, deeply unfair and prejudicial to the

15   government to put us in the spot where we're asking him about

16   the user documents that have been in this case, disclosed in an

17   exhibit a month before trial, and now we're getting into

18   questions about a set of code lines and a conversation with

19   Mango developers that we never even knew about, let alone knew

20   that he reviewed and what specific line he's talking about

21   until just now.

22             THE COURT:  Well, you did ask the witness about those

23   spreadsheets that he had not -- were not part of his

24   affirmative testimony and that you had characterized as Mango

25   Markets documents and had him walk through the borrows; right?

O4GCeis3                        Sheridan - Redirect

1          MR. BURNETT:  We disclosed those a month before trial.

2          THE COURT:  That's what I hope that I've done.  I

3    think there's an issue of whether they have what it is he's

4    relying on, because if they did -- here's what we're going to

5    do:  You're going to cross him on this; right?  Or are you not

6    going to?

7          MR. BURNETT:  I don't even know if I'm going to cross

8    him on it because I don't even know what he's talking about.

9          THE COURT:  Let's see what the testimony is and we'll

10   pick it up.  If you make a motion to exclude, then I will tell

11   the jury to disregard testimony and figure out what that's

12   going to look like.  Right now, it's unclear to me -- I mean,

13   do you have this code?  If he looked at it, how does the FTI

14   team not have this code?

15         MS. MARTABANO:  It's because it's publicly available.

16   I don't think that they downloaded every time they examined it.

17   I imagine they have a copy.  But it's the GitHub that you could

18   just click on it and access it, as I understand it.  I don't

19   think that they're creating a spreadsheet every time that they

20   examine the code because they just pick it up live, look at it

21   much like with the Blockchain, you bring it up, you analyze it,

22   and then it's always available because it's publicly available

23   to pull and apply their expertise to.

24         MR. BURNETT:  This also doesn't capture the separate

25   point about the fact that the FTI team clearly could not figure

O4GCeis3                          Sheridan - Redirect

1    this out, so they called someone who has not been identified,

2    whose notes have not been produced to tell them what the answer

3    was, that person's not here and not subject to cross

4    examination.

5         MS. MARTABANO:  Your Honor, we won't go into that.

6    That was a surprise to me.

7         THE COURT:  If I understood the testimony and context,

8    what I gather his team did is that they located the function,

9    and I agree with you that we don't know what they asked the

10   Mango development team, but they probably wanted to make sure

11   that those were the applicable functions.

12        MR. BURNETT:  But even if that's what they did, then

13   the answer, yes or no, and who it came from and what that

14   person said is not only hearsay, which would be like a second

15   or third order hearsay piece for someone we can't cross

16   examine, they never produced the underlying notes, they never

17   provided notice of the call.  I would like to cross examine him

18   of who was on the call, what specifically did you show them on

19   the call, what exactly did they say on the call.  I don't have

20   any of that underlying information because none of it was made

21   available.  In fact, it wasn't disclosed until ten seconds ago

22   when he was on the stand.

23        MS. MARTABANO:  I think there may be a way to shortcut

24   this.  The code says zeros and ones, they determined that.

25   That's for you're either borrowing or on a withdrawal you're

O4GCeis3                          Sheridan - Redirect

1     borrowing.

2              I really just want to point out because the code is a

3     zero and a one, there's no way to tell when it's toggled on

4     that you are definitely borrowing or definitely withdrawing.

5     And he did say, I believe, already, that the code is unclear as

6     to whether having the 1 on the toggle on, which is the toggle

7     they talked about, means it's all a withdrawal or all a borrow

8     or some portion.  And, in fact, you would need the screenshot

9     that comes up given during a transaction that one of which, an

10    example of which Mr. Burnett showed, which would tell you as

11    the user this portion is a borrow, this is how much you're

12    withdrawing.  We do not have any evidence in the record from

13    Mango or the government of what that screen would have looked

14    like for Mr. Eisenberg's trade.  The fact that they're

15    suggesting that it would have looked like a complete --

16             THE COURT:  That's an argument that you can make in

17    your case.  I'm sure that you will make that argument.  For

18    present purposes, if Mr. Burnett were to cross Mr. Sheridan on

19    this issue, would he be able to get on a computer and show

20    Mr. Burnett the code that he's referring to or in some way

21    provide the basis for the opinion that he's giving to the jury?

22             MS. MARTABANO:  I think so.  I don't know without

23    being able to speak to him, but I believe so.  If he clicked on

24    the Mango Markets hub, he could find it.

25             MR. BURNETT:  This should all be excluded because it's

O4GCeis3                        Sheridan – Redirect

1    not noticed, totally new, and we never received the underlying

2    basis.  That's our initial application.  If the Court is not

3    inclined to grant that application, we would ask if we could

4    *voir dire* outside the presence of the jury on it.

5              THE COURT:  Let's figure this out and see if you can

6    do it.  That's my fundamental concern, is that the government

7    doesn't have the underlying basis for this opinion and then

8    there's the other issues, but we can get to that.

9              (Continued on next page)

O4GCeis3                         Sheridan – Redirect

1                    (In open court)

2                    THE COURT:  Members of the jury, we're going to take a

3      quick 10-minute break, bonus break while we work things out.

4      And so, all rise for the jury.

5                    (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O4GCeis3                        Voir dire

 1            (Jury not present)

 2            THE COURT:  Mr. Burnett.

 3            MR. BURNETT:  Thank you.

 4            Mr. Sheridan.  Just a few questions about this

 5       zero-one thing you're testifying about.

 6            THE WITNESS:  Yes, sir.

 7            MR. BURNETT:  Who was it that went into the code and

 8       found zeros and ones?

 9            THE WITNESS:  That would be members of my team.

10            MR. BURNETT:  Would you personally have been able to

11       do that yourself or you needed them to do it for you to find

12       the zeros and ones?

13            THE WITNESS:  I've never tried, so I can't -- I don't

14       know.

15            MR. BURNETT:  And if I showed you the full code today,

16       could you today point me to the zeros and ones and say what

17       they mean?

18            THE WITNESS:  So, one step back.  The zero and one in

19       the code review was conducted by members of my team.  The zero

20       and one as displayed in the Blockchain explorer is something

21       that I can do and I'm familiar with.

22            MR. BURNETT:  Sorry.  I want to make sure I

23       understand.

24            So the code base is not something that I could show

25       you today and you would be able to find for me and tell me

O4GCeis3                        Voir dire

1    where it is in the code base and what it means, that's

2    something your FTI team did?  Or you would just be parroting

3    what your FTI team told you about it?

4         THE WITNESS:  The code base, that is, I would need to

5    rely on my team for the code review.

6         MR. BURNETT:  And this Blockchain explorer thing, do

7    you have the documents with you that you looked at for this

8    Blockchain explorer thing to find the zeros and ones?

9         THE WITNESS:  I don't have them with me.

10         MR. BURNETT:  So we'd move to preclude this entire

11    line of testimony.

12         THE COURT:  Is that something that you can find, do

13    you know what the URL is and could you find it in five seconds?

14         THE WITNESS:  We could have it in minutes, sir.  Me

15    personally, right now?

16         THE COURT:  Yes.

17         THE WITNESS:  I would need the transaction data of a

18    borrow and another transaction to be able to find it.  We have

19    specific ones.  I could make that effort, sir, if that's what

20    you're asking.

21         THE COURT:  Explain to me, you mentioned code and you

22    mentioned Blockchain explorer.  So tell me the relationship

23    between those two things and how it is the basis of your

24    opinion.

25         THE WITNESS:  So the Blockchain explorer is a product

O4GCeis3                    Voir dire

1    that is publicly available in order to analyze and pull

2    information about the Blockchain transactions.  So in this

3    case, specific borrows or deposits or withdrawals and so forth.

4    The code -- there are elements of code within the Blockchain

5    explorer and instructions and program logs specific to the

6    transaction you are researching.  The code for the Mango

7    Markets protocol upon which those transactions are based and

8    details the instructions of what reports the 1 or the 0 as it

9    relates to borrow is that is what we've been discussing, it's

10   on GitHub and is the much broader and more extensive set of

11   instructions to allow the Mango Markets protocol to run.

12          THE COURT:  So for your opinion, are you relying on

13   what you reviewed yourself in the Blockchain explorer or

14   instead what your team reviewed in the code base?

15          THE WITNESS:  The Blockchain explorer shows the 1

16   and 0, which I've personally seen, if that's what you're

17   asking.

18          THE COURT:  So when you testified about a "borrow 1"

19   and a "borrow 0," is that from this Blockchain explorer or is

20   it from the code base?

21          THE WITNESS:  The ones and zeros are reported on the

22   Blockchain explorer.

23          THE COURT:  In what way did you rely on your team's

24   analysis to figure out what those terms meant within the

25   Blockchain explorer?

O4GCeis3                          Voir dire

1          THE WITNESS:  So looking at the 1 and the 0 in the

2     Blockchain explorer and looking at the program log and

3     instruction logs, I could not identify what the 1 and the  0

4     meant.  Part of the objective, as requested by the defense

5     counsel, was to identify which transactions were borrows, which

6     were lends, or which were withdrawals and which were borrows.

7     So because I could not identify what that 1 and 0 meant, I

8     asked my team, can you guys go into the deeper full code base

9     upon which the program is written, or the instructions for the

10    protocol, I should say, and see if you can find information as

11    to why this is being reported as a 1 and a 0.

12         THE COURT:  So for any borrow or withdrawal in a

13    user's account, they are reflected as what in Blockchain

14    explorer?

15         THE WITNESS:  Well, that's the challenge.  As it

16    relates to this 1 and 0?

17         THE COURT:  I'm saying, is that how they're reflected,

18    either as a 1 or a 0?

19         THE WITNESS:  Yes.  The borrow designation is either 1

20    or 0.

21         THE COURT:  For any transaction.  What about a pure

22    withdrawal where there's absolutely no borrow?

23         THE WITNESS:  That's the challenge.  There's no

24    withdrawal 1 or 0.  There's only borrow 1 or 0.

25         THE COURT:  For all transactions?

O4GCeis3                          Voir dire

1              THE WITNESS:  For all transactions that I reviewed --

2     I don't know -- as it relates to this matter -- and I need to

3     clarify that, for the transactions that we reviewed related to

4     trying to identify whether a withdrawal was a borrow or not.

5     So I didn't review, personally, every transaction and looked

6     for the 1 or 0.  We looked for, as it relates to the

7     $50 million -- 50 million USDC, we looked for that 1 or 0 or

8     identified that 1 or 0 on that transaction.

9              THE COURT:  In the Blockchain explorer?

10             THE WITNESS:  In the explorer.

11             THE COURT:  Did you do that or did your team do that?

12             THE WITNESS:  They researched the activity and I

13    reviewed the results of that research.

14             THE COURT:  How is that reflected?  Did you get

15    printouts of the Blockchain explorer log or did you just view

16    it online?

17             THE WITNESS:  They sent me the transaction ID for that

18    transaction and I pulled up that transaction online and viewed

19    it.

20             THE COURT:  Okay.  Understood.

21             MR. BURNETT:  Can I inquire further, your Honor?

22             THE COURT:  Yes.

23             MR. BURNETT:  So I want to be clear about something.

24    When you asked your team to figure out what 0 and 1 means, that

25    was because you do not have the technological background to

O4GCeis3                        Voir dire

1    figure that out; right?  It's not like they were saving you

2    time, you just don't know how to do that; right?

3          THE WITNESS:  Within the full Mango Markets code, yes,

4    I would not have the technical knowledge to be able to do that.

5          MR. BURNETT:  Even if there is this one-zero thing on

6    the Blockchain explorer as you claim, the only way you would

7    know what the 0 or 1 means is because some other person who has

8    more expertise at FTI on the code told you that; right?

9          THE WITNESS:  Yes.

10          MR. BURNETT:  And, in fact, even those FTI people

11    weren't able to figure it out.  You testified they called

12    someone from Mango developers or something?

13          THE WITNESS:  We contacted them on Discord.  We could

14    not find that code.

15          MR. BURNETT:  But you didn't even speak to someone,

16    you contacted someone on Discord?

17          THE WITNESS:  It was Discord communication.

18          MR. BURNETT:  Who was involved in that communication?

19          THE WITNESS:  Members of my team.

20          MR. BURNETT:  Who?

21          THE WITNESS:  Their specific names?

22          MR. BURNETT:  Yeah.

23          THE WITNESS:  Christopher Schroeder and Fredrix

24    Vazquez Ortiz.

25          MR. BURNETT:  Who did they speak to on Discord?

O4GCeis3                          Voir dire

1          THE WITNESS:  I don't remember this particular

2     development member.

3          MR. BURNETT:  Do you remember who it could have been?

4          THE WITNESS:  We were communicating with I think Pam

5     and Maximillian and Microwaved Cola.

6          MR. BURNETT:  Microwaved Cola, is that what you said?

7          THE WITNESS:  Yes, sir.

8          MR. BURNETT:  Those Discord things are actual

9     messages, so they're typed out like with a screenshot?

10         THE WITNESS:  I don't know if we kept screenshots, but

11    they're typed out.

12         MR. BURNETT:  Do you have them with you?

13         THE WITNESS:  No, sir.

14         MR. BURNETT:  Your Honor, I think it's very clear --

15    we could do this outside the presence of Mr. Sheridan, is

16    probably appropriate.  Based on the Court's ruling yesterday

17    and what's been developed today, none of this is appropriate

18    testimony.

19         THE COURT:  Is it as simple as striking Mr. Sheridan's

20    testimony as to what the 1 or the 0 mean?

21         MR. BURNETT:  And no further questions on that

22    one-zero code analysis topic.

23         THE COURT:  We'll do that.  And I think just to speed

24    things up, once we finish with this, I can give the parties the

25    reasons for excluding that testimony, but I think in the

O4GCeis3                              Voir dire

  1    interest of time, it makes sense to get the jury back in and to

  2    continue with the redirect examination and any recross.  Does

  3    that make sense to both sides?

  4              MS. MARTABANO:  Yes, your Honor.

  5              I just wanted to clarify before so we don't have any

  6    problems.  I would like to show him DX 20, he will not testify

  7    about ones and zeroes, but DX 20 which is already admitted in

  8    evidence, which is basically another shot similar to what the

  9    government showed that's in the GX 1011, the Mango Markets

 10    documents.  It's just another example and I think it would cure

 11    the prejudice I was mentioning earlier about the fact that what

 12    they showed was a withdrawal that was a 100-percent withdraw

 13    and borrow.  And DX 20 shows an instance where there is --

 14              THE COURT:  Well, I don't think you can preview this

 15    with the witness.  I think just do whatever you're going to do

 16    and we'll take the objections up as they come.

 17              MS. MARTABANO:  Okay.

 18              (Continued on next page)

O4GCeis3                           Sheridan - Redirect

1          (Jury present)

2          THE COURT:  Before the break, you heard testimony

3     concerning what a 1 and a 0 meant.  You should disregard that

4     testimony.  It is stricken from the record.

5          Ms. Martabano, you may proceed with a different line

6     of questioning.

7          MS. MARTABANO:  Thank you, your Honor.

8          Mr. Smith, if you could bring up DX 20.  This has

9     already been admitted into evidence, so you can show it to the

10    jury.  If you could bring up next to that GX 1011, page 81.

11    BY MS. MARTABANO:

12    Q.  Mr. Sheridan, can you see the two exhibits on your screen?

13    A.  Yes, ma'am.

14    Q.  Mr. Burnett was just asking you about the one on the

15    left-hand side from GX 1011 showing a withdraw and a borrow --

16    a withdraw that says -- includes a borrow of the amount that's

17    equal to the withdraw.  Do you remember testifying about that?

18    A.  Yes, ma'am.

19    Q.  Looking at DX 20, I'm going to have Mr. Smith turn to page

20    2 of that.  Looking at this exhibit, can you explain what the

21    withdrawal string says at the bottom and what that indicates to

22    you based on your understanding of Mango Markets.

23    A.  Based on my understanding, it is a confirmation withdrawal

24    that is including both what's labeled a withdrawal and a

25    borrow.

O4GCeis3                          Sheridan - Redirect

1  Q.  Are those two numbers equal?

2  A.  They are not equal.

3  Q.  And why are they not equal based on your understanding of

4  Mango Markets?

5  A.  Because the requested withdrawal does not have enough

6  assets within the account to be withdrawn without completing a

7  borrow.

8  Q.  Is it possible to have just borrowed the whole amount?

9  A.  It would have been possible the whole amount if there's

10 enough collateral and health in the account to complete the

11 borrow.

12 Q.  But in this instance, they're withdrawing more than the

13 borrow.  So there's a distinction between the borrow and the

14 withdraw amount?

15            MR. BURNETT:  Objection.  Leading.

16            THE COURT:  Overruled.

17 A.  Yes, ma'am.

18            MS. MARTABANO:  You can take that down.  Thank you,

19 Mr. Smith.

20 Q.  I believe Mr. Burnett was talking to you about using the

21 risk calculator and simulating Mr. Eisenberg's transactions and

22 whether you received a warning or anything like that.  We've

23 talked about how a settle and a withdrawal would work on the

24 platform.

25            Based on your understanding and using the risk

O4GCeis3                        Sheridan - Redirect

1    calculator to simulate those transactions, when

2    Mr. Eisenberg -- when you entered the transaction that led to

3    the long increasing in value, do you remember what the maximum

4    account value was, the maximum balance was showing in the

5    account at that time?

6    A.   In terms of dollar amount?

7    Q.   Yeah.  And it can be a ballpark, it doesn't have to be

8    specific.

9    A.   It would have exceeded $100 million.  I don't remember the

10   exact.

11   Q.   And based on your understanding of the platform, if you had

12   taken $50 million out from that $100 million, based on your

13   understanding of how health ratios work and collateral, would

14   the account still have been healthy after a $50 million

15   withdrawal?

16   A.   If you're taking $50 million from an account that has

17   $100 million value in it, yes.

18   Q.   Why is that?

19   A.   Because you still have enough positive assets, whether it's

20   collateral or other positively valued positions as compared to

21   your liabilities.

22   Q.   Mr. Burnett asked you about the Mango DAO and how the code

23   was launched.  Who initially launched version 1 of the code?

24   Was it the DAO?

25   A.   No, that would have been the Blockworks foundation.

1    Q.  He asked you about this could be a decentralized or

2    centralized, and a centralized entity could similarly propose

3    changes to the code.  For the Mango DAO, if I wanted to change

4    something right this instant, can I immediately implement that,

5    and if not, why?

6    A.  You cannot immediately implement because your proposed

7    changes have to go before the DAO as a vote.  You have to have

8    enough Mango tokens to be able to propose that vote.  The other

9    members of the DAO have to conduct the vote and it has to be

10   approved.

11   Q.  Is there a minimum amount of time that that might take?

12   A.  I believe they had a three-day minimum on their voting

13   procedures.

14   Q.  And even if it wasn't a three-day minimum, can you explain

15   a little more about how the voting works, how reaching

16   consensus, the minimum amount of votes works in order to make

17   proposals and get changes on the DAO.

18   A.  So in order to be able to participate in the voting

19   procedures, you have to stake or, for lack of better

20   explanation, lock up a volume of Mango tokens.  The volume you

21   lock up and commit to the DAO will effect certain factors about

22   voting rights and other timelines associated to the voting

23   process.  Once you have staked those tokens and are granted

24   recognition of that staking, you can then make proposals to the

25   DAO for votes.

O4GCeis3                        Sheridan - Redirect

1    Q.  And people have to have time to vote, some period of time

2    to vote on those; is that accurate?

3    A.  That's correct.

4    Q.  Going back to the discussion about going bankrupt on Mango

5    Markets, as far as you're aware, other than liquidation, is

6    there any other consequence to going bankrupt on Mango Markets

7    for the individual account that was liquidated?

8            MR. BURNETT:  Objection.  Scope.

9            THE COURT:  Overruled.

10   A.  Can you repeat the question, please.

11   Q.  Sure.  Mr. Burnett was asking you about being bankrupt on

12   Mango Markets and the impact of that, and I'm just asking you

13   on Mango Markets, if your account goes bankrupt, other than

14   becoming liquidated, is there any other consequence to you?

15   A.  The consequence is liquidation of your account, yes.

16   Q.  As far as you know, was there anything stopping you if you

17   had been bankrupted once from opening another account later on

18   Mango Markets?

19   A.  There is no stoppage of that, no.

20   Q.  What, if any, rules does Mango Markets have built in to

21   prevent repeat bankrupters from getting on the system again and

22   again?

23   A.  Due to the lack of identity requirements, they wouldn't

24   know that information.  And so, they don't put those procedures

25   in place.

1  Q.  And they also asked you about socialized loss.  In this

2  instance, in the trades at issue, did Mango Markets have to use

3  socialized loss in order to cover the losses incurred by the

4  protocol?

5  A.  We did not look into those procedures.  I don't know that

6  answer.

7  Q.  We discussed on your direct the fact that there had been a

8  bad debt repayment proposal that was passed?

9  A.  Proposal, yes.

10  Q.  $67 million repaid.  Does that affect your analysis here of

11  whether there was socialized loss?

12          MR. BURNETT:  Objection.  Leading.

13          THE COURT:  You're going to have to rephrase that

14  question.

15          MS. MARTABANO:  Sure.

16          Can we show the exhibit, which I believe is 901, just

17  to Mr. Sheridan.

18  Q.  Mr. Sheridan, while that's coming up, if you could just

19  explain your understanding of the order of how things proceed

20  on Mango Markets after a bankruptcy.  So liquidation going on

21  forward to finish off that loss up to socialized loss, which

22  Mr. Burnett was talking to you about.

23  A.  So liquidation followed by bankruptcy, followed by

24  insurance fund, followed by socialized losses.

25  Q.  And based on your understanding of the amounts at issue in

1    the case and exhibit 901, which you've already testified about,

2    what is your understanding about whether the socialized loss

3    mechanism was used in response to this transaction?

4    A.   My understanding of how the protocol works is that the

5    socialized loss mechanism would have engaged.

6    Q.   And why is that?

7    A.   Because there were still liabilities or account deficits

8    that could not be covered by the other liquidation and

9    insurance fund actions.

10   Q.   After the $67 million was repaid?

11   A.   After the -- can you ask the question again.

12   Q.   Sure.  What I'm really asking you about is this $67 million

13   was repaid.  Was this $67 million plus the insurance fund

14   sufficient to cover the losses in this case?

15   A.   So this $67 million plus the $70 million in the treasury,

16   is that what you're asking?

17   Q.   Yes.

18   A.   Yes, the $130 million amount would exceed the amounts that

19   were withdrawn, yes.

20   Q.   So given that, would the socialized loss have kicked in?

21   A.   I just don't know the timing because we didn't look into

22   the socialized loss.  I can speak to the amounts, but

23   socialized loss was not a function of what we researched.  So

24   if you're asking me if there were funds within the treasury and

25   this $67 million to cover, then that, I can testify to that.

O4GCeis3                        Sheridan - Redirect

1    Q.  And were there?

2    A.  Yes.

3            MS. MARTABANO:  Final exhibit, I hope to promise.

4    DX 60, page 3, Mr. Smith.

5    Q.  Mr. Burnett covered this with you, it's the Neodyme audit.

6    If you'd like to see page 1 to confirm that, just let Mr. Smith

7    know.

8    A.  No, I recognize the introduction.

9    Q.  Did you review this whole audit before testifying today as

10   part of your preparation in this case?

11   A.  Yes, ma'am.

12   Q.  And I believe you testified that it confirmed that the

13   code -- it was just an analysis of the code; is that accurate?

14   A.  It was a security analysis of the code.

15   Q.  And based on the findings of the audit and the timing, do

16   you have any conclusions about how Mango's code was functioning

17   on October is 1th?

18           MR. BURNETT:  Objection.  Scope.

19           THE COURT:  Ms. Martabano, can you rephrase your

20   question.

21           MS. MARTABANO:  Sure.

22   Q.  You testified earlier that the findings of the audit were

23   that there were some problems, but they were all fixed; is that

24   fair?

25   A.  According to the audit, yes.

O4GCeis3                          Sheridan - Recross

1    Q.  And so, if a code audit is done and they ultimately say all
2    the problems were fixed, what does that mean to you about the
3    functioning of the code?
4    A.  It means to me that the functioning of the code for the
5    issues that they identified were fixed and are fully
6    functioning.
7              MS. MARTABANO:  If you could turn to page 5,
8    Mr. Smith.
9    Q.  Mr. Burnett was asking you about the line that says "ruling
10   out economic attacks."  Does this audit explain anywhere else
11   in it what "ruling out economic attacks" means or what that
12   fixes?
13   A.  No, ma'am.
14             MS. MARTABANO:  That's all, your Honor.
15             THE COURT:  All right.  Any recross?
16             MR. BURNETT:  Yes, your Honor, but just a few minutes.
17             If we could pull up Government Exhibit 901.
18   RECROSS EXAMINATION
19   BY MR. BURNETT:
20   Q.  This is that repayment proposal that you were testifying
21   about a moment ago; right?
22   A.  Yes, sir.
23   Q.  In this proposal, Mr. Eisenberg agreed to pay back some
24   portion of the money he had taken; correct?
25   A.  Yes, sir.

O4GCeis3                          Sheridan - Recross

1    Q.  And the Mango DAO was left having to chip in, what,

2    $40 million worth to cover the rest of the losses; right?

3    A.  I didn't look into what the Mango DAO paid specifically.

4    Q.  Fair to say Mr. Eisenberg didn't give it all back; right?

5    A.  Give all of what back?

6    Q.  What he took.

7    A.  Again, I didn't do a line-by-line accounting of what was

8    withdrawn and what was repaid in this repay bad debt.

9    Q.  And Mr. Eisenberg also gave it back in exchange for

10   something; right?

11   A.  There are requests for other -- there are other requests

12   made in the repay bad debt.

13           MR. BURNETT:  Right.  If we could highlight the last

14   line here.

15   Q.  One of the things that was a condition of returning the

16   money was that the Mango DAO will not pursue any criminal

17   investigations or freezing of funds once the tokens are sent

18   back as described above.

19           Did I read that right?

20   A.  Yes, sir.

21           MR. BURNETT:  We can take those down.

22   Q.  Now, I want to ask about this round number thing you

23   mentioned earlier in your testimony.  Do you remember that?

24   A.  Yes, sir.

25   Q.  If I'm understanding it right, it's the idea that, hey,

O4GCeis3                          Sheridan - Recross

1    things move around in cryptocurrency all the time, so it's kind

2    of unexpected to see a round number because the odds that you

3    would click a button exactly when a round number is hit are

4    pretty low; right?  That's the basic idea?

5    A.  That's a very good description, yes.

6    Q.  But if you were to type in a borrow of say 50 million USDC,

7    odds would be pretty high you could have a round number, right,

8    because a person could type in 50 million as the borrow and

9    then click that; right?

10   A.  Yes, sir.

11   Q.  Now, let's also talk about just one last thing, and these

12   were the hypotheticals you were asked.  You were asked a number

13   of hypotheticals by Ms. Martabano about an assumption that an

14   account has no assets and what could they withdraw if they have

15   no assets in there; right?

16   A.  Yes, sir.

17   Q.  Mr. Eisenberg's account had a lot of assets from the

18   perpetuals; right?

19   A.  Yes, sir.

20   Q.  And you can borrow against the value of those assets on

21   Mango Markets; correct?

22   A.  Yes, sir.

23           MR. BURNETT:  No further questions.

24           THE COURT:  Okay.  Thank you very much, Mr. Sheridan.

25           THE WITNESS:  Thank you, sir.

O4GCeis3

1            (Witness excused)

2            THE COURT:  Members of the jury, we're right on time

3    for our midday break, so we will take a break.  Be back at

4    noon.  And just to not keep you in suspense, I think we're

5    going to be able to send you home early today consistent with

6    what I previously told you about when we would be kind of

7    getting closer to the finish line here.  So take your break,

8    we'll be back, and hopefully I'll have some better clarity for

9    you on the schedule moving forward.  Thank you very much.

10            (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O4GMEIS4

1          (Jury not present)

2          THE COURT:  The Court struck Mr. Sheridan's testimony

3     as to the interpretation of the borrow ones and zeros.  During

4     *voir dire*, Mr. Sheridan said that his testimony about what the

5     borrow ones and zeroes meant was based on Blockchain data that

6     was never produced or identified to the government on

7     information from his coders that he could not independently

8     verify the accuracy of and on a Discord chat with someone from

9     Mango Markets who he could not identify.  That chat was also

10    never produced or identified to the government.

11         As such, there are numerous issues with Mr. Sheridan's

12    testimony about the borrow ones and zeros.

13         First, there was an inadequate disclosure, which is a

14    violation of Criminal Rule of Procedure 16.  Neither the

15    underlying Blockchain data nor the Discord chat was ever

16    identified or produced to the government, even to this very

17    moment.  The Court already granted a continuance to avoid

18    excluding Mr. Sheridan's testimony and to give the defense the

19    chance to produce everything Mr. Sheridan relied upon to the

20    government.  The defense failed to do so as to this issue.

21    Another continuance would not be practical or just at this

22    point.

23         In addition, Mr. Sheridan's testimony was serving as a

24    conduit to convey his coder's interpretation of the code.  It

25    is true that experts are permitted to rely on opinions of other

O4GMEIS4

1      experts to the extent that they are of the type that would be

2      reasonably relied upon by other experts in the field.  That's

3      from Rule 703.

4             But in doing so the expert witness must, in the end,

5      be giving his own opinion.  He cannot simply be a conduit for

6      the opinion of an unproduced expert.  That's *Mallatier v.*

7      *Dooney & Bourke, Inc.*, 525 F.Supp. 2d 558 at page 64 (S.D.N.Y.

8      2007).  Plus Mr. Sheridan testified that he was not able to

9      check or verify the interpretation of the code that was offered

10     by his team members.

11            And, finally, Mr. Sheridan testified that even his own

12     coders were unable to determine what the code meant having to

13     reach out to a Mango Markets coder, which suggests that the

14     coders were not merely acting as data gatherers or gofers but

15     were instead offering their discretionary expert judgments,

16     which is impermissible under *Faulkner v. Arista Records LLC*, 46

17     F.Supp. 3d 365, 385 (S.D.N.Y. 2014), which then quotes the

18     other applicable authorities.

19            So that's the basis for the Court's ruling.

20            Mr. Burnett, anything further?

21            MR. BURNETT:  No.  Thank you.

22            THE COURT:  Ms. Martabano, do you have any further

23     clarity on what we are looking at in terms of the afternoon?

24            MR. TALKIN:  Your Honor, I do.

25            As an initial matter, Mr. Eisenberg is prepared to be

O4GMEIS4

1  allocuted about his testimony or the fact that he is not going

2  to testify.  2, the issue that I raised in the back, timing

3  wise, scheduling wise, is no longer an issue.  That's not a

4  concern for the Court.

5          THE COURT:  If I'm correct, the defense will rest.

6          Does the government have a rebuttal case?

7          MR. BURNETT:  No, your Honor.

8          THE COURT:  We can let the jury go home for the day,

9  we will have our charge conference, and we will be prepared for

10  closings tomorrow morning.  Is that right?

11          Who is going to be closing for the government?

12          MR. DAVIS:  I'll be doing the first summation for the

13  government.

14          THE COURT:  Who is doing rebuttal?

15          MR. DAVIS:  Mr. Burnett.

16          THE COURT:  Do you have a time estimate?

17          MR. DAVIS:  I think an hour, your Honor, to be safe,

18  maybe a little bit longer, but I don't anticipate much longer

19  than an hour.

20          THE COURT:  Mr. Burnett, you have about half an hour,

21  something like that?

22          MR. BURNETT:  I think that's right, unless the defense

23  closing is like two hours or something.

24          THE COURT:  On the defense side, who is going to be

25  closing, Mr. Klein?

```
1              MR. KLEIN:  Yes.

2              THE COURT:  Do you have a time estimate?  Is it less

3    than three hours?

4              MR. KLEIN:  I hope so, your Honor.  Yes.  It is

5    definitely less than three hours.  It's going to be, depending

6    on what they say, obviously, but an hour, hour and a half,

7    somewhere in there.

8              THE COURT:  How is the jury going to have exhibits

9    back in the jury room?  Do we have any agreement on a laptop or

10   other device that can be given to the jury, or do the parties

11   have a proposal?

12             MR. BURNETT:  In my experience, a clean laptop is a

13   lot easier.

14             MR. KLEIN:  We are fine with a clean laptop, your

15   Honor.

16             Your Honor, we would like to just review the list and

17   the exhibits one more time before they are put on the clean

18   laptop, just to double check.

19             THE COURT:  I don't have a clean laptop.  I'm assuming

20   that the parties --

21             Mr. Davis.

22             MR. DAVIS:  While we are on the real logistics of

23   tomorrow, the big issues of the day, could I make the request

24   to move the podium with the monitor in front of the jury.  The

25   reason for my request is, I anticipate having Power Point
```

O4GMEIS4

1    slides, and I need to be able to see them and read from them

2    while I'm doing that, and podium does not have a monitor.

3            THE COURT:  Mr. Hernandez, let's check with the AV

4    department and see if they can haul that lecturn over.

5            Is the defense going to have slides as well?  Do you

6    have an objection to doing this?

7            MR. KLEIN:  I don't want to be -- I liked it there and

8    I was planning to be there, so I am not trying to create an

9    unnecessary dispute.  We do have a Power Point also.  We will

10   be offering, I don't think demonstratives, but showing

11   exhibits.

12           THE COURT:  Let me ask you this.  Do you care one way

13   or another whether you're standing right in front of the jury

14   or on the side?

15           MR. KLEIN:  I kind of do, your Honor, but I am not

16   trying to be difficult about it.

17           THE COURT:  I am not sure that we can actually move

18   that entire thing over, to begin with.  We will try to figure

19   out what we are able to do, and then we can deal with it.

20           MR. DAVIS:  Sounds good.  Thank you, Judge.

21           MR. KLEIN:  Your Honor, I would just ask, if they are

22   going to have demonstratives, we be given a chance, in the

23   morning, right before, just to look at them in case there is

24   some sort of objection, like it's a fact not in evidence that

25   they are referencing or something.  I don't want to have to

1    object in the middle of his closing.

2         THE COURT:  I don't normally have people exchange

3    demonstratives for closings.  I wouldn't ask you to disclose

4    your demonstratives either.  If you have an objection, you can

5    raise it.  I think both sides know -- we have gone over it a

6    number of times in terms of the rules of the road.  I think the

7    parties on both sides have stuck to those rules for the most

8    part, aside from a couple of issues.  I don't anticipate that

9    there will be any issues.

10        Of course, this is one of the most solemn times at a

11   trial, so I expect that the parties will be mindful of it.

12   However, if something is shown, and it's objectionable, I'll

13   expect you to raise your objections, and we will deal with it

14   in the least disruptive way possible.

15        If the parties can come to an agreement and they want

16   to agree to exchange their demonstratives, that's fine, but

17   that's the parties' agreement.

18        Otherwise, Mr. Davis, you'll understand that you may

19   be facing an objection if you have some sort of really

20   objectionable demonstrative.  I won't even try to describe what

21   it might be.  If you try to put it in, you will be facing an

22   objection.

23        MR. DAVIS:  Understood.

24        MR. KLEIN:  Your Honor, one more thing.  We are going

25   to want to renew the Rule 29 after we rest.

O4GMEIS4

1          Are you going to call the jury back and then send them

2     away and then we will renew that?

3          What do you propose for that?

4          THE COURT:  Do you want to renew it right now?

5          MR. KLEIN:  We need to rest in front of the jury.

6          THE COURT:  You want to do it after you rest?

7          MR. KLEIN:  Yeah.

8          THE COURT:  We will just deal with it after you rest.

9          MR. KLEIN:  I just didn't want a surprise --

10         THE COURT:  I understand.

11         MR. KLEIN:  We are ready for Mr. Eisenberg's

12     allocution.

13         THE COURT:  Mr. Klein, may I inquire of Mr. Eisenberg?

14         MR. KLEIN:  You may, your Honor.  I am putting the

15     microphone in front of him.

16         THE COURT:  Mr. Eisenberg, how are you feeling this

17     morning?

18         THE DEFENDANT:  I'm all right.

19         THE COURT:  In the last 48 hours, have you taken any

20     drugs, medicine, pills or had any alcohol?

21         THE DEFENDANT:  No.

22         THE COURT:  Is your mind clear today?

23         THE WITNESS:  Yes, your Honor.

24         THE COURT:  Do you understand what is happening here

25     in the courtroom?

O4GMEIS4

1          THE DEFENDANT:  Yes, your Honor.

2          THE COURT:  You understand that as a defendant in a

3    criminal case you have the right to testify on your own behalf

4    if you want to testify?

5          THE DEFENDANT:  Yes, your Honor.

6          THE COURT:  Do you understand that you also have the

7    right not to testify?

8          THE DEFENDANT:  Yes, your Honor.

9          THE COURT:  Do you understand that if you decide not

10   to testify that no one, including the jury, could draw any

11   inference or suggestion of your guilt from the fact that you

12   did not testify?

13         THE DEFENDANT:  Yes, your Honor.

14         THE COURT:  Do you understand that whether you testify

15   or not is a decision for you to make, with the assistance of

16   your lawyers, but ultimately it is your decision to make and

17   not your lawyer's decision to make.

18         Do you understand that?

19         THE DEFENDANT:  Yes, your Honor.

20         THE COURT:  Don't tell me what you discussed, but have

21   you discussed with your lawyers whether you should or should

22   not testify in this case?

23         THE DEFENDANT:  Yes, your Honor.

24         THE COURT:  Have you had enough time to do that, to

25   talk to them and whether to testify and the advantages and

O4GMEIS4

1    disadvantages of whether to testify?

2              THE DEFENDANT:  Yes, your Honor.

3              THE COURT:  Is it your decision not to testify in this

4    case?

5              THE DEFENDANT:  Yes, your Honor.

6              THE COURT:  Is that your decision assisted by counsel,

7    but ultimately it's your decision?

8              THE DEFENDANT:  Yes, your Honor.

9              THE COURT:  That is your decision that you are making?

10             THE DEFENDANT:  Yes, your Honor.

11             THE COURT:  Counsel, any further questions that I

12   should ask?

13             MR. DAVIS:  No, your Honor.

14             MR. KLEIN:  No, your Honor.

15             THE COURT:  We will be back at noon, and we should be

16   done.

17             Anything further?

18             Thank you very much.

19             (Recess)

20             THE COURT:  Mr. Hernandez, we can get the jury.

21             THE DEPUTY CLERK:  Yes, your Honor.

22             MR. KLEIN:  Your Honor, tomorrow's schedule.  Are they

23   going to be here until 5?

24             THE COURT:  Yes.  It is up to them, but they can stay

25   here later than that, if they want.  It's a full day.  It's not

O4GMEIS4

1      until 2:30.

2                  MR. BURNETT:  We still do the 9:00 start?

3                  THE COURT:  I would like to, unless anyone has an

4      issue with that.

5                  (Jury present)

6                  THE COURT:  Mr. Talkin, does the defense have any

7      further witnesses?

8                  MS. MARTABANO:  The defense rests, your Honor.

9                  THE COURT:  Does the government have any case in

10     rebuttal?

11                 MR. BURNETT:  No, thank you.

12                 THE COURT:  Members of the jury, that is the close of

13     the evidence in this case, so we will be back here tomorrow

14     morning at 9 a.m. for closing arguments, after which I will

15     provide to you my final instructions on the law to apply to

16     this case.  You can settle in for that.  It is going to be

17     long.  And then you will have the case for deliberations.

18                 Between now and then, as I have instructed you many

19     times, do not research anything about this case, don't talk

20     about this case with anyone.  Don't talk look up any

21     information about this case on your phones, on the Internet,

22     anywhere.  Make sure that at the end of the day all you are

23     considering is the evidence that's been presented to you in

24     this courtroom and the instructions that I will provide.

25                 With that, have a great rest of the day, and we will

O4GMEIS4

1        see you here for 9:00.  Thank you very much.

2                    (Jury not present)

3                    THE COURT:  Mr. Klein or Mr. Greenspan.

4                    MR. GREENSPAN:  Your Honor, the defense renews its

5        Rule 29 application on the grounds previously stated.  Thank

6        you.

7                    THE COURT:  Thank you, Mr. Greenspan.

8                    The Court will reserve decision under Rule 29(b).

9                    Are the parties prepared to proceed to the charge

10       conference?

11                   MR. BURNETT:  Yes, your Honor.

12                   MS. MARTABANO:  Yes, your Honor.

13                   THE COURT:  Mr. Klein, I can see you from my

14       peripheral vision.

15                   MR. KLEIN:  Some of us are going to leave from the

16       defense team.

17                   THE COURT:  That's fine.  Anyone who doesn't need to

18       be here does not need to be here.  Why don't we give people a

19       chance to leave the courtroom, and then we will proceed.

20                   Why don't we start with the government, and I will

21       hear your objections or proposed changes, and then we will go

22       to the defense.  If you do have an objection or any issue with

23       anything that's in here, I'll expect that you will have a

24       proposed solution as well.

25                   MR. BURNETT:  For the some of the issues where there

O4GMEIS4

| | |
|---|---|
| 1 | was a long back and forth before, can we just refer to what our |
| 2 | prior objection and proposal was rather than restating it all? |
| 3 | THE COURT:  Yes, you may. |
| 4 | MR. BURNETT:  Thank you. |
| 5 | I think the first question really is on page 14.  This |
| 6 | is the summary of the indictment section. |
| 7 | THE COURT:  Yes. |
| 8 | MR. BURNETT:  We noticed that the verdict form had |
| 9 | adopted the formulation of swap manipulation as to Count Two. |
| 10 | We just think -- |
| 11 | THE COURT:  Needs to be consistent. |
| 12 | MR. BURNETT:  We should just conform things one way or |
| 13 | another. |
| 14 | THE COURT:  We will change it on the verdict form to |
| 15 | commodities manipulation. |
| 16 | Any objection to that change? |
| 17 | MR. GREENSPAN:  No objection, your Honor. |
| 18 | MR. BURNETT:  The second one is on page 18, line 426. |
| 19 | THE COURT:  OK. |
| 20 | MR. BURNETT:  I think we would propose deleting the |
| 21 | phrase, in their property rights.  I think that concept of |
| 22 | deceiving someone and their property rights has a home under |
| 23 | the wire fraud statute, where the object of the fraud needs to |
| 24 | be money or property.  But in the context of securities and |
| 25 | commodities fraud, it needs to be dishonest, but it's not in |

O4GMEIS4

1    relation to money or property.  It's in relation to whatever

2    the scheme is.

3            THE COURT:  Mr. Greenspan, do you have an issue with

4    that proposed change?

5            MR. GREENSPAN:  No.  We don't object to that.

6            THE COURT:  That change will be made.

7            In their property rights will be removed from line 426

8    on page 18.

9            MR. BURNETT:  With respect to materiality on page 19,

10   the heart of which runs from 436 to 453, this is just two

11   preservation arguments.

12           One is, as the government briefed, we don't believe

13   the materiality element applies as to the manipulation prong of

14   this count, and, second, with respect to the substance of the

15   material instruction, we had proposed an instruction in a

16   letter to the Court that directed the jury that they could more

17   specifically -- more specifically that if they find that the

18   defendant -- the defendant's asset level or selection of the

19   borrow function is what allowed him to borrow what he borrowed

20   off of the platform, that alone is sufficient to establish

21   materiality.  That wasn't the exact wording, but this was in

22   the context of the *Rigas* submission we made.  We would just

23   note that for preservation purposes.

24           THE COURT:  Your objection is noted.

25           MR. BURNETT:  The next one, this is just another

O4GMEIS4

1    preservation purpose, page 20, line 463 to 472.

2            THE COURT:  I said it was noted.  But it's noted and

3    overruled, to be very clear.

4            MR. BURNETT:  Of course.

5            463 to 472, the government had previously proposed an

6    instruction that USDC was also a commodity and proposed a

7    definition of commodity in a contract-of-sale theory.  The

8    government just preserves that proposal, understanding the

9    Court overruled that.

10           THE COURT:  Objection noted and, as previously stated,

11   it was overruled.

12           MR. BURNETT:  The next one is page 21, line 480 to 82.

13   This is in the mixed-swap definition.  If I understood the

14   discussion with defense yesterday, it sounded like there was an

15   agreement to the deletion of "from other" on line 481 through

16   "momentarily," so we would propose removing that.

17           THE COURT:  Mr. Greenspan, is that correct?

18           MR. GREENSPAN:  That's correct, your Honor.

19           THE COURT:  Just to be clear, an objection has been

20   made by the government.  They have proposed a change, which is

21   to remove the language, other than a narrow-based security

22   index which I will define momentarily, from lines 480 and 481

23   on page 21.

24           Mr. Greenspan, on behalf of the defendant, has no

25   objection to that change, so it will be made.

O4GMEIS4

1          MR. BURNETT:  The next proposal is to the end of line

2    487 on this page.  The government proposes adding at the end of

3    this paragraph the following sentence:  An interest, in

4    quotation marks, is a right, title, or legal share in

5    something, and the basis for this addition is twofold.

6          First, the definition of a narrow-based security index

7    described at 485 to 86 is an index or group of minor fewer

8    security, but then goes on to say, including any interest

9    therein or based on the value therefrom.

10          As the government explained in its letter submitted to

11    the Court, I believe Sunday night, the phrase interest actually

12    has a meaning in the context of the securities laws and that

13    interest is that it's a right, title, or legal share in

14    something.  That's clear both from the common meaning of the

15    term interest.  It's also clear from the statutory scheme and

16    the other definitions in the securities laws which use the term

17    interest to define an interest or a share in something.  This

18    is just what the legal definition of the term is.

19          We think an instruction clarifying what interest means

20    is important for two reasons:

21          First, the word interest already appears in the

22    statute.  And because that word has kind of a special legal

23    meaning, particularly in the context of the securities and

24    commodities laws, it would be important for the jury to have an

25    understanding of what that word means.

O4GMEIS4

1          Second, I think it's kind of particularly important in

2     the context of this case because there is a chance a juror who

3     is kind of unfamiliar with this area could think of interest as

4     meaning like an interest rate, which would kind of very clearly

5     not be what this is referring to.

6          So we would propose that clarification.  We think that

7     is a legally accurate instruction that also preserves what we

8     understood the Court's goal to be, which is to allow the

9     parties to sort of argue it out as to what the funding rate

10    qualifies as under here.

11         THE COURT:  Mr. Greenspan, any objection to this

12    change, which does not -- which basically adopts your proposed

13    definition of the general terms but then provides a generic

14    definition of one of those terms at the close of the

15    instructions.

16         MR. GREENSPAN:  Can we have Mr. Burnett repeat it one

17    more time.

18         MR. BURNETT:  Sure.

19         An interest, with interest in quotation marks, with a

20    right, title, or legal share in something.

21         MR. GREENSPAN:  No objection to that, your Honor.

22         THE COURT:  We will add an interest with a right,

23    title, or legal share in something to line 489 on page 21.

24         MR. BURNETT:  Just, again, for preservation purposes,

25    the government does not think there is a basis for a

O4GMEIS4

1    narrow-based security index instruction to begin with,

2    partially because I think the relevant reference here is the

3    oracle, which includes USDC and USDT, which would take it out

4    of the realm of a narrow-based security index, because it is

5    not purely based on securities and also because a rate, by

6    definition, cannot be an index, but understanding the Court has

7    overruled that, I am just preserving it.

8         THE COURT:  Understood.

9         All right.  Next.

10         MR. BURNETT:  The next proposal --

11         THE COURT:  Before we proceed, Ms. Goldberg, you're

12    getting these down.  I want to make sure.  You're the official

13    arbiter.  You're the scrivener.

14         MR. BURNETT:  The next proposal is page 25, line 574.

15         We propose making the following change.  The sentence

16    begins:  Market -- not begins:  The line begins:  Market or by

17    actions taken.

18         THE COURT:  Which line number?

19         MR. BURNETT:  I'm sorry.  574.

20         We propose revising it to read:  Market or by actions

21    taken, including trading, and then continuing with the rest of

22    the sentence, and the rationale there.

23         THE COURT:  I must be on just the wrong line.  You're

24    on page 25?

25         MR. BURNETT:  Line 574.  I should start at the

O4GMEIS4

1    beginning of the sentence rather than --

2              THE COURT:  As we are modifying some of this, the line

3    numbers are going to move, but you're at the third element.

4              MR. BURNETT:  The sentence begins, perpetual -- the

5    sentence really begins up at 571.

6              THE COURT:  Got it.

7              MR. BURNETT:  We would propose -- there is a clause

8    that begins:  Such as making false or misleading statements to

9    the market or by actions taken, including trading, that

10   otherwise distorted estimates, and then continue the sentence.

11             And the rationale for that is this.  If you look up to

12   the sentence that precedes the one that I proposed the change

13   to, it says:  A price is not artificial merely because it has

14   been affected by a market participant's trading, even a large

15   trade, because price movements are expected to be affected by

16   orders and trades in the marketplace.

17             We think that's legally accurate and are not objecting

18   to that sentence, but, as I understand the law in this area,

19   what that sentence is trying to make clear is that the fact

20   that trading alone has moved the market around does not mean

21   the price is artificial, but there can still be trading,

22   particularly trading with the intent to manipulate a price that

23   can make an artificial price.

24             So what we wanted to do is just clarify that the

25   actions that are referred to in this next sentence can include

O4GMEIS4

1   trading actions.

2           THE COURT:  Mr. Greenspan, do you have an objection to

3   that change?

4           MR. GREENSPAN:  No, we don't object to that.

5           THE COURT:  On page 25, in the last sentence under

6   artificial price, we will add, comma, including trading comma

7   before that otherwise distorted estimates of the underlying

8   economic value of the MNGO perpetuals.

9           MR. BURNETT:  Before we move to the next one, I should

10  add, just again for preservation purposes, that we have

11  previously registered an objection to the definition of

12  willfulness that the Court adopted with respect to Count One

13  and would preserve that objection.

14          THE COURT:  Understood.

15          MR. BURNETT:  The next piece is on my page 33.  It's

16  the extraterritoriality section.

17          This is really a purely housekeeping thing.  We would

18  propose after "occurred in the United States," which I have as

19  line 749 to 750, adding, "which includes Puerto Rico,"  just to

20  avoid some possibility someone gets confused about that.

21          THE COURT:  Mr. Greenspan, do you have any issue with

22  that edit?

23          MR. GREENSPAN:  No.  We agree that Puerto Rico is part

24  of the United States.

25          THE COURT:  We will add, "which includes Puerto Rico"

1      to the extraterritoriality instruction.

2              MR. BURNETT:  I think the last proposal from us is

3      going to be on page 40, which is in the terms of service and

4      disclaimer section.

5              THE COURT:  OK.

6              MR. BURNETT:  The proposal we have here relates to

7      something we had discussed, I think, with some level of detail

8      in the motion *in limine* stage of the case.

9              So at the motion *in limine* stage of the case the

10     government had moved to say that the defense should be excluded

11     from making arguments or introducing evidence, basically, for

12     the purpose of this code-is-law argument, the idea that just

13     because it's possible on the platform, it's legal on the

14     platform.

15             The defense, very clearly on the record there, said

16     they have no intent to make this code-is-law argument, but I

17     think it is fair to say that many of the lines of questioning

18     and examinations that have been conducted in this case have

19     been designed to suggest to the jury that if it was possible

20     technologically on the platform that it was not criminal.

21             To that end, the government proposes adding an

22     instruction in this section that is of the same ilk of the

23     terms of service and disclaimer instructions that have been

24     provided.

25             Here is what we would propose for that.  It's a little

O4GMEIS4

1    bit longer.  I'll slow down.  Let me know if you need help

2    keeping up.

3           You have heard evidence in this case concerning Mango

4    Markets' code.  Just as with terms of service and

5    disclaimers -- sorry.  Hold on a sec.  I got off track.  Let me

6    actually read what we have written down here.  I apologize.

7    That's wrong.  Let's start from the beginning.

8           You have heard evidence in this case concerning Mango

9    Markets' code.  In considering whether the defendant's conduct

10   was manipulative, fraudulent, or deceptive in violation of the

11   criminal laws at issue in this case, let me caution you that

12   Mango Markets' code cannot render any fraudulent or

13   manipulative conduct, legal, or immaterial as a matter of law.

14   Rather, it is just one of the many factors you may consider

15   when determining whether the defendant has committed any of the

16   charged offenses.

17           THE COURT:  Mr. Greenspan.

18           MR. GREENSPAN:  We object to this.  I think the

19   government has already pushed this terms of service and

20   disclaimers piece quite far beyond what's normally given.  The

21   terms of service typically starts with just being about terms

22   of service.  They have already gotten the lack of terms of

23   service, which is an unusual instruction already.  They then

24   got an instruction on a pop-up, which is also unusual.

25           And now they are suggesting -- first of all, the

O4GMEIS4

1    suggestion the government made about the lines of questioning

2    was inaccurate.  There have been no lines of questioning to

3    suggest that code is law.  All of the questioning has gone to

4    intent and materiality and it has been pretty clear.  The Court

5    set guideposts, and we have endeavored to and, I believe, have

6    followed them.

7         And this is just another piece of this that the

8    government is using to use the instructions to suggest that the

9    jury should convict.  It is not an appropriate instruction.

10   It's also legally wrong, we think under *Rigas*, where the code,

11   especially if it's a contract, could render something

12   immaterial.  We think it's legally wrong as well.

13        THE COURT:  I am going to overrule the government's

14   objection here.  At least one of the reasons is that as to the

15   terms of service and the disclaimers, those were mirror

16   instructions.  The terms-of-service instruction was one that

17   was requested by the defense because the government had put in

18   terms of service from other platforms, and we provided some

19   limiting instructions along the way about that.

20        But the defendant had requested that there be a final

21   instruction relating to terms of service, so that was included.

22        In response, and for fairness, the government, after

23   much light had been paid to -- attention paid to the

24   disclaimer, requested that a similar instruction be provided as

25   to the disclaimer, and that was fair as to two pieces of

O4GMEIS4

1    evidence that were in terms that a juror potentially could

2    be -- could misunderstand to be related to legality of the

3    underlying conduct or illegality of the underlying conduct.

4           The code generally, I think, stands on different

5    footing, so I think it's fair -- I think it would be unfair,

6    excuse me, for there to be a specific instruction focusing on

7    that.  At that point we might have to have instructions

8    focusing on every single type of evidence that was put in with

9    both sides' instructions to the jury as to what it can and

10   cannot be considered for.

11          For all those reasons, the objection will be

12   overruled, and the proposed instruction will not be given.

13          MR. BURNETT:  Thank you, your Honor.

14          That's all from the government.

15          THE COURT:  Same thing, Mr. Greenspan.  We will go

16   back up to the top.

17          MR. GREENSPAN:  Your Honor, if I may start with the

18   verdict form.

19          This is a very minor point.  But the instructions at

20   the top at the end say:  Please circle your answers.  I think

21   it would just be better if it would say:  Please check off your

22   answers, or something to that effect.

23          THE COURT:  Yes.  That's fine.

24          MR. BURNETT:  To that end, there was one other little

25   housekeeping like that at the end that I forgot to mention.

O4GMEIS4

1           THE COURT:  Let's do this one at a time.

2           Mr. Greenspan, you want:  Please check off your

3   answers?

4           MR. GREENSPAN:  Yes, that would be great, or the

5   equivalent.

6           THE COURT:  I will do whatever you want.

7           MR. GREENSPAN:  Please check off your answers is fine.

8           THE COURT:  Any issues with that from the government?

9           MR. BURNETT:  No.

10          THE COURT:  Anything further, Mr. Greenspan?

11          MR. GREENSPAN:  Nothing further on the verdict form,

12  your Honor.

13          THE COURT:  Mr. Burnett, on the verdict form, since we

14  are there.

15          MR. BURNETT:  Nothing on the verdict form.

16          I realized in the instructions there was one

17  nonsubstantive thing on page 42.

18          THE COURT:  Since we are on the verdict form, neither

19  side has any further objections or other proposed edits to the

20  verdict form.

21          Correct, Mr. Burnett?

22          MR. BURNETT:  Correct.

23          THE COURT:  Correct, Mr. Greenspan?

24          MR. GREENSPAN:  Correct.

25          THE COURT:  Understood.

O4GMEIS4

1          Back to the jury instructions.

2          MR. BURNETT:  The thing I forgot to mention was on

3     page 42, in the section that's about the right to see exhibits.

4          In light of the fact that the jury will now be having

5     the exhibits back with them, I think it might make sense to

6     edit the paragraph just so it refers to requesting testimony

7     rather than requesting exhibits.

8          THE COURT:  The third sentence will be:  If you want

9     testimony read back to you, please try to be as specific as you

10    possibly can.  The next sentence will start with:  The court

11    reporter will have to look through the transcript and the

12    parties will have to agree on what portions of testimony may be

13    called for in response to your requests.  And if they disagree,

14    we must resolve those disagreements.  The next paragraph, your

15    request for testimony, in fact any communications with the

16    Court, should be made to me in writing.

17         That should take care of it.

18         MR. BURNETT:  That's right.  Thank you.

19         THE COURT:  Mr. Greenspan, any issues with those

20    changes?

21         MR. GREENSPAN:  No, your Honor.

22         THE COURT:  So now we will take it back up to the top.

23         Mr. Greenspan, it's your show.

24         MR. GREENSPAN:  First objection we have is on page 19

25    at line 443.  This is an objection that's on the basis of

O4GMEIS4

1    *Rigas*.

2                We initially submitted a *Rigas*-based instruction.

3    What we are touching on here is the difference between, as

4    *Rigas* finds, something that is material and something that

5    could have actually been acted on.  At the end of the sentence,

6    which ends, making a business decision, we'd like to add, and

7    could have impacted that decision.

8                THE COURT:  Just so you're looking at the right

9    version -- actually, are there any objections to -- line 439

10   says:  A decision.  Line 442 -- these are numbers that I'm just

11   looking at on my version.  It says:  Making a business

12   decision.  But I think it's proper to say "making a decision"

13   in both lines.

14               Mr. Greenspan, do you have any issues with that?

15               Then I'll get to your proposed edit.

16               MR. GREENSPAN:  Can you say that one more time.  I'm

17   sorry.

18               THE COURT:  Do you see in the preceding sentence, it

19   says:  A material fact is one that a reasonable person would

20   consider important in making a decision.  And so in the next

21   sentence, do you have an issue with making -- conforming the

22   end of that sentence to that language, so "making a decision"

23   in both sentences?

24               MR. GREENSPAN:  No, your Honor.

25               THE COURT:  We will make that change.

O4GMEIS4

```
1              What is the proposed change?

2              MR. GREENSPAN:  To line 43.  The fraudulent act was

3     one that would have been important to a reasonable person in

4     making a business decision, and we propose --

5              THE COURT:  Making a decision, right?  You're OK with

6     that?

7              MR. GREENSPAN:  Yes.  Sorry.

8              THE COURT:  That's OK.  I just wanted to make sure

9     that --

10             MR. GREENSPAN:  And propose adding:  Could have

11    impacted --

12             THE COURT:  That could have impacted?

13             MR. GREENSPAN:  That decision.

14             THE COURT:  That decision.

15             It would be "making a decision," that could have

16    impacted that decision?

17             MR. GREENSPAN:  That's the proposal, your Honor.

18    Thanks.

19             THE COURT:  Mr. Burnett, any issues with that?

20             MR. BURNETT:  We object to that.  We object on the

21    grounds that adding that language in takes materiality -- it

22    starts to take materiality out of the objective tests of

23    whether or not information is important and starts to make it

24    sound more like a reliance test or test that looks at what

25    actually happened.
```

O4GMEIS4

1    We also think, to the extent that this is coming from

2  *Rigas*, as we briefed for the Court in the pretrial letters, we

3  think the defense's interpretation of *Rigas* is wrong, and in

4  fact the *Rigas* case supports a version of materiality that we

5  had proposed before trial, which is that if you need to click a

6  button or have a certain amount of assets in order to do what

7  the defendant did, it is effectively per se material.

8    So we propose keeping the instruction as it is written

9  rather than trying to add *Rigas*-based changes to it,

10  particularly in light of the Court's rejection of the

11  government's proposal based on that case.

12    THE COURT:  Mr. Greenspan, since we are talking about

13  it, do you have the citation for *Rigas*?

14    MR. GREENSPAN:  I do.  It's 490 F.3d 208 and pin cite

15  234.

16    Defendant's misrepresentations certainly concern a

17  variable that mattered to the banks.  The leverage ratio was

18  clearly relevant information, but relevance and materiality are

19  not synonymous.

20    Then it goes on to talk about:  For misstatements to

21  be material -- this is now on the next page.

22    THE COURT:  We are at 235?

23    MR. GREENSPAN:  Correct, your Honor.

24    However, they had to be capable of influencing a

25  decision that the bank was able to make.

O4GMEIS4

1          That's the distinction we are trying to make here, and

2     we don't think that that's captured to this point in the

3     instruction.  Previously we understood the government to object

4     to the phrasing of the *Rigas* instruction that we had, which we

5     thought was clear enough, but we understood their objection

6     that it wasn't full stop something that was incapable of

7     influencing, so we are trying to mimic that language here.  We

8     think that there is a clear distinction that *Rigas* makes that's

9     important to this case, and we are trying to do it in a way

10    that's as limited as possible in terms of altering the

11    instructions as they currently stand.

12         THE COURT:  Mr. Burnett, I guess what Mr. Greenspan is

13    saying is that he is not trying to get into the previous issues

14    that were raised by *Rigas*.  It's just *Rigas* makes kind of a

15    simple point, which is that to be a material misrepresentation,

16    it has to be at least capable of influencing someone's

17    decision.

18         So I'm happy to use the word capable, as opposed to

19    could or "that could" as proposed, but what's the substantive

20    objection to inclusion of that language as part of the

21    standard?

22         MR. BURNETT:  We think it's already fairly encompassed

23    in the paragraph.  But if the Court is inclined to add

24    something, we would ask that it actually track the language of

25    *Rigas*, that's the capable of influencing language, as opposed

O4GMEIS4

1    to this could have impacted that decision.

2              THE COURT:  Then it would be that it is capable of

3    impacting that decision.

4              MR. BURNETT:  Or influencing, I think the word was

5    from *Rigas*.

6              MR. GREENSPAN:  That's fine with the defense, your

7    Honor.

8              THE COURT:  That's the language that we will use at

9    the conclusion of that sentence, that is, capable of

10   influencing that decision.

11             Next, Mr. Greenspan.

12             MR. GREENSPAN:  Turning to page 21, the defense has --

13   I suppose we included this in our proposed instruction, but I

14   want to clarify that.  On line 480, where it starts first and

15   refers to USDC --

16             THE COURT:  Let's take a step back.  I want to just

17   make sure that we are all clear.  You should raise any

18   objections that you have at this time, so I just want to make

19   sure that you're clear about that, because I know in the swap

20   definition you had proposed excising part of this definition.

21             Have you dropped that objection, or are you still

22   asserting that?

23             MR. GREENSPAN:  No.  I missed that.

24             Let's go back to page 20.  Thank you for remind me of

25   that, your Honor.

O4GMEIS4

1          On line 467, the first sentence I think is an

2    instruction that's based on the subsection, I think it's 47,

3    Roman numeral little i, little i.

4          We don't think there has been any evidence that there

5    was any occurrence or nonoccurrence in this case.  So we just

6    don't think there is a factual predicate for even giving that

7    first instruction.  So we would propose deleting -- after the

8    word, a swap, everything starting from the word includes to the

9    word it also on the next line.  Then proceeding only on the

10   basis of subparagraph 47, little Roman numeral iii.

11         THE COURT:  Mr. Burnett, I take it the objection is

12   just that there is no evidentiary basis to give that first

13   proposed definition of swap to the jury?  Was there in fact

14   any -- I guess I did not hear previously that the government

15   was pursuing to define Mango perpetuals as a swap on that

16   basis.  It was, however, in the original proposal, so that's

17   why it's here.  Does it need to be here?

18         MR. BURNETT:  I don't think so.  I think it was

19   actually proposed by the defense originally in the definition

20   of swaps, so I don't think we have an objection to taking that

21   part out.

22         THE COURT:  Then it should read:  A swap includes any

23   agreement, contract, or transaction that provides for an

24   exchange of payments going forward.  Is that right?

25         MR. BURNETT:  That's right.

O4GMEIS4

1          THE COURT:  Mr. Greenspan, that's what you're

2    proposing?

3          MR. GREENSPAN:  That's right, your Honor.

4          THE COURT:  Now back to page 21.

5          MR. GREENSPAN:  Just further to that, as the Court

6    knows, on our Rule 29 motion, we believe, as a matter of law,

7    that the government hasn't met that instruction, but we don't

8    have a legal objection to the rest of the instruction as it is

9    given.

10          THE COURT:  Understood.

11          MR. GREENSPAN:  Turning to page 21 and the paragraph

12    first, we object to the inclusion of USDC as a potential basis

13    for a mixed swap for two reasons.

14          One is that USDC has been exchanged in this case, and

15    we don't think that something has been exchanged can be the

16    basis for a mixed swap.

17          The second is that, as we have briefed many times, we

18    think that USDC is simply a medium of exchange or medium of

19    settlement, and there has been absolutely no evidence, and even

20    definitionally we don't think that the value of the Mango

21    perpetual could depend on it, so that's our objection.

22          THE COURT:  Just as a technical matter, doesn't both

23    what's been called the market price and also the settlement

24    value of the Mango perpetuals, isn't it literally based on, at

25    least in part, the value of USDC?

O4GMEIS4

1          MR. GREENSPAN:  The settlement value is the oracle,

2     which is reported out in USD, which is part of the argument

3     here.  The market price is stated in USDC.  It was previously

4     stated, I believe, in USDT.  That was something that changed.

5     I don't think there was any particular value-based reason for

6     that change.  I think it was simply more convenient.

7          Again, we think it's the equivalent of saying that a

8     cup of coffee, the value of it is based in dollars because you

9     pay dollars.  We just don't think there is a logical or legal

10     argument to support that.

11          THE COURT:  Mr. Burnett, your response?

12          MR. BURNETT:  Yes, your Honor.

13          Both on Mango Markets and in the oracle the price of

14     Mango is relative to USDC.  It's not Mango compared to U.S.

15     dollars.  USDC is an important reference price.  Even if there

16     are times when USDC equals one dollar, it is still the USDC

17     price that's the reference price.  So USDC is a core component

18     of the value of this swap.  It's not just a medium of exchange.

19          And I would add, the defense has continued to use this

20     phrase medium of exchange.  The currency -- a foreign currency

21     is a medium of exchange and it is a commodity.  A medium of

22     exchange does not take something out of the coverage of the

23     commodities laws.

24          THE COURT:  Let me just make sure I understand

25     something.

O4GMEIS4

1          If instead of USDC the Mango Markets used a dollar,

2     just literally used a dollar, would that also just take this

3     out of the -- put it into the mixed swap definition, given how

4     broad this language is?  Because it says value of a currency or

5     a financial or economic interest or property of any kind.  Or

6     am I missing something?  It's not just a commodity.  It can be

7     all these other things.

8          MR. BURNETT:  I think the complication there is like,

9     there are special carve-outs that I think are like the treasury

10    laws for like actual U.S. dollars, but like everything else --

11         THE COURT:  Like absent those exclusions for like the

12    dollar.

13         MR. BURNETT:  Right.  If this had been say like the

14    Hong Kong dollar, just like tracks the dollar and it had been

15    the Hong Kong dollar instead of USDC, that would clearly be a

16    mixed swap.

17         THE COURT:  Understood.

18         MR. GREENSPAN:  Your Honor, if I could just make one

19    more point, just to complete the record.

20         I think your Honor's question was exactly right

21    because USDC and the dollar and Mango Markets are considered

22    one in the same.  There is no conversion in the event that USDC

23    falls off the peg.  They are literally the same.  That I think

24    is exactly the right question to be thinking about here.

25              (Continued on next page)

O4GCeis5

1          THE COURT:  Understood.  I'm going to overrule the

2     objection to the jury instructions.  However, Mr. Greenspan,

3     the defendant has obviously made this argument in connection

4     with its Rule 29 motion, and the Court will certainly consider

5     it.

6          Next.

7          MR. GREENSPAN:  One moment, your Honor.

8          Your Honor, on the narrow-based security index

9     paragraph, paragraph 485, lines 485 to 487.  We think it

10    important to instruct the jury that for purposes of this case,

11    they are to treat Mango and the Mango perpetual as a security.

12         THE COURT:  So just give me the sentence.

13         MR. GREENSPAN:  "For purposes of this case, Mango and

14    the Mango perpetual are securities."

15         THE COURT:  Any objection to that from the government?

16         MR. BURNETT:  Yes.  The instructions already define

17    what a security is, so the jury can reach a decision about

18    whether Mango is a security based on the instruction that the

19    Court has provided.  That's a fact question.

20         THE COURT:  Do you have an argument that Mango and

21    Mango perpetuals are not securities?  I take it what's going to

22    happen in closings is that Mr. Klein is going to argue that

23    Mango and Mango perpetuals are securities.  Are you going to be

24    arguing that they are not securities?  You don't need to

25    affirmatively assert that they are or are not securities, but

O4GCeis5

1    if you're not, for these purposes, objecting to the treatment

2    of those two things as securities, then, in fairness, wouldn't

3    we let the jury know that those two things are securities?

4    That's what I'm trying to figure out.

5          MR. BURNETT:  I understand.  I think that's true with

6    respect to Mango.  As to Mango perpetuals, I actually haven't

7    thought through what all of the bouncing balls are for if a

8    Mango perpetual is a mixed swap, whether it's still qualified

9    as a security or not.

10          THE COURT:  Wouldn't it not?  Mr. Greenspan, what am I

11    missing?  You're arguing that as a security-based swap.

12          Let's break this apart.  Let's say for the moment

13    there's not a dispute between the parties that Mango is a

14    security.  Maybe we put that in.  As to Mango perpetuals, isn't

15    that the dispute that we're having as to the mix swap

16    definition?  Meaning you're going to argue that it's a security

17    because it's a security-based swap, the government is saying

18    it's not, it's a mixed swap, and it falls out of that

19    definition and is governed by the commodities laws.

20          MR. GREENSPAN:  Your Honor, my understanding, and I do

21    my best to do this without the exact language, is that the

22    concept of a mixed swap is that it's both a swap and a

23    securities-based swap.  And so, a securities-based swap is

24    defined in the securities laws as a security.  So even if it's

25    a mixed swap, I still think the definition of it, statutorily,

O4GCeis5

1  is that it's a security.  The idea being that the SEC and the

2  CFTC both have jurisdiction.  I think it's still a security.

3         MR. BURNETT:  I'd agree a mixed swap is a

4  security-based swap.  I'm not 100 percent sure it's actually

5  still a security.  I think it would be extraordinarily

6  suggestive to the jury to say a Mango perpetual is a security

7  in this case when a core question for them is to figure out

8  what a Mango perpetual is.  The defense has all the pieces they

9  need to make the argument they need to make in the jury

10 instructions, including the definition of a security and a

11 mixed swap and a narrow-based security index.  The government

12 would not consent to an instruction that directs Mango

13 perpetuals are securities.

14        MR. GREENSPAN:  Your Honor, I think the government is

15 just mistaken on the law.  We cited the statute in the --

16        THE COURT:  Can you walk me through it.

17        MR. GREENSPAN:  Yes.  We cited the statute in the

18 Rule 29 motion in explaining why the oracle was a narrow-based

19 security index.  We cited the specific statute.  It's contained

20 in 15 U.S.C. -- I believe it's 78, but I have to look it up.

21 The definition of security specifically includes security-based

22 swaps.  In fact, the government is unsure about that.  We can

23 provide the citation in a letter afterwards if it clarifies

24 things.

25        THE COURT:  We're at the charge conference, so we're

O4GCeis5

1    supposed to figure out all the issues with the charge so that

2    everyone can prepare for closing arguments.  So if you can get

3    all of that in front of you and let's figure it out.

4              MR. BURNETT:  I'd add that we're trying to be

5    accommodating here on potentially agreeing to this instruction

6    that, for purposes of this case, there's not a dispute that

7    Mango is a security.  But if this is about turning also an

8    instruction and Mango are securities too, we're not going to

9    consent to any of that.  I think that's extremely suggestive in

10   the context of the instructions.

11             MR. GREENSPAN:  The statute is 15 U.S.C. 78c(a)(68).

12   It's the definition of securities-based swaps.

13             THE COURT:  Okay.

14             MR. GREENSPAN:  In our previous letter, we cited that,

15   slightly above that, in that same statute, 78c subsection

16   (a)(10), it defines securities more broadly and treats

17   securities-based swaps as a security.  This is in our April

18   14th letter on page 4.  It's a footnote, footnote 5.

19             THE COURT:  Understood.  I am not going to include an

20   instruction on MNGO as a security or Mango perpetuals as

21   securities swaps or securities.  However, as I understand it,

22   you're going to take that position in closings.  If you're

23   correct, the government is not going to dispute that

24   characterization because they've not taken the contrary

25   position.  I think, from their perspective, the additional

O4GCeis5

1      instruction that those two things are securities are not in any

2      statutory definition, they're not in the actual statutes that

3      we're instructing the jury about, and they would be confusing

4      given that, in other contexts, the parties are duking it out as

5      to what MNGO perpetuals are for purposes of the mix swap

6      definition and elsewhere.  That's a fair argument that it would

7      be confusing to the jury to hear than say Mango perpetuals are

8      securities, when there's a whole section of these instructions

9      that has other instructions relevant to the characterization of

10     those perpetuals for purposes of the swap definition in the

11     commodities laws.

12            Now, the government has offered that they may not

13     object to having MNGO as a security as part of this definition.

14     So, if you want to take them up on that and there's no dispute

15     between the parties, I'm happy to do that, just as an agreement

16     between the parties as what might be included in this

17     definition.

18            MR. GREENSPAN:  That's fine, your Honor.

19            THE COURT:  After "a security is an investment of

20     money in a common enterprise, with the expectation of profits

21     to be derived from the efforts of others," and then you wanted,

22     "for these purposes, MNGO is a security"?

23            MR. GREENSPAN:  Yes, your Honor.

24            THE COURT:  Mr. Burnett, any objection to that?

25            MR. BURNETT:  No, your Honor.  I'm only pausing

O4GCeis5

1    because this is something that I would really want to get

2    supervisory approval of.  Could I do a provisional no and we'll

3    just write in as soon as I get back to the office if there's a

4    change?

5            THE COURT:  Yes, you may do that.

6            MR. BURNETT:  Thank you.

7            What was the precise sentence?

8            THE COURT:  "For these purposes, MNGO is a security."

9            MR. GREENSPAN:  Your Honor, we included for these

10   purposes, noting that we're not trying to lock the government

11   into a position if there's additional language that would help

12   them --

13           THE COURT:  "You may assume"?

14           MR. GREENSPAN:  We wouldn't object to it.

15           MR. BURNETT:  "You may assume" would be a good

16   addition there.

17           THE COURT:  "For these purposes, you may assume

18   that..."

19           Mr. Greenspan, you're fine with that change?

20           MR. GREENSPAN:  Yes, your Honor.

21           THE COURT:  Okay.  All right, Mr. Greenspan, next.

22           MR. GREENSPAN:  Turning to Count Two, I think we

23   understood from the brief colloquy yesterday that your Honor

24   was making a ruling on the inclusion of the word "market"

25   before "price."  We've written on it extensively and we stand

O4GCeis5

1    on that position.

2            The only other point I'd like to make is that,

3    first -- two points, I guess.  One is that Amaranth, which is

4    the test here and which we have cited, and I know the Court

5    knows, includes the word "market" before "prices" in the

6    four-prong test.

7            The other thing we would like to note is even the

8    instruction as it's currently given, it talks about the price

9    of Mango perpetuals on Mango Markets.  The oracle settlement

10   price that the government seems to base its theory around isn't

11   even a price for the Mango perpetuals on Mango Markets.  It's a

12   price for settlement on the spot market, which is exactly why

13   all the cases they cited are not on point.

14           So that's our objection.  We think that the

15   government's theory is one that doesn't comport with the law,

16   and that's why we pushed for the inclusion of that "market"

17   before "price."

18           THE COURT:  So there's a legal objection and a factual

19   dispute between the parties.  Did you agree with

20   Mr. Greenspan's characterization of the oracle price and how it

21   functioned on Mango Markets?

22           MR. BURNETT:  No.

23           THE COURT:  The factual dispute is one that's just

24   going to be the subject of closing arguments and has been the

25   subject of testimony in this case.  Let's just make sure that,

O4GCeis5

1    as to the legal issue, we're coming out the right way because,

2    as I understand it, the rule and then the statute that are

3    applicable on Counts One and Two both refer to "price," they do

4    not refer to "market price," just as a pure statutory

5    interpretation as to the rule of statute at issue; is that

6    correct, Mr. Greenspan?

7         MR. GREENSPAN:  In the statute in the rule, you're

8    asking does the word "market" appear?

9         THE COURT:  Yes.

10        MR. GREENSPAN:  Correct, it does not appear in the

11   statue in the rule.

12        THE COURT:  The rule is 17 CFR 180.1, and the statute

13   is 7 U.S.C. 13a(2).  Am I right about that?  Are those the two

14   provisions?

15        MR. GREENSPAN:  I think 180.1, I believe, is relevant

16   to Count One.

17        THE COURT:  Right.  And then Count Two is 7 U.S.C.

18   13a(2); is that right?  Am I just getting that wrong?

19        MR. BURNETT:  I think the confusion, Count One, the

20   statute and rule don't even have "price" in it at all.

21        THE COURT:  This is only coming up as to Count Two,

22   and that is 7 U.S.C. 13a(2)?

23        MR. GREENSPAN:  Correct.

24        THE COURT:  Is there any case that concerns this

25   statute that says that "price," as used in this statute, refers

O4GCeis5

1    to "market price" as opposed to "price"?

2            MR. GREENSPAN:  Yes, and that's why we're citing

3    Amaranth.  The four-prong test in Amaranth uses the word

4    "market" before "price."

5            THE COURT:  Just focus me on the language that you're

6    pointing to.

7            MR. GREENSPAN:  This is In re Amaranth Natural Gas,

8    730 F.3d 170.  Amaranth lays out a four-prong test.  This is on

9    page --

10           THE COURT:  I'm there.  183.

11           MR. GREENSPAN:  Section 3 analysis.  It says

12   commodities manipulation requires, one, defendants possess an

13   ability to influence market prices.  So that's where it

14   includes the word "market" before "prices."

15           THE COURT:  This case references DiPlacido v. CFTC,

16   which is one of the cases that the government relies on.  I

17   take it your submission is that whatever that earlier case

18   said -- and to be clear, again, this is why I separated out the

19   legal objection and the factual dispute because whether the

20   term used in the instructions is "market price" or not, the

21   parties are still going to fight it out as to whether these

22   different things qualify under that definition; is that

23   correct, Mr. Greenspan?

24           MR. GREENSPAN:  I anticipate that to be correct, your

25   Honor, yes.

O4GCeis5

1          THE COURT:  You're just making, for these purposes, a

2     pure legal argument that under Amaranth, the way that it is

3     explained, this test under this statute, is to refer to "market

4     price."

5          MR. GREENSPAN:  Correct.  And we also discussed this

6     in our letter about ATSI and some other market manipulation

7     cases that not only in the test, but talk about what's to be

8     evaluated, and they talk about market prices.

9          THE COURT:  Right.  This is a separate issue from what

10    was discussed between the parties as to whether a settlement

11    price qualifies under the statute.  The government has cases

12    that point -- or at least a case that points their way.  You

13    pointed to some district court cases that would point your way.

14    For these purposes, that's not what the Court is deciding for

15    purposes of the jury instruction.  It's a pure legal question

16    of -- that's why I asked the question.  Is there a case that

17    says under this statute, when the statute refers to "price,"

18    it's referring to "market price."  This would be the case that

19    you would point to along with cases following that four-prong

20    test; is that fair?

21         MR. GREENSPAN:  Yes.  One clarification.  We don't

22    think the government does have any cases pointing their way.

23    DiPlacido, the settlement was a market.  It was a price on that

24    market.  It was the electricity futures market.

25         THE COURT:  It's a factual dispute.  You're going to

O4GCeis5

1    find out.  It's a heated disagreement about that issue.

2              MR. GREENSPAN:  That's our position, is that they

3    don't have a case and that's the reason that it's different.

4              THE COURT:  What's the counterexample of a price that

5    would not be a market price?  The statute says "price," I

6    understand that Amaranth says "market price."  And so, what are

7    the other prices that are just not covered by this statute?

8              MR. GREENSPAN:  We think the oracle settlement price

9    is a market price, it's just the wrong market.  It's a price of

10    the spot market, and the spot market is clearly not relevant to

11    the analysis here.

12              THE COURT:  But let me give you another example.  So

13    if you have contracts that have a market price that's

14    determined by some market reporting and then you have a private

15    discussion between two people who have contracts and they

16    decide, just negotiate a price.  Is it your submission that the

17    negotiated price between two parties would not qualify if it

18    was somehow manipulated by one of the sides and it would always

19    be what the prevailing market price would be that would be the

20    subject of the commodities manipulation statute?

21              MR. GREENSPAN:  For the purposes of the manipulation

22    statute, yes, that would be our position.

23              THE COURT:  Mr. Burnett, just help me with

24    government's position.  As I take it, I'm with you that

25    there's -- you disagree with Mr. Greenspan that they have the

O4GCeis5

1   right side of the facts.  Whether it's price or market price,

2   your position is we'll be able to show it fits under that

3   definition.  For these purposes, I'm just concerned with making

4   sure that the law is right here.  And so, Mr. Greenspan points

5   to Amaranth and just says, look, like, on this statute, the way

6   the Second Circuit has defined the standard is using "market

7   price."  So what's wrong with that?

8          MR. BURNETT:  What's wrong with it is the Second

9   Circuit was defining it in the context of a case and just

10  explaining it and talking about the law.  The way to make sure

11  you're right on the law in the jury instructions is to follow

12  what the actual statute says, which is "price."  The case I'd

13  point you to is United States v. Fuchs, which is the Fifth

14  Circuit decision that we cited in our brief on this.  I

15  apologize, I don't have the cite off the top of my head.  But

16  there, the Fifth Circuit explicitly rejected an effort to add

17  "market" before "price" because that doesn't appear in the

18  statute.  And the problem with that is that it is deeply

19  legally confusing because it is not clear what "market price"

20  means.  Given the way the defense has repeatedly tried to use

21  that phrase through trial, the jury is apt to be confused that

22  it has some special meaning that they've been referring to.  I

23  actually think Amaranth is a perfect example of this.  If you

24  go back to the Amaranth case, Amaranth was a case about

25  settlement prices.  The whole case was about manipulation of a

O4GCeis5

1    settlement price.  And it cites DiPlacido, which set the rule

2    that a settlement price is a market price.

3        THE COURT:  And so, in terms of just the pure legal

4    argument, is the issue that in Amaranth and these other cases

5    that incorporate that four-prong test, this particular issue

6    just never came up, meaning that something that was not a,

7    quote-unquote, market price was at issue, and yet, the Second

8    Circuit said no, this statute only covers market prices as

9    opposed to other prices.  That just didn't come up.  So really,

10    when we think about that four-prong test, it's like a shorthand

11    for what they used to describe what's covered by the statute.

12    It doesn't displace the language that's in the statute.

13        MR. BURNETT:  Exactly.  I think if the Court were to

14    use "market price" and in order to be legally correct, it would

15    also need to add the phrase, "a settlement price is a market

16    price," which is legally accurate and comes straight from

17    DiPlacido.  That's what the CFTC said in DiPlacido, which was

18    affirmed by the Second Circuit and is clearly what underpins

19    the decision in Amaranth, which was about settlement prices and

20    cited DiPlacido.

21        THE COURT:  I thank the parties for their patience.

22        Mr. Greenspan, we'll get back to where you started.

23    This discussion has been very helpful.  For the reasons that

24    we've discussed and that I've discussed with the parties, I

25    will overrule defendant's objection and use "price," which is

O4GCeis5

1    the language from the statute.

2              Next.

3              MR. GREENSPAN:  I appreciate the Court's indulgence

4    and allowing us to have that back and forth again.

5              On page 26, this is I think more a preservation issue,

6    but we object to the inclusion of attempted commodities

7    manipulation.  We've written on that in the past.

8              THE COURT:  Just to be clear, attempted commodities

9    manipulation was charged in the indictment; correct?

10             MR. GREENSPAN:  Correct.

11             THE COURT:  Understood, Mr. Greenspan.  Next.

12             MR. GREENSPAN:  The objection, just to recap, is

13   really a factual predicate.  We don't think there's a factual

14   predicate here distinguishing any kind of attempted commodities

15   manipulation from the regular commodities manipulation.  To the

16   extent the government was concerned about an argument that the

17   price wasn't artificial because of fundamental value, that was

18   never argued or brought out in evidence and we don't plan to

19   argue that.  So that's why we didn't think it was necessary.

20             THE COURT:  Mr. Burnett, just to make sure I'm not

21   missing something, Mr. Greenspan says there was no factual

22   predicate laid for the attempted commodities manipulation

23   charge.  I don't really follow that analysis, but maybe you can

24   help me.  The only question is just, if you can't establish

25   that there was actual manipulation of the price, you may still

O4GCeis5

1  be able to prove that there was an attempt and an intent to

2  manipulate the price.  And so, the jury could still find the

3  defendant guilty of the attempted commodities manipulation

4  charge, which was laid out in the indictment.  Obviously, the

5  evidence would be overlapping with the commodities manipulation

6  charge.  Is that all right?

7          MR. BURNETT:  That's all correct.

8          THE COURT:  I understand, Mr. Greenspan, the

9  objection, it will be overruled, but you've certainly preserved

10  it.

11          MR. GREENSPAN:  Thank you, your Honor.

12          Turning to wire fraud.  I think we'd like to conform

13  the materiality definitions, and the Court's agreements to give

14  us an instruction or clause based on Rygus in the materiality

15  instruction for Count Three.  I'm just trying to find where

16  that would go.  I think this starts on line 652.  I believe we

17  included it at the end of the equivalent of line 658.

18          THE COURT:  So we're going to make a few conforming

19  changes here absent objections from the parties.  So one, here

20  we have a business decision, which we had taken out of the

21  prior instruction.

22          Are there any issues, Mr. Greenspan, with me taking

23  those out?

24          MR. GREENSPAN:  No, your Honor.

25          THE COURT:  So we'll take those out.

O4GCeis5

1      I believe it was, "that is capable of influencing the

2  decision" was the addition.

3      Here's the question I have, which is, instead of

4  putting that addition, which we had previously discussed, at

5  the end of this sentence, because if you look, the sentence now

6  spans about five lines.  It may be more comprehensible to the

7  jury if it is part of the preceding sentence.  So, "A material

8  fact is one that a reasonable person would consider important

9  in making a decision, and that is capable of influencing that

10 decision."

11     Mr. Greenspan, any --

12     MR. GREENSPAN:  I actually agree that that's better.

13     THE COURT:  We'll make that change here and we'll also

14 make that change in the preceding place.

15     Mr. Greenspan.

16     MR. GREENSPAN:  Page 30, at the top, 677 is the line

17 number.  It's the first full sentence.  The government is also

18 not required to prove that the defendant personally originated

19 the scheme or artifice to defraud.  We think that's legally

20 correct, we just think it has no factual basis in this case and

21 isn't necessary for the jury to hear.

22     THE COURT:  Does the government have any objection to

23 removing that sentence?  The government is also not required to

24 prove that the defendant personally originated the scheme or

25 artifice to defraud.  I'm not even sure that's an issue that's

O4GCeis5

1    surfaced in any way, shape, or form in this case.

2            MR. BURNETT:  No objection, barring something

3    unexpected in closings, in which case we might ask to add it

4    back in.

5            THE COURT:  Understood.  So that line will be removed.

6            MR. GREENSPAN:  Turning to the intent instruction for

7    Count Three, which is also on page 30, the defense previously

8    requested a willfulness instruction, noting that in the

9    Middendorf case, Judge Oetken talked about how willfulness was

10   an instruction that was generally given, even though it was not

11   specifically included in the statute.  So we renew that

12   objection.  As we pointed out, we think that it's somewhat

13   misleading to the jury to have two different intent

14   requirements that are similar, but not the same for Counts One

15   and Three.  So that's our objection.

16           THE COURT:  Understood.  As I understand it, the

17   willfulness instruction comes out of the *Sand* model

18   instructions; is that right?

19           MR. GREENSPAN:  That's right, your Honor.  I think

20   that's typically the reason judges in this district give it.

21   The proposal we gave was verbatim from the *Sand* instruction

22   regarding wire fraud.

23           THE COURT:  Understood.  And then in Middendorf and in

24   some later cases, they note there's no basis in the statute for

25   the willfulness instruction.  It's really just a vestige of it

O4GCeis5

1    coming out of the *Sand* instruction?

2             MR. GREENSPAN:  That's true, but they note it's one

3    that's generally given.  I think some judges have found it, for

4    reasons of fairness, it's appropriate to give and it's fair to

5    give because it's often given in similar cases.

6             THE COURT:  Does the government have an objection to

7    providing the jury with a willfulness instruction as to this

8    count?

9             MR. BURNETT:  Yes, your Honor.

10            THE COURT:  Mr. Greenspan, I understand and have noted

11   the objection and you certainly preserved it.

12            MR. GREENSPAN:  Thank you, your Honor.

13            Your Honor, turning to extraterritoriality briefly,

14   page 33.  We believe the instruction is correct for Counts One

15   and Two, but that the last clause, that the government can

16   prove an activity related to the trading had a direct and

17   significant connection with activities in commerce in the

18   United States, we don't think that would apply to Count Three,

19   the wire fraud.

20            THE COURT:  Okay.  Mr. Burnett.

21            MR. BURNETT:  So I think that's right.  I'm trying to

22   think of what to do.  I don't actually understand what the

23   factual basis is for an extraterritoriality instruction.  But,

24   in any event, I think maybe the way to do this is --

25            THE COURT:  Or, "The government can prove that the

O4GCeis5

1    conduct relevant to the offense has occurred in the United

2    States, which includes Puerto Rico."  Or, "With respect to

3    Counts One and Two only, the government can prove that an

4    activity related to the trading had a direct and significant

5    connection with activities in commerce of the United States."

6    Would that do it?

7        MR. BURNETT:  Yes.  Although, I realize it should be

8    "related to the offense."

9        THE COURT:  Okay.  So after the colon, it would read:

10   "The government can prove that the conduct relevant to the

11   offenses occurred in the United States, which includes Puerto

12   Rico or with respect to Counts One and Two only, the government

13   can prove that an activity related to the offense had a direct

14   and significant connection with activities in commerce of the

15   United States."

16       Mr. Burnett, any issues there?

17       MR. BURNETT:  No, your Honor.

18       THE COURT:  Mr. Greenspan.

19       MR. GREENSPAN:  No, your Honor.

20       THE COURT:  All right.

21       MR. GREENSPAN:  We have a similar objection to the

22   venue instruction.  Much of this has already been addressed by

23   the Court's willingness to accept the parties' instructions.

24   In line 754, starting on 753, it says, in addition to all of

25   the elements I just described, you must also consider the issue

O4GCeis5

1    of venue, namely -- and after that, it says, whether an act in

2    furtherance of each of the charged crimes occurred within the

3    Southern District of New York.  We think that's confusing as to

4    the wire fraud because it's not an act in furtherance, it must

5    be a wire, as the Court clarified.

6          MR. BURNETT:  Your Honor, we would object to that

7    because a wire is an act.  The Court's instructions with

8    respect to the wire fraud specify that there needs to be a

9    wire.

10         THE COURT:  Mr. Greenspan, do you have a proposed edit

11   here?  This is repeated essentially twice, then there's a

12   clarification that, "With respect to Count Three, the wire must

13   be an interstate wire was transmitted into or out of the

14   district."  So if you have a proposal on how to edit this in a

15   way that would not do violence to the general legal

16   instruction, I'm happy to hear it.

17         MR. GREENSPAN:  I think we propose the following.  So

18   on line 754.  Venue, namely whether an act, we propose

19   inserting constituting the charged crime and eliminate "in

20   furtherance of each of the charged crimes."  I actually stated

21   it exactly the opposite.  The issue is that the wire fraud

22   venue charge is broader than under the Commodities Exchange

23   Act.  So that, I flipped it.  The issue is the opposite of what

24   I originally said, and I apologize for that.

25         MR. BURNETT:  So that instruction would be legally

O4GCeis5

1    wrong.  It does not need to be an act constituting the crime.

2                THE COURT:  Just so I'm clear, the objection is not as

3    to the impact on this instruction on the wire fraud count, it's

4    that with respect to Counts One and Two, Mr. Greenspan, you're

5    saying it is legally incorrect to use "in furtherance," is that

6    fair?

7                MR. GREENSPAN:  Correct.

8                THE COURT:  Do you have any case you want to point me

9    to that reflects that?  I thought this instruction was

10   literally out of numerous prior instructions that have been

11   provided by this court, but I'm happy to learn that those other

12   instructions are wrong, if you've got a cite for me.

13               MR. GREENSPAN:  We believe this has come up only in

14   the securities context.  The case we have United States v.

15   Tzolov, but I've misplaced it and I don't have the citation.  I

16   have it here somewhere, so I'll try to find it.

17               MR. BURNETT:  I could explain why the securities laws

18   are just different, too, if it would help.

19               MR. GREENSPAN:  I do have the citation, so I'll give

20   it to you.  It's 642 F.3d 314.  There is some reliance in this

21   case on language specific to the securities fraud statute.

22   Specifically, this is on page 318 of the case.  It says any

23   criminal proceedings may be brought in the district wherein any

24   act or transaction constituting the violation occurred, and it

25   cites to 15 U.S.C. 78a(a).  We acknowledge that there's no

O4GCeis5

1    corresponding text in the commodities fraud statute or in the

2    CEA, but we think the principle is the same.  We would advocate

3    for that same principle in the commodities space.

4                THE COURT:  Mr. Burnett.

5                MR. BURNETT:  Yes.  It's not a principle, it's the

6    text of the statute is different.  So the securities laws have

7    a purchase or sale requirement, and the venue provision is tied

8    to the purchase or sale requirement in securities laws.  So

9    when you're proving venue in the securities context, you need

10   to prove something constituting part of the sale was happening

11   in the district.  There's no purchase or sale requirement in

12   the context of the commodities fraud, it's just a scheme

13   liability.  It says a scheme to defraud in connection with a

14   swap is fraud, which is more akin to the language of the wire

15   fraud statute, which also says that it's a scheme to defraud.

16   Just like any wire, in furtherance of a wire fraud, regardless

17   of whether it was a scheme, regardless of whether that wire was

18   fraudulent or not can be a wire in furtherance to wire fraud to

19   establish venue.  So too can an any act in furtherance of a

20   commodities fraud scheme be something that can establish venue

21   for a commodities fraud scheme.

22               MR. GREENSPAN:  So just one quick response to that.

23   The wire fraud statute includes the language "in furtherance

24   of," the CA does not.

25               MR. BURNETT:  The wire fraud statute just doesn't have

O4GCeis5

1    the language "in furtherance of," which is not true.

2            MR. GREENSPAN:  Sorry.  Let me doublecheck.

3            The government's right and we withdraw that.

4            THE COURT:  So you're withdrawing the objection to the

5    venue language here; is that fair?

6            MR. GREENSPAN:  Not the objection, but the final point

7    statutorily.

8            THE COURT:  So I'm going to overrule the objection and

9    the instruction will remain as is, "in furtherance."

10           MR. GREENSPAN:  Understood, your Honor.

11           Turning to the terms of service instruction.  Our

12   request is just a simple one.  We think that the instruction is

13   about terms of service.  We think it would make more sense to

14   talk about the platforms that did have terms of services before

15   talking about the one that didn't.  We would suggest flipping

16   the order of the sentences that start on 915 and 918 without

17   any change to the text itself.

18           THE COURT:  So you're saying, "you have heard evidence

19   that various platforms," and then right after that, "you have

20   also heard evidence," and then that first sentence; is that

21   correct?

22           MR. GREENSPAN:  Yes.

23           THE COURT:  So it would read:  "You have heard

24   evidence that various platforms the defendant allegedly used,

25   including FTX, AscendEX, and Switchboard did have terms of

O4GCeis5

1    service.  You have also heard evidence in this case that at the

2    time of the events at issue, Mango Markets did not have terms

3    of service."  And then it proceeds as stated in the proposed

4    jury charge.

5         MR. GREENSPAN:  Right.  And then the corresponding

6    sentences, starting "in considering" on 915.  And similarly on

7    918, we would request that the order of those be inverted, as

8    well.

9         THE COURT:  So it would read, "in considering whether

10   the defendant's conduct was manipulative, fraudulent, or

11   deceptive in violation of the criminal laws in this case, let

12   me caution you that the fact that the defendant violated terms

13   of service on certain platforms does not by itself mean that

14   the defendant has committed a crime."

15        Then read me the next sentence, as you would propose

16   it.

17        MR. GREENSPAN:  "similarly," I would have it, again,

18   starting the sentence, "In considering whether the defendant's

19   conduct was manipulative, fraudulent, or deceptive in violation

20   of the criminal laws at issue in this case, if you find that

21   the defendant violated terms of service on certain platforms,

22   that does not by itself mean that the defendant has committed a

23   crime.  Similarly, let me caution you that the lack of terms of

24   service cannot render any fraudulent or manipulative conduct

25   legal or immaterial as a matter of law," and then finishing the

O4GCeis5

1    way it is now at the end of 919.

2            THE COURT:  Any objection from the government?  I'll

3    read it for you, just so you understand what's being proposed.

4            "In considering whether the defendant's conduct was

5    manipulative, fraudulent, or deceptive in violation of the

6    criminal laws at issue in this case, if you find that the

7    defendant violated terms of service on certain platforms, that

8    does not by itself mean that the defendant has committed a

9    crime.  Similarly, let me caution you that the lack of terms of

10    service cannot render any fraudulent or manipulative conduct

11    legal or immaterial as a matter of law.  In determining whether

12    the defendant has committed any of the charged offenses, you

13    are to apply the instructions I have given you today."

14            MR. BURNETT:  No objection from us.

15            THE COURT:  Mr. Greenspan, does that meet with your

16    approval?

17            MR. GREENSPAN:  That's right, your Honor.

18            I think that's all we have, but if you'll permit us to

19    speak just for one moment.

20            THE COURT:  Of course.

21            MR. BURNETT:  While they're talking, your Honor, I

22    realize we have two more things, I apologize, to cover on the

23    way through when they're done.

24            THE COURT:  That's fine.

25            Do you have a case that makes clear that, aside from

O4GCeis5

1    the securities context -- I think even in the securities

2    context, the "in furtherance" instruction is typically given.

3    Do you have a case you can point me to to confirm that that's

4    correct outside of the securities context?

5              MR. BURNETT:  I think it's Svoboda.

6              THE COURT:  That's the case that I pulled up.  That's

7    the insider trading case?

8              MR. BURNETT:  I think that's the insider trading case.

9    That has the "in furtherance" language.  I know Judge Liman

10   gave this like exact same instruction in Phillips.

11             THE COURT:  He gave this exact instruction on venue,

12   which is where the Court obtained it.  I just want to confirm.

13             In U.S. v. Svoboda, 347 F.3d 471, which I believe is

14   an insider trading case.  The Second Circuit approved the "in

15   furtherance" instruction, even in the securities context.  So

16   that, in addition to the fact that this instruction has been

17   given in a number of prior cases, including in Phillips, I just

18   wanted to make sure that was something that was reflected in

19   the cases.  There are also a number of other cases that have

20   reviewed instructions, including the in furtherance

21   instruction, without having any issues or errors with those

22   instructions.

23             Mr. Greenspan, anything further on your end?

24             MR. GREENSPAN:  Not on that issue, your Honor.

25             MR. BURNETT:  For another securities fraud venue case,

O4GCeis5

1    it looks like Lange, 834 F.3d 58.

2           THE COURT:  Understood.  Thank you.

3           MR. GREENSPAN:  Is your Honor waiting on the defense?

4           THE COURT:  Yes.

5           MR. GREENSPAN:  We rest on this procedure.  We're

6    done.

7           THE COURT:  No further objections?

8           MR. GREENSPAN:  No further objections.

9           THE COURT:  So I have two additional points, which is

10   one on alternate jurors, the second sentence reads:  "The final

11   two," and it should be:  "The final juror who is an alternate

12   won't deliberate at this time," hoping that we don't lose an

13   additional juror.

14          Any issues with that change?

15          MR. GREENSPAN:  No, your Honor.

16          MR. BURNETT:  Fingers crossed.

17          THE COURT:  So we'll make that change.

18          And then, at the end, very end of the instruction, on

19   the point that was raised earlier today, I would add:  "One

20   final note on timing.  At this point onward, you are free to

21   continue your deliberations as you see fit, and as all jurors

22   agree, so if everyone is in agreement, you may stay until

23   5:00 p.m. to continue your deliberations, or even later if all

24   jurors agree, but please be mindful of other jurors' time

25   constraints after in making your determination of how long each

O4GCeis5

1   day to deliberate.  Meals will be provided and you can let the

2   marshal and Mr. Hernandez know if you have any questions in

3   that regard."

4           Any issues with that proposed addition at the end of

5   the instructions?

6           MR. GREENSPAN:  No, your Honor.

7           MR. BURNETT:  No, your Honor.

8           THE COURT:  Mr. Burnett, you had two additional

9   issues?

10          MR. BURNETT:  Yes, your Honor.  I apologize.

11          The first is on our venue instruction, which is page

12  33, line 756.  We would just propose adding, "north of the

13  Bronx, including Poughkeepsie."

14          MR. GREENSPAN:  Shouldn't it be Dutchess County?

15  Isn't Poughkeepsie in Dutchess County?

16          MR. BURNETT:  I'm not sure if the jurors will know

17  that Poughkeepsie is in Dutchess County.

18          THE COURT:  Let's be accurate.  "The Southern District

19  of New York includes Manhattan, the Bronx, Dutchess County,

20  including Poughkeepsie, and several other counties north of the

21  Bronx."  Is that accurate?  Am I going to get yelled at by the

22  folks in Westchester that I'm misrepresenting --

23          MR. BURNETT:  To be honest, I don't know Westchester

24  well enough.

25          That was the first thing.

O4GCeis5

1          MR. GREENSPAN:  No objection.

2          THE COURT:  Understood.  "The Southern District of New

3    York includes Manhattan, the Bronx, Dutchess County, including

4    Poughkeepsie, and several other counties north of the Bronx."

5          Mr. Greenspan, any issues with that?

6          MR. GREENSPAN:  No, your Honor.

7          THE COURT:  Mr. Burnett.

8          MR. BURNETT:  So that was one thing.  The other thing

9    is back on page 20, our definition of swap.

10          THE COURT:  Okay.

11          MR. BURNETT:  So we're still fine with deleting the

12    sentence that the defense had requested be deleted.  Our

13    request would be that the remaining instruction actually be

14    revised to more closely track what the statute says here.  I

15    think when this was originally proposed, there were some things

16    that had been left out because we didn't necessarily think that

17    securities were going to be at issue in the case and some of

18    these risk transfer issues weren't as crystalized.  I think the

19    easiest way to go through our proposal would be for us to pull

20    the text of the statute up so you can see it.  Basically, our

21    proposal is going to be tracking the text of the statute here

22    more closely.

23          THE COURT:  Okay.

24          MR. BURNETT:  So the statute is 7 U.S.C.

25    1a(47)(A)(iii).

O4GCeis5

1          THE COURT:  You're still pulling that up; right?

2          MR. BURNETT:  Do you want us to pull it up for you on

3     the screen here?

4          THE COURT:  I can certainly pull it up.  I thought

5     that's what you were doing.

6          MR. BURNETT:  The instruction that we have is page 20.

7     So right now, we keep the phrase that says, "a swap includes

8     any agreement, contract, or transaction that provides for an

9     exchange of payment based on the value of one or more rates,

10    currencies, commodities, securities, indices, quantitative

11    measures, or economic interests, or property of any kind that

12    transfers in whole or in part the risk of changes in value of

13    the things underlying the swap without actually exchanging an

14    asset that incorporates the financial risk so transferred."

15          (Continued on next page)

16

17

18

19

20

21

22

23

24

25

O4GMEIS6

1          THE COURT:  Do you have that proposal in a way -- can

2     you put that proposal up on the screen?  Maybe you can type it

3     up and put it on the screen.

4          Mr. Greenspan, any issues with modifying that sentence

5     in the way proposed by the government?

6          MR. GREENSPAN:  I just need one more second to study

7     it, versus the language.

8          THE COURT:  Of course.

9          MR. GREENSPAN:  We are OK with this, but I think this

10     incorporates the issue we had with USDC on the next page.  So

11     we would ask for a corresponding instruction on the next page

12     about -- in the first -- that Mango perpetuals are based in

13     part on the value of USDC and that USDC has a currency or

14     financial or economic interest or property of any kind -- the

15     addition -- and is not exchanged between the parties.

16          MR. BURNETT:  We would object to that.  That is just

17     legally wrong.

18          THE COURT:  Mr. Greenspan, let's do it step by step.

19          As to subpart 2, Count One, commodities fraud, second

20     element, swap, the second paragraph would be replaced with what

21     is reflected on the screen and what was read by Mr. Burnett,

22     which is a swap includes any agreement, contract, or

23     transaction that provides for an exchange of payments based on

24     the value of one or more rates, currencies, commodities,

25     securities, indices, quantitative measures, or economic

O4GMEIS6

1      interest or property of any kind and that transfers, in whole

2      or in part, the risk of changes in value of the things

3      underlying the swap without actually changing an asset that

4      incorporates the financial risk so transferred.

5              As to just that change, Mr. Greenspan, any objection?

6              MR. GREENSPAN:  No, your Honor.

7              THE COURT:  We will exchange those sentences and put

8      in the government's proposal.

9              Now let's go to USDC.  So you say, in the mixed

10     swap --

11             MR. GREENSPAN:  The issue here is that USDC is being

12     exchanged between the parties.  If it's being exchanged between

13     the parties and it's the basis -- the value of it is the basis

14     for the perpetual, then it either can't be a swap in the first

15     place or it can't be an exception to move the Mango perpetual

16     into the category of mixed swaps.

17             THE COURT:  Can you just point me to where in 47(d)

18     the definition -- the mixed-swap exception portion of this rule

19     where you would see the analogous language that the government

20     pointed to in the definition of swap?

21             MR. GREENSPAN:  We acknowledge that it's not in (d).

22     We just think that this is a logical reading of (a) in the

23     first place.  If we are talking about -- I think they are

24     taking contradictory positions, basically.  The USDC is a

25     basis -- its value is a basis for the Mango perpetual and it is

O4GMEIS6

1    being exchanged, and therefore it's not even a swap.

2            MR. BURNETT:  Your Honor, we are not taking

3    inconsistent positions.  We are following the statutory

4    language of both statutes.  If they want to make an argument

5    about this to the jury, they can do that, but they shouldn't

6    get a legally wrong instruction on mixed swaps because he

7    thinks it's logically inconsistent.

8            THE COURT:  I am just trying to literally understand

9    the argument at this point.

10            Mr. Greenspan, can you just walk me through it.

11            Government says, we are putting this swap definition

12    into the instructions in a way that is consistent with the

13    statutory text.  I don't know what their position is on what

14    those swaps would be, so I take it your argument is, if they

15    take the position that the thing being swapped, that if --

16    maybe you just need to tell me.  You need to characterize it

17    for me.

18            MR. GREENSPAN:  This is in the definition for swap in

19    47, subparagraph (A)(iii).

20            At the end, and this is part of what their definition

21    was on the screen, it talked about:  Without also conveying a

22    current or future direct or indirect ownership interest in an

23    asset, and I'm skipping, that incorporates the financial risks

24    so transferred.

25            If they are relying on an argument for the mixed-swap

O4GMEIS6

1    definition that USDC --

2            THE COURT:  Let's just stop there.  You are saying

3    that, for the reasons that you have explained, these are not

4    swaps under the swap definition, right?

5            MR. GREENSPAN:  Correct.  We just think that it's

6    logically inconsistent to rely on USDC as being a basis for

7    Mango perpetuals, which USDC has exchanged.  If that's the

8    case, we don't even get to mixed swaps because it's not a swap

9    in the first place.

10           THE COURT:  Mr. Burnett, if I'm understanding it, I

11   think Mr. Greenspan is saying, it doesn't make sense,

12   especially given the change that you are proposing to the swap

13   definition, to have a discussion of USDC here on the

14   defendant's argument that USDC is exchanged, so there is no --

15   either this isn't a swap or you shouldn't have been proposing

16   that change that you did, if I'm understanding things right.

17   Maybe I'm not.

18           MR. BURNETT:  I don't really understand what the

19   argument is, but we are asking for what is a legally -- we are

20   tracking the language of the statute for a swap.  We are

21   tracking the language of a statute for the mixed swap.  We are

22   going to make our argument about why it's a swap.

23           THE COURT:  The only issue is that with respect to

24   mixed swap, we are specifying that things -- the things that

25   the jury should focus its attention to.

O4GMEIS6

1          And I think Mr. Greenspan is saying, because of the

2     definition of swap that we are putting in, that the government

3     is proposing, there is an inconsistency because of the actual

4     fact in evidence that we are suggesting would be the thing for

5     the jury to look at on the mixed-swap definition.  I am just

6     trying to understand this.

7          MR. BURNETT:  I'm struggling to understand what the

8     inconsistency is.

9          THE COURT:  Mr. Greenspan, what's the inconsistency?

10          MR. GREENSPAN:  Sure.  The inconsistency is that

11     factually USDC is exchanged, right.  So if USDC is part of the

12     transfer, part of what is the swap here, then we don't have a

13     swap at all because it doesn't meet the definition of

14     47(a)(iii).

15          THE COURT:  Stop right there.

16          Is that right, Mr. Burnett?

17          MR. BURNETT:  No.  That's wrong.

18          THE COURT:  Why?

19          MR. BURNETT:  Think about this outside the context of

20     crypto.  Say you have like a Japanese stock that trades on the

21     Nikkei and like the yen, and you have a swap that's based on

22     the value of the stock and the yen, the relative value there,

23     and it settles in yen too, so it doesn't settle in dollars; it

24     settles in yen.

25          What the swap definition is referring to, are you

O4GMEIS6

1    exchanging any asset that incorporates -- the financial risk

2    that you are transferring there, is that the risk of the

3    relative value of the yen and the stock.  So it's not asking,

4    are you transferring yen at the end of the day.  It's asking,

5    are you transferring some other asset that would actually

6    incorporate the same value as the relative risk of yen and

7    Nikkei.  It's analogous.

8              The yen makes it a mixed swap too because the yen

9    would be, under the mixed-swap definition, a currency that this

10   is also based on the value of.  The fact that it's settling in

11   yen does not make it not a mixed swap.  This is actually right

12   out of the total return swap stuff that they cited the other

13   day.  But that's what it is.

14             The fact that you are transferring USDC does not make

15   it not a swap, because the swap is what you're swapping, is the

16   relative value of Mango USDC, and USDC itself does not

17   incorporate the risk of the relative value of Mango USDC.  It's

18   one component of that risk.

19             THE COURT:  If you had just a straight Mango USDC

20   swap, let's just imagine that you did, and under the terms of

21   the agreement, at the end of three months, you would exchange

22   MNGO for USDC.  That's just the terms of the parties'

23   agreement.  That is not a swap, right?

24             MR. BURNETT:  That's just a future there.

25             THE COURT:  Right.

O4GMEIS6

1          MR. BURNETT:  Here that's because you have like a

2     definite end date, and you're like swapping the things back and

3     forth at the end.  A future has like a special carve-out.  A

4     future actually technically is a swap, but is like explicitly

5     carved out of the statute.  It's not that a future is not a

6     swap; it's just a carved-out swap.

7          THE COURT:  In your view, it's irrelevant whether any

8     USDC is transferred here for purposes of either the swap

9     definition or the application of the mixed-swap exception.

10         MR. BURNETT:  That's right.

11         THE COURT:  Now, let's go back to what your proposed

12    change was, Mr. Greenspan.

13         So you wanted to add what to this language on USDC?

14         MR. GREENSPAN:  Just I wanted to add, at the end,

15    after any kind and is not exchanged between the parties.

16         Just to respond to what the government just said, I

17    think this has been our issue all along with the way they have

18    treated USDC and mixed swaps.  The rule making is very clear

19    that this is supposed to be a very narrow category.  We have

20    got the CFTC on one side that has jurisdiction over things and

21    the SEC, and those are supposed to be split, and narrowly we

22    have this category of mixed swaps.

23         What I just heard from the government is just about

24    any stock that's traded in a foreign currency is a mixed swap,

25    and they talked about total return swaps, which the rule making

O4GMEIS6

1    specifically says are securities-based swaps.

2             This is the issue with including this USDC here in the

3    first place, is that it explodes the definition of mixed swaps.

4    It's antithetical to the way the statute is written and the

5    rule making, and that's really the problem here.  That's what

6    we are trying to address.

7             MR. BURNETT:  Your Honor, their argument is this is

8    inconsistent with the statute, but their instruction has no

9    basis in the statute.

10            THE COURT:  Mr. Greenspan, the issue is that in the

11   mixed-swap exception there is no basis for this particular

12   language that you're proposing to be added.  I take it that

13   what you're saying is, there is a problem now with the proposed

14   definition of swap because, on your argument, if USDC is

15   transferred, then this cannot be a swap, right?

16            MR. GREENSPAN:  Yes.  The problem is this USDC

17   component, we think.  This USDC basis for a mixed swap just

18   makes no sense.  It's not consistent with the statute.  It's

19   not consistent with the facts of this case.

20            I don't want to belabor the point, because your Honor

21   has been very patient with us, and we have written umpteenth

22   letters about this, but this is really the sort of stumbling

23   block for us.

24            MR. BURNETT:  Your Honor, I appreciate their position,

25   and they have been repeating it, but we are asking for an

O4GMEIS6

1   instruction that tracks the language of the statute for both of

2   these pieces.

3           They have made their Rule 29 argument, they can

4   reraise it after, but Mr. Greenspan asserting that it doesn't

5   logically make sense to him does not make the instructions we

6   have requested legally wrong and also doesn't make his

7   instruction legally right.

8           MR. GREENSPAN:  To be clear, that's not what I

9   asserted.  I asserted it's not consistent with the statute, not

10  that it doesn't logically make sense to me, and that's a

11  misrepresentation.

12          THE COURT:  Mr. Greenspan, if on the swap

13  definition -- you are going to be making this argument full

14  throated in your closing, right?

15          MR. GREENSPAN:  Mr. Klein will be.

16          THE COURT:  Mr. Klein.  You'll be doing it in

17  solidarity from your chair.

18          MR. GREENSPAN:  Yeah.  That's fair.

19          THE COURT:  Now it seems like the government has

20  essentially done you a favor, because they have proposed that

21  this swap definition track the language of the statute, which

22  then puts that language that you are going to be relying on,

23  which wasn't previously there, into the instruction, without

24  actually exchanging those things.  So now you are going to be

25  able to rely on that language to try to establish that because

O4GMEIS6

1    USDC has transferred this, Mango perpetuals do not fall under

2    the definition of swap.

3         You're happy with that change, right?

4         MR. GREENSPAN:  Yes, your Honor.

5         THE COURT:  So then the instructions continue that if

6    the jury, for whatever reason, based on the government's

7    arguments or based on their own evaluation of the evidence,

8    rejects your submission and finds that the government has

9    proven beyond a reasonable doubt that Mango perpetuals are

10   swaps, then we fall out of that swap definition and move into

11   the mixed-swap exception, and there the government is just

12   giving you a heads-up as to what it's going to be arguing if it

13   is under that mixed-swap exception.

14        In that regard, what Mr. Burnett is saying is they are

15   simply just tracking the language of the statute in terms of

16   what the exception says, and I'm not seeing in the exception

17   the language that you are pointing to about the exchange of

18   things -- not exchanging those things, that's simply not in the

19   mixed-swap exception, whereas the language that we have

20   included here concerning currency or a financial or economic

21   interest or property of any kind, or the narrow-based security

22   index, those that are used in this mixed-swap exception.

23        Unless I'm missing anything, the proposed addition

24   that you are making does not have a basis in the mixed-swap

25   exception.  However, you have full license here to make any

O4GMEIS6

1     arguments that you want to make.

2          And in fact, as to the swap definition, it seems like

3     the government's proposed instruction would be favorable to

4     your efforts to make that argument.

5          I am going to overrule and not include the proposed

6     language on the mixed-swap definition.  However, we will

7     proceed with the government's proposed edit to the swap

8     definition, which the defendant has consented to.

9          Any further issues, Mr. Greenspan?

10         MR. GREENSPAN:  No, your Honor.

11         THE COURT:  Mr. Burnett, having gone through this

12    whole exercise, any further issues from your end, any

13    objections that the Court has not heard or has not ruled on

14    that you would like to raise?

15         MR. BURNETT:  No.

16         Thank you for letting me reraise things.  On that

17    Mango securities sentence, the Court can assume that we are OK

18    with it.  If we are not, we will write something within an hour

19    of when I get back to the office.

20         THE COURT:  That's fine.

21         Mr. Greenspan, are there any issues, edits, objections

22    that you have not raised or that the Court has not heard and

23    ruled upon?

24         MR. GREENSPAN:  No, your Honor.

25         THE COURT:  The Court has one remaining issue that I

O4GMEIS6

1    don't think will be an issue for either side.

2          We changed the alternative jurors' language to make it

3    singular.  I think some conforming changes to those paragraphs

4    need to be made to make sure it's singular.

5          Any issues with that?

6          MR. BURNETT:  Nope.

7          MR. GREENSPAN:  None, your Honor.

8          THE COURT:  The Court will make these edits.  We will

9    remove the line numbers, and we will send the parties the final

10   jury charge and verdict form.  You should closely review those

11   to make sure they reflect what we have discussed today.  And if

12   there are any issues, you should promptly get back to the

13   Court.

14         Otherwise, any issues to raise, Mr. Burnett?

15         MR. BURNETT:  No, your Honor.

16         THE COURT:  Mr. Greenspan, anything from your side?

17         MR. GREENSPAN:  No.  Thank you.

18         THE COURT:  Thank you very much.  We will see everyone

19   back at 9 a.m. tomorrow.  We are adjourned.

20              (Adjourned to April 17, 2024, at 9:00 a.m.)

21                            *  *  *

22

23

24

25

1                    INDEX OF EXAMINATION

2   Examination of:                          Page

3   JEREMY SHERIDAN

4   Cross By Mr. Burnett . . . . . . . . . . . .1174

5   Redirect By Ms. Martabano  . . . . . . . . .1212

6   Recross By Mr. Burnett . . . . . . . . . . .1252

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25