O4HMEIS1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                            23 Cr. 10 (AS)

5   AVRAHAM EISENBERG,

6              Defendant.                    Trial

7   ------------------------------x
                                            New York, N.Y.
8                                           April 17, 2024
                                            9:30 a.m.
9

10  Before:

11                 HON. ARUN SUBRAMANIAN,

12                                          District Judge
                                            -and a jury-
13
                              APPEARANCES
14

15  DAMIAN WILLIAMS,
        United States Attorney for the
16      Southern District of New York
    PETER J. DAVIS
17  THOMAS S. BURNETT
    TIAN HUANG
18      Assistant United States Attorneys

19  WAYMAKER LLP
        Attorneys for Defendant
20  BRIAN E. KLEIN
    ASHLEY MARTABANO
21  RILEY SMITH
        -and-
22  TALKIN MUCCIGROSSO & ROBERTS, LLP
    SANFORD N. TALKIN
23  NOAM B. GREENSPAN

24  Also Present:  Brandon Racz, FBI
                   Ryan Sears, Paralegal Specialist-USAO
25                 Jonathan Oshinsky, Paralegal Specialist-USAO

O4HMEIS1

1          (Trial resumed; jury not present)

2          THE COURT:  Before we get started with summations,

3    just to put this on the record, yesterday the Court emailed the

4    parties to inform them about a couple of changes to the

5    instructions and to the verdict sheet, so I will just put that

6    into the record.

7          The email to the parties indicated that references to

8    in their property rights were removed from pages 16 and 18 in

9    line with the change requested by the government at yesterday's

10   conference to which the defendant did not object.  On page 14,

11   attempted commodities manipulation was added to the description

12   of Count Two in the indictment.

13         The following changes were made to the verdict sheet.

14   The verdict sheet omitted reference to attempted commodities

15   manipulation, but which is in the jury charge, so the verdict

16   form that the Court will provide to the jury adds that count,

17   and space for all the jurors' signatures was added consistent

18   with the jury charge.  The Court informed the parties that if

19   they had any objections, they should inform the Court.  We

20   received no objection from the government, and we received an

21   email from the defense indicating that they had no objections.

22         Anything, Mr. Davis, to raise with respect to that

23   email?

24         MR. DAVIS:  No, your Honor.

25         THE COURT:  Anything from the defense?

O4HMEIS1

1          MR. KLEIN:  No, your Honor.

2          THE COURT:  Anything further that we need to discuss

3    before we bring the jury in?

4          MR. DAVIS:  No, your Honor.

5          MR. KLEIN:  No, your Honor.

6          THE COURT:  Mr. Hernandez, can you bring in our jury.

7          THE DEPUTY CLERK:  Yes, your Honor.

8          (Jury present)

9          THE COURT:  Welcome back, members of the jury.  I hope

10    you had a pleasant evening.  Once again, on behalf of the

11    parties and the Court, I wanted to thank you for all the hard

12    work and close attention that you have paid to this case so

13    far.

14          We are going to proceed with summations this morning.

15          As you know, first, we will be proceeding with the

16    government's summation, and then the defense summation, and

17    then the government will have a chance at rebuttal.  The reason

18    that we are proceeding that way is because the government at

19    all times bears the burden of proof, as I have told you before

20    and will tell you again.

21          I remind you that what the lawyers say is not

22    evidence.  Your recollection of the evidence controls.  That is

23    to say, if they say anything about the evidence that differs

24    from your recollections, it is your recollection that controls.

25          Similarly, to the extent that the lawyers comment on

O4HMEIS1                    Summation - Mr. Davis

1    what they anticipate my instructions will be and comment on the

2    law, as they are permitted to do, if there is any conflict

3    between what they say to you and what I tell you after they

4    finish, it is my instructions that will govern.

5           With that understanding, however, you should listen to

6    what they have to say.  This is an important part of the

7    process.  It may be the most important part of the process.

8    It's the lawyers' opportunity to summarize the evidence for you

9    and tie it all together and to make arguments to you as to what

10   conclusions you should draw from the evidence.  It's a very

11   helpful part of the process.  For that reason, you should

12   listen with care to both sides.  I know you will because you've

13   been listening with care to the presentations this entire

14   trial, and I am grateful to you for that.

15          We will take appropriate breaks during the day just to

16   ensure that you can listen and give careful attention to both

17   sides to all the arguments.  So if anyone needs a break after

18   an argument, please let Mr. Hernandez know, and we will make

19   sure that we can take appropriate breaks.

20          With that, we will proceed.

21          Mr. Davis.  Are you ready to proceed?

22          MR. DAVIS:  Yes, your Honor.  Thank you.

23          Avraham Eisenberg ran a con.  During this trial you

24   heard how he lied and deceived to put millions in his pocket.

25   He created a fake trade with himself.  He pumped the price

O4HMEIS1                    Summation - Mr. Davis

1   through the roof.  He hid behind a Ukrainian woman's identity,

2   and he lied.  He said he was borrowing, but he was simply

3   stealing.

4          Now, his deception may have been on cryptocurrency

5   platforms, but make no mistake, this was old-fashioned

6   manipulation and fraud.  He pumped the price and lied so he

7   could steal people's money, plain and simple.

8          And this fraud, the manipulation, it was brazen.  It

9   was criminal from start to finish.  In private messages he said

10  he was going to pump the price.  He said he was going to pull

11  borrows.  He looked up the statute of limitations for market

12  manipulation.  He stole a hundred million dollars and fled the

13  country, and he thought he could get away with it.  But not

14  anymore.

15         Ladies and gentlemen, you have heard the witnesses.

16  You have seen the documents.  You know the truth.  It is time

17  to hold the defendant accountable for what he did, for blatant

18  manipulation, for fraud, for stealing.

19         Now, this closing statement, it's our opportunity to

20  help you put the evidence together.  Here is what we are going

21  to cover.

22         First, I am going to talk about the defendant's

23  scheme.  We will walk step by step through each layer of

24  deception.  Then we are going to talk about the charges.

25         But before we dive in, I want to take a step back.

O4HMEIS1                    Summation - Mr. Davis

Now that you have seen the evidence, you know exactly what the
defendant's con was.  He borrowed from Mango Markets based on
fake collateral.  He told Mango Markets that he had something
valuable, a shiny diamond ring, and he put that diamond ring up
as collateral for his borrow, 110 million in cryptocurrency
that he pulled off the platform and fled with.

     But the defendant was not borrowing.  He was stealing.
And the diamond ring, it was a fake.  It only appeared that way
because the defendant made it look that way.  His fake diamond
ring, the Mango perpetuals that he bought, they only looked
valuable because he pumped the price.  He ran off with every
deposit on the platform and left Mango Markets holding a
worthless, fake ring.

     I want to be clear about something.  The defense has
no burden here.  But when they make arguments, it is your job
to scrutinize them, to ask yourselves if they hold water.  And
what the defense has suggested in this trial is that the
defendant thought he was allowed to steal every last deposit on
the platform because it was technically possible for him to do
it.  But you sat through this trial.  You know that's not what
the evidence showed.  The evidence showed over and over again
that the defendant knew what everyone knows, that he could not
manipulate the market and lie.  Remember, he researched the law
before he ran his scam.  And once he got his money, he fled the
country.  He knew he was violating the law.

O4HMEIS1                     Summation - Mr. Davis

1          We are here today because there is no special set of

2     rules for Mr. Eisenberg.  We are here today because

3     manipulation, lies, and deceit, it's criminal, whether it

4     happens on Wall Street or on a computer program.

5          I want to dive in now.  Let's go through each stage of

6     the defendant's scheme.  I want to talk about the facts that

7     show that this was a premeditated and deceptive con.

8          Along the way we are going to talk about the

9     defendant's actions and the defendant's words and how they

10    prove over and over again that the defendant is guilty.

11         Let's put something to rest right away.  The defendant

12    knew that manipulation and fraud was illegal.  This is

13    Government Exhibits 1704 and 609.  You saw that, in July 2022,

14    months before his own crimes, the defendant sued someone in

15    federal court for price manipulation of a cryptocurrency.

16    Let's look on the right here.  The defendant sued them because

17    they, and this is the highlighted portion in the middle, spent

18    tens of millions of dollars buying up waves so that the price

19    went up from single digits to a high of $60.

20         Then the next sentence:  They then turned those waves

21    into USDN at this inflated price and borrowed about 550 million

22    of USDC and USDT against it.  Does this sound familiar?  The

23    defendant sued them for market manipulation and fraud.  He sued

24    them for market manipulation because he knew then, as he did

25    when he committed these crimes, that it's illegal to

1    intentionally distort a market, that tricking people into

2    thinking an asset is valuable when it's not, it's deceptive and

3    it's wrong, that making people think that a price is the result

4    of supply and demand when it's really just you pumping it up.

5              It's a crime.  Using inflated collateral to borrow,

6    it's fraud.  It's lying.  This is important because the

7    defendant did not think there were no rules in cryptocurrency.

8    He knew that the laws against fraud and price manipulation

9    applied, and he knew why they applied.

10             Let's fast forward a little bit.  I want to talk about

11   leading up to October 11.  Let's start in September of 2022.

12   This is about a month before the defendant stole from the

13   platform.

14             I want to talk about the defendant's private messages,

15   private Discord messages.  This is Government Exhibit 502A.  We

16   have taken the Excel spreadsheet and tried to put them in chat

17   form, but the text is the same.  This is a private chat that

18   the defendant never thought you would see, and the messages

19   show you how he knew his scheme was criminal.  They show you

20   that he knew he was lying.

21             Let's start with this first chat.  He says:  The idea

22   is you buy a ton, massively increase the price, and borrow on

23   lending to lever.

24             You know what he's talking about, because a few lines

25   down he references MNGO, the Mango token.

O4HMEIS1                    Summation - Mr. Davis

1          When he is saying massively increase the price, he is

2   saying he is going to manipulate the price.  One person cannot

3   decide that they are going to massively increase the price.

4   That is not how markets work.  Markets have buyers and sellers,

5   supply and demand.  What the defendant is talking about is

6   different.  He is talking about singlehandedly moving up a

7   price.  He is talking about brute-force price manipulation.

8          But there is more in this chat that we should talk

9   about.  This is the next line in the same chat.  MNGO, that's

10  the Mango token, has much lower liquidity, but lower limits, so

11  I'd need to pump it a lot more to be profitable.

12         He says he is going to pump it, that he needs to pump

13  it a lot more to be profitable.  Pumping is not trading.

14  Pumping is not an investment.  Pumping is not supply and

15  demand.  Pumping is criminal.  And what he is saying is, he

16  needs to create a really fake price in order to steal money

17  from the platform.  He is not saying he has a great investment

18  in the Mango token.  He is talking about taking the market into

19  his own hands and moving the price.  He is saying that his

20  scheme only makes sense if he can move the price a lot.  He is

21  telling you exactly how he is going to steal from the platform.

22  This is just cheating.  It's cheating because creating a price,

23  he's creating a price that isn't real.  It's cheating because

24  he's using that fake price to make other people think he has

25  something really valuable.  That's the manipulation.

O4HMEIS1                        Summation - Mr. Davis

1          You all know that the defendant was well aware that

2     pumping was illegal.  The defendant knew that people get

3     criminally charged for pumping in the markets.

4          This is Government Exhibits 800 and 800A.  This is

5     still September, so we are about a month before his own crimes.

6     Here is what Mr. Eisenberg tweets.  He tweets about a criminal

7     prosecution for market manipulation.  This tweet shows you that

8     he knows it is a crime to pump the price.  It shows you that he

9     knows what he's about to do is wrong.  It shows you what he's

10    describing in those chats he knows is criminal.

11         But there is more.  This is Government Exhibits 802

12    and 802A, another tweet from Mr. Eisenberg.  He says:  The SEC

13    going after a market maker for manipulating trading volume and

14    price of crypto securities.

15         The defendant did not need to be told that pumping a

16    price was illegal.  He knew full well that this was criminal

17    through and through.  These tweets show you that he knew he was

18    breaking the law.

19         But there is more.  Let's go back to 502A.  Again,

20    this is that September chat, the private message where he's

21    talking about pumping.  What else does he say?  He says:  We

22    can pull borrows.

23         Pull borrows.  He is going to take money that he is

24    supposed to be borrowing off the platform and run with it.  He

25    is going to say that he is borrowing when he's really stealing.

O4HMEIS1                    Summation - Mr. Davis

That is how he is going to make money from the scheme, by lying

and pulling every last deposit off the platform, literally

running away with the money.  That's the fraud.

One more chat.  He says:  Either it's a ghost town and

I can 1,000 times it.  He's talking about 1,000 timesing the

price.  He means he can move the price and then lie about the

value of his collateral, that he can make it look like the

collateral is 1,000 times more valuable than in reality.  This

is how he is going to make the fake ring shine, moving the

price on purpose.  That is manipulation.  Lying about the value

of the collateral and lying about borrowing, that's the fraud.

And what you're reading in this chat is the defendant's

playbook for the crimes he is about to commit.  This chat, the

one he never wanted you to see, tells you exactly what is in

his mind.  It shows you he knows what he was doing was illegal.

It shows you that he knew the law applied to him.

Let's get closer in time to the crime itself.  Now we

are on October 8, so three days before October 11 and the

crime.  I want to talk about the defendant's search history

during this time.  You saw what was on top of the defendant's

mind three days before he commits this crime.  This is

Government Exhibit 119A.  What is he searching for during this

time?  He is searching for the statute of limitations for

market manipulation.  That's the time limit for how long after

a crime you can be prosecuted.  This search has nothing to do

1    whether something is illegal.  It's about how long you have to

2    be on the run before you can get caught.  He searches for the

3    elements of fraud.  He searches for market manipulation under

4    federal law.  He even goes on the Wikipedia page for fraud.

5            Look at the last one.  He visits a Department of

6    Justice website announcing a criminal sentence for someone who

7    manipulated the market three days before he commits the crime.

8    He Googles the crime to see how long people are spending in

9    jail for it.  This web history, it's crushing proof of the

10   defendant's guilt.  These searches show you that the defendant

11   knew that everything he was about to do on October 11 was

12   illegal, and he did it anyway.

13           But there is one more thing I want to show you.

14   Within an hour of searching for fraud, Wikipedia for fraud,

15   what website does he visit?  Trade.mango.markets/borrow.  He is

16   searching for the elements of fraud around the same time he is

17   going to the borrow page of Mango, because he's about to commit

18   fraud on the borrow page of Mango.  These searches show you

19   that he knows he can't do this, that he knows it's unlawful.

20           Let's zoom in on October 11.  I want to talk about the

21   stages of the defendant's crime.  This is Government Exhibit

22   1351.  I want to start in the first part of the day, so

23   midnight to 6:20 p.m.  The defendant has his playbook.  You all

24   read that in the private chat, but he has to move his funds

25   around to set up the con.  He needs to trade a gigantic

O4HMEIS1                    Summation – Mr. Davis

1    perpetual with himself, and he needs to pump that price of that

2    perpetual with illegal trade after illegal trade.

3            Government Exhibit 1351 is Special Agent DeCapua's

4    chart of the fund flows.  This is showing how the defendant set

5    the table for the crime.

6            A couple main takeaways from it.

7            First, the defendant is behind each one of these

8    transfers.  That's not in serious dispute.  But I want to look

9    a little closer at these wallets.  I want to look a little

10   closer at these transfers.  Let's start with the blue wallet

11   towards the left of the screen, the one that says Avraham

12   Eisenberg underneath.  This wallet is in his own name.  This is

13   the Circle wallet you have been hearing about during this

14   trial.  This is the registration information for that account.

15   It's under his name, with his passport, has his address.

16           Here is the important thing about this.  This Circle

17   account, this is not the account that Mr. Eisenberg used to

18   pump the price.  That's important because he did not want his

19   name connected with this con.  He wanted to hide.  He wanted to

20   put distance between his name and his crime.  This shows you he

21   had a guilty mind.

22           Let's go back and break this down.  Now we are back on

23   1351.  Each step in this process is meant to create distance

24   between Mr. Eisenberg's name and the crime.  The blue wallet is

25   the account in his name.  The first thing he does to stake the

O4HMEIS1                        Summation - Mr. Davis

1   funds for this crime, he sends it to an intermediate wallet,

2   this like beige one in the middle, sends 15 million USDC.

3            But he doesn't stop there.  He sends that to another

4   wallet, the bochen clean wallet at FTX.  This wallet is in the

5   name of Natalia Bochenkova.  This is deceptive.  It makes it

6   look like someone named Natalia Bochenkova is behind this when

7   it's really the defendant.

8            Let's look at this account.  This is the registration

9   information for the Bochenkova FTX account.  This is Government

10  Exhibits 1246 and 1247, and the account information is in 1219.

11           You don't need me to tell you this, but Natalia

12  Bochenkova is not Avraham Eisenberg.  You learned that this was

13  the defendant's dummy account on FTX.  This was his disguise.

14  And if you are using a disguise, you are trying to hide

15  something.

16           You also learned about how Mr. Eisenberg purchased

17  this account.  He purchased it from someone named Dmitriy.  We

18  are going to look at those chats.  But I want you to ask

19  yourself, why is the defendant buying another person's

20  information?  He wants to hide who he is.  He wants to hide his

21  involvement in the crime.  He wants to put distance between his

22  name and his scheme.

23           (Continued on next page)

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O4HCeis2                    Summation - Mr. Davis

1            MR. DAVIS:  He doesn't want to get caught.

2            So this is that Dimitriy chat.  This is Government

3    Exhibit 116.  Now, this is not a chat between the defendant and

4    Natalia Bochenkova.  This is a chat between someone named

5    Dimitriy and the defendant.

6            And look at the text from Dimitriy at the top.  He

7    says, today, tomorrow, the verification of FTX will be done for

8    a first company, remaining two verifications are ready.  He

9    then says, there's a new company with three accounts, already

10   done verification with FTX and LKX.  The defendant responds,

11   I'll be interested in this one soon, still waiting for the SIM

12   to come Tuesday on the second company to get access.  So

13   Natalia Bochenkova was not the only account that the defendant

14   was trying to purchase.

15           And what happens next?  Dimitriy sends a bunch of

16   passwords and user names and bank account information for

17   Natalia Bochenkova.  This is 116B.  Why is the defendant buying

18   someone else's log in information?  Why is he buying passwords

19   and bank accounts in someone else's name?  It's because he

20   wants to hide who he is.  He wants to put distance between his

21   own name and the crime.  It shows you he's committing a crime.

22   It shows you he doesn't think he's acting above board.  He's

23   not out in the open on this.  He is not using his account, he's

24   using a disguise.

25           We're back to 1351, still setting the table for the

O4HCeis2                        Summation - Mr. Davis

1   fraud.  We made our way to the FTX account, bochen.clean, the

2   Natalia Bochenkova.  But we're not even done.  We go to two

3   more intermediary wallets, $5 million each.  One goes up, one

4   goes down.  Then he uses those two wallets to set up two

5   different accounts on Mango Markets.  Look how far we are from

6   the Circle account at this point.  We are four wallets removed.

7   He puts a wallet in between the Circle account and Natalia

8   Bochenkova's account, then the Bochenkova account goes to two

9   separate wallets, then those two separate wallets open two more

10  accounts.  This is deceptive.  He is trying to hide.  He is

11  putting distance between his name and the crime.

12          All right.  So now let's see the account opening on

13  Mango Markets.  This is Government Exhibits 930 and 927.  The

14  defendant is behind both these accounts.  Look at the timing

15  and the amount of the deposits in these accounts.  Within one

16  minute of each other, they both get almost 5 million in USDC.

17  But this is the defendant making both these deposits.  This is

18  deceptive, it's deceptive because he's controlling both of

19  these accounts.  He does not open these accounts to have

20  separate trading strategies, he opens them for one purpose, so

21  that they could trade with each other, so that he can make his

22  fake bet.  Their sole purpose is to stake the fraud, but he's

23  making it look like they're two independent users on Mango

24  Markets with 5 million USDC ready to spend.

25          So we're going to move on from 1351.  But each layer

O4HCeis2                    Summation - Mr. Davis

of this transfer is meant to deceive, it's meant to put

distance between his name and his crime, it's meant to set up

two different accounts on Mango Markets with the same amount of

funds.  It's deceptive, it's deceptive because it looks to

Mango like there are two different users about to engage in

legitimate activity when, in reality, it's just the defendant.

So that sets the table.

         The defendant has his con planned and he moved his

funds around.  He's got these two different accounts at Mango

Markets with the same amount of money.  We looked at these

deposits, we looked at the timing.  This is when he buys his

fake bet.

         This is Government Exhibit 921 and 926.  He takes out

three gigantic perpetuals with himself.  Look at the timestamps

on these trades.  He does this in a minute.  Look at the amount

of contracts he purchases, almost $500 million.  And look at

the times.  They line up identically.  These are both of his

accounts, he's on both sides of this, he is both the long and

the short.  If the price of Mango goes up, one of his accounts

makes money and one of his accounts loses money.  If the price

of Mango goes down, one of his accounts loses money and one of

his accounts makes money.  But no matter what, he hasn't gained

or lost anything.  This shows you he's trying to deceive.  It

shows you he wants Mango Markets to think that this is a

legitimate trade with two users when, in reality, it's just one

O4HCeis2                        Summation - Mr. Davis

1   user trading with himself.  And you heard that this trade makes

2   no economic sense if the same person is on both sides of it.

3         This is Government Exhibit 1302.  This is the slide

4   that Dr. Mordecai showed you of how one side goes up, the other

5   side goes down, the net position of being on both the long and

6   the short.  It shows it makes no economic sense, but it does

7   make sense if you're committing a crime.  It makes sense if

8   you're going to make money off of this by lying, and that's

9   what the defendant was doing here.  The fake trading was going

10  to allow him to steal a huge amount of money.  It was going to

11  allow him to pump the price and to pull borrows.  This is

12  deceptive.  There's usually a short side that would care about

13  losing their money, but here, Mr. Eisenberg is on both sides.

14  He only cares about his own bottom line.  These giant trades,

15  they're not trades at all.  It's just a tool for the scheme.

16        The other thing about these trades we have to talk

17  about is their size.  I mean, they're gigantic.  This is

18  Government Exhibit 1303.  This is the chart showing open Mango

19  perpetual contracts leading up to October 11th.  You can see

20  the line is basically at the bottom until we get to the

21  defendant's trading where it skyrockets to 500 million

22  contracts.  This shows you about the defendant's intent in this

23  scheme.  It shows you his intent was to manipulate the price

24  because the bigger the perpetual, the more impact his

25  manipulation would have.  Remember when he said, I need to pump

O4HCeis2                        Summation - Mr. Davis

it way more to be profitable, this is what he's talking about.
The bigger the perpetual, the more he can steal.

And think about what we just talked about.  He's net
zero on this trade.  He's trading with himself.  So why does
the size matter?  The size matters because of the role it's
playing in this fraud.  It allows him to pump one side, to lie,
and to steal funds.  That's why it matters.  This is not a real
investment.  This is not a real trade.  This is just a tool for
the defendant's crime.  He set up his fake trade, he has his
tool in place.  You know the next step because he gave you the
playbook.  He's got to pump it, right?  He has to make what he
just bought appear valuable.  He has to make it look like one
side of that bet is worth something valuable.  He has to make
his ring shine.

This is slide 1353.  We're going to go step by step
through this slide.  But this is the pump right here.

The first thing we should know is where he is doing
this trading, where, what location.  He's doing them at
AscendEX, he's doing them at FTX, and he's doing them at
Serum DEX.  Is that a random coincidence?  No.  Those are the
three exact exchanges that feed into the price of the Mango
perpetual.  The fact that he is trading on these three
exchanges shows you his intent is to manipulate.  It shows you
he's doing this to manipulate because he's picking the
locations you would pick if you wanted to influence the price.

O4HCeis2                              Summation - Mr. Davis

1    This is the manipulation in practice right here.

2              So you remember hearing about the oracle from

3    Mr. Hermida from Switchboard.  This is where he explained that

4    the three exchanges that the oracle looks at are FTX, AscendEX,

5    and Serum, the same three locations that the defendant pumps.

6              Let's read his testimony.  What was your rationale for

7    choosing the three exchanges that your group did for choosing

8    FTX, AscendEX, and Serum.  He answers at the bottom there, that

9    is to say so it could have the best sort of truest

10   representation of the price at that point in time.  This is an

11   important point because that's the point of having oracle look

12   at multiple exchanges, to try and get the truest representation

13   of a price, not to have one person dictate what the price is.

14   It's to prevent people from manipulating.

15             And Switchboard also picked these locations because

16   these locations had rules.  They had rules against

17   manipulation.  This is AscendEX's terms of service.  It shows

18   you that people expect that the oracle was going to be on

19   unmanipulated prices, not one person pumping.  But the

20   defendant did not see it that way.  For him, this was a

21   roadmap.  All he needed to do was pump these exchanges in big

22   enough amounts at the same time and he would have a shiny fake

23   ring.

24             Let's look now in detail at the pump.  Let's take

25   these one by one.  At the top here, AscendEX.  This is from

6:26 to 6:40 p.m.  We're talking about 14 minutes in time.  He

sells 74,000 USDC and he buys over a million MNGO.  Look what

happens to the price of MNGO on AscendEX at that time.  It

skyrockets, but he's not done.  Look at FTX.  This is the

Bochenkova account.  He sells a million USDC and buys

16 million MNGO.  Look what happens to the price on FTX, it

skyrockets, but he's not done.  He goes on Serum DEX and buys

three and a half million MNGO and sells 750,000 USDC.  What

happens there?  The price skyrockets.  This is powerful proof.

It shows you the manipulation in action.  This is not what

supply and demand looks like.  This is what it looks like when

one person is moving the price intentionally, and it does

exactly what he intended — the price of the Mango perpetuals,

his fake bet goes up over 1,000 percent during this time.

Let's look at these purchases again.  Look at their

timing, look at their size, look at when he makes them.  He

makes them within minutes of creating this fake bet.  He is

buying every last token he can, and it's absolutely clear while

he's doing this, why he's pouring money into these tokens all

on these three platforms.  It certainly wasn't to buy MNGO

cheaply.  If he wanted to do that, he could have spread it out.

And you know he didn't want these tokens anyway because we're

about to discuss he sells them right after the fraud.  He

bought it like this so the price would go up on the platforms

and that the Mango perpetuals price would also skyrocket.  The

O4HCeis2                          Summation - Mr. Davis

1    oracle sets the settlement price for his fake ring so his fake

2    bet skyrocketed.  This is not trading, this is not one person

3    trying to move a price, this is pumping, and that's exactly

4    what happened.  It goes up over 1,000 percent in 25 minutes,

5    1,000 percent in 25 minutes is not natural market forces.  This

6    is not legitimate trading.  It's pumping a price so he can lie

7    about the value of his collateral so that he can use that lie

8    to steal.  It's deceptive because it makes the perpetual look

9    like it's really valuable when it's only being pumped up by the

10   defendant's trading.

11           This is Government Exhibit 1309.  This is another way

12   of looking at the price manipulation.  It shows the Mango perp

13   price skyrocket at the time of the defendant's pump.  That's

14   this gigantic peak.  This is the manipulation.  This is the

15   false price.  This is the fraud in action.  And you heard, it

16   wasn't just the settlement price of the Mango perpetual that

17   went up, but the prices of matched trades on Mango Markets

18   skyrocketed, as well, going up over 700 percent in about 14

19   minutes.  This is Special Agent DeCapua's testimony.  This is

20   where he says the price of matched trades on Mango Markets also

21   skyrocketed by 700 percent.

22           And none of this should really be surprising to you

23   all at this point because this is exactly what the defendant

24   said he was going to do in private.  He said he was going to

25   1,000 times the price.  That's exactly what he did.  He said, I

O4HCeis2                    Summation - Mr. Davis

1    can 1,000 times it, not the market forces of supply and demand.

2    Mr. Eisenberg, he's creating this fake price, he is lying about

3    the value of the collateral.  This is the manipulation at work.

4            How else do you know he was committing a crime and not

5    engaged in any real trading?  After he pumps it 1,000 percent,

6    what does he do?  He steals every single deposit on the

7    platform.  His long position just skyrocketed 1,000 percent in

8    25 minutes.

9            Here's what he does next:  Just minutes after opening

10   the fake bet with himself and after he starts pumping the

11   price, he clicked "borrow" and he starts borrowing against his

12   inflated assets.  This is the "borrow" button.  This is from

13   Government Exhibit 1011.  You have to click this button to

14   borrow funds.  Mr. Sheridan testified yesterday that by

15   pressing this button, you're representing to the platform that

16   you are borrowing funds.  This is how you do that, you click

17   this button and you get to borrow.  This is Mr. Sheridan's

18   testimony from yesterday.  At the bottom, you got to signal to

19   the platform that you are borrowing funds if you want to borrow

20   funds; correct?  Answer, that's accurate.

21           And you all learned that the defendant was borrowing.

22   This is Government Exhibit 1011 again.  Remember there was a

23   question-and-answer page we had gone over.  One of those

24   questions is how do I tell if I have borrows.  At the bottom it

25   says, look in the account tab, the balance table has a borrows

O4HCeis2                    Summation - Mr. Davis

1    column.  All spot borrows will show up there.

2         So let's take a look.  This is Government Exhibit 914.

3    This is the balances tab for the long position.  Look at all

4    these borrows.  50 million in USDC, 700,000 in MSOL, 700,000 in

5    SOL.  These are all borrows because the defendant borrowed

6    against his fake bet.

7         How else do you know?  Let's look at Government

8    Exhibit 318.  This shows the defendant was on the borrow page

9    of Mango Markets for an hour during the crime.

10        But there's other ways too.  We can look directly at

11   the data.  This is Government Exhibit 1002.  Now, you might

12   remember, yesterday, Mr. Burnett went over this with

13   Mr. Sheridan and went through the increase in borrows before

14   the defendant's trading and after the defendant's trading.

15   This is that same spreadsheet.  This spreadsheet shows a

16   dramatic increase in borrows right around the time of the

17   defendant's trades.  These are all the borrows that the

18   defendant took out.  And it shouldn't be surprising.  Remember

19   the defendant's private chat?  He said he was going to pull

20   borrows.  This is what he's talking about.  That's exactly what

21   he did.

22        You know who else testified that the defendant

23   borrowed?  Mr. Sheridan.  This is what he said yesterday.  So

24   we can agree that there were borrows from Mr. Eisenberg taking

25   money off the platform.  Answer, yes, sir.  That's right.  The

O4HCeis2                        Summation - Mr. Davis

defendant represented to the platform he was borrowing.  But he
wasn't borrowing.  This was a lie.  The defendant was stealing.
You know that because you hear that "borrowing" has a meaning.
It did not mean steal.

         Let's go back to the user guide for a second.  This is
one of the frequently asked questions from the users.  What
prevents someone from borrowing funds, withdrawing, and running
away with it?  In short, this is a borrow button, this is not a
steal button.  But the defendant did not have any intention of
borrowing from this platform.  And you learned how the process
of borrowing worked.

         Let's go to Government Exhibit 1011.  Before you could
borrow, Mango Markets did a credit check.  They had to make
sure you had enough collateral to borrow to open this position
and support it.  This screenshot is what happens when you
borrow.  There's this account health check and it takes a look.
It says, like, what's your account value, what's your account
risk, what's the leverage, what's the borrow value.  That was
step 1, a credit check on your account.

         Mr. Sheridan yesterday talked about this, as well.
Question, before it can do that, the system runs basically a
credit check under account value to make sure you have enough
assets there to support that borrow before you can withdraw it.
The defense expert said, yeah, that's accurate.  In other
words, if you don't have enough collateral on the platform, the

O4HCeis2                        Summation - Mr. Davis

1   platform will not let you borrow.  That is why the defendant

2   had to lie about it.  He had to fool the credit check.  He had

3   to make the program think that his collateral was worth a ton

4   when it was secretly being inflated by his own trading.  So

5   that is a lie that allows him to open a borrow.  But he also

6   lies because he has no intention of maintaining collateral on

7   the platform.  You heard that you had to maintain collateral on

8   the platform to support your borrow.

9        Let's go back to the user guide.  This is Government

10  Exhibit 1011.  Just reading from the top.  Once a position is

11  opened, it must maintain a health ratio above 0%.  This is

12  important because the defendant had no intention of borrowing,

13  he had no intention of maintaining collateral.  He was stealing

14  and running away with it.

15       Let's keep looking at the user guide.  Remember, these

16  are fully collateralized loans.  That's what the user guide

17  said.  Under the hood, the Mango Markets risk engine permits

18  users to take out fully collateralized loans against any

19  deposited assets.  Remember, the defendant did not intend to

20  maintain collateral, he wanted to pull borrows and run away

21  with the money.

22       So let's look at what he's doing.  Let's look at the

23  withdrawals and borrows he's making.  This is Government

24  Exhibit 1354.  These are the borrows and withdraws from the

25  long side of his Mango accounts.  Look how concentrated this

O4HCeis2                    Summation - Mr. Davis

1    time is, from 6:29 p.m. to 6:45 p.m., he takes out about, I

2    don't know, over 80 million in cryptocurrency.  But this was

3    not borrowing.  He lied to take these borrows out.  He tricked

4    the credit check because his collateral was fake.  He lied

5    because he did not intend to maintain collateral.  He lied when

6    he clicked "borrow."  That's the fraud right there.  It's fraud

7    because it tricks Mango Markets into letting him steal every

8    single deposit on the platform.

9         All right.  The defendant just took out — borrowed —

10   80 million cryptocurrency tickets, but he doesn't stop there.

11   Remember, he just pumped MNGO.  He just bought a bunch of

12   Mango, right, but that Mango is only pumped up because he's the

13   one pumping it.  He knows it's about to crash.  He knows this

14   isn't a genuine trade in MNGO.

15        This is Government Exhibit 1355.  A few minutes after

16   he starts withdrawing and borrowing, what does he do?  He

17   starts selling the Mango right back.  He's dumping it, he's

18   dumping it minutes after he purchased it.

19        Let's take these one by one.

20        At 6:47, he's selling Mango on AscendEX.  At 6:48,

21   he's selling 16 million Mango on FTX.  At 6:49, he's selling

22   20 million Mango on Serum DEX.  This shows you manipulation

23   because it shows you that the defendant was not making a real

24   investment in MNGO.  He wanted to unload his MNGO as soon as he

25   cashed out his borrow, as soon as his lie worked.  He held

1   these tokens for what, less than half an hour?  That's not

2   legitimate trading.  That's about milking every last dollar out

3   of the con.  And it's deceptive.  He knows it's worth nothing,

4   but he has to sell it before other people find out.

5         And look what happens to the price of Mango perpetuals

6   after the defendant stops pumping.  It crashes nearly 100

7   percent.  That's important.  It shows you that the Mango perps,

8   the perpetual price was propped up by the defendant's trading.

9   It shows you that he knew the price was artificial because he

10  tried to sell it before anyone could find out.  That's what's

11  deceptive about this.  The defendant knows he's intentionally

12  pushing up the price, but no one else does.  The defendant

13  knows the price is about to crash, but no one else does.  The

14  defendant is out there dumping this into the market, taking

15  advantage of his deceit.  You saw the gigantic increase, then

16  you saw the crash.  You saw the pump, then you saw the dump.

17  That is manipulation.

18        But, ladies and gentlemen, he doesn't stop there.

19  Remember, he's just drained his borrows from the long side.

20  But remember, he's got another account, the short side.  What

21  does he do with the short side account after he withdraws from

22  the long side?  This is the short side of this fake bet, the

23  supposed losing side.  Minutes after he's done borrowing and

24  withdrawing, he starts borrowing all he can from the short

25  side.  Same lie, same fraud.  He steals as much as he can until

O4HCeis2                    Summation - Mr. Davis

every last deposit was stolen until there's nothing left.  This

slide right here, this is just pure greed.  Even after

squeezing every bit of cryptocurrency out of the long position,

even after selling back all the Mango that he had purchased,

the defendant is stealing every last deposit on the platform

through his short position.  He's draining everything.

So the defendant has just withdrawn over $100 million

in 30 minutes.  What does he do next?  He starts to move the

funds around.  Let's go to slide 53.  This is Government

Exhibit 1357.

So now we're a little bit later in the night.  This is

all happening within an hour.  This is 7:01 p.m.  At 7:01 and

7:14, you see him move nearly 60 million in USDC to his Circle

wallet in his own name right after the crime.  But does it stay

there?  No, he immediately moves it to two additional wallets,

sending 20 million USDC to one and 30 million to another.  All

of this happens within 30 minutes.  Why is he moving 60 million

in USDC so quickly?  He knows his funds could be frozen at any

time.  He's trying to put distance between his funds and his

fraud.  He doesn't keep these in his Circle account with his

name on them, he puts them in two different wallets, nearly

30 million each.  He's trying to protect his fraud proceeds.

This is why he was using the name of Natalia Bochenkova while

he put wallet after wallet between his name and the fraud.  So

he moves this money around.

O4HCeis2                        Summation - Mr. Davis

1              Let's keep going.  You heard testimony that a few

2      hours later, there was a proposal on Realms.  This is

3      Government Exhibit 1003.  There's a few big things to talk

4      about with this proposal.  This is like the repaid bad debt.

5              First off, let's read the first two sentences.  "Hi,

6      all.  The Mango treasury has about 70 million USDC available to

7      repay bad debt.  I propose the following."  This is an

8      anonymous post.  This does not say who the poster is.  At this

9      point, the defendant thinks he's anonymous.  Look what he

10     proposes.  He proposes giving back a little bit of money, but

11     he wants something in exchange.  Look what he wants in

12     exchange, an agreement that they will not pursue any criminal

13     investigations or freezing of funds once the tokens are sent

14     back.  The defendant did not want to give money back to the

15     Mango DAO out of the goodness of his heart.  Think about this.

16     If you executed a winning trade, you wouldn't just give money

17     back.  If you worked at a bank and you told your boss, hey, I

18     just did a great trade.  First step, I'm going to give half of

19     it back.  You're not going to be in that job very long, you're

20     just not.  He wants something.  What's top of mind for him?

21     The defendant knew he just committed a crime.  He knew he could

22     be prosecuted for it.  He knew his funds could be frozen at any

23     moment.  He wanted to buy his way out of that.

24              And look at the timing of this proposal.  You heard

25     this was within hours of him committing the crime.  He makes

O4HCeis2                        Summation - Mr. Davis

1    this plea for criminal immunity within hours of pulling off the

2    con.  This didn't just occur to him that he was committing a

3    crime.  He had known that for weeks.  You saw his searches, you

4    saw his chats, you saw his Tweets about people being prosecuted

5    for doing market manipulation.  It didn't just happen upon him

6    that maybe he was committing market manipulation, he knew it.

7    He was just trying to get away with it.  He was just trying to

8    buy it back with stolen funds.

9           All right.  So, important takeaways.  Still anonymous

10   at this point, but this post fails.

11          So let's keep going on the timeline.  This is

12   Defendant's Exhibit 70.  This shows you October 12th, 2022.

13   And this is in UTC time, around 1:40 p.m. UTC time.  So morning

14   time that day, one posts an article that says the following:

15   Scoop, who was the hacker that stole more than $100 million USD

16   from Mango Markets last night.  Carl Stack has some answers.

17   So the defendant sees this page.  He thinks his disguise is

18   blown.  All his efforts to put distance between his name and

19   his fraud have failed.  His anonymous post on Realms failed.

20   His attempt to purchase not freezing funds failed.  Look what

21   happens next.  Remember, 1:40 p.m. UTC.

22          This is Government Exhibit 604.  Within an hour of

23   reading that post, the defendant books the next flight out of

24   the country, a flight leaving that afternoon.  He booked it

25   within an hour of being identified.  This shows you he knew he

O4HCeis2                      Summation - Mr. Davis

1    was committing a crime.  He is escaping, he is fleeing.  He's

2    trying to get out of the country as fast as he possibly can.

3    He's trying to do that so he doesn't get arrested for what he

4    just did.

5            And you've seen the chats where he talks about his

6    flight.  This is Government Exhibit 110.  Earlier in the chat,

7    this is from November 2022, someone says hey, you received two

8    packages and it was laying in the hallway.  I dropped them

9    inside your apartment.  Mr. Eisenberg says, I ordered a bunch

10   of food and then had to leave quickly.  He sure did.  He had to

11   leave quickly because he thought he was just outed as the

12   person behind the crime.  And you all know exactly what's going

13   on in his mind during this time, too.  Let's look at his search

14   history from October 13th.

15           This is Government Exhibit 121A.  What's he searching

16   for?  Market manipulation, criminal; market manipulation,

17   criminal; market manipulation, criminal elements; criminal and

18   regulatory enforcement of market manipulation; individual

19   indicted for market manipulation conspiracy.  Of course he did.

20   He just committed criminal market manipulation is and fled the

21   country.  It makes sense that he's Googling market

22   manipulation, criminal, when he just did criminal market

23   manipulation.

24           This is another chat.  It says he's hanging out

25   internationally until stuff blows over.  This is Government

O4HCeis2                    Summation - Mr. Davis

Exhibit 112.  Yeah, until stuff blows over.  He had to dodge
town.  So he leaves the country.

But by the way, what's happening on Mango Markets
during this time?  What's happening when the defendant has fled
the country with $110 million in cryptocurrency, what's
happening there?  The platform is shut down.  All the users'
deposits, they're gone.  So the defendant fled the country.  He
has all this stolen cryptocurrency, but no way to spend it, and
he knew he just committed a crime.  So he keeps using these
stolen funds as leverage against Mango Markets.

This is the second proposal.  Proposes giving a little
bit more money back.  But the key terms, an agreement not to
pursue criminal investigations and no freezing of funds,
they're still in there, they're still what the defendant cares
about.  You know from these proposals what he cares about.
Keeping $40 million and getting away with the crime.

So this proposal passes, and at the end of the day,
the defendant keeps $40 million, and the managing DAO pays
$40 million out-of-pocket to make users whole.  The defendant
got his $40 million payday from this company, but he knew he
just committed a crime.  You know that because even after
October 11th, he keeps searching for more about his crime.
This is Government Exhibit 122A, in December of 2022, searching
for an SEC described promoter with a Micro-Cap market
manipulation scheme, searching for FBI surveillance; this is

O4HCeis2                      Summation - Mr. Davis

1    Government Exhibit 123, searching for Otisville prison, a white

2    collar prison; this is Government Exhibit 124, looking up the

3    list of Israel extraditions.  He's looking all this up because

4    he knew he committed a crime.  He thinks he's being surveilled

5    by the FBI because he just committed a crime.  He wants to

6    research a federal jail he might go to because he just

7    committed a crime.

8           Use your common sense.  If you think you did

9    everything above board, are you researching particular jails

10   that you might go to?  Are you looking up FBI surveillance?

11   That's what you do when you think you've committed a crime and

12   you think you're about to get caught.  So that's what happened.

13   The defendant flew back to the United States and he was charged

14   with these crimes.

15          We've gone through the defendant's scheme.  I want to

16   turn to the charges now.  I want to be clear about something.

17   After summations, the Judge is going to give you instructions

18   on the law, and you should absolutely follow those.  His

19   instructions control, but I want to talk about them briefly

20   with you now.

21          There are three crimes charged here: commodities

22   fraud, commodities manipulation, and wire fraud.  You've seen

23   the key facts, but I want to go through the elements for each

24   and show you why the defendant is guilty.

25          Let's start with Count One, commodities fraud.  Here's

O4HCeis2                         Summation - Mr. Davis

a summary of the elements of commodities fraud.  The first
element asks:  Did the defendant use manipulation, lies, or a
scheme to defraud?  You only need to find one, but you know he
did all three.  You know he manipulated the price of the Mango
perpetuals, you know he lied when he said he was borrowing, you
know he engaged in a scheme to defraud because the entire
scheme was deceitful from the trade with himself to an
artificial inflation of the price.

          So let's go through the reasons you know he committed
fraud.  You saw the premeditation.  He planned to pump and pull
borrows.  This was his own words describing how he was going to
artificially influence the prices without the market knowing.
This is not a legitimate trade.  That's not how markets work.
That's manipulation right there.  He also said he was going to
"pull borrows."  But the defendant had no intention of
borrowing, he was going to pull them, meaning he was going to
strip them off the platform and steal them.  That was a lie.

          You saw that he created a fake bet with himself, a
trade that makes no sense other than to commit a crime.  This
is deceptive because the market thinks that two users entered
into this trade, that both users would enter into this trade
because they thought it would be profitable.  It's part of his
scheme because it was just a tool to take money from the
platform.  The defendant was on both sides.  There were not two
counterparties to this trade.  This is part of the scheme to

O4HCeis2                    Summation - Mr. Davis

1    defraud.

2            You saw a pump.  He pumped the price of the perpetuals

3    by 1,000 percent.  And you saw how he did it.  He took supply

4    and demand into his own hands.  He made the market think that

5    the price of Mango perpetuals were going way, way up for

6    legitimate reasons, but it wasn't legitimate at all.  It was

7    just him making illegal buy after illegal buy.  You saw he

8    pumped the settlement price for those perpetuals.  You saw he

9    pumped the market price for those perpetuals.  This is the

10   manipulation.

11           You saw him lie about his identity.  You saw he did

12   this crime behind a Ukrainian woman named Natalia Bochenkova.

13   The defendant knew how to create an FTX account in his own

14   name.  He had accounts in his own name before, but he didn't

15   use his own name here.  He pretended to be someone else.

16           He lied about his collateral.  He pumped it to make it

17   look like it was worth something so valuable, and he did this

18   to trick the Mango Markets credit check.  He did it so that he

19   could borrow, to make it look like his assets were valuable,

20   but that was a lie.

21           He lied about borrowing.  He wasn't borrowing, he was

22   just stealing.  He did not intend to maintain collateral on the

23   platform.  It was all a lie, a lie that allowed him to withdraw

24   every single users' deposit.

25           And you saw him trying to buy his way out, trying to

O4HCeis2                          Summation - Mr. Davis

1  extort Mango Markets for a claim of criminal immunity.  This

2  was all part of the scheme.

3          Each piece of evidence, separately and together, they

4  show the defendant's manipulation, deception, and lies, and it

5  shows you how he used them to steal every users' deposits.  And

6  you heard time and time again that the defendant's fraud, it

7  mattered, it was material.  You know it mattered because

8  without the deception, without the defendant inflating the

9  price and lying, the whole con fails.  You saw that Mango

10 Markets does this credit check before it lets you borrow.  If

11 he did not artificially inflate his perpetuals, lie about the

12 value of his collateral, he would not be able to borrow

13 100 million, he would not have tricked the credit check.  It

14 was the lie that allowed him to do that.  That's materiality

15 right there.  So he wouldn't have even begun to borrow without

16 the scheme because he would have failed to pass the credit

17 check.

18         But he also would not be able to borrow $100 million

19 without the fraud.  The only reason he's allowed to borrow that

20 much is because he pumped the price by that much.  This is

21 because the amount you could borrow on Mango Markets depended

22 on the health of your collateral.  So the more he pumped, the

23 more he could steal.  That's materiality right there.  If he

24 pumped it 0%, he would have gotten nothing.

25         You also know that the lie about borrowing mattered.

O4HCeis2                    Summation - Mr. Davis

1    If he didn't click "borrow," the whole scheme fails.  The

2    program literally would not give him any money.  He would not

3    be able to borrow $100 million unless he made the borrow lie.

4    That's materiality right there.  So not only did this scheme

5    matter, it had to matter for it to work.  That's materiality.

6              But you also heard from witnesses.  You heard from

7    witnesses that this scheme mattered.  Here's Mr. Tonkin when

8    he's asked, would it have mattered to you if you knew someone

9    was borrowing from the platform without intending to maintain

10   collateral or pay interest.  He says, yes, because if somebody

11   borrows from the platform and they don't effectively intend to

12   repay the money or keep collateral to the extent of the wider

13   depositor's pool position, of course that puts my funds at

14   risk.  This is Mr. Tonkin again.  Would it matter to you if you

15   knew that a person was intentionally moving the price of

16   perpetuals on Mango Markets.  Answer, it would matter, yes.

17   Why would it matter to you.  Because obviously that puts at

18   risk my funds if someone can manipulate that price.  It puts my

19   funds at risk as a depositor.

20             Here's Mr. Shipe.  As a contributor, would it matter

21   if someone was borrowing from the platform without the intent

22   to maintain collateral to liquidate.  Yes, it would.  What kind

23   of problems could it cause.  It could cause deplete the

24   insurance fund, socialize losses, users would lose funds.

25             Here's Brian Smith.  Why would it matter to you if

O4HCeis2                    Summation - Mr. Davis

someone was borrowing from the platform without intending to
maintain collateral on the platform.  Because all assets on a
platform are aggregated across users.  So if there's a scenario
where one user defaults and the protocol incurs a loss, that
can result in cascading losses to all users on the platform.

          And of course it would matter to depositors on the
platform.  Why would none put a single deposit on a platform if
it could be stolen in an instant.  And you know it mattered to
Mango Markets because right after the defendant withdrew all
the funds, the platform shut down.  It stopped working.

          So that's element 1.  Let's talk about element 2, that
the scheme was in connection with a swap.  So the Judge is
going to provide you with the definition of what a swap means
in this case and how to determine whether a Mango perpetual is
a swap.

          But for now, let me provide this:  A swap includes any
agreement that transfers in whole or in part the risks of
changes in value of the things underlying a swap.  Swap just
transfers the risk of the things underlying the swap.  And you
heard about Mango perpetuals.  Mango perpetuals are just a bet
on how Mango will perform compared to USDC.  One side bets that
Mango will go up compared to USDC, the other side bets that
Mango will go down compared to USDC.  So perpetuals just
transfer the risk of changes in value between Mango and USDC.

          This is Government Exhibit 1827.  This shows you how

1    this works.  If someone has a long position in a Mango

2    perpetual and Mango goes up relative to USDC, they're winning

3    their bet.

4          This is 1828.  This shows the reverse.  If the long

5    position sees that the value of Mango goes down relative to

6    USDC, the long position is losing the bet.  This instrument is

7    just trading the risk values between Mango and USDC.  And you

8    saw that when you purchased a Mango perpetual, it's priced in

9    USDC.

10         And you heard the defense expert explain it exactly

11   the same way.  This is what Mr. Sheridan said yesterday.  If we

12   showed the price of a Mango token relative to USDC to go down,

13   the long position became lost funds or was in a loss state.

14   For the short position, if the price of the Mango token

15   relative to USDC went up, the short position similarly lost

16   assets and became a lost state.  This is just describing how

17   the Mango perpetuals transfer the risks between Mango and USDC.

18   He nailed it.  That's a swap right there.

19         So the perpetuals are swaps.  We expect the Judge also

20   to instruct you that you need to find at least one of the two

21   following things to find that this swap is covered by the

22   commodities laws.  It's listed here on slide 81.  First, that

23   Mango perpetuals are based in part on the value of USDC and

24   that USDC is a currency or financial or economic interest, or

25   property of any kind.  Or second, that Mango perpetuals are

O4HCeis2                    Summation - Mr. Davis

based in part on any rate, index, or quantitative measure other
than the price of MNGO or a narrow-based security index.

Let's take the first one, whether Mango perpetuals are
based in part on the value of USDC. That's what we just talked
about. Perpetuals are based on the relative value of Mango and
USDC. And you know, and you've heard throughout this trial,
that USDC is a currency, it's a cryptocurrency. It's also
property of any kind. People find it very valuable. Indeed,
Mr. Sheridan owns some. This is what he was asked yesterday.
Do you own any cryptocurrency. Yes. What tokens, generally,
which tokens do you own. I have Bitcoin, Ethereum, Solana, and
USDC.

So it says it all right there, USDC is a currency or a
financial or economic interest, or property of any kind. So
that first one's checked. As to the second one, we know that,
too. The second one asks, is Mango perpetuals based in any
part on any rate.

And we learned in this trial about the funding rate
for Mango perpetuals. This is Government Exhibit 1011. This
talked about the funding rate for Mango perpetuals. It shows
that there's a stream of payments based on what's called the
funding rate. It says it right there, it's a funding rate.

And you learned from Mr. Jain how the funding rate is
calculated basically by comparing the order book mid price to
the price of contracts on Mango Markets to the oracle price,

O4HCeis2                    Summation – Mr. Davis

1    and that determines who's paying the funding rate to whom.  And

2    the big takeaway is it's a funding rate.  It's a rate.  That's

3    all you need to find.

4              (Continued on next page)

1            MR. DAVIS:  That's the first two elements, but I want

2      to talk briefly about the in-connection-with requirement.

3            The Mango perpetuals is a swap.  The next question is

4      whether the scheme necessarily involved the Mango perpetuals.

5      And of course it did.  The whole point was to pump the price of

6      the perpetuals so that he could use it as fake collateral to

7      steal from the platform.  This scheme does not work without the

8      Mango perpetuals.  If there are no perpetuals, there is no con.

9      If there are no perpetuals, he cannot steal.  So the scheme is

10     in connection with the swap.

11           Let's turn to the last element, that the defendant

12     acted knowingly, willfully, and with the intent to defraud.

13           This really boils down to whether the defendant knew

14     that his manipulative trading was against the law, and it is

15     clear as day the defendant knew he wasn't allowed to manipulate

16     the price of Mango perpetuals to steal all the money on the

17     platform.

18           For starters, he had sued someone for price

19     manipulation.  If it was wrong for the people that the

20     defendant sued to manipulate prices, then the defendant

21     certainly knew it was wrong for his own trading to manipulate

22     prices.

23           But there is more.  You saw him search the statute of

24     limitations for market manipulation before the fraud.  It shows

25     you he knew about these laws.  It shows you he knew this was

1    unlawful, and he knew why, because manipulating the price is

2    deceptive.  It makes assets look valuable when they are not.

3    He looked up people who were convicted of the same thing.  He

4    tweeted about prosecutions for market manipulation.  This all

5    shows that he knew what he was doing was unlawful.

6         He searched for market manipulation after the fraud.

7    Even in the days after the fraud, he kept searching for market

8    manipulation and fraud.  This is because he just committed that

9    crime.

10        He hid his identity.  You saw him use a fake name.

11   You saw his disguise.  He didn't pump under his own name.  You

12   saw him pump under Natalia Bochenkova's name.  You saw him buy

13   a woman's identity of the Internet.

14        He hid his money.  You saw him put wallet after wallet

15   in between his own account and the crime and then, as soon as

16   the crime was done, he sent it to additional wallets.

17        You saw the extortion for this no-criminal-referrals

18   issue.  You saw him seek criminal immunity from the Mango DAO

19   within a few hours of committing the crime.  That's because he

20   knew he just did something against the law.

21        You saw his private chats, the chats where he talked

22   about a thousand timesing the price.  That is not normal market

23   activity.  No one person can thousand times the price unless

24   they are committing crime.

25        You saw him flee the country within an hour of being

1    outed.  You saw him evade arrest, and you saw the text where he

2    had to leave in a hurry.  This shows you he knows what he did

3    was against the law.

4            You saw him look up a white-collar prison because he

5    just committed a white-collar crime.  You saw him search for

6    FBI surveillance because he thought he was under FBI

7    surveillance for the crime he just committed.  And you saw him

8    look up Israel extraditions, because he knew he had just

9    committed a crime.

10           The defendant knew what he was doing was against the

11   law.  He just didn't let it stop him.

12           Those are the three elements of commodities fraud, a

13   manipulative scheme, and deception in connection with the swap

14   that the defendant knew was against the law and that's the

15   crime, that's what the defendant did.  That's Count One.

16           Let's go to Count Two, commodities manipulation.  Now,

17   this count is different.  It focuses on the manipulation of the

18   swap, of the Mango perpetuals.  We already went over the swap

19   definition, but I am going to go through the other elements

20   here.

21           For Count Two, the defendant is guilty if he intended

22   to manipulate the price of the swap.  This count is focused on

23   the manipulation.  Let's talk about these elements, that the

24   defendant had the ability to influence the price, that an

25   artificial price existed, that the defendant caused that

1    artificial price, and that he specifically intended to

2    manipulate it.

3          Let's go through the reasons you know he committed

4    manipulation.

5          The first one, he pumped the price by a thousand

6    percent.  First way you know it was successful.  You saw that

7    increase was caused by the defendant's pumping in a short time

8    span.  Look at the size of his positions, the size of his buys

9    that day.  Look at the timing of the trades.  This all shows he

10    had the ability to cause a fake price, and he did cause it.

11    The 1,000 percent was not natural forces of supply and demand.

12    It was one person creating a fake price.  That's manipulation.

13          You also saw where he pumped the price.  It was the

14    exact three exchanges that determined the price of the

15    perpetuals.  It shows you his intent.  This wasn't an accident.

16    His intent was to pump the price of his swaps on Mango Markets

17    and that's why he picked FTX, AscendEX, and Serum DEX.

18          Also look at the concentration of the trading.  It all

19    happens within minutes.  This didn't spread out over weeks or

20    days.  It's within 20 minutes.  He does it this way to have the

21    biggest possible impact on the price.  He does it to deceive

22    others to think that the price is going way, way up in this

23    short amount of time, when it's only moving because he moved

24    it.

25          You know it's artificial because what happens next?

1  The price crashes when he stops pumping it.  This was the slide

2  we looked at earlier when he starts dumping the Mango back into

3  the market.  It shows you that the thousand percent increase

4  was not supply and demand.  It was just the defendant's illegal

5  pumping.  The whole point is to send a false price to Mango

6  Markets, that his swaps were worth something when they were

7  not.  And when he stopped, when he stopped buying, the price

8  crashed.  That's an artificial price.  That shows you the price

9  wasn't real.  It shows you that he caused it and it was just

10  him propping it up.  It shows you his intent.

11          Another way you know.  The exact moment he starts

12  pumping, what does he do?  He starts borrowing from the

13  platform.  He steals all of the money.  This shows you what his

14  intent was.  This wasn't a genuine investment.  He had to lie

15  about his collateral.  He needs to pump the perpetuals so he

16  can steal these funds.  This shows his intent to manipulate.

17          Number 6.  After withdrawal of the funds, what does he

18  do?  He dumps the Mango.  It shows you this wasn't a genuine

19  investment.  These were not legitimate trades.  He sells it

20  back minutes after buying.  He knows that it's worth nothing,

21  that the price is artificial, so he sells it all back, trying

22  to get rid of it.

23          Finally, how else do you know?  Just go back to 502A,

24  the private chat.  He says he was going to pump it, he says he

25  was going to do it a thousand times.  That's exactly what

O4HMEIS3                         Summation - Mr. Davis

1    happens.  He is telling you his intent.  That is not market

2    activity.  That's cheating.

3         One last thing on this count, Count Two.  The judge

4    will instruct you that even attempting to commit price

5    manipulation is enough to convict the defendant of Count Two.

6    And you know the defendant attempted to manipulate the price

7    because he said that's what he wanted to do, to pump it a

8    thousand times, and he spent millions of dollars pumping the

9    price.  All the evidence we talked about also proves that he

10   attempted manipulation as well.

11        Let's turn to the last count, wire fraud.

12        I am going to summarize it briefly here, but one big

13   place to start is, this doesn't involve or require an

14   involvement of a swap.  This is just a scheme to obtain money

15   by lies with the specific intent to defraud.  It's just a

16   scheme to defraud and obtain money.

17        We have talked about the defendant's deceptions and

18   lies, and they are all applicable here, but I want to focus on

19   just two.  The first is the fake collateral.  The second is the

20   borrow lie.

21        Remember, the program ran this credit check before

22   they let someone borrow.  The defendant lied to trick that

23   credit check.  He made it seem as if his collateral was worth a

24   thousand percent more than in reality.  That was a lie.

25        This is that account health check screen again, 1011.

O4HMEIS3                        Summation - Mr. Davis

1          Without that lie, he would not be able to take out any

2    money.  He would not be able to borrow.

3          He also lied when he clicked borrow.  He had no

4    intention of maintaining collateral at all, and you heard over

5    and over again why these lies mattered.  They mattered because

6    he could not take out $110 million without them.  If he fails

7    the credit check, he can't borrow them.  If he doesn't pump the

8    collateral so much, he can't take out 110 million.  If he

9    doesn't click borrow, he can't borrow.

10         But you also heard from witnesses, we talked about

11   them before, Mr. Shipe, Mr. Smith, and Mr. Tonkin.

12         One other thing on this.  You also saw his intent,

13   that he was specifically trying to get all the users' funds off

14   the Mango Markets.  He took all their money.  He took every

15   single user deposit.  The whole point of the scheme was to

16   drain the platform.  A scheme to defraud is at the core of this

17   conduct.

18         The last element was an interstate wire.  You remember

19   when Mr. Farrell from AscendEX talked about that AscendEX has

20   employees in New York City.  And you learned that each day

21   AscendEX employees do what's called a trade reconciliation

22   report where they reconcile the trades in New York City.  And

23   these New York City based employees do those reports, and a

24   finance team reviews them as well.

25         He said it's roughly akin to what a broker does in a

O4HMEIS3                          Summation - Mr. Davis

1  securities market.  You even saw the deposit confirmations sent

2  to the defendant with this New York City based address.

3         The takeaway from this is, when the defendant pumped

4  on AscendEX and he made those trades, when he was in Puerto

5  Rico, those wires had to travel to New York City.  They had to

6  travel there for the trade reconciliation report.  That's a

7  wire that started with the defendant's trading in Puerto Rico

8  and ended up in New York, so that's an interstate wire.  That's

9  wire fraud.  The defendant lied to get money from the users of

10  Mango Markets, and he used interstate wires.  The defendant is

11  guilty of Count Three as well.

12         One last note.  The judge is also going to instruct

13  you on venue.  Follow his instructions.  Two quick things to

14  point out.

15         First, venue is a preponderance of the evidence.  It's

16  a different standard of proof.

17         Second, you need only find that any act in furtherance

18  of the crime occurred in New York City.  So these AscendEX

19  wires, the wires that the defendant sent when he made these

20  deposits that arrived in New York, they satisfy the venue

21  requirement as well, that any act in furtherance of the crime

22  occur here in New York.

23         I am going to sit down.  Before I do, there is

24  something I want you to keep in mind.  As you are thinking

25  about this case, as you are trying to get to the truth, come

O4HMEIS3

1    back to the defendant's words and the defendant's actions.  The

2    private chats where he said he is going to pump the price by a

3    thousand percent, the gigantic perpetual that he traded with

4    himself, the millions and millions of dollars of illegal trades

5    he used to pump the price, his lies about borrowing, his

6    searches for the statute of limitations for market

7    manipulation, and his flight from the country, after stealing

8    $100 million, it's time to hold the defendant accountable.  The

9    defendant is guilty.

10            Thank you, your Honor.

11            THE COURT:  We will take a brief recess until 11:30

12    and come back.

13            Members of the jury, make sure you do not discuss this

14    case or what you have heard today with each other.  No

15    research.  As I have told you many times, don't look anything

16    up.  And we will be back in 15 minutes for the defendant's

17    closing argument.

18            All rise for the jury.

19            (Jury not present)

20            THE COURT:  One issue with respect to the laptop that

21    goes back to the jury.  Make sure that the demonstratives are

22    not on that laptop.  You may have already done this, but the

23    demonstratives should not be on the laptop; only the admitted

24    exhibits.

25            Any other issues to take up before the defendant's

1    closing?

2            MR. DAVIS:  None from the government, your Honor.

3            MR. KLEIN:  None from the defense, your Honor.

4            THE COURT:  OK.  We will be back at 11:30.

5            (Recess)

6            THE COURT:  Are we ready to proceed?

7            MR. KLEIN:  Yes, your Honor.

8            THE COURT:  Mr. Hernandez, let's get our jury.

9            THE DEPUTY CLERK:  Yes, your Honor.

10           (Jury present)

11           THE COURT:  We will now proceed to the defendant's

12   summation.

13           Mr. Klein, when you are ready.

14           MR. KLEIN:  Good morning, ladies and gentlemen.

15           Avraham Eisenberg did not commit any crimes.  As my

16   colleague, Mr. Talkin, told you at the start of this case, he

17   engaged in a successful and legal trading strategy, one in

18   which he put his own money at risk.  This case isn't about

19   whether Mr. Eisenberg took advantage of the Mango Markets

20   platform trading opportunities.  It's about whether he

21   committed crimes, and he did not.

22           Both prosecutors talked to you about this con man with

23   the fake diamond ring.  You remember that in the opening

24   statement and from the prosecutor who just spoke to you.  But

25   you have now sat here for over a week and heard the evidence,

O4HMEIS3                        Summation - Mr. Klein

testimony, and you know that's not the case, because what the
prosecutors have glossed over are some very important facts in
evidence.  This is not how things worked here, how they have
described them, not even close.

       Let's start with the con man in the prosecutor's
analogy.  On Mango Markets you don't communicate with anybody.
No one says:  Who are you?  Why are you here?  What are you
trying to do?  Are you trying to maintain collateral?  Are you
intending to repay this?  The program works automatically.  It
doesn't care who you are.  It doesn't even care if you trade
with yourself.  This is fully permissible on the program.

       The evidence shows that my client, Avi -- and I'm
going to call him Avi because that's what people call him who
know him -- fully complied with the Mango Markets smart
contracts.  Also, he didn't borrow $110 million.  That is
wrong.  The evidence does not show that.  I am going to walk
you through why.

       But at the start I am going to tell you what happened
is, he did take some money off the platform.  He did withdraw
it.  He withdrew his own capital, 5 million in USDC that came
from Circle, and then he took profits, approximately $50
million.  That wasn't a borrow.  And the rest of the money he
returned shortly after.

       I want to talk to you about what this trial is and is
not about.  The prosecutor mentioned Avi is brazen, he is

O4HMEIS3                    Summation - Mr. Klein

greedy.  Those aren't crimes.  And Avi is not charged with

hacking into Mango Markets.  I want to be clear.  You are going

to hear -- you have heard no evidence of that, and the

prosecutors aren't claiming that.  By that I mean, this isn't a

case about someone surreptitiously changing the code or

accessing the protocol unauthorized.  That's not what this case

is about.  No one is going to dispute that.  This case isn't

also about violating terms of service.  The judge will instruct

you that that's not illegal, even if my client did it, which we

dispute.

          This case also is not about profiting improperly on

the three exchanges thanks to his Mango token trading.  The

charges center on something different.  They center on Mango

Markets and the Mango perpetual.

          Those charges that you heard from the prosecutor are

commodities fraud, Count One; commodities manipulation, Count

Two; and wire fraud, Count Three.  And there are four alleged

misrepresentations that the prosecutors need to prove.  One is

identity and location, two is taking both sides of the swap,

that's the long and the short, three is the intent to borrow,

that's the $110 million, and four is market manipulation.

That's market manipulation on Mango Markets.  Avi isn't guilty

of any of these crimes, nor did he make any of these

misrepresentations.

          What I am going to do next is, I am going to walk you

O4HMEIS3                      Summation - Mr. Klein

1    through some key legal concepts that the judge is going to

2    instruct you on.  And the judge, what he says goes.  I am going

3    to summarize some of them.  Then I am going to talk about the

4    testimony and exhibits, things like the terms of service, Avi's

5    trades, the alleged $110 million borrow, and his alleged

6    flight.  Lastly, I am going to talk about the three counts and

7    go into why he is not guilty of violating any of those charges.

8          Let's start with some basic legal concepts that the

9    judge is going to talk to you about.  I want you to keep these

10   in mind as we walk through the evidence.  They are key to how

11   you look at the evidence.  They are a lens for which you should

12   see the evidence.

13         The first one is direct and circumstantial evidence.

14   Direct evidence is Mr. Tonkin, the nice man from England who

15   came here, testifying that all his funds were returned.  That's

16   direct evidence.  Circumstantial evidence is something like Avi

17   returning to the United States in December, not knowing that he

18   was going to be arrested.  That shows he didn't think he had

19   done anything wrong.

20         Let's talk about inferences for a moment.  That's when

21   you look at a bunch of evidence and say, what can I learn from

22   this?  What can I draw from it?  What does it help explain to

23   me?  The prosecutors want you to draw every inference in every

24   instance against Avi.  You don't need to do that, you don't

25   have to do that, and the evidence does not support you doing

O4HMEIS3                          Summation - Mr. Klein

1    that.  You are allowed to draw favorable inferences, and you

2    can and should.

3            Avi is cloaked in the presumption of innocence.  Let

4    me give you an example.  After his Mango Markets trades and

5    before flying back from Puerto Rico, where, again, he didn't

6    know he would be arrested, Avi sued two of those exchanges.

7    You heard about that.  He sued AscendEX and he sued Circle to

8    try to get his funds back.  It's fair to infer that he would do

9    that for two reasons.  One, he didn't think he committed any

10   crimes; two, he believed he had lawfully obtained those funds.

11           Let's talk for a moment about reasonable doubt.  The

12   burden of proving Avi committed the three charged crimes is a

13   high one and it's on the government, it's on the prosecutors.

14   I am not saying it's impossibly high, but it is a fundamental

15   part of our justice system.

16           After I sit down, a prosecutor is going to talk to you

17   next.  That prosecutor may tell you, ladies and gentlemen,

18   every day in courts around the country people are on trial and

19   people are convicted under that same standard.  Guess what?

20   Every single day people are acquitted too.

21           At the start of this case the prosecutor asked you to

22   pay attention, listen to the judge's instructions, and use your

23   common sense.  The defense has wanted and continues to want you

24   to do those exact same things, but you need to do it with two

25   things in mind, my client's presumption of innocence and the

O4HMEIS3                    Summation - Mr. Klein

1    high burden of proof the prosecutors have.

2            Let's turn and start talking about some of the

3    testimony and exhibits you saw here.  I am going to try to do

4    this chronologically.  I am going to start with these three

5    exchanges and its terms of service.  I brought my reading

6    glasses.

7            Before I get to those, I am first going to talk to you

8    about what people saw when they went to Mango Markets.  This

9    came in through the government's first witness, Mr. Smith.  The

10    defense put this in.  You learned from Mr. Sheridan and

11    Mr. Smith about this.  This is the opening thing you saw when

12    you went to Mango Markets version 3, the version my client was

13    using.  This is something we can all read and understand.  It's

14    clear as day.  This is an unaudited software.  Use at your own

15    risk.  Check.  I understand and accept these risks.  You had to

16    check that box before you went onto Mango Markets.  This sets

17    people's expectations.  This goes to directly to what people

18    who are using this platform would think, and it goes to also

19    what my client would think, what his expectations would be and

20    his intent in conducting these transactions.  Use at your own

21    risk.

22            Now let's compare this with the terms of service you

23    saw and heard on FTX, it's one of those exchanges, AscendEX,

24    and Switchboard.

25            Before I go there, I wanted to let you know that this

O4HMEIS3                    Summation - Mr. Klein

1    is the most important set of terms of service or disclaimer,

2    whatever you want to call it.  This is what people saw who used

3    Mango Markets.  Again, that's the center of these charges, is

4    what happened on Mango Markets, not these other exchanges.  You

5    should give this the most weight.

6          Let's turn to these other terms of service.

7          Pages and pages of legalese.  You only heard companies

8    come in here and talk about them.  You didn't hear from any

9    users that said:  I read and understood this.  This is the one

10   where both myself and Mr. Farrell had to pull out their glasses

11   to read.

12         There is one exception about reading and understanding

13   the terms of service, and I'll discuss it with AscendEX.  You

14   did learn, and I mentioned it earlier, that my client sued

15   AscendEX and brought that arbitration in Singapore.  So we

16   agree, he read these after the fact.  Once they had frozen his

17   funds, just like anybody, use your common sense, the company

18   freezes your funds.

19         He started looking around saying:  How do I get these

20   out?  We don't dispute that he then looked at these terms of

21   service.  But it doesn't mean that he looked at them before or

22   knew about it, and there is no evidence that he did, none in

23   the record.

24         It's also worth noting in these terms of service that

25   AscendEX had what it talks about with crypto.  This is

consistent with the Mango Markets opening page.  There is a

high degree of risk.  This is new and improving.  There is

frequent price volatility, a lot of bad stuff, a lot of

volatility happens here.

Let's now talk about Switchboard.  You may recall

Switchboard is the company that provided the price oracle for

Mango Markets.  This is their terms of service, undated, pages

and pages and pages and pages of legal documentation, legalese.

You have no direct evidence that anyone on Mango Markets saw

and read these.  At most, you have that Avi visited a portion

of a website for this called the Explorer.  But there is no

evidence that these terms of service were posted there or that

he saw them.  The fairest inference of this is these didn't

matter to anybody because no one knew about them.  Don't let

the prosecutors convince you otherwise.

Now let's talk about FTX.  There is an example of

where he went to the Switchboard.  That's GX-117A.  You see we

put the exhibit numbers here to help you when you take your

notes.

This is FTX's terms of service.  That's half of them,

half.  Some of it is in a foreign language.  A witness from

FTX, a former employee, came, didn't talk about these, didn't

say anybody had seen them.  The government called an FBI agent.

Didn't know if anybody had seen them, didn't know if FTX even

cared to enforce them.  You should disregard these terms of

1    service, all of them.  They didn't put anybody on notice, and

2    you also are going to learn, the judge will instruct you, that

3    violating terms of service is not a crime.  It's not a crime.

4            Let's go back to where we started, the opening page of

5    Mango Markets version 3, the place where this trading happened

6    of the perpetual.  Use at your own risk.  This, again, set

7    everyone's expectation.

8            Now I want to talk to you about what happened next.

9    There is a version 4 later.  That's not connected -- that's not

10   where Mr. Eisenberg or Avi traded, but after this incident

11   Mango Markets put up longer, more legalese.  They actually had

12   terms of use.  Now they are called terms of use.  I'm calling

13   terms of service.  These came in March 6, 2023.

14           There is a big difference in what you might be

15   thinking if you saw the one versus the other and that's

16   important here, ladies and gentlemen.  It's important what my

17   client might have in his head.  That's critical to deciding

18   whether he is guilty of anything.  It's also critical to what

19   other users on the platform would think.

20           Look at 1010 versus DX-2.  The defense put both of

21   these in.  Don't let the government have it both ways here and

22   say, hey, our terms of service that we like matter, but these

23   other ones or the lack of them don't.  You should look at the

24   terms of service or the lack of them on Mango Markets.  That's

25   what this case is about.

1           Always keep in mind that Avi is cloaked in the

2    presumption of innocence, and the government has got to prove

3    things beyond a reasonable doubt.

4           Now I want to talk to you about the trading that

5    happened on AscendEX, FTX, and Serum.  That's the trading in

6    the Mango token.  I think we know this, but I just want to be

7    clear, that's completely different from the perpetual that was

8    traded on Mango Markets.  Those are two completely distinct

9    things.

10          So the trading on these exchanges was in the Mango

11   token and the trading on the Mango Markets was in the

12   perpetual.  The prosecutor made a big deal with pumping, about

13   my client using that word.  But for Count Two that, quote, pump

14   that they claim, that was on a different market.  The market we

15   are focused to in Count Two is the Mango Markets and any

16   alleged pump would have occurred on these three exchanges, not

17   on Mango Markets.  For Counts One and Three, none of this is

18   material, and those are the counts of commodities fraud and

19   wire fraud.

20          I'll tell you why.  Because you heard how the protocol

21   was set up.  It was permissionless.  It didn't care who you

22   are, it didn't rely on you to tell it anything, it didn't care

23   why you were doing anything on it, and it didn't care what that

24   price is that was coming in off the oracle.  All it did was

25   just input that price.  It didn't ask, is this price accurate

O4HMEIS3                    Summation - Mr. Klein

1    in some way, or is this price because of your trading on

2    another offsite exchange?  It didn't ask any questions.  It

3    literally took an input and used it.  It's completely

4    automatic.  No one could have done anything differently.  It

5    goes straight to the heart of materiality.

6            Now let's talk about the trades for a minute.  We are

7    not disputing that Avi did those trades.  That is not an issue

8    here.  We are not disputing that he tried to move the price up.

9    He did try, and he did move it up on certain of them.

10           Now, the government called two witnesses from FTX or

11   about FTX, the general counsel for AscendEX, and no one from

12   Serum.  In fact I didn't even hear about them.  I don't know

13   what it's called.  No one testified who traded with Avi on

14   those exchanges.  No one testified that they would have done

15   anything differently on those exchanges.  You heard no evidence

16   about that.  You heard evidence from people on Mango Markets,

17   but you didn't hear anybody from FTX who traded with them,

18   anybody from Serum, or anybody from AscendEX, and that's

19   important to keep in mind.

20           Let's talk about the FTX count for a moment, setting

21   aside their ridiculous, and I submit to you, completely

22   ridiculous 60-page terms of service.  We have no evidence

23   anyone saw or were they ever enforced.  What happened on this

24   exchange, there was trading done, but you learned about how

25   that trading was done.  You saw a contract for purchase.  I

O4HMEIS3                    Summation - Mr. Klein

submit to you this shows my client purchased the company that

had an FTX account that was then used, and that gave him

permission.

I want to show you one other thing. That's 116A.

This is trading data from FTX. Now, there was a lot

of talk about the price and it was pumped up. Guess what the

price was a year before? 44 cents. This price was high

before. This price didn't come out of nowhere. Avi, when he

traded, only got the price from three cents to 14 cents. A

year before this price was a lot higher.

Let's talk about AscendEX. You remember Mr. Farrell,

he is the guy who works at a New York City company called HDL

Consulting that has some arrangement for this Romanian

exchange. He talked to you about this user information page

and KYC level zero. You learned that KYC is know your

customer. And we can all know, from our experience and our

common sense, zero is the lowest number.

This is a nothing. They asked for nothing,

essentially. You could input, and he told you this, your

email, any email. In this case, it's an email -- I'm trying to

find it. It's highlighted up there on the upper left.

Opaque.com.

You learned from a special agent who came and

testified, Ms. LaGrange, that that is a masked email. My

client used masked emails. We don't dispute that. He used one

O4HMEIS3                    Summation - Mr. Klein

to purchase his United Airlines ticket, and he used it in his
own name.  And you also learned you can use masked emails for
legitimate purposes.  There is a reason to have them.

         The only other thing that was required here was an IP
address, and this says Poland.  It is drawn from your IP
address.  I submit to you that AscendEX nominally a Romanian
exchange, but with a U.S. company apparently pulling all the
strings behind the scenes, didn't care about any of this,
didn't care where you really were.  They could have done a lot
more things.  They could have done a lot of things.

         And you learned about what you can do from Mr. Tonkin.
Remember him?  He is the British guy who came in, and he was
one of the Mango Markets users, and he talked about all the
things the company where he worked does.  His company was a
crypto company too.  And all the information they take in to do
their business, it was a long list.  You remember Ms. Martabano
went through it with him.  They didn't do any of this.  KYC
level zero is a zero.

         You know what else tells you that Avi didn't think he
did anything wrong here?  He sued AscendEX to get his funds
back in his own name.  You learned that from Mr. Farrell.  He
brought an arbitration in Singapore, which I have talked about
twice now, at least, in his own name to get his funds back.
Ladies and gentlemen, you don't do that unless you think you
are rightfully entitled to those funds, they are lawful funds,

O4HMEIS3                          Summation - Mr. Klein

1    and you think you should have them.

2            Serum, you didn't hear anything about it, not even a

3    sea of terms of service, so I am going to move on.

4            Let's talk about the Mango Markets smart contact.  I'm

5    actually -- my clicking skills are not up to par right now.

6    Let's talk about the Mango Markets smart contract.

7            Again, that's that splash page where it says use at

8    your own risk.  That's the opening page that you have to click

9    on to go onto the Mango Markets.  What did you learn from

10   witness after witness after witness?  Mango Markets, the smart

11   contract, it's permissionless.  Anybody can use it.  It's open

12   source.  The code is out there in the code base.  Anybody can

13   look at it and make contributions or suggestions.  It's also

14   self-enforcing.  Mr. Smith told you that.  What that means is,

15   it relies on itself to enforce the rules.  It's its own little

16   rule maker.  It doesn't look to outside things.

17           So when you go to Mango Markets, you're engaged with

18   that smart contract.  That's how you do your trades.  It takes

19   in inputs and it has an output, and you learn it doesn't ask

20   for anything.  You don't have to put in your name.  You don't

21   have to put in your address, your location.  You don't have to

22   say whether you will maintain collateral.  You don't have to

23   say whether you intend to repay.  You don't have to say your

24   source of funds.  By that I mean, where did you get this crypto

25   you're depositing?  It doesn't even care.

1          Now, you might remember we asked a series of questions

2     about, does it care if you had stolen tokens.  You might have

3     wondered why do they keep asking about this.  This case is not

4     about my client using stolen tokens to conduct these trades.

5     They are not going to claim those were stolen tokens.

6          But this was an extreme example to show you that the

7     smart contract didn't care about anything.  You just put

8     information in and it gave you outputs.  It's automatic.

9          You also learned, and I am going to say this a bunch,

10    because it's important here, it let you trade with yourself.

11    You could open up as many smart contracts as you want and trade

12    with yourself all day if you wanted to.  It didn't stop you

13    from doing that.  It didn't ask you whether you're doing it.

14    It didn't care.

15         You also learned from Mr. Sheridan, the defense

16    expert, that you could go, quote, bankrupt and keep opening up

17    accounts and keep trading.  It didn't care.  It didn't ask.

18    And people who used this, you learned, knew this.  The

19    witnesses the government called came in and told you this.

20    They said:  Yes.  It didn't ask these questions.  It didn't

21    care.

22         What do we know about my client?  We know he went and

23    looked at how the contract worked.  We know that from

24    Government Exhibit 118A.

25         You learned from Mr. Sheridan that Blockworks is the

1    person who set up the smart contract, and that it's on GitHub,

2    and this is a depository for the code.  This is my client,

3    repeatedly in the days leading up to his trades, looking at the

4    smart contract, trying to understand that.

5         The government has talked about a lot of other things

6    he did.  You need to put this all in context.  That's part of

7    the presumption of innocence that he's cloaked in and part of

8    the proof beyond a reasonable doubt.  You need to have the full

9    context and the full story.

10         He also looked at the risk calculator, and that was

11   something Mr. Sheridan came in and talked to you about, and he

12   explained what that was.  You learned from him this is a tool

13   Mango Markets version 3 offered to people.  You could input

14   your prospective trade and see what the output would be.

15         Mr. Sheridan told you:  I went and did that, and I got

16   the outputs that Mr. Eisenberg got when he did his trades.

17         Now, the prosecutor may get up and say, well, you

18   couldn't input them both at the same time, and you couldn't do

19   both.

20         It doesn't matter.  You know why it doesn't matter?

21   Because the contract didn't care if you were trading with

22   yourself.  You only needed to know what you were doing in each

23   smart contract.

24         Now let's talk about Avi's trades on Mango Markets.  A

25   couple of things I want to talk about.  He doesn't dispute he

1    made those trades.  He doesn't dispute he took a long and a

2    short out against himself.

3            Those trades were publicly viewable.  They were not

4    done at 2 in the morning.  They were done at 6 p.m.  And by

5    publicly viewable, you saw the prosecutor's exhibits.  You can

6    see them coming in and out.

7            Also, what do you know?  The prosecutors spent a lot

8    of time talking to you about how there was no movement and, all

9    of a sudden, there is these trades.  Anybody seeing that would

10   know that's not a coincidence.  Two random people didn't show

11   up one night at 6 p.m. and each have a $5 million position

12   opposite themselves.  That defies all logic and all common

13   sense.  Anyone seeing that would know they are a party trading

14   with themselves, straight up, and that's what happened here.

15   He did conduct those trades, and the smart contract permitted

16   it 100 percent.

17           Now, just a couple of points I want to point about

18   these trades.  After he did the trades, where did the funds go?

19   The prosecutors made a big deal about sounding like he's trying

20   to hide himself and hide these trades.  He sent these funds to

21   a Circle account in his own name.  It was easy to trace.  He

22   didn't do things like use a tumbler or a mixer.  He literally

23   sent it right to a Circle account in his own name, straight up.

24   Yes, the funds moved on after that.  Who cares?  The first

25   place it went, basically, was his own account.

1      There was also a discussion about this health check.

2  We can see if your account is healthy.  The prosecutor equated

3  it to a credit check.  There is no credit check, ladies and

4  gentlemen.  You know this.  The smart contract doesn't ask you

5  anything about what you intend to do or why you intend to do

6  it.  You put in your information and it spits it back out to

7  you.  This is an automatic process.

8      I want to talk to you now about something that my

9  colleague, Mr. Talkin, talked to you about at the beginning of

10  this case.

11      Avi put his real money at risk here.  There is over

12  $13 million of his own money at risk here.  The prosecutors

13  want to make it look like there was no risk.  Not true.  He had

14  $5 million in the short position on the perpetual, and these

15  are approximates, 5 million in the long, and 3 million he put

16  on those three exchanges for the Mango token.

17      You know about this risk, and you know Avi understood

18  it, because of Government Exhibit 502A.  Avi talks about the

19  risk.  He says the question is risk.  Risky if move up the

20  price 10X.  There is risk here when he is trading on those

21  other exchanges.  That price needs to move up.  Otherwise, bad

22  things are going to happen to his money and his trades.

23      You learned from various witnesses about trading bots

24  that could have prevented the Mango price from moving up,

25  making the trades fail.  You learned about, quote, hidden

O4HMEIS3                        Summation – Mr. Klein

1    liquidity that would have also had the same effect.

2         As the evidence shows, if his health score got poor,

3    anybody's health scare got poor.  There is -- liquidations

4    start happening.  There was money at risk here the whole time.

5         (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O4HCeis4                    Summation - Mr. Klein

1              MR. KLEIN:  Did he end up on the winning side of this?

2      Yes.  Did he make money on this?  Yes.  But that's what

3      trading's about.  It's not illegal to make money on trades,

4      it's not illegal to take big positions and take big bets.

5              And I think this is a natural segue to talking about

6      the, quote, $110 million borrow.  I'm going to talk about the

7      intent to repay next, but I want to focus on the borrow.  Now,

8      the prosecutor spent a lot of time talking about Mr. Sheridan's

9      testimony.  We appreciate that.  Mr. Sheridan answered

10     questions directly, forthrightly to both Mrs. Martabano and the

11     prosecutor.  That's a stark contrast you all saw with the

12     government's two experts.  Dr. Mordecai, who almost refused to

13     answer questions on a $100 hypothetical, and Mr. Jain.  Keep

14     that in mind, because Mr. Sheridan told it like it is here.

15             What I'm going to tell you now is let's step back to

16     yesterday afternoon and before.  So, my client withdrew

17     $50 million in USDC.  We don't dispute the 50 million USDC, but

18     it wasn't a borrow, it was a combination of his own money he

19     put in, and no one disputes he put 5 million in USDC in.  So at

20     least $5 million of the money he took out is his own money, not

21     a borrow.  Let's start there.  That's the first level.  The

22     rest was his profit on his trade.

23             This is DX 50.  This is computer code.  It's a little

24     hard to read, we tried to blow it up.  What this shows here is

25     that there was a command from my client to settle his P&L.

1    Settling your P&L is when you withdraw profits, you learned

2    that.  This command, 17 seconds later, $50 million in USDC

3    withdrawing.  17 seconds later.  That's this, nothing.  My

4    client is withdrawing his profits.  Mr. Sheridan told you about

5    the 17 seconds, explaining this document to you.  As you know

6    from this exhibit, the one the government put in, the Mango

7    Markets documentation, settling your P&L means moving the

8    profit or loss from the PERP market into a USDC token balance.

9    When you settle your P&L on a perpetual on one of these longs

10   or short, you're moving it into USDC, and that's what happened

11   here.  He took profits, $50 million, and he withdrew them.

12   Don't let the government try to convince you otherwise.  This

13   was not a borrow.  You don't need to settle P&L to borrow,

14   period.  There's no P&L to settle.  A borrow is a borrow.  You

15   only settle P&L when you're withdrawing profits.

16          I want to talk to you about this exhibit.  The

17   prosecutor talked to you a little bit about how when you

18   withdraw, it's a borrow.  Actually, this says you're

19   withdrawing, not borrowing.  When you take money out, an

20   individual cannot withdraw more than the equity.  It does not

21   say borrow, it says withdraw.  You learned that you can both --

22   from Mr. Sheridan, you can toggle to borrow, but you can at the

23   same time withdraw and borrow.  That was Mr. Sheridan's

24   testimony.

25          I want to talk to you about Government Exhibit 914,

1    which the prosecutor referenced.  Let's focus on a few things

2    here.  The date of this document, it's December 15th, 2022,

3    months and months later.  This is not taken at the time of my

4    client's trade.  It's not accurate, straight up.  It shows a

5    negative health score.  We know when he did these trades, he

6    would have had to have positive health score to withdraw

7    anything.  It shows a negative value of $115 million in USDC.

8    This shows his USDC withdrawn is a borrow -- the 50 million,

9    sorry, down here.  But you know that's impossible because at

10   least $5 million of it is his own money.  You can't borrow your

11   own money.  You're just taking your own money out.

12            Let's show another exhibit from the government.  This

13   is an undated exhibit, but it lists these same things as

14   withdrawals.  This is Dr. Mordecai's exhibit.  You should

15   reject this exhibit.  It's not accurate.  You know that from

16   Mr. Sheridan's testimony.  Dr. Mordecai came in here and said,

17   I know a very limited scope and I can only do certain things.

18   Mr. Sheridan explained why this isn't a borrow.  You see right

19   up top, the 50 million USDC, the first thing that happened,

20   that's the settling P&L command, that's the 17 seconds later,

21   the taking out of profits.  The documentation shows you that,

22   the code shows you that, 17 seconds tells you that.  This is

23   not accurate.

24            One thing I will say, though, is even Dr. Mordecai

25   doesn't rely on Government Exhibit 914, the December exhibit.

O4HCeis4                        Summation - Mr. Klein

 1   Those sources down there aren't based on 914.  Dr. Mordecai's

 2   not even relying on 914 and neither should you.

 3            Now I want to talk to you about the repay bad debt

 4   proposals.  There's a lot of things to talk about here, so

 5   please be patient with me.

 6            First, these were publicly posted.  This wasn't a

 7   secret backroom chat with certain select people on Mango

 8   Markets.  This was visible to the entire world.  You heard

 9   that.  This was the worst way to hide yourself from the world,

10   if that's what you're doing.  These proposals were also posted

11   before the threats we're going to talk about in a minute,

12   before my client left this first one, and before that outing

13   article on Carl Stack, the prosecutor talked about, this came

14   out first within three hours of the trades.

15            The prosecutors like to make a big deal about this

16   last part, will not pursue any criminal investigation.  Ladies

17   and gentlemen, use your common sense, who is this binding on?

18   This is a public proposal.  Anybody can read this.  Only

19   certain people are voting it, and even their witnesses said

20   they didn't vote on this.  This isn't binding on anybody.  Use

21   your common sense.  Yeah, my client might have been worried

22   that, like, hey, if I gave all this money back, I also don't

23   want people reporting me because they shouldn't because I

24   haven't done anything wrong.  That's a natural thing to think.

25            This proposal, what it actually shows is a willingness

O4HCeis4                      Summation – Mr. Klein

1   to return funds, that it was a borrow.  This is a resolution.

2   This is a settlement.  This is a way to resolve a dispute.

3   You're making an offer.

4         Let's talk about the next one.  So the first one you

5   heard was rejected.  My client made another offer to resolve

6   this.  What's important about this, though, is at this moment

7   in time when this was up, my client was out of the country, he

8   was in Israel.  He had control of the $110 million.  He didn't

9   have to do any of this.  He could have just stayed in Israel.

10  Instead, he was seeking to return the funds in a negotiated

11  fashion.

12        Now, maybe this is the way you wouldn't have handled

13  it or some other people would, but this is how people do things

14  in this world of cryptocurrency.  And I submit to you that you

15  should be drawing favorable inference about my client on this,

16  that if that other money was a borrow, that he was seeking to

17  repay it quickly, and in fact he negotiated a resolution to

18  repay it.  And the money was sent back, $67 million.  So what

19  was kept was the profits and what was returned was the borrow.

20  And both the government's witnesses, Casey and Tonkin explained

21  they got their money back.

22        Now I'm going to talk about my client's allegedly

23  fleeing.  What the prosecutor didn't tell you about was my

24  client started immediately getting threats.  And this probably

25  isn't surprising that people might have been upset, but look at

O4HCeis4                         Summation - Mr. Klein

1    these threats.  These threats happened before he bought his

2    ticket, before he was outed, before he left.  You learned my

3    client was in Puerto Rico, that's PR there.  This is someone

4    who identified my client, where he lives, and these are threats

5    of violence.

6         He went to Israel.  We don't dispute that, and this is

7    the reason:  The evidence shows that he knew about these

8    threats, he visited the Mango Discord where these were posted

9    over 60 times.  It shows zero seconds, ladies and gentlemen,

10   for the view, but you don't visit 60 times and not look at

11   anything.  I submit to you the evidence shows he knew about

12   these threats, he booked his ticket out of town, he went to

13   Israel.

14        I also want to focus on another thing to think about.

15   When did he buy that ticket?  They talked a lot -- we spent a

16   lot of time talking about how he planned this all out, he had

17   all these plans to do this.  Why not go to Israel first?  Why

18   wait until afterwards?  Why not do these trades from Israel?

19   He could have done these trades from Israel.  You learned that.

20   You can do these trades from anywhere.  All you need is an

21   internet connection and you can do these trades.  Why not start

22   in Israel?  He wasn't fleeing because he thought he had done

23   something wrong, he was fleeing because of the threats.  Or

24   leaving.  Sorry.  Fleeing is the wrong word.

25        And why he was in Israel, what was he doing?  You know

O4HCeis4                        Summation - Mr. Klein

1    two things he did.  He sued AscendEX and Circle to get his

2    funds back in his own name, telling them, hey, you froze my

3    funds, I want them back, these are my funds.  Those are funds

4    the prosecutors have tied directly to this case.  He's filing

5    lawsuits, he's bringing arbitrations.  Common sense tells you,

6    you don't do that if you think you are entitled to those funds,

7    if you think they are lawful funds.

8           Now let's talk about, he's in Israel, he had the means

9    to stay there, but guess what he did, he came back to the

10   United States in December on his own, in his own name on a

11   flight, and he landed in Puerto Rico, and unbeknownst to him,

12   there was an arrest warrant and he was arrested.  But he's the

13   one who chose to come back here and he came back voluntarily.

14   And I think the inference I would ask you to draw from that and

15   from all this other is what his state of mind was.  He didn't

16   think he had done anything wrong.  He could have stayed in

17   Israel if he wanted to.  He flew back on his own.

18          He also flew back to the same city he left from.  If

19   you're really trying to, like, navigate around law enforcement,

20   are you going to fly back on your own name?  Are you going to

21   fly back in the same city where you're from?  No, you're going

22   to take lots of evasive steps.  None of those were taken here.

23   Own name, passport, back to the same city he left from.

24          Let's talk for a moment about the searches, the chats,

25   the press releases, and the Waves documents.  These are all

1    helpful in establishing Avi's innocence.  That may seem like an

2    odd thing to say because the government spent a lot of time

3    talking about them, but when you look at them in context, when

4    you look at them with the presumption of innocence in mind and

5    you give my client the fair shot you're supposed to, they show

6    he's innocent.

7         What I want to start with is a chat the prosecutor

8    talked about, hanging out internationally until stuff blows

9    over.  We don't dispute he went to Israel in his own name and

10   he flew back.  He had been threatened.  Blows over, perfectly

11   fair interpretation of this, until the threats go away, until

12   I'm safe to return from physical violence.  And if this was

13   about law enforcement, why come back in December?  He could

14   have stayed there.

15        The prosecutors also talked a bunch about these press

16   releases and put them into evidence.  Look at those cases,

17   ladies and gentlemen, look at the press releases.  They're all

18   different.  Those aren't his case.  One of the cases, I'll call

19   it the Phillips case, it's very different.  Phillips was

20   registered with the CFTC, his hedge fund was also registered

21   with the CFTC.  It involved foreign currency and option

22   trading.  It's not this case.

23        And we spent -- the prosecutor spent a lot of time

24   talking about his web searches and how these show he had a

25   guilty frame of mind.  He was searching words like "wire fraud"

1    or "manipulation," but you got to look at all the web searches

2    and put them in context.  He was doing the same searches both

3    before he left as he was doing after he left.

4            So, let me give you this example.  If you're a bank

5    robber and you for some reason don't know what robbing a bank

6    is and you type a search, what is bank robbing, how do I rob a

7    bank, then you go out and rob a bank, you don't keep searching

8    afterwards, how do you rob a bank.  You just looked it up, did

9    it, and you're done.  But if you don't know what you've done is

10   wrong, if you're worried that it might be, you might look up

11   things and say, hey, I'm thinking about doing this trade, we

12   know he was planning this, we don't dispute that.  If you're

13   trying to figure out where the lines are, you might do this

14   research.  And we all know, common sense tells us, none of us

15   want to be judged solely on our web searches, none of us, or if

16   we do, we want to put in context, the entire context.  So he's

17   doing web searches, but he's doing the same type of web

18   searches afterwards.  That tells you that he wasn't sure what

19   he had done was wrong, especially when you combine it with all

20   these other things, coming back voluntarily, booking a flight

21   on your own.  When you look at the whole picture, not isolated

22   bits and pieces, you actually get the full picture.

23           Another example of this, this is something the

24   prosecutor showed you right before when he's looking up statute

25   of limitations, market manipulation, elements of fraud, fraud.

O4HCeis4                          Summation - Mr. Klein

He's also looking up cryptocurrency tax lawyer, master your

crypto taxes with the pros.  Someone who decided that they're

committing a crime, like wire fraud, is not trying to figure

out next how they pay taxes on their legal gains.  Common sense

tells you that.  Rather, it shows that what Avi thought he was

doing was legal and he was prepared to pay taxes on it.

        The prosecutor also spent a bunch of time talking

about this Waves document.  What you didn't see and what I'm

showing you here is when these documents were created and these

searches were done.  These searches are the terms directly in

this document.  "Market manipulation," right there, straight

up.  It's the exact same time.  That timestamp is the file

metadata showing that.  So he's writing this document about

Waves, and the prosecutor wants you to believe that Waves is

the same thing that happened here.  It's not.  It's a separate

thing.  It's completely different.  It sounds similar, but it's

different.  In Waves, they created a lending platform that

people stole.  Mango Markets was decentralized, no one

controlled it.  This is a completely different thing.  Guess

what my client did, guess what you know here, he filed a

lawsuit about this.  He was trying to resolve this civilly.

This was him talking about it and writing about it apparently,

but he had filed a lawsuit.

        I've walked you now through the testimony and exhibits

you saw, filled in the gaps the prosecutor left, giving you the

1       context you need, talking about the presumption of innocence,

2       reasonable doubt.  I now want to turn to talking about the

3       counts.

4               But there's a gatekeeping issue that my colleague,

5       Mr. Talkin, mentioned in his opening, and I need to talk about

6       it.  And I apologize, it's dry.  I'm going to be reading more

7       of this than I'd like, but it's important because the

8       government hasn't cleared this initial hurdle on these two

9       counts.  What this is, it's for you to consider the

10      prosecutor's arguments on Counts One and Two.  They have to

11      prove that perpetual is something called a swap, and the Judge

12      will instruct you on that term.  They don't even get off the

13      starting line without proving that, and I submit to you they

14      haven't.

15              The summary version of the first thing the prosecutors

16      must prove, and again, the Judge will give you much more

17      thorough instructions on this, is that the Mango perpetuals

18      involve an exchange of payment and a transfer of risk without

19      actually exchanging the asset that incorporated the risk.  The

20      prosecutor talked to you about it, but forgot to mention that

21      last clause, which is the key clause here, "without actually

22      exchanging the asset that incorporated the risk."  The

23      prosecutor left that out when he talked to you.

24              And you heard them talk about how the perpetual was a

25      pairing of Mango and USDC.  You know that because USDC was

1    actually exchanged by the parties to the perpetual.  So it

2    can't be a swap.  Counts One and Two fail right there, end of

3    story.  But even if the prosecutors could prove that part

4    beyond a reasonable doubt, they also have to prove:  One, that

5    the perpetual is based either on the value of USDC or the

6    funding rate; or two, that the funding rate isn't something

7    known as a narrow-based security index.  That is a

8    complicated-sounding term that I'll have to explain in a moment

9    and the Judge will instruct you on much later about.

10          And let me explain to you why the prosecutors won't be

11    able to prove it either.  The USDC is the easier part of this,

12    I submit.  The value of the perpetual is dependent on the

13    oracle, and the oracle reported out in dollars, not USDC.  You

14    heard from Mr. Hermida — that's the guy from Switchboard who

15    ran the oracle company — and others that USDC is a functional

16    equivalent of a dollar on the Blockchain.  It's pegged to the

17    value of the dollar, and you can even trade it for dollars at

18    certain institutions.  USDC is just the virtual cash one uses

19    to buy or get paid in the perpetuals, just like a cup of coffee

20    isn't based on the strength of a dollar, the perpetual doesn't

21    depend on the value of USDC.

22          The prosecutors also can't meet the funding rate piece

23    of this because the funding rate is something called a

24    narrow-based security index.  Again, your instructions will

25    have more details on this.  When you strip away that legal

O4HCeis4                          Summation - Mr. Klein

jargon, all that it means is that it's an interest or the share

in something that based on a small group of investable assets

called securities.  The Judge will instruct you on that for

purposes -- sorry.  The Judge will instruct you that in this

case, Mango is a security.  And that's the Mango token, to be

clear.

So here, because the funding rate is entirely based on

Mango, it's a narrow-based security index and is legally an

exception of the basis from the perpetual.  And I'm telling you

that the funding rate is based on Mango because you know that

the funding rate is based on the oracle, which is just a

calculation of three different prices of Mango on the exchanges

and the price to buy Mango perpetuals on Mango Markets, which

is based on Mango.  In other words, because Mango is at the

heart of every piece of the funding rate and because the

funding rate is an interest in a payment based on these manual

inputs, the funding rate legally can't be the basis for the

perpetual.  Because the prosecutors can't prove beyond a

reasonable doubt that the Mango perpetual is based on the value

of either USDC or the funding rate, you should acquit my client

on Counts One and Two.

Now I'm going to talk about Counts One and Three.

I'll call them the fraud counts, for simplicity.  I'm going to

put together briefly what I've been talking about to show you

Avi didn't have the necessary criminal intent.  By that, I mean

O4HCeis4                         Summation - Mr. Klein

1   the mindset to defraud people.  There are big and little things

2   I've been talking to you about up here.

3           Some of the examples.  He didn't fly to Israel first

4   and then do the trades.  And while in Israel, he quickly

5   negotiated a settlement and returned $67 million.  He sued

6   Circle and AscendEX in his own name to get his crypto back.

7   And then he flew to Puerto Rico in his own name.  When thinking

8   about whether he had the intent to defraud, again, I want to

9   emphasize it, he's cloaked in the presumption of innocence.

10  You need to take in the context, and you can draw inferences

11  favorable to him, and I will submit to you that the evidence

12  shows you should.  And always, the proof beyond a reasonable

13  doubt is on the government.

14          I want to talk to you about another element for both

15  of those.  It's called materiality.  So to prove these two

16  counts, the government has to prove materiality.  The Judge is

17  going to define that for you, you will get that in your

18  instructions.  Boiling it down, it means the alleged deceptions

19  relate to things of real importance.  I expect the Judge will

20  also explain to you the alleged deceptions have to be on

21  something that could have influenced a reasonable person's

22  decision.

23          Let's take the deceptions, or alleged deceptions in

24  turn.  There's the location and identity allegation.  Again,

25  you heard a lot of testimony that Mango Markets doesn't care

O4HCeis4                    Summation - Mr. Klein

1    where you are or who you are.  There should be no dispute about

2    that.  Didn't ask those questions.  The smart contract didn't

3    ask them.  And the smart contract could have been programmed in

4    other ways.  And I already explained why this didn't matter to

5    FTX, AscendEX, and there's been no mention of Serum.

6              The next alleged deception is taking both sides of the

7    perpetual trade — that's the long and the short — on Mango

8    Markets.  This one is even more obvious of why this wasn't

9    material.  Mango Markets let you do that.  There's nothing

10   stopping you.  Smart contract absolutely permitted that.  You

11   heard that testimony.  You could trade yourself all day long.

12             The third one is the intention to borrow and maintain

13   collateral.  We've talked about this a bunch.  I just explained

14   why the $55 million in USDC wasn't a borrow.  For the rest, my

15   client quickly negotiated the return of it through resolution.

16   That goes to show that he was planning to return it always.

17   Things blew up in a way maybe he hadn't anticipated, there were

18   threats, other things were happening, but ultimately, those

19   funds were returned.

20             They also didn't show that he was deceptive about the

21   borrow.  You know the smart contract permitted it.  As long as

22   your health score was a certain point, you could borrow

23   whatever you wanted, end of story.  So his intent to borrow --

24   sorry.  His intent to borrow could not have been material

25   because he always intended to pay people back, and he did pay

1  them back quickly.

2          More importantly or equally important, any borrow

3  wasn't capable of influencing anybody's decision.  The smart

4  contract was permissionless, it was self-enforcing, it was not

5  programmed to deny that transaction if your health score let it

6  do it, and it did because it happened.  That's how we know it.

7  All his trades fully complied with the smart contract, and

8  Mango Markets was set up to deal with the situation or you

9  didn't.  You heard about it.  You got liquidated.  That was the

10  solution.  If there wasn't enough after a liquidation, there

11  was the insurance fund, then there was socialized loss.  This

12  was all built into the system.

13          The fourth alleged deception is market manipulation,

14  false pricing signals.  You heard a lot about the prices of the

15  Mango token, but there's one thing you didn't hear from anybody

16  on notice that was trading with them, with the Mango token.  No

17  witnesses came in and talk about that, none, zero.  That's

18  classic immateriality.  No one said it mattered to them who was

19  trading with them on those exchanges.

20          On a similar note, the Mango Markets smart contract

21  could not have done things differently based on the oracle.  So

22  the oracle was setting a price, and all the Mango Markets

23  contract does is respond to that price.  It doesn't ask why the

24  price is moving, who's moving it, none of those questions.  It

25  just says what is the price, and then I'm doing this.  So

O4HCeis4                    Summation - Mr. Klein

1    trading up the spot price wasn't influencing the smart contract

2    in this way.  It just had to do it.  It was responding

3    automatically.  And nothing anybody else was doing was

4    affecting that either.

5            Now, you also heard, and the prosecutor pointed this

6    out, from a number of witnesses about what they thought under

7    various hypotheticals.  Would you have done this if you had

8    known this, would this matter to you if this happened.  First,

9    none of these people were trading with my client.  There's no

10   evidence of that.  Second, and the Judge will instruct you on

11   this, people's individual thoughts and feelings can be

12   considered, but they don't control.  The question for you to

13   answer is whether the information was capable of influencing

14   any other result.  The evidence showed it wasn't because the

15   smart contract controlled and it operated the way it was

16   supposed to.

17           So I've talked about Counts One and Three, now I'm

18   going to talk about Count Two, the market manipulation count.

19   The Judge is going to instruct you about these elements, but

20   this charge is essentially that my client manipulated the price

21   of the perpetuals on Mango Markets.  Let's first talk, it's the

22   price on Mango Markets, it's not the price of the Mango token

23   on those other exchanges.  It's the price of the perpetual

24   itself.

25           Second, it's on Mango Markets.  Again, it's not on

FTX, AscendEX, or Serum.  It's the price of the perpetual on
Mango Markets.  That's the starting point, and that's important
because I understand it can get confusing here.  When you put
those pieces together, the price of the Mango perpetual on
Mango Markets, the prosecutor has to show that my client
intentionally moved the trading cost of the perpetual, the
price it costs to buy it on Mango Markets.  You heard almost no
evidence of this whatsoever.  Even Dr. Mordecai, the
government's expert, the prosecutor's expert struggled a lot to
answer questions directly and admitted that none of his slides
that are in evidence included the price it cost to buy the
perpetual.

          The trading price of the perpetual didn't matter to
Avi.  I know that's a little counterintuitive, but it didn't.
He didn't sell his perpetuals.  That's not what he was trying
to move, was the price of the perpetual.  He didn't need to
move the price of the perpetual to make his trades work.

          The prosecutor is focusing and the prosecutors are
focusing on the oracle settlement price.  That's something
different.  I know this can get confusing, but those are two
distinct things:  The price of the Mango Markets perpetual and
the oracle settlement price.  The oracle is the price of the
Mango token on those three exchanges.  Remember, it comes
together and it spits out one price based on the median.  It's
not the price of the perpetuals, it's not the price on Mango

O4HCeis4                        Summation - Mr. Klein

Markets.  And why the oracle affects the value of the

perpetual, that's simply not what market manipulation is about.

            I want to talk to you on venue, and you're going to

get an instruction on venue, whether this is the right

courthouse for this case to be in.  You have not heard

sufficient evidence of that, ladies and gentlemen.  You should

scrutinize the evidence on this.  The things the prosecutor

talked about to support that, that you've heard about so far,

don't show they were done in furtherance.

            There's no proof that those emails you saw were sent

from New York.  It's just the bottom line.  Doesn't mean it had

to be sent.  You didn't hear anyone come in and say, I sent

these from New York.  And those daily reports on AscendEX, a

daily report is just a recap, it's not something done in

furtherance.

            I'm now going to wrap up.  I appreciate your

attention.  Thank you.  The entire defense team and Avi

appreciate you taking time out of your lives to be here with

us.

            I want to go back to where we started with the

prosecutor's opening now that you've seen and heard all of the

evidence.  The only fake diamond in this case is the

prosecution.  The prosecution is asking you to commit to its

flawed and incomplete version of events.  The testimony and

evidence we just discussed lets you know that you can't and you

O4HCeis4

1    shouldn't, that the prosecutors haven't met their high burden

2    of proof beyond a reasonable doubt.  After I sit down, a

3    prosecutor is going to get up, and that's as the Judge

4    explained, they have the burden.  No one from the defense gets

5    to respond, but that of course doesn't mean we wouldn't have

6    things to say.  You now hopefully have a good sense of the full

7    story and a lens of how to evaluate the prosecutors' final

8    arguments.

9        Some of the things I want you to remember:  That

10   splash page disclaimer, use at your own risk, how the smart

11   contract operated.  All of these are highly relevant to what

12   was going on in my client's head, what he thought about what

13   was happening, but also what people's expectations were on

14   Mango Markets.  Keep things like that in mind.  The only

15   verdict consistent with the evidence and the legal instructions

16   the Judge is going to provide you is not guilty on all counts.

17   Avi should be acquitted.

18             THE COURT:  Thank you, Mr. Klein.

19             MR. KLEIN:  Yes, your Honor.

20             THE COURT:  I will invite the jury, if they're

21   interested, to stand up for a second while Mr. Burnett goes to

22   the podium and we'll continue with the government's rebuttal.

23        By the way, Mr. Burnett, if you need a couple of

24   minutes or feel it would be helpful, I'm happy to take a short

25   break.

O4HCeis4

1          MR. BURNETT:  Just a moment to get some papers

2     together would make this a much more efficient rebuttal.

3          THE COURT:  We'll take a short five-minute rest.  You

4     can retire to the jury room and come back.

5          Just so you know what's going to happen next, we're

6     going to have the government's rebuttal, then we'll take a

7     longer break so you can get some lunch and settle in for jury

8     instructions, which we'll take up after lunch.  So let's come

9     back in five.

10          (Jury not present)

11          Mr. Burnett, I apologize for that.  I thought you were

12     kind of ready to go, so I apologize for everyone kind of

13     standing and waiting for you to approach.

14          MR. BURNETT:  I apologize.  My aspiration was to do

15     that, but there was a fair bit to cover up.  I just wanted to

16     make sure --

17          THE COURT:  No, that's okay.  I wanted to make sure

18     you had time to get ready.

19          While you're doing that, we have an exhibit list that

20     was furnished by the government.  I just want to make sure that

21     the defense has seen that list and is comfortable with that

22     version of the list being sent back to the jury room.

23     Specifically, the list that contains the various headers and

24     descriptions.  So you'll have time during the lunch break to

25     take a look at that, but you just need to check that and make

O4HCeis4

1    sure that what we send back into the jury room everyone is on

2    board with.

3            MR. TALKIN:  Your Honor, there are certain FTX

4    documents that are very difficult to redact that were put in

5    subject to redaction.  They're on the list.  Because of that,

6    they are not on the computer.  If they're asked for, the

7    parties have discussed how to handle that situation, and if

8    it's okay with the Court, we think the best way to handle it

9    is -- they're on the list, they can be seen.  If they're asked

10   for, we can redact them and add them to the computer.  I don't

11   know if that procedure is acceptable to the Court, I think it's

12   acceptable to the parties.  I don't think they're in the crux

13   of any of the arguments you heard here today, but certainly

14   they're fair game in this case and can be asked for.

15           THE COURT:  That sounds fine.

16           Ms. Huang, is that acceptable to the government?

17           MS. HUANG:  Yes, your Honor.  The only thing I was

18   going to add, obviously we don't want the jury to wait if they

19   wanted to see one of those exhibits, so during the lunch break,

20   we can also work on starting to redact those documents so that

21   they are ready.

22           THE COURT:  If you're able to put them on, great.  If

23   not, I'm sure the jury would ask if they would like to see any

24   of those documents.

25           MR. TALKIN:  Thank you.

O4HCeis4                    Rebuttal - Mr. Burnett

1            THE COURT:  Okay.  We'll come back in five.

2            (Recess)

3            Mr. Hernandez, let's get our jury back.

4            THE DEPUTY CLERK:  Yes, your Honor.

5            (Jury present)

6            THE COURT:  Mr. Burnett, you may proceed.

7            MR. BURNETT:  Thank you, your Honor.

8            Good afternoon, everybody.

9            So this is the last chance we're going to have to

10   speak with you.  Let me start out by saying thank you for all

11   the work you've put in so far and all the attention you've paid

12   throughout this case.  It's the way both the parties can know

13   that everyone's getting a fair trial here.  It's also how we

14   can know that you know the evidence in this case, that you know

15   the truth, and that you know what the defendant, Avraham

16   Eisenberg, did was a crime.

17           You heard Judge Subramanian tell you at the beginning

18   that the defense has no burden, and that stays true right now

19   the same way it's been true throughout trial, the burden is

20   always on the government.  But, when the defense makes

21   arguments, you have to scrutinize those, you have to see how

22   they line up with the evidence to see if they make sense, and

23   our rebuttal is our chance to respond to some of those

24   arguments.  I can promise you, I'm not going to try to respond

25   to all of them because you don't need me to.  You've been here

O4HCeis4                              Rebuttal - Mr. Burnett

1   the whole time, you've seen the evidence, you've heard the

2   testimony, you know the case.

3        But let me tell you this, there was a purpose behind a

4   lot of the defense arguments, and that was to point you in a

5   lot of different directions, to terms of service, to something

6   about whether anyone cared about locations, to Oliver Tonkin's

7   business, and it's all pointing away from the core of the case,

8   and that's that the defendant committed fraud and manipulation.

9        The fact that he did fraud and manipulation on

10  something called a smart contract doesn't make it legal, it

11  doesn't make it not fraud, it doesn't make it not manipulation.

12  That's because the defendant manipulated and lied about two

13  things that the smart contract cared about.  Might not have

14  cared about your name, might not have cared about where money

15  came from, but it cared if you had enough assets on the

16  platform to support a borrow, and it cared if you clicked that

17  borrow button.  That's how it decided if you had enough so

18  you're allowed to take a borrow, and that's how it decided to

19  give you a borrow.  Those were the two core things that that

20  smart contract and the people who designed it, because there

21  were people behind it just like there were real people who had

22  their money on that platform, that's what they cared about and

23  that's what the defendant lied about.

24        Now, I want to make sure we're talking about those

25  lies, because just because the defense is saying they're not

1  contesting certain parts of the case doesn't mean those parts

2  of the case don't matter.  One important part is the

3  manipulation.  That manipulation should be front and center in

4  your deliberations because it's the center to both the

5  manipulation counts in the case, but also the fraud counts in

6  the case.  You saw, and the defense doesn't really contest,

7  that the defendant pumped the price of Mango relative to USDC

8  by over 1,000 percent in just 15 minutes.

9           Now, importantly, that wasn't just the price of Mango

10 on a bunch of different platforms like Mr. Klein was trying to

11 tell you because you heard the testimony that what Mango

12 Markets does is it uses that oracle, it takes those prices, it

13 brings that price back to its platform, and that price becomes

14 the settlement price for the perpetual.  It's how everyone

15 knows if they're winning the bet, if they're losing the bet.

16 It's the key price that matters.  If you want to know if your

17 long position is up, if you want to know if your long position

18 is down, if you want to know if you're making money, if you're

19 losing money, that price, the settlement price that comes from

20 the oracle, the price that the defendant manipulated by over

21 1,000 percent, that's the whole ballgame and that was the focus

22 of the defendant's crime.  He manipulated that price so he

23 could trick the system into giving him money.  The system ran a

24 credit check, and it checked the value of his assets which were

25 determined by that price.  Smart contract might not have cared

about his name, but it cared about if he had enough money to

support the borrow that he was going to take out.

        You can think about this outside the context of

cryptocurrency easily.  Say you go on something like Rocket

Mortgage, a place where you can apply for a loan online.  You

can plug in the value of your house, the value of your assets

there.  There might not be a person on the other end of that

checking it, it's a software program.  The software program

will see if the assets you plug in match up with the size of

the loan you want to take out.  But that still matters to the

platform.  In fact, it's the key thing that matters to the

platform in determining whether it's going to let you take out

that loan or not.  And that key thing is what the defendant

manipulated and it's what he lied about.

        The other core part of the fraud was clicking that

borrow button.  Again, remember, doesn't matter if the smart

contract cares about your name or your location because you

know from the testimony, from the screenshots that you saw and

from the testimony of every single witness, including the

defense's own expert, that the system cares if you click that

borrow button.  The system cares if you click that borrow

button because you have to click it in order to borrow.  You

can't borrow without clicking the button.

        (Continued on next page)

O4HMEIS5                          Rebuttal - Mr. Burnett

1              MR. BURNETT:  By clicking that button, what the

2    defendant was doing was representing to the system that he was

3    trying to borrow, that he wanted to take out a loan, and that

4    has meaning.  You know borrow has meaning in your everyday

5    life.  If someone came up to you and said, hey, I'd like to

6    borrow ten bucks, you would know what that meant, and that's

7    what the system was programmed for too, giving someone money on

8    the understanding that they were going to keep up enough

9    collateral on the platform until they repaid.

10             But the defendant was lying because he had no

11   intention to do what borrowing was.  He had no intention to

12   keep collateral on the platform until he repaid.  He planned to

13   take the money and run.  He was clicking the borrow button, but

14   he was stealing.  That's the second lie, and it mattered

15   because he couldn't have gotten the money off the platform

16   unless he did it.

17             Now, you have heard Mr. Klein argue to you that, well,

18   maybe the defendant didn't borrow at all, really.  Maybe this

19   was a settlement and he was just taking away profits.  You know

20   that's wrong because you have seen it with your own eyes.  You

21   saw it in two places.

22             First, you saw the account balance page that was

23   Government Exhibit 914, and that showed all of the borrows

24   listed out on the accounts there.  Those numbers aren't just

25   made up.  That's the numbers from the Mango Markets system that

1    list out all the borrows.  But you also saw it in another

2    place.  You don't even have to take that Government Exhibit 914

3    on its own.

4         Mr. Sears, if we can put up the one slide, please.

5         You saw Government Exhibit 1002.  This was the

6    spreadsheet that we walked through maybe a little painfully

7    with Mr. Sheridan on cross-examination the other day, which is

8    the actual borrowing data from Mango Markets, which showed that

9    while the defendant was on that program, while he was sitting

10   on the borrow page committing his crime, the borrows for every

11   one of the cryptocurrencies he took out skyrocketed.

12        You don't have to just rely on Government Exhibit 914.

13   There is a reason Mr. Klein didn't talk about this at all, and

14   it's because it's devastating evidence that what the defendant

15   was doing was borrowing.  Just look at the second-to-last line.

16   USDC.  How much do borrows jump during the time of the

17   defendant's crime?  54 million.  That's the same amount that

18   shows up on Government Exhibit 914, the account balance page.

19   The data and the documents show he was borrowing.  You should

20   believe your own eyes.

21        Now, I want to shift gears and focus a bit on this

22   willfulness point.  Willfulness is basically just the idea of,

23   hey, did the defendant understand what he was doing was against

24   the law?  He didn't need to know he was violating a particular

25   law.  He didn't need to know, here is how the commodities laws

1   worked.  He needed to know what he was doing was generally

2   unlawful.  And I'm not going to go through blow by blow all the

3   evidence that you heard on the closings, because you have heard

4   it all.  You can use your common sense here.  But what I will

5   answer is this point about how the defendant eventually sued

6   some places and later came back.

7        That is not the good point that the defense tries to

8   make it out to be.  So you need to put it in context of the

9   timeline.  Remember what happened.  The defendant planned all

10  of this scheme out, knowing that it was illegal.  He knew that

11  it was illegal because he knew people had been prosecuted for

12  market manipulation and fraud.  He tweeted about it.  He knew

13  it was illegal because he ran searches about market

14  manipulation and fraud.

15       And you know what he was thinking about his searches

16  and the conclusions that he draw from those searches because

17  the first thing that he did as soon as he completed that crime

18  was to go and say, hey, I'll give you some of the money back if

19  you promise not to press charges against me.  That shows you

20  what he thought about his searches.  This wasn't someone who

21  was unsure about whether what he was doing was illegal or not.

22  The minute he finished it he said, hey, I'm holding all this

23  money ransom, promise not to prosecute me, and I'll give some

24  of it back.  He didn't do that under his own name.  He did that

25  anonymously.

O4HMEIS5                         Rebuttal – Mr. Burnett

1    He didn't stay anonymous for long because you saw that

2    someone eventually found him out the next day.  How did he

3    react?  He got on a plane out of the country.  He didn't get

4    out of a plane out of the country because someone somewhere on

5    the Mango Markets Discord said, oh, I am going to hurt that

6    guy.  We don't even know if he looked at that, let alone cared

7    about it.

8         But what you do know is that he got on an airplane out

9    of the country, a few days later was searching extraditions

10   from Israel, and that same night, while he was on the airplane,

11   while he was sitting on the tarmac, he was searching criminal

12   market manipulation, elements of criminal market manipulation.

13   He was getting out of dodge because he knew he had broken the

14   law and that his cover was blown.

15        So what happens after that?  His cover is blown.  He

16   is out there now.  So people know who he is.  So what does he

17   do?  He gets his deal through.  He gets his promise from Mango

18   Markets not to press charges by getting another deal through

19   there.  And he's feeling pretty good.  He is out there, but he

20   has got his promise from Mango Markets.  They are not going to

21   press charges or freeze his funds.

22        Sure, he's brazen.  He goes and tries to get his money

23   from other places, like AscendEX or FTX, the same way he got it

24   from Mango Markets.  He doesn't need to hide anymore because he

25   has already gotten his waiver of criminal liability from Mango

1    Markets, and he can't hide because someone has already outed

2    him.

3          So he waits, he challenges some things, and he thinks

4    things have blown over, and then he comes back.  He thinks

5    things have blown over, and then he comes back.

6          And he thinks things have blown over because nothing

7    about the law enforcement action against him is public.  You

8    saw that he was arrested on a sealed arrest warrant.  That

9    means he flew back having no idea that law enforcement was

10   still looking for him.  He thought the coast was clear, so he

11   came back.  He was wrong.

12         Let me switch gears now and spend just a few minutes

13   talking about this swap issue.  There is no need for this to be

14   overly complicated.  It's actually quite simple.

15         You know that a Mango perpetual is a swap because

16   every witness has really explained it to you in the exact same

17   way.  Not just the government's witness, Mr. Sheridan also

18   explained it the same way yesterday as well.

19         And a swap is really just a bet.  It's a bet on the

20   value of two things.  Here it's the relative value of Mango and

21   USDC.  You heard that that relative value, that pairing is

22   important because cryptocurrencies, it's how they trade.  They

23   trade in these pairs.  So the price of the cryptocurrency is a

24   price relative to another cryptocurrency.  The value of each is

25   what matters because it's a supply and demand, the supply of

1    Mango relative to USDC.  That's what determining the value, and

2    that's what the bet is on in a perpetual.

3         Now, Mr. Klein tried to tell you, well, because the

4    parties ultimately pay up in USDC, it's not a swap.  That's not

5    what the judge is going to instruct you on.  What the judge is

6    going to instruct you on is something is not a swap if the

7    parties exchange an asset that incorporates the risk that they

8    are betting on.  The risk that they are betting on is the risk

9    of the relative value of Mango and USDC.

10        So if the parties were exchanging Mango and USDC, at

11   the end of the day, like in those futures that Mr. Jain

12   described to you early in trial, that would be the parties'

13   exchanging something that's the same value they are betting on.

14   But that's not what they do.  At the end of the day, they just

15   exchange USDC, which is why this is a swap.

16        Judge Subramanian will instruct you that in this case

17   this needs to be a swap that falls within the commodities laws.

18   That's something that's important too.  You know that is the

19   case for two reasons.

20        First, you know it's the case because Mango

21   perpetuals, the value of them is based on in part on USDC, and

22   you know that that's the case because that's literally what

23   every witness has said throughout trial.  The perpetuals are

24   based on relative value of Mango and USDC.

25        Mr. Klein's only answer to that has been to say, well,

O4HMEIS5                         Rebuttal - Mr. Burnett

1    USDC is kind of just like a dollar.  People treat it like a

2    dollar.  It doesn't matter if it is why like a dollar.  It's

3    not a dollar.  It's a cryptocurrency issued by some company in

4    Boston called Circle, not the Federal Government.  You don't

5    walk around with USDC in your pocket.  You don't pay taxes with

6    USDC.  It's just a different thing.  It's property, it's a

7    cryptocurrency, it's not the green thing you have in your

8    wallet, so it's not a dollar.  It's really as simple as that.

9             The other way you know that this swap is a swap

10   subject to the commodities laws is because of the funding rate.

11   Now, the funding rate, Mr. Davis and Mr. Jain explained it to

12   you.  It's based on the value of the order book on Mango

13   perpetuals against the oracle price and it's a rate.  It's a

14   stream of payments.  You know it's a rate because it's called a

15   funding rate.  You don't need to take my word for it.  You can

16   take Mango Markets' word for it.  That's what they called it

17   too.

18             Now, Mr. Klein is trying to convince you that the

19   funding rate is something called a narrow-based security index.

20   That's a bunch of jargon, but it's not.  Here is the deal.  An

21   index is something like you see in the news, like the S&P 500

22   is an index, NASDAQ is an index.  It's a group of stocks, big

23   group of stocks, a basket of them.

24             Something is a narrow-based security index if it's a

25   small group of stocks or it's an ownership interest in that

O4HMEIS5                    Rebuttal - Mr. Burnett

group of stocks.  Let's say you have like a portfolio of

stocks, and you own a share in that portfolio of stocks, that's

an interest in an index.  The funding rate is not an interest

in an index.  You don't own a share of anything.  You don't own

a share of a portfolio of stocks.  You don't own a share of

Mango.

          The fact that Mango prices are incorporated in there

is not the question for you.  The question is, is it an

interest in an index.  And it's not an interest in an index.

It's just a rate.  A rate is something different.

          You will see this in the instructions, but at the end

of the day it's clear.  As long as a rate is not an interest,

which it's not, then this is subject to the commodities laws.

And as long as USDC is not the same thing as a dollar, then

this is also subject to the commodities laws.  If either of

those are true, you can move on from the technical stuff, and

the evidence is clear that both those things are true.

          Now, I want to stay on the topic of swaps for a

minute, but get ourselves out of the technical weeds and into

this issue of manipulating the price.  Now, Mr. Klein seemed to

admit that his client manipulated the price of Mango relative

to USDC and manipulated the oracle and made the price shoot up

a thousand percent.  You didn't hear anything contesting that

was true.

          Instead, the argument was, well, that's not really the

O4HMEIS5                        Rebuttal - Mr. Burnett

price on Mango, not the price on Mango Markets.  You have not

heard that from any single witness in this case.  That's just

Mr. Klein saying something, and you don't need to treat

arguments from the lawyers as evidence.  You know the evidence,

and the evidence is that that oracle price gets incorporated

into Mango Markets.  That is the settlement price that Mango

Markets uses when it determines the price of the perpetual and

who is winning and who is losing, just like we talked about

earlier.  The price comes from somewhere else, but it's brought

on to Mango Markets and used to price the perpetuals.  And the

defendant, he manipulated that price.  There is no dispute.

          Now, Mr. Klein also ignored something else, which is

that the actual underlying trades of Mango perpetuals also

increased in price because of the defendant's misconduct.  You

saw Special Agent DeCapua show two charts that showed the

actual trades of Mango perpetuals during the scheme shot up by

over 700 percent.  That was also because of the defendant's

crime.  So what you saw then is both the reference price of

those contracts was going up because of the defendant's crime,

and the settlement price of those contracts was going up

because of the defendant's crime.

          At the end of the day, this shouldn't be hard because

this was the whole point.  The whole point of the scheme was to

make the price of the perpetuals go up because that's what was

going to make the value of his assets look really, really big.

1  That's what was going to let him trick the system into

2  borrowing and stealing from the platform.

3          I want to touch now on this process of tricking the

4  system, this idea called materiality that Mr. Klein talked

5  about.  Mr. Klein seems to think that, well, because the system

6  let him do it, it's not material.  It's just an automated

7  system.  It's a smart contract.  That's exactly backwards.

8  It's exactly backwards because he had to lie.  He had to trick

9  the system in order to take out the money that he took out.

10          I think this is actually easiest to think about if we

11  take it out of the context of Mango Markets for a second and

12  just think about something that's a little bit simpler.

13          Imagine there is a thief who goes and steals someone's

14  bank account login information, something you would log into

15  your bank account online for.  That thief goes and sits at the

16  computer and types in the stolen identity to log onto the

17  person's bank account and then clicks the withdraw button to

18  drain all the money out of that unsuspecting victim's bank

19  account.

20          Now, what Mr. Klein would have you believe is, well,

21  because the software code for the bank account can't stop him

22  once he has entered that false information, it's not material.

23  That's wrong.  That's exactly backwards.

24          What's key -- it's the only thing that matters,

25  really, is who is the right person who can access that bank

1    account.  He had to lie to access the bank account to drain the

2    money.  That's how you know it was capable of influencing the

3    bank account.  He couldn't get into the bank account unless he

4    lied to it.

5         It's the same thing here.  In order for the defendant

6    to drain $110 million of cryptocurrency from the system, he had

7    to lie to it.  He had to lie by inflating the value of his

8    assets.  Otherwise, he wouldn't have been able to withdraw that

9    much money.  And he had to lie by clicking the borrow button,

10   because you can't borrow unless you click that borrow button.

11   You know that his fraud was not only capable of influencing and

12   tricking the smart contract, it was the two things that that

13   smart contract cared about most, how much money you have and

14   what are you trying to borrow, and the defendant lied about

15   both of those things, and that's how he tricked the system into

16   giving him the money.

17        One last thing on this materiality point.  You heard

18   Mr. Klein open his summation with that opening page, the one

19   that says:  I accept all risks to use the platform.

20        I expect you are going to hear from Judge Subramanian

21   that disclaimers, disclaimers like that saying, I accept the

22   risks, they can't render something like fraud or manipulation

23   legal or immaterial as a matter of law, and of course not.  Of

24   course that's not the case.  No one thinks when they click a

25   generic, I accept the risks of using this box that they are

signing up to get defrauded, that they are signing up for

crime, that's not the way it works, and you heard the witnesses

say that.

You heard Brian Smith, you heard Oliver Tonkin, you

heard Tyler Shipe, people who used and built the platform

explain to you that they didn't expect this kind of thing to

happen, and of course they didn't.  They didn't expect fraud.

They didn't expect manipulation just because they clicked a

little box the first time they used the platform saying, I

accept risks.

Before I wrap up, I just want to touch briefly on this

point about venue that Mr. Klein raised.  Now, venue is

basically is this the right place, the right courthouse for

this case to be, and should it be here in New York City.

You are going to hear it's a different standard.  We

have to prove everything else in this case beyond a reasonable

doubt, but venue is just a preponderance of the evidence.

That's a 50/50, a little more than 50 percent is preponderance

of the evidence.

But here you had clear and overwhelming evidence that

acts in furtherance of the crime took place here in New York

City.

You are going to hear that it doesn't matter if the

defendant was here in New York City.  As long as something the

defendant caused to happen, even if it was by someone else, to

1  further the crime that happened here, then that's sufficient to

2  establish venue.

3          And you heard, with respect to AscendEX, every step of

4  Mr. Eisenberg's fraudulent conduct happened in part here in New

5  York because this was the main place where AscendEX was run out

6  of.

7          Look at Jim Farrell's testimony if you need to.  He

8  explained to you that when Mr. Eisenberg opened up an account,

9  that account appears here in New York.  When Mr. Eisenberg

10  deposited the money that he was going to use to manipulate the

11  market, that was handled by the finance team here in New York.

12  He explained that when Mr. Eisenberg's trading happened, those

13  fraudulent trades were settled and cleared.  That was all

14  managed by the finance team here in New York.  And you heard

15  that Mr. Farrell was sitting in his office in New York when he

16  got the call that they needed to freeze this account because

17  they caught Mr. Eisenberg for what he was doing.  That all

18  happened here in New York and all of those acts were acts in

19  furtherance of the crime.  It was how he was carrying out the

20  manipulation.

21          You also heard testimony from John Casey.  He was the

22  man from Poughkeepsie who came here earlier, and he told you

23  that he saw the false price signal, that spike in price happen

24  when he was sitting in Poughkeepsie.  That's also in the

25  Southern District of New York.  And while that crime was going

1    on, he was seeing the price spike, and he was trying to

2    withdraw.  He was trying to withdraw his money, but he couldn't

3    do it.  There was a victim right here in the district, too,

4    which is another way you know that venue is proper here.

5         I'm about to sit down.  When I'm done, Judge

6    Subramanian will instruct you on the law for this case, and you

7    should listen carefully because if any of us have gotten

8    everything wrong, including me, what his word is goes.

9         Then you'll have your chance to go back and

10   deliberate.  When you go back there, focus on the evidence and

11   use your common sense, and I submit you should ask yourselves a

12   few simple questions to guide your deliberations.

13        First, did the defendant manipulate the market to make

14   it look like he had something really valuable?  Second, did he

15   use that manipulation to trick Mango Markets into letting him

16   borrow everyone else's cryptocurrency?  Third, when he clicked

17   that borrow button, and represented that he was borrowing, was

18   he really borrowing or was he stealing?  And, fourth, was his

19   manipulation and lying, were those lies and manipulation the

20   reason he was able to take out $110 worth of cryptocurrency

21   from the platform.

22        If the answers to those questions is yes, then I would

23   suggest that's fraud.  That's market manipulation.  That's the

24   core of the case.

25        Because, at the end of the day, the heart of this case

O4HMEIS5

1    is not about computer code, it isn't about what was

2    technologically possible or not on Mango Markets.  Just because

3    something is possible doesn't make it legal.  You know that and

4    the defendant certainly knew it.  This is a case about laws

5    that go back way before cryptocurrency and even computers.

6    It's about laws that protect people from fraud and

7    manipulation.  The defendant broke those laws.  He is guilty.

8            THE COURT:  Members of the jury, we will take a

9    30-minute lunch at this point.  We will come back, and I will

10    instruct you as to the law in this case.

11            All rise for the jury.

12            (Jury not present)

13            THE COURT:  Anything that we need to take up before we

14    instruct the jury, Mr. Davis?

15            MR. DAVIS:  No, your Honor.

16            THE COURT:  Anything from the defense?

17            MR. KLEIN:  No, your Honor.

18            THE COURT:  We will see everyone back here at 2.

19            (Recess)

20            THE COURT:  Do we have that exhibit list issue

21    resolved?  Do we have an exhibit list that can go back with the

22    laptop?

23            MR. SMITH:  Yes, your Honor.

24            THE COURT:  Fantastic.

25            Is everyone ready to sit back and relax for a while?

O4HMEIS5                    Charge

1          Mr. Hernandez, you have the printed copies of the
2    charge and the verdict form?
3          THE DEPUTY CLERK:  Yes, I do, your Honor.
4          THE COURT:  Let's go get our jury.
5          (Jury present)
6          THE COURT:  We have come to the final step before you
7    begin your deliberations, and I will now instruct you on the
8    law that you are to apply in this case.  Get comfortable.
9          There is a lot here.  So we are going to hand out
10   copies of what I am going to read to you.  You should pay
11   attention to the instructions that I am giving you as I say it.
12   However, I know that some people like to follow along in
13   writing.  That's how they take in information.  It's easier for
14   them.  So each of you will have a copy of the instructions, and
15   you can take that back with you into the jury room.  However,
16   if there is any difference or distinction between what's
17   written there and what I tell you, it's what I'm telling you
18   that is the instructions that you should follow, although I
19   don't anticipate that there will be any differences between
20   what you have in your hands and what I'll be telling you.
21         Just for reference, I am going to be starting from
22   page 5 in what you have.  I'll give you a second to turn there,
23   if you'd like to.
24         You have now heard all of the evidence in this case,
25   as well as the final arguments of the parties.

O4HMEIS5                    Charge

1              My duty at this point is to instruct you as to the

2       law.  It is your duty to accept these instructions of law and

3       apply them to the facts as you determine them.

4              On these legal matters, you must take the law as I

5       give it to you.  If an attorney has stated a legal principle

6       different from any that I state to you in my instructions, it

7       is my instructions that you must follow.

8              You should not single out any instruction as alone

9       stating the law, but you should consider my instructions as a

10      whole when you retire to deliberate in the jury room.

11             And you should know that you're going to be able to

12      take a copy of these instructions into the jury room.  It's

13      what you have in your hands.

14             Your final role is to pass upon and decide the fact

15      issues that are in this case.  You, the members of the jury,

16      are the sole and exclusive judges of the facts.  You pass upon

17      the weight of the evidence; you determine the credibility of

18      the witnesses; you resolve such conflicts as there may be in

19      the testimony, and you draw whatever reasonable inferences you

20      decide to draw from the facts as you have determined them.  I

21      will later discuss with you how to pass upon the credibility,

22      or believability, of the witnesses.

23             In determining the facts, you must rely upon your own

24      recollection of the evidence.  The evidence before you consists

25      of the answers given by witnesses, the testimony they gave as

1    you recall it, and the exhibits that were received in evidence.

2    The evidence does not include questions.  Only the answers are

3    evidence.  But you may not consider any answer that I directed

4    you to disregard.

5         You may also consider the stipulations of the parties

6    as evidence.

7         Since you are the sole and exclusive judges of the

8    facts, I do not mean to indicate any opinion as to the facts or

9    what your verdict should be.  The rulings I have made during

10   the trial are not any indication of my views of what your

11   decision should be as to whether or not the guilt of the

12   defendant has been proven beyond a reasonable doubt.

13        You are the exclusive judges of the facts, and you are

14   to perform the duty of finding the facts without bias or

15   prejudice as to any party.

16        As I said, in determining the facts, you must rely

17   upon your own recollection of the evidence.  What the lawyers

18   have said in their opening statements, in their closing

19   arguments, in their objections, or in their questions is not

20   evidence.

21        If your recollection of the facts differs from the

22   statements made in opening or closing, you should rely on your

23   recollection.  If a statement was made during an opening or

24   summation and you find that there is no evidence to support the

25   statement, you should disregard the statement.

1         A question put to a witness is not evidence.  It is

2    only the answer that is evidence.  Nor is anything I may have

3    said during the trial or may say during these instructions with

4    respect to a fact to be taken in substitution for your own

5    independent recollection.  What I say is not evidence.

6         Relatedly, do not conclude from any of my questions or

7    any of my rulings on objections or anything else I have done

8    during this trial that I have any view as to the credibility of

9    the witnesses or how you should decide the case.

10        In addition, remember that it is the duty of a party

11    to object when the other side offers testimony or other

12    evidence that the party believes is not properly admissible.

13    Therefore, you should draw no inference from the fact that

14    there was an objection to any evidence.  An objection is not

15    evidence, nor should you draw any inference from the fact that

16    I sustained or overruled an objection.  Simply because I have

17    permitted certain evidence to be introduced does not mean that

18    I have decided on its importance or significance.  That is for

19    you to decide.

20        The personalities and the conduct of counsel are not

21    in any way at issue.  If, from their conduct at this trial, you

22    formed opinions of any kind about any of the lawyers in this

23    case, favorable or unfavorable, whether you approved or

24    disapproved of their behavior, those opinions should not enter

25    into your deliberations.  The only issue is whether the

O4HMEIS5                          Charge

1    government has proven each of the elements of the charged

2    offenses beyond a reasonable doubt.

3          The fact that the prosecution is brought in the name

4    of the United States of America entitles the government to no

5    greater consideration than that accorded to any other party to

6    a litigation.  By the same token, it is entitled to no less

7    consideration.  All parties, whether government or individuals,

8    stand as equals at the bar of justice.

9          Now I will instruct you on the presumption of

10   innocence and the government's burden of proof in this case.

11   The defendant has pleaded not guilty.  By doing so, he denies

12   the charges in the indictment.  Thus, the government has the

13   burden of proving the charges against the defendant beyond a

14   reasonable doubt.  The defendant is presumed innocent.  A

15   defendant does not have to prove his innocence.  This

16   presumption of innocence was in the defendant's favor at the

17   start of the trial, continued in his favor throughout the

18   entire trial, is in his favor even as I instruct you now, and

19   continues in his favor during the course of your deliberations

20   in the jury room.

21         The government has the burden of proof in this case.

22   The presumption of innocence is removed as to the defendant if,

23   and only if, you, as members of the jury, are satisfied that

24   the government has sustained its burden of proving the guilt of

25   the defendant beyond a reasonable doubt.

O4HMEIS5                          Charge

1          The question that naturally arises is, what is a

2     reasonable doubt?  A reasonable doubt is a doubt based on your

3     reason, your judgment, your experience, and your common sense.

4     It is a doubt that a reasonable person has after carefully

5     weighing all the evidence.  It is a doubt founded in reason and

6     arising out of the evidence in the case or lack of evidence.

7          Proof beyond a reasonable doubt does not mean proof

8     beyond all possible doubt.  It is practically impossible for a

9     person to be absolutely and completely convinced of any

10    disputed fact that, by its very nature, cannot be proven with

11    mathematical certainty.  The government's burden is to

12    establish guilt beyond a reasonable doubt, not all possible

13    doubt.

14         If, after a fair and impartial consideration of all

15    the evidence, you can candidly and honestly say that you do

16    have an abiding belief of the defendant's guilt, such a belief

17    as a prudent person would not hesitate to act upon in important

18    matters in the personal affairs of his or her own life, then

19    you have no reasonable doubt, and under such circumstances it

20    is your duty to convict.  On the other hand, if, after a fair

21    and impartial consideration of all the evidence, you can

22    candidly and honestly say that you are not satisfied with the

23    guilt of the defendant, that you do not have an abiding belief

24    of the defendant's guilt, in other words, if you have such a

25    doubt as would reasonably cause a prudent person to hesitate in

O4HMEIS5                        Charge

1   acting in matters of importance in his or her own affairs, then
2   you have a reasonable doubt, and in that circumstance it is
3   your duty to acquit.

4           The government is not required to prove the essential
5   elements of the offenses by any particular number of witnesses.
6   The testimony of a single witness may be sufficient to convince
7   you beyond a reasonable doubt of the existence of the essential
8   elements of the offense you are considering if you believe that
9   the witness has truthfully and accurately related what they
10  have told you.

11          Now, there are two types of evidence that you may
12  properly use in deciding whether the defendant is guilty or not
13  guilty of the crimes with which he is charged.

14          One type of evidence is called direct evidence.
15  Direct evidence of a fact in issue is presented when a witness
16  testifies to that fact based on what he or she personally saw,
17  heard, or otherwise observed through the five senses.  The
18  second type of evidence is circumstantial evidence.
19  Circumstantial evidence is evidence that tends to prove a
20  disputed fact indirectly by proof of other facts.

21          There is a simple example of circumstantial evidence
22  that is often used in this courthouse.  I think I have used
23  this with you in this courthouse.  Assume that when you came
24  into the courthouse this morning, the sun was shining and it
25  was a nice day outside.  Also assume that the courtroom shades

O4HMEIS5                    Charge

1    were drawn, and you could not look outside.  Assume further

2    that as you were sitting here, someone walked in with an

3    umbrella that was dripping wet and then, a few moments later,

4    somebody else walked in with a raincoat that was also dripping

5    wet.

6              Now, because you could look outside the courtroom and

7    you could not see whether it was raining, you would have no

8    direct evidence of that fact.  But, on the combination of facts

9    that I have asked you to assume, it would be reasonable and

10   logical for you to conclude that it was raining.

11             That is all there is to circumstantial evidence.  You

12   infer on the basis of your reason, experience, and common sense

13   from one established fact the existence or the nonexistence of

14   some other fact.

15             The matter of drawing inferences from facts in

16   evidence is not a matter of guesswork or speculation.  An

17   inference is a logical, factual conclusion that you might

18   reasonably draw from other facts that have been proven.

19             Many material facts, such as a person's state of mind,

20   are not easily proven by direct evidence.  Usually, such facts

21   are established by circumstantial evidence and the reasonable

22   inferences you draw.  Circumstantial evidence may be given as

23   much weight as direct evidence.  The law makes no distinction

24   between direct and circumstantial evidence.  The law simply

25   requires that before convicting a defendant, you must be

O4HMEIS5                    Charge

1    satisfied of the defendant's guilt beyond a reasonable doubt,

2    based on all of the evidence in the case.

3            During the trial you may have heard the parties use

4    the term inference and in their arguments they have asked you

5    to infer, on the basis of your reason, experience, and common

6    sense, from one or more established facts, the existence of

7    some other fact.

8            An inference is not a suspicion or a guess.  It a

9    reasoned, logical decision to conclude that a disputed fact

10   exists on the basis of another fact that you know exists.

11           There are times when different inferences may be drawn

12   from facts, whether proven by direct or circumstantial

13   evidence.  The government asks you to draw one set of

14   inferences, while the defense asks you to draw another.  It is

15   for you, and you alone, to decide what inferences you will

16   draw.

17           The process of drawing inferences from facts in

18   evidence is not a matter of guesswork or speculation.  An

19   inference is a deduction or conclusion that you, the jury, are

20   permitted, but not required, to draw from the facts that have

21   been established by either direct or circumstantial evidence.

22   In drawing inferences, you should exercise your common sense.

23           So while you are considering the evidence presented to

24   you, you are permitted to draw, from the facts that you find to

25   be proven, such reasonable inferences as would be justified in

1    light of your experience.

2           In this case you have heard evidence in the form of

3    stipulations of fact and testimony.  A stipulation of fact is

4    an agreement between the parties that a certain fact or set of

5    facts are true, and you must regard such agreed facts as true.

6    It is for you to determine the effect or weight to give to

7    those agreed-upon facts.  A stipulation of testimony is an

8    agreement among the parties that, if called, a witness would

9    have given certain testimony.  You must accept as true the fact

10   that the witness would have given the testimony.  However, it

11   is for you to determine the effect or weight to give that

12   testimony.

13          If certain testimony or evidence was received for a

14   limited purpose, you must follow the limiting instructions I

15   have given and use the evidence only for the purpose I

16   indicated.

17          You, as jurors, must decide this case based solely on

18   the evidence presented here within the four walls of this

19   courtroom.  As I told you at the beginning of this case, you

20   must not conduct any independent research about the case, the

21   matters in the case, and the parties involved in the case.  In

22   other words, you should not consult dictionaries or reference

23   materials, search the Internet, websites, blogs, social media

24   outlets, or use any other electronic tools to obtain

25   information about the case or to help you decide the case.  You

 1  must not visit any location mentioned in the case for the

 2  purpose of investigating it.  Please do not try to find out

 3  information from any source outside the confines of this

 4  courtroom.

 5      You must not talk to anyone about this case or use

 6  these tools to communicate electronically with anyone about the

 7  case.  This includes your family and friends.  You may not

 8  communicate with anyone about the case on your cell phone,

 9  through email, instant messaging, text messaging, through any

10  blog or website, through any Internet chat room, or by way of

11  any other social networking platforms, including Facebook,

12  Twitter, or X, TikTok, Instagram, threads, LinkedIn, Snapchat,

13  and YouTube.

14      If you become aware that any other juror is violating

15  this instruction, you should immediately bring it to my

16  attention through my courtroom deputy, Mr. Hernandez, but

17  please do not make it known to any other jurors.

18      Your verdict must be based solely upon the evidence

19  developed at trial or the lack of evidence.

20      It would be improper for you to consider, in reaching

21  your decision as to whether the government sustained its burden

22  of proof, any personal feelings you may have about the

23  defendant's race, religion, national origin, sex, or age.  As I

24  have explained to you, all persons are entitled to the

25  presumption of innocence, and the government has the burden of

1    proof.

2            It would be equally improper for you to allow any

3    feelings you might have about the nature of the crimes

4    committed or charged to interfere with your decision-making

5    process.

6            To repeat, your verdict must based exclusively upon

7    the evidence or the lack of evidence in this case.

8            I also caution you that, under your oath as jurors,

9    you cannot allow to enter into your deliberations any

10   consideration of the punishment that may be imposed upon the

11   defendant if he is convicted.  The duty of imposing a sentence

12   in the event of conviction rests exclusively with the Court,

13   and the issue of punishment may not affect your deliberations

14   as to whether the government has proven the defendant's guilt

15   beyond a reasonable doubt.

16           Under your oath as jurors, you are not to be swayed by

17   sympathy.  You are to be guided solely by the evidence in this

18   case, and the crucial question that you must ask yourselves as

19   you sift through the evidence is, has the government proven the

20   guilt of the defendant beyond a reasonable doubt?  It is for

21   you alone to decide whether the government has proven that the

22   defendant is guilty of the crimes charged solely on the basis

23   of the evidence and subject to the law as I charge you.  It

24   must be clear to you that once you let fear or prejudice or

25   bias or sympathy interfere with your thinking, there is a risk

O4HMEIS5                         Charge

1    that you will not arrive at a true and just verdict.

2                If you have a reasonable doubt as to the defendant's

3    guilt, you should not hesitate for any reason to return a

4    verdict of not guilty.  But on the other hand, if you should

5    find that the government has met its burden of proving the

6    defendant's guilt beyond a reasonable doubt, you should not

7    hesitate because of sympathy or any other reason to return a

8    verdict of guilty.

9                The defendant, Avraham Eisenberg, has been formally

10   charged in an indictment.  An indictment is not evidence.  As I

11   instructed you at the outset of the case, the indictment is a

12   charge or accusation.  It merely describes the charges made

13   against a defendant.  An indictment is a formal method of

14   bringing a case into court for trial and determination by a

15   jury.  It creates no presumption that a crime was committed,

16   and no inference of any kind may be drawn from an indictment.

17   You may not consider an indictment as any evidence of the

18   defendant's guilt.  The fact that the defendant is the subject

19   of this indictment and is on trial here may not be used against

20   him in any way whatsoever.

21               I will first summarize the offenses charged in the

22   indictment and then explain in detail the elements of each of

23   the offenses.

24               The indictment contains three counts.  Each count

25   charges a separate offense or crime.  You must, therefore,

O4HMEIS5                    Charge

1    consider each count separately, and you must return a separate

2    verdict on each count.

3            Count One charges the defendant with committing

4    commodities fraud by engaging in a scheme to fraudulently

5    obtain approximately $110 million worth of cryptocurrency from

6    a cryptocurrency exchange called Mango Markets and its

7    investors.

8            Count Two charges the defendant with committing

9    commodities manipulation and attempted commodities manipulation

10   by engaging in a scheme involving the intentional and

11   artificial manipulation of the price of MNGO perpetuals on

12   Mango Markets.

13           And Count Three charges the defendant with committing

14   wire fraud by engaging in a scheme to fraudulently obtain

15   cryptocurrency from Mango Markets and its users.

16           Mr. Eisenberg denies the government's charges, Counts

17   One through Three.  With respect to Counts One and Three, the

18   commodities fraud and wire fraud, Mr. Eisenberg did not intend

19   to violate the law or defraud anyone and denies that he did so.

20   With respect to Count Two, commodities manipulation,

21   Mr. Eisenberg denies that he either intended to or did create

22   an artificial market price for the MNGO perpetual on Mango

23   Markets.

24           The indictment alleges that certain conduct occurred

25   on or about various dates.  It is not necessary, however, for

O4HMEIS5                         Charge

the government to prove that any conduct alleged occurred

exactly when the indictment alleges.  As long as the conduct

occurred around any dates the indictment alleges it occurred,

that is sufficient.

Now, you must return a separate verdict of guilty or

not guilty for each count charged.  Whether you find the

defendant guilty or not guilty as to one offense should not

affect your verdict as to any other offense.  You must analyze

and evaluate the evidence separately as to each count.

Count One, commodities fraud.

Count One charges the defendant with committing

commodities fraud.  The indictment alleges that:  In or about

October of 2022, the defendant carried out a scheme to

fraudulently obtain approximately $110 million worth of

cryptocurrency from a cryptocurrency exchange called Mango

Markets and its users.

To meet its burden of proof with respect to Count One,

the government must prove each of the following three elements

beyond a reasonable doubt:

First, that the defendant did any one or more of the

following:  (a) employed a manipulative device, scheme, or

artifice to defraud; (b) made an untrue statement of a material

fact or omitted to state a material fact which made what was

said, under the circumstances, misleading; or (c) engaged in an

act, practice, or course of business that operated, or would

O4HMEIS5                        Charge

operate, as a fraud or deceit upon any person or entity.

Second, the defendant's fraudulent scheme was in connection with a swap:

Third, that the defendant acted knowingly, willfully, and with an intent to defraud.

Count One, commodities fraud:  First element.

The first element of commodities fraud is that the defendant did any one or more of the following:  (1) employed a manipulative device, scheme, or artifice to defraud; (2) made an untrue statement of a material fact or omitted to state a material fact which made what was said, under the circumstances, misleading; or (3) engaged in an act, practice, or course of business that operated, or would operate, as a fraud or deceit upon any person or entity.

It is not necessary for the government to prove all three types of these fraudulent acts.  Any one is sufficient to satisfy this element of the offense.  However, you must be unanimous as to which type of fraudulent act the defendant committed, and the government must prove that the defendant committed that type of fraudulent act beyond a reasonable doubt.

I will now explain a number of terms used in this first element.

Count One, commodities fraud:  First element. Manipulative device, scheme or artifice to defraud.

1          As I just instructed you, the first type of fraudulent

2     act is employing a manipulative device, scheme, or artifice to

3     defraud.

4          A device, scheme or artifice is a plan for the

5     accomplishment of any objective.  A device, scheme, or artifice

6     to defraud is any plan or course of action calculated to wrong

7     another by dishonest methods, including the deprivation of

8     something of value by trick, deceit, chicanery, or

9     overreaching.

10          As for what is manipulative, manipulation is a term of

11     art when used in connection with the financial markets.

12     Manipulation refers to intentional or willful conduct designed

13     to deceive or defraud by controlling or artificially affecting

14     some type of price.  An act is manipulative if it is designed

15     to deceive or defraud others by sending a false pricing signal

16     to the market.  Quantitatively, a transaction is not

17     manipulative when the market is fully aware of the terms and

18     purposes behind a transaction, as that transaction will not

19     mislead or deceive the market.  Keep in mind that the mere fact

20     that a transaction affected prices does not render it

21     manipulative.

22          An act can be manipulative even if it is conducted on

23     the open market or through ordinary market activity, such as by

24     placing an order to buy or sell, or by actually buying and

25     selling.  In some cases, a defendant's intent to manipulate a

price is all that distinguishes legitimate trading from
manipulative trading.  Similarly, in some cases, the
determination of whether an activity is manipulative can only
be made by placing the activity in context and considering
whether it is part of a pattern of trading activity.  What
matters is whether the defendant has an intent to inject a
false price signal into the market or to mislead others by
artificially affecting the price.

        If there are two purposes for a transaction, one of
which is not to deceive or defraud others, it is not
manipulative, even if the defendant also had an intent to
deceive or defraud.  On the other hand, if the transaction
would not have been done at the same time and in the same
manner, except for the intent to deceive or defraud, then the
transaction is manipulative.  Thus, if the government proves
beyond a reasonable doubt that but for an intent to deceive or
defraud, the defendant would not have engaged in the
transactions at issue in this case, at the times and in the
amounts he did, then those transactions were manipulative.

        Count One commodities fraud:  First element.  Untrue
statements.

        Recall that, for the first element of Count One, there
are three ways the government can prove the element.  I have
just described the first way, a manipulative device, artifice,
or scheme to defraud.  The second way that the government can

O4HMEIS5                       Charge

1    establish the first element is by proving that the defendant

2    made an untrue statement of material fact, or omitted to state

3    a material fact which made what was said misleading.

4           A statement is false if it is untrue when made and was

5    then known to be untrue by the person making it.  A statement

6    is fraudulent if it was made with the intention to wrong

7    another by dishonest methods, including the deprivation of

8    something of value by trick, deceit, chicanery, or

9    overreaching.  A statement may also be false if it contains

10   half truths or if it conceals material facts in a manner that

11   makes what is said or represented deliberately misleading.

12   This includes statements that may be literally true but that

13   nevertheless create a materially misleading impression.

14          Count One, commodities fraud.  First element.  Act,

15   practice, or course of business that operated, or would

16   operate, as a fraud or deceit.

17          I have now described the first two ways that the

18   government can establish the first element of commodities

19   fraud.  The third way that the government can establish the

20   first element is by proving that the defendant engaged in an

21   act, practice, or course of business that operated or would

22   operate as a fraud or deceit.

23          (Continued on next page)

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O4HCeis6                    Charge

1              THE COURT:  An act, practice, or course of business

2      that operated or would operate as a fraud or deceit means,

3      consistent with the prior instructions I have provided to you,

4      all efforts to wrong another by dishonest methods, including

5      the deprivation of something of value by trick, deceit,

6      chicanery or overreaching.  The fraud or deceit need not

7      involve a specific oral or written statement.

8              Count One — Commodities Fraud:  First element —

9      materiality.

10             I have now described the three types of fraudulent

11     acts the government can prove to establish the crime of

12     commodities fraud that the defendant:  One, employed a

13     manipulative device, scheme, or artifice to defraud; two, made

14     an untrue statement of a material fact, or omitted to state a

15     material fact, which made what was said under the circumstances

16     misleading; or three, engaged in an act, practice, or course of

17     business that operated, or would operate, as a fraud or deceit

18     upon any person or entity.

19             For each of these fraudulent acts, the government must

20     additionally prove beyond a reasonable doubt that the

21     defendant's acts related to a material fact or matter.  We use

22     the word "material" to distinguish between those facts or

23     matters that we care about and those that are of no real

24     importance.  A material fact is one that a reasonable person

25     would consider important in making a decision and that is

1    capable of influencing that decision.  That means that if you

2    find a particular act of the defendant to have been fraudulent,

3    before you can find that act to be material, you must also find

4    beyond a reasonable doubt that the fraudulent act was one that

5    would have been important to a reasonable person in making a

6    decision.

7            Any testimony that you may have heard from any witness

8    with respect to whether a particular fact would or would not

9    have been important reflects that witness's individual views.

10   Although you may consider such testimony, it is not

11   controlling.  It is for you to determine whether a particular

12   fact would have been important to a reasonable person.

13           When we say "reasonable person," we are referring to a

14   person of ordinary intelligence.  Here, we are referring to a

15   person of ordinary intelligence in the position of Mango

16   Markets or its users.  Because a question focuses on a person

17   of ordinary intelligence, it does not matter whether the

18   intended victims were careless, gullible, or even negligent, or

19   that they might have uncovered the defendant's act on their own

20   had they probed more deeply, because the law protects the

21   gullible and unsophisticated as well as the experienced market

22   participant.

23           I have now instructed you on the three types of

24   fraudulent acts that the government bears the burden to prove

25   to establish the first element of Count One.

1          Now that I have gone through them, I remind you that

2     any one will be sufficient to satisfy this element of the

3     offense.  You must, however, be unanimous as to which type of

4     fraudulent act or acts the defendant committed beyond a

5     reasonable doubt.

6          With respect to all three types of fraudulent acts, it

7     is not necessary for the government to prove that the defendant

8     succeeded in defrauding another person, or that any person lost

9     money or property.  Nor do you need to find that the defendant

10    profited from the scheme.  You must focus on whether the

11    defendant engaged in the act as I have described, not the

12    consequences of that act.

13          Count One — Commodities Fraud.  Second element — Swap.

14          The second element of commodities fraud is that the

15    defendant committed his fraudulent act in connection with a

16    swap.  Here the government contends that the MNGO perpetuals

17    involved in the alleged scheme were swaps.

18          A "swap" includes any agreement, contract, or

19    transaction that provides for an exchange of payments based on

20    the value of one or more rates, currencies, commodities,

21    securities, indices, quantitative measures, or economic

22    interests, or property of any kind, and that transfers, in

23    whole or in part, the risk of changes in value of the things

24    underlying the swap without actually exchanging an asset that

25    incorporates the financial risks so transferred.

O4HCeis6                    Charge

1          Count One — Commodities Fraud:  Second Element — Swaps
2   Covered by the Commodities Laws.
3          If you find that the government has proven beyond a
4   reasonable doubt that MNGO perpetuals are swaps, as I defined
5   that term a moment ago, you must then determine whether they
6   are swaps that are covered by the commodities laws.
7          To find that MNGO perpetuals are swaps covered by the
8   commodities laws, you must find beyond a reasonable doubt at
9   least one of the following:
10          First, that MNGO perpetuals are based in part on the
11   value of USDC, and that USDC is a currency or a financial or
12   economic interest, or property of any kind; or
13          Second, that MNGO perpetuals are based in part on any
14   rate, index, or quantitative measure, other than the price of
15   MNGO or of a narrow-based security index.
16          A narrow-based security index is an index or a group
17   of nine or fewer securities, including any interest therein, or
18   based on the value therefrom.  A security is an investment of
19   money in a common enterprise with the expectation of profits to
20   be derived from the efforts of others.  For these purposes, you
21   may assume that MNGO is a security.  An interest is a right,
22   title, or legal share in something.
23          If you find one of these two things beyond a
24   reasonable doubt, then MNGO perpetuals are swaps covered by the
25   commodities laws.  If you find that the government has not

1    proved either of these two things beyond a reasonable doubt,

2    then you should acquit Mr. Eisenberg as to Count One.

3        Count One — Commodities Fraud:  Second Element — In

4    Connection With.

5        Next, you must find beyond a reasonable doubt that the

6    defendant's fraudulent act was in connection with a swap

7    covered by the commodities laws.  A fraudulent act is in

8    connection with that swap if it has some meaningful

9    relationship to that swap, or if the fraudulent act's

10   accomplishment necessarily involves that swap.  However, the

11   "in connection with" requirement is not so broad as to convert

12   every instance of fraud that is incidentally related to a swap

13   into a violation of the commodities laws.

14       Let me provide you with some additional guidance in

15   applying this element here.  Here, the government has alleged

16   that MNGO perpetuals are swaps covered by the commodities laws.

17   In assessing this element, you should consider whether the

18   defendant's allegedly fraudulent act necessarily involved MNGO

19   perpetuals and not simply the MNGO spot market.  In determining

20   whether the defendant's fraudulent act was in connection with

21   MNGO perpetuals, you should consider whether the defendant's

22   act necessarily involved MNGO perpetuals.

23       Count One — commodities Fraud:  Third Element.

24       The third element of commodities fraud is the

25   defendant participated in the fraudulent act knowingly,

1    willfully, and with the intent to defraud.

2            To act knowingly means to act voluntarily and

3    deliberately rather than mistakenly or inadvertently.

4            To act willfully means to act voluntarily and with a

5    wrongful purpose.  That is, with a purpose to disobey or

6    disregard the law.  It is not necessary the defendant knew he

7    was violating a particular law.  It is enough if he was aware

8    that what he was doing was, in general, unlawful.

9            To act with intent to defraud means to act knowingly

10    and with an intent to deceive.  Here, it is not sufficient that

11    the defendant knew his transactions would affect the price of

12    MNGO perpetuals.  Instead, he must have made those transactions

13    for the purpose of defrauding other market participants.

14            A defendant does not act willfully or with intent to

15    defraud if he honestly believes that his actions were proper.

16    Consequently, a defendant's good faith is a complete defense to

17    the charge.  The defendant has no burden to establish good

18    faith.  The burden is on the government to prove fraudulent

19    intent, and thus a lack of good faith beyond a reasonable

20    doubt.

21            However, an honest belief on the part of the defendant

22    that ultimately everything would work out would not necessarily

23    mean the defendant acted in good faith.  If the defendant

24    knowingly and willfully participated in the scheme with intent

25    to deceive, an honest belief that others ultimately would not

O4HCeis6                    Charge

1   be harmed will not excuse his conduct.

2           Direct proof of knowledge and fraudulent intent is

3   almost never available.  It would be a rare case where it could

4   be shown that a person wrote or stated that he committed an act

5   with fraudulent intent.  Such direct proof is not required.

6   Instead, the ultimate facts of knowledge and intent, though

7   subjective, may be established by circumstantial evidence,

8   based upon a person's word, his conduct, his acts, and all the

9   surrounding circumstances disclosed by the evidence, and the

10  rational or logical inferences that may be drawn from them.

11  You may also infer, but are not required to infer, that people

12  intend the natural and probably consequences of their actions.

13  As I instructed you earlier, circumstantial evidence, if

14  believed, is of no less value than direct evidence.

15          Count Two — commodities manipulation.

16          I will now turn to Count Two, which charges defendant

17  with committing commodities manipulation and attempted

18  commodities manipulation.  Here, the government argues that the

19  defendant engaged in manipulation, and attempted manipulation

20  of swaps by artificially inflating the price of MNGO perpetuals

21  on Mango Markets.

22          Let me begin with commodities manipulation and then

23  later turn to attempted commodities manipulation.  With respect

24  to commodities manipulation, to sustain its burden of proof

25  with respect to the offense charged in Count Two, the

1    government must prove beyond a reasonable doubt the following

2    four elements:

3              First, the defendant possessed an ability to influence

4    the price of a swap, which here refers to the prices of MNGO

5    perpetuals on Mango Markets;

6              Second, an artificial price of a swap existed;

7              Third, the defendant caused the artificial price; and

8              Fourth, the defendant specifically intended to

9    manipulate.

10             I will discuss each in turn.

11             Count Two — Commodities Manipulation:  First Element —

12   Ability to influence Prices.

13             The first element of commodities manipulation is that

14   the defendant had the ability to influence the price of a swap.

15   Here, this means that the government must prove beyond a

16   reasonable doubt that the defendant had the ability to

17   influence the prices of MNGO perpetuals on Mango Markets.  I

18   have previously instructed you on the definition of "swap," and

19   you should initially determine, as you did in relation to Count

20   One, whether the government has proven beyond a reasonable

21   doubt that the MNGO perpetuals are swaps covered by the

22   commodities laws.

23             If you find beyond a reasonable doubt that they are

24   swaps covered by the commodities laws, then you must find that

25   defendant, through his conduct, had the ability to

1    intentionally alter, change, or influence the price of MNGO

2    perpetuals on Mango Markets.  There are many ways that a person

3    can have the ability to influence prices.  Factors that you may

4    consider include, but are not limited to, the size of the

5    defendant's positions, the liquidity in the relevant markets,

6    the magnitude and timing of the defendant's trading, including

7    whether the defendant engaged in trading in a concentrated

8    manner and whether the defendant's trading in fact influenced

9    prices.

10           Count Two — Commodities Manipulation:  Second element

11   — Artificial Price.

12           With respect to the second element, you must determine

13   whether the government has proven that the price of MNGO

14   perpetuals was artificial.

15           While there is no universally accepted measure or test

16   of price artificiality, generally, a price is artificial if it

17   was caused by some mechanism other than the basic forces of

18   supply and demand, meaning that a price that sends a false

19   signal to the market.  A price is not artificial merely because

20   it has been affected by a market participant's trading — even a

21   large market participant — because price movements are expected

22   to be affected by orders and trades in the marketplace.  The

23   question is whether the government has proven beyond a

24   reasonable doubt that the price of MNGO perpetuals was caused

25   by illegitimate forces, such as making false or misleading

1    statements to the market, or by actions taken, including

2    trading, that otherwise distorted estimates of the underlying

3    economic value of the MNGO perpetuals.

4         Count Two — Commodities Manipulation:  Third element —

5    Causation.

6         The third element of commodities manipulation that the

7    government must prove beyond a reasonable doubt is that the

8    defendant caused the artificial prices of MNGO perpetuals.  To

9    find that the defendant caused the artificial prices, you must

10   find that those prices would not have existed on the date at

11   issue, but for the defendant's conduct.  To make this finding,

12   you do not need to find that the defendant's conduct was the

13   only factor that brought about the artificial prices.  It can

14   be sufficient if the defendant's conduct caused the artificial

15   prices in combination with other factors, so long as you find

16   that the artificial prices would not have existed on the date

17   they did absent the defendant's conduct.

18        Count Two — Commodities Manipulation:  Fourth element

19   — Intent.

20        For the fourth element, the government must prove

21   beyond a reasonable doubt that Mr. Eisenberg special intended

22   to cause the MNGO perpetuals to have an artificial price.  It

23   is not enough that the government show that Mr. Eisenberg

24   entered into a transaction to move the MNGO spot price knowing

25   it would have the effect of changing the price of the MNGO

1      perpetuals.  Rather, the government must prove that

2      Mr. Eisenberg's purpose or conscious object was to create an

3      artificial price for the MNGO perpetuals.

4              Count Two — Commodities Manipulation:  Attempted

5      Commodities Manipulation — Elements.

6              The instructions I just gave you were for commodities

7      manipulation.  As I previously instructed you, the defendant is

8      also charged in Count Two with attempted commodities

9      manipulation.  Accordingly, you may separately find the

10     defendant guilty of the offense charged in Count Two if you

11     find that the government has proven beyond a reasonable doubt

12     that the defendant committed attempted commodities

13     manipulation, even if no artificial price was in fact created.

14             With respect to attempted commodities manipulation, to

15     sustain its burden of proof with respect to the offense charged

16     in Count Two, the government must prove beyond a reasonable

17     doubt the following two elements:

18             First, the defendant specifically intended to

19     manipulate the price of a swap, which here refers to

20     manipulating the price of MNGO op Mango Markets; and

21             Second, the defendant took a substantial step towards

22     committing that crime.

23             I will discuss each in turn.

24             Count Two — Commodities Manipulation:  Attempted

25     Commodities Manipulation — First Element

O4HCeis6                    Charge

1          The first element of attempted commodities

2    manipulation that the government must prove beyond a reasonable

3    doubt is that the defendant acted with the specific intent to

4    manipulate the price of a swap.  I have previously instructed

5    you on the meaning of intent to manipulate and of a swap

6    covered by the commodities laws in connection with my

7    instructions on commodities manipulation.  You should follow

8    those same instructions when considering the first element of

9    attempted commodities manipulation.

10          Count Two — Commodities Manipulation:  Attempted

11    Commodities Manipulation — Second Element.

12          The second element of attempted commodities

13    manipulation is that the defendant took an overt act in

14    furtherance of carrying out the crime.  Mere intention to

15    commit a crime does not amount to an attempt.  To convict the

16    defendant of an attempt, you must find beyond a reasonable

17    doubt that he also took some overt action that was a

18    substantial step toward the commission of that crime.

19          In determining whether the defendant's actions

20    amounted to a substantial step toward the commission of the

21    crime, it is necessary to distinguish between mere preparation

22    on the one hand and the actual doing of the criminal deed on

23    the other.  Mere preparation, which may consist of planning the

24    offense or devising, obtaining, or arranging a means for its

25    commission is not an attempt, although some preparations may

O4HCeis6                         Charge

 1   amount to an attempt.  The acts of a person who intends to

 2   commit a crime will constitute an attempt when the acts

 3   themselves clearly indicate an intent to commit the crime, and

 4   the acts are a substantial step in the course of conduct

 5   planned to culminate in the commission of the crime.

 6               Count Three.

 7               Count Three — Wire Fraud Elements.

 8               I will now turn to Count Three, which charges the

 9   defendant with committing wire fraud.  As I said earlier, Count

10   Three charges that the defendant devised and participated in a

11   scheme to fraudulently obtain cryptocurrency from Mango

12   Markets.  To sustain its burden of proof with respect to the

13   offense charged in Count Three, the government must prove

14   beyond a reasonable doubt the following three elements:

15               First, that there was a scheme or artifice to defraud,

16   or to obtain money or property, by materially false and

17   fraudulent pretenses, representations, or promises;

18               Second, that the defendant knowingly participated in

19   the scheme or artifice to defraud with knowledge of its

20   fraudulent nature and with specific intent to defraud;

21               Third, that in execution of that scheme, the defendant

22   used or caused the use of interstate wires.

23               I will discuss each in turn.

24               Count Three — Wire Fraud:  First Element — Scheme or

25   Artifice to Defraud.

1          As to the first elements of wire fraud, a scheme or

2     artifice to defraud is any plan, device, or course of action to

3     deprive another of money or property by means of false or

4     fraudulent pretenses, representations, or promises.  It is, in

5     other words, a plan to deprive another person of money or

6     property by trick, deceit, deception, swindle, or overreaching.

7          A pretense representation or promise is false if it is

8     untrue when made and was then known to be untrue by the person

9     making it.  A pretense, representation, or promise is

10    fraudulent if it was falsely made with the intent to deceive.

11    Deceitful statements of half truths, and the concealment of

12    material facts may also constitute false or fraudulent

13    statements under the statute.

14          As I have previously explained, we use the word

15    "material" to distinguish between the kinds of statements we

16    care about and those that are of no real importance.  A

17    material fact is one that a reasonable person would consider

18    important in making a decision and that is capable of

19    influencing that decision.  That means that if you find a

20    particular statement of fact or omission to have been

21    untruthful or misleading, before you could find that statement

22    or omission to be material, you must also find beyond a

23    reasonable doubt that the statement or omission was one that

24    would have been important to a reasonable person in making a

25    decision.

1          Any testimony that you may have heard from any witness

2    with respect to whether a particular fact would or would not

3    have been important reflects that witness's individual views.

4    Although you may consider such testimony, it is not

5    controlling.  It is for you to determine whether a particular

6    fact would have been important to a reasonable person.

7          When we say "reasonable person," we are referring to a

8    person of ordinary intelligence in the position of Mango

9    Markets or its users.  However, because the question focuses on

10   a person of ordinary intelligence, it does not matter whether

11   the intended victims were careless, gullible, or even

12   negligent, or that they might have uncovered the scheme on

13   their own had they probed more deeply because the law protects

14   the gullible and unsophisticated, as well as the experienced

15   market participant.

16         The government is not required to prove that the

17   scheme or artifice actually succeeded.  That is that an

18   intended victim actually relied upon any false statement or

19   suffered any loss or that the defendant realized any gain.

20         In addition to proving that a pretense,

21   representation, or promise was false or fraudulent and related

22   to a material fact, in order to establish a scheme to defraud,

23   the government must prove that the alleged scheme or artifice

24   contemplated wrongly depriving another of money or property,

25   even if only temporarily.  It is not necessary, however, that

1    the person or entity whose money or property was targeted be

2    the same person or entity that the defendant sought to deceive

3    through the scheme or artifice.  Furthermore, as I have noted,

4    it is not necessary that the government prove that the

5    defendant actually realized any gain from the scheme or

6    artifice, or that the intended victim actually suffered any

7    loss.

8              A scheme or artifice to defraud need not be shown by

9    direct evidence, but may be established by all the

10   circumstances and facts in this case.  If you find beyond a

11   reasonable doubt that a scheme or artifice to defraud did

12   exist, you next should consider the second element of wire

13   fraud.

14             Count Three — Wire Fraud:  Second Element — Intent.

15             The second element that the government must prove

16   beyond a reasonable doubt is that the defendant participated in

17   the scheme or artifice to defraud knowingly and with a specific

18   intent to defraud.

19             As I have instructed you previously, to act knowingly

20   means to act voluntarily and deliberately rather than

21   mistakenly or inadvertently.

22             In the context of wire fraud, intent to defraud means

23   to act knowingly and with specific intent to deceive for the

24   purpose of causing some financial or property loss to another.

25   Thus, the defendant acted with an intent to defraud in the

1    context of wire fraud if he engaged or participated in the

2    fraudulent scheme with awareness of its fraudulent or deceptive

3    character, with an intention to be involved in the scheme to

4    defraud and help it succeed, and with the purpose of obtaining

5    money or property from a victim, or depriving a victim of money

6    or property, even temporarily.

7        The government, however, need not prove that any

8    intended victim was actually harmed, or that such harm, as I

9    have just described it, was intended by the defendant.  Actual

10   financial harm includes depriving someone of the real and

11   immediate control over the use of assets.  Thus, even if the

12   defendant believed money obtained by fraudulent means would one

13   day be repaid, and therefore believed that ultimately no harm

14   would come to the owner of the funds, his intention of

15   eventually to repay is no defense.

16       Because an essential element of wire fraud is intent

17   to defraud, it follows that good faith on the part of the

18   defendant is a complete defense to a charge of wire fraud.  I

19   have previously instructed you on the meaning on good faith in

20   instructing you on Count One, and you should use the same

21   definition with respect to Count Three.  As I have previously

22   instructed you, the defendant has no burden to establish a

23   defense of good faith.  The burden is on the government to

24   prove fraudulent intent and the consequent lack of good faith

25   beyond a reasonable doubt.  If the defendant participated in

O4HCeis6                    Charge

the scheme to defraud, then a belief by the defendant, if such
a belief existed, that ultimately everything would work out so
that no one would lose any money does not mean the defendant
acted in good faith.

As I mentioned before, direct proof of knowledge and
fraudulent intent is almost never available.  It would be a
rare case where it could be shown that a person wrote or stated
that as of a given time in the past, he committed an act with
fraudulent intent.  Such direct proof is not required.
Instead, the ultimate facts of knowledge and intent, those
subjective, may be established by circumstantial evidence based
upon a person's words, his conduct, his acts, and all the
surrounding circumstances disclosed by the evidence, and the
rational or logical inferences that may be drawn from them.

To conclude on this element, if you do not find beyond
a reasonable doubt that the defendant was a knowing participant
in the scheme or artifice to defraud, or that he had the
specific intent to defraud, you should find the defendant not
guilty.  On the other hand, if you find that the government has
established beyond a reasonable doubt not only the first
element — namely, the existence of the scheme or artifice to
defraud — but also the second element, intent, you next should
consider the third and final element of wire fraud.

Count Three — Wire Fraud:  Third element — Interstate
Wire.

O4HCeis6                          Charge

The third and final element the government must
establish beyond a reasonable doubt with respect to Count Three
is that an interstate wire, including, for example,
transactions or communications over the internet was used in
furtherance of the scheme or artifice to defraud within the
period of the scheme charged in Count Three.

A wire communication need not itself be fraudulent.
Indeed, it may be completely innocent as long as it was made in
furtherance of the scheme or artifice to defraud.  To be in
furtherance of the scheme or artifice, the wire communication
must be incident to an essential part of this scheme or
artifice to defraud and must have been caused, directly or
indirectly, by the defendant.  The wire communication
requirement can be satisfied.  However, even if the wire
communication was done by the person being defrauded or some
other innocent party.  When a person does an act with knowledge
that the use of the wires will follow in the ordinary course or
where such use can reasonably be foreseen by that person, even
though he does not actually intend such use, that nonetheless
causes the wires to be used.  Thus, there is no requirement
that the defendant specifically authorized otherwise to make a
communication by wire.

The government must prove beyond a reasonable doubt
that the wire communication was interstate or international.
To do so, the government may prove that a wire communication

O4HCeis6                     Charge

1  whose origin and destination were within one state was routed

2  through another state, or that the wire communication passed

3  between two or more states or between the United States and a

4  foreign country.  The government is not required to prove that

5  the defendant knew or could foresee the interstate or

6  international nature of the wire communication.

7         Now, for each of Count One, Count Two, and Count

8  Three, the government must also prove beyond a reasonable doubt

9  that the charged offense had a sufficient relationship to the

10  United States.  The government may satisfy its burden to show a

11  sufficient relationship to the United States in one of two

12  ways.  The government can prove that the conduct relevant to

13  the offenses occurred in the United States, which includes

14  Puerto Rico, or with respect to Counts One and Two only, the

15  government can prove that an activity related to the offense

16  had a direct and significant connection with activities in

17  commerce of the United States.

18         Venue.

19         In addition to all the elements I have just described,

20  you must also consider the issue of venue, namely, whether an

21  act in furtherance of each of the charged crimes occurred

22  within the Southern District of New York.  The Southern

23  District of New York includes Manhattan, the Bronx, Dutchess

24  County, including Poughkeepsie, and several other counties

25  north of the Bronx.

1          Venue refers to the fact that the government must
2     prove that a charge was properly brought in this court as
3     opposed to a different federal court.  You'll determine the
4     satisfaction of the venue requirement separately for each
5     count.
6          The government does not have to prove that a completed
7     crime was committed within the Southern District of New York,
8     or that the defendant was ever in the Southern District of New
9     York.  With respect to Count One, Count Two, and Count Three,
10    it is sufficient to satisfy the venue requirement if any act in
11    furtherance of the crime charged occurred in this district.
12    The act itself need not be a criminal act.  And the act need
13    not have been taken by the defendant so long as the act was
14    part of the crime that you find he committed.
15         I should note that on this issue and this issue alone,
16    the government need not prove venue beyond a reasonable doubt,
17    but only by a mere preponderance of the evidence.  A
18    preponderance of the evidence means that the government must
19    prove that it is more likely than not that any act in
20    furtherance of the crime occurred in the Southern District of
21    New York.  Thus, the government has satisfied its venue
22    obligations if you conclude that it is more likely than not
23    that any act in furtherance of the crime with which the
24    defendant is charged occurred within this district.
25         If you find that the government has failed to prove

1    this venue requirement with respect to a particular charge,

2    then you must acquit the defendant of that charge.

3          In order to establish venue for the wire fraud charge

4    in Count Three, the government must prove the defendant caused

5    any interstate wire, such as an email, phone call, or financial

6    transaction to be transmitted into or out of the district.  The

7    wire need not itself be criminal so long as it was transmitted

8    or caused to be transmitted as part of the scheme or artifice

9    to defraud.  Transmission of the wire need not have been taken

10   by the defendant so long as the transmission was a foreseeable

11   part of the crime that you find he committed.

12         Now I'm going to briefly discuss evaluating the

13   credibility of witnesses.

14         You have had the opportunity to observe the witnesses.

15   It is now your job to decide how believable or credible each

16   witness was in his or her testimony.  You are the sole judges

17   of the credibility of each witness and of the importance of his

18   or her testimony.  How do you judge the credibility of

19   witnesses?  There's no magic formula.

20         You should carefully scrutinize all of the testimony

21   of each witness, the circumstances under which each witness

22   testified, the impression the witness made when testifying, the

23   relationship of the witness to the controversy and the parties,

24   the witness's bias or impartiality, the reasonableness of the

25   witness's statement, the strength or weakness of the witness's

1    recollection viewed in light of all other testimony and

2    evidence, and any other matter in evidence that may help you

3    decide the truth and the importance of each witness's

4    testimony.

5            In other words, what you must try to do in deciding

6    credibility is to size a witness up in light of his or her

7    demeanor, the explanations given, and all of the other evidence

8    in the case.  You should use your common sense, your good

9    judgment, and your everyday experiences in life to make

10   credibility determinations.

11           In passing upon the credibility of a witness, you may

12   also take into account any inconsistencies or contradictions as

13   to material matters in his or her testimony.

14           If you find that any witness has willfully testified

15   falsely as to any material fact, you have the right to reject

16   the testimony of that witness in its entirety.  On the other

17   hand, even if you find that a witness has testified falsely

18   about one matter, you may reject as false that portion of his

19   or her testimony, and accept as true any other portion of the

20   testimony which commends itself to your belief or which you may

21   find corroborated by other evidence in this case.  A witness

22   may be inaccurate, contradictory, or even untruthful in some

23   respects, and yet be truthful and entirely credible in other

24   respects of his or her testimony.

25           The ultimate question for you to decide in passing

1    upon credibility is:  Did the witness tell the truth before

2    you?  It is for you to say whether his or her testimony at

3    trial is truthful in whole or in part.

4         In deciding whether to believe a witness, you should

5    specifically note any evidence of hostility or affection the

6    witness may have towards one of the parties.  Likewise, you

7    should consider evidence of any other interest or motive that

8    the witness may have in cooperating with a particular party.

9    You should also take into account any evidence of any benefit

10   that a witness may receive from the outcome of this case.

11        It is your duty to consider whether the witness has

12   permitted any such bias or interest to color his or her

13   testimony.  In short, if you find that a witness is biased, you

14   should view his or her testimony with caution, weigh it with

15   care, and subject it to close and searching scrutiny.

16        Of course, the mere fact that a witness is interested

17   in the outcome of the case does not mean that he or she has not

18   told the truth.  It is for you to decide from your observations

19   in applying your common sense and experience and all the other

20   considerations mentioned whether the possible interest of any

21   witness has intentionally or otherwise colored or distorted his

22   or her testimony.  You are not required to disbelieve an

23   interested witness.  You may accept as much of his or her

24   testimony as you deem reliable, and reject as much as you deem

25   unworthy of acceptance.

1          You have heard evidence during the trial that

2   witnesses had discussed the facts of the case in their

3   testimony with the lawyers before the witnesses appeared in

4   court.  Although you may consider that fact when you are

5   evaluating a witness's credibility, I should tell you there is

6   nothing either unusual or improper about a witness meeting with

7   lawyers before testifying so that the witness can be made aware

8   of the subjects he or she will be questioned about, focus on

9   those subjects, and have the opportunity to review relevant

10  exhibits before being questioned about them.  In fact, it would

11  be unusual for a lawyer to call a witness without such

12  consultation.  Again, the weight you give to the fact or the

13  nature of the witness's preparation for his or her testimony

14  and what inferences you draw from such preparation are matters

15  completely within your discretion.

16         You have heard the testimony of a law enforcement

17  official.  The fact that a witness may be employed as a law

18  enforcement official does not mean that his or her testimony is

19  necessarily deserving of more or less consideration or greater

20  or lesser weight than that of an ordinary witness.  In this

21  context, the defendant is allowed to try to attack the

22  credibility of such a witness on the ground that his or her

23  testimony may be colored by a personal or professional interest

24  in the outcome of the case.

25         It is your decision, after reviewing all of the

O4HCeis6                    Charge

1   evidence, whether to accept the testimony of a law enforcement

2   witness and to give to that testimony whatever weight, if any,

3   you find it deserves.

4          The fact that one party called more witnesses and

5   introduced more evidence than the other does not mean that you

6   should necessarily find the facts in favor of the side offering

7   the most witnesses.  By the same token, you do not have to

8   accept the testimony of any witness who has not been

9   contradicted or impeached if you find the witness not to be

10  credible.  You also have to decide which witnesses to believe

11  and which facts are true.  To do this, you must look at all of

12  the evidence, drawing upon your own common sense and personal

13  experience.  I have just discussed the criteria for evaluating

14  credibility.  Keep in mind that the burden of proof is always

15  on the government and the defendant is not required to call any

16  witnesses or offer any evidence since he is presumed to be

17  innocent.

18         Now, the defendant did not testify in this case.

19  Under our constitution, a defendant has no obligation to

20  testify or to present any evidence because it is the

21  government's burden to prove the defendant guilty beyond a

22  reasonable doubt.  That burden remains with the government

23  throughout the entire trial and never shifts to the defendant.

24  A defendant is never required to prove that he is innocent.

25         You may not speculate as to why the defendant did not

O4HCeis6                          Charge

testify.  There are many reasons why a defendant may decide not
to testify.  You may not attach any significance to the fact
that the defendant did not testify.  No adverse inference
against him may be drawn by you because he did not take the
witness stand.  You may not consider this against the defendant
in any way in your deliberations in the jury room.

          Now, certain witnesses in this case were offered as
experts and were permitted to express their opinions about
matters that are in issue.  A witness may be permitted to
testify to an opinion on those matters about which he or she
has special knowledge, skill, experience, and training.  Such
testimony is presented to you on the theory that someone who is
experienced and knowledgeable in the field can assist you in
understanding the evidence or in reaching an independent
decision on the facts.

          In weighing this opinion testimony, you may consider
the witness's qualifications, his or her opinions, the reasons
for testifying, as well as all of the other considerations that
ordinarily apply when you are deciding whether or not to
believe a witness's testimony.  You may give the opinion
testimony whatever weight, if any, you find it deserves in
light of all the evidence in this case.  You should not,
however, accept the testimony of an expert merely because I
allowed the witness to testify as an expert.  Nor should you
substitute it for your own reason, judgment, and common sense.

The determination of the facts in this case rests solely with
you.

Now, again, you have heard the testimony of law
enforcement and government officials.  The fact that a witness
may be employed by the government does not mean that his or her
testimony is necessarily deserving of more or less
consideration, or greater or lesser weight of an ordinary
witness.

At the same time, it is quite legitimate for defense
counsel to try to attack the credibility of a law enforcement
witness or government employee witness on the grounds that his
or her testimony may be colored by a personal or professional
interest in the outcome of the case.

It is your decision, after reviewing all the evidence,
whether to accept the testimony of the law enforcement
witnesses, or government employee witnesses, and to give that
testimony whatever weight, if any, you find it deserves.

You have heard the names of several people during the
course of the trial who did not appear here to testify, and one
or more of the attorneys may have referenced their absence.  I
instruct you that each party had an equal opportunity or lack
of opportunity to call any of these witnesses.  However, the
government bears the burden of proof, the defendant does not.
Therefore, you should not draw any inferences or reach any
conclusions as to what these persons would have testified to

1    had they been called.  Their absence should not affect your

2    judgment in any way.

3          You may not draw any inference, favorable or

4    unfavorable, toward the government or the defendant from the

5    fact that any person was not named as a defendant in this case,

6    and you may not speculate as to the reasons why other people

7    are not on trial before you now.  Those matters are wholly

8    outside your concern and have no bearing on your function as

9    jurors in deciding the case before you.

10          At certain times during the trial, the parties have

11    used demonstrative aids to assist you in considering the

12    evidence or testimony at trial.  These demonstrative aids are

13    not evidence and will not be available to you in the jury room.

14    However, you may consider these aids if you find them useful in

15    assessing the evidence or testimony.

16          Some of the exhibits that were admitted into evidence

17    were in the form of charts and summaries.  Those exhibits

18    purport to summarize the underlying evidence that was used to

19    prepare them.  I admitted these charts and summaries into

20    evidence in place of or in addition to the underlying documents

21    that they represent in order to save time and avoid unnecessary

22    inconvenience.  They are no better than the documents upon

23    which they are based.  Therefore, you are to give no greater

24    consideration to these charts and summaries than you would give

25    to the evidence upon which they are based.  It is for you to

1    decide whether they correctly present the information contained

2    in the testimony and in the exhibits on which they were based.

3          You have heard evidence that various platforms the

4    defendant allegedly used, including FTX, AscendEX, and

5    Switchboard did have terms of service.  You have also heard

6    evidence in this case that at the time of the events at issue,

7    Mango Markets did not have terms of service.  Terms of service

8    are civil contracts.  This, of course, is a criminal case.  It

9    is not a civil case for breach of contract.  In considering

10   whether the defendant's conduct was manipulative, fraudulent,

11   or deceptive in violation of the criminal laws at issue in this

12   case, if you find that the defendant violated terms of service

13   on certain platforms, that does not by itself mean that the

14   defendant has committed a crime.  Similarly, let me caution you

15   that the lack of terms of service cannot render any fraudulent

16   or manipulative conduct legal or immaterial as a matter of law.

17   In determining whether the defendant has committed any of the

18   charged offenses, you are to apply the instructions I've given

19   you today.

20         You have also heard evidence concerning disclaimers

21   shown to Mango Markets users.  Just as with terms of service,

22   disclaimers cannot render any fraudulent or manipulative

23   conduct legal or immaterial as a matter of law.  Rather, it's

24   just one of the many factors you may consider when determining

25   whether the defendant has committed any of the charged

O4HCeis6                         Charge

1   offenses.

2            There's no legal requirement that the government prove

3   its case through any particular means.  Although, you are to

4   carefully consider the evidence adduced by the government, you

5   are not to speculate as to why they used the techniques they

6   did or why they did not use other techniques.  The government

7   is not on trial and law enforcement techniques are not your

8   concern.  Your concern is to determine whether, on the evidence

9   or lack of evidence, a defendant's guilt has been proven beyond

10  a reasonable doubt.

11           Your function now is to weigh the evidence in this

12  case and to determine if the government has sustained its

13  burden of proof with respect to each count of the indictment.

14           You must base your verdict solely on the evidence and

15  these instructions as to the law, and you are obliged under

16  your oath as jurors to follow the law as I have instructed you,

17  whether you agree or disagree with a particular law in

18  question.

19           The verdict must represent the considered judgment of

20  each juror.  In order to return a verdict, it is necessary that

21  each juror agree to it.  Your verdict must be unanimous.

22           Let me also remind you that you took an oath to decide

23  this case impartially, fairly, and without prejudice or

24  sympathy, without fear solely based on the evidence in this

25  case and the applicable law.

1           You have been chosen to try issues of fact and reach a

2   verdict on the basis of the evidence or lack of evidence.  Both

3   sides are entitled to a fair trial.  You are to make a fair and

4   impartial decision so that you come to a just verdict.

5           So you're about to go into the jury room and begin

6   your deliberations.  A list of exhibits and the exhibits that

7   were received into evidence will be provided to you in the jury

8   room.  If you want any of the testimony read back to you, you

9   may also request that.  If you want testimony read back to you,

10  please be as specific as you possibly can.  The court reporter

11  will have to look through the transcript and the parties will

12  have to agree on what portions of testimony may be called for

13  in response to your request, and if they disagree, I must

14  resolve those disagreements.  If you have any questions

15  regarding my instructions to you, you should also send me a

16  note.

17          Your requests for testimony — in fact any

18  communications with the Court — should be made to me in

19  writing, signed by your foreperson, and given to one of the

20  marshals.  In any event, do not tell me or anyone else how the

21  jury stands on any issue until after a unanimous verdict is

22  reached.

23          If any one of you took notes during the course of the

24  trial, you should not show your notes to or discuss your notes

25  with any other jurors during your deliberations.  Any notes you

O4HCeis6                         Charge

1    have taken are to be used solely to assist you.  The fact that

2    a particular juror has taken notes entitles that juror's views

3    to no greater weight than those of any other juror.  Finally,

4    your notes are not to substitute for your recollection of the

5    evidence in this case.  If, during your deliberations, you have

6    any doubt as to any of the testimony, you may — as I just told

7    you — request that an official trial transcript that has been

8    made in these proceedings be read back to you.

9           You will now retire to decide the case.  Again, your

10   function is to weigh the evidence in this case and to determine

11   whether the government has proven the guilt of the defendant

12   with respect to each count charged in the indictment.

13          It is your duty as jurors to consult with one another

14   and to deliberate with a view to reaching an agreement.  Each

15   of you must decide the case for himself or herself, but you

16   should do so only after a consideration of the case with your

17   fellow jurors, and you should not hesitate to change an opinion

18   when convinced that it is erroneous.  Discuss and weigh your

19   respective opinions dispassionately without regard to sympathy,

20   without regard to prejudice or favor for either party, and

21   follow my instructions on the law.

22          When you are deliberating, all 12 jurors must be

23   present in the jury room.  If a juror is absent, you must stop

24   deliberations.

25          And again, your verdict must be unanimous, but you are

1    not bound to surrender your honest convictions concerning the

2    effect or weight of the evidence for the mere purpose of

3    returning a verdict or solely because of the opinion of other

4    jurors.  Each of you must make your own decision about the

5    proper outcome of the case based on your consideration of the

6    evidence and your discussion with your fellow jurors.  No juror

7    should surrender his or her conscientious beliefs for the

8    purpose of returning a unanimous verdict.

9         Remember at all times, you are not partisans.  You are

10   judges — judges of the facts.  Your sole interest is to seek

11   the truth from the evidence in this case.

12        If you are divided, do not report how the vote stands.

13   If you reach a verdict, do not report what it is until you are

14   asked in open court.

15        Now, I've prepared a verdict form for you to use in

16   guiding your deliberation.  In recording your decision, please

17   use that form to report your verdict.  It will be provided to

18   you back in the jury room.

19        The first thing you should do when you retire to

20   deliberate is take a vote to select one of you to sit as your

21   foreperson, and then send out a note indicating whom you have

22   chosen.

23        The foreperson doesn't have any more power or

24   authority than any other juror, and his or her vote or opinion

25   doesn't count for any more than any other juror's vote or

O4HCeis6                    Charge

1    opinion.  The foreperson is just your spokesperson to this

2    Court.  He or she will send out any notes, and when the jury

3    has reached a verdict, he or she will notify the marshal that

4    the jury has reached a verdict, and you will come into open

5    court and give the verdict.

6         After you have reached a verdict, your foreperson will

7    fill in and date the form that has been given to you.  All

8    jurors must sign the form reflecting each juror's agreement

9    with the verdict.  The foreperson should then advise the

10   marshal outside your door that you are ready to return to the

11   courtroom.

12        I will stress that each of you must be in agreement

13   with the verdict that is announced in court.  Once your verdict

14   is announced by your foreperson in open court and officially

15   recorded, it cannot ordinarily be revoked.

16        Now, at this time, the first 12 jurors will begin

17   their deliberations in this case.  Our final juror, who is an

18   alternate, will not deliberate at this time.  I believe that is

19   Ms. Levenstone.  Nevertheless, the alternate juror,

20   Ms. Levenstone, is not quite excused.  While the jury conducts

21   its deliberations, you do not have to be here in court, but you

22   should give Mr. Hernandez phone numbers where you can be

23   reached because it is possible that you could be needed to

24   deliberate if a juror is unable to continue.  Mr. Hernandez

25   will call you when deliberations are completed so that you will

1    know you are completely finished.

2            Between now and then, you must continue to observe all

3    of the restrictions I have instructed you on throughout the

4    trial.  That is, you must not discuss this case with anyone,

5    including the other jurors, other people involved in the trial,

6    members of your family, friends, coworkers, or anyone else, and

7    until a verdict is reached, as I have already instructed, you

8    may not communicate with anyone about this case in any way.  If

9    anyone approaches you and tries to talk to you about the case,

10   please report that to me through Mr. Hernandez immediately.

11           Do not listen to or watch or read any news reports

12   concerning this trial.  If there were to be any, do not do any

13   research on the internet or otherwise.  The reason for this, of

14   course, is that should you be asked to participate in reaching

15   a verdict in this case, the only information you will be

16   allowed to consider is what you learned in the courtroom during

17   this trial.  Now, please accept my heartfelt gratitude for your

18   service.

19           I'm sorry you will likely miss the experience of

20   deliberating with the jury, but the law provides for a jury of

21   12 persons in this case.  So before the rest of the jury

22   retires to the jury room, if you have any clothing or objects

23   out there, you can pick them up and withdraw them, and without

24   discussing the case, you may also say your goodbyes to your

25   fellow jurors.  I want to say, I'm very thankful that you've

1   been here for this trial.  You were one of the reasons we made

2   sure to get through the trial with the 12 jurors that we needed

3   for deliberations, and you still may be needed in this case.

4   You've worked so hard, and I appreciate it and all the parties

5   appreciate it too.  So when the jury goes back to the jury

6   room, we give you a chance to get your materials, say any

7   goodbyes, and after that point, the jury will begin its

8   deliberations.

9           One final note on timing.  At this point onward you

10  are free to deliberate as you see fit, and if you are all in

11  agreement, you may stay until 5:00 p.m. to continue your

12  deliberations, or even later if all jurors agree.  I know there

13  is one conflict today.  I think one of the jurors has a meeting

14  that they would like to attend at 5:00.  So as for today, you

15  can end a little earlier, you can do that by agreement, and

16  that will be okay for today.

17          Please be mindful of other jurors' time constraints,

18  such as the one we're accommodating today, in making your

19  determination of how long to deliberate each day.  Meals will

20  be provided.  You can let the marshals and Mr. Hernandez know

21  if you have any questions in that regard.

22          In conclusion, ladies and gentlemen, I am sure that if

23  you listen to the views of your fellow jurors, and if you apply

24  your own common sense, you will reach a fair verdict here.

25          All right.  Thank you for your patience and your

O4HCeis6

1    attention.  I can tell during the instructions that you were

2    reading along, so I know that you've been following very

3    closely.  What we will do at this time is that we will have you

4    retire to the jury room.

5            Ms. Levenstone, you can take your materials, say your

6    goodbyes, you can leave.  At that point, the jury will begin

7    their deliberations.

8            (Jury not present)

9            Here's what we'll do, sort of order of operations.

10   Mr. Hernandez, why don't you head back and make sure if

11   Ms. Levenstone has any questions, you could attend to those.

12   Once she leaves, we'll swear in the marshal, then we'll proceed

13   from that point.

14           Do the parties have the laptop and exhibit list to

15   provide to the jury?

16           MR. SEARS:  We have the laptop.

17           THE COURT:  What about the exhibit list?

18           MR. SEARS:  We don't have a printed version, but we

19   can go print one right now.

20           THE COURT:  You want to email it to us and then we'll

21   print it out to save you the trouble.

22           MR. SEARS:  It's emailed.

23           THE COURT:  On the defense side, do you know what's

24   being furnished to the jury?  Has everyone taken a look and

25   it's agreed upon?

O4HCeis6

1              MR. KLEIN:  Yes, your Honor.

2              THE COURT:  We'll take care of that in order.

3              Mr. Davis or whoever wants to speak for the

4    government, anything further for the Court to address from the

5    government?

6              MR. DAVIS:  No, your Honor.  Thank you.

7              THE COURT:  Anything from the defense?

8              MR. KLEIN:  No, your Honor.

9              THE COURT:  What you should do is stay close.  What

10   we'll do today is there's one juror who may have a meeting that

11   he or she needs to attend to.  And so, we'll give them about an

12   hour and we'll be back here, I'll excuse the jury for the day.

13   Stay close and we'll see if we need you back before then.  I

14   don't anticipate that will be the case, but we'll be back here

15   around 4:30 so that we can be here to excuse the jury from the

16   day.

17             From tomorrow on, I'm going to tell the jury that they

18   can go straight into the jury room and begin their

19   deliberations.  So you certainly don't need to be here at 8:30.

20             MR. KLEIN:  Just not used to it, your Honor.

21             THE COURT:  Don't need to be here by 8:30, but try to

22   be here around 9:30 in case we have a note from the jury so we

23   don't have to have them wait and so we can figure that out.  We

24   will proceed from there.

25             Mr. Oshinsky, is the correct exhibit list the one sent

O4HCeis6

1     out at 12:03 p.m.?

2                MR. OSHINSKY:  Yes.

3                THE COURT:  Anything else that we need to take care

4     of?

5                Mr. Hernandez, Ms. Levenstone.

6                THE DEPUTY CLERK:  Yes.  And I'm printing the

7     document, your Honor.

8                THE COURT:  Let's swear in the marshal and then we

9     will -- then I think we can take care of that first and we can

10    drop the laptop and the exhibit list.

11               (Marshal sworn)

12               I heard something printing, so I think we probably

13    have the exhibit list.  Do either side want to take a look at

14    it to make sure it's the right one?  Just give them a quick

15    look.

16               So, we don't have it because we had a printer error.

17    We'll get that attended to.

18               Otherwise, two things I wanted to raise.

19               First of all, Mr. Klein or Mr. Talkin, in terms of

20    Mr. Eisenberg, just help me with, it might be a dumb question,

21    but while we're waiting and while we're here in the courtroom,

22    what happens to Mr. Eisenberg?

23               MR. TALKIN:  Your Honor, my understanding is that's

24    the marshals' call.  My experience, if it's something quick, an

25    hour turnaround, they usually leave him up.  Tomorrow, they

O4HCeis6

1    leave him down until the first note you think something is

2    going to happen fast, and they can correct me if I'm wrong, but

3    I think that's been how they deal with it.

4           THE MARSHAL:  That's correct, your Honor.  We can have

5    him up here for the rest of the day.  If we get a note

6    tomorrow, we'll bring him up immediately.  We'll be on standby

7    to bring him up as soon as possible.

8           THE COURT:  Is there a way for, if he would want to,

9    for him to spend any time with family members that are in the

10    audience?

11           THE MARSHAL:  He can do it here if the Court permits

12    that.  I have no problem with that.

13           THE COURT:  Okay.  We received a note from the jury

14    that they have selected their foreperson.  It is Joshua Mann,

15    juror No. 5.  We will put a timestamp on here, we will make it

16    an exhibit for the record, and the parties are free to examine

17    that if they so choose.

18           First of all, to the marshals, I'm happy to order

19    anything you need me to, to accommodate Mr. Eisenberg spending

20    time with his family during this time.  This is going to sound

21    like a really dumb question, but just on a human level, if

22    there's a way to -- if Mr. Eisenberg wants to give his mom a

23    hug or something like that, if there's a way to make that

24    happen, if we can do that in a way that's in accordance with

25    your guidelines, let me know.  Mr. Klein, Mr. Talkin, you'll

O4HCeis6

1    let me know if there's something you need my help with, but I'm

2    happy to accommodate the defendant if there's a way we can do

3    that in accordance with the rules that are in place.

4            MR. KLEIN:  Thank you, your Honor.

5            THE DEPUTY CLERK:  Your Honor, I have the printed

6    sheet.  May I show the parties?

7            THE COURT:  Show the parties.

8            Last thing, I'll let you all sort out the exhibit

9    list, but I think this is the appropriate time to say this case

10   was exceptionally tried on both side.  I really appreciate the

11   good lawyering, the professional lawyering, the collegiality

12   between the sides in this case.  You really all did, on both

13   sides, a fantastic job.  So I really wanted to congratulate you

14   and thank you for all your hard work the past week and a half.

15   So thank you very much.

16           You'll let me know if there's any issues with the

17   exhibit list, but there shouldn't be.

18           (Recess)

19           We received a note from our jury that says, we are

20   finished for today.  We need to continue tomorrow.

21           That can certainly be reviewed by everyone.  Enter it

22   as Court Exhibit C.

23           Unless there's anything else, we'll bring back the

24   jury.  Mr. Hernandez, you can bring out our jury.

25           THE DEPUTY CLERK:  Yes, your Honor.

O4HCeis6

1              (Jury present)

2              THE COURT:  Welcome back.  We're a little bit short of

3      5 o'clock, but we're going to excuse you for today.  Thank you

4      for all your hard work.  It's been a very long day.  You've

5      kept your attention the entire day, which I really appreciate.

6              So let me give you some closing instructions.

7              First of all, tomorrow you should arrive before 9:00

8      a.m., same thing, by 8:45 if you can so you can resume your

9      deliberations.  There should be breakfast for you as usual.

10     Once again, you'll find lunch order forms for tomorrow so you

11     don't need to interrupt your deliberations.  You can continue

12     through lunch.  You can obviously take a break if you like,

13     it's up to you, during lunch, but bottom line is that way

14     you'll be in the jury room to continue your deliberations.

15             I am not going to bring you in the courtroom in the

16     morning.  You can resume your deliberations when you're all

17     present.  But let me stress that you all must be present.  That

18     is to say you should not resume discussing the case with one

19     another until all 12 of you are there.  Unless all 12 of you

20     are there, you can't deliberate.  You need to deliberate as a

21     whole.  So, for that reason, continue to talk about the

22     weather, sports, I heard a lot of laughs back there, so you're

23     talking about something, but not about this case until all 12

24     of you are there.  Once all 12 of you are there, you may resume

25     your deliberations, and that's out of respect for one another,

O4HCeis6

1    if not for everyone here.  For that reason, please be in the

2    jury room, try to be there by the 8:45 time that you've been

3    trying to get there so you can resume no later than 9:00 a.m.

4         In the meantime, for the reasons I just described,

5    don't discuss the case with each other or with anyone else

6    until you resume your deliberations when all 12 of you have

7    arrived tomorrow.  Don't do any research about the case.  All

8    of the instructions that I've given you previously about not

9    considering anything, not having discussions, please follow

10   that.

11        And you should continue to keep an open mind to ensure

12   that you have an open mind when you resume your deliberations

13   with one another.  Leave your notebooks as well as the laptop,

14   exhibit list, jury instructions in the jury room.  My staff and

15   the court security officer will secure it overnight.

16        With that, I wish you a very pleasant evening and I

17   will see you at some point tomorrow.  If we get a note from you

18   during the day, I presume I'll see you earlier, if not, I'll

19   bring you out at the end of the day as I have today.

20        Thank you so much.  Have a great evening.

21        (Jury not present)

22        Anything further from either side?

23        MR. DAVIS:  No, your Honor.  Thank you.

24        MR. KLEIN:  No, your Honor.

25        THE COURT:  Take some rest.  Hopefully you guys can

O4HCeis6

1   get some rest tonight.  See you tomorrow.

2              (Adjourned to April 18, 2024 at 9:30 a.m.)

3                              *  *  *

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25