UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>-against-<br><br>AVRAHAM EISENBERG,<br><br>Defendant. | Case No.: 23 Cr. 10 (AS) |

## AVRAHAM EISENBERG'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR JUDGMENT OF ACQUITTAL OR, IN THE ALTERNATIVE, A NEW TRIAL

Brian E. Klein
Ashley E. Martabano
Riley P. Smith
Waymaker LLP
515 S. Flower Street, Suite 3500
Los Angeles, California 90071
(424) 652-7800

Sanford N. Talkin
Noam B. Greenspan
Talkin, Muccigrosso & Roberts, LLP
40 Exchange Place, 18th Floor
New York, New York 10005
(212) 482-0007

*Attorneys for Avraham Eisenberg*

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................................. i

TABLE OF AUTHORITIES ......................................................................................................... ii

PRELIMINARY STATEMENT ................................................................................................... 1

RULE 29/33 LEGAL STANDARDS ........................................................................................... 4

ARGUMENT ................................................................................................................................ 7

    A.   Venue .......................................................................................................................... 7

        1.   Applicable Law Regarding Venue ......................................................................... 8

        2.   Statement of Facts Regarding Venue ..................................................................... 9

        3.   Argument .............................................................................................................. 14

    B.   Counts 1 and 2: The CEA Does Not Apply ............................................................. 23

        1.   Rule 29: The MNGO Perpetual is Neither a "Swap" Nor a "Mixed Swap" ...... 23

        2.   Rule 29: Rule of Lenity ....................................................................................... 41

        3.   Rule 33: The Court's Instructions Regarding Mixed Swaps ............................... 43

    C.   Count 2: Commodities Manipulation ....................................................................... 45

        1.   Rule 29: Insufficient Evidence of Commodities Manipulation .......................... 45

        2.   Rule 29: Rule of Lenity ....................................................................................... 52

        3.   Rule 33: Jury Instruction on Market Price ......................................................... 52

        4.   Rule 33: Improper Summation Arguments Regarding Pumping .......................... 53

    D.   Counts 1 and 3: Government Failed to Prove Falsity and Materiality ...................... 55

        1.   Falsity: Rule 29: Insufficient Evidence of Falsity ............................................. 55

        2.   Rule 29: Insufficient Evidence of Materiality .................................................... 57

    E.   Count 3: No Evidence of an Interstate Wire ............................................................ 66

CONCLUSION ........................................................................................................................... 69

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

*Babbit v. Sweet Home Chapter of Communities for a Great Oregon*, 515 U.S. 687 (1995)........ 41

*CFTC v Archegos Capital Mgmt. LP*, 2023 WL 6123102, 2023 U.S. Dist. LEXIS 166409 (S.D.N.Y. Sep. 19, 2023) ................................................................................................. 26, 42

*CFTC v. Amaranth Advisors LLC*, 554 F. Supp. 2d 523 (S.D.N.Y. 2008).................................. 54

*CFTC v. Parnon Energy Inc.*, 875 F. Supp. 2d 233 (S.D.N.Y. 2012) .................................... 51, 54

*CFTC v. Wilson*, 27 F. Supp. 3d 517 (S.D.N.Y. 2014).................................................................. 54

*Choi v. Tower Research Capital LLC*, 165 F. Supp. 3d 42 (S.D.N.Y. 2016).............................. 54

*Cleveland v. United States*, 531 U.S. 12 (2000) .......................................................................... 41

*Cofacredit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229 (2d Cir. 1999)........................ 67

*DiPlacido v. CFTC*, 364 F. App'x 657 (2d Cir. 2009) ................................................................ 49

*ECD Investor Grp. v. Credit Suisse Int'l*, 2017 WL 3841872, 2017 U.S. Dist. LEXIS 142186 (S.D.N.Y. Sep. 1, 2017)........................................................................................................... 40

*FDIC v. W.R. Grace & Co.*, 877 F.2d 614 (7th Cir. 1989).................................................... 58, 66

*Gamma Trader - I LLC v. Merrill Lynch Commodities, Inc.*, 41 F. 4th 71 (2d Cir. 2022)........... 46

*Grossman v. Citrus Assoc. of New York Cotton Exchange, Inc.*, 706 F. Supp. 221 (S.D.N.Y. 1989) ....................................................................................................................................... 46

*Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258 (2014)............................................. 46

*In re Amaranth Natural Gas Commodities Litig.*, 730 F.3d 170 (2d Cir. 2013) ................... 46, 51

*In re Bibox Holdings Ltd. Sec. Litig.*, 534 F. Supp. 3d 326 (S.D.N.Y. 2021) ............................. 61

*In re Energy Partners Natural Gas Litig.*, No. 4:07-cv-3349 (KPE), 2009 U.S. Dist LEXIS 75859, 2009 WL 2633781 (S.D. Tex. Aug. 26, 2009) ............................................................ 51

*In the Matter of Anthony K. DiPlacido*, CFTC Dkt. No. 2008, 2008 CFTC LEXIS 101 (Nov. 5, 2008) ............................................................................................................... 49

*Neder v. United States*, 527 U.S. 1 (1999) ................................................................. 58

*Rewis v. United States*, 401 U.S. 808 (1971) ............................................................ 41

*SEC v. Terraform Labs Pte. Ltd.*, No. 23 Civ. 1346 (JSR), 2023 U.S. Dist. LEXIS 230518 (S.D.N.Y. Dec. 28, 2023) .................................................................................. 24

*Smith v. Ayres*, 845 F.2d 1360 (5th Cir. 1988) ......................................................... 67

*Staples* v. *United States*, 511 U.S. 600 (1994) .......................................................... 41

*Three Crown Ltd. P'ship. v. Caxton*, 817 F. Supp. 1033 (S.D.N.Y. 1993) ........... 48, 50

*United State v. Reed*, 773 F.2d 477 (2d Cir. 1985) ................................................... 19

*United States v. Anderson*, 328 U.S. 699 (1946) ...................................................... 18

*United States v. Aurenheimer*, 748 F.3d 525 (3rd Cir. 2014) ............................... 8, 18

*United States v. Banki*, 685 F.3d 99 (2d Cir. 2012) .................................................. 41

*United States v. Beech-Nut Corp.*, 871 F.2d 1181 (2d Cir. 1989) ............................ 16

*United States v. Bowens*, 224 F.3d 302 (4th Cir. 2000) ........................................... 18

*United States v. Cabrales*, 524 U.S. 1 (1998) .................................................. 9, 18, 21

*United States v. Cassese*, 428 F.3d 92 (2d Cir. 2005) ................................................. 5

*United States v. Connolly*, 24 F.4th 821 (2d Cir. 2022) ............................... 5, 55, 56

*United States v. D'Amato*, 39 F.3d 1249 (2d Cir. 1994) ............................................. 6

*United States v. Ferguson*, 246 F.3d 129 (2d Cir. 2001) ....................................... 6, 20

*United States v. Glenn*, 312 F.3d 58 (2d Cir. 2002) .................................................... 6

*United States v. Gore*, 154 F.3d 34 (2d Cir. 1998) ..................................................... 5

*United States v. Granderson,* 511 U.S. 39 (1994) ..................................................... 41

*United States v. Johnson*, 323 U.S. 273 (1944) ....................................................... 8, 9

*United States v. Johnson*, 945 F.3d 606 (2d Cir. 2019) .................................................... 58

*United States v. Kaufman*, No. 21-2589, 2023 U.S. App. LEXIS 3275, 2023 WL 1871669 (2d Cir. Feb. 10, 2023) .................................................................................................... 22

*United States v. Khalupsky*, 5 F.4th 279 (2d Cir. 2021) ......................................... 16, 22

*United States v. Kim*, 246 F.3d 186 (2d Cir. 2001) ...................................................... 19

*United States v. Klein*, 913 F.3d 73 (2d Cir. 2019) ....................................................... 5

*United States v. Lange*, 834 F.3d 58 (2d Cir. 2016) ............................................... 17, 19

*United States v. LeRoy*, 687 F.2d 610 (2d Cir. 1982) .................................................... 6

*United States v. Levy*, 594 F. Supp. 2d 427 (S.D.N.Y. 2009) ........................................ 7

*United States v. Miller*, 20 Cr. 232 (JRT/DTS), 2024 U.S. Dist. LEXIS 87327 (D. Minn. May 15, 2024) .......................................................................................................... 68

*United States v. Morrison*, 153 F.3d 34 (2d. Cir. 1998) ................................................. 5

*United States v. Mulheren*, 938 F.2d 364 (2d Cir. 1991) ............................................... 6

*United States v. Nusraty*, 867 F.2d 759 (2d Cir. 1989) .................................................. 5

*United States v. Pacilio*, 85 F. 4th 450 (7th Cir. 2023) ................................................ 46

*United States v. Phillips*, 376 F. Supp. 2d 6 (D. Mass. 2005) ..................................... 67

*United States v. Phillips*, No. 22 Cr. 138 (LJL), 2024 U.S. Dist. LEXIS 54989, 2024 WL 1300269 (S.D.N.Y. Mar. 27, 2024) ................................................................ 59, 65, 66

*United States v. Reed*, 875 F.2d 107 (7th Cir. 1989) ..................................................... 6

*United States v. Rigas*, 490 F.3d 208 (2d Cir. 2007) ............................................... 58, 66

*United States v. Rodriguez*, 140 F.3d 163 (2d Cir. 1998) ............................................. 59

*United States v. Rodriguez-Moreno*, 526 U.S. 275 (1999) ........................................ 9, 21

*United States v. Saavedra*, 223 F.3d 85 (2d Cir. 2000) ............................................... 19

*United States v. Samaria*, 239 F.3d 228 (2d Cir. 2001) ................................................. 5

*United States v. Sanchez*, 969 F.2d 1409 (2d Cir. 1992) .......................................... 6, 20

*United States v. Snype*, 441 F.3d 119 (2d Cir. 2006)................................................................ 58

*United States v. Svoboda*, 347 F.3d 471 (2d Cir. 2003)............................................................ 22

*United States v. Truman*, 688 F.3d 129 (2d Cir. 2012)............................................................... 6

*United States v. Tzolov*, 642 F.3d 314 (2d Cir. 2011)....................................................... passim

*United States v. Valle*, 807 F.3d 508 (2d Cir. 2015)............................................................. 5, 6

*United States v. Walker*, 289 F. Supp. 3d 560 (S.D.N.Y. 2018)................................................. 7

*United States v. Weiss*, 930 F.2d 185 (2d Cir. 1991)................................................................ 5

*Utz v. Correa*, 631 F. Supp. 592 (S.D.N.Y. 1986)................................................................... 67

*Van Loon v. Dept. of Treasury*, 688 F. Supp. 3d 454 (2023)................................................... 61

*Vitanza v. Bd. of Trade of N.Y.*, No. 00 Civ. 7393, 2002 WL 424699, 2002 U.S. Dist. LEXIS 4499 (S.D.N.Y. Mar. 18, 2002) ................................................................................... 47, 50

*Williams v. Block One*, No. 20 Civ. 2809 (LAK), *5, 2022 U.S. Dist. LEXIS 171550**, 2022 WL 5294189 (S.D.N.Y. Aug. 13, 2022) ........................................................................... 61

*Xu v. Direxion Shares ETF Trust*, No. 22 Civ. 5090, 2023 U.S. Dist. LEXIS 150230, 2023 WL 5509151 (S.D.N.Y. Aug. 25, 2023) ................................................................................ 42

## **Statutes**

7 U.S.C. § 13.................................................................................................................... 45, 48

7 U.S.C. § 1a.................................................................................................................... passim

7 U.S.C. § 25............................................................................................................................ 47

15 U.S.C. § 78c.................................................................................................... 25, 36, 37, 38

15 U.S.C. § 8302................................................................................................................ 26, 42

18 U.S.C. § 1343..................................................................................................................... 67

## **Rules**

Fed. R. Crim P. 33 .................................................................................................................... 6

Fed. R. Crim. P. 29 ............................................................................................................ 4

**Regulations**

77 Fed. Reg. 48208 .......................................................................................................... 26

**PRELIMINARY STATEMENT**

On October 11, 2022, Avraham Eisenberg, while located far from New York, executed a highly successful strategy in which he staked $13 million of his own money.  Mr. Eisenberg profited when his open-market trading of the crypto token MNGO on crypto exchanges AscendEX, FTX, and Serum DEX triggered a rise in MNGO's price and caused derivative bets (MNGO Perpetuals) he had made on the Mango Markets exchange to grow substantially in value.  After trial, Mr. Eisenberg was convicted of commodities fraud (Count 1), commodities manipulation (Count 2), and wire fraud (Count 3), despite the fact that this prosecution suffered from a series of fundamental flaws, both legal and evidentiary. Any of these flaws rendered one or more of the counts of conviction invalid, and, taken together, they compel the entry of a judgment of acquittal on all counts or, in the alternative, a new trial, pursuant to Federal Rules of Criminal Procedure 29 and 33, respectively.

*First*, all three counts of conviction are improperly venued in the Southern District of New York ("District").  There is simply not a sufficient connection between the evidence at trial and this District because not a single act performed in connection with the crimes of conviction took place in this District, let alone such an act that would have been foreseeable to Mr. Eisenberg.  The evidence was unequivocal that Mr. Eisenberg was at all relevant times—an amount of time that was rather circumscribed as all of the relevant trading and withdrawal activity took place in a roughly hour-long period—situated in or around Puerto Rico and acting alone.  Faced with a total lack of evidence as to venue, the government resorted to mischaracterizations of the facts and the law in its summation.  The government told the jury that because James Casey, a "victim" of the fraud, was physically present in this District, that fact was sufficient to establish venue even though that assertion was contrary to law.  The

1

government also mischaracterized and contorted the testimony of James Farrell, general counsel

of one of the cryptocurrency exchanges on which Mr. Eisenberg traded, AscendEX, whose

testimony did not describe a single act taken in this District during the relevant time period, let

alone one that constituted the crimes alleged.

**Second**, the government failed to prove that the Commodities Exchange Act ("CEA")

applied to this case, requiring dismissal of Counts 1 and 2, the commodities fraud and

manipulation counts charged pursuant to 7 U.S.C. § 9(1) and 7 U.S.C. § 13(a)(2), respectively.

Having abandoned any claim that Mr. Eisenberg's trading involved a commodity, the

government was required but failed to prove that the MNGO Perpetual—the target instrument of

the CEA counts—was both (1) a "swap" and (2) that it was not exclusively a security because

securities are specifically excluded from the purview of the statute and reserved for the

jurisdiction of the securities laws (not charged in this case). The government failed on both

scores. The evidence at trial showed that Mr. Eisenberg was on both sides of all of his MNGO

Perpetual transactions and thus that there was no exchange of risk exposure, a requirement to

render an instrument a "swap." And even if the government had proven a swap, that swap would

have been a security because the risk being exchanged in the MNGO Perpetual related entirely to

changes in the price of MNGO, which the government did not dispute was a security. The

government's argument to the contrary in an attempt to transform the MNGO Perpetual into the

very narrow category of "mixed swap," in which the nature of the risk being exchanged causes

the instrument to be subject to both securities and commodities laws, defies the statutory

structure and defies logic. United States Dollar Coin ("USDC") is nothing more than the digital

equivalent of dollars ("USD") and plays no role in the risk transfer. The funding payments—a

stream of payments designed to keep the market price of the MNGO Perpetual from straying

away from the price of its underlying reference, MNGO—does not change the fundamental nature of the MNGO Perpetual from being based entirely on the value of a security.

*Third*, Count 2, commodities manipulation, should also be dismissed because the government failed to prove that Mr. Eisenberg had any intent to manipulate the market price of the MNGO Perpetual. The trial evidence proved that this price was entirely irrelevant to Mr. Eisenberg because he never made any attempt to sell any of his contracts, instead profiting from his ability to withdraw and borrow against the value of his unclosed positions. Unable to prove that Mr. Eisenberg manipulated the market price of MNGO Perpetuals, the government instead set out to prove that he manipulated the market price of MNGO, despite conceding that MNGO is not covered by the CEA, and attempted to transform this conduct into a manipulation of the MNGO Perpetual because it had an effect on the settlement price of the MNGO Perpetual. The government could provide no support for its novel position that manipulation of an unregulated market equates to CEA market manipulation of a wholly separate (regulated) asset so long as the former affected the allegedly regulated market. Two courts have, in fact, held otherwise. This Court should become the third and dismiss Count 2.

*Fourth*, both fraud counts, Counts 1 and 3, suffered from the same two fatal flaws: Mr. Eisenberg's alleged deceptions were not false and, in any event, were immaterial because there was no action of which Mango Markets was capable that it was deceived out of taking. The government's fraud case essentially rested on two omission-based theories, that Mr. Eisenberg failed to disclose that he had manipulated the price of MNGO and that he borrowed funds from the Mango Markets protocol without disclosing that he did not intend to maintain collateral. But the evidence at trial proved that Mango Markets, a decentralized exchange run on smart contracts, neither asked for nor had any ability to process this information. Instead, the

permissionless nature of the exchange meant that the smart contract inquired only into the price of MNGO at the time or any withdrawal, a price that at all relevant times accurately reflected the level at which MNGO was trading on the exchanges.  Moreover, given this structure, the protocol had no discretion and was required to execute the transactions, regardless of the manner in which the price of MNGO had been achieved and regardless of any intent to maintain collateral.  Because the protocol lacked discretion and the transactions were automatic, the smart contract was incapable of being deceived in the manner alleged by the government.

*Fifth and finally*, because it never proved the location of any act in furtherance of his trades, including the location of any server, the government failed to prove that Mr. Eisenberg used an interstate wire, requiring dismissal of the wire fraud charge (Count 3).  While the testimony of Mr. Farrell described certain back-office functions AscendEX contractors sometimes performed in New York, the government did not establish beyond a reasonable doubt that any of those functions were performed in relation to Mr. Eisenberg's trades, let alone one that actually involved a wire and furthered his objectives.

For these reasons, the Court should grant Mr. Eisenberg's motion pursuant to Rule 29 and enter judgement of acquittal.  In the alternative, Mr. Eisenberg moves for a new trial pursuant to Rule 33 because of various errors in the jury instructions and because of false and misleading arguments made by the government in summation.

## <u>RULE 29/33 LEGAL STANDARDS</u>

A judgment of acquittal pursuant to Rule 29 must be entered if no "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also United States v. Rodriguez*, 392 F.3d 539, 544 (2d Cir. 2009) (same).  This Rule permits a court to set aside a guilty verdict entered by a jury after the close of evidence and enter an acquittal in its place.  Fed. R. Crim. P. 29(a), (c).  A defendant

who challenges the sufficiency of evidence shoulders a heavy burden, but not one that is impossible or "insurmountable." *See United States v. Cassese*, 428 F.3d 92, 98 (2d Cir. 2005); *see also United States v. Samaria*, 239 F.3d 228, 233 (2d Cir. 2001); *United States v. Nusraty*, 867 F.2d 759, 762 (2d Cir. 1989). In evaluating a defendant's challenge to the sufficiency of the evidence to support a conviction, a district court must view the evidence "in the light most favorable to the [g]overnment" drawing all inferences and resolving all issues of credibility in favor of the government." *United States v. Weiss*, 930 F.2d 185, 191 (2d Cir. 1991). The evidence should be assessed "as a whole" and "not evaluate[d] piecemeal or in isolation." *United States v. Connolly*, 24 F.4th 821, 832 (2d Cir. 2022) (citing *United States v. Klein*, 913 F.3d 73, 78 (2d Cir. 2019)).

A reviewing court should defer to a jury's assessments with respect to credibility, conflicting testimony, and "the jury's choice of the competing inferences that can be drawn from the evidence." *Samaria*, 239 F.3d at 233 (quoting *United States v. Morrison*, 153 F.3d 34, 49 (2d. Cir. 1998)). However, in order to be given deference, a jury's inferences must arise from "a logical and convincing connection between the facts established and the conclusion inferred." *United States v. Gore*, 154 F.3d 34, 41 (2d Cir. 1998) (citation omitted). While inferences must be drawn in the government's favor in a Rule 29 motion, inferences that are "specious" are "not indulged," for that would permit a conviction of a defendant who is merely "probably guilty." *United States v. Valle*, 807 F.3d 508, 515 (2d Cir. 2015).

Although there is "always some evidence of guilt" in a criminal trial, a district court must be convinced that the evidence at trial was sufficient for a jury to "reasonably find" a defendant guilty "beyond a reasonable doubt." *Id.* at 513, 515. "[I]f the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of

guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt," meaning the district court must grant a judgment of acquittal.  *United States v. Glenn*, 312 F.3d 58, 70 (2d Cir. 2002) (citation omitted); *see also Valle* 807 F.3d at 513 (If the trial record "gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence," that means a "reasonable jury must necessarily entertain reasonable doubt"). Similarly, it is not enough for the government to have introduced evidence "at least as consistent with innocence as with guilt."  *United States v. D'Amato*, 39 F.3d 1249, 1256 (2d Cir. 1994) (quoting *United States v. Mulheren*, 938 F.2d 364, 372 (2d Cir. 1991)).

Rule 33 permits a court to "vacate a judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim P. 33.  In weighing a Rule 33 motion, a district court must determine whether "it would be a manifest injustice to let the guilty verdict stand."  *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992) (quoting *United States v. Reed*, 875 F.2d 107, 114 (7th Cir. 1989)).  A trial court generally has broader discretion to grant a new trial under Rule 33 than to grant a motion for acquittal under Rule 29.  *See United States v. Ferguson*, 246 F.3d 129, 134 n.1 (2d Cir. 2001) (Walker Jr., J. concurring) ("[A] guilty verdict might survive a Rule 29(c) motion . . . but fail to meet the Rule 33 standard . . . .").  When analyzing the evidence to evaluate a Rule 33 motion, a court certainly "must defer to the jury's resolution of the weight of the evidence and the credibility of the witnesses."  *United States v. LeRoy*, 687 F.2d 610, 616 (2d Cir. 1982).  However, this deference does not limit the reviewing court's discretion to "weigh the evidence and in so doing evaluate for itself the credibility of the witnesses."  *United States v. Truman*, 688 F.3d 129, 141 (2d Cir. 2012) (citation omitted).  The district court thus must determine that "'competent, satisfactory and sufficient evidence' in the record supports the jury verdict.'"  *Ferguson*, 246 F.3d at 134 (quoting *Sanchez*, 967 F.2d at 1414).  Additionally, the

court is "'not required to review the evidence in the light most favorable to the prosecution,'" in a Rule 33 analysis. *United States v. Walker*, 289 F. Supp. 3d 560, 567 (S.D.N.Y. 2018) (quoting *United States v. Levy*, 594 F. Supp. 2d 427, 435 (S.D.N.Y. 2009)).

## ARGUMENT

### A.    Venue

From the outset, the government has failed to articulate a clear theory of venue. In the Complaint and Indictment, both of which laid out in substantial detail the government's contentions of the specific conduct underlying the charges, the government's only venue allegation was that one of the cryptocurrency exchanges, which at trial was revealed to be AscendEX, had "offices in [] New York." Complaint ¶ 13; Indictment ¶17(e). However, the evidence at trial conclusively proved that AscendEX did not in fact have an office in New York (or even in the United States) and that no act constituting the charged crimes was undertaken by any person associated with AscendEX in New York.

The government also failed to elicit any evidence that established the identity of any individual actor whom it alleges played a role in Mr. Eisenberg's trading while located in this District. Instead, the government relied on vague testimony from AscendEX's general counsel, James Farrell, about certain teams of employees who worked in the New York office of HD Consulting Services, not AscendEX, that provided back-office services to AscendeEX. Importantly, Mr. Farrell's testimony failed to identify a single work function that was actually performed in New York relating to Mr. Eisenberg's trading or name a single employee who would or even could have performed a relevant function. Undeterred, the government in summation mischaracterized and contorted acts they told the jury had occurred in New York, in contradiction to the testimony of Mr. Farrell and unsupported by any other evidence.

Perhaps recognizing the insufficiency of Mr. Farrell's testimony to meet its burden to prove venue by a preponderance of the evidence, the government unpersuasively attempted to bolster its argument through the testimony of John Casey, an alleged victim.  In sum and substance, Mr. Casey testified that he was in Poughkeepsie, New York on the night of October 11, 2022, that he had MNGO token deposits on Mango Markets, that he noticed the price of MNGO spike that evening, and that he tried but failed to withdraw his assets from the platform. Despite the fact that Mr. Casey's actions had clearly done nothing to further Mr. Eisenberg's objectives, the government relied on his testimony in summation by misstating the law to the jury and telling the jurors that the mere presence of a purported "victim"[1] in the District was sufficient to prove venue.

As discussed in greater detail below, even viewed in the light most favorable to the government, a review of the trial record demonstrates a total lack of evidence connecting any act constituting one of the charged crimes to this District.  The government therefore failed to meet its burden to prove venue and the case should be dismissed in its entirety.

### 1.    Applicable Law Regarding Venue

Federal Rule of Criminal Procedure 18 provides that "[u]nless a statute or these rules permit otherwise, the government must prosecute an offense in a district where the offense was committed."  "Venue in criminal cases is more than a technicality; it involves 'matters that touch closely the fair administration of criminal justice and public confidence in it."  *United States v. Aurenheimer*, 748 F.3d 525, 525 (3rd Cir. 2014) (quoting *United States v. Johnson*, 323 U.S. 273, 276 (1944)).  "This is especially true of computer crimes in the era of mass connectivity."

---

[1] Though ultimately irrelevant to determining the issue of venue, it is debatable whether Mr. Casey was a victim.  He testified that all of his money was refunded, and he was later able to withdraw it.  Tr. 823.

*Id.* "It was of such concern that the Constitution of the United States 'twice safeguards the defendant's venue right'" in both Article III and the Sixth Amendment. *Id.* (quoting *United States v. Cabrales*, 524 U.S. 1, 6 (1998)). Venue is thus to be construed narrowly. *Johnson*, 323 U.S. at 276.

Where Congress has not prescribed a specific venue, "[t]he locus delicti must be determined from the nature of the crime alleged and the location of the act or acts constituting it." *Cabrales*, 524 U.S. at 6; *United States v. Rodriguez-Moreno*, 526 U.S. 275, 282 (1999) (Scalia, J., dissenting) (same); *see also Black's Law Dictionary* 1025 (9th ed. 2009) (defining *locus delicti* as the "place where an offense was committed"). Determination of the *locus delicti* requires that the Court "initially identify the conduct constituting the offense . . . and then discern the location of the commission of the criminal acts." *Rodriguez-Moreno*, 526 U.S. at 279. Venue is thus "proper only where the acts constituting the offense—the crime's 'essential conduct elements'—took place." *United States v. Tzolov*, 642 F.3d 314, 318 (2d Cir. 2011) (quoting *Rodriguez-Moreno*, 526 U.S. at 280). The government bears the burden of proving venue as to each count by a preponderance of the evidence. *Id.* at 318.

### 2.    Statement of Facts Regarding Venue

Below is a summary of the entirety of the evidence the government elicited regarding venue.

(a)    The Testimony of James Farrell

Mr. Farrell was called as the government's second witness and was asked about any and all connections between AscendEX and New York.  He testified in relevant sum and substance that:

- He was "the general counsel of HD Consulting," and he and many other HD Consulting employees who provided services to AscendEX worked out of an office in Midtown Manhattan.  Tr. 141-42.[2]

- AscendEX itself did not have a New York office.  Tr. 179.

- AscendEX was a Romanian company that owned and operated a cryptocurrency exchange, and customers of the exchange were customers of this Romanian company.  Tr. 177-78.

- From the time of the company's founding in 2018 to 2021, the parent company was a Singapore company, but, at some point in 2021, it transferred ownership and operations of the exchange to the Romanian entity.  Tr. 178.

- The New York-based HD Consulting employees could access a management portal that contained account information about the various users.  Tr. 146.  Mr. Farrell did not testify that anyone in New York accessed this portal to review information regarding Mr. Eisenberg's account during the relevant time period.

- Deposits were to be reviewed by New York-based finance and development teams, and a daily reconciliation of all deposits and withdrawals was created.  Tr. 148.  Mr. Farrell offered no testimony about when this review could or should occur or that any review of Mr. Eisenberg's account ever occurred, let alone when such a review would have taken place.

- A daily trade reconciliation report reflected transactions appearing on the company's internal ledger and that report was reviewed (at some unspecified time) by the finance team in New York to make sure that trades were accurately captured.  Tr. 151.  Compliance personnel in New York sometimes reviewed these reports if there were "concerning patterns or observations from the trading data."  *Id.*  Mr. Farrell offered no testimony that any of this happened with respect to Mr. Eisenberg's trading, or specifically when such a review would have occurred (in the ordinary course or otherwise).

- The finance team in New York reviewed requests to withdraw assets from the exchange, and the development team in New York executed those transactions.  Tr.

---

[2] References to "Tr." refer to the relevant page of the trial transcript.

152. Mr. Farrell offered no testimony that any of this happened with respect to Mr. Eisenberg, who never withdrew any assets from AscendEX.[3]

- Mr. Farrell was not aware of any disclosure to the public of the fact that any of these teams resided in New York, and specifically stated that to his knowledge this fact was not disclosed on any AscendEX website or application, noting that the terms of service stated that AscendEX was a Romanian company with an arbitration clause that called for disputes to be filed in Singapore. Tr. 178-79, 185.

- Mr. Farrell was shown two automated emails, GX-606 and 607, sent from AscendEX customer support to Mr. Eisenberg that bore a New York City address in the fine print at the bottom of the email below information regarding copyright and a customer support help center. Tr. 189-90.

        (b)     The Testimony of John Casey

Mr. Casey was called for the apparent purpose of establishing a connection between the effects of Mr. Eisenberg's trading and this District. He testified in relevant sum and substance that while in Poughkeepsie, New York on October 11, 2022, after noticing a spike in prices, he became unable to access the approximately $2,000 worth of assets he had on Mango Markets and posted about this on the instant messaging application Discord, GX- 817. Tr. 815-17.

        (c)     The Government's Misleading Summation and Rebuttal

The government spent little time in its primary summation discussing venue, stating only that "you learned that each day AscendEX employees do what's called a reconciliation report where they reconcile the trades in New York City . . . and a finance team reviews them." Tr. 1381. From this statement the government confusingly argued that when Mr. Eisenberg "made these deposits that arrived in New York, they satisfy the venue requirement." Tr. 1381-82. The government failed to explain or substantiate the connection it drew between deposits and the trade reconciliation process, which had nothing to do with one another. More fundamentally, the

---

[3] Notably, Mr. Farrell's testimony was that there were very different procedures for deposits, which were "reviewed" by the finance team (at some unspecified time for some unspecified purpose), and withdrawals, which required finance approval.

government misrepresented the record.  Contrary to the government's assertion, at best a fundamentally deficient inference, there was no evidence that any deposit made by Mr. Eisenberg ever reached New York or that the vague reconciliation process in any way constituted the charged offenses.

After the defense addressed the issue of venue in greater detail in its summation, Tr. 1421, the government attempted to rebut that argument, and in so doing, failed to make a single assertion that was not highly misleading.  The following bullet points are the four factual assertions the government made regarding venue in its rebuttal summation and why each is an obfuscation:

- "Look at Jim Farrel's testimony if you need to.  He explained to you that when Mr. Eisenberg opened an account, that account appears here in New York."  Tr. 1441.

Mr. Farrell testified that account information could be accessed by employees in New York, Tr. 146, but there was no testimony that such information automatically "appears here in New York" or that any employee actually accessed Mr. Eisenberg's information until well after his trading was complete.

- "When Mr. Eisenberg deposited the money that he was going to use to manipulate the market, that was handled by the finance team here in New York."  Tr. 1441.

While Mr. Farrell testified that deposits were supposed to be "reviewed" by the finance team, Tr. 148, he did not testify that the finance team "handled" any deposits.  Moreover, there was no evidence that any New York employee actually reviewed Mr. Eisenberg's deposits during the relevant time period (or otherwise).  Indeed, the documentary evidence was overwhelmingly to the contrary.  AscendEX records, GX-1506, showed that Mr. Eisenberg's

deposit of 100,000 USDT[4] was confirmed within a second and that a confirmation email, GX-606, sent by the customer service team (not finance), which was not in New York, was sent within three seconds of confirmation. *See id.* Similarly, the records, GX-1506, show that a prior deposit of 10,000 USDT was confirmed in under a second at 04:54:11 UTC on October 11, 2022, and a confirmation email sent out two seconds later. GX-608. There was no evidence that the limited number of AscendEX employees in New York did or even could confirm such sizeable deposits in a matter of a second or less. The timing demonstrates that New York employees not only did not "handle" deposits, as the government misleadingly told the jury, the evidence is overwhelming that the process, at least as it related to Mr. Eisenberg, was fully automated by computers and servers with no established connection to this District and did not depend on any employee review thus rendering the government's assertion false.

- "[W]hen Mr. Eisenberg's trading happened, those trades were settled and cleared . . . by the finance team in New York." Tr. 1441.

This is not accurate. The government's attempt to recast an automated, off-shore cryptocurrency exchange into the equivalent of a regulated US broker-dealer was unfounded. Mr. Farrell could hardly have been clearer that there was no manual settlement and clearance of trades, let alone that such a process occurred in New York, when he testified during the government's examination:

> We have what's called a smart order routing engine. What that does is that looks at all the people who have offered to buy a certain cryptocurrency at the price that they designated and all the people who to sell the same, and if the price and people who want to sell at a price, the smart order routing engine matches those two things together and executes the transaction.

---

[4] Mr. Farrell testified that USDT "is commonly referred to as Tether, which is a stable coin that is designed to maintain a one U.S. dollar fixed value." Tr. 157.

Tr. 149-150.  The New York finance team did not match buyers and sellers (clearing trades) or execute the delivery of assets between parties (settling trades).  All of that was automated and done outside this District.  The government's misrepresentation regarding a fact as significant as the nature of the AscendEX exchange in an effort to create venue was substantially misleading to the jury and, as discussed below, in conjunction with the other misrepresentations made by the government in rebuttal requires a new trial under Rule 33. Lastly, the government claimed:

- "[Y]ou heard that Mr. Farrell was sitting in his office in New York when he got the call that they needed to freeze this account."  Tr. 1441.

In fact, Mr. Farrell testified, "I was at home working on something, and online on my work computer."  Tr. 159.  There was no evidence establishing that Mr. Farrell lived in this District.

The government concluded by stating, "That all happened here, and all of those acts were in furtherance of the crime."  Tr. 1441.  However, these purported acts never actually occurred, did not occur in this District, and/or were not in furtherance of Mr. Eisenberg's trading.  The government's arguments regarding the issue of venue simply highlight the lack of evidence establishing the relevant nexus between the charged crimes and this District.

### 3.    Argument

#### (a)    Rule 29: No Evidence of Venue Requires Acquittal

As the detailed factual recitation above makes clear, there was no evidence that any act constituting the offense—the crime's essential conduct elements—took place in this District. *See Tzolov*, 642 F.3d at 318 ("Venue is thus "proper only where the acts constituting the offense—the crime's 'essential conduct elements'—took place.") (citation omitted).  It is

14

undisputed that at all relevant times,[5] Mr. Eisenberg was located and his trading occurred outside this District.  *See* Tr. 1382 (government arguing that Mr. Eisenberg traded from Puerto Rico).

The government's attempt to establish a connection between the services performed for AscendEX by contractors in New York City and Mr. Eisenberg's trading was largely based on nonexistent "facts" which highlights the complete lack of evidence of venue in the record.  As detailed above, the only specific action taken relevant to Mr. Eisenberg about which Mr. Farrell testified was the freezing of his account, an action that took place well after Mr. Eisenberg's trading was complete and which was clearly not part of the offense conduct.  Mr. Farrell additionally offered vague testimony about certain job functions tasked to New York-based groups that might (or might not) have occurred.  *See*, *e.g.,* Tr. 150-151.  The vagueness of this testimony alone renders it irrelevant and insufficient to meet the government's burden.  Moreover, a review of each of these potential acts shows that none was an act constituting the charged crimes.

The first "act" to which the government pointed in summation was the ability of individuals in New York to access account information, including account information belonging to Mr. Eisenberg.  Tr. 1441.  Not only was there no evidence that this happened during the time of Mr. Eisenberg's trading, the government did not even attempt to articulate an argument for how such a hypothetical review of the account information would have been an act constituting the offense.  There was no evidence, for example, that Mr. Eisenberg would have required such a review to complete his trades or that the reviews were part of the trading activity.  Consequently,

---

[5] All of the MNGO purchases on AscendEX occurred between 6:27 pm and 6:45 pm EST on October 11, 2022.  *See* GX-1353.  While there were a small number of sales in the account, those were both irrelevant to the government's claims and in no way touched New York.

this hypothetical review did not constitute the offense and could not, even had they occurred, support venue in this District.

The second "act" to which the government pointed in summation was the supposed review of Mr. Eisenberg's deposits on the AscendEX platform. As discussed above, there was no evidence showing that any such review occurred, and, instead, the evidence, including the confirmation of six-figure deposits occurring in mere seconds or fractions of a second, proved that no such manual review occurred at all, let alone in this District. Moreover, there was no testimony that such a review, had it taken place, was in any way necessary for Mr. Eisenberg's deposits to clear and for him to begin trading on AscendEX. Regardless, the deposit of funds was at most preparatory and was not part of the offenses of commodities fraud, commodities manipulation, or wire fraud. "Venue is not proper in a district in which the only acts performed by the defendant were preparatory to the offense and not part of the offense." *United States v. Beech-Nut Corp.*, 871 F.2d 1181, 1190 (2d Cir. 1989); *see also Tzolov*, 642 F.3d at 319 (collecting cases) (holding that preparatory acts like boarding flights to travel to meeting with investors in which false statements were made in securities fraud scheme were not sufficient for venue because these were preparatory and thus "not acts 'constituting' the violation"); *United States v. Khalupsky*, 5 F.4th 279, 291 (2d Cir. 2021) ("To be in furtherance of the charged offense, acts or transactions must *constitute* the securities laws violation—mere preparatory acts are insufficient.") (emphasis in original). Because depositing funds on a cryptocurrency exchange is not an essential conduct element of fraud or market manipulation, these acts could not establish venue. *See Tzolov*, 642 F.3d at 318 ("Venue is [] proper only where the acts constituting the offense—the crime's 'essential conduct elements'—took place.").

16

The third set of "acts" to which the government pointed in summation was the supposed settlement and clearance of trades by teams in New York. As noted, this was a particularly blatant inaccurate claim by the government belied by the evidentiary record, including Mr. Farrell's testimony that AscendEX's exchange operated on the basis of an automated smart order routing engine. Tr. 149-50.

The fourth "act" to which the government pointed in summation was Mr. Farrell getting a call regarding potentially irregular trading in Mr. Eisenberg's account, which ultimately led to AscendEX freezing Mr. Eisenberg's account. Nothing about this act can reasonably be said to have constituted the offense conduct.[6] Freezing the account, an obvious impediment to trading, was not an element of the charged offenses and cannot reasonably be argued to have aided Mr. Eisenberg in completing his trades. Moreover, the only relevance of AscendEX to the government's theory of the case was that it was allegedly used by Mr. Eisenberg to increase the spot price of MNGO. This purpose would have been accomplished by the time Mr. Eisenberg completed his trades, which was, by definition, before the account was frozen.

Even if the government could point to evidence that one of these was an act constituting one of the charged offenses—and it cannot—venue would still be improper in this District because none of these acts were foreseeable to Mr. Eisenberg. *See United States v. Lange*, 834 F.3d 58, 71 (2d Cir. 2016) (holding in connection with venue that government must prove that "it is foreseeable to the defendant that [] an act would occur in the district and th[e] act does in fact occur"). Mr. Farrell testified that AscendEX marketed itself as a Romanian entity with connections to Singapore and has no offices or employees (other than contractors) in New York.

---

[6] Mr. Farrell further testified that a team in New York City reviews and approves withdrawals, Tr. 152, but there was no evidence presented at trial that Mr. Eisenberg ever withdrew any funds from AscendEX so this testimony bore no relevance to the issue of venue.

Tr. 178-79, 185. The only evidence of any connection between AscendEX and New York of which Mr. Eisenberg could have been aware was the inclusion of a New York address in the fine print of three emails he received. GX-606-608. In each, the address and preceding text appeared in small print at the bottom as follows:

Reminder: This email contains very important and confidential information. Please do not share this email with any third party. For any questions, please contact Customer Support at https://ascendex.com/en/help-center

Copyright © 2022 AscendEX. All rights reserved.
22 W 19th St, 4th Floor, New York, NY 10011

This text provides no notice that AscendEX had a clandestine office in New York City under the name of a different company that includes finance, development, and compliance teams. Instead, it gave the email recipient nothing more than the indication that AscendEX might have had a customer support team and/or a copyright office in New York City.

Finally, the government stated in rebuttal summation that Mr. Casey's discovery while in Poughkeepsie that he could not withdraw his MNGO tokens established venue. Here, too, the government could not and did not articulate any explanation as to how Mr. Casey's inability to withdraw assets from Mango Markets constituted the offense conduct. Instead, the government resorted to a blatant misstatement of the law, telling the jury, "There was a victim right here in the [D]istrict, too, which is another way you know that venue is proper here." Tr. 1442. No court has ever so held. Both the Supreme Court and the Second Circuit (and every other circuit court), however, have stated that "venue in a criminal trial [is limited] to the place of the essential *conduct* elements of the offense." *United States v. Bowens*, 224 F.3d 302, 309 (4th Cir. 2000) (citing *United States v. Anderson*, 328 U.S. 699, 705 (1946); *Cabrales* 524 U.S. at 7-8; *see also*, *e.g.*, *Tzolov*, 642 F.3d at 318 ("Venue is proper only where the acts constituting the offense . . . took place.")). At least one circuit court has specifically rejected the location of victims as a basis for venue. *See Aurenheimer*, 748 F.3d at 535-36 (holding venue improper in

CFAA case regarding improper acquisition of email account information despite the fact that approximately 4,500 of the email addresses obtained belonged to residents of the district of prosecution because the defendants committed all acts comprising the alleged crimes while located and using servers out of the district).[7]

In addition to the above-described evidentiary deficiencies with regard to venue for all three counts, the government further failed to meet its burden of proof regarding wire fraud venue because the government failed to elicit evidence of a single wire in furtherance of the alleged scheme originating in, traversing through, or terminating in this District.  *See United States v. Kim*, 246 F.3d 186, 191-92 (2d Cir. 2001).  Importantly, no other evidence in the trial record beyond that which the government unpersuasively attempted to argue established venue during its primary and rebuttal summations exists that would establish venue. [8]

Because the government failed to identify any evidence of any act (or wire) constituting any of the offenses that occurred in this District, it failed to meet its burden to prove venue and all of the charges should be dismissed.

---

[7] The Third Circuit in *Aurenheimer* noted that in *United State v. Reed*, 773 F.2d 477, 481 (2d Cir. 1985), the Second Circuit articulated a substantial contacts test that included, among other facts, "the locus of the effect of the criminal conduct," but wrote that "the test operates to limit venue, not to expand it."  748 F.3d at 536.  The Second Circuit has similarly clarified that the "substantial contacts inquiry is not a 'formal constitutional test,' but instead is a useful guide to consider 'whether a chosen venue is unfair or prejudicial to a defendant.'"  *Lange*, 834 F.3d at 71 (quoting *United States v. Saavedra*, 223 F.3d 85, 93 (2d Cir. 2000)).

[8] While the government's burden to prove a wire into or out of this District for venue was proof by a preponderance of the evidence, it was also required as an element of the offense of wire fraud to prove an interstate wire in furtherance of the scheme beyond a reasonable doubt, which it failed to do for the reasons articulated in connection with the discussion of Count 3 in Section E below.

      (b)      <u>Rule 33: In the Alternative, the Government's Misrepresentations<br>Require a New Trial</u>

As detailed above, the government repeatedly, virtually with every sentence related to venue, misrepresented both the law and the facts in its rebuttal summation, to which the defense had no opportunity to respond. There is "broader discretion to grant a new trial under Rule" than "to grant a motion for acquittal under Rule 29." *Ferguson*, 246 F.3d at 134 (citing *Sanchez*, 969 F.2d at 1414). The touchstone for the Court in evaluating a Rule 33 motion is determining "whether letting a guilty verdict stand would be a manifest injustice." *Id.* (citing *Sanchez*, 969 F.2d at 1414).

The government misrepresented the record in ways both big and small, but overall gave the jury a completely distorted view of the record on venue, failing to offer a single argument actually supported by the record while repeatedly twisting or inventing facts. Most notably, the government alleged that trades were settled and cleared in New York City, which is not accurate. But the government also made extra-record assertions when it stated that the finance team handled deposits and that Mr. Farrell was located in New York when he was notified of abnormal trading of MNGO on AscendEX.

The government compounded these misleading assertions by misstating the law, telling the jury that the mere presence of a victim in this District is sufficient to find venue. All of these misstatements of the facts and the law are particularly significant given the total lack of evidence of venue in this case. Given this lack of evidence, the government's improper summation was manifestly unjust and likely led to the conviction of an innocent man. *Ferguson*, 246 F.3d at 134. The Court should thus grant the Rule 33 motion and order a new trial.

(c)     Rule 33: In the Alternative, the Jury Instructions Require a New Trial

During the charge conference, the defense requested with respect to Counts 1 and 2 that the language of the instruction be changed from requiring an act in this District "in furtherance of the charged crimes" to requiring "an act constituting the charged crime," citing *Tzolov*, 614 F.3d 314. Tr. 1309-12. The government objected, stating that the holding of *Tzolov* did not apply to charges under the CEA because, according to the government, the venue requirement to prove the occurrence of an act constituting the charged crime in this District was inapplicable because it was based on the "purchase or sale requirement" of the securities laws, which did not apply in this case because the CEA contains no corresponding language. Tr. 1311. The Court overruled the defense's objection. Tr. 1312.

The government was undisputedly wrong on the law. In two seminal cases regarding venue, the Supreme Court stated that the "*locus delicti* of the charged offense must be determined from the nature of the crime alleged and the location of the ***act or acts constituting it.***" *Rodriguez-Moreno*, 526 U.S. at 279 (emphasis added) (cleaned up); *Cabrales*, 524 U.S. at 6-7. Notably, neither *Rodriguez-Moreno* (kidnapping, etc.) nor *Cabrales* (money laundering) involved securities fraud or another statute containing a "purchase or sale" requirement. The Second Circuit repeatedly reaffirmed this standard, most notably in *Tzolov*, which stated that "[v]enue is proper only where the acts constituting the offense—the crime's 'essential conduct elements'—took place." 642 F.3d at 318 (citing *Rodriguez-Moreno*, 526 U.S. at 280). More recently, the Second Circuit held that "'when a federal statute defining an offense does not [expressly] specify' [where venue lies], venue is proper in the district 'where the acts constituting the offense—the crimes essential conduct elements took place.'" *United States v. Kaufman*, No. 21-2589, 2023 U.S. App. LEXIS 3275, 2023 WL 1871669, at *1 (2d Cir. Feb. 10,

2023) (cleaned up) (quoting *Tzolov*, 642 F.3d at 318).  Because the CEA does not specifically direct otherwise, the proper standard for determining venue in this case is thus whether the government proved any acts constituting the offense in this District.

To be sure, there is a lack of total clarity in the caselaw regarding whether the "in furtherance" standard has been replaced by the "constituting the offense" standard, *see Khalupsky*, 5 F.4th at 291 ("To be in furtherance of the charged offense, acts or transactions must *constitute* the securities fraud violation—mere preparatory acts are insufficient.") (emphasis in original), but it is clear that "constituting the offense" is, at the very least, the preferred articulation of the standard.  *See Tzolov*, 642 F.3d at 318-19.  This is particularly so when the government's theory of venue relies on preparatory acts, as it does in this case.  In *Tzolov*, the Court rejected the government's attempt to rely on the "in furtherance" standard articulated in *United States v. Svoboda*, 347 F.3d 471 (2d Cir. 2003), because "[i]n *Svoboda* we were not faced with the question of whether preparatory acts alone could establish venue."[9]  642 F.3d at 319.

For the reasons discussed above, Mr. Farrell's testimony was extremely vague and failed to establish that any act occurred in this District until well after Mr. Eisenberg completed his trading on AscendEX.  Nevertheless, the government argued that it had established venue on the basis of testimony that Mr. Farell gave about potential acts that could have been done in New York but that were, at most, preparatory, to the alleged crimes, including that New York employees could have accessed Mr. Eisenberg's account information when he opened an account, Tr. 1441, and could have viewed his deposits.  *Id.*  It was critical that the jury

---

[9] As an alternative reason, the Second Circuit distinguished *Svoboda* in a footnote on the basis that the defendant in *Tzolov* "was tried under a statute governed by a specific venue provision." 642 F.3d at 319 n.3.  Its primary reason for distinguishing *Svoboda*, however, and the entirety of its discussion comparing the two cases involved the issue of preparatory acts.

understand that preparatory acts like opening an account—which did not even happen in New York City—are irrelevant because they are not acts constituting the crime, regardless of whether they arguably could have furthered the charged conduct.

The Court, on the basis of the government's totally erroneous legal argument, failed to give the appropriate instruction requested by the defense. In doing so, there was a possibility that the jury was satisfied that the venue requirement was met on the basis of preparatory acts, an invalid conclusion under the law. Because there is a "real concern that an innocent person [may] have been convicted" under the government's baseless theory of venue, in the event that it does not dismiss the charges, the Court should grant Mr. Eisenberg a new trial. *Ferguson*, 246 F.3d at 134.

**B.    Counts 1 and 2: The CEA Does Not Apply**

### 1.    Rule 29: The MNGO Perpetual is Neither a "Swap" Nor a "Mixed Swap"

Initially, the government failed to prove that the MNGO Perpetual was a swap at all. As the government acknowledged, Mr. Eisenberg held both the long and short positions in connection with all of his MNGO Perpetual contracts, and, as a result, he was not exposed to any risk. Tr. 1349. In summation, the government argued:

> These are both of his accounts, he's on both sides of this, he is both the long and the short. If the price of Mango goes up, one of his accounts makes money and one of his accounts loses money. If the price of Mango goes down, one of his accounts loses money and one of his accounts makes money. But no matter what, he hasn't gained or lost anything.

*Id.* The statute states that "'swap' means any . . . transaction . . . that provides on an executory basis for the exchange . . . of 1 or more payments . . . and that transfers . . . the financial risk associated with a future change" in an asset' value." 7 U.S.C. § 1a(47)(A)(iii). Because Mr. Eisenberg's transactions with himself involved no risk transfer, the MNGO Perpetual was not a

"swap," and Counts 1 and 2 should be dismissed.  *See SEC v. Terraform Labs Pte. Ltd.*, No. 23 Civ. 1346 (JSR), 2023 U.S. Dist. LEXIS 230518, *56-57 (S.D.N.Y. Dec. 28, 2023) (granting partial summary judgment and dismissing SEC claim for failure to prove a security-based swap because "there is no evidence in the record showing how a holder of [the instrument] transfers any "financial risk associated with a future change' in the value of [the underlying asset] to or from a counterparty in a transaction") (citing 7 U.S.C. § 1a(47)(A)(iii)).  Mr. Eisenberg at all times "b[ore] all of the risk for himself," transferring none to a counterparty, and thus did not engage in a swap transaction. *See id.*  at *56.

Even if the MNGO Perpetual were deemed a "swap," the evidence presented at trial was unequivocal that the MNGO Perpetual would be classified as a "securities-based swap" and not a "swap" and would therefore not be covered by the CEA, 7 U.S.C. § 1 *et seq*.  Fundamentally, the classification of instruments under the CEA depends upon an analysis of the nature of the risk being transferred, and the risk transferred by the MNGO Perpetual related entirely to the future price of MNGO, an undisputed security.[10]  *See* Tr. 377-78 (explaining that MNGO Perpetual is a bet on price changes in MNGO).  Stated another way, the MNGO Perpetual was a derivative asset based entirely on various measures of the movement in price of MNGO.  Because all of the inputs into the MNGO Perpetual were securities-based, the MNGO Perpetual was itself a security subject to the exclusive jurisdiction of the SEC and specifically exempted from the purview of the CEA.

The government's attempts to insert the settlement medium, USDC, the virtual equivalent of USD, as an asset upon which the MNGO Perpetual's value was based is patently inconsistent with the factual record and logically and legally wrong.  USDC, which is pegged to the dollar

---

[10] The jury was instructed that it could "assume that MNGO is a security."  Tr. 1466.

and for which the protocol did not even use an exchange rate, was a medium of exchange used to effectuate the transaction and was at most incidental to the risk exchanged in the MNGO Perpetual.  Similarly, the government's attempt to use the funding payments of the MNGO Perpetual, a payment stream based entirely on the price of MNGO, a security, to convert the MNGO Perpetual into something other than a security (a mixed swap) finds no support in law and is antithetical to the framework of the statute, which invested exclusive jurisdiction over securities in the SEC (and not the CFTC).  Like USDC, the funding payments, the purpose of which was to keep the MNGO Perpetual's market price in line with the price of MNGO, were simply a mechanism to effectuate the transfer of MNGO price risk.  Thus, even credited with all reasonable inferences, the government still failed to meet its burden to prove that the MNGO Perpetuals were "swaps."  The CEA is therefore inapplicable, and the commodities fraud and manipulation counts (Counts 1 and 2) should be dismissed.

The government's sole theory at trial for the application of the CEA was that the MNGO Perpetuals were swaps as that term is defined in 7 U.S.C. § 1a(47).  However, under 7 U.S.C. § 1a(47)(B)(x), security-based swaps are excluded from the definition of swap and not covered by the CEA.  The definition of security-based swap is found in the securities laws and is a swap under the commodities laws that is based on a security or a narrow-based security index.  15 U.S.C. § 78c(a)(68)(A).  The government did not contest that MNGO was a security.  Tr. 1295.  Nor it seems did the government contest that the MNGO Perpetual was based on the value of MNGO and thus a securities-based swap.  Instead, the government's only theory for the application of the CEA was that the MNGO Perpetual was also a "mixed swap" and therefore both a security subject to securities laws, 15 U.S.C. § 78c(a)(10) ("The term 'security' means any . . . security-based swap. . ."), 15 U.S.C. § 78c(a)(68)(D), and a swap subject to commodities

laws, 7 U.S.C. § 1a(47)(D).[11]  The government claimed this was so because the MNGO

Perpetuals were based on the value of USDC and on a funding rate.  Neither argument was

supported by any evidence at trial or by the law.

As Judge Oetken explained in his dismissal order rejecting the CFTC's argument that

certain security-based swaps were mixed swaps in *CFTC v Archegos Capital Mgmt. LP*, 2023

WL 6123102, 2023 U.S. Dist. LEXIS 166409, at *7 (S.D.N.Y. Sep. 19, 2023):

> Pursuant to Title VII of the Dodd-Frank Act, Congress allocated regulatory
> authority to the SEC over "security-based swaps" and the CFTC over "swaps."  *See*
> 15 U.S.C. § 8302(b).  The agencies hold joint authority over "mixed swaps."  15
> U.S.C. § 8302(a)(8).  Congress also directed the agencies, in consultation with the
> Federal Reserve, to adopt rules further defining each term. 15 U.S.C. § 8302(d)(1).
> The agencies did so via a joint rulemaking ('the Joint Release') promulgated on
> August 13, 2012.  Further Definition of "Swap," "Security-Based Swap," and
> "Security Based-Swap Agreement"; Mixed Swaps; Security-Based Swap
> Agreement Recordkeeping, 77 Fed. Reg. 48208, 48264 (August 13, 201).[12]

Judge Oetken further noted:

> [T]he Joint Release makes clear that the category of mixed swaps is intended to be
> a "narrow" one, covering only a "small subset of Title VII instruments."  Joint
> Release at 48291.  It further specifies that: "For example, a Title VII instrument in
> which the underlying references are the value of an oil corporation stock and the
> price of oil would be a mixed swap. Similarly, a Title VII instrument in which the
> underlying reference is a portfolio of both securities (assuming the portfolio is not
> an index or, if it is an index, that the index is narrow-based) and commodities would
> be a mixed swap."  *Id.*

---

[11] "Mixed swaps are the narrow category of agreements, contracts, or transactions that are
subject to Title VII of the Dodd-Frank Act and thus referred to as a Title VII instruments and that
are simultaneously both 'swaps' and 'security-based swaps.'"  *CFTC Fact Sheet: Final Rules
and Interpretations i) Further Defining "Swap," "Security-Based Swap," and "Security-Based
Swap Agreement"; ii) Governing Books and Records for "Security-Based Swap Agreements,"* at
6, 8 available at
https://www.cftc.gov/sites/default/files/idc/groups/public/@newsroom/documents/
file/fd_factsheet_final.pdf.

[12] The Joint Release is additionally reported in 17 CFR Part1 (CFTC), and 17 CFR Parts 230,
240, and 241(SEC) and can be accessed in its entirety at:
https://www.govinfo.gov/content/pkg/FR-2012-08-13/pdf/2012-18003.pdf.

As the examples in the Joint Release noted in *Archegos* make clear, in order to make a security-based swap also a mixed swap, the instrument must contain an underlying reference (not a single security or a narrow-based securities index) sufficient to qualify the instrument a swap like the price of a commodity such as oil. The definition of swap involves an exchange of "the financial risk associated in a future change in [the] value or level [of a financial or economic interest] without also conveying a current or future direct or indirect ownership interest in an asset . . . or liability." 7 U.S.C. § 1a(47)(iii). Because neither USDC nor the funding rate is such a reference, the MNGO Perpetual is not a mixed swap.

(a)     <u>USDC</u>

The government has long sought to rely on the use of USDC in the spot and perpetuals markets for MNGO as a basis for the application of the CEA despite the fact that it was nothing more than the virtual equivalent of USD. The government previously tried but failed to prove that USDC was itself a commodity before ultimately being forced to abandon its reliance on this theory due to a lack of admissible supporting evidence. At trial, the government also argued but ultimately provided no evidence that the value of USDC was a component on which the MNGO Perpetual was based. This argument fails because the evidence was unequivocal that changes in the value of USDC would have no effect on the price of the MNGO Perpetual, which was based exclusively on various measures of the value of MNGO.

Because USDC was nothing more than a medium of exchange, a stand-in for USD to facilitate transactions on the crypto markets, the MNGO Perpetual was not "based on the value of" USDC, and the government's proffered basis for application of the CEA fails. *See* 7 U.S.C. § 1a(47)(D). Likewise, the evidence confirmed that USDC could not serve as an underlying reference that rendered the MNGO Perpetual a mixed swap because the value of the MNGO Perpetual did not depend on "the financial risk associated in a future change in [the] value" of

USDC." 7 U.S.C. § 1a(47)(iii). Because USDC was merely assumed to be the equivalent of USD with no conversion, it did not factor in the financial risk exchanged and could not render a Title VII instrument like MNGO Perpetuals a swap (or a mixed swap).

The evidence at trial was overwhelming that the value of the MNGO Perpetual was based on (various measures of) the value of the MNGO token and that this value was reported ***in USD (not USDC)***. Tyler Shipe, the government's primary fact witness regarding the mechanics of Mango Markets, testified that the MNGO Perpetual was "the futures market for the MNGO token." Tr. 373. He stated that the price of the MNGO Perpetuals was listed in cents and USD. Tr. at 375 (testifying regarding GX-916). Mr. Shipe further testified that "the value of perpetuals go[es] up" or "[t]hey're worth less" depended on whether the value of Mango went up or down. Tr. 377-78. By contrast, Mr. Shipe offered no testimony that the MNGO Perpetual depended in any way on the value of, let alone future changes in the value of, USDC.

Various documents in evidence also demonstrated that key indicators of the price or value of MNGO Perpetual were not even listed on the Mango Markets site in USDC and were instead denominated in USD. In a letter submitted during trial arguing in support of its requested jury instructions regarding mixed swaps, the government asserted that the value of USDC was a basis for the MNGO Perpetuals because they "appeared on the Mango Markets website as being based on the relative value of MNGO and USDC." Dkt. 145 at 3. That assertion is not accurate. In the very exhibit cited by the government as support for its requested charge, GX-991, the "notional size," "oracle price," "24hr volume," "open interest," "unrealized PnL," and "redeemable value" are all listed in USD. *Id.* Similarly, snapshots of Mr. Eisenberg's account list deposit and asset values in USD. GX-915, 916. Neither Mr. Shipe nor any other witness

testified that the value of the MNGO Perpetuals depended on movements in the value of USDC, and the documentary evidence also flatly contradicts this assertion.[13]

The trial evidence proved overwhelmingly that USDC was nothing more than an equivalent for USD used to settle the MNGO Perpetual because a cryptocurrency (rather than fiat currency like the dollar) was needed to execute trades on the block chain. Tr. 328 (government expert Kapil Jain explaining the concept of base currencies on crypto exchanges and that USD could be the base currency even though dollars are not actually usable on the exchange because they are not a cryptocurrency). Indeed, the evidence established that both the Mango oracle, which computed the settlement price for the MNGO Perpetual on the basis of spot prices for MNGO, and Mango Markets used no exchange rate and simply regarded USDC (and USDT) as equaling USD when gathering Mango token pricing data from Serum (stated in USDC), Ascendex (stated in USDT), and FTX (stated in USD) and converted it into a single oracle price stated in dollars. Tr. 472-73, 480. In explaining why a calculation converting USDC into USD was unnecessary, Christopher Hermida, CEO of Switchboard, the company that created and hosted the Mango Markets oracle, testified that any difference between dollars and dollar equivalents (USDC and USDT) was so infinitesimal that it was of no consequence to the oracle.[14] Tr. 472-73, 480. He further stressed the lack of distinction between USDC and USD

---

[13] The government relied on this same critical factual error in a colloquy with the Court, stating, "Both on Mango Markets and in the oracle the price of Mango is relative to USDC. It's not Mango compared to U.S. dollars." Tr. 1288. This assertion was flatly wrong. Trial testimony and documentary evidence established that the value of the MNGO Perpetual on Mango Markets was listed in USD and that the oracle price was also reported in USD. GX-915, 916, 991; Tr. 375, 780.

[14] Mr. Hermida testified that USDT was "normalized" into USDC, but no conversion was done between USDC and USD, and, in any event, the values of all three were so nearly identical that even the "normalization" of USDT into USDC was insignificant. Tr. 471-72.

by pointing out that anyone with a Circle or Coinbase account could redeem USDC for USD one-for-one at any time regardless of the value of USDC.  Tr. 473.

Moreover, Mr. Hermida testified that the oracle settlement price was reported in USD, Tr. 480, which was then settled on Mango Markets in USDC without any price conversion, further proving the lack of any meaningful distinction between USDC and USD.[15]  Similarly, Dr. David Mordecai, in defending his use of USDC on slides reflecting pricing data that was actually in USD, testified that, during the applicable time period, the values of USDT, USDC, and USD were essentially identical and interchangeable and that his error in using the wrong currency was therefore immaterial.  Tr. 791.  The trial evidence thus demonstrated that any hypothetical change in the value of USDC would have had absolutely no effect on the value of the MNGO Perpetual.

In the face of this overwhelming evidence that USDC was not a factor in the risk transferred in the MNGO Perpetual, the government advanced increasingly logically flawed arguments totally divorced from the statutory structure and basic principles of economics.  The government repeatedly argued that any time someone purchased a good or service, they were selling their currency.  *See*, *e.g.,* Tr. 5-6, 1289, 1414.  In other words, if someone buys a cup of coffee, they do so by selling dollars or some other currency and a swap based on such a transaction would therefore incorporate the risk of that currency changing in price.  Building on

---

[15] The government argued that "USDC is an inseparable component" of the MNGO Perpetual in this matter because Mr. Eisenberg it claims "artificially chang[ed] the supply and demand conditions for the MNGO/USDC pair on three exchanges."  Dkt. 145 at 3.  In fact, both Ascendex (USDT) and FTX (USD) reported the spot price of Mango in something other than USDC, and the oracle price itself was reported in USD.  GX-1353.  The facts of this case thus demonstrate that not only was USDC separable from the value of the spot prices, it was in some cases never a part of the trading and in all cases separated entirely by the time the oracle calculated the settlement price.

this extremely flawed argument that any transaction involving currency necessarily implicated the underlying currency as a fundamental factor in the value of the good or service being purchased, the government sought rhetorically to allow the narrow mixed swap exception to completely swallow the category of security-based swaps, stripping the SEC of a substantial portion of its exclusive jurisdiction in the process.

In open court, the government also argued, citing nothing, that any swap based on a stock settling in a foreign currency is a mixed swap. Tr. 1325. In describing a hypothetical "swap that's based on the value of [a Japanese] stock and the yen," the government took the extraordinary position that "the yen makes it a mixed swap too because the yen would be, under the mixed-swap definition, a currency that this is also based on the value of." *Id.* At an earlier proceeding, the government articulated its theory that but for the fact that dollars have "a special carving out through [] the treasury acts," the same analysis would apply to dollar-denominated stock-based swaps and that, in such a scenario, dollars would be deemed a commodity. Tr. 62. Indeed, the government in these two colloquies with the Court essentially stated, without any authority other than its creative parsing of the language of the statute, that the use of any settlement currency, fiat or crypto, not specifically carved out of the statute would turn any derivative transaction into a swap and any security-based swap into a mixed swap, essentially destroying the statutory scheme and division of powers the Commissions spent hundreds of pages articulating in their Joint Release. The Joint Release makes clear that the SEC, which in *Archegos* took the rather remarkable step of arguing in an amicus brief against a far narrower definition of mixed swaps taken by the CFTC, would strongly disagree with this extreme government position.

Indeed, in the Joint Release—the single most important source for defining the critical terms of the CEA and one which the government has almost completely ignored—the SEC and CFTC (the "Commissions") contradicted the government's interpretation in their comparison of "quanto" and "compo" equity Total Return Swaps (TRS):

> ***The Commissions view a quanto equity swap as a security-based swap, and not a mixed swap***, where (i) the purpose of the quanto equity swap is to transfer exposure to the return of a security or security index without transferring exposure to any currency or exchange rate risk; and (ii) any exchange rate or currency risk exposure incurred by the dealer due to a difference in the currency denomination of the quanto equity swap and of the underlying security or security index is incidental to the quanto equity swap and arises from the instrument(s) the dealer chooses to use to hedge the quanto equity swap and is not a direct result of any expected payment obligations by either party under the quanto equity swap.
>
> By contrast, in a compo equity swap, the parties assume exposure to, and the total return is calculated based on, both the performance of specified foreign stocks and the change in the relevant exchange rate. Because the counterparty initiating a transaction can choose to avoid currency exposure by entering into a quanto equity swap, the currency exposure obtained via a compo equity swap is not incidental to the equity exposure for purposes of determining mixed swap status. In fact, investors seeking synthetic exposure to foreign securities via a TRS may also be seeking exposure to the exchange rate between the currencies, as evidenced by the fact that a number of mutual funds exist in both hedged and unhedged versions to provide investors exposure to the same foreign securities with or without the attendant currency   Consequently, a compo equity swap is a mixed swap.

Joint Release at 48265-66 (emphasis added).  "The Joint Release instructed that quanto swaps are security-based swaps (and not mixed swaps) because "the dealer's exchange rate exposure could be seen as incidental to the securities exposure desired by the party initiating the quanto equity swap."  Joint Release at 48265.  By contrast, a compo equity swap would be a mixed swap because "in a compo equity swap, the parties assume exposure to both the performance of specified foreign stocks and the change in the relevant exchange rate."  *Id.*

USDC cannot render the MNGO Perpetual a mixed swap because its role was similar to the role of the foreign currency in the quanto equity swap example—and dissimilar to the role of

the foreign currency exchange rate in the compo equity swap example. This would have been the case even had there been an exchange rate between USDC and USD, because that exchange rate would have been no more than incidental to the risk exposure transferred between the parties to the transaction. The trial evidence demonstrated that the exclusive purpose of the MNGO Perpetual was to gain exposure to changes in the price of MNGO, not to gain exposure to price changes in USDC. Tr. 377-78, 469-70. Moreover, the evidence proved that there was no exchange rate calculation at all; USDC and USD were simply assumed to have the same price. There was thus no theoretical USDC risk exposure the MNGO Perpetual investor could have assumed. Tr. 472-73. The risk transfer in the MNGO Perpetual thus bore substantially less connection to USDC than did the quanto equity swap example in the Joint Release to either the domestic or foreign currency used to effect that transaction.

Moreover, the Joint Release's discussion of quanto and compo swaps establishes that in order for a reference to render a security-based swap a mixed swap it must not be transferred between the parties. Because USDC was transferred, it was not such a reference.[16] The Joint Release thus counsels that the MNGO Perpetual cannot be a mixed swap on the basis of USDC.

In attempting to justify its radical position that any currency used to settle a transaction would cause a security-based swap to be a mixed swap, the government claimed inaccurately that "[t]his is actually right out of the total return swap stuff that [the defense] cited." Tr. 1325. In fact, Joint Release's discussion of TRS, including the aforementioned discussion of quanto

---

[16] Throughout the discussion of compo and quanto equity swaps, the CFTC and SEC discuss the need to evaluate the "purpose" of the swap, and, in particular, the purpose of the exposure being exchanged. Joint Release at 48266-67. The testimony in the trial record was definitive that trading in MNGO Perpetuals was exclusively done for the purpose of gaining exposure into price changes in MNGO (hence the name of the perpetual). Tr. 377-78, 469-70. There was no testimony or other evidence that the purpose of trading the MNGO Perpetual was to gain exposure to USDC.

and compo equity swaps, made clear that rates and other inputs incidental to the risk transferred could not make an instrument a mixed swap; only inputs integral to the risk transfer like "embed[ed] interest-rate optionality (e.g. a cap, collar, call or put)" or "the price of oil" would render the instrument a mixed swap.  Joint Release at 48265.  The Joint Release thus clarified that the CEA's discussion of "currency" as an underlying reference in "swaps," *see* 7 U.S.C. § 1a(47), referred to currency exchanges and exchange rates integral to the risk transfer, not the fact that money or other currency (like USDC) was used to complete the transaction.

Because USDC was nothing more than a substitute for USD whose value was incidental to the risk exposure being transferred in the MNGO Perpetuals, USDC could not render the MNGO Perpetual a mixed swap.  The government's reliance on USDC as a hook is thus misplaced and should be rejected.

(b)   <u>Funding Payments</u>

The government's second asserted basis for the MNGO Perpetuals being mixed swaps relied on funding (payments).  Because funding is nothing more than a stream of payments based on a single security, MNGO, it cannot be the basis for a mixed swap under the CEA.  Moreover, funding bears no resemblance to the examples of references the CFTC and SEC gave in the Joint Release that would convert a security-based swap into the narrow category of mixed swaps such as the price of oil or interest rate optionality.  *See* Joint Release at 48265.  Unlike those references, the funding payments were merely incidental to the risk transfer whose sole purpose was to keep the price of the MNGO Perpetual in line with the price of its underlying security, MNGO.

As an initial matter, the parties imprecisely referred to the reference as the "funding rate" during the course of the trial.  In fact, both witnesses and the Mango Markets documentation made clear that the payments themselves are called "funding" or "funding payments."  GX-1011

34

at 92 ("Funding is the mechanism used to ensure that the price of a futures contract stays in line with the current spot price."); Tr. 304 (Jain: "There's a second source of value called the funding payments."). The funding rate, by contrast, is the computation of how much funding is paid out and with what frequency. GX-1011 at 45-46, 92. The relationship between funding and the funding rate is similar to the relationship between interest payments and an interest rate. As discussed below, the government seized on this confusion of terms as the centerpiece of its flawed argument that funding made the MNGO Perpetual a mixed swap, analyzing various dictionary definitions of the word "rate," *see* Dkt. 145 at 3, in support without addressing the more relevant fact that funding was a payment stream based upon the price of securities.[17]

Mechanically, the MNGO Perpetual's funding was a stream of periodic payments made by the short traders to the long traders or vice versa calculated based on the difference between the market price of the MNGO Perpetual—the mid-price of the order book averaging the best bid and ask—and the oracle settlement price. Tr. 241-43; GX-1011 at 92. Funding payments were made by the shorts to the longs when the oracle price exceeded the order book mid price (the market price of the perpetual) and vice versa. Tr. 243-44. According to the Mango Markets documentation, "Funding is a mechanism used to ensure that the price of a futures contract stays in line with the current spot price." GX-1011 at 92.[18] Funding payments were necessary to keep

---

[17] The government previously wrote, "The defense's error begins with the name of the term itself. Mango Markets documents repeatedly refer to a 'funding rate.'" Dkt. 145 at 3 (citing GX-1011 at 45, 52, 92). The government's citation directly undercuts its position. The top section of Page 92 of the Mango Markets documentation,GX-1011, is titled "Funding," states that "Funding is the mechanism" for payment and, talks about how "funding is paid." The references to "rate" and "funding rate" on page 92 and elsewhere in the documentation relate to the manner in which "funding" is determined.

[18] Notably, the Mango Markets documentation denominated funding rate payments, as it did virtually everything else relating to the perpetual, in dollars (and not USDC). GX-1011 at 92.

these prices from diverging because the contracts were perpetual in nature and thus had no expiration date.  Tr. 244.

Both the text of the statute and the Joint Release make clear that payments such as funding cannot make the MNGO Perpetual a mixed swap.  The CEA and the Securities Exchange Act define mixed swap as a subset of security-based swaps that also are based on the value of one or more interest or other rates, currencies, commodities, instruments of indebtedness, indices, quantitative measures, other financial or economic interest or property of any kind (***other than a single security or a narrow-based security index***).  7 U.S.C. § 1a(47)(D) (emphasis added); 15 U.S.C. § 78c(68)(D) (emphasis added).  Because the funding was based entirely on the price(s) of MNGO, it was specifically excluded from the definition of mixed swap.

As noted above, the funding payments were calculated based on two sources, both of which were derived from the price of MNGO, the oracle and the order book price.  Mr. Hermida testified that the oracle was determined by taking the median price for MNGO from three cryptocurrency exchanges, FTX, AscendEX, and Serum DEX, and from those prices a median price was calculated, which became the oracle price.  Tr. 468.  The oracle was thus an index for determining the accurate spot price of MNGO, a security.  Tr. 459.

The other input into the funding payments was the mid price of the order book, the market or trading price of the MNGO Perpetual on Mango markets.  That price also was a function of MNGO, a security.  As Messrs. Hermida and Shipe, and others explained, the MNGO Perpetual was a bet on whether the spot price of MNGO would go up or down.  Tr. 377-78, 469-70.  And while the order book price and the oracle price (the MNGO spot price) could at

times diverge, the funding payments were designed so that the two prices would ultimately converge. GX-1011 at 92.

The funding payments were thus based on various calculations either directly or indirectly relying upon the price of MNGO. Conversely, there were no inputs into the funding that were not derived from the value of MNGO and certainly none that were not derived from securities.[19] For the reasons previously discussed, the value of USDC was irrelevant to the basis of the MNGO Perpetual and its order book price. The same was true of the oracle. Indeed, Mr. Hermida, who designed the oracle, mentioned USDC only briefly as the currency used on one of the feeder exchanges, Serum, Tr. 457, but otherwise made clear that the oracle price was reported in USD without any conversion from USDC, Tr. 472-73, and was based exclusively on the price of MNGO. Tr. 459.

This conclusion that funding did not make the MNGO Perpetual a mixed swap is further supported by the Joint Release, which noted that payment streams like this based on securities are references of securities-based swaps that are not swaps or mixed swaps subject to the CEA. The Joint Release states:

> Broadly speaking, Title VII instruments based on interest or other monetary rates would be swaps, whereas ***Title VII instruments based on the yield or value of a single security, loan, or narrow-based security index would be security-based swaps***.

---

[19] Even if it were determined that the mid price of the MNGO Perpetual was a unique price and not simply a bet on the price of MNGO spot, it would still be the price of a security. Because the MNGO Perpetual was a security-based swap, it was also itself deemed a security by the Securities Exchange Act. 15 U.S.C. § 78c(a)(10) ("The term 'security' means any . . . security-based swap. . .").

Joint Release at 48262 (emphasis added).[20]  In denoting illustrative examples of rates that would cause an asset to fall within the ambit of the CEA, the Joint Release includes rates bearing no resemblance to the funding payments in this case, including interbank offer rates, money market rates, government target rates, general lending rates, broad based indexes, and other monetary rates like the Consumer Price Index.  *Id.*  at 48263.  By contrast, the Joint Release notes that yields on securities—except specifically exempted securities like Treasuries not at issue here— and narrow-based security indexes are generally subject to SEC (and not CEA) jurisdiction.  *Id.* at 48264.

In short, the funding payments were akin to a yield based upon the value of a single security, MNGO, and therefore cannot make the MNGO Perpetual a mixed swap.  However, were the Court to conclude that the various versions of the price of MNGO that serve as the inputs into the calculation of the funding payment were different securities, the funding would nevertheless not render the MNGO Perpetual a mixed swap because the funding would be a narrow-based security index.  The funding payments were based upon a differential calculated against an index (the oracle settlement price) that was comprised exclusively of securities, the spot price of MNGO on the three exchanges computed into an oracle price and the trading price of the MNGO Perpetual.  Index is defined as "an index or group of securities, ***including any interest therein or based on the value therefrom***."  15 U.S.C. § 78c(a)(68)(E) (emphasis added).

---

[20] While the Joint Release itself does not specifically define the term "yield," it does state yield "is used as a proxy for the value of the security."  Joint Release at 48264.  The term yield is broadly understood in finance to "refer[] to how much income an investment generates, separate from the principal" from things like "interest payments an investor receives on a bond or dividend payments on a stock."  "Understanding yield vs. return," U.S. Bank Wealth Management, *available at* https://www.usbank.com/financialiq/invest-your-money/investment-strategies/investments-yield-vs-return.html (Jan. 6, 2023).  Funding rate payments could constitute a yield because they are similar to dividend payments and are income separate from the principal and because they were a determined on the basis of a security, MNGO.

The funding was a payment stream based on the value of a group of securities and indices and thus fits squarely within the definition.

The government made a faulty, hypertextual argument during trial that the funding payments could not be a narrow-based security index based on the dictionary definition of several terms. Dkt. 145 at 3-5. First, it stated that funding was a "rate" and "rate" and "index" meant different things. *Id.* And second it argued that an "index" could not be a payment stream. Dkt. 145 at 3-5. The argument suffers from multiple flaws.

Initially, as discussed above, funding was a stream of payments based on a rate and was not itself a rate. Moreover, index is defined as "an index or group of securities, ***including any interest therein or based on the value therefrom***." 15 U.S.C. § 78c(a)(68)(E) (emphasis added). The government's convoluted and repeated use of dictionary definitions was misguided as those terms were discussed at length in a way contrary to the government's position and far more germane to the relevant analysis in the Joint Release. In its discussion of TRS, the Joint Release states:

> *Indexes:* A rate derived from an index of any of the foregoing or following rates, averages, or indexes, including but not limited to a constant maturity rate (U.S. Treasury and certain other rates), the interest rate swap rates published by the Federal Reserve in its "H.15 Selected Interest Rates" publication, the ISDAFIX rates, the ICAP Fixings, a constant maturity swap, or a rate generated as an average (geometric, arithmetic, or otherwise) of any of the foregoing, such as overnight index swaps ("OIS")—***provided that such rates are not based on a specific security, loan, or narrow-based group or index of securities***.

Joint Release at 48263 (emphasis added). The Joint Release's definition of an index as "[a] rate derived from an index" thus refutes the government's argument that "rate" and "index" are two completely separate concepts. Dkt. 149 at 1. This also clearly contradicts the government's further assertion that the word "interest" in the statutory definition of "index" "is meant to refer either to "a basket of securities . . .  or an ownership interest in a basket of securities" and cannot

refer to a rate. *Id.* at 2. Instead, the Joint Release states that an index can be a rate and that that rate can be based on a narrow-based securities index. If the various inputs into the funding rate—the MNGO spot price on the exchanges that feed into the oracle and the market price of the MNGO Perpetual—all of which are derived from the price of MNGO, are nevertheless considered separately as more than one security, then they would in combination be a narrow-based security index which cannot render a Title VII instrument a mixed swap.

The government was also wrong to claim that a stream of payments cannot be based upon an index. Dkt. 145 at 4 (The statutory "definition [of 'index'] and the statutory structure make clear that 'index' refers to a basket of securities, not to a stream of payments based on a differential, like the funding rate."). As noted above, the CFTC and SEC specifically contemplated payment streams (i.e., yields) based on narrow-based security indexes (like the oracle) and stated that such Title VII instruments would not be mixed swaps. Joint Release at 48262. The Joint Release also includes other discussions of payment streams, including in relation to TRS. TRS involve "private contract[s] by which two parties agree to make payments to each other on the basis of the performance of different assets specified in the contract," often on the basis of a differential against an index. *ECD Investor Grp. v. Credit Suisse Int'l*, 2017 WL 3841872, 2017 U.S. Dist. LEXIS 142186, at *14 (S.D.N.Y. Sep. 1, 2017). The Joint Release states that "where a TRS is based on a single security or loan, *or a narrow-based security index*, the TRS would be a security-based swap." Joint Release at 48264 (emphasis added). The Joint Release thus specifically contemplates that an instrument with a payment stream, like funding, may be based upon a narrow-based security index.

The funding payments therefore are not an input sufficient to render the MNGO Perpetual a mixed swap.  Because the MNGO Perpetual is a security-based swap, the CEA does not apply and Counts 1 and 2 should be dismissed and a judgment of acquittal entered.

### 2.    Rule 29: Rule of Lenity

The rule of lenity, when considered in conjunction with the arguments raised above, also mandates that Counts 1 and 2 be dismissed. "[A]mbiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." *Rewis v. United States*, 401 U.S. 808, 812 (1971) (citations omitted).  The rule "is premised on two ideas: First, a fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed; second, legislatures and not courts should define criminal activity." *Babbit v. Sweet Home Chapter of Communities for a Great Oregon*, 515 U.S. 687, 704 n.18 (1995) (citations and internal quotations omitted).  The rule of lenity requires that "ambiguous criminal statute[s] . . . be construed in favor of the accused." *Staples* v. *United States*, 511 U.S. 600, 619 n.17 (1994); *see also  United States v. Granderson,* 511 U.S. 39, 54  (1994) ("In these circumstances -- where [a statute's] text, structure, and history fail to establish that the Government's position is unambiguously correct—the rule of lenity operates to resolve the ambiguity in [the defendant's] favor."); *Rewis*, 401 U.S. at 812 (emphasizing that "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity").

The Indictment alleges a novel and expansive interpretation of the CEA, as detailed above.  Expanding criminal liability to the alleged conduct would involve a "sweeping expansion of federal criminal jurisdiction in the absence of a clear statement by Congress" in violation of the rule of lenity.  *See Cleveland v. United States*, 531 U.S. 12, 24 (2000); *see also United States v. Banki*, 685 F.3d 99, 109 (2d Cir. 2012) (applying rule in vacating convictions for violating Iran sanctions and explaining that "[t]he rule of lenity requires ambiguous criminal laws to be

interpreted in favor of the defendants subjected to them").  Because there is substantial ambiguity regarding the meaning of "mixed swap," and specifically whether payment streams based on securities meet the statutory definition of the term under 7 U.S.C. § 1a(47)(D), the Court should resolve the ambiguity in favor of the defense and find the funding insufficient to render the MNGO Perpetual a mixed swap.

There can be little doubt regarding the ambiguity of the statutory definition of mixed swap.  It is precisely this ambiguity that the government has seized upon in an attempt to transform an instrument based entirely upon security inputs into a swap, contradicting the obvious intent of the statute to maintain a separation between the sweep of the CEA and securities and security-based instruments.  Congress, recognizing the ambiguity of the term, mandated that the SEC, CFTC, and Federal Reserve together draft the Joint Release to clarify it. 15 U.S.C. § 8302(d)(1).  Ultimately, the Joint Release ran hundreds of pages in an effort to clarify the terms of the statute, the Dodd-Frank Wall Street Reform and Consumer Protection Act.  Even the Commissions responsible for drafting the Joint Release acknowledged that "identifying a mixed swap may not always be straightforward."  Joint Release at 48294.

Notably the CFTC's enforcement division has also struggled to identify mixed swaps.  In *Archegos*, 2023 U.S. Dist. LEXIS 166409, 2023 WL 6123102, at *3-4, the CFTC asserted that two instruments, ETF[21] Swaps and Custom Basket Swaps, were mixed swaps, but the Court disagreed.  Regarding both the ETF and the Custom Basket Swaps, the Court found that the swaps were based only on securities, the share in the given underlying ETF fund. *Id.* at *4.  The

---

[21] Exchange Traded Funds or ETFs are "pooled investment products" that "seek generally to track the performance . . . of an underlying benchmark or index."  *Xu v. Direxion Shares ETF Trust*, No. 22 Civ. 5090, 2023 U.S. Dist. LEXIS 150230, *3, 2023 WL 5509151 (S.D.N.Y. Aug. 25, 2023).

Court held that the fact that the underlying ETF may have been based on a broad-based securities index or a basket of securities did not mean that the ETF Swap was itself based on that index or basket. *Id.* That the agency charged with interpreting and enforcing the CEA cannot itself determine the proper scope of "mixed swap" proves that the term is ambiguous. It would be exceedingly unfair to jeopardize the liberty of a layperson like Mr. Eisenberg on the basis of an incredibly technical statutory analysis that even the CFTC, an agency tasked with interpreting and enforcing the statute, has struggled to correctly perform. Consequently, the Court should accept Mr. Eisenberg's interpretation of the definition of mixed swap, which excludes the MNGO Perpetuals, and enter judgment of acquittal on Counts 1 and 2.

### 3.    Rule 33: The Court's Instructions Regarding Mixed Swaps

The defense requested that the Court instruct the jury that the MNGO Perpetual was a security so that the jury would have had the proper context when considering whether the funding was a narrow-based security index. Despite the fact that there was no factual or legal dispute that the MNGO Perpetual was a security, the Court declined to give the instruction deeming it potentially confusing. This was error. Not giving the instruction was substantially more confusing to the jury as the jury then had to determine whether the funding rate was a narrow-based security index comprised entirely of securities without knowing whether one of the inputs, the order book price of the MNGO Perpetual, was itself the price of a security.

The defense requested at the charge conference that "on the narrow-based security index" the jury be instructed that "for purposes of this case, they are to treat Mango and the Mango perpetual as a security." Tr. 1290. While the government demurred when asked by the Court whether it intended to argue that the MNGO Perpetual was not a security, the defense explained that "a securities-based swap is defined in the securities laws as a security. So even if it's a mixed swap, I still think the definition of it, statutorily, is that it's a security." Tr. 1291-92. The

defense pointed out that mixed swaps are considered both "swaps" and "security-based swaps" under the CEA, 7 U.S.C. § 1a(47)(D) and that securities-based swaps are considered securities under the Securities Exchange Act, 15 U.S.C. §§ 78c(a)(10), 78c(a)(68).  Tr. 1292-93.

The government ultimately did not dispute that MNGO Perpetuals were securities but objected to the instruction because it believed that accurately instructing the jury on the legal characterization of the MNGO Perpetual as a security "would be extraordinarily suggestive."  Tr. 1292.  The Court agreed with the government, stating that "the additional instruction that [MNGO Perpetuals] are securities are not in any statutory definition, they're not in the actual statutes that we're instructing the jury about, and they would be confusing given that, in other contexts, the parties are duking it out as to what MNGO Perpetuals are for the purposes of the mixed swap definition and elsewhere."  Tr. 1294.

The Court's ruling and reasoning were mistaken.  There was no legitimate debate that the MNGO Perpetual was a security.  The government conceded as much.  The only contested issue was whether it was also a mixed swap, rendering it both a security and a swap.  Moreover, the requested instruction was grounded directly in the language of the very statutes about which the Court was instructing the jury, the CEA and the Securities Exchange Act.  The requested instruction was accurate under both the facts of the case and the law.

Nor was giving the jury an important and legally accurate instruction on an issue critical to their verdict overly confusing.  Just the opposite was true; the jury was left with an extremely complicated analysis regarding whether the funding rate was a narrow-based security index and had to apply the legally complicated definitions of "narrow-based," "index," and "security" despite the fact that there was no dispute as to the last of these.  The definition of "security" was particularly confusing, involving multiple prongs and a complicated analysis that needed to be

applied to each of the inputs into the funding.  It is entirely possible, likely even, that the jury

incorrectly deemed the funding not a narrow-based security index because it could not determine

whether the MNGO Perpetual was a security.  Because the Court should have given the

defense's requested instruction that MNGO Perpetual was a security and because that error

created a substantial chance that the jury improperly convicted Mr. Eisenberg, the Court should

order a new trial in the event that it does not dismiss Counts 1 and 2.

C.    **Count 2: Commodities Manipulation**

1.    **Rule 29: Insufficient Evidence of Commodities Manipulation**

The government fundamentally misunderstood and misapplied the law of commodities

manipulation with respect to Count 2.  Unable to prove that Mr. Eisenberg intentionally

manipulated the market price of the MNGO Perpetual—the prevailing price at which the MNGO

Perpetual could be bought and sold on Mango Markets—the government instead urged and

ultimately secured from the jury a conviction based upon Mr. Eisenberg's manipulating the

settlement price—the oracle's calculation approximating the median price at which MNGO

could be bought and sold in the spot market.  The government could find no authority for the

strained proposition that a market manipulation claim could be based on the manipulation of

anything other than the market (trading) price of a covered asset, let alone on the basis of the

trading price of a non-covered asset (*i.e.,* MNGO) in an unregulated market.  Having failed to

offer a viable legal theory of market manipulation and having consequently failed to provide

sufficient evidence to support a conviction, a judgement of acquittal should be entered on Count

2.

The CEA states, "It shall be a felony . . for any person to manipulate or attempt to

manipulate the price of any . . . swap."  7 U.S.C. § 13(a)(2).  In implementing this statute, the

CFTC similarly stated that "[i]t shall be unlawful for any person . . . to manipulate the price of

any swap." 17 C.F.R. § 180.2. Courts considering the statute and regulation have held that commodities manipulation requires that "(1) Defendant[] possessed an ability to influence *market prices*; (2) an artificial price existed; (3) Defendant[] caused the artificial price; and (4) Defendant[] specifically intended to cause the artificial price." *In re Amaranth Natural Gas Commodities Litig.*, 730 F.3d 170, 183 (2d Cir. 2013) (emphasis added) (citation omitted); *see also Grossman v. Citrus Assoc. of New York Cotton Exchange, Inc.*, 706 F. Supp. 221, 231 (S.D.N.Y. 1989) (compiling cases). Thus, the Second Circuit's caselaw regarding market manipulation and the test specific to the CEA explicitly state that the artificially altered "price" in market manipulation must be the market price.

Similarly, the CFTC endorsed the same test, stating, "In response to the comments received regarding this matter, the Commission reiterates that, in applying final Rule 180.2, it will be guided by the traditional four-part test for manipulation that has developed in case law arising under 6(c) and 9(a)(2)" including "[t]hat the accused had the ability to influence *market prices*." Joint Release at 41407. Similarly, "[i]n cases of attempted manipulation under section 9(a)(2), the CFTC is required to show: (1) An intent to affect the *market price*; and (2) some overt act in furtherance of that intent." *Id.* (emphasis added).

Market price, in turn, has been consistently defined by the courts to be the level at which an asset is traded. *See*, *e.g.*, *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 265 (2014) (concluding that "anyone who buys or sells stock at the market price may be considered to have relied" on misrepresentations in private securities fraud action); *Gamma Trader - I LLC v. Merrill Lynch Commodities, Inc.*, 41 F. 4th 71, 75 (2d Cir. 2022) (in CEA spoofing case, repeatedly referring to "market price" as the rate at which precious metals were traded); *United States v. Pacilio*, 85 F. 4th 450, 456 (7th Cir. 2023) ("Commodity prices are determined by

supply and demand. Orders placed in the CME order book communicate buying and selling interest, affecting the market price for futures contracts."); *United States v. Brooks*, 681 F.3d 678, 697 (5th Cir. 2012) (holding that term "price" was not vague in CEA and noting dictionary definition of "'price' as 'the amount of money given or set as consideration for the sale of a specified thing'").  The government has argued that the settlement price is a market price because it is a "reference[] for determining whether there are gains or losses" and because the settlement price "come[s] from market forces."  Dkt. 145 at 4.  The government offered no explanation or support, either legal or factual, for this definition of "market price," which is inconsistent with the above-cited authority.

Judges of this court have twice previously been asked to determine whether the alleged manipulation of a settlement price not reflecting the market or trading price of a covered asset could be actionable as commodities manipulation, and, in both cases, held it could not.  In *Vitanza v. Bd. of Trade of N.Y.*, No. 00 Civ. 7393, 2002 WL 424699, 2002 U.S. Dist. LEXIS 4499 (S.D.N.Y. Mar. 18, 2002), the defendants were alleged to have violated the CEA by manipulating the arithmetically calculated settlement price used for determining margin rates for P-Tech options, swaps based on a composite index of 100 technology stocks compiled by the Pacific Stock Exchange.  *Id.* at *3, 14.  The district court held that plaintiffs had not properly alleged a violation of the statute's requirement that defendants "'manipulat[ed] [] the price of [the] contract or the price of the commodity underlying such contract,'" *id.* at *15 n. 9 (quoting 7 U.S.C. § 25(a)(1)(D)), because the relevant P-Tech option settlement price "was not the value of the contract itself or the value of the commodity underlying the contract."  *Id.* at 19.  That court acknowledged but was unpersuaded by the plaintiff's argument that "settlement prices are an essential element in the operation of a commodities market and their corrupting is just as

corrupting to the integrity of the market as an attempt to manipulate the contract prices," deeming this policy rationale insufficient to overcome the statutory requirement that the manipulated price be the market price. *Id.*

The holding in *Vitanza* was based largely on the prior holding in *Three Crown Ltd. P'ship. v. Caxton*, 817 F. Supp. 1033 (S.D.N.Y. 1993). In *Three Crown*, the defendants were alleged to have manipulated the price of Treasury notes which negatively impacted plaintiff's position in the futures markets for Treasury bills, among other things. In dismissing the complaint, the district court agreed with the defendants that "Treasury **bills** (not Treasury notes) are the commodities underlying the Treasury bills futures markets." *Id.* at 1043. That court acknowledged that "defendants alleged manipulation of the . . . markets in Treasury notes may have adversely impacted positions plaintiffs took in the Treasury bill futures or eurodollar futures" but held that such impact was insufficient under the CEA. *Id.*

The holdings in *Vitanza* and *Three Crown* are applicable in this matter. As in those cases, the government has alleged manipulation of a price that is not the market price at which the underlying asset (the MNGO Perpetual) was trading, a position rejected in both cases. Similarly, the government's stated rationale that the oracle settlement price plays a substantial role in the market, Dkt. 145 at 5 ("[T]he settlement price is ultimately what determines who wins or loses on a bet."), was considered and rejected in both cases for having failed to overcome the statutory requirement that the market price be manipulated.

The government has also made an unpersuasive attempt at a textual argument based on the language of the statute stating that "the statute does not use the phrase 'market' price." *Id.* The CEA forbids "[a]ny person to manipulate or attempt to manipulate **the** price of . . . any swap." 7 U.S.C. § 13(a)(2) (emphasis added). As discussed above, the *Amaranth* test defines

manipulating the price in reference to "market prices," 730 F.3d at 183, the price at which the Title VII instrument can be purchased or sold. The government, however, citing no authority, rereads "the price" to mean "a price" and states in essence that because the oracle settlement price is a price applicable to the MNGO Perpetual, it is covered by the statute. Dkt. 145 at 5 (arguing that the statute does not "restrict the type of price that is covered" and contending "that 'price' in the CEA's anti-manipulation law includes settlement prices"). But the statute, as its terms have consistently been interpreted by *Amaranth* and its progeny and by the CFTC, refers only to the market price at which the MNGO Perpetual is traded. The oracle price is the market price, or at least a calculation of the price, of MNGO in the spot market. Because MNGO is not a commodity and because the CEA is inapplicable to the MNGO spot market, the government's attempt to apply the anti-manipulation statute fails.

The sole authority cited by the government, the CFTC's Adjudicatory Opinion in *In the Matter of Anthony K. DiPlacido*, CFTC Dkt. No. 2008, 2008 CFTC LEXIS 101 (Nov. 5, 2008), aff'd *DiPlacido v. CFTC*, 364 F. App'x 657 (2d Cir. 2009), is inapplicable. In *DiPlacido*, the defendant was a floor broker on the New York Mercantile Exchange who on four occasions placed large trades in electricity futures contracts in the final minutes of the trading period in an effort to artificially push the close higher or lower at the request of his clients who thereafter profited by exercising options based on the manipulated close/settlement prices. The Commission, distinguishing the facts of *Vitanza*, pointed out that

> **[T]he price of an individual future can be unlawfully manipulated. Where this is the case**, the artificially obtained price is included in the calculation of the settlement price, and accordingly causes the settlement price to be subject to artificial influence as well. Accordingly, manipulation of settlement prices can be the subject of an administrative enforcement action.

*Id.* at 89-90 (emphasis added). *DiPlacido* thus limited its holding to the specific facts of the case, facts totally distinct from *Vitanza* and this case. Mr. Eisenberg's case, like the defendants in *Three Crown*, 817 F. Supp. 1033, and unlike the defendant in *DiPlacido*, was alleged to have manipulated the market/trading price of an instrument not covered by the CEA. Here, the spot market for MNGO, in contrast to the electricity futures market in *DiPlacido*, was not regulated by the CEA and could not be unlawfully manipulated under the statute. *DiPlacido*, under its explicit terms, is thus inapplicable.

The government, relying on *DiPlacido*, has also attempted unpersuasively to distinguish *Vitanza* and *Three Crown* from this case by pointing out that both were civil cases and thus analyzed manipulation claims required to meet the requirements of both 7 U.S.C. § 13(a) and 7 U.S.C. § 25(a)(1)(D) (private right of action), the latter of which is inapplicable in this criminal matter. That distinction, however, is irrelevant. Like this matter, the critical issue in both of those cases was whether the statutory violation "constitutes a manipulation of the price" of a covered asset, and both held that a claim based on a settlement price not the trading price of a covered asset was not legally cognizable. *See* 7 U.S.C. § 25(a)(1)(D). *DiPlacido* involved materially different facts. The Commission's attempt in *DiPlacido* to distinguish *Vitanza* on the basis that it was a civil case without any rationale or explanation is thus of no weight. Likewise, the government in its prior letter also offered no rationale, let alone applicable authority or analysis of the applicable statutory provisions, for its argument, stating only that *Vitanza* and *Three Crown* "addressed the reach of the CEA's private right of action provision." Dkt. 145 at 5. Notably, the government also failed to acknowledge the central factual differences in *DiPlacido* and that the inquiry in *Vitanza* and *Three Crown*, like that at issue here, was whether and to what extent settlement prices are actionable as the basis for CEA market manipulation claims.

Notably, the elements of market manipulation in civil and criminal cases are the same. Indeed, the Second Circuit articulated those elements in a civil case, *In re Amaranth Natural Gas Commodities Litig.*, 730 F.3d at 183, and those elements served as the basis for the Court's instructions to the jury in this matter.

While the government previously claimed, without any citation or explanation, that it had "introduced evidence that the defendant intentionally and artificially inflated both [the market and settlement] prices," Dkt. 145 at 4, the record is clear that the government provided insufficient evidence for a rationale jury to find that it had met its burden to prove the fourth *Amaranth* element of market manipulation, that Mr. Eisenberg specifically intended to create an artificial price for MNGO Perpetuals. The evidence overwhelmingly established that Mr. Eisenberg had no intent to move the trading price of the MNGO Perpetual. "To meet the specific intent element of a claim for manipulation or attempted manipulation of a futures contract, the [prosecution] must [prove that] Defendant[] 'acted (or failed to act) with the purpose or conscious object of causing or effecting a price . . . that did not reflect the legitimate forces of supply and demand.'" *CFTC v. Parnon Energy Inc.*, 875 F. Supp. 2d 233, 244-45 (S.D.N.Y. 2012) (quoting *In re Energy Partners Natural Gas Litig.*, No. 4:07-cv-3349 (KPE), 2009 U.S. Dist LEXIS 75859, 2009 WL 2633781, at *5 (S.D. Tex. Aug. 26, 2009)). The trading price was totally insignificant to Mr. Eisenberg. There was no evidence that, after his initial purchase of the long and short positions, Mr. Eisenberg ever sold or even contemplated selling a single MNGO Perpetual contract. In text conversations prior to October 11, 2023, admitted into evidence, Mr. Eisenberg made it clear that he was focused on raising the spot price of MNGO and had no interest in the trading price of the MNGO Perpetual. *See* GX-502A. He was explicit that he did not need to sell any of the contracts. *Id.* ("You don't need to sell."). Ultimately, the

evidence showed that Mr. Eisenberg accomplished his trading objectives without selling any MNGO Perpetual contracts.  Tr. 1130 ("He did not sell off his perpetual positions.").  The evidence in the case overwhelmingly proved that the success of Mr. Eisenberg's trades and his ability to withdraw funds from the platform did not depend at all on the market price, and there is no evidence that Mr. Eisenberg ever used the market price to monetize his position by closing it.  There was thus no evidence that Mr. Eisenberg cared at all about the trading price of the MNGO Perpetual, let alone that he specifically intended to manipulate that price.

Because the government failed to establish that Mr. Eisenberg specifically intended to cause an artificial market price for MNGO Perpetuals, judgement of acquittal as to Count 2 should be entered.

### 2.  Rule 29: Rule of Lenity

In the alternative, the phrase "manipulate the price" is ambiguous and should be read in defendant's favor under the rule of lenity.  As discussed, the government has been unable to point to any case—civil, enforcement, or criminal—in which a defendant has been charged with market manipulation in relation to the price of an asset not covered by the CEA.  Moreover, the *Amaranth* test and cases applying it suggest that the target price must be a market price, which, in turn, must be the trading price of a covered asset.  The sheer novelty of the government's prosecutorial theory in combination with the ambiguity regarding what price is covered by the statute militates toward adopting the defense interpretation under the rule of lenity.

### 3.  Rule 33: Jury Instruction on Market Price

Over the objection of the defense, the Court decided not to instruct the jury that the target price of the manipulation had to be a market price.  The government in rebuttal seized on this ambiguity arguing:

Now, Mr. Klein seemed to admit that his client manipulated the price of Mango relative to USDC and manipulated the oracle and made the price shoot up a thousand percent. You didn't hear anything contesting that was true. Instead, the argument was, well, that's not really the price on Mango, not the price on Mango Markets. You have not heard that from any single witness in this case. That's just Mr. Klein saying something, and you don't need to treat arguments from the lawyers as evidence. You know the evidence, and the evidence is that that oracle price gets incorporated into Mango Markets. That is the settlement price that Mango Markets uses when it determines the price of the perpetual and who is winning and who is losing, just like we talked about earlier. The price comes from somewhere else, but it's brought on to Mango Markets and used to price the perpetuals. And the defendant, he manipulated that price. There is no dispute.

Tr. 1437.

For the reasons discussed above, the *Amaranth* test makes clear that "manipulate the price" must refer to a market price. The Court's decision not to give this instruction limited the defense's ability to argue to the jury that the oracle price was not the correct price because it was the price of a different asset in a different market. The government utilized the fact that the instructions lacked any description of the type of price needed for manipulation, stating that the defense's argument was "just Mr. Klein saying something" and encouraging the jury to disregard the argument as inconsistent with the evidence.

The argument was a legal one, not a factual one like the government argued to the jury. An instruction including the term "market price" would have been substantially clearer to the jury and prevented a potential miscarriage of justice.

### 4.    Rule 33: Improper Summation Arguments Regarding Pumping

The government repeatedly told the jury that it was illegal to "pump" or raise the market price of an asset, and, relatedly, that the jury could infer Mr. Eisenberg's intent to manipulate MNGO by the fact that he "pumped" the price. This was an inaccurate statement of the law.

The government's summation included the following improper references to "pump" or

"pumping":[22]

- "Pumping is not trading. Pumping is not an investment. Pumping is not supply and demand. Pumping is criminal." Tr. 1341.

- "You all know that the defendant was well aware that pumping was illegal." Tr. 1342.

- "This tweet shows you that he knows it is a crime to pump the price. It shows you that he knows what he's about to do is wrong. It shows you what he's describing in those chats he knows is criminal." *Id.*

- "The defendant did not need to be told that pumping a price was illegal. He knew full well that this was criminal through and through." *Id.*

- "He needs to pump that price of that perpetual with illegal trade after illegal trade." Tr. 1345.

Use of market power or a trading strategy alone, without deception, does not amount to fraud.

*See Parnon Energy, Inc.*, 875 F. Supp. at 233 (scheme based on abuse of market power without

misstatements or omissions did not sound in fraud even though defendants' dominant market

position permitted them to apply upward price pressure because they did not do so in a "deceitful

or misleading manner"); *CFTC v. Amaranth Advisors LLC*, 554 F. Supp. 2d 523, 531 (S.D.N.Y.

2008) (scheme based on alleged timing of trades did not sound in fraud); *Choi v. Tower*

*Research Capital LLC*, 165 F. Supp. 3d 42, 47-48 (S.D.N.Y. 2016) (submission of above or

below market bids to alter market price did not sound in fraud) (citing *CFTC v. Wilson*, 27 F.

Supp. 3d 517, 532 (S.D.N.Y. 2014) (attempted manipulation was effectuated through "a

particular trading strategy" and did not involve "misleading statements or omissions" so CFTC

---

[22] The government noted that in a Discord chat, GX-502, Mr. Eisenberg spoke of a "pump" in relation to MNGO. Tr. 1341. The fact that the government pointed out that Mr. Eisenberg used this term makes it more prejudicial that the government then proceeded to inaccurately state the law relating to this term.

failed to allege fraud).  The government's repeated statements to the jury that Mr. Eisenberg's

use of his market power to raise the price of MNGO showed that he knew he was committing a

crime was legally erroneous and tainted the trial with respect to all three counts of conviction.

### D.    Counts 1 and 3: Government Failed to Prove Falsity and Materiality

The government failed to meet its burden to prove that the alleged fraud counts (Count 1

and Count 3) because its alleged deceptions involve representations or omissions that were not

false, and, relatedly, it failed to prove any deception was material because there was no evidence

that there was any action that Mango Markets was capable of taking but for Mr. Eisenberg's

alleged deception.  In fact, the evidence proved the opposite; even if Mr. Eisenberg had

announced his precise intentions at the outset of his trading, nothing different would have

happened.  Because no reasonable jury could have found the government to have satisfied its

burden to prove materiality, a verdict of acquittal should be entered on the commodities fraud

and wire fraud charges (Counts 1 and 3).

### 1.    Rule 29: Insufficient Evidence of Falsity

Ultimately, the government at trial accused Mr. Eisenberg of "lie[ing] by inflating the

value of his assets" and "lie[ing] by clicking the borrow button."  Tr. 1439.  The government

failed to prove either alleged deception was false.  *See United States v. Connolly*, 24 F.4th 821,

833 (2d Cir. 2022) (noting that "schemes to defraud" require "false statements" or "half-truth[s]"

made misleading by "the failure to state additional or qualifying matter").

There is no evidence in the record that Mr. Eisenberg ever made any representation (or

omission) to Mango Markets about the value of his MNGO Perpetuals, and, at all times, that

value was accurate.  Mr. Hermida testified that the oracle functioned as it was designed and

correctly conveyed the price at which MNGO was trading in the spot markets, which was then

used to settle the MNGO Perpetual.  Tr. 461-62.  Likewise, one of the government's experts, Dr.

Mordecai, showed various charts confirming that Mr. Eisenberg's profits in his "PnL" well exceeded $100 million during the period of his withdrawals. Tr. 808; GX-1341. In other words, Mr. Eisenberg did not "inflate" the value of his long position. The evidence is irrefutable that at that moment in time, his position was worth exactly the amount input into the smart contract by the system. As discussed in greater detail below, the smart contract did not ask and had no capacity to consider how Mr. Eisenberg's position had achieved this level—including whether the settlement price was "artificial"—and/or whether this level of collateral would be sustained.

Similarly, Mr. Eisenberg did not mislead Mango Markets "by clicking the borrow button." Tr. 1349. As an initial matter, there was substantial evidence that the government was simply wrong about Mr. Eisenberg's borrowing. As noted, prior to his initial withdrawal, Mr. Eisenberg's profits in the long account exceeded $100 million and he settled that position. Tr. 1119. Defense expert Jeremy Sheridan testified that settling PnL "is a way to withdraw profits" and that Mr. Eisenberg had settled at least $50 million in profit immediately prior to his first withdrawal. *Id.* Moreover, as discussed above, there was no evidence at all that the smart contract asked about (or even could consider) a borrower's intent to retain collateral. Indeed, the evidence was overwhelming that Mango Markets did not require repayment of borrows, instead resorting to liquidation to collect debt. GX-1011 at 148-51.

The government's mistaken assertion that Mr. Eisenberg lied to the smart contract is reminiscent of the government's failed claims in *Connolly*, 24 F.4th 821. In *Connolly*, the defendants were convicted by a jury of wire fraud and conspiracy charges for submitting false entries of the rate at which their bank, Deutsch Bank ("DB"), could borrow funds on a given day. *Id.* at 824-26. These entries were then submitted to the British Bankers' Association ("BBA") and incorporated into the determination of the London Interbank Offered Rate (LIBOR), a

financial benchmark used to determine available borrowing rates relied upon in financial transactions across the world. *Id.* at 824-26. The Second Circuit reversed the convictions, finding that the government had failed to prove the defendant's LIBOR submissions false even though they were influenced by DB's derivatives traders for the benefit of those traders' position because "[t]he government failed to produce any evidence that any DB LIBOR submissions . . . were not the rates at which DB could request, receive offers, and accept loans in DB's typical loan amounts." *Id.* at 842-43. The Second Circuit further rejected the government's contention that the LIBOR submissions carried an "implied certification" that they had not been influenced by traders, because there was no proof that the BBA's rules and regulations specifically prohibited such conduct until they were amended after the conduct in question. *Id.* at 842.

Similarly, here, the government's failure to prove that the information conveyed to the smart contract was false or misleading means it failed to prove conduct within the scope of the fraud statutes. *Id.* at 843. Mr. Eisenberg never did, nor had the ability or opportunity to, represent anything to the Mango Markets smart contract regarding the manner in which his MNGO Perpetual positions achieved their level of profits, nor did he make any representation in connection with any funds he withdrew from the protocol. To the extent that the government argues any "implied certification," as it did in *Connolly*, that too fails because, as in *Connolly*, Mango Markets had no rules requiring any such certification until it implemented terms of service after the relevant time period. *See* DX-2 (terms of service implemented after the relevant conduct); Tr. 433-34.

### 2.    Rule 29: Insufficient Evidence of Materiality

The Court instructed the jury that the first element of wire fraud required "a scheme or artifice to defraud or to obtain money or property by materially false and fraudulent pretenses, representations, or promises" and that:

> A material fact is one that a reasonable person would consider important in making a decision and ***that is capable of influencing that decision***. That means that if you find a particular statement of fact or omission to have been untruthful or misleading, before you could find that statement or omission to be material, you must also find beyond a reasonable doubt that the statement or omission was one that would have been important to a reasonable person in making a decision.

Tr. 1475-76 (emphasis added). The Court further defined "reasonable person" as "a person of ordinary intelligence in the position of Mango Market or its users." Tr. 1477. The Court gave the same instruction regarding commodities fraud. Tr. 1463-64. Materiality thus required, at a minimum, proof beyond a reasonable doubt of a misrepresentation capable of influencing a decision by a person in the position of Mango Markets or its users. *See United States v. Johnson*, 945 F.3d 606, 614 (2d Cir. 2019) ("A misrepresentation is material if it is capable of influencing the intended victim.") (citation omitted); *United States v. Snype*, 441 F.3d 119, 129 (2d Cir. 2006) (noting presumption that juries follow legal instructions given by the Court).

The Court added the emphasized text at the request of the defense during the charge conference. Tr. 1282-85. The request was made on the basis of *United States v. Rigas*, 490 F.3d 208 (2d Cir. 2007). *Rigas* emerged out of the implosion of cable television provider Adelphia Communications Corporation, which resulted in criminal prosecution against Timothy Rigas, his son John Rigas, and two other employees charging them with multiple counts of securities and bank fraud for allegedly looting the company and hiding billions of dollars of debt. *Id.* at 212. The Second Circuit found that the government had sufficiently proven that the defendants made misrepresentations to banks from whom they borrowed regarding leverage ratios, but that "[f]or those ratios to be material, [] they had to be capable of influencing a decision that the bank was able to make." *Id.* at 235 (citing *Neder v. United States*, 527 U.S. 1, 16 (1999); *FDIC v. W.R. Grace & Co.*, 877 F.2d 614, 620 (7th Cir. 1989)). The Second Circuit noted that "the only decisions that the bank could make . . . involved how much interest would be charged—an

objective decision cabined by the ranges set in the Co-Borrowing Agreement." *Id.* The Court held that with regard to one of the counts, the evidence demonstrated that the misrepresented leverage ratio influenced the charged interest rate but that with regard to another count involving a separate borrowing agreement, there was insufficient evidence that defendants' misrepresentation could have or did influence the bank's decisions, which were restricted by the contract. *Id.* at 236 (citing *United States v. Rodriguez*, 140 F.3d 163, 168 (2d Cir. 1998)) (holding that defendant's falsehood regarding her employer was immaterial because no evidence showed that this misrepresentation "could have or did influence Chemical Bank's decision to allow Rodriguez to reach the funds at issue").

As Judge Lewis Liman, citing *Rigas*, recently held in *United States v. Phillips*, No. 22 Cr. 138 (LJL), 2024 U.S. Dist. LEXIS 54989, at *106, 2024 WL 1300269, at *28 (S.D.N.Y. Mar. 27, 2024), "importance [of the deception] alone is insufficient," the "scheme also had to be important to a counterparty's decision with respect to the swap." There was no evidence that Mango Markets was capable of taking any other action than what it did on October 11, 2022. As in *Rigas*, the relationship between users of the platform like Mr. Eisenberg and Mango Markets was governed by contract. The government's first witness, Brian Smith, explained that Mango Markets was "permissionless" which meant that "it is structured as a smart contract on the blockchain so that anyone can access it." Tr. at 100. The Mango Markets documentation similarly stated that "Mango Markets' code maintenance and future releases are reliant on successful proposals to update the smart contracts" and listed the code of the smart contract. GX-1011 at 93, 138. The documentation explained that all trading on Mango Markets was "permissionless" and that the perpetual futures market allows users to "enjoy permissionless price exposure to any of the assets in the Mango Markets group." *Id.* at 63, 70. The Mango

Markets website further stated that "completely permissionless" meant that there was "[n]o KYC [know your customer], no personal information held, [and] all data is on-chain." GX-900 at 10. Another Mango Markets contributor, Mr. Shipe, confirmed that withdrawals, deposits, borrows, and trades all operated "automatically" under the smart contract and were based exclusively on the mathematical equation in the code. Tr. 424-26. Mr. Shipe further explained that the smart contract is permissionless and does not ask any questions. *Id.* One of the government's expert, Mr. Jain, explained that all of the operations of Mango Markets are governed by the smart contract, including that "deposit transactions and withdrawal and borrow transactions are done programmatically with a smart contract" and no interaction with a human employee is required. Tr. at 336. He further explained that "you don't have to tell it where your funds came from," "you don't have to say why you want to borrow funds," "[t]here is no ability to tell the smart contract when you're going to return the funds," and "borrows don't have a fixed repayment schedule." Tr. 338.

The evidence thus confirmed that the permissionless nature of the smart contract rendered Mr. Eisenberg's trades automatic. Tr. 424-26. Mango Markets was both mechanically and legally obligated to pay Mr. Eisenberg without regard to whether the price of MNGO was "artificial" as that term was defined for commodities manipulation purposes. Because the platform was "permissionless" and automatic, the smart contract took account only of what the price was and not how it had come about or whether it reflected supply and demand. Tr. 338.

Various courts analyzing decentralized cryptocurrency markets have held that smart contracts, like that at issue here, are legally binding unilateral contracts.

> A smart contract allows the parties to define the terms of their contract and submit the crypto-assets to a secure destination. The smart contract then automatically distributes the crypto-assets to the appropriate party upon the satisfaction of the relevant conditions precedent defined in the smart contract.

*In re Bibox Holdings Ltd. Sec. Litig.*, 534 F. Supp. 3d 326, 330 (S.D.N.Y. 2021); *see also Williams v. Block One*, No. 20 Civ. 2809 (LAK), *5, 2022 U.S. Dist. LEXIS 171550, 2022 WL 5294189, at *2 n.19 (S.D.N.Y. Aug. 13, 2022) (quoting plaintiffs allegation that "[s]mart contracts are programs that verify and enforce the negotiation or performance of binary contracts and thus are self-executing and self-enforcing, making the transactions more secure and less costly."); *Van Loon v. Dept. of Treasury*, 688 F. Supp. 3d 454, 468 (2023) (collecting cases and observing that "smart contracts are like vending machines [because they] are examples of unilateral contracts . . . that carr[y] out a particular, predetermined task.").

Because the evidence demonstrated that the Mango Markets smart contract was "permissionless" and unilateral, Mango Markets was legally obligated to pay under the contract on the basis of the oracle settlement price, regardless of how that price came to be. *See* GX-1011 at 169 (noting oracle error under "risks" and containing no exception for price artificiality). This obligation extended to all assets in the protocol, including assets made available for borrowing. *Id.* at 78-80 (describing automatic nature of borrowing on Mango Markets). Conversely, the "permissionless" smart contract had no discretion to reject requests for payment, including with regard to the fairness of the price or the possibility that the user would not repay a borrow. The smart contracts only obligated Mr. Eisenberg to pay losses to the extent of the assets he had deposited on the platform. GX-1011 at 133 (noting that borrower "could prefer not to settle a negative balance" but could be automatically settled by a counterparty). Mr. Shipe described the process the protocol used to collect outstanding debts, including liquidation of account assets, followed by use of an insurance fund, and then finally, if necessary, socialized losses spread across all Mango Markets users, making clear that there was no collections process outside of the protocol. Tr. 413-15; *see also* Tr. 1125 ("Q. We had talked about liquidation earlier. If I only put

$10 million into the platform, but I have a short that's 100 million under water, how much money can the protocol take from me? SHERIDAN. $10 million. Q. It can't collect anything else from my account? SHERIDAN. No, ma'am. Q. Is there a collections process built into the code? SHERIDAN. Through liquidation.").

Mr. Eisenberg could have hypothetically announced his intention to move the spot price of MNGO and use his long MNGO Perpetual position on Mango Markets to profit from this increased price, and the smart contract, which had no ability to consider such information, would have processed his transactions in exactly the same manner. Indeed, there is no evidence that any disclosure that Mr. Eisenberg could have made would have had any effect on the execution of the smart contract or would have caused the permissionless Mango Market system to deny his transactions as long as the oracle price of MNGO reflected that he had sufficient profits to support his withdrawals. The government wrote prior to trial that, in accordance with *Rigas*, "when a decisionmaker's discretion is constrained, materiality depends on whether the deceptive conduct would have made a difference to the decision taking the constraints into account." Dkt. 126 at 8. Applying this articulation of the law to the trial evidence, the smart contract constrained the discretion of Mango Markets such that no allegedly deceptive conduct could have made a difference.

Rather than address the facts of this case, the government in its pretrial letter and in summation offered several obviously distinguishable hypotheticals. First, the government described "a bank [that] had a website that automatically issued home loans, the size of which were based on the home value the borrower inputted to the system." Dkt. 126 at 9. This

comparison is hard to fathom because no such home loan website exists or ever would.[23]  Any

mortgage or home loan of which the defense is aware would involve both vetting on the front

end, including the submission of personal and financial information from the borrower and an

analysis of the value of the property, and on the back end a written contract stating both the

terms and conditions of repayment and the borrower's commitment to abide by those terms.

Mango Markets involved nothing of the sort.  However, even accepting the government's

extraordinarily fanciful factual scenario, the facts of this case are different because the borrower

in the mortgage scenario explicitly lied about the value of the property.  By contrast, Mr.

Eisenberg was never asked the value of his collateral and never misrepresented the value of his

collateral.  In fact, the smart contract asked only for the market price of MNGO in the spot

market, and the oracle at all times provided the smart contract with accurate information of the

price at which one could buy MNGO at any given time.  Tr. 461-62 (Mr. Hermida testifying that

oracle conveyed accurate price).

The government's second hypothetical was even less relevant.  The government asked

the Court to "imagine a computer program requires a person to input certain login information to

ensure only certain people can access the cite" and "someone used stolen login information to

gain access."  Dkt. 126 at 9.  This hypothetical bears nothing in common with the evidence in

---

[23] In its rebuttal closing, the government used a similar analogy stating, "Say you go on
something like Rocket Mortgage, a place where you . . . can plug in the value of your house, the
value of your assets []. There might not be a person on the other end of that checking it, it's a
software program."  Tr. 1428.  The government badly misled the jury regarding how Rocket
Mortgage works.  In fact, on Rocket Mortgage, "before you close the loan, the company has to
check your credit score, as well as verify that your income and employment information are
correct and that you have adequate homeowners insurance. It also has to order a
home appraisal from a third party."  https://www.investopedia.com/articles/personal-
finance/010815/how-quicken-loans-mortgages-work.asp.

this case.[24]  Mr. Eisenberg did not steal anyone's identity or represent to Mango Markets that he

was someone else.  It was not even possible for him to do so because Mango Markets had no

KYC requirements and asked for no identification information.  In the government's

hypothetical, the hacker has expressly lied to the computer about her identity and/or authority to

access the account.  Mr. Eisenberg never made this or indeed any other affirmative

misrepresentation to Mango Markets.[25]

> In its rebuttal summation, the government went even further, asserting:
>
> If someone came up to you and said, hey, I'd like to borrow ten bucks, you would
> know what that meant, and that's what the system was programmed for too,
> giving someone money on the understanding that they were going to keep up
> enough collateral on the platform until they repaid.

Tr. 1429.  The basic premise that a ten-dollar loan casually agreed upon between friends

involved the maintenance of a collateral requirement was perhaps the most glaring but least

significant flaw in this hypothetical.  More importantly, this, of course, was not remotely "what

the system was programmed to do."  *Id.*  The protocol documentation stated clearly that a user

could borrow as long as they had sufficient collateral at the time of the borrow, which the

protocol referred to as "initial collateral ratio."  GX-1011 at 135.  The program then monitored

the account to see whether this collateral ratio was maintained, what various witnesses and the

documentation referred to as "health," *id.* at 60, and if at any time that ratio was not maintained,

---

[24] The government relied on this same erroneous hypothetical in closing, analogizing the facts of
this case to a "thief who goes and steals someone's bank account login information" and "types
in the stolen identity to log onto the person's bank account" and withdraws all the money.  Tr.
1438.

[25] Mr. Eisenberg's alleged deceptions appears to come in the form of omissions rather than
affirmative misstatement: that he did not tell the protocol that he had moved the price of MNGO
and that he did not tell it of his intentions regarding collateral maintenance.  But, as discussed
below, this was information the smart contract did not ask for and was incapable of utilizing.

the account could be liquidated.  *Id.* at 148-151.  The smart contract did not ask whether a user intended to maintain collateral because it was designed to be self-enforcing and simply liquidate any account that did not have sufficient collateral.  *See id.*  Moreover, and critically, the smart contract had no discretion not to lend the money as long as the initial collateral ratio was met. *Id.* at 135.

The discussion of materiality in *Phillips*, 2024 U.S. Dist. LEXIS 54989, is instructive. That case involved a Rule 29 motion seeking to overturn a conviction for commodities fraud on the basis of a market manipulation theory that the defendant's trading moved the relevant exchange rate in order to trigger a $20 million barrier option.  *Id.* at *1-6.  Noting the holding in *Rigas*, Judge Liman evaluated the defendant's assertion "that the [g]overnment did not put forward evidence indicating that his trades, even if significant to a reasonable counterparty, would be capable of affecting that counterparty's conduct or decision with respect to" the barrier option.  *Id.* at *106.  Judge Liman disagreed with the defense, citing specific testimony given by a J.P. Morgan official that "whether a counterparty to a barrier option had traded to intentionally trigger the barrier would be an important factor for [J.P. Morgan's] willingness to pay a settlement amount under that option."  *Id.* at *107.  Critical to Judge Liman's holding was that the counterparty had discretion regarding whether to pay.  *Id.* 9 ("[I]t would be reasonable for a jury to infer that whether a barrier has been intentionally triggered through trading could affect the willingness of a reasonable party in Morgan Stanley's position to validate that triggering event and pay the resulting settlement amount.").

Unlike the evidence in *Phillips*, here the government elicited testimony not about what actions Mango Markets could or would have taken had it known Mr. Eisenberg's intentions, but instead elicited testimony based on hypotheticals regarding whether Mr. Eisenberg's alleged

deception "mattered to them," *i.e.*, whether it was relevant. "'[R]elevance' and 'materiality' are not synonymous." *Rigas*, 490 F.3d at 234; *see also Phillips*, 2024 U.S. Dist. LEXIS at *106 ("[I]mportance alone is insufficient."). The government repeatedly asked witnesses (Messrs. Smith and Shipe, as well as Oliver Tonkin): "would it matter to you if you knew someone was borrowing from the platform without intending to maintain collateral?" Tr. 107, 385, 834. Likewise, the government asked these same witnesses, "Would it matter to you if you knew that a person was intentionally moving the price of the perpetuals on Mango Markets?" Tr. 110, 380, 828. That it would have mattered means, at most, that it was relevant. None of this is evidence that Mango Markets could or would have taken any action to prevent Mr. Eisenberg's trading and withdrawals. The smart contract gave Mango Markets no such discretion; it was legally obligated to pay. Judge Liman's analysis of *Rigas* thus confirms the government's failure to prove materiality in this case. *See Phillips*, 2024 U.S. Dist. LEXIS 54989, at *107; *see also W.R. Grace & Co.*, 877 F.2d at 620 (affirming liability because contract was not final but noting that "fraud would be immaterial" if contract had been totally "firm").

Having failed to prove that Mr. Eisenberg enacted any deception that could have changed the manner in which Mango Markets acted, the government's burden was not satisfied. The Court should enter judgment of acquittal on the fraud counts (Counts 1 and 3).

## E. <u>Count 3: No Evidence of an Interstate Wire</u>

For decades, the Supreme Court has narrowed the scope of the federal criminal wire fraud prosecutions, and that trend has increased substantially in recent years. *See* David Kwok, *Court narrows scope of federal wire fraud statutes*, SCOTUSblog (May. 12, 2023, 1:46 AM), https://www.scotusblog.com/2023/05/court-narrows-scope-of-federal-wire-fraud-statutes/. This case is a prime example for why that trend has occurred. Here, the government made little attempt to prove either of the most fundamental and basic parts of wire fraud: wire and fraud.

Regarding the former, the government neither identified any specific interstate wire in the Indictment, nor proved the existence of one at trial.  Regarding the latter, as discussed above, the government failed to prove a material misrepresentation, marshalling no evidence that any action would have or even could have been undertaken but for Mr. Eisenberg's conduct.  For each of these reasons, a judgment of acquittal should be entered on Count 3.

The government failed to prove wire fraud (Count 3) because it failed to introduce any evidence of an interstate wire.  "[T]he plain words of the wire fraud statute, 18 U.S.C. § 1343, extend only to situations where the defendant 'transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds' for the purpose of executing an artifice or scheme to defraud." *United States v. Phillips*, 376 F. Supp. 2d 6, 8 (D. Mass. 2005).  "The wire fraud statute requires that the defendant communicate by wire 'in interstate or foreign commerce' in furtherance of a scheme to defraud.  *Cofacredit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229, 243 (2d Cir. 1999) (quoting 18 U.S.C. § 1343); *see also Smith v. Ayres*, 845 F.2d 1360, 1366 (5th Cir. 1988) ("As several courts have recognized, the statute requires that the wire communication cross state lines."); *Utz v. Correa*, 631 F. Supp. 592, 595-96 (S.D.N.Y. 1986) (telephone calls made within one city cannot constitute predicate acts of wire-fraud in RICO complaint); *Harris Trust & Savings Bank v Ellis*, 609 F. Supp. 1118, 1122 (N.D. Ill. 1985) (same).

While the government presented evidence that Mr. Eisenberg was located in or around Puerto Rico at the time of the commission of the alleged criminal conduct and that he used wires to complete his cryptocurrency trading, it crucially failed to present any evidence that any one or more of those wires traveled across state or federal lines.  As examples of this failure of proof, there was no evidence of the location of any of the servers used, there was no evidence of the

67

location of any counterparty to the transactions, and there was no evidence of the location of anyone communicating with Mr. Eisenberg.  The government thus failed to meet its burden of proving an interstate wire beyond a reasonable doubt.

At least two courts have granted Rule 29 motions dismissing wire fraud counts in cases like this where the government failed to prove an interstate wire.  In *Phillips*, the court vacated guilty verdicts and entered judgment of acquittal as to multiple wire fraud counts against multiple defendants because "the evidence linking the defendants to any actual interstate transmissions was practically non-existent." [26]  376 F. Supp. 2d at 9.  Similarly, the court in *United States v. Miller*, 20 Cr. 232 (JRT/DTS), 2024 U.S. Dist. LEXIS 87327, at *8 (D. Minn. May 15, 2024), granted a motion for acquittal as to one count of wire fraud because it found the government had failed to show the wire at issue, an email, traveled across state lines.  The court noted the government's assertions that one party to the email was located in New Mexico while another was in Minnesota and that the email server was in California but found that evidence only of the New Mexico location had been presented.  *Id.*  The court stated that it "readily acknowledges that it is unlikely that Harbert, Esherick, and the Google servers were all in New Mexico at the time of the email.  But the government cannot satisfy its burden [of proof beyond a reasonable doubt] by relying on likelihoods, unsupported by evidence."  *Id.* at *9.

The government's total lack of evidence of an interstate wire in this case was confirmed by its confusing presentation of the issue to the jury.  In summation, the government argued only that:

---

[26] The *Phillips* court threw out an additional count of wire fraud on the basis that its jury instruction had been erroneous in requiring only a finding of the use of "an instrument of an integrated system of interstate commerce" and not a specific interstate wire.  376 F. Supp. 2d at *9.

> The last element was an interstate wire. You remember when Mr. Farrell from AscendEX talked about that AscendEX employees do what's called a trade reconciliation report where they reconcile the trades in New York City. And these New York City based employees do those reports, and a finance team reviews them. He said it's roughly akin to what a broker does in a securities market. You even saw the deposit confirmations sent to the defendant with this New York City based address. The takeaway from this is, when the defendant pumped on AscendEX and he made those trades, when he was in Puerto Rico, those wires had to travel to New York City. They had to travel there for the trade reconciliation report.

Tr. 1381-82. The government's theory was riddled with logical and factual errors. First and foremost, there was no testimony that a reconciliation report reflecting Mr. Eisenberg's trades was ever actually created, and, notably, no such report was admitted in evidence. Second, there was no testimony regarding the location of the AscendEX server. Third, the trade reconciliation report—assuming one ever existed—and any hypothetical wire used to transmit and/or create it would have done nothing to further the charged scheme. Fourth, Mr. Farrell described the reconciliation report as a daily report that would have been created after the day's trading was completed, Tr. 151-52, so any hypothetical wire used to transmit and/or create it would have been transmitted after the fact. The total incoherence of this theory of an interstate wire, the government's only one, based on a hypothetical report, compiled at a hypothetical time, from information acquired from a server in an unknown location, all done in service of something that did nothing to further the crime demonstrates the total lack of evidence in the record.

Because the government failed to prove the existence of an interstate wire in furtherance of the alleged fraud, judgement of acquittal should be entered as to the wire fraud charge (Count 3).

## CONCLUSION

For the reasons described herein, the Court should grant Mr. Eisenberg's motion and enter judgment of acquittal as to all counts under Rule 29. In the alternative, the Court should order a new trial pursuant to Rule 33.

Dated:  August 5, 2024                     Respectfully Submitted,

                                           *Brian Klein*

                                           Brian E. Klein
                                           Ashley E. Martabano
                                           Riley P. Smith
                                           Waymaker LLP

                                           -and-

                                           *Noam Greenspan*

                                           Sanford N. Talkin
                                           Noam B. Greenspan
                                           Talkin, Muccigrosso & Roberts, LLP

                                           *Attorneys for Avraham Eisenberg*