UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

                    Plaintiff,

          -against-

AVRAHAM EISENBERG,

                    Defendant.

Case No.: 23 Cr. 10 (AS)

**AVRAHAM EISENBERG'S REPLY MEMORANDUM OF LAW IN
FURTHER SUPPORT OF MOTION FOR JUDGMENT OF
<u>ACQUITTAL OR, IN THE ALTERNATIVE, A NEW TRIAL</u>**

Sanford N. Talkin
Noam B. Greenspan
Talkin, Muccigrosso & Roberts, LLP
40 Exchange Place, 18th Floor
New York, New York 10005
(212) 482-0007


Brian E. Klein
Ashley E. Martabano
Riley P. Smith (Admitted Pro Hac Vice)
Waymaker LLP
515 S. Flower Street, Suite 3500
Los Angeles, California 90071
(424) 652-7800

*Attorneys for Avraham Eisenberg*

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ ii

PREMILIMINARY STATEMENT ..................................................................................... 1

A.   Venue ..................................................................................................................... 3

    1.   The Government Failed to Present Any Evidence of an Act in Commission of   the Charged Crimes that Occurred in This District (Rule 29) ........................................... 3

    2.   The Government's Improper Summation (Rule 33) ...................................................... 10

    3.   Incorrect Jury Instruction on Venue (Rule 33) ............................................................ 12

B.   Counts 1 and 2: The CEA Does Not Apply ......................................................... 14

    1.   Counts 1 and 2 Should be Dismissed Because the Mango Perpetual is not a Mixed Swap (Rule 29) ................................................................................................ 15

      a.   Statutory Structure ............................................................................................. 16

      b.   The MNGO Perpetual was not Based on *the Value* of USDC .................................. 18

      c.   The Funding Payments Could Not Render the MNGO Perpetual a Mixed Swap ........ 26

    2.   Rule of Lenity (Rule 29) ........................................................................................ 31

    3.   The Court Should Have Instructed the Jury that the MNGO Perpetual was a   Security (Rule 33) ...................................................................................................... 33

C.   Count 2: Commodities Manipulation .................................................................... 35

    1.   Insufficient Evidence of Commodities Manipulation (Rule 29) ...................................... 35

    2.   Rule of Lenity (Rule 29) ........................................................................................ 41

    3.   Jury Instruction on Market Price (Rule 33) ................................................................ 41

    4.   Improper Summation Arguments Regarding "Pumping" (Rule 33) ................................. 42

D.   Counts 1 and 3: Government Failed to Prove Falsity and Materiality (Rule 29) ................. 43

    1.   Insufficient Evidence of Falsity .............................................................................. 44

    2.   Conflation of Intent and Falsity .............................................................................. 50

    3.   Insufficient Evidence of Materiality ........................................................................ 53

E.   Count 3: No Evidence of an Interstate Wire (Rule 33) .......................................... 59

CONCLUSION………………………………………………………………………….65

# TABLE OF AUTHORITIES

**Cases**

*CFTC v Archegos Capital Mgmt. LP*, 2023 WL 6123102, 2023 U.S. Dist. LEXIS 166409 (S.D.N.Y. Sep. 19, 2023) ........................................................................... passim

*CFTC v. Gorman*, No. 21 Civ. 870 (VM), 2023 U.S. Dist. LEXIS 50750, 2023 WL 2632111 (S.D.N.Y. Mar. 24, 2023) .............................................................................. 49

*CFTC v. Parnon Energy Inc.*, 875 F. Supp. 2d 233 (S.D.N.Y. 2012) ........................... 43

*CFTC*, 364 F. App'x 657 (2d Cir. 2009) ...................................................................... 39

*FDIC v. W.R. Grace & Co.*, 877 F.2d 614, 620 (7th Cir. 1989).................................... 55

*Grossman v. Citrus Assoc. of New York Cotton Exchange, Inc.*, 706 F. Supp. 221 (S.D.N.Y. 1989) .............................................................................................................. 41

*In re Amaranth Natural Gas Commodities Litig.*, 730 F.3d 170 (2d Cir. 2013) .................... 41, 45

*Three Crown Ltd. v. Caxton*, 817 F. Supp. 1033 (S.D.N.Y. 1993) ........................... 42, 45

*United States ex rel. O'Donnell v. Countrywide Home Loans, Inc.*, 822 F.3d 650 (2d Cir. 2016) 54

*United States v. Bailey*, 444 U.S. 394, 100 S. Ct. 624, 62 L. Ed. 2d 575 (1980)........................ 44

*United States v. Bankston*, 820 F.3d 215 (6th Cir. 2016) ............................................ 63

*United States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1181 (2d Cir. 1989)................................ 10

*United States v. Brooks*, 681 F.3d 678 (5th Cir. 2012)................................................. 41

*United States v. Cabrales*, 524 U.S. 1 (1998) ....................................................... 16, 17

*United States v. Chanu*, 40 F.4th 528 (7th Cir. 2022) ................................................. 48

*United States v. Connolly*, 24 F.4th 821 (2d Cir. 2022) ......................................... 49, 55

*United States v. D'Amato*, 39 F.3d 1249 (2d Cir. 1994) ............................................. 54

*United States v. Finnerty*, 533 F.3d 143 (2d Cir. 2007) ......................................... 50, 62

*United States v. Frampton*, 382 F.3d 213 (2d Cir. 2004) ............................................................ 44

*United States v. Futch*, 278 F. App'x 387 (5th Cir. 2008) ........................................................... 41

*United States v. Glenn*, 312 F.3d 58, 67 (2d Cir. 2002)……………………………………………………...8

*United States v. Irving*, 682 F. Supp. 2d 243 (E.D.N.Y. 2010) ....................................................... 8

*United States v. Kaufman*, No. 21-2589, 2023 WL 1871669 (Feb. 10, 2023) ............................. 17

*United States v. Kim*, 246 F.3d 186 (2d Cir. 2001) ...................................................................... 63

*United States v. Phillips*, No. 22 Cr. 138 (LJL), 2024 U.S. Dist. LEXIS 54989, 2024 WL
    1300269, at *28 (S.D.N.Y. Mar. 27, 2024) ........................................................................ 59, 62

*United States v. Rigas*, 490 F.3d 208 (2d Cir. 2007) ........................................................ 55, 59, 62

*United States v. Rodriguez-Moreno*, 526 U.S. 275 (1999) ........................................................... 16

*United States v. Royer*, 549 F.3d 886 (2d Cir. 2008) .................................................................... 13

*United States v. Svoboda*, 347 F.3d 471 (2d Cir. 2003) .......................................................... 13, 17

*United States v. Tzolov*, 642 F.3d 314 (2d Cir. 2011) ........................................................ 9, 16, 17

*United States v. Valdivia-Flores*, 876 F.3d 1201 (9th Cir. 2017) ................................................. 44

*United States v. Valle*, 807 F.3d 508 (2d Cir. 2015) ...................................................................... 8

*Vitanza v. Board of Trade*, No. 00 Civ. 7393, 2002 WL 424699 (S.D.N.Y. Mar. 18, 2002) ... 42, 45

**Statutes**

15 U.S.C. § 78c ...................................................................................................... 19, 32, 37, 38

15 U.S.C. § 8302 ................................................................................................................... 20

7 U.S.C. § 13 ........................................................................................................................ 42

7 U.S.C. § 1a ....................................................................................................... 19, 22, 29, 30, 32

7 U.S.C. § 25 ........................................................................................................................ 42

**Other Authorities**

*In re Cox*, Comm. Fut. L. Rep. (CCH) ¶ 23,786 (CFTC July 15, 1987) ...................................... 41

*In the Matter of Anthony K. DiPlacido*, CFTC No. 01-23, 2008 CFTC LEXIS 101, 2008 WL 4831204 (Nov. 5, 2008) ................................................................................................... 39

**Rules**

Fed. R. Crim. P. 29 ............................................................................................. 24, 61, 65

Fed. R. Crim. P. 33 .................................................................................................65

**Regulations**

180 CFR § 180.2 ...................................................................................................... 40

75 Fed. Reg. 67660 ................................................................................................... 40

77 Fed. Reg. 48208 ......................................................................................... 20, 27, 30

## PREMILIMINARY STATEMENT

In his opening brief, Avraham Eisenberg recounted the myriad of legal flaws in the government's charging theory in this case, including that the case was charged in the wrong court under commodities laws that did not apply because none of the underlying instruments were covered by the applicable statute, and that even the government's basic theory of fraud was deficient because the government could not settle on a theory of deception that was either supported by any evidence or that was material to the decision any counterparty could have taken.  *See* Dkt. 183 ("Br.").  The government's response is ineffectual in responding to the various issues raised in the opening brief, failing to address applicable law and often significantly misstating the record.  *See* Dkt. 186 ("Opp.").

Venue in the Southern District of New York ("this District" or "SDNY") is improper, and the government has not and cannot identify, let alone provide evidence of, a single act constituting the charged crimes that occurred in this District.  Instead, the government resorts to dramatic mischaracterization of the record and obvious misstatements of the law, none of which can change the reality that the charges in this case lack a legal basis to be venued in this District. The government's defense of the application of the commodities laws under which it charged Counts 1 and 2 fares no better.  In response to Mr. Eisenberg's detailed explanation of why the relevant instrument, the MNGO Perpetual, is a security-based swap subject exclusively to the securities laws (and not to the commodities laws), the government ignores the fundamentally required analysis of whether the exchange of risk relates to a security.  The government unpersuasively attempts to insert the currency used to effect the transaction, USDC, into the analysis despite USDC's lack of risk transfer, and also attempts to convolute the analysis by incorrectly arguing  that the funding payments used to ensure that the MNGO Perpetual

continues to track the price of its underlying security, MNGO, somehow render the MNGO Perpetual not a pure security.  Neither argument changes the fact that the MNGO Perpetual is nothing more than a futures bet on the price of a security and thus cannot be the basis for prosecution under the commodities laws.

Mr. Eisenberg's opening brief also pointed out the fundamental flaw in the prosecution's theory on Count 2 that the price alleged to be manipulated was not a market price as required by the commodities manipulation statute.  The government dodges the defense's argument entirely, and instead argues that a settlement price may be actionable for market manipulation claims. While that may be true in cases in which the settlement price is also a market price, that is not the case here.  The government thus fails to distinguish any of the substantial authority supporting the commonsense position that market manipulation must relate to a market price.

Finally, Mr. Eisenberg explained that the government's theory of fraud (for both the commodities fraud and wire fraud, Counts 1 and 3) failed because (1) there was no actual evidence that Mr. Eisenberg ever deceived anyone and (2) assuming arguendo that he did deceive someone, there was no evidence of any action that any counterparty could have taken had they learned of the deception, rendering any deception immaterial as a matter of law.  The government responds by asserting that Mr. Eisenberg deceived Mango Markets and its users by violating an obligation that it did not and cannot prove he had under the contract to maintain collateral and by failing to disclose the artificiality of the value of his assets even though the smart contract did not ask for and could not process such information.

The government further claims that these alleged deceptions materially thwarted unnamed individuals from pausing the contract, even though pausing the contract was a violation of the smart contract and there was no evidence that anyone was misled or that the voting and

2

code-writing necessary to pause the contract could have been done in the time available. In fact, there was substantial evidence to the contrary. Likewise, the government asserts that users like Messrs. Casey and Tonkin would have withdrawn their assets, but Mr. Eisenberg had no legal duty disclose his trading to such users. Furthermore, Mr. Casey testified that he was not misled and still could not withdraw his assets, and Mr. Tonkin could neither have been misled nor acted because it was the middle of the night in London, and he was asleep. The government's case thus lacked sufficient evidence of both falsity and materiality.

The wire fraud charge also fails because the government cannot identify a specific interstate wire in furtherance of the alleged scheme. Instead, the government simply relies on the insufficient argument that because wires generally existed in this case, they have satisfied their obligation to prove a specific wire in furtherance of the alleged scheme. The prosecution fails to rebut cases cited by the defense in the opening brief holding that the government cannot meet its burden to prove every element beyond a reasonable doubt on such a non-specific basis.

Because of the lack of venue and the insufficiency of the evidence, the Court should enter judgement of acquittal under Rule 29. Alternatively, various improprieties in the government's summation and errors in the jury instructions warrant a new trial pursuant to Rule 33.

## A.  Venue

### 1.    The Government Failed to Present Any Evidence of an Act in Commission of the Charged Crimes that Occurred in This District (Rule 29)

Mr. Eisenberg, while physically outside of this District, created accounts and traded on servers also located outside of this District, and never set foot in or communicated with anyone in this District. On its face, therefore, this case has never belonged in the SDNY. The Indictment failed to state a clear theory of venue, and, for the reasons discussed in Mr. Eisenberg's opening brief, even the Indictment's purported (and insufficient) venue allegations

were specifically disproven at trial.  *See* Br. at 7-23.  In an effort to save its case, the government, as it did before the jury, now resorts to twisting the record to cobble together supposed "facts" connecting Mr. Eisenberg's charged trading to this District.  *See* Opp. at 58-62.  In doing so, the government also misstates well-settled law.  But the government's unsupported assertions of fact would still fail even had they occurred in SDNY because they relate to actions that bear no relation to the commission of the charged crimes.  In a final argument, contrary to all authority, the government claims that a purported victim's ***failure to act*** is sufficient to confer venue, citing cases that hold precisely the opposite.  *See* Opp.  at 60.  The government has blatantly failed to satisfy its burden to prove venue for any of the charged counts, and the jury's verdict therefore cannot stand.

In his opening brief, Mr. Eisenberg methodically detailed every piece of testimony Mr. Farrell or Mr. Casey offered regarding any connection between the charged crimes and the SDNY as well as every venue-related argument the government made to the jury during its summation and rebuttal.  Br. at 10-11.  He then explained why the testimony fundamentally failed to establish venue and that the arguments were either totally false or highly misleading to the jury.  Br. at 11-14.  Rather than address these specific recitations of the record, the government mounts an opposition utterly divorced from the facts, failing to address any specific testimony or exhibit and again relying on total distortions of the record.  While the legal standard for motions challenging the sufficiency of the evidence certainly requires the reviewing court to draw all permissible inferences in favor of the government, it does not permit the Court to do what the government attempts here; to satisfy its burden with non-existent "facts" and to take specious inferences drawn from those "facts."  *See, e.g.*, *United States v. Valle*, 807 F.3d 508, 515 (2d Cir. 2015) ("While we defer to a jury's assessments with respect to credibility, conflicting

4

testimony, and the jury's choice of the competing inferences that can be drawn from the evidence, ***specious inferences are not indulged***, because it would not satisfy the Constitution to have a jury determine that the defendant is probably guilty.") (emphasis added); *United States v. Glenn*, 312 F.3d 58, 67 (2d Cir. 2002) (finding evidence insufficient to support conviction because it required a "sizeable inferential leap"); *United States v. Irving*, 682 F. Supp. 2d 243, 266 (E.D.N.Y. 2010) (same).

The government, failing to cite any specific evidence in support, states that there are four conclusions the jury could have drawn to find that the government had met its burden to prove venue. Opp. at 58. In fact, none of the government's asserted conclusions has any factual support in the record.

First, the government asserts "that when the defendant created an AscendEx account . . . he sent information to the people running AscendEX in Manhattan through the 'management portal.'" *Id*. No evidence, and certainly not the two transcript pages the government cites (without explanation) in its response, contain any facts that support this assertion. Mr. Farrell testified only that there is a management portal "available to . . . the people in the New York office." Tr. 146. There is no evidence that anyone in New York reviewed any information about Mr. Eisenberg's account during the relevant time period. The government's further assertion that Mr. Eisenberg "sent information to the people running AscendEX in Manhattan through the 'management portal'" lacks any evidentiary support and should be disregarded.[1] *See* Opp. at 58.

_____

[1] According to the prosecutor's own notes, Mr. Farrell told the government in a December 19, 2022 interview that AscendEx's primary server is in Japan and that account and transaction data is sent to that server. *See* 3503-002. The government surely would not, and cannot, suggest that it is reasonable, proper, or sufficient for the jury to make or rely upon an inference it knows to be contrary to the facts. The defense believes that the Court has copies of the 3500 material in this case, but these documents can be promptly provided if that would be helpful to the Court.

Second, the government claims, without discussing any supporting evidence, that "when the defendant deposited cryptocurrency on AscendEx . . . that electronic transmission was reviewed by the finance team in Manhattan." *Id.* Mr. Eisenberg addressed the inaccuracy of this claim in his opening brief, Br. at 12-13, which the government made no attempt to rebut, and will therefore only summarize those points here. While Mr. Farrell testified that there was a team in New York that could review deposits, he did not testify when, even in the ordinary course, such a review would take place, let alone that any such a review took place in the instant case. Tr. 148. Moreover, the documentary evidence conclusively proved that the two deposits were confirmed in one second or less and a confirmation email was sent within another second or two, demonstrating that the deposit process as it related to Mr. Eisenberg was fully automated by computers and servers with no connection to this District. Br. at 12-13 (citing GX-608, GX-1506). The government also offers no response to Mr. Eisenberg's point that, even if it had occurred, the review of any deposited funds would amount to, at most, a preparatory act and could not establish venue.[2] *See United States v. Tzolov*, 642 F.3d 314, 319 (2d Cir. 2011) ("'[V]enue is not proper in a district in which the only acts performed by the defendant were preparatory to the offense and not part of the offense.'") (quoting *United States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1181, 1188 (2d Cir. 1989)).

Third, the government asserts that "members of the finance team in Manhattan reviewed [Mr. Eisenberg's] trade information to ensure that AscendEx's internal ledgers appropriately reflected all of the trades and to check for any potentially concerning trading patterns." Opp. at

---

[2] Not only is there a total lack of evidence to support the government's claim, once again the prosecutor's own notes confirm that the government knows its assertion is not true because Mr. Farrell told the government in a December 19, 2022 interview that there was no manual review of Mr. Eisenberg's transactions and that all deposits were reviewed outside the United States by a third-party vendor called Chainalysis. *See* 3503-003.

58.  This, too, is false.  While he testified that a daily trade reconciliation report was at times reviewed by the finance team, Tr. 148, Mr. Farrell did not testify when such a review ordinarily occurred, and there was no evidence that any such report was ever created, let alone reviewed, regarding Mr. Eisenberg's trades.  Moreover, the government makes no attempt to explain why a quality control review by exchange personnel to ensure that the company's systems are operating properly would constitute any part of the crimes charged.  *See Tzolov*, 642 F.3d at 319 (holding venue proper only where "acts 'constituting' the violation" occurred).

Fourth, the government argues that "***while the defendant was carrying out his unlawful scheme***, members of AscendEx's team in Manhattan saw the unusual trading pattern and began the steps to investigate and stop it."  Opp. at 58 (emphasis added).  Again, this assertion finds no support in the record, to say nothing of the government's failure to explain why efforts to freeze Mr. Eisenberg's account constituted or furthered Mr. Eisenberg's alleged scheme.  Mr. Farrell testified on direct examination that "one of the people in our development team put a freeze on this account at 2:53:46 UTC time on October 12th 2022," more than four hours after Mr. Eisenberg's last purchase of MNGO on AscendEx.  Tr. 163-64, *see also* GX-1513 (noting "Freeze Account" action taken at 2:53:46 on October 12, 2022); GX-1507 (last buy executed at 2022-10-11, 22:47:14 UTC).  Furthermore, Mr. Farrell testified that on the evening of October 11, 2024, while at home, he received a call from the head of client services who "had learned about unusual trading in" Mr. Eisenberg's account.  Tr. 162.  There was no testimony or other evidence that anyone at AscendEx "saw the unusual trading," as the government asserted, as opposed to being informed of it by Mango Markets—as the government knows actually

occurred—let alone that this occurred while the defendant was trading.[3]  The government's

blatant mischaracterization of the record should, once again, be rejected.

In addition to lacking evidentiary support, as noted, these four asserted "facts" are

irrelevant because they were either preparatory or otherwise could not have constituted any part

of the charged offenses.  *See Tzolov*, 642 F.3d at 319.  The government, instead of explaining

why any of these four facts would satisfy its burden, shifts to a new set of actions even further

divorced from the factual record, stating, "The defendant could not have manipulated th[e] price

without creating an AscendEx account, sending cryptocurrency to the platform, and doing all the

trading there, all of which caused activities in Manhattan."  Opp. at 59.  Notably—in addition to

alluding to a "but for" standard that is plainly not the legal standard for venue, *see Tzolov*, 642

F.3d at 319—the government does not even attempt to cite any evidence to support this baseless

assertion.  As the government well knows, Mr. Eisenberg's creation of the account, deposits into

the account, and trading all occurred on servers in Japan bearing no connection to this District.

The government then attempts to build on this objectively false premise and states that actions

like "use of AscendEx," "fill[ing] that account with cryptocurrency," and "carr[ying] out his

manipulative trading" were not "mere preparation for venue purposes."  Br. at 59.  The argument

is an odd one because, even with the substantial liberties the government has taken with the

record, it does not argue, nor can it, that any of these actions took place in this District.

Similarly, the government cites a series of cases in which it appears to contend that courts

have found sufficient evidence of venue based upon the location in which a brokerage or clearing

agent performs functions "such as execution or settlement."  Opp. at 59.  In his opening brief,

---

[3] Yet again, the government appears to be advocating in favor of conclusions by the jury it knows to be false.  The prosecutor's notes reflect that AscendEx learned of Mr. Eisenberg's trading only after its head of security was contacted by a team from Mango Markets.  *See* 3503-015.

Mr. Eisenberg pointed out that the government misled the jury during rebuttal summation by stating, without evidence, that AscendEx executed and cleared trades in New York when, in fact, Mr. Farrell testified that the exchange used a "smart routing engine" to perform these functions through its offshore server.  Br. at 13 (citing Tr. 149-150).  Remarkably, while citing cases regarding brokers clearing trades, the government makes only a perfunctory effort to explain the basis for its false assertion, noting that Mr. Farrell stated that some of the work the finance team does is "akin to what a broker does."  Opp at 59 (citing Tr. 151).  But that testimony was given in the context of explaining after-the-fact review of "trade reconciliation report[s] . . . to make sure that our systems are working correctly . . . and we capture all the trades."  *Id.*  By contrast, Mr. Farell was abundantly clear—and his testimony was quoted and discussed extensively in Mr. Eisenberg's opening (and seemingly ignored) brief, Br. at 13-14—that trade execution and clearance were automated and thus done on AscendEx's offshore server.[4]  Tr. 149-150.  The government's attempted reliance on "facts" directly contradicted by the evidence and further reliance on distinguishable cases speaks volumes about the lack of real evidence and relevant authority supporting its position.

In one last attempt to show that it met its burden at trial regarding venue, the government states that because Mr. Casey saw Mr. Eisenberg's trading and "tried [but failed] to withdraw his funds from Mango Markets," that "is sufficient to establish venue."  *See* Opp. at 60.  The government, of course, makes no effort to explain why Mr. Casey's attempted (and failed) action was a part of or furthered the alleged crimes.  Instead, the government appears to argue, based on

_____

[4] Not only is the record clear that the government's assertion is false, the prosecutor's own notes for at least the fourth time contradict alleged facts (not in the record) the government has relied on in this motion.  In a December 8, 2022 interview, Mr. Farrell explained that "the matching engine . . . goes through the AWS cloud" in Japan."  *See* 3503-002.

a cherry-picked statement from *United States v. Royer*, 549 F.3d 886 (2d Cir. 2008), that for

venue "'receipt of electronic transmissions in a district is sufficient to establish venue activity

there.'"  *See* Opp at 60.  But *Royer* made clear that for the government to satisfy its burden, it

must present proof that "'an act in furtherance of the charged offense [] occur[ed] in the district

of venue.'"  *Royer,* 549 F3d at 894 (quoting *United States v. Svoboda*, 347 F.3d 471, 483 (2d Cir.

2003)).  Unlike here, *Royer* involved the dissemination of misappropriated confidential law

enforcement information to subscribers of a website providing information on which stocks to

sell short.  *Id.* at 890-92.  The *Royer* court held that venue was proper in the Eastern District of

New York ("EDNY") because seven of the approximately 300 subscribers to the site were

located in EDNY and because sufficient evidence existed to infer that trades in the securities

affected by dissemination of the information were made by investors who resided in EDNY and

affected the actions of market makers in these securities who were located in EDNY.  *Id.*  Mr.

Casey ultimately took no action of consequence at all.  And the action he testified that he tried to

take, withdrawing his funds, would have hindered, not furthered, Mr. Eisenberg's trading.  Mr.

Casey's testimony was thus totally irrelevant to the issue of venue.

    The government's misstatements of the record and the law should be rejected and the

case dismissed for lack of venue.

### 2.    The Government's Improper Summation (Rule 33)

    The government's failure to abide by the evidentiary record and the legal framework

surrounding venue was particularly prominent in the government's rebuttal summation, in which,

as detailed in Mr. Eisenberg's opening brief, the government failed to articulate a single point on

venue to the jury that was not, at a minimum, highly misleading.  Br. at 11-14.  The

government's repeated obfuscation of the facts, and its failure to articulate an accurate factual assertion regarding venue denied Mr. Eisenberg a fair trial.

In opposition, the government asserts that it "simply urged the jury, as it should, to make certain, reasonable inferences from the evidence presented."  Opp. at 62.  That is not at all what the government did.  To take but one example, the government told the jury that Mr. Eisenberg's "trades were settled and cleared . . . by the finance team in New York."  Tr. 1441.  That statement was not true, let alone a reasonable inference, and, even now, the government has made only minimal efforts to explain its (flawed) basis for making that argument, as discussed above.  *See* Opp. at 59.

Additionally, the government misstated that law when it told the jury that the presence of a victim in this District is sufficient for purposes of venue.  Tr. 1442 ("There was a victim right here in the district, too, which is another way you know that venue is proper here.").  The government does not even attempt to defend that position.  Instead, the government pretends that this simply did not happen, stating that it "did not . . . make claims about the law at all," with no discussion of what it told the jury, why it believes the statement appropriate, and/or its basis for concluding that telling the jury what types of evidence establish venue is not a claim about the law.  *See* Opp. at 62.  The record and the law support Mr. Eisenberg's position.  The government told the jury that the mere presence of Mr. Casey in this District established venue.  That statement of the law is fundamentally incorrect.

Although it is true that the defense did not object at the time (due to strategic reasons), because the government's rebuttal was so thoroughly misleading about both the legal requirements for proving venue and the facts connecting (or not connecting) Mr. Eisenberg's

actions to this District, if the Court does not dismiss the action, it should grant a new trial
pursuant to Rule 33.

### 3.     Incorrect Jury Instruction on Venue (Rule 33)

At the charge conference the defense requested that the Court instruct the jury that venue
required "an act constituting the charged crime," rather than "an act in furtherance of the charged
crime." Tr. 1309-12 (citing *Tzolov*, 614 F.3d at 314).  Despite incorrectly telling the Court during
the charge conference that the defense's proposed instruction was wrong because *Tzolov* did not
apply to commodities fraud and commodities manipulation cases and again claiming in its
opposition brief that "the defense's proposed instruction would have been legally wrong," Opp.
at 56, the government only a few sentences later notably concedes that the defense's proposed
instruction "is correct as a broad legal principle."  Opp. at 57.  But the government still maintains
that the Court's instruction was correct because, according to the government, giving the
defense's accurate legal instruction would have been misleading and because both instructions
are correct.  Opp. at 56-57.  Neither argument is persuasive.

Though, as noted above, the government takes internally inconsistent positions, it appears
there is no contestation that the "locus delicti of the charged offense must be determined from the
nature of the crime alleged and ***the location of the act or acts constituting it***."  *United States v.
Rodriguez-Moreno*, 526 U.S. 275, 279 (1999) (emphasis added) (cleaned up); *United States v.
Cabrales*, 524 U.S. 1, 6-7 (1998); *see also Tzolov*, 614 F.3d at 318 ("Venue is proper only where
the acts constituting the offense—the crime's 'essential conduct elements'—took place.") (citing
*Rodriguez-Moreno*, 526 U.S. at 280).  While the government spends multiple pages discussing
the fact that venue may be appropriate in multiple districts in cases charging continuing offenses,
Opp. at 54-56, that is largely irrelevant to the question at hand because the standard articulated

by the defense is, in fact, the proper standard for continuing offenses, and the cases cited by the defense all relate to continuing offenses. *See* Br. at 11-14.

Instead, the government seems to argue that the defense's proposed instruction would have been misleading for two reasons. First, the government contends that the instruction lacked "guidance on what it means for an 'act' to 'constitute' the charged offenses." Opp. at 56. If accepted, that argument would at most make the instruction incomplete but would not render it misleading. Had the government felt that further clarification was needed, it should have proposed additional language or instructions rather than requesting that the Court charge the jury with an incorrect legal standard. Moreover, the defense's proposed instruction would not have been vague; the jury would have understood that the government was required to prove the occurrence in this District of an act that was part of the criminal scheme.

The government further argues that the defense's proposed instruction "would have wrongly implied to the jury that each of [the charged] crimes has a single locus or a single act that makes up the offense." *Id.* The underlying logic of this argument is difficult to distill, and the government has not offered any explanation. Nothing about the defense's proposed instruction implied either a solitary act or location. To the extent that the government is seizing on the fact that "act" was in the singular, that is consistent with both the charge the government proposed and the Court gave ("an act in furtherance of each of the charged crimes," Tr. 1482), and with the case law. The language simply means that the jury can find venue based on a single supporting act and need not find that multiple acts or the entire crime occurred in this District.

Finally, the government argues that the Court was correct not to give the defense's proposed charge because numerous courts have held the "in furtherance" standard appropriate in conspiracy cases. Opp. at 57 (citing *Cabrales*, 524 U.S. at 9-10 (noting conspiracy can be

prosecuted where acts "in furtherance" of the crime occurred); *United States v. Kaufman*, No. 21-2589, 2023 WL 1871669, at *2 (Feb. 10, 2023) (quoting *Svoboda*, 347 F.3d at 483 ("[I]n a conspiracy prosecution, venue is proper in any district in which an overt act in furtherance of the conspiracy was committed by any of the coconspirators.")). This, of course, is not a conspiracy case, and as established in *Tzolov*, venue, particularly in relation to preparatory acts is different in conspiracy cases. 642 F.3d at 319 ("The conspiracy charges [] require a different analysis."). As discussed in Mr. Eisenberg's opening brief, that is precisely the prejudice inherent in not giving the defense's proposed instruction. Br. at 22.

Finally, the government attempts to distinguish *Tzolov* on the basis that its holding was cabined to securities fraud because the securities fraud statute has a specific venue provision permitting proceedings to be brought "in the district wherein any act or transaction constituting the violation occurred." Opp. at 57. But, as discussed previously, that venue provision in securities fraud is virtually identical to the general venue standard the government appears to concede applies in this case. Moreover, the Second Circuit specifically stated that it was rejecting the government's attempt to rely on the "in furtherance" standard articulated in *Svoboda*, 347 F.3d 471, because "[i]n *Svoboda* we were not faced with the question of whether preparatory acts alone could establish venue." *Tzolov*, 642 F.3d at 319. For the reasons articulated in Mr. Eisenberg's opening brief and discussed above, the governments summation squarely relied on preparatory acts (most or all of which never happened). Br. at 22-23.

Because the jury, following the Court's instructions, could have convicted on the basis of preparatory acts such as opening or funding a trading account, the Court should order a new trial in the event that this case is not dismissed.

## B. **Counts 1 and 2: The CEA Does Not Apply**

1. **Counts 1 and 2 Should be Dismissed Because the Mango Perpetual is not a Mixed Swap (Rule 29)**

In his opening brief, Mr. Eisenberg explained that, as dictated by statute, the analysis of whether the MNGO Perpetual was subject to the Commodities Exchange Act ("CEA") requires scrutinizing the risk exchanged in the swap. Because every witness and piece of evidence at trial established that transacting in the MNGO Perpetual was nothing more than placing a bet on the future price of MNGO, a security,[5] the MNGO Perpetual is subject exclusively to the securities laws and not the CEA. The government's attempt to backdoor the MNGO Perpetual into the ambit of the CEA by claiming it is a mixed swap due to the use of USDC to purchase MNGO Perpetuals and the fact that holders of these assets either paid or received funding payments entirely ignores the basic analysis. The evidence was overwhelming that USDC was simply a stand-in for USD and thus nothing more than the e-currency used to purchase assets on Mango Markets, including perpetuals, and that no investor did or would buy MNGO Perpetuals to speculate, even partially, on the value of USDC. And funding payments were simply a mechanism employed to ensure that the price of the MNGO Perpetual at all times reflected the price of its underlying security, MNGO. Nothing about using USDC as a medium of exchange or the existence of the funding payments changed the fact that MNGO Perpetuals were purely a futures bet on a single security. Because the MNGO Perpetual is not a Title VII asset covered by the CEA, Counts 1 (commodities fraud) and 2 (commodities manipulation) should be dismissed.

---

[5] On September 27, 2024, Mango Labs, LLC, Blockwork Foundation, and Mango DAO entered into a consent and proposed final judgment with the SEC in which it was effectively conceded that MNGO was a security. *See SEC v. Mango Labs, LLC*, 24 Civ. 07334, Dkt. 5 (S.D.N.Y. Sep. 27, 2024). Similarly, the Court instructed the jury, "you may assume that MNGO is a security." Tr. 1466.

a.  <u>Statutory Structure</u>

A "swap" under the CEA is nothing more than an exchange of risk.  *See* 7 U.S.C. §

1a(47)(A)(iii) ("'[S]wap' means any . . . transaction . . . that provides on an executory basis for

the exchange . . . of 1 or more payments . . . and that transfers . . . the financial risk associated

with a future change" in an asset's value).  Likewise, a "securities-based swap," as the name

implies, is simply an exchange of risk in which part or all of the risk relates to a security.  *See* 7

U.S.C. § 1a(42) ("The term security-based swap" has the meaning given the term in section 3(a)

of the Securities Exchange Act of 1934 (15 U.S.C. § 78c(a))); 15 U.S.C. § 78c(a)(68)

("'[S]ecurity-based swap' means' any . . . transaction that is a swap, as that term is defined under

the [CEA] and is based on a single security . . . including any interest therein or on the value

thereof. . . .").  If the MNGO-Perpetual is a swap, then there can be no reasonable debate that it is

a security-based swap because it is uncontested that MNGO is a security and that the risk

exchanged relates to MNGO.  *See id.*  Because security-based swaps are almost always exempted

from coverage of the CEA, *i.e.*, in all instances other than the very narrow exception for mixed

swaps, the government was required to prove beyond a reasonable doubt that the MNGO-

Perpetual qualified under the narrow category of mixed swaps.  7 U.S.C. § 1a(47)(B)(x) ("The

term 'swap' does not include any security-based swap, other than a security-based swap as

described in subparagraph (D).");  7 U.S.C. § 1a(47)(D) (defining "Mixed Swaps"); *CFTC v*

*Archegos Capital Mgmt. LP*, 2023 WL 6123102, 2023 U.S. Dist. LEXIS 166409, at *7 (S.D.N.Y.

Sep. 19, 2023) (noting that Congressionally mandated rulemaking by SEC and CFTC makes

clear that "the category of mixed swaps is intended to be a 'narrow' one, covering only a 'small

subset of Title VII instruments.'") (quoting "Further Definition of 'Swap,' 'Security-Based

Swap,' and 'Security Based-Swap Agreement'; Mixed Swaps; Security-Based Swap Agreement

Recordkeeping, 77 Fed. Reg. 48208, 48264 (August 13, 201) ("Joint Release").[6]

    With little factual or legal support for its argument, the government has attempted to

confuse and convolute the analysis, focusing on cherry-picked definitions of statutory terms,

neglecting to identify the witnesses it cites (almost exclusively Mr. Jain, the government's paid

expert who had no prior knowledge or experience with Mango Markets)[7] or the context of the

unidentified witness's testimony, and shying away almost entirely from any discussion of the

critical centerpiece of the analysis of swaps, scrutinizing the risk transferred.  The government

fails to cite any authority for the sweeping rewrite of the statutory scheme it attempts, which, if

accepted, would result in the narrow mixed swap exception essentially swallowing the entire

category of security-based swaps and taking them away from the exclusive jurisdiction of the

SEC.  Indeed, the government's argument required it to acknowledge the untenable result that its

interpretation would render any stock or stock-based swap that was purchased with gold, euros,

and seemingly any other type of currency, a mixed swap.  Opp. at 17.  There is simply no support

in the statutory text or regulatory rulemaking, which is a Congressionally mandated part of the

statutory scheme, for the government's argument.

---

[6] 15 U.S.C. § 8302(d)(1) instructs "the Commodity Futures Trading Commission and the Securities and Exchange Commission, in consultation with the Board of Governors, shall further define the terms 'swap' [and] 'securities-based swap,'" a directive that the Commissions properly understood to also include further defining "mixed swap," which is a subset of both "swap" and "security-based swap."  The Joint Release is thus part of the statutory structure.

[7] Among other things, Mr. Jain testified that he had never traded on Mango Markets, had not read the "Mango Markets li[te] paper," did not know in which currency the Mango Markets oracle was reported, did not know when the MNGO token was issued, did not know how many tokens had been issued, and was not aware that Mango had an upgrades council."  Tr. 332-34.  When asked which documents he had reviewed, Mr. Jain stated that he did "a general internet search."  Tr. 333.

The government acknowledges that "the agencies expected the mixed swaps to be few in number," but states that this "does not provide any guidance for how a jury should evaluate whether the particular instrument here . . . should be categorized." *Id*. at 13. The government misunderstands that the argument it is making, that any instrument purchased with any currency and/or that pays a yield based on a rate derived from securities, is not cabined to the particular instrument here and, if accepted, would eliminate security-based swaps because they would be swallowed by the category of mixed swaps. Moreover, its argument that it was appropriate to charge the jury purely by tracking the statutory text, without any tools to evaluate what it meant for an instrument to be "based on the value" of a reference, Opp. at 29, supports the defense position that the determination of whether an instrument is a mixed swap is a legal question more appropriately decided by the Court than the jury, just as Judge J. Paul Oetken determined in *Archegos*. 2023 WL 6123102 at *4 (holding that certain swaps were not mixed swaps as a matter of law and dismissing CFTC complaint with prejudice).

Turning to the specific contentions in the government's opposition, neither the use of USDC as a stand-in for USD that is used to facilitate dollar-based trading on Mango Markets nor the existence of funding payments derived entirely from the value of a single security, MNGO, transforms the MNGO Perpetual into anything other than what it was, a security.

    b.  The MNGO Perpetual was not Based on ***the Value*** of USDC

The record is devoid of any evidence that any investor would ever trade MNGO Perpetuals in order to speculate on the value of USDC. Instead, the evidence conclusively demonstrated that the MNGO Perpetual was a bet on the future price of MNGO. The evidence was equally conclusive that Mango Markets was a dollar-based market in which USDC was used simply as a stand-in for USD, with no exchange rate or other conversion between the two,

because cryptocurrency like USDC was needed as a mechanism to transact on the blockchain. *See, e.g.*, Br. at 27. The value of MNGO Perpetuals (and all other positions on Mango Markets) was ultimately stated in USD, not USDC, without accounting for any potential change in the value of USDC, and it was thus impossible for the value of USDC to affect the value of the MNGO Perpetual. This fact is yet another reason the MNGO Perpetual was not "based on the value of" USDC, and USDC could thus not transform it into a mixed swap. *See* 7 U.S.C. § 1a(47)(D).

The government's response appears not to address the essential issue: the lack of evidence that the MNGO-Perpetual was a bet on the change in price of USDC. The government, misstating the relevant standard, instead argues over and over that "MNGO Perpetuals are based, in part, on USDC," *see, e.g.*, Opp. at 13, 14, 16, 17 19, without explaining what this means and neglecting to answer the actual question, whether the MNGO Perpetual was based on ***the value*** of USDC. *See* 7 U.S.C. § 1a(47)(D) (emphasis added). The government thus spends many pages going down rabbit holes, arguing that traders purchased MNGO Perpetuals with USDC, Opp. at 13-15, 19, that one (of three) of the oracle's data sources was an exchange on which USDC was used, Opp. at 13-15, and that USDC is not the same as USD, Opp. at 16-17. While much of this is factually inaccurate, more importantly, it does not address the central issue that traders in MNGO Perpetuals were only exposed to and concerned with price changes in MNGO and not the value of USDC.

As discussed in greater detail in Mr. Eisenberg's opening brief, Br. at 28-29, Mr. Shipe, a contributor who helped write the code that operated the Mango Markets interface, Tr. 362, and who served as the government's primary witness regarding the mechanics of the Mango Markets platform, testified that "the value of MNGO Perpetuals go[es] up or down based on the value of

19

MNGO," without mentioning USDC. Tr. 377-78.  Mr. Shipe further testified, among other things, that the MNGO Perpetual was "the futures market for the MNGO token," Tr. 373, and that prices and values for MNGO Perpetuals were listed in USD (not USDC).  Tr. 375 (regarding GX-916).  The government, perhaps recognizing that this evidence eviscerates its claims, argues, without citing any evidence or offering any explanation, that "Shipe was talking in shorthand." Opp. at 15.  It is not clear what the government believes this precise and detailed testimony was shorthand for.  Instead, it seems the government is actually arguing that the testimony of its own central fact witness should be ignored.  Doing so would be improper because there is no probative evidence contradicting Mr. Shipe's account and ample documentary evidence corroborating his testimony.

In urging that the jury could have disregarded Mr. Shipe's testimony, the government cites but does not discuss—without disclosing the identity of the witnesses on whom it is relying—three transcript portions that do not in fact support its position.  First, the government cites to Mr. Jain's testimony about a hypothetical transaction he created that did not even involve MNGO or MNGO Perpetuals.  Br. at 15 (citing Tr. 231-32).  Second, the government cites another hypothetical trade Mr. Jain created in which he described using USDC to purchase MNGO Perpetuals.  *Id.* (citing Tr. 318).  Mr. Jain, who, as discussed, had no expertise in Mango Markets, went on to testify that this hypothetical MNGO Perpetual would go up or down in value based on the price of MNGO, with USDC acting as the baseline for measuring that price movement.  *Id.* (citing Tr. 318-19).  Similarly, the government's third citation is to the testimony of defense expert Jeremy Sheridan that the value of Mr. Eisenberg's positions would have gone up or down based on changes in the value of MNGO.  *Id.* (citing Tr. 1193).  In addition to the testimony not supporting the government's position, the government's reliance on Mr. Sheridan's

testimony is procedurally improper and should be disregarded because Mr. Sheridan testified

after Mr. Eisenberg's initial motion for judgment of acquittal, which was made at the close of the

government's case and upon which the Court reserved decision. Tr. 947 ("The Court will reserve

judgment on defendant's motion."); Fed. R. Crim. P. 29(b) ("If the court reserves decision, it

must decide the motion on the basis of the evidence at the time the ruling was reserved."). In

any event, none of these pieces of testimony relate to whether changes in the value of USDC had

any effect on the risk exchanged.

Moreover, the government does not and cannot contest that the value of a Mango Markets

user's profits and losses, trading volumes, and all other indicators of the value of a position on

Mango Markets were listed in USD (not USDC). *See* GX-900, 914-921. For example, GX-916,

which lists all of the MNGO-Perp trades in the long account relevant to this case, depicts in USD

the reference price paid, the value of each position, the processing fee charged, the total value of

the account, the amount of collateral available, and the amount of margin available. By contrast,

there is no mention of USDC. S*ee id.* The same is true of GX-920, which depicts the MNGO

Perpetual positions in the short account. Likewise, GX-915 and GX-919 depict the value of the

deposits in the two accounts, respectively, in USD, and GX-917 and GX-921 depict the value of

the withdrawals in the two accounts, respectively, in USD with no mention of USDC.[8]

Despite the mountain of evidence to the contrary, the government obstinately insists that

"MNGO Perpetuals . . . appear on the Mango Markets website as being based on the relative

value of MNGO and USDC." Opp at 15. That assertion is simply inaccurate. As discussed

above, the trades, deposits, and withdrawals in the long and short accounts were all depicted in

---

[8] While the Court has copies of all of the admitted exhibits, should the Court desire, the exhibits
cited in the parties' papers can be provided forthwith.

USD with no reference to USDC. *See* GX-916 (holding in long account), GX-917 (withdrawals from long account), GX-920 (holdings in short account). Rather than address the actual holdings and accounts at issue in this case, the government cites to two generic snapshots from Mango Markets, GX-989, 991, but even these exhibits offer no support for the government's position as both depict profit and loss, prices, fees, and values in USD.[9] The only mention of USDC is in the price and quantity boxes relating to the actual purchase of the MNGO Perpetual, but all this means is that USDC is being used as the stand-in for USD to mechanically complete the transaction. *See id.* Once the transaction is complete, even this reference price is denoted in the account in USD without conversion or even mention that USDC was used to execute the transaction. *See* GX-916, GX-920.

The government similarly misstates the facts with respect to the oracle. Mr. Hermida, the CEO of Switchboard and a member of the team that developed the Mango Markets oracle, testified in extensive detail that the Mango Markets oracle reported out in USD, that it did nothing to normalize data received in USDC to USD, instead treating them as equivalents, and noting that there was no difference between USDC and USD because the values during the relevant time period were essentially identical and because anyone could exchange USDC for USD 1-1 at Coinbase or Circle regardless of any theoretical difference in value between the two. Tr. 471-73. The government focuses on the fact that one of the three sources for the oracle was in USDC,[10] Opp. at 14, but that is irrelevant because the oracle was ultimately reported in USD

---

[9] The government concedes that these various values are stated in USD, but states that "this is consistent with many other parts of the Mango Markets webpage that normalize values of many different types of cryptocurrencies to dollars." Opp. at 15. That is precisely the point. Every value is converted to USD, and not USDC, because USD is the base currency of the platform.

[10] Only Serum reported prices in USDC. AscendEx reported prices in USDT and FTX in USD. Indeed, FTX, like the oracle itself, treated USDC and USD as equivalents such that when a user

with no conversion and because none of this relates to the risk exchanged. *See* Tr. 457 (noting that oracle reported out as MNGO v1 USD feed). The oracle was therefore reporting out the spot price of MNGO in USD with no mention or consideration of the value of USDC.

The evidence was thus conclusive that values, including the oracle price, on Mango Markets were denoted in dollars with no conversion of any USDC inputs and that the government's contention to the contrary are wholly inconsistent with the evidence. Regardless, the government misses the fundamental point; whether a reference can convert a Title VII instrument into a mixed swap depends on its purpose, and, more specifically, whether it is fundamental to the risk transfer. In much the same way that an investor could use dollars, Euros, bitcoin, or any manner of other currencies to buy corn futures, the risk transferred in that transaction would still be whether the price of a bushel of corn went up or down, not the relative strength of the currency utilized as the medium of exchange. Tr. 416 (Mr. Shipe agreeing that "USDC is used as a medium of exchange"). Despite the fact that the Joint Release and logic dictate otherwise, the government continues to push its frivolous theory to the contrary, essentially continuing to argue that a customer who buys coffee at a coffee shop is selling their dollars, not simply buying coffee. Citing no authority and offering no explanation, the government writes:

> Under the plain text of the statute, there is no question that a swap based on, say, the relative value of a stock and the price of gold would be a mixed swap. The same is true for a swap based on the relative value of a stock and the Euro.

Opp. at 17. The government makes no attempt to square its astoundingly broad view of the mixed swap exception—any security-based swap that is bought with currency (fiat or digital) or

---

deposited one USDC into her account she was automatically credited with 1 USD with no conversion and without regard to the actual value of USDC. Tr. 456.

precious metal, or conceivably anything else, would be a mixed swap—in direct contradiction of the Joint Release's very direct instruction that the category of mixed swaps is intended to be a "narrow" one, covering only a "small subset of Title VII instruments." Joint Release at 48291; *see also Archegos Capital Mgmt. LP*, 2023 WL 6123102, at *7.[11]

To be clear, the defense position is not that currency can never be a reference converting a Title VII instrument into a mixed swap. However, in order for currency to be such a reference, the purpose of the transaction must include exposure to movements in the price of the currency. That is precisely the point of the detailed discussion in the opening brief of quanto and compo equity swaps. Br. at 32. The Joint Release clearly stated that quanto equity swaps were not mixed swaps because exposure to the foreign currency "could be seen as incidental to the securities exposure." Joint Release at 48265. By contrast, a compo equity swap would be a mixed swap because the purpose of the instrument includes "exposure to . . . the change in the relevant exchange rate." *Id.* The MNGO Perpetual is similar to the quanto equity swap because its purpose does not involve any exposure to the exchange rate for USDC. Indeed, as discussed above, Mango Markets uses ***no exchange rate*** to convert USDC to USD.[12] The government

---

[11] The government criticizes as irrelevant the defense pointing out that at trial the government astonishingly asserted that any swap involving a foreign currency would be a mixed swap and that even dollar-denominated swaps would be mixed swaps but for a specific carve out for dollars. Opp. at 17. Yet, the government not only does not now soften this position, it essentially repeats it in the above-quoted passage and makes clear that the notion is not a passing comment but the logical keystone of the government's argument.

[12] The Mango Markets documentation states that "[t]he quote currency [here USDC] will always have all weights and prices equal to 1." GX-1011 at 108. Moreover, the documentation is replete with examples discussing and using USDC and USD interchangeably. *See, e.g.*, *id.* at 60 (explaining health ratio entirely in USD and then noting "if you have ***$100 of USDC*** within your account you can exchange that for up to 5x of another asset") (emphasis added); 105 (explaining how to use risk calculator to evaluate health after a purchase of perpetuals and stating that as part of the calculation "you will also need to subtract ***$1,850 from your USDC balance***") (emphasis added); 118 (noting that USDC is always assigned an asset weight of "1" when calculating the

unpersuasively attempts to distinguish this authority stating that the Joint Release's discussion of these swaps "was a specific decision on a discrete set of swaps." Opp. at 18. That may be so, but the logic that incidental use of a currency used to facilitate risk exposure to some other asset is not sufficient to render a securities-based swap a mixed swap clearly applies more broadly to the Joint Release's purpose of defining mixed swaps. The government continues to misinterpret the guidance, stating "this part of the Joint [Release] underscores that a security-based swap incorporating a foreign currency *is a* mixed swap." Opp. at 18 (emphasis original). This is not what the Joint Release stated. Rather, the section concludes that a foreign currency only renders a Title VII instrument a mixed swap when exposure to movements in price of that foreign currency are fundamental (rather than incidental) to the purpose of the instrument. *See* Joint Release at 48266-67 (discussing the need to evaluate the purpose of the swap and the exposure being exchanged).

In addition to the reasons discussed above, the opening brief also noted that USDC could not serve as a reference creating a mixed swap because the MNGO Perpetual conveyed "a current or future . . . ownership interest" settled in USDC. 7 U.S.C. § 1a(47)(A)(iii); Br. at 33. In other words, a swap involves the exchange of risk without conveying the underlying asset, but USDC *is* exchanged between the parties while the position remains open. The government's

---

value of an account's collateral while all other cryptocurrency, including USDT, is discounted); 133 (explaining profits in perpetual trading scenario, "your PnL will be *$50.00 USDC*") (emphasis added); 133 (noting that PnL is shown in USD and if account in hypothetical scenario is out of the money, it "will now borrow *$20.00 USDC*") (emphasis added). Similarly, it is apparent from the withdrawals in the long account that there is no exchange rate because a withdrawal of 50,000,000 USDC was assigned a value of $50,000,000.00 and another of 2,807,721 USDC was assigned a value of $2,807,721.00. GX-917. Even an infinitesimal difference in value would be reflected in transactions of that size, as shown by the fact that a withdrawal of 3,266,426 USDT was reflected with a value of $3,265,936.30, a conversion rate of .99985 - 1. *Id.*

response that the parties do not exchange USDC during the pendency of the swap is wrong and demonstrates a misunderstanding of the manner in which settlement worked on Mango Markets. Both Messrs. Jain and Sheridan testified that at any time, a party could choose to settle their PnL balance, which, in turn would settle the corresponding PnL balance of their counterparty. Tr. 332; 1119, GX-1011 at 113. That settlement would move any profits into the party's USDC token balance, which could then be withdrawn without closing the position. *Id.* Contrary to the government's assertion, USDC is thus regularly exchanged between the parties during the pendency of the swap when a party chooses to settle rendering USDC statutorily incapable of serving as a reference to a swap or mixed swap. *See* 7 U.S.C. § 1a(47)(A)(iii).

In sum, the instrument was called a MNGO Perpetual for a reason: it was a bet on the future price of MNGO. There was no evidence that the purpose of the instrument was to gain exposure to USDC or that gaining such exposure was even possible and overwhelming evidence to the contrary. Further, USDC was the currency used to settle profits and losses during the pendency of the swap and was therefore legally incapable of converting the MNGO Perpetual into a mixed swap. A jury verdict that USDC rendered the MNGO Perpetual a mixed swap would be irrational and should not stand.

c. The Funding Payments Could Not Render the MNGO Perpetual a Mixed Swap

The MNGO Perpetual is a complex product designed for a simple purpose: to bet on the future price of MNGO. Tr. 377-78, 469-70. Mr. Shipe, among others, explained exactly that. *Id.* If MNGO goes up, the long positions win and if MNGO goes down the short positions win. *Id.* The MNGO Perpetual is simply a bet on the price of a security, MNGO. *Id.* It is quintessentially a security-based swap, the very type of instrument the CFTC, the SEC, and the framers of Dodd Frank agreed would not be covered by the CEA. *See* 7 U.S.C. 1a(47)(B)(x) (exempting security-

based swaps from definition of "swap"); Joint Release at 48267 ("[A] single-name CDS that is based on a single reference obligation would be a security-based swap because it would be based on a single security or loan . . . ."). Ironically, the government now seeks to transform the MNGO Perpetual into a mixed swap on the basis of funding payments that are designed to ensure that the MNGO Perpetual continues to accurately reflect the price of its underlying security, MNGO. The government essentially argues that the Court should overlook the purpose of the funding payments and find that they make the MNGO Perpetual a mixed swap because they are calculated on the basis of not one security but two. This position should be rejected because it is factually wrong and self-evidently antithetical to the statutory scheme.

The Joint Release offers various illustrative examples, including that discussed above relating to quanto and compo equity swaps, in which it stresses the importance of evaluating the "purpose" of a reference in a Title VII instrument in order to determine the character of the risk exposure of the instrument and thus the manner in which the instrument is legally characterized. *See*, *e.g.*, Joint Release at 48266-67 ("[T]he scope of the mixed swap category of Title VII instruments is intended to be narrow and [] when variable interest rates are used for financing purposes incidental to counterparties' purposes, and risks assumed, in entering into a TRS, the TRS is a security-based swap and not a mixed swap."). According to the Mango Markets documentation, "Funding is a mechanism used to ensure that the price of a futures contract stays in line with the current spot price." GX-1011 at 92. This mechanism is necessitated by the fact that perpetuals, unlike standard futures contracts, do not contain an expiration date that would otherwise ensure that, at least at or near the date of expiration, the prices converged. Tr. 244.

This structure confirms two important things. First, the MNGO Perpetual is nothing more than a bet on the future price of MNGO. And second, the funding is simply meant to

27

ensure that the market price of that contract continues to reflect the price of the underlying

security.  Because the government can cite no contrary evidence regarding the nature of the

funding payments, this alone proves that the purpose of the funding payments was to retain risk

exposure only to the price of a single security, MNGO, rendering the MNGO Perpetual a classic

security-based swap exempt from the CEA.  *See Archegos Capital Mgmt. LP*, 2023 WL 6123102

("[A] mixed swap must be based on multiple underlying references — one that is subject to SEC

authority and one that is subject to CFTC authority.").

Application of the statutory text confirms this conclusion.  The mixed swap exception

***cannot*** be triggered by references "based on the value of . . . a single security or a narrow-based

security index."  7 U.S.C. 1a(47)(D).  The funding payments, which are simply based upon one

or more expressions of the value of MNGO, a security, can thus not make the MNGO Perpetual a

mixed swap.

As discussed in greater detail in Mr. Eisenberg's opening brief, the funding payments

were calculated on the basis of the differential between the oracle and the price of the Mango

Perpetual on Mango Markets.  Br. at 36 (citing Tr, 468, 459); *see also* GX-1011 at 92 ("The

midprice of the bids and asks is compared to the oracle price to determine the funding rate.").  At

their core, both of these inputs are expressions of the price of MNGO.

The oracle is an index used to determine the "accurate[]" current price of MNGO in the

spot market according to Mr. Hermida.[13]  Tr. 459.  That spot MNGO price is then compared to

_____

[13] If the oracle is not based on the value of a single security (MNGO) because it aggregates three
prices of the same security, MNGO, it is nonetheless a narrow-based security index, which is
treated as a security for purposes of the statutory scheme.  The government concedes that the
oracle is an index, which is based on the price of MNGO, a security, but argues that the oracle is
not a narrow-based security index because it gathered prices from markets that utilized USDC
and USDT as their trading cryptocurrencies and so the index "is not based solely on securities."
Opp. at 23 (citing 15 U.S.C. § 78c(68)(E)).  This argument is easily rejected because the oracle's

the market price of the MNGO Perpetual on Mango Markets to determine both whether it is the long or short position that makes the funding payments and the amount, if any, of those payments. GX-1011 at 92. The funding payments thus are directly based upon the value of a security, MNGO, and cannot serve as a reference that transforms a security-based swap into a mixed swap. *See* 7 U.S.C. § 1a(47)(D).

In addition to totally ignoring the fact that the risk exposure and purpose of the MNGO Perpetual are entirely geared toward a single security, the government also convolutes several other aspects of the analysis of the funding payments. Initially, the government doggedly defends its long-running attempt to conflate the funding payments with the underlying rate used to calculate the amount of those payments. This position requires brushing aside testimony and evidence regarding the fact that funding is a payment stream, not a mathematical calculation. Instead, the government oddly cites the CEA, which, of course, says nothing about the factual nature of the funding payments or any other particular reference. *See* Opp. at 21, Br. at 34-35. Next, the government implies that the funding payments are not based on the price of MNGO (or any other security) despite the government's own description of the funding payments as being calculated based on the oracle and the uncontroverted evidence that the oracle price is the spot price of MNGO. Opp. at 22. Instead, the government states that the funding "derives from the difference between" the oracle and the price of the MNGO Perpetual on Mango Markets, as though a difference in price is not based upon the value of one or both of the things being

---

purpose was to report the spot price of MNGO (not USDC or USDT). The oracle price was reported in USD, and no conversion was used to normalize the stablecoins into USD. Tr. 472-73 (Hermida testifying that delta between USDC, USDT, and USD was extremely small, that USDC could be exchanges 1-1 for dollars regardless of its value, and that oracle reported in USD without any USDC-USD conversion). In other words, the actual value of USDC and USDT was irrelevant to the oracle.

differentiated.  *Id.*  This argument, for which the government offers no explanation or evidence, is utterly illogical.  Indeed, the computer code confirms the centrality of the MNGO oracle (index price) in calculating the funding.  GX-1011 at 46-47 ("Funding is computed continuously as the daily difference in the index price and the current book price.").

Third, the government argues, in the alternative, that the funding payments render the MNGO Perpetual a mixed swap because in essence they are based not on one security but on two securities, MNGO and the MNGO Perpetual.  Opp. at 22-23 ("[T]he MNGO Perpetual is an entirely different instrument from the MNGO token."); Br. at 43-44 (explaining why there is no dispute that MNGO Perpetual is a security).  The government offers no explanation for its mistaken position that a reference based on the value of two securities would render an instrument a mixed swap.  *See Archegos Capital Mgmt. LP*, 2023 WL 6123102 ("[A] mixed swap must be based on multiple underlying references — one that is subject to SEC authority and one that is subject to CFTC authority.").  Moreover, the text of the statute is clear that a reference based on an interest in fewer than ten securities is a narrow-based security index which is treated as a security and cannot convert an instrument into a mixed swap.  S*ee* 7 U.S.C. § 1a(47)(D) (excepting narrow-based security indices as references for mixed swaps); 15 U.S.C. §§ 78c(a)(55)(B) (defining narrow-based security index as an index containing nine or fewer securities), 78c(a)(68)(E) ("'[I]ndex' means . . . a group of securities including any interest therein or based on the value thereof").

Whether based on one security, two securities, or several securities, there is no legitimate dispute that the funding payments were based exclusively on securities and could not render the MNGO Perpetual a mixed swap.  This conclusion is entirely consistent with the purpose of the funding payments, which was to ensure that the MNGO Perpetual remained consistent in price

with its underlying security, MNGO.  Likewise, all of this aligns with the purpose of the MNGO

Perpetual, to exchange the risk of price movements in MNGO.  There is no legal or factual basis

for finding otherwise, and the jury's determination that the MNGO Perpetual was a mixed swap

and the resulting guilty verdicts on Counts 1 and 2 were thus unreasonable as a matter of law and

cannot stand.

### 2.    Rule of Lenity (Rule 29)

For all the reasons stated above and in Mr. Eisenberg's opening brief the proper result in

this matter is for the Court to dismiss Counts 1 and 2 because the MNGO Perpetual is a classic

securities-based swap.  *See* Br. at 24-25.  However, in the event that the Court were to rule in the

government's favor, it would require the Court to accept a definition of the term "mixed swap" in

a manner unforeseeable to the public, and the rule of lenity should therefore apply.

In addition to describing the legal requirements for application of the rule of lenity, Mr.

Eisenberg's motion offered a detailed explanation of the ambiguity of defining mixed swaps, and

particularly of the ambiguity of determining that a funding stream based entirely on the value of

securities somehow created a mixed swap.  Br. at 42-43.  Mr. Eisenberg's interpretation of the

statue was substantially similar to that of Judge Oetken in *Archegos* in which he found that "a

mixed swap must be based on multiple underlying references — one that is subject to SEC

authority and one that is subject to CFTC authority."  *Archegos Capital Mgmt. LP*, 2023 WL

6123102.  The MNGO Perpetual is indisputably not based on a reference subject to CFTC

authority.  Despite this explication, the government argues that "the defense[] does not present a

viable alternative to the government's interpretation of this statute or this Court's instructions."

Opp. at 26.  Not only has the defense identified such a reading, that reading is consistent with the

reading of another judge of this Court.

31

Equally striking is the government's assertion that the jury instructions on mixed swaps were "simple, correct legal principles against which the jury could measure the facts."  Opp. at 26.  The parties and the Court worked diligently to craft jury instructions, but despite the best efforts of everyone involved, those instructions were anything but "simple."  The task of, for example, determining whether the funding rate was a narrow-based security index, particularly without the knowledge that a security-based swap is a security, was far from a measurement of the facts.  Indeed, the defense position has always been that the task of determining whether an instrument is a mixed swap is a thoroughly legal question for the Court and, for this reason, stressed this argument in its oral Rule 29 motion at the close of the government's case and again in letters submitted during trial.  Tr. 930-932.  Even the agencies charged with implementing and defining the terms of the Dodd-Frank Act recognized how difficult it was for legally trained subject matter experts to determine whether an instrument is a mixed swap.  Joint Release at 48294 ("[I]dentifying a mixed swap may not always be straightforward.").

The remainder of the government's opposition to applying the rule of lenity consists of more mischaracterizations of the defense's position and straw man arguments.  The government asserts that "the defense has no true narrower interpretation of the statute," the defense argument "sounds heavily in factual arguments about the design of the MNGO Perpetual," and the argument is really one of vagueness.  Opp. at 26-27.  None of these assertions is accurate.  The defense and the government have a disagreement regarding the legal definition of mixed swaps with the government asserting that a reference based exclusively on the value of one or two securities (and a pegged currency, USDC, whose actual value has no bearing on the swap) is a mixed swap.  The defense rejects that definition.

Finally, the government asserts that the rule of lenity need not apply because, in essence, if the defendant's conduct is not illegal under the commodities laws, it is illegal under the securities laws.  Opp. at 27.  There has been no proof that the government could have met its burden had it charged Mr. Eisenberg under securities law.  Indeed, at various points in the case the government has tried to distinguish between the two areas in its favor.  For example, in its opposition, it claims that the venue provision for securities laws is narrower than that for commodities laws.  Opp. at 57.  Similarly, at the December 6, 2023 oral argument on the motion to dismiss, the government represented that the "'purchase or sale' requirement" rendered the "in connection with" requirement of the securities laws narrower than commodities fraud under the CEA.  12/6/23 Tr. 22-23.  The difference is even more pronounced for commodities manipulation, which has no direct analogue in the securities laws.

For all these reasons, the Court should dismiss Counts 1 and 2.

### 3.      The Court Should Have Instructed the Jury that the MNGO Perpetual was a Security (Rule 33)

It is uncontested that the MNGO Perpetual is a security.  Despite this being an established fact central to the jury's analysis, the government contends that properly instructing the jury about the nature of the instrument it was tasked with evaluating would be "misleading and confusing."  Opp. at 28.  The opposite is true.  It was misleading and inaccurate not to instruct the jury regarding the legal characterization of the MNGO Perpetual, which was relevant to the analysis with which it was tasked and which the jury did not have the legal framework to

evaluate on its own. The Court's refusal to give this instruction was thus incorrect and materially prejudicial.[14]

Despite arguing that it would have been "erroneous" to instruct the jury that the MNGO Perpetual was a security, the government acknowledges that the instruction would have been accurate. Opp. at 29 ("It is true that [] 'security' includes a security-based swap." (citing 15 U.S.C. § 78c(a)(10)). Nevertheless, the government asserts that giving the jury this accurate instruction on the law and uncontested facts would have "confused the jury and given them an incorrect impression of the law" because the "instruction did not provide any guidance whatsoever about how, or why, the fact that this security-based swap is a security matters for deciding whether MNGO Perpetuals are mixed swaps." *Id.* But explaining "how" and "why" the law applies to the facts of the case is the province of the parties, in summation, not of the Court. Moreover, if the government wanted additional legal instruction, it should have proposed it. Indeed, even now the government does not articulate what additional element(s) of the law the jury would have needed to understand to give context to an instruction that the MNGO Perpetual was a security.

The government further argues that the Court's instruction was "legally correct" because it "tracked the statutory definition of mixed swaps" and "left the defense free to make exactly the

---

[14] The government complains that the defense proposed instructing the jury that the MNGO Perpetual was a security "for the first time" at the charge conference. Opp. at 28. But, in addition to the fact that proposing instructions at the charge conference is permitted, the delay was caused by the government, which refused to concede that MNGO was a security until the charge conference. Tr. 1294. Moreover, the government was on notice prior to the charge conference that the defense took the (now undisputed) position that the MNGO Perpetual was a security because this position, along with the supporting authority, was stated by the defense both orally in its initial Rule 29 motion and again in a written letter. Tr. 931, Dkt. 148 at 4, n.5. Nevertheless, the government apparently had not researched the issue prior to the charge conference. Tr. 1291 ("I actually haven't thought through what all of the bouncing balls are for if a Mango Perpetual is a mixed swap, whether it's still qualified as a security or not.").

same arguments that it has advanced in its post-trial papers." Opp. at 29. But the former misses the point, and the latter is not true. The defense's challenge to the instructions is that they were incomplete in a very significant way—lacking any instruction on the fact that a security-based swap such as the MNGO Perpetual is a security—so the accuracy of other portions of the instruction is irrelevant. That gap in the instructions prevented the defense from thoroughly presenting its case to the jury. Most notably, the jury did not understand that the debate regarding the funding was whether it was based on the value of one security or two securities. Though the jury received an instruction on the definition of "security," Tr. 1466, it was not instructed that the law also deemed a security-based swap to be a "security" and could not figure this out from the definitions it received. The jury thus had no way of knowing that the value of the MNGO Perpetual, which the government argued was a basis for the funding payments, was the value of a security. Relatedly, the jury could not evaluate whether the MNGO Perpetual (and its component funding payments) was a narrow-based security index because it could not determine whether it was based on the value of a group of securities. *See* 15 U.S.C. §§ 78c(a)(55)(B) (defining narrow-based security index as an index containing nine or few securities), 78c(a)(68)(E) ("'[I]ndex' means . . . a group of securities including any interest therein or based on the value thereof"). Because the jury could have convicted on the basis of the fact that it did not understand that the MNGO Perpetual was a security, the legal instructions were misleading, and a new trial is warranted.

## C. **Count 2: Commodities Manipulation**

### 1. **Insufficient Evidence of Commodities Manipulation (Rule 29)**

Mr. Eisenberg's opening brief, citing both numerous cases and the CFTC's own rulemaking, explained that the law of commodities manipulation required that the government

prove the intentional creation of an artificial market price, which is the prevailing price at which a covered asset can be bought and sold.  Br. at 45.  Mr. Eisenberg explained that "[t]he government c[an] find no authority for the strained proposition that a market manipulation claim could be based on the manipulation of anything other than the market (trading) price of a covered asset, let alone on the basis of the trading price of a non-covered asset (*i.e.,* MNGO) in an unregulated market."  *Id.*  The government does not respond to either the opening brief's arguments or the authority cited in support.  Instead, the government's opposition spends multiple pages attacking an argument that has not been made and misses the point: whether manipulation of a settlement price can ever be actionable under the CEA.  Opp. at 35 ("Because a settlement price is a price of a swap, that requires upholding the jury's verdict.").  The government's fundamental misinterpretation of the issue colors all of the arguments it then proceeds to make, including its reliance on the single authority it cites in support of its position, the CFTC's Adjudicatory Opinion in *In the Matter of Anthony K. DiPlacido*, CFTC No. 01-23, 2008 CFTC LEXIS 101, 2008 WL 4831204 (Nov. 5, 2008), aff'd *DiPlacido v. CFTC*, 364 F. App'x 657 (2d Cir. 2009).

The government, disregarding both the defense's discussion of *DiPlacido*, Br. at 49-50, and the facts of that case, seizes on the opinion's holding that settlement prices can be market prices that are "'legally cognizable as prices that can be the subject of a manipulation charge under the' CEA."  Opp. at 33 (citing CFTC No. 01-23, 2008 WL 4831204, at *30-31.  Indeed, as Mr. Eisenberg has previously pointed out, the holding in that case was explicitly limited to "case[s]" in which "the price of an individual future can be unlawfully manipulated."  2008 WL 4831204, at *30.  The opening brief explained:

> In *DiPlacido*, the defendant was a floor broker on the New York Mercantile Exchange who on four occasions placed large trades in electricity futures contracts

> in the final minutes of the trading period in an effort to artificially push the close higher or lower at the request of his clients who thereafter profited by exercising options based on the manipulated close/settlement prices.

Br. at 49.  Unlike this case, the defendant in *DiPlacido* manipulated the market price of a covered asset, electricity futures, which also happened to act as a settlement price.

Indeed, several years later, the CFTC, in the commentary to the implementing legislation of the CEA, 180 CFR § 180.2, specifically cited *DiPlacido*'s application of the "analytical framework . . . to settlement prices" a sentence before adopting a four-element test focused on the manipulation of "market prices."  CFTC, "Prohibition of Market Manipulation," 75 Fed. Reg. 67660 (Nov. 3, 2010).[15]  The holding of *DiPlacido* thus is totally irrelevant to determination of the issues in this case.

Mr. Eisenberg's opening brief initially explained that CEA market manipulation claims require proof of manipulation of a market price, noting that the Second Circuit's well-established four-element test for commodities manipulation specifically holds that the artificially altered "price" in market manipulation must be the market price.  Br. at 45-46 (citing *In re Amaranth Natural Gas Commodities Litig.*, 730 F.3d 170, 183 (2d Cir. 2013); *Grossman v. Citrus Assoc. of New York Cotton Exchange, Inc.*, 706 F. Supp. 221, 231 (S.D.N.Y. 1989) (compiling cases)).  The defense further noted that the CFTC's official rulemaking implementing the CEA endorsed the same tests used by the Second Circuit, stating that both market manipulation and attempted market manipulation relate to "market price."  75 Fed. Reg. 67660 (citing *In re Cox*, Comm. Fut. L. Rep. (CCH) ¶ 23,786 at 34,061 (CFTC July 15, 1987)).

---

[15] Both Mr. Eisenberg's opening brief and the government's opposition mistakenly refer to the CFTC's commentary to 17 C.F.R. § 180.2 as the "Joint Release."  *See* Br. at 46, Opp. at 33 n.6. It was the CFTC alone (not in conjunction with the SEC) that issued this commentary.  *See* 75 Fed. Reg. 67657.

The government's only response to this authority is its previously discussed attempt to create a distinction between settlement prices and market prices, *see* Opp. at 33 (stating irrelevantly that *Amaranth*'s holding "was not because a settlement price was not actionable"), and reliance on an unpublished, out-of-circuit case that does not actually support the government's position that the CEA's prohibition on market manipulation applies to prices other than market prices. *Id.* at 32.  In *United States v. Futch*, 278 F. App'x 387, 394 (5th Cir. 2008), the Fifth Circuit rejected the defendant's void-for-vagueness argument that "price" was overbroad without the addition of the term "market" because "market price is the price that is actually paid by buyers for the same commodity in the same market."  The *Futch* court thus held that this "broad definition . . . would not significantly alter the scope of § 13(a)(2) . . . in light of the facts of this case [which related to] the index price of natural gas."  *Id.*  In other words, the Fifth Circuit, while agreeing with Mr. Eisenberg's definition of "market price," made no determination on whether this was the proper interpretation of "price" in the statute because the definition did nothing to narrow the scope of the statute when applied to the facts of that case.

Four years later, in a published opinion in *United States v. Brooks*, 681 F.3d 678, 697 (5th Cir. 2012)—a case cited previously by Mr. Eisenberg, Br. at 47, but not addressed by the government—the Fifth Circuit, after discussing *Futch*, stated that "the term 'price' [in § 13(a)(2)] is clear" and means "the amount of money given or set as consideration for the sale of a specified thing."[16]  The Fifth Circuit thus agreed with the Second Circuit and the CFTC's official commentary that "price" for commodities manipulation means market price.

---

[16] At the charge conference, the government argued that the Fifth Circuit in *Futch* declined to add "market" before "price" because, according to the government, "it is not clear what 'market price' means."  Tr. 1301.  But as discussed, that is not at all what *Futch* held, and shortly thereafter in *Brooks* the Fifth Circuit had no trouble clearly defining "market price" and holding that that was the price applicable to the analysis of CEA market manipulation claims.

For the reasons stated in Mr. Eisenberg's opening brief, two opinions from other judges of this Court, *Vitanza v. Board of Trade*, No. 00 Civ. 7393, 2002 WL 424699 (S.D.N.Y. Mar. 18, 2002), and *Three Crown Ltd. v. Caxton*, 817 F. Supp. 1033 (S.D.N.Y. 1993), further establish that manipulation of a settlement price not reflecting the market or trading price of a covered asset could not be actionable as commodities manipulation.  Br. at 47-48.  The government attempts to distinguish these cases on the basis that they address the CEA's private right of action, ignoring the fact that, as discussed in Mr. Eisenberg's opening brief, there is no material difference in the language of the two statutory sections because both address what "constitutes a manipulation of the price."  *See* Opp. at 50 (comparing 7 U.S.C. § 25(a)(1)(D) (private right of action) with 7 U.S.C. § 13(a)(2)).  Rather than address the statutory language, the only purported distinction argued by the government is that "*Vitanza* addressed a different statute that serves a different purpose."  Opp. at 34.  The government offers no explanation for what this different statutory purpose is or why it would change the definition of "manipulation" or "price" common to both anti-manipulation sections of the CEA.

The Court, in a colloquy with defense counsel at the charge conference, alluded to the problem with the government's reasoning that "price" in market manipulation claims does not have to be a market price.  Tr. 1300.  The Court raised the scenario of a privately negotiated price between two parties for a contract determined by some market reporting.  *Id.*  A similar scenario could involve the owner of a gas station or grocery store raising the prices they charge their own customers.  Under the government's definition of "price," the elements of commodities manipulation could be met because you have a person specifically intending to and capable of setting an artificial price for a commodity.  But while such an action might amount to price gouging, it is plainly not market manipulation.  Moreover, the entire concept of artificiality in the

law of commodities manipulation relates to market forces of supply and demand.  *CFTC v. Parnon Energy Inc.*, 875 F. Supp. 2d 233, 246 (S.D.N.Y. 2012) ("An artificial price is a price that does not reflect basic forces of supply and demand.") (citation omitted).  The settlement price of the MNGO Perpetual did not reflect the forces of supply and demand in the market for MNGO Perpetuals.

The government next shifts its argument and asserts that even if the market price of the MNGO Perpetual was the relevant price, "the jury also had sufficient evidence to conclude beyond a reasonable doubt that the defendant manipulated the price of MNGO Perpetuals."  Opp. at 35.  This argument is easily refuted.  The government fails to cite any evidence that Mr. Eisenberg specifically intended to move the market price—or reference price, as the government calls it—of the MNGO Perpetual or to otherwise even address, let alone refute, the substantial evidence cited in Mr. Eisenberg's opening brief that moving this price was totally irrelevant to his trading. Br. at 51-52.  Instead, the government asserts only that due to the funding rate, the oracle (settlement) price will (at some point) move in line with the reference (market) price of the MNGO Perpetual so Mr. Eisenberg was aware that his trading in the spot market would cause the price of the MNGO Perpetual to rise artificially.  Opp. at 35.  The government's argument is a classic conflation of knowledge with specific intent.  *See*, *e.g.*, *United States v. Valdivia-Flores*, 876 F.3d 1201, (9th Cir. 2017) ("'[A] person who causes a particular result is said to act purposefully'—or with specific intent—'if he consciously desires that result . . . while he is said to act knowingly if he is aware that that result is practically certain to follow from his conduct, whatever his desire may be as to that result.'"  (quoting *United States v. Bailey*, 444 U.S. 394, 404, 100 S. Ct. 624, 62 L. Ed. 2d 575 (1980)); *United States v. Frampton*, 382 F.3d 213, 223 (2d Cir. 2004) (noting the difference between knowledge and specific intent in the context of aiding

and abetting). Regardless of whether Mr. Eisenberg knew that the market price of the MNGO Perpetual would move, the evidence was overwhelming and undisputed that any such price movement was of no moment to him and that it was thus not his specific intent to move the market price. *See* Br. at 51-52.

Because the government failed to establish that Mr. Eisenberg specifically intended to cause an artificial market price for MNGO Perpetuals, there is insufficient evidence to support the jury's guilty verdict on Count 2, and judgement of acquittal should be entered.

### 2.    Rule of Lenity (Rule 29)

Mr. Eisenberg's opening brief noted the ambiguity of the phrase "manipulate the price" and the lack of precedent for the government's interpretation of that phrase to encompass manipulation of the price of an asset not covered by the CEA. Br. at 52. The government responds that the term is not ambiguous, with no explanation for that position, and that the defense's interpretation of the term is "no narrower that the Government's interpretation." Opp. at 34. That is not so, given that the government's interpretation would encompass the manipulation of all manner of prices of uncovered assets so long as they affect settlement prices of other assets, while the defense interpretation, consistent with *Vitanza*, *Three Crown*, and the definition of "market price" from *Amaranth* and the CFTC's own guidance, would not encompass such trading. The rule of lenity should therefore apply, and the Court should enter judgement of acquittal on Count 2.

### 3.    Jury Instruction on Market Price (Rule 33)

The government argues that it "would have been legal error" to give an instruction that included the word "market" before the word "price," Opp. at 32, despite the fact that such an instruction would have been consistent with *Amaranth*, 730 F.3d 170, and the CFTC's

commentary to the CEA's implementing regulations.  75 Fed. Reg.  67660.  The government

offers two points in support.  First, it cites the Fifth Circuit's unpublished opinion in *Futch*

which, as described above, offers no support for the government's position; a position directly

undercut by the Fifth Circuit's published opinion in *Brooks* four years later.  *See* Opp. at 32.  And

second, the government gives its own opinion of the "statutory [] purpose" behind Section

13(a)(2), citing no authority, which it claims was designed for things like policing the settlement

price of MNGO Perpetuals.  Opp. at 32.  Though the government protests otherwise, there is no

indication that Congress or the CFTC intended for the reach of the CEA to extend to the market

price of instruments not covered by the CEA (like MNGO) regardless of whether they affected

the value of other instruments arguably covered by the CEA (and for the reasons stated above in

Section B, MNGO Perpetuals are also not covered by the CEA).  Indeed, both *Three Crown*, 817

F. Supp. 1033, and *Vitanza*, 2002 WL 424699, rejected the government's position, and the

government has failed to cite a single supporting authority.

As discussed more thoroughly in Mr. Eisenberg's opening brief, the government seized

on the lack of an instruction regarding "market price," arguing in rebuttal that it was "just Mr.

Klein saying something" and urging the jury to ignore the defense argument that the appropriate

price for evaluation of a CEA market manipulation claim is the market price.  Br. at 53 (citing Tr.

1437).  Thus, for the reasons stated above and in the opening brief, *id.* at 52-53, it was prejudicial

error not to instruct the jury that the relevant price for Count 2 was the market price of the

MNGO Perpetual.

### 4.    Improper Summation Arguments Regarding Pumping (Rule 33)

In his opening brief, Mr. Eisenberg catalogued five instances in which the government

erroneously told the jury in summation that "pumping is criminal," "pumping was illegal," "it is

42

a crime to pump the price," "pumping the price was illegal," and describing a "pump" with "illegal trade after illegal trade." Br. at 54. The government does not dispute that use of market power to "pump" the price is not in fact a crime. S*ee id.* (citing cases); Opp. at 36. Yet counterfactually the government now asserts that it "never argued that there is some independent crime of 'pumping.'" Opp. at 36. As noted, that is exactly what it told the jury, including the following: "You all know that the defendant was well aware that pumping was illegal. Tr. 1342. The defendant knew that people get criminally charged for pumping in the markets." *Id*. The government cannot change that it repeatedly told the jury that pumping was a crime.

The government argues that its summation was permissible because "pump" was "also a word the defendant used himself." *Id.* Mr. Eisenberg addressed this in his opening brief, noting that the government's mischaracterization of the law in relation to his own words made its summation even more prejudicial. Br. at 54 n. 22. In other words, the government told the jury that Mr. Eisenberg was essentially confessing his intention to commit a crime when he used the word "pump" because pumping was a crime. Even though the defense did not object at the time (for strategic reasons), the Court should order a new trial with respect to all three counts of conviction because the government's summation was prejudicial and misstated the law.

**D. Counts 1 and 3: Government Failed to Prove Falsity and Materiality (Rule 29)**

The government's theory of fraud at its core is that Mr. Eisenberg never intended to comply with the smart contract, but there was no evidence that Mr. Eisenberg ever violated the contract. Indeed, the government neither introduced the contract into evidence nor called anyone who had ever read the contract. That alone is dispositive that the government did not meet its burden to prove fraud beyond a reasonable doubt. Further, a review of the Mango Markets documentation and the testimony about the structure of the platform suggests that Mr. Eisenberg

fully complied with the contract and was therefore not deceptive.  This compliance rendered any

potential deception immaterial because the platform was legally obligated under the smart

contract to permit his trading and withdrawals.  The verdict on Counts 1 and 3 should not stand.

### 1.  Insufficient Evidence of Falsity

The frauds charged in Counts 1 and 3 both fail because there was no evidence in the

record that Mr. Eisenberg made any false or deceptive statement or representation to the contract.

While the government argued a hodgepodge of theories of deception before trial, it has now

narrowed them down to two, an alleged false statement about the value of his assets and a failure

to maintain sufficient collateral, each of which is fundamentally flawed.  First, Mr. Eisenberg did

not transmit information to the platform about the value of his assets, and the smart contract's

analysis of the value of his positions was accurate.  *Id.* at 40.  At the instant of Mr. Eisenberg's

withdrawals, the only time period the contract considered, his profit balance contained in excess

of $100 million (in USDC).  And second, Mr. Eisenberg's alleged failure to maintain collateral

was not false because there was no such requirement under the smart contract.  *See* Opp. at 38-

39.  The evidence was clear that Mango Markets offered non-recourse collateralized loans for

which a borrower like Mr. Eisenberg could either maintain assets on the platform or forfeit his

collateral.  Having failed to prove deception, the government's fraud claims (Counts 1 and 3)

should be dismissed.

The government initially asserts that it was "fraudulent to create the false impression that

[Mr. Eisenberg's] MNGO Perpetual position was an extraordinarily valuable asset."  Opp. at 42.

But for the reasons discussed in Mr. Eisenberg's opening brief, there was nothing false about the

value of Mr. Eisenberg's positions, which at the time of his withdrawals were accurately valued

by Mango Markets at well in excess of $100 million.[17]  Br. at 56.[18]  The smart contract did not

ask or have any ability to process whether that value was artificial or unsustainable.  Moreover,

for the reasons discussed in Mr. Eisenberg's opening brief, an artificial price does not equate to

fraud without some additional deception.  Br. at 54 (collecting cases).  The government's reliance

on *United States v. Chanu*, 40 F.4th 528, 533-34 (7th Cir. 2022), is thus misplaced, because that

case, which related to spoofing, involved the defendant directly trading with counterparties who

had discretion to trade and exercised that discretion based on a misleading impression of the

market caused by the defendant, not a smart contract that had no such discretion.

The government argues that Mango Markets and its users were misled because they

"would [not] expect the price to be manipulated because the oracle had been designed to reflect

[] organic price discovery."  Opp. at 42.  There are numerous legal flaws with this argument.

Initially, with respect to Mango Markets users, there is no evidence that any user had any

knowledge that the oracle was designed to convey organic price discovery.  Regardless, as a

matter of law, Mr. Eisenberg owed no duty to disclose the nature of his open-market trading to

any users.  *See CFTC v. Gorman*, No. 21 Civ. 870 (VM), 2023 U.S. Dist. LEXIS 50750, at *38,

2023 WL 2632111 (S.D.N.Y. Mar. 24, 2023).  As in *Gorman*, Mr. Eisenberg's "was neither in a

relationship of trust and confidence with any other market participants that would require

disclosure, nor was he an insider who was exploiting his position of privilege to those in the

market."  *Id.*  While the holding in *Gorman* relates to contrasting the CEA with the securities

---

[17] There is no dispute that the oracle correctly conveyed the spot price of MNGO.  The day after
Mr. Eisenberg's trades, Mango Markets tweeted about the prior day that "the oracle price
reporting worked as it should have."  (SDNY_01_00016839).

[18] The government asserts that by borrowing "Mr. Eisenberg automatically sen[t] Mango Markets
information about his assets so the program could run a credit check," but that is exactly
backwards.  Opp. at 41.  The screenshot included in the government's brief, *id.*, shows Mango
Markets sending a user information about their assets.

laws, the rationale applies to wire fraud as well. *Gorman* noted that the creation of a duty to disclose in market manipulation violations of the Securities Exchange Act "was premised on the notion that the securities laws are aimed at a 'philosophy of full disclosure' to curb 'insiders from conspiring to frustrate the efficient function of securities markets by exploiting their position of privilege.'" *Id.* (quoting *In re Initial Public Offering Sec. Litig., a pre-Levitt*, 241 F. Supp. 2d 281, 382 (S.D.N.Y. 2003)).

The Mango Markets creators' purpose behind the oracle is also irrelevant to the government's allegation that Mr. Eisenberg deceived Mango Markets. Whatever the intent behind the oracle, the terms of the agreement between Mr. Eisenberg and Mango Markets were governed by the smart contract. *See United States v. Connolly*, 24 F.4th 821, 842 (2d Cir. 2022) (rejecting government attempt to insert counterparty expectations into analysis of falsity for fraud). The government does not and cannot allege that Mr. Eisenberg violated the smart contract. Mr. Eisenberg explained in detail in his opening brief that the permissionless nature of the smart contracts meant that Mango Markets was legally obligated to pay under the contract on the basis of the oracle settlement price, regardless of how that price came to be. Br. at 61-63. Rather than respond to those arguments or the evidence cited, the government argues that Mr. Eisenberg committed fraud by frustrating the intentions of the platform's creators, intentions those creators chose not to include in the smart contract or the terms of use and never disclosed to Mr. Eisenberg or any other platform user. The government's theory is patently frivolous.[19]

---

[19] Though the platform creators' intent behind the oracle is irrelevant, even if it were not, there is substantial evidence contradicting the government's assertion that price creation was antithetical to the platform's design. The Mango Markets documentation encourages platform users to use the Risk Calculator tool to "develop strategies based on [traders'] project of market movements . . . such as changing the price of a token" and includes an example transaction that would move the oracle price almost 3x from 15 to 42 cents and then borrow against the increased value of the user's 10,000 MNGO Perpetual contracts. GX-1011 at 101. Moreover, even if Mango Markets

The government's second alleged deception is that Mr. Eisenberg's borrowing falsely "signaled his intent to undertake the obligations that come along with taking out a loan on Mango Markets." Opp. at 39. Without identifying its witnesses or discussing anything they said, the government asserts that "[m]ultiple witnesses testified that borrowing entails promising to take on certain obligations, including to have sufficient collateral at the time of the borrow, and to keep a sufficient collateral level to pay interest while the loan is outstanding." *Id.* In fact, neither the evidence cited by the government nor any other evidence in the record supports this assertion. Any "obligations" undertaken by a user of Mango Markets would have been contained in the terms of use and the code of the smart contract. Mango version 3, which was in use at the relevant time, contained no specified terms of service, instructing users only that they were to "use [the platform] at your own risk." GX-1010. It was only after the relevant period, on March 6, 2023, that Mango Markets introduced terms of use with version 4. *See* DX-2. The only other source for the terms of the contract between Mango Markets and its users was the code of the smart contract, which the government elected not to introduce into evidence because it contained none of the "obligations" upon which the government baselessly seeks to rely.

Rather than cite a primary source for the purported contractual terms, the government instead cites two witnesses, neither of whom testified as the government asserts. In response to a question about "expectation on the platform," Mr. Smith, a Mango Markets social media contributor who could not write code, testified that borrowers on the platform "are ***generally expected*** to keep collateral value positive and, ***if not, they will be liquidated***." Tr. 106 (emphasis added). Regarding a similar question relating to the "expect[ation]" around interest payments, he

---

did not encourage price manipulation and had had a rule prohibiting such actions, that would still not have been legally sufficient to support a fraud claim without some additional deception of users. *See United States v. Finnerty*, 533 F.3d 143, 150 (2d Cir. 2007).

responded only that "interest payments are automatically applied to any outstanding borrowings by the program." *Id.* Mr. Smith clearly did not testify about any legal obligations. And to the extent that he testified regarding non-legal "expectations," he was clear that interest payments were automatic (saying nothing of any action the borrower was expected to take or not take) and that a lack of collateral maintenance resulted in liquidation. *Id.* Indeed, Mr. Smith acknowledged that he had himself failed to maintain collateral on at least one occasion and had been liquidated. Tr. 107. The government has not insinuated that Mr. Smith committed wire fraud or commodities fraud, regardless of his intentions relating to his liquidation.

The only other evidence cited by the government for the proposition that borrowers were "obligated" to maintain collateral was the testimony of the government's paid expert, Mr. Jain, who, as discussed above, had no particular expertise regarding Mango Markets and who was not a lawyer, had never used the platform, and did not testify to having reviewed the code, certainly had no basis or expertise regarding the legal obligations of the smart contracts. *See supra* at 19. Any testimony the government alleges Mr. Jain provided regarding legal obligations should thus be disregarded. Moreover, Mr. Jain did not identify any "obligations" undertaken by a borrower, instead testifying only that "you need to have enough maintenance collateral to keep your account in a positive balance or positive health." Tr. 307. In other words, he testified only that a borrower had to keep collateral or else they would be liquidated. *Id.*; *see also* Tr. 316 (Mr. Jain: "If an account falls to [a health ratio] of zero percent, it will be liquidated and funds will be lost."), Tr. 1186 (Mr. Sheridan noting that "you need to maintain collateral to keep your health high enough . . . [o]therwise you are going to be liquidated"); GX-1011 at 50 ("A Mango Markets margin account is fully cross-margined and can be liquidated once the collateral ratio drops below maintenance margin level."). Mr. Jain conceded on cross-examination that a

48

borrower does not have to represent to the smart contract when or whether that borrower intends to repay the borrowed funds.  Tr. 337.

The defense's expert, Mr. Sheridan, provided the clearest testimony, which is undisputed regarding collateral.  He testified that the only thing that happens when an account does not maintain a sufficient collateral level is that it "goes into a liquidation status" and "can be taken over by anyone willing to liquidate it."  Tr. 1116.  Mr. Sherdan did not testify that a user was obligated to deposit more assets or maintain collateral, though they could do so if they wished to avoid liquidation.  *Id.*  Mr. Sheridan further testified that the maximum exposure a user had to losses was the value of that user's deposit on the platform because there was no collections process other than liquidation.  Tr. 1125.  The government suggestion that by opening a leveraged position one is committing to put in more money if the position loses value is thus directly contradicted by the evidence.  Moreover, if accepted, this position would destroy the business model of much of the cryptocurrency industry because it would make trading far too risky.  The government's attempts to prosecute this criminal fraud case by rewriting the contract between the parties should thus be rejected.

To meet its burden of proof beyond a reasonable doubt on the element of false statement/deceit, the government must rebut any reasonable interpretation of Mango Market's terms of use, *i.e.*, the context for the "borrow" button, the intentionally lax token lending parameters, and the inescapable interpretation that a non-recourse loan really is a non-recourse loan.  Mr. Eisenberg played by Mango Markets' rules and thus cannot be said to have misrepresented his intention to comply with some obligation he never had.

Finally, there was no evidence supporting the government's allegation that "Mango Markets and its users" were deceived by Mr. Eisenberg's "secret efforts to inflate the value of his

assets." Opp. at 41.  Contrary to this assertion, the evidence showed that Mr. Eisenberg's trading was conducted openly, that it was patently obvious to anyone who saw that trading that it would result in a dramatic rise in the value of MNGO, and that Mr. Eisenberg did nothing to prevent the market from seeing or understanding his trading.  Special Agent DeCaupa testified that Mr. Eisenberg's open-market trading caused the oracle price to rise 1100% in twenty-five minutes. Tr. 569-570.  Government expert Dr. Mordecai prepared a series of slides showing how anomalous the oracle price was, GX-1308, GX-1309, and the unparalleled spikes in both trading and volume on the exchanges.  GX-1314 (FTX), GX-1322 (AscendEx), GX-1330 (Serum DEX). Mr. Casey, testified that he immediately took note of the price of Mango, posted a chart of the spike in price on Discord, and tried to withdraw his assets.  Tr. 817, GX-817.  Additionally, the evidence showed that the same wallet that was used to purchase the long MNGO Perpetual contracts was used on the open market to buy $750,000 worth of MNGO on Serum DEX.  *See* GX-1351, GX-1353.  Conversely, there was no evidence of any action that Mr. Eisenberg took to hide his open and notorious trading, nor was there any testimony or evidence that anyone was deceived as to what that trading meant.  The very premise the government seeks to rely upon, that the trading was "secretive" and that individuals were misled, is contrary to the factual record and should be rejected.

### 2.    Conflation of Intent and Falsity

The government is conflating the elements of (1) intent and (2) false statement/deceit, just as it tried to do in *Connolly*, but each element must be separately proven beyond a reasonable doubt.  Intent does not change whether Mr. Eisenberg's borrows complied with Mango Markets' terms, definitions, and requirements and is irrelevant to the issue of whether the

false statement element was satisfied.  Here, the government failed to prove that Mr. Eisenberg

did not "borrow" in accordance with Mango Markets' rules.

As the caselaw cited by the government makes clear, "'[f]ailure to comply with a

contractual obligation is only fraudulent when the promisor **never intended** to honor the

contract.'"  *United States ex rel. O'Donnell v. Countrywide Home Loans, Inc.*, 822 F.3d 650, 660

(2d Cir. 2016) (emphasis in original) (quoting *United States v. D'Amato*, 39 F.3d 1249, 1261 n. 8

(2d Cir. 1994)).  The government, having failed to introduce the contract or call any witness who

had reviewed the contract, supplied absolutely no proof that Mr. Eisenberg ever violated the

contract, let alone that it was always his intent to do so.  Moreover, Mr. Eisenberg

unquestionably complied with the contract by exposing his positions to liquidation, the

platform's mechanical remedy described by each of the witnesses and the documentation for

insufficient collateral.  Tr. 1131 (Mr. Sheridan testifying that protocol liquidated both long and

short positions).  To the extent that the government suggests that Mr. Eisenberg violated the spirit

(*i.e.*, the "expectations") of the contract he had with Mango Markets, that is plainly insufficient

as a matter of law.  *O'Donnell*, 822 F.3d at 665 (finding trial evidence of fraud insufficient

because language of contracts related only to representations of quality at the time of contract

formation and rejecting government's attempt "to read the relevant contract provisions as, in

essence, promises at execution to make **future** representations as to quality") (emphasis in

original).

The evidence (or lack thereof) thus undercuts the very core of the government's second

theory of deception because the supposed "obligations" on which it rests are found nowhere in

the contract.  Instead, the loans were collateralized non-recourse loans by Mango Markets'

express terms.  GX-1011[20] ("Mango Markets . . . permits users to take out fully collateralized

loans against any deposited asset.").  There was no contractual obligation to pay back any

borrowed funds beyond what the collateral covered, and Mr. Eisenberg, like any other platform

user, never said or suggested anything other than that he was subjecting himself to liquidation

under the terms of the smart contract.  *See FDIC v. W.R. Grace & Co.*, 877 F.2d 614, 620 (7th

Cir. 1989) (Posner, J.) (noting that it is legally acceptable for a parties to enter a non-recourse

lending arrangement even where the borrower does not intend to repay and knows that the

collateral is as valueless as if "the Loch Ness monster had swallowed the entire State of

Mississippi so that [lender] would not recoup a penny"); *United States v. Rigas*, 490 F.3d 208,

234 (2d Cir. 2007) (citing *W.R. Grace & Co.*).

    In similar fashion to its misconstruction of the application of *O'Donnell* to this case, the

government also misstates the relevance of *Connolly*, 24 F.4th 821, which was discussed in detail

in Mr. Eisenberg's opening brief.  Br. at 56-57.  The *Connolly* Court held that the government

failed to prove that the defendants' London Interbank Offered Rate ("LIBOR") submissions were

not rates at which the bank could request and receive typical loan amounts.  *Id.* at 842.  The

Second Circuit further noted that the evidence of potentially improper influence in the rate

setting in order to affect the outcome of the bank's contracts was ultimately irrelevant to the

question of whether the rate submission was false.  *Id.*  This was so because it did not refute that

the submitted rate was, in fact, a rate the bank could receive, and because the relevant rules and

instructions the bank received regarding LIBOR submission did not explicitly forbid

consideration of the bank's financial interests.  *Id.*  Likewise, here, the government suggests that

---

[20] Though the Mango Markets documentation is highly instructive regarding the mechanics of
Mango Markets, it neither purports to be nor is the contract between the parties.

Mr. Eisenberg's actions were unfair because he violated the general expectations articulated by Mr. Smith that a borrower on Mango Markets maintain sufficient collateral, Opp. at 39 (citing Tr. 106), and because he violated the expectation of the creators of the oracle that price discovery be organic. Opp at 42. But, just as in *Connolly*, the government's invocation of "a reasonable notion of fairness" is irrelevant to the question of whether Mr. Eisenberg deceived any counterparty, a question whose answer is dictated by the language of the smart contract and terms of use. 24 F.4th at 842.

For the reasons discussed above, both theories of deception relied upon by the government lack any evidentiary support. The contract did not require the "obligations" on which the government relies to argue that Mr. Eisenberg deceived Mango Markets by borrowing without intending to maintain sufficient collateral. And Mr. Eisenberg never deceived anyone or anything regarding the value of his collateral. He made no representation or deceptive omission to any user about the value of his assets, and, in any event, he had no legal duty to any user, with whom he never contracted or transacted. Nor did he mislead the Mango Markets smart contract, which, regardless of its creators' intentions, did not ask about and had no ability to process whether the value of assets was artificial. Rather, the contract calculated the present value of Mr. Eisenberg's assets, which at all times was accurate. Finally, the evidence was overwhelming and uncontested that neither Mango Markets nor its users were deceived by Mr. Eisenberg's open trading. Because the government failed to prove any deception, Counts 1 and 3 should be dismissed.

### 3.    Insufficient Evidence of Materiality

Mr. Eisenberg's opening brief explained that the law and the Court's instructions required that the government prove materiality by, among other things, showing that Mr. Eisenberg's

alleged deceptions were capable of influencing a material decision made by a counterparty.  Br. at 57-60.  Mr. Eisenberg further described how he could have hypothetically announced his exact plans and intentions, and it would have made no difference.  Br. at 61-62.  The government responds with two actions it alleges for the first time in its opposition that counterparties could have taken that would supposedly have thwarted Mr. Eisenberg's trading had they not been deceived: (1) Mango Markets would have paused the platform and (2) users would have withdrawn funds.  In addition to the fact that there was no evidence that anyone was deceived regarding Mr. Eisenberg's trading and that he owed no duty of disclosure to the users of the platforms, there is additionally no evidence that either of the government's purported actions could or would have occurred.  The government thus failed to prove materiality, and Counts 1 and 3 should be dismissed.

        First, the government asserts that "the people running Mango Markets," without identifying who those people were, "'paused' the entire marketplace upon learning of the defendant's misconduct, which had the effect of stopping all withdrawals."  Opp. at 46.  The government alleges, without supporting evidence and without explanation, that "[h]ad they known about the fraud, that same action could have prevented the defendant" from withdrawing user funds.  *Id.*  The government did not call anyone involved in or knowledgeable about the act of pausing the platform.  Nor did the government introduce any documentary evidence regarding the pause.  The government, as it does throughout its brief when it lacks evidence for its assertions, notably does not identify the witnesses whose testimony it is citing or discuss their testimony, and analysis of the cited testimony demonstrates that it does not support the government's assertion.  First the government cites testimony from Mr. Smith on cross-examination that the Mango Markets community paused the platform with no testimony

regarding how that occurred, when it occurred, how it was determined to take this action, or who made the determination. Opp. at 45 (citing Tr. 132-33). Next, the government cites Mr. Shipe, who testified that the pause required that computer code be written but that he did not know who wrote the code or when the pause went into effect. Tr. 420-421. Finally, the government cites the direct examination of Mr. Sheridan, Opp. at 45 (citing Tr. 1131-32), whose testimony during the defense case, as noted, it cannot legally rely upon. *See* Fed. R. Crim. P. 29(b). Moreover, Mr. Sheridan testified that the pause was done without a vote of the DAO by a group of developers and coders who comprised a "security team," and that he did not know the mechanics of how the pause occurred or when it occurred. Tr. 1131-32. Taken together, there was absolutely no testimony that Mango Markets was delayed in pausing the protocol because it was deceived by Mr. Eisenberg or that it was possible to pause the protocol in the roughly twenty minutes it took for Mr. Eisenberg to complete his purchases of MNGO. GX-1353 (trading between 6:26 PM and 6:44 PM). Moreover, the limited testimony in the record indicated that pausing the platform required that a council be convened and that new computer code be written, a process that surely would have taken more time than was available. The government thus came nowhere close to proving beyond a reasonable doubt that Mango Markets would have paused the platform but for Mr. Eisenberg's alleged deception.

In addition to there being no evidence that pausing the platform during the trading was at all possible, and substantial evidence to the contrary, the pause-related theory is also deficient for legal reasons. The smart contract was permissionless and required that Mango Markets pay Mr. Eisenberg. There was no evidence that Mango Markets was permitted to pause the platform under the contract. The Second Circuit was clear in *Rigas*, 490 F.3d at 233-36, that the government was required to prove that the defendant's deception prevented a counterparty from

taking an action that was not only factually possible but also permitted within the terms of the contract. Because Mango Markets would have had to violate the smart contract to pause the platform, that action, even had it been possible, was not a legally sufficient basis for the government to prove materiality.

The government's "pause" theory stands in stark contrast to the discussion of *Rigas* in *United States v. Phillips*, No. 22 Cr. 138 (LJL), 2024 U.S. Dist. LEXIS 54989, at *106, 2024 WL 1300269, at *28 (S.D.N.Y. Mar. 27, 2024), which was addressed in detail in the opening brief, Br. at 65-66, a discussion the government notably did not address other than to state in a footnote with no reasoning that *Phillips* "had nothing to do" with this case. Opp. at 50 n.10. In *Phillips*, Judge Lewis Liman, in order to find sufficient evidence of materiality, relied on the fact that a witness from a counterparty to the trade testified that they would not have paid had they not been deceived by the defendant. 2024 U.S. Dist. LEXIS 54989, at *107. Judge Liman also noted evidence from the contract, which was in the record, that this refusal was legally permissible. *Id.* No such evidence was presented by the government here.

The government's other theory of an act that a counterparty could have taken was that "the users could have withdrawn their funds to prevent the defendant from getting them." Opp. at 47. The evidence the government cites is remarkable for how little support it provides, and, once again, the government notably does not discuss that evidence at all. First, the government cites the testimony of Mr. Casey, who stated that he was immediately aware that something was wrong—*i.e.*, he was not at all deceived—that he alerted the broader community by posting about the spike in MNGO on Discord, and that he was unable to withdraw his assets. *Id.* (citing Tr. 815-17, GX-817 (Discord chat)). This testimony directly contradicts the government's position because Mr. Casey and other users were both not deceived and could not have withdrawn their

assets.  The other testimony the government cites is Mr. Tonkin's testimony that he lived in London, was sleeping during the trading, and woke up the next morning unable to withdraw his assets.  *Id.*  (citing Tr. 829-30).  Additionally, the government cites GX-1603, a screenshot of Mr. Tonkin's Mango Markets account that he took in 2024, over a year-and-a-half later, that has no apparent relevance to the government's argument.  In sum, the government's proof that users supposedly would have withdrawn their funds had they not been deceived is the testimony of a witness who was so thoroughly not deceived that he alerted others about what was happening on social media and still could not withdraw assets and another witness who was not misled and could not have been misled because the trading happened in the middle of the night (his time), and he was asleep.  Indeed, in a moment of candor, the government acknowledges that the "scheme moved too quickly" for any user to withdraw assets from the platform.  Opp. at 50.  The government's total failure of proof weighs strongly in favor of dismissal of the fraud counts.

Having utterly failed to marshal evidence supporting its theory of materiality, the government proceeds to attack several arguments the defense did not make and relies on a series of irrelevant hypotheticals, just as it did during trial.  *See* Br. at 63-65.  The government asserts, without citing the defense brief, that "the defense appears to interpret [*Rigas*] for the proposition that if a representation causes something to happen through an automated process, that representation cannot be material."  Opp. at 48.  That is, of course, not the defense argument, which instead rests on the specific facts of this case, including the applicable provisions of the Mango Markets smart contract and terms of use, and whether under those facts a counterparty was deceived out of taking an action that it was practically and contractually able to take.  The government then reverts back to a hypothetical it used during trial in which a bank gives out loans on the honor system and a borrower lies about the value of his collateral to obtain a loan.

57

*Id.* Mr. Eisenberg addresses the myriad flaws of a substantially similar argument in his opening brief to which the government has not responded, including that the hypothetical bears no similarity to the information (or lack thereof) requested by the smart contract and the fact that Mr. Eisenberg never input any false information. Br. at 62-63.

Next, the government analogizes to a recent spate of check frauds at ATMs in which individuals deposited fake checks into their accounts and withdrew a portion of the funds made available before the check cleared. Opp. at 49. Once again, unlike this case, the bank customer is introducing a check with fake information on it to the ATM. By contrast, Mr. Eisenberg had real assets on Mango Markets that were worth exactly what the smart contract valued them at when conducting the health check. Had there been no false information on the check, simply depositing a check known by the depositor to be drawn on insufficient funds ("check kiting") has long been held by the Second Circuit to "not contain the requisite false or fraudulent pretenses, representations, or promises" necessary for wire fraud. *United States v. Burnett*, 10 F.3d 74, 78 (2d Cir. 1993). Regardless, the hypothetical bears no relation to this case. The government's persistent comparisons to inapplicable hypotheticals in conjunction with its repeated reluctance to discuss the factual record speaks volumes about the total lack of evidence supporting the government's position.

Finally, the government makes the objectively circular argument that Mr. Eisenberg conduct must have been fraudulent and material because in the government's view there was no "option for the defendant to lawfully accomplish his scheme." Opp. at 50. The government continues by relying on its own label that Mr. Eisenberg "stole[] all the assets off of the platform" and alleges that he could not have done so without materially deceiving the contract. *See United States v. Finnerty*, 533 F.3d 143, 150 (2d Cir. 2007) (rejecting government assertion

that "conduct [w]as 'self-evidently deceptive' [a]s conclusory; there must be some proof of manipulation or a false statement, breach of a duty to disclose, or deceptive communicative conduct"). But, labels aside, the government offers no response to Mr. Eisenberg's explanation that his borrowing at all times complied with the requirements of the smart contract. Br. at 64 (citing Mango Markets documentation, GX-1011). The government thus cannot cite any evidence that Mr. Eisenberg committed a deception that influenced any action Mango Markets could have taken under the contract. As noted in the opening brief, all of the evidence proffered by the government related strictly to relevance, *i.e.*, whether Mr. Eisenberg's actions "mattered" to Messrs. Smith, Shipe, and Tonkin, and not whether it was capable of influencing their decision making. Br. at 66 (citing *Rigas*, 490 F.3d at 234 ("'Relevance' and 'materiality' are not synonymous."); *Phillips*, 2024 U.S. Dist. LEXIS at *106 ("[I]mportance alone is insufficient.")).

The government has thus failed to prove that any alleged deception committed by Mr. Eisenberg was material, and Counts 1 and 3 should be dismissed.

**E.**  **Count 3: No Evidence of an Interstate Wire (Rule 33)**

Mr. Eisenberg's opening brief pointed out the fact that wire fraud (Count 3) requires proof beyond a reasonable doubt of an interstate wire in furtherance of the alleged scheme and that the government was unable to describe such a wire to the jury. Br. at 67-68. In response, the government (largely inaccurately) describes the testimony of Mr. Farrell that various unnamed back-office employees performed functions for AscendEx from an office in New York City and that various teams could potentially have taken certain actions vis-à-vis Mr. Eisenberg's account.

Opp. at 51-52.  But, as discussed regarding venue in Section A, Mr. Farrell offered no testimony

that any action was taken, let alone that such an action furthered Mr. Eisenberg's objectives.

The government does not dispute that it has failed entirely to establish the location of the

servers of Mango Markets or any of the exchanges.  Instead, it cites cases that it incorrectly

asserts stand for the proposition that it could prove an interstate wire without any proof that the

wire traveled out of the state or country.  Opp. at 52 (citing *United States v. Kim*, 246 F.3d 186,

189-91 (2d Cir. 2001) (faxes and other wires sent to and from Chase Manhattan Bank in New

York); *United States v. Bankston*, 820 F.3d 215, 235 (6th Cir. 2016) (witness testified that he was

uncertain regarding exact location of server but though it was in Nevada or California, not Ohio

where defendant was located).

The government next argued that two additional pieces of evidence support its argument.

The first was the testimony of Mr. Farrell that Mr. Eisenberg purportedly used a Polish IP address

to access AscendEx.  The government asserts that an "IP address provides information about the

server a particular person is using to access the internet."  Opp at 53.  But the evidence the

government cites, the testimony of Mr. Farrell, does not support the assertion.  Mr. Farrell never

testified about IP addresses, instead confusingly discussing internet service providers ("ISPs"),

which Mr. Farrell called "internet service something or other," the equivalent of Verizon Fios or

Spectrum.  Tr. 154-55.  The government fails to cite any evidence that Mr. Eisenberg would have

needed to access a Polish server to represent that he had a Polish IP address.[21]

Next, the government cites the testimony of Mr. Casey that he could see the price of

MNGO spiking from Poughkeepsie, New York.  Opp. at 53-54.  But, as previously discussed,

---

[21] While there was some testimony about virtual private networks ("VPNs") and the fact that they
could be used to reflect a different IP address, Tr. 820-21, there was no evidence regarding how
they worked, let alone that they required routing to a foreign server.

nothing Mr. Casey did or saw, and certainly not his unsuccessful attempt to withdraw assets from Mango Markets, which the government confusingly refers to as "a necessary byproduct of defendant's withdraw[als]," *id.*, was in any way an action in furtherance of Mr. Eisenberg's objectives.  The government's argument to the contrary is frivolous.

Because the government can cite no evidence of an interstate wire in furtherance of Mr. Eisenberg's alleged scheme, judgement of acquittal should be entered as to Count 3 (wire fraud).

## **CONCLUSION**

For the reasons discussed herein and in Mr. Eisenberg's opening brief, the Court should grant Mr. Eisenberg's motion and enter judgment of acquittal as to all counts under Rule 29.  In the alternative, the Court should order a new trial pursuant to Rule 33.

Dated: October 8, 2024                               Respectfully Submitted,


*Noam Greenspan*
Sanford N. Talkin
Noam B. Greenspan
Talkin, Muccigrosso & Roberts, LLP


 -and-


*Brian Klein*
Brian E. Klein
Ashley E. Martabano
Riley P. Smith
Waymaker LLP

*Attorneys for Avraham Eisenberg*

61