

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*The Jacob K. Javitz Building*
*26 Federal Plaza*
*New York, New York 10278*

February 10, 2025

**By Email**
Megan Henriquez
U.S. Probation Officer Specialist
Megan_Henriquez@nysp.uscourts.gov

      Re:    <u>United States</u> v. <u>Avraham Eisenberg</u>, 23 Cr. 10 (AS), 24 Cr. 251 (AS)

Dear Officer Henriquez:

      The Government writes in response to defense counsel's January 21, 2025 letter in the above-captioned case, which proposes revisions and makes objections to the initial presentence report ("PSR"). This letter will address only those revisions and objections that the Government opposes. Where the same response applies to multiple defense objections, this letter will identify the full group of objections to which the response applies.

      **I.**    **Factual Objections**

      <u>PSR ¶ 15</u>: The Government objects to all of the defense's proposed revisions to PSR ¶ 15. The defendant's first two objections claim that MNGO Perpetuals are based on the value of dollars, rather than USDC, and are not "swaps" under the Commodities Exchange Act. The jury convicted the defendant of commodities fraud and manipulation, which necessarily required finding that MNGO Perpetuals are "swaps." *See* Tr. 1466. There was also extensive evidence at trial that MNGO Perpetuals are based, in part, on the value of USDC. That evidence is summarized at pages 13-19 of the Government's opposition to the defendant's post-trial motions (the "Government Opposition"). *See* 23 Cr. 10 (AS), Dkt. 186. Finally, the defense's third objection—that borrowing is based on "profit level" instead of "value"—is incorrect: witness testimony established that borrowing on Mango Markets was a "a loan against the value of the assets that you have in your account." Tr. 306.

      <u>PSR ¶ 16</u>: The Government objects to all of the defense's proposed revisions to PSR ¶ 16. The defendant first reiterates his objections to PSR ¶ 15, but none of those are correct. The defendant next claims that the PSR is wrong to use the terms "steal." This is simply fighting with his conviction. The use of the term "steal" is correct because, in finding the defendant guilty of multiple counts of fraud, the jury concluded that the defendant deceptively represented that he was borrowing money from the Mango Markets platform, when he in fact had no intention to repay that money. That is fraudulent theft, as described in more detail at pages 36-43 of the Government Opposition. The defendant is similarly wrong to object to the PSR's use of the terms "price," "artificially manipulat[e]," and "artificially increas[e]." The jury convicted the defendant of commodities manipulation, which required finding that the "defendant caused [an] artificial price"

for a swap—namely, MNGO Perpetuals. Tr. 1470. There was ample evidence to support the jury's conclusion that the defendant manipulated, and artificially increased, the price of MNGO Perpetuals, which is explained in more detail at pages 30-36 of the Government Opposition.

PSR ¶ 17: The Government objects to all of the defendant's proposed revisions to PSR ¶ 17. The defendant's first objection—which is to the term "value"—is wrong for the reasons given in the section addressing PSR ¶ 15. The defendant is also wrong to claim, in his third objection, that the PSR should not state he had "no intention to repay the borrowed funds." As summarized in the Government's Opposition at pages 1-4 and 36-43, a key component of the defendant's fraud was manipulating the value of his assets Mango Markets, then representing he was "borrowing" against those assets when he, in fact, had no intention to repay. It is true that, days later, the defendant engaged in a negotiation with the Mango DAO and agreed to return some of the stolen money in exchange for a promise that Mango DAO and investors on Mango Markets would not pursue civil or criminal charges against him. But that does not mean he had an intent to repay the loan. Quite the opposite, it shows that he had no intention to repay, and instead made a partial payoff to obtain a separate benefit—namely, protection from civil and criminal claims.

The defendant is similarly wrong to claim, in his fourth objection, that the PSR should not say that "investors with deposits on Mango Markets lost much, or all, of th[eir] deposits" because they were not "investors" and they were ultimately reimbursed. On the naming convention, it is correct to call people who put cryptocurrency on Mango Markets "investors" because they used the platform with the hope of making money from loans based on, and investments based on the value of, different cryptocurrencies. As for losing their deposits, the evidence at trial showed—and the defendant admits—that investors on the platform did, in fact, lose their cryptocurrency for days or weeks. The PSR already addresses the subsequent reimbursement of Mango Markets investors in PSR ¶ 40, so there is no need to change PSR ¶ 17, which is correct.

Finally, the defendant is incorrect to claim that he borrowed only $61 million, instead of $110 million. Mango Markets kept records showing the amount that each user borrowed, and the total amount borrowed from the platform at any particular time. Those records clearly showed that the defendant borrowed $110 million worth of cryptocurrency from the platform, including more than $50 million of USDC. *See* GX 1002, 918, 929; Tr. 1206-11. The $50 million withdrawal of profit was just an assumption the defense expert made, contrary to these clear records. Tr. 1198-1211. The defendant is correct that he deposited approximately $10 million of USDC on Mango Markets, which can be accounted for elsewhere in the PSR.

PSR ¶¶ 21-22 and 29-31: The Government objects to the defendant's proposed changes to PSR ¶¶ 21 and 22 for the same reasons given above because the proposed changes reflect the defendant's objection to the terms "USDC" and "investors."

PSR ¶ 23: The Government objects to the defendant's proposed changes to PSR ¶ 23. Any method of borrowing on Mango Markets requires clicking a "Borrow" button. As the Mango Markets user manual shows, even when an investor uses the "Withdraw" function to borrow cryptocurrency, the investor is still sent to a page that requires the user to select a button to "Borrow Funds." The defense's proposed revision is, therefore, incorrect and misleading.

PSR ¶ 34: The Government objects to the defendant's proposed revisions to PSR ¶ 34, which relate primarily to the location of AscendEx and the existence of a wire through the Southern District of New York. The defense's arguments are wrong for the reasons given in pages 51-62 of the Government's Opposition. The defense's objection to the term "sell USDT for over 1 million MNGO" is also incorrect. In the foreign-exchange context, people regularly talk about selling one currency to buy another (e.g., selling dollars to buy yen or selling Euros to buy pesos). The same applies in the context of cryptocurrencies. Here, for example, the defendant sold USDC or USDT (depending on the market) to buy MNGO.

PSR ¶¶ 35-36: The Government objects to the defendant's proposed revisions to PSR ¶¶ 35-36. Those objections relate to the use of terms such as "price," "manipulation," "artificial," and "value." As explained above, it is correct for the PSR to use those terms, because the defendant was convicted of manipulating the price of a swap.

PSR ¶ 37: The Government objects to the defendant's proposed revisions to PSR ¶ 37. His objections to the $110 million figure and the use of the term "investors" are wrong for the reasons given above. The defendant's third objections—that assets deposited on Mango Markets did not belong to investors—is also incorrect. Investors who deposited cryptocurrency on Mango Markets were entitled to that cryptocurrency and had the right to withdraw it. It is true that it was theoretically possible Mango Markets might not have enough available cryptocurrency to support a withdrawal, just like a bank might not have enough cash on hand to support a withdrawal during a bank run. But that does not mean that an investor does not own their deposits, just cash in the bank belongs to the bank depositor, even though the bank can lend the money out to others.

PSR ¶ 38: The Government objects to the defendant's proposed revisions to PSR ¶ 38. The defendant's first three objections relate to his intent to repay and the use of terms like "USDC" and "value." As explained above, those objections are unfounded. The defendant's fourth and fifth objections effectively argue that the long and short MNGO Perpetual positions against which the defendant "borrowed" had actual value, and that the PSR should be revised to reflect as much. That position is at odds with what the jury found in convicting him. The defendant's MNGO Perpetual positions appeared to have value only because he manipulated the price of MNGO Perpetuals, and that value collapsed as soon as the defendant ran off with investors' funds and stopped manipulating the price. That was the whole point of the defendant's fraudulent scheme. Revising the PSR as the defendant proposes would incorrectly make it seem like the defendant had an asset with genuine value and borrowed in good-faith against the value of that asset, which is a defense the jury rejected.

PSR ¶ 42: The Government objects to the substance of the defendant's proposed revisions to PSR ¶ 42, but would agree to a revision of the sentence at issue. The point of PSR ¶ 42 is to explain that, after reaching an agreement on or about October 13, 2022, the defendant sent a total of approximately $67 million of cryptocurrency that went toward reimbursing investors who lost deposits on Mango Markets, and that this did not fully reimburse those investors, who lost over $110 million worth of cryptocurrency. The defendant's proposed revision would be misleading because it would leave out that the defendant did not fully reimburse investors. To clarify, the Government proposes revising the challenged sentence to read: <Those repayments did not fully

reimburse investors in Mango Markets, who had lost over $110 million worth of cryptocurrency as a result of the defendant's scheme.>

PSR ¶ 51: The defendant challenges the second sentence of PSR ¶ 51, which states: <Eisenberg used multiple accounts under fraudulent identities to avoid detection.>. The Government disagrees with the basis for the defendant's objection. The evidence at trial showed that the defendant used an FTX account in the name of a Ukrainian woman to commit his crime, along with an anonymous account on the platform AscendEx. The evidence at trial also showed the defendant took other steps to avoid detection and apprehension, including fleeing to Israel. The defendant's public admission to the scheme took place only after a cryptocurrency reporter informed the defendant that he planned to publish a piece identifying him as the Mango Markets attacker. The Government proposes modifying the challenged sentence to read: <Eisenberg attempted to avoid detection by, among other things, using a cryptocurrency account opened using another person's identity.>.

PSR ¶ 53: The defendant is correct that he deposited approximately $10 million of USDC onto Mango Markets, so the Government does not object to altering the amount misappropriated to $104 million of cryptocurrency. After the October 13, 2022 agreement described in the PSR, the defendant paid approximately $67 million worth of cryptocurrency, which was used to reimburse Mango Markets investors, leaving approximately $36 million worth of cryptocurrency in outstanding losses. The Government dos not object to revising PSR ¶ 53 along those lines.

As to the entity with which the defendant negotiated, the Government proposes revising the relevant sentence to read: <People speaking on behalf of the Mango DAO subsequently negotiated . . . .> The Government does not, at this time, take a position on the whether those people were from the Mango Upgrades Council and/or Mango Labs, and there is no need for the PSR to take position on that point.

II.     Guidelines Objections

Acceptance of Responsibility: The Government agrees with the defendant that he accepted responsibility for a child-pornography offense and should be sentenced in light of his acceptance of responsibility. It appears that the Presentence Report correctly follows the steps in U.S.S.G. § 1B1.1(a), which applies the reduction for acceptance of responsibility only after the counts of conviction have been grouped. Because the defendant has elected to be sentenced on both the child-pornography offense and his other convictions jointly, this leads to the result where—despite pleading guilty to the child-pornography offense—under the order-of-operations in the Guidelines, the defendant does not receive a reduction for acceptance of responsibility. That said, the defendant's request to apply a three-point reduction *after* grouping would also not reflect reality because the defendant did not accept responsibility for all his criminal conduct, but rather only his child-pornography offense.[1] The Government intends to argue at sentencing that the defendant accepted responsibility for his child-pornography offense and—at least under Section 3553(a)—

---

[1] A more realistic approach would apply the three-point reduction to the child-pornography offense before grouping, which would result an overall one-level reduction to the offense level.

should receive credit for accepting responsibility, but that the defendant has not accepted responsibility for his other crimes.

Loss Amount: A 24-point enhancement for loss applies under U.S.S.G. § 2B1.1(b)(1)(M), because the defendant was responsible for approximately $104 million worth of loss. The Government agrees that the defendant should receive a $10 million credit because he deposited $10 million of USDC on the platform, which reduces the loss from approximately $114 million to approximately $104 million. But a further reduction to $61 million would be inappropriate. The defendant's theory for that reduction appears to be that the defendant withdrew—instead of borrowing—$50 million of his own trading profit. This argument is doubly wrong. First, as explained above, the Mango Markets records clearly show the defendant borrowed over $110 million worth of cryptocurrency, including over $50 million worth of USDC. The defense's claim that he withdrew, instead of borrowing, $50 million of trading profit was speculation from the defense expert that was not supported by the relevant records. Second, even if the defendant theoretically withdrew $50 million of USDC, instead of borrowing it (which he did not), his ability to do so came only from the profit he momentarily achieved by fraudulently manipulating the price of MNGO Perpetuals. Because this so-called profit was also caused by fraud, it should not be credited against the losses he inflicted.

Number of Victims: A two-point enhancement for 10 or more victims applies under U.S.S.G. § 2B1.1(b)(2)(A)(i). There were two different ways in which the defendant's crime had ten or more victims: First, the defendant stole over $110 million worth of cryptocurrency from Mango Markets investors, and there were more than 10 such investors. The defense argues that those investors are not "victims" because they were reimbursed, citing *United States v. Abiodun*, 536 F.3d 162 (2d Cir. 2008). But that decision does not support the defendant's position. In *Abiodun*, the Second Circuit held that someone who is reimbursed for lost money still qualifies as a victim if they "suffered (1) an adverse effect (2) as a result of the defendant's conduct that (3) can be measured in monetary terms." *Id.* at 168-69. The Mango Markets investors are victims under this standard because they were not simply reimbursed for their lost funds, such as when a credit card company reimburses a user for fraudulent charges. Rather, as part of receiving that money, investors needed to accede to the defendant's demand that they "waive any potential claims" against him and "not pursue any criminal investigations or freezing of funds once the tokens are sent back." Tr. 388. In other words, the victims had to give something up to get their funds back. That is an adverse effect, and it can be measured in monetary terms—indeed, the defendant paid nearly $67 million worth of cryptocurrency to obtain those releases.

Second, the defendant's crime also caused loss to more than 10 victims because his repayment did not cover all of the lost funds, and the Mango DAO treasury spent tens of millions of dollars' worth of cryptocurrency to cover outstanding investor losses. The Mango DAO treasury belonged to the holders of MNGO tokens, of which there were more than 10. As a result, these individuals also suffered a monetary loss from the defendant's crime and are victims.

Sophisticated Means: A two-point enhancement for use of sophisticated means applies under U.S.S.G. § 2B1.1(b)(10)(C). As the PSR recognizes, and as explained above, one way in which the defendant's scheme was sophisticated was the use of someone else's identity to access an account on FTX. But that was not the only sophisticated part of the crime. The defendant's

fraudulent scheme was also sophisticated in that it involved complicated trading across multiple different cryptocurrency platforms to accomplish.

<u>Proposed Amendments to PSR ¶¶ 158-159</u>: The Government opposes the defendant's proposed amendment to PSR ¶¶ 158-159. The defense's position is properly included in its sentencing submission, rather than the Presentence report. Moreover, in this particular case the offense level for the child pornography conviction is not a primary driver of the overall offense level. As the PSR explains, the defendant's convictions at trial result in a higher offense level, so the child-pornography conviction results in only a two-point enhancement after grouping.

Very truly yours,

DANIELLE R. SASSOON
United States Attorney

by: /s/_____
    Thomas Burnett
    Peter Davis
    Assistant United States Attorneys

    Tian Huang
    Special Assistant United States Attorney