TALKIN, MUCCIGROSSO & ROBERTS, L.L.P.
ATTORNEYS AT LAW
40 EXCHANGE PLACE
18TH FLOOR
NEW YORK, NEW YORK 10005

(212) 482-0007 PHONE
(212) 482-1303 FAX
WWW.TALKINLAW.COM
EMAIL: INFO@TALKINLAW.COM

MARYLAND OFFICE:
5100 DORSEY HALL DRIVE
SUITE 100
ELLICOTT CITY, MD 21042

410-964-0300

NEW JERSEY OFFICE:
2500 PLAZA 5
HARBORSIDE FINANCIAL CENTER
JERSEY CITY, NJ 07311

201-342-6665

**BY ECF**

April 7, 2025

Honorable Arun Subramanian
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

        Re:    <u>United States v. Avraham Eisenberg</u>
               23 Cr. 10 (AS)

Dear Judge Subramanian:

      Pursuant to the Court's March 31, 2025 order, Dkt. 203 ("Order"), we write with answers to the Court's questions in advance of the April 10, 2025 hearing. For the reasons that follow, as well as those previously asserted in our client Avraham Eisenberg's Rule 29 and 33 motions, Dkts. 183 (moving brief), 191 (reply), the Court should enter judgment of acquittal, or, in the alternative, order a new trial.

**Question 1 (Mixed Swaps): "Why doesn't the transfer of USDC 'convey[]' a 'future direct or indirect interest in' USDC, which 'incorporates the financial risk so transferred,' 7 U.S.C. § 1a(47)[(A)](iii)?"**

      As an initial matter and for important context, the defense respectfully reiterates its position that the transfer of USDC could not make the MNGO Perpetual a mixed swap because the MNGO Perpetual was only a mechanism for trading the risk of MNGO, not USDC, which was established at trial through the testimony of a government witness, Tyler Shipe, and the MNGO documentation admitted into evidence. *See* Tr. 373 (describing Perpetual as "the futures market for the MNGO token"); 377-78 (describing changes of value of Perpetual strictly on the basis of price fluctuations of MNGO); GX-1011 (referring on various pages to Perpetuals with no mention of changes in USDC value). There was no evidence that anyone did (or would) trade Perpetuals to transfer the risk of USDC.

Hon. Arun Subramanian
Page 2

The defense has maintained throughout this case that the government's arguments to the contrary are nonsensical because they ignore the evidentiary record, including the fact that Mango Markets operated in USD, *see, e.g.*, Dkt. 183 at 29, and are premised on its farfetched view that the buying of products is not a purchase but rather the selling of currency (in this case, USDC). As the defense has often explained, if the price of a cup of coffee rises from $3.50 to $4.00, that is an increase in the price of coffee, not a decrease in the value of the dollar or the relative value of the dollar measured against coffee. *Id.* The foundation of the government's argument is therefore illogical, and its argument that USDC is a reference at all in the analysis of whether the Perpetual is a mixed swap fails at the threshold because the Perpetual is not "based on the value of" USDC. 7 U.S.C. § 1a(47)(D).

Moreover, even if USDC had been a potential reference in the analysis, it was not possible to transfer any risk relating to USDC because the platform (and the oracle) operated in dollars and assumed that USDC, a stablecoin pegged to the dollar, was equivalent to the dollar, regardless of whether USDC was actually worth exactly a dollar. Take, for example, a hypothetical scenario in which USDC fell off its peg—to be clear, this never happened during the relevant time period, Tr. 472-73, 480, 791—and dropped to .8 USD. Mango Markets would ignore the price drop and continue to assume 1 USDC = $1. Such a price change in USDC would thus have absolutely no effect on the risk transferred by the Perpetual because both sides would continue to be exposed to USDC throughout the pendency of the transaction, and both sides would lose funds compared to their expectations based on this price drop without either side passing any of this USDC-based risk of the other. The value of USDC was thus irrelevant to the risk transfer. *See* Dkt. 191 at 18-25.

Turning to the Court's specific question, USDC *is conveyed* between the counterparties to the MNGO Perpetuals ("Perpetuals"), and USDC therefore cannot meet the statutory definition for a reference that can qualify the instrument (the Perpetual) as a mixed swap. *See* 7 U.S.C. § 1a(47)(A)(iii), 7 U.S.C. § 1a(47)(D). For this additional reason, the government's theory that the use of USDC (serving as an electronic stand-in for USD) to purchase and settle the Perpetual renders the instrument a mixed swap fails to meet the statutory definition, and Counts 1 and 2 should be dismissed.

During the charge conference, the Court and the defense engaged in an extensive colloquy on this issue, with the Court ultimately overruling a defense request to add "that is not exchanged by the parties" in the jury instructions regarding a reference that can render an instrument a "mixed swap." Tr. 1320-30 (defense request at 1326). The government did not articulate a clear response to this issue at the charge conference, arguing only that its proposed instruction was appropriate (and any additions were legally wrong) because it "tracks the language of the statute." Tr. 1328. The government, in its rebuttal summation, however, responded to the defense position as follows:

> Now, Mr. Klein tried to tell you, well, because the parties ultimately pay up in USDC, it's not a swap. That's not what the judge is going to instruct you on. What the judge is going to instruct you on is something is not a swap if the parties exchange an asset that incorporates the risk that they are

Hon. Arun Subramanian
Page 3

> betting on. The risk that they are betting on is the risk of the relative value of Mango and USDC.
>
> So if the parties were exchanging Mango and USDC, at the end of the day, like in those futures that Mr. Jain described to you early in trial, that would be the parties exchanging something that's the same value they are betting on. But that's not what they do. At the end of the day, they just exchange USDC, which is why this is a swap.

Tr. 1434. The government further argued that USDC rendered the Perpetuals mixed swaps because "the value of [the Perpetuals] is based [] in part on USDC," with no explanation of, and in the absence of any trial evidence establishing, how USDC could serve as such a reference given that it was exchanged by the parties (in addition to the fact that USDC was not the governing currency for Mango Markets). *Id.*; *see also* Dkt. 186 at 18.

The government was wrong, as the defense has repeatedly pointed out.[1] USDC cannot render a "security-based swap" a "mixed swap."[2] "[A] mixed swap must be based on multiple underlying references — one that is subject to SEC authority and ***one that is subject to CFTC authority***." *CFTC v Archegos Capital Mgmt. LP*, 2023 WL 6123102, 2023 U.S. Dist. LEXIS 166409, at *7 (S.D.N.Y. Sep. 19, 2023) (emphasis added) (citing "Further Definition of 'Swap,' 'Security-Based Swap,' and 'Security Based-Swap Agreement'; Mixed Swaps; Security-Based Swap Agreement Recordkeeping," 77 Fed. Reg. 48208, 48264 (August 13, 201) ("Joint Release")). Thus, though unstated explicitly in the "mixed swap" definition, 7 U.S.C. § 1a(47)(D), the *Archegos* court, citing the Joint Release, acknowledged that a reference sufficient to render an instrument a mixed swap must also meet the general "swap" definition, 7 U.S.C. § 1a(47)(A)(iii). Applied to this factual scenario, for the Perpetual to be a mixed swap based on USDC, USDC must also be a reference sufficient to make the Perpetual a swap. USDC cannot be such a reference because it is exchanged between the parties (and MNGO cannot be such a reference because it is a security). For this additional reason, the Perpetual, which is undisputedly a security-based swap by virtue of its exchange of the risk of the security MNGO, is not a mixed swap and therefore is excluded from the application of the CEA. *See* Dkt. 191 at 19.

---

[1] As the Court's Order notes, USDC was not only exchanged "when the parties pay up"—the government's vague phrasing, Tr. 1434; *see also* Dkt. 186 at 18 (asserting that "[t]he parties do not exchange any asset during the pendency of the deal that incorporates th[e] risk" of USDC")—it was exchanged at various times when Perpetual positions were open, including for "interim payments" and to "settle any payments," which could occur, just as it did with Mr. Eisenberg, while the position was open. Order at 1 (citing Tr. 237); Dkt. 196 at 25-56 explaining that PnL could be settled and USDC exchanges at any time without closing position (citing Tr. 332; 1119; GX-1011 at 113); Tr. 1130 (explaining that Mr. Eisenberg "did not sell off his perpetual positions")).

[2] Because the Court is well-versed in the statutory scheme, the definition of these terms, which have previously been briefed, will not be repeated in full here. *See* Dkt. 191 at 16.

That the government's position is wrong is even clearer when its reasoning is extended to its logical conclusion. Under the government's theory, ***any*** securities-based swap settling in dollars (or any other currency, fiat or crypto) would be based on the value of the dollar (or other currency), thereby expanding the category of mixed swaps to the point where it swallows all securities-based swaps and destroying the statutory structure carving out regulatory spheres set up by Congress.[3] Such a result, for which the government has offered no authority, is plainly contradicted by the Joint Release. *Id.* at 48265 (noting that quanto equity swaps are not mixed swaps because their currency "exposure could be viewed as created in the seller by the act of entering into the quanto equity swap, rather than as a transfer between the parties, as is required by the third prong of the statutory swap definition" rendering this exposure "incidental to the securities exposure desired by the party initiating the quanto equity swap"). The Joint Release thus clarifies that the general swap definition is also applicable to the mixed swap definition and that a reference that is exchanged cannot render an instrument a mixed swap.

Accordingly, USDC was not part of the risk transfer, and, even had it been, it could not have been a reference sufficient to render the Perpetual a mixed swap because it was conveyed between the parties.

Two additional points regarding the complexity of the issue of defining these terms and instructing the jury regarding those definitions merit discussion. First, the issue, which is a mixed question of law and fact, is particularly appropriate for resolution by the Court on a Rule 29 motion. Despite considerable effort by the Court and the parties, the instruction given to the jury was extremely complicated and included none of the explanatory commentary from the Joint Release that has informed the discussion of the matter post-trial.

Second, the Court should invoke the rule of lenity in resolving the ambiguous definition of mixed swap. *See* Dkt. 191 at 31. Over a hundred pages in over a half dozen filings have now been devoted to discussion of the matter, and the Court still has important questions for the parties. Moreover, the process of crafting a legal instruction on the matter was extraordinarily challenging. Clearly, this is the very type of issue on which the average person would lack notice about what the law required. In a similar circumstance regarding the definition of

---

[3] The government remarkably acknowledged that it was taking the untenable position that any currency not specifically carved out under the Treasury laws would be a reference rendering an instrument a mixed swap. Tr. 1289. While the government asserted that dollars are specifically carved out under the Treasury Laws, it cited no authority for this assertion, let alone any authority specifically carving dollars out of the "mixed swap" definition, which the government appears to argue is distinct from the general "swap" definition." *See id.* It would thus appear that accepting the government's position would render any swap purchased with and/or settled in dollars (or any other currency) a mixed swap. This premise would make the security-based swap exception irrelevant, violating a foundational rule of statutory interpretation. *See Corley v. United States*, 556 U.S. 303, 314, 129 S. Ct. 1558 (2009) ("[O]ne of the most basic interpretive canons[ is] that a statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant.") (internal quotation marks and alteration omitted).

Hon. Arun Subramanian
Page 5

"commodity" under the CEA, the Court invoked the rule of lenity, and it should do so here. Tr. 169.

The Court should thus enter judgment of acquittal as to Counts 1 and 2 pursuant to Rule 29. Furthermore, Mr. Eisenberg respectfully submits that the denial of his request for an instruction that USDC could not be a mixed swap reference if the jury found that it was exchanged was error. Because the instruction given to the jury, Tr. 1466, allowed it to find that the Perpetual was a mixed swap (and accordingly to convict on Counts 1 and 2) regardless of whether USDC was exchanged, the Court should, in the alternative, order a new trial under Rule 33.

**Question 2 (Venue): "Is the government's position that venue is proper because there were people in this district who were theoretically capable of reviewing Eisenberg's trading activity, even if they didn't do so?"**

i)   "Would venue have been proper in *Teman* regardless of whether the bank employees reviewed the checks?"

No. A crucial aspect of *United States v. Teman*, 2023 U.S. App. LEXIS 14247, at *4, 2023 WL 3882974 (2d Cir. June 8, 2023), was that bank employees "reviewed the checks for fraud in Manhattan." The Second Circuit further noted that passing this fraud review was a critical step in the fraud "because Teman needed the bank to approve the checks to gain access to the full amount" regardless of the fact that the review was "intended to defeat, not further, fraud." *Id.* Had the review not taken place and been passed, Teman's checks would have remained flagged and his scheme would have failed. *Id.* The fact that the review actually occurred, and did so in Manhattan, was thus critical to the Second Circuit's venue holding. By contrast, the existence of a team in Manhattan that theoretically could have but, in fact, did not review the checks would have been insufficient to meet the venue requirement to demonstrate the occurrence of an act constituting the offense. *See id.*

ii)  Or is the government's argument not based on the capability to review Eisenberg's information, but that the jury could make a non-spurious inference that Eisenberg's trading activity was in fact reviewed in New York, and defendant had full opportunity to try to prove otherwise, including through appropriate use of the 3500 material they cite to?

It is improbable that this is the government's position because it cannot ask the jury to rely on an inference it knows to be false, and any such inference is necessarily spurious. Furthermore, and more fundamentally, the government, not the defense, carries the burden of proving venue. The defense does not have any obligation to prove lack of venue, nor need it controvert an inference that is contrary to the facts known to the parties. With these principles in mind, an argument that the jury could have inferred that Mr. Eisenberg's trades were reviewed in New York, if advanced by the government, fails for two fundamental reasons: (1) such an "inference" would be spurious because the government failed to present any evidence to justify the inference; and (2) even if such a review had taken place, it would have been irrelevant to the success of Mr. Eisenberg's trading and therefore could not constitute any part of the charged crimes.

Hon. Arun Subramanian
Page 6

As Mr. Eisenberg previously explained, Dkt. 191 at 6-7, while James Farell, AscendEx's general counsel, testified that a daily trade reconciliation report was at times reviewed by the finance team, Tr. 148, he did not testify when such a review occurred in the ordinary course, and there was no evidence that any such report was ever created, let alone reviewed, regarding Mr. Eisenberg's trades. Nor did he testify that such a review would have had an effect on Mr. Eisenberg's trading. The government thus presented no evidence to meet its burden to show that the trades would, or even could, have been reviewed in the roughly twenty minutes that they took place. The Rule 29 standard is not so permissive that it allows a court to rely on inferences the jury may have made in support of the government's case that lack any evidentiary foundation. *See* Dkt. 191 at 4-5 (citing, *United States v. Valle*, 807 F.3d 508, 515 (2d Cir. 2015) ("While we defer to a jury's assessments with respect to credibility, conflicting testimony, and the jury's choice of the competing inferences that can be drawn from the evidence, ***specious inferences are not indulged***, because it would not satisfy the Constitution to have a jury determine that the defendant is probably guilty.") (emphasis added); *United States v. Glenn*, 312 F.3d 58, 67 (2d Cir. 2002) (finding evidence insufficient to support conviction because it required a "sizeable inferential leap"); *United States v. Irving*, 682 F. Supp. 2d 243, 266 (E.D.N.Y. 2010) (same)).[4]

By contrast, there was substantial evidence that no such review occurred because Mr. Eisenberg's AscendEx account remained unrestricted for hours after the trades. Mr. Farrell testified that "one of the people in our development team put a freeze on this account at 2:53:46 UTC time on October 12th 2022," more than four hours after Mr. Eisenberg's last purchase of MNGO on AscendEx. Tr. 163-64, *see also* GX-1513 (noting "Freeze Account" action taken at 2:53:46 on October 12, 2022); GX-1507 (last buy executed at 2022-10-11, 22:47:14 UTC). The 3500 material, which confirmed, among other things, that AscendEx learned about Mr. Eisenberg's trading from Mango Markets, *See* 3503-015, only served to reinforce that which was already plain in the evidentiary record; certain assertions made in the government's brief rather stunningly appeared to advocate for conclusions not only unsupported by evidence but also directly contradicted by notes the prosecutors took of their meetings with Mr. Farrell. *See* Dkt. 191 at 5 n.1, 6 n.2, 8 n.3.

Moreover, the government has never even attempted to explain why a review of "trade reconciliation report[s] . . . to make sure that our systems are working correctly . . . and we capture all the trades," Tr. 151, would constitute any part of the crimes charged. *See Tzolov*, 642 F.3d at 319 (holding venue proper only where "acts 'constituting' the violation" occurred). The evidence in this case established that the sole role of AsendEx in Mr. Eisenberg's trading was to convey a higher price for MNGO, which would then be incorporated into the algorithm used by the oracle, a process that was automated and occurred in seconds. A "review" of Mr.

---

[4] While the vast majority of cases on the standard for Rule 29 motions discuss whether the jury was rationale to determine that the government had met its burden as to a particular issue or element beyond a reasonable doubt, the same general analysis applies to issues, like venue, on which only a preponderance of the evidence standard applies. Though the amount of evidence required is lower, there must be some evidence, not merely specious inferences, to support the jury's verdict.

Hon. Arun Subramanian
Page 7

Eisenberg's trade would, by definition, have taken place after the trade had taken place and would therefore have been of no consequence to Mr. Eisenberg. Further, unlike the facts of *Teman*, Mr. Eisenberg was not concerned with overcoming a quality control or anti-fraud review to obtain funds from AscendEx. The review in question was irrelevant to Mr. Eisenberg and thus could not establish venue.

> iii)    "The government argues that Casey's testimony establishes venue because it demonstrates that Eisenberg's actions transmitted a "false pricing signal" and "caused a victim to unsuccessfully try to withdraw funds in the District." Dkt. 186 at 60. How is this an act constituting any of Eisenberg's offenses?"

The government's arguments regarding John Casey are frivolous, and their inclusion highlights the government's inability to articulate a legitimate basis for venue. Mr. Eisenberg's Reply addressed both the logical and legal infirmity of this argument as well as the failure of the government to provide any relevant authority, including its failure to explain how the ***inaction*** of a person like Mr. Casey could amount to an act constituting the offense. *See* Dkt. 191 at 9-10. Moreover, the law is clear that actions like those attempted (though not ultimately taken) by Mr. Casey that would frustrate rather than further the defendant's aims are not part of the crime of fraud.

In *United States v. Maze*, 414 U.S. 395, 396 (1974), the defendant stole another person's credit card and used it at various motels, which later mailed invoices to the bank that issued the credit card. The Supreme Court held that there was insufficient evidence of mail fraud since the mailings were not for the purpose of executing the scheme. *Id.* The *Maze* Court pointed out that the scheme had already reached fruition when the defendant checked out of the motels and that his scheme did not depend on which of his victims ultimately bore the loss. *Id.* at 403. Distinguishing the authority relied on by the government, the Supreme Court noted that "the successful completion of the mailings from the motel owners here to the [] bank increased the probability that respondent would be detected and apprehended" and therefore were not part of the scheme. *Id.*

Similarly, here, Mr. Casey's attempt to withdraw funds, had it occurred, would not have been an act constituting the offense because it could only have served to frustrate, not advance, Mr. Eisenberg's objectives. The government's continued reliance on Mr. Casey's failure to take action against the interests of Mr. Eisenberg—and its legally wrong argument to the jury that Mr. Casey's mere presence in the district was sufficient to confer venue—demonstrate the weakness of the government's argument. This case should never have been brought in this District, and it should now be dismissed.

*\*\**

Thank you for Your Honor's consideration of this letter.

Respectfully submitted,

*Sanford N. Talkin*

*Noam B. Greenspan*

Sanford N. Talkin
Noam B. Greenspan
Talkin, Muccigrosso & Roberts, LLP

-and-

Brian E. Klein
Ashley E. Martabano
Riley P. Smith
Waymaker LLP

*Attorneys for Avraham Eisenberg*

cc: all counsel of record (by ECF)