

*U.S. Department of Justice*

*United States Attorney
Southern District of New York*

*The Jacob K. Javitz Building
26 Federal Plaza
New York, New York 10278*

April 7, 2025

**By ECF**
Hon. Arun Subramanian
United States District Court
500 Pearl Street
New York, NY 10007

>    Re:    <u>United States</u> v. <u>Avraham Eisenberg</u>, 23 Cr. 10 (AS)

Dear Judge Subramanian:

The Government respectfully submits this letter to address the questions in this Court's March 31, 2025 order (the "March 31 Order") related to (1) the definition of "swaps" under the Commodity Exchange Act ("CEA") and (2) the Government's proof of venue.

### I.    MNGO Perpetuals are Swaps

This Court has asked the Government to explain why "the transfer of USDC" in a MNGO Perpetual does not take that product out of the definition of a "swap" under 7 U.S.C. § 1a(47)(A)(iii) because the transfer "'convey[s]' a 'future direct or indirect ownership interest in' USDC, which 'incorporates the financial risk so transferred.'" The answer is twofold: First, the "risk[s] . . . transferred" in a MNGO Perpetual are different from the risks transferred when one party pays USDC to another, so the transfer of USDC does not "incorporate the financial risk so transferred." Second, MNGO Perpetuals do not "convey[]" an "ownership interest" in USDC because, at the time of the agreement, it is not clear which side will be entitled to payment or how much. The "ownership interest" clause is meant to distinguish swaps from sales, and MNGO Perpetuals are not sales of USDC.

### A.    A Transfer of USDC Conveys a Different Financial Risk Than the "Financial Risk so Transferred" in a MNGO Perpetual

A MNGO Perpetual is a swap under § 1a(47)(A)(iii) if it has three components: First, the "agreement, contract or transaction" provides for the exchange of "1 or more payments based on the value or level of 1 or more [specified assets]." Second, the "agreement, contract or transaction" "transfers, as between the parties to the transaction, in whole or in part, the financial risk associated with a future change in any such value or level." And third, the "agreement, contract or transaction" does not "also convey[] a current or future direct or indirect ownership interest in an asset . . . or liability that incorporates the financial risk so transferred."

The jury correctly found that MNGO Perpetuals satisfy each aspect of the statute. First, MNGO Perpetuals entail two types of payments. One is based on how the relative value of MNGO

and USDC (as calculated by a pricing oracle) changes between the time the perpetual was created and the time of settlement. Br. 7-8. The other is based on the funding rate, which reflects the difference between (1) the mid-point between bids and asks for the relevant perpetual on Mango Markets' orderbook and (2) the oracle price for the underlying cryptocurrency pair. *Id*. at 10.

Second, MNGO Perpetuals transfer "the financial risk associated with a future change" in the values or levels at issue. Specifically, MNGO Perpetuals transfer two types of financial risks: They transfer the financial risk that the relative value of MNGO/USDC, as calculated by the oracle, will change relative to the reference price between the time the perpetual is formed and the time it is settled. And they transfer the financial risk that the Mango Markets orderbook will diverge from the oracle price for MNGO/USDC over the life of the perpetual.

Third, MNGO Perpetuals do not "convey[] a current or future direct or indirect ownership interest in an asset . . . or liability that incorporates the financial risk so transferred." Even though parties make settlement and funding payments in USDC, those payments transfer a different type of "financial risk" than MNGO Perpetuals transfer. Start with funding. What is the "financial risk . . . transferred" under that aspect of a MNGO Perpetual? It is the risk that the Mango Markets orderbook price for MNGO Perpetuals will diverge from the MNGO/USDC oracle price. USDC does not incorporate that same risk. A party who receives USDC does not experience the same financial risk as a party who holds a MNGO Perpetual and is therefore obligated to make, or entitled to receive, funding payments as the orderbook price and MNGO/USDC oracle price move.

Transferring USDC as part of settlement also does not incorporate the same "financial risk" that the parties transfer through entering into a MNGO Perpetual. Funding aside, what is the other "financial risk . . . transferred" in a MNGO Perpetual? It is the risk that, between inception and settlement, the settlement price from the MNGO/USDC oracle—which is calculated based on MNG/USDC and MNGO/USDT trading across three cryptocurrency exchanges—will rise above, or fall below, the reference price set when the perpetual was created. As explained in the Government's opening brief, it is true that the value of USDC is relevant to this calculation. But that does not mean that transferring USDC at the time of settlement incorporates the "financial risk . . . transferred" in MNGO Perpetuals.

A core component of the risk transfer in a MNGO Perpetual revolves around the reference price. That risk is not present at all in USDC—the asset transferred at settlement. For example, suppose a MNGO Perpetual has a reference price of .04 USDC per MNGO. Whether a party to that perpetual will receive, or have to pay, USDC at the time of settlement depends on how whether the MNGO/USDC settlement price is higher, or lower, than that reference, along with the extent of the difference. *See* Tr. 319-21. When the parties settle, the USDC does not incorporate that aspect of the "financial risk . . . transferred" in a MNGO Perpetual: The holder of the USDC does not risk losing that asset, or having the asset value fall to zero, if the MNGO/USDC oracle price changes relative to the reference price. By contrast, parties in a MNGO Perpetual would remain highly sensitive to that reference point.

Another central aspect of the risk transfer in a MNGO Perpetual relates to the relative value of MNGO/USDC at settlement, as calculated by the oracle. Although the value of USDC is relevant to that risk, receiving USDC does not incorporate that same financial risk.

As explained at trial, the settlement price for MNGO Perpetuals on Mango Markets was set by an oracle that looked at three sources: the MNGO/USDC market on Serum, the MNGO/USDT market on AscendEx, and the MNGO/USD market on FTX. Tr. 455-58. The prices on those exchanges depended on the "supply [and] demand" for exchanging those cryptocurrencies, on those "particular exchange[s], at a particular time." Tr. 209-10. For instance, a sudden swell of people interested in trading MNGO for USDC on Serum might change the relative value on that platform, without altering the MNGO/USDC price on another exchange, or even the relative value of USDC compared to other assets (such as a dollar) on Serum itself. *See* Br. 6-7. Accordingly, the financial risk in a MNGO Perpetual is different than the risk of receiving USDC because party to a MNGO Perpetual has extensive exposure to the particular price inputs to the oracle, whereas a USDC holder does not. For instance, if the MNGO/USDC on Serum and MNGO/USD price on FTX skyrocketed (as happened in this case), that would dramatically change the potential gain or loss for the parties to a MNGO Perpetual, whereas someone who had already settled for USDC would face a fundamentally different risk situation.

Relatedly, settlement in USDC also does not "incorporate the risk . . . transferred" in a MNGO Perpetual because there is an important timing difference. The parties to a MNGO Perpetual are transferring the risk of changes to the relative value of MNGO/USDC, between the time of inception and settlement. When the parties settle, the recipient of USDC is inheriting the risk that the value of USDC may change *in the future*, but that is a different risk. The significance of this difference is common across many markets. Suppose two parties make a bet about how the price of oil will change over the month of October. That is fundamentally different than a bet about the price of oil in November. By the same token, while a MNGO Perpetual incorporates financial risk that the value of USDC may change between inception and settlement, that is different than the risk that the value of USDC may change after settlement.

Notably, there is also strong textual evidence to support the jury's conclusion that MNGO Perpetuals are swaps, notwithstanding settlement in USDC. The first question in the March 31 Order revolves around whether, under § 1a(47)(A)(iii), an instrument that is based, in part, on the value of particular asset (such as USDC), but also involves the exchange of that asset, can be a swap. The examples in § 1a(47)(A)(iii) show, unambiguously, that the answer is yes.

Section 1a(47)(A)(iii) contains a list of examples of "agreement[s], contract[s], or transaction[s]" that qualify as swaps under that provision. That list includes instruments that— like MNGO Perpetuals—are both based on the value of, and involve the exchange of, a particular asset. The list, for instance, includes "foreign exchange swap[s]." 7 U.S.C. § 1a(47)(A)(iii)(VIII). A foreign exchange swap involves "an exchange of two different currencies on a specific date at a fixed rate that is agreed upon [at] inception," and "a reverse exchange of the [two] currencies . . . at a later date . . . at a fixed rate that is agreed upon [at] inception." 7 U.S.C. § 1a(25). Similarly, "currency swap[s]" and "cross-currency swap[s]" are listed as swaps. 7 U.S.C. §§ 1a(47)(A)(iii)(V), (VII). Those, too, are based on the relative value of two currencies and also involve the ultimate exchange of both currencies. *See* Federal Reserve, "Trading and Capital-Markets Activities Manual," at 619, *available at* https://www.federalreserve.gov/boarddocs/supmanual/trading/trading.pdf; *see also* 77 Fed. Reg. 48,208, at 48,254-55 (classifying non-deliverable forward contracts involving foreign exchange as swaps under 1a(47)(A)(iii)). And outside the context of currencies, § 1a(47)(A)(iii)(XV) lists "credit default swap[s]," even though,

if a credit-event occurs, parties often transferred the referenced debt. The inclusion of these instruments as examples of swaps under § 1a(47)(A)(iii) is strong evidence that MNGO Perpetuals are properly classified as swaps under the provision, even though they involve payment in USDC.

Finally, the March 31 Order noted that MNGO Perpetuals can have "interim payments," citing Kapil Jain's testimony. Mr. Jain's testimony explains that a party can settle a MNGO Perpetual—forcing the other side to pay—and simultaneously keep open that perpetual, with a new reference price as of the time of settlement. *See* Tr. 237. That does not change any of the analysis described above because the asset transferred at settlement (USDC) has a different risk profile than the MNGO Perpetual, even if that perpetual continues to exist with a new reference price. Indeed, the whole reason a party would want to settle a MNGO Perpetual for USDC, while keeping that perpetual open at a new reference price, is because the USDC has a different risk profile than the MNGO Perpetual, and the party is essentially locking in gains or losses.

In short, the fact that MNGO Perpetuals involve the transfer of USDC as funding payments and at settlement does not take those instruments outside of § 1a(47)(A)(iii) because USDC does not incorporate the financial risk transferred by the MNGO Perpetuals.

### B. A MNGO Perpetual Does Not Convey an Ownership Interest in USDC

Separately, a MNGO Perpetual does not "convey[] a[n] . . . ownership interest" in USDC because, at the time the agreement is struck, it is not settled which party will receive the USDC or how much that party will receive.

In defining swaps, Congress has been careful to distinguish swaps from routine commercial sales, where one party sells something to another. *See generally* 77 Fed. Reg. at 48,246-50. For example, in 7 U.S.C. § 1a(47)(A)(i), Congress classified as a swap any "agreement, contract, or transaction" that is an "option . . . for the purchase or sale" of a listed asset. And in 7 U.S.C. § 1a(47)(A)(ii), Congress classified as a swap any "agreement, contract, or transaction" that "provides for any purchase [or] sale" that is "dependent on the occurrence" or "nonoccurrence" of an event. Both provisions are clear that a sale is a swap only if it is contingent on the exercise of an option or the contingency of a particular event. Standard sales are not swaps.

Section 1a(47)(A)(iii) works the same way. Under the first two prongs of the statute, an "agreement, contract, or transaction" is a swap if it involves one or more executory payments based on the value of an asset, and it transfers as between the parties the financial risk associated with a future change in the value of that asset. If Congress had stopped there, many sales would have qualified as swaps. For example, suppose a person had one Bitcoin on a thumb drive, and that person sold the Bitcoin to a buyer for an $80,000 payment on Tuesday, promising to deliver the drive by Thursday. That agreement involves an executory, based on the value of an asset, that transfers between the parties the risk of a future change in value of that asset (if the price of Bitcoin plummeted Wednesday, the buyer would be unhappy).

To make sure this type of arrangement—which is clearly a sale—is not regulated as a swap, Congress added the final clause of the provision, carving out agreements that "convey[] a current or future direct or indirect ownership interest in an asset . . . that incorporates the financial risk so transferred." This harmonized § 1a(47)(A)(iii) with the other provisions defining swaps.

This statutory context shows why the final clause of § 1a(47)(A)(iii) does not exclude MNGO Perpetuals from the definition of "swaps." The "agreement, contract, or transaction" at issue is the MNGO Perpetual. That agreement does not "convey a current or future direct or indirect ownership interest" in USDC. Rather, it conveys a *contingent* right to receive USDC, but at inception, neither party to the MNGO Perpetual knows who will be the one to pay or receive the USDC, or the amount that will have to be transferred. That is the difference between a swap and a sale, just like in the other provisions of § 1a(47)(A), which are clear that sales contingent on an option or an event are swaps. Accordingly, the transfer of USDC as part of funding payment and settlement does not implicate the "convey[s] a[n] . . . ownership interest" clause of § 1a(47)(A)(iii), and the jury correctly concluded that MNGO Perpetuals are swaps.

## II. Venue is Proper in the Southern District of New York

The jury also correctly concluded that venue was proper in the Southern District of New York. The evidence at trial supported the reasonable inference that (1) Eisenberg's scheme involved sending wire transmissions to AscendEx in Manhattan and members of AscendEx's team in Manhattan reviewing his account and manipulative trading and (2) Eisenberg's scheme involved sending misleading price signals to victims in the Southern District of New York.

### A. The Evidence Regarding AscendEx was Sufficient to Establish Venue

In the March 31 Order, this Court asked the Government to clarify its position on how the evidence related to AscendEx established venue. The Government's position is that the evidence was sufficient to support the jury's reasonable conclusion that Eisenberg sent wire transmissions that travelled to Manhattan and people working for AscendEx in Manhattan reviewed Eisenberg's account and trading activity, not just that those people "were theoretically capable of reviewing Eisenberg's trading activity, even if they didn't do so."[1] The 3500 material the defense cites does not support the argument that the AscendEx team in New York did not review Eisenberg's account or trading activity—indeed, it refutes that argument. And in any event, 3500 material that the defense had, but chose not to use, at trial is not a basis to overturn a jury verdict.

Factually, there was a strong evidentiary basis at trial from which to conclude that Eisenberg's scheme involved sending wire transmissions to AscendEx in Manhattan and that members of AscendEx's team in Manhattan reviewed his account and manipulative trading. James Farrell testified that "roughly two-thirds" of the people who work for AscendEx do so from "Midtown Manhattan," including "legal compliance, HR, about half our programmers, our entire finance team, and about half our sales team." Tr. 141-42.

Mr. Farrell went on to explain that users interacting with AscendEx's platform send information to the New York team, which reviews and uses that information. That begins with

---

[1] For some inchoate offenses, "venue may lie in a district where the defendant knows or reasonably should foresee that acts in furtherance of the criminal enterprise would take place, even if such events have not yet occurred." *United States v. Davis*, 689 F.3d 179, 187-88 (2d Cir. 2012). But the Government did not proceed on such a theory here. *See* Tr. 1483 (instruction directing the jury to consider whether "any act in furtherance of the crime charged occurred in the district").

account creation.  Mr. Farrell testified that, "[w]hen someone creates an account in AscendEx, the information is captured in . . . our management portal, which is available to and reviewed by the people in the New York office."  Tr. 146-47.  Then, when users transfer cryptocurrency to AscendEx, people in the "New York office" help manage "that deposit process" because the finance team reviews "all of the deposits . . . when they come in" and also performs a "daily reconciliation . . . for all deposits, all withdrawals, and all trades to make sure that what's reflected in our computer system matches up with what is on the internal ledger that we maintain."  Tr. 148.

Once a user has cryptocurrency on AscendEx, the user can trade, and the New York team has a role in that trading process.  Because AscendEx is a centralized exchange, cryptocurrency does not actually move hands between different users.  Instead, the cryptocurrency stays in one place, and AscendEx records the trades on an "internal ledger" that keeps track of transactions and who owns what.  Tr. 150-51.  Many members of the New York team use that internal ledger: It goes into a "trade reconciliation report" that the New York team uses "to make sure that the systems are working correctly"; the "finance team" uses it to make sure they system has "capture[d] all the trades"; and "the compliance people who are in New York also review it" for "any concerning patterns or observations . . . that might lead them to start further questions or investigate some pattern or practice of trading."  *Id*.  Mr. Farrell said this is "akin to what a broker does in a traditional securities vault."  Tr. 151.

After hearing this information about AscendEx's operations, the jury heard evidence that the New York team had a role in identifying Eisenberg's manipulation and freezing his account.  Mr. Farrell was asked whether there was "a time on October 11th, 2022"—the day of the crime—"when [he] learned anything about trading in the Mango token on AscendEx." Tr. 158.  Mr. Farrell responded: "I did.  I got a call that evening from a person who was in charge of our client services group," who Mr. Farrell explained "*was located in New York*."  Tr. 158-59 (emphasis added).  Mr. Farrell explained that, as a result of the call, he personally reviewed the trading at issue—which he saw had "driven the price of [MNGO] up significantly"—and directed his "team" to "find out . . . more information about the trading."  Tr. 162.  Mr. Farrell testified that his team was ultimately "able to identify the account that was responsible for the trading" and that "the head of client services"—whom Mr. Farrell had previously testified "was located in New York"—gave the instruction to "freeze the account," which resulted in a freeze notification appearing in Eisenberg's AscendEx account.  Tr. 162-63.

Mr. Farrell's testimony provided a firm basis for the jury to find venue in the District.  With respect to wire fraud, all that is required is that an interstate wire in furtherance of the crime went to or through the District.  *See United States v. Kim*, 246 F.3d 186, 191-93 (2d Cir. 2001) (holding that a wire "transmitted" through the District is sufficient for venue).  Mr. Farrell's testimony was sufficient for a jury to draw a "reasonable inference" that Eisenberg's scheme transmitted wires to New York because he explained that creating an account, loading cryptocurrency to an account, and trading on AscendEx all entailed sending data to the Manhattan office, both through AscendEx's management portal and through the company's internal ledgers.  *United States v. Booth*, 22-1823-cr, 2024 WL 911854, at *1 (2d Cir. Mar. 4, 2024) (wire through correspondent bank in New York sufficient for wire fraud); *see also United States v. Rutigliano*, 246 F.3d 186, 397-98 (2d Cir. 2015) (wire "travel[ing] through or over waters within the Eastern District, which are statutorily defined to be also part of the Southern District" sufficient for wire fraud).

As for the CEA counts, venue was proper in the District because the evidence was sufficient for a reasonable juror to conclude that the AscendEx team in Manhattan, in fact, reviewed Eisenberg's account and trading. For one, the evidence showed that members of the New York team interacted with Eisenberg's account through the management portal, both around the time of account creation and during the crime. Tr. 146-47. Specifically, Mr. Farrell's testimony established that new accounts appear in Manhattan in the management portal and the New York team typically reviews when accounts are funded. Tr. 146-48. Mr. Farrell's also testified that, on the day of the crime, the head of client services in New York and Farrell's team (which the jury could infer was also in New York, as Farrell was the head of legal based in New York) identified Eisenberg's account as the manipulator and froze that account. Tr. 158-59, 161-63.

The evidence showed that members of the New York team reviewed Eisenberg's trading at the time of the offense, both as part of its routine trading-management practices and in effort to stop the crime in progress. Again, Mr. Farrell first established the general point that members of the New York team, including in finance and compliance, routinely review the trading ledger both to ensure trades are properly booked and to monitor for problems. Tr. 150-51. The jury could also infer that members of the New York team, in fact, reviewed Eisenberg's trading at the time of the crime because Mr. Farrell testified that a call from the head of client services in New York prompted Farrell to review MNGO trading, that he directed that team to conduct a trading review, and that team (under the direction of the head of client services) froze Eisenberg's account as a result of the review. *See* Tr. 158-59, 161-63.

This evidence comfortably satisfied the venue requirements. As Mr. Farrell explained, AscendEx's team in New York performs similar functions to a "broker," reviewing accounts, checking that trades are properly recorded, and ensuring that assets are assigned to the right places. *See* Tr. 148-51. The Second Circuit has repeatedly held that this type of trade processing activity is activity in furtherance of trading-related crime. *See, e.g.*, *United States v. Buyer*, 23-7202-cr, 2025 WL 855773, at *5 (2d Cir. Mar. 19, 2025); *United States v. Khalupsky*, 5 F.4th 279, 291-92 (2d Cir. 2021); *United States v. Chow*, 993 F.3d 125, 143 (2d Cir. 2021). Similarly, for Eisenberg's scheme to work, he needed to be able to trade on AscendEx without his account being frozen. This implicated New York because the New York team, in general, reviews for suspicious trading and the jury could have concluded they conducted such a review on October 11. That, too, is sufficient for venue under Circuit precedent. *See United States v. Teman*, 21-1920-cr, 2023 WL 3882974, at *2 (2d Cir. Mar. 19, 2025).

Eisenberg's use of 3500 materials to contradict the evidence a trial is legally improper and factually far off base. Legally, a Rule 29 motion is limited to the evidence presented at trial; notes "provided pursuant to 18 U.S.C. § 3500" that were not presented at trial are not relevant. *United States v. Reyes*, 302 F.3d 48, 52-53 (2d Cir. 2002); *see* Fed. R. Crim. P. 29(b) (explaining that, if the Court reserves on a Rule 29 motion at trial, "it must decide the motion on the basis of the evidence at the time the ruling was reserved"). Practically, this makes good sense: 3500 material often consists of interview notes and so is not direct witness testimony. If the defense wishes to use 3500 material, the way to do it is to inquire of a witness on the stand, where the witness can provide testimony under oath and, if necessary, clarify anything that may be unclear or incorrect.

The defense's misuse of 3500 material shows why that material is not properly the subject of a Rule 29 motion. First, the defense cites 3503-002 for the point that AscendEx's matching

engine is on a cloud-computing system in Japan. *See* Reply 5 nn.1 & 4. That correctly describes the notes, but it does not, as defense claims, mean it is wrong for the Government to argue that AscendEx's trade reconciliation in New York is akin to clearing and settlement. As Mr. Farrell testified, trade matching occurs on a "smart order routing engine," but then that information is "reflected in [AscendEx's] internal ledger," which the New York team uses for "trade reconciliation," making sure that "all the right amounts have been credited to all the right users," and reviewing for suspicious activity. Tr. 150-51. It is common for trading to "consist of multiple steps," so the fact that matching occurs on a computer server in Japan is consistent with other important trade reconciliation steps happening in New York. *Buyer*, 2025 WL 855773, at *5.

Second, the defense cites 3503-003 to claim that the Government is wrong to argue that the AscendEx finance team reviewed data about Eisenberg submitting cryptocurrency to AscendEx. Reply 6 n.2. This is a misreading of the 3500 material. The passage the defense cites is about "Know Your Transaction" review. *See* 3503-003. The notes reflect that this review is first conducted by a third-party vendor, then sent to AscendEx for additional manual review by the compliance team. *See id.*; *see* 3503-002 ("Every transaction goes through chain analysis and risk evaluation through software tool, certain transactions then selected for manual review by the compliance team in New York"). That "Know Your Transaction" process is separate from the finance team's function of reviewing deposits "when they come in" and performing "daily reconciliation . . . for all deposits" to make sure the AscendEx ledger is correct. Tr. 148.

Third, the defense cites 3503-015 to claim that AscendEx only learned of Eisenberg's trading "after its head of security was contacted by a team from Mango Markets." Reply 8 n.3. It is not clear from the notes whether that claim about the order of events is correct, which is why the defense should have asked the witness about it, if it were an important point. But this was not an important point: Even assuming, for the sake of argument, that AscendEx began looking at Eisenberg's trading because it was tipped off by Mango Markets, Mr. Farrell's testimony still provided reasonable grounds for the jury to conclude that trading review, and the freezing of Eisenberg's account, occurred from Manhattan, which is sufficient to establish venue.

What is more, the 3500 materials are replete with information connecting Eisenberg's crime to AscendEx's activities in Manhattan. The notes show, among other things, that: The head of customer service in Manhattan learned about Eisenberg's crime and had compliance in New York shut down the account. 3503-002, 3503-003, 3503-015, 3503-18. Employees in New York are responsible for making sure ledgers correctly reflect all transactions. 3503-003. And the finance team in New York monitors inflows to AscendEx, such as deposits. 3503-003, 3503-018.

In short, Mr. Farrell's testimony was more than sufficient for the jury to conclude, by a preponderance of the evidence, that acts in furtherance of Eisenberg's crimes occurred in the District, including a wire transmitted to the District. The defense had a fair opportunity to examine Mr. Farrell using 3500 material. That material is not a legally appropriate basis to overturn the verdict after trial, and the arguments the defense makes from that 3500 material are incorrect.

### B. Testimony from a Victim was Sufficient to Establish Venue

Testimony from Jon Casey was also sufficient to establish that venue was proper in the District. A core part of Eisenberg's crime was sending the false signal that MNGO/USDC price

had skyrocketed, such that some of his MNGO Perpetuals were incredibly valuable. This false price signal allowed him to trick Mango Markets into allowing him to "borrow" vast amounts of cryptocurrency. The false price signal also mattered for Mango Markets users: the cryptocurrency Eisenberg was trying to "borrow" from Mango Markets belonged to Mango Markets users and the users could withdraw at any time, which would have reduced the amount of money available for Eisenberg to steal off the platform. Casey's testimony and Discord messages established that he received the false price signal while in the District and that, because he found it suspicious, he tried to withdraw his funds from the platform. This is evidence that the false price signal reached victims in the District and illustrates how information about the price of assets on Mango Markets was relevant to whether Mango Markets users would leave cryptocurrency on the platform, where other users could borrow it.

Sending a false price signal to the District, and preventing a victim in the District from withdrawing funds, are part of the acts constituting Eisenberg's crimes. In the context of securities fraud—including securities fraud by market manipulation—the Circuit has held that "[r]eceipt of electronic transmissions in a district is sufficient to establish venue." *United States v. Royer*, 549 F.3d 886, 895 (2d Cir. 2008); *accord United States v. Lange*, 834 F.3d 58, 79 (2d Cir. 2016) ("Venue is also proper in the district where an electronic communication was received"). For example, in *Royer*, which was a market-manipulation and fraud case, the Second Circuit concluded that it was sufficient to establish venue that "misappropriated information" reached people relevant to the scheme in the Eastern District of New York. 549 F.3d at 895. Here, that same principle applies because the false price signal was relevant not only to Mango Markets, but also to Mango Markets users, and it reached at least one of those users in the District. The fact that those users may be spread out widely does not defeat venue. *United States v. Rowe*, 414 F.3d 271, 279 (2d Cir. 2005) (recognizing that crimes over the internet may have venue in many places). Separately, Casey's unsuccessful effort to withdraw his funds before Eisenberg could take them was akin to the bank reviewers in *Teman* trying to catch Teman's fraud. *Teman*, 2023 WL 3882974, at *2. This is akin to a long line of cases holding that causing a victim to take an action relevant to the crime in the District is sufficient to establish venue in a fraud case. *See, e.g.*, *Kim*, 246 F.3d at 192; *Booth*, 2024 WL 911854, at *1.

Accordingly, Casey's testimony was an independent basis for the jury to conclude that venue was appropriate in the Southern District of New York.

Respectfully submitted,

MATTHEW PODOLSKY
Acting United States Attorney

by: __/s/_____
Thomas Burnett/Peter Davis
Assistant United States Attorneys

Tian Huang
Special Assistant United States Attorney