P4aWeisO

```
1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4                    v.                          23 Cr. 10 (AS)

5   AVRAHAM EISENBERG,

6                    Defendant.
                                                Oral Argument
7   ------------------------------x

8                                               New York, N.Y.
                                                April 10, 2025
9                                               10:00 a.m.

10  Before:

11

12                       HON. ARUN SUBRAMANIAN,

13                                              District Judge

14                           APPEARANCES

15  MATTHEW D. PODOLSKY
         Acting United States Attorney for the
16       Southern District of New York
    BY:  THOMAS S. BURNETT
17       PETER J. DAVIS
         Assistant United States Attorneys
18       -and-
         TIAN HUANG
19       Special Assistant United States Attorney

20  TALKIN, MUCCIGROSSO & ROBERTS, L.L.P.
         Attorneys for Defendant
21  BY:  NOAM B. GREENSPAN
         SANFORD N. TALKIN
22       -and-
    WAYMAKER LLP
23  BY:  BRIAN E. KLEIN

24  Also Present:
    Special Agent Brandon Racz, FBI

25
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P4aWeisO

1          (Case called; appearances noted)

2          THE COURT:  Good morning to you.

3          And good morning, Mr. Eisenberg.

4          All right.  Well, thank you, everyone, for coming in

5    today.  And I apologize for the change in scheduling in terms

6    of what we're going to be handling today.

7          As indicated in the order we issued -- and the Court

8    thanks the parties for the supplemental letters -- I really

9    want to focus on USDC as the basis for treating the Perpetuals

10   as mixed swaps and the issue a venue.  And maybe because I've

11   thought about the mixed-swap issue way too much, maybe we'll

12   start with venue, and then we'll move to the USDC issue.

13          So, first, just a technical question.

14          If I were to hold that there was insufficient evidence

15   on venue, would the outcome be an acquittal under Rule 29, or

16   would it be vacatur of the convictions?

17          Mr. Burnett.

18          MR. BURNETT:  I believe the outcome is an acquittal

19   because there wasn't a separate verdict form.  There wasn't,

20   like, a special interrogatory on that point.

21          THE COURT:  OK.  And you're saying that, familiar with

22   the 2023, I think, Supreme Court case that addressed the issue

23   of acquittal versus vacatur.  I just want to make sure that

24   we're talking about the same thing.

25          MR. BURNETT:  So, your Honor, I haven't read that

P4aWeisO

1  coming in here, so I'm not.  I'm not. familiar with it.

2          THE COURT:  Why don't you take a look at that, and

3  then after the argument if you want to change your answer, you

4  can change your answer.

5          MR. BURNETT:  OK.

6          THE COURT:  Mr. Greenspan, do you have any thoughts on

7  that particular point?

8          MR. GREENSPAN:  Sorry, your Honor.  Could you repeat

9  the question?

10          THE COURT:  Do you have any different views on that?

11          The question is if I were to rule in your favor on the

12  venue question, would the outcome be an acquittal or a vacatur?

13  And you may also not be familiar with the Supreme Court case --

14  it's in the Second Circuit handbook; it came down a couple

15  terms ago -- addressing the question of venue.  In that case

16  the Supreme Court held that the proper outcome would not be an

17  acquittal.  It would be a vacatur for re-prosecution of the

18  case in the correct venue.

19          Have you read that case?  If you haven't, then --

20          MR. GREENSPAN:  I'm familiar with the case, vaguely,

21  but not familiar enough to speak on it.  So I think we will

22  defer, just as the government did.

23          THE COURT:  OK.  OK.  So the parties can give me their

24  views on that after this hearing.

25          All right.  Here's my general take on the venue issue,

P4aWeisO

1   and then I'll let both sides address this.

2          As to what the cases say, the cases seem to say that

3   if there was actually account activity regarding the

4   defendant's conduct in the district, there is likely venue,

5   especially if that account activity involved the clearing of

6   trades.

7          And so, Mr. Greenspan, you cited the *Khalupsky* case.

8   That's an example of that, right?  So where there was actual

9   evidence that the trades were cleared in the district, then

10  that's going to be enough, and it would be enough for the three

11  counts at issue here.

12         The issue in this case seems to be on the facts, which

13  is did the facts show that?  Could the jury have drawn that

14  inference based on what was presented?  And so as I understand

15  Mr. Farrell's testimony on these issues, he says from a

16  real-world perspective, there was a management portal.

17         Now, what I understand that to be is almost like if

18  you're trying to access your account on Chase and there's a

19  Chase app, the app can be looked at anywhere you are.  But what

20  he's saying is that people were in New York, and so when they

21  accessed this portal -- it's not this portal that's always

22  open, like we're in the *Avengers* or something.  It's like when

23  they access this thing, then that portal will show information

24  pertaining to what's on AscendEx at that time.

25         And so he's saying the people are in New York, and

P4aWeisO

1   typically what happens is that there's personnel involved in

2   the opening, the depositing and review of various information

3   concerning trading activity in New York, as a general matter.

4           Mr. Farrell does not say that any of that happened

5   specifically with respect to Mr. Eisenberg's account or

6   trading.  Now, that's just left as an open issue, and the

7   government says, well, the jury can infer, based on

8   Mr. Farrell's testimony, that all of those things happened with

9   respect to Mr. Eisenberg's trades.  And if that's true, they

10  say, this fits squarely within all of those cases that are

11  cited by the parties that say account activity, like the

12  clearing of trades, that's enough for venue.

13          Mr. Greenspan, you come back and you say there's an

14  absence of evidence as to Eisenberg's, as to your client's

15  account activity.  So unlike all of those cases, where there

16  was actual evidence, meaning, like, explicit evidence, of stuff

17  happening in the district concerning your client's account,

18  here, there's not that explicit evidence.  You're trying to

19  infer, from general corporate behavior, something about what

20  happened with respect to this particular account and you say

21  that's a glaring difference.

22          And I haven't even any case, submitted by anyone, that

23  addresses that particular issue.  Maybe you can help me out and

24  show me that case, if either side has it.

25          And so you say there's just not that linkage here that

P4aWeisO

 1    you might have had in some other cases.  And you further

 2    suggest that there's a reason for the absence of evidence,

 3    which is that the 3500 material, if you look at it, suggests,

 4    strongly suggests, if not explicitly says, that none of those

 5    steps actually happened with respect to Mr. Eisenberg's

 6    account.

 7            That's what I understand sort of the setting to be,

 8    and I guess I'll let the parties take it from there and give me

 9    their perspective, given my sort of understanding of where we

10    are.

11            You need not focus on the separate Casey issue.  Let's

12    put that to the side, because it's unlikely that I'm going to

13    find that venue is satisfied based on the Casey piece of this.

14    I think it all sort of rises or falls on Mr. Farrell's

15    testimony.  So at least for present purposes, let's treat it

16    like that and see how far we get.

17            So, Mr. Burnett, I think I'll let you speak to this

18    first.  And I have the testimony here, so if you want to walk

19    me through the testimony, that's fine.  I'll let you lead the

20    way here.

21            MR. BURNETT:  Thank you.

22            Do you mind if I go to the podium?

23            THE COURT:  You may.

24            MR. BURNETT:  So, I appreciate the Court's summary of

25    how you're thinking about this.  It's very helpful for

P4aWeisO

1    approaching the argument.

2            I think as a few sets of answers, one of which starts

3    from, I think, our view is a little bit different on whether

4    the tip-it turns entirely on this clearing issue legally.  So

5    maybe I'll start there, just because, I think -- and then I'll

6    handle the factual plan about clearing as well.

7            THE COURT:  OK.

8            MR. BURNETT:  On the clearing point, I think it is

9    correct that clearing or clearing-type activity would be

10   sufficient to establish venue in the district.

11           I think there are two other ways that the AscendEx

12   activity satisfies venue in the district.  So one is specific

13   to wire fraud.

14           So I think the case law on wire fraud is different

15   than the case law with respect to the other types of fraudulent

16   schemes, the commodities schemes, in that the relevant act for

17   venue purposes under the wire fraud statute is simply the

18   transmission of a wire as part of the offense into or out of

19   the district.  So that's an important difference, because if

20   Mr. Eisenberg's activity sent wires into the district -- so it

21   sent data or other information to someone sitting in New York

22   in the district -- that by itself would be sufficient to

23   establish venue if that wire into the district was caused as

24   part of the doing the crime.

25           So, for instance, here, if it was simply the case that

P4aWeisO

```
 1   Mr. Eisenberg's activity sent wire information in the form of,
 2   like, updating information about the internal ledger to folks
 3   who are in New York, regardless of how they used that
 4   information, I think that alone would be sufficient under the
 5   wire fraud statute.  And I think the case law for this, which
 6   we cited in our letter, would be the Rutigliano case.
 7        About just a wire passing through under the waters of
 8   New York, it would be the Booth case, which we cited -- it's a
 9   pretty recent decision -- which, there, the issue was that
10   nothing, like, happens in New York, but a wire got routed
11   through a correspondent bank account in New York before going
12   to an actual account overseas.
13        And then maybe the one that most clearly, like, makes
14   this point in the text of the opinion, but I think we omitted
15   from our letter brief, is the Bruce decision, which the Court
16   could find at 293 F.App'x 826.
17        THE COURT:  You said Booth?
18        MR. BURNETT:  Booth.
19        THE COURT:  OK.  So what's the cite there?
20        MR. BURNETT:  293 F.App'x 826.
21        And that one, for this principle, it cites the Gilboe
22   decision, which is cited -- it's a pretty old decision; it's
23   cited a lot of times.  And that one is at 684 F.2d 239.
24        So I think the point one, I guess, is that I think
25   wire fraud is a little bit different than this clearing point,
```

P4aWeisO

1    and the clearing cases all arise in securities fraud cases, not

2    wire fraud cases.

3            THE COURT:  All right.  So map that on to the facts

4    here.  So let's say that I don't think there was evidence that

5    the trades were actually cleared in New York in any meaningful

6    sense.  You say, well, wire fraud, there's still venue.

7            Why?

8            MR. BURNETT:  Because as a necessary part of Mr.

9    Eisenberg accomplishing his scheme, he needed to use AscendEx's

10   systems, and part of AscendEx's systems, as Mr. Farrell

11   described it, was that whenever someone creates an account,

12   deposits into the account and does trading on the account, that

13   data gets transferred to the Manhattan office through either

14   the management portal for the account registration, through the

15   trade and deposit reconciliation reports, which is for the

16   deposits, and then for the internal ledger for the trading.

17           So let's say that just populates on the screen, but

18   someone's just, like, sitting back and, like, whistling, and

19   not doing anything with it, I think that would still be

20   sufficient in the same way that a wire passing under the waters

21   of New York, in *Rutigliano*; or a wire getting routed through a

22   correspondent bank account, in *Booth*, would be similar.

23           And the *Brown* decision actually -- or the *Brown*

24   decision that I cited actually explicitly says, I believe, that

25   the processing does not matter for the wire fraud venue.  So

P4aWeisO

 1    it's just a transfer alone.

 2            THE COURT:  OK.  Now, the second -- now, you said

 3    *Brown*.

 4            MR. BURNETT:  *Brown*.

 5            THE COURT:  OK.  So the 293 F.App'x 896, that's *Booth*.

 6            MR. BURNETT:  826.

 7            THE COURT:  826.

 8            That's *Booth*, right?

 9            MR. BURNETT:  That is *Brown*.

10            THE COURT:  *That is Brown*.  OK.  I think I asked you,

11    and you said *Booth*.  I just wanted to make sure that there were

12    two *Booth*s, but OK.

13            MR. BURNETT:  No.  I'm sorry.  Let me make sure I'm

14    very clear on this here.

15            So*, Booth* we had cited in our letter, and that one

16    doesn't yet have a Federal Appendix.  That's on page 6 of our

17    letter, the last paragraph.

18            THE COURT:  No.  I've got that.

19            In that decision, the defendant had agreed that

20    transmission of the wires through these correspondent banks

21    would be sufficient, and the question was whether there was

22    admissible evidence that that had actually occurred.  So a

23    slightly different issue, but I'll take a look at the *Brown*

24    case.

25            But your basic point is just that the standards are

P4aWeisO

1    different.

2         MR. BURNETT:  Yes.

3         THE COURT:  In the wire fraud statute, the question

4    is, technically speaking, were there wires in furtherance of

5    the offense that passed through the district.

6         Here, there certainly is evidence of that.  Even if

7    you discount the functional significance of what was happening,

8    as a technical matter, the jury could have inferred that there

9    was transmissions into the district based on, as you're saying,

10   the management portal, the trade reconciliation report, etc.

11        MR. BURNETT:  That's right.

12        THE COURT:  OK.

13        MR. BURNETT:  So, that's point one on why clearing

14   alone is not the issue here.

15        Point two on clearing alone not being the issue is the

16   *Teman* case, which I think the Court asked about in the letter.

17        So, the *Teman* case, what's important, I think it's

18   worthwhile, if the Court hasn't done it, to read Judge

19   Engelmayer's decision on this too, because it's a little bit

20   more fulsome on the point.  But what happened in the *Teman*

21   case, so the part about the folks who were clearing the checks.

22   It's not that they were clearing.  It's that -- actually, I

23   don't think they even used the word "clearing."

24        What that point was about was that you basically have

25   a compliance function in the bank in Manhattan in *Teman*, and

P4aWeisO

1    for *Teman*'s scheme to succeed, he basically needed to, like,

2    get the fake checks past those compliance people.  So even

3    though those compliance people are, in fact, trying to stop

4    Mr. Teman's scheme, the fact that he is using or his crime

5    involves, like, acts in New York that are in furtherance of the

6    scheme -- namely, getting it past the compliance folks -- that

7    alone is sufficient.  And I think that's important here, too,

8    for a point we'll talk about in a minute on the clearing

9    function, which is here, I think there is strong circumstantial

10   evidence from Mr. Farrell's testimony that, two things:

11          First, not only do, like, the finance and operations

12   people at AscendEx monitor the internal trading, you also have

13   compliance people who are monitoring the internal ledgers for

14   purposes of trying to detect the possible unlawful or

15   manipulative trading occurring on the platform, which makes

16   perfect sense because the terms of service prohibit that type

17   of activity.  And there's strong circumstantial evidence that

18   those type of compliance folks were involved in actively

19   monitoring Mr. Eisenberg's trading here because of the evidence

20   that on the evening of October 11, Mr. Farrell got a call from

21   someone at his head of client services in New York, saying,

22   hey, we're seeing an issue on the platform that prompted him to

23   go look into the trading, and then he directed that team to go

24   and do more trading review.

25          So I think it's an analogous situation here, because

P4aWeisO

```
1    for Mr. Eisenberg's scheme to work, he's got to not only trade

2    on AscendEx, but he's trading on AscendEx in violation of the

3    terms of service there.  So he's got to do it and get it past

4    the compliance folks or basically beat the compliance folks for

5    his manipulative scheme to succeed, or else he's going to get

6    shut down.  So I think that is a separate analogy, and that's

7    also sufficient -- that is, related to clearing in that you

8    still need someone doing something here in the district, but

9    it's a different point.

10            THE COURT:  So you're saying that the evidence that

11   the folks in New York ultimately called Mr. Farrell and

12   initiated what ultimately became the freezing of the account,

13   that's not just significant because they froze the account,

14   which the defense says came after the offense was completed.

15   What it shows is that they were engaged in monitoring trading

16   activity.  And so to use your term, you have to "beat the

17   compliance folks," they were the compliance folks and he did

18   beat them until they finally figured it out and froze his

19   account.

20            MR. BURNETT:  Exactly.  And I think that's going to be

21   one, when we get to the factual point here, one important

22   scheme here is that -- what's important to keep in mind is we

23   don't in this case just have Mr. Farrell's general testimony

24   about, hey, here's how AscendEx typically operates.  You also

25   have that testimony about this call he got on October 11, and
```

P4aWeisO

 1    it's important to keep those two things in mind together

 2    because what happens on October 11 is circumstantial evidence

 3    that the AscendEx folks were, in fact, doing what they

 4    generally do with respect to Mr. Eisenberg's trades.

 5            So I'll get to that fact point in a minute.

 6            Just within the subheading now of clearing, so you had

 7    asked whether there needs to be, like, direct evidence that

 8    clearing happened with respect to the trades that were

 9    happening here.  I think the answer to that is no, and I think

10    there are a few circuit cases that basically make that point.

11            For starters, I think it is often the case that you do

12    not have evidence at trial about, hey, here's someone who

13    actually, like, did the specific thing with the defendant's

14    trades.  It's usually a circumstantial inference that happens

15    with these securities fraud trials.  And the point that I think

16    is most useful for thinking about why this can be done in terms

17    of circumstantial evidence is by looking at the decision in

18    *Chow*, which we cited in our letter, and also *Buyer*, which is

19    the recent circuit decision which came out, I think, last

20    month, both of which, in the securities fraud context, rely on

21    the fact that NASDAQ is headquartered in Manhattan as part of

22    the basis for establishing venue.

23            I think *Chow* probably relies on that point a little

24    bit heavier than the *Buyer* case does, but what's important

25    there is there's not separate evidence of, like, hey, here's

P4aWeisO

1    how the function of the NASDAQ headquarters works in Manhattan.
2    They didn't have someone say, even someone say, like, someone
3    in the headquarters, like, has to click certain buttons for
4    every trade generally.  They just said the headquarters being
5    there was sufficient for the jury to draw the inference that
6    there were activities that would've been relevant to the trade
7    that happened at that headquarters.
8            So I actually think that the evidence that the jury
9    had here, Mr. Farrell describing, hey, here's how generally our
10    process worked, and the evidence on October 11 is a lot more
11    evidence than the circuit has considered as required in these
12    analogous securities fraud cases.  So I think that's, to answer
13    your, like, kind of legal point what, like, the quality of the
14    evidence needs to be, that's how we're thinking about it.
15            Now, moving to the factual question, I think, here,
16    there was strong circumstantial evidence that the folks who
17    were in the Manhattan office were actually involved in
18    processing Mr. Eisenberg's trading -- I'll get to what that
19    means in a second -- and performing a compliance function on
20    them.
21            So, for that, let me just, I guess, start with a
22    little bit of the timeline, because I think the timeline of
23    events here is helpful and, maybe, not a point we were as clear
24    on as I would have wished in our letter.
25            So, Mr. Eisenberg creates his AscendEx account on

P4aWeisO

1    October 11, at about 12:30 a.m.  So many hours -- not many

2    hours, but most of a day before the attack happens.  And at

3    12:50 a.m., he puts about 10,000 USDT on the account.  So he

4    does a deposit pretty much right away after he does it.

5          Then there's a lag in time, so at about 6:10 p.m. he

6    adds another million USDT into the account, and then the

7    trading activity happens between 6:27 and 6:45 p.m.  And if the

8    Court -- I think we had put this timeline -- you can see it in

9    Mr. DeCapua's summary slides.  But the actual, like, underlying

10   exhibits were exhibits 1505, 1509 and 1503.  They kind of spell

11   out that timeline there.

12         So, I want to take Mr. Farrell's testimony and line it

13   up to these events now that we sort of have the structure of

14   what's going on.

15         So, starting with the account creation and that

16   initial deposit, Mr. Farrell testified that the -- when someone

17   creates an account, that goes into and appears in a management

18   portal at AscendEx and that folks in New York have the ability

19   to review that account creation.  That's transcript 146 and

20   147.

21         And also, with deposits what he said was that

22   deposits, when they come in, the finance team needs to get a

23   report every day that gets you the inflow and outflow of the

24   deposits.

25         THE COURT:  Let me back you up to the account opening.

P4aWeisO

1          MR. BURNETT:  OK.

2          THE COURT:  So, he says it is captured in what is

3     called or management portal, which is available to and reviewed

4     by the people in the New York office.  Right?

5          MR. BURNETT:  Yes.

6          THE COURT:  All right.  Did they actually review the

7     account opening for Mr. Eisenberg's account?

8          MR. BURNETT:  Well, I think the inference that -- so,

9     there's no evidence on that point in the record.  I think the

10    inference is that they must have reviewed it if not at opening,

11    that at some point between opening and when they -- before they

12    freeze his account, and that's Mr. Farrell's testimony on

13    October 11, which I think is important, that he's communicating

14    with his folks in New York, like, hey, figure out what's going

15    on on this platform and identify the account that's the

16    problem.

17         So we know ultimately at the end it gets frozen, his

18    account, but I think what you can draw, the inference is that

19    the team before that, when Mr. Farrell is having them look up

20    what's going on and trying to figure out the problem, is also

21    looking at Mr. Eisenberg's account portal earlier in time than

22    the freeze occurs.  So to answer your point, it's only an

23    inference as to them potentially reviewing it when it opens,

24    but there is strong circumstantial evidence that they saw his

25    account between the time of opening and the time of the attack

P4aWeisO

1    happening.

2              THE COURT:  All right.  So let's keep going.  So after

3    someone -- I don't know if you were asking the question.

4              So after someone is creating an account, how can they

5    get cryptocurrency onto your platform?  I think that's where

6    you're going next.

7              MR. BURNETT:  Yes, that's the deposit piece of it.

8              And so I think it's important to remember here that

9    AscendEx is a centralized exchange.  So it's not the case

10   that -- like, Mango Markets, you just deposit into your own

11   cryptocurrency wallet and, like, it's yours; it's not going

12   into, like, the same type of central pool.

13             What Mr. Farrell described was that AscendEx is

14   different.  The cryptocurrency is held centrally by AscendEx,

15   and it gets transferred in to them.  Some of that is held in,

16   like, a hot wallet, which is, like, easily traded in and out.

17   Something that's handled in a cold wallet, and he described the

18   finance team as having a role in basically needing to keep

19   track on what's coming in, the deposits are coming in, so they

20   can make sure, A, it's all recorded properly and, B, that

21   they're properly balancing, like, what's in the hot wallet and

22   what's in the cold wallet.  And he talks about this on 148.

23             THE COURT:  Right.  So then he says, when your

24   colleagues asked, what, if any, role did the folks in the New

25   York office have in managing that deposit process?  And he

P4aWeisO

1     says:

2          Two major aspects.  First, all of the deposits are

3     reviewed by our finance team and our development team when they

4     come in.

5          So that's the first part, and then he talks about the

6     daily reconciliation process.

7          MR. BURNETT:  Yes.  And I think here, there's a strong

8     inference that the finance folks actually did that,

9     particularly with respect to that initial 10,000 USDT deposit,

10    because remember, that one comes in just after midnight on

11    October 11 and the attack happens between 6:30 and 6:45.  So

12    there's really a whole workday in between during which these

13    folks, as he's describing it, are doing this trade

14    reconciliation, deposit, accounting on a daily basis for them

15    to have done it.

16         So do we have direct evidence of someone saying, hey,

17    I looked at the deposit coming in?  No, but I think the jury

18    certainly had sufficient evidence to conclude that those folks

19    would have done this for, would have done that process for Mr.

20    Eisenberg's deposit as well.

21         Here, I know there's also the 3500 point, which I

22    think we addressed in our letter brief, which there's a

23    separate process of when a deposit comes in.  AscendEx also

24    often does, like, a know-your-transaction-type compliance

25    review of that, which, like, first gets kicked out to chain

P4aWeisO

```
 1   analysis and then gets sent back to the team in New York, and
 2   some subset of that is manually reviewed by compliance folks.
 3           Mr. Farrell didn't testify about that, and that wasn't
 4   a basis that we were claiming for there to be venue under.
 5   Instead, it's this finance function.
 6           THE COURT:  All right.  And since we're at the deposit
 7   stage, why isn't the opening of the account and the deposit of
 8   the cryptocurrency merely preparatory to the offense, right?
 9   And so maybe you have a case that kind of draws the
10   distinction, because usually what the cases say is that, well,
11   putting the money in the account and then having their trades
12   cleared through the account, that's enough to establish venue.
13   So they sort of mix those two things together.
14           And here, I'm wondering whether the opening of the
15   account is like getting on that plane that would be something
16   that would be a precursor to the offense and so wouldn't be
17   sufficient on its own.
18           MR. BURNETT:  I think -- it's a good question.
19           I think there's an important difference because Mr.
20   Eisenberg is already lying at this stage.  And so what's
21   important here, and the cases -- I think it's important for us,
22   like, to step back conceptually and think where we are legally
23   here.  A lot of, like, the substantial step cases, like Tzolov,
24   are cases that are in the securities fraud context, where
25   there's sort of a special securities fraud venue provision.
```

P4aWeisO

1            Now, here, the commodities fraud statute, we have

2      general scheme liability as to the commodities fraud.  But also

3      importantly, for the commodities manipulation, we have the --

4      and the Court instructed the jury on this -- we have an attempt

5      as well, so there's, like, an inchoate element to the offense.

6      So I think when you're thinking about it conceptually, you want

7      to be thinking, like, is this, like, a substantial step in the

8      way that it's like an overt act?  That's one way to help think

9      about it.

10            And here, what's important is it's not just like

11      getting on the plane, because Mr. Eisenberg at this point -- I

12      think there was strong circumstantial evidence the jury could

13      have concluded that he already knew that he was not going to be

14      going on to AscendEx to comply with the terms of service.  He

15      had his manipulative scheme baked already.  So when he signs up

16      for the platform, he's already misrepresenting that he's going

17      to comply with its terms of service.  That's one part.

18            And the second part is think about, like, how he set

19      up the account.  What was important here is that Mr. Eisenberg

20      chose the account option that was, like, a know-KYC option for

21      the account and used, like, the Polish IP address to, A, get

22      himself access to AscendEx, because he couldn't have done it

23      through a U.S. IP address, but also to help kind of not make it

24      as easy to identify ahead of time, like, who is the user of the

25      account.  So I think what's important here is that Mr.

P4aWeisO

1    Eisenberg is already making misrepresentations and already kind

2    of doing a crucial step in the scheme, when he's loading money

3    on to the account.  And the kind of "crucial to the success"

4    language comes from the *Langley* case, which is cited in our

5    briefs.

6          The other, for this, like, substantial step point and

7    how you should, maybe, think about that in the attempt context,

8    I think the best case for that is *Abdallah*.  I can't remember,

9    candidly, if it was in our letter or in our briefing, but

10   there's a discussion in *Abdallah* about how they're kind of --

11   think about preparatory and using the substantial-step concepts

12   to help think about that idea.

13         So, I think that is the point for why this is

14   different than getting on the airplane.

15         THE COURT:  OK.  But another way in which it's

16   different is that he's not actually opening his account and

17   depositing cryptocurrency in New York or in the district,

18   right?  It's getting reviewed.

19         So yes, it is true that his, the opening of the

20   account and the deposit of the cryptocurrency is crucial to his

21   scheme.  I'll spot you that.  But that's not happening in New

22   York *per se*, because what Mr. Farrell says is that is reviewed

23   in New York, meaning that it happens wherever it happens in the

24   world, through the servers and everything else, where the

25   wallet is, but he says that it's reviewed in New York.  So is

P4aWeisO

1    that review crucial to the success of the scheme?

2                MR. BURNETT:  Getting past the review is crucial to

3    the success of the scheme.

4                So, for instance, like, one of the things that's

5    important, like, for instance, about this Polish IP address and

6    the know-KYC account, like, let's say Mr. Eisenberg had been

7    honest and said:  I'm Avraham Eisenberg.  I'm in Puerto Rico.

8    I'm a U.S. citizen and, like, typed in, like, the regular info

9    to open the account, someone would have flagged, or potentially

10   flagged that, but that's something that would've gone into a

11   different level of review, and the fact that he's coming from

12   the United States would've mattered also for his ability to use

13   the platform, which is reflected in the terms of service.

14               So I think yes, the review does matter, and getting

15   past that review does matter in New York as well.

16               THE COURT:  All right.

17               MR. BURNETT:  So the next step in the order of

18   operations is the trading, which now, that takes us up to --

19   this occurs between 6:27 and 6:45 p.m. on October 11.

20               Now, I think, I want to be clear about the kind of

21   different steps of trading.

22               So what Mr. Farrell testified -- I believe this was at

23   150 and 151 of the transcript -- is that the trading happens on

24   a smart engine -- I forget exactly the phrase that he uses --

25   and that is the thing in Japan, the cloud-computing service in

P4aWeisO

1      Japan that the 3500 is referring to.  But then, remember, this

2      is where we get important about the difference between a

3      decentralized exchange, like Mango Markets or some other

4      cryptocurrency platforms, and a centralized exchange, like

5      AscendEx.  Because Mr. Farrell described that what that

6      matching engine is is not, like, actually people exchanging

7      cryptocurrency, like you have on a decentralized exchange

8      platform.  That's, like, where electronically trades get

9      matched in the order of what happens in the same way that,

10     like, in a foreign exchange market or a stock exchange market

11     you'll have, like, a server that, like, actually matches buyers

12     and sellers.  But the money isn't moving around at that point.

13             Instead, what happens is the information about the

14     trades and who's gotten what at the end of those trades comes

15     into an internal ledger that Mr. Farrell testifies about.  And

16     the finance team is the one that's in New York that has the

17     responsibility to make sure that that internal ledger is

18     accurately reflecting the trades that occurred and accurately

19     reflecting basically who should be credited with what, making

20     sure that the accounts are all lined up and then ultimately

21     using it for that, like, deposit, hot wallet, cold wallet, like

22     making sure things are balanced purpose.

23             I want to say that I don't think Mr. Farrell

24     testified, for instance, that, like, they get, like, a random

25     set of trades and they are actually the ones, like, matching up

P4aWeisO

1    the trades.  I think it's fair that they likely get -- the

2    ledger comes to them in some form, where, you know, the trades

3    appear matched up and they're making sure everything lines with

4    what they're seeing in their internal system.  But that

5    internal trade reconciliation process is still a very important

6    process in the same way that clearing is an important process

7    in the securities markets, just because, like, a server spits

8    out, like, hey, here's how I think we know who owns what at the

9    end of the day in the brokerage house.  Here, the AscendEx

10   folks are getting spit out a ledger of, hey, here's what we

11   think who owns what is at the end of the day on the AscendEx

12   platforms, and they're the ones who are responsible for making

13   sure that those all line up.

14          Separately, that internal ledger, as I alluded to

15   earlier, Mr. Farrell testified again on that same paragraph, I

16   think, 150 to 151, that the compliance team folks are also

17   using that internal ledger because they, that's how they are

18   doing monitoring to make sure there's not suspicious activity

19   happening on the platform.  So I think --

20          THE COURT:  So, there's two aspects to this.

21          One is to effectuate his trades, which were part of

22   the scheme, the folks in New York are making sure that the

23   ledger is correct and that all the trades are going through

24   properly.  So they're not effecting these trades for the

25   reasons that you said, using the technical aspects here, but

P4aWeisO

1    they are making sure that this is actually being reflected in
2    the correct way in the system, because if it's not, then Mr.
3    Eisenberg couldn't do what he wanted to do.

4              That's one aspect.  And then the second aspect is the
5    "beat the compliance folks" thing that we've been talking
6    about.

7              Is that fair?

8              MR. BURNETT:  That's right.  And I think that there
9    are parallels to the securities universe, because -- obviously
10   not exactly the same, because it's, like, a different industry.
11   It's regulated differently, different requirements.  But what I
12   think is important is that -- I can't remember if this is
13   *Khalupsky* or the *Buyer* case, but it's clear that in the
14   securities context, there's a distinction between, like,
15   execution of the trades, like, the actual contract gets formed
16   on the server between buyer and seller.  And then the stuff you
17   do after the fact in the broker house to, like, make sure that
18   everything is assigned properly, and what I think the legal
19   principle that it's important to draw from that is that it does
20   not matter that the matching and the actual execution happens
21   on a server that's not in the SDNY because it is also
22   sufficient that, like, the back office work to make sure that
23   everything looks right on the trade reconciliation report and
24   the right accounts have the right stuff, is also sufficient.

25             And I think that's the principle to draw from those

P4aWeisO

1    cases, because, like, I don't really know if execution,

2    clearing, settlement -- those are very defined industry

3    concepts in the securities space.  I don't want to stress the,

4    like, the particular language too much.  But I think the

5    principle is, is that execution can happen somewhere, but if

6    the, what is akin to clearing, making sure everything matches

7    up, happens in the district, that is sufficient to establish

8    venue.  And that's what the trade reconciliation process is,

9    and the jury reasonably could have drawn that conclusion.

10        So I think then that brings us to -- so I think in

11   terms of that stuff actually happening then in the district,

12   first, I think it is sufficient legally -- if Mr. Farrell

13   hadn't talked at all about October 11, I still think that would

14   have been legally sufficient, under *Chow*, *Khalupsky* and *Buyer*,

15   for the jury to hear that this process, that AscendEx does this

16   trade reconciliation process for all of the trades and folks

17   who do it are the folks who did it in New York and these were

18   real trades.

19        I'd also add that the jury did see extensive, like,

20   spreadsheet evidence showing that there were, in fact, trading

21   that happened on the platform.  So they could infer from that,

22   too, that there were folks who actually, like, made sure those

23   things were right consistent with the actual, like, internal

24   process.

25        So I guess that is a long way of saying that I think

P4aWeisO

1    if Mr. Farrell had stopped there under the case law, that would

2    have been enough for the jury to draw a reasonable inference

3    that it happened here.  But I think October 11 itself really

4    puts this in a different category, because Mr. Farrell's

5    testimony provided strong circumstantial evidence that the

6    folks in New York were reviewing these trading ledgers here.

7    And I think it's important to kind of walk through the ticktock

8    of what Mr. Farrell testified, because what he said was that he

9    was at his house that evening.  Right?  So we're talking that

10   evening of October 11, not midnight or, you know, early the

11   next morning.  And he says he gets a call that evening from the

12   head of compliance, who he testifies -- or not head of

13   compliance.  Sorry -- the head of client services, who he

14   testified was located in New York, and that that call prompted

15   Mr. Farrell to start looking at suspicious trading in the Mango

16   Market on AscendEx.

17          OK.  So, first, what's the inference that the jury

18   could draw from that phone call and the fact that Mr. Farrell

19   reacts that way?

20          I think the entirely reasonable inference that the

21   jury could draw is that there was someone sitting with the head

22   of client services in that New York office who's looking at the

23   internal trade ledger and goes, hey, something crazy is going

24   here in the market; you should call our general counsel,

25   Mr. Farrell, and tell him what's going on.  So that's a very

P4aWeisO

1    reasonable inference that someone who's looking at what's

2    happening on these traded markets at the time.  And then to

3    even go a step further, Mr. Farrell said that he directed that

4    head of client services guy to tell his team to go and figure

5    out what's going on with the MNGO placing.

6           Well, who's Mr. Farrell's team and who's the team that

7    the jury could, like, reasonably infer would do that?  I think

8    it's fair to say that would be the compliance and the legal

9    folks, at a minimum, if not finance folks too, all of whom

10   Mr. Farrell testified are located in New York.

11          So not only does the call in to Mr. Farrell give rise

12   to the natural inference that someone in the New York office

13   saw something going on with the trading, Mr. Farrell's

14   subsequent direction to, like, hey, figure out if we need to

15   stop something also gives rise to the reasonable inference that

16   someone in New York did something in response to Mr. Farrell's

17   direction to them.  And then you know that, too, because what

18   happens after, Mr. Farrell eventually gets a call back saying,

19   hey, we've tied this to a particular account, and ultimately

20   they make the decision to shut down the account, which we know

21   happens later, like, 10 o'clock that night.

22          But what I think is important is while we know the

23   process ends at 10 o'clock, when someone is told to click the

24   freeze button, Mr. Farrell testified that the initial call that

25   he got was that evening.  And what was happening that evening?

P4aWeisO

1    Well, Mr. Eisenberg's trading was in that evening.  It was 6:27

2    to, like, 6:45 p.m., is when a lot of it was happening.  So I

3    think the reasonable inference that the jury could draw is that

4    like other folks in this case, someone sitting in New York sees

5    something haywire going on in their market and starts making a

6    phone call, which shows that there are actually people who are

7    using these internal ledgers in the New York office.  And

8    that's the inference they could draw.

9         So I think to kind of summarize, the general

10   testimony, I think, would have been enough under the circuit

11   case law, but this is not really close compared to those cases

12   because you have this added evidence about these particular

13   trades, which not only is useful for the commodities fraud

14   counts but also is, like, very clear as to the wire fraud

15   count, because not only do you have data going in, we have,

16   like, someone on the phone from Manhattan making a call out to

17   Farrell.

18        So I think that is the kind of heart of it.

19        I think the last piece that I would add here is that

20   even though the freeze happens after the manipulation is done,

21   the freeze happens before Mr. Eisenberg is able to get the

22   money off of the platform.

23        So if you'll remember from trial, the money that

24   Mr. Farrell, like, ultimately sucks into his kind of home base

25   accounts by the end of this is not only the money that he took

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P4aWeisO

off of the Mango Market platform, because he both pumped and

dumped the actual MNGO tokens on the various platforms that he

used to do the manipulation.  So Special Agent DeCapua's charts

show that it wasn't just Mango Markets money going into his

account, but you also have, like, FTX money going in there and

Serum money going in there as well.

         The one place where money did not come back at the end

from was the AscendEx account.  Why?  Because they froze it.

So I think that freezing, too, even though it occurs after the

fact, is stopping an important part of Mr. Eisenberg's scheme,

which is getting the rest of the money off the platform, which

is akin to, like, if the compliance folks in *Teman* had caught

the checks, basically.

         THE COURT:  All right.  But that's not part of the

crime.  That's the effort to stop the crime, but I don't know

if we need to get big into that, because it just goes back to

the compliance folks who were in New York, those are the people

that he was trying to beat and he beat them until he didn't.

And so, you know, that's what the story is.

         MR. BURNETT:  That's right.

         The only thing I would press on is that -- I can't

remember if it's *Rutigliano* or -- sorry.  It's a circuit

argument on this, so I'm forgetting the case names now.

         But there are several circuit cases that talk about

how in a fraud scheme getting, the process of getting the

P4aWeisO

1  proceeds at the end also is part of the fraud.  Like, basically

2  the fraud for venue purposes, the scheme is not complete until

3  you have the money in your control.  So getting that, I think

4  under circuit law, getting that money off of AscendEx actually

5  is still part of the scheme and the fact that he is stopped

6  there in New York would be an act in New York that, in this

7  case, frustrates the scheme.  But again, the act of an innocent

8  party trying to stop the scheme can also be sufficient for

9  venue.

10          THE COURT:  OK.  I understand that.

11          And then on foreseeability, it's the emails --

12          MR. BURNETT:  Yes.

13          THE COURT:  -- with the two-point font saying the New

14  York address.  Right?

15          MR. BURNETT:  I think it's that, and Mr. Eisenberg is

16  a sophisticated cryptocurrency trader, who I think it was

17  reasonable for a jury to infer that some of his activities

18  would have happened here given that while many legal entities

19  in this space are offshore their operations are often in the

20  major financial centers of the country.  I say that because

21  that's actually sort of the foreseeability logic that courts

22  use in cases like *Chow* and other ones.

23          But yes, here you have also the emails.

24          THE COURT:  All right.  Thank you very much.

25          Mr. Greenspan, are you going to be addressing this for

P4aWeisO

1    Mr. Eisenberg?

2              MR. GREENSPAN:  Yes, your Honor.

3              So, two general points about the government's

4    presentation just now.

5              I think one is it was really short on any connection

6    to in furtherance, and that's true of their briefing and it's

7    true of the letter they filed two days ago.  And you know, we

8    have this list of things that happened, but there's not a

9    connection -- and the Court asked a few questions about this --

10   of how those things were actually in furtherance of the scheme.

11   So that's one thing.

12             And then the other is I think, you know, we've

13   gotten -- over the period of briefing, we've gotten different

14   factual stories from the government.  The initial presentation

15   in the rebuttal summation -- you know, we'd moved for a Rule 33

16   new trial on this -- is the government told the jury that those

17   trades had cleared and settled in New York.  Today we heard

18   that they did not.  Right?

19             And so there's a, we're sort of dealing with an

20   evolving set of facts and conclusions that can be drawn from

21   those facts.  But I think that is particularly important, and

22   the Court focused on this.  You know, in most of the cases the

23   government cited, the act that was in furtherance of the scheme

24   that conferred venue was clearing, settlement or execution of

25   the trades.  We know that none of that happened in New York.

P4aWeisO

1    And the evidence they've requested to the contrary and the

2    evidence they requested in their summation's improper.  So

3    turning back, I think doing it chronologically makes a lot of

4    sense.

5         You know, again, we started with the general

6    proposition that people in New York do certain things.  They

7    have certain functions relating to finance.  They have certain

8    functions relating to compliance.  We have no testimony of when

9    they did those things, not even normally, and certainly not

10   with respect to this case.

11        THE COURT:  If Mr. Farrell testified that in every

12   instance this is how account creation and depositing functions,

13   why, under the standard applicable under Rule 29, wouldn't a

14   jury be able to reasonably infer that it happened in the

15   context of Mr. Eisenberg's account creation and deposits?

16        MR. GREENSPAN:  Well, I don't think that's exactly

17   what he did testify to.  And certainly, you know, you can take

18   the different pieces of this differently.

19        You know, one example is reviewing the trade ledgers,

20   which was a big part of their case.  He never testified about

21   when those reviews happened.  He clearly testified that they

22   happened after the fact, and we'll get to this in a minute,

23   because he said that they do that essentially for quality

24   control.  They have nothing to do, those reviews have nothing

25   to do with the clearance or the execution of the trades, and

P4aWeisO

 1   that was something that the government, I think, just sort of

 2   skirted by and, I think, almost misrepresented just now.  So

 3   when those things happened, I don't think he stated in the

 4   normal course.

 5         And then moving back to reviewing the account

 6   information on the management portal, I think the Court was

 7   correct in saying, you know, that information was -- that

 8   information went to the server in Japan.  It was available to

 9   the New York office to access.  We have no idea, even in the

10   normal course, when they access that information.

11         The government says they must have accessed it

12   sometime before the account was frozen.  That was four hours

13   later.  The trading took 20 minutes.  So you know, the idea

14   that you can infer -- and I think we'll get to the whole

15   scenario of Mr. Farrell learning about this and freezing the

16   account in a moment, but the notion that because an account is

17   frozen four hours later, you know, we should infer or we should

18   allow the jury to infer that these steps were taken four hours

19   earlier, steps that, by the way, are not in furtherance of the

20   scheme.

21         THE COURT:  Well, I'm not going to go through step by

22   step Mr. Farrell's testimony, since we just did that.  But just

23   to give you an example, when he's talking about the deposit

24   process, he says all of the deposits are reviewed by our

25   finance team and our development team when they come in.

P4aWeisO

1        And so independently, the government is saying the

2   jury could infer that when the deposits were made, they were

3   reviewed, at that time.  And you may disagree with that, but

4   there was at least a sufficient basis for the jury to conclude

5   that that, in fact, happened at the time that the deposits were

6   made.

7        MR. GREENSPAN:  Sure.

8        Two things on that.

9        One is, you know, again, we have no specific testimony

10  about that happened, but I take your point that he's talking

11  about a general pattern.  And he's different in that testimony

12  than he is about other things.  But he doesn't say in that

13  testimony that those deposits need to be reviewed in order for

14  the customer to use the funds.  He doesn't say what the purpose

15  of that review is.  And the government actually just said that

16  the purpose of the review is to balance these hot and cold

17  wallets.  Well, that's clearly not in furtherance of the

18  defendant's scheme.

19        I mean I don't think Mr. Eisenberg was concerned with

20  whether the hot and cold wallets were balanced when he was

21  executing his trades.  So -- and we talked about the, in our

22  brief we talked about the evidence that there is about how that

23  depositing happened.  And basically what happens is he deposits

24  money.  Within less than a second, that money is credited to

25  his account.  Within less than another second, essentially,

P4aWeisO

 1    because this is two different deposits, he gets an email.  So

 2    the evidence is extremely strong that there was no manual

 3    review.  And that's as to these particular deposits, not the

 4    general course.

 5         So I think the notion that the jury could infer that

 6    these things were reviewed and that that review somehow was

 7    meaningful, there's no evidence of that.

 8         THE COURT:  But just to zoom out for a second, you

 9    don't disagree with the government that, as a general matter, a

10    jury can infer that things happened with respect to a

11    defendant's transactions based on a general pattern; that

12    general proposition you don't disagree with, right?

13         MR. GREENSPAN:  We don't, but -- correct.  The general

14    proposition we don't disagree with.  But in this case we have

15    specific evidence that that didn't happen.  So in this case, we

16    think that an inference by the jury both that the deposits were

17    reviewed before they were credited to the account and that it

18    was necessary to review them in order for the user of AscendEx

19    to trade, that would be unreasonable.  There's no evidence of

20    that.

21         THE COURT:  And the evidence that you're pointing to

22    is?  Meaning when you say that the evidence before the jury

23    actually refuted that any manual review was conducted, in any

24    way that was meaningful here, that evidence is?

25         MR. GREENSPAN:  Yeah.  Let me find it in our reply

P4aWeisO

1  brief.

2          But essentially that we step through the government

3  exhibits that showed the crediting of the USDT, because that's

4  the currency that's used on AscendEx, the account, and those

5  emails.  It was the same emails that you were referring to that

6  had the small print.

7          THE COURT:  OK.

8          MR. GREENSPAN:  And the timeline there -- and again,

9  the government walked us through this.  There's a 10,000 USDT

10  deposit earlier in the day.  And later on, they said a million,

11  but it's actually 100,000 USDT.

12          In both instances, the currency is confirmed and the

13  email is sent within seconds.

14          THE COURT:  OK.

15          MR. GREENSPAN:  So we think the evidence was crystal

16  clear, you know, on that point in the way that we've just gone

17  through.

18          As to the internal ledger and the discussion of

19  clearance and execution of trades, the government made a

20  distinction between AscendEx and the fact that it's a

21  centralized exchange versus Mango Markets.  But there's no

22  testimony here that the internal ledger was in any way

23  different and that the reviews of the internal ledger were at

24  all in furtherance of the scheme.

25          You know, we quoted Mr. Farrell's testimony on page

P4aWeisO

151 of the transcript regarding the matching engine.  So we
know that -- and that, by the way, matching is the clearing.
So he's testified that that didn't happen in New York.  It
happened in Japan.  So, again, that wasn't true when it's said
to the jury.

        And then he clarifies what that review is, and he
talks on 151 about how that's a quality control review to make
sure their systems are working.  So again, just like the review
with the deposits, this is just clearly not in furtherance.
Again, Mr. Eisenberg's concern isn't whether AscendEx's
matching engine is working properly.  It's that he's able to
complete his transactions, which happens, we know, before,
because all of these reviews are after the fact.  They're
quality control.

        And again, I think, you know, the government is really
taking liberties with *Teman* and comparing these things to
*Teman*, and that applies also to the compliance review.  There's
no evidence here that he needed to pass some sort of compliance
review to execute his transactions.  And I think it's important
to remember what it is that he was doing on AscendEx.  He was
trading on AscendEx in order to achieve a certain price level.

        He wasn't trying to buy MNGO and to profit off of
MNGO.  And so his scheme, as it concerns AscendEx, was complete
the second that the trades went through.  It didn't depend on
him receiving the MNGO, and in any case, there's no evidence

P4aWeisO

1   that he needed to pass some sort of review to get the MNGO.  So

2   in *Teman*, and the Court's more focused on this in its order to

3   the parties, those were checks that needed to pass a review in

4   order for the defendant to receive the funds.  There's no

5   evidence about what would happen here if this compliance

6   review, which we don't even know if it occurred, what would

7   happen if he failed at that.  We don't even know what it is,

8   right?  There's no evidence about that.

9        THE COURT:  What the government says is that if you

10  look at the district court's decision in *Teman*, there is a

11  broader principle that where the compliance function is in the

12  jurisdiction and the defendant has to evade that compliance

13  function, that is going to be a basis for venue where evading

14  that compliance function is necessary.  And so they say from

15  start to finish, he needs to evade that compliance review in

16  order to be able to make these transactions that is going to

17  increase the value of his Perpetual positions.

18       And so I'll take a look at the district court

19  decision, but do you have any reason to disagree with that

20  general legal principle, that where, if you personally were

21  trying to rob a bank and that bank's compliance -- all their

22  security guards, everything -- they were in the jurisdiction

23  and you needed to evade them in order to perpetuate, you know,

24  to rob the bank, that the presence of those people in New York

25  and the fact that you had to evade them to accomplish your bank

P4aWeisO

 1    robbery, that that would be enough for venue in the district?

 2    As a general principle.  I understand you disagree with how

 3    that maps on to the facts here.

 4            MR. GREENSPAN:  OK.  You know, I'll admit that, just

 5    like the Court, I haven't read Judge Engelmayer's opinion.  I

 6    have read the Second Circuit opinion, and so I can't speak to

 7    whether, what Judge Engelmayer said or what the context was

 8    exactly.  But what I know about the context from the Second

 9    Circuit opinion is that he's talking about an instance where

10    somebody's beating compliance folks because beating the

11    compliance folks is part of the process of obtaining the money.

12    And the *Teman* Second Circuit opinion specifically talks

13    about -- and this is in our letter, about how even though that

14    was, you know, in theory, something that could have frustrated

15    the defendant's scheme, it was actually a part of the scheme

16    because he had to do that to get the money.

17            There's no such comparison here.  There's no process

18    that he had to defeat -- there's no evidence of it at least --

19    in order for the scheme to occur.  We know that there was a

20    smart matching engine that did all of these things

21    automatically.  So what this compliance process was that he

22    would have had to overcome, there's just no evidence of that.

23            THE COURT:  What about the fact that, in your view,

24    after the fact there was this freezing of the account?  And so

25    what the government says is it's not just the freezing of the

P4aWeisO

```
1   account.  That shows that there was monitoring happening, and
2   maybe the folks at AscendEx weren't looking closely enough, and
3   so they only caught this in the evening after everything had
4   happened, but they could have been monitoring in real time, and
5   that's what could have happened.
6           That's the way in which this is necessary and crucial
7   to the success of the scheme, evading that compliance function.
8   It's not just fantasy.  It's actually a reality that they were
9   doing this, and he actually succeeded in evading them in the
10  time that he needed to, when he needed to increase the value of
11  his positions.  But then just, finally, they figured it out.
12          Why isn't that enough to establish venue here?
13          MR. GREENSPAN:  Well, again, this is a question of
14  what's in furtherance of the scheme.  Right?
15          First of all, we know that freezing his account,
16  that's not in furtherance.  And I understand that's not exactly
17  the Court's question.  But the government has said it was, and
18  so that's not really a valid argument.
19          Second is the timing issue, right?  And we know that
20  the freezing of his account happens four hours later.  We also
21  knows that it happens after Mango Markets tells him this is
22  going on.  So the fact that the government said that it was
23  reasonable for the jury to infer that people were looking at it
24  as it was happening and just took four hours, that's not a
25  valid argument and it's a specious inference.  But the idea
```

P4aWeisO

1    that -- *Teman* doesn't, and no other case that I'm aware of,

2    hold that there's some compliance function out there, nobody

3    does anything and that's somehow an act in furtherance of the

4    scheme that they don't do anything.  I just don't think that's

5    consistent with the case law and what it means to be an act in

6    furtherance.  So you know, if they're saying that's what Judge

7    Engelmayer said in *Teman*, you know, I think we all need to look

8    at that.  But I'm skeptical of that.  It's not consistent with

9    the way *Teman*'s written in the Second Circuit?

10         THE COURT:  All right.  What's the best case on your

11    side, meaning there are a lot of cases here finding the venue

12    requirement satisfied?  And in your briefing, you distinguish

13    those cases, but what's the best one, from your perspective.

14         MR. GREENSPAN:  Well, it depends on which part of

15    this.  I think *Tzolov* is a very powerful case and *Beech-Nut* are

16    very powerful cases on preparatory acts.  And I think, you

17    know, the Court's question about depositing funds, I think our

18    position is that it's a preparatory act.  And you know, we can

19    get into some of the things that the government said about

20    that.

21         THE COURT:  Well, what I mean is on facts that are at

22    least remotely similar to those at issue here, what's the best

23    case, from your perspective?

24         MR. GREENSPAN:  Well, that's, you know -- I think

25    *Teman* is a very good case for us.  I think *Teman* shows you

P4aWeisO

1    what's necessary and, by inference, what's not appropriate.  I

2    mean the entire holding of the Second Circuit on *Teman* was if

3    you've got something, an act here -- and again, I'm talking

4    about freezing the account, you've got -- or the compliance

5    function.  If you've got an act that's designed to frustrate

6    the purposes of the defendant, what they're trying to

7    accomplish, that's only part of the -- or in furtherance of the

8    scheme if it's a necessary component to achieving the ends of

9    the defendant.

10          So in *Teman* it was you have to pass that review, and

11   he knows he has to pass that review -- they talk about that

12   too -- in order to get the funds.  Here, there's no compliance

13   review he has to pass.  This is a total inaction that the

14   government is talking about.  And you know, again, the timeline

15   doesn't support any of this either.  I mean all of these trades

16   clear and all of the deposits come into the account

17   immediately.  So this notion that -- again, in *Teman*, there's

18   this whole process that has to take place in order for those

19   funds to clear and get to the defendant.  That's not present

20   here at all.

21          The government talked about the *Buyer* case.  *Buyer*

22   involved trades at a, that were cleared on a data center in New

23   York.  They were written to storage in New York, and they were

24   trades that were done on the New York Stock Exchange.  I think

25   that was one of the key cases that they cited.  And it has

P4aWeisO

nothing to do with the facts here.  And neither does *Chow* or
the other cases.  There's no case.

You know, I think part of the problem with venue, and
it's true of a lot of legal issues, is all of these things are
very fact-specific, and our facts are unique because we're
dealing with a unique kind of product.  So when you're looking
at securities cases and things of that nature, you know, none
of us have cited any crypto cases.

THE COURT:  Well, I think that's right, but I think
that if you look at these cases, sometimes there are general
propositions, but if you actually dig into the facts, what was
relied upon was fairly generic information.  Like, if you take
*Khalupsky*, right?  It was, I think J.P. Morgan clearing was the
clearing agent for the accounts, and it was just, like, they're
headquartered in New York and that was enough.  And so the
specificity that you seem to be demanding here in terms of the
precise, there was, you know, a person in New York who reviewed
these transactions, that sort of thing seems to be lacking at a
factual level in some of these cases.

Another example is *Kim*.  There was knowledge that
invoices were being signed off on, and these were going to be
paid by New York banks.  And I think the basis for that was
that someone said yeah, there's a bank in New York who's paying
this, right?

Similarly, you might say, well, does the mere fact

P4aWeisO

1    that the bank is in New York -- like, what does that mean?

2    Like, where are the funds actually coming from?  You could dig

3    beneath the surface, but the cases seem to say you don't dig at

4    that granular level; that if there is a basis on a

5    preponderance standard to conclude that there's a tie to the

6    district or something that is a part of the offense, mind

7    you -- I take your point there -- that that's going to be

8    enough.

9        And so that's why I asked you what the best case is,

10    from your perspective.  Like, normally you would have a case

11    that says there's not sufficient evidence for venue on

12    something that's remotely similar here.  And I, again, take

13    your point that there's no cryptocurrency case like this so

14    you're not going to have that kind of precedential authority.

15    But what's the case saying no venue because XYZ defect, where I

16    can see those principles being mapped on to something similar?

17        MR. GREENSPAN:  I just think this case is *sui generis*.

18        I do want to talk about *Kim*.  I mean *Kim* involves

19    faxes and wires to Chase Manhattan Bank.  I mean we've got

20    specific actions, including specific wires, and if the Court

21    wants, we can get into why the wire fraud is also deficient.

22    But there's none of that here.  I don't think there's a good

23    case for the government; I'm not sure there's a case that's on

24    all fours with us.

25        But I think if you look at the principles, and you

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P4aWeisO

```
1    know, you talk about the standard that this needs to be, the

2    act that happened in the district needs to be an act that

3    constitutes the crime or is in furtherance of the crime,

4    there's none of that here.  And I think the government was

5    incorrect in stating the standard that the general, that the

6    Second Circuit is saying that the general, having an office

7    somewhere in New York, I don't see that in Chow.  I don't see

8    that in Buyer.  I don't see that in any of the cases that

9    they've cited.

10        So I mean the focus on all of these cases is on

11   specific acts.  That's what the test is.  That's how the jury

12   was instructed.  So we're talking about what is the act, not

13   who generally are these people.  And you know, you're right

14   that it's a preponderance of the evidence and also that

15   reasonable inferences can be credited to the jury.

16        For reasonable inferences, we cited the Valle case and

17   others about what a specious inference is on a Rule 29.

18   Reasonable inferences have to be supported by some evidence,

19   so -- and we also need to step through and decide which act is

20   even potentially in furtherance.  None of these are.  There's

21   not a single act that they've talked about that's even in

22   furtherance of the scheme.  So the notion --

23        THE COURT:  The government says that he's got to open

24   the account.  He's got to deposit the funds, and if there's

25   steps that are taken affiliated with those things, then that's
```

P4aWeisO

1     part of the offense.

2             MR. GREENSPAN:  He does, but that's a sort of but-for

3     test right?  But for opening the account he couldn't do this,

4     but for depositing the funds, but for stepping on a plane, the

5     individual in *Tzolov* wouldn't have gotten to his meeting and,

6     you know, secured the investments that were part of the scheme

7     in that case.  I just don't think that's the way *Beech-Nut* and

8     *Tzolov* set out what is preparatory versus what constitutes part

9     of the crime.  And the only thing that I heard that the

10    government's saying distinguishes this from those -- and the

11    first time they said it was here today -- is that he was

12    already lying, is what they said.  Those lies that they talked

13    about ultimately were not part of the theory of fraud that they

14    presented to the jury, and so they're irrelevant.  That doesn't

15    make this part of the crime as it was charged and as it was,

16    you know, deliberated on by the jury.  And the fact that

17    AscendEx -- and one of the lies, I think, was he already knew

18    in his mind that he was going to violate the terms of use of

19    AscendEx.  I mean that has no relevance to what the jury was

20    ultimately asked to find.  That's not the fraud in this case.

21            So again, it's true that he needed to do those things.

22    Those things weren't criminal acts.  They weren't part of the

23    conduct.  They weren't part of the elements that the jury

24    needed to consider to determine whether he committed the

25    crimes.

P4aWeisO

1          Now, had he cleared and settled the trades in the

2     district, that's different, because the trading activity was

3     what they were focused on.  So I think that's how I would

4     address those things.

5          And now, you know, if you go through the progression,

6     freezing the account, clearly not part of the scheme.

7          THE COURT:  I think I understand your point there.

8          So when you're looking into the vacatur issue, I'll

9     also allow you to, without argument, if you want to say look at

10    these cases, with, like, quotations from those cases, not any

11    kind of argument, then I'll take a look at that.  You can put

12    that in by, let's say, this coming Monday.  The government can

13    do the same.

14         But what I'm looking for, again, from your

15    perspective, is a case that has some circumstances similar to

16    this one and finds the kind of connections that the government

17    is pointing to insufficient to support venue.  And if you don't

18    put anything in, I'm not going to hold it against, you because

19    you've cited to a bunch of cases in your briefing, but I do

20    want to afford you the opportunity to do that.

21         Are you going to be also, just in the interest of

22    time, are you also going to be addressing the USDC issue?

23         MR. GREENSPAN:  Yes.

24         THE COURT:  OK.

25         MR. GREENSPAN:  Just so I understand the Court's

P4aWeisO

1    directive, it's just going to be case citation and, at most, a

2    quote.

3              THE COURT:  Just a quote.  That's it.

4              MR. GREENSPAN:  OK.

5              THE COURT:  You can have, like, a header that says

6    what the cases pertain to.  But I think as you put it in your

7    letter, we've had hundreds of pages of briefing on these

8    issues, so I don't think I need more argument.  But if you have

9    a case that is in your favor, I'll give you an opportunity to

10   put it in.

11             OK.  So on USDC, first question:

12             Given the statutory directive from Congress, is it

13   your view that the joint rule-making is not, like, a usual

14   agency statement?  It is controlling, and so what's in the

15   joint rule-making is the gospel, right?  Because Congress told

16   the agencies to get together and to provide further definition

17   to the terms that are at issue here.

18             MR. GREENSPAN:  That's correct, and that's in our

19   brief.

20             THE COURT:  OK.  So second question, let's say that I

21   agree with you on USDC that that can't serve as a basis to call

22   these instruments mixed swaps, but I disagree with you on the

23   funding payments based on the rate.  OK?

24             Under those circumstances, I would deny the Rule 29

25   motion.  Is that fair?

P4aWeisO

1          MR. GREENSPAN:  Correct.

2          THE COURT:  All right.  So now let's talk about USDC.

3          So the government says, after talking about a lot of

4     other things, that the Perpetuals do not transfer an ownership

5     interest in USDC because what they actually transfer between

6     the parties is a contingent set of rights based on the outcome

7     of what happens in the market.  So unlike a sale -- and they

8     give an example of this -- it's not as if there's a transfer of

9     USDC at the beginning of the contract.  There are just a set of

10    rights and one side or the other may transfer USDC to the other

11    party, but it's uncertain at the inception of the contract

12    who's going to do what.  And so for that reason, the issue

13    raised by the Court in our order doesn't really apply under

14    these circumstances.

15         What's your response to that?  Because it was an

16    argument that was first raised in the government's letter.

17         MR. GREENSPAN:  Could I just quickly amend my response

18    a second ago?

19         We did make an argument in the brief that these aren't

20    swaps at all, and we make that argument based on the fact

21    there's no transfer of risk because Mr. Eisenberg is on both

22    sides.  And we cited Judge Rakoff's opinion in the *Terraform*

23    case.

24         So my answer to you about the funding rate relates to

25    the issue of mixed swaps.  If we get to the fact that it's a

P4aWeisO

1    swap and it goes into the securities-based swap bucket --

2              THE COURT:  We're on the same page.

3              MR. GREENSPAN:  OK.

4              THE COURT:  That's what I understood you to be saying.

5              MR. GREENSPAN:  So I think, from our perspective, we

6    need to actually take a step back and talk about the risk

7    exchange.  And that's where we started with our letter, and

8    it's interesting that the government to some extent, I think --

9    their letter's a little bit different than ours, but they start

10   by saying that the USDC risk is different than the risk under

11   the MNGO Perpetual, and that's the basis of our entire argument

12   on this.  USDC is not part of the risk transfer at all, and

13   that's why USDC can't be a reference that converts this into a

14   mixed swap.  Because I think the Court and the government and

15   the defense, I believe, now agree that the "based on the value

16   of" language in the mixed swap definition incorporates the

17   requirements of (A)(iii), that those things that need to be

18   accomplished to be a swap in the first place, including the

19   transfer of risk and including not actually being physically

20   transferred as part of the process or ownership interest being

21   transferred.

22             So the government, I wouldn't say acknowledges our

23   position but I think has come close to our position in saying

24   USDC isn't part of the risk transfer at all.  And the joint

25   release focuses entirely on this.  And the best example of that

P4aWeisO

1    is the quanto/compo equity swaps discussion, which basically

2    says if you've got an exchange rate risk, if it's hedged out

3    and it's not part of the risk transfer, then that foreign

4    currency can't be considered a part of the swap, and it can't

5    make it a mixed swap.  It's a securities-based swap if you're

6    buying a foreign security.

7            The same thing would be true here.  We've not no

8    exchange rate.  In fact, it's hard-coded that USDC is one to

9    one with USD.  So there can't be --

10           THE COURT:  Let me stop you for just a second, because

11   I think one of the problems is that a lot of your arguments are

12   interlocking, but I want to, for the moment, see if we can deal

13   with them separately, understanding that there's a relationship

14   between all of them, which goes back to last year around this

15   time when we were talking about the medium of exchange and that

16   USDC just fundamentally can't be anything that turns this into

17   a mixed swap.  I get you with that.

18           But just as a basic matter, let's assume for the

19   moment that you've got USDC, and that's the thing that you're

20   saying, under the general swap definition, is being actually

21   transferred as part of these transactions, right?  Through the

22   funding payments and everything else.

23           MR. GREENSPAN:  Yes.

24           THE COURT:  And so you're saying that means it can't

25   render this a mixed swap, and the government says that's not

P4aWeisO

1    how it works, because when these Perpetuals are actually

2    formed, when the contract is formed, there is no transfer of

3    any kind of right to USDC by either side to the other side

4    because all you have is a contingent transfer of these payments

5    in the future, and contingent transfers of that kind is not

6    something that's covered by the definition.

7         Do you agree with that just principle?  Just yes or

8    no.

9         MR. GREENSPAN:  No.

10        The statute says nothing about that.  The joint

11   release says nothing about that.  They didn't cite the joint

12   release, I don't think, in any way in justifying that.  They

13   talked about other sections of the statute and the general

14   proposition that a sale and a swap are different.  But if we're

15   going to be textualists -- the government's been hyper-textual

16   in this argument, ignoring the joint release, I would say.  The

17   joint release -- sorry.  The text of the statute and joint

18   release don't say that there needs to be a defined direction or

19   amount of the transfer.  It just says that an ownership

20   interest, direct or indirect, needs to be transferred.  And

21   that clearly does happen.  And the Court correctly identified

22   that it happens not just at settlement, as the government

23   discussed in their opposition.  It also happens when the

24   position is open, and that's exactly what happened in this

25   case, because we know that Mr. Eisenberg never closed his

P4aWeisO

1    position.

2            THE COURT:  Well, it happens during the time that the

3    position is open, but I think that the government's point is

4    that you evaluate whether it's a mixed swap or not, of course,

5    at the time the Perpetual is formed, and at that point there is

6    no transfer of an actual ownership interest in USDC.  That only

7    happens in real time either as a virtue of the settlement

8    payments or the funding rate payments in the interim of the

9    contract or when there's a final resolution.  And so for that

10   reason, it doesn't fit into the swap definition.  But I

11   understand your position there.

12           But getting back to the quanto and compo issue under

13   the joint rule-making, so explain to me -- so the government

14   says it's not like the quanto swaps.  It's like the compo

15   swaps, because the USDC exposure is still there because, and

16   that goes back to the fact that all of these calculations are

17   all done between MNGO and USDC as a pair.  That's always the

18   case.  And so it's not like the quanto example, where the

19   interest rate exposure is hedged out because it's all fixed at

20   the time of the contract.  It's more like the compo example,

21   where that's not the case and you're exposed to that risk.

22           Why isn't that true here?

23           MR. GREENSPAN:  First of all, it's factually

24   incorrect.  I mean we've gone through this in detail.  Mango

25   Markets was a USD market.  It was not USDC.  Everything, you

P4aWeisO

 1    know, and the best evidence is to look at the statements in the

 2    900 series that we cited that are the long and the short

 3    account that Mr. Eisenberg had.

 4            THE COURT:  Understand that argument.  You're saying

 5    regardless of anything that was happening, the way it actually

 6    worked is that the market hedged away any risk exposure there

 7    might be.  You don't think there was any because it's so close

 8    to the dollar anyway.

 9            MR. GREENSPAN:  Correct.

10            THE COURT:  But to the extent that there was any risk,

11    it's undisputed that that all got washed away by the market.

12            MR. GREENSPAN:  That's the entire point of using a

13    stablecoin.  It acts like a dollar.

14            THE COURT:  Right, but you're not just saying that.

15            MR. GREENSPAN:  No, I'm not just saying that.

16            THE COURT:  The market itself, the evidence was, and

17    it was undisputed, that Mango Markets itself washed away the

18    risk because it equated USDC to the dollar.

19            MR. GREENSPAN:  I don't know that I would say it's

20    disputed.  I believe the government disputes it.  I think their

21    dispute is clearly wrong.  I think the evidence is

22    overwhelming.

23            We also know that the oracle was reported in dollars.

24    That is, I think, undisputed.  Mr. Hermida testified about

25    that, and even though some of the inputs -- one was in dollars,

P4aWeisO

1     one was in USDT and one was in USDC; they were all converted to

2     dollars with no conversion.  Right?  Again, it was hard-coded

3     one to one.  And Mr. Hermida, you know, to the point of whether

4     these things were equivalent, he couldn't have been clearer

5     that, in his mind, they were the same.  And you know, he said,

6     he talked about how if you had a Circle account or Coinbase

7     account, you could go and swap them out.  They were always the

8     same during this time period.  Mr. Mordecai had a chart.  He

9     talked about how they were the same as well.

10          But to the extent that there is, you know -- so

11    stepping back, I think it's important, actually, to look at

12    this, I think, from a macro level.  The product is called the

13    MNGO Perpetual, and Tyler Shipe was the only person who really

14    testified about what it was and its purpose.  So his testimony

15    is undisputed, that he's called it a future bet in MNGO.  He

16    doesn't say it had anything to do with USDC.

17          THE COURT:  And I've got your arguments on that point.

18          In terms of the consequences here, I take it what

19    you're saying is if you accept the government's position, then

20    any futures contract that is based on a security, as long as

21    it's denominated in something other than U.S. dollars, would be

22    a mixed swap.  And that can't possibly be right.

23          MR. GREENSPAN:  And I'm skeptical even for dollars.  I

24    mean the government said that the reason the dollars didn't

25    apply was because of a particular Treasury law.  But that

P4aWeisO

1    Treasury law it's not clear to me applies to the mixed swap

2    definition.  Perhaps it does, you know, if we're agreeing now

3    that the mixed swap definition incorporates the main swap

4    definition.

5                Starting over.

6                So, the government's position was and I think the

7    charge conference colloquy was that the only reason that

8    dollars wouldn't also qualify is because of the specific

9    carve-out in the Treasury law.  They didn't cite that law, and

10   I haven't found it independently, but I'll take them at their

11   word that it exists.  But that, I think, would carve it out of

12   the main swap definition.  My position would be that it would

13   also carve it out of the mixed swap reference definition.  But

14   that assumes that -- and I suppose this is all academic,

15   because I think the parties agree that the mixed swap

16   definition does incorporate the requirements of the general

17   swap definition in (A)(iii).

18               THE COURT:  All right.  And so then, I have, maybe, 80

19   pages of argument on some of these issues.  So there are just a

20   couple points, and you have these letters that were put in that

21   are very helpful.

22               So just one last issue, which is on the lenity

23   argument.  What are you saying in particular is the ambiguity

24   in the mixed swap definition that should be resolved in your

25   client's favor?

P4aWeisO

1          MR. GREENSPAN:  The ambiguity is the definition of

2     mixed swap.

3          THE COURT:  Well, more specific --

4          MR. GREENSPAN:  If the term is mixed swap, then how is

5     it ambiguous?  It's ambiguous as to whether the underlying

6     currency could make it a mixed swap.  You know, I don't think

7     there was any notice that that could happen.

8          THE COURT:  Right.  So are you saying that, under

9     these circumstances, USDC was the currency that was used, just

10    like any kind of U.S. dollars or foreign currency.  Under these

11    circumstances, it is ambiguous that that renders the instrument

12    a mixed swap, and for all the reasons you point out in your

13    papers, there's a legitimate argument as to at least an

14    ambiguity.  And so under the rule of lenity that should be

15    resolved in your favor.

16         MR. GREENSPAN:  Correct.  I mean we've put aside the

17    USD/USDC issue, which we've already established on the record.

18    But you know, the rule-making -- and Judge Oetken's opinion in

19    *Archegos* talks about this -- talks about a narrow category of

20    mixed swaps, we accept their definition, as we just said, it

21    basically eliminates securities-based swaps.  Almost all of

22    them become mixed swaps, and so, you know, how could anyone be

23    on notice that this is a mixed swap when it's completely, you

24    know, anti the rule-making and the guidance that's out there.

25         So that's the ambiguity.

P4aWeisO

1              THE COURT:  OK.  Understood.  Thank you very much.

2              All right.  Mr. Burnett, if you're going to be

3    handling this --

4              MR. BURNETT:  Yes, your Honor.

5              THE COURT:  -- you don't need to necessarily go back

6    to any of the venue issues, since we talked about them for

7    about an hour and a half.  If there's something earth

8    shattering that you wanted to address, I'm happy to hear it,

9    but really I just want to just finish up very quickly with some

10   of the USDC points.

11             MR. BURNETT:  Just maybe two sentences on the venue

12   issue.

13             So, first, just to be crystal clear, the, like, get it

14   past compliance point, the issue is that his account could have

15   been frozen at any point in time while he was trying to execute

16   the scheme.  So that's why you have to beat compliance.

17             And on the timing of when this happened, it's clear

18   that Mr. Farrell said he heard about it that evening, even

19   though the freeze happens later.  It's not proper to rely on an

20   inference from 3500 that the only reason they knew about it is

21   from Mango Markets infers something about timing from that, if

22   they wanted to ask about that on cross-examination, they could

23   have.

24             We think that's it on venue.

25             THE COURT:  OK.  Understood.

P4aWeisO

1          And so let's pick up where we left off with

2     Mr. Greenspan, which is, is it the government's position that

3     any futures contract involving a security that's denominated in

4     a foreign currency is a mixed swap?

5          MR. BURNETT:  Yes, unless the risk of that foreign

6     currency is hedged out to make it a quanto swap.  And I think

7     that is extremely clear from the joint rule-making, because a

8     compo swap is a security, and a foreign exchange --

9          THE COURT:  Can you get closer to your mic a little

10    bit.

11         MR. BURNETT:  Sorry.

12         And I think that's clear from the joint rule-making

13    for two reasons.

14         So, first is the general principle and the general

15    definition of a total return swap.  And I think this is what we

16    cite in our original briefing, that it's very clear that a

17    total return swap that is based, in part, on the value of the

18    security and, in part, on the value of something else,

19    including a currency, is -- which is explicitly said in the

20    joint rule-making, is a mixed swap.  So that's the general

21    principle.

22         And then that is specifically discussed in a compo

23    swap, or what a compo swap is is a swap that's based on a

24    security and a foreign currency, where that foreign currency

25    risk is not hedged out.  And just to spell that out, imagine a

P4aWeisO

1    South African company who, you have a swap on that South

2    African company's share price, which is a rand share price,

3    now, that company's stock price could fluctuate based on,

4    either because the value of the company goes up or down -- it's

5    a better company; it's a worse company -- or because the rand

6    goes haywire, it's a volatile currency, and that can also move

7    the value of that security around in rand.

8         If that rand piece of the movement is hedged out,

9    that's a quanto swap.  If it's not hedged out, such that you

10   are assuming the rand risk, then that is a compo swap.  So I

11   think the joint rule-making is crystal clear that its

12   security-currency combo is a mixed swap.  And I think, here,

13   what that means, this mixed swap issue boils down to is really,

14   is USDC -- is there some exception for USDC because we don't

15   expect it to move around that much really?

16        I think the answer to that is clearly no.

17        First of all, USDC is heartland, like a property of

18   any kind, so it clearly falls into the same bucket as currency.

19        Second, there is no exception in that compo definition

20   for an expectation that the currency will remain stable if it

21   is unhedged.

22        So, for example, let's say instead of the South Africa

23   example, we take the example of a Nestle's share that trades on

24   a European exchange in euros, such that you are assuming euro

25   risk, maybe it's the case that people assume that over the life

P4aWeisO

1    of the swap, the euro is going to basically stay stable; that's

2    not a question that's in the compo swap analysis.  The question

3    is have you done something to hedge out that euro risk, right?

4    It's not about just what do we think the parties think about

5    the euro stability.  And here, there is no hedge out of the

6    USDC risk.  There's no hedge out of the USDC risk -- for

7    starters, I think it should go without saying USDC is not a

8    dollar, and USDC does not always remain pegged to a dollar

9    generally.  So there's independent volatility of USDC as

10   against the dollar.

11          But more importantly, it's important to remember the

12   markets that we're in, too, where the question is really what

13   is the relative value of the cryptocurrency pair?  Because as

14   Professor Jain explained during his testimony, what's important

15   is that because of these markets, you can have a situation

16   where USDC and MNGO, the relative value of those two things

17   moves around a lot at a particular time without the relative

18   value of USDC against the dollar or USDC against Bitcoin or

19   MNGO against Bitcoin or MNGO against the dollar moving around,

20   too, because it's about the liquidity conditions of that

21   particular pair on a particular exchange on a particular time.

22          THE COURT:  So what's the response to the argument

23   that Mango Markets treated USDC and USD as equivalents and

24   there was no exchange rate between the two, so in this

25   circumstance it's like the quanto example, meaning it is hedged

P4aWeisO

1    out in the context of Mango Markets?

2             MR. BURNETT:  It's a good question.

3             I think what's important is people were referring to

4    it as being like a dollar, but it was not hedged out.  So for

5    instance, if USDC did, in fact, diverge from the dollar for a

6    period of time, there was no mechanism that would have

7    corrected on Mango Markets to hedge out that difference, that

8    divergence from the dollar.

9             So what the defense is capitalizing on is that folks

10   in this universe make an equation in their minds between USDC

11   and dollars.  That is an assumption people make, but that is

12   not, in fact, hedged out.  And you know that the operation is

13   about USDC and not about USD, because Mr. Hermida explained the

14   way that the oracle actually functions.

15            And what does the oracle look at?

16            First, it looks at -- well, three things:

17            One, it looks at the price of USDC Mango Market on

18   AscendEx.  So that's clearly a USDC market.

19            Two, it looks at the FTX USD market, which the FTX

20   witness testified is a USDC market on FTX.

21            And third -- I'm sorry.  I apologize.

22            AscendEx is MNGO USDT.  And then Serum MNGO USDC, so

23   that's another USDC market.  And for the AscendEx market, the

24   one that's not USDC, the USDT one, Mr. Hermida testified that

25   they have a converter that converts USDT to USDC.  So that's

P4aWeisO

1    what the conversion is.  That's looking, that's hedging out an

2    exchange rate risk between USDT and USDC, which, I guess, A, is

3    strong evidence that folks actually do understand there's a

4    difference between stablecoins.  It's not like stablecoin means

5    equal to dollar at all the times.  But there was no additional

6    converter in that oracle that would have converted or tried to

7    normalize USDC against USD.  So if USDC had dropped to, say, 70

8    cents against the dollar, there was no mechanism that would

9    have hedged out the risk of that happening.

10            THE COURT:  OK.  That's helpful.

11            All right.  I'm going to switch gears on you.

12            MR. BURNETT:  OK.

13            THE COURT:  So, when the withdrawal of funds was

14   conducted and there was an account health check and the value

15   of Mr. Eisenberg's portfolio was measured, as to the MNGO

16   Perpetuals, the value of those Perpetuals was the settlement

17   price.  Is that right?

18            MR. BURNETT:  As to the MNGO --

19            THE COURT:  Or just maybe you can tell me how, what is

20   the value that was used?  It was an elevated value.  What was

21   it?  Meaning how did Mango Markets calculate the value of Mr.

22   Eisenberg's portfolio?  Just as a technical matter.

23            MR. BURNETT:  Yeah.  So I think the way it works is --

24   it's slightly different than what I think you're thinking.

25            The oracle price is, like, the settlement price, but

P4aWeisO

1    that doesn't reflect the full value of the position because

2    it's -- the position value is the difference between the

3    reference price --

4                THE COURT:  Right.

5                MR. BURNETT:  -- and that settlement number.  Yeah.

6                THE COURT:  Right.  And so there's the reference

7    price.  There's the oracle price.  The difference between the

8    two becomes the effective settlement price.  If whoever's ahead

9    on the contract wants to call it, then that's what you would

10   call it for.

11               MR. BURNETT:  Yes.

12               THE COURT:  OK.  And so it's that difference, which

13   I'll just call the settlement price, that's the value that is

14   attributed to the MNGO Perpetuals as part of the account health

15   check.

16               MR. BURNETT:  Yes.  Yes.

17               THE COURT:  OK.  All right.

18               Anything further?

19               MR. BURNETT:  Let me just check my notes here.

20               No.  I guess just the last point I'd make on the very

21   first question on this swap issue, the just convey the interest

22   argument, the sale question that the Court had, I think

23   Mr. Greenspan had mentioned that we don't cite, like, a statute

24   or regulations.

25               I actually think, A, the structure of the statute that

P4aWeisO

```
 1   we laid out on our letter is pretty clear about this difference
 2   between a sale and, like, a contingent right to something in
 3   the future.  But also if you read the joint rule-making, which
 4   we cite a passage of in that part of our letter, the
 5   fundamental issue that the CFTC is grappling with in that joint
 6   rule-making is how do we draw a distinction between sales and
 7   options, such that we're not sweeping in sales.  Like, there's
 8   whole sections about the joint rule-making that are about, you
 9   know, we don't view these lists of commercial transactions as a
10   swap.  We view these as sales.
11        So I think this is, and there are references to this
12   in their guidance, but, like, this has been a, like,
13   fundamental issue that, like, the CFTC has consistently
14   grappled with going back to, I guess, before the first swap
15   definition was put in place, because at first you have to deal
16   with this in the context of what's a future and what's a
17   forward.  And then under the Commodity Futures Modernization
18   Act, so in 2000, that's the first time really the swap
19   definition comes in.  So they start grappling with it then too.
20   So what you're seeing in the joint rule-making is in reaction
21   to Dodd-Frank, but it's reflecting sort of a long line of CFTC
22   history that's grappling with this distinction.
23        So I think to say that this sale-swap difference and
24   making sure that -- there's an important difference between the
25   two of them is, like, made up is really -- just denies the
```

P4aWeisO

1   whole history of the agency on this statute.

2              THE COURT:  Yeah.  You're not saying that the

3   sale-swap distinction, that's the reason.  You're saying the

4   basis for not saying that an ownership interest in USDC is

5   conveyed, it's just in the text of the statute, meaning that if

6   you just looked at the text you would need to have the transfer

7   of an ownership interest, even if it's in the future, at the

8   outset of the contract, and that's just not done here.

9              MR. BURNETT:  Yeah.

10             THE COURT:  There's no evidence.  It's not disputed,

11  that that didn't happen here because you would have to measure

12  at later points in time what was occurring, and based on that,

13  there would be a potential transfer of USDC between the

14  parties.

15             MR. BURNETT:  Yes.

16             THE COURT:  OK.

17             All right.  Thank you very much.

18             Mr. Greenspan, last words.

19             MR. GREENSPAN:  Last words, please.  And I will keep

20  it brief.

21             Just a couple points in response to what the

22  government just said about mixed swaps.

23             I think the government said something like, that

24  everyone makes it an equation in their mind, that USD and USDC

25  are the same, and I'm sorry if I'm -- I'm paraphrasing, of

P4aWeisO

1    course.  That's not a quote.

2            But that's the point that we're trying to make.

3    Right?  The parties' intent here was not to speculate on USDC.

4    In fact, it wasn't even possible to speculate on USDC by buying

5    MNGO Perpetual, and that's, you know, what the joint release

6    talks about in evaluating whether something is a mixed swap or

7    a securities-based swap or something else.  And so, you know,

8    if you had a situation -- and the government talked about USDC

9    falling off its peg; of course, that didn't happen here.

10   Right?  So that's one.  But even if it did -- and we wrote

11   about this briefly in our letter -- both sides would lose.

12   Right?  Because everyone assumes that USDC -- you know, they're

13   getting paid out in USD, but it's mechanically happening in

14   USDC.  So that risk isn't transferred.

15           So the question is what risk is transferred?

16           If USDC drops in value, that risk affect both sides.

17   It's not transferred, and it has nothing to do with the

18   intention of the parties in the first place.  So you know, if

19   you -- again, I think the easiest way to evaluate this is to

20   focus on the joint release's statement that the purpose of the

21   instrument is what you should focus on.

22           The purpose here is crystal clear.  The evidence was

23   totally unrefuted, and it all came from Tyler Shipe and the

24   documentation, that this was about trading the future price of

25   MNGO and the mechanics of this only back that up.  There was no

P4aWeisO

1  way and no one would ever buy the MNGO Perpetual in order to

2  speculate on USDC.  So that's my point on that.

3          The venue piece, my colleagues just pointed out that I

4  didn't address the notion that Mr. Eisenberg still had money on

5  AscendEx at the time of the freeze.  Mr. Eisenberg lost money

6  on AscendEx.  The money that he had on AscendEx wasn't part of

7  the loss amount that's been calculated.  It has nothing to do

8  with the scheme that he's been charged with.  So that clearly

9  couldn't be in furtherance and/or frustrating him.  First of

10 all, it's not in furtherance.  It frustrates his ability.  And

11 second of all, in time and in terms of scheme completion, it

12 has nothing to do with what he was charged with.

13         THE COURT:  All right.  Thank you very much.

14         Mr. Burnett, any questions, logistical or otherwise,

15 at this time?

16         MR. BURNETT:  OK.  To avoid -- to correct our venue

17 answer at the very beginning, it's vacatur under that 2023

18 case, not acquittal.

19         THE COURT:  OK.  All right.  Thank you.  You spared

20 yourself having to put in a further letter on that point.

21         MR. BURNETT:  Every sentence I can reduce.

22         THE COURT:  OK.

23         All right.  Mr. Greenspan, any further issues at this

24 time?

25         MR. GREENSPAN:  You know, I guess -- I think the

P4aWeisO

 1    answer's going to be no, but if the Court has any questions

 2    about fraud, we're all here and we'd love to answer them.

 3              THE COURT:  Not at this time.  I think the parties

 4    have given me enough, but if the Court has any questions we'll

 5    issue an order and you can get us those answers in writing.

 6              MR. GREENSPAN:  OK.  Thank you, your Honor.

 7              THE COURT:  All right.

 8              Excellently argued on both sides.  Thank you very

 9    much.  I know it's been long, so I thank both sides.

10              And thank you, Mr. Eisenberg as well.

11              All right.  We are adjourned.

12              (Adjourned)

13

14

15

16

17

18

19

20

21

22

23

24

25