

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Jacob K. Javitz Building*
*26 Federal Plaza*
*New York, New York 10278*

April 22, 2025

**By ECF**
Hon. Arun Subramanian
United States District Judge
United States District Court
500 Pearl Street
New York, NY 10007

> Re:    **United States** v. **Avraham Eisenberg**, 23 Cr. 10 (AS)

Dear Judge Subramanian:

  The Government respectfully submits this letter in advance of the May 1, 2025 sentencing of Avraham Eisenberg. The defendant is being sentenced for (1) his conviction after trial for committing wire fraud, commodities fraud, and commodities manipulation and (2) his conviction, pursuant to a guilty plea, for possessing child sexual abuse material ("CSAM"). The Government respectfully submits that the Court should impose total term of 78 to 97 months' imprisonment. The Government also respectfully requests that, in imposing that term of imprisonment, the Court specify that it is sentencing the defendant to a term of imprisonment within or below the stipulated Guidelines range on the child-pornography offense, so that it is clear which aspects of the defendant's sentence are subject to the terms of his written plea agreement.

## I.    Background

### A.    The Defendant's Fraudulent Scheme

  The defendant orchestrated a brazen scheme to fraudulently steal mammoth sums of cryptocurrency from unsuspecting investors. The Court is already familiar with the mechanics of that scheme: The defendant created accounts on FTX, AscendEx, and Mango Markets, lying about his identity and whereabouts in the setup process. Once those pieces were in place, the defendant created a massive MNGO Perpetual position on Mango Markets by trading between two accounts that he controlled. The defendant then used the accounts he had created on FTX and AscendEx, along with another platform called Serum, to pump up the value of MNGO relative to USDC. This caused the settlement price of the "long" MNGO Perpetual position he had created to skyrocket, creating the misleading impression that one of his accounts on Mango Markets was extraordinarily valuable. Armed with that seemingly valuable asset, the defendant "borrowed" huge sums of cryptocurrency that other investors had placed on Mango Markets, even though he had no intention to repay those loans. He then turned from pumping the value of MNGO/USDC to dumping, causing the relative value of MNGO to plummet. As a result, the value of the "short" MNGO Perpetual position he had created rose, allowing the defendant to "borrow" whatever

cryptocurrency remained on Mango Markets. By the time the defendant was done, he had stolen over $100 million worth of cryptocurrency from other investors on the platform. PSR ¶¶ 15-37.

Because the Court presided over the trial, the Government will not recite all the details of the defendant's crime. But it bears emphasizing that, at each step of the defendant's scheme, it was clear that the defendant knew he was breaking the law and was acting with intent to defraud.

The defendant went into his criminal endeavor knowing full well that fraudulent market manipulation is illegal, and that the cryptocurrency space was no exception. For example, months before his crime, in July 2022, the defendant filed a lawsuit of his own, arguing that others had violated the Commodities Exchange Act ("CEA") through a fraud and market-manipulation scheme related to cryptocurrencies. (GX1704; GX609.) In September 2022—the month before the offense—the defendant posted on social media about a federal indictment for commodities fraud arising out of market manipulation and about an SEC market-manipulation case related to cryptocurrency. (GX800, 800A, 802, 802A.) And just days before committing his crime, the defendant did research on fraud and market manipulation, in between running internet searches to prepare for his crime. (GX119A.)

The defendant had no illusions that his scheme was anything other than fraudulent market manipulation. Weeks before the crime, the defendant described his nascent plans to someone on Discord. (GX502A.) He was explicit about both his intent to manipulate and his plan to use the borrowing function to obtain other people's cryptocurrency, despite having no intention to repay the loan. For example, the defendant began the conversation by describing the scheme as, "you buy a ton, massively increase the price, and borrow on lending to lever," adding "[y]ou don't need to sell. You can just let the loan stand." (*Id.*) He went on to describe a plan to "pump" MNGO then "dump" after, remarking that "Mngo has a lending market" so he could "pull borrows." (*Id.*)

In light of this understanding that he was about to commit a crime, the defendant went about his scheme in a manner designed to make it more difficult for others to be able to quickly identify him as the perpetrator. This took the form of submitting false information to the two centralized exchanges—FTX and AscendEx—that he needed to use for the crime. With respect to FTX, the defendant obtained and used personal identifying information, including a passport, belonging to a Ukrainian woman. (GX116, 116B, 1219, 1247.) As for AscendEx, the defendant selected an account creation option that did not require immediately submitting "Know Your Customer" information and falsely made it appear that he was in Poland, rather than the United States. (GX1513.) These actions allowed him to use FTX and AscendEx when he otherwise would have been unable to do so, and it placed a layer of distance between his true identity and the manipulative scheme that he used those accounts to commit.

The defendant's evasive actions continued after draining Mango Markets of all investor funds. First, the defendant made sure that the cryptocurrency he stole was not in a place where it could be frozen by sending it off of the Solana blockchain. (GX1357.) Then, once the assets were secreted away, the defendant approached Mango DAO with what was, at bottom, a ransom note, offering to return a portion of the stolen cryptocurrency, but only if members of the Mango DAO agreed not to pursue any criminal investigations or efforts to freeze his other assets. (GX1003.) The defendant sent that message anonymously—maintaining his secrecy even after having completed his crime. (*Id.*)

The defendant's fortunes changed the next day. On the morning of October 12, 2022, a blogger covering the cryptocurrency industry published an article speculating that the defendant was behind the Mango Markets scheme. (DX70.) The defendant viewed that article in the late morning (*see id.*), and within an hour booked a ticket to leave the United States for Israel that same day, (GX604). Messages he later sent to friends confirmed that this was not a planned trip, but that he instead left in a hurry. (GX110.) The defendant also improved the offers he was making to the Mango DAO, continuing to extract an assurance that members of the Mango DAO would not pursue a criminal investigation or try to freeze his other assets. (GX901.)

Ultimately, the defendant made it to Israel and received the promises he demanded from the Mango DAO. At that point, the defendant decided to publicly come forward and take responsibility on social media. That public announcement was posturing: The defendant claimed that he had engaged in a legal trading strategy with a group of other people, making it seem that he had nothing to hide. In reality, the defendant knew he had committed a crime and had tried to conceal his involvement, coming forward only after others had identified him and he had both fled the country and received what he believed were promises from the Mango DAO that they would not make the case criminal.

**B.    The Arrest and Possession of CSAM**

The defendant remained in Israel for several months after his crime, which he described to a friend as "[h]anging out internationally until stuff blows over." (GX112.) Eventually, in late December, the defendant decided it was safe to return and booked a return ticket to Puerto Rico.

On December 23, 2022, the Honorable Gabriel W. Gorenstein authorized a complaint, charging the defendant with committing commodities fraud and commodities manipulation. Federal law enforcement officers arrested the defendant on that complaint when the defendant arrived in Puerto Rico on or about December 26, 2022. At the time of his arrest, the defendant possessed multiple electronic devices, and the Government subsequently obtained a warrant to search those devices. During a review of those devices, law enforcement officers identified child sexual abuse material, and the Government obtained a second search warrant to search for evidence of child-pornography offenses. (PSR ¶¶ 45-46.)

A review of the defendant's devices pursuant to that warrant showed that he had a significant history of downloading child sexual abuse material. Agents identified approximately 1,274 images and videos of child sexual abuse material, which the defendant downloaded between 2017 and 2022. Those materials included images and videos involving toddlers, as well as depictions of sadistic violence and masochism against children. (PSR ¶ 47.)

**C.    The Indictment, Guilty Plea, and Trial**

On January 9, 2023, a grand jury in the Southern District of New York returned an indictment charging the defendant with committing wire fraud, commodities fraud, and commodities manipulation.

On April 3, 2024, which was shortly before trial was scheduled to begin on the indictment, the defendant pled guilty to a one count information charging him with possessing child sexual

abuse material between 2017 and 2022. That plea was entered pursuant to a written plea agreement, in which the parties stipulated that the applicable Guidelines offense level was 28, which reflected enhancements for, among other things, more than 600 images, images involving prepubescent minors, and images that portrayed sadistic or masochistic conduct. Because the defendant was in Criminal History Category I, the stipulated Guidelines range was 78 to 97 months' imprisonment. (PSR ¶ 10.) The parties' plea agreement also contained an appellate waiver based on the stipulated Guidelines range.

After pleading guilty to possessing child sexual abuse material, the defendant proceeded to trial on the indictment related to his scheme involving Mango Markets. On April 10, 2024, a jury found the defendant guilty of all three counts in that indictment. (PSR ¶ 6.) Sentencing is currently scheduled for May 1, 2025.

## II.    Applicable Law

The advisory Sentencing Guidelines promote the "basic aim" of Congress in enacting the Sentencing Reform Act, namely, "ensuring similar sentences for those who have committed similar crimes in similar ways." United States v. Booker, 543 U.S. 220, 252 (2005). Along with the Guidelines, the other factors set forth in Title 18, United States Code, Section 3553(a) must be considered. Section 3553(a) directs the Court to impose a sentence "sufficient, but not greater than necessary" to comply with the purposes set forth in paragraph two. That sub-paragraph sets forth the purposes as:

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . .

Section 3553(a) further directs the Court to consider: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the statutory purposes noted above; (3) the kinds of sentences available; (4) the kinds of sentences and the sentencing range as set forth in the Sentencing Guidelines; (5) the Sentencing Guidelines policy statements; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a).

## III.    Discussion

### A.    Presentence Report – Offense Conduct

The Government respectfully submits that the Court should adopt the factual recitation of the offense conduct that is currently in the Presentence Report. Before the report was finalized, the defense made numerous objections to a draft of the Presentence Report. The Government provided written responses to those objections, which included agreeing to some modifications

and opposing many others.  The defense has maintained its objections to many provisions and has included the Government's response in its sentencing submission.  The Government stands on those responses and respectfully submits that the factual portion of the Presentence Report does not need revisions beyond those the Probation Office has already made.

**B.    The Applicable Guidelines Range**

The Presentence Report accurately calculated the applicable Guidelines range.  The Presentence Report begins by grouping the defendant's crimes into two groups: one for the Mango Markets scheme and another for his possession of CSAM.  The first group has a total offense level of 35, reflecting: a base offense level of 7; a 24-point enhancement for a loss greater than $65 million; a two-point enhancement for 10 or more victims; and a two-point enhancement for the use of sophisticated means.  (PSR ¶¶ 66-73.)  The second group has a total offense level of 31, reflecting: a base offense level of 18; a two-point enhancement for possessing material involving a prepubescent minor or minor under 12; a four-point enhancement for possessing material displaying sadistic conduct or abuse of an infant or toddler; a two-point enhancement for the use of a computer; and a five-point enhancement for possessing more than 600 images.  (PSR ¶¶ 74-82.)  Those groups combine for an offense level of 37.  (PSR ¶¶ 83-89.)  Because the defendant is in Criminal History Category I, this results in an applicable Guidelines range of 210 to 262 months' imprisonment.  (PSR ¶ 127.)

1.    Acceptance of Responsibility

As the defense notes, the calculation of the applicable Guidelines range in the Presentence Report does not, as a practical matter, properly reflect the fact that the defendant pled guilty to possessing CSAM.  As explained above, the defendant pled guilty to that offense before trial, and the parties stipulated that the applicable Guidelines range for that offense was 78 to 97 months' imprisonment.  That range incorporated a three-point reduction for timely acceptance of responsibility.  But because the defendant is now being sentenced for the child-pornography offense at the same time as his crimes involving Mango Markets, that reduction for acceptance of responsibility does not appear in the Probation Office's calculation of the Guidelines range.

The Government stands by the plea agreement and believes that the defendant should receive credit at sentencing for accepting responsibility for that crime.  That credit, however, should come in applying the Section 3553(a) factors, not in a change to the applicable Guidelines range because the Probation Office's calculation is legally correct.  The Sentencing Guidelines have application instructions that set forth the "order" in which courts must "apply[] the provisions of this manual," unless "specifically directed" otherwise.  U.S.S.G. § 1B1.1.  Those application instructions state that courts should first calculate the offense level and perform a grouping analysis and, only after that is complete, "[a]pply the adjustment as appropriate for the defendant's acceptance of responsibility." *Id.*  The Probation Office followed those instructions and, therefore, properly calculated the applicable Guidelines. Range.[1]  The appropriate way to account for the

---

[1] The defense correctly notes that, in *United States v. Kellum*, 372 F.3d 1141 (9th Cir. 2004), the Ninth Circuit held that, when a defendant pled guilty to crimes in one indictment, then proceeded to trial on crimes in a different indictment, it was not plain error to apply an adjustment for

acceptance of responsibility is in crafting a sentence under the Section 3553(a) factors, and the Probation Office was correct to reject the defendant's proposed revision to the Guidelines range.

2.   <u>Loss Amount</u>

The Probation Office was also correct to reject the defendant's objection to the 24-point enhancement for causing a loss of between $65 million and $150 million, pursuant to U.S.S.G. § 2B1.1(b)(1)(M). The defendant caused a loss of approximately $104 million, and the defense's arguments are contrary to the weight of the evidence and the plain text of the Guidelines.

The Sentencing Guidelines define "[a]ctual loss" to "mean[] the reasonably foreseeable pecuniary harm that resulted from the offense," with "pecuniary harm" referring to "harm that is monetary or that otherwise is readily measurable in money." U.S.S.G. § 2B1.1(b). The Guidelines also address "[c]redits [a]gainst [l]oss" in the notes, stating that "[l]oss shall be reduced" for a number of specified reasons, including for "money returned . . . by the defendant or other persons acting jointly with the defendant[] to the victim before the offense was detected." *Id.* note 3(D). The notes define "[t]he time of detection" narrowly to mean "the earlier of (I) the time the offense was discovered by a victim or government agency; or (II) the time the defendant knew or reasonably should have known that the offense was detected or about to be detected by a victim or government agency." *Id.*

Here, the Probation Office properly calculated the applicable Guidelines range because the reasonably foreseeable pecuniary harm that resulted from the defendant's crime was approximately $104 million. There appears to be no dispute that, during the offense, the defendant took approximately $114 million worth of cryptocurrency off of Mango Markets, and that approximately $10 million of that was cryptocurrency that the defendant had put onto the platform. That means the defendant took approximately $104 million worth of cryptocurrency belonging to other people, which is reasonably foreseeable pecuniary harm to those other people.

The evidence at trial established that the defendant was able to obtain that $104 million worth of cryptocurrency because of his criminal activity. Specifically, the Government presented extensive proof that the defendant was able to take $104 million worth of cryptocurrency off of Mango Markets because he fraudulently inflated, then crashed, the price of MNGO Perpetuals. (*See, e.g.*, GX1353-56.) And the Government presented evidence from the Mango Markets system showing that the defendant borrowed over $104 million worth of cryptocurrency before withdrawing it. (*See, e.g.*, GX914, 918, 1002.) This was in keeping with the plan the defendant articulated before committing the crime, which he described as pumping the value of his assets on Mango Markets and then "pull[ing] borrows." (GX502A.)

In resisting the clear conclusion that the defendant caused $104 million worth of losses, the defense tries to characterize the defendant's crime as solely borrowing without intent to repay. *See* Br. 68. That is not a fair account of the defendant's criminal scheme because it ignores half of his conduct. With respect to inflicting losses, the defendant's crime involved *both*

_____

acceptance of responsibility. The Government respectfully submits that this decision is inconsistent with Section 1B1.1 of the Guidelines.

(1) fraudulently manipulating the settlement price of MNGO Perpetuals, which had the effect of misleadingly inflating the value of his assets on Mango Markets for the health checks that Mango Markets ran on accounts and (2) fraudulently representing that he was borrowing cryptocurrency, when he had no intent to repay or pay interest. In other words, the misrepresentation about borrowing was only one way in which his crime caused losses; it also caused losses because of the fraudulent manipulation, which was an important part of why Mango Markets allowed the defendant to take as much as he did.

The fact that the defendant's crime was not limited to fraudulently representing his intention to "borrow" from Mango Markets means that the defendant's argument about whether the defendant actually borrowed 50 million USDC is irrelevant. Even assuming, *arguendo*, that the defendant did not borrow that cryptocurrency but instead, as the defendant claims, withdrew it from profits, the only reason the defendant had those profits was because he fraudulently manipulated the settlement price of MNGO Perpetuals. As a result, the 50 million USDC is properly considered a loss under the Guidelines. *See United States v. Phillips*, No. 22 Cr. 138 (LJL), 6/25/2025 Sentencing Tr., ECF Doc. 126 (calculating loss amount in commodities fraud case based on payment defendant received under swap he manipulated market to trigger).

In any event, the evidence shows that the defendant's claim that he did not borrow 50 million USDC is wrong. The defense's expert team has attempted to parse code for evidence that the defendant withdrew 50 million USDC from profits and did not borrow it. But there is no need for parsing code: The Government introduced evidence directly from Mango Markets on this point, and it unambiguously showed that the defendant borrowed 50 million USDC. First, the Government introduced screenshots of the defendant's account-activity pages on Mango Markets. Those account pages have a column labeled "borrows," which show that the defendant borrowed substantial amounts of cryptocurrency off of Mango Markets, including over 54 million USDC in the account beginning with 4ND8F. (*See* GX914, 918.) Second, the Government introduced evidence that Mango Markets kept records of the amount of each cryptocurrency borrowed from the platform. (Tr. 364-66; GX1002.) Those records showed that, as of approximately 6:00 pm on October 11—which was right before the crime—approximately 41 million USDC had been borrowed from Mango Markets. (GX1002.) By 8:00 pm, which was after the crime, approximately 95 million USDC had been borrowed. (*Id.*) This is consistent with the account pages showing that the defendant borrowed approximately 54 million USDC. Together, the evidence is clear: the defendant planned to borrow from Mango Markets in committing his crime, and that is exactly what he did.

Even the defense's evidence that the defendant was withdrawing profit actually supports the conclusion that he was borrowing. The FTI report's analysis of the 50 million USDC transaction code shows that the "allow borrow" function was toggled to "true." (*See* Dkt. 213-1 at 11-12.) Read in conjunction with the Mango Markets records, the natural inference is that, when "allow borrow" is set to "true," that is classified as a borrow. FTI's alternative interpretation— that the defendant did not borrow 50 million USDC—essentially boils down to the highly implausible argument that the Mango Markets website and its records do not properly interpret the Mango Markets code.

Separately, the defense appears to suggest that the defendant should receive a credit against the loss amount for cryptocurrency that he returned. (*See* Br. 69-71.) This is plainly wrong. For

one, the Guidelines state that reimbursement only counts as a credit against loss if the defendant makes the reimbursement before "the offense was discovered by a victim or government agency." U.S.S.G. § 2B1.1 note 3(D). That is not the case here because the defendant's partial repayment came after his crime was highly publicized.

Second, and more fundamentally, the idea that what the defendant did constitutes "money returned" for purposes of the Guidelines is preposterous. The Guidelines contemplate a situation in which the defendant wrongfully took money, then thought better of it and returned the money before the victims even knew it was missing. *See id.* That is far from what happened here. Instead, the defendant stole approximately $104 million worth of cryptocurrency, then used that as ransom, saying that he would return only some of the funds and do so only if the Mango DAO met a number of demands, including that Mango DAO use its treasury to make up the rest of investor losses, "waive any potential claims against accounts with bad debt," and "not pursue any criminal investigations or freezing of funds once the tokens are sent back." (GX1003.) Ultimately, this resulted in the defendant returning approximately $67 million worth of cryptocurrency, while forcing the Mango DAO to accede to his demands and pay approximately $37 million worth of cryptocurrency to make investors whole. The defendant subsequently used that agreement against Mango Labs when Mango Labs sued, arguing that the agreement constituted a binding settlement that prevented civil claims about the defendant's conduct. *See Mango Labs v. Eisenberg*, 23-cv-665 (LJL), Dkt. 35 (S.D.N.Y. Feb. 15, 2023). This was not returning funds in any genuine sense of the term. The defendant understood that his theft gave him enormous leverage, and he used that leverage to extract valuable concessions from Mango DAO.

Based on the record at trial, this Court should adopt the loss amount reflected in the Presentence Report.

3. <u>Number of Victims</u>

Next, the defendant argues that the Court should not apply a two-level enhancement for an offense involving 10 or more victims because there is only "one party that lost funds, the Mango DAO." (*See* Br. 71-76.) That argument is wrong for two reasons.

First, the defendant is factually wrong that the only party that lost funds was the Mango DAO. *See* U.S.S.G. § 2B1.1 note 1 (defining a "victim" as "any person who sustained any part of the actual loss determined under subsection (b)(1)"). The defendant's crime involved stealing funds from every investor who had cryptocurrency on Mango Markets, which was, according to Tyler Shipe, at a minimum hundreds of people. (Tr. 363.) The defendant eventually returned a portion of the funds he stole, and the Mango DAO used that money and its treasury to create a fund, from which Mango Markets users could claim reimbursement and assign any potential claims against the defendant to Mango Labs. (*See* Mango Labs Victim Statement at 4.) The vast majority of Mango Markets users received reimbursement through that process, but not all of them. According to Mango Labs, approximately 90% of victims claimed reimbursement. Dkt. 216 at 2. This leaves more than 10 uncompensated users, who are plainly victims under the Guidelines. *Id.* at 5 n.4.

Second, for purposes of the enhancement for 10 or more victims, it does not make sense to treat the Mango DAO as a singular entity, but rather as the collective group of all MNGO token

holders. As witnesses explained at trial, a "decentralized autonomous organization," or DAO, is akin to a "community group[]" where "people own the native token [MNGO]" and can vote on how to run Mango Markets. (*See* Tr. 96-97.) This included making decisions about how to use the Mango DAO treasury, which had about $70 million worth of cryptocurrency before the defendant's crime. (*See* Tr. 438.)

Aware of this structure, when the defendant agreed to return some cryptocurrency after committing his crime, he posted a proposal for the Mango DAO that made demands on MNGO token holders. Specifically, he demanded they make the following promises: "By voting for this proposal, *mango token holders* agree to pay [a] bounty and pay off the bad debt with the [Mango DAO] treasury, and waive any potential claims against accounts with bad debt, and will not pursue any criminal investigations or the freezing of funds." (GX1003 (emphasis added).) In other words, the MNGO token holders were making promises to use the treasury to repay investors and to give up their claims against the defendant. Giving up the cryptocurrency in the treasury was a pecuniary harm to those token holders. *Cf. United States v. Ryan*, 806 F.3d 691, 694 (2d Cir. 2015) (holding that spouses count as two victims for taking of joint property). And relinquishing the right to bring civil suits against the defendant was also parting with a valuable asset. *See United States v. Abiodun*, 536 F.3d 162, 168-69 (2d Cir. 2008) (finding victim includes one who, as a result of the defendant's conduct, lost something that "can be measured in monetary terms").[2] Because there were more than 10 MNGO token holders, this is a separate reason to apply the enhancement for 10 or more victims.

4. Sophisticated Means

Finally, the defendant objects to the two-point enhancement for the use of sophisticated means enhancement on the grounds that he did not use fraudulent identities to open accounts. (*See* Br. at 76.) The defendant concedes that the sophisticated-means enhancement is appropriate because the crime itself was sophisticated, so this objection has no bearing on the applicable Guidelines range. Nonetheless, the enhancement is also appropriate because, as explained above in the fact section, the defendant used another person's identity to access FTX. The defense's response appears to be that he used that person's identity because his own FTX account had been frozen and he obtained the identity by "purchas[ing] a company." (*See* Br. at 62.) But that evidence only supports the government's Guidelines position: The fact that the defendant needed to use someone else's identity to get on FTX because he had previously been locked out of the site is strong evidence he was trying to deceive FTX so it would be more difficult to identify him. Similarly, the fact that the defendant bought someone else's identity, instead of stealing it, does

---

[2] The defendant is wrong to claim that, because MNGO token holders received reimbursement, they did not give up anything by agreeing not to sue. Someone could be a MNGO token holder without having any assets on Mango Markets, and reimbursement was for funds taken by the defendant, not having to expend the Mango DAO treasury. The defendant also cannot claim that giving up the right to sue was an illusory promise when, as explained above, the defendant opposed Mango Labs' civil lawsuit on the grounds that members of the Mango DAO had agreed not to file civil claims against him.

not change the point that he was trying to make it seem like someone else was using the FTX account during his crime.

## C.   The Utility of the Guidelines

In addition to objecting to the Probation Office's calculation of the applicable Guidelines range, the defendant also challenges the usefulness of the Guidelines more broadly.   The Government, on the facts of this case, is already recommending a sentence that is meaningfully below both the applicable Guidelines range and the Guidelines range.   That said, the Guidelines are nonetheless a useful starting point for the Court's imposition of a sentence, particularly for the crimes related to Mango Markets.[3]

In his first challenge to the Guidelines, the defendant argues that the loss amount of loss" calculation in the Sentencing Guideline applicable to fraud offenses, U.S.S.G. § 2B1.1, is "not tethered to any empirical data or based on any criminal justice or economic objective" and thus warrants a downward variance.   Br. at 30.   This argument fails to consider that the Sentencing Guidelines, including the relevant fraud Guideline, were crafted through extensive and iterative work, including through various policy considerations, by the Sentencing Commission, and are an appropriate measure of the seriousness of the offense in this case.

"One of the central reasons for creating the sentencing guidelines was to ensure stiffer penalties for white-collar crimes and to eliminate disparities between white-collar sentences and sentences for other crimes."   *United States v. Davis*, 537 F.3d 611, 617 (6th Cir. 2008).   "[T]he sentencing guidelines sought to address the inequities of prior sentencing practices that tended to punish white collar economic crimes less severely than other comparable blue collar offenses." *United States v. Fishman*, 631 F. Supp. 2d 399, 403 (S.D.N.Y. 2009).

Over a five-year period between 1996 and 2001, the Commission engaged in a deliberative process to address the Guidelines' treatment of white-collar offenses, with the involvement of relevant stakeholders including the defense bar, the Department of Justice, probation officers, and the U.S. Judicial Conference.   *See* Federal Register Notice BAC2210-40, 62 Fed. Reg. 152, 171-74 (1997) (proposals by the Commission for comment regarding economic crime sentencing reform).   The Commission explained that the resulting amendments, which became effective on November 1, 2001, were based on the determination that "loss serves as a measure of the seriousness of the offense and the defendant's relative culpability."   Sentencing Guidelines for the United States Courts, 66 Fed. Reg. 30,512, 30,533 (June 6, 2001).   Thus, the 2001 amendments to Section 2B1.1 reflected the considered view of the Commission, following a collaborative process with relevant stakeholders, that loss amount should be a central consideration in determining the seriousness of an offense to which that Guideline applies.   Indeed, "[e]ven if the enhancements may lack robust empirical support related to deterrence, they have foundations in empirical data

---

[3] The Government recognizes that, in *United States v. Dorvee*, the Second Circuit noted that district courts should "take seriously the broad discretion they possess" to vary from the Guidelines range in child-pornography cases.   616 F.3d 174, 188 (2d Cir. 2010).

and national experience related to the goals of fair sentencing and retribution." *United States v. Moose*, 893 F.3d 951, 958 (7th Cir. 2018).

In 2002, following major corporate fraud at Enron, WorldCom, and Adelphia, Congress instructed the Commission to amend the Guidelines for white-collar crime again, this time as part of the Sarbanes-Oxley Act, and in response the Commission amended the modified loss-amount enhancement in Section 2B1.1 for high-loss cases — that is, cases involving loss amounts in excess of $200 million. *See* U.S. Sentencing Comm'n, Emergency Guidelines Amendments, 15 Fed. Sentencing Reporter 281, 283 (Apr. 1, 2003) ("[T]he amendment expands the loss table at §2B1.1(b)(1) to punish adequately offenses that cause catastrophic losses of magnitudes previously unforeseen, such as the serious corporate scandals that gave rise to several portions of the Act."), *available at* 2003 WL 22016909. Thus, to the extent Section 2B1.1 emphasizes loss amount to the degree it does, that was an intentional decision by the Commission based on years of consideration and guidance from Congress. *See United States v. Ebbers*, 458 F.3d 110, 129 (2d Cir. 2006) ("Congress has directed that the Guidelines be a key component of sentence determination. . . . [T]he Guidelines reflect Congress's judgment as to the appropriate national policy for [white collar] crimes.").

The defendant's challenge to the loss Guidelines relies principally on *United States v. Algahaim*, 842 F.3d 796, 800 (2d Cir. 2016).[4] But that decision did not grapple with the aforementioned history of thoughtful deliberation from Congress and the Sentencing Commission that went into the Guidelines. And though the Sentencing Commission has amended the Guidelines, including U.S.S.G. § 2B1.1, since the Circuit's *Algahaim* decision, it has not changed its methodology for using loss to calculate level increases. *See, e.g.*, United States Sentencing Commission, "Amendment 827," *available at* https://www.ussc.gov/guidelines/amendment/827.

In fact, courts in this Circuit have continued to use the Guidelines are a starting point for sentencing calculations, as well as considering 3553 factors. For example, in *United States v. Jergensen*, the defendants similarly attacked the loss table in Section 2B1.1 of the Guidelines as "substantively unreasonable" in reliance on *Algahaim*. *United States v. Jergensen*, 797 F. App'x 4, 7 (2d Cir. 2019). And, as the Second Circuit noted there, the district court "recognized that 'loss can be an imperfect measure of the seriousness of an offense,' stated that it understood that it could vary form the Guidelines on that basis, and then denied a variance." *Id.* On that basis, the Second Circuit declined to find that the sentences were substantively unreasonable. *Id.* at 8. Indeed, even in *United States v. Johnson*, another case that Eisenberg cites at length, Judge Garafius, while critiquing the relevant fraud Guideline, did not apply a downward variance, but instead, "look[ed]

---

[4] Though the Second Circuit in *Algahaim* remanded to "permit the sentencing judge to consider whether the significant effect of the loss enhancement, in relation to the low base offense level, should result in a non-Guidelines sentence," 842 F.3d at 800, the district court, upon remand and written submissions by the parties, reaffirmed its original sentence, see *United States v. Jones*, 777 F. App'x 18, 19 fn. 1 (2d Cir. 2019) (citing *United States v. Murshed et al.*, No. 13 Cr. 489 (N.D.N.Y. Apr. 26, 2017), ECF No. 205).

closely at the Section 3553 factors to guide the court to a reasonable sentence." No. 16-CR-457-1 (NGG), 2018 WL 1997975, at *4 (E.D.N.Y. Apr. 27, 2018).

Separately, the defendant suggests that "[o]verall, prosecutions in the cryptocurrency space have routinely resulted in lenient sentences . . . in recognition of the novelty of cryptocurrency and the lack of established regulation and guidance in the industry." (*See* Br. at 35.) The defendant suggests that he, too, should receive a significant downward variance, in part, because his crime involved cryptocurrency.

There is not, and should not be, a bespoke sentencing reduction for cryptocurrency cases. There is nothing new or uncertain about the idea that fraud is a crime, whether it involves cryptocurrency or not. Nor does stealing hurt victims less because the perpetrator steals cryptocurrency, instead of money or another asset.

Sentencing decisions in the cryptocurrency space line up with those realities. The cases defendant cites as examples of defendants receiving lenient sentences all involve crimes related to unlicensed money transmitting or failing to implement anti-money laundering programs. *See, e.g.*, *United States v. Arthur Hayes*, 20 Cr. 500 (S.D.N.Y.); *United States v. Changpeng Zhao*, 23 Cr. 179 (W.D. Wash. 2023); *United States v. Flashdot Limited et al.*, 24 Cr. 168 (S.D.N.Y. 2024). The lengths of the sentences in those cases reflect the regulatory nature of the crimes. By contrast, courts have not hesitated to impose significantly longer sentences in cryptocurrency cases involving fraud. *See, e.g.*, *United States v. Lichtenstein*, 23 Cr. 239 (D.D.C. 2024) (60 months for fraudulent theft of Bitcoin); *United States v. Bankman-Fried*, 22 Cr. 673 (LAK) (25 years for misappropriation of cryptocurrency and other offenses); *United States v. Harmon*, 21 Cr. 433 (BAH) (D.D.C.) (51 months for sealing 712 bitcoin from the bitcoin mixer Helix); *United States v. Sharma*, 18 Cr. 340 (LGS) (8 year imprisonment for stealing millions from investors in initial coin offering). Consistent with these decisions, the defendant should not receive a downward variance simply because he committed his fraud in the cryptocurrency space.

### D.   The Court Should Impose a Sentence of 78 to 97 Months' Imprisonment

The Government respectfully submits that the Court should impose a below-Guidelines sentence of 78 to 97 months' imprisonment. This sentence is necessary to, among other things, appropriately reflect the gravity of the defendant's crimes, promote respect for the law, deter the defendant from future criminal activity, and protect the public.

#### 1.   The CSAM Conviction

The defendant possessed images depicting sexual abuse of children—including infants as young as two-to-six months old. (PSR ¶ 45-48.) These images included depictions of sadistic violence and masochism against children. (*Id.*). What is shown in these images is heartbreaking. And it speaks to the dangerousness of the defendant's conduct—providing a demand for these videos only encourages their creation, which encourages further victimization. The victims of these crimes—the children who were abused—are entitled to a just sentence here.

The defendant's conduct in possessing and viewing CSAM is incredibly serious, and a significant sentence is necessary to reflect the seriousness of the offense, to promote respect for

the law, and to protect the public. As the Second Circuit has observed, "[C]hild pornography crimes at their core demand the sexual exploitation and abuse of children. Not only are children seriously harmed—physically, emotionally, and mentally—in the process of producing such pornography, but that harm is the exacerbated by the circulation, often for years after the fact, of a graphic record of the child's exploitation and abuse." *United States v. Reingold*, 731 F.3d 204, 216 (2d Cir. 2013). Indeed, the Supreme Court recognized that a child exploitation victim "suffers continuing and grievous harm as a result of . . . knowledge that a large, indeterminate number of individuals have viewed and will in the future view images of the sexual abuse." *Paroline v. United States*, 572 U.S. 434, 457 (2014) (also finding that harm to a victim is caused by "the trade in her images," and that a defendant who possessed such images "is a part of that cause, for he is one of those who viewed her images.").

"Harms of this sort are a major reason why child pornography is outlawed," and "[t]he unlawful conduct of everyone who reproduces, distributes, or possesses the images of the victim's abuse . . . plays a part in sustaining and aggravating this tragedy." *Id.* CSAM possession is far from a victimless crime—it "create[s] a market for child pornography and thus harm[s] children, scarr[ing] [them] for life." *United States v. Gouse*, 468 F. App'x 75, 78 (2d Cir. 2012).

There are severe and long-lasting harms associated with the sexual exploitation of children. And CSAM is illicitly traded through difficult to detect channels, including on portable media and the dark web, and the defendant amassed a large collection of such material before he was caught when he was arrested for committing entirely different crimes. Demand for this kind of material only perpetuates the market, and has caused, and will continue to cause, intense pain and suffering to the victims whose brutalization was depicted in the images and videos that the defendant possessed. Such demand, combined with the difficulty in detecting the distribution of this illicit material, necessitates that sentences for these crimes send the message that deters individuals— including the defendant— from engaging in this type of criminal activity.

2. The Fraud and Manipulation Convictions

The fraud the defendant perpetrated on Mango Markets and its users was also a brazen crime that requires a separate, substantial punishment.

For one, a significant sentence is necessary to reflect the severity of the crime and promote respect for the law. It is worth keeping in mind the state of play before the defendant's crime. Mango Markets was a burgeoning cryptocurrency platform, with a significant number of users, who put assets onto the platform looking to make a return through lawful means. The defendant saw that as an opportunity for exploitation. He devoted time, energy, and resources to devising a fraudulent and manipulative scheme that wiped out the assets of the investors on Mango Markets and shut down the platform for a substantial period of time. A fraud that takes over $100 million from investors and effectively shuts down a business is a shocking violation of criminal law, and it necessitates a sentence commensurate with the crime.

In seeking to minimize the severity of his conduct, the defendant repeatedly claims responsibility for making sure that investors were made whole. That argument is not remotely credible; in fact, it is a cover that the defendant has been planning since soon after committing his crime. To be clear, the reason investors on Mango Markets lost all their cryptocurrency is because

the defendant stole it. He also did not give all the stolen cryptocurrency back. Instead, he returned a portion of it for a promise that token holders would not sue or pursue criminal investigations, and the Mango DAO reimbursed the rest from the Mango DAO treasury. The defendant should not receive credit for the fact that a *different group of people* reimbursed investors for $37 million worth of losses that he inflicted. And the defendant's attempt to argue otherwise is particularly galling in light of the fact that, shortly after the crime, the defendant texted a friend to tell him that he planned to push for investors to be reimbursed in his negotiations to "[g]et[] rid of sympathetic victims" and leave the Mango DAO with all the losses. (*See* Ex. 1.)

Separately, a significant term of imprisonment is also necessary to deter the defendant and others from committing similar crimes in the future. The legislative history of Section 3553 demonstrates that "Congress viewed deterrence as 'particularly important in the area of white collar crime.'" *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (citing S. Rep. No. 98-225, at 76 (1983), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3259); *see also United States v. Mueffelman*, 470 F.3d 33, 40 (1st Cir. 2006) (deterrence of white-collar crime is "of central concern to Congress").

General deterrence is a particularly important sentencing factor in fraud and other white-collar cases because the decision to commit those crimes is often a calculated cost-benefit decision. *Martin*, 455 F.3d at 1240 ("Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence."). As Judge Posner observed, "[c]onsiderations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expedited benefits of a crime and hence the punishment required to deter it." *United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994); *see United States v. Zukerman*, 897 F.3d 423, 429 (2d Cir. 2018) (citing *Heffernan*).

Here, both general and specific deterrence necessitate a significant sentence. The defendant put substantial planning into his scheme, profited handsomely from it, and (after he was identified) gave interviews based on the moment of cryptocurrency fame he garnered from the crime. All the while, the defendant knew that what he was doing was unlawful. These facts demand a substantial sentence to deter a copycat from trying a similar scheme and to ensure that the defendant does not again put his efforts to making quick money by defrauding others.

The defendant argues in mitigation that he "researched the legality of the MNGO trade;" that he "acted in an environment where the practice of actively identifying and exploiting vulnerabilities or 'bugs' in cryptocurrency platforms is commonplace and financially rewarded;" and that he intended to repay "a substantial amount" of the money he obtained before he was charged. (Br. 13.) All three of these arguments are directly contracted by the trial record.

*First*, the defendant knew what he was doing was illegal. As outlined during the trial and described in the fact section above, the defendant:

- Sued another person for price manipulation. (GX 1704; 609.)
- Posted about criminal charge for market manipulation on September 1, 2022. (GX 800, 800A.)

- Tweeted a press release about the "SEC going after a market maker for manipulating trading volume and price of crypto 'securities.'" (GX 802, 802A.)
- Searched for the "elements of fraud," and "statute of limitations market manipulation." (GX 119A.)

Most basically, as soon as he saw a tweet that stated, "[w]ho was the hacker that stole more than $100,000,000 USD from @mangomarkets last night?" (DX70), the defendant fled the country. (GX 604.) Indeed, as he was fleeing the country, he searched for "market manipulation criminal." (GX 121A.) The defendant even searched for "ottisville prison"–a designated Bureau of Prisons facility for many white collar criminal defendants—and searched for a list of Israel extraditions. (GX 123, 124.) Simply put, the idea that the defendant "researched" his scheme and wrongly concluded it was legal was simply belied by the record, rejected by the jury, and does not square with common sense at all. Instead, the Court should draw the opposite inference—a more serious sentence is warranted because of the defendant's extensive premeditation of the scheme.

*Second*, the defendant's reliance on the existence of "bug bounties" in cryptocurrency platforms makes no sense here because Mango Markets *had* a bug bounty program. (GX 1011 at 123.) The problem for the defendant is the bug bounty would not pay out because it did not apply to "[a]ttacks that the reporter has already exploited themselves, leading to damage," *id.*, and the defendant did not use the program. Accordingly, that the defendant did not alert Mango Markets to this perceived weakness *before executing* his scheme is an aggravating factor.

*Third*, the defendant's "intent" to repay is hardly persuasive given that he demanded immunity from Mango Markets in return for giving back *some* of the money. Specifically, in exchange for returning *some* of the stolen funds, the defendant demanded that Mango Markets agree not to pursue "criminal investigations or freezing of funds." (GX 901.) That was not the defendant returning money out of the goodness of his heart—that was the defendant making a ransom demand that is part of the scheme. Again, this is far from mitigating conduct—it is simply further criminal activity that weighs on the side of punishment.

*Finally*, the defendant relies on the "reaction of the crypto community," to contend that some people on the internet had "mixed" views on whether his conduct was "legal and/or acceptable." (Br. 16.) To this end, the defendant cites Discord threads and cryptocurrency investors for the idea that the "tenor of the discussion demonstrates just how unsettled the law was." (Br. 18.) There is a reason that courts and juries do not rely on internet forums to determine whether conduct is lawful or to judge guilt or innocence. Here, a unanimous jury found the defendant guilty on all counts, which included finding beyond a reasonable doubt that he had the intent to defraud and knew his conduct was unlawful. The defendant cannot rely on cherry-picked excerpts from a chat room to mitigate the reality that he knew what he was doing was illegal and deceitful.[5]

---

[5] The defendant points to several factors, including his upbringing, and the conditions of his confinement at the Metropolitan Detention Center ("MDC") as a justification for a downward variance. While the Court can and should take these circumstances into account in fashioning an appropriate sentence, none of those factors justify the variance the defendant seeks. And while a

### E.    The Defendant Has Not Shown that Section 13(a)(5) Applies to Him

The defendant does not qualify for relief from imprisonment under 7 U.S.C. § 13(a)(5). Section 13(a)(5) states that "no person shall be subject to imprisonment . . . for the violation of any rule or regulation if such person proves that he had no knowledge of such rule or regulation." The defendant has not carried that burden with respect to either of the CEA counts. The defendant does not, and cannot, argue that he lacked knowledge of the anti-manipulation of statute under which he was convicted because he filed a lawsuit under that statute months before committing his crime. (GX1704; GX609.) As for commodities fraud, the defendant has not submitted any evidence—such as an affidavit—showing that he did not know about Rule 180.1, so he cannot carry his burden of proof. The evidence at trial also showed that he did, in fact, know about that regulation before committing his crime: The defendant tweeted excerpts of the indictment in *United States v. Phillips*, which charged a violation of Rule 180.1. (GX800, 800A.) And days before the crime, the defendant viewed an article called "Market Manipulation Under Federal US Law," which includes a discussion of Rule 180.1. (GX119A (link to https://www.rahmanravelli.co.uk/articles/market-manipulation-in-the-us-explained/).) This supports a strong inference that the defendant knew about the commodities-fraud regulation at the time of his offense.

## IV.    Conclusion

For the foregoing reasons, the Government respectfully submits that the Court should impose total term of 78 to 97 months' imprisonment

Respectfully submitted,

JAY CLAYTON
United States Attorney

by: _/s/_____
Thomas Burnett/Peter Davis
Assistant United States Attorneys

Tian Huang
Special Assistant United States Attorney

---

number of courts in this District have previously found that the conditions at MDC were in need of significant improvement, the MDC has over recent months taken serious steps to address those issues and has steadily improved conditions, increasing staffing levels and addressing persistent medical issues. As Judge Caproni noted, "MDC is improving every day." (24 MJ 4261 (UA) (VEC), Dec. 10, 2024 Tr. 15.)