UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                          Plaintiff,<br><br>           -against-<br><br>AVRAHAM EISENBERG,<br><br>                        Defendant. | 23-cr-10 (AS)<br><br><br>OPINION AND ORDER |

ARUN SUBRAMANIAN, United States District Judge:

After a nine-day trial, a jury convicted cryptocurrency investor Avraham Eisenberg of commodities fraud, commodities manipulation, and wire fraud. Dkt. 152. Eisenberg moves for relief under Federal Rule of Criminal Procedure 29, arguing that the evidence at trial was insufficient to sustain these convictions. Dkt. 182. For the following reasons, the motion is GRANTED. The Court vacates counts one and two and will enter a judgment of acquittal on count three.

## BACKGROUND

On January 9, 2023, the government charged Eisenberg in a three-count indictment for defrauding an exchange called Mango Markets and stealing over $100 million worth of cryptocurrency. *See* Dkt. 4 ¶ 1. Mango Markets is a platform where investors can buy and sell both the platform's native crypto token, MNGO, and a derivative product called a "MNGO Perpetual." A MNGO Perpetual is essentially a futures contract—that is, an "agreement to purchase or sell a particular asset on a later date at a predetermined price." *Choi v. Tower Rsch. Cap. LLC*, 2 F.4th 10, 13 n.2 (2d Cir. 2021). A futures contract allows investors to "take positions on future values of" an asset; the investor who holds the short position (i.e. agrees to sell) bets that the value of the asset will go down, while the investor who holds the long position (i.e. agrees to buy) bets that it will go up. *See id.* at 13; *Leist v. Simplot*, 638 F.2d 283, 286 (2d Cir. 1980); *Ryder Energy Distrib. Corp. v. Merrill Lynch Commodities Inc.*, 748 F.2d 774, 776 (2d Cir. 1984); Tr. 224:4–23. Futures contracts can be settled by "price settlement," in which "one party pays the other for the difference" in the price of the underlying asset on a predetermined date without exchanging the actual asset. Tr. 225:2–9. To use the futures contract analogy, the "asset" underlying a MNGO Perpetual is the MNGO token.[1]

Unlike a traditional futures contract, there is no predetermined settlement date for a MNGO Perpetual. Tr. 228:2–10. Instead, the parties can realize profits during the pendency of the contract.

---

[1] The parties dispute whether the underlying asset is just the MNGO token, or rather the relative value of MNGO and USDC tokens. The Court need not resolve this dispute, so for simplicity's sake, this opinion refers just to MNGO.

For example, if the price of MNGO rises from the reference price (that is, the price of MNGO when the contract was formed), then the party holding the long position will have an unrealized gain. A "mechanism in the [MNGO Perpetual] contract" allows the winning party to force the losing party to pay them that unrealized gain. After that, the parties' contract "continue[s] on" with a new reference price. Tr. 237:3–18.

For these settlement payments, the contemporaneous price of MNGO is determined by reference to a pricing "oracle." Tr. 238:19–239:6. An oracle "aggregat[es] prices across a variety of other venues" to determine the "fair market value of an asset." Tr. 109:20–25. The MNGO Perpetuals oracle pulls data from three other cryptocurrency exchanges—FTX, AscendEX, and Serum—to determine the average spot price of MNGO, and thus the parties' unrealized loss or gain. Tr. 455:16–21.

MNGO Perpetuals have one other distinct feature. So that the futures market stays tethered to the price of the MNGO token, the parties exchange a series of payments based on the so-called "funding rate." Tr. 233:1–11. To understand the funding rate, it helps to understand how a perpetual contract is created. One party will enter a "bid," or an offer to buy into the perpetual, at an opening reference price; the other party will enter an "ask," or offer to sell. Tr. 229:6–231:9. When the terms match, the exchange creates a contract between the buyer and seller. Tr. 231:15–232:2. The average midpoint of these "bids" and "asks" sometimes deviates from the oracle price for MNGO. If the order-book mid-price is lower than the oracle price, the party holding the short position must pay the party holding the long position to induce them "to bid up the order-book price." Tr. 243:19–244:8. And vice versa: if the order-book mid-price is higher than the oracle price, the long position must pay the short. Tr. 245:2–7. Those payments are exchanged in USDC. Tr. 245:10–11. USDC is a "reserve collateralized stablecoin" pegged to the US dollar. Tr. 214:3–215:23.

During the time in question, Mango Markets not only allowed investors to trade crypto assets and perpetuals but also to take out collateralized loans of cryptocurrency based on the value of their portfolio on the platform. See Tr. 104:12–15. Both digital assets (like MNGO) and derivative contracts (like MNGO Perpetuals) counted as collateral. Tr. 105:19–24. The higher the value of an investor's portfolio, the larger a loan they could take out. Tr. 105:25–106:3.

For all this complicated background, the basic contours of Eisenberg's scheme are straightforward and undisputed on this motion. On October 11, 2022, Eisenberg deposited approximately five million USDC into two wallets on Mango Markets. See GX-1351; Tr. 553:21–554:19. He used one of the wallets to sell and the other to buy the same MNGO Perpetuals, such that he held both the long and short positions. GX-1352; Tr. 562:10–563:24. He then bought MNGO on the three exchanges that fed into the oracle, which increased the oracle price of MNGO and, by extension, the value of his long position. See GX-1353; Tr. 565:20–568:6, 569:15–23. Eisenberg then borrowed against his long position on the Mango Markets platform. See GX-1354; Tr. 575:3–8. A few minutes later, he sold MNGO on the same three cryptocurrency exchanges, which caused the oracle price of MNGO to plummet and, by extension, the value of his short position to rise. See GX-1355; Tr. 579:15–583:17. He then borrowed more from Mango Markets against his short

position. *See* GX-1356; Tr. 587:7–13. In total, Eisenberg borrowed and then quickly withdrew over $100 million in cryptocurrency from Mango Markets. *See* GX-1342; Tr. 692:8–695:9.

## LEGAL STANDARDS

"[O]n the defendant's motion" a court "must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). Evidence is insufficient to sustain a conviction only if it is "nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." *United States v. Cuti*, 720 F.3d 453, 461 (2d Cir. 2013) (citation omitted). As the Second Circuit has explained, "[a] defendant challenging the sufficiency of the evidence bears a heavy burden, because the reviewing court is required to draw all permissible inferences in favor of the government and resolve all issues of credibility in favor of the jury verdict." *United States v. Kozeny*, 667 F.3d 122, 139 (2d Cir. 2011).

Under Federal Rule of Criminal Procedure 33, "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). "Generally, the trial court has broader discretion to grant a new trial under Rule 33 than to grant a motion for acquittal under Rule 29, but it nonetheless must exercise the Rule 33 authority 'sparingly' and in 'the most extraordinary circumstances.'" *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001) (quoting *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992)). "In the exercise of its discretion, the court may weigh the evidence and credibility of witnesses. At the same time, the court may not wholly usurp the jury's role." *United States v. Autuori*, 212 F.3d 105, 120 (2d Cir. 2000) (citation omitted). "The defendant bears the burden of proving that he is entitled to a new trial under Rule 33, and before ordering a new trial pursuant to Rule 33, a district court must find that there is 'a real concern that an innocent person may have been convicted.'" *United States v. McCourty*, 562 F.3d 458, 475 (2d Cir. 2009) (quoting *Ferguson*, 246 F.3d at 134). Accordingly, "the court must 'examine the entire case, take into account all facts and circumstances, and make an objective evaluation,' keeping in mind that the 'ultimate test' for such a motion is 'whether letting a guilty verdict stand would be a manifest injustice.'" *United States v. Landesman*, 17 F.4th 298, 330 (2d Cir. 2021) (quoting *United States v. Alston*, 899 F.3d 135, 146 (2d Cir. 2018)).

## DISCUSSION

### I.  Counts 1 and 2: The Commodities Charges

#### A.  Venue

Eisenberg argues that venue in the Southern District of New York was improper on the commodities-fraud and -manipulation counts. "A criminal defendant has the right to be tried in the 'district wherein the crime shall have been committed[.]'" *United States v. Svoboda*, 347 F.3d 471, 482 (2d Cir. 2003) (alteration in original) (quoting U.S. Const. amend. VI); *see also* U.S. Const. art. III, § 2, cl. 3 (trials "shall be held in the State where the . . . Crimes . . . have been committed"); Fed. R. Crim. P. 18 ("Unless a statute or these rules permit otherwise, the government must prosecute an offense in a district where the offense was committed."). Questions of venue "are not

merely matters of formal legal procedure," but "raise deep issues of public policy." *United States v. Johnson*, 323 U.S. 273, 276 (1944).

"In determining whether an offense was committed in a particular district," courts "look to 'the nature of the crime alleged and the location of the act or acts constituting it.'" *United States v. Magassouba*, 619 F.3d 202, 205 (2d Cir. 2010) (quoting *United States v. Cabrales*, 524 U.S. 1, 5 (1998)). In other words, determining whether venue is proper requires courts to "first identify the conduct constituting the offense and then determine where that conduct occurred." *United States v. Kim*, 246 F.3d 186, 191 (2d Cir. 2001). "In performing this analysis, [courts] must separate 'essential conduct elements' from 'circumstance element[s].'" *United States v. Calonge*, 74 F.4th 31, 35 (2d Cir. 2023) (second alteration in original) (quoting *United States v. Rodriguez-Moreno*, 526 U.S. 275, 279, 280 & n.4 (1999)). "Only essential conduct elements provide the basis for venue." *Id.*

Some crimes occur in more than one location. For "any offense . . . begun in one district and completed in another," venue is proper "in any district in which such offense was begun, continued, or completed." 18 U.S.C. § 3237(a). Eisenberg doesn't dispute that the commodities charges here are such so-called "continuing offenses," capable of being tried in more than one district. *See* Dkt. 191 at 12–13.

"Because venue is not an element of a crime, the government need establish it only by a preponderance of the evidence." *United States v. Tzolov*, 642 F.3d 314, 318 (2d Cir. 2011). Courts "review the sufficiency of the evidence as to venue in the light most favorable to the government, crediting 'every inference that could have been drawn in its favor.'" *Id.* (quoting *United States v. Rosa*, 17 F.3d 1531, 1542 (2d Cir. 1994)).

### 1. Rule 29: There Was Insufficient Evidence to Support Venue in the Southern District

Recall that the evidence at trial showed that on the evening of October 11, 2022, Eisenberg purchased and sold large amounts of MNGO on FTX, Serum, and AscendEX, the three exchanges used to value MNGO Perpetuals on Mango Markets. By doing this, Eisenberg caused the price of MNGO to go up quickly (benefitting his long position in MNGO Perpetuals) and then crater (benefitting his short position). Using the "borrow" function on Mango Markets, he was able to withdraw from Mango Markets over $100 million in cryptocurrency based on the artificially inflated value of his positions. All of this happened in approximately thirty minutes. *See* GX-1352 (establishing that Eisenberg bought and sold the perpetuals around 6:24 PM); GX-1342 (showing Eisenberg's withdrawals taking place between 6:29 PM and 6:57 PM).

Eisenberg was never in New York in connection with this scheme; he was in Puerto Rico. *See* Tr. 1382:3–5. He didn't make trades in New York, call or email anyone in New York, or go to New York in connection with his scheme. There is no allegation that the Mango Markets platform had ties to New York. FTX and Serum weren't in New York either. Instead, the government bases venue in this district on two things: First, the presence of personnel working for HD Consulting, a vendor providing trade-related services to AscendEX, in Manhattan; and second, the location of one of Mango Markets' users—John Casey—in Poughkeepsie, New York. Casey saw the price of

MNGO fluctuate on Mango Markets and attempted to withdraw his funds in response, unsuccessfully.

As to HD Consulting, the Government argues that the "essential conduct" that took place in this district were trade-related functions related to Eisenberg's manipulating the MNGO price on the AscendEX platform. Dkt. 186 at 58–59. As to Casey, the government says that Eisenberg caused a "false price signal" to be sent to Casey, and caused Casey, a "victim," to unsuccessfully try to withdraw his funds. *Id*. at 60–61.

### a.  HD Consulting's Trade-Related Functions Do Not Support Venue

The jury heard testimony from James Farrell, the general counsel for HD Consulting, which provides services to AscendEX. Tr. 140:9–21. Farrell testified that certain operations associated with trading on AscendEX took place in New York, and that he works out of an office in midtown Manhattan, alongside "roughly two-thirds of the people who provide work to support AscendEX's operations." Tr. 141:2–142:7. He explained that "[w]hen someone creates an account in AscendEX, the information is captured" in a "management portal, which is available to and reviewed by the people in the New York office." Tr. 146:20–25. When someone makes a cryptocurrency deposit into their AscendEX account, Farrell explained, "[i]t goes into a custodial wallet" maintained by the company. Tr. 148:1–4. Farrell also testified that finance and development staff in the New York office review "all of the deposits" when they come in and conduct a "daily reconciliation . . . for all deposits, all withdrawals, and all trades to make sure that what's reflected in [their] computer system matches up with what is on the internal ledger that [they] maintain." Tr. 148:12–19. The reconciliation report is used by "compliance people . . . in New York," who "review [it] to see if there are any concerning patterns or observations from [the] trading data that might lead them to start [asking] further questions or investigat[ing] some pattern or practice of trading." Tr. 151:2–14. This process, Farrell explained, is "roughly very akin to what a broker does in a traditional securities vault." Tr. 151:17–18.

Farrell also testified that the New York team had a role in identifying Eisenberg's market manipulation and ultimately freezing his account. In the evening of October 11, 2022, Farrell got a call from the head of the client services group, who was in New York. Tr. 158:23–159:7. That person told Farrell that "he had learned about unusual trading in the Mango USDT pair and wanted to know what to do next." Tr. 162:3–6.[2] When Farrell reviewed the trading data, he saw "volume in a very limited period of time [that] was atypical, which had driven the price of [MNGO] up significantly" and created "a significant deviation from the price at which that same cryptocurrency was trading on other exchanges." Tr. 162:16–22. Farrell's team identified Eisenberg's account as the one responsible, and the head of client services "instructed [the] development team to freeze the account." Tr. 162:23–164:1. A member of the development team put a freeze on Eisenberg's account on October 12, 2022, at 2:53 UTC, hours after Eisenberg had withdrawn the

---

[2] USDT, or "Tether," is a crypto stablecoin. Like USDC, it is pegged to the dollar and used to purchase other crypto like MNGO. *See* Tr. 215:3–216:18.

cryptocurrency from Mango Markets. Tr. 163:10–16; *see also* GX-1342 (showing Eisenberg's withdrawals taking place between 6:29 PM and 6:57 PM on October 11, 2022).

The government says that a reasonable juror could conclude from Farrell's testimony that the HD Consulting team in Manhattan "reviewed Eisenberg's account and trading activity," which is sufficient for venue on the commodities charges because "[t]he Second Circuit has repeatedly held that this type of trade processing activity is activity in furtherance of trading-related crime." Dkt. 208 at 5, 7. Eisenberg argues that the team in New York didn't have anything to do with his deposits or trades: Eisenberg received confirmation emails within seconds of depositing cryptocurrency onto the platform, indicating that the deposit process was automated, *see* Dkt. 183 at 12–13; *see also* GX-1506; GX-607; GX-608, and Farrell testified that trades were executed by a "smart order routing engine" that matches buyers and sellers together, *see* Tr. 149:20–150:6. There was no evidence that the routing engine was in New York. So Eisenberg argues that the government's cases are inapplicable.

The Court agrees with Eisenberg. Let's start with the opening of Eisenberg's account on AscendEX and the deposit of his funds there. The government doesn't argue that these actions alone give rise to venue, and with good reason. Even if these things happened in this district, which is questionable,[3] they were not "essential conduct elements" or a "part" of Eisenberg's commodities offenses. They were instead done in preparation for the manipulative trading that Eisenberg subsequently engaged in. The Second Circuit has confirmed that "[w]hether the crime be continuing or noncontinuing, venue is not proper in a district in which the only acts performed by the defendant were preparatory to the offense and not part of the offense." *United States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1181, 1190 (2d Cir. 1989); *see also id.* at 1190–91 (holding orders of adulterated concentrate from Eastern District then used in adulterated apple juice introduced into commerce were "merely preparatory to the eventual introduction of the juice into commerce"); *United States v. Ramirez*, 420 F.3d 134, 140–42 (2d Cir. 2005) (holding presentation and approval of allegedly false labor condition forms in Manhattan "preparatory" even though forms incorporated in fraudulent visa filings). The government cites no case holding that the opening of an account or depositing of funds gives rise to venue in a case like this one. To the extent that the government focuses on the timing or circumstances of Eisenberg's opening of his account (the same day of the crime and using an anonymous email address), Dkt. 186 at 59, no authority suggests that venue is proper based on preparatory acts that happen close in time to a crime or under dubious circumstances.

But what about Eisenberg's trading on AscendEX? On this score, the government doesn't argue that the cryptocurrency Eisenberg used to trade on AscendEX was stored in New York. (The government's 3500 material indicated that the wallet was managed by another company called

---

[3] Nothing in Farrell's testimony permits the inference that the HD Consulting team did anything more than monitor account creation and deposit activity, and as set forth above, the government offers no case to support the proposition that venue is proper in a trading-related case wherever someone can review such activity.

Fireblocks, not HD Consulting. *See* 3503-002.) The government doesn't argue that the trades were executed in New York. As noted above, they were executed using a smart order routing engine that wasn't in New York, as far as the evidence at trial showed. So what *did* happen in New York? The government's evidence on this point is based on two answers from Farrell. When asked what role, if any, employees in New York have in managing an internal ledger that "keeps track of who owns what," Farrell responded:

> So, every day, there's what's called a trade reconciliation report or reconciliation report. That is reviewed by the development team in New York to make sure that the systems are working correctly, that all of the transactions appear to be reflected in the internal ledger. It's also reviewed by the finance t[eam] in New York for basically the same purpose, to make sure that our systems are syncing and we capture all the trades. It seems that all the right amounts have been credited to all the right users. And then the compliance people who are in New York also review that to see if there are any concerning patterns or observations from that trading data that might lead them to start doing further questions or investigate some pattern or practice of trading.

Tr. 150:25–151:14. Even viewed in the light most favorable to the government, Farrell didn't testify that Eisenberg's trades were executed, cleared, or settled in New York. At best, Farrell testified that the New York team engaged in quality control to ensure that trades went through properly and the platform was functioning as expected. Sure enough, the government followed up the last question by asking how Farrell's description of HD Consulting's functions "compare[d] to similar processes outside the cryptocurrency context," and Farrell responded, "I mean, it's roughly very akin to what a broker does in a traditional securities vault." Tr. 150:15–18. But just saying that HD Consulting's functions are "roughly very akin" (whatever that means) to what "a broker does" (same) can't put enough lipstick on this pig to transform quality control into the essential conduct of executing, clearing, or settling trades in this district.[4] On a Rule 29 motion, courts "defer to a jury's assessments with respect to credibility, conflicting testimony, and the jury's choice of competing inferences that can be drawn from the evidence," but "specious inferences are not indulged." *United States v. Valle*, 807 F.3d 508, 515 (2d Cir. 2015) (quoting *United States v. Lorenzo*, 534 F.3d 153, 159 (2d Cir. 2008)).

With that factual backdrop, the Court examines the cases cited by the government where venue was upheld based on trade-related functions in the district. In *United States v. Khalupsky*, 5 F.4th 279 (2d Cir. 2021), the Second Circuit held that venue was proper where "the government introduced evidence that one of [the defendants'] brokerage accounts used J.P. Morgan Clearing

---

[4] While it was not presented at trial and does not factor into this decision, the Court notes that the government's notes from its interviews with Farrell indicate there was no "review of [Eisenberg's] account at the time he created it," 3503-002, nor was there any "[m]anual review . . . done on Eisenberg['s] transactions, largely because of [the] short time between money coming in and [the] account getting frozen," 3503-003.

Corporation, located in the EDNY, as its clearing agent." *Id.* at 292. This was sufficient to confer venue in that district because using a clearing agent was an act "'constituting' the securities fraud violation," where the defendants had used stolen information to execute illicit trades that netted them $18 million in profits. *Id.* at 285, 292. As the court explained, "clearing agents are . . . 'crucial to the success of the scheme,'" because "[w]ithout them, there would be no completed sale of a security." *Id.* at 292. Similarly, in *United States v. Chow*, 993 F.3d 125 (2d Cir. 2021), the court held that venue was proper because "there was ample evidence that a material number of . . . purchases of . . . stock were completed through brokers and other service providers in Manhattan," and the jury heard testimony that "settlement and clearing are absolutely necessary parts of any trade." *Id.* at 133–34 (cleaned up); *see also id.* at 142–44 (venue proper where exchange on which shares were listed and traded; execution, clearing, and recording of purchases; and brokers for sellers were in district). So the acts that occurred in the district constituted the offense of trading in stock based on material nonpublic information. Finally, in *United States v. Buyer*, 2025 WL 855773 (2d Cir. Mar. 19, 2025), another securities-fraud case based on the defendant's misuse of material nonpublic information, the court held that venue was proper because "the government offered evidence that securities trades—the criminal acts at issue—consist of multiple steps, including execution, clearing, and settlement," and "[t]he government provided support for a conclusion that these steps of Buyer's trades took place at least in part in SDNY." *Id.* at *5.

Here, by contrast, the government didn't introduce any evidence that anything the team did in New York was a "necessary part[] of any trade." *Chow*, 993 F.3d at 134. To the contrary, Farrell's testimony established that the New York team's internal review of trades was to ensure that its "systems [were] working correctly . . . and [it] capture[d] all the trades," and to "see if there are any concerning patterns or observations from that trading data that might lead them to start [asking] further questions or investigate some pattern or practice of trading." Tr. 151:2–14. In other words, the evidence was that HD Consulting retroactively reviewed completed trades on AscendEX to ensure the accuracy of its ledgers and the integrity of its platform, and the government failed to introduce any evidence that these actions were essential conduct for Eisenberg's commodities offenses.

The government also argues that it need not prove that anyone in New York did anything because the Second Circuit has found sufficient evidence of venue based merely on the location of an exchange. For example, the *Buyer* court held that the government had introduced sufficient evidence of venue by showing that Buyer "traded on the New York Stock Exchange," which is "headquartered in SDNY." 2025 WL 855773, at *5. And in *Svoboda*, the court held that venue was proper in the Southern District because the defendant was "a savvy investor" who could "reasonably foresee that his trades would likely be executed on either NYSE or AMEX." 347 F.3d at 483.

First off, Farrell readily admitted that "the company that owns and operates the [AscendEX] exchange is a Romanian company," that its customers are "customers of the Romanian company," and that AscendEX itself "does not have a New York office." Tr. 178:1–179:10. This isn't an NYSE/AMEX situation. But more importantly, the facts here are unlike either *Buyer* or *Svoboda*.

In *Buyer*, the government offered testimony that both the clearing and completion of the trades at issue took place on data centers and servers located in the district, *and* that Buyer traded on NYSE, headquartered in SDNY. 2025 WL 855773, at *5. In *Svoboda*, the government offered evidence that "all thirteen of the trades underlying" the criminal counts "were executed on the [NYSE or AMEX]," both of which the court assumed "are located in the Southern District of New York," and "[a]fter each trade was completed, [the defendant] received a written confirmation indicating the exchange at which the trade was executed." 347 F.3d at 482. Here, unlike in *Buyer* and *Svoboda*, there's nothing in the record to support the inference that any of Eisenberg's trades were executed by the HD Consulting team in New York, nor to support the inference that the actions that *did* take place here constituted part of the offense.

Next, the government argues that the jury could have inferred from Farrell's testimony that the HD Consulting personnel in New York were actively monitoring for fraud and capable of stopping it. In the government's view, this matters because the Second Circuit has held that venue is proper where, to complete a transaction in furtherance of a fraud offense, a defendant must "beat the compliance folks." Oral Arg. Tr. 12:25–13:9. Specifically, in *United States v. Teman*, 2023 WL 3882974 (2d Cir. June 8, 2023), the Second Circuit held that venue was proper in this district for bank fraud because employees of Signature Bank, located in Manhattan, had reviewed the defendant's checks for fraud. *Id.* at *2. The court held that "[t]his review was an act 'in furtherance of the scheme to defraud[]' because Teman needed the bank to approve the checks to gain access to the full amount." *Id.* (citation omitted). The court also explained that "[i]t is immaterial that Signature Bank's employees intended to defeat, not further, fraud, because even acts of third parties unaware of the attempted fraud can be made part of the fraudulent scheme by the defendant." *Id.*

Based on *Teman*, the government says that the jury could reasonably have inferred that Eisenberg needed to avoid setting off the compliance team's alarm to complete his scheme of transacting in MNGO to manipulate the value of MNGO Perpetuals. The government argues that Farrell's testimony about the events of October 11 provides further support for this inference. Farrell testified that he received a call in the evening of October 11 about unusual trading activity, which ultimately led HD Consulting to freeze Eisenberg's account. Tr. 158:23–159:7, 162:23–163:9. The government argues that the jury could infer from this portion of Farrell's testimony that compliance personnel in New York in fact reviewed Eisenberg's trading activity with the intent of identifying unusual behavior. Oral Arg. Tr. 12:11–24.

But even drawing all inferences in the government's favor, the Court disagrees that this case is analogous to *Teman*. In *Teman*, the Second Circuit concluded that the presence of employees checking for fraud sufficed for venue not because they were the "compliance folks" to evade, but because they actually "reviewed the checks for fraud in Manhattan," which was "an act 'in furtherance of the scheme to defraud,' *because Teman needed the bank to approve the checks to gain access to the full amount*." 2023 WL 3882974, at *2 (emphasis added). There was no evidence presented at trial that Eisenberg needed the HD Consulting team in New York to approve his trades to have them be executed. For this reason, the compliance review—even if it happened while Eisenberg's scheme was ongoing—was not an "essential conduct element" of Eisenberg's offense.

On the government's logic, venue is appropriate in any case where security officers or other "compliance folks" are keeping tabs on things and could leap into action to stop a crime in progress. The government cites no authority for this proposition. Accordingly, the Court rejects Farrell's testimony as a basis for venue on the commodities counts.[5]

### b.   Causing a False Price Signal to Be Sent to John Casey Is Insufficient

The Court rejects the government's second basis for venue, which turns on the testimony of John Casey, a Mango Markets investor. On October 11, 2022, Casey was in Poughkeepsie, New York, when he noticed that the price of MNGO had spiked and then plummeted. Tr. 817:7–818:16. He tried to withdraw his cryptocurrency assets from Mango Markets but was unable to. Tr. 817:25–818:3. The government argues that Casey's testimony establishes venue because it demonstrates that Eisenberg's actions transmitted a "false price signal" and "caused a victim to unsuccessfully try to withdraw funds in the District." Dkt. 186 at 60.

The government doesn't explain how transmitting a false price signal to a Mango Markets investor constituted a part of Eisenberg's offenses, let alone an "essential *conduct* element." The government's reference to "sending a false pricing signal" is based on *Set Capital LLC v. Credit Suisse Group AG*, 996 F.3d 64 (2d Cir. 2021), which held that trading, even open-market trading, may be manipulative if it "'sends a false pricing signal to the market' or otherwise distorts estimates of the 'underlying economic value' of the securities traded." *Id.* at 76 (citation omitted). But *Set Capital*'s "false pricing signal" verbiage is just a way of figuring out whether someone's trades are legitimate or not. *See id.* at 76–77. The "essential conduct" is the trading, which didn't happen in New York. Like its "beat the compliance folks" argument, the government takes the unprecedented view that in any securities or commodities case involving market manipulation, venue is proper in any district where a market participant sees false prices. No authority is cited for this proposition.

The government also relies on *United States v. Royer*, 549 F.3d 886 (2d Cir. 2008). There, one of the defendants, Amr Elgindy, created a website for subscribers that provided recommendations about which stocks to short. *Id.* at 890–91. Elgindy's recommendations were based on misappropriated information conveyed to him by co-defendant Jeffrey Royer, who worked for the FBI. *Id.* Elgindy would "instruct the . . . site members to short the stock but not yet release the information to the public[,] [t]hen, when Elgindy gave the signal, the . . . site members would . . . disseminate the misappropriated information to the general public, and thereby profit from the resulting drop

---

[5] The government doesn't argue that the freezing of Eisenberg's account, which prevented Eisenberg from withdrawing his cryptocurrency from AscendEX, could independently support venue. And for good reason. First off, the freezing of Eisenberg's account was not "essential conduct" underlying his offense. At best, it was conduct designed to thwart Eisenberg's crime. Second, the withdrawal of funds *from AscendEX* was not part of Eisenberg's commodities-fraud and -manipulation offenses. These funds weren't even the proceeds of Eisenberg's crime. Those proceeds were the crypto tokens from Mango Markets that Eisenberg was able to withdraw based on his manipulation of the value of his MNGO Perpetuals, all of which happened long before his account was frozen.

in the stock's price." *Id.* at 891. Elguindy would also sometimes trade on the misappropriated information in advance of releasing it to the site members, and "manipulate[] prices in the relevant securities by orchestrating trades by . . . site subscribers in thinly traded stocks." *Id.* "Elguindy kept close control over his . . . site subscribers and even threatened to exclude them from the site if they failed to follow his trading instructions." *Id.* After Elguindy and Royer were convicted of securities fraud, they challenged the sufficiency of the evidence on venue. The court held that the existence of website subscribers in the Eastern District of New York was enough to confer venue because Elguindy had conveyed "hundreds of messages" to subscribers, so the jury could infer "that the subscribers in the [district] received [misappropriated] information about [the applicable] stocks from Elguindy." *Id.* at 894–95. The court held that this was sufficient because "[r]eceipt of electronic transmissions in a district is sufficient to establish venue activity there." *Id.* at 895.

The government argues that Casey similarly received an electronic transmission when Eisenberg's trading broadcast a "false price signal." But to confer venue, an electronic transmission into the district must be part of the crime. In *Royer*, for example, the electronic transmissions to website subscribers were essential components of the defendants' scheme to "orchestrat[e] . . . trading by themselves and the . . . site members in order to artificially affect the market prices of various" securities. *See id.* at 897. Similarly, in *United States v. Lange*, 834 F.3d 58 (2d Cir. 2016), the Second Circuit held that emails and calls into the district to solicit investments "constituted securities fraud violations" because they "'were crucial to the success of the scheme' of securities fraud and contained a number of material misstatements regarding the . . . scheme." *Id.* at 71–72 (quoting *Royer*, 549 F.3d at 895). Finally, in *United States v. Rowe*, 414 F.3d 271 (2d Cir. 2005), the Second Circuit held that venue in the Southern District was proper when the defendant had posted an advertisement for child pornography from Kentucky that was viewed in New York. *See id.* at 273, 280. But there, the conduct constituting the offense was "the publication of an offer . . . to provide, receive or exchange child pornography" itself. *Id.* at 278. Here, the transmission of a pricing signal to Casey wasn't part of Eisenberg's scheme to defraud Mango Markets or to manipulate the price of MNGO Perpetuals. The court rejects the government's attempt to leverage *Set Capital*'s "false pricing signal" test for evaluating trades into a new argument for venue anywhere and everywhere.

The government also argues that causing a victim to take an action in the district, which it characterizes as causing "Casey to try, and fail, to withdraw funds," Dkt. 186 at 61, suffices for venue. The government doesn't address how Casey's efforts to withdraw funds were "essential conduct" underlying Eisenberg's commodities-fraud and -manipulation offenses. And once again, if the government's theory were accepted, then venue in any criminal case would always be proper in any venue where a victim took any action in response to the defendant's crime, regardless of what the defendant did in that venue. In support of this view, the government cites *United States v. Kim*. In *Kim*, the defendant approved the payment of inflated invoices by his employer from Chase Manhattan Bank, with the proceeds going to him and his compatriots. 246 F.3d at 188. Further, he was told while the scheme was ongoing "that the invoices were being paid by Chase Manhattan." *Id.* So in *Kim*, the payment of invoices from this district was both "essential conduct" underlying the fraud that was caused by the defendant—the whole point was to get the invoices

paid. And it was also foreseeable that the payments were coming from this district. Neither of these things is true here. The government also relies on *United States v. Booth*, 2024 WL 911854 (2d Cir. Mar. 4, 2024), but in that case, the court did not address whether the alleged conduct was legally sufficient for venue, because the defendant conceded it was. *Id.* at *1 n.1. The only issue the court decided was "the sufficiency and admissibility of the venue evidence." *Id.* And in any event, in *Booth*, the wires that the government claimed gave rise to venue were the proceeds of the fraud itself. *Id.* at *1. Not the case here.

As for foreseeability, there's nothing in the record suggesting that Eisenberg knew or had reason to know about Casey or that Mango Markets had New York users at all. The government's one-sentence argument on foreseeability is: "It would doubtlessly be foreseeable to a sophisticated cryptocurrency trader like the defendant that Mango Markets would have users in New York City, so Casey's testimony is a separate reason to uphold the verdict." Dkt. 186 at 61. Putting aside that Casey was in Poughkeepsie, not New York City, there is no evidence supporting foreseeability. The government cites to *United States v. Riley*, 638 F. App'x 56 (2d Cir. 2016), but there the court held that trading in this district was foreseeable not because the defendant was a "sophisticated trader," but because he was the Chief Information Officer of Foundry, the company at issue, and "Foundry's shares were publicly traded on NASDAQ, located in Manhattan." *Id.* at 62.

Accordingly, the Court rejects Casey's testimony as a basis for venue. This conclusion entitles Eisenberg to vacatur of the convictions on counts one and two. *See Smith v. United States*, 599 U.S. 236, 253 (2023) ("The reversal of a conviction based on a violation of the Venue or Vicinage Clauses, even when styled as a 'judgment of acquittal' under Rule 29, plainly does not resolve the bottom-line question of criminal culpability." (internal quotation marks and citation omitted)).[6]

### 2. *Rule 33: The Government's Venue Summation Doesn't Warrant a New Trial*

Given the vacatur of Eisenberg's convictions on the commodities charges, the Court is required to address whether, in the alternative, it would grant Eisenberg's request for a new trial under Rule 33. *See* Fed. R. Crim. P. 29(d)(1). It would not. Eisenberg argues that he's entitled to a new trial based on the government's summation. In closing, the prosecutor made the following statements, which Eisenberg didn't object to:

- "Look at Jim Farrell's testimony if you need to. He explained to you that when Mr. Eisenberg opened up an account, that account appears here in New York."
- "When Mr. Eisenberg deposited the money that he was going to use to manipulate the market, that was handled by the finance team here in New York."
- "[W]hen Mr. Eisenberg's trading happened, those fraudulent trades were settled and cleared . . . by the finance team here in New York."

---

[6] On count two, the jury convicted Eisenberg of both commodities manipulation and attempted commodities manipulation. The government doesn't contend that there is any difference between the two charges for venue purposes.

- "[Y]ou heard that Mr. Farrell was sitting in his office in New York when he got the call that they needed to freeze this account because they caught Mr. Eisenberg for what he was doing."

Tr. 1441:7–17.

"To secure a new trial based on these statements, [Eisenberg] ha[s] to show improprieties 'so severe and significant' as to deny a 'fair trial.'" *United States v. Ballard*, 727 F. App'x 6, 8–9 (2d Cir. 2018) (quoting *United States v. Coplan*, 703 F.3d 46, 86 (2d Cir. 2012)). "Such cases are 'rare' and arise only when the improper comments so infect the trial as a whole as to result in a conviction violative of due process." *Id.* at 9 (quoting *United States v. Caracappa*, 614 F.3d 30, 41 (2d Cir. 2010)). "[E]ven 'substantially improper remark[s]' may not warrant vacatur when a defendant's guilt is established by 'overwhelming evidence' of the relevant crime." *Id.* at 11 (alteration in original) (quoting *United States v. Rivera*, 971 F.2d 876, 885 (2d Cir. 1992)). Eisenberg didn't object to the government's statements at trial, so he bears the even heavier burden of showing that "the remarks amounted to a 'flagrant abuse.'" *United States v. Coriaty*, 300 F.3d 244, 255 (2d Cir. 2002) (quoting *United States v. Germosen*, 139 F.3d 120, 128 (2d Cir. 1998)).

Eisenberg doesn't make that showing here. Eisenberg says that Farrell merely testified that Eisenberg's account could be accessed by personnel in New York; that Farrell didn't testify that the finance team "handled" any deposits but rather "reviewed" them; that trades were "settled or cleared" by the smart order routing engine, not the finance team; and that Farrell was sitting at home, not at his office, when he got the call about Eisenberg's account. Dkt. 183 at 12–14. None of these are "improprieties 'so severe and significant' as to deny a 'fair trial.'" *Ballard*, 727 F. App'x at 8–9 (quoting *Coplan*, 703 F.3d at 86). The Court instructed the jury that it shouldn't consider the prosecutor's closing argument as evidence, so the jury knew to credit Farrell's testimony over any inconsistencies in the prosecutor's statements. *See* Tr. 1446:16–20.

Eisenberg also argues that the government erred by telling the jury that the presence of a victim in the district was enough to confer venue as a matter of law (although again, no objection was raised during trial to this argument). *See* Tr. 1442:3–4. The Court agrees, but the jury was expressly instructed to follow the Court's legal instructions. *See* Tr. 1445:5–7 ("If an attorney has stated a legal principle different from any that I state to you in my instructions, it is my instructions that you must follow."). And as discussed below, the Court's venue instruction was proper. Accordingly, the government's misstatement of the law on venue didn't "so infect the trial as a whole as to result in a conviction violative of due process." *Ballard*, 727 F. App'x at 9 (quoting *Caracappa*, 614 F.3d at 41).

### 3. *Rule 33: The Jury Instruction on Venue Doesn't Warrant a New Trial*

Eisenberg also argues that the Court's instruction on venue warrants a new trial on counts one and two. The Court charged the jury as follows:

> The government does not have to prove that a completed
> crime was committed within the Southern District of New

> York, or that the defendant was ever in the Southern District
> of New York. With respect to Count One, Count Two, and
> Count Three, it is sufficient to satisfy the venue requirement
> if any act in furtherance of the crime charged occurred in this
> district. The act itself need not be a criminal act. And the act
> need not have been taken by the defendant so long as the act
> was part of the crime that you find he committed.

Tr. 1483:6–14. Eisenberg argues that "in furtherance of the charged crimes" should have been "an act constituting the charged crime." *See* Dkt. 183 at 21; Tr. 1310:2–7.

To demonstrate that he's entitled to a new trial, Eisenberg must show that "the requested instruction accurately represented the law in every respect and that, viewing as a whole the charge actually given, he was prejudiced." *United States v. Wilkerson*, 361 F.3d 717, 732 (2d Cir. 2004) (quoting *United States v. Abelis*, 146 F.3d 73, 82 (2d Cir. 1998)). "A jury instruction is erroneous if it misleads the jury as to the correct legal standard or does not adequately inform the jury on the law." *Lore v. City of Syracuse*, 670 F.3d 127, 156 (2d Cir. 2012) (quoting *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 153 (2d Cir. 1997)). "An omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law." *Id.* (quoting *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977)). "If the instructions, read as a whole, presented the issues to the jury in a fair and evenhanded manner, they do not warrant reversal." *Id.*

Again, Eisenberg can't meet this burden. First, the Second Circuit has used the "in furtherance of" and "constituting" formulations interchangeably. In *Khalupsky*, for example, the Second Circuit indicated that the "acts constituting the offense" test is satisfied "in any district where 'the defendant intentionally or knowingly causes an act in furtherance of the charged offense to occur.'" 5 F.4th at 291 (citation omitted); s*ee also United States v. Kaufman*, 2023 WL 1871669, at *2 (2d Cir. Feb. 10, 2023) (citing the "in furtherance" language when discussing whether the defendant's act was a "crucial component" of, and "not merely preparatory to," the crime charged (citation omitted)).

Second, Eisenberg's concern is that the jury instruction permitted jurors to find venue based solely on preparatory acts. Dkt. 183 at 22–23. But Eisenberg ignores the Court's instruction that the act must have been "part of the crime that you find [Eisenberg] committed." Tr. 1483:6–14. This instruction is consistent with Supreme Court case law on venue for continuing offenses. *See Rodriguez-Moreno*, 526 U.S. at 282 (explaining that a continuing offense can be tried "in all of the places that any part of it took place"). Accordingly, even if the "constituting the offense" language is the "preferred articulation" of venue for continuing offenses, *see* Dkt. 183 at 22, Eisenberg fails to show that the difference in nomenclature prejudiced him.

### B. The Scope of the CEA

Eisenberg argues that vacatur for lack of venue isn't enough, and that the Court should acquit him of the commodities-fraud and -manipulation charges. His arguments focus on whether he manipulated an instrument covered by the Commodities Exchange Act (CEA). The parties agreed at

trial that the MNGO token is a security, not a commodity governed by the CEA. So at trial, the government instead argued that MNGO Perpetuals are "mixed swaps" under the CEA.[7]

### 1.  *Rule 29: There Was Sufficient Evidence that MNGO Perpetuals Are Swaps*

The first issue is whether MNGO Perpetuals are "swaps" in the first place. If they are, then the next question is whether they are "mixed swaps."

The CEA defines a "swap" as "any . . . transaction . . . that provides on an executory basis for the exchange . . . of 1 or more payments . . . and that transfers, as between the parties to the transaction, in whole or in part, the financial risk associated with a future change in any such value or level without also conveying a current or future direct or indirect ownership interest in an asset." 7 U.S.C. § 1a(47)(A)(iii). Eisenberg says that the MNGO Perpetuals *in this case* don't meet the statutory definition because his "transactions with himself involved no risk transfer." Dkt. 183 at 23. Remember that Eisenberg was on both sides of his MNGO Perpetuals. Using different accounts, he acquired both the long and short positions. As the government put it in its summation, "[i]f the price of Mango goes up, one of his accounts makes money and one of his accounts loses money. If the price of Mango goes down, one of his accounts loses money and one of his accounts makes money. But no matter what, he hasn't gained or lost anything." Tr. 1349:19–23.

Nothing in the statutory text, however, supports Eisenberg's argument that "an instrument loses its status as a swap whenever one person controls both sides of the transaction." *See* Dkt. 186 at 11. To constitute a swap under the CEA, the transaction must transfer risk "between the parties to the transaction." 7 U.S.C. § 1a(47)(A)(iii). The statute doesn't exclude from this definition transactions where the buyer and seller are controlled by the same entity. To the extent that Eisenberg equates "parties" and "persons," those are different terms and "persons" is used elsewhere in the statute. *See, e.g.*, *id.* § 1a(4). When "Congress 'uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended.'" *Cruz-Miguel v. Holder*, 650 F.3d 189, 196 (2d Cir. 2011) (quoting *Sosa v. Alvarez-Machain*, 542 U.S. 692, 711 n.9 (2004)).

Nor does anything in the statutory structure support Eisenberg's argument. As the government points out, the CEA makes it unlawful to engage in swaps that are "wash sale[s]." *See* 7 U.S.C. § 6c(a)(2)(A)(i). "A wash trade is a transaction made without an intent to take a genuine, *bona fide* position in the market, such as a simultaneous purchase and sale designed to negate each other so that there is no change in financial position." *Reddy v. CFTC*, 191 F.3d 109, 115 (2d Cir. 1999). Eisenberg's argument is incompatible with this provision because under his reading of the CEA a wash trade is not a swap at all, since it involves no genuine risk transfer.

The only case Eisenberg cites, *SEC v. Terraform Laboratories Pte. Ltd*, 708 F. Supp. 3d 450 (S.D.N.Y. 2023), doesn't support his position. There, the defendants created a "mirror protocol"

---

[7] For commodities fraud, 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1 prohibit the use of any manipulative device in connection with "any swap," and for commodities manipulation, 7 U.S.C. § 13(a)(2) prohibits manipulating the "price . . . of any swap."

that allowed users to obtain crypto tokens "whose value would 'mirror' the price of a pre-existing non-crypto asset, such as a publicly traded security." *Id.* at 460. To mint one of these tokens, the user had to deposit collateral of 150% or more of the value of the underlying security. *Id.* But "[w]henever the price of an underlying security increases above the user's initial payment," the court explained, "the user is required to deposit additional collateral to meet the higher price." *Id.* at 477. "In other words, a user cannot profit from holding [a token] because his deposit must always exceed the value of the underlying reference security." *Id.* Accordingly, the court held that the mirror protocol did not constitute a "swap" under the CEA because no risk moved between the counterparties; instead, the token holder "b[ore] all the risk for himself." *Id.* Here, by contrast, the instrument is structured to transfer risk between the counterparties, even if in this case Eisenberg happened to be on both sides of the trade. The MNGO Perpetuals are swaps.

### 2. *Rule 29: There Was Sufficient Evidence that MNGO Perpetuals Are Mixed Swaps*

Eisenberg next argues that MNGO Perpetuals aren't subject to the CEA even if they are swaps. As noted above, the parties agreed that MNGO is a security. Because MNGO Perpetuals are based on MNGO, they are so-called "security-based swaps." Security-based swaps are usually outside the CEA's purview. *See* 7 U.S.C. § 1a(47)(B)(x). But there's an exception. The CEA covers security-based swaps that are "mixed swaps." In simple terms, a mixed swap is a security-based swap that is also based on something other than a security. To use the statutory definition, a mixed swap is a security-based swap that is "also . . . based on the value of 1 or more interest or other rates, currencies, commodities, instruments of indebtedness, indices, quantitative measures, other financial or economic interest or property of any kind (other than a single security or a narrow-based security index)." *Id.* § 1a(47)(D).

At trial, the government argued that MNGO Perpetuals are "also . . . based" on two of these things: the funding rate, a "rate[]," and USDC, a "currenc[y]." *Id.* Eisenberg argues that neither the funding rate nor USDC fits the bill.[8] As discussed below, there was sufficient evidence that the funding rate is a "rate" and that MNGO Perpetuals are based on its value, so the Court need not address Eisenberg's USDC argument. *See United States v. Delano*, 55 F.3d 720, 730 (2d Cir. 1995) ("[W]hen divergent theories of criminal liability are submitted to the jury and the jury renders a general guilty verdict, on a challenge to the sufficiency of the evidence, if the evidence amply supports one of the theories presented[,] the verdict must be affirmed."); *see also* Oral Arg. Tr.

---

[8] Although Eisenberg frames his "mixed swap" argument as a sufficiency-of-the-evidence challenge, he says in his reply brief "that the determination of whether an instrument is a mixed swap is a legal question more appropriately decided by the Court than the jury." Dkt. 191 at 18. The parties broadly agree that whether an instrument is covered by the CEA is a mixed question of law and fact. *See* Dkts. 218, 219. These questions are typically resolved by juries. *See United States v. Gaudin*, 515 U.S. 506, 512 (1995) (explaining that "the application-of-legal-standard-to-fact sort of question[,] . . . commonly called a 'mixed question of law and fact,' has typically been resolved by juries"). In any event, the classification of this issue is irrelevant. Whether it is a question of fact, law, or something in between, MNGO Perpetuals are mixed swaps based on the value of a "rate."

50:20–51:1 (Eisenberg conceding motion must be denied if the Court disagrees with him on the funding rate, regardless of where it lands on USDC).

As a reminder, the funding rate requires the parties to a perpetual to exchange a series of payments to keep the market for MNGO Perpetuals tethered to the price of MNGO. The payments are based on the difference between the order-book mid-price for MNGO Perpetuals on Mango Markets and the spot price of MNGO as calculated by the oracle. As the Mango Markets documentation explains:

> Funding is the mechanism used to ensure that the price of a futures contract stays in line with the current spot price. The midprice of the bids and asks is compared to the oracle price to determine the funding rate. . . . The rate is continually calculated and paid, and is shown above the market as an hourly rate. Funding is paid continuously and is automatically added to the user's unsettled [profits and losses].

GX-1011 at 92.

The funding rate fits the text of the statute, which provides that a mixed swap is "based on the value of *one or more interest or other rates, . . . quantitative measures, or other financial or economic interest or property of any kind* (other than a single security or a narrow-based security index)." 7 U.S.C. § 1a(47)(D) (emphasis added). Eisenberg's response focuses on the exclusion of "a single security or a narrow-based security index." He argues that the "funding rate" is just a stream of payments based on the value of a single security—MNGO—which means that it is "excluded from the definition of mixed swap." Dkt. 183 at 36. In the alternative, he argues that the funding rate is a narrow-based security index. *Id.* at 38.

Neither argument is convincing. First, the funding rate isn't a "single security." Although Eisenberg argues that all the inputs to the rate are based on the value of MNGO, that doesn't make the rate itself a "single security." Eisenberg's argument is also factually untrue. Even if in some sense the inputs to the rate each reflect market valuations of MNGO, they are distinct. Indeed, that's the reason for the funding rate in the first place, as Eisenberg himself recognizes. *Id.* at 36–37. The record establishes that one of the inputs to the funding rate is the order-book mid-price of MNGO Perpetuals on Mango Markets.[9] *See* GX-1011 at 92. This reflects the supply and demand for that instrument on that exchange. Tr. 242:10–243:3. The funding rate's other input—the oracle price—reflects the spot price of MNGO on three other exchanges. And not just that, the evidence at trial showed that the oracle price isn't solely based on the value of MNGO, but rather on the

---

[9] To the extent Eisenberg argues that the difference in value between the order-book mid-price of MNGO Perpetuals and oracle price of MNGO was neither a "rate" nor "quantitative measure," the Court disagrees. The evidence at trial showed that the funding rate is expressed as a percentage, depending on the "difference between the trading market and the oracle," which is then applied to the size of the perpetual to determine the amount of payment due. *See* GX-1011 at 92. Eisenberg fails to explain why this wouldn't be a "rate" or "quantitative measure" under the statute.

value of MNGO relative to other cryptocurrencies. *See* Tr. 455:16–457:8. While reported in dollars, the evidence at trial supported the conclusion that the oracle price is in fact based on "pairs" of MNGO and stablecoins including USDC and USDT. Tr. 480:20–23. This doesn't come close to the statute's exclusion of a "single security or a narrow-based security index." As the government points out, the statute's exclusion "conspicuously uses the singular: referring to one security *or* one narrow-based security index." Dkt. 186 at 22; *see also United States ex rel. Wood v. Allergan, Inc.*, 899 F.3d 163, 171 (2d Cir. 2018) ("If the statutory language is unambiguous, 'we construe the statute according to the plain meaning of its words.'" (quoting *Nwozuzu v. Holder*, 726 F.3d 323, 327 (2d Cir. 2013))). The funding rate is anything but.

As for Eisenberg's alternative argument that the funding rate is a narrow-based security index, this fails. "The term 'index' means an index or group of securities, including any interest therein or based on the value thereof." 15 U.S.C. § 78c(a)(68)(E). At trial, without objection from the defense, the Court instructed the jury that an "interest" is a "right, title, or legal share in something." *See* Tr. 1271:19–21, 1466:21–22. Although Eisenberg argues that the funding rate "fits squarely within th[is] definition," Dkt. 183 at 39, the funding rate isn't an "interest" in an "index or group of securities," nor is it an "interest" "based on the value" of an index or group. An "index" in this context is something like the S&P 500. The funding rate here is different. It reflects the difference between the mid-price of bids and asks for MNGO Perpetuals on Mango Markets on the one hand, and the oracle price of MNGO on three different exchanges on the other. *See* GX-1011 at 92. As the government's expert witness, Kapil Jain, noted at trial, the two inputs reflect "different supply and demand" and "different prices." Tr. 243:13–14. The point of exchanging payments based on the rate was to "induce the prices to converge." Tr. 245:4–22. That isn't an "index" on any understanding.

Nonetheless, Eisenberg argues that a "rate" can be an "index" under the statute, pointing to a joint rulemaking issued by the CFTC and SEC. *See* Further Definition of "Swap," "Security-Based Swap," and "Security-Based Swap Agreement"; Mixed Swaps; Security-Based Swap Agreement Recordkeeping, 77 Fed. Reg. 48208 (Aug. 13, 2012). He focuses on a portion addressing the distinction between swaps and security-based swaps (not mentioning mixed swaps), which states that the agencies "believe" that where an instrument is based "solely on the levels of certain interest rates or other monetary rates that are not themselves based on one or more securities, the instrument would be a swap and not a security-based swap." *Id.* at 48262. Focusing on one of those examples, Eisenberg argues that the joint rulemaking includes in the definition of "index" "a rate derived from an index":

> Indexes: *A rate derived from an index* of any of the foregoing or following rates, averages, or indexes, including but not limited to a constant maturity rate (U.S. Treasury and certain other rates), the interest rate swap rates published by the Federal Reserve in its "H.15 Selected Interest Rates" publication, the ISDAFIX rates, the ICAP Fixings, a constant maturity swap, or a rate generated as an average (geometric,

arithmetic, or otherwise) of any of the foregoing, such as overnight index swaps ("OIS")—*provided that such rates are not based on a specific security, loan, or narrow-based group or index of securities*.

*Id.* at 48263 (emphases added); *see also* Dkt. 183 at 39–40.

Eisenberg takes this portion of the joint rulemaking to mean "that an index can be a rate and that that rate can be based on a narrow-based securities index." Dkt. 183 at 40. It doesn't. This section of the joint rulemaking isn't trying to define "index" or any other statutory term. It simply identifies categories of different rates (none of which is at issue here) that, if they serve as the sole basis for a swap, would qualify the instrument as a "swap" and not a "securities-based swap." Further, Eisenberg takes the "Indexes" example above out of context. As anyone who dares to read this section of the 300-page joint rulemaking would see, the header "Indexes" is just a topic header explaining the category of rates being discussed, that is, "[a] rate derived from an index" of specified "rates, averages, or indexes." It doesn't and isn't trying to say that the rates are themselves indexes. In sum, this section of the rulemaking doesn't purport to expand or modify the statutory definition of "index," "interest," or "rate," nor does it show that the jury erred by applying those terms to the facts of this case.

Eisenberg lodges one final objection based on the joint rulemaking. There, the agencies explained that "[b]roadly speaking, Title VII instruments based on interest or other monetary rates would be swaps, whereas Title VII instruments based on the yield or value of a single security, loan, or narrow-based security index would be security-based swaps." *See* 77 Fed. Reg. at 48262. Eisenberg says that the funding rate is akin to a yield on a single security, so it can't transform MNGO Perpetuals into mixed swaps. Setting aside that this portion of the joint rulemaking is descriptive and speaks only in generalities, it doesn't support Eisenberg's argument. As the agencies went on to explain, a "yield" is "another way of expressing the price or value of a debt security, loan, or narrow-based security index." *Id.* at 48263. "For example, debt securities often are quoted and traded on a yield basis rather than on a dollar price . . . ." *Id.* But the funding rate was not simply a way of expressing MNGO's price. Instead, as noted above, the evidence at trial was that it was a rate designed to induce the prices of different things in different places—MNGO Perpetuals and MNGO—to converge. So the joint rulemaking provides no support for Eisenberg's argument that the funding rate could be understood as a "yield."

One final point. Eisenberg's arguments concerning the funding rate, by and large, aren't based on statutory text or structure, nor are they based on any agency interpretation of the terms in the mixed-swap definition. They certainly aren't based on any agency pronouncements on the instruments and payment mechanisms at issue in this case. (For this reason, the Court need not address whether any such interpretation would be entitled to deference after *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024).) Instead, Eisenberg invites the Court to read tea leaves from agencies' beliefs, expressed in the joint rulemaking, about financial instruments that aren't at issue in this case. That isn't a basis to override the plain language of the statute, which applies here based on the evidence presented at trial.

### 3. Rule 29: The Rule of Lenity Doesn't Apply

Eisenberg argues that the rule of lenity requires counts one and two to be dismissed. The rule of lenity "provides that ambiguities concerning legislative intent in criminal statutes should be resolved in favor of the accused." *United States v. DiCristina*, 726 F.3d 92, 97 (2d Cir. 2013) (quoting *United States v. Figueroa*, 165 F.3d 111, 119 (2d Cir. 1998)). The rule "only applies if, after considering text, structure, history, and purpose, there remains a grievous ambiguity or uncertainty in the statute." *Id.* (quoting *Barber v. Thomas*, 560 U.S. 474, 488 (2010)). For the reasons set forth above, there is no ambiguity, let alone a grievous one. Further, Eisenberg's arguments are largely based on factual disputes concerning what the funding rate measures and the rate's relationship to the MNGO Perpetuals at issue. The rule of lenity does not require resolving factual ambiguities in a criminal defendant's favor. *See United States v. Gonzalez*, 407 F.3d 118, 124 (2d Cir. 2005).

### 4. Rule 33: The Jury Charge on Mixed Swaps Doesn't Warrant a New Trial

Eisenberg requested at trial that the Court instruct the jury that MNGO Perpetuals are securities so that "the jury would have . . . the proper context when considering whether the funding rate was a narrow-based security index." Dkt. 183 at 43; *see also* Tr. 1290:8–11. The Court overruled this request, reasoning that the instruction would confuse the jury given that its task was to determine whether MNGO Perpetuals are mixed swaps. Tr. 1293:19–1294:11. Eisenberg argues that he is entitled to a new trial under Rule 33 based on the Court's refusal to give this instruction. Dkt. 183 at 43.

Eisenberg argues that his proposed instruction was accurate in every respect because "mixed swaps" are considered both "swaps" and "security-based swaps" under the CEA, 7 U.S.C. § 1a(47)(D), and security-based swaps are securities under the Securities Exchange Act, *see* 15 U.S.C. § 78c(a)(10). He says that the Court's failure to give this instruction prejudiced him because "[i]t is entirely possible, likely even, that the jury incorrectly deemed the funding [rate] not a narrow-based security index because it could not determine whether the MNGO Perpetual was a security." Dkt. 183 at 45. The government responds that the defense's proposed instruction would have been "misleading and inaccurate" because it would have suggested that because MNGO Perpetuals are securities, they are not swaps or mixed swaps, which is erroneous. Dkt. 186 at 28–29.

The Court agrees. Although as a technical matter, mixed swaps are security-based swaps and security-based swaps are securities, the task for the jury was to determine whether MNGO Perpetuals are mixed swaps. Instructing the jury that MNGO Perpetuals are securities would have introduced confusion on the question whether MNGO Perpetuals are mixed swaps. If it's not already clear, the statutory framework in this case is complex enough, and the Second Circuit has advised district courts to avoid giving instructions that might "confuse jurors," even if those instructions are "technically accurate." *See Brown v. Greene*, 577 F.3d 107, 111–12 (2d Cir. 2009). Moreover, viewing the jury charge as a whole, Eisenberg fails to show that he was prejudiced. The Court instructed the jury on the definition of a "security" and of a "narrow-based security index." *See* Tr. 1466:16–20. Eisenberg was free to argue to the jury that MNGO Perpetuals fit the former definition

(to this end, the government didn't suggest that MNGO Perpetuals are *not* securities) and the funding rate fit the latter. Accordingly, he fails to show that the Court's decision not to instruct the jury on Eisenberg's trial argument—which he was free to advance unencumbered by any opposition from the government—warrants a new trial.

## II.    Count 2: Commodities Manipulation

### A. Rule 29: There Was Sufficient Evidence that Eisenberg Intended to Manipulate the Price of MNGO Perpetuals

Next, Eisenberg challenges the sufficiency of the evidence on the commodities-manipulation charge. Under the CEA, it is a felony "for . . . [a]ny person to manipulate or attempt to manipulate the price of any . . . swap." 7 U.S.C. § 13(a)(2). To convict Eisenberg under this provision, Eisenberg argues that the jury had to find that he intended to manipulate the "market price" of MNGO Perpetuals, meaning the price at which MNGO Perpetuals are "traded." Dkt. 183 at 45–46. As a reminder, MNGO Perpetuals have two prices: the "reference price" and the "settlement price." First, the reference price: Recall that to enter a MNGO Perpetual contract, one person must enter a "bid," or an offer to buy, and the other person must enter an "ask," or an offer to sell. Tr. 229:6–231:9. Each party must specify "the price at which [they are] willing to bid into the order-book to create this perpetual." Tr. 229:16–25. When the terms match, the exchange creates a contract between the buyer and seller. Tr. 231:17–20. That's the reference price.

Next, the settlement price. No currency is exchanged when the parties create a MNGO Perpetual. Instead, the parties make payments only if the price of MNGO rises or falls from the reference price. If the price rises, the party holding the long position will have an unrealized gain and can force the losing party to pay that unrealized gain. Tr. 237:3–18. Same thing if the oracle price falls. In that case, the short position has an unrealized gain and can force the party holding the long position to pay. *Id.* This "settlement price"—meaning the difference between the reference price of the contract and the spot price of MNGO—is determined by looking to the oracle. At any time, the winning party can force the losing party to pay them any unrealized gain based on this settlement price, after which the perpetual "continue[s] on" with a new reference price. *Id.*

Eisenberg says that the evidence at trial only established that Eisenberg intended to manipulate the settlement price of his perpetuals. But in his view, the government was required to prove that Eisenberg intended to manipulate the "market price," which Eisenberg defines as "the mid-price of the order-book averaging the best bid and ask"—in other words, the average reference price of the perpetuals. *See* Dkt. 183 at 35, 45. Eisenberg bases this argument on the Second Circuit's decision in *In re Amaranth Natural Gas Commodities Litigation*, 730 F.3d 170 (2d Cir. 2013). There, the court explained that although the CEA doesn't define the term "manipulation," "a court will find manipulation where '(1) Defendants possessed an ability to influence market prices; (2) an artificial price existed; (3) Defendants caused the artificial prices; and (4) Defendants specifically intended to cause the artificial price.'" *Id.* at 173 (quoting *Hershey v. Energy Transfer Partners, L.P.*, 610 F.3d 239, 247 (5th Cir. 2010)).

Eisenberg argues that *Amaranth*'s reference to "market price" refers to the price at which the asset is traded, not the settlement price of the contract. Dkt. 183 at 46. But *Amaranth* itself did not draw this distinction. The distinction between a "market price" versus some other price, or even the definition of what a "market price" is, was not presented in that case. And zooming out from the cases, the statute at issue here doesn't refer to "market price." It says "price."

Nevertheless, Eisenberg points to two cases in which courts dismissed cases brought under 7 U.S.C. § 25(a)(1)(D), which creates a private right of action for claims based upon "manipulation of the price of any . . . contract or swap or the price of the commodity underlying such contract or swap." *See Vitanza v. Bd. of Trade of City of New York*, 2002 WL 424699, at *4–6 (S.D.N.Y. Mar. 18, 2002); *Three Crown Ltd. P'ship v. Caxton Corp.*, 817 F. Supp. 1033, 1042–43 (S.D.N.Y. 1993). In *Vitanza*, the court held that although plaintiffs "allege[d] that settlement prices of [futures] contracts were manipulated[,] . . . the settlement price is not the value of the contract itself or the value of the commodity underlying the contract." 2002 WL 424699, at *5. In *Three Crown*, the court held that allegations that the defendant manipulated treasury notes couldn't sustain a claim because "Treasury notes are not the commodity 'underlying' either Treasury bill futures or Eurodollar futures." 817 F. Supp. at 1043.

Eisenberg argues that these cases reflect that the manipulation of settlement prices doesn't count under 7 U.S.C. § 13(a)(2). The Court disagrees. And it's in good company: Both the CFTC and Second Circuit have rejected this argument. *See In re DiPlacido*, CFTC No. 01-23, 2008 WL 4831204, at *31 (Nov. 5, 2008) ("[S]ettlement prices are market prices that can be manipulated."); *DiPlacido v. CFTC*, 364 F. App'x 657, 660 n.1 (2d Cir. 2009) (affirming in relevant part the CFTC's decision and distinguishing *Vitanza*, which was "cited by DiPlacido for the proposition that a 'settlement price' is not susceptible to manipulation as a matter of law"). As the Second Circuit explained in *DiPlacido*, *Vitanza* simply held that the plaintiffs couldn't sustain a claim based on the facts of that case. *DiPlacido*, 364 F. App'x at 660 n.1. Specifically, the settlement prices in *Vitanza* were based on a mathematical formula, not trading, and they just impacted account margins, and did not reflect the "value of the contract." 2002 WL 424699, at *1, *5. And as the CFTC noted, *Vitanza* expressed no opinion on the scope of any statutory provision other than the private right of action under 7 U.S.C. § 25(a)(1)(D), which isn't at issue here. *In re DiPlacido*, 2008 WL 4831204, at *30. Same thing with *Three Crown*. It didn't address the definition of "price" or the distinction between market and settlement prices. Instead, the court based its decision on the fact that the defendants manipulated something two steps removed from the futures contracts at issue—treasury notes when the futures contracts at issue were based on treasury bills. 817 F. Supp. at 1042–43. Here, the jury had a firm basis to find that Eisenberg manipulated the settlement price of MNGO Perpetuals itself.

Eisenberg argues that the CFTC's holding in *DiPlacido* that "settlement prices are market prices" was narrow. *In re DiPlacido*, 2008 WL 4831204, at *31. It wasn't. In fact, in distinguishing *Vitanza* and affirming the agency's authority to bring an enforcement action for manipulating settlement prices, the CFTC concluded that it "d[id] not believe that the statutory language in [7 U.S.C. § 13(a)(2)] could be construed to limit the Commission's authority in the same way as the

court found with regard to a litigant pursuing a private right of action." *Id*. at *30. And to the extent that Eisenberg argues that in *DiPlacido* it was critical that the thing directly manipulated was a commodity or instrument covered by the CEA, and not, say, a security like MNGO, it didn't say that either. Instead, the agency simply noted that manipulating an input to the settlement price—there the price of an individual futures contract—where it "causes the settlement price to be subject to artificial influence"—is actionable. *Id*. at *31.

In this case, there was ample evidence to conclude that Eisenberg manipulated the "price of . . . any swap." 7 U.S.C. § 13(a)(2). The trial evidence made clear that by manipulating the value of MNGO on the three exchanges that made up the oracle, Eisenberg intentionally manipulated the price used to value MNGO Perpetual positions. That price, in turn, is what counterparties use to figure out who pays who and how much. Nothing in the text of the statute or the cases cited by Eisenberg suggests that the "price" in the heartland of what Congress wanted to protect is somehow out of bounds.

And even if the government was required to show that Eisenberg manipulated the "market price" of MNGO Perpetuals, a reasonable juror could have concluded that the "settlement price" was a "market price," in that it represented the value of the contract. *Cf. Vitanza*, 2002 WL 424699, at *5 ("[T]he settlement price is not the value of the contract itself . . . ."). As the government explains, "[n]o one exchanges the original, reference price; its primary role is to serve as a baseline against which to measure the settlement price." Dkt. 186 at 32. The settlement price, in turn, "determines who pays whom, and how much." *Id.* So "it makes no sense to think of [the reference price] as the 'trading' price" of MNGO Perpetuals. *Id.* at 35. Indeed, describing the order-book mid-price as the "market price" for MNGO Perpetuals was met with confusion at trial. When asked on cross examination whether the order-book mid-price is "often referred to as the market price," one government witness responded that "mid price is more accurate" and "all of these prices could be referred to as market prices." Tr. 331:10–19. Another witness testified that he wouldn't understand "market price" to refer to "the price at which one could purchase contracts of perpetuals on Mango Markets." Tr. 784:10–20. In sum, based on the evidence the jury heard about how MNGO Perpetuals functioned, it had sufficient evidence to conclude that the settlement price constituted the market value, and thus market price, of the contract. *See, e.g.*, Tr. 377:9–11.

But even if "market price" in this context necessarily refers to the order-book mid-price of MNGO Perpetuals, the jury reasonably could have concluded that Eisenberg manipulated that price. As the government points out, "a scheme to intentionally manipulate the oracle price is also a scheme to intentionally manipulate the reference price because the latter will move in response to the former," given that "[t]he funding rate keeps the reference price of new MNGO Perpetuals close to the oracle by requiring one side or the other to make payments if there is a gap between those two metrics." Dkt. 186 at 35. Indeed, the evidence at trial showed that Eisenberg's MNGO trading caused reference prices to rise by 700% in fourteen minutes. Tr. 573:7–24.

Nonetheless, Eisenberg argues that the change in this price was incidental to his scheme, and the government failed to introduce any evidence that he specifically intended to move that price. "To meet the specific intent element of a claim for manipulation," the government must show that

Eisenberg "acted (or failed to act) with the purpose or conscious object of causing or effecting a price or price trend in the market that did not reflect the legitimate forces of supply and demand." *CFTC v. Parnon Energy Inc.*, 875 F. Supp. 2d 233, 249 (S.D.N.Y. 2012) (citation omitted). Given that the reference price and settlement price are inextricably linked, the jury could reasonably have concluded that Eisenberg's conscious object was to manipulate both, even if manipulating the reference price wasn't necessary to effectuate his scheme.

In sum, the trial record was replete with evidence that Eisenberg intended to and did manipulate "the price," 7 U.S.C. § 13(a)(2), of MNGO Perpetuals.

### B.  Rule 29: The Rule of Lenity Doesn't Apply

In the alternative, Eisenberg argues that "price" is ambiguous and should be read in Eisenberg's favor under the rule of lenity. Dkt. 183 at 52. Putting aside the fact that there was sufficient evidence at trial that Eisenberg manipulated what he calls the "market price" of MNGO Perpetuals, there is no ambiguity, let alone a "grievous ambiguity," in the statute that would justify application of the rule. *See DiCristina*, 726 F.3d at 97 (quoting *Barber*, 560 U.S. at 488). To the extent that Eisenberg argues that the rule of lenity should apply because this case is a novel application of the CEA to a bespoke financial instrument, the Court disagrees. The rule of lenity isn't triggered every time the government advances a novel charging theory. *Cf. United States v. Kinzler*, 55 F.3d 70, 74 (2d Cir. 1995) ("The claimed novelty of this prosecution does not help Lida's cause, for it is immaterial that there is no litigated fact pattern precisely in point." (internal quotation marks and citation omitted)).

And taking a real-world view of the evidence in this case, it isn't so novel. Rather, the government's case—supported by evidence in the record—was that Eisenberg intentionally manipulated the price that determined the value of his swap positions on Mango Markets, and that he then utilized that manipulated price to withdraw over $100 million in cryptocurrency from the exchange. That is a conventional tale; what's novel is the context and the type of instrument at issue in this case. But if that were enough for application of the rule of lenity, the enforcement of the securities and commodities laws in an age of rapid development in technology and financial instruments would be impossible.

### C.  Rule 33: Neither the Jury Charge on Commodities Manipulation nor the Government's Summation Warrants a New Trial

Eisenberg argues that he is entitled to a new trial under Rule 33 based on the Court's refusal to instruct the jury that commodities manipulation under 7 U.S.C. § 13(a)(2) requires manipulation of a "market price." Dkt. 183 at 52–53. Again, to show that he is entitled to a new trial based on the Court's omission of the word "market" before "price," Eisenberg must show that the jury instruction was both erroneous and prejudicial. *See Lore*, 670 F.3d at 156. For the reasons set forth above, Eisenberg can't do that here.

Eisenberg also argues that he's entitled to a new trial based on several statements the government made during its summation—to which he didn't object—referring to Eisenberg's "pumping"

of MNGO as "illegal" or a "criminal." *See* Tr. 1341:12–15, 1342:1–3, 15–18. He says that the prosecutor's statements were improper because "[u]se of market power or a trading strategy alone, without deception, does not amount to fraud." Dkt. 183 at 54. In support, he cites to cases where courts have held that market-manipulation claims based on trading strategies don't "sound in fraud," so they aren't subject to Federal Rule of Civil Procedure 9(b)'s heightened pleading requirement. *See CFTC v. Amaranth Advisors, L.L.C.*, 554 F. Supp. 2d 523, 531 (S.D.N.Y. 2008); *Parnon Energy*, 875 F. Supp. 2d at 244; *Choi v. Tower Rsch. Cap. LLC*, 165 F. Supp. 3d 42, 47–48 (S.D.N.Y. 2016).

But the government didn't say that's Eisenberg's trading strategy alone constituted fraud. After describing Eisenberg's "pumping," the prosecutor said, "That's the manipulation." Tr. 1341:25. The prosecutor then referenced Eisenberg's plan to "pull borrows" from the platform (i.e., withdraw the cryptocurrency that he borrowed against his collateral) and said:

> He is going to take money that he is supposed to be borrowing off the platform and run with it. He is going to say that he is borrowing when he's really stealing. That is how he is going to make money from the scheme, by lying and pulling every last deposit off the platform, literally running away with the money. *That's the fraud.*

Tr. 1342:23–1343:3 (emphasis added). In other words, read in context, the prosecutor didn't say that pumping alone constitutes fraud, or that "pumping" constitutes an independent crime.

## III.     Count 3: Wire Fraud

### A.  Rule 29: There Was Sufficient Evidence of an Interstate Wire, But Not Venue

Eisenberg first argues that the government introduced insufficient evidence that he used a foreign or interstate wire. "The wire fraud statute requires that the defendant communicate by wire in 'interstate or foreign commerce' in furtherance of a scheme to defraud." *Cofacredit S.A. v. Windsor Plumbing Supply Co., Inc.*, 187 F.3d 229, 243 (2d Cir. 1999) (quoting 18 U.S.C. § 1343). Eisenberg argues that the government didn't introduce any evidence that the wires that he used to complete his cryptocurrency trading from Puerto Rico "traveled across state or federal lines." Dkt. 183 at 67. He also argues that the government failed to prove that venue for the wire-fraud charge was proper in the Southern District. The first argument fails, but the Court agrees on the second.

On the interstate-wire element, Eisenberg conducted his entire scheme online from Puerto Rico, and the jury reasonably concluded based on the evidence that he relied on interstate wires. For example, the jury heard testimony that Eisenberg used a Polish IP address to access AscendEX and FTX, two of the exchanges on which he bought MNGO. Farrell testified that when a user creates an account on AscendEX, the "nationality field" is populated based on the "ISP from which [a user] say[s] that they are registering th[eir] account." Tr. 154:18–24. Farrell explained that an "ISP" is "the unique server located throughout the world from which you are logging onto a computer system." Tr. 155:3–8. The jury also heard evidence that Eisenberg used an IP address from

Poland to access FTX, another exchange on which he pumped up the oracle price of MNGO. *See* Tr. 551:21–553:2; GX-1101.

Eisenberg argues that this isn't enough to establish a foreign wire because Farrell referenced an "ISP" rather than "IP" address, and the jury didn't hear evidence explaining that foreign IP addresses necessarily route through a foreign server. *See* Dkt. 191 at 60. But Farrell testified that it looked like Eisenberg created his account from Poland, and that his location data was based on the server's location. *See* Tr. 155:3–8. That is enough for a reasonable jury to conclude that Eisenberg used a foreign wire.[10]

But as for venue, the same issues plaguing the commodities charges surface again. "[V]enue [in wire-fraud cases] lies where a wire in furtherance of a scheme begins its course, continues[,] or ends." *United States v. Rutigliano*, 790 F.3d 389, 397 (2d Cir. 2015); *see also Kim*, 246 F.3d at 191–92. The government relies on the same testimony here that it relied on for the commodities-fraud and -manipulation charges, and for the same reasons, it doesn't suffice.

True enough, there was evidence of wires coming into New York, albeit not sent by Eisenberg: to the HD Consulting team in Manhattan through the management portal and to Casey in Pough-keepsie. The government says that's enough, and that venue is proper so long as "Eisenberg's activity sent wires into the district." Oral Arg. Tr. 7:14–24. But those wires still must be "essential conduct" underlying the charged offense. *See Ramirez*, 420 F.3d at 145–46 (holding in mail-fraud venue case "that 'having devised or intending to devise a scheme or artifice to defraud,' while an essential element, is not an essential *conduct* element for purposes of establishing venue"); *United States v. Connolly*, 24 F.4th 821, 833 (2d Cir. 2022) (noting mail-fraud and wire-fraud statutes "are analyzed in the same way" (internal quotation marks and citation omitted)); *Kim*, 246 F.3d at 193 ("[W]e believe that the wire communications to and from Manhattan were essential to the continuing offense of causing fraudulent wires to be transmitted."). Indeed, in each case cited by the government, Dkt. 210, venue was proper because the wires were part of the offense, such as payment of the fraud proceeds, sending of fraudulent documents, location of accounts, etc.[11] As

---

[10] The two out-of-circuit cases Eisenberg cites in support of his argument are inapposite. In *United States v. Phillips*, 376 F. Supp. 2d 6 (D. Mass. 2005), the court's instruction to the jury erroneously "relieved the government of th[e] responsibility" of "prov[ing] beyond a reasonable doubt that the pertinent wire transmissions actually crossed state lines." *Id.* at 9. Here, the court properly instructed the jury on the government's burden. *See* Tr. 1481:1–6. In *United States v. Miller*, 2024 WL 2218446 (D. Minn. May 15, 2024), the charge involved "causing an email to be transmitted from John Harbert III in New Mexico to Eric Stephen Esherick in Minnesota on or about August 15, 2018." *Id.* at *3. The trial record contained no information about "Esherick's whereabouts at any time on or around August 15, 2018," and in post-trial briefing, "the government d[id] not claim to have introduced any evidence about Esherick's location." *Id.* That's not the case here: as discussed above, the trial record contains evidence that Eisenberg, from Puerto Rico, used a server in Poland to carry out his scheme.

[11] *See Kim*, 246 F.3d at 191–92 (invoices to and fraud proceeds paid by in-district bank); *Rutigliano*, 790 F.3d at 397 ("unlawfully obtained disability benefits" wired to participants through district); *United States v. Levis*, 488 F. App'x 481, 485 (2d Cir. 2012) (fraudulent 10-K report transmitted to analyst in district);

discussed above, the government introduced no evidence from which a reasonable juror could infer that the wires in the district were essential conduct underlying his offense. Accordingly, for the same reasons venue was improper with respect to the commodities-fraud and -manipulation charges, *see supra* Part I.A, the Court finds insufficient evidence that wires constituting "essential conduct elements" of Eisenberg's offense began, continued, or ended in this district. *See Ramirez*, 420 F.3d at 146.

## IV.    Counts 1 and 3: The Fraud Charges

Next, Eisenberg challenges the sufficiency of the evidence on falsity and materiality for his commodities- and wire-fraud convictions.

### A.    Rule 29: There Was Insufficient Evidence of Falsity on the Wire-Fraud Charge

"The essential elements of [mail and wire fraud] are (1) a scheme to defraud, (2) money or property as the object of the scheme, and (3) use of the mails or wires to further the scheme." *United States v. Weaver*, 860 F.3d 90, 94 (2d Cir. 2017) (alteration in original) (quoting *United States v. Binday*, 804 F.3d 558, 569 (2d Cir. 2015)). "[T]he gravamen of the offense is the scheme to defraud." *Id.* (alteration in original) (quoting *United States v. Greenberg*, 835 F.3d 295, 305 (2d Cir. 2016). "Establishing a scheme to defraud requires proof of a material misrepresentation . . . ." *United States v. Kitchen*, 2000 WL 553884, at *2 (2d Cir. May 3, 2000); *Connolly*, 24 F.4th at 833 ("[T]o come within the federal fraud statutes, a 'scheme to defraud' must have employed a false-hood that was 'material.'" (emphasis omitted) (quoting *Neder v. United States*, 527 U.S. 1, 20 (1999))). The misrepresentation can take the form of a false statement, a fraudulent omission, or a half-truth, which is "a 'representation stating the truth so far as it goes' but [that] is nonetheless misleading because of the 'failure to state additional or qualifying matter.'" *Connolly*, 24 F.4th at 833–34 (citation omitted).

At trial, the government pointed to two alleged misrepresentations that Eisenberg made: First, he deceived Mango Markets into believing he was taking out a loan of cryptocurrency, when in fact he intended to steal it; and second, he misrepresented the value of his collateral, making Mango Markets believe it was valuable, when it was artificially inflated and worthless. *See* Tr. 1343:10–11 ("Lying about the value of the collateral and lying about borrowing, that's the fraud."); *see also* Dkt. 186 at 36 ("The jury reasonably concluded that the defendant committed fraud by deceiving

---

*United States v. Greenwood*, 2025 WL 354692, at *5 (2d Cir. Jan. 31, 2025) (fraudulent transactions at issue "used correspondent accounts based in New York"); *United States v. Tuzman*, 2021 WL 1738530, at *27 (S.D.N.Y. May 3, 2021) (defendant was in Manhattan on at least one occasion when he engaged in an interstate communication in furtherance wire fraud), *aff'd*, 2024 WL 1173044 (2d Cir. Mar. 19, 2024); *United States v. Teman*, 465 F. Supp. 3d 277, 319 (S.D.N.Y. 2020) (fraud review in district was "a hurdle Teman needed to clear by fraudulent means to gain the money he sought"), *aff'd*, 2023 WL 3882974 (2d Cir. June 8, 2023); *United States v. Abbas*, 100 F.4th 267, 282–83 (1st Cir. 2024) (proceeds of fraud wired from banks in Massachusetts); *United States v. Brodie*, 524 F.3d 259, 273 (D.C. Cir. 2008) (defendant faxed title search requests on properties involved in loan-fraud scheme from district to settlement companies in Maryland).

Mango Markets into believing that he was taking out a loan against valuable assets, when in reality he had neither the intention to borrow the cryptocurrency, nor the collateral to support the loan.").

Before addressing whether there was sufficient evidence to support these alleged misrepresentations, here's a summary of what Eisenberg did. At the time in question, users on Mango Markets could take out a collateralized loan of cryptocurrency from the platform. *See* Tr. 309:7–310:9. Instead of withdrawing cryptocurrency from their own accounts, users could "borrow" against their assets, using those assets as collateral. Tr. 311:1–6. It mechanically worked like this: A user who wanted to either withdraw their own assets, or borrow assets, would click "withdraw" or "borrow" on the following screens (clicking either would take the user to the same place):



GX-1011 at 78. The user would then get taken to the screen below:



GX-1011 at 80; Tr. 311:7–312:2. This screen allowed users to withdraw their own cryptocurrency assets, or to borrow cryptocurrency from the platform. By toggling the "borrow" switch, a user could indicate that they wanted to borrow cryptocurrency—as opposed to withdrawing their own crypto—and say how much. *See* Tr. 335:17–19. The evidence at trial showed that when a user wanted to borrow funds, the program would automatically conduct a risk calculation based on the user's account value to "ensure that [the user's] withdrawal is sufficiently collateralized and covered based on the other assets in [the] account." Tr. 313:17–25.

After clicking "Next," the user would be taken to this screen:



GX-1011 at 81. The screen indicates how much cryptocurrency is being withdrawn, how much of that is being "borrowed," and provides the user with information concerning their "account health." *See* Tr. 313:9–314:4. After clicking "Withdraw," the user gets the cryptocurrency.

At the time of Eisenberg's offense, Mango Markets had no terms and conditions, policies, or rules regarding either manipulation or the borrowing of funds. *See* Tr. 433:2–23; DX-2. The stated consequence of not repaying a loan was liquidation. *See* GX-1011 at 148 ("Accounts must maintain a minimum 110% collateral ratio. If an account falls below the 110% threshold, a liquidator absorbs your position and becomes the new account owner."); *see also id.* at 61 ("Once a position is opened, it must maintain a Health Ratio above 0%. If an account falls to 0% it will be liquidated and funds will be lost."). So if a user borrowed funds, but then their account health dipped below 0% (meaning their account value has declined below the required collateral amount), the cryptocurrency would just be taken out of the user's account. Tr. 360:25–361:5.

The government's theory of fraud was that Eisenberg, knowing his account value was artificially inflated, nevertheless toggled the "borrow" switch, which caused a "health check" to be performed to determine how much he could borrow. Dkt. 186 at 38–41. Because that health check was based on the inflated value of his Mango Perpetual positions, Eisenberg was able to withdraw more than he would have been allowed to absent his manipulation. Accordingly, the government says that Eisenberg "create[d] the false impression that his MNGO Perpetual position was an extraordinarily valuable asset[] against which he could borrow huge sums of cryptocurrency." *Id.* at 38.

Eisenberg argues that the government failed to prove that he made any material, false representation to Mango Markets. By and large, his arguments focus on the lack of any terms and conditions on the platform and the fact that Mango Markets was permissionless and automatic, so anything Eisenberg represented to the platform couldn't influence its decision to lend him cryptocurrency.

The Court agrees that there was insufficient evidence of falsity. First, the government argues that Eisenberg's act of borrowing funds when he intended to steal parallels signing a contract with

no intent to honor one's obligations under that contract, which the Second Circuit has held can be fraudulent. *U.S. ex rel. O'Donnell v. Countrywide Home Loans*, 822 F.3d 650, 658–60 (2d Cir. 2016). But the contract analogy doesn't get the government far. There was no evidence at trial that Mango Markets required any user to promise that they would repay funds as a condition of borrowing against their assets, so this isn't a case where "a contractual promise was made, [but] the promiser had no intent ever to perform the obligation." *Id.* at 660. To the contrary, as Eisenberg points out, the version of Mango Markets in use during Eisenberg's scheme "contained no specified terms of service, instructing users only that they were to 'use [the platform] at [their] own risk,'" Dkt. 191 at 47; *see also* GX-1010. Indeed, when a contributor to the platform, Brian Smith, was asked "When someone borrows from the platform, what is that user expected to do with respect to collateral," he answered that they are "generally expected to keep the collateral value positive *and, if not, they will be liquidated*." Tr. 106:9–12 (emphasis added). What happens if a user borrows funds but the value of their collateral plummets? They get liquidated. There was no evidence that the "borrow" function on Mango Markets entailed an obligation to repay—or any other obligation for that matter—even if that's how the term is conventionally understood.

So while in other contexts a contractual agreement to "borrow" might give rise to a claim of fraud if an individual intentionally misrepresents or omits something relevant to the terms of the agreement or the parties' negotiations, here there were no terms and no negotiations. There was just the word "borrow." That word could have been "Access Collateral," "Utilize Assets," or anything else for that matter. Inferring a "contractual promise" from the conventional understanding about what "borrow" means—especially in the unconventional context of a cryptocurrency platform running on an algorithm—stretches *O'Donnell* too far. *Cf. Williams v. United States*, 458 U.S. 279, 286 (1982) ("[W]hen interpreting a criminal statute that does not explicitly reach the conduct in question, we are reluctant to base an expansive reading on inferences drawn from subjective and variable 'understandings.'").

The government's only case other than *O'Donnell* on the borrowing point is *United States v. Chanu*, 40 F.4th 528 (7th Cir. 2022). In that case, the Seventh Circuit upheld a wire-fraud conviction for defendants who placed "spoofing" orders on the CME that they did not intend to honor, a strategy intended to manipulate the price of futures contracts. *Id.* at 532–34, 539. The court held that the defendants had "advanced a quintessential 'half-truth' or implied misrepresentation" by publicly signaling an "intent to trade" by placing real orders while maintaining "a private intent to cancel in the hopes of financial gain." *Id.* at 541. In *Chanu*, however, "at all times relevant to th[e] case, CME rules prohibited" traders "from placing orders that they *intend* to cancel before execution." *Id.* at 533. Here, by contrast, Mango Markets had no rules and no one testified that Mango Markets users understood borrowing to reflect an intent to repay. The *Chanu* district court opinion denying the defendants' Rule 29 motion further underscores the differences between that case and this one. The court held that the defendants "implicitly and falsely represented that they intended to execute the 'spoofing' orders" based on substantial evidence that the "CME's rules do not permit traders to cancel an order if their purpose for doing so is to manipulate or deceive other traders" and that "market participants understand orders in the exchange to reflect a bona fide intent to

trade." *United States v. Vorley*, 2021 WL 1057903, at *3–6 (N.D. Ill. Mar. 18, 2021). That evidence is what is missing from this case.

Eisenberg also didn't make any false representations about the value of his assets on the platform. As noted above, when users on Mango Markets borrow against their collateral, the platform conducts an automated "account health check." *See* GX-1011 at 81. The government argues that by prompting the borrowing process, and thus allowing Mango Markets to conduct this health check, Eisenberg created the false impression that his collateral was valuable. Dkt. 186 at 40. But as Eisenberg points out, the platform automatically measured the *actual* value of his collateral, so he didn't represent anything untrue.

Of course, Eisenberg knew that the value of his portfolio was the product of his market manipulation, and he knew it wouldn't stay valuable for long. So although the value of Eisenberg's portfolio may have been technically accurate at the specific moment in time when he borrowed against it, the government argues that Eisenberg's representation about its value was deceptive. In support, the government points to testimony that the MNGO Perpetuals oracle was designed to pull data from exchanges like FTX and AscendEX because those exchanges had "some level of . . . anti-manipulation protection there, such that" investors could expect the "activity and trading activity" that happened on those exchanges to reflect "organic demand." Tr. 458:16–460:4. (The evidence at trial showed that while Mango Markets had no anti-manipulation rules or terms of service, FTX, AscendEX, and Switchboard, which ran the oracle, did. Tr. 144:13–146:15 (AscendEX); 452:9–454:18 (Switchboard); 645:10–646:19 (FTX).) The government also points to testimony from Mango Markets users that not maintaining collateral and manipulating asset values would have "mattered" to them. Tr. 107:15–108:8, 110:10–25 (Smith); 380:12–381:6 (Shipe); 828:18–829:17 (Tonkin).

Based on these expectations and beliefs, the government argues that when Eisenberg borrowed, he implicitly represented to Mango Markets that the collateral in his account had not been manipulated, and that it was in fact valuable, both of which were false. But that theory runs into the Second Circuit's decision in *United States v. Connolly*. There, Deutsche Bank (DB) submitted daily reports to the British Bankers' Association (BBA) about "the rate at which DB could borrow cash in the interbank market." 24 F.4th at 826. Defendants, who were traders at the bank, sometimes requested that the LIBOR submitters make submissions beneficial to their positions. *Id.* at 828–29. The evidence at trial included testimony from another DB employee and the LIBOR submitters themselves that "altering DB's LIBOR submissions to benefit DB trader positions was 'wrong' at the time they engaged in it." *Id.* at 830.

Among other things, the court rejected the government's argument that the submissions carried an "'implied certification' that there had in fact been no trader influence on the submission." *Id.* at 842. Even though there was evidence that market participants understood that trader influence on LIBOR submissions was improper, the absence of any rule or instruction prohibiting that conduct was dispositive. The court observed that while the BBA later adopted rules prohibiting this kind of conduct (just like Mango Markets did after Eisenberg's scheme), "during the earlier period at issue in the present case, there were no such guidelines or prohibitions." *Id.* So while "defendants'

efforts to take advantage of DB's position as a LIBOR panel contributor in order to affect the outcome of contracts to which DB had already agreed may have violated any reasonable notion of fairness," there was no actionable falsehood. *Id*. at 843; *see also id.* at 834 (noting "these federal fraud statutes are not catch-all laws designed to punish all acts of wrongdoing or dishonorable practices"). Similarly, there was no evidence at trial that Mango Markets had any rules, instructions, or guidance addressing manipulation or requiring users to maintain sufficient collateral in their accounts. *Cf. United States v. Skelly*, 442 F.3d 94, 97 (2d Cir. 2006) ("Under [the wire-fraud statute], a seller or middleman may be liable for fraud if he lies to the purchaser or tells him misleading half-truths, but not if he simply fails to disclose information that he is under no obligation to reveal.").

While the government doesn't mention it, in *Connolly*, the BBA did expressly prohibit *interbank* collaboration on LIBOR rates, which the court held bolstered its holding that there was no implicit prohibition concerning *intrabank* trader influence. 24 F.4th at 842. There's of course no analog here, given that Mango Markets had no prohibition of any kind. But that's the point. On a platform with no rules, instructions, or prohibitions about borrowing, the government needed more to show that Eisenberg made an implicit misrepresentation by allowing the algorithm to measure the actual value of his collateral.

The only other cases cited by the government in its briefing on falsity and materiality for the wire-fraud charge are *United States v. Regan*, 937 F.2d 823 (2d Cir. 1991), and *Set Capital LLC*, 996 F.3d 64. Neither of these cases is relevant here. The government cites *Regan* for the proposition that "[f]ailure to disclose that market prices are being artificially depressed operates as a deceit on the market place and is an omission of a material fact." 937 F.2d at 829 (citation omitted). But *Regan* involved Rule 10b-5, which bars not only schemes to defraud but also "any manipulative or deceptive device," and the defendants were in fact "charged with market manipulation." *Id*. The government quotes *Set Capital* as holding that "deception" includes "intentional or willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities." 996 F.3d at 76 (citation omitted). But again, *Set Capital* was brought under section 10(b) of the Securities Exchange Act, which bars any "manipulative or deceptive device or contrivance." *Id*. (citation omitted). In that context, the court offered a definition of "manipulative act," which does not bear on the wire-fraud charge here. *See id.* at 76–77. If anything, *Regan* and *Set Capital* prove Eisenberg's point. While Eisenberg's market manipulation might be grounds for a charge of commodities manipulation, or even commodities fraud given that law's broader reach (as described below), it doesn't fit within the "scheme to defraud" required to prove a violation of the wire-fraud statute.

For these reasons, even when viewing the trial record in the light most favorable to the government, there was a failure of evidence on the element of falsity.

### B. Rule 29: There Was Sufficient Evidence of Materiality on the Commodities-Fraud Charge

Unlike wire fraud, the commodities-fraud charge could be proven not only based on a material falsehood, but also on "a manipulative device." Tr. 1458:17–1459:1. Indeed, the jury found Eisenberg guilty on this aspect of the charge, while it did not find him guilty on the separate material-falsehood prong.

> <u>If you find a verdict of "Guilty"</u> as to Count One, please select which of the three (3) acts you find that the defendant committed. You may select more than one, but all jurors must agree on each act selected.
>
> ✓ (1) Use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud
>
> _____ (2) Make, or attempt to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading
>
> ✓ (3) Engage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person

Dkt. 152. Despite the government expressly raising this as a point of distinction between the commodities- and wire-fraud charges, Eisenberg does not argue that there was insufficient evidence for the jury to find that Eisenberg employed a "manipulative device." *See* Dkt. 186 at 43 ("This is an independent reason why the jury was correct to find that the defendant's fraudulent and manipulative scheme violated the CEA in [c]ount [o]ne."). Accordingly, Eisenberg has waived any sufficiency challenge on his use of a manipulative device.

As for materiality, Eisenberg doesn't address this issue in the context of a "manipulative device." But because his manipulation of the settlement price of MNGO Perpetuals directly impacted Mango Markets' calculation of the amount Eisenberg was permitted to borrow from the platform, there was sufficient evidence of materiality even under Eisenberg's chief authority, *United States v. Rigas*, 490 F.3d 208 (2d Cir. 2007). In that case, the court considered whether the defendants committed bank fraud by misrepresenting their leverage ratios to banks to obtain loans at lower interest rates. *See id.* at 217–18. For the defendants' misrepresentations about their leverage ratios to be "material," the court explained that "they had to be capable of influencing a decision that the bank was able to make." *Id.* at 235. And "[t]he only 'decisions' that the bank could make, in the case the government presented to the jury, involved how much interest would be charged—an objective decision cabined by" a contractual formula set forth in the "Co-Borrowing Agreements." *Id.* The Co-Borrowing Agreements "tied the interest rate of a loan to a range of leverage ratios; changes in the leverage ratios within the range did not alter the interest rate." *Id.* at 232. Accordingly, where the Co-Borrowing Agreements "provided that a higher interest rate would be charged if the leverage ratio was above 5.0," and the evidence showed that defendants had submitted a

33

leverage ratio of 4.98 instead of 5.01 to the bank, the court held that misrepresentation was material. *Id.* at 235–36.

As the court explained in a footnote, the entire process was both contractually mandated and automated. *See id.* at 234 n.35 ("Referring to the bank's discretion to charge a different interest rate is not an entirely accurate description of what actually occurred under the Co-Borrowing Agreements. A leverage ratio above 5.0 on the CCH Co-Borrowing Agreement, for example, would automatically require the co-borrowers to pay a higher interest rate on the term loan component than one that was below 5.0."). In that context, the defendants' misrepresentation about their leverage ratio was material because, under the governing formula, the false input resulted in a different output. *See id.* at 235 ("The misrepresentation was material only if the jury could have concluded that the fraudulent leverage ratio resulted in the co-borrowers being in a different interest category that they would have been had the accurate leverage ratio been reported.").

The evidence at trial permitted the jury to reach the same conclusion here: Eisenberg's manipulation increased the value of his collateral on Mango Markets, which in turn caused the platform's algorithm to permit him to borrow and withdraw far more cryptocurrency than he otherwise would have been allowed to. Eisenberg's argument for acquittal on the commodities-fraud charge fails.

**CONCLUSION**

For these reasons, Eisenberg's motion under Rule 29 is GRANTED. Eisenberg's convictions on counts one and two are vacated. The Court will enter a judgment of acquittal on count three.

The Clerk of Court is directed to terminate Dkt. 182.

SO ORDERED.

Dated: May 23, 2025
New York, New York

_____
ARUN SUBRAMANIAN
United States District Judge